# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona,

Defendant/Petitioner,

and GERARD A. SHERIDAN,

Specially appearing non-party/Petitioner,

vs.

UNITED STATES DISTRICT COURT for the District of Arizona,

Respondent Court,

and

MANUEL DE JESUS ORTEGA MELENDRES, et al.,

Plaintiffs/Real Parties in Interest.

No.

U.S. District Court
No. CV 07-02513-PHX-GMS

---

## EXHIBITS TO PETITION FOR WRIT OF MANDAMUS
## VOLUME II OF VII -- (EXHIBITS 8 – 11)

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone:  602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County, Arizona

EXHIBITS TO PETITION FOR WRIT OF MANDAMUS

**VOLUME II:**

| EX. | DOCUMENT | PAGES |
|---|---|---|
| 8. | District Court ORDER Denying Motion for Recusal or Disqualification filed in District Court, dated July 10, 2015 [Dist. Ct. Docket No. 1164] | 0267-0306 |
| 9. | Defendant Arpaio's Reply in Support of Motion for Recusal or Disqualification of Judge G. Murray Snow filed in District Court, dated June 22, 2015 [Dist. Ct. Docket No. 1158] | 0307-0332 |
| 10. | Plaintiffs' Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court filed in District Court, dated June 12, 2015 [Dist. Ct. Docket No. 1150] | 0333-0354 |
| 11. | Defendant Arpaio and Chief Deputy Gerard Sheridan's Motion for Recusal or Disqualification of District Court Judge G. Murray Snow filed in District Court, dated May 22, 2015 [Dist. Ct. Docket No. 1117] | 0355-0541 |

RESPECTFULLY SUBMITTED this 6th day of August, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES


By /s/ John T. Masterson *(w/permission from)*
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson *(w/permission from)*
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Specially appearing counsel for
    Petitioner Joseph M. Arpaio in his
    official capacity as Sheriff of Maricopa
    County, Arizona

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing EXHIBITS TO PETITION FOR WRIT OF MANDAMUS – VOLUME II OF VII with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 6th day of August, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Karen Gawel



*EXHIBIT 8*

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

9

10

11

12

13

14

15

| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
|---|---|
| Plaintiffs, | **ORDER DENYING MOTION FOR RECUSAL OR DISQUALIFICATION** |
| v. | |
| Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, AZ; et al. | |
| Defendants. | |

16

17      Pending before the Court is the Motion for Recusal/Motion for Disqualification

18  filed on May 22, 2015 by Defendant Joseph M. Arpaio and non-party contemnor Gerard

19  Sheridan pursuant to 28 U.S.C. §§ 144 and 455. (Doc. 1117.) Along with their Motion,

20  Movants[1] have submitted an affidavit by Sheriff Arpaio as required by § 144, as well as

21  supporting exhibits and certifications from counsel.

22      In April, the Court began the first phase of civil contempt proceedings against

23  Movants and other members of MCSO's command staff for violating a number of the

24

25      [1] For clarity, the Court will refer to Sheriff Arpaio and Chief Deputy Sheridan as

26  "Movants" in relation to their pending Motion, and use "Defendants" when referencing
    the parties named in the underlying action, Sheriff Arpaio and Maricopa County/the

27  Maricopa County Sheriff's Office. Neither Maricopa County, MCSO, nor the other
    named civil contemnors in this action—Executive Chief (retired) Brian Sands, Deputy

28  Chief John MacIntyre, and Lieutenant Joseph Sousa—have joined the Motion for
    Recusal, or otherwise taken a position on its merits. (*See* Docs. 1129, 1135, 1137.)

Court's orders, entered both before and after trial. Sheriff Arpaio and Chief Deputy Sheridan have admitted the facts charged in the Order to Show Cause and have consented to the Court's entering a finding of civil contempt against them, although issues remain about the appropriate scope of remedies for their violations. The evidentiary hearings on contempt were slated to resume in June but have been postponed pending the resolution of the instant Motion.

The proposed bases on which the Motion is predicated are legally insufficient and untimely. Further, to the extent that Movants, by their own actions, created the circumstances on which they now seek the Court's recusal, they have improperly attempted to invoke the recusal provisions for strategic purposes. For these reasons, more fully explained below, Sheriff Arpaio and Chief Deputy Sheridan's Motion is denied.

## BACKGROUND

This case has a lengthy procedural history; the following limited facts provide context for the grounds on which Sheriff Arpaio and Chief Deputy Sheridan have moved for recusal.

Over two years ago, the Court ruled that Sheriff Arpaio and MCSO had violated the Fourth and Fourteenth Amendment rights of the Plaintiff class and entered associated injunctive relief. (Doc. 579.) For the past year and a half, a Monitor has been involved in supervising and assessing Defendants' implementation of the injunction and reporting to the Court on MCSO's ongoing compliance.[2] (*See* Doc. 649.) Since his appointment, the

---

[2] The Monitor's position is outlined in the Supplemental Permanent Injunction. Defendants appealed the injunction to the Ninth Circuit, which affirmed all provisions except those that permitted the Monitor to consider MCSO's discipline for "*any violations of departmental policy*" as well as whether any deputies are repeatedly the subject of "Complaints, civil suits, or criminal charges, including for off-duty conduct." *Melendres v. Arpaio*, 784 F.3d 1254, 1267 (9th Cir. 2015) (quoting Doc. 606 at 53). The Ninth Circuit reasoned that not every instance of officer misconduct "bear[s] on the constitutional rights at stake here," and directed that the injunction be clarified to relate to the constitutional violations found by the Court. *Id.* The mandate from the Ninth Circuit issued the day before this Order was filed. (Doc. 1163.) Thus, the Court shall more narrowly define the aspects of MCSO's internal affairs processes that the Monitor may consider so that they are clearly tailored to addressing the violations of federal law at issue in this case and matters related thereto.

0268

Court has adjusted the Monitor's responsibilities in response to various issues presented by Defendants' actions.

On motion by Plaintiffs, in February the Court ordered the Sheriff's Office, Sheriff Arpaio, Chief Deputy Sheridan, and others in MCSO's chain of command to show cause why they should not be held in contempt for violating (1) the December 23, 2011 preliminary injunction; (2) their pre-trial discovery obligations under the Federal Rules of Civil Procedure; and (3) the Court's orders at a sealed hearing directing Defendants to cooperate with the Monitor in developing a protocol to recover audio/video recordings of traffic stops that were not disclosed during discovery. (Doc. 880.) The Order to Show Cause charged the named contemnors with civil contempt only.[3] (Doc. 880 at 7–9.) Sheriff Arpaio was noticed on all three matters; Chief Deputy Sheridan was implicated in the first and the third.

The charges in the Order to Show Cause resulted from materials MCSO had posthumously found in the home of Deputy Charley Armendariz as well as from MCSO's ensuing administrative investigations into Armendariz, his supervisors, and his former patrol division.[4] The Monitor was responsible for evaluating the sufficiency of these investigations, which revealed that Defendants had failed to disclose a considerable quantity of relevant evidence during pre-trial discovery. Because of Defendants' omission, Plaintiffs were precluded from admitting the evidence in support of their case-

---

[3] *See United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir. 1983) (explaining that it "would usually be wiser to try the civil and criminal charges separately" in light of the additional safeguards applicable only to criminal proceedings). The Court has noted that if a criminal contempt prosecution proves necessary to vindicate its authority after the civil contempt hearing, it will refer such proceedings to another judge. (*See* Tr. of Mar. 20, 2015 Status Conf. 61:23–62:2, Doc. 965.)

[4] Some of the evidence, such as the traffic stop recordings, was plainly requested by Plaintiffs during discovery but was never identified nor produced by Defendants. Other evidence suggested that members of the Plaintiff class may have been subjected to additional routine constitutional infringements other than those that were addressed in the underlying trial. The evidence also revealed that Defendants, as a matter of regular practice and operation, had actively enforced federal immigration law and detained persons after officers concluded that there was no legal justification for such detention for at least seventeen months after the Court prohibited these practices in the preliminary injunction. (Tr. Nov. 20, 2014 Status Conf. 67:10–22, Doc. 804.)

in-chief and uncovering the additional constitutional violations likely suffered by the Plaintiff class before trial. Further, the Court did not have the evidence to consider when making findings of fact and conclusions of law concerning what defects in MCSO's operations and procedures had led to the deprivation of Plaintiffs' rights, nor when fashioning supplemental injunctive relief to remedy those defects. (*See, e.g.*, Tr. of Sept. 10, 2013 Status Conf. 89:21–91:23 (declining to incorporate Plaintiffs' suggestions regarding the inadequacy of MCSO's existing internal investigative practices into the Supplemental Permanent Injunction due to the lack of evidence presented at trial on that issue).) As a result of these revelations and procedural inadequacies in MCSO's self-investigative processes that had been noted by the Monitor,[5] the Court authorized members of the monitoring team to conduct independent inquiries into the Armendariz materials in addition to supervising those undertaken by MCSO and its Professional Standards Bureau (PSB).  This authorization was to allow the Monitor to assess whether Defendants' implementation of the Court's orders and responsiveness to the Armendariz evidence promoted the constitutional and professional treatment of the Plaintiff class by MCSO. (Doc. 795 at 16–21, *amended by* Doc. 825 (following input by the parties).)

In the Order to Show Cause, the Court remarked that "crafting suitable civil relief for each of the grounds on which contempt is charged [would] be of chief interest to the Court if Defendants, or their subordinates, [we]re ultimately adjudged to be in contempt of court." (Doc. 880 at 25.) Prior to and throughout the contempt proceedings, the Court reiterated its expectation that the parties would develop an evidentiary record sufficient for the Court to fashion an appropriate remedy for members of the Plaintiff class whose rights were impaired by the contemnors' violations of the Court's orders and rules. (*See, e.g.*, Tr. of Mar. 20, 2015 Status Conf. 2:2–6, 11:6–12, 12:21–25, 13:1–21, Doc. 965; Tr. of Apr. 21–24, 2015 Evid. Hr'gs ("Tr.") 44:14–25, Docs. 1017, 1021, 1027, 1030, 1041,

---

[5] *See* Memorandum from Chief Robert S. Warshaw to the Honorable G. Murray Snow, Update and Assessment of MCSO's Armendariz and Related Investigations (Sept. 28, 2014) (Doc. 795, Attach. 1); (*see generally* Tr. Oct. 28, 2014 Status Conf., Docs. 776 780.)

1043; Doc. 1007 at 1–2.) Such a remedy would both compensate those individuals specifically harmed by Defendants' noncompliance and also provide relief for possible system wide deficiencies, relief to which Plaintiffs may have been entitled after trial but for Defendants' discovery violations.

Approximately one month before the scheduled hearing, Sheriff Arpaio and Chief Deputy Sheridan filed an Expedited Motion to Vacate the hearing. (Doc. 948.) Movants admitted to being in civil contempt on the charges in the Order to Show Cause and suggested possible remedial measures. (*Id.*) Plaintiffs opposed the Motion because it did not specify how the admitted violations of the Court's orders had occurred, nor did it resolve all outstanding questions involving the appropriateness and feasibility of the proposed remedies. (*See* Doc. 952.) At the next status conference, the Court encouraged the parties to pursue settlement while advising that any remedies would need to adequately compel Movants' compliance with the Court's orders going forward—in addition to any compensatory element—before the Court would approve the terms. (Tr. of Mar. 20, 2015 Status Conf. 38:12–42:18, Doc. 965.) In the end, negotiations with Plaintiffs were unsuccessful. (*See* Doc. 1005 at 1.) A representative of the United States Attorney's Office for the District of Arizona also declined, citing departmental policy, to participate in any pre-referral settlement of criminal contempt with the contemnors.[6] (Doc. 924; Tr. of Feb. 26, 2015 Status Conf. 35:7–16, Doc. 926.) The Court thus denied the motion without prejudice, as well as Movants' renewed Motion to Vacate that was substantively identical to the first. (Docs. 1003, 1007.)

Although the Court had ordered expedited discovery in advance of the scheduled hearings on contempt, (Doc. 881), this discovery was inhibited by Defendants' delays in

---

[6] The Court is required to designate the United States Attorney for the district in which it sits to prosecute criminal contempt of court. Fed. R. Crim. P. 42. The Court invited a representative of the Arizona USAO to attend status conferences following the later Armendariz revelations, some of which had potential criminal implications for members of MCSO. (Doc. 797 at 2; Tr. of Dec. 4, 2014 Status Conf. 5:4–8, Doc. 817.)

completing the Armendariz investigations,[7] assertion of a purported privilege over information pertaining to ongoing internal investigations, and inadequate document search and retrieval protocols. Consequently, Defendants had not disclosed the complete catalog of documents responsive to Plaintiffs' discovery requests by the beginning of the April hearings.[8] (Docs. 995, 1002, 1013; Tr. 16:14–19:1.)

At the show-cause hearing, the Court noted that it would participate in questioning witnesses, as it had done at trial. Nevertheless, the Court invited counsel to freely object during its examination of the witnesses,[9] and counsel did, in turn, successfully raise objections. (*See, e.g.*, Tr. 626:18–24 ("Ms. Iafrate: 'Your Honor, may I object just as to the way that question is worded? Could we include civil contempt?' The Court: 'Surely.'"); *see also* Tr. 985:19–86:19 (objection sustained).) Movants both had civil and criminal representation during the hearing.

Sheriff Arpaio testified under oath on the second and third days of the contempt hearing. In framing its examination of Sheriff Arpaio, the Court explained that it was important, from a remedial perspective, whether Sheriff Arpaio's admitted contempt was an isolated incident or reflected a pattern of resistance on his part or by MCSO to the Court's directives. (Tr. 635:12–18.) Accordingly, the Court questioned Sheriff Arpaio on

---

[7] For example, Defendants initially indicated that all internal investigations arising out of the Armendariz matter would be completed by March 13, 2015. (Doc. 864.) Defendants subsequently postponed the deadline for completing these investigations until April 13 and, again, until May 18. (Docs. 923, 1052.) The investigations have still not been completed. As a consequence of these delays, the Monitor was unable to make outcome assessments and recommendations based on MCSO's handling of the Armendariz investigations before the April hearings.

[8] Defendants' insufficient efforts to locate and produce the documents responsive to Plaintiffs' discovery request also led to the scheduling of the additional proceedings that were supposed to begin in June.

[9] "I'm going to have some questions, some of them may be difficult to answer, and I'm going to certainly let your attorneys participate if they have concerns, but I'm going to try and ask you [Sheriff Arpaio] my questions with respect, and I hope you'll afford me the same in response." (Tr. 625:12–16; *see also* Tr. 42:20–44:12 (explaining that specially appearing counsel could object where necessary to protect contemnors' criminal interests, even in the civil proceeding); Tr. 965:4–11 ("In all seriousness, Ms. Iafrate, I think that if you have objections or if anybody else does, they ought to make them . . . .").)

aspects of MCSO's internal investigations that had previously raised concerns for the Court and the Monitor about the integrity of those investigations, such as MCSO's apparent reluctance to mete out punishment for violations of department policy and this Court's orders. Sheriff Arpaio acknowledged that, although MCSO's failure to comply with a court order is a "pretty big deal," he had taken no action to hold anyone responsible for the violations of the Preliminary Injunction or the Court's May 14 instructions. (Tr. 628:20–29:1, 633:12–19, 635:19–22.) The Court also inquired about the reassignment of Captain Steven Bailey from the command of the Special Investigations Division (SID)—which was responsible for the unit to which Deputy Armendariz was assigned and that had been responsible for many of the constitutional violations found at trial—to the PSB at the time when the Human Smuggling Unit was under investigation by the PSB because of the Armendariz materials. (Tr. 637:19–38:1, 638:25–40:12.) The Monitor had previously identified this as a potential conflict of interest, which led to MCSO's appointment of an "independent" contractor named Don Vogel to oversee the two principal Armendariz-related investigations being conducted by MCSO. (*See* Tr. 979:24–80:12.)

Sheriff Arpaio went on to confirm that, in addition to overseeing the Human Smuggling Unit, the SID was also responsible for investigations that involved confidential informants, and that someone in the SID chain of command would have been responsible for approving payments to confidential sources during Captain Bailey's tenure there. (Tr. 642:3–14.) The Court then produced an article published in the *Phoenix New Times* on June 4, 2014, the approximate time of Captain Bailey's transfer to PSB. (Tr. 642:17–43:3.) The Court invited Sheriff Arpaio and all counsel to take a minute to read the article, which alleged that MCSO was paying a confidential informant from Seattle, Washington named Dennis Montgomery to investigate possible collusion between this Court and the United States Department of Justice. (Tr. 643:14–17.) Sheriff Arpaio confirmed the existence of an investigation being conducted by MCSO, the Maricopa County Sheriff's Cold Case Posse, and Mr. Montgomery, but repudiated the

- 7 -

article's implication that "what Montgomery was actually doing was investigating [the Court]." (Tr. 647:4–12.) The Court directed Defendants to preserve and immediately produce all documents implicated by Sheriff Arpaio's testimony, subject to a contemporaneous review for privilege by counsel. (Tr. 653:18–25.)

Defense counsel initiated the questioning on this matter when Chief Deputy Sheridan took the stand the following day, which was supplemented with a handful of follow-up inquiries by the Court. (Tr. 958:9–67:10.) At the end of Chief Deputy Sheridan's testimony, three separate attorneys who presently or formerly represented Sheriff Arpaio noted an ethical obligation to correct aspects of his testimony from the previous day. They have since made a variety of disclosures in fulfillment of their duty to act with candor toward the tribunal, including the submission of a November 8, 2013 letter/investigative summary from Movants' then-attorney to Sheriff Arpaio, which was copied to Chief Deputy Sheridan and others at the MCSO. (Tr. 1019–34; *see also* Docs. 1040, 1044, 1053.) From Sheriff Arpaio and Chief Deputy Sheridan's testimony and the corrective disclosures provided by former defense counsel, it is now apparent that Sheriff Arpaio in fact testified as to two investigations with a possible connection to the Court.

The first, the "Montgomery matter," was the topic of the *New Times* article and the subject of the Court's examination. In approximately September 2013 MCSO apparently hired Dennis Montgomery, a computer consultant based out of Seattle, Washington. (Tr. 960:9–14, 1006:2–4, 1007:21–08:2.) Montgomery was given the status of an MCSO confidential informant. (Tr. 998:12–14, 1006:10–16.) According to Movants, Montgomery represented to MCSO that he was in possession of a large number of documents he had obtained while employed by the United States Central Intelligence Agency that the CIA had harvested from American citizens. (Tr. 1000:2–18.) Sheriff Arpaio characterized Mr. Montgomery's investigation as pertaining to whether "someone" had infiltrated Movants' phone lines and the phones and e-mail accounts of various local attorneys and judges connected to Defendants, including this Court. (Tr. 649:14–50:6, 652:11–53:8.) Chief Deputy Sheridan reiterated that Mr. Montgomery had

made allegations that the "CIA hacked into individual bank accounts" of county residents, (Tr. 960:11–13, 1004:9–11), and that he, Sheriff Arpaio, and the two law firms representing Defendants in a related lawsuit brought against the MCSO by the Department of Justice had been the subject of a secret wiretap by the government. (Tr. 999:16–1000:6.) At some point during Montgomery's investigation, Chief Deputy Sheridan was informed that Montgomery had evidence of a communication sent by the DOJ to the Court's computer. (Tr. 1000:12–14). Sheridan testified that he ordered the MCSO personnel working on the project "not to investigate any information involving Judge Snow," and that "[i]f any further information comes up, [he] want[ed] to know immediately." (Tr. 1003:12–19.) He further testified that, after he issued this instruction, nothing further "ever did materialize." (Tr. 1003:19–29.)

Sheriff Arpaio avowed that nothing gleaned from Montgomery gave him any concern that the Court's judgment or neutrality in this case might be affected, (Tr. 652:16–18), and Chief Deputy Sheridan similarly confirmed that "there was really nothing [in the information from Montgomery] to think that there was any collusion between this Court and the Department of Justice." (Tr. 1003:1–2.) Movants both declare that MCSO eventually concluded that Montgomery had made false representations regarding his work product, and that they have no confidence in Montgomery or his allegations; they were "junk." (*Id.* at 650:18–25, 961:1–11.)

Documents pertaining to the Montgomery investigation that were subsequently disclosed pursuant to this Court's orders, however, call into question the version of events testified to by Movants. Some of these documents have been filed by Plaintiffs in their Response to this Motion. (Doc. 1150, Aff. of Cecilia Wang, Exs. B–F (available at Doc. 1153).) Although the body of documents produced has not yet been reviewed in full, and the Monitor has made document requests of the County that remain pending, at least some of the materials do—falsely—assert the existence of telephone calls between this Court and agents of the DOJ, including Eric Holder, Lanny Breuer, and one of this

0275

Court's former law clerks, dating back to before this case was assigned to the Court.[10] They also appear to imply that this Court authorized a wiretap on MCSO. (*See id.*, Ex. F (available at Doc. 1153).) These documents and Sheriff Arpaio's hearing testimony further suggest that the same persons in charge of implementing the Court's injunctive decree within MCSO and supervising MCSO's internal affairs processes were aware of Mr. Montgomery's attempt to construct a conspiracy between the Court and other agents of the federal executive branch. In addition, although Movants apparently knew by at least November 2014 that the CIA database of documents from which Montgomery was supposedly providing this information was fraudulent, (*id.*, Ex. C (available at Doc. 1153)), the investigation was still ongoing as of the contempt proceedings (Tr. 651:24–52:4) and MCSO continued to press Montgomery for work-product until the day before the hearings began. (Doc. 1150, Aff. of Cecilia Wang, Ex. E (available at Doc. 1153).) It was after the Court noted some of the apparent inconsistencies between the documents from the Montgomery investigation and Movants' previous testimony, authorized the Monitor to collect documents and conduct additional interviews on the matter, and invited Movants to address these inconsistencies in the resumed contempt hearings, that Movants filed the instant Motion.

The second investigation, the "Grissom matter," came to light during the Court's questioning of Sheriff Arpaio about the Montgomery investigation; the Court was unaware of the Grissom matter until Sheriff Arpaio testified to its existence. After Sheriff Arpaio denied being aware of any investigation involving the Court, he then testified as follows:

> Q.    Are you aware that I've ever been investigated by anyone?
>
> A.    You investigated?
>
> Q.    Yes.

---

[10] The phone number that is attributed to the Court in these documents is not, however, accurate.

|   |   |
|---|---|
| A. | No. No. |
| Q. | Any of my activities? |
| A. | No. |
| Q. | Any of my family members? |
| A. | That have been investigated? |
| Q. | Yes. |
| A. | Not by our office. |
| Q. | Are you aware of anybody who's investigated any of my family members by any—any office. Or anybody. |
| A. | I believe there was an issue, but once again, it wasn't my office. |
| Q. | Well, whose office was it? |
| A. | It was an outside investigator not hired by us. |
| Q. | Who hired the outside investigator? |
| A. | Could have been Counsel. |
| Q. | "Counsel" meaning your counsel? |
| Q. | Yes. |

(Tr. 647:8–48:3.) The Court's inquiry of Sheriff Arpaio on the Grissom matter lasted only for a few minutes prior to the lunch recess. The next day, the Court asked a few clarifying questions on this topic during defense counsel's cross-examination of Chief Deputy Sheridan. The Court asked no additional questions about a possible investigation of its family members during its own colloquy with Sheridan.

MCSO apparently initiated the Grissom investigation after a woman named Karen Grissom sent a message through Facebook.com to Sheriff Arpaio in August of 2013. Mrs. Grissom's message to Sheriff Arpaio alleged that she heard this Court's wife make remarks to the effect that "[the Court] hates u [Arpaio] and will do anything to get u out of office." (Doc. 1115 at 8; Doc. 1117, Ex. 5.) Mrs. Grissom attributes the statement to a conversation she had with the Court's wife fourteen or fifteen months earlier at a local restaurant. (Doc. 1115 at 6; Tr. 964:1–9.) Upon receiving the message, Sheriff Arpaio

consulted with his counsel, Timothy Casey, who initially tried to locate Mrs. Grissom and evaluate the credibility of her story. (Doc. 1115 at 8–9.) Although Mrs. Grissom repeated the supposed memory of her encounter with the Court's wife, her demeanor and general non-responsiveness led Mr. Casey to conclude that "the matter was over" and that "the information from Ms. Grissom lacked substance or merit." (*Id.* at 9.) Mr. Casey shared this conclusion with Sheriff Arpaio and Chief Deputy Sheridan. (*Id.*)

Nevertheless, after a subsequent meeting with Sheriff Arpaio and Chief Deputy Sheridan, Mr. Casey retained Don Vogel—the "independent contractor" to whom the principal Armendariz investigations were later outsourced by MCSO—in October 2013 to further investigate Mrs. Grissom's allegations. (*Id.* at 10; Tr. 966:2–3, 21–23.) In the interviews Mr. Vogel subsequently conducted with Mrs. Grissom and her family, all corroborated that Mrs. Grissom had met with a woman at this particular restaurant who had implied harboring negative feelings toward Sheriff Arpaio. (Doc. 1115 at 10–11; Tr. 967:17–68:2.) However, they were generally unable to remember the details of the conversation. (Doc. 1115 at 10–11.) There were also inconsistencies in the Grissoms' recounting of the statement pertaining to Sheriff Arpaio supposedly made by the woman in the restaurant. (*Id.*) According to counsel, Mr. Vogel found the Grissoms "sincere and truthful in their statements about what they believe they heard from Mrs. Snow." (*Id.* at 6.) Nevertheless, at the conclusion of Mr. Vogel's investigation, Mr. Casey made the following determination: "[T]he Grissom information is, in my judgment, so fundamentally flawed in its substance that it likely cannot be used in a Rule 60 motion, appeal, or otherwise without the lawyer doing so violating the Federal Rules of Civil Procedure and the Arizona Rules of Professional Conduct." (*Id.* at 7, 18–19.) Mr. Casey "recommend[ed] and strongly advise[d]" Sheriff Arpaio "*against any* use of the Grissom information." (*Id.* (emphasis in original).)

Despite their hearing testimony that the investigator allegedly found the Grissoms' stories credible, Chief Deputy Sheridan stated that nothing came of the Grissom allegations. (Tr. 968:5–9) He has since acknowledged both in interviews with the press

0278

and on the record that Movants took Mr. Casey's advice, given in November 2013, and chose not to pursue the matter further (Tr. of May 14, 2015 Status Conf. 9–11, Doc. 1097.) Consequently, the matter "sat in [Chief Deputy Sheridan's] desk drawer for a year and a half, until it came out in court when the Sheriff was on the stand" because Movants "had no intention to do anything" after they were "told it would be unethical for [them] to make a complaint on third-party hearsay." (*Id.* (quoting Yvonne Wingett Sanchez, *How Mexican Food Drew Couple Into Heart of Arpaio Case*, Ariz. Republic, May 08, 2015).) Movants' counsel also avowed to the Court that the Sheriff and the Chief Deputy "accepted the advice of counsel and let it go." (*Id.*) Movants continue to maintain, as with the Montgomery matter, that "at no time was Judge Snow or his wife the subject of an investigation." (Docs. 1083, Ex. 1; *see also* Doc. 1117 at 9; Tr. 961:8–9.)

## LEGAL STANDARDS

The two principal statutes that govern federal judicial recusal are 28 U.S.C. § 144, "Bias or Prejudice of Judge," and 28 U.S.C. § 455, "Disqualification of Justice, Judge, or Magistrate Judge." Section 144 provides a statutory method for seeking recusal only on the basis of a federal district judge's personal bias and is triggered by the filing of "a timely and sufficient affidavit" setting forth the facts that would convince a reasonable person that the judge has a bias or prejudice. 28 U.S.C. § 144. The affidavit must be "accompanied by a certificate of counsel of record stating that it is made in good faith." *Id*. The affidavit and accompanying certificate are strictly construed for form, timeliness, and sufficiency. *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993). The court has a duty to "proceed no further" and assign the motion to another judge for a determination of the merits only after it determines the affidavit is legally sufficient. *United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980). A party may file only one affidavit pursuant to § 144 in any case. 28 U.S.C. § 144.

Section 455, in contrast, has two recusal provisions. Subsection (a) states that a "judge. . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). An objective standard

0279

applies to disqualification under § 455(a), which contemplates whether "a reasonable person with knowledge of all the facts would conclude the judge's impartiality might reasonably be questioned." *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993). Subsection (b) enumerates specific situations that require a judge to disqualify himself, regardless of whether the conflict of interest creates an appearance of impropriety:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> . . .
>
> (4) He knows that he, individually or as a fiduciary, or his spouse . . . has a financial interest in the subject matter in controversy . . . or any other interest that could be substantially affected by the outcome of the proceeding; [or]
>
> . . .
>
> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
>
> . . .
>
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; [or]
>
> (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b)(1)–(5). The analysis under section 455(b) is subjective and also self-enforcing on the part of the presiding judge. *United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008).

Recusal for actual bias pursuant to subsection (b)(1) is required only if the moving party can prove by "compelling evidence" that a reasonable person would be convinced the judge was biased in a way that may prevent a fair decision on the merits.[11] *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir. 1985); *see also Liteky v. United States*, 510 U.S. 540, 553–56 (1994) (defining bias as animus or malice of a kind that a fair-

---

[11] The standard is identical under § 445(b)(1) and § 144. *Sibla*, 624 F.2d at 867.

minded person could not entirely set aside when judging certain persons or causes). The party seeking recusal carries a "substantial burden" of overcoming the presumption that a district court is free from bias. *United States v. Denton*, 434 F.3d at 1104, 1111 (8th Cir. 2006). The other relevant provisions of § 455(b) mandate disqualification on the basis of a judge's personal interest in the case or his familial relationship with a material witness or other interested party to a proceeding. 28 U.S.C. § 455(b)(4)–(5). The statute specifies that the degree of relationship that necessitates recusal under § 455(b) is calculated according to the civil law system, which includes spouses and siblings. *Id.* § 455(d)(2).

Motions brought pursuant to either § 144 or § 455 are subject to the extrajudicial source rule, meaning that the disqualifying bias or prejudice must generally stem from something other than "information and beliefs" the judge "acquired while acting in his or her judicial capacity." *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012) (quoting *United States v. Frias-Ramirez*, 670 F.2d 849, 853 n.6 (9th Cir. 1982)); *accord United States v. Wilkerson*, 208 F.3d 794, 799 (9th Cir. 2000) ("To disqualify a judge, the alleged bias must constitute animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct." (internal quotation marks omitted)). A judge's courtroom conduct, expressions of opinion, or adverse rulings during the course of proceedings in which disqualification is sought, or in related proceedings, do not constitute a valid basis for the judge's disqualification under §§ 144 or 455. *See Liteky*, 510 U.S. at 555; *In re Marshall*, 721 F.3d 1032, 1043 (9th Cir. 2013).

Recusal motions must also be filed in a timely manner. *See* 28 U.S.C. § 144; *Preston v. United States*, 923 F.3d 731, 732–33 (9th Cir. 1991) (applying same timeliness standard to § 455 motion). This requirement avoids "wasted judicial time and resources and a heightened risk that litigants would use recusal motions for strategic purposes." *Id.* (internal citations omitted). Although "no per se rule exists regarding the time frame in which recusal motions should be filed," they must be filed with "reasonable promptness after the ground for such a motion is ascertained." *Id.*

When a case is close, the balance should tip in favor of recusal. *Holland*, 519 F.3d

0281

at 912. Nevertheless, the recusal statute "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). In considering whether recusal is appropriate under § 455, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge." *Balistrieri*, 779 F.2d at 1202.

## DISCUSSION

For the reasons set forth below, Movants have not satisfied the requirements to bring a motion pursuant to § 144. Therefore, the Court need not accept the truth of the allegations in Sheriff Arpaio's affidavit nor refer the Motion to another judge for a determination of its merits. *See Sibla*, 624 F.2d at 868. The Court will instead consider whether the record as a whole demonstrates actual bias against Movants, triggers the automatic recusal provisions of 28 U.S.C. § 455(b), or raises a reasonable question about the Court's impartiality.[12] (*See* Doc. 1117 (quoting 28 U.S.C. § 455).)

**I.    The Court's Actions and Rulings Relating to the Contempt Proceedings Are Not Grounds for Recusal.**

The record of the contempt proceeding belies Movants' contention that the Court exhibits antipathy toward Movants; nor would an objective third party perceive a significant risk that the Court would resolve the case on a basis other than the merits. Movants' reliance on the Court's rulings and actions as the foundation for their Motion to Recuse also ignores the long-settled principle that, to trigger recusal, any alleged bias must spring from an extrajudicial source, not from information or beliefs the judge gained over the course of litigation, or else the bias must be particularly excessive in degree. *See*

---

[12] The Motion also refers to the recusal requirements under the Judicial Code of Conduct. The standard for disqualification under the judicial canons is substantively identical to that under the federal statutes. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 870 (1988) (Rehnquist, J., dissenting) (explaining that § 455 was substantially revised by Congress to bring it in conformity with Canon 3C of the Code of Conduct for United States Judges). The state canons cited in the Motion are inapplicable to federal courts.

- 16 -

0282

*Litkey*, 510 U.S. at 550–51.

Sheriff Arpaio and Chief Deputy Sheridan argue that the Court's conduct during the civil contempt proceedings establish that it has a "personal bias or prejudice" against them, 28 U.S.C. § 455(b)(1), or might cause a reasonable person to question the Court's partiality. *Id.* § 455(a). In particular, Movants challenge the Court's denial of their Motions to Vacate and its invitation to the United States Attorney's Office to attend status conferences. (Doc. 1117 at 5–7.) Movants further assert that the Court "engaged in outside investigations . . . that [it] infused into the proceeding," "took evidence outside of court," "asked leading questions," "was argumentative with" and "interrupted" Chief Deputy Sheridan, and "gave [its] own testimony." (*Id.* at 15.) Movants attempt to prove these allegations solely by reference to the declaration[13] of Ronald D. Rotunda, who is a professor at Chapman University School of Law. (*See id.* at 14–15.)

However, the Rotunda declaration—as well as Plaintiffs' corresponding declaration by Stephen Gillers, a professor at New York University School of Law—is an expert opinion. The law of this and every Circuit is that while an expert may provide an opinion to help the jury or judge understand a particular fact, the expert is not permitted to give an opinion as to his legal conclusion. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *see also* Fed. R. Evid. 702(a) (requiring that expert opinion evidence "help the trier of fact to understand the evidence or to determine a fact in issue"). The question presented on the recusal motion is whether 28 U.S.C. § 455 requires this Court to disqualify itself. This decision is solely a question of law. *See Jefferson Cnty. v. Acker*, 92 F.3d 1561, 1581 (11th Cir. 1996), *vacated on other grounds*, 520 U.S. 1261 (1997) ("Whether a judge is disqualified, that is, must not take part in

---

[13] Movants' reply memorandum is accompanied by a second declaration from Professor Rotunda dated June 19, 2015. (Doc. 1158, Ex. I.) In addition to the reasons stated below, the Court will not consider this new declaration because parties may not present new evidence for the first time in their reply briefs. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("Where new evidence is presented in a reply to a motion . . . the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990))).

deciding a case, is a question of law."); *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (same). Because both declarations only purport to offer interpretations and analyses of § 455 and express the professors' opinions on whether the Court must withdraw from this case, (*see* Doc. 1117, Decl. of Ronald Rotunda ¶¶ 29–30; Doc. 1150, Decl. of Stephen Gillers ¶ 21), they are not appropriate for the Court to consider in deciding whether its recusal is appropriate. *See in re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (excluding expert opinions of law professors that trial judge should recuse herself on the grounds that they impermissibly stated conclusions of law); *accord United States v. Eyerman*, 660 F. Supp. 775, 781 (S.D.N.Y. 1987).

Although the Court disregards both declarations, it is Movants who bear the burden of overcoming the presumption that the Court is impartial. *See Denton*, 434 F.3d at 1111. Movants' failure to cite to anything admissible that might suggest how the Court's course of examination or rulings demonstrate its actual bias against them falls short of the "compelling evidence" standard that governs motions to recuse under § 455(b)(1). *See Hook*, 89 F.3d at 355. Moreover, to the extent that the examples of the Court's bias cited to by Movants are based on the Court's rulings and conduct during the contempt proceedings, the Motion also fails under § 455(a) and (b)(1) because judicial rulings and conduct during litigation are not a valid basis for a bias or partiality motion "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. If the Court committed error in relation to the contempt proceedings, Movants' proper recourse is an appeal to the Ninth Circuit, not a motion for recusal. *Id.* Under the circumstances, a person apprised of all relevant facts would not reasonably doubt the Court's impartiality.

First, the proceedings in which the underlying events occurred were civil contempt hearings, the factual basis for which Movants do not contest. (*See* Docs. 880, 948, 1003.) Even if it were to accept Movants' unsupported contention that the Court "interrupted" Chief Deputy Sheridan or was "argumentative," (*see* Doc. 1117 at 15), these actions would have to be especially severe or pervasive to fairly suggest the kind of "deep-

seated" animus toward Movants that requires the Court's recusal. *See Liteky*, 510 U.S. at 555–56; *see also Marshall*, 721 F.3d at 1043 (holding that a series of hostile comments toward litigant did not require the judge's recusal because the comments "might also be reasonably seen as the product of [the judge's] frustration with [the litigant's] behavior throughout the litigation"). The record reflects that the Court's orders were violated from a very early stage in this litigation, and that Movants continued to resist the Court's directives after the Court entered its permanent injunction and throughout the compliance phase. The Court has expressed concern for what it perceives to be, at best, Movants' negligent approach to the timely implementation of its orders and, at worst, a pattern of knowing defiance and subversion of the Court's efforts to administer justice in this action. Movants' antagonism has necessitated substantial judicial corrective action; yet, as of the Monitor's last report, MCSO was not close to achieving full compliance with the injunctive order entered nearly two years ago. *See* Robert S. Warshaw, *Third Quarterly Report* 112 (2015) (Doc. 1010). The Court's comment about Movants' having "skin in the game" in any proposed settlement does not provide a basis for recusal for similar reasons. The Court has previously questioned whether, due to the organization of the Maricopa County government—which requires the County as a whole to bear the brunt of the financial costs incurred by Movants' recalcitrance—and Movants' ability to solicit contributions to fund their litigation, Movants might appreciate no adverse consequences, financial or otherwise, from their admitted contempt. (*See, e.g.*, Tr. of Mar. 20, 2015 Status Conf. 52:16–53:7, Doc. 965.) The Court need not ignore these facts in making its rulings. *See in re Yagman*, 796 F.2d 1165, 1181–82 (9th Cir. 1986) ("When [a judge imposes sanctions], the judge will obviously be dissatisfied with some aspect of the offending . . . conduct[;] . . ."[w]ithout more, this natural responsive attitude does not provide reasonable grounds to question the judge's impartiality . . . ."). "Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky*, 510 U.S. at 551 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)). In this case,

0285

the record does not support the conclusion that the Court was critical of or hostile toward Movants, let alone that its behavior was "serious enough to overcome the high standard set forth in *Liteky.*" *Marshall*, 721 F.3d at 1043.

Second, the accusation that recusal is required because the Court "took evidence" outside of court is misplaced. (*See* Doc. 1117 at 15.) During the evidentiary hearing, Sheriff Arpaio testified on the source of funding for the Montgomery investigation, which involved MCSO deputies as well as a member of the Cold Case Posse. Sheriff Arpaio stated that Maricopa County had not paid for the Cold Case Posse member's trips to the Seattle area. (Tr. 645:15.) During the ensuing lunch break, the Monitor mentioned to the Court that the Cold Case Posse may have separate finances from MCSO. When the proceedings resumed, the Court confirmed as much with Sheriff Arpaio during questioning. (Tr. 657:18–59:1.)

As an initial matter, only in the "rarest of circumstances" need the Court recuse itself on the basis of knowledge gained in a judicial capacity. *Holland*, 519 F.3d at 913–14. The Monitor is an agent of the court and, in this role, has communicated with the Court as necessary to oversee and coordinate Defendants' compliance with existing judicial orders on the Court's behalf. *See United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 184 (2d Cir. 1991) (denying motion to recuse based on communications between judge and court-appointed outside housing advisor). In addition, the Monitor's unprompted comment during the recess did not provide the Court with the kind of substantive information about proceedings that "cannot be controverted or tested by the tools of the adversary process." *See Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996). Rather, the only evidence on this matter is in the record: Sheriff Arpaio's testimony, as developed through the Court's examination. Under the circumstances, then, the Court's clarifying questions did not constitute an independent investigation or otherwise demonstrate that the Court possessed impermissible knowledge of a disputed evidentiary fact. *See* 28 U.S.C. § 455(b)(1). This would also not cause a reasonable and informed observer to question the Court's impartiality. *See id.* § 455(a); *Yonkers*, 946 F.2d at 184.

Third, the Court's orders after the first phase of the contempt hearings that Defendants immediately produce all documents relating to the matters on which Sheriff Arpaio had testified or pertaining to the Monitor's discretion to inquire into "matters . . . pertinent to the current contempt findings" are not an adequate basis for the instant Motion.[14] (*See* Tr. of May 14, 2015 Status Conf. 50:24-51:6, Doc. 1097.) The orders relating to document production were justified by Defendants' past failures to adequately and timely conduct discovery and produce requested documents. These failures are one of the grounds for contempt noticed in the Order to Show Cause to which the Movants have admitted and are largely the reason the evidentiary hearings remain incomplete. Defendants' past destruction of responsive documents also has already resulted in the imposition of sanctions at an earlier stage of litigation. (Doc. 493.) Movants' non-compliance with Court orders in a way that risked additional evidence spoliation is yet another ground on which Movants are charged with, and have admitted to being in, contempt. Further, Defendants' ambivalence toward meeting self-imposed deadlines has repeatedly delayed the judicious progression of this litigation; in the context of internal affairs, for example, Defendants' delay in completing the Armendariz-related investigations has prevented the Monitor from being able to assess the adequacy of a number of MCSO's self-investigations. In light of this history, the Court's efforts to ensure the preservation of the Montgomery and Grissom documents and their timely production do not fairly suggest that the tribunal is biased against Movants. *See Marshall*, 721 F.3d at 1042–43 (considering judge's orders in light of litigant's history in the case); *McTiernan*, 695 F.3d at 892 (finding judge's negative comments about a defendant did not imply her partiality where they were based on the defendant's known past misconduct).

---

[14] Movants' arguments that the Court ordered the disclosure of materials without providing an opportunity for counsel to conduct privilege review, or that the Court provided the Monitor with unbounded investigative power bearing no relation to this case, mischaracterize the record. (*See, e.g.*, Doc. 1032; Tr. 653:18–25; Tr. of May 8, 2015 Status Conf. 30:1–4, 30:25–31:15, Doc. 1086; Tr. of May 14, 2015 Status Conf. 53:12–56:25, Doc. 1097.)

0287

The Court's specification following the first phase of the contempt hearing that the Monitor's investigative and oversight authority extended to the Montgomery investigation is likewise responsive to Movants' testimony and does not otherwise imply an invidious motive on the part of the Court. Under the terms of the Supplemental Permanent Injunction, the Federal Rules of Civil Procedure, and its inherent power, the Court has continuing authority to modify the Monitor's role in adaption to changed circumstances. (*See* Doc. 606); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380–81 (1992). Since the permanent injunction was entered, Defendants' actions have resulted in a number of modifications to the scope of the Monitor's authority.

For instance, in April 2014 the Court, at the parties' request, amended the Supplemental Permanent Injunction to transfer responsibility for conducting community outreach programs designed to improve relations with the Plaintiff class from Defendants to the appointed Monitor after Defendants objected to their compelled participation in these programs. (Tr. of March 24, 2014 Hr'g, Doc. 662; *see* Doc. 670.) Around this time, the Court became aware that Movants and other members of MCSO's command staff had repeatedly mischaracterized the Court's orders since it issued its Findings of Fact, including during a training organized for MCSO patrol deputies and in other public forums. (*See* Docs. 656 at 4–14, 680 at 1–3, 684 at 4; Tr. of Mar. 24, 2014 Hr'g, Doc. 662; Tr. of Apr. 3, 2014 Hr'g, Doc. 672; Tr. of Oct. 28, 2014 Status Conf., Doc. 776.) After the Movants agreed to voluntarily address these misrepresentations, subsequent press coverage caused Sheriff Arpaio to change his mind. (Doc. 680 at 3.) The Court, in response, entered an enforcement order requiring that Defendants distribute a corrective statement within MCSO and that command staff and patrol personnel take steps to familiarize themselves with the content of the Court's Findings of Fact and Conclusions of Law; the Court assigned to the Monitor the responsibility for verifying Defendants' compliance with that order. (Doc. 680 at 4.) The following month, developments brought about by the death of Deputy Armendariz put MCSO in the conflicted position of investigating its own operations and supervisors in matters related to this litigation. When

0288

MCSO insisted on undertaking such investigations despite the conflict of interest, Defendants agreed that the Monitor's involvement and oversight was appropriate. (*See* Tr. of May 14, 2014 Status Conf. 95:6–96:15, Doc. 700.) In November 2014, concerns about the adequacy of MCSO's investigations into the Armendariz issues, and the revelation that MCSO had never complied with this Court's preliminary injunction, resulted in the addition of an independent investigative component to the Monitor's authority. (Doc. 795.) At each stage, the supplements to the Monitor's responsibilities were discussed with the parties and the memorializing orders revised at their suggestion. Movants do not explain why a detached third party would now infer bias from the Court's specification that the Monitor's independent investigative authority allowed him to look into the Montgomery investigation. Certainly, the documents produced by Defendants after Movants' testimony do suggest, at a minimum, the inaccuracy of their previous testimony sufficient to justify the Monitor to consider such matters in conjunction with his investigative and oversight authority.

Lastly, Movants' assertion that the Court's questions denied them of due process is baseless. The Federal Rules of Evidence plainly extend to the Court the right to participate in questioning witnesses. Fed. R. Evid. 614 & advisory committee notes; *see also Barba-Reyes v. United States*, 387 F.2d 91, 93 (9th Cir. 1967) ("[T]he function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. . . . [I]t is his duty to see that a case on trial is presented in such way as to be understood . . . . He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other."). In addition, in a civil contempt proceeding, it is "the offended judge [who is] solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). The record further indicates that on the first day of the contempt proceedings the Court informed the parties of its intent to participate in questioning witnesses. (Tr. 140:6–12.) Movants were each represented by civil and criminal counsel at the show-cause hearings,

0289

none of which objected to the Court's examination at the time or to the questions posed to either Movant, despite being invited to do so by the Court. (Tr. 625:12–16); *cf.* Fed. R. Evid. 614(b)–(c); *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987) ("[T]he failure of . . . counsel to object to any of this questioning at trial precludes our review of this issue on appeal."). Due process guarantees the right to be fairly heard before the Court arrives at a decision. *See Little v. Kern Cnty. Sup. Ct.*, 294 F.3d 1075, 1080 (9th Cir. 2002). However, a fact witness in a legal proceeding  has no constitutional entitlement to advance notice of every question he might be asked. The now-challenged topics on which the Court questioned Movants are relevant to the Court's determination of the extent of Defendants' resistance to the Court's orders and what measures are necessary to compel Movants' ongoing compliance with its orders and provide comprehensive relief to the Plaintiff class for Movants' contempt. Moreover, the Court's intervention in witness examination was particularly appropriate in light of the fact that Defendants had restricted Plaintiffs' ability to develop the evidentiary record by withholding discoverable evidence.  *See United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) (noting judge's questioning of witnesses is especially appropriate in such circumstances). No due process violation occurred merely because Movants' compelled testimony revealed evidence contrary to Movants' interests in the litigation, namely, that MCSO may have hired a confidential informant at least partly in an attempt to discredit this Court by linking it to a speculative conspiracy. *Barba-Reyes*, 387 F.2d at 93; *cf. Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991) (remarking on district courts' inherent power to police litigants whose actions show bad faith or the intent to hamper enforcement of court orders).

Under the principles discussed above, Movants' arguments for recusal that relate to the Court's conduct in and around the contempt hearing are foreclosed by the record and the extrajudicial source rule. The examples Movants provide of the Court's alleged bias consist of rulings and conduct all occurred in the course of judicial proceedings and neither reflect a negative opinion of Movants based on facts that the Court acquired

0290

extrajudicially, nor display a level of antagonism that would impede fair judgment on the merits. *See Liteky*, 510 U.S. at 556. Sheriff Arpaio is a frequent litigant before this Court on a wide variety of civil matters, and is a named defendant in a half-dozen pending cases assigned to the Court in which he has not sought the Court's recusal. This further suggests that the impetus for Movants' efforts to disqualify the Court in this case is not concern that the Court harbors any extrajudicial bias against Sheriff Arpaio or Chief Deputy Sheridan, but, rather, stems from their dissatisfaction with the Court's rulings in this case, which is not an issue properly resolved through a disqualification motion. *See id.* at 555–56. Although a court must recuse when the provisions of § 455 are implicated, it also has an obligation to hear all cases assigned to it when there is no legitimate reason to recuse. *Holland*, 519 F.3d at 912. In this case, nothing about the Court's conduct pertaining to the contempt hearing warrants its recusal under § 455(a) or (b)(1).

**II.    The Montgomery and Grissom Investigations Do Not Give the Court or its Wife a Disqualifying Interest in the Outcome of the Proceedings, Demonstrate its Actual Bias, or Otherwise Warrant Recusal.**

Neither the facts underlying the Grissom and Montgomery investigations nor the Court's inquiry into those investigations demonstrate actual bias or reasonably risk an appearance of partiality to an objective third party with knowledge of the matters. *See* 28 U.S.C. § 455(a)–(b)(1). Furthermore, neither investigation implicates an interest of the Court or its wife that stands to be substantially affected by the outcome of this proceeding. *See id.* § 455(b).

**A.    The Montgomery Matter**

A charge of bias or prejudice under § 455(b)(1) or that a judge's impartiality might reasonably be questioned under § 455(a) must be sufficiently grounded in fact to generate doubt in the mind of a fully informed, objective observer; mere speculation or innuendo is not enough. *See in re United States*, 666 F.2d 690, 695 (1st Cir. 1981). In this case, nobody—not even Movants—asserts that the Court was actually involved in the alleged conspiracy that is reflected in the documents on the Montgomery matter produced by

- 25 -

0291

Defendants subsequent to Movants' testimony. (*See* Tr. 1003:1–2) Sheriff Arpaio and Chief Deputy Sheridan testified that they no longer have confidence in any of the materials provided by Mr. Montgomery—they believed those materials to be "junk" (Tr. 650:20–25)—that they had always been "very skeptical" of Mr. Montgomery's claims, and that they "finally realized that he was stringing [them] along." (Tr. 1002:2–16.) Among other problems apparent from the face of the Montgomery materials, the telephone number attributed to the Court in documents that purported to prove phone calls with the Department of Justice, (Doc. 1150, Aff. of Cecilia Wang, Ex. B (available at Doc. 1153)),   is similar to, but has never been, the Court's telephone number. "[R]umor, speculation . . . and similar non-factual matters" that are advocated by no one do not suffice to establish actual bias. *Clemens v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005).

Nor do they raise a reasonable question about the Court's impartiality: Sheriff Arpaio testified that nothing about the Montgomery matter affected his perception of the Court's ability to remain neutral in this case. (Tr. 652:16–18.) Chief Deputy Sheridan also disclaimed that the Montgomery materials caused him to believe there was collusion between the Court and the Department of Justice. (Tr. 1002:1–2.) Movants continue to contend under penalty of perjury that the Montgomery investigation never "involved any investigation of [the Court]." (Doc. 1117 at 9; Doc. 1083, Ex. 1 ("At no time was an investigation initiated against Judge Snow . . . . At no time was Judge Snow or his wife the subject or target of investigation.").) Movants have neither sought to recant those declarations nor assert the truth of the conspiracy apparently outlined in the Montgomery documents. If Movants, knowing the facts of the Montgomery investigation as they did, did not doubt the Court's impartiality it follows that a reasonable person would not either. *See* 28 U.S.C. § 455(a).

To the extent that the Movants seek to now implicitly assert the truth of the Montgomery materials, they are precluded from doing so because a party must seek to disqualify a judge "in a timely fashion" after he becomes aware of the basis for

disqualification.  Yet, Movants knew about the content of the Montgomery documents for some time before they filed the instant Motion. *See Preston*, 923 F.3d at 732–33 (quoting *Molina v. Rison*, 886 F.2d 1124, 1131 (9th Cir. 1989)). At the contempt hearing, Chief Deputy Sheridan testified that, over the course of Mr. Montgomery's investigation, he was presented with materials suggesting that the Department of Justice had made contact with the Court; it was at this point that he apparently ordered his subordinates to undertake no investigation of the Court. He further testified that no additional materials regarding the Court "materialized" after this point in time. Therefore, assuming the accuracy of Chief Deputy Sheridan's testimony, he has long been aware of all of the Montgomery documents implicating the Court in an alleged conspiracy, but nevertheless elected not to seek the Court's disqualification until May 2015—after the Court invited the parties to address the seeming inconsistencies between the Montgomery documents and Movants' testimony and months after Movants apparently lost faith in Mr. Montgomery's credibility.[15] There is a presumption that a recusal petition submitted after the moving party suffers adverse rulings has been filed for suspect tactical and strategic reasons. *See E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1295 (9th Cir. 1992).

Furthermore, that the Court inquired into the Montgomery investigation is not a proper basis for the Court's disqualification under § 455(b)(1) because there is nothing to suggest the Court's examination was the product of extrajudicial bias. *See Liteky*, 510 U.S. at 555. Aspects of the Montgomery investigation are relevant to this litigation for reasons the Court has already explained on the record. Sheriff Arpaio began a time- and resource-intensive operation involving Mr. Montgomery at a time when MCSO was

---

[15] The *New Times* article that summarizes what the documents subsequently produced by Defendants tend to show was also published over a year ago, and documents that have since been produced by Defendants reinforce the timeline testified to by Movants, that they suspected Mr. Montgomery was stringing MCSO along for at least several months. (*See* Doc. 1150, Aff. of Cecilia Wang, Ex. C (compiling e-mails from at least November 2014 challenging Mr. Montgomery's work product) (available at Doc. 1153).)

0293

under an obligation to implement the Supplemental Permanent Injunction. To the extent that MCSO may have been trying to use Montgomery to discredit the Court and undermine the legitimacy of its judgment in the underlying lawsuit, these facts are relevant to the attitude that Defendants have toward the Court and its orders, and to the corrective measures that may be necessary to remedy Movants' contempt and achieve the implementation of the permanent injunctive relief. This may be particularly germane in light of the evidence that MCSO apparently continued to press Mr. Montgomery for work product up until the eve of the show-cause hearings even after his credibility was found to be lacking. (Doc. 1150, Aff. of Cecilia Wang, Exs. C–E (available at Doc. 1153).)

The integrity and transparency of MCSO's PSB and SID processes are also implicated by the Montgomery investigation. There is no dispute that there was misconduct within the HSU and the MCSO generally that is relevant to this lawsuit,[16] including patrol deputies' unexplained confiscation of personal identifications and other items. These matters were, at least at the time, systemically under-investigated by supervisors within the SID. Further, the intentional destruction of the evidence of that misconduct may have been sanctioned by those in charge. The inquiry into these issues— when they finally came to light—was handled internally by PSB at the election of MCSO and ultimately compromised by conflicts of interest, delays, and procedural inadequacies. There now appears to have been substantial overlap in the personnel who failed to adequately supervise Deputy Armendariz and the HSU, and those who were responsible for the Montgomery investigation with its speculative ties to this Court. This raises obvious questions about whether those personnel are, in fact, working to implement all of this Court's orders in good faith, especially since the documents that have been produced from the Montgomery investigation tend to suggest that Movants' testimony on the matter may have been at least partially inaccurate. Therefore, the Court's questions about

---

[16] Defendants have never contested the relevance of the Armendariz materials to the Plaintiffs' underlying constitutional claims or that it falls within the scope of the Monitor's oversight. (*See, e.g.*, Tr. of May 14, 2014 Status Conf. 55:21–56:8, 73:20–24, Doc. 700.)

0294

the Montgomery investigation are relevant to this proceeding, and there is nothing to suggest that the questions were motivated by deep-rooted antagonism against Movants. *See Liteky*, 510 U.S. at 555.

In addition, to the extent that Movants are responsible for creating the circumstances that they now offer as grounds for their Motion, the Montgomery materials provide no basis for judicial disqualification. The Ninth Circuit is clear that a party cannot effect recusal of a trial judge by its own actions. "[B]aseless personal attacks on or suits against the judge by a party," "quotes attributed to the judge or others, but which are in fact false or materially inaccurate or misleading," or "attempts to intimidate the judge" will not suffice to trigger the Court's disqualification. *Clemens*, 428 F.3d at 1179 (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)). Movants instigated the Montgomery matter and have controlled the investigation and the limited disclosures to date concerning its subject, scope, outcome, and relevance to this Court and Movants' contempt. By bringing the Motion, Movants stalled additional discovery into the Montgomery materials from occurring. This kind of risk of strategic manipulation is what § 455 (and its timeliness requirement) explicitly does not allow.

Lastly, none of the specific disqualifying subsections of § 455(b) are applicable here. Under § 455(b)(4), a judge must recuse himself if he has a "financial interest in the subject matter in controversy" or "any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). A judge must also disqualify himself under § 455(b)(5)(iii) where he or his spouse is "known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." *Id.* § 455(b)(5)(iii). A disqualifying "interest" is one that concerns the "subject matter of the litigation or a party to it." *See in re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1314 (2d Cir. 1988). Courts have generally limited the kinds of "interests" for which recusal is mandatory to those that are somehow pecuniary or proprietary in nature. *See Guardian Pipeline, LLC v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008); *In re N.M. Nat. Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980); *In re Va. Elec. & Power*

- 29 -

*Co.*, 539 F.2d 357, 367 (4th Cir. 1976); (*see also* Doc. 138 at 15–16.) Even if a court's concern with its general reputation were sufficient to constitute an "interest" within the meaning of §§ 455(b)(4) and (b)(5)(iii), such an interest would not be affected in this case because no one claims that the conspiracy outlined in the Montgomery documents is true. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1042 (9th Cir. 2011) ("[W]here an interest is not direct, but is remote, contingent or speculative, it is not the kind of interest which reasonably brings into question a judge's partiality." (quoting in parenthetical *Sensley v. Albritton*, 385 F.3d 591, 600 (5th Cir. 2004))).

### B.    The Grissom Matter

As with the Montgomery matter, the Court's questions and orders relating to the Grissom matter do not warrant its recusal under §§ 455(b)(1) or (a). *See Liteky*, 510 U.S. at 555. The Court's knowledge of the Grissom investigation was acquired in the course of this judicial proceeding, and the Court's conduct since learning of its existence in no way suggests that the Court is now biased or prejudiced against Movants in a way that threatens its ability to evaluate the case on the merits, let alone evidences the degree of antagonism required to justify recusal where no extrajudicial source is involved. *See id.*

Although the Court had read the *New Times* article concerning an alleged investigation of the Court by MCSO, the Court had no awareness of the Grissom matter until Sheriff Arpaio testified, in response to the Court's questioning about the reported investigation, that he knew of an investigation involving a member of the Court's family. The Court asked a few follow-up questions of Sheriff Arpaio; then, the next day, defense counsel elicited testimony on the matter from Chief Deputy Sheridan, apparently in an attempt to clarify Sheriff Arpaio's earlier statements. However, aspects of Sheriff Arpaio's testimony were sufficiently inaccurate to prompt the disclosure of additional materials on the subject by Sheriff Arpaio and his former attorneys. (*See generally* Tr. 1019–1035; Doc. 1083, Ex. 1.) As a result, the Grissom matter garnered further attention as the Parties litigated the applicability of attorney-client privilege and/or work-product immunity to some of those disclosures. The Court's own examination of Movants on this

0296

matter has been minimal, and Movants provide no evidence that is reasonably suggestive of any newly generated bias on the part of the Court since it learned of Mrs. Grissom's allegations and Movants' decision to investigate them.

Mrs. Grissom's paraphrasing of a statement allegedly made by the Court's wife, alone, does not suffice to warrant the Court's recusal. Sheriff Arpaio's counsel initially evaluated the statement and Mrs. Grissom and concluded that her allegations "lacked substance or merit." (Doc. 1115 at 9.) Nonetheless, apparently at the request of Sheriff Arpaio, Mr. Casey took the additional step of retaining Mr. Vogel to investigate the matter further. (*Id.* at 10; Tr. 966:2–3, 21–23.) After reviewing the results of that investigation, Mr. Casey concluded that the Grissom information was "fundamentally flawed" and provided no basis for a "Rule 60 motion [or] appeal . . . without the lawyer doing so violating the Federal Rules of Civil Procedure and the Arizona Rules of Professional Conduct." (Doc. 1115 at 7, 18–19.) Movants acknowledge that they accepted this advice against any use of the Grissom information and let the matter go.

Movants stood by this decision even after the first phase of the contempt proceedings. Sheriff Arpaio's specially appearing counsel (who filed the instant motion) stated publicly following Sheriff Arpaio's testimony that the Grissom matter was not a basis on which the Court should recuse. (*See* Doc. 1150, Aff. of Cecilia Wang, Ex. H.) In addition, Movants argued before Magistrate Judge Boyle that nothing about the Grissom investigation was relevant to issues at stake in this case in order to preserve attorney-client privilege and work-product immunity over the November 2013 letter disclosed by Mr. Casey in which he had summarized Mr. Vogel's findings for Sheriff Arpaio. (*See* Doc. 1073 at 4–5; Doc. 1107 at 5.) Movants were successful in preventing disclosure of portions of the letter because Judge Boyle was apparently convinced, as Movants claimed, that the facts underlying the Grissom investigation did not relate to the contempt proceedings. (Doc. 1053 at 6.) The recusal statutes do not allow for the use of disqualifying elements as a sword and a shield any more than the doctrines of attorney-client privilege and work-product immunity do. *See Bivens Gardens Office Bldg., Inc. v.*

- 31 -

1   *Barnett Bks. of Fla., Inc.*, 140 F.3d 898, 913 (11th Cir. 1998) (noting that the

2   disqualification statute was "intended as a shield, not a sword," and that disqualification

3   cannot be used as "an insurance policy to be cashed in if a party's assessment of his

4   litigation risks turns out to be off and a loss occurs"). Accordingly, the history amply

5   demonstrates that Movants themselves have concluded, repeatedly and after thorough

6   investigation of all of the facts, that the Grissom matter does not warrant the Court's

7   recusal. The Court agrees with these conclusions.

8       When a party becomes aware of a basis to seek to disqualify a judge, it must act

9   with "reasonable promptness" after the basis for disqualification is ascertained. *Preston*,

10  923 F.3d at 732–33. The Ninth Circuit has cautioned that a party that unduly delays the

11  filing of a recusal motion is presumed to be filing it for manipulative purposes. *See E. &*

12  *J. Gallo*, 967 F.2d at 1295–96. Sheriff Arpaio became aware of the Grissom allegations

13  in August 2013, and, after inquiries by his attorney and an independent investigator,

14  elected not to pursue the Grissom matter further. Now, nineteen months later, Movants

15  have filed the instant Motion for disqualification. In the interim time, the Armendariz

16  materials came to light, precipitating the revelation of additional evidence of MCSO's

17  repeated failures to comply with the orders of this Court and the institution of civil

18  contempt hearings. Movants' delay in raising the Grissom allegations until after the

19  contempt proceedings were underway not only raises the specter of attempted

20  manipulation of the judicial process, it runs counter to § 455's requirement of prompt

21  action.

22      In an apparent attempt to bolster their argument for recusal, Movants now assert

23  that because testimony about the Grissom investigation occurred during the contempt

24  hearing, then "Mrs. Snow is undoubtedly a material witness in this proceeding." (Doc.

25  1117 at 14; *but see also id.* at 14 (noting the "irrelevance of the Grissom and

26  Montgomery investigations to the issue of whether the admitted contempt of the

27  Preliminary Injunction occurred . . .").) However, § 455(b)(5)(iv) requires recusal only

28  when the judge or his spouse "is to the judge's knowledge likely to be a material witness

- 32 -

in the proceeding." 28 U.S.C. § 455(b)(5)(iv). A material witness is one "who can testify about matters having some logical connection with the consequential facts" of a case. *Williams v. Stewart*, 441 F.3d 1030, 1055 (9th Cir. 2006) (quoting Black's Law Dictionary (8th ed. 2004)); *United States v. Vazquez-Botet*, 453 F. Supp. 2d 362, 370 (D.P.R. 2006) (applying definition in context of motion under § 455(b)(5)(iv)). The Court has no reason to think that its spouse will be a material witness in any proceeding pertaining to either the instant Motion or to the civil contempt proceedings. First, Sheriff Arpaio's former attorney already concluded that Mrs. Grissom's claims were fundamentally flawed and legally insufficient. Movants accepted that conclusion. Second, all of the facts from the Grissom investigation were known by Movants by the fall of 2013, and seeking disqualification on their basis now is untimely, regardless of which provision of the statute Movants claim it triggers. *See E. & J. Gallo*, 967 F.2d at 1295 n.8; *Preston*, 923 F.2d at 733. Third, Movants do not suggest a single example of admissible testimony that the Court's wife could offer: the Grissom allegation is not of material importance to the show-cause hearing, nor did Movants request a hearing in conjunction with their Motion for disqualification at which such testimonial evidence might be taken. A judge will not be disqualified under § 455(b)(5)(iv) based on mere speculation that the judge or his family member will be called as a witness. *See United States v. Rivera*, 802 F.2d 593, 601 (2d Cir. 1986) (finding judge was not required to recuse himself on the basis of defendants' allegations that judge would be material witness at a requested hearing where defendants did not allege sufficient facts demonstrating their entitlement to the hearing). Fourth, there is no precedent for Movants' contention that an alleged statement by a judge's spouse that might be used to question the judge's impartiality is grounds for disqualification because the spouse is likely to be a "material witness." If this was the case, a party could deliberately manipulate the recusal process by raising statements whose substance is "fundamentally flawed" to demonstrate the supposed bias of the presiding judicial officer and attribute them to the judge or a family member and, by forcing their contravening testimony to

0299

1  rebut the charge of bias, oblige the judge to recuse under § 455(b)(5)(iv). That is exactly
2  what Movants attempt to do here by trying to re-raise a forfeited suggestion of alleged
3  bias. To the extent that anything about the Grissom matter continues to have incidental
4  relevance to this case—for example, it may illuminate that factual misrepresentations
5  have been made on the record, and suggests the existence of yet another potential conflict
6  in Defendants' selection of Don Vogel as the independent contractor to whom to
7  outsource the Armendariz investigations—it is not because the Court's wife will be a
8  material witness.

9       Section 455's commitment to fairness in the administration of justice does not
10 require recusal "upon the merest unsubstantiated suggestion of personal bias or
11 prejudice." *Holland*, 519 F.3d at 913. If a judge were to allow manipulation to deter the
12 normal course of litigation, this would equally risk "subvert[ing] [judicial] processes,
13 undermin[ing] our notions of fair play and justice, and damag[ing] the public's
14 perception of the judiciary." *Id.* at 915. Accordingly, the "reasonable person" as to whom
15 the Court must evaluate the appropriateness of its recusal in light of a case's
16 particularities is not someone who is "hypersensitive or unduly suspicious," but rather is
17 a "well-informed, thoughtful observer." *Id.* at 913 (quoting *In re Mason*, 916 F.2d 384,
18 385 (7th Cir. 1990)). After careful consideration of all of the relevant facts, there is no
19 basis to believe the Court or its wife has a disqualifying bias or interest in the litigation
20 based on the Grissom matter. Moreover, Mrs. Grissom's allegations do not raise a
21 reasonable question about the Court's impartiality, because a neutral observer would not
22 infer the existence of actual prejudice against Movants from a single instance of third-
23 party hearsay that Movants' own counsel determined to be baseless. *See* 28 U.S.C.
24 § 455(a).

25 **III.    The Court's Brother-in-Law's Partnership Interest Does Not Require the
26         Court's Recusal**

27      Movants also revive as an issue the Court's brother-in-law's affiliation with
28 Covington & Burling LLP, the law firm that represents Plaintiffs in this case. That a

- 34 -

relative of a judge is a law partner of an attorney of record triggers a judge's recusal only if the nature of the familial relationship raises a reasonable question about the judge's impartiality, or if the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding." *See* 28 U.S.C. §§ 455(a), (b)(5)(iii); *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83–84 (2d Cir. 1996).

The Court raised the issue of whether its withdrawal was appropriate in light of its brother-in-law's partnership interest at Covington with the parties three years ago, prior to trial. The Court entered an order setting forth the nature of its relationship with Mr. Teel, the extent of its past consideration of the matter, and the reasons why its recusal was not compelled by law or the judicial canons.[17] (Doc. 537.) The Court also noticed a hearing, (Doc. 539), at which it offered to recuse on the request of any party and to vacate the orders it entered after Covington & Burling's appearance, including the Summary Judgment and Preliminary Injunction order of December 23, 2011. (Tr. of June 29, 2012 Status Conf. 5:19–9:17, Doc. 1149.) At the hearing, Defendants agreed recusal was not mandatory and affirmatively stated that they desired this case to remain on the Court's docket. (*Id.* 15:13–17:2.) Defendants also filed a notice indicating they expressly "waiv[ed] any and all appeal issues regarding . . . the Court's potential bias, impartiality, and/or conflict of interest" potentially implicated by its brother-in-law's partnership interest at Covington & Burling. (Doc. 541.)

The Court, in another order, concluded that the Court's brother-in-law had no interest, financial or otherwise, that required the Court's recusal under § 455(b)(5)(iii), and that no reasonable and objective observer would question the Court's impartiality

---

[17] In 2010 when Covington was substituted as counsel for Plaintiffs the Court reviewed the case law, the Code of Conduct for United States Judges, and the commentaries to the canons and determined its recusal was not necessary, although the Court later observed that it may have been preferable to have fully discussed the matter with the parties at this time. (*See* Doc. 537.)

0301

based on Mr. Teel's partnership at Covington.[18] (Doc. 542.) As Plaintiffs explained, Covington had screened Mr. Teel from participating in the case or receiving any income that may accrue to the firm, so he had no existing economic stake in the case. Further, no party had articulated a non-pecuniary interest of Mr. Teel's that might be "substantially affected by the outcome of the proceeding," *see* 28 U.S.C. § 455(b)(5)(iii), and the Court reasoned that any speculative reputational benefits or Mr. Teel's general interest in his firm's goodwill and client relationships did not amount to a disqualifying interest under § 455(b)(5)(iii) under the facts of this case. In the intervening three years, nothing that has occurred alters the Court's initial analysis: Movants offer no evidence suggesting that Mr. Teel has acquired an interest in the interim time that could be substantially affected by the outcome of these proceedings nor do they explain why the Court's impartiality would now be questioned by any abstract personal interest of Mr. Teel's in this litigation. *See Perry v. Schwarzenegger*, 630 F.3d 909, 914 (9th Cir. 2011) (explaining that recusal is not required where the alleged interest is remote).

In any event, this ground for recusal has long been forfeited. Covington & Burling first entered an appearance in 2010. Sheriff Arpaio was aware of the issue prior to trial three years ago and expressly waived the conflict. (*See* Doc. 541; *see also* Doc. 1117 at 13 (acknowledging that Movants waived this basis for recusal "early in this action").) Although the parties could not remit the Court's disqualification if recusal was required under § 455(b)(5)(iii), a conflict that is disqualifying only because it risks a judge's appearing impartial can be waived. 28 U.S.C. § 455(e); *United States v. Conforte*, 624

---

[18] The primary conflict observed by the Court was between the commentary to the judicial canons, which notes that "[t]he fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself disqualify the judge," Code of Conduct for U.S. Judges, cmt. Canon 3C(1)(d)(ii), and the advice of the United States Committee on Codes of Conduct, which suggests a categorical rule of recusal when a relative within the third degree of relationship of a judge has an equity interest in a law firm in a case before that judge. Code of Conduct for U.S. Judges Canon 3C, Advisory Opinion No. 58. The Court explained at length in its earlier opinions on the matter why the per se rule of disqualification set forth in Advisory Opinion No. 58 is an erroneous interpretation of Judicial Canon 3C and the corollary subsection of § 455(b). (*See* Docs. 537, 542.)

0302

F.2d 869, 880–81 (9th Cir. 1980). Further, even claims for recusal under § 455(b) may be lost by inaction after the facts supporting the claim are known by the party and no motion is timely made. *See E. & J. Gallo*, 967 F.2d at 1295 n.8 ("The timeliness of a party's presentation to the court of information it has that comprises a potential ground for disqualification is a different issue than is addressed by subsection (e)."). Movants' failure to raise this ground for disqualification before now precludes them from attempting to do so at this juncture.

## IV.     This Motion Is Legally Insufficient Under 28 U.S.C. § 144.

Section 144 provides for the assignment of a new judge when a party to a proceeding files a timely and legally sufficient affidavit alleging personal bias or prejudice on the part of a judge before whom the matter is pending. 28 U.S.C. § 144. All § 144 motions must also be accompanied by a certificate of good faith from counsel for the party moving for recusal. *Id.* Because the judge must accept the truth of the facts alleged in the affidavit as demonstrating the purported bias, the affidavit and certificate of counsel are strictly construed for form, timeliness, and sufficiency. *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993); *see also Rademacher v. City of Phoenix*, 442 F. Supp. 27, 29 (D. Ariz. 1977) (explaining that affidavits filed in support of § 144 motions "must be given the utmost of strict construction to safeguard the judiciary from frivolous attacks upon its dignity and integrity and to prevent abuse and to insure orderly functioning of the judicial system." (internal citations omitted)). The judge against whom a § 144 affidavit of bias is filed may pass on its legal sufficiency. *Sibla*, 624 F.2d at 868.

For the reasons set forth above, Movants' affidavit is legally insufficient. Recusal motions brought pursuant to § 144 are subject to the same timeliness requirement and extrajudicial source rule as § 455 motions. *See* 28 U.S.C. § 144; *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986). The Court's relationship to its brother-in-law and the facts underlying the Grissom and Montgomery investigations were all known by Movants for years before they filed their Motion. Furthermore, to the extent that any of the bases in Sheriff Arpaio's affidavit stem from the Court's conduct, they fail to establish

recusable bias or prejudice. *See Sibla*, 624 F.2d at 868 ("[A]n affidavit . . . is not legally sufficient unless it specifically alleges facts that fairly support the contention that the judge exhibits bias or prejudice directed toward a party that stems from an extrajudicial source."); *United States v. Scholl*, 166 F.3d 964, 977 (9th Cir. 1999) (holding that actions taken by a judge during proceedings are not a legally sufficient ground to include in a § 144 affidavit). A litigant may also not compel a judge's recusal through his own actions under § 144 any more than he can under § 455. *See Studley*, 783 F.2d at 939–40 (rejecting affidavit where "intemperate and scurrilous attacks" on the judge were the only grounds for recusal asserted).

In addition, this is Defendants' second Motion for Recusal brought pursuant to § 144 and second accompanying affidavit of prejudice. Section 144 explicitly limits a party to filing only one affidavit in support of recusal per case. 28 U.S.C. § 144 ("A party may file only one such affidavit in any case."). In 2009, Defendants moved to recuse Judge Murguía, then presiding over this case, on the grounds that her relationship with her twin sister raised concerns about her impartiality or at least risked an appearance thereof. (Doc. 63.) Defendants' motion was accompanied by an affidavit pursuant to § 144 and the requisite certification of good faith by counsel. (*Id.* at 17, Ex. 1.) Judge Murguía granted Defendants' motion and withdrew from the case. (Doc. 138.) Having previously filed a Motion and affidavit under § 144, in accordance with the express provisions of the statute, Movants are not permitted to file another against this Court.[19] *See United States v. Merkt*, 794 F.2d 950, 961 (5th Cir. 1986) ("[Movant's] affidavit violates the one-affidavit rule of 28 U.S.C. § 144 and need not be considered."); *Balistrieri*, 779 F.2d at 1200 n.6 (same). The limit on successive affidavits is considered necessary to prevent litigants from disqualifying each judge designated to the case and thereby avoid any disposition of its merits. *S.E.C. v. Loving Spirit Found. Inc.*, 392 F.3d

---

[19] If a party discovers new grounds for recusal after submitting an affidavit under § 144, it may still obtain the judge's recusal through a § 455 motion, to which the one-affidavit rule does not apply. *Cf. Sibla*, 624 F.2d at 867–68 (suggesting that an affidavit is not required under § 455).

0304

486, 496 (D.C. Cir. 2004). Movants do not address the one-affidavit rule in their Motion or Reply nor have they credibly argued for its inapplicability even though it was raised to them by the Court on the filing of their Motion. (*See* Tr. of May 22, 2015 Status Conf. 7:13–8:9, Doc. 1130; Doc. 1158 at 12.)

The certifications of counsel submitted in support of Sheriff Arpaio and Chief Deputy Sheridan's Motion also fail to meet the statutory requirements of § 144, which oblige counsel to personally certify that the affidavit of alleged bias as well as the motion to which it is appended are filed in good faith. *See Loving Spirit*, 392 F.3d at 496. Like the ban on successive affidavits, the certification is not simply a pro forma procedural requirement "but is key to the integrity of the recusal process." *Klayman v. Judicial Watch, Inc.*, 744 F. Supp. 2d 264, 270 (D.D.C. 2010); *see also Loving Spirit*, 392 F.3d at 496 ("[T]he attorney's certificate plays a critical role in the recusal process. . . [by] guard[ing] against the removal of an unbiased judge through the filing of a false affidavit. . . " (internal citations omitted)). Although attorneys may have an obligation to consider the record in the light most favorable to their clients when certifying a motion for recusal, there is a difference between presenting the facts in a way that highlights the client's interests and misstating or mischaracterizing the facts in order to effect reassignment of a case. The Court need not determine whether counsel have acted improperly here, however, because the certificates filed by Movants' counsel are legally insufficient on their face. The four attorneys bringing this motion on behalf of Movants have signed an identical certificate stating only that "the associated affidavit from Joseph M. Arpaio for the recusal of Judge G. Murray Snow is made in good faith." (Doc. 1117, Exs. 11–13.) Counsel has not, however, personally certified that there is a good faith basis for the substantive factual allegations contained therein, nor that the Motion itself has been filed in good faith. Each certificate is therefore in disregard of the statutory mandate. The Court, therefore, denies Sheriff Arpaio and Chief Deputy Sheridan's alternative Motion to Recuse pursuant to § 144 as legally insufficient.

///

**CONCLUSION**

**IT IS THEREFORE ORDERED** that Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal/Disqualification (Doc. 1117) is **DENIED**.

**IT IS FURTHER ORDERED** that any stay on pre-hearing discovery and/or the activities of the Monitor related to the resumption of the show-cause hearings is lifted.

**IT IS FURTHER ORDERED** setting a status conference in these matters for **Monday, July 20, 2015,** at **11:00 a.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003. All parties and specially appearing non-parties are required to attend.[20] The parties shall be prepared to discuss: (1) Defendants' Motion relating to the definition of the Plaintiff Class (Doc. 1103); (2) Plaintiffs' Motion to Compel (Doc. 1085); (3) the status of MCSO's remaining internal investigations; (4) the Department of Justice's request to see the database of documents given by Montgomery to the MCSO, which he claims to have taken from the CIA; (5) the procedures pertaining to Maricopa County's independent review of the Monitor's billing; (6) whether Maricopa County is entitled to representation in this litigation separate from Sheriff Arpaio; and (7) the scheduling of the second phase of the civil contempt hearings.

Dated this 10th day of July, 2015.

_____
Honorable G. Murray Snow
United States District Judge

---

[20] Out-of-state counsel may appear telephonically for the status conference. Plaintiffs' counsel are directed to establish a call-in number and disseminate to the parties and non-parties.



*EXHIBIT 9*

1   John T. Masterson, Bar #007447
    Joseph J. Popolizio, Bar #017434
2   Diana J. Elston, Bar #025461
    Justin M. Ackerman, Bar #030726
3   JONES, SKELTON & HOCHULI, P.L.C.
    2901 North Central Avenue, Suite 800
4   Phoenix, Arizona  85012
    Telephone:  (602) 263-1700
5   Fax:  (602) 200-7846
    jmasterson@jshfirm.com
6   jpopolizio@jshfirm.com
    delston@jshfirm.com
7   jackerman@jshfirm.com

8   A. Melvin McDonald, Bar #002298
    JONES, SKELTON & HOCHULI, P.L.C.
9   2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
10  Telephone:  (602) 263-1700
    Fax:  (602) 200-7847
11  mmcdonald@jshfirm.com

12  and

13  Michele M. Iafrate, Bar #015115
    Iafrate & Associates
14  649 North Second Avenue
    Phoenix, Arizona 85003
15  Tel: 602-234-9775
    miafrate@iafratelaw.com

16

17  Attorneys for Defendant Joseph M. Arpaio in
    his official capacity as Sheriff of Maricopa
    County, AZ
18

19                 **UNITED STATES DISTRICT COURT**

20                      **DISTRICT OF ARIZONA**

| | |
|---|---|
| 21  Manuel de Jesus Ortega Melendres, et al., | NO. CV 07-02513-PHX-GMS |
| 22                                 Plaintiff, | **REPLY IN SUPPORT OF MOTION FOR RECUSAL OR DISQUALIFICATION OF JUDGE G. MURRAY SNOW** |
| 23         v. | |
| 24  Joseph M. Arpaio, et al., | |
| 25                                 Defendant. | |
| 26 | |

27

28

I.      **THE THREE CIVIL CONTEMPT ISSUES TO BE LITIGATED DURING THE APRIL 2015 OSC HEARING DID NOT INCLUDE THE GRISSOM/MONTGOMERY INVESTIGATIONS.**

Plaintiffs' Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court ("Response") incorrectly argues that the Grissom and Montgomery investigations are somehow related to the three clearly defined areas of the Order to Show Cause ("OSC") Order. [Doc. 880]. The record is uncontested that Judge Snow ordered only *three* issues to be determined during the April 2015 OSC hearing.   These were whether Sheriff Arpaio, Chief Deputy Gerard Sheridan, and other MCSO leadership acted in contempt of this Court's "lawful writs, processes, orders, rules, decrees, or commands" by: "(1) failing to implement and comply with the preliminary injunction; (2) violating their discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders." [Doc. 880 at 26].  Inquiry into whether Judge Snow's wife allegedly stated that Judge Snow hated Defendant Arpaio and would do everything in his power to remove him from office (Grissom Investigation) or that, among other things, whether federal agents had hacked into bank accounts of Arizonans without lawful authority (Montgomery Investigation), have nothing to do with any of the three clearly defined OSC hearing subjects.   Plaintiffs have not attempted to argue otherwise, and to do so would be disingenuous.

Rather, Plaintiffs argue that the Grissom/Montgomery investigations related to one or more of the three defined OSC subjects because they relate to the remedies the Court should impose from the OSC hearing.      [Response at 11:1-7].    The Grissom/Montgomery investigations have nothing to do with whether MCSO: (1) failed to implement and comply with the preliminary injunction; (2) violated their discovery obligations; or (3) acted in derogation of the May 14, 2014 Order, and thereby cannot relate to any remedy this Court should impose.  Moreover, Plaintiffs' attempt to argue that Defendants were somehow put on notice that the Court would suddenly inquire about the Grissom/Montgomery investigations based on the Court's admonition that it would

1    broadly review evidence in the OSC hearing stretches the bounds of reality.[1]   Finally,

2    while Plaintiffs are correct to note that a court may examine witnesses and comment on

3    evidence [Response at 7-8], such inquiry is improper when it involves matters entirely

4    ***unrelated*** to the current proceeding and ***directly*** implicates the court's reputation.   *United*

5    *States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994) (new trial necessary when judicial

6    remarks and questioning of witnesses projected the "appearance of advocacy or

7    partiality."); [Rotunda at ¶¶ 20-24, Ex. 10; Rotunda Supp. at ¶¶ 6-7, 11, 16, attached as

8    Ex. 1].   Simply put, the Grissom/Montgomery matters were not relevant to the OSC

9    hearing until the Court made them so through its own inquiry.[2]

10            Finally, Plaintiffs argue that the Court had an independent basis to inquire

11    about the Montgomery investigation because it had continued up to the date of the OSC

12    hearing.  This argument is belied by the record and Plaintiffs' own exhibits.  First, even

13    Plaintiffs acknowledge that both Arpaio and Sheridan testified that the Montgomery

14    investigation stopped long before the April 2015 OSC hearing after they deemed

15    Montgomery to not be credible.  [*See* Response at 12:3-6].  Moreover, Plaintiffs' own

16    exhibits demonstrate that while MCSO recently communicated with Montgomery, it never

17    directed an investigation of Judge Snow or relied upon Montgomery's purported

18    accusations about Judge Snow.  [Wang. Decl., Ex. C, D, E].

19    _____

20          [1] Plaintiffs' reference to the March 20, 2015 and April 21, 2015 hearing transcripts do not demonstrate in any way that the Court alerted Defendants that it would inquire into the Grissom/Montgomery investigations.  [*See* Response at 3:19-25; 11:1-7].

21          [2] Plaintiffs also argue that the Court was permitted to expand its civil (and potential

22    criminal) contempt inquiry into other areas *just prior* to the civil contempt proceeding on April 21, 2015.  [Response at 3:19-25].  However, this argument runs afoul of a civil contemnor's right to notice and an opportunity to be heard.  *Int'l Union, United Mine*

23    *Workers of America v. Bagwell*, 512 U.S. 821, 827, 833-34 (1994) (the law requires progressively greater protections for contempts of complex injunctions that necessitate

24    more elaborate and in-depth fact-finding); *Stuart v. United States*, 813 F.2d 243, 251 (9th Cir. 1987) *rev'd on other grounds* 489 U.S. 363 (1989) (notice includes prior

25    identification of areas of examination); *Taylor v. Hayes*, 418 U.S. 488, 498 (1974) (***in contempt proceedings, procedural protections such as prior notice are crucial*** "***in view***

26    ***of the heightened potential for abuse posed by the contempt power***.") (emphasis added). Defendants also argued that Judge Snow's surprise inquiry into matters unrelated to the

27    OSC hearing demonstrates the perception of bias ***because*** he willingly violated their Due Process rights, not that the violations themselves are grounds for recusal.  *See infra* § IV.

28

## II.   BOTH JUDGE SNOW AND HIS SPOUSE HAVE AN UNWAIVABLE, DISQUALIFYING INTEREST UNDER § 455(b)(5)(iii) & (iv).

Plaintiffs' Response avoids a simple and undeniable truth. By his own inquiry, statements, and questions in open court on the record, Judge Snow unexpectedly inquired about matters that directly injected into the proceeding the credibility and reputation of both himself and that of his family and made both himself and his spouse a material witness.[3] Even Plaintiffs' own expert recognized that Judge Snow must recuse himself if the allegations underlying the Grissom investigation were true. [Doc. 1150-2 at ¶ 14]. No reasonable person with knowledge of the facts can deny that Judge Snow is now investigating and presiding over issues involving his own family, which is expressly forbidden by 28 U.S.C. § 455(b)(5). *See United States v. Alabama*, 828 F.2d 1532, 1545 (11th Cir. 1987) (disqualification required when the judge was "forced to make factual findings about events in which he was an active participant.").

Plaintiffs' attempt to argue that the Court did not run afoul of 28 U.S.C. § 455(b) because Sheriff Arpaio and Chief Deputy Sheridan testified that the Montgomery investigation was not credible and that Timothy Casey found the Grissom investigation was not reliable.[4] [Response at 12-13]. Notwithstanding the fact that these determinations predated Judge Snow's conduct during the April 2015 OSC hearing, the *credibility* of these statements is not what is at issue under § 455(b) and Defendants' Motion. Defendants' Motion presented *uncontroverted* statements from credible witnesses that Judge Snow is biased against Defendant Arpaio. Irrespective of the validity of these opinions, the uncontradicted statements squarely make Judge Snow and his wife material witnesses in this action. Even if at some point there is a denial that Mrs. Snow

---

[3] Plaintiffs' assertion that Ms. Iafrate initiated this questioning is entirely incorrect. It was only after the Court began its inquiry into these matters that she elicited further testimony to clarify the Court's comments.

[4] Plaintiffs are incorrect regarding the Grissom Investigation. The investigation into the comments allegedly made by Judge Snow's spouse determined that the Grissoms were credible witnesses, but out of an abundance of caution and respect for the Court, Defendant Arpaio and MCSO did not further pursue the investigation at that time.

made the statements alleged by the Grissoms, the conflict that is created is unwaivable under § 455(b).  [Rotunda Supp. at ¶ 7].  Accordingly, because sufficient facts support Defendant Arpaio's allegation that Judge Snow and his wife are material witnesses in this proceeding, recusal is mandatory under § 455(b).  *See Preston*, 923 F.2d at 734 (9th Cir. 1991) (holding that recusal is appropriate under 455(b) even absent actual bias); *U.S. v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013) (holding that "partiality is conclusively presumed, making recusal mandatory" where the judge or his spouse are "likely to be a material witness in the proceeding" under 28 U.S.C. § 455(b)(5)(iv)).[5]

Finally, Plaintiffs incorrectly argue that Mrs. Snow's alleged statement to Mrs. Grissom is not admissible evidence and therefore cannot support a recusal motion. The standard for recusal under § 455 is not tethered to the Federal Rules of Evidence.[6] *See e.g., Matter of Searches Conducted on March 5, 1980,* 497 F.Supp. 1283 (E.D. Wis. 1980) ( all that is necessary for a recusal motion is some kind of probative evidence). While Defendants acknowledge that a recusal motion must, of course, rest on a factual basis, the test is whether "facts have been presented that, assuming their truth, would lead a reasonable person to reasonably infer that bias or prejudice existed, thereby foreclosing impartiality of judgment."  *U.S. v. Corr*, 434 F. Supp. 408 (S.D.N.Y. 1977).  Because Defendant Arpaio has presented uncontroverted evidence demonstrating that Judge Snow and his spouse are material witnesses in this case, recusal of Judge Snow is mandatory.[7]

_____

[5] It is axiomatic that just because the Court has an independent obligation under § 455 to recuse itself, and has not done so, does not mean that recusal is still not appropriate.  If Plaintiffs argument is taken to its logical conclusion, there would be no need for parties to ever file recusal motions under 28 U.S.C. §§ 144, 455.

[6] Regardless, Mrs. Snow's statements are admissible as a statement against interest under FRE 804(b)(3). *See also* FRE 605 ("The presiding judge may not testify as a witness."); *Cheeves v. Southern Clays Inc.* 797 F.Supp. 1570, 1582 (M.D. Ga. 1992) (federal judge is rendered incompetent as a witness concerning his or her own disqualification).  At the very least, the statements would be admissible during a future evidentiary hearing or lead to discoverable evidence.  [Rotunda Supp. at ¶¶ 6-8].

[7] Plaintiffs also incorrectly argue that the failure to object during Judge Snow's inquiry into these matters at the April 2015 OSC hearing is somehow a waiver of Defendants' right to bring a recusal motion under § 455.  Nothing under § 455 requires a timely objection during the hearing giving rise to the grounds for recusal.  [Rotunda Supp. at ¶ 10 ("Judges should not be able to pressure a waiver of disqualification by figuratively

1
2

### III.   JUDGE SNOW ALSO HAS AN UNWAIVABLE DISQUALIFYING INTEREST UNDER § 455(b)(1).

3

Relying primarily on *Liteky v. United States,* 510 U.S. 540 (1994), Plaintiffs

4

repeatedly argue that a motion to disqualify based on the Court's actions and statements is

5

insufficient to constitute a valid basis for bias or partiality.  Plaintiffs fail to acknowledge,

6

however, that *Liteky* recognized that judicial rulings and comments do provide a basis for

7

recusal under § 455 and a recusal motion is not ***required*** to be grounded in an

8

extrajudicial source.  *Liteky*, 510 U.S. at 551 (holding that an extrajudicial source is a

9

"***common*** basis [for disqualification] but not the ***exclusive*** one.") (emphasis added); *id.* at

10

541 (judicial rulings "***almost*** never constitute a valid basis for a bias or partiality

11

motion.") (emphasis added); *id.* at 555 ("[O]pinions formed by the judge on the basis of

12

facts introduced or events occurring in the course of the current proceedings, or of prior

13

proceedings" "constitute a basis for a bias or partiality motion" if "they display a deep-

14

seated favoritism or antagonism that would make fair judgment impossible.").  Moreover,

15

the *Liteky* Court explicitly referred to two different scenarios when remarks made during

16

judicial proceedings constitute disqualification: (1) when remarks reveal an extrajudicial

17

bias and (2) when the remarks reveal an excessive bias arising from information acquired

during judicial proceedings.  *Id.* at 555.

18
19

Judge Snow's actions in the April 2014 OSC hearing lend credence to the

20

reasonable perception of bias by placing his reputation and credibility directly at issue and

21

making both his wife and himself material witnesses to the proceeding.  *See United States

22

v. Microsoft Corp.,* 253 F.3d 34, 115 (D.C. Cir. 2001) (recognizing the difference between

23

statements made from the bench and those same comments made off the bench, while the

24

matter is pending); *United States v. Cooley,* 1 F.3d 985 (10th Cir. 1993) (reversing refusal

25

to disqualify where trial judge made comments outside the courtroom alleging that

26

defendants "are breaking the law.").  Moreover, a reasonable observer would believe that

27

cloaking the judge's iron fist in a velvet glove.")].  Moreover, as Plaintiffs' expert has

28

previously opined, the conflict created by Judge Snow's brother-in-law is unwaivable.
[Rotunda Supp. at ¶¶ 10, 12]; Advisory Opinion No. 58 (1978).

1   Judge Snow's questioning and investigation into unrelated issues as part of the OSC

2   hearing patently demonstrates a perception of "deep-seated favoritism or antagonism" or

3   "extra-judicial bias" that makes fair judgment impossible.  [Rotunda at ¶¶ 19-25; Rotunda

4   Supp. at ¶ 16].   Judge Snow's statements and conduct in this action therefore resemble

5   both of the scenarios contemplated by the *Liteky* court requiring recusal; or at the very

6   least rise to the level of an ***appearance*** of bias and partiality sufficient to justify his

7   recusal from this action under § 455(b)(1).  *See Hook v. McDade,* 89 F.3d 350, 355 (7th

8   Cir. 1996) ("In determining whether a judge must disqualify himself under 28 U.S.C. §

9   455(b)(1), "the question is whether a reasonable person would be convinced the judge was

10  biased.")*; United States v. Sibla,* 624 F.2d 864, 867 (9th Cir. 1980) (The same standard

11  will be applied to both § 455(a) and (b).).[8]

12          Finally, Plaintiffs fail to recognize that an underlying basis for Defendants'

13  Motion stems from extrajudicial sources – i.e., Mr. and Mrs. Grissom's statements and

14  Dennis Montgomery.[9]   Accordingly, Defendants' Motion is not merely based on the

15  Court's actions and statements during the proceedings, but largely premised on Judge

16  Snow injecting the Grissom/Montgomery investigations into the proceeding.  Because

17  these two investigations directly implicate the court's credibility and reputation and make

18  Judge Snow and his spouse material witnesses to the proceedings, they alone provide

19  sufficient grounds for recusal, and do not run afoul of the concerns expressed by the court

20  in *Liteky.*

21

22

23  _____

24      [8] Judge Snow's conduct also falls outside the seven traditionally identified judicial
    actions the Ninth Circuit has enumerated "which will not ordinarily require recusal under
25  § 455."   *United States v. Holland*, 519 F.3d 909, 914 n.5 (9th Cir. 2008).   Moreover,
    contrary to Plaintiffs' arguments, Defendant Arpaio has not argued in his Motion that
26  Judge Snow had expressed "impatien[ce], dissatisfaction, annoyance, and even anger"
    sufficient to justify his recusal.  *Liteky,* 510 U.S. at 555-56.

27      [9] *See United States v. Johnson,* 610 F.3d 1138, 1147 (9th Cir. 2010) (describing an
    extrajudicial source as "something other than rulings, opinions formed or statements made
28  by the judge during the course of trial.").

## IV.   RECUSAL IS REQUIRED UNDER § 455(a) BECAUSE A REASONABLE OBSERVER WITH FULL KNOWLEDGE OF THE RECORD WOULD CONCLUDE THERE IS AN APPEARANCE OF BIAS.

The relevant test for recusal under § 455(a) is whether "a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial." *Preston v. United States*, 923 F.2d 731, 734 (9th Cir. 1991). Other circuits have clarified that this independent outside observer is "less inclined to credit judges' impartiality and mental discipline than the judiciary…." *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990); *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998); *In re Faulkner*, 856 F.2d 716, 721 (5th Cir. 1998) ("[p]eople who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges."). The Ninth Circuit has also instructed that when a case is close, the balance should tip in favor of recusal. *United States v. Holland*, 519 F.3d 909, 911 (9th Cir. 2008) (quoting *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993). Finally, Judge Murguia previously held that "***[n]o Court should tolerate even the slightest chance that its continued participation in a high profile lawsuit could taint the public's perception of the fairness of the outcome***." [Doc. 138 at 27:10-11 (emphasis added)].

These principles support a finding that a reasonable observer would believe that the actions of Judge Snow in this case demonstrates the appearance of bias. It is uncontested that Defendant Arpaio and Chief Deputy Sheridan have already consented to a finding of civil contempt and would stipulate to the facts as stated in the Court's OSC Order. [Docs. 748, 880, 948]. Judge Snow prevented Arpaio from utilizing his own legal defense fund and ordered him to put "skin in the game" by pledging his own funds for settlement of the contempt allegations, despite the fact that the suit was brought against him in his official capacity only. Despite Defendant Arpaio's willingness to comply with this request, Judge Snow still ordered the contempt proceeding to continue. [Doc. 1007].

During the April 2015 OSC hearing, Judge Snow unexpectedly launched an inquiry into matters entirely unrelated to the OSC hearing that directly implicated the Court's reputation and that of his spouse making him a material witnesses to this action

and in violation of Defendant Arpaio's constitutional due process rights.   Moreover, during these proceedings Judge Snow became an advocate by giving his own testimony, asking leading questions, being argumentative with civil contemnors when they testified, and taking evidence from outside of court.  [Rotunda at ¶¶ 19-25; Rotunda Supp. at ¶ 16]. Judge Snow then subsequently directed his Monitor to investigate further into these irrelevant matters.    [Doc. 1117-1, Ex. 9., 5/14/15 Transcript at 49:15-21, 51].   Over Defendant's objections, Judge Snow ruled that his Monitor would not be "shackled" by Defendants' constitutional rights.  [*Id.* at 56].

Finally, the perception of bias is not limited to events preceding the Motion for Recusal.  Despite Judge Snow entering a stay and ordering that he "shall issue no further orders" in this matter until he issued a ruling on the Recusal Motion [Doc. 1120], he still issued orders regarding the very irrelevant investigations he injected into the proceedings, thus violating his own stay order.  [*See* Doc. 1133 and 1134].  It was not until Defendant Arpaio objected to the Court's violation of the stay [Doc. 1138] that Judge Snow enforced his stay order, holding that if the Court were to issue any further orders it would be to "preserve the status quo" of its previous injunctive orders.  [Doc. 1141].

Pursuant to § 455(a), a reasonably objective observer, considering all of Judge Snow's conduct referenced above, would believe that there is an appearance of bias necessitating his recusal. *See United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980) ("It is a general rule that the appearance of partiality is as dangerous as the fact of it."); *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 163, 166 (3d Cir. 1993) ("When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced.").    Contrary to Plaintiffs' characterizations, nothing in Defendants' Motion is based on "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, or similar non-factual matters."  *Clemens,* 428 F.3d at 1178; *see also Holland*, 519 F.3d at 911 (To the extent the facts are disputed, the balance tips in favor of recusal).   Moreover, under § 455(a), this Court has previously held that recusal was

necessary when the comments of Judge Murguia's *sister* and her *organization* were highly disparaging of Sheriff Arpaio. [Doc. 138 at 26-27]. Recusal in this instance is even stronger under § 455(a) because undisputed allegations demonstrate that Judge Snow *himself* has may have made highly disparaging comments regarding Defendant Arpaio.

### A.     Plaintiffs' unfounded assertion that Arpaio manufactured a basis for recusal is refuted by the uncontested record.

Plaintiffs assert that the Montgomery investigation was leaked to the press and led to the Court's inquiry of both the Grissom and Montgomery investigations. [Response at 14]. Moreover, Plaintiffs assert that MCSO's investigations targeted the Court. Both of these accusations are unfounded.

First, none of the communications cited in Plaintiffs' exhibits came from Defendant Arpaio or Chief Deputy Sheridan. Plaintiffs do not have any proof, outside of speculation, that either Defendants leaked the investigations to the press. Second, whether Judge Snow would actually pick up on a news article reported by the Phoenix New Times and then directly question Defendants on topics entirely irrelevant to the three clearly defined OSC hearing topics is pure conjecture. Rather the ***facts***, as Plaintiffs admit, are that two different sources voluntarily, and on their own accord, came to MCSO and provided information regarding Judge Snow. The record is devoid of any evidence that the Defendants in this action solicited these sources. Moreover, upon receiving the information voluntarily reported by these sources, Defendants and counsel had a duty to investigate further to determine the veracity of the allegations made by these informants. Out of respect for the Court, Defendant Arpaio did not proceed further, despite finding that the Grissoms were credible.

### B.     Plaintiffs' cited authority against recusal is inapposite.

Plaintiffs argue that recusal is not warranted under § 455(a) based on Ninth Circuit (and other) precedent where a judge is threatened by a litigant's suit or by a litigant's intemperate or scurrilous attacks. *See e.g., United States v. Studley*, 783 F.2d 934, 940 (9th Cir. 1986). As stated above, neither Sheriff Arpaio nor any other MCSO

1    defendant ever threatened the Court.  Again, it was ***Judge Snow's*** inquiry into these

2    irrelevant matters that made them relevant.  Had Judge Snow not injected the

3    Grissom/Montgomery investigations into the proceeding, they would never have been at

4    issue.  Plaintiffs' cited case authority is, therefore, inapposite.  [*See* Response at 14-15].

5    A reasonable observer in this case ***would*** conclude there is an appearance of bias.

## V.    <u>DEFENDANT ARPAIO'S RECUSAL MOTION WAS TIMELY.</u>

7    Plaintiffs argue that this Court should decline to rule on the Motion to

8    Disqualify/Recuse Judge Snow because it was not timely made.  Plaintiffs ignore,

9    however, that Judge Snow's injection of the Grissom/Montgomery investigations into the

10    OSC hearing and his subsequent orders directing the Monitor to explore these

11    investigations ***generated*** the grounds for this Motion.  Timeliness of a Motion to

12    Disqualify/Recuse must be based on the grounds for disqualification. *See U.S. ex rel.*

13    *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, No. CV06-1381PHX-NVW, 2008 WL 169636,

14    at *11 (D. Ariz. Jan. 16, 2008) (timeliness for each ground for recusal "must be analyzed

15    independently.").  Moreover, unlike § 144, a motion for recusal under § 455(a) does not

16    have a strict timeliness requirement.  *U.S. v. Kehlbeck*, 766 F.Supp. 707 (S.D. Ind. 1990);

17    *see also Conforte*, 624 F.2d at 880 ("we leave open here the question whether timeliness

18    may be disregarded in exceptional circumstances.").  Accordingly a recusal motion filed

19    eighteen months after the case was assigned to a judge was timely in *Preston v. U.S.*,

20    because the grounds for recusal were unknown until ten days before the motion was filed.

21    923 F.2d 731, 733 (9th Cir. 1991) ("recusal motions should be filed with reasonable

22    promptness after the ground for such a motion is ascertained.").

23    Despite Plaintiffs' mischaracterizations, Defendants' Motion clearly argued

24    that the perception of Judge Snow's bias and the appearance of impropriety was

25    demonstrated when he injected the Grissom and Montgomery investigations into the April

26    2015 civil contempt proceedings.  Defendant Arpaio never argued that the grounds for

27    recusal arose out of the Grissom/Montgomery investigations themselves, but that it was

28    this Court's improper inquiry into these matters during an OSC hearing with three clearly

defined topics, none of which included the Grissom/Montgomery investigations, which ***made these investigations relevant to the proceedings***.   [Rotunda Supp. at ¶ 13]. Defendants' Motion was filed on May 22, 2015.  Like in *Preston,* the Motion was timely filed because the grounds for recusal did not arise until, at the earliest, April 23, 2015. Moreover, Judge Snow's subsequent Orders, directing that his monitor be given unfettered access to investigate these irrelevant matters did not occur until May 14, 2015. The Motion was therefore filed roughly within ***one month*** after Judge Snow's injection of the Grissom/Montgomery investigation into the OSC proceeding, and within a ***week*** of his subsequent Order expanding his monitor's authority to investigate into these irrelevant subjects.  Therefore, the Motion is timely.[10]

## VI.    DEFENDANTS' MOTION IS NOT PRECLUDED.

Even presuming that a motion brought pursuant to 28 U.S.C. § 144 may be precluded, the Court must still consider the motion under 28 U.S.C. § 455.  *Adesanya v. W. Am. Bank*, 19 F.3d 25 (9th Cir. 1994).  Regardless of § 144, then, Defendants' Motion must be considered under § 455.

## VII.   CONCLUSION

Defendant Arpaio respectfully requests that: (1) Judge Snow recuse himself from these proceedings and (2) if Judge Snow declines to recuse himself, that this Motion be assigned to another United States District Court judge for immediate consideration.

---

[10] Regardless, the Court should decide the merits of this Motion.  In recusing herself under § 455(a), Judge Murguia previously recognized that "because the Court must abide by an unwavering commitment to the perception of fairness in the judicial process, it will not deny the petition on the basis of timeliness and will instead address the substantive questions raised by the request for recusal."  [Doc. 138 at 13:3-6].  This concern equally applies here. *See Bradley v. Milliken*, 426 F.Supp. 929 (E.D. Mich. 1977) (despite a motion for recusal being untimely, because plaintiffs' asserted grounds for recusal were true, the judge could not sit on the case regardless of any implied wavier or untimeliness of motion).

0318

1    DATED this 22nd day of June, 2015.

2                                          JONES, SKELTON & HOCHULI, P.L.C.

3

4                                          By s/ John T. Masterson
                                              John T. Masterson
5                                             Joseph J. Popolizio
                                              Diana J. Elston
6                                             Justin M. Ackerman
                                              2901 North Central Avenue, Suite 800
7                                             Phoenix, Arizona  85012
                                              Attorneys for Defendant Joseph M. Arpaio
8                                             in his official capacity as Sheriff of
                                              Maricopa County, AZ
9

10                                         JONES, SKELTON & HOCHULI, P.L.C.

11

12                                         By s/ A. Melvin McDonald
                                              A. Melvin McDonald
13                                            2901 North Central Avenue, Suite 800
                                              Phoenix, Arizona  85012
                                              Attorneys for Defendant
14

15                                         IAFRATE & ASSOCIATES

16

17                                         By s/ Michele M. Iafrate
                                              Michele M. Iafrate
18                                            649 North Secnod Avenue
                                              Phoenix, AZ 85003
19                                            Attorneys for Defendant

20                                         MITCHELL STEIN CAREY, PC

21

22                                         By s/ Lee Stein
                                              Barry Mitchell
23                                            Lee Stein
                                              One Renaissance Square
24                                            2 North Central Avenue, Suite 1900
                                              Phoenix, AZ 85004
25                                            Attorneys for Gerard Sheridan

26

27

28
     4317455.1
     6/22/15                                         12

                                                                                         0319

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 22 day of June, 2015, I caused the foregoing

3 document to be filed electronically with the Clerk of Court through the CM/ECF System

4 for filing; and served on counsel of record via the Court's CM/ECF system.

5

/s/ Sruti J. Patel
6 _____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

0321

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Civil Action No. 07-2513-PHX-GMS
Judge G. Murray Snow

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 07-2513-PHX-GMS |
| Joseph M. Arpaio, et al., Defendants. | ) ) ) ) | |
| | ) ) ) ) ) | The Hon. G. Murray Snow, *Judge Presiding.* |

**SUPPLEMENTAL DECLARATION OF RONALD D. ROTUNDA**

I, RONALD D. ROTUNDA, declare as follows:

## I.   INTRODUCTION

**1.** My name is Ronald D. Rotunda.  I am currently the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University School of Law in Orange, California, where I teach courses in Legal Ethics and Constitutional Law.

**2.** This Declaration supplements my earlier Declaration of on 6 May 2015.

## II.   OPINION AND ANALYSIS

**3.** For all the papers filed in this case and the related cases, one thing is very clear.  Several witnesses heard Judge Snow's wife say, in substance, that her husband (Judge Snow)

1     wanted to do whatever he could to make sure that Sheriff Arpaio is not reelected.  The

2     witnesses may not recall or agree on the exact language that Judge Snow's wife used, but

3     they do agree on the substance and import of the statement.

4     **4.** Judge Snow has never denied making such a statement under oath. In fact, he has never

5        denied it at all.

6     **5.** Judge Snow's wife has never denied making that statement or the substance of that

7        statement under oath. In fact, she has never denied making it at all.

8     **6.** Professor Gillers, in his Declaration of June 12, 2015 ("Gillers Declaration"), responds

9        that this evidence is "would not be admissible in evidence."  Gillers Declaration, ¶ 14.[1]

10       Assuming that this is true, it misses the point.  At Judge Snow's future disqualification

11       hearing, Judge Snow, unless he disqualifies himself, will, under oath, testify whether he

12       said, in substance, that he would do whatever he could to assure that Sheriff Arpaio is not

13       reelected.  Similarly, Judge Snow's wife will testify as to whether

14          **a.** she was lying when she told witnesses that her husband would do what he could

15             to make sure that Sheriff Arpaio is not reelected, or

16          **b.** whether the other witnesses were all lying when they state that they heard her

17             reassure others that her husband would do what he could to make sure that

18             Sheriff Arpaio is not reelected.

19     **7.** Judge Snow should not be presiding at that disqualification hearing because (1) his wife

20       will be a witness, and (2) he will be a witness.  That is why he must recuse himself from

---

[1]     Let us leave aside the fact that Professor Gillers is now apparently testifying as an expert on an issue of law, the admissibility of a statement on the law of evidence rather than on an issue dealing with judicial disqualification.

1    this case and why he certainly should recuse himself from the hearing on his

2    disqualification.

3    **8.** Professor Gillers also states, "Nor would Mrs. Snow's impressions [*i.e.*, her statement of

4    what she heard Mrs. Snow say] be admissible in evidence even if we assume that she said

5    what Mrs.Grissom said she said."  Gillers Dec. ¶14. This is mindboggling.

6    **a.** Assume, as part of a thought experiment, that the Judge's wife told others that

7    the Judge said, in substance, that her husband (Judge Snow) wanted to do

8    whatever he could to make sure that Mr. Melendres, the plaintiff, would lose his

9    job.  Would anyone be surprised if plaintiff moved to disqualify Judge Snow?

10    **b.** Assume another judge makes statements, off the bench, to a reporter indicating

11    that he is prejudiced against a party or a race.  Those statements (like the

12    statement that Mrs. Snow made in the restaurant) are not made in a courtroom

13    and not subject to cross examination (unless the court holds a hearing). Yet,

14    Florida removed that judge as chief judge for such statements made out of court,

15    even though they did not refer to any particular case but only about the "area

16    covered by his court."[2]

17    **9.** Professor Gillers defends Judge Snow for conducting his own investigation of an

18    incident.  As Professor Gillers says, "What appears to have happened is that someone told

19    Judge Snow that the Cold Case Posse had its own funding."  Gillers Dec. ¶ 15.  Professor

20    Gillers' response is that Judge Snow complied with the Canon 3(A)(4) of the Code of

21    Conduct for United States Judges.

---

[2]    See, Gillers, Regulation of Lawyers: Problems of Law and Ethics ("Statements off the Bench") 625 (8th ed. 20009).

1    **a.**   Unfortunately, Professor Gillers, in quoting that Canon, does not quote the most

2          important part.   Here is the relevant part, with the sentence *in italics,* that

3          Professor Gillers does not quote:

4          "*Except as set out below, a judge should not initiate, permit, or consider*
5          *ex parte communications or consider other communications concerning a*
6          *pending or impending matter that are made outside the presence of the*
7          *parties or their lawyers.* If a judge receives an unauthorized ex parte
8          communication bearing on the substance of a matter, the judge should
9          promptly notify the parties of the subject matter of the communication and
10         allow the parties an opportunity to respond, if requested."[3]

11   **b.**   Professor Gillers argues the Judge Snow complied with Canon 3(A)(4).  Judge

12         Snow did not follow Canon 3(A)(4), which instructs federal judges not to

13         "permit or consider ex parte communications," but Judge Snow did permit and

14         consider ex parte communications.

15   **c.**   When Judge Snow disclosed to the parties that he was collecting information ex

16         parte that did not cure his earlier violation of Canon 3(A)(4).   As Professor

---

[3]    http://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges#d
(emphasis added).  The complete Canon 3(A)(4) states:

"(4) A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:

(a) initiate, permit, or consider ex parte communications as authorized by law;

(b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

(c) obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received; or

(d) with the consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters."

1      Gillers acknowledges, "What appears to have happened is that someone told

2      Judge Snow that the Cold Case Posse had its own funding." Gillers Dec. ¶ 15.

3     **d.** The fact that Judge Snow does not tell us who told him about any alleged

4      funding, how he got the information is another reason why he should disqualify

5      himself. Judge Snow is gathering evidence someplace and that place is not in

6      open court, because no one knew (or, at least, the defendants did not know[4])

7      about this until Snow told us. What else did Judge Snow learn from this

8      mysterious source, how did Snow and the source meet, why did Judge Snow

9      permit this person to talk about this case at all?

10  **10.** Professor Gillers and the plaintiffs repeatedly claim that the defendants have "waived"

11     any argument regarding the judge's disqualification. Professor Gillers uses the word

12     "waived" or "waiver" a half-dozen time in his Declaration.

13     **a.** Oddly enough, neither the plaintiffs nor Professor Gillers (who is certainly

14      familiar with and cites the "Code of Conduct for United States Judges," Gillers

15      Dec. ¶ 15) ever cite the portion of Code of Conduct for United States Judges

16      dealing with waiver.

17     **b.** Canon 3(D) of the Code of Conduct for United States Judges provides the

18      procedure for waiver of *judicial disqualification:*

19       (D) *Remittal of Disqualification*. Instead of withdrawing from the
20       proceeding, a judge disqualified by Canon 3C(1) may, except in
21       the circumstances specifically set out in subsections (a) through
22       (e), disclose on the record the basis of disqualification. The judge
23       may participate in the proceeding if, after that disclosure, the
24       parties and their lawyers have an opportunity to confer outside the
25       presence of the judge, all agree in writing or on the record that the

---

[4]     Even if one of the plaintiffs or one of the plaintiffs' lawyers told Judge Snow, but that still is a violation of Canon 3A(4).

1            judge should not be disqualified, and the judge is then willing to
2            participate. The agreement should be incorporated in the record of
3            the proceeding.

4     **c.**   Judge Snow did not follow the procedure for waiver.  First, the judge must

5          disclose on the record the basis for disqualification (what he is asking the parties

6          to waive).  Second, "the *parties* and their lawyers have an opportunity to confer

7          outside the presence of the judge."  The lawyer's statement that the client waives

8          a conflict is not sufficient.  The lawyers must secure their clients' consent by

9          meeting with them outside the presence of the judge.  If both parties agree, and

10         that agreement is reduced to writing or the agreement is put on the record there is

11         a valid waiver. If one party does not agree, there is no valid waiver.  More

12         significantly, the judge will not know which party refused to waive.

13     **d.**  The purpose of this meticulous procedure is (1) to prevent the lawyers from

14         waiving without discussing the matters with their client, (2) to prevent the judge

15         from subtly pressuring the lawyers and parties and, (3) to prevent the judge from

16         ever learning which party did not waive.

17                "The purpose of imposing the writing requirement on both the
18                lawyers *and* the parties 'independently of the judge's participation'
19                is to prevent the judge from cajoling the parties and their lawyers
20                to waive important rights. It is also to make sure that lawyers
21                consult their clients outside of the judge's presence. Some lawyers
22                may be sycophants, falling over themselves in an effort to please
23                the judge, and thus too willing to waive their clients' rights. ***Judges***
24                ***should not be able to pressure a waiver of disqualification by***
25                ***figuratively cloaking the judge's iron fist in a velvet glove.*** The
26                writing procedure minimizes the chance that a party or lawyer will
27                feel coerced into an agreement."  Ronald D. Rotunda & John S.
28                Dzienkowski, Legal Ethics: The Lawyer's Deskbook on
29                Professional Responsibility § 10.2-2.11 (ABA-Westlaw/Reuters
30                2013-2014 ed.) (Italics in original)(Bold added).

1      **e.**   The fact that Judge Snow did not follow the procedures in Canon 3(D) of the

2         Code of Conduct for United States Judges is another reason why Judge Snow

3         should disqualify himself. He should not benefit from securing a waiver that he

4         obtained in violation of Canon 3(D) of the Code of Conduct for United States

5         Judges.

6   **11.** The defendants make much of the statement in *Liteky v. United States*, 510 U.S. 540

7         (1994), that judicial rulings "almost never constitute a valid basis for a bias or partiality

8         motion." Frankly, that misses the point. The offer of proof is that Judge Snow, out of

9         court, said (to his wife) that he would do whatever he could to make sure that Sheriff

10        Arpaio is not reelected. The references —

11             i.   to what Judge Snow has said in the course of these hearings,

12            ii.   to Judge Snow's rulings,

13           iii.   to Judge Snow's failure to follow Canon 3(D) of the Code of Conduct for

14               United States Judges, and

15           iv.   to Judge Snow's refusal to recuse himself, order a hearing, or allow

16               another judge to rule on the disqualification

17         These references are completely consistent with what a judge would do if, in

18         fact, he wanted to do whatever he could to prevent Sheriff Arpaio from being

19         reelected.

20   **12.** Professor Gillers points out that "Judge Snow's brother-in-law, Keith Teel, is a *partner* in

21         Covington & Burling." (Emphasis added.) Gillers Dec. ¶ 4.7.

22      **a.**   Professor Gillers book, "Regulation of Lawyers," has a brief section titled, in

23         bold, "Lawyer Relatives," in his chapter on Judges. There he states:

1                      "Advisory Opinion No. 58 (1978), issued by a committee of the
2                      U.S. Judicial Conference, concerns judicial disqualification in a
3                      case in which a relative is employed by a participating law firm.  It
4                      provides in part:

5                              "We believe the following conclusions find support in the
6                              Code [of Judicial Conduct].  A judge is disqualified and
7                              should recuse if a relative within the third degree of
8                              relationship to the judge or his spouse (a) is a partner in a
9                              law firm appearing in the case; or (b) will profit or lose
10                           from the judge's action in the case either financially or
11                           otherwise, for example, the reputation of the firm would be
12                           significantly affected by the litigation."

13   **b.**    The motion of defendant to disqualify Judge Snow does not focus on the fact the

14         brother-in-law of Judge Snow is a partner in Covington & Burling,  the law firm

15         representing the plaintiffs.  Professor Gillers, however, does appear to emphasize

16         this fact.  In fact, Professor Gillers mentions Covington seven (7) times in his

17         affidavit.

18   **c.**    Consequently, it is surprising the Professor Gillers' Declaration does not cite

19         Advisory Opinion No. 58 (1978), issued by a committee of the U.S. Judicial

20         Conference, because that Opinion directly applies to this case.  Professor Gillers

21         argues that any objection was waived.  Let us leave aside the question whether

22         Judge Snow followed the strict waiver requirements of Canon 3(D).  The fact

23         remains that Advisory Opinion No. 58 provides that Judge Snow must disqualify

24         himself and that there is no provision for waiver.  Let us turn to Opinion No. 58,

25         as it now exists. We can find it at, The Federal Guide to Judiciary Policy, Vol. 2:

26         Ethics and Judicial Conduct Pt. B: Ethics Advisory Opinions,

27         http://www.uscourts.gov/file/document/published-advisory-opinions

1    **d.**  The Committee advises that under Canon 3(C)(1)(d)(ii), the judge must

2         disqualify if the brother-in-law is "acting as a lawyer in the proceeding," Or if,

3         under Canon 3(C)(1)(d)(iii), the brother-in-law is "known by the judge to have

4         an interest that could be substantially affected by the outcome of the

5         proceeding."

6    **e.**  The Committee then states quite clearly:

7         > The Committee concludes that an equity partner in a law
8         > firm generally has 'an interest that could be substantially
9         > affected by the outcome of the proceeding' in all cases
10        > where the law firm represents a party before the court.

11   **f.**  Covington & Burling is the law firm, and this "law firm represents a party before

12        the court."

13   **g.**  The Committee then concludes — and its language merits quotation at length —

14        > As a cautionary note, the Committee further observes that
15        > *the remittal procedures of Canon 3D are not available if*
16        > *the judge's relative* is acting as a lawyer in the case *or is a*
17        > *partner in the law firm representing a party before the*
18        > *court. Recusal is required.* As discussed, recusal is not
19        > mandated if the firm representing a party before the court
20        > employs a judge's relative as an associate or non-equity
21        > partner and the relative has no involvement in the case. If
22        > nonetheless a judge is concerned that his or her impartiality
23        > might reasonably be questioned, the judge may invoke the
24        > remittal procedures of Canon 3D.

25        > The Committee notes that recusal decisions are also
26        > governed by the recusal statutes, 28 U.S.C. §§ 455 and 144,
27        > and the case law interpreting them. Although the
28        > Committee is not authorized to render advisory opinions
29        > interpreting §§ 455 and 144, *Canon 3C of the Code closely*
30        > *tracks the language of § 455, and the Committee is*
31        > *authorized to provide advice regarding the application of*
32        > *the Code.*" (Emphasis added.)

1        **h.** I do not understand how anyone could read Advisory Opinion No. 58 and

2                 conclude that Judge Snow followed that Opinion.

3  **13.** Professor Gillers and the Plaintiffs argue that the Defendant "waives" its right to file a

4     disqualification motion because the Defendant waited too long.

5        **a.** First, a waiver is a voluntary relinquishment of a known right. The Defendant

6                 does not waive a right simply because his lawyer and the judge did not follow

7                 the recusal requirements of Canon 3(D), or because the Judge asked for a waiver

8                 when the law does not allow a waiver, see, e.g., Advisory Opinion No. 58, supra.

9        **b.** Second, when the Defendant's lawyers learned of the startling statement of Judge

10                Snow's wife, they investigated. That is what they are supposed to do.

11        **c.** These investigations took place two to three years ago, and the Defendant's

12                lawyers did not think them relevant to this proceeding.  It was not until Judge

13                Snow injected the Grissom/Montgomery investigations into the April 2015 Order

14                to Show Cause Hearing that the grounds for disqualification became ripe.  The

15                Order to Show Cause Hearing had three clearly defined topics – none of which

16                included these investigations.  Judge Snow's actions at that point made the

17                grounds for recusal ripe.   One should not criticize lawyers for being careful and

18                not jumping the gun.

19        **d.** As the Ninth Circuit has explained, a recusal motion filed 18 months after case

20                was filed was timely, because the lawyers could not know the grounds for

21                recusal until ten days before motion was filed. *Preston v. United States*, 923 F.2d

22                731 (9th Cir. 1991)

14. In the judge's order of April 27, he states that he ordered the "MCSO defendants to *immediately disclose* certain materials discussed in the Court's colloquy Sheriff Arpaio." [Emphasis added.] The judge states, "Attorney review for privilege was conducted contemporaneously with this production . . . ." I have been advised that this is not true.

### III.   CONCLUSION

15. We know that several people report that the judge's wife said that her husband, Judge Snow, "Judge Snow wanted to do everything to make sure [that Sheriff Arpaio is] not elected." It should be quite obvious that whatever the duties of a federal judge are, that job description does not include conducting a judicial proceeding in a way to insure that Sheriff Arpaio is not elected and to pursue an investigation that is even broader than that for what appears to be personal reasons.

16. Moreover, we also know that in the several days of hearing, the judge —

    **a.** asked leading questions,
    **b.** gave his own version of the facts,
    **c.** conducted his own investigation outside the courtroom,
    **d.** argued with witnesses, and
    **e.** was extremely interested in what evidence existed concerning the statement he made to his wife that he would do all that he could to make sure that Sheriff Arpaio is not elected.

17. I declare under penalty of perjury that the foregoing is true and correct and that I signed this declaration on 19 June 2015, in Orange, California.

RONALD D. ROTUNDA



**EXHIBIT 10**

Cecilia D. Wang (*Pro Hac Vice*)
cwang@aclu.org
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950

Daniel J. Pochoda
dpochoda@acluaz.org
Joshua Bendor
jbendor@acluaz.org
ACLU Foundation of Arizona
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

*Attorneys for Plaintiffs (Additional attorneys
for Plaintiffs listed on next page)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>Joseph M. Arpaio, *et al.*,<br><br>          Defendants. | CV-07-2513-PHX-GMS<br><br>**RESPONSE IN OPPOSITION TO SHERIFF ARPAIO AND CHIEF DEPUTY SHERIDAN'S MOTION FOR RECUSAL OR DISQUALIFICATION OF THE COURT** |

0333

Additional Attorneys for Plaintiffs:

Andre I. Segura (*Pro Hac Vice*)
asegura@aclu.org
ACLU Foundation
Immigrants' Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Telephone: (212) 549-2676
Facsimile: (212) 549-2654

Priscilla G. Dodson (*Pro Hac Vice*)
pdodson@cov.com
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001
Telephone: (202) 662-5996
Facsimile: (202) 778-5996

Anne Lai (*Pro Hac Vice*)
alai@law.uci.edu
401 E. Peltason, Suite 3500
Irvine, CA 92697
Telephone: (949) 824-9894
Facsimile: (949) 824-0066

Jorge M. Castillo (*Pro Hac Vice*)
jcastillo@maldef.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266

Stanley Young (*Pro Hac Vice*)
syoung@cov.com
Hyun S. Byun (*Pro Hac Vice*)
hbyun@cov.com
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Tammy Albarran (*Pro Hac Vice*)
talbarran@cov.com
Lauren E. Pedley (*Pro Hac Vice*)
lpedley@cov.com
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-7066
Facsimile: (415) 955-6566

**INTRODUCTION**

Plaintiffs respectfully submit this Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court. The motion fails to meet the standards for recusal in 28 U.S.C. §§ 144 and 455, and runs afoul of the long-settled principle that rulings and judicial remarks made during the course of litigation are almost never a basis for recusal. *Liteky v. United States*, 510 U.S. 540, 550-51 (1994). The motion also fails to demonstrate actual bias or an appearance of bias. The Court's actions—questioning the movants about MSCO investigations—were proper and relevant to the ongoing contempt hearing and the question of remedies to ensure compliance with prior orders. The motion is also untimely and appears to be filed for purposes of manipulation and delay. In the words of ethics expert Professor Stephen Gillers, each of the asserted grounds for recusal "is baseless. Some are frivolous." Gillers Decl. ¶ 5. The motion should be denied.

**FACTUAL BACKGROUND**

The procedural history of this case is centrally relevant under the recusal standard, since the Court's actions and statements must be viewed in light of the evidence it has seen. *Liteky*, 510 U.S. at 550-51.

**Evidence of Sheriff Arpaio and Chief Deputy Sheridan's Defiance of the Court**

During the 18 months between the issuance of the Supplemental Permanent Injunction [Doc. 606] and the beginning of the contempt hearing on April 21, 2015, the Court saw evidence that top commanders of the MCSO, including Sheriff Arpaio and Chief Deputy Sheridan, had repeatedly violated court orders, made statements that mischaracterized and disparaged the Court's orders to MSCO personnel, and expressed defiance towards the Court's orders. Those statements are set forth in Plaintiffs' Memorandum of Law and Facts re Contempt Proceedings and Request for Order to Show Cause at 12-16 [Doc. 843], incorporated by reference here. *See also* Tr. of Status Conference (Oct. 28, 2014) at 68:25-72:20. Among other things, in August 2013, Sheriff

1   Arpaio stated in a letter to supporters that he "won't stand for" a Court-appointed

2   monitor.  [Doc. 843 at 15].  And during the contempt hearing, Plaintiffs introduced a

3   video recording of a press interview in October 2013, after issuance of the Supplemental

4   Permanent Injunction, in which the Sheriff proclaimed, "I'm an elected constitutional

5   sheriff, and no one is going to take away my authority that I have under the Constitution."

6   Ex. 193C; Tr. of Apr. 23, 2015 at 581:25-582:17.  And in October 2014, Sheriff Arpaio

7   made another defiant statement, telling a reporter that he would conduct the Guadalupe

8   operation—one of the saturation patrols the Court held to have violated Plaintiffs'

9   constitutional rights—"all over again."  Tr. of Oct. 28, 2014 at 61:9-77:5; Tr. of Apr. 23,

10   2015 at 583:20-584:6.

11   **Grounds for Civil Contempt**

12         In addition, over a period of months starting in May 2014, the three charged

13   grounds for contempt came to light.  In April-May 2014, a former MCSO deputy,

14   Charley Armendariz, who had been a key witness at trial, was arrested and subsequently

15   committed suicide.  MCSO searched Armendariz's home pursuant to a criminal warrant.

16   The search ultimately revealed, among other things, that there was a widespread practice

17   among MCSO personnel of recording traffic stops, that MCSO had no policy governing

18   the recording of traffic stops, and that such recordings should have been disclosed to

19   Plaintiffs before trial, but were not.  Tr. of of Dec. 4, 2014 at 22:15-22:25.  The failure to

20   disclose the recordings before trial is one of three charged grounds for civil contempt.

21   [Doc. 880 at 8, 18-21].

22         The second ground for contempt arose on May 14, 2014.  During a status

23   conference on that date, the Court ordered Sheriff Arpaio and Chief Deputy Sheridan to

24   cooperate with the Monitor in formulating a plan to "quietly" collect the recordings of

25   traffic stops throughout MCSO.  [Doc. 880 at 22]; Tr. of May 14, 2014 Status Conference

26   at 61 [Doc. 700].  The movants violated that court order that same day, by putting into

27   action a plan without the Monitor's approval, and then agreeing to a different plan in

28

2

1   consultation with the monitor, while failing to disclose that the initial, unapproved plan

2   had already been implemented.  [Doc. 880 at 23].

3        The third ground for contempt came to light during the November 20, 2014 status

4   conference when Defendants' counsel disclosed that one of the traffic stop recordings

5   recovered by the MCSO during the Armendariz investigations demonstrated that deputies

6   had violated the Court's preliminary injunction order.  Counsel also revealed that the

7   Court's preliminary injunction order had never been communicated to MCSO deputies.

8   Tr. of Nov. 20, 2014 at 67:10-67:24 [Doc. 804].

9   **Relevance of MCSO's Internal Investigations**

10        During the same period leading to the contempt hearing, the adequacy of

11   MCSO's internal investigation processes became a central issue.  Immediately upon

12   learning of the Armendariz investigations in May 2014, Plaintiffs raised concerns about

13   MCSO's internal investigation process.  Tr. of May 14, 2014 at 102:6-18.  In September

14   2014, the Monitor reported serious deficiencies with MCSO's Armendariz-related

15   internal investigations.  [Doc. 795-1].  Plaintiffs also raised numerous issues with

16   MCSO's internal investigations and gave notice of their intent to seek remedies to protect

17   the interests of the Plaintiff class.  *See* Plaintiffs' Response to the Monitor's Report at 7-

18   10 (Oct. 21, 2014) [Doc. 753]; Tr. of Dec. 4, 2014 at 23:1-24:21 [Doc. 812].

19        Prior to the beginning of the contempt hearing on April 21, 2015, the Court

20   indicated that it would not limit the scope of the evidence to liability for civil contempt,

21   but would take evidence on the remedies needed to ensure compliance with the Court's

22   prior orders, with a particular focus on the adequacy of MCSO's internal investigations.

23   *See*, *e.g.*, Tr. of Mar. 20, 2015 at 11:6-12, 12:21-25, 13:1-21; Tr. of Apr. 21, 2015 at

24   15:19-22; [Doc. 1007]; [Doc. 880 at 25].

25   **Questioning About Defendants' Investigations of the Court**

26        During the contempt hearing, as during the bench trial, the Court questioned

27   witnesses after the parties' counsel, and gave counsel an opportunity to object to

28

3

1    questions and to re-examine the witnesses after its examination.  On April 23, 2015, the

2    Court questioned Sheriff Arpaio, beginning with the grounds for civil contempt.  The

3    Court also questioned the Sheriff about the re-assignment of Captain Steven Bailey from

4    the command of the Special Investigations Division, with oversight of its subunit the

5    Human Smuggling Unit (which had been primarily responsible for the constitutional

6    violations found after trial), to the command of the Internal Affairs unit.  Tr. of Apr. 23,

7    2015 at 637:2-642:22.  Bailey's reassignment occurred during a time when the Human

8    Smuggling Unit was under investigation by the Internal Affairs department because of

9    misconduct uncovered after Deputy Armendariz's arrest and death, and the apparent

10   conflict was an issue in the litigation leading up to the contempt hearing.

11        The Court then questioned Sheriff Arpaio about an article that had appeared in the

12   *Phoenix New Times* newspaper on June 4, 2014, reporting that two MCSO detectives,

13   Brian Mackiewicz and Travis Anglin, a member of the MCSO's civilian "Cold Case

14   Posse," Mike Zullo, and a paid confidential informant named Dennis Montgomery, were

15   engaged in an investigation of a "bizarre conspiracy theory" that the Court and the U.S.

16   Department of Justice were conspiring to "get" Sheriff Arpaio.  Wang Decl., Ex. A.  The

17   Court questioned the Sheriff about the source of funding for the investigation and

18   whether Captain Bailey was involved in that process.  Tr. of Apr. 23, 2014 at 658:4-

19   659:1.

20        During the Court's questioning of Sheriff Arpaio about the MCSO-Montgomery

21   investigation reported in the *Phoenix New Times* article, the Sheriff testified that there

22   was a second investigation involving the Court.  The Sheriff testified that an outside

23   investigator hired by Defendants' then-counsel had investigated an allegation that the

24   Court's spouse had stated to a woman named Grissom that "Judge Snow wanted to do

25   everything to make sure I'm not elected."  Tr. of Apr. 23, 2015 at 654:6-655:12.

26        The next day, on April 24, 2015, Defendants' counsel examined Chief Deputy

27   Sheridan about the investigations implicating the Court and the Court's spouse.  After

28

4

asking defense counsel if she had any objection and emphasizing that she should interrupt with any objection, Tr. of Apr. 24, 2015 at 966:4-11, the Court joined in questioning of Chief Deputy Sheridan on the subject of Karen Grissom's allegations about the Court's spouse.  In response to the Court's questions, Sheridan testified that Defendants' counsel had hired a private investigator who had interviewed Karen Grissom and her family, and that MCSO did not do anything to follow up on the investigation.  *Id.* at 968:5-9.  The Court then proceeded to question Chief Deputy Sheridan about the grounds for contempt, MCSO's internal affairs operations, and other matters, and finally asked Chief Deputy Sheridan about the MCSO-Montgomery investigation.

Chief Deputy Sheridan testified and stated publicly that MCSO ultimately decided not to pursue the investigation of the Grissom allegations relating to the Court's spouse. Tr. of Apr. 24, 2015 at 968:5-9; Tr. of May 14, 2015 at 10:1-24.  Both Arpaio and Sheridan testified that they concluded that confidential informant Dennis Montgomery was not credible.  Tr. of Apr. 23, 2015 at 650:18-25, Tr. of Apr. 24, 2015 at 961:1-11, 1002:14-15.  Arpaio, however, testified that he did not know whether the Montgomery investigation was still ongoing.  Tr. of Apr. 23, 2015 at 652:5-6.  Documents later produced by the Defendants indicate that the MCSO-Montgomery investigation continued at least up until the eve of the contempt hearing.  Wang Decl., Ex. E.

The Court directed the Sheriff to preserve all documents relating to both of these investigations.  Tr. of Apr. 23, 2015 at 653:9-654:2, 655:13-17, 656:3-6, 656:25-657:2. The Court later directed that copies of the documents be produced and instructed defense counsel to review the material for attorney-client privilege, work product, and confidential information.   Tr. of May 8, 2015 at 30:1-4.  The Court also sua sponte raised a potential security issue about documents that Dennis Montgomery purportedly had obtained from the U.S. Central Intelligence Agency, and proposed that the Monitor and Defendants review such documents prior to disclosure to the Plaintiffs, and that defense counsel communicate with the CIA.  Both Plaintiffs' and Defendants' counsel agreed to

5

1   that proposal.  Tr. of May 8, 2015 at 30:25-31:15.  Contrary to Defendants' assertions,

2   the Court did not order the production of documents that may be protected by the

3   attorney-client privilege or work product doctrine.

4       At the close of the four days of evidence, the Plaintiffs had not completed their

5   case-in-chief.  Prior to the evidentiary hearing, on April 7, 2015, the Court had

6   anticipated that four days of testimony might be insufficient and tentatively set additional

7   dates for a continuation of the evidentiary hearing, on June 16-19 and 23-26, 2015.  Tr. of

8   Apr. 7, 2015 at 32:13-23.

9                               **ARGUMENT**

10  **I.      The Court's Actions During the Contempt Hearing Do Not Show Actual**

11          **Bias and Are Not a Ground for Recusal**

12      In moving to disqualify the Court based upon actual bias under 28 U.S.C.

13  § 455(b)(1), Sheriff Arpaio and Chief Deputy Sheridan point to the Court's actions and

14  statements during the contempt proceeding.[1]  The motion therefore fails because "rulings

15  and conduct" during litigation "almost never constitute a valid basis for a bias or

16  partiality motion."  *Liteky*, 510 U.S. at 555; *see also In re Marshall*, 721 F.3d 1032, 1041

17  (9th Cir. 2013); *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012).  Judicial

18  actions or remarks in the litigation will be a ground for recusal only if "they reveal such a

19  high degree of favoritism or antagonism as to make fair judgment impossible."  *Liteky*,

20

21

22  _____

23  [1] Although they do not assert it as a basis for recusal, the movants insinuate that the
    timing of the Court's trial ruling was "curious and problematic" because it issued nine
24  months after the bench trial and purportedly one week before a recall petition against
    the Sheriff was due.  Defendants' imputation of bad intent due to the time it took the
25  Court to issue its 142-page trial ruling is unwarranted.  The movants also fail to
    mention that the Sheriff faced a regular election six months earlier, in November 2012
26  (*see* http://recorder.maricopa.gov/electionarchives/2012/11-06-
    2012%20Final%20Summary%20Report.pdf)—a more opportune time for a court, if it
27  had been biased, to time a ruling for improper purposes.

28

                                   6

1   510 U.S. at 555; *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000).  The

2   motion entirely fails to meet this standard.

3        As evidence of actual bias, the motion cites only "rulings and conduct" during the

4   contempt hearing—that the Court asked leading questions on "irrelevant matters; offered

5   "his own testimony"; was "argumentative" with Chief Deputy Sheridan on the stand;

6   interrupted Chief Deputy Sheridan and "challenged" his decision to use Dennis

7   Montgomery as a confidential informant; ordered the production of documents relating to

8   non-party Dennis Montgomery and his attorney Larry Klayman "that may be protected

9   by the work product doctrine or attorney client privilege"; inquired into matters

10  "unrelated to the contempt proceeding" and thereby purportedly deprived Sheriff Arpaio

11  of his due process rights; and "improperly expanded" the Monitor's authority into

12  purportedly irrelevant matters. These are matters that should be raised, if at all, through

13  appeal, not through a recusal motion.  *Liteky*, 510 U.S. at 555.

14       The motion also mischaracterizes the record.  The Court questioned Sheridan

15  about how the MCSO-Montgomery investigation was conducted in order to elicit the

16  evidence.  Tr. of Apr. 24, 2015 at 1000:19-1008:13.  Nothing in the course of that

17  examination can fairly be construed as "argumentative," as the movants claim.  But even

18  if it were true that the Court expressed hostility toward Sheridan, that would not be a

19  ground for recusal.  *See* Gillers Decl. ¶ 7.

20           The judge who presides at a trial may, upon completion of the evidence, be
             exceedingly ill disposed toward the defendant, who has been shown to be a
21           thoroughly reprehensible person.  But the judge is not therefore recusable for bias
             or prejudice, since his knowledge and the opinion it produced were properly and
22           necessarily acquired in the course of the proceedings, and are indeed sometimes
             (as in a bench trial) necessary to completion of the judge's task.
23
    *Liteky*, 510 U.S. at 550-51.  Thus, a judge's "expressions of impatience, dissatisfaction,
24
    annoyance, and even anger" during litigation are not a ground for recusal.  *Id.* at 555-56.
25
         Moreover, none of the challenged actions by the Court was erroneous, much less
26
    a ground for recusal.  It is entirely proper for a court to examine witnesses and to
27
    comment on the evidence (which Sheriff Arpaio and Chief Deputy Sheridan attempt to
28

                                               7

1    mischaracterize as "testifying," *see* Gillers Decl. ¶ 8).  Fed. R. Evid. § 614(b).  A court

2    "should not hesitate to ask questions for the purpose of developing the facts; and it is no

3    ground of complaint that the facts so developed may hurt or help one side or the other."

4    *Barba-Reyes v. United States*, 387 F.2d 91, 93 (9th Cir. 1967); *see also United States v.*

5    *Larson*, 507 F.2d 385, 389 (9th Cir. 1994); *United States v. Robinson*, 449 F.2d 925, 933

6    (9th Cir. 1971); *Hanson v. Waller*, 888 F.2d 806, 810, 813 (11th Cir. 1989) (judges may

7    ask leading questions even in jury trial); *Ruiz v. Estelle*, 679 F.2d 1115, 1130 (5th Cir.

8    1982), *amended in part and vacated in part on other grounds*, 688 F.2d 266 (5th Cir.

9    1982).

10          The Court's questions do not indicate any bias.  Gillers Decl. ¶¶ 16-20.  They

11   were a proper exercise of the Court's inherent power to protect the integrity of the

12   judicial process and ensure compliance with its prior orders, as they were relevant to

13   Sheriff Arpaio's attitude toward the Court and compliance with the Court's orders and to

14   the subject of MCSO's internal investigations.  The *Phoenix New Times* article that the

15   Court introduced as an exhibit indicated that the MCSO-Montgomery investigation was

16   aimed at developing a conspiracy theory to discredit the Court during that same time

17   period (October 2013 through April 2015) in which the movants had expressed defiance

18   of the Court's Supplemental Permanent Injunction, in which there were numerous

19   instances of noncompliance with the Court's orders, and leading up to the April

20   evidentiary hearing on contempt charges and remedies.  Documents later produced by the

21   Defendants support the newspaper account that—contrary to the testimony of Arpaio and

22   Sheridan—the MCSO-Montgomery investigation targeted the Court.  Wang Decl., Ex. B,

23   F.  The documents also reveal that MCSO personnel continued to press Dennis

24   Montgomery for results up until the eve of the contempt hearing, even though they had

25   already concluded that he was not credible.  Wang Decl., Ex. C, D, E.  The evidence thus

26

27

28

1   suggested that the MCSO-Montgomery investigation might be an attempt to undermine

2   the Court's authority rather than comply with its lawful orders.[2]  This was particularly

3   problematic in light of the Monitor's recent finding that MCSO was only 29 percent in

4   compliance with the Supplemental Injunction despite the passage of one-and-a-half years.

5       The movants' allegation that the Court "requested that the U.S. Attorney function

6   as his investigator to determine whether criminal contempt of his Preliminary Injunction

7   had occurred" (Mot. at 7) is false.  The Court invited the U.S. Attorney's Office to attend

8   status conferences in this case so that the government would be apprised of the facts and

9   would be in a position to make an independent determination whether to proceed with a

10  criminal contempt prosecution, if the Court were to make a referral in the future.  Tr. of

11  Dec. 4, 2014 at 29:5-9, 29:24-30:3.  Defendants did not object to the presence of a federal

12  prosecutor or even to the Court's suggestion that relevant documents be provided to the

13  U.S. Attorney's Office.  *Id.* at 30:4-14.  Moreover, Defendants themselves subsequently

14  sought the participation of the United States Attorney's Office in their efforts to settle the

15  contempt issues.  Tr. of Feb. 26, 2015 at 32:23-34:1, 34:2-6, 34:8-17.  Contrary to the

16  movants' assertion, the U.S. Attorney's Office never declined any referral, as none has

17  yet been made.  Tr. of Mar. 20, 2015 at 28:2-6.

---

[2] Even more troubling, as the Court noted in a post-hearing status conference, the evidence indicates that Dennis Montgomery informed MCSO personnel—with Chief Deputy Sheridan's knowledge—that he was using a database of information "harvested by the CIA and confiscated by him" in his investigation, and also purported to be tracking telephone calls between the Court, the Attorney General, the Assistant Attorney General, and the U.S. Attorney for the District of Arizona.  Tr. of May 14, 2015 at 44:22-45:2, 45:10-16; Wang Decl., Ex. C, F.  This implicates possible violations of federal criminal laws by MCSO personnel in the course of the MCSO-Montgomery investigation.  See, e.g., 18 U.S.C. §§ 793(b)-(f) (taking or communication of documents relating to national defense); 798 (disclosure of classified information); 1503 (intimidation of federal court and obstruction of justice); 1509 (obstruction of court orders); 1924 (unauthorized removal of classified information); 2511 (intercepting electronic communications); 2701 (unlawful access to stored communications).

9

1    Further, the Court properly authorized the Monitor to investigate MCSO's

2  "investigative operations."  Overruling the Defendants' objections, the Court stated that it

3  would not require the Monitor to give Defendants advance notice of topics of interviews,

4  but that Defendants could contemporaneously raise any objections during any interviews

5  and that the Court would make itself available to hear such objections.  The Court further

6  stated that the Monitor's investigations would be limited to the enforcement of the

7  Court's prior orders.  Tr. of May 14, 2015 at 53:12-56:25.  There was nothing improper

8  in these orders since they were directly relevant to enforcing compliance with the Court's

9  prior orders.

10    Sheriff Arpaio and Chief Deputy Sheridan also mischaracterize the record when

11  they allege that the Court ordered the disclosure of confidential materials that "may be"

12  subject to the attorney-client privilege or work product immunity.[3]  In fact, the Court

13  gave the Defendants an opportunity to review documents for privilege and to produce a

14  log prior to producing documents relating to the MCSO-Montgomery investigation, and

15  the Court also proposed procedures to ensure that any confidential or sensitive documents

16  would be protected from disclosure.  Tr. of May 8, 2015 at 30:1-4, 30:25-31:15.

17  Moreover, even if the Court had issued such an order, any objection should be addressed

18  through ordinary litigation, not through a recusal motion.  *Liteky*, 510 U.S. at 555.

19    Finally, Sheriff Arpaio and Chief Deputy Sheridan's assertion that the Court

20  violated their due process rights by failing to give notice of its intent to question them

21  about the MCSO-Montgomery investigations is misplaced.  The Court stated clearly prior

22  to the beginning of the evidentiary hearing that subjects relating to remedies, and

---

23

24  [3] The movants also allege that the Court "apparently took evidence outside of court."
    Mot. at 15.  In fact, the Court stated on the record that it had been informed that the
25  Cold Case Posse "has its own funds" and asked Sheriff Arpaio whether that was
    "possible."  Tr. of Apr. 23, 2015 at 658:1-2.  Defense counsel did not object.  The
26  record reveals that the Court did not take the information at face value, but asked the
    Sheriff whether it was true.  The Court's actions were proper.  Gillers Decl. ¶ 15.

27

28

10

1    particularly relating to MCSO investigations, would be within the scope of the hearing.

2    *See* Tr. of Mar. 20, 2015 at 11:6-12, 12:21-25, 13:1-21; [Doc. 880 at 25]; [Doc. 1007 at

3    2]; Tr. of Apr. 21, 2015 at 15:19-22. Arpaio and Sheridan were not unfairly surprised;

4    they acknowledged reading the *New Times* article and were also provided a copy by the

5    Court.  Tr. of Apr. 23, 2015 at 642:17-25, 643:1-24; Tr. of Apr. 24, 2015 at 959:9-10,

6    959:17-18. Defense counsel made no objection to the Court's questions and indeed

7    initiated the questioning of Sheridan on this subject.

8

9         **II.**       **Neither the Court nor the Court's Spouse Has a Disqualifying Interest**

10        Sheriff Arpaio and Chief Deputy Sheridan argue for recusal under 28 U.S.C.

11   § 455(b)(5)(iv), which  provides for recusal when a judge, his or her spouse, or a person

12   within a third degree of relationship to either of them, "[i]s to the judge's knowledge

13   likely to be a material witness in the proceeding," and under 28 U.S.C. § 455(b)(1),

14   which provides for recusal when a judge "has a personal bias or prejudice concerning a

15   party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

16   These arguments fail on the merits.

17        First, the movants argue that recusal is required because the Court's brother-in-law

18   is a partner in the Washington, D.C. office of Covington & Burling (Mot. at 13), but they

19   *expressly* waived any recusal argument when they learned of this fact in 2012.  *See* [Doc.

20   537 (order setting status conference on issue)]; Tr. of June 29, 2012 at 5:19-7:2 (Court's

21   offer to recuse on request of any party); *id.* at 16:6-17:2 (Defendants statement that they

22   would be prejudiced by Court's recusal and any order vacating prior orders);  [Doc. 541

23   (Defendants' written waiver of appeal of any recusal issue)]; [Doc. 542].  Moreover, the

24   Court's previous ruling on the merits was correct.  Gillers Decl. ¶¶ 9-10.

25        Sheriff Arpaio and Chief Deputy Sheridan also assert that the Court must recuse

26   because the interests of the Court and the Court's spouse are "substantially affected by

27   the outcome of this proceeding." Mot. at 13.  The movants now insinuate that the Court's

28

                        11

1    interests are at stake because the allegations of the MCSO-Montgomery investigation—

2    that the Court conspired with the Attorney General of the United States and others to

3    subvert the random case assignment process—may actually be true.  Mot. at 13.  This

4    assertion fails because both Sheriff Arpaio and Chief Deputy Sheridan testified that they

5    concluded that the MCSO-Montgomery investigation was not credible and indeed was

6    "junk."  Tr. of Apr. 23, 2015 at 650:18-25; *see also* Tr. of Apr. 24, 2015 at 961:1-11,

7    1002:14-15.  Documents relating to the MSCO-Montgomery investigation support that

8    testimony.  Wang Decl., Ex. C, D, E.

9         Sheriff Arpaio and Chief Deputy Sheridan further assert that recusal is required

10   under § 455(b)(5) because the Court's spouse is a material witness.  While they do not

11   explain, presumably they assert that she is a witness on the factual issues arising from

12   their investigation of Karen Grissom.  This assertion should be rejected because Chief

13   Deputy Sheridan testified that after a private investigator hired by their counsel

14   interviewed Ms. Grissom and her family members in 2013, MCSO chose not to pursue

15   the allegations.  Tr. of Apr. 24, 2015 at 968:5-9; Tr. of May 14, 2015 at 10:1-24.  And

16   Defendants' own counsel, after reviewing the private investigators' report, stated that

17   "the Grissom information is so fundamentally flawed in its substance that it likely cannot

18   be used in a Rule 60 motion, appeal, or otherwise, without the lawyer who does so

19   violating the federal courts rule of civil procedure and the Arizona Rules of Professional

20   Conduct."  [Doc. 1115 at 13-14 (letter from Timothy J. Casey to Joseph M. Arpaio dated

21   Nov. 6, 2013)].  This is likely because of the numerous inconsistencies in the various

22   statements that Karen and Dale Grissom made about their meeting with Mrs. Snow.  *See*

23   Gillers Decl. ¶¶ 4.1-4.4, 12.

24        Notably, in asserting the grounds for recusal for actual bias, Sheriff Arpaio and

25   Chief Deputy Sheridan do not explicitly include Karen Grissom's allegation which—in

26   the strongest version, appearing in her Facebook message to the Sheriff more than a year

27   after her alleged conversation with Mrs. Snow—was that that Mrs. Snow stated that the

28

12

1    Court "hates" the Sheriff and "will do anything to get [him] out of office."  *See* Mot. at

2    14-16 (grounds for assertion of actual bias based upon Court's statements and actions

3    during contempt proceedings).  But in any event, the Court's spouse is not a material

4    witness on any issue in this litigation.  Whether Mrs. Snow made the alleged statement to

5    Mrs. Grissom is not admissible evidence of the Court's state of mind.  Gillers Decl.

6    ¶¶ 13-14.  Moreover, a court has an independent and self-executing obligation under 28

7    U.S.C. § 455(b)(1) to recuse if it has an actual bias, and the Court has not done so here.

8    Gillers Decl. ¶ 14.

9

10          **III.    No Reasonable Observer Would Perceive an Appearance of Bias**

11          Sheriff Arpaio and Chief Deputy Sheridan move for recusal based upon 28

12   U.S.C. § 455(a), which requires "[a]ny justice, judge, or magistrate judge of the United

13   States [to] disqualify himself in any proceeding in which his impartiality might

14   reasonably be questioned."  Section 455(a) imposes an objective standard, requiring

15   recusal when "a reasonable third-party observer would perceive that there is a 'significant

16   risk' that the judge will be influenced by the threat and resolve the case on a basis other

17   than the merits."  *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008).  The

18   standard is applied based upon "all the relevant facts" and an examination of the record

19   and the law.  *Id.* (citing *LoCascio v. United States*, 473 F.3d 493, 496 (2d Cir. 2007)).

20          As an initial matter, Sheriff Arpaio and Chief Deputy Sheridan do not clearly

21   state the basis for their motion under § 455(a), but Plaintiffs presume that it is based upon

22   the same allegations underlying their assertions under §§ 455(b)(1) and (b)(5).   The

23   motion therefore should fail because a reasonable observer would understand that in the

24   context of the record, as set forth above, none of the Court's conduct gives rise to any

25   appearance of improper bias.  "Rumor, speculation, beliefs, conclusions, innuendo,

26   suspicion, opinion, and similar non-factual matters" are generally not sufficient to

27   warrant recusal under § 455(a).  *Clemens*, 428 F.3d at 1178.  Nor are "baseless personal

28

                                          13

attacks on or suits against the judge by a party," or "quotes attributed to the judge or others, but which are in fact false or materially inaccurate or misleading," or "attempts to intimidate the judge." *Id.* at 1179.

Moreover, Sheriff Arpaio and Chief Deputy Sheridan's argument under § 455(a) should fail because courts have held that a party cannot manufacture a basis for recusal. In this case, the movants appear to argue that there is an appearance of bias because they themselves launched investigations to develop proof that the Court is biased, one of those investigations (the MCSO-Montgomery investigation) was leaked to the press,[4] and the Court inquired about the news report, leading to the Sheriff's testimony about both the MCSO-Montgomery and Grissom investigations. Contrary to the testimony of Arpaio and Sheridan, the investigations were done by MCSO and MSCO's paid agents and they did attempt to call the Court's impartiality into question. Sheriff Arpaio's testimony that the MCSO-Montgomery investigation did not target the Court is contradicted by documents later produced by Defendants. Wang Decl., Ex. F. And when asked whether MCSO had investigated the Court's spouse, Chief Deputy Sheridan equivocated by answering "it depends on how you define, 'investigated your wife.'" Tr. of Apr. 24, 2015 at 967:11-14. But in fact, Chief Deputy Sheridan's complete testimony and documents produced under an order by Magistrate Judge Boyle demonstrate that the investigation was aimed at determining whether Mrs. Snow made the statement. [Doc. 1115].

Controlling cases do not require recusal in these circumstances. In cases where a party has made allegations against the Court, for example, the Ninth Circuit has held that recusal is not required. "A judge is not disqualified by a litigant's suit or threatened suit against him, … or by a litigant's intemperate and scurrilous attacks." *United States v.*

---

[4] One of the documents produced by the Defendants suggests that an MCSO investigator leaked the MCSO-Montgomery investigation to the *Phoenix New Times*. Wang Decl., Ex. B.

14

1    *Studley*, 783 F.2d 934, 940 (9th Cir. 1986) (citing *Ronwin v. State Bar of Ariz.*, 686 F.2d

2    692, 701 (9th Cir. 1981); *United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977)).

3    Otherwise, "defendants could readily manipulate the system … [and] force delays….

4    Such blatant manipulation would subvert our processes, undermine our notions of fair

5    play and justice, and damage the public's perception of the judiciary." *United States v.*

6    *Holland*, 519 F.3d 909, 915 (9th Cir. 2008); *see also United States v. Spangle*, 626 F.3d

7    488, 496 (9th Cir. 2010) (court properly declined to recuse after police found personal

8    information about judge and judge's family in the defendant's car).  Numerous cases

9    have held that "a party cannot effect recusal of a trial judge by the party's own actions,"

10   such as through statements critical of the judge or accusing the judge of wrongdoing.

11   *United States v. Cerrella*, 529 F. Supp. 1373, 1380 (S.D. Fla. 1982) (citing *United States*

12   *v. Bray*, 546 F.2d 851 (10th Cir. 1976); *United States v. Garrison*, 340 F. Supp. 952, 957

13   (E.D. La. 1972); *United States v. Fujimoto*, 101 F. Supp. 293, 296 (D. Haw. 1951)).  In

14   *Bray*, 546 F.2d at 857-58, the Tenth Circuit rejected a recusal motion based upon the

15   moving party's accusation that the judge had committed bribery and conspiracy.

16   Similarly, the First Circuit held that negative statements about the court in a newspaper

17   the moving party owned, well into the proceedings, could not require recusal because

18   otherwise a party might manipulatively create a basis for recusal.  *In re Union Leader*

19   *Corp.*, 292 F.2d 381, 388-89 (1st Cir. 1961).  In short, the law does not permit a party to

20   trigger recusal at will, simply by alleging that the Court participated in a conspiracy to

21   "get" him.

22       A reasonable observer with full knowledge the record of this case, and the

23   caselaw, would not conclude that there is an appearance of bias.

24

25   **IV.    The Motion Should Be Denied as Untimely**

26       The recusal motion also should be denied because it is untimely.  Sheriff Arpaio

27   and Chief Deputy Sheridan knew of Karen Grissom's allegations in August 2013, and

28

15

1    documents reveal that they had concluded their interviews on that issue by November

2    2013—almost *two years* before filing this motion.  [Doc. 1115].  Defendants knew of the

3    relationship between the Court and Keith Teel in June 2012—*three years* before filing

4    their motion—and expressly waived any claim to recusal.  And to the extent the movants

5    now rely upon an insinuation that the allegations in the MCSO-Montgomery

6    investigation are true, despite their repudiation, they should be foreclosed as they knew

7    Montgomery was not credible at least by November 2014 (Wang Decl., Ex. C), seven

8    months before filing their motion.  In light of these extraordinary delays, the recusal

9    motion should be denied as untimely.  Gillers Decl. ¶¶ 9, 11-12.  *E. & J. Gallo Winery v.*

10   *Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992) (recusal motion untimely when

11   filed seven months after assignment of case to judge and after adverse ruling); *Studley*,

12   783 F.2d at 939 (recusal motion filed "weeks after" conclusion of trial in which court

13   allegedly exhibited bias was untimely).

14          These cases are based on the presumption that a party that delays the filing of a

15   recusal motion is presumed to be filing the motion for purposes of manipulation, after

16   suffering adverse rulings.  *See E. & J. Gallo Winery*, 967 F.2d at 1295; *United States v.*

17   *Rogers*, 119 F.3d 1377, 1380 (9th Cir. 1997); *Bivens Gardens Office Bldg., Inc. v.*

18   *Barnett Banks of Fla., Inc.*, 140 F.3d 898, 913 (11th Cir. 1983) (recusal "cannot be used

19   as an insurance policy to be cashed in if a party's assessment of his litigation risks turns

20   out to be off and a loss occurs").  In this case, there is good reason to believe that the

21   motion was in fact filed for manipulative purposes.  Sheriff Arpaio and Chief Deputy

22   Sheridan attempted repeatedly to avoid the evidentiary hearing on contempt by filing

23   motions to vacate the hearing.[5]  It was only after those efforts failed, after the hearing

24

25   [5] Defendants assert that the Court improperly refused to grant those motions and
26   rejected proposed remedies that Plaintiffs had agreed to as settlement terms.  Mot. at 6.
     This assertion on its face violates the confidentiality provision of Federal Rule of
27   Evidence 408 and also is misleading. Plaintiffs made clear on the record that they
     (continued…)
28

16

1    brought forth clear evidence of their willful and systematic violations of the Court's

2    orders,[6] and after the Court indicated in post-hearing status conferences that strong

3    remedies were in order (Tr. of May 8, 2015 at 19:8-21:4), that they finally moved for

4    recusal.[7]  Moreover, after filing the recusal motion, the Defendants initially took the

5    position that ongoing activities toward compliance with the Supplemental Permanent

6    Injunction were stayed, contrary to the terms of the Court's far more limited stay order.

7    Wang Decl., Ex. G; [Doc. 1120].  The timeliness requirement prevents precisely this sort

8    of manipulation.  Gillers Decl. ¶ 11.

9

10   **V.      The Motion Fails To Meet the Requirements for Recusal Under § 144**

11         Finally, the recusal motion fails to meet the requirements of 28 U.S.C. § 144,

12   which provides for reassignment of a case to another judge upon the filing of "a timely

13   and sufficient affidavit that the judge before whom the matter is pending has a personal

14   bias or prejudice either against him or in favor any adverse party."  Section 144 provides

15   that a party may only file one such affidavit in any case.  *See also Adesanya v. West Am.*

16   *Bank*, 1994 WL 56960, at *3 (9th Cir. Feb. 25, 1994) (unpub. op.) (construing recusal

17   motion as filed under § 455 because party previously filed affidavit under § 144).

18   Defendants Sheriff Arpaio, MCSO, and Maricopa County previously moved for the

19   _____

20   never agreed to any settlement.  Tr. of Feb. 26, 2015 at 38:7-11, 41:20-42:24.
     Plaintiffs opposed Defendants' Motion to Vacate because Plaintiffs had not had an
21   opportunity to take discovery relevant to whether Defendants' violations were
     deliberate, or on the adequacy of remedies [Doc. 952 at 2-4], and the Court denied
22   Defendants' motions on that ground.  [Doc. 1003, 1007].

23   [6] For example, the evidence developed during the contempt hearing on April 21-24,
     2015 demonstrated that Chief Deputy Sheridan was not truthful with the Court-
24   appointed Monitor about the events of May 14, 2014 underlying one of the charged
     grounds of contempt.  Tr. of Apr. 24, 2015 at 840:10-841:15; 846:22-848:5; 850:6-11;
25   851:22-25; 853:20-859:19; 861:4-11; 868:19-869:6.

26   [7] Tellingly, immediately after the Court's examination of the Sheriff, his specially
     appearing counsel (who filed the instant motion) stated publicly that there was no basis
27   for recusal of the Court.  Wang Decl., Ex. H.

28

                                        17

1    recusal of Judge Murguia through the filing of an affidavit under § 144.  [Doc. 63].

2    While that affidavit was signed by then-Chief Deputy David Hendershott, it was done on

3    behalf of the Defendants as parties to this litigation.

4           In any event, § 144 does not present any independent basis for recusal.  It is

5    settled that the same substantive and timeliness standards apply whether the statutory

6    basis asserted is § 144 or § 455.  *Liteky*, 510 U.S. at 548 (noting that § 144 "seems to be

7    properly invocable only when § 455(a) can be invoked anyway").  The remaining

8    distinction between § 144 and § 455 appears to be that under § 144, the motion shall be

9    referred to a different district judge.  But that is so only if the judge to whom the motion

10   is directed first determines that the affidavit is timely and sufficient.  *United States v.*

11   *Sibla*, 624 F.2d 864, 868 (9th Cir. 1980); Gillers Decl. ¶ 3.  For all the reasons set forth

12   above, the motion under § 144 should be denied.

13

14                                    **CONCLUSION**

15          Sheriff Arpaio and Chief Deputy Sheridan's motion to disqualify the Court

16   should be denied.

17          RESPECTFULLY SUBMITTED this 12th day of June, 2015.

18

19                                   By: /s/ Cecillia D. Wang

20                                   Cecillia D. Wang (*Pro Hac Vice*)
21                                   Andre I. Segura (*Pro Hac Vice*)
                                     ACLU Foundation
22                                   Immigrants' Rights Project

23                                   Daniel Pochoda
24                                   Joshua Bendor
                                     ACLU Foundation of Arizona
25

26                                   Anne Lai (*Pro Hac Vice*)

27

28

                                          18

0352

Stanley Young (*Pro Hac Vice*)
Tammy Albarran (*Pro Hac Vice*)
Hyun S. Byun (*Pro Hac Vice*)
Priscilla G. Dodson (*Pro Hac Vice*)
Lauren E. Pedley (*Pro Hac Vice*)
Covington & Burling, LLP


Jorge M. Castillo (*Pro Hac Vice*)
Mexican American Legal Defense and
Educational Fund

*Attorneys for Plaintiffs*

19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2015, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

/s/ Cecillia D. Wang

1

0354



*EXHIBIT 11*

Michele M. Iafrate, Bar #015115
Iafrate & Associates
649 North Second Avenue
Phoenix, Arizona 85003
Tel: 602-234-9775
miafrate@iafratelaw.com

A. Melvin McDonald, Bar #002298
Jones, Skelton & Hochuli, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com

Attorneys for Defendant Joseph M. Arpaio


Barry Mitchell Bar #013975
Lee Stein Bar #12368
Mitchell, Stein, Carey, PC
One Renaissance Square
2 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
Telephone: (602) 358-0290
Fax: (602) 358-0291
barry@mitchellsteincarey.com
lee@mitchellsteincarey.com

Attorneys for Gerard Sheridan

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | NO. CV 07-02513-PHX-GMS |
| Plaintiff, | **Motion for Recusal or Disqualification of District Court Judge G. Murray Snow** |
| v. | |
| Joseph M. Arpaio, et al., | |
| Defendant. | |

## I.   <u>INTRODUCTION</u>

No doubt, moving for the recusal or disqualification of any sitting judge is a serious matter.  Under statute, case law, and judicial canons, the perception of judicial bias

and the appearance of impropriety, punctuated by the material witness status of the presiding judge's spouse, mandate the recusal and disqualification of the Honorable G. Murray Snow. Accordingly, Defendant Arpaio and Chief Deputy Gerard Sheridan have no other choice but to file this Motion.

Pursuant to 28 U.S.C. § 144 and § 455, Defendant Arpaio and Chief Deputy Gerard Sheridan respectfully move for recusal and/or disqualification of the Honorable G. Murray Snow. (Affidavit of Sheriff Joseph M. Arpaio, attached as Exhibit 1). Defendant Arpaio Chief Deputy Gerard Sheridan present this Memorandum and file the attached affidavit and corresponding Certificates of Filing in Good Faith by Counsel. Defendant Arpaio and Chief Deputy Gerard Sheridan respectfully request the transfer of this case to a different judge, immediately, as provided by 28 U.S. Code § 144, and the disqualification or recusal of Judge Snow in further related proceedings concerning Defendant Arpaio and Chief Deputy Gerard Sheridan.[1]

By his own official inquiry, statements, and questions in open court on the record, one of the investigations into which Judge Snow unexpectedly inquired during recent contempt proceedings concerns his spouse, Sheri Snow. No reasonable person with knowledge of the facts can deny that Judge Snow is now investigating and presiding over issues involving his own family. This alone is sufficient to mandate recusal and disqualification. Furthermore, the fact that Judge Snow's wife is now a material witness, while dispositive, is not the only appearance of bias and impropriety requiring recusal.

Defendant Arpaio and Chief Deputy Gerard Sheridan therefore move: (1) for Judge Snow to recuse himself based upon the facts and law stated in the Motion for Change of Judge for Cause; or (2) if Judge Snow declines to recuse himself, Defendant Arpaio and Chief Deputy Gerard Sheridan move that this Motion for Change of Judge for

---

[1] The legal opinion of Professor Ronald Rotunda, a renowned expert on Professional Responsibility and Constitutional Law, is attached and incorporated in support of this Court's disqualification. (Exhibit 10). As Professor Rotunda explains in his declaration, Judge Snow now has- by his own admission- "an incurable personal interest in the case, at least in this new phase of this case as it has metastasized into something entirely new." *Id.*

1  Cause be assigned to another United States District Court judge.

2  **II.      STATEMENT OF FACTS RELEVANT TO MOTION**

3         **A.      *Melendres* Preliminary and Permanent Injunction**

4              In December 2007, Latino motorists brought a class action under 42 U.S.C.

5  § 1983 against the Maricopa County Sheriff's Office ("MCSO") and Sheriff Joseph

6  Arpaio, in his official capacity only, alleging that Defendants engaged in a custom, policy,

7  and practice of racially profiling Latinos, and a policy of unconstitutionally stopping

8  persons without reasonable suspicion that criminal activity was afoot, in violation of

9  Plaintiffs' Fourth and Fourteenth Amendment rights.[2] [Doc. 1, amended by Doc. 26.] The

10  Plaintiffs sought declaratory and injunctive relief to prevent Defendants from engaging in

11  racial profiling and exceeding the limits of their authority to enforce federal immigration

12  law. [Doc. 1 at 19–20.]

13              After pre-trial discovery was closed, the parties filed competing motions for

14  summary judgment; Plaintiffs' motion included a request for the entry of a preliminary

15  injunction. [Docs. 413, 421.] Judge Snow granted the Plaintiffs' motion in part, and

16  entered a preliminary injunction on December 23, 2011. [Doc. 494.] The injunction

17  prohibited MCSO from "detaining individuals in order to investigate civil violations of

18  federal immigration law," and from "detaining any person based on actual knowledge,

19  without more, that the person is not a legal resident of the United States." [*Id.* at 39.] The

20  injunction further stated that, absent probable cause, officers may only detain individuals

21  based on reasonable suspicion that "criminal activity may be afoot." [*Id.* at 5.]

22              Seventeen months later, approximately nine months following a bench trial,

23  and one week before the recall petition for Sheriff Arpaio was due, Judge Snow issued his

24  Findings of Fact and Conclusions of Law in May 2013, in which he found MCSO liable

25  for a number of constitutional violations in its operations and procedures. [Doc. 579 at

26  115–31.] The timing of the decision was curious and problematic, as it resulted in

27  ────────────────

28       [2]  MCSO, a non-jural entity, is no longer a named defendant in this action. Maricopa County has recently become a defendant in this action.

immediate marches and protests against Defendant Arpaio at a crucial point in his political career.

After allowing the Parties, at their request, to attempt to negotiate the terms of a consent decree, in October 2013 Judge Snow ordered supplemental injunctive relief to remedy the violations outlined in his Findings and Conclusions and defined enforcement mechanisms for such remedies. [Doc. 606.]

## B.   Judge Snow's Determination that a Civil Contempt Hearing was Necessary.

On May 14, 2014, Defendants, on their own initiative, informed Judge Snow and Plaintiffs' counsel that a former member of the Human Smuggling Unit, Deputy Charley Armendariz, was found to be in possession of hundreds of personal items, many of which appeared to have been appropriated from members of the Plaintiff class. [*See* Doc. 700 at 12–13.] Deputy Armendariz was a regular participant in the HSU's saturation patrols, both large and small scale. He also testified at trial and was personally implicated by the allegations of two representatives of the Plaintiff class regarding his involvement in a 2008 immigration sweep in which two Hispanic American citizens were allegedly profiled and illegally detained on the basis of their suspected undocumented status. [Doc. 576.] After his apparent suicide, in addition to the numerous personal items apparently seized from persons he had stopped, MCSO also discovered numerous video recordings of traffic stops that Armendariz had conducted, apparently going back several years. [Doc. 700 at 11.] Some of those videos revealed what MCSO characterized as "problematic activity" on the part of Deputy Armendariz during the stops. [*Id.* at 35, 57.] Other officers, and at least one supervisor of Armendariz who also testified at the trial in this action, were depicted on these recordings during one or more problematic stops. [*Id.* at 35.]

In light of the inappropriate activity observable on Deputy Armendariz's videotapes and the questions surrounding other officers' use of video and audio recording devices during the time period in which pre-trial discovery in this case was occurring,

1   Judge Snow ordered Defendants to immediately formulate and obtain the Monitor's
2   approval of a plan designed to retrieve all recordings made by officers that might still be
3   in existence. [*Id*. at 25–27.]  The ensuing investigations unearthed documents apparently
4   requiring officers to make such recordings during the period of time relevant to Plaintiffs'
5   claims, and that those here-to-fore unknown documents and recordings were never
6   disclosed.

7         Moreover, the Armendariz videotapes resulted in administrative interviews
8   with MCSO personnel.  Those interviews have apparently revealed that, for at least
9   seventeen months after Judge Snow issued his preliminary injunction, Defendants, as a
10  matter of regular practice and operation, continued to enforce federal immigration law by
11  conducting immigration interdiction operations, and detaining persons after officers
12  concluded that there was no criminal law basis for such detention,.

13        Accordingly, Judge Snow determined that civil contempt proceedings were
14  necessary to determine if MCSO, Sheriff Joseph Arpaio, Chief Deputy Gerald Sheridan
15  and other MCSO leadership acted in contempt of this Court's "lawful writs, processes,
16  orders, rules, decrees, or commands" by "(1) failing to implement and comply with the
17  preliminary injunction; (2) violating their discovery obligations; and (3) acting in
18  derogation of this Court's May 14, 2014 Orders."  [Doc. 880 at 26.]  Moreover, Judge
19  Snow noted that the development of the evidentiary record in the contempt proceedings
20  would permit him to evaluate whether civil remedies can vindicate the rights of the
21  Plaintiff class, or if criminal remedies are necessary.

22   **C.    Pre-Civil Contempt Hearing Events**

23        On March 17, 2015, Defendants Sheriff Arpaio and the MCSO filed an
24  Expedited Motion to Vacate Hearing and Request for Entry of Judgment.  [Doc. 948.]
25  The purpose of that Motion was to "convey to the Court and to Plaintiffs that Defendants
26  Joseph M. Arpaio and Maricopa County Sheriff's Office, and identified nonparty Chief
27  Deputy Gerard Sheridan (collectively, "Defendants") consent[ed] to a finding of civil
28  contempt against them and the imposition of remedies designed to address their conduct."

[*Id.* at 1.] Defendants expressed their most sincere remorse to the Court and to Plaintiffs and explicitly acknowledged that they had violated the Court's Preliminary Injunction. [*Id.* at 2.] Accordingly, Defendants adopted and stipulated to the facts as stated in the Court's Order to Show Cause, [Doc. 880] as well as to the entry of an order finding them in civil contempt of court. [Doc. 948 at 3.]

Judge Snow demanded, before accepting the proposal, that Arpaio have "skin in the game", specifically that Defendant Arpaio pay a sanction from his personal funds and not from any defense funds supporting Defendant Arpaio. It is noteworthy that Defendant Arpaio is only named as a defendant in his official capacity in this lawsuit. To this end, Defendants attached a proposed list of stipulated remedial measures that Defendants had agreed to implement, including the payment of $100,000 from Defendant Arpaio's *personal funds* to a civil rights organization and that a fund would be created to compensate victims of the Defendants' violation of the Court's December 2011 injunction.[3] In light of these remedial measures, Defendants requested that Judge Snow vacate the evidentiary hearing to determine the existence of the admitted contempt. [Doc. 948 at 4.]

Despite the *admitted* violation of this Court's preliminary injunction and the remedial measures Defendants sought to implement, including Defendants agreeing to Plaintiffs' settlement terms that also would have mooted the need for contempt proceedings, Judge Snow refused to vacate the contempt proceedings. [Doc. 1007.] In fact, he requested that the United States Attorney for the District of Arizona attend the proceedings to determine whether sufficient evidence would be presented to justify

---

[3] The remedies proposed by Arpaio included: (1) acknowledging in a public forum the violations of this Court's orders; (2) Sheriff Arpaio and MCSO will seek from Maricopa County the creation and initial funding of a reserve to compensate victims of MCSO's violation of the Court's December 2011 injunction; (3) develop and implement a plan to identify victims of the Court's December 2011 order; (4) permit the Monitor to investigate any matter that relates to Defendants' violation of the Court's preliminary injunction; (5) move to dismiss the then pending appeal in the Ninth Circuit Court of Appeals; and (6) pay for Plaintiffs' reasonable attorneys' fees that were necessary to ensure compliance with this Court's Orders. [Doc. 748, Ex. B].

criminal contempt proceedings.  In essence, Judge Snow requested that the U.S. Attorney function as his investigator to determine whether criminal contempt of his Preliminary Injunction had occurred.  The U.S. Attorney appropriately declined Judge Snow's invitation to participate in this capacity by letter and subsequently in open court.

> **D.**   **Judge Snow's Surprise Examination of Unexpected, Irrelevant Subjects During Contempt Proceedings.**

On April 23, 2015, Judge Snow embarked on his own inquiries during the testimony of Sheriff Arpaio.  Those inquiries were entirely unrelated to the three grounds that were the defined and noticed subjects of the contempt proceeding.[4]  Judge Snow continued these inquiries when he examined Chief Deputy Sheridan following Sheriff Arpaio's testimony.  These lines of questioning were based on Judge Snow's reading of, reference to, and reliance on hearsay statements contained in a Phoenix New Times blog post by Stephen Lemons.  [Phoenix New Times Blog Post, attached as Exhibit 2; *see also* 4/23/15 Transcript at 648-649, attached as Exhibit 3].  Importantly, this article had never been disclosed and no advance notice was provided to any of the Defendants or their counsel in the contempt proceeding that the article would be discussed or relied upon by Judge Snow.

> **1.**   **The "Grissom Investigation"**

Specifically, Judge Snow questioned Sheriff Arpaio regarding a blog posting by Stephen Lemons in the Phoenix New Times that detailed an alleged investigation by Sheriff Arpaio regarding comments made by Judge Snow's wife ("Grissom Investigation").  [4/23/15 Transcript at 643-644].  During this line of questioning, Judge Snow questioned Sheriff Arpaio regarding whether he was aware if Judge Snow or any of his family members had ever been investigated by anyone.  [*Id.* at 647:8-17].  In response, Sheriff Arpaio testified that he had received a communication in

---

[4] Again, the issues of the contempt proceeding were clearly defined: "(1) failing to implement and comply with the preliminary injunction; (2) violating [ ] discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders."  (Doc. 880 at 26.)

August 2013 from Karen Grissom regarding comments that Judge Snow's spouse had made to her in a restaurant about Judge Snow's hatred for Sheriff Arpaio and his desire to do anything to get Sheriff Arpaio out of office.  [*Id.* at 654-55; 4/24/15 Transcript at 962:14-16].  It was ultimately revealed that a private investigator hired by the Sheriff's counsel had interviewed three individuals: Karen Grissom, her husband Dale Grissom, and their adult son Scott Grissom, regarding the reliability of Mrs. Grissom's report.  [4/23/15 Transcript at 655].

The private investigator's interviews of these individuals determined that Mrs. Grissom was credible in the following statement:



[Facebook Message, attached as Exhibit 5; 4/23/15 Transcript at 655].   The Grissoms have been unwavering in their recollection of the comments Judge Snow's wife made regarding Judge Snow's hatred toward Sheriff Arpaio and his desire to do anything to get him out of office. *See* 10/26/13 Transcript of Karen Grissom at 12:18-21, 14:18-20, 19, 28:10-18 attached as Exhibit 6; 10/28/13 Transcript of Dale Grissom at 13:21-25, 16:5-12, 22:19-23:9, attached as Exhibit 7; 5/20/15 Arizona Republic Article, attached as Exhibit 8].

Although the interviews of these individuals were deemed credible, in that they corroborated Judge Snow's spouse had made these statements, Sheriff Arpaio never "went any further than just verifying that [a] conversation [between Karen Grissom and Sheri Snow] . . . occurred."  [4/24/15 Transcript at 966:11-16].  Moreover, to date, neither Judge Snow nor Mrs. Snow have denied that Mrs. Snow made the statements attributed to her.

**2. The "Montgomery Investigation"**

In addition, Judge Snow questioned Sheriff Arpaio and Chief Deputy Sheridan regarding a second investigation, also unrelated to the three clearly defined subjects of the contempt proceedings.  Judge Snow inquired regarding athe unrelated investigation and MCSO's use of a confidential informant, Dennis Montgomery, involving e-mail breaches, including the e-mails of certain attorneys representing the Sheriff, wiretaps of the Sheriff and judges, and computer hacking of 50,000 bank accounts of Maricopa County citizens.  [4/23/15 Transcript at 647:1-3, 649; 4/24/15 Transcript at 1003:9-11; 1006:6-10].

Neither the Grissom investigation nor the Montgomery investigation involved any investigation of Judge Snow or his family.  [4/23/15 Transcript at 649].

**E. Post Contempt Proceeding Expansion of Monitor's Duties by Judge Snow**

As the sole arbiter of the matters relevant to the contempt proceedings, Judge Snow has also utilized the *Melendres* Monitor to expand his investigation into these unrelated issues.  In an attempt to justify this expansion of power, Judge Snow is trying to create a connection between the Grissom and Montgomery investigations and a speculative pattern of "knowing defiance" rather than "inadvertence" of Judge Snow's Orders and necessary remedies for members of the Plaintiff class.  [5/14/15 Transcript at 49:15-21, attached as Ex. 9].  In doing so, he has granted the Monitor "broad leeway" in determining what matters are pertinent to the current contempt proceedings.  [*Id.* at 51].

When Defendant Arpaio's counsel requested clarification regarding the Monitor's investigatory powers, Judge Snow refused.  Instead, Judge Snow stated that he is "not going to limit the Monitor's authority and [he's] not going to require [the Monitor] to provide [Defendant Arpaio's counsel] with advance notice of what [the Monitor] wants to inquire into."  [*Id.* at 53:15-21].  Defendant Arpaio's counsel objected to the Court's morphing of the OSC hearing into something quite different than the three subjects that were a part of the original OSC Order and the expansion of the Monitor's powers as a

1    violation of her client's Due Process rights.  Judge Snow overruled her objection and

2    refused to "unduly shackle [the Monitor]."  [*Id.* at 56:20].  Thus, the Monitor now has

3    court ordered unlimited investigatory power.

4             Accordingly, despite the Ninth Circuit's recent Order, Judge Snow has

5    improperly expanded the authority and investigatory powers of the Monitor into matters

6    completely immaterial and irrelevant to the contempt proceedings and issues, as framed

7    by Judge Snow's Order to Show Cause (*e.g.*, the Grissom and Montgomery investigations,

8    and most recently MCSO's long past investigation into the authenticity of President

9    Obama's birth certificate).[5]

10   **III.   JUDGE SNOW MUST RECUSE HIMSELF FROM THIS ACTION.**

11            The right to a neutral and detached judge in any proceeding is protected by

12   the Constitution and is an integral part of maintaining the public's confidence in the

13   judicial system.  *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972).  Accordingly, in

14   order to preserve the integrity of the judiciary, and to ensure that justice is carried out in

15   each individual case, judges must adhere to high standards of conduct.  *York v. United*

16   *States*, 785 A.2d 651, 655 (D.C. 2001).

17            Cannon 2 of the Code of Conduct for United States Judges provides that

18   "[a] judge should avoid impropriety and the appearance of impropriety in all activities."

19   Avoidance of the *appearance* of impropriety in all judicial activities is important because:

20              Public confidence in the judiciary is eroded by irresponsible or
            improper conduct by judges. A judge must avoid all
21           impropriety and appearance of impropriety. This prohibition
            applies to both professional and personal conduct. A judge
22           must expect to be the subject of constant public scrutiny and
            accept freely and willingly restrictions that might be viewed as
23           burdensome by the ordinary citizen.

24   _____

25      [5] The Ninth Circuit has advised Judge Snow against extending the Monitor's
     powers into areas not narrowly tailored to address the violations of federal law at issue in
26   this case.  *Id.* (holding that the injunction improperly requires the Monitor to consider the
     "disciplinary outcomes for any violations of departmental policy" and to assess whether
27   Deputies are subject to "civil suits or criminal charges ... for off-duty conduct.").   Judge
     Snow now seeks to expand the authority of the Monitor without regard to the Ninth
28   Circuit's Order.

1   Comment 2A to Cannon 2.

2          Cannon 3 requires that "[a] judge shall disqualify himself or herself in a

3   proceeding in which the judge's impartiality might reasonable be questioned, including

4   but not limited to instances in which:

5              (a) the judge has a personal bias or prejudice concerning a
               party, or personal knowledge of disputed evidentiary facts
6              concerning the proceeding;

7              . . .

8              (c) the judge knows that the judge … [has an] interest that
               could be affected substantially by the outcome of the
9              proceeding;[6]

10             (d) the judge or the judge's spouse, or a person related to
               either within the third degree of relationship, or the spouse of
11             such a person is:

12             …

13                 (iii) known by the judge to have an interest that could
                   be substantially affected by the outcome of the
14                 proceeding; or

15                 (iv) to the judge's knowledge likely to be a material
                   witness in the proceeding;

16         Cannon 3 is, in essence, codified by 28 U.S.C. § 455.  "Section 455(a)

17  covers circumstances that appear to create a conflict of interest, whether or not there is

18  actual bias." *Preston v. United States*, 923 F.2d 731, 734 (9th Cir.1991) (citation omitted)

19  (emphasis in original).  In contrast, "[s]ection 455(b) covers situations in which an actual

20  conflict of interest exits, even if there is no appearance of one." *Id.* (citation omitted).

21  Given the developments in this case, both provisions require recusal.

22

23

24

25

26  ───────────────────

27         [6] "Proceeding" includes pretrial, trial, appellate review, or other stages of
    litigation."  Cannon 3(C)(3)(d).

28
    4272904.1                              11
    5/22/15

                                                                                      0365

1

### A.    28 U.S.C. § 455(b) Requires *Mandatory* Disqualification of Judge Snow.[7]

2

Section (b) of 28 U.S.C. § 455 provides for ***mandatory*** recusal without

3

investigation into the  appearance of partiality by a judge.  *Preston*, 923 F.2d at 734 (9th

4

Cir. 1991) ("We need not explore whether an appearance of partiality existed in this case.

5

The drafters of section 455 have accomplished this task for us.").

6

Section 455(b) "requires disqualification under Section 455(a), even absent

7

any evidence of actual bias." *Mangini v. United States*, 314 F.3d 1158, 1161 (9th Cir.)

8

opinion amended on denial of reh'g, 319 F.3d 1079 (9th Cir. 2003); *see also Preston,* 923

9

F.2d at 734 (addressing Section 455(b)(2), which requires disqualification when the judge

10

either served as a lawyer or a lawyer with whom he previously practiced law served as a

11

lawyer during such association in the matter in controversy).  "[I]t is sufficient to state that

12

section 455(b) provides us with a concrete example where the appearance of partiality

13

suffices to establish a ground for recusal under section 455(a) ***even absent actual bias***."

14

*Preston*, 923 F.2d at 734 (emphasis added).

15

### 1.    28 U.S.C. § 455(b)(5) Requires Disqualification of Judge Snow Due to Spousal Relationship.

16

Under 28 U.S.C. § 455(b)(5), a judge shall disqualify himself in the

17

following circumstances:

18

19

(5) He or **his spouse**, or a person within the **third degree of relationship** to either of them, or the spouse of such a person:

20

…

21

(ii) Is acting as a lawyer in the proceeding;

22

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

23

24

(iv) Is to the judge's knowledge likely to be a **material**

25

---

[7] As a matter of style, most courts look first to Section 455(b), "which provides that

26

a judge is automatically recused upon the existence of certain familial and/or financial relationships, and then to the more general terms of § 455(a)."

27

*In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1143 (6th Cir. 1990).  Accordingly, this Motion is organized in accordance with this principle.

28

4272904.1
5/22/15

12

1    **witness** in the proceeding.

2    (Emphasis added).

3            ***This requirement is strictly imposed.***   *Preston*, 923 F.2d at 734 (9th Cir.

4    1991).   For example, a judge was required to recuse himself when it was learned that his

5    daughter had participated in certain early depositions in a case, even though the daughter's

6    role in the depositions was minimal and the firm she was working for was no longer

7    involved in the case.  *See In re Aetna Cas. & Sur. Co*., 919 F.2d 1136 (6th Cir. 1990).

8    Here, Judge Snow's recusal is required for three reasons:

9            First, a person within the third degree of relationship to Judge Snow is

10   affiliated with Plaintiffs' Counsel.   Judge Snow's brother-in-law is an attorney with

11   Covington Burling.  Early in this action, Defendant Arpaio's former counsel waived this

12   conflict.   However, in light of recent events, reconsideration of this previously waived

13   conflict is necessary.

14           Second, the interests of Judge Snow and his spouse are substantially

15   affected by the outcome of this proceeding.  Judge Snow himself has recognized that the

16   documents involved in the Montgomery investigation "appear to allege or suggest that this

17   Court had contact with the Department of Justice about this case before the Court was

18   ever assigned to it."  [5/14/15 Transcript at 45:17-19].   Moreover, Judge Snow stated on

19   the record that the Montgomery Investigation appears to allege that the random selection

20   process of this Court was subverted so that the case was deliberately assigned to him and

21   that he had conversations with Eric Holder and Lanny Breuer about this case.  [*Id.* at

22   45:19-25].  Judge Snow, therefore, has an interest that could be substantially affected by

23   the outcome of the proceeding because his reputation is squarely at stake.  [*Id.* at 46:23-

24   47:7 (recognizing the potential of a "bogus" conspiracy theory to discredit the court)]; *see*

25   *also* 28 U.S.C. § 455(b)(4) (requiring disqualification when a Judge "knows that he …

26   [has] any other interest that could be substantially affected by the outcome of the

27   proceeding.").

28

4272904.1
5/22/15

Finally, and most importantly, the fact that the Judge himself believes that the Grissom investigation is relevant to the contempt proceeding establishes his spouse as a material witness.   In fact, Mrs. Snow is undoubtedly a material witness in this proceeding (i.e., whether she made the statement at issue and/or what she meant by it and the context in how it was made).   Moreover, regardless of the irrelevance of the Grissom and Montgomery investigations to the issue of whether the admitted contempt of the Preliminary Injunction occurred, Judge Snow infused himself and the materiality of his wife as a witness and her uncontradicted statement into the contempt proceeding. Whether a sitting judge is admittedly biased toward a defendant in his Court and will do anything to ensure he is not re-elected is – without question – a conflict that creates grounds for recusal.[8]   Accordingly, even if at some point there is a denial that Mrs. Snow made the statements at issue, the conflict that is created is unwaivable under § 455(b). *See* 28 U.S.C. § 455(e) ("No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)."). Judge Snow is solely responsible for making his spouse a material witness to this proceeding.[9]

**2.    28 U.S.C. § 455(b)(1) Requires Disqualification of Judge Snow Due To His Personal Bias.**

Under 28 U.S.C. § 455(b)(1), a judge shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Under Section 455(b), Judge Snow has made comments that indicate he has a personal bias or prejudice concerning a party, namely Sheriff Arpaio.

As revealed during the contempt proceeding, Judge Snow has engaged in

---

[8] Implicitly, Judge Snow has complete and unfettered access to a material witness in this case, his wife.

[9] For the same reasons, Judge Snow's wife has an interest that could be substantially affected by the outcome of the proceeding because her reputation is also squarely at stake under 42 U.S.C. § 455(b)(5).

outside investigations with regard to matters that he thought to be relevant and that he infused into the proceeding. [Rotunda Declaration ¶ 20, attached as Ex. 10]. What's more, he apparently took evidence outside of court. [*Id.*]. Although Judge Snow did not disclose the identity of the individual with whom he spoke regarding this matter, he clearly stated that he engaged in an investigation outside the courtroom during a lunch break. [*Id.*]. In addition, Judge Snow also asked leading questions on irrelevant matters during the contempt proceeding. [*Id.* at ¶¶ 19, 21]. In addition, he gave his own testimony during the proceeding. [*Id.* at ¶¶ 22-23]. Furthermore, Judge Snow was argumentative with witness Chief Deputy Sheridan when he was on the stand. He interrupted Chief Deputy Sheridan and challenged his decision to make an informant, Dennis Montgomery, a confidential informant in an investigation unrelated to the contempt proceeding. [*Id.* at ¶ 24]. Judge Snow has also ordered the production of documents that may be protected by the work product doctrine or attorney client privilege. Those documents pertain to an attorney, Larry Klayman, and his client, Dennis Montgomery. Mr. Klayman is not an attorney who has appeared in this case and Mr. Montgomery is not a party to this action. [*Id.* at ¶ 25].

Moreover, Judge Snow's inquiry into matters unrelated to the contempt proceeding deprived Sheriff Arpaio of his due process constitutional rights. At a minimum, a Court must provide an alleged contemnor with notice and an opportunity to be heard. *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994). The concept of notice includes prior disclosure and provision of documents used at trial and prior identification of areas of examination. *See generally, Stuart v. United States*, 813 F.2d 243, 251 (9th Cir.1987), rev'd on other grounds, 489 U.S. 353 (1989); *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 846-47 (9th Cir. 2001). Such advance notice is consistent with an alleged contemnor's right to present a defense. *See United States v. Powers*, 629 F.2d 619, 625 (9th Cir. 1980). Further, the law requires progressively greater procedural protections for indirect contempts of complex injunctions that necessitate more elaborate and in-depth fact-finding, as in this case. *See*

*Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821 at 833-34. Here, although Defendant Arpaio testified that he previously read the Phoenix New Times blog Judge Snow utilized to justify his unauthorized line of questioning (Transcript, 643:23-24), neither the Court nor any other party previously provided it to Defendants nor gave notice that Defendant Arpaio or Chief Deputy Sheridan would be questioned about it. It was not identified as an exhibit. Neither was Defendant Arpaio nor Chief Deputy Sheridan provided notice that this subject area would be addressed. In contempt proceedings, procedural protections such as prior notice are crucial "in view of the heightened potential for abuse posed by the contempt power." *Taylor v. Hayes*, 418 U.S. 488, 498 (1974). Judge Snow's failure to abide by these fundamental and basic constitutional requirements, demonstrates further evidence of the perception of an unwaivable bias towards Sheriff Arpaio.

Finally, Judge Snow has improperly expanded the authority and investigatory powers of the Monitor into matters completely immaterial and irrelevant to the contempt proceedings and issues, as framed by his own Order to Show Cause (*e.g.*, the Grissom and Montgomery investigations, and most recently MCSO's long past investigation into the authenticity of President Obama's birth certificate). Judge Snow's willingness to ignore Defendant Arpaio's and Chief Deputy Sheridan's constitutional rights in favor of granting the Monitor "unfettered access" to further his own investigational curiosities or agenda further demonstrates a perception of bias.[10]

**B.    28 U.S.C. § 455(a) Requires Disqualification of Judge Snow Because His Impartiality is Questionable.**

Under 28 U.S.C. § 455(a), a judge shall disqualify himself "in any

---

[10] Additionally, the procedure outlined by the Court in its Order (Doc. 1032) places Defendants in an untenable position in which they must immediately provide documents pursuant to the Court's Order in such a way that sacrifices the attorney-client and work product privileges. The two Deputy County Attorneys who quickly reviewed documents on April 23, 2015 made random selections throughout the documents to discern what the documents were and made a cursory check for any privileged documents. They did not view any privileged documents; however, time did not allow for a careful or thorough review. It is probable that privileged documents were given to the monitors.

0370

1    proceeding in which his impartiality might reasonably be questioned."  A violation of

2    section 455(a) occurs even if the judge is unaware of the circumstances that created the

3    appearance of impropriety.  *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 8847

4    (1988).  In determining whether disqualification is proper, courts apply an objective test:

5    "whether a reasonable person with knowledge of all the facts would conclude that the

6    judge's impartiality might reasonably be questioned." *Clemens v. U.S. Dist. Ct. for*

7    *Central Dist. of California*, 428 F.3d 1175, 1178 (9th Cir. 2005) (citations omitted). "The

8    'reasonable person' in this context means a 'well-informed, thoughtful observer,' as

9    opposed to a 'hypersensitive or unduly suspicious person.'"  *Id.* (citations omitted).

10   Further, the grounds for disqualification must arise from "extrajudicial" factors, namely,

11   factors not related to the judicial proceeding at hand.  *Id.*

12          Under Arizona Judicial Canon Rule 2.11, the standard for disqualification is

13   identical to the disqualification standard under 28 U.S.C. § 455(a).  Rule 2.11 states that

14   the "Judge shall disqualify himself in any proceeding in which his impartiality might

15   reasonably be questioned.  For instance, a Judge shall disqualify himself if his spouse or a

16   person within the third degree of relationship to either of them is a person who has more

17   than a de minimis interest that could be substantially affected by the proceeding or is

18   likely to be a material witness in the proceeding."  *See* Rule 2.11(A)(2)(c)(d). In addition,

19   the comments under Rule 2.11 provide guidance.  For instance, comment 2 specifically

20   states that: "A Judge's obligation not to hear or decide matters in which disqualification is

21   required, applies regardless of whether a Motion to Disqualify is filed."  Additionally,

22   Comment 5 to Rule 2.11 requires the Judge to disclose on the record information that he

23   believes the parties or their lawyers might reasonably consider relevant to a possible

24   Motion for Disqualification, even if the Judge believes there is no basis for

25   disqualification.

26          Finally, even in cases of a close question of judicial impartiality, this Court

27   should decide in favor of recusal.  The U.S. Courts of Appeals for the First, Fifth, Tenth,

28   and Eleventh Circuits have said that close questions of judicial impartiality should be

decided in favor of recusal.  *See Republic of Pan v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 5th Cir. 1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

For all of the reasons stated above, Judge Snow's recusal is required because his impartiality might reasonably be questioned.  Even presuming this Court does not find that the aforementioned actions by Judge Snow demonstrate evidence of *actual* bias, *see supra* § III(B), a reasonable person with knowledge of all the facts would certainly question Judge Snow's impartiality.  Recusal is therefore required because of the bedrock notion and importance of public confidence in the judiciary and that confidence in the judiciary is severely eroded by even the appearance of irresponsible, improper or biased conduct by judges.

## IV.  <u>CONCLUSION</u>

For the aforementioned reasons Defendant Arpaio and Chief Deputy Gerard Sheridan respectfully request that (1) Judge Snow recuse himself from these proceedings and (2) if Judge Snow declines to recuse himself, Defendant Arpaio and Chief Deputy Gerard Sheridan move that this Motion for Change of Judge for Cause be assigned to a another United States District Court judge for immediate consideration.

DATED this 22nd day of May, 2015.

IAFRATE & ASSOCIATES

By s/ Michele M. Iafrate
Michele M. Iafrate
649 North Second Avenue
Phoenix, Arizona 85003
Attorneys for Defendants Joseph M. Arpaio

4272904.1
5/22/15

18

0372

1    DATED this 22nd day of May, 2015.

2                                    JONES SKELTON & HOCHULI, PLC

3

4                                    By s/ A. Melvin McDonald
                                        A. Melvin McDonald
5                                       2901 North Central Avenue, Suite 800
                                        Phoenix, Arizona  85012Attorneys for
6                                       Defendants Joseph M. Arpaio

7    DATED this 22nd day of May, 2015.

8                                    MITCHELL STEIN CAREY, PC

9

10                                   By s/ Barry Mitchell
                                        Barry Mitchell
11                                      Lee Stein
                                        One Renaissance Square
12                                      2 North Central Avenue, Suite 1900
                                        Phoenix, Arizona 85004
13                                      Attorneys for Gerard Sheridan

14

15

16                       **CERTIFICATE OF SERVICE**

        I hereby certify that on this 22nd day of May, 2015, I caused the foregoing
17
     document to be filed electronically with the Clerk of Court through the CM/ECF System
18
     for filing; and served on counsel of record via the Court's CM/ECF system.
19

20   s/ Mance Caroll

21

22

23

24

25

26

27

28
     4272904.1                              19
     5/22/15

# EXHIBIT 1

0374

1  Michele M. Iafrate, Bar #015115
   Iafrate & Associates
2  649 North Second Avenue
   Phoenix, Arizona 85003
3  Tel: 602-234-9775
   miafrate@iafratelaw.com
4
   and
5
   A. Melvin McDonald, Bar #002298
6  Jones, Skelton & Hochuli, P.L.C.
   2901 North Central Avenue, Suite 800
7  Phoenix, Arizona 85012
   Telephone: (602) 263-1700
8  Fax: (602) 200-7847
   mmcdonald@jshfirm.com
9
10 Attorneys for Defendant Joseph M. Arpaio

11                 **UNITED STATES DISTRICT COURT**

12                      **DISTRICT OF ARIZONA**

13 Manuel de Jesus Ortega Melendres, et al.,,   |   NO. CV 07-02513-PHX-GMS

14                               Plaintiff,   |   **Affidavit of Maricopa County**
                                              |   **Sheriff Joseph M. Arpaio in Support**
15       v.                                   |   **of Motion for Recusal or**
                                              |   **Disqualification of District Court**
16 Joseph M. Arpaio, et al.,,                 |   **Judge G. Murray Snow**

17                               Defendant.

18

19
                 STATE OF ARIZONA        )
20
                                         ) ss.
21
                 County of Maricopa      )
22

23

24       Maricopa County Sheriff Joseph M. Arpaio being first duly sworn, deposes

   and states as follows:
25
         1.     I am over the age of 18 years, am competent to testify to the matter
26
   set forth in this affidavit, and make this affidavit from my own personal knowledge.
27
         2.     I am the duly elected constitutionally and statutorily empowered
28
   4272903.1
   5/21/15

1   Sheriff of Maricopa County.   As Maricopa County Sheriff, I run and am the highest

2   ranking official in the Maricopa County Sheriff's Office ("MCSO").  I have knowledge of

3   all aspects of MCSO, including but not limited to jail and law enforcement divisions of

4   MCSO and their operations.

5          3.      I have been the duly elected Sheriff for over twenty two years.  I have

6   held various positions and ranks in law enforcement agencies, including Federal agencies,

7   for an additional thirty two years exclusive of my tenure as Maricopa County Sheriff.

8          4.      This affidavit is to support the Motion for Recusal or Disqualification

9   of District Court Judge G. Murray Snow which is filed simultaneously with this Affidavit

10  pursuant to 28 U.S.C. §144.

11         5.      I truly appreciate the seriousness of moving for the recusal or

12  disqualification of any sitting Judge.    Nevertheless, realizing what is at stake in this

13  proceeding, including potential criminal contempt, I am left with no other choice but to

14  file this Motion and Affidavit to protect myself and my constitutional rights, and to ensure

15  that I and others in this proceeding are afforded due process of law.

16         6.      As set forth in the Motion filed by my counsel, under statute, case

17  law and judicial canons, judicial bias and the appearance of impropriety, punctuated by

18  the material witness status of Judge Snow's spouse, Sheri Snow, and perhaps Judge Snow

19  mandate the recusal and disqualification of Judge Snow.   Facts and reasons exist to

20  demonstrate that bias and prejudice mandate the recusal or disqualification of Judge Snow

21  from this case.   Those facts and reasons are set forth in detail in the Motion filed on my

22  behalf.

23         7.      By Judge Snow's own official inquiry, statements and questions in

24  open Court on the record, Judge Snow inquired into investigations during a contempt

25  proceeding. His inquiry thrust Judge Snow's wife, Sheri Snow, into the limelight of these

26  proceedings as a material witness due to statements that she made regarding her husband,

27  Judge Snow, and specifically his alleged hatred for me and his willingness to do anything

28  to remove me from office.  Even though Judge Snow knows that this statement was made,

4272903.1
5/21/15                                               2

0376

1   as verified by three individuals, Judge Snow is now unethically investigating issues

2   regarding his wife's statements attributed to him with the use of his Court appointed

3   Monitor in this case, Robert Warshaw, who has a twelve member monitor team at his

4   disposal.  While this alone is sufficient to mandate recusal and disqualification, the fact

5   that Judge Snow's wife is now a material witness, creates not the only appearance of bias,

6   prejudice and impropriety that requires Judge Snow to recuse himself from this action, but

7   also requires another Judge decide whether to disqualify Judge Snow from presiding over

8   this case.

9        8.     Judge Snow himself has recognized that the documents involved in

10  the Montgomery investigation "appear to allege or suggest that this Court had contact

11  with the Department of Justice about this case before the Court was ever assigned to it."

12  [5/14/15 Transcript at 45:17-19].  Moreover, Judge Snow stated on the record that the

13  Montgomery Investigation appears to allege that the random selection process of this

14  Court was subverted so that the case was deliberately assigned to him and that he had

15  conversations with Eric Holder and Lanny Breuer about this case.  [*Id.* at 45:19-25].

16  Judge Snow, therefore, has an interest that could be substantially affected by the outcome

17  of the proceeding because his reputation is squarely at stake.

18       9.     I believe that Judge Snow should recuse himself for the reasons set

19  forth in the Motion, if not merely for the material witness status of his wife, and perhaps

20  the Judge himself.  However, there are other facts and reasons that exist that mandate the

21  recusal and disqualification of Judge Snow from this case, in addition to his wife's

22  material witness status, an unwaivable conflict in the eyes of the law that requires Judge

23  Snow to remove himself from this case and further related proceedings concerning me and

24  MCSO.

25       10.    Aside from the unavoidable and unwaivable material witness status

26  of Judge Snow's spouse, Sheri Snow, and perhaps Judge Snow, other reasons and facts

27  exist to demonstrate that Judge Snow is biased and prejudiced towards me, and that more

28  than an appearance of impropriety regarding Judge Snow's handling of this case exists.

1  Although all of the facts and reasons that require recusal and disqualification of Judge
2  Snow are set forth in the motion, I highlight them in this affidavit.

3         11.    Seventeen months after Judge Snow's entering of a Preliminary
4  Injunction in this matter, approximately nine months following a bench trial, and one
5  week before the deadline to file a Recall Petition against me, Judge Snow issued his
6  Findings of Fact and Conclusions of Law in May 2013.  The delay in issuing his Findings
7  was curious.   The timing of the issuance of his Findings, however, was problematic, as it
8  fell approximately one week before the Recall Petition deadline, and resulted in
9  immediate marches and protests against me at a crucial point in my career as Sheriff.

10         12.    At one point during this litigation, Judge Snow determined that civil
11  contempt proceedings would occur in this case to determine if I and certain other MCSO
12  personnel were in contempt of Judge Snow's Orders and discovery obligations in this
13  case.

14         13.    On March 17, 2015 an Expedited Motion to Vacate Hearing and
15  Request for Entry of Judgment was filed on my behalf.  The purpose of that Motion was
16  to convey to the Court and to Plaintiffs that I, MCSO and identified non-party Chief
17  Deputy Gerard Sheridan consented to a finding of civil contempt against us and the
18  imposition of remedies designed to address our conduct.  We expressed our sincere
19  remorse to the Court and to Plaintiffs and explicitly acknowledged that we had negligently
20  violated the Court's Preliminary Injunction.  We adopted and stipulated to the facts as
21  stated in the Court's Order to Show Cause, as well as to the entry of an Order finding us in
22  civil contempt.

23         14.    Nevertheless, Judge Snow demanded that I have "skin in the game"
24  and, specifically, that I pay a sanction from my personal funds and not from any fund
25  created to assist me in my legal defense.  We provided a proposed list of stipulated
26  remedial measures that Defendants had agreed to implement, including a payment of
27  $100,000 from my personal funds to a civil rights organization. In light of these remedial
28  measures, we requested that Judge Snow vacate the evidentiary hearing to determine the

1   existence of the admitted contempt.

2        15.    Despite the admitted inadvertent violation of the Court's Preliminary

3   Injunction and the remedial measures to which we agreed, including agreeing to

4   Plaintiffs' settlement terms that would have mooted the need for contempt proceedings,

5   Judge Snow refused to discontinue the contempt proceedings. Instead, he requested that

6   the United States Attorney for the District of Arizona attend the proceedings to determine

7   whether sufficient evidence would be present to justify criminal contempt proceedings. In

8   essence, Judge Snow requested that the U.S. Attorney function as his investigator to

9   determine whether criminal contempt of his Preliminary Injunction had occurred. The

10  U.S. Attorney appropriately denied Judge Snow's invitation to participate in this capacity

11  by letter and subsequently in open Court.

12       16.    During the unnecessary contempt proceedings, Judge Snow

13  embarked on his own inquiries during his examination of me which was entirely unrelated

14  to the three grounds that were the defined subjects of the contempt proceeding: (1) failing

15  to implement and comply with the Preliminary Injunction; (2) violating [ ] discovery

16  obligations; and (3) acting in derogation of Judge Snow's May 14, 2014 Orders.

17       17.    Judge Snow continued his inquiries during his examination of Chief

18  Deputy Gerard Sheridan following my testimony. Judge Snow's questioning of me and

19  Chief Deputy Sheridan was based on Judge Snow's reading of, reference to, and reliance

20  on hearsay statements contained in a Phoenix New Times blog posted by Stephen

21  Lemons. The investigations into which Judge Snow inquired had no relevance to the

22  contempt proceedings (i.e. the "Grissom investigation" and the "Montgomery

23  investigation" defined and explained in Section II D. of the Motion.)

24       18.    During Judge Snow's surprise examination regarding the Grissom

25  investigation, it appeared that Judge Snow believed that we had investigated him and his

26  wife. Despite the fact that testimony revealed that no such investigations had occurred,

27  Judge Snow persisted in his examination. What was clearly understood by the testimony

28  that Judge Snow elicited during the surprise examination of me and Chief Deputy

1  Sheridan, MCSO had not investigated Judge Snow's wife or any member of his family.

2  Rather an investigator hired by my former counsel interviewed individuals to whom the

3  Judge's spouse, Sheri Snow, made statements to the effect that Judge Snow hates me and

4  would do anything to get me out of office.  The interviews that the private investigator

5  conducted of the individuals who heard Judge Snow's spouse, Sheri Snow, make the

6  serious statements verified that Judge Snow's wife had, in fact, made these statements.

7  Nevertheless, testimony that Judge Snow elicited demonstrated that MCSO decided to go

8  no further than just to verify that Mrs. Snow had made such statements.  Nevertheless,

9  Judge Snow is continuing to inquire into the Grissom investigation by using his Monitor,

10  Robert Warshaw, and the Monitor's twelve member team, to conduct an investigation on

11  Judge Snow's behalf.

12        19.    During the recent contempt proceedings, Judge Snow also conducted

13  surprise examinations of me and Chief Deputy Sheridan regarding a second investigation

14  also unrelated to the three clearly defined subjects of the contempt proceedings.  In doing

15  so, Judge Snow inquired regarding MCSO's use of a confidential informant, Dennis

16  Montgomery, involving email breaches, including the emails of certain attorneys who

17  represented me, wiretaps of me and Judges, and computer hacking of approximately

18  50,000 bank accounts of Maricopa County citizens.  Like the Grissom investigation, this

19  "Montgomery investigation" did not involve any investigation of Judge Snow or his

20  family.  Nevertheless, Judge Snow has expanded the powers of the Monitor to further

21  inquire into the "Montgomery investigation" regardless of relevance to the contempt

22  proceedings and this action as a whole.

23        20.    Judge Snow as a sole arbiter of the matters relevant to the contempt

24  proceedings, and this case as a whole, has utilized the Monitor to expand his investigation

25  into these unrelated issues.  To justify this expansion of power, and after the Court

26  received a separate motion by an attempted intervenor seeking the recusal or

27  disqualification of Judge Snow, Judge Snow tried earnestly to create a connection

28  between the Grissom and Montgomery investigations and a speculative pattern of

1  "knowing defiance" rather than "inadvertence" of Judge Snow's Orders and necessary

2  remedies for members of the Plaintiffs' class.  Again, civil contempt due to inadvertence

3  or negligence had already been admitted.  No known defiance or intentional contempt of

4  Judge Snow's Orders ever occurred.  Nevertheless, Judge Snow granted the Monitor

5  "broad leeway" in determining what matters are pertinent to the current contempt

6  proceedings, despite the clear irrelevance and the testimony that Judge Snow elicited

7  during his surprise examinations.

8         21.    What's more, when my counsel requested clarification regarding the

9  Monitor's investigatory powers, Judge Snow refused her request.  In doing so, he stated

10  that he was not going to limit the Monitor's authority or unduly shackle the Monitor.

11  Thus, the Monitor now has unlimited investigatory powers into issues completely

12  unrelated to the contempt proceedings that will continue despite admissions of civil

13  contempt.

14         22.    In addition, the 9th Circuit Court of Appeals has recently ordered that

15  Judge Snow had improperly expanded the authority and investigatory powers of the

16  Monitor in this case.  However, despite the 9th Circuit's recent Order, Judge Snow has,

17  once again, improperly expanded the authority and investigatory powers of the Monitor

18  into matters completely immaterial and irrelevant to the contempt proceedings and issues,

19  as framed by Judge Snow's Order to Show Cause (e.g., the Grissom and Montgomery

20  investigations, and most recently, MCSO's investigation into the authenticity of President

21  Obama's birth certificate).

22         23.    Furthermore, a person within the third degree of relationship to Judge

23  Snow is affiliated with Plaintiffs' counsel.  Judge Snow's brother in-law is an attorney

24  with Covington Burling, counsel for Plaintiffs in this action.  Early in this action, my

25  former counsel waived this conflict.  However, in light of recent events, reconsideration of

26  this previously waived conflict is necessary.

27

28         24.    In light of the statements that Judge Snow's wife, Sheri Snow made,

4272903.1
5/21/15

7

1  Judge Snow's statement regarding his alleged hatred for me and his desire to see me
2  removed from Office, the reputations of Judge Snow and his wife are at stake in this
3  proceeding.   Thus, the Judge has in interest that could be substantially affected by the
4  outcome of the proceeding.

5          25.     The fact that Judge Snow believes that the Grissom investigation is
6  relevant to the contempt proceeding establishes his spouse as a material witness.
7  Undoubtedly, Mrs. Snow is now a material witness in this proceeding because of Judge
8  Snow's injection of her and her statements into the contempt proceedings.  Certainly, at
9  issue is whether she made the statement, what she meant by the statement and her
10 conversations that she may have had with her husband, Judge Snow, and any statements
11 that Judge Snow may have made about me, his feelings for me and his alleged desire to
12 see me removed from the Office of Maricopa County Sheriff.  I realize and appreciate the
13 gravity of this situation, but even if there is a denial that Mrs. Snow made the statements
14 at issue, although there has been none to date, the conflict that is now created is
15 unwaivable and the integrity of this proceeding and my constitutional right to due process
16 of law is in jeopardy.  And Judge Snow is solely responsible for making his spouse, and
17 perhaps himself, a material witness to this proceeding by injecting irrelevant matters into
18 this proceeding.

19         26.     The Judge has made comments that indicate that he has a personal
20 bias or prejudice against me.

21         27.     As Judge Snow revealed during the contempt proceedings, he has
22 engaged in outside investigation with regard to matters that he thought to be relevant and
23 that he infused into the proceeding.

24         28.     What's more, he apparently took evidence outside of Court, although
25 he did not disclose the identity of the individual with whom he spoke regarding this
26 matter.  However, he clearly stated that he engaged in an investigation outside the Court
27 room during a lunch break.

28         29.     Judge Snow also asked leading questions on irrelevant matters during

4272903.1
5/21/15

8

29.    Judge Snow also asked leading questions on irrelevant matters during the contempt proceeding.

30.    Moreover, he gave his own testimony during the proceeding.

31.    Furthermore, Judge Snow was argumentative with witness Chief Deputy Sheridan when he was on the stand; he interrupted Chief Deputy Sheridan and challenged his decision to make an informant, Dennis Montgomery, a confidential informant in an investigation unrelated to the contempt proceeding.

32.    Judge Snow has also ordered the production of documents that may be protected by the work product doctrine or attorney client privilege. Those documents pertain to an attorney, Larry Klayman, and his client Dennis Montgomery. Mr. Klayman is not an attorney who has appeared in this case and Mr. Montgomery is not a party to this action.

33.    For the reasons set forth in this affidavit and in the simultaneously filed Motion for Recusal or Disqualification of District Court Judge G. Murray Snow, I am requesting that:

(1)    Judge Snow recuses himself from these proceedings; and

(2)    If Judge Snow declines to recuse himself, that this Motion be assigned to another United States District Court Judge for consideration.

FURTHER AFFIANT SAYETH NAUGHT.

_____

Sheriff Joseph M. Arpaio

SUBSCRIBED AND SWORN before me this 21ˢᵗ day of May, 2015 by Sheriff Joseph M. Arpaio.

_____
Notary Public

My Commission Expires:

4-19-17

SHELLEY COFFEY
Notary Public - Arizona
Maricopa County
Expires 04/19/2017

4272903.1
5/21/15

9

0383

# EXHIBIT 2

# **Phoenix New Times**

# JOE ARPAIO'S INVESTIGATING FEDERAL JUDGE G. MURRAY SNOW, DOJ, SOURCES SAY, AND USING A SEATTLE SCAMMER TO DO IT

**BY STEPHEN LEMONS**         WEDNESDAY, JUNE 4, 2014  |  12 MONTHS AGO



Sheriff Joe Arpaio, during a 2012 press conference about his ludicrous birther investigation

*AP Photo/Matt York*

0385

The most revealing part of Phoenix filmmaker Randy Murray's recent documentary *The Joe Show* was a strategy meeting during Sheriff Joe Arpaio's 2012 re-election campaign that included Arpaio, his top flack, Lisa Allen, Chief Deputy Jerry Sheridan, and campaign manager Chad Willems.

The group huddled in the back of a Fountain Hills restaurant to discuss how to spin Joe's negatives -- the misspending of more than $100 million, the deaths in the jails, the scores of millions in lawsuit payouts -- for the public.

At some point, Arpaio's "birther" investigation came up. You know, the one in which President Barack Obama's birth certificate gets investigated by both the Maricopa County Sheriff's Office's Cold Case Posse, a nonprofit organization, and MCSO Deputy Brian Mackiewicz, whom Arpaio flew to Hawaii as part of this snipe hunt, at a cost of nearly $10,000 to taxpayers.

Arpaio's March 2012 press conference -- in which the sheriff and the Cold Case Posse's "lead investigator," ex-used-car salesman Mike Zullo, declared Obama's birth certificate to be a forgery -- was in the planning stage when the scene was filmed.

At the mere mention of the birther investigation and the future press event, Allen and Willems practically rolled their eyes.

Willems called the birther probe "nuts."

Allen said the sheriff might as well go the press conference "in big ol' clown shoes." Arpaio shrugged, literally.

"There ain't gonna be no damage control," Arpaio promised Willems. "You'll get more money [in campaign contributions] than you'll know what to do with."

Wilier than the cartoon coyote, Arpaio had tapped into a nationwide right-wing anti-government, anti-Obama feeding frenzy with his birther probe and with his tirades against the U.S. Department of Justice, which was investigating him for abuse of power and other issues and is now suing him in federal court.

"The DOJ is a hot item everywhere," Joe told his flunkies.

See, whenever Arpaio's never-ending political campaign sends out an e-mail blast begging for loot from Obama-haters, it reels in contributions from retired, far-right ofays all over the country.

Willems essentially admitted as much in another scene from the film.

"Now, with Arpaio going to battle with Barack Obama," Willems said, "it's meant literally millions of dollars for his campaign."

As everybody knows, Arpaio was re-elected in 2012, but the investigation into Obama's birth certificate continues apace, according to both Arpaio and Cold Case Posse "commander" Zullo.

At the beginning of May, Arpaio mentioned the birther probe during a speech before a group of Silicon Valley conservatives.

Around the same time, he appeared on *The Right Side*, a conservative cable-access show in Mountain View, California. He told host Chris Pareja that the inquiry into Obama's birth certificate was going strong.

"I'm not done with that yet," Arpaio insisted. "People think I surrendered. No . . . I'm trying to find out who's behind it now. That's the key. You can always have a crime to investigate, but I think you would like to know who did it."

The sheriff said he was after whoever created this "forged, fraudulent document," meaning a computer scan of the president's long-form birth certificate, released by the White House in April 2011.

Arpaio's statements have paralleled assurances from Zullo during periodic interviews with Florida pastor/radio host Carl Gallups that new revelations concerning the Obama birth certificate are on the way.

Critics of birthers regularly mock Zullo's vague pronouncements on Gallups' show as never resulting in any "new" finds.

Why, even the information disclosed during Arpaio's two birther-themed press conferences in 2012 were a rehash of debunked conspiracy theories.

But during a February interview with Gallups, Zullo caused an Internet kerfuffle when he told Gallups' audience that there were now two investigations: the original birther one and an offshoot of the birther probe, this one a criminal investigation.

Moreover, the second investigation was using two MCSO detectives and, presumably, county money.

"I don't know how this is all going to play out," Zullo said. "I know that [in] the criminal investigation that we're working on now, Sheriff Arpaio has dedicated resources and two full-time Maricopa County Sheriff's Office detectives."

He added, "These are seasoned pros [who] are working this. These are the guys that go hunt down the really bad guys."

Zullo promised to release "universe-shattering" results of these investigations in March, a deadline Zullo since has extended indefinitely.

Blogger Mitch Martinson of arizonaspolitics.com was the first to query the MCSO on Zullo's claim, and the first to report that Sheriff's Office spokesman Brandon Jones kinda-sorta had confirmed it.

"We have two sheriff's detectives assigned to look into other issues surrounding the birth certificate," Jones told Martinson, in a blog item posted February 10. "However, they are not investigating the birth certificate issue itself."

Later, Jones walked back his comments to Martinson, sending the blogger an e-mail, which Martinson used in a screen shot to a follow-up post.

"Mitch, I was misinformed," Jones stated. "The detectives are not working on anything regarding the birth certificate. Not even surrounding. Mr. Zullo was incorrect: They are working on other serious cases not even related."

Who were these two detectives, what were they up to, and why is Zullo, a mere posse member, privy to it?

Based on information given to me by longtime sources, the two detectives mentioned are Brian Mackiewicz, the same deputy who made a taxpayer-funded run to Hawaii in May 2012, and Sergeant Travis Anglin, once a lieutenant with the notorious Maricopa Anti-Corruption Effort who was demoted after an MCSO investigation into his private security company and its use of MCSO detectives.



Dennis Montgomery, in a mugshot from a 2009 arrest

*Riverside County Sheriff's Department*

My sources -- one of whom is a former detective with the MCSO's Special Investigations Division and is well-acquainted with SID and those in it -- say Anglin and Mackiewicz were involved in an odd investigation dating back to October 2013.

Moreover, they say, the deputies have used as a confidential informant a notorious scammer in the Seattle area.

What have they been investigating? According to my sources, Mackiewicz, Anglin, and the informant are focused on U.S. District Court Judge G. Murray Snow, the Justice Department, and a bizarre conspiracy theory that the DOJ and Snow have conspired to somehow "get" Joe Arpaio.

0388

The person who purportedly convinced Arapio of this paranoid fantasy, the sources say, is computer fraudster Dennis L. Montgomery, the subject of a 2010 Playboy exposé titled "The Man Who Conned the Pentagon."

In that article, investigative reporter Aram Roston detailed how, in the wake of the 9/11 attacks, Montgomery snookered the CIA, the White House, the Department of Homeland Security, and the Air Force into believing he had software that could decode secret messages to terrorists, supposedly embedded in broadcasts of the Al Jazeera Media Network.

As crazy as this now sounds, Roston, using unsealed court documents, reported that eTreppid Technologies, the Nevada software company Montgomery co-owned, scored multimillion-dollar contracts for computer software touted by Montgomery.

In fact, Roston wrote, the United States went to Code Orange, the DHS' second-highest terror alert, in 2003 based on data supplied to the CIA by Montgomery.

International flights were delayed, sometimes canceled, because of Montgomery's work. Based on Montgomery's "intelligence gathering," Homeland Security Secretary Tom Ridge told reporters at the time about the threat of "near-term attacks" that could "rival or exceed" those of 9/11.

"Montgomery calls the work he was doing noise filtering," Roston wrote. "He was churning out reams of data he called output. It consisted of latitudes and longitudes and flight numbers."

This data was given to then-CIA Director George Tenet, according to Roston, and "eventually ended up in the White House."

There was one big problem, Roston reported: "The communications Montgomery said he was decrypting apparently didn't exist."

Roston wrote that Montgomery's eTreppid colleagues questioned his computer skills. Company employees also claimed that Montgomery had faked demonstrations of weapons-recognition software for representatives of the U.S. military.

With the help of a "branch of the French intelligence services," the CIA finally got wise to Montgomery, realizing that there were no secret messages to bad guys in the Al Jazeera broadcasts.

Montgomery left eTreppid, wrote Roston, and went on to work for software companies backed by a wealthy heiress; to accuse Nevada Governor Jim Gibbons of taking a bribe (Gibbons later was cleared of wrongdoing); to lose big at a Rancho Mirage, California casino ($422,000 in one day); and to declare bankruptcy.

Now, Montgomery lives in Yarrow Point, Washington, a short drive from downtown Seattle. My sources report that MCSO detectives Anglin and Mackiewicz have spent a lot of time this year in Seattle with Montgomery, who, the sources say, has convinced the sheriff that he has information suggesting an anti-Arpaio conspiracy between Judge Snow and the DOJ.

These sources say there is no report number assigned to the case, that Arpaio himself is running it, and that the investigation has been financed with funds for confidential informants, RICO funds.

Montgomery has been assigned a "confidential informant number" or "control number," the identity of which is known only to Arpaio, a few MCSO brass, and those in Special Investigations, according to my sources, who claim Montgomery has been paid about $100,000 to date by the MCSO.

The situation gives Arpaio and the MCSO a degree of deniability because the department is allowed to keep the identities of confidential informants secret in most instances. Though there should be MCSO paperwork associated with such payments, it would show a payment to a control number, not a name.

The MCSO's official policy on "informant management" states that control numbers must be maintained in a confidential-informant log "monitored by the [Special Investigations Division] commander or his designee."

It further states that all informant files be kept in a "secured area within the SID." The policy notes that the MCSO "will protect these sources through all available and reasonable legal means."

Such "informant files" are retained as "permanent records" of SID, "unless the division commander determines that the records may be purged."

My sources say Mackiewicz has received, to date, $50,000 in overtime pay and Zullo has gotten about $5,000 in payments.

Zullo's role is unclear, though he currently is involved in the investigation, according to these sources, as well as the perpetual birther probe.

Additionally, they say the MCSO made about a $50,000 purchase of computer equipment for Montgomery sometime this year from a store in Washington state.

According to the MCSO's policy regarding "Undercover and Investigative Funds Accountability," an expenditure of up to $6,000 for undercover and investigative work can be approved by a division commander.

Anything over $6,000 must be approved by a bureau commander.

As for funds specifically paid to confidential informants, the reins are even tighter.

Payments to a CI of more than $300 must be approved by a division commander "prior to the expenditure of the funds," according to the MCSO's informant-management policy. The amount of money involved in detectives Anglin and Mackeiwicz's Seattle quest has raised red flags with MCSO accountants, I've been told.

These same MCSO accountants reportedly have expressed concern internally about the procurement of the computer equipment, excessive CI payments, the amount of overtime involved, and the money spent on airfare and stays in Seattle.

In several broadly worded public-records requests sent to the MCSO in February, I asked for any and all e-mails traded among the players involved, as well as any and all records regarding MCSO employees' trips to Seattle, payments of informant funds to Dennis Montgomery, and Mackiewicz's overtime requests.

In each case, I was advised by MCSO spokesman Jones that "this is an ongoing investigation . . . no records can be released at this time."

In March, I called Zullo at his home phone number. I asked him about the work he was said to be doing with Montgomery.

He claimed not to know what I was talking about. When I pressed him, he said all such inquiries should go through the MCSO.

"I have no comment to make, especially to the *New Times*," he told me before hanging up.

The opportunity to question Arpaio about the Montgomery caper came as he munched on cheese at a recent fundraiser for embattled Arizona Attorney General Tom Horne at the University Club in Phoenix.

I asked the sheriff about Montgomery and the work that my sources tell me he has done for the MCSO.

At first, he played dumb, asking if I meant County Attorney Bill Montgomery.

"No, *Dennis* Montgomery," I replied. "The computer guy in Seattle who is helping you investigate Judge Snow and the DOJ. You are investigating Snow and the DOJ, aren't you?"

As he hit the cheese platter again, Arpaio looked over his shoulder at me with a grin. But he said nothing.

I kept after him, asking why deputies Mackiewicz and Anglin had spent so much time in Seattle.

"I dunno, maybe they like the weather up there," he said over his shoulder, "or the snow crab."

True to form, the sheriff was cagey, but there was no denial.

The ex-Special Investigations source I know tells me that the joke around Arpaio's office is that Montgomery's referred to as "Snowden," after Edward Snowden, the American computer geek responsible for a massive 2013 leak of classified documents from the National Security Agency that exposed Orwellian surveillance programs run by the U.S. government.

"[Montgomery] says he worked for the CIA on a project called Hammer [and] collected data similar to Snowden's," the source says. "[Montgomery] claims he can prove there was a conspiracy between [U.S. Attorney General] Eric Holder and Judge Snow . . . a conspiracy against Arpaio."

Montgomery, who is middle-aged and stocky with a shock of white hair, is no Snowden. Whatever you think of Snowden, at least the information he released generally has been confirmed as legitimate.

As with the gibberish Montgomery reportedly gave the CIA in the early 2000s, he has, according to my sources, produced many printouts for the MCSO that seem off point, with dates going back to 1999 and earlier.

Obviously, that's long before Arpaio took up the cause of illegal immigration, long before he was investigated or sued by the DOJ, and long before he became the subject of the ACLU's big racial profiling lawsuit *Melendres v. Arpaio*.

One source informs me that at least one underling told Arpaio recently that what Montgomery provided the MCSO is worthless, that Joe is getting played -- which caused the sheriff to erupt into a fit of anger.

When Montgomery was approached by a freelance reporter on behalf of *New Times* in April, he was nonplussed.

Montgomery came to the door of his Yarrow Point home, a cell phone at his ear, talking to someone about computer equipment.

The reporter identified himself, and Montgomery asked for a card, which the reporter presented.

"I really don't wanna talk to you," Montgomery said, ending his call.

"Okay, about Phoenix . . .," the reporter began.

"No comment," Montgomery shot back.

"Arizona . . .," the reporter started again.

"No comment," Montgomery repeated. "Who sent you up here?"

"*Phoenix New Times*," the reporter explained.

"Yeah," growled Montgomery.

"Have you done any work for Joe Arpaio?" the reporter asked.

"I, I, I have no comment," Montgomery said, moving away. "I'll call you later. I'll think about it."

Montgomery went back into his house and shut the door, ending the conversation on a mysterious note. As with Arpaio, there was no denial.

Is Dennis Montgomery Joe Arpaio's Snowden? I cannot say absolutely.

But it's not far-fetched to think that Arpaio would investigate any powerful public official. He continues to investigate the president. He and now-disbarred former County Attorney Andrew Thomas investigated Superior Court judges perceived to be thwarting their anti-undocumented-immigrant policies.

That is, it fits a pattern cultivated over his reign of more than 20 years.

Among Arpaio's bogus investigations have been:

• One targeting former Arizona Attorney General Terry Goddard for alleged bribery. The probe began in 2007 and didn't seem to end until Goddard left office.

• One that brought the 2008 indictment of then-county Supervisor Don Stapley on 118 criminal counts related to his allegedly not properly disclosing sources of income. All counts were dismissed ultimately.

• An infamous December 2009 RICO suit brought by Arpaio and Thomas against the entire Board of Supervisors, various county employees and certain Superior Court judges. Supposedly, they all were part of a conspiracy involving the county's new court tower. The suit was a disaster that finally got dismissed by Thomas himself.

• A probe resulting in the filing of false bribery charges in 2009 against former Superior Court Judge Gary Donahoe. Arpaio and Thomas ginned up these charges as retaliation against Donahoe for adverse rulings and to make Donahoe vacate a hearing that Arpaio and Thomas didn't want to take place.

And now Judge Snow, who in 2013 found the MCSO guilty of racial profiling and assigned a monitor to make certain that Arpaio was obeying court orders on reforming and re-educating deputies so that the agency does not profile Latinos or any other minority again?

As for Holder, the DOJ remains engaged in a lawsuit accusing Arpaio of abuse of power and prejudiced policing.

At age 82, the sheriff faces the ignominy of ending his law enforcement career as a disgraced political colossus.

All -- in his mind -- because of Snow and the DOJ.

Why not attempt an investigation aimed at discrediting his perceived nemeses?

Though there never will be any pink handcuffs in Snow's or Holder's future, Arpaio's racist, wing-nut supporters would consider it an act of bravery that their hero is investigating federal officials getting in the way of keeping despised Latinos in their place.

Meaning more money in the sheriff's perpetual re-election kitty and proving that bogus investigations continue to pay off.

My dream, of course, is that Snow blows a gasket and perp-walks the aged autocrat. We'll see.

*Rick Anderson in Seattle contributed to this story.*

---

Sponsor Content

0393



0394

# EXHIBIT 3

0395

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV 07-2513-PHX-GMS |
| vs. | ) ) | Phoenix, Arizona April 23, 2015 |
| Joseph M. Arpaio, et al., | ) ) | 8:34 a.m. |
| Defendants. | ) ) ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Evidentiary Hearing Day 3, pages 512-817)

Court Reporter:                  Gary Moll
                                 401 W. Washington Street, SPC #38
                                 Phoenix, Arizona   85003
                                 (602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

1  Q.  Do you remember him writing about investigations that he

2  had sources were telling him your office was doing out of

3  Seattle involving confidential informants?

4  A.  He may -- I may remember that, yes.

5  Q.  Let me just give you -- I've copied the article.  Let me

6  give it to you and see if it helps to refresh your recollection

7  that you've read it.

8       Do you want to distribute that?

9       (Off-the-record discussion between the Court and the

10 clerk.)

11      THE COURT:  Hand it to the attorneys.

12      THE WITNESS:  It's a long article.

3  BY THE COURT:

14 Q.  It is a long article, and if you need to take the time to

15 read it, you can do that.  But I'm just asking if you have any

16 recollection, now having me give it to you, if you ever read

17 it.

18      I will tell you that in the article he says he talked

19 to you about some of the materials in the article, and that's

20 kind of on the last page, if that will help you.

21      (Pause in proceedings.)

22 BY THE COURT:

23 Q.  Do you remember reading this article?

24 A.  I believe I read it.

25 Q.  And I just want to ask you some questions about the article

1    and some of the things that it states.

2         I recognize, and I believe Mr. Lemons does in the

3    article, too, that he can't personally vouch for everything

4    that the article says, it's just what he's had some sources

5    tell him.

6         So I don't mean to suggest one way or another that the

7    article is accurate.  I just want to ask about some of the

8    things that it says so I understand them.  And I trust that

9    you'll tell me the truth, and you understand you're under oath,

10   correct?

11        Did you detail some of your personnel to conduct

12   investigations that resulted in their frequent trips and stays

3    in the Washington state area beginning in 2013 or 2014?

14   A.  We had a couple investigations -- investigators go up

15   there, yes.

16   Q.  And who were those investigators?

17   A.  I think it was Zullo and Brian Mackiewicz.

18   Q.  And Mackiewicz is --

19   A.  A detective.

20   Q.  Is he in your -- is he assigned to you personally, your

21   risk detail?

22   A.  Well, we had a lot of threats on me and --

23   Q.  I understand that.  Is that generally his assignment, to

24   protect you and assess risks that come against you?

25   A.  Yes.

0398

1  Q.  And what were those?

2  A.  Had to do with computer tampering and also bank fraud, that

3  type of thing.

4  Q.  Did you ever -- you see that the article says that what

5  Montgomery was actually doing was investigating me.

6      You see that that's what the article says?

7  A.  It's not true.

8  Q.  All right.  Are you aware that I've ever been investigated

9  by anyone?

10  A.  You investigated?

11  Q.  Yes.

12  A.  No.  No.

3  Q.  Any of my activities?

14  A.  No.

15  Q.  Any of my family members?

16  A.  That have been investigated?

17  Q.  Yes.

18  A.  Not by our office.

19  Q.  Are you aware of anybody who's investigated any of my

20  family members by any -- any office.  Or anybody.

21  A.  I believe there was an issue, but once again, it wasn't my

22  office.

23  Q.  Well, whose office was it?

24  A.  It was an outside investigator not hired by us.

25  Q.  Who hired the outside investigator?

1    A.    Could have been counsel.

2    Q.    "Counsel" meaning your counsel?

3    A.    Yes.

4    Q.    And would that have been Mr. Casey or Ms. Iafrate?

5    A.    I believe it would have been Mr. Casey.

6    Q.    And who did he hire?

7    A.    It was the counsel.

8    Q.    I'm sorry?

9    A.    Mr. Casey.

10   Q.    Mr. Casey.  Who did Mr. Casey hire?

11   A.    Pardon?

12   Q.    Who did Mr. Casey hire?  To investigate me or a member of

3    my family, or members of my family.

14   A.    We weren't investigating you, Your Honor.

15   Q.    Well, who were you investigating?

16   A.    We were investigating some comments that came to our

17   attention.

18   Q.    Okay.  And how did they come to your attention?

19   A.    Through e-mail.

20   Q.    And do you know who the author of the e-mail was?

21   A.    I don't have the name right now.

22   Q.    Okay.  Let me ask, in his article Mr. Lemons indicates --

23   well, let me get -- let me get this clear.  Your testimony is

24   that Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, never were involved

25   in any investigation of the Department of Justice or of me, is

1    that correct?

2    A.   Not -- no, not of you.

3    Q.   Well, were they involved in an investigation of the

4    Department of Justice?

5    A.   I'm not sure.

6    Q.   Were they trying to determine whether the Department of

7    Justice had contacted me in any way?

8    A.   I'm not sure about that.

9    Q.   You're not sure about that?

10   A.   No.

11   Q.   And would Mr. Montgomery have been involved in assisting

12   them to determine whether the Department of Justice had

3    contacted me in any way?

14   A.   No.   I believe there was information about many judges

15   being infiltrated or wiretaps and that type of thing.   That's

16   what the informer said that right now we don't have much

17   confidence in.

18   Q.   Well, who was the informer and what did the informer say?

19   A.   We're speaking about Montgomery.

20   Q.   All right.   Montgomery said that judges had been

21   infiltrated?

22   A.   That many judges -- if I recall, that they're wire -- their

23   phones were tapped, e-mails, that type of thing.

24   Q.   By the Department of Justice?

25   A.   By someone.

1     Do you understand that direction?

2   A.   Yes.

3   Q.   Who else was aware of these investigations within the MCSO?

4   A.   I'm not sure.  Because of the sensitivity, we were trying

5   to keep it quiet.

6   Q.   Now, I think in addition to the investigation that may have

7   involved me and my phone or any contact or tapping by the

8   Department of Justice, you indicated that there were

9   investigations made into members of my family.

10     Did you indicate that?

11   A.   That had nothing to do with Montgomery.

12   Q.   What did it have to do with?

3   A.   I believe there was a, as I say, e-mail that came to me.

14   Q.   And do you still have that e-mail?

15   A.   We may have it, yes.

16   Q.   I'm going to direct you to keep that e-mail.

17     What did the e-mail say, to the best of your

18   recollection?

19   A.   I think it mentioned that Judge Snow wanted to do

20   everything to make sure I'm not elected.

21   Q.   Do you recall who the author of that e-mail was?

22   A.   I believe it was someone named Grissom.

23   Q.   Grissom?

24   A.   Grissom.

25   Q.   Okay.  And how did this person purport to know that?

1   A.   The person met your wife in a restaurant, and she's the one

2   that made those comments.

3   Q.   According to whatever Mr. Grissom said.

4   A.   There was other witnesses, yes.

5   Q.   Okay.  And so you turned that over to your counsel and

6   counsel hired a private investigator, and what did the

7   investigator do?

8   A.   He investigated it.

9   Q.   And what was the result of the investigation?

10  A.   Results were that he confirmed that your wife was in that

11  restaurant and con -- I guess talked to the witnesses, three or

12  four, that confirm that remark was made.

3   Q.   All right.  And do you have any materials pertaining to

14  that investigation?

15  A.   We should have.

16  Q.   Okay.  Will you save those as well?

17  A.   Yes.

18  Q.   All right.  Thank you.

19            Who has told you that the information that

20  Mr. Montgomery provide -- or how is it that you've come to

21  conclude that the information you were getting from

22  Mr. Montgomery is not reliable?

23  A.   I think the investigators, as time progressed, figured that

24  he may not be reliable.

25  Q.   Did the MCSO also purchase computer equipment for

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) |
| Plaintiffs, | ) CV 07-2513-PHX-GMS ) |
| vs. | ) Phoenix, Arizona ) April 24, 2015 |
| Joseph M. Arpaio, et al., | ) 8:41 a.m. ) |
| Defendants. | ) ) ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Evidentiary Hearing Day 4, pages 818-1030)

Court Reporter:          Gary Moll
                         401 W. Washington Street, SPC #38
                         Phoenix, Arizona  85003
                         (602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

Page 962

1          THE COURT:  And did it make allegations that I was

2    doing something illegal?

3          THE WITNESS:  No, sir.

4          THE COURT:  Did it make allegations that I was biased

5    in this litigation?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  All right.  You may go ahead and answer.

8    BY MS. IAFRATE:

9    Q.   Do you remember the question?

10   A.   Could you please repeat it?

11   Q.   Sure.  You were talking about this Facebook message that

12   went to the sheriff's office, and I asked you what was the

3    content of the message.

14   A.   Yes.  I can't quote it verbatim, but it was -- I know

15   Judge Snow's wife.  She told me he hates you and he wants to

16   see you out of office.

17   Q.   Did you identify who that message was from?

18   A.   Yes.  The header from the individual that it came from was

19   Karen Grissom.

20   Q.   Did you learn -- subsequently learn more about how

21   Ms. Grissom came to get this information that Judge Snow's wife

22   said that Judge Snow hates the sheriff and wants to get him out

23   of office?

24   A.   Yes, ma'am.

.5   Q.   What did you -- what did you learn subsequently?

1    because he sent it to my office.  You're aware that Mr. Casey,

2    while acknowledging that he has duties to you and not

3    commenting on it, denies that he was involved in any way, or he

4    says -- he doesn't deny anything, but he says something to the

5    effect that he's confidant that when the materials are

6    evaluated he was not involved in any way in the investigation

7    of me or a member of my family.

8          And is it your view that you were at a conversation in

9    which that just simply isn't true?  That if I read it that way,

10   my understanding is wrong?

11   A.   Your Honor, that -- that's where I started out saying it

12   depends on how you define "investigated your wife," because

3    no one, no one ever went any further than just verifying that

14   conversation --

15   Q.   All right.

16   A.   -- occurred.

17   Q.   Mr. Casey hired, if not an investigator, somebody?

18   A.   That's correct.

19   Q.   And that somebody went and talked to Ms. Grissom?

20   A.   Correct.

21             THE COURT:   Okay.

22                    CROSS-EXAMINATION CONTINUED

23   BY MS. IAFRATE:

24   Q.   And also spoke to her husband and her grown son?

.5   A.   Correct.

1   Indonesia and back within seconds.  And it comes back in your

2   computer, the system puts it back together.

3           Montgomery has that data, or he says he does, in

4   those -- in that format.  He needs -- or he says he needed

5   supercomputers to put that information together.  He doesn't

6   have one.  He's got this huge one in his garage, and it takes

7   forever to run programs.  And so he would come back with

8   information.

9           Our primary focus, Your Honor, was the fraud, the bank

10  fraud, the -- excuse me, the computer fraud of him hacking into

11  person -- people's personal bank accounts.

12  Q.  Are you uncomfortable telling me who the target of this

3   investigation was?

14  A.  No, because there were about 50,000 people.  Some of them

15  very prominent people.

16  Q.  Well, the sheriff told me that the target was the

17  Department of Justice.  Do you remember that?

18  A.  I -- I'm sorry, I don't.

19  Q.  Oh.  Who would have had to sign off on these

20  investigations?

21  A.  I don't --

22  Q.  When I say the target of the investigation, in other words,

23  he thought the Department of Justice was doing the bugging.  Do

24  you remember that?  And the investigation was trying to find

25  out the Department of Justice's bugging of judges and your

1    A.  No, but when the -- somebody leaks to members of the media

2    who he is, he's no longer confidential.

3    Q.  Well, but what was he doing that he needed to be

4    confidential for?

5    A.  Well, it could have shown --

6    Q.  He hadn't infiltrated organized crime, had he?

7    A.  Could have shown that either the Department of Justice or

8    the CIA was breaching American citizens' personal information,

9    and he had at least 50,000, that I remember, of citizens that

10   lived here in Maricopa County.

11   Q.  But I still don't understand.  Do you have a definition of

12   what a confidential informant is anywhere in your operations

13   manual?

14   A.  Yes, sir, we do.

15   Q.  And is it written so broadly that Dennis Montgomery

16   qualifies?

17   A.  I believe so.

18   Q.  Who all has to sign off -- you purchased a bunch of

19   equipment for him.

20   A.  We did, but we never gave it to him.

21   Q.  You authorized travel and overtime and pay for your

22   detectives to go to Seattle?

23   A.  Yes, sir.

24   Q.  Why were you doing this out of Seattle?

25   A.  That's where he lives.

0409

# EXHIBIT 5

**REDACTED**

**REDACTED**

**REDACTED**

Conversation started today

**Karen Morris Grissom**

Judge Snow I know his wife and talked with her one day
she recognized me from our childhood  she told me that her
husband hates u and will do anything to get u out of office.
This has bothered me since last year when I saw her.

Sent from Phoenix

8/22/2013 4:09 PM

# EXHIBIT 6

Transcript of

Recorded Interview of Karen Grissom

Conducted by Don Vogel

on October 26, 2013

DESERT HILLS REPORTING, INC.
2415 E. CAMELBACK ROAD
SUITE 700
PHOENIX, ARIZONA  85016
BY:   TERESE M. HEISIG/RPR
CERTIFIED COURT REPORTER 50378
TRANSCRIPTIONIST

0413

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Okay.  The tape recorder is

2    going.  It is Saturday morning, October 26th.  It is

3    just about 9 o'clock in the morning.  My name is Don

4    Vogel.  And can you go ahead and say your name for the

5    tape?

6          KAREN GRISSOM:  Karen Grissom.

7          DON VOGEL:  Okay.  Karen, just to kind of

8    bring the tape up to speed, I've been here somewhere in

9    the neighborhood of five to ten minutes.

10          KAREN GRISSOM:  Yes.

11          DON VOGEL:  Um, I explained to you that I was

12   here because of some information that has been kind of

13   passed to me through some different channels of

14   Mr. Casey's office that, um, you may have heard a

15   conversation in a restaurant some time back when you

16   were with your husband, and it may involve a situation

17   involving Sheriff Arpaio.

18          KAREN GRISSOM:  Yes.

19          DON VOGEL:  And I've told you that I do not

20   work for the sheriff's office.  I'm a licensed private

21   investigator.  I -- I spoke with you a little bit about

22   my background so that you could be comfortable.  I told

23   you that I have -- I have been retired from a local

24   police department, not the sheriff's office, for

25   eight years.  And we just kind of talked about wanting

Karen Grissom    -    10/26/2013

1  to, I guess, get a -- get an understanding of exactly

2  what it is that you heard on tape, and you have

3  knowledge that this is being recorded.

4          KAREN GRISSOM:  Yes.

5          DON VOGEL:  Okay.  Is there anything that we

6  talked about that I haven't kind of included in the

7  summary?

8          KAREN GRISSOM:  No.

9          DON VOGEL:  Okay.  Karen, how old are you

10  roughly, if you don't want to say.

11          KAREN GRISSOM:  I just turned 64.

12          DON VOGEL:  Okay.  Um, and I know you are

13  short on time this morning, so we will do this as

14  quickly as we can.  We may have to come back and touch

15  up some of the details when we talk with your -- with

16  your husband Dale.  But, um, you had -- do you remember

17  this conversation -- we haven't discussed it, but this

18  conversation that, obviously, I'm here to talk with you

19  about.

20          KAREN GRISSOM:  Yes.

21          DON VOGEL:  When -- do you remember when that

22  occurred?

23          KAREN GRISSOM:  It was last year.  I don't

24  know -- I don't remember if it was in the summer or

25  beginning of the summer.

Karen Grissom    -    10/26/2013

1                   DON VOGEL:  Okay.  So somewhere in the area

2    of maybe 13 to 16 months ago.

3                   KAREN GRISSOM:  Yes.

4                   DON VOGEL:  Okay.  And where did the

5    conversation occur.

6                   KAREN GRISSOM:  At Sombrero's Restaurant.

7                   DON VOGEL:  And which Sombrero's Restaurant

8    were you at?

9                   KAREN GRISSOM:  On Mill Avenue and Baseline.

10                  DON VOGEL:  Okay.  Do you remember what day

11   of the week it was.

12                  KAREN GRISSOM:  No, I don't.

13                  DON VOGEL:  Okay.  Do you remember

14   approximately what time of day it was.

15                  KAREN GRISSOM:  Lunchtime, because we were

16   there for lunch.

17                  DON VOGEL:  Okay.

18                  KAREN GRISSOM:  It had to have been probably

19   on a Saturday.

20                  DON VOGEL:  Okay.

21                  KAREN GRISSOM:  3:00, you know, that is when

22   we probably go.

23                  DON VOGEL:  Okay.  And, um, you were with

24   your husband, obviously.

25                  KAREN GRISSOM:  Yes.

1          DON VOGEL:  Was there anybody else with you
2    when you got to the restaurant.
3          KAREN GRISSOM:  There were -- I think our son
4    was with us.
5          DON VOGEL:  And what is your son's name.
6          KAREN GRISSOM:  Scott Grissom.
7          DON VOGEL:  And how old is Scott.
8          KAREN GRISSOM:  He is 40.
9          DON VOGEL:  Okay.  And where does Scott
10   reside.
11         KAREN GRISSOM:  In California.
12         DON VOGEL:  Can you tell me what city.
13         KAREN GRISSOM:  He is in Oxnard.
14         DON VOGEL:  Okay.  And if it would become
15   necessary, would you be able to give me his cell phone
16   number for him.
17         KAREN GRISSOM:  Yes.
18         DON VOGEL:  Okay.  So you, your husband, and
19   your son Scott were at Sombrero's Restaurant.  Do you
20   remember what you were doing on that side of town?
21         KAREN GRISSOM:  Ah, we go over there quite a
22   bit to eat, and, um, we were -- that is why we go there.
23   We have been going there since they opened.
24         DON VOGEL:  Okay.  And even though you live
25   here on the west side, that is really not that far of a

Karen Grissom     -     10/26/2013

1   drive from here.

2            KAREN GRISSOM:  No, it is not.

3            DON VOGEL:  Within 10 to 15 minutes probably,

4   maybe 15 minutes.

5            Um, where were you seated at in the

6   restaurant?  I'm pretty familiar with that restaurant.

7            KAREN GRISSOM:  We were over on the south

8   side of the door --

9            DON VOGEL:  Okay.  So when you --

10           KAREN GRISSOM:  -- at the window.

11           DON VOGEL:  Okay.  So when you walk in, there

12   is a tremendous amount of seating to your left, and

13   there is just a few tables off to your --

14           KAREN GRISSOM:  On the right.

15           DON VOGEL:  -- right.  And you were off to

16   the right?

17           KAREN GRISSOM:  Right next to the window.

18           DON VOGEL:  Okay.  And do you remember if

19   that is a booth or a table.

20           KAREN GRISSOM:  Table.

21           DON VOGEL:  Okay.  Um, what happened?

22           KAREN GRISSOM:  We were just sitting there

23   eating our lunch, and, um, this girl, tall girl comes

24   up.  I didn't know who she was, and she asked, Irene?  I

25   says, no, I'm Karen.

Desert Hills Reporting, Inc.
602.999.3223

0418

Karen Grissom    -    10/26/2013

1           DON VOGEL:  Okay.  So she asked you if you
2   were Irene?
3           KAREN GRISSOM:  My sister, my younger sister.
4           DON VOGEL:  Okay.  Is Irene -- and you had
5   mentioned when I got here that Irene -- one of your
6   sisters is a paralegal.
7           KAREN GRISSOM:  That is her.
8           DON VOGEL:  Is that -- okay.  What last name
9   does she go by now.
10          KAREN GRISSOM:  Winterburn.
11          DON VOGEL:  Okay.  So she asked if you were
12  Irene.  Do you look like Irene?
13          KAREN GRISSOM:  Yes.
14          DON VOGEL:  Okay.  So is -- does that -- does
15  that happen in the past, where people have --
16          KAREN GRISSOM:  Yes.
17          DON VOGEL:  -- confused you guys?
18          KAREN GRISSOM:  Even -- yeah, even at church.
19          DON VOGEL:  Okay.  Um, so she asked if you
20  were Irene, and you were -- that is nothing new, so you
21  immediately knew that --
22          KAREN GRISSOM:  M'hum.
23          DON VOGEL:  -- somebody was confusing you and
24  your sister.  What happened next.
25          KAREN GRISSOM:  And she -- and then I asked

Karen Grissom        -        10/26/2013

1   her who she was, and she said Sheri Smoch -- Snow.

2           DON VOGEL:  Okay.  She said Sheri Smoch.  Did

3   she say know, too, or are you just adding that.

4           KAREN GRISSOM:  No.  Um, she said Sheri, um,

5   Snow, and I says, well, I don't know you.  And, oh, she

6   said I'm Sheri Smoch.  Remember my family.

7           DON VOGEL:  Okay.

8           KAREN GRISSOM:  From Yuma.

9           DON VOGEL:  Okay.

10          KAREN GRISSOM:  I said, oh, yeah, I remember

11  your dad.  He was a railroad man.

12          DON VOGEL:  What was the dad's name?

13          KAREN GRISSOM:  Um, I don't remember.

14          DON VOGEL:  I thought you just said it.

15          KAREN GRISSOM:  He was a railroad -- he

16  worked in railroad.

17          DON VOGEL:  Oh, okay.

18          KAREN GRISSOM:  Railroad.

19          DON VOGEL:  Okay.

20          KAREN GRISSOM:  And, um -- and I remember her

21  mother.  I don't remember her mother's name.

22          DON VOGEL:  Okay.

23          KAREN GRISSOM:  I remember her stepmother was

24  my piano teacher in college.

25          DON VOGEL:  Okay.

Karen Grissom    -    10/26/2013

1           KAREN GRISSOM:  But she was murdered.  I

2    don't know if they ever found out who did it.

3           DON VOGEL:  What city was she murdered in.

4           KAREN GRISSOM:  In Yuma.

5           DON VOGEL:  Okay.  Now, are you from Yuma.

6           KAREN GRISSOM:  Yes.

7           DON VOGEL:  What year did you -- were you

8    born in Yuma.

9           KAREN GRISSOM:  No.

10          DON VOGEL:  Did -- when did you live there.

11          KAREN GRISSOM:  Um, since I was about

12   six years old.

13          DON VOGEL:  Until when.

14          KAREN GRISSOM:  1970 we moved away.

15          DON VOGEL:  So you lived there for quite some

16   time.

17          KAREN GRISSOM:  Yes.

18          DON VOGEL:  So what year were you born.

19          KAREN GRISSOM:  '49.

20          DON VOGEL:  So you lived there from, like,

21   194- -- excuse me, 1955 until '77 -- until 70.

22          KAREN GRISSOM:  Somewhere around there.

23          DON VOGEL:  Okay.  So you lived there for

24   quite some time.  Um, so she ident- -- she told you her

25   name was Sheri Snow, and then you were kind of puzzled.

Karen Grissom     -     10/26/2013

1  And what was her maiden name, again.

2          KAREN GRISSOM:  Smoch.

3          DON VOGEL:  Do you know how to spell that.

4          KAREN GRISSOM:  S-m-o-c-h or k.

5          DON VOGEL:  Okay.  Had you known her growing

6  up.

7          KAREN GRISSOM:  Growing up, yes.  We just

8  lived a few blocks away from her.

9          DON VOGEL:  Were you friends, or did you just

10 kind of know each other.

11         KAREN GRISSOM:  We were friends.  I would go

12 over to her mother -- to her house and -- and we would

13 play.

14         DON VOGEL:  Okay.

15         KAREN GRISSOM:  We were a different age.

16         DON VOGEL:  Okay.  So after she introduced

17 herself and kind of figured out who everybody was, what

18 happened.

19         KAREN GRISSOM:  Um, she -- and then I said,

20 well, what do you do?  She said, well, I used to be a

21 teacher.  I was a teacher.  I went to BYU, she said.

22 And I think that is where she said she met her husband,

23 and he is a federal judge.

24         DON VOGEL:  Okay.

25         KAREN GRISSOM:  Snow.

1          DON VOGEL:  Did she say his first name.

2          KAREN GRISSOM:  I don't think so.

3          DON VOGEL:  Okay.  Did you know he was a

4   federal judge before that, or did she --

5          KAREN GRISSOM:  No.

6          DON VOGEL:  -- offer that to you.

7          KAREN GRISSOM:  No.  She brought that up.

8          DON VOGEL:  Okay.  What happened next.

9          KAREN GRISSOM:  And, ah -- and, oh -- and I

10  said, oh, he is the one that is after Joe, the sheriff.

11  Oh, yes, he is.

12         DON VOGEL:  Now, you said, "after Joe, the

13  sheriff."  What did you mean by that.

14         KAREN GRISSOM:  Um, what I meant is, he is

15  the judge on the -- on the -- on the case that --

16         DON VOGEL:  Okay.

17         KAREN GRISSOM:  -- that he had a lawsuit.

18         DON VOGEL:  Okay.

19         KAREN GRISSOM:  I've seen it on T- -- on --

20  on the news.  That is all I knew.

21         DON VOGEL:  Okay.  Now, did you remember

22  if -- if she said he is the one after Joe, or he is the

23  one that is on the case involving Joe, or don't you

24  remember.

25         KAREN GRISSOM:  I think it was probably

Karen Grissom     -     10/26/2013

```
 1  after.
 2          DON VOGEL:  Okay.
 3          KAREN GRISSOM:  Not that...
 4          DON VOGEL:  Okay.  Um, now, were you
 5  following that case in the news, or was it just
 6  something that you would see from --
 7          KAREN GRISSOM:  It is just --
 8          DON VOGEL:  -- time to time.
 9          KAREN GRISSOM:  -- I had seen on the news.
10          DON VOGEL:  Okay.  So it wasn't something you
11  watched for on --
12          KAREN GRISSOM:  Because I like --
13          DON VOGEL:  -- the news every night.
14          KAREN GRISSOM:  -- Joe, and I don't -- I
15  didn't like the way he, you know, has been treated, you
16  know.
17          DON VOGEL:  Okay.
18          KAREN GRISSOM:  And, ah -- and then she
19  started, yeah, my husband, um, doesn't like him.  He
20  wants him out of the -- out of his office.  And he --
21  anything he can do to get him out of the office.
22          DON VOGEL:  Okay.  Um, how did you respond to
23  that.
24          KAREN GRISSOM:  I didn't respond to anything
25  to it, because I didn't want to voice my opinion about
```

Karen Grissom    -    10/26/2013

1    it.

2              DON VOGEL:  Okay.  Now, do you think your

3    husband heard that comment that you made.

4              KAREN GRISSOM:  Yes, he did.

5              DON VOGEL:  Did your son hear it.

6              KAREN GRISSOM:  I don't know.

7              DON VOGEL:  Okay.

8              KAREN GRISSOM:  I didn't -- I haven't never

9    talked to him --

10             DON VOGEL:  Okay.

11             KAREN GRISSOM:  -- about it.

12             DON VOGEL:  Was there any reason that your

13   son wouldn't have heard it?  Was he on the phone?  Was

14   he talking to somebody else?

15             KAREN GRISSOM:  Um, probably -- he probably

16   would have heard it if --

17             DON VOGEL:  Okay.  So he was there and

18   present for the conversation.

19             KAREN GRISSOM:  Yes.

20             DON VOGEL:  Okay.  Um.

21             KAREN GRISSOM:  At the time, I think he was

22   living with us.

23             DON VOGEL:  Okay.  Do you remember why he was

24   living with you.

25             KAREN GRISSOM:  His wife kicked him out.

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Okay.  So is he back together.

2          KAREN GRISSOM:  No.

3          DON VOGEL:  Didn't work out.

4          KAREN GRISSOM:  No.

5          DON VOGEL:  I'm sorry.

6          KAREN GRISSOM:  They are divorced now.

7          DON VOGEL:  Okay.  Um, what does your son do

8  in Oxnard.

9          KAREN GRISSOM:  He, ah, worked for a company.

10  He is a project manager.  They -- he is over the crew

11  that takes care of the streets down by the ocean from

12  the streets on the --

13          DON VOGEL:  Okay.  So he works for the city.

14          KAREN GRISSOM:  No.  It is a contract job.

15          DON VOGEL:  Okay.

16          KAREN GRISSOM:  Because I don't know the

17  company.

18          DON VOGEL:  Okay.  Um, so she said that --

19  that her husband wanted Joe out of office.

20          KAREN GRISSOM:  M'hum.

21          DON VOGEL:  What happened next.

22          KAREN GRISSOM:  Oh, we just talked, and she

23  talked about her daughter going to -- leaving for BYU

24  when school starts.  And that is pretty much the

25  conversation.

Karen Grissom      -      10/26/2013

1          DON VOGEL:  Was anybody with her.

2          KAREN GRISSOM:  She had one of her -- one of

3   her daughters with her.

4          DON VOGEL:  Do you remember which one.

5          KAREN GRISSOM:  No.

6          DON VOGEL:  Can you describe her for me?

7          KAREN GRISSOM:  Kind of sandy blonde hair.

8          DON VOGEL:  How old.

9          KAREN GRISSOM:  Oh, in her 20s, maybe not

10  even that.

11          DON VOGEL:  Okay.

12          KAREN GRISSOM:  Probably just out of high

13  school or that.

14          DON VOGEL:  Okay.  Can you describe Sheri for

15  me?

16          KAREN GRISSOM:  She had short hair.

17          DON VOGEL:  Okay.  Is she -- is she white,

18  Hispanic?

19          KAREN GRISSOM:  She is white.

20          DON VOGEL:  Okay.  So she is a white female.

21          KAREN GRISSOM:  M'hum.

22          DON VOGEL:  About how old.

23          KAREN GRISSOM:  She is probably about 55, 56.

24          DON VOGEL:  Okay.  About how tall.

25          KAREN GRISSOM:  Oh, she is probably about 5'

Karen Grissom      -      10/26/2013

```
1   9", 5' 10".

2           DON VOGEL:  And is she heavy?  Is she thin.

3           KAREN GRISSOM:  She is -- she is thin.

4           DON VOGEL:  Okay.  And what color hair.

5           KAREN GRISSOM:  It looked like a -- it wasn't

6   quite blonde, but it was -- it had blonde streaks in it.

7   Sandy blonde or --

8           DON VOGEL:  Was the rest of it lighter, the

9   part that didn't have blonde streaks.

10          KAREN GRISSOM:  Yeah, it was darker.

11          DON VOGEL:  What color would you say the --

12  if you had to tell me what color hair she had, what

13  color hair did she have.

14          KAREN GRISSOM:  Ah, light brown.

15          DON VOGEL:  Okay.  Um, and did she have any

16  distinguishing characteristics about her.

17          KAREN GRISSOM:  No.

18          DON VOGEL:  Okay.  Do you remember what color

19  shirt she was wearing.

20          KAREN GRISSOM:  No.

21          DON VOGEL:  Um.

22          KAREN GRISSOM:  She had a white dog with her.

23          DON VOGEL:  She had a -- what kind of dog.

24          KAREN GRISSOM:  Um, probably a, I don't know,

25  a lab short -- real short hair.
```

Karen Grissom      -      10/26/2013

```
1              DON VOGEL:  Big dog or little dog.

2              KAREN GRISSOM:  It was a big dog.  They had

3    it outside.

4              DON VOGEL:  Okay.  Was anybody outside

5    watching the dog.

6              KAREN GRISSOM:  Another daughter, I believe.

7              DON VOGEL:  Okay.

8              KAREN GRISSOM:  Or it was -- you know, I

9    think another daughter was outside.

10             DON VOGEL:  Okay.  And the daughter that was

11   in was also a white female.

12             KAREN GRISSOM:  Yes.

13             DON VOGEL:  And she was how old, did you say?

14             KAREN GRISSOM:  Oh, probably in her 20s.  I

15   don't --

16             DON VOGEL:  Mid, early, late?

17             KAREN GRISSOM:  Mid 20s, early 20s.

18             DON VOGEL:  Do you remember what color hair.

19             KAREN GRISSOM:  She had -- I think she had

20   long hair.  It is was blonde.

21             DON VOGEL:  Okay.  Any -- um, about how tall?

22             KAREN GRISSOM:  About same tall -- height as

23   her mother.

24             DON VOGEL:  And was she thin, heavy --

25             KAREN GRISSOM:  Thin.
```

Karen Grissom      -      10/26/2013

1            DON VOGEL:  Okay.  Do you remember what
2   color -- what clothing she had on.
3            KAREN GRISSOM:  No.
4            DON VOGEL:  Did she say anything in the
5   conversation.
6            KAREN GRISSOM:  No, I don't think so.
7            DON VOGEL:  Was she close enough to the table
8   to hear what was going on.
9            KAREN GRISSOM:  She was, ah, kind of back.
10  She probably would have --
11           DON VOGEL:  Okay.
12           KAREN GRISSOM:  -- was there.
13           DON VOGEL:  Would it surprise you if, with
14  the activity in the restaurant, based on her position,
15  if we asked her if she heard this comment, would you
16  expect her to be able to have heard it, or would you be
17  surprised if she said she didn't hear it.
18           KAREN GRISSOM:  I would be surprised if he
19  didn't hear it.
20           DON VOGEL:  Okay.  Did -- when she said that
21  comment was there a lot of emotion behind it?  Was she
22  making any faces or anything.
23           KAREN GRISSOM:  No, uh-uh.  Just like that
24  was just her -- she just was, ah, talking with us, you
25  know, about him and --

Karen Grissom    -    10/26/2013

```
 1              DON VOGEL:  Kind of matter of factly.
 2              KAREN GRISSOM:  Kind of bragging about her
 3   husband.
 4              DON VOGEL:  Bragging about her husband.
 5              KAREN GRISSOM:  Yes.
 6              DON VOGEL:  Okay.
 7              KAREN GRISSOM:  That he was a judge.
 8              DON VOGEL:  Okay.  Um, would you have any
 9   problems responding to a subpoena if you were issued a
10   subpoena to talk about this.
11              KAREN GRISSOM:  No.
12              DON VOGEL:  Okay.  Um, and something I want
13   to ask you, and, obviously, you know this is being
14   taped.  It is very important, um, I certainly would
15   never ask you to keep any secrets from your husband, but
16   I -- but I would like you to not tell him about the
17   content of what we talked about.  Certainly, you are
18   going to tell him I was here.
19              KAREN GRISSOM:  Yes.
20              DON VOGEL:  Certainly, you are going to tell
21   him it was about this situation in the restaurant.  But
22   if you could not go into specifics about what we talked
23   about, I think that would be best.
24              KAREN GRISSOM:  Yeah.
25              DON VOGEL:  And then, um, as well with your
```

Karen Grissom      -      10/26/2013

```
1   son.  Maybe not even contact your son about this.  Let
2   us contact him.
3            KAREN GRISSOM:  I haven't done anything, even
4   my sister.
5            DON VOGEL:  Okay.  Um, that is my next
6   question.  Who else have you told about this.
7            KAREN GRISSOM:  Just -- just between my
8   husband and I.  That is all.
9            DON VOGEL:  Now, did you make an entry on a
10  Facebook page about this.
11           KAREN GRISSOM:  Yes.
12           DON VOGEL:  Okay.  When did you do that.
13           KAREN GRISSOM:  Oh, it was just --
14           DON VOGEL:  How long after the incident.
15           KAREN GRISSOM:  It has been a while.
16           DON VOGEL:  Why did -- what prompted you to
17  make the entry into the Facebook page.
18           KAREN GRISSOM:  It was after, ah, some ruling
19  that -- in court about something being dismissed and
20  not -- had to do with immigration.  It was -- I don't
21  remember.  But it just bothered me all the time that
22  when -- after she had said that and then knowing that he
23  was the federal judge on the case.  And for her to say
24  that, because she wouldn't be saying that unless her
25  husband was talking about it.
```

Karen Grissom      -      10/26/2013

1          DON VOGEL:  Okay.

2          KAREN GRISSOM:  And things like that, we were

3  always brought up to, if there is a problem, you tell

4  the truth, and, you know, you tell somebody.

5          DON VOGEL:  Okay.  So when you made that

6  Facebook entry, it was as a result --

7          KAREN GRISSOM:  It was of concern.  It was a

8  big concern.

9          DON VOGEL:  Because of you were following

10 some different rulings by the Court from -- did you ever

11 go down to court and watch it --

12         KAREN GRISSOM:  No.

13         DON VOGEL:  -- or did you just see it on TV.

14         KAREN GRISSOM:  No, just news.

15         DON VOGEL:  So you saw it on TV, and then

16 because of the particular ruling that was -- I'm

17 assuming was that adverse to Sheriff Arpaio?

18         KAREN GRISSOM:  M'hum.  I messaged him

19 personally on because -- Facebook, because I didn't want

20 it to be publicized.

21         DON VOGEL:  Okay.  So that entry was to him

22 as a personal message.

23         KAREN GRISSOM:  Yes.

24         DON VOGEL:  It wasn't out for the world to

25 see.

Karen Grissom      -      10/26/2013

1            KAREN GRISSOM:  No.  No, it wasn't.

2            DON VOGEL:  Have you been contacted by

3  anybody at all prior to me.

4            KAREN GRISSOM:  No.

5            DON VOGEL:  Okay.  Mr. Casey spoke with

6  you --

7            KAREN GRISSOM:  Yes --

8            DON VOGEL:  -- by telephone about --

9            KAREN GRISSOM:  -- Mr. Casey.

10            DON VOGEL:  -- this.  Any -- anyone other

11  than myself or Mr. Casey --

12            KAREN GRISSOM:  No.

13            DON VOGEL:  -- speak with you.

14            If I -- okay.  Have you made any other

15  special messages to Sheriff Arpaio?

16            KAREN GRISSOM:  No.

17            DON VOGEL:  Okay.  Have you made any phone

18  calls to him.

19            KAREN GRISSOM:  No.

20            DON VOGEL:  Have you ever met him.

21            KAREN GRISSOM:  No.

22            DON VOGEL:  Do you have any relationship with

23  him at all.

24            KAREN GRISSOM:  No.

25            DON VOGEL:  Does your husband or your son

Karen Grissom    -    10/26/2013

1  have any relationship with him.

2           KAREN GRISSOM:  No.

3           DON VOGEL:  Is there any reason that you

4  would be making a false statement about this.

5           KAREN GRISSOM:  No.

6           DON VOGEL:  Have you ever been in trouble.

7           KAREN GRISSOM:  No.

8           DON VOGEL:  Have you ever been arrested.

9           KAREN GRISSOM:  No.

10           DON VOGEL:  No criminal convictions.

11           KAREN GRISSOM:  No.

12           DON VOGEL:  How about your husband or your

13  son.

14           KAREN GRISSOM:  No.

15           DON VOGEL:  Okay.  Before I leave, could I

16  get a cell phone number from your son.

17           KAREN GRISSOM:  Um, my phone is not working

18  right now.

19           DON VOGEL:  No -- oh, so you can't get it off

20  your phone?

21           KAREN GRISSOM:  It has something to do with

22  iCloud and passwords.  It is an Apple phone.  I don't

23  know, it is --

24           DON VOGEL:  If you want, I've been through

25  that within the last few days.

Karen Grissom      -      10/26/2013

1              KAREN GRISSOM:  Oh.

2              DON VOGEL:  I might be able to help you, if

3    you want me to.

4              KAREN GRISSOM:  I've been trying to get -- do

5    it on the internet.

6              DON VOGEL:  I might be able to help you with

7    your phone, because I just when through it.

8              KAREN GRISSOM:  Oh.

9              DON VOGEL:  So -- but I don't want the tape

10   on while I'm going -- you know, that would just create a

11   lot of unnecessary time.

12             KAREN GRISSOM:  My son, I did -- he did work

13   for the State of Arizona.  He did get in some trouble.

14   He was in the motor vehicle -- well, it is not motor

15   vehicle anymore, but he was a sergeant, and he kind of

16   used a credit card when --

17             DON VOGEL:  Was --

18             KAREN GRISSOM:  -- when he wasn't supposed

19   to, and he recently...

20             DON VOGEL:  Was he a policeman?

21             KAREN GRISSOM:  No.  Um, he was a -- he did

22   have the lights.  He was for the heavy, you know, larger

23   trucks inspection.

24             DON VOGEL:  Okay.  Um, anything like that

25   administratively ever happen to you or your husband.

Karen Grissom     -     10/26/2013

1              KAREN GRISSOM:  No, nothing.

2              DON VOGEL:  Um, and was your son charged

3   criminally.

4              KAREN GRISSOM:  No, not that I know of.

5              DON VOGEL:  Okay.  But he lost his job over

6   it.

7              KAREN GRISSOM:  He resigned over it.  He was

8   going through some marital problems, and his wife

9   expected too much, I think, of him.

10              DON VOGEL:  Okay.  Um, was that in the

11   newspapers.

12              KAREN GRISSOM:  No.  It was on Channel 5.

13              DON VOGEL:  Okay.  I'm sorry to hear that.

14   Um.

15              KAREN GRISSOM:  He just -- it was a $2,000

16   credit card.

17              DON VOGEL:  Um, how long have you lived in

18   this house.

19              KAREN GRISSOM:  We've been here, um,

20   two years.

21              DON VOGEL:  Okay.  Um, is it a problem if I

22   come back and see you to clarify anything --

23              KAREN GRISSOM:  No.

24              DON VOGEL:  -- that may --

25              KAREN GRISSOM:  No.

Karen Grissom    -    10/26/2013

1          DON VOGEL:  -- or may not come up?

2          Okay.  Um, do you have any hearing aids?

3          KAREN GRISSOM:  No.

4          DON VOGEL:  So your hearing is good.

5          KAREN GRISSOM:  Yes.

6          DON VOGEL:  Um, your vision is good.

7          KAREN GRISSOM:  Um, it was -- yes, it is

8    good.  I just have a macular degeneration in the left

9    eye.

10          DON VOGEL:  Do you remember what you had for

11   lunch that day.

12          KAREN GRISSOM:  Ah, it was probably my

13   favorite.

14          DON VOGEL:  Okay.

15          KAREN GRISSOM:  Enchilada and taco and beans

16   and rice.

17          DON VOGEL:  Okay.  You are saying probably,

18   but is it because that is what you usually have, or --

19          KAREN GRISSOM:  That is --

20          DON VOGEL:  -- that is what you remember

21   having.

22          KAREN GRISSOM:  -- what I usually have.

23          DON VOGEL:  Okay.  Do you remember what you

24   were wearing that day.

25          KAREN GRISSOM:  No.

Karen Grissom      -      10/26/2013

1            DON VOGEL:  Do you remember what car you went

2   in that day.

3            KAREN GRISSOM:  Our van.

4            DON VOGEL:  Okay.  Um, is there anything else

5   that you remember about that that we haven't discussed.

6            KAREN GRISSOM:  No.

7            DON VOGEL:  And I may have asked you this,

8   and if I did, I apologize.  How long was your contact

9   with Ms. Snow that day.

10           KAREN GRISSOM:  Maybe less than 10,

11  5 minutes.

12           DON VOGEL:  That is a long time.

13           KAREN GRISSOM:  Yeah.

14           DON VOGEL:  So she was -- what else did talk

15  about.

16           KAREN GRISSOM:  We were just -- she would --

17  she was just talking about her career, what she did.

18  She taught school for a while.  And I told her I was

19  going to school.  I finished my bachelor's, and I was

20  working on my masters.

21           DON VOGEL:  Where did she tell you she taught

22  school at.

23           KAREN GRISSOM:  I don't remember.

24           DON VOGEL:  Okay.  Do you remember what high

25  school, college, university, grammar school?

1          KAREN GRISSOM:  Um, I don't remember what

2    school it was or what grade it was.

3          DON VOGEL:  Do you remember what subject

4    matter she taught.

5          KAREN GRISSOM:  No.

6          DON VOGEL:  Um, do you remember anything else

7    that she told you about -- during that conversation

8    about her or her life or her family?  Or what else did

9    she offer in the conversation?

10          KAREN GRISSOM:  Just, ah, where she went to

11   school, um, and that she came back here and taught

12   school for a while.  And I don't -- and who she was

13   married to.  And then I recognized the Snow, and then

14   our conversation came up to Joe Arpaio and what she had

15   said, he wanted her out -- wanted him out.  He didn't

16   like him.  And then we changed the subject, and she had

17   to go, because she had a dog outside waiting, and they

18   were going back home.

19          DON VOGEL:  Okay.  Do you remember what she

20   changed the subject to.

21          KAREN GRISSOM:  No, I don't.

22          DON VOGEL:  Okay.  All right.  Well, if I

23   need to clarify anything, again, it is okay for me to

24   come back and see you.

25          KAREN GRISSOM:  Yes.

Karen Grissom      -      10/26/2013

```
 1              DON VOGEL:  And you understand that this was
 2   recorded today --
 3              KAREN GRISSOM:  Yes.
 4              DON VOGEL:  -- correct.
 5              I'm going to go ahead and turn my tape off.
 6   Um, the clock on my tape recorder shows that we've been
 7   on just about 20 minutes and 15 seconds.  And, um, you
 8   didn't -- I never turned the tape recorder on and then
 9   off and --
10              KAREN GRISSOM:  That's right.
11              DON VOGEL:  -- it was continually running
12   through our entire conversation.
13              KAREN GRISSOM:  Yes.
14              DON VOGEL:  Okay.  I will turn the tape off.
15   It now says 20 minutes and 29 seconds.
16              (End of tape.)
17
18
19
20
21
22
23
24
25
```

Karen Grissom    -    10/26/2013

```
 1  STATE OF ARIZONA          )
                              )ss.
 2  COUNTY OF MARICOPA        )

 3

 4          I, TERESE M. HEISIG, Certified Reporter No.

 5  50378, Transcriptionist, do hereby certify that the

 6  foregoing pages constitute a full, true, and

 7  accurate transcript, from electronic recording, of the

 8  proceedings had in the foregoing matter, all done to the

 9  best of my skill and ability.

10          SIGNED and dated this 6th day of November,

11  2013.

12

13

14

15          _____
            TERESE M. HEISIG, RPR, CSR, CPE
16          Certified Court Reporter/Transcriptionist
            CR #50378
17

18

19

20

21

22

23

24

25
```

# EXHIBIT 7

Transcript of

Recorded Interview of Dale Grissom

Conducted by Don Vogel

on October 28, 2013

DESERT HILLS REPORTING, INC.
2415 E. CAMELBACK ROAD
SUITE 700
PHOENIX, ARIZONA  85016
BY:   TERESE M. HEISIG/RPR
CERTIFIED COURT REPORTER 50378
TRANSCRIPTIONIST

Dale Grissom      -      10/28/2013

1              DON VOGEL:  Okay.  It is Monday,

2    October 28th.  It is just about 9:25 in the morning.  My

3    name is Don Vogel.  And can you go ahead and state your

4    name for the tape, sir.

5              DALE GRISSOM:  I'm Dale Grissom.

6              DON VOGEL:  Okay.  Dale, I've been here just

7    a couple minutes.  And just to get everything on the

8    tape, we just kind of got to know each other, just

9    chatted about the weather.  I explained to you that I'm

10   working for an attorney by the name of Tim Casey.  Tim

11   represents Mr. Arpaio in this -- in this ongoing matter.

12   And I'm not employed by the sheriff's office.  I've

13   never been employed by the sheriff's office.  And I'm a

14   private investigator.  I am a retired law enforcement

15   officer, but nothing to do with the Maricopa County

16   Sheriff's Office.

17              Is that pretty accurate as far as what we

18   discussed?

19              DALE GRISSOM:  Yes.

20              DON VOGEL:  Okay.  Um.  Your first name,

21   Dale?

22              DALE GRISSOM:  Dale.

23              DON VOGEL:  Dale.  Dale, how old are you.

24              DALE GRISSOM:  Ah, well, I'm 64, but I will

25   be 65 in about three weeks.

Dale Grissom    -    10/28/2013

```
 1              DON VOGEL:  Okay.  And where is your home?
 2  At 2005 West Harwell?
 3              DALE GRISSOM:  M'hum, yeah.
 4              DON VOGEL:  How long have you lived here for.
 5              DALE GRISSOM:  Ah, jeez, two and a half
 6  years, two years, something like that.
 7              DON VOGEL:  And where did you guys live
 8  before this.
 9              DALE GRISSOM:  We lived out in Goodyear.
10              DON VOGEL:  Okay.  Um, how long have you been
11  in the Valley for, or in Arizona.
12              DALE GRISSOM:  Well, we've been back for --
13  for about three or four years.
14              DON VOGEL:  Okay.
15              DALE GRISSOM:  We lived here all our lives,
16  so...
17              DON VOGEL:  You left for a period of time.
18              DALE GRISSOM:  Yeah.  We left -- we moved up
19  to Utah for about 13 or 14 years, something like that.
20              DON VOGEL:  What cities in Utah did you
21  reside at.
22              DALE GRISSOM:  Cedar City.
23              DON VOGEL:  Okay.
24              DALE GRISSOM:  Well, it was a little town
25  outside of Cedar City called Enoch.
```

Dale Grissom    -    10/28/2013

1              DON VOGEL:  And can you spell that town for

2    me.

3              DALE GRISSOM:  E-n-o-c-h.

4              DON VOGEL:  Okay.  Um, and your wife told you

5    that I was here Saturday.

6              DALE GRISSOM:  M'hum.

7              DON VOGEL:  Obviously, I spoke with her, your

8    wife Karen.

9              Can -- can you tell me what she told you

10   about my visit with her?

11             DALE GRISSOM:  Not much.

12             DON VOGEL:  Okay.  What is not much.

13             DALE GRISSOM:  Well, she said that you were

14   going to come by today and talk about the incident that

15   we had out at Sombrero's.

16             DON VOGEL:  Okay.  Um, did she tell you --

17   did you guys talk in detail about the incident about

18   what -- what happened out there?

19             DALE GRISSOM:  No.

20             DON VOGEL:  Okay.  Um, do you remember that

21   day very well.

22             DALE GRISSOM:  Ah, not real well, but I can

23   kind of remember --

24             DON VOGEL:  Okay.

25             DALE GRISSOM:  -- kind of what went on,

Dale Grissom    —    10/28/2013

```
 1    and...

 2            DON VOGEL:  Do you remember where you were

 3    before you went to Sombrero's that day?

 4            DALE GRISSOM:  Oh, jeez.  Ah, I think we were

 5    home, and we went with my son out there, I believe.

 6            DON VOGEL:  Okay.

 7            DALE GRISSOM:  I think he was with us.

 8            DON VOGEL:  And what is your son's name.

 9            DALE GRISSOM:  Scott.

10            DON VOGEL:  And Scott, what is his middle

11    name.

12            DALE GRISSOM:  Eugene Grissom.

13            DON VOGEL:  And -- Grissom.  Okay.  So you,

14    your wife, and Scott.

15            DALE GRISSOM:  M'hum.

16            DON VOGEL:  Went out to Sombrero's.  Do you

17    remember what time of day it was, if it was lunch or

18    dinner?

19            DALE GRISSOM:  Oh, it was probably lunch, a

20    little after lunch, I think.

21            DON VOGEL:  Okay.  Do you remember what day

22    of the week it was or if it was a weekend or a weekday.

23            DALE GRISSOM:  If he was here, it was

24    probably a weekend.  I don't know for sure, though.  I

25    don't remember.
```

Dale Grissom    -    10/28/2013

1          DON VOGEL:  Okay.  Do you remember around
2  when this was?  I mean, I -- I don't expect --
3          DALE GRISSOM:  Oh --
4          DON VOGEL:  -- you to be able to give me a
5  date, but can you --
6          DALE GRISSOM:  I had my knee done on the 12th
7  of April, so it was probably about first part of May,
8  end of April, May, right in there.
9          DON VOGEL:  Okay.  And I can see your right
10  knee has quite a scar on it.  Um, do you -- do you kind
11  of relate this situation back to during the time of your
12  recovery with your knee?
13          DALE GRISSOM:  Ah, yeah, somewhat.
14          DON VOGEL:  Why is that?
15          DALE GRISSOM:  Well, it was still kind of
16  tender and, you know, still -- I think I still had a
17  walker getting around.
18          DON VOGEL:  Okay.  Do you remember if you
19  were -- did you drive to Sombrero's.
20          DALE GRISSOM:  No.  My wife drove.
21          DON VOGEL:  Okay.  If you were to go to
22  Sombrero's today, who would drive.
23          DALE GRISSOM:  I would.
24          DON VOGEL:  Okay.  But your wife drove.  Was
25  that because of your knee.

Dale Grissom    -    10/28/2013

1           DALE GRISSOM:  Yeah.

2           DON VOGEL:  Okay.

3           DALE GRISSOM:  Either her or my son, and I

4    don't remember.

5           DON VOGEL:  Okay.  But you remember you

6    didn't drive because of --

7           DALE GRISSOM:  Yeah.

8           DON VOGEL:  -- your -- you were convalescing

9    your knee -- knee surgery?

10          DALE GRISSOM:  Yeah.

11          DON VOGEL:  Okay.  Um, when you got there --

12   um, I've been to that Sombrero's many times.  It is a

13   good restaurant.  Would you remember where you sat?

14   When you walk in, there are some tables to your right,

15   and there is more tables to your left, and there is also

16   a great deal of seating outside.

17          DALE GRISSOM:  When we walked in, we sat at a

18   longer table on the right, and it was the second one in

19   from the window.

20          DON VOGEL:  Okay.

21          DALE GRISSOM:  It is -- well, I guess it is

22   the first window when you go in there on the right.

23          DON VOGEL:  Okay.  So the part of the table

24   actually abuts up to the window.

25          DALE GRISSOM:  No.  It is the second one back

Page 8

Dale Grissom    -    10/28/2013

```
 1   out from the window table.
 2              DON VOGEL:  So it sits in the middle of the
 3   floor.
 4              DALE GRISSOM:  Yeah.
 5              DON VOGEL:  Okay.  Um, so you, your wife, and
 6   your son Scott, had you ordered your food yet?
 7              DALE GRISSOM:  Yeah, I think so.
 8              DON VOGEL:  Okay.  Do you remember what you
 9   had that day.
10              DALE GRISSOM:  No.
11              DON VOGEL:  Okay.  Was the -- was the
12   restaurant crowded.
13              DALE GRISSOM:  Not too much, no.
14              DON VOGEL:  Okay.  When you go to Sombrero's,
15   how do you pay.
16              DALE GRISSOM:  Usually debit.
17              DON VOGEL:  Okay.  And who -- who usually --
18   who would pay, you or your son?
19              DALE GRISSOM:  Well, my son don't pay.  But
20   I -- I think I gave him the debit card, and he paid that
21   way.
22              DON VOGEL:  Okay.  Would you be open to
23   helping us try to track down your bank records from any
24   Sombrero's purchases in April or May of 2012.
25              DALE GRISSOM:  Sure.
```

Dale Grissom        -       10/28/2013

```
 1              DON VOGEL:  Okay.  Who do you bank with.

 2              DALE GRISSOM:  Ah, it is this Wells Fargo

 3   right over here.

 4              DON VOGEL:  Okay.

 5              DALE GRISSOM:  We just changed, but that is

 6   the one that we were using.

 7              DON VOGEL:  Have you had your account with

 8   Wells Fargo -- have you been with Wells Fargo for

 9   several years.

10              DALE GRISSOM:  Yes.

11              DON VOGEL:  Okay.

12              DALE GRISSOM:  M'hum.

13              DON VOGEL:  Do you have your wallet with you.

14              DALE GRISSOM:  Sure.  I don't, but I can get

15   it for --

16              DON VOGEL:  Well, let's get it after this.

17   After this, I will get your debit card number.

18              DALE GRISSOM:  Okay.

19              DON VOGEL:  And then maybe we can, ah, draft

20   a letter for you, and you can send it to the bank to get

21   the records.  And then, when you get the records --

22              DALE GRISSOM:  Now --

23              DON VOGEL:  -- I can come back and get them.

24              DALE GRISSOM:  -- usually my wife has those

25   on the computer.
```

Dale Grissom      -      10/28/2013

1            DON VOGEL:  Okay.  Maybe we could look for
2  that today.
3            DALE GRISSOM:  Yeah, probably.
4            DON VOGEL:  So, ah -- so you are there.  You
5  believe you may have ordered your food.  Um, what
6  happened?  What started -- or where were you seated?  I
7  know you were seated to the right.
8            DALE GRISSOM:  M'hum.
9            DON VOGEL:  Is it benches or chairs?
10           DALE GRISSOM:  It is chairs.
11           DON VOGEL:  Okay.
12           DALE GRISSOM:  Um, my wife was on the right
13  side.  I was on the second -- well, she was on the end
14  but on the west side of the table.  And then I was
15  sitting right beside her.
16           DON VOGEL:  So you were sitting to her right.
17           DALE GRISSOM:  Her left.
18           DON VOGEL:  Her left.  And where was your
19  son.
20           DALE GRISSOM:  Ah, I think he was right
21  across from us.
22           DON VOGEL:  Okay.  And if I went back over to
23  the restaurant, if it became necessary, and I took some
24  pictures, would you be able to point to the table and
25  then assign the seats to where everybody was --

Dale Grissom     -     10/28/2013

1              DALE GRISSOM:  Oh, yeah.

2              DON VOGEL:  -- seated.

3              DALE GRISSOM:  Yeah.

4              DON VOGEL:  Okay.

5              DALE GRISSOM:  And I'm not sure my son was

6    there, but I'm pretty sure he was.

7              DON VOGEL:  Okay.  Did you talk to your wife

8    about -- about who was there since I've been here to see

9    your wife on Saturday.

10             DALE GRISSOM:  No.

11             DON VOGEL:  Okay.  So the son is something

12   that you -- that you guys didn't discuss.  You just

13   believe that that is how it happened.

14             DALE GRISSOM:  Yeah.

15             DON VOGEL:  Okay.  So what, you guys are

16   eating?  Is that how it is going?  What is --

17             DALE GRISSOM:  Yeah.

18             DON VOGEL:  -- going on?

19             DALE GRISSOM:  I think we were still waiting

20   on our food, and the lady that sat on the table by the

21   window knew Karen's sister, which was Irene.

22             DON VOGEL:  Okay.  So she was already seated

23   inside?

24             DALE GRISSOM:  Yeah.

25             DON VOGEL:  Um, now, was she by herself, or

Dale Grissom    -    10/28/2013

1  was somebody with her.

2          DALE GRISSOM:  No, there was someone with

3  her.  And I don't remember if there was two people with

4  her inside.  But outside there was -- I think she said

5  her daughter and somebody, maybe her daughter's husband

6  or boyfriend, and they had a dog.  So they were sitting

7  just right outside that window.

8          DON VOGEL:  Okay.  Um, so how did -- how did

9  contact become initiated between these folks.

10          DALE GRISSOM:  Well, she thought my wife was

11  Irene, so she said, Irene.

12          DON VOGEL:  Okay.  Now, who is Irene.

13          DALE GRISSOM:  Irene is Karen's sister, the

14  younger one.

15          DON VOGEL:  Okay.  Does it -- do they get --

16  is there a confusion often that people come up to your

17  wife and call her Irene.

18          DALE GRISSOM:  Yup.  They look pretty much

19  alike.

20          DON VOGEL:  Okay.

21          DALE GRISSOM:  Karen is a little bit older,

22  but they have the same features --

23          DON VOGEL:  Okay.

24          DALE GRISSOM:  -- and everything.

25          DON VOGEL:  So this woman -- did you know

Dale Grissom    -    10/28/2013

```
 1  this woman prior to today?  Like when you sat down did
 2  you think, boy, she looks familiar?
 3              DALE GRISSOM:  No, I didn't know her at all.
 4              DON VOGEL:  Okay.
 5              DALE GRISSOM:  Until they started talking,
 6  and then she told -- I believe she told Karen her name
 7  or Karen told me her name or -- I don't know how exactly
 8  that happened right there.
 9              DON VOGEL:  Okay.  Were you -- could you hear
10  everything that was going on in the conversation.
11              DALE GRISSOM:  Yeah, pretty much.
12              DON VOGEL:  Okay.  So you're -- you're -- do
13  you remember, um, how it kind of -- how the conversation
14  got going specifically, what they were talking about, or
15  just that they --
16              DALE GRISSOM:  Well, I think they were
17  talking about her and Irene I think went to the same
18  church, and that is kind of how things started.  She
19  thought that my wife was Irene.  So they kind of got
20  started that way.  And then she knew their mother, and
21  it kind of got into that, the best I can remember.  And
22  then they -- I don't remember exactly how it got into
23  Joe Arpaio and her husband.  But it came back, what I
24  remember, she says, yeah, my husband wants to get him or
25  wants him to go down or something like that.
```

0456

Dale Grissom      -      10/28/2013

```
 1              DON VOGEL:  Okay.  You don't remember
 2  specifically what she --
 3              DALE GRISSOM:  No, I --
 4              DON VOGEL:  -- said, though.
 5              DALE GRISSOM:  No, I don't.
 6              DON VOGEL:  But that was the idea of what she
 7  said.
 8              DALE GRISSOM:  M'hum.
 9              DON VOGEL:  Do you remember, was there any --
10  any -- did she say it with any emotion, or was it --
11              DALE GRISSOM:  Ah, not really, I guess.  I
12  don't remember.
13              DON VOGEL:  Okay.  And who is her husband.
14              DALE GRISSOM:  Ah, is that Judge Snow?
15              DON VOGEL:  Okay.  Um, do you know -- have
16  you been following the Arpaio case before this.
17              DALE GRISSOM:  Oh, yeah.
18              DON VOGEL:  How were you -- how did you
19  follow it.
20              DALE GRISSOM:  I followed it right along with
21  everything he did, because I approved of most everything
22  he did.  I didn't have any problems.
23              DON VOGEL:  Okay.  So did you -- but did you
24  follow it by going down to the courthouse and watching,
25  or watching --
```

Dale Grissom    -    10/28/2013

1           DALE GRISSOM:  No, no.

2           DON VOGEL:  -- the news or reading about it.

3           DALE GRISSOM:  Yes, it was the news.  I

4    watched it on the news and Facebook and stuff like that.

5           DON VOGEL:  Okay.  Did you know that Judge

6    Snow was involved in the case?  Did you know his name?

7           DALE GRISSOM:  Not really, huh-uh.  Not

8    until, actually, I heard that, and then I started

9    getting a little more in it.  And then here lately when

10   he -- he was -- him and Judge Snow was kind of at it, I

11   guess you could say.  But...

12          DON VOGEL:  So when she said that her husband

13   was the judge on the case, it wasn't like you

14   immediately knew, oh, that would be Judge Snow.

15          DALE GRISSOM:  No.

16          DON VOGEL:  Okay.

17          DALE GRISSOM:  I didn't know that until I

18   found out her name.

19          DON VOGEL:  Okay.

20          DALE GRISSOM:  And I think Karen was saying,

21   well, that is Judge Snow's wife or her name was Snow, or

22   something like that.  I --

23          DON VOGEL:  Okay.

24          DALE GRISSOM:  I don't remember.

25          DON VOGEL:  So she said that -- that her

Dale Grissom        -        10/28/2013

1   husband wanted Sheriff Arpaio to, and you used some

2   words, go down or something like that, but you don't

3   remember exactly what she said.

4           DALE GRISSOM:  I -- I don't.

5           DON VOGEL:  Did -- did she ever tell you

6   where she -- why she believed her husband wanted

7   Judge -- wanted Joe Arpaio to not do so well?

8           DALE GRISSOM:  It seems like, ah -- I don't

9   know.  It sounded to me like he was telling her

10  everything that was going on, and she just kind of,

11  yeah, well, he needs to go down because he is doing all

12  this stuff, and people don't like him.

13          DON VOGEL:  Did it sound to you like Judge

14  Snow told his wife that he didn't like Joe Arpaio, and

15  he wanted Joe Arpaio to, and I'm using your words, to go

16  down?

17          DALE GRISSOM:  I would think so.

18          DON VOGEL:  Okay.

19          DALE GRISSOM:  I mean --

20          DON VOGEL:  But did she ever say, my husband

21  told me he doesn't like Joe, and he wants Joe to go

22  down, or don't you remember that.

23          DALE GRISSOM:  I don't remember.  That may

24  have come up, but I don't remember.

25          DON VOGEL:  Okay.

Dale Grissom      -      10/28/2013

```
 1              DALE GRISSOM:  I just didn't pay attention
 2   like I probably should have, thinking, you know, maybe
 3   later something would come up.  But I just kind of
 4   remember bits and pieces along the way.
 5              DON VOGEL:  But you remember she told you
 6   that her husband, who was the federal judge, didn't like
 7   Mr. Arpaio, and he -- and using your words, he wanted
 8   Mr. Arpaio to go down.
 9              DALE GRISSOM:  Yeah.  And that was something
10   that, how would I say?  She didn't say it to me.  She
11   was telling my wife this stuff.
12              DON VOGEL:  How far away from the
13   conversation were you?  You were seated at the same
14   table.
15              DALE GRISSOM:  About this far away.
16              DON VOGEL:  And you are opening your --
17              DALE GRISSOM:  It's the aisle.
18              DON VOGEL:  -- hands up about three -- about
19   three feet.
20              DALE GRISSOM:  Yeah.  Between the tables, you
21   know, it is a little walkway there, and it is about
22   three feet.
23              DON VOGEL:  So you had no difficulty hearing.
24              DALE GRISSOM:  No.
25              DON VOGEL:  Okay.  Could you identify this
```

Page 18

Dale Grissom    -    10/28/2013

1  woman if you saw her again?

2          DALE GRISSOM:  You know, I don't know if I

3  could or not.  I kind of remembered she had -- seemed

4  like she had kind of short hair, and she was wearing

5  like a -- oh, a sweatpants-type thing, I think.

6          DON VOGEL:  Well, let's talk about this.  Is

7  she a white woman, a Hispanic woman?

8          DALE GRISSOM:  Yeah, she is white.

9          DON VOGEL:  A white woman, okay.  About how

10  old is she.

11          DALE GRISSOM:  She is about 51 or 2, 3.  She

12  was the same age as Karen's sister, so --

13          DON VOGEL:  Okay.

14          DALE GRISSOM:  -- that is about the same age.

15          DON VOGEL:  Early 50s.

16          DALE GRISSOM:  Yeah.

17          DON VOGEL:  Um, what color hair?

18          DALE GRISSOM:  It was dark.

19          DON VOGEL:  Um, do you remember about how

20  tall she is.

21          DALE GRISSOM:  I don't know that she ever

22  stood up, that I can remember.  Yeah, she did stand up

23  when they left before we did, I think.  She was probably

24  5' 5", 5' 6", 5' 7", someplace in that -- I don't think

25  she was taller than me.

0461

Dale Grissom    -    10/28/2013

```
 1              DON VOGEL:  So was -- was Mrs. Snow still
 2   seated at her table having a conversation with your wife
 3   across the aisle.
 4              DALE GRISSOM:  No.  My wife was standing up,
 5   I think, and talking to her.
 6              DON VOGEL:  Okay.
 7              DALE GRISSOM:  And they sat down and -- and I
 8   think they said a few words back and forth after that,
 9   but...
10              DON VOGEL:  And, again, can you clarify how
11   many -- if you remember, how many people were seated
12   inside with Mrs. Snow during this.
13              DALE GRISSOM:  I think it was her and two
14   people on the west side of that table.  I think there
15   was two.  I know there was one.  And then there was, I
16   believe, two outside with the dog.
17              DON VOGEL:  Okay.  And the people inside, do
18   you remember if they were male or female.
19              DALE GRISSOM:  Ah, seemed like they were
20   female.  There may have been one male on that far side.
21   I didn't pay attention to who was --
22              DON VOGEL:  Okay.
23              DALE GRISSOM:  -- there.
24              DON VOGEL:  So I'm still a little unclear.
25   You think there were two people inside.
```

Dale Grissom    -    10/28/2013

```
 1              DALE GRISSOM:  Yeah.

 2              DON VOGEL:  Okay.

 3              DALE GRISSOM:  Well, yeah, Mrs. Snow and two,

 4  I think.

 5              DON VOGEL:  Mrs. Snow, excuse me, and two

 6  others; correct?

 7              DALE GRISSOM:  Yeah.

 8              DON VOGEL:  And then -- and then additional

 9  people outside.  Do you think the two people inside were

10  in a position to hear that conversation.

11              DALE GRISSOM:  Well, I would think so.  They

12  were sitting right across the table.

13              DON VOGEL:  Okay.  But you are really -- you

14  are really not 100 percent sure if both were female or a

15  male and a female, or what.

16              DALE GRISSOM:  Yeah, I'm not sure.  Seems

17  like the one closest to us on the west side of the table

18  was a female, and the other one may have been a male.

19              DON VOGEL:  Okay.  And do you think you can

20  identify those two people if you saw them again.

21              DALE GRISSOM:  I doubt it.

22              DON VOGEL:  Okay.  If you were to walk

23  into -- if you were to be in Circle K today and

24  Mrs. Snow were to walk in, do you think you would

25  realize, hey, there is Mrs. Snow, the woman I had this
```

1   conversation with.

2           DALE GRISSOM:  No.

3           DON VOGEL:  Okay.

4           DALE GRISSOM:  If she walked up and said

5   something that would make me remember, you know, kind

6   of -- I would say, oh, that is who you are.

7           DON VOGEL:  Okay.  But you wouldn't just pick

8   her out of the crowd at the ballpark.

9           DALE GRISSOM:  Probably not, no.

10           DON VOGEL:  Okay.  Um, have -- did you and

11   your wife talk about -- and Scott talk about what she

12   said, you know, after the -- after the fact?

13           DALE GRISSOM:  I don't know if we talked

14   about it after she left.  And you know what, I don't

15   even think -- I think all that we knew at the time was

16   her husband was a judge.

17           DON VOGEL:  Okay.

18           DALE GRISSOM:  And that is kind of the best I

19   can remember.  That is kind of where that was kind of

20   left.  And then, later on, when we started seeing this

21   Judge Snow doing -- you know, putting all this stuff

22   against Arpaio, then we -- to me, it clicked.

23           DON VOGEL:  Okay.

24           DALE GRISSOM:  Karen may have known before.

25   I don't know.

Page 22

Dale Grissom      -      10/28/2013

```
 1            DON VOGEL:  Have you talked to anybody
 2   outside of your wife and -- and your son Scott about
 3   this incident.
 4            DALE GRISSOM:  No.
 5            DON VOGEL:  Okay.  Have you talked to Scott
 6   about this incident since that day.
 7            DALE GRISSOM:  I haven't.
 8            DON VOGEL:  Have you talked to your wife
 9   occasionally about it.
10            DALE GRISSOM:  Oh, yeah.
11            DON VOGEL:  It comes up.
12            DALE GRISSOM:  Yeah, it comes up.
13            DON VOGEL:  Um, did you -- did you send any
14   messages through Facebook or e-mail or anything like
15   that about this.
16            DALE GRISSOM:  No.
17            DON VOGEL:  Do you know your wife did.
18            DALE GRISSOM:  I don't.
19            DON VOGEL:  Okay.  Um, did anything, that you
20   know of, happen or through conversation with your wife,
21   why would this have come up here in the last couple of
22   months to be -- you know, to get to the point to where
23   you guys feel it was needed to be reported now as
24   opposed to when it happened?
25            DALE GRISSOM:  Well, I think it was because
```

Desert Hills Reporting, Inc.
602.999.3223

0465

Dale Grissom    -    10/28/2013

1  we -- we started seeing Judge Snow in court and putting

2  these injunctions and all this stuff down on Arpaio.  So

3  then that is kind of when we said, hey, you know, this

4  is not right.  What is going on?

5         DON VOGEL:  Okay.

6         DALE GRISSOM:  What we thought was not right

7  was his wife telling people that -- that Judge Snow

8  wanted to do away with Arpaio and get rid of him or

9  whatever, whatever it was.

10        DON VOGEL:  Okay.  Do you know that your wife

11 had a conversation with Tim Casey about this, and he is

12 an attorney.

13        DALE GRISSOM:  Yeah, I did.

14        DON VOGEL:  Now, um, I know that Tim has made

15 some -- some attempts to recontact your -- your wife,

16 and those have gone without any response.  Do you -- do

17 you know why your wife chose not to call Tim back.

18        DALE GRISSOM:  I don't.

19        DON VOGEL:  Are you --

20        DALE GRISSOM:  I know -- now, I know that

21 several times that we tried to talk to him, we were in

22 the area, the phone wouldn't work.

23        DON VOGEL:  M'hum.

24        DALE GRISSOM:  And so we just -- I don't know

25 that she tried to call him back or -- or what.

Dale Grissom     -     10/28/2013

1              DON VOGEL:  But since that day, are you aware

2       of any -- any efforts by Mr. Casey to get in touch with

3       your wife or your wife making a conscious decision not

4       to return any calls to him.

5              DALE GRISSOM:  I -- you know, I thought she

6       did return his call once after that --

7              DON VOGEL:  Okay.

8              DALE GRISSOM:  -- that time.

9              DON VOGEL:  Okay.  Now, I'm going to read

10      something to you that I got off of Facebook.  It is --

11      it is from -- it says:  Judge Snow, I know his wife and

12      talked with her one day.  She recognized me from our

13      childhood, and she told me that her husband hates you

14      and will do anything to get you out of office.  This has

15      bothered me since last year when I saw her.

16              Um, now, your wife -- this is from your

17      wife's Facebook account.

18              DALE GRISSOM:  Okay.

19              DON VOGEL:  And it went to Mr. Arpaio.  Now,

20      you know, we talked about it, and did she ever say that

21      she hated Joe?

22              DALE GRISSOM:  Who?

23              DON VOGEL:  Mrs. Snow.

24              DALE GRISSOM:  Oh.  I -- I don't know.

25              DON VOGEL:  Okay.  Do you know if he -- if

Dale Grissom      -      10/28/2013

1  she ever told you that her husband said that he would do

2  anything to get him out of office, or is the only part

3  of that conversation you remember what you've already

4  told me.

5          DALE GRISSOM:  I think that is pretty much

6  all I remember.

7          DON VOGEL:  Okay.

8          DALE GRISSOM:  And there was -- there was a

9  lot of stuff going on, and some of it I was kind of --

10  you know, after a little bit, I tried to listen, and

11  then I just --

12          DON VOGEL:  Kept --

13          DALE GRISSOM:  It is one of those things, you

14  know, you just, whatever.

15          DON VOGEL:  I get it.  Do you have any -- do

16  you have any criminal record.

17          DALE GRISSOM:  No.

18          DON VOGEL:  Have you ever received any -- any

19  court ordered psychological treatment.

20          DALE GRISSOM:  No.

21          DON VOGEL:  Do you have any -- any reason

22  that -- anything in your background that would suggest

23  that you have a reason to lie about this.

24          DALE GRISSOM:  No.

25          DON VOGEL:  Are you lying about this.

Dale Grissom    -    10/28/2013

```
 1            DALE GRISSOM:  Nope.

 2            DON VOGEL:  Would you honor a subpoena if we

 3  were to give one to you.

 4            DALE GRISSOM:  Sure.

 5            DON VOGEL:  Okay.

 6            DALE GRISSOM:  I would be glad to say

 7  whatever I can remember about this.

 8            DON VOGEL:  Okay.

 9            DALE GRISSOM:  Whatever it is.  I like Joe

10  Arpaio, but I'm not going to put my neck out on the, you

11  know, thin robe somewhere to...

12            DON VOGEL:  And you understand -- and have I

13  ever asked you to say anything other than the absolute

14  truth.

15            DALE GRISSOM:  No.

16            DON VOGEL:  Okay.  Um, now, my tape recorder

17  shows we have been on just coming up -- it says right

18  now 20 minutes and 18 seconds.  Would it be possible,

19  one, to go inside, and maybe we can take a look and see

20  if we can get those bank records, and then also get a

21  phone number for your son Scott?

22            DALE GRISSOM:  Yeah, sure.

23            DON VOGEL:  Okay.  I'm going to go ahead and

24  turn the tape off.  Have I -- have I stopped and started

25  the tape at any point in time during this conversation.
```

Dale Grissom    -    10/28/2013

```
1              DALE GRISSOM:  No.

2              DON VOGEL:  Okay.  So it has been

3    continuously running.

4              DALE GRISSOM:  Yes.

5              DON VOGEL:  Okay.  My tape shows 20 minutes

6    and 41 seconds.  I'm going to turn it off.

7              (End of tape.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dale Grissom      -      10/28/2013

```
 1  STATE OF ARIZONA          )
                              )ss.
 2  COUNTY OF MARICOPA        )

 3

 4           I, TERESE M. HEISIG, Certified Reporter No.

 5  50378, Transcriptionist, do hereby certify that the

 6  foregoing pages constitute a full, true, and

 7  accurate transcript, from electronic recording, of the

 8  proceedings had in the foregoing matter, all done to the

 9  best of my skill and ability.

10           SIGNED and dated this 6th day of November,

11  2013.

12

13

14

15           _____
             TERESE M. HEISIG, RPR, CSR, CPE
16           Certified Court Reporter/Transcriptionist
             CR #50378
17

18

19

20

21

22

23

24

25
```

# EXHIBIT 8

# How Mexican food drew couple into heart of Arpaio case



Yvonne Wingett Sanchez, The Republic | azcentral.com    *12:45 p.m. MST May 8, 2015*

*Dale Grissom never expected his family to be caught up in a federal court case involving Maricopa County Sheriff Joe Arpaio. But thanks to a craving for Mexican food on a summer day back in 2012, they are now key figures in Arpaio's civil contempt hearing.*



*(Photo: Michael Schennum/The Republic)*

Dale Grissom never expected his family to be caught up in a federal court case involving Maricopa County Sheriff Joe Arpaio (/topic/joe-arpaio/).

But here they are, thanks to a craving for Mexican food from their favorite restaurant, Someburros, back in summer 2012.

The events of that day led to an important disclosure during civil-contempt proceedings last month against Arpaio in U.S. District Court. Under questioning by Judge G. Murray Snow, Arpaio confirmed a probe into remarks allegedly made to the Grissoms by the judge's wife at the restaurant.

The contempt hearings have focused on the defiance by Arpaio and others of Snow's orders in an ongoing racial-profiling lawsuit.

Snow's questioning of Arpaio left the man of many words nearly speechless and thrust the Grissoms into the middle of a high-stakes political and legal drama.

"It just blew up a couple of weeks ago — like *kapow*," said Grissom, speaking publicly for the first time about the case from behind a screen door as the nightly news blared on TV in his south Phoenix home.

"We just thought, 'Wow — what happened here? And we've been following it right along. We're not trying to hide anything, we're just telling the truth, and that's the way it was, and that's what she said, and hey, whatever happens, happens."

**PREVIOUSLY:** Attorneys prep for 2nd bout of Arpaio contempt hearings in June (/story/news/local/phoenix/2015/05/07/sheriff-joe-arpaio-contempt-hearings-secound-bout-june/70931926/)

The judge's wife, Cheri Snow, declined comment when reached by phone Thursday.

About a month after their lunch-time encounter at Someburros, Snow presided over the start of a trial to weigh allegations that Arpaio's office engaged in a pattern of discriminatory policing.

Dale said that he and his family sat at a table just a few feet from Cheri. He said Cheri began talking to Karen, confusing her with Karen's sister, an acquaintance of Cheri's from their childhood days in Yuma.

"She was talking to my wife and I don't even know how it got brought up," recalled Dale, 66. "And I heard them start talking about Sheriff Joe and how her husband wanted him out and didn't want him back in office again, and that's kind of where it went, then they talked about school.

"I didn't pay attention. As soon as that came up, that stuck to me, and I thought, 'How rude is that? Why is this guy, a federal judge, telling his wife he doesn't want Sheriff Joe back in office — and why is she out telling people?' "

The Grissoms returned home and didn't think much of Cheri's remarks until May 2013, when they heard that her husband had ruled Arpaio and his deputies violated the constitutional rights of Hispanics by targeting them during raids and traffic stops.

Dale says he's not a die-hard Arpaio fan or critic, saying, "There's a lot of things where he kind of goes overboard, but I think he's a good sheriff."

But news of Snow's decision upset his wife in light of Cheri's alleged comments, Dale recalled. (Karen would not come to the front door to speak to *The Arizona Republic*.)

"It went on and on and on, and it just got to bothering her and she said, 'I think they need to know,' " Dale remembered.

0473

Three months later, in August 2013, Karen sent a Facebook message to Arpaio that described her encounter with Cheri. It said, in part, that "she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

Days later, a private investigator arrived at their home. Jerry Sheridan, Arpaio's chief deputy, said Tim Casey, Arpaio's former defense attorney on the racial-profiling case, hired the investigator to look into the veracity of the message.

Sheridan said the office was obligated to look into Karen's note: "The sheriff and I felt that we should have our lawyer look into the comment in the event that it was made, and it was credible, because it went to the judge's state of mind," Sheridan said in an interview.

Dale said he was outside when the private investigator stopped by.

"They came to talk to us and to see how we were and ... if we were a bunch of kooks with tinfoil hanging on our heads," Dale said, laughing.

He says he never learned what happened after their interviews, "But I don't believe the investigator went to investigate Snow's wife."

When asked that question, Sheridan said Casey told him and Arpaio there wasn't enough evidence to take the tip any further.

"And it sat in my desk drawer for a year and a half, until it came out in court when the sheriff was on the stand," Sheridan said. "We had no intention to do anything with it because we were told it would be unethical for us to make a complaint on a third-party hearsay."

Dale stands by his story, saying he and his wife were truthful in their account.

"I would not go as far to lie for Sheriff Joe," he said. "I mean, I like the guy, but I wouldn't go as far and say ... this. I wouldn't do that. You just don't do that.

*Reach the reporter at yvonne.wingett@arizonarepublic.com or 602-444-4712.*

Read or Share this story: http://azc.cc/1bDNNe3



**MORE STORIES**



**Interview: Bette Midler planning Divine intervention in Phoenix, 5/24**

(/story/entertainment/music/2015/05/20/interview-bette-midler-planning-divine-intervention-phoenix/27240571/) (/story/entertainment/music/2015/05/20/interview-bette-midler-planning-divine-intervention-phoenix/27240571/)

May 20, 2015, 1:20 p.m.

0474



**Bickley: Valley can learn a lot from Republic's history**

(/story/sports/2015/05/18/bickley-
valley-can-
learn-lot-
republics-
history/27560829/)
**(/story/sports/2015/05/18/bickley-valley-can-
learn-lot-republics-history/27560829/)**
May 18, 2015, 7:44 p.m.



**Why can't liberals accept the charity of Christians?**

(/story/dougmaceachern/2015/05/20/poverty-
charity-
christians-
obama/27655411/)
**(/story/dougmaceachern/2015/05/20/poverty-
charity-christians-obama/27655411/)**
May 20, 2015, 4:11 p.m.

## IMMIGRATION AND SHERIFF JOE ARPAIO

2005    2006    2007    2008    2009    2010    2011    2012    2013    2014    2015    2016

## Carrington College®
carrington.edu/Phoenix-Area
Gain Hands-On Training At A Career-Focused School. Learn More!

# EXHIBIT 9

1                   UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega          )
    Melendres, et al.,              )
5                                   )
                 Plaintiffs,        )   CV 07-2513-PHX-GMS
6                                   )
                 vs.                )   Phoenix, Arizona
7                                   )   May 14, 2015
    Joseph M. Arpaio, et al.,       )   9:35 a.m.
8                                   )
                 Defendants.        )
9   _____)

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17                     (Status Conference)

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1  is evidence that such seizure practices existed

2  department-wide.  There is further evidence that the MCSO

3  failed to adequately investigate and evaluate the seizure of

4  items of value from members of the plaintiff class, attempted

5  to destroy relevant evidence and manipulate internal and          10:38:46

6  independent investigations to exonerate those whom it may have

7  wished to clear, or to mitigate any possible discipline.

8            This evidence may thus tend to demonstrate that the

9  MCSO attempted to keep all matters pertaining to this case, its

10  speculative investigations into this Court, and to the          10:39:05

11  investigations triggered by the unfortunate death of Deputy

12  Armendariz, in the hands of a relative few people who may not

13  have been working to implement this Court's order in good

14  faith.

15            Further, it may tend to demonstrate that contemptuous   10:39:18

16  actions that have been noticed by this Court in its order to

17  show cause hearing were part of a pattern of knowing defiance

18  rather than inadvertence.  This may affect necessary remedies

19  for members of the plaintiff class in civil contempt.  It is

20  for these reasons that the Seattle operations materials may be   10:39:35

21  relevant to this action.

22            Nevertheless, the Montgomery materials are

23  considerable, and they have only been reviewed in small part.

24  When they are reviewed in more complete detail, it may suggest

25  other potential problems in the operations of the MCSO that are  10:39:54

1    allowed to investigate these matters that are pertinent to the

2    current contempt findings.  He will have to, of course, have

3    broad leeway in determining what those are.  He has authority

4    and I'm going to authorize him to conduct such investigations,

5    and the defendants will completely cooperate in those          10:41:57

6    investigations.

7              Of course, when the monitor is conducting an interview

8    of an MCSO employee, counsel will be informed and may be

9    present if they wish to be.  And by "counsel" I don't just mean

10   defense counsel.  I mean plaintiffs' counsel; I, of course,    10:42:13

11   mean special appearing counsel; and Mr. Como, of course, you're

12   welcome.

13             Even if the monitor is conducting interviews of

14   persons who are not MCSO employees, all parties may have

15   transcripts of all of his interviews if they wish to pay for    10:42:29

16   them.  That does not prohibit the parties from looking at the

17   documents and seeking to obtain additional depositions if they

18   wish to do so, or making additional document production

19   requests.

20             Certainly, you may proceed with the depositions of the  10:42:48

21   attorneys that I've already basically authorized.  But before

22   conducting such depositions, I'm going to require you to check

23   with the monitor and obtain his approval to make sure that it

24   does not foul up his investigative plan.

25             As we approach the hearing, if his investigations make  10:43:10

1    would like to take before the June dates, but those have been

2    subject to revision as we are still getting documents from the

3    defendants.  So we would, I guess when we're ready to do that,

4    submit the list of proposed depositions to the Court.

5              THE COURT:  Ms. Iafrate.                            10:45:09

6              MS. IAFRATE:  Your Honor, I have a couple questions.

7              The investigative areas that you're talking about

8    currently involves PSB, correct?

9              THE COURT:  I'm not going to limit it.

10             MS. IAFRATE:  Well, is there any way for us to        10:45:22

11   understand the list of areas of investigations?

12             THE COURT:  Well, the monitor will inform you who he

13   wants to investigate.  I don't know, do you want -- do you want

14   to know anything else?

15             MS. IAFRATE:  I want to know the issues that are being  10:45:35

16   investigated.

17             THE COURT:  Well, they're going to be relevant to

18   the -- I suppose if you're saying -- well, I'm not going to

19   limit the monitor's authority, and I'm not going to require him

20   to provide you with advance notice of what he wants to inquire    10:45:48

21   into.

22             MS. IAFRATE:  Well, so, Your Honor, essentially

23   anything that the monitor wants to investigate, he can

24   investigate.

25             THE COURT:  No.  You have the right to object if you    10:45:59

1  witnesses about, it ain't happening --

2          MS. IAFRATE:  No, Your Honor, I --

3          THE COURT:  -- but you can object to it.

4          MS. IAFRATE:  Your Honor, I was asking you to provide

5  us with a list of what areas, what issues, what are at issue as          10:48:34

6  we approach this June OSC continuation.

7          THE COURT:  Well --

8          MS. IAFRATE:  What are the issues?  My clients have a

9  right to know what they are.

10          THE COURT:  I think I indicated to you that as we          10:48:49

11  approach the June hearing, I'll tell you what issues I believe

12  are relevant and concern me.  But I don't know that now,

13  because I have not had the opportunity to know everything

14  that's in Mr. Montgomery's files.  And it is, I assure you, it

15  is not my intent to explore all the various things that may or          10:49:04

16  may not be in there except as they relate to the order to show

17  cause.

18          However, the monitor also has independent

19  investigative authority pertaining to previous orders, and I'm

20  not going to unduly shackle him as long as it falls within his          10:49:22

21  authority under those previous orders to prevent him from doing

22  his investigation.

23          MS. IAFRATE:  Well, Your Honor --

24          THE COURT:  Nevertheless, if you have objections, you

25  can make them.          10:49:35

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Civil Action No. 07-2513-PHX-GMS
Judge G. Murray Snow

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | CV 07-2513-PHX-GMS |
| v. | ) ) | |
| Joseph M. Arpaio, et al., Defendants. | ) ) ) ) | |
| | ) ) ) | The Hon. G. Murray Snow, *Judge Presiding*. |

## DECLARATION OF RONALD D. ROTUNDA

I, RONALD D. ROTUNDA, declare as follows:

### I.    INTRODUCTION

1. My name is Ronald D. Rotunda.  I am currently the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University School of Law in Orange, California, where I teach courses in Legal Ethics and Constitutional Law. Attached, as Exhibit A is a copy of my current resume.

2. Except where otherwise noted, I make this declaration based on my personal knowledge and if called upon as a witness, I could and would testify competently to its contents.

1.

- 2 -

## II.   QUALIFICATIONS

3.  Before I joined Chapman U. in August 2008, I was the George Mason University Foundation Professor of Law from August 2002 (when I started teaching at George Mason University School of Law), until August 2006, when I became University Professor and Professor of Law at George Mason University School of Law.  Please see my resume, Exhibit 1, for more information, including a list of my publications.

4.  Prior to that (from 1993 until 2002), I was the Albert E. Jenner, Jr. Professor of Law at the University of Illinois.  I left the University of Illinois in 2002, and then began working full-time at George Mason University.

5.  I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.  During the course of my legal career, I have practiced law in Illinois, New York, Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee.

6.  I am the co-author of PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including ROTUNDA & DZIENKOWSKI, LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA/Thompson, 2014).

7.  In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume. State and federal courts at every level have cited my treatises and articles over 1000

times. From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

8. In 2000, the University of Chicago Press published a lengthy study that sought to determine the influence, productivity, and reputations of law professors over the last several decades. That study ranked me as the 17th highest in the nation. *See Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000).

9. The 2002-2003 New Educational Quality Ranking of U.S. Law Schools (EQR) ranked me the 11th most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml . I was selected the Best Lawyer in Washington, DC, in 2009 in Ethics and Professional Responsibility Law, as published in the November 2008 in the Washington Post in association with the Legal Times. I was also selected as one of the Best Lawyers in Southern California, in 2010 in Ethics and Professional Responsibility Law, and yet again in 2011, 2012, 2013, 2014, as published in the Los Angeles Times, in association with American Law Media.

10. I am a member of the bars of New York, Illinois, Washington, D.C., the Second Circuit, Seventh Circuit, the D.C. Circuit, the Fourth Circuit, the Central District of Illinois, D.C. District Court, and the U.S. Supreme Court.

11. Over the years, I have spoken at various ABA conferences on legal ethics and was a featured speaker on an ABA videotape series on legal ethics. I am a former —

- Member of the Bar Admissions Committee of the Association of American Law Schools;
- Chair of the Section on Professional Responsibility of the Association of American Law Schools;
- Member of the ABA Standing Committee on Professional Discipline (1991-1997);

- 4 -

- Chair of the ABA Subcommittee on Model Rules Review (1992-1997); member of the Consultant Group of the American Law Institute's Restatement of the Law Governing Lawyers.
- Member of the Advisory Council to Ethics 2000, the ABA Commission that proposed revisions to the ABA Model Rules of Professional Conduct (1998-2000).
- Liaison to the ABA Standing Committee on Ethics and Professional Responsibility (1994-1997).

**12.** Since 1994, I have been a member of the Publications Board of the A.B.A. Center for Professional Responsibility. I am a Life Fellow of the American Bar Foundation and the Illinois Bar Foundation, and a former consultant to the Administrative Conference of the United States on various issues relating to legal ethics.

**13.** During May 1996, I was the Consultant to the Chamber of Advocates of the Czech Republic: under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for lawyers in the Czech Republic. I also wrote the original draft of the first Czech Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of that Court to create an independent judiciary.

**14.** During November-December, 2002, I was Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law in, Leuven, Belgium.

**15.** In May 2004, and December 2005, I was visiting lecturer at the Institute of Law and Economics, Institut für Recht und Ökonomik, at the University of Hamburg.

**16.** During July 2007, I was in Latvia where I conferred with various judges from the Baltic States on judicial ethics, under the auspices of the U.S. Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. A copy of my curriculum vitae is attached.

## III. DOCUMENTS

- 5 -

**17.** I have reviewed the followings documents in connection with this matter. It appears that the judge is getting most of his "information" from articles of the Phoenix New Times:

    **a.** http://blogs.phoenixnewtimes.com/valleyfever/2015/04/judge_murray_snow_joe_arpaio_contempt_trial.php

    **b.** http://blogs.phoenixnewtimes.com/valleyfever/2015/04/arpaio_cops_to_investigating_federal_judge_judges_wife_confirming_new_times.php ("judge's spouse allegedly made at a restaurant, to the effect that Judge Snow wanted to 'make sure' Arpaio's not re-elected")

    **c.** http://blogs.phoenixnewtimes.com/valleyfever/2015/04/arpaios_chief_deputy_confirms_wack_investigations_of_judges_wife_cia_doj_et.php ("I know Judge Snow's wife, she told me he hates you and wants to see you out of office.")

    **d.** Order re evidentiary hearing of 4/27/2015; MEO re Day 4 evidentiary hearing

    **e.** Transcripts of Evidentiary Hearing of 4/21/2015; 4/22/2015;/ 4/23/2015; 4/24/2015

## IV.   SUMMARY OF THE FACTS

**18.** On April 22, 2015, and on April 23, 2015, Judge Snow conducted a cross examination of Sheriff Arpaio. Judge Snow quickly learned that Sheriff Arpaio was not investigating the judge (Evidentiary Hearing, 4/23/2015, p. 648, l. 14.) Instead, the judge was interested in learning all he could about an email that Sheriff Arpaio received from "someone named Grissom," who met the judge's wife in a restaurant." (Evidentiary Hearing, 4/23/2015, p. 654-55.). Mr. Grisson heard the judge's wife say that "Judge Snow wanted to do everything to make sure I'm [Sheriff Arpaio] not elected." (Evidentiary Hearing, 4/23/2015, p. 655, ll. 19-20.)

**19.** Sheriff Arpaio wanted to confirm that Mr. Grisson's statement was actually true. The judge then asked Sheriff Arpaio various leading questions (indicating that the judge was cross-examining the witness). Q is Judge; A. is Sheriff

    **Q.**      *Okay. And so you turned that over to your counsel and counsel hired a private investigator,* and what did the investigator do?

    **A.**      He investigated it.

- 6 -

> Q.     And what was the result of the
>        investigation?
> A.     Results were that *he confirmed that your
>        wife was in that restaurant* and con -- I
>        guess *talked to the witnesses, three or
>        four, that confirm that remark was made.*
>        [Evidentiary Hearing, 4/23/2015, p. 655, ll.
>        5-12 (emphasis added)]

20. The *judge apparently engaged in his own investigation of facts outside the courtroom* he thought relevant that were not in evidence. (Evidentiary Hearing, 4/23/2015, at p. 657, l. 25 & p. 658, ll. 1-2.)  The judge said, "I *was told* [during the luncheon break] that you also have various sources of funding within the MSCO," and Sheriff Arpaio responded that the judge's information was false. [Emphasis added.]  The judge did not say who told him this false information, nor does he say if he questioned others as well.

21. Later, the *judge* said, "Well, so he found information that the DOJ [Department of Justice] had sent a communication to my computer?"  Evidentiary Hearing of 4/24/2015, at p. 1000, ll. 19-20.  Note that this is a leading question, to which the witness (Sheridan) responds, "Something to that effect, yes."

22. Shortly thereafter, Mr. Sheridan said that he did not think the evidence of this email showed "collusion," to which the judge promptly replied, "Well, I certainly agree with that . . . ."  Evidentiary Hearing of 4/24/2015, at p. 1002, l.3.

23. The judge appears to be taking evidence outside of court (See ¶ 20), asking leading questions (e.g. ¶ 21), and giving his own testimony (¶ 22).

24. The judge also becomes argumentative. He tells Mr. Sheridan that he did not have to hire Mr. Montgomery as a "confidential" consultant — "Well, but what was he doing that needed to be confidential for?"  The witness tries to answer, but the judge *interrupted* the witness, preventing him from finishing his sentence.  Then the judge argues that there

- 7 -

was no need for confidentiality because the consultant was not a mole infiltrating organized crime. The witness responds that the investigation was confidential because it concerns the CIA breaching personal information at least 50,000 American citizens, including "citizens that lived here in Maricopa County." However, the judge became more argumentative, telling the witness, "I still don't understand" why such a witness should be called "confidential," even though the witness informed the judge that this informant qualified as "confidential" under the *written* rules of the operations manual. Evidentiary Hearing of 4/24/2015, at pp. 1005-0116.

25. I am told that Judge Snow is now ordering that documents showing communications with or referring to Larry Klayman, the lawyer for Mr. Montgomery, be turned over to him, including documents covered at least by the Attorney Work Product Privilege.

    **a.** Mr. Klayman and Mr. Montgomery are not parties to this case;
    **b.** No party has issued subpoenas for any of these documents;
    **c.** I am advised that the documents are confidential and within the Attorney Client and/or Work Product Privileges.

26. In the judge's order of April 27, he states that he ordered the "MCSO defendants to *immediately disclose* certain materials discussed in the Court's colloquy Sheriff Arpaio." [Emphasis added.] The judge states, "Attorney review for privilege was conducted contemporaneously with this production . . . ." I have been advised that this is not true.

### V.   CONCLUSION

27. We know that several people report that the judge's wife said that her husband, Judge Snow, "Judge Snow wanted to do everything to make sure [that Sheriff Arpaio is] not elected." It should be quite obvious that whatever the duties of a federal judge are, that job description does not include conducting a judicial proceeding in a way to insure that

- 8 -

Sheriff Arpaio is not elected and to pursue an investigation that is even broader than that for what appears to be personal reasons.

28. Moreover, we also know that in the several days of hearing, the judge —

    **a.**  asked leading questions,
    **b.** gave his own version of the facts,
    **c.** conducted his own investigation outside the courtroom,
    **d.** argued with witnesses, and
    **e.** was extremely interested in what evidence existed concerning the statement he made to his wife that he would do all that he could to make sure that Sheriff Arpaio is not elected.

29. Under these set of facts, the judge should be disqualified because of his personal bias or prejudice against a party, Sheriff Arpaio. See 28 U.S.C. §144. This section has no provision for any waiver.

30. The judge should also be disqualified pursuant to 28 U.S.C. §455(b)(1) ("personal bias or prejudice concerning a party" *or* "personal knowledge of disputed evidentiary facts concerning the proceeding." Section 455(e) allows for waiver of some disqualifications but does not allow any waiver for any disqualification under §455(b). 28 U.S.C 144 is also implicated here.

31. I declare under penalty of perjury that the foregoing is true and correct and that I signed this declaration on 6 May 2015, in Orange, California.

                                          RONALD D. ROTUNDA

# Attachment A

0491

RONALD D. ROTUNDA
Email: rrotunda@chapman.edu

April 27, 2015
Home Page ☞ http://www1.chapman.edu/~rrotunda

**Office Address:**

> Chapman University
> Dale E. Fowler School of Law
> Room 406
> One University Drive
> Orange, CA  92866-1005
> ☎:    (714) 628-2698
> Fax:    (714) 628-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

- 2 -

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

## Education:

**Legal:** HARVARD LAW SCHOOL     (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:** HARVARD COLLEGE     (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

## Member:

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000). Best teacher selected by George Mason U. Law School Graduating Class of 2003.

## Scholarly Influence and Honors:

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times*, picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

Ronald D. Rotunda

### LIST OF PUBLICATIONS:

**BOOKS:**

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> **CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> **1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> **1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> **1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> **1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> **1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> **1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> **1978 SUPPLEMENT TO CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> **1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> **1982 SUPPLEMENT TO CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

Ronald D. Rotunda

MODERN CONSTITUTIONAL LAW: CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM: LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

0496

Ronald D. Rotunda

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

MODERN CONSTITUTIONAL LAW: CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

THE POLITICS OF LANGUAGE: LIBERALISM AS WORD AND SYMBOL (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

Ronald D. Rotunda

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

CONSTITUTIONAL LAW: PRINCIPLES AND CASES (West Publishing Co., St. Paul, Minnesota, 1987).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

> 1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

> 1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

> 1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

> 1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

> 1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

> 1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

> 1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

> 1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

    1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

    1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

    1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

    1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

    1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

    1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

    1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

    1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

    1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

    1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

    1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

Ronald D. Rotunda

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

Treatise on Constitutional Law: Substance and Procedure — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

Ronald D. Rotunda

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차를 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

0501

Ronald D. Rotunda

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Group, St. Paul, Minnesota, 6th ed. 2000).

> **2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW** (West Group, St. Paul, Minnesota, 6th ed. 2000).

> **2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW** (West Group, St. Paul, Minnesota, 6th ed. 2001).

> **2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW** (West Group, St. Paul, Minnesota, 6th ed. 2002).

**CONSTITUTIONAL LAW** (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-West Group, St. Paul, Minnesota, 2001).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

**PROFESSIONAL RESPONSIBILITY** (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

**LEGAL ETHICS IN A NUTSHELL** (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> **2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2003).

> **2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2004).

Ronald D. Rotunda

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

0503

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

0504

Ronald D. Rotunda

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

> 2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

> 2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

> 2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

> 2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

> 2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

> 2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

> 2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

> 2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

> 2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Ronald D. Rotunda

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

2014 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Academic Publishing, St. Paul, Minnesota, 2014).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

Ronald D. Rotunda

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson Reuters, Eagan, Minnesota, 2014) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA- Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson Reuters, Eagan, Minn., 12th ed. 2014) (a Treatise on legal ethics, jointly published by the ABA and Thomson Reuters) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(unabridged edition).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(abridged edition).

Ronald D. Rotunda

## ARTICLES:

*The "Liberal" Label:  Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant:  Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions:   An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74*, 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses:  A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE:  A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

Ronald D. Rotunda

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies: Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases: Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information: The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time: Can the E.R.A. Be Saved*, 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

Ronald D. Rotunda

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews: The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators*, Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism: A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights: A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox: What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering*, 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

Ronald D. Rotunda

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised?*, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319 (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law: An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

Ronald D. Rotunda

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation,* 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.,* 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?,* CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits,* in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution,* 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

Ronald D. Rotunda

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past*, HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers*, 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment*, 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act*, THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?*, WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act: Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press*, in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

Ronald D. Rotunda

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible*, WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

Ronald D. Rotunda

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers,* 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics,* 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich,* CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?,* WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking: A Brief Case Study,* 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums,* LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts,* WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate,* 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws,* LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers,* THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence,* LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment,* 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention,* CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

0520

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics*, in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

Ronald D. Rotunda

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine*, 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution*, CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City*, NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?*, 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

0522

Ronald D. Rotunda

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

- 33 -                                                    Ronald D. Rotunda

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

Ronald D. Rotunda

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21 LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April 2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203 (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223 (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008, http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

Ronald D. Rotunda

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

0526

Ronald D. Rotunda

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 McGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution*, NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

Ronald D. Rotunda

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară*, REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?*, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training*, 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare*, WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

- 38 -                                      Ronald D. Rotunda

*Lessons of Watergate*, 54 Orange County Lawyer 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, National Law Journal, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, The Jerusalem Post, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, New York Post, June 1, 2012.

*ObamaCare Legal Battles Not Over*, Orange County Register, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, Washington Times, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* Orange County Register, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, Washington Times, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in Model, Resource, or Outlier? What Effect Has the U.S. Constitution Had on the Recently Adopted Constitutions of Other Nations?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

*'What did he know, and when did he know it?'*, Washington Times, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over: This Time Around, Take a Closer Look at America's Bill of Rights*, Wall Street Journal, July 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, Washington Post, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, Wall Street Journal, July 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

0529

Ronald D. Rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt*, DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

*The Ninth Circuit Departs from Tinker in Upholding Ban on American Flag T-Shirts in School*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 12, 2014, http://verdict.justia.com/2014/05/12/ninth-circuit-departs-tinker-upholding-ban-american-flag-t-shirts-school#sthash.pHSroRA6.dpuf

*Prayers before Meetings of the Town Board of Greece, New York*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 19, 2014, http://verdict.justia.com/2014/05/19/prayers-meetings-town-board-greece-new-york#sthash.pIt3d53k.dpuf

*Amending the First Amendment*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 9, 2014, http://verdict.justia.com/2014/06/09/amending-first-amendment

*Increasing Revenue by Lowering Taxes*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 23, 2014, http://verdict.justia.com/2014/06/23/increasing-revenue-lowering-taxes

*Changes in the Legal Profession and the Progress of Female Lawyers*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 7, 2014, http://verdict.justia.com/2014/07/07/changes-legal-profession-progress-female-lawyers#sthash.wKzv73e1.dpuf

*Banning the Export of American Oil*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 21, 2014, http://verdict.justia.com/2014/07/21/banning-export-american-oil

Ronald D. Rotunda

*Using Facebook as a Discovery Device*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 4, 2014, http://verdict.justia.com/2014/08/04/using-facebook-discovery-device

*Suing the President*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 18, 2014, http://verdict.justia.com/2014/08/18/suing-president

*IRS Monitoring Religious Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 15, 2014, http://verdict.justia.com/2014/09/15/irs-monitoring-religious-groups

*A Special Counsel to Investigate the IRS Targeting of Tea Party Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 29, 2014, http://verdict.justia.com/2014/09/29/special-counsel-investigate-irs-targeting-tea-party-groups

*Qualifications for Representatives,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 64-67 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Privileges and Immunities Clause,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 349-54 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Civil Forfeiture in Philadelphia*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 6, 2014, http://verdict.justia.com/2014/10/06/civil-forfeiture-philadelphia

*The Military Commissions Are Still Proceeding*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 20, 2014, http://verdict.justia.com/2014/10/20/military-commissions-still-proceeding

*Law Firms Creating In-House Ethics Counsel*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 3, 2014, http://verdict.justia.com/2014/11/03/law-firms-creating-house-ethics-counsel

*Targeting Political Speech for the Next Election*, WALL STREET JOURNAL, Nov. 5, 2014, p. A19, http://online.wsj.com/articles/ronald-rotunda-targeting-political-speech-for-the-next-election-1415145765

*The Problem of Inflating Billable Hours*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 17, 2014, http://verdict.justia.com/2014/11/17/problem-inflating-billable-hours

*The Mystery of Case Assignment in the Ninth Circuit,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 1, 2014, http://verdict.justia.com/2014/12/01/mystery-case-assignment-ninth-circuit

Ronald D. Rotunda

*The Ferguson, Missouri, Tragedy and the Future of Eyewitness Identification*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 15, 2014, http://verdict.justia.com/2014/12/15/ferguson-missouri-tragedy-future-eyewitness-identification

*Jonathan Gruber and the Wisdom of Crowds*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 29, 2014, https://www.facebook.com/ronald.rotunda/posts/10205409160371299?notif_t=like

*The President's Power to Waive the Immigration Laws*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Jan. 12, 2015, http://verdict.justia.com/2015/01/12/presidents-power-waive-immigration-laws

*The House of Representatives Lawsuit against the Executive Branch*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 2, 2015, https://verdict.justia.com/2015/02/02/house-representatives-lawsuit-executive-branch

*Je Suis Charlie Hebdo*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 16, 2015, https://verdict.justia.com/2015/02/16/je-suis-charlie-hebdo?utm_source=twitter&utm_campaign=wordtwit&utm_medium=web

*Protecting Rights in the Supreme Court*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 3, 2015, https://verdict.justia.com/2015/03/02/protecting-rights-supreme-court

*Lawyers Lying in Negotiations*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, MAR. 16, 2015, HTTPS://VERDICT.JUSTIA.COM/2015/03/16/LAWYERS-LYING-IN-NEGOTIATIONS

*King v. Burwell and the Rise of the Administrative State,* 23 U. MIAMI BUSINESS REV. 267 (2015)

*Hillary's Emails and the Law*, WALL STREET JOURNAL, March 17, 2015

*Is the Federal Government Really a State, if the IRS Says It Is?*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 30, 2015, https://verdict.justia.com/2015/03/30/is-the-federal-government-really-a-state-if-the-irs-says-it-is

*Ignoring the Supreme Court When You Don't Like the Result*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 13, 2015, https://verdict.justia.com/2015/04/13/ignoring-the-supreme-court-when-you-dont-like-the-result

*The Way of Death in the Netherlands, Oregon, and, Perhaps, California*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 27, 2015, https://verdict.justia.com/2015/04/27/the-way-of-death-in-the-netherlands-oregon-and-perhaps-california

Ronald D. Rotunda

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
   CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations

0533

Ronald D. Rotunda

Transitional Authority in Cambodia) and Cambodian political leaders, who were charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

Ronald D. Rotunda

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, Distinguished International Research Fellow at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, Associate Editor of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

1    Michele M. Iafrate, Bar #015115
     Iafrate & Associates
2    649 North Second Avenue
     Phoenix, Arizona 85003
3    Tel: 602-234-9775
     miafrate@iafratelaw.com
4

5    Attorneys for Defendant Joseph M. Arpaio

6
                    UNITED STATES DISTRICT COURT
7
                        DISTRICT OF ARIZONA
8

9    Manuel de Jesus Ortega Melendres, et al.,,    NO. CV 07-02513-PHX-GMS

10                              Plaintiff,    **Certification of Michele M. Iafrate**
                                             **Pursuant to 28 U.S.C. § 144.**
11            v.

12   Joseph M. Arpaio, et al.,,

13                              Defendant.

14   STATE OF ARIZONA        )
                             )   ss.
15   County of Maricopa      )

16          Michele M. Iafrate, being first duly sworn upon her oath, says:

17          1.    I am a member of the law firm of Iafrate & Associates, attorneys of

18   record for Defendant Joseph M. Arpaio in the above referenced action.  I have personal

19   knowledge of the statements contained herein.

20          2.    The associated affidavit of Joseph M. Arpaio for the recusal of Judge

21   G. Murray Snow is made in good faith.

22

23

24

25

26

27

28
     4272950.1
     5/22/15

                                                                            0536

1

2  DATED this 22nd day of May, 2015.

3  IAFRATE & ASSOCIATES

4

5  By s/ Michele M. Iafrate
   Michele M. Iafrate
6  649 North Second Avenue
   Phoenix, Arizona 85003
7  Attorneys for Defendants Joseph M. Arpaio

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4272950.1
5/22/15

2

0537

1   A. Melvin McDonald, Bar #002298
   Jones, Skelton & Hochuli, P.L.C.
2   2901 North Central Avenue, Suite 800
   Phoenix, Arizona 85012
3   Telephone: (602) 263-1700
   Fax: (602) 200-7847
4   mmcdonald@jshfirm.com

5

6  Attorneys for Defendant Joseph M. Arpaio

7             **UNITED STATES DISTRICT COURT**

8              **DISTRICT OF ARIZONA**

9   Manuel de Jesus Ortega Melendres, et al.,     NO. CV 07-02513-PHX-GMS

10                     Plaintiff,  **Certification of A. Melvin McDonald**
                                  **Pursuant to 28 U.S.C. § 144.**

11      v.

12  Joseph M. Arpaio, et al.,

13                     Defendant.

14

15  STATE OF ARIZONA   )
                       )  ss.
16  County of Maricopa    )

17         A. Melvin McDonald, being first duly sworn upon his oath, says:

18         1.    I am a member of the law firm of Jones, Skelton & Hochuli, P.L.C.

19 attorneys of record for Defendant Joseph M. Arpaio in the above referenced action.  I

20 have personal knowledge of the statements contained herein.

21         2.    The associated affidavit of Joseph M. Arpaio for the recusal of Judge

22 G. Murray Snow is made in good faith.

23

24

25

26

27

28

4274856.1
5/22/15

1

2          DATED this 22nd day of May, 2015.

3                                              JONES, SKELTON & HOCHULI, P.L.C.

4

5                                              By s/ A. Melvin McDonald

6                                                 A. Melvin McDonald
                                                  Jones, Skelton & Hochuli, P.L.C.
                                                  2901 North Central Avenue, Suite 800
7                                                 Phoenix, Arizona 85012
                                                  Attorneys for Defendants Joseph M. Arpaio
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Barry Mitchell Bar #013975
    Lee Stein Bar #12368
2   Mitchell, Stein, Carey, PC
    One Renaissance Square
3   2 North Central Avenue, Suite 1900
    Phoenix, Arizona 85004
4   Telephone: (602) 358-0290
    Fax: (602) 358-0291
5   barry@mitchellsteincarey.com
    lee@mitchellsteincarey.com
6
    Attorneys for Gerard Sheridan
7
8              **UNITED STATES DISTRICT COURT**

9                 **DISTRICT OF ARIZONA**

10  Manuel de Jesus Ortega Melendres, et al.,        NO. CV 07-02513-PHX-GMS

11                                   Plaintiff,      **Certification of Barry Mitchell and
                                                     Lee Stein Pursuant to 28 U.S.C. §
12       v.                                          144.**

13  Joseph M. Arpaio, et al.,

14                                   Defendant.

15  STATE OF ARIZONA          )
                              )   ss.
16  County of Maricopa        )

17           Barry Mitchell and Lee Stein, being first duly sworn upon their oath, says:

18           1.       We are members of the law firm of Mitchell, Stein Carey, PC

19  attorneys of record for Chief Deputy Gerard Sheridan in the above referenced action.  We

20  have personal knowledge of the statements contained herein.

21           2.       The associated affidavit of Joseph M. Arpaio for the recusal of Judge

22  G. Murray Snow is made in good faith.

23

24

25

26

27

28
    4274857.1
    5/22/15

1

2          DATED this 22nd day of May, 2015.

3                              MITCHELL, STEIN , CAREY PC

4

5                              By s/ Barry Mitchell
6                                 Barry Mitchell
                                  Lee Stein
7                                 Mitchell, Stein, Carey, PC
                                  One Renaissance Square
8                                 2 North Central Avenue, Suite 1900
                                  Phoenix, Arizona 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4274857.1                              2
5/22/15