# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona, | No. |
| Defendant/Petitioner, | U.S. District Court No. CV 07-02513-PHX-GMS |
| and GERARD A. SHERIDAN, | |
| Specially appearing non-party/Petitioner, vs. | |
| UNITED STATES DISTRICT COURT for the District of Arizona, | |
| Respondent Court, and | |
| MANUEL DE JESUS ORTEGA MELENDRES, et al., | |
| Plaintiffs/Real Parties in Interest. | |

---

## EXHIBITS TO PETITION FOR WRIT OF MANDAMUS
## VOLUME III OF VII -- (EXHIBITS 12 – 14)

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone:  602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County, Arizona

# EXHIBITS TO PETITION FOR WRIT OF MANDAMUS

## VOLUME III:

| EX. | DOCUMENT | PAGES |
|-----|----------|-------|
| 12. | Reporter's Transcript of Proceedings; May 14, 2015 District Court Status Conference [Dist. Ct. Docket No. 1097] | 0542-0606 |
| 13. | District Court ORDER Re Determination Whether Documents are Protected from Disclosure by the Attorney-Client Privilege and/or Work-Product Immunity (see Order for Details) dated May 7, 2015 [Dist. Ct. Docket No. 1053] | 0607-0630 |
| 14. | Reporter's Transcript of Proceedings, April 24, 2015 District Court Evidentiary Hearing Day 4, pages 818-1030 [District Ct. Docket No. 1043] | 0631-0832 |

RESPECTFULLY SUBMITTED this 6th day of August, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES


By /s/ John T. Masterson  *(w/permission from)*
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson  *(w/permission from)*
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Specially appearing counsel for
    Petitioner Joseph M. Arpaio in his
    official capacity as Sheriff of Maricopa
    County, Arizona

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing EXHIBITS TO PETITION FOR WRIT OF MANDAMUS – VOLUME III OF VII (Exhibits 12 – 14) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 6th day of August, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

_____ /s/ Karen Gawel _____



**EXHIBIT 12**

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
              Plaintiffs,            )   CV 07-2513-PHX-GMS
6                                    )
              vs.                    )   Phoenix, Arizona
7                                    )   May 14, 2015
     Joseph M. Arpaio, et al.,       )   9:35 a.m.
8                                    )
              Defendants.            )
9    _____)

10

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          BEFORE THE HONORABLE G. MURRAY SNOW

17                  (Status Conference)

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24

     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3  For the Plaintiffs:          Cecillia D. Wang, Esq.
                                AMERICAN CIVIL LIBERTIES UNION
4                               FOUNDATION
                                Immigrants' Rights Project
5                               39 Drumm Street
                                San Francisco, California  94111
6                               (415) 343-0775

7                               Stanley Young, Esq.
                                COVINGTON & BURLING, L.L.P.
8                               333 Twin Dolphin Drive
                                Suite 700
9                               Redwood Shores, California  94065
                                (650) 632-4700

10
   (Telephonically)            Tammy Albarran, Esq.
11                              COVINGTON & BURLING, L.L.P.
                                One Front Street, 35th Floor
12                              San Francisco, California  94111
                                (415) 591-7066

13
                                Daniel J. Pochoda, Esq.
14                              Joshua Bendor, Esq.
                                AMERICAN CIVIL LIBERTIES
15                              FOUNDATION OF ARIZONA
                                P.O. Box 17148
16                              Phoenix, Arizona  85011-0148
                                (602) 650-1854

17
   (Telephonically)            Andre Segura, Esq.
18                              AMERICAN CIVIL LIBERTIES UNION
                                125 Broad Street, 18th Floor
19                              New York, New York  10004
                                (212) 549-2676

20
   For the Defendant Maricopa County:
21
                                Richard K. Walker, Esq.
22                              WALKER & PESKIND, P.L.L.C.
                                16100 N. 71st Street
23                              Suite 140
                                Scottsdale, Arizona  85254
24                              (480) 483-6336

25

1                          A P P E A R A N C E S

2

3    For the Defendants Arpaio and MCSO:

4                              Michele M. Iafrate, Esq.
                             IAFRATE & ASSOCIATES
5                              649 N. 2nd Avenue
                             Phoenix, Arizona  85003
6                              (602) 234-9775

7    For the Defendant Arpaio:  A. Melvin McDonald, Esq.
                             JONES, SKELTON & HOCHULI, P.L.C.
8                              2901 N. Central Avenue, Suite 800
                             Phoenix, Arizona  85012
9                              (602) 263-1700

10   For Chief Deputy Sheridan:  Barry D. Mitchell, Esq.
                             MITCHELL STEIN CAREY
11                             One Renaissance Square
                             2 North Central Avenue
12                             Suite 1900
                             Phoenix, Arizona  85004
13                             (602) 358-0290

14   For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
                             DICKINSON WRIGHT, P.L.L.C.
15                             Attorneys at Law
                             1850 N. Central Avenue, Suite 1400
16                             Phoenix, Arizona  85004
                             (602) 285-5000

17
     For Executive Chief Brian Sands:
18
                             Greg S. Como, Esq.
19                             LEWIS BRISBOIS BISGAARD
                             & SMITH, L.L.P.
20                             Phoenix Plaza Tower II
                             2929 N. Central Avenue
21                             Suite 1700
                             Phoenix, Arizona  85012-2761
22                             (602) 385-1040

23

24

25

1                        A P P E A R A N C E S

2

3    For Lieutenant Joseph Sousa:

4                             David S. Eisenberg, Esq.
                             DAVID EISENBERG, P.L.C.
5                             2702 N. 3rd Street
                             Suite 4003
6                             Phoenix, Arizona  85004
                             (602) 237-5076
7
     For Timothy J. Casey:    Karen Clark, Esq.
8                             ADAMS & CLARK, P.C.
                             520 E. Portland Street
9                             Suite 200
                             Phoenix, Arizona  85004
10                            (602) 258-3542

11   Also present:           Chief Robert S. Warshaw, Monitor
                             Deputy Monitor John Girvin
12                            Deputy Monitor Sherry Kiyler
     (Telephonically)        Deputy Monitor Raul Martinez
13                            Ms. Cari Shehorn

14

15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2

3            THE COURT:  Please be seated.

4            THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

5    on for status conference.                                    09:35:06

6            Counsel, please announce your appearances.

7            MS. WANG:  Good morning, Your Honor.  Cecillia Wang of

8    the ACLU for plaintiffs.

9            THE COURT:  Good morning.

10           MR. YOUNG:  Good morning, Your Honor.  Stanley Young,  09:35:14

11   Covington & Burling, for plaintiffs.

12           MR. BENDOR:  Good morning, Your Honor.  Josh Bendor,

13   ACLU of Arizona, for plaintiffs.

14           MR. POCHODA:  Dan Pochoda, ACLU of Arizona, for

15   plaintiffs.                                                   09:35:26

16           MS. IAFRATE:  I thought the people on the phone were

17   going to announce, Your Honor.  That's why I paused.

18           Michele Iafrate on behalf of Sheriff Arpaio.  With me

19   is my law clerk, Cari Shehorn.

20           MR. WALKER:  Richard Walker on behalf of the County as 09:35:40

21   I've defined in previous proceedings.

22           MR. McDONALD:  Mel McDonald, limited appearance for

23   Sheriff Arpaio.

24           MR. COMO:  Good morning, Your Honor.  Greg Como on

25   behalf of former Chief Brian Sands.                          09:35:53

1          THE COURT:  Is Chief Sands waiving his presence?

2          MR. COMO:  He is, Your Honor.

3          MR. MITCHELL:  Good morning, Judge.  Barry Mitchell,

4   specially appearing on Chief Gerard Sheridan's behalf.  He is

5   here in the courtroom.                                          09:36:06

6          THE COURT:  Thank you.

7          MR. BIRNBAUM:  Good morning, Your Honor.  Gary

8   Birnbaum, special appearance for Deputy Chief MacIntyre, who

9   may appear later this morning.  Otherwise, we'll waive his

10  appearance.                                                     09:36:16

11         THE COURT:  Thank you.

12         MR. EISENBERG:  Good morning, Your Honor.  David

13  Eisenberg on behalf of Lieutenant Joseph Sousa, special

14  appearance for him.  We will waive his appearance today.

15         MS. CLARK:  Karen Clark, specially appearing on behalf   09:36:28

16  of non-party Tim Casey, Your Honor.  He is not here today.

17         THE COURT:  Who's on the phone?

18         MR. SEGURA:  Good morning, Your Honor.  Andre Segura

19  of the ACLU for the plaintiffs.

20         MS. ALBARRAN:  Good morning, Your Honor.  Tammy          09:36:43

21  Albarran from Covington & Burling on behalf of the plaintiffs.

22         CHIEF MARTINEZ:  Good morning, Your Honor.  Raul

23  Martinez, deputy monitor.

24         THE COURT:  Good morning, Chief.  I do recognize the

25  monitor staff:  The monitor, Chief Robert Warshaw in the       09:36:54

1    witness box, and assistant monitor John Girvin and

2    Chief Sherry Kiyler in the jury box, members of the monitor

3    team.

4           As always, or at least as is not atypical, there have

5    been a number of last-minute filings, but I would still like to     09:37:17

6    roughly follow the order I set out in my order and notice.

7    I'll insert some things that seem to make sense to insert where

8    we do, and in a few places, because of the nature of the

9    subject matter, I thought we might be able to resolve some

10   topics that were raised last week.     09:37:32

11          But we start off, Ms. Iafrate, with your response to

12   my inquiry regarding Ethical Rule 3.3(a)(3).  I've read your

13   pleading and I've read the sheriff's affidavit.  And I also, to

14   put it in context, went back and read Judge Boyle's order

15   regarding the two documents that were submitted to him by     09:37:54

16   Ms. Clark and Mr. Liddy, and I read those documents as redacted

17   by Judge Boyle.

18          I'm just going to try and roughly set out a chronology

19   here so that I understand it, and if you have any objection

20   with my word choice or anything else you can let me know.  But     09:38:13

21   it seems to me from Mr. Casey's November 6th letter to the

22   sheriff like he set forth certain facts pertaining to the

23   timing of Mrs. Grissom's Facebook message relative to the

24   events they report, a history of his interactions with

25   Mrs. Grissom and his evaluation of the consistency of the     09:38:31

1    accounts of Mr. and Mrs. Grissom, and he said that he'd

2    personally concluded that the matter was over, the information

3    lacked substance.

4         Then it seems that pursuant to a meeting he had with

5    the sheriff and Chief Deputy Sheridan he further retained          09:38:45

6    Don Vogel, and the letter sets forth the scope of Mr. Vogel's

7    charge in terms of the inquiries.  And I believe Mr. Casey's

8    letter notes that the sheriff could refer to Mr. Vogel's

9    separate conclusions on these same points.

10        And it does seem to me that at trial Chief Deputy              09:39:03

11   Sheridan and Sheriff Arpaio testified in some detail about

12   Mr. Vogel's report and his conclusions, and it was on that

13   basis, among others, that Judge Boyle determined that the

14   attorney-client privilege in the letters had been waived.

15        Have I misstated anything, according to your                  09:39:22

16   understanding?

17        MS. IAFRATE:  Your statements are correct.

18        THE COURT:  Okay.  I guess, then, last time I think I

19   heard plaintiffs' counsel indicate that you were reserving the

20   Vogel report itself from production.                               09:39:39

21        Are you still reserving that from production?

22        MS. IAFRATE:  Not based on Magistrate Boyle's

23   conclusion.  I was waiting for Magistrate Boyle's decision

24   whether it was going to be sealed or unsealed before disclosing

25   the report.                                                        09:39:59

1     THE COURT:  All right.  It does seem to me that the

2 entire Vogel report -- and I guess we need to bifurcate Vogel

3 reports now, because I have now become aware that Vogel was the

4 attorney that was -- or the private investigator hired to do

5 the Grissom inquiries.  But the Grissom Vogel report in its          09:40:14

6 entirety needs to be produced.

7     But it does seem to me -- and now I am basing this on

8 a newspaper article, I just want to check with you, that

9 appeared over the weekend, and I want to make sure the

10 understanding is correct -- that regardless, even though the          09:40:34

11 sheriff and chief deputy both testified about the content and

12 confirmation provided by Mr. Vogel in his separate

13 investigation, it appears to me, based on the content of the

14 news report, that regardless of whatever Detective Vogel found,

15 they accepted the advice of Mr. Casey, determined it would be          09:40:57

16 unethical to try to file ethical charges, and let the matter

17 go.

18     I guess I'm asking:  Do you contest what Chief Deputy

19 Sheridan is quoted as saying in the newspaper article?

20     MS. IAFRATE:  Your Honor, I do not know what article          09:41:17

21 you're referring to.

22     THE COURT:  Sure.

23     MS. IAFRATE:  But if you are asking, "Did they accept

24 the advice of counsel and let it go?" that was the

25 determination.          09:41:27

1       THE COURT:  Kathleen, can you please give -- you can

2   just give that to counsel.

3       This was an article in the print -- I understand it

4   was in the Sunday Arizona Republic, and it may have been in an

5   earlier electronic version of The Republic.  It's divided up        09:41:47

6   into three columns, and if you go to the bottom of the second

7   column, it says:  "Days later, a private investigator arrived

8   at their home.  Jerry Sheridan, Arpaio's chief deputy, said Tim

9   Casey, Arpaio's former defense attorney on the racial profiling

10  case, hired the investigator to look into the veracity of the      09:42:09

11  message.  Sheridan said the office was obligated to look into

12  Karen's note:  'The sheriff and I felt that we should have our

13  lawyer look into the comment in the event that it was made, and

14  it was credible, because it went to the judge's state of mind,'

15  Sheridan said in an interview.  Dale ..." -- referring to          09:42:27

16  Dale Grissom -- "... says he never learned what happened after

17  their interviews, 'But I don't believe the investigator went to

18  investigate Snow's wife.'  When asked that question, Sheridan

19  said Casey told him and Arpaio there wasn't enough evidence to

20  take the tip any further.  'And it sat in my desk drawer for a     09:42:42

21  year and a half, until it came out in court when the sheriff

22  was on the stand,' Sheridan said.  'We had no intention to do

23  anything with it because we were told it would be unethical for

24  us to make a complaint on a third-party hearsay.'"

25      I guess, and we have Chief Deputy Sheridan here, I             09:43:00

 1    want to know if that's an accurate statement that he -- or an

 2    accurate recitation of a statement that he made.

 3              MS. IAFRATE:  May I have a moment?

 4              THE COURT:  You may.

 5              (Pause in proceedings.)                                    09:43:23

 6              MS. IAFRATE:  Your Honor, I'm told that those

 7    statements that you just read attributed to Chief Deputy

 8    Sheridan are accurate statements.

 9              THE COURT:  All right.  Thank you.

10              So that -- I think there are two ramifications of         09:44:06

11    that.  One is the Sheriff's Office at the time chose to follow

12    their attorney's advice and they didn't pursue the matter

13    further.

14              I also think, however, that upon reading Judge Boyle's

15    report, he'd made a determination that the attorney work           09:44:22

16    product immunity had not been waived, and I believe that this

17    statement may waive the attorney-work-product immunity, and so

18    I'm going to refer this matter back to Judge Boyle to evaluate

19    whether the November 6 letter should be unredacted due to a

20    waiver of the attorney-work-product immunity based on the          09:44:40

21    statements made by Chief Deputy Sheridan.

22              Obviously, I don't know the unredacted portions, but

23    Judge Boyle does, and he can make the determination whether or

24    not there's such a waiver.

25              MS. IAFRATE:  Your Honor?                                 09:44:55

1           THE COURT:  Yes.

2           MS. IAFRATE:  If you are going to refer this back to

3    Magistrate Boyle, this piece of information was not briefed to

4    Magistrate Boyle.  We were dealing with other instances.  So

5    could we have an opportunity to brief at least this limited --      09:45:10

6           THE COURT:  Sure.

7           MS. IAFRATE:  -- position?

8           THE COURT:  He will set the briefing schedule, but I

9    will tell him that I would prefer that it be quick, because we

10   are on a limited time frame.                                        09:45:23

11          I must say, though, that -- and I suppose because the

12   motion was -- or the clarification on 3.3 was only filed last

13   night, I'm not sure that the parties have had a chance to

14   react.

15          Ms. Clark, do you have anything you want to add?            09:45:42

16          MS. CLARK:  Your Honor, it has been an extremely

17   limited amount of time.  We got the documents --

18          THE COURT:  Could I have you come to a microphone?

19          MS. CLARK:  Yes.  Thank you, Judge.  Sorry about that.

20          Yes, Your Honor.  It has been an extremely limited          09:45:58

21   amount of time.  We got it short -- I received it shortly

22   before 5:00 p.m. and forwarded it to Mr. Casey, who was

23   reviewing it late last night.

24          Based on that very fast review, Mr. Casey's authorized

25   me to inform the Court that he does not believe at this time,      09:46:14

```
 1   based on the information he's aware of right now, that he has
 2   further remedial duties towards the Court.
 3          THE COURT:  All right.  Thank you.
 4          Ms. Wang -- I don't know who's speaking for the
 5   plaintiffs on this.  Do the plaintiffs have any concerns with    09:46:27
 6   the clarification?
 7          MS. WANG:  Your Honor, plaintiffs don't have any
 8   comment on it at this time.
 9          THE COURT:  All right.  So I don't -- when I saw it, I
10   didn't think that it required any sort of special scheduling.    09:46:38
11   I'll still allow the parties to speak if they want to be heard,
12   but I don't think the clarification is of such a nature that it
13   requires separate testimony by the sheriff.
14          I realize that the parties may have reserved the right
15   to recall him and interim developments may necessitate his       09:46:53
16   recall, but I don't know that anything about the clarification
17   statement is of such a nature that I think it needs anything
18   more than what you've already done, Ms. Iafrate, and so can we
19   move on?
20          MS. IAFRATE:  Yes, please.                                09:47:13
21          THE COURT:  All right.  The next thing that I would
22   like to address is last night, Ms. Iafrate, you also filed --
23   and it might not have been last night; it actually might have
24   been a day ago, I can't remember -- you filed sort of a
25   reconciliation, which is what I had asked for, on closed         09:47:33
```

 1  investigations.

 2          And one of the reasons I'd asked for it is because

 3  when you represented last week that there were 40 some-odd

 4  closed investigations, my monitor only had 31.  And you do have

 5  41 that are closed, but let me tell you the ones that my          09:47:49

 6  monitor does not have.

 7          (Cell phone rings.)

 8          THE COURT:  Everybody turn off your cell phones,

 9  please.

10          We don't have 2014-0572, 574, 576, 578, 581, 584, 588,   09:48:01

11  761, 817, and we also -- my monitor doesn't have 2015-0103.

12          Can we get those, please?

13          MS. IAFRATE:  Yes, Your Honor.  And actually, since

14  last week two more have been completed, so that's why the

15  number is at 43 now rather than 41.                              09:48:44

16          THE COURT:  Well, when they're completed, would you

17  give copies to the monitor?  And we're about to -- we're going

18  to take up probably at this time, if we can, what plaintiffs

19  filed late last night or early this morning.

20          And let me just clarify that -- well, let me give you    09:48:56

21  a little bit of history.  You may know this, and if you do,

22  Ms. Iafrate, I apologize, but it was just before you entered

23  the case.

24          Last October we held a hearing in which we determined

25  that Captain Bailey was conflicted.  He is the captain of       09:49:16

1    the -- he was at the time the captain of the PSB but was also

2    involved in matters being investigated, and it required the

3    appointment of a special investigator.  So the monitor wrote to

4    Chief Deputy Sheridan, indicated that we were going to need a

5    special investigator, or an independent investigator.  Chief    09:49:39

6    Sheridan wrote back and suggested Mr. Vogel.  We said fine.

7    Mr. Vogel began his work.

8          Then Mr. Vogel, I think it was Mr. Vogel, said, Well,

9    you know, I've done work in the past for Tim Casey.  And

10   Chief Warshaw, the monitor, wrote to Tom Liddy and said:  We    09:49:58

11   need to stop.  It's very irregular to have an independent

12   investigator be the investigator for the defense attorney.

13   What investigations has he done?  And of course, we didn't know

14   at the time, and I didn't know until last week, that one of the

15   investigations was the Grissom inquiry.                         09:50:18

16         And we never did get an answer to that question, but

17   it was in that interim that Mr. Casey withdrew from the case

18   and you came in the case, and you may remember this.  We

19   established a criteria whereby the monitor could oversee and

20   supervise internal investigations as well as external          09:50:38

21   investigations.

22         And so I said, Well, if they want to proceed with

23   Vogel, that's irregular, but it's their choice.  We'll note it,

24   and if there's any problem, but why don't we assign a monitor

25   to accompany chief Vogel on all his inves- -- or Deputy Vogel   09:50:53

1    on all his investigations, and we did.  It was one of our

2    internal monitors.  It was Chief Kiyler, who's here.  She did

3    accompany Deputy Vogel on all of his investigations through the

4    months, on the two investigations that he did complete within

5    the limits within which MCSO placed on him.                        09:51:13

6         I do believe, and I don't mean to put words in

7    anybody's mouth, that the monitor is satisfied that his report

8    is adequate and independent, despite the irregularity of having

9    him be selected in the way that he was, meaning somebody who

10   had done work for Tim Casey.  And I don't believe that the        09:51:34

11   monitor's evaluation has changed even though he was involved in

12   the Grissom inquiries.

13        Now, the monitor has not evaluated his Grissom

14   inquiries, but I think that the monitor is satisfied that in

15   the main, it wouldn't be acceptable, really, to pick a           09:51:53

16   defendants' private investigator to do an independent

17   investigation, but I think that the monitor is satisfied that

18   despite that irregularity, in the main his investigation has

19   been adequate and thorough.

20        Am I misstating that?                                        09:52:10

21        CHIEF WARSHAW:  No.

22        THE COURT:  Towards that end, that's one of the things

23   that plaintiffs want, and I thought last week you said you'd

24   give it to them.

25        Why are you going to withhold it?                            09:52:21

1          MS. IAFRATE:  What are you referring to, Your Honor?

2          THE COURT:  The Vogel investigations.

3          MS. IAFRATE:  I don't think that that's what they were

4    requesting only; I think that they were requesting much more

5    than that.                                                        09:52:37

6          THE COURT:  They were.  One of the categories --

7    you're right, and I don't mean to misstate that.  But one of

8    the categories that they were asking for was the Vogel

9    investigations, and they said that you had elected not to

10   provide that as well, I think.                                    09:52:51

11         Let me see.  I have here -- they're asking for all

12   documents related to the four investigations originally

13   assigned to be conducted by Don Vogel; all documents related to

14   investigations stemming from former Deputy Charley Armendariz,

15   including, but not limited to, the investigations referenced in  09:53:12

16   defendants' reports on the status of current IA investigations;

17   and all MCSO Internal Affairs or Professional Standards Bureau

18   documents relating to investigations of alleged misconduct

19   involving race discrimination and/or illegal detentions.

20         Why can't they have those?                                 09:53:27

21         MS. IAFRATE:  Well, first of all, Your Honor, I'm

22   unsure what you're reading from.

23         THE COURT:  Oh.  Fair enough.  This is another one of

24   those late filings.  This is one we got last night.  I got a

25   ton from you and I got a few things from plaintiff and so you    09:53:41

 1  may not have seen this yet.

 2          THE CLERK:  (Handing document to Ms. Iafrate).

 3          MS. WANG:  Your Honor?

 4          THE COURT:  Yes.

 5          MS. WANG:  We did recognize that we filed the motion          09:54:03

 6  to compel on these documents late last night, and plaintiffs

 7  didn't expect it to be teed up --

 8          THE COURT:  All right.

 9          MS. WANG:  -- for today.

10          THE COURT:  Well, we can take it up next week if you          09:54:14

11  want.

12          MS. WANG:  Sure.  We do have an interest in getting

13  them sooner rather than later, given that the continuation of

14  the evidentiary hearing is looming, but we would not object to

15  giving Ms. Iafrate a chance to respond to the motion.          09:54:24

16          THE COURT:  All right.  Why don't you do that,

17  Ms. Iafrate, and if there's not going to be a problem, turn

18  them over to her.

19          I thought you said you were going to give the Vogel

20  investigations on the 18th, anyway, last week.  Did I          09:54:35

21  misunderstand you?

22          MS. IAFRATE:  Right.  I don't think that that's the

23  category.  I mean, it's very difficult for me, Your Honor, to

24  read this and respond to you at the same time.

25          THE COURT:  No problem.  And I won't make you.          09:54:47

1           MS. IAFRATE:  Okay.

2           THE COURT:  But if you read through those things and

3    we can resolve problems, resolve it and we won't take it up.

4           MS. IAFRATE:  Okay.

5           THE COURT:  Okay?                                    09:54:55

6           I have a few questions on the parties' briefings re

7    the depositions of Casey, Liddy, and Stutz.  I don't know if

8    you wanted to actually make oral arguments, and if you do I'll

9    hear them, but I have a few questions and I want to get that

10   out so that you can move on it as well.                     09:55:18

11          It's plaintiffs' motion.  Who's arguing?

12          MS. WANG:  Your Honor, Mr. Bendor will argue that.

13          THE COURT:  All right.

14          MR. BENDOR:  Thank you, Your Honor.

15          And if you want to, just ask questions.  I don't need 09:55:48

16   to belabor what's in the written papers.

17          THE COURT:  I appreciate the invitation, but you can

18   rest assured I will ask you questions.

19          MR. BENDOR:  I wasn't concerned that you wouldn't.

20          Your Honor, defendants have raised the advice of      09:56:06

21   counsel --

22          THE COURT:  Let me tell you, let's just cut right to

23   the quick of it, Mr. Bendor.  I'm persuaded on the preliminary

24   injunction issue.  Of course, I'm going to allow Ms. Iafrate to

25   speak and listen carefully to what she says, but it seems to me 09:56:18

 1    that defendants have clearly raised the advice of counsel on

 2    the preliminary injunction issue, and I think they've waived

 3    the attorney-client privilege and the work-product immunity.

 4    We can go through all that, and maybe Ms. Iafrate wants to go

 5    through it in more detail.                                        09:56:35

 6         More concerning to me is the May 14th -- now, it seems

 7    clear to me, based on Chief Deputy Sheridan's testimony, that

 8    clearly you can depose these folks on matters that -- in which

 9    the defendants were neither seeking nor obtaining legal advice,

10    and Chief Deputy Sheridan, for example, has already indicated   09:57:00

11    that he was not seeking nor obtaining legal advice in his

12    conversation with Chief Trombi and Ms. Stutz.  So clearly, you

13    can depose her on that, I think.

14         But it isn't so neatly teed up on the rest of the May

15    14th meeting.  I did read in your briefing, and I appreciate    09:57:20

16    that Ms. Iafrate invoked the privilege when you asked at

17    deposition about the May 14th meeting, and then in hearing she

18    seems to have sure skated awfully close to the line when she

19    said in her questioning of Sheriff Arpaio -- well, the

20    question:  "Chief Sheridan told him to send out the e-mail?"    09:57:45

21         "Sheriff Arpaio:  I believe he did."

22         "Ms. Iafrate:  Did anyone in the room object to that

23    directive?"

24         "Answer:  No.

25         "Question:  Not even counsel?                              09:57:58

1          "Answer:  No."

2          That's skating pretty close to being a sword and a

3    shield on the one hand, but on the other hand, Mr. Bendor, is

4    silence of counsel the same thing as advice of counsel?  I

5    mean, I'm the one that's going to be the trier-of-fact here.          09:58:15

6    I'm not particularly persuaded that when counsel don't say

7    anything it means anything at all.  I think she might have been

8    trying to draw an implication, but I'm not going to draw it,

9    and I don't know that that breaches the attorney-client

10   privilege.                                                            09:58:30

11         Do you understand my question?

12         MR. BENDOR:  I do understand your question, Your

13   Honor, and I think we would argue that that is the -- first of

14   all, it's clear this is the sort of question that defendants

15   were objecting to at deposition and they were assert --           09:58:45

16         THE COURT:  I read that in your brief.

17         MR. BENDOR:  Right.  And would say that if counsel's,

18   you know, asked, you know, "Can I do A or B?" and counsel

19   doesn't say anything, then that communication back and forth is

20   a communication intended to obtain advice, and the fact of the    09:59:08

21   question and the answer or non-answer appears to be relevant.

22         THE COURT:  Well, let me ask you this:  Is the way to

23   proceed, then, to proceed somewhat like a privilege log, which

24   is to allow you to take the deposition, and to tee up what was

25   actually said, and if they're going to seek to invoke the         09:59:27

 1  privilege, they have to sort of assert enough in a privilege

 2  log for me to know, and then I can rule on whether or not this

 3  question waived that.

 4        Do you understand what I'm saying?

 5        MR. BENDOR:  I believe I do.  Your Honor, I guess I          09:59:46

 6  think it would be unfair to allow defendants to object to

 7  questions about what non-attorneys said or -- or other advice

 8  that was given, right?  I mean, if attorneys said, "Well, you

 9  can do A or B," but they didn't happen to speak to us another

10  issue, what they did give advice towards seems clearly          10:00:10

11  relevant --

12        THE COURT:  Well --

13        MR. BENDOR:  -- to the statement that they didn't

14  object to --

15        THE COURT:  I think I've indicated you can depose          10:00:18

16  them, but then you're going to have to think very carefully

17  about your questions, right?

18        MR. BENDOR:  Yes.  I think we would argue that we're

19  going to end up in basically the same place, and that by --

20        THE COURT:  Well, you may well end up in the same          10:00:35

21  place, but if you want my ruling now, I think my ruling is

22  silence of counsel is not the same thing as advice of counsel.

23        I do think that you can take the deposition, and I do

24  think Ms. Iafrate's questioning of the sheriff may, in certain

25  contexts, waive a privilege.                                    10:00:56

1        I do think you're also require -- allowed, and I'll

2    say this, but I do want to hear from Ms. Iafrate on this, I do

3    think you're allowed to ask questions to make sure that there's

4    actually a good faith basis for the invocation of the

5    attorney-client privilege.  And so I'm not -- not going to          10:01:13

6    deprive you of asking questions about that May 14 meeting.

7        But it does seem to me that it's quite possible that

8    advice was sought and/or given in that meeting, and that if it

9    can be cabined, you're going to have to determine whether

10   Ms. Iafrate's question to the sheriff was sufficient to waive      10:01:32

11   it.

12       MR. BENDOR:  Understood, Your Honor.  I think I would

13   also note that we have a second argument on waiver for May

14   14th, which is the voluntary disclosure of otherwise privileged

15   information, and --                                                10:01:47

16       THE COURT:  Which would be what?

17       MR. BENDOR:  Which would be -- I mean, it pertains to

18   the same portion of the transcript, which is that counsel was

19   silent on whether or not the Trombi e-mail was proper, and we

20   would argue that that is disclosure as to what counsel did or      10:02:10

21   did not say.

22       And I understand they are similar arguments, but I

23   think that you could say that whether or not it's advice, it

24   certainly is a disclosure of the facts regarding potentially

25   privileged communications.                                        10:02:29

1           If they want to assert that the meeting isn't
2    privileged at all, then, I mean, that makes the matter moot.
3           THE COURT:  Well, they may do that.  We'll have to
4    see.
5           MR. BENDOR:  Okay.  Your Honor, do you have any          10:02:40
6    further questions of me?
7           THE COURT:  Well, I guess I'll just point out I'm
8    going to ask Ms. Iafrate, and I don't know if you're interested
9    in this, but it seems to me, and I think Ms. Iafrate's
10   acknowledged this, that Judge Boyle's already said there's a    10:02:52
11   waiver of the attorney-client privilege on any of the Grissom
12   stuff.  I don't know if you want to ask about that, but I just
13   am telling you that I'm going to ask Ms. Iafrate in case this
14   becomes an issue.
15          MR. BENDOR:  I don't think we have anything further to    10:03:05
16   say about this at the time, other than it appears that
17   defendants have waived that privilege and work product
18   immunity.
19          THE COURT:  All right.  Ms. Iafrate.
20          MS. IAFRATE:  Your Honor, regarding the pleading, I do   10:03:15
21   not want to make an oral argument that reiterates my papers to
22   you.  I'm certain that you've read them already.  They weren't
23   filed last night, so you had a little bit of time to review
24   them.  But regarding the May 14 hearings -- or May 14 meetings,
25   I recall that during examination you were very, very particular  10:03:41

 1    how you defined attorney-client privilege.

 2            So for example, when I had Chief Deputy Sheridan on

 3    the stand I asked him, "Were you seeking advice from Christine

 4    Stutz?"  He testified:  "No."  Therefore, I elicited further

 5    testimony from him regarding those statements.                    10:04:06

 6            THE COURT:  Um-hum.

 7            MS. IAFRATE:  That is not a waiver.  I was not going

 8    into --

 9            THE COURT:  I don't view that as a waiver.

10            MS. IAFRATE:  Right.                                      10:04:17

11            THE COURT:  I don't view that as a waiver at all.  I

12    just don't think the privilege has been established there,

13    right?

14            MS. IAFRATE:  Correct.  I'm with you.  I guess that my

15    point to you is this regarding this overreaching waiver of it    10:04:28

16    all.  The sheriff's --

17            THE COURT:  Well, did you understand where I'm going

18    with Mr. Bendor?  Do you have any concerns about that?

19            MS. IAFRATE:  I didn't understand how -- what that

20    would look like.  So, for example, the deposition can be set.    10:04:39

21            THE COURT:  Right.

22            MS. IAFRATE:  The deponent will appear.  And then do

23    we go on a question-by-question basis?

24            THE COURT:  I'm afraid that it may go that way and

25    you'll just kind of have to -- maybe what we'll have to do is    10:04:55

```
 1   when you're going to take that, you'll just have to reserve
 2   some time with me.  And if I'm available I'll come sit in the
 3   deposition; if I'm not available you'll just cabin the
 4   questions.  And then I can resolve them at the end of the day.
 5           MS. IAFRATE:  Well, my client has a privilege, but I      10:05:08
 6   believe that these attorneys also have concerns and attorney --
 7           THE COURT:  Clearly, they do.
 8           MS. IAFRATE:  And so I would --
 9           THE COURT:  In terms of their ethical
10   responsibilities?                                               10:05:24
11           MS. IAFRATE:  Yes.
12           THE COURT:  Right.
13           MS. IAFRATE:  So I would assume that those attorneys
14   would be invited to the table as well.
15           THE COURT:  I think they have to be.  I don't disagree   10:05:29
16   with that at all.
17           Do you have any problem with that, Mr. Bendor?
18           MR. BENDOR:  No, Your Honor.
19           MS. IAFRATE:  So if that is your ruling, so be it.
20   However --                                                      10:05:41
21           THE COURT:  Well, it is my inclination.  I'm just
22   asking you if you have any problem.  I'm going to also ask
23   Mr. Como if he -- if he wants to be heard on that.  Or if you
24   have any suggestion that would be different if you think that
25   would appropriate, I'm giving you an opportunity to be heard, I  10:05:51
```

1    guess, is what I'm saying.

2              MS. IAFRATE:  Well, I'm trying to -- this is yet one

3    more unique situation in this case.

4              THE COURT:  Yeah, there's lots of them in this case.

5              MS. IAFRATE:  Yes.  I would suggest that an                10:06:04

6    alternative would be to do -- I assume that to err on the side

7    of caution, plaintiffs will be writing out their questions,

8    similar to a script.  I would suggest that the deposition be

9    based on written questions so that then we could identify which

10   ones we would be objecting to and which ones would be easily       10:06:23

11   answered.

12             If we're doing this on the fly, Your Honor, you know,

13   I'm doing a lot on the fly right now, and it's not the best way

14   to protect something as important as the attorney-client

15   privilege to all be in a room and listening to the question for    10:06:37

16   the first time.  So I would recommend that we do this as the

17   rules allow, that it be done by written questioning and then we

18   do written objections.

19             THE COURT:  I don't think I'm going to do that.  You

20   know that the idea that you're entitled to pre-knowledge of all    10:06:55

21   the questions doesn't float very well with me.  But I do -- you

22   will know the subject matter and I believe -- I have great

23   confidence in your competence and the competence of Ms. Clark

24   and the other attorneys who will be present.

25             If you -- you know, I do think it's important to go       10:07:15

```
 1  carefully.  So if you need some time in the deposition, I don't
 2  think you're going to need a lot of time.  You're a very
 3  experienced attorney.  But I don't think they -- I'm not going
 4  to buy into them writing out the questions in advance.  So just
 5  try and cabin in the way I've indicated.                         10:07:30
 6        If I can be there I will.  If not, you just save the
 7  areas and get in touch with me.  Let me know when you're going
 8  to do it and I'll try and make myself available to make those
 9  rulings.
10        Mr. Como, do you want to be --                             10:07:43
11        Oh, did you have anything more, Ms. Iafrate, on this?
12        MS. IAFRATE:  Nothing other than what I've written in
13  the pleading.
14        THE COURT:  All right.  Thank you.
15        Mr. Como.                                                  10:07:52
16        MR. COMO:  Your Honor, I don't have any objection to
17  the preliminary, I guess, rulings or thoughts that you've
18  expressed on these issues, nor the procedure that you've
19  outlined.
20        THE COURT:  All right.  Ms. Clark.                         10:08:00
21        MS. CLARK:  Thank you, Judge.  Just briefly, I, of
22  course, would ask to be able to attend the depo to advise
23  Mr. Casey about his obligations in this increasingly complex
24  matter.  I think more clarification ahead of time on the
25  parameters of what has been waived and what has not been waived  10:08:24
```

```
 1    and what he can testify to is going to be extremely helpful.

 2           THE COURT:  I'm going to do a written order on this

 3    one.  But I'm just going to tell you, it's a very broad waiver

 4    as it pertains to the preliminary injunction advice.  It's a

 5    very broad waiver, as I read it, but it's really Judge Boyle's      10:08:40

 6    order.

 7           If you want me to clarify it or expand it or detract

 8    it, I will, but it seems to me that Judge Boyle has already

 9    ruled that there's a waiver on the Grissom stuff.

10           And my ruling on the 2014 May meeting, which may be of       10:08:54

11    interest, is that the deposition can proceed to the extent that

12    the discussion involved matters in which legal advice was not

13    sought nor given, but that's why I was, you know, sparring a

14    little bit with Mr. Bendor.  The questions are going to have to

15    be very skillfully asked and carefully answered so that we can      10:09:22

16    cabin those areas and protect the privilege.

17           There's also the issue of whether or not any of the

18    questions or answers would potentially be waived by

19    Ms. Iafrate's subsequent questioning of Sheriff Arpaio, but I

20    am not ruling that that -- at this point I'm not ruling that        10:09:42

21    that constitutes any sort of definable waiver of an

22    attorney-client privilege absent a factual context.

23           MS. CLARK:  Right.  Thank you for that clarification,

24    Judge, that's very helpful.

25           Of course, in addition to the privilege, there's also       10:09:54
```

 1 | client confidentiality, which is Mr. Casey's --

 2 | THE COURT:  I am well aware.

 3 | MS. CLARK:  Yes, I am aware that you're aware.

 4 | In regard to this entire issue, I do need to make a

 5 | record about one thing, and that is that a lot of what's going          10:10:08

 6 | on in these proceedings is involving Mr. Casey, who is a

 7 | non-party, who's paying out of his pocket for me to attend

 8 | these hearings.

 9 | Up until the hearing on the 21st and 24th of April, we

10 | were receiving copies of transcripts of these hearings from the        10:10:24

11 | defense and then that stopped.  Mr. Casey was required to pay

12 | out of his own pocket for the transcript of the April 23rd and

13 | 24th testimony so that he could comply with his ethical

14 | obligations to this Court.  And I've also asked for a copy of

15 | the May 8th hearing transcript and that is not forthcoming,            10:10:41

16 | either.

17 | So he needs to be having these transcripts in order to

18 | comply with this Court's order the day that he withdrew that he

19 | have a continuing obligation to assist in the transition of

20 | this case, to ensure that Your Honor's concerns about the             10:10:55

21 | defendants and carrying out the orders and Mr. Casey's

22 | involvement in that is carried out.  So I guess I'm asking for

23 | the Court to help me to help Mr. Casey by somehow ordering the

24 | defendants to provide him with copies of transcripts they're

25 | ordering.          10:11:13

 1          THE COURT:  Well, the defense, I think Ms. Iafrate

 2  made a position that because Mr. Casey was a potential witness,

 3  she was invoking the rule with respect to him.

 4          Is that right, Ms. Iafrate?

 5          MS. IAFRATE:  That is correct, Your Honor.                10:11:26

 6          THE COURT:  And I assume that's why you haven't been

 7  providing the transcripts?

 8          MS. IAFRATE:  Your Honor, I forwarded that information

 9  to the County, because they are paying for the transcripts.  So

10  the answer to that question is more appropriately asked of the   10:11:35

11  County, not of me.

12          THE COURT:  Mr. Walker.

13          MR. WALKER:  I have no objection in principle to

14  providing Mr. Casey with transcripts, but I do need to evaluate

15  the issue about the invocation of the rule.                      10:11:53

16          THE COURT:  All right.  Well, I would ask you to do

17  that and get back with Ms. Clark promptly.

18          MR. WALKER:  I'll do that.

19          THE COURT:  Thank you.

20          MS. CLARK:  Then the last thing, Judge, was just to      10:12:04

21  clarify that I would be allowed to not only attend the

22  deposition, but also to raise appropriate objections.

23          THE COURT:  You will.  But as I recall, there are a

24  number of client confidentiality obligations that can be

25  overcome by court order.                                         10:12:15

 1              MS. CLARK:  Correct.  That's why I would suggest that

 2    we need you there, Judge Snow.

 3              THE COURT:  Well, it hasn't been scheduled yet.  If I

 4    can be there, I will be.

 5              MS. CLARK:  It will be very difficult for me to advise          10:12:27

 6    him about how to answer in light of what you just said.

 7              THE COURT:  All right.

 8              MS. CLARK:  Thank you, Judge.

 9              THE COURT:  Uh-huh.

10              Now, I want to take up the application for admission          10:12:36

11    to practice pro hac vice of Mr. Jon -- oh, was there anybody

12    else who had anything to say on that?

13              I want to take up the application for admission to

14    practice pro hac vice of Mr. Jonathon A. Moseley.  He called

15    and asked to appear telephonically.  We authorized him to           10:12:52

16    appear telephonically but I did not hear him appear.

17              Are you there, Mr. Moseley?  Mr. Moseley?

18              All right.  Let me tell you my concerns, and I guess

19    I'm going to lay them out.

20              Ms. Iafrate, Mr. Moseley is affiliated with Freedom        10:13:11

21    Watch, which represents Sheriff Arpaio in another action in the

22    district court of -- or in the D.C. Circuit now, so he has an

23    attorney-client relationship with Sheriff Arpaio.  Sheriff

24    Arpaio, and I believe Chief Deputy Sheridan, have both

25    testified in this action that the material they received from        10:13:35

1    Mr. Montgomery has been discredited, and I don't mean to put

2    words in their mouth but I think it's pretty clear they said

3    that on a number of occasions.  At my invitation, I think

4    Sheriff Arpaio at one time called it junk.  I mean, that was my

5    word but he said yes.                                          10:13:52

6           Is the sheriff -- are you withdrawing that testimony?

7           MS. IAFRATE:  No, Your Honor, we're not withdrawing

8    it.

9           THE COURT:  If that's the case, then it seems to me

10   like it's just not possible for Mr. Moseley, without creating a   10:14:04

11   conflict, to represent Mr. Montgomery in this action while

12   representing Sheriff Arpaio in another action and challenging

13   the validity of Sheriff Arpaio and Chief Deputy Sheridan's

14   statements about Mr. Moseley in this action.  And Mr. Moseley's

15   not appearing, and so it is my determination that I'm going to    10:14:29

16   deny his petition -- or application for admission to practice

17   pro hac vice, because it seems to me that it would create a

18   conflict in this case.

19          MS. IAFRATE:  Well, Your Honor, it's unfortunate that

20   Mr. Moseley is not here because this is his motion, not mine.    10:14:48

21   However, all that I can tell you is that within his pleading

22   papers they're saying that there is no conflict.  I would like

23   to ask -- I was hopeful that Mr. Moseley would be on the phone

24   so that we could ask how could he say that.  Without him

25   appearing to answer those questions, I just have -- I have no    10:15:06

1    understanding regarding whether there is a conflict or there is

2    not a conflict.

3          THE COURT:  Well, I understand the position you're in,

4    but he's not here.  We did authorize him to be here.  You can

5    understand why I think there is an apparent conflict, despite          10:15:23

6    what he says.

7          I will say I've read his motion to intervene and I

8    don't think that's well taken.  But, of course, I'm not going

9    to rule on it because I'm going to strike it because I'm not

10   going to allow his admission.  I'm certainly not going to          10:15:36

11   prevent Mr. Montgomery from seeking to intervene if he wishes

12   to do so.  But he has to do so through counsel that is not

13   going to create a conflict by his very appearance, and it

14   surely seems to me like Mr. Moseley does that.

15         So how about we do this?  I'm going to deny          10:15:54

16   Mr. Moseley's application for admission to practice pro hac

17   vice without prejudice if he wants to appear and take it up.

18   But even if I admit him pro hac vice, we still have to then

19   deal with his motion to intervene, which strikes me, as I said,

20   to be a little bit problematic, anyway.  But that's --          10:16:12

21         Did you want to be heard on that, Mr. Young?

22         MR. YOUNG:  I do want to be heard on the motion for

23   pro hac vice admission, Your Honor.

24         Our view is that the Court has the discretion and

25   should exercise that discretion to deny the motion for          10:16:31

1    additional reasons beyond what Your Honor has just stated, and

2    I'll state those on the record now since the motion may be

3    renewed.

4         Under Local Rule 83.1(b)(2), this is a discretionary

5    issue for the Court under United States versus Ries,                    10:16:47

6    100 F.3d 1469 (9th Cir. 1996):  "Where an out-of-state attorney

7    strongly suggests through his behavior that he will neither

8    abide by the court's rules and practices - thus impeding the

9    'orderly administration of Justice' - nor be readily answerable

10   to the court, the Judge may ... deny the pro hac vice                   10:17:09

11   application."  And here already, based on the filings that have

12   been made, it is our view that that likelihood exists.

13        I would refer first to Mr. Moseley's May 2nd letter,

14   which is attached to the Court's May 8 order.  There is a

15   notation there that counsel of record were copied.  As of May          10:17:28

16   8, I believe the Court asked counsel of record and none of them

17   had received it.  We still have not received the letter.  We

18   only have it because of the Court's order.

19        The letter also states that Montgomery was not engaged

20   in relation to this case; he was engaged to help research other        10:17:45

21   matters, not this case.  We believe that statement by

22   Mr. Moseley is false.  We won't get into the substance of that

23   for now but we believe it is not correct.

24        Mr. Moseley's May 2nd letter also says that his

25   appearance would be, quote, for the purpose of presenting              10:18:05

 1    answers to the Court.  That's also not true, because he

 2    subsequently filed a motion to intervene.  That's not just

 3    providing information to the Court about the testimony of the

 4    witnesses in the earlier hearing, but it's actually filing a

 5    motion that's not anticipated or not mentioned in this letter.      10:18:23

 6    So we believe that that letter by itself is indicative of

 7    disruption and, frankly, the possibility of improper activity

 8    if he were to be admitted.

 9          Now, this has been -- some of this letter has been

10    later withdrawn, but I believe that you can't just make a          10:18:51

11    statement about something that's material to a matter before

12    the Court and just say, "Oh, sorry," later, and withdraw it

13    without even apologizing or offer much explanation.

14          THE COURT:  Well, for what it's worth, Mr. Young, I

15    noted that he wanted to withdraw it -- he might want to            10:19:08

16    withdraw it, but I've attached it to my order and I'm not

17    withdrawing it from my order.

18          MR. YOUNG:  And that's the reason why we're able to

19    see it ourselves, Your Honor.

20          There was also a sealed document which was                   10:19:19

21    accompanied -- which accompanied the May 2nd letter, and as

22    Your Honor noted previously, that communication said that the

23    purpose of the filing by Mr. Moseley was to file an amicus

24    brief on behalf of Sheriff Arpaio.  That statement has also

25    been withdrawn through a clarification paper that was filed        10:19:37

1  late yesterday, with some explanation that relates to what

2  apparently was a word processing error on the part of

3  Mr. Moseley, but there wasn't even an apology for that error.

4  And again you have a material misstatement in a document filed

5  in this court.  And he hasn't even been admitted to appear in          10:19:57

6  this case yet, and I believe that just tells us that it would

7  not be a wise thing to have him admitted.

8          Even more seriously, although Mr. Moseley's letter

9  refers to a Virginia Supreme Court case relating to his earlier

10  suspension from practice for a period of six months in that          10:20:21

11  court, I believe looking at the Virginia Supreme Court decision

12  will disclose that there is a lot that has not been disclosed

13  to this Court, and the citation for it is 694 S.E.2d.

14          THE COURT:  Wait.  Give me that again.

15          MR. YOUNG:  694 S.E.2d 586.  And I have copies of the          10:20:43

16  decision if you would like to see them.

17          THE COURT:  Yes, please provide copies.

18          MR. YOUNG:  Now, what happened in the Virginia case

19  that caused Mr. Moseley's suspension was that there was a key

20  document with an arbitration clause which was not disclosed          10:21:15

21  prior to a hearing by Mr. Moseley.

22          At the hearing, and this is what Mr. Moseley does not

23  say, according to the Virginia Supreme Court, on

24  cross-examination Mr. Moseley's client admitted that he had

25  given a copy of that document to Mr. Moseley, and that that          10:21:34

 1   contract did contain an arbitration clause, which would make

 2   the action that Mr. Moseley had filed improper.  So the courts

 3   in Virginia decided, well, that's not proper behavior, and they

 4   suspended him for that.

 5          In addition, the Virginia court noted -- and this is          10:21:54

 6   also omitted from Mr. Moseley's letter to you -- the court

 7   found that Mr. Moseley filed in excess of 80 pleadings and

 8   motions in the case and used abusive discovery tactics and

 9   filed frivolous pleadings.

10          The court also found that Mr. Moseley wrote letters to        10:22:14

11   the adverse party that were unprofessional and intended to

12   intimidate and harass.  And Mr. Moseley stated that the judge

13   in that case issued an absurd decision, was a wacko judge who

14   he believed was bribed, and he believed that opposing counsel

15   were demonically empowered.                                          10:22:36

16          The Virginia Supreme Court then said the following,

17   quote:  "Moseley clearly made derogatory statements about the

18   integrity of the judicial officer adjudicating his matters, and

19   those statements were made either with knowing falsity or with

20   reckless disregard for their truth or falsity."  Now, that's        10:22:56

21   information that we believe is highly relevant to any

22   application by Mr. Moseley to appear in this case.

23          Your Honor has already noted the conflict issue.

24   Mr. Moseley's clarification statement filed yesterday says,

25   quote:  "Neither Dennis L. Montgomery nor his counsel are           10:23:20

1   adverse to Sheriff Arpaio, his deputies, the Cold Case Posse or

2   the MCSO in any respect."  We believe that for the reasons that

3   Your Honor has already noted, and for other reasons in some of

4   the documents that have been produced, which I won't go into,

5   that statement also is false.                                    10:23:41

6          So for making all these false statements to the Court,

7   and for the behavior that led him to be suspended in the

8   Virginia bar, we believe that any application for pro hac vice

9   appearance in this case by Mr. Moseley should be denied.

10         THE COURT:  Thank you.  Ms. Iafrate.                       10:23:56

11         MS. IAFRATE:  Your Honor, I'll leave it to your

12  discretion.  I do not advocate or have any opinion regarding

13  what Your Honor should do regarding the admission pro hac vice.

14         THE COURT:  Mr. Como?

15         MR. COMO:  I have no position on this issue, Your          10:24:12

16  Honor.

17         THE COURT:  All right.  Then I'm going to deny the

18  application, and if he wants me to move to reconsider he can do

19  that, but the application is denied.

20         The last matter, and I have some fairly important         10:24:21

21  things to say here, and I think we've all recognized that this

22  is a very unusual case with permutations that are new, and I've

23  decided to handle this in this way.  I have ordered the

24  defendants to produce certain documents, and I believe that

25  they have been doing so.  Among those documents are the          10:24:53

```
 1    documents that are apparently a data dump of some kind by

 2    Mr. Montgomery to MCSO.  And then in addition to those

 3    documents there are other documents about what I will call the

 4    Seattle operations with Mr. Montgomery that are not data dumps.

 5            Last week I ordered Ms. Iafrate to contact the CIA       10:25:20

 6    since I think at least it was Chief Deputy Sheridan's

 7    understanding, that I think has been confirmed by some of the

 8    documents that I've seen, that at least Mr. Montgomery claims

 9    that some of these documents were taken from the CS -- or the

10    CIA.  And again, I don't know whether that's true or not, but    10:25:38

11    we've given the CIA another week to come lay any claim to any

12    sort of protection it wants.

13            And so I'm going to order the parties, at least with

14    respect to those documents that are the Montgomery data dump,

15    do not disclose them in any way.  I'm not saying you can't look   10:25:55

16    at them.  If you choose to, look at them all you want, but

17    don't disclose them to anybody else.  And that will give the

18    United States another week in which to act if it wishes to do

19    so.  I've been credibly informed that they're aware of your

20    letter.                                                           10:26:16

21            MS. IAFRATE:  That's good to know, Your Honor.

22            I have a piece of information that I would like to

23    share with you also when it's my time.

24            THE COURT:  Go ahead.

25            MS. IAFRATE:  I have heard that the CIA is aware of       10:26:27
```

1    the letter, and I filed a notice just so that you saw that the

2    letter actually did get sent out.

3           Yesterday I was contacted by phone several times, and

4    then by e-mail, from two people that said that they were part

5    of the Department of Justice and they wanted the letter.        10:26:54

6           THE COURT:  They wanted the letter you sent the CIA?

7           MS. IAFRATE:  Correct.  So I said -- I asked them if

8    they were representing the CIA and they said no.  I asked them

9    if they had authority from the CIA for me to give them the

10   letter, if there was someone that I could talk to.  They said   10:27:13

11   no.  I said I feel uncomfortable providing you with this letter

12   if I don't have someone from the CIA saying that you have

13   authority.

14          Your Honor, this is all new territory to me.  They

15   didn't write me a letter requesting it.  And when I asked       10:27:29

16   specifically regarding whether they had authority on behalf of

17   the CIA, they said no.

18          THE COURT:  Well, let me just say isn't it a good

19   thing we live in a country where there's a separation of

20   powers?  And I've told everybody, every party here, you can     10:27:43

21   hang on to the documents, and nobody's going to be taking those

22   documents.  You're going to have them.  They may be under some

23   sort of protective order.  We will proceed in an orderly

24   fashion.  So --

25          MS. IAFRATE:  Well, Your Honor, the reason --          10:28:02

1          THE COURT:  -- why don't you just direct them, if they

2     wish, to come to a proceeding or contact the Court or the

3     Court's monitor.

4          MS. IAFRATE:  Very well.

5          THE COURT:  Okay.                                        10:28:10

6          We have had issues, apparently, lately with the

7     County, Mr. Walker, about the County not being sure -- the

8     monitor has made requests to try and follow the financial trail

9     about payments that may have been made to Mr. Montgomery,

10    payments that may have been made to MCSO folks, and travel        10:28:28

11    costs and hardware costs and software costs that may have been

12    expended on this operation.

13         The folks at the County are not really sure about

14    whether or not they have such documents, in response to the

15    monitor's request.  Let me just throw something out there and     10:28:46

16    see if the parties can live with it.

17         Because we've had some past dealings with Sandi Wilson

18    in this case, I know she knows where the budgets are and where

19    things are kept if the County has them.  Is there any problem

20    if the monitor contacts Ms. Wilson about where or not -- where    10:29:05

21    these documents may be found if they are in the possession of

22    the County?

23         MR. WALKER:  Your Honor, I have no problem with

24    Ms. Wilson speaking directly with the monitor as long as I or

25    someone from my office can also be present.                       10:29:23

1          If I could just elaborate a little bit, I think the

2    problem is the way expense documents are filed.  And what I

3    understand is they're filed by a vendor name.  So if the office

4    management -- office management and budget is looking -- is

5    looking for a document, say one of my bills, and they know the        10:29:50

6    name of my firm, that's fairly easy.  If they don't know the

7    name of the vendor it's like looking for a needle in a

8    haystack.

9          So the only problem I think we have is there's a

10   degree of coordination that needs to happen between                   10:30:10

11   Ms. Wilson's office and the Sheriff's Office so that we have

12   the information we need so that a meaningful search for the

13   documents can be conducted.

14         THE COURT:  I think that's understandable and the

15   monitor can coordinate that with Ms. Wilson, with you, with          10:30:25

16   Ms. Iafrate, and whoever's handling document production at the

17   sheriff's Office.  If we can set up those meetings and avoid

18   problems, it sounds like a great solution.

19         Any problem with that, Chief?

20         CHIEF WARSHAW:  No, sir.                                        10:30:45

21         THE COURT:  Okay.  Now, I'd like to talk about how

22   we're going to go forward in light of these new documents.

23   There are a great number of them, even excluding the data dump.

24   And my monitor has had a chance to look at several of them but

25   far from the totality.                                               10:31:03

1            He has shown me several, 50 or so documents, that

2    cause me great concern.  And I acknowledge that we're all

3    plowing new ground here.  But I'm going to say what those

4    documents show, and I'm going to say that it is a concern that

5    I expect the MCSO to address in the resumption of our May          10:31:23

6    hearing, and I'm going to propose how we proceed.

7            The documents that I have seen pertain to what appears

8    to be some of the activities of the Seattle operation we

9    involve Dennis Montgomery as a confidential informant.  The

10   documents seem to reveal that as at least part of their          10:31:43

11   operations, the Seattle operatives attempted to construct an

12   alleged conspiracy that supposedly involved this Court; one of

13   this Court's former law clerks; Eric Holder, the attorney

14   general of the United States; Lanny Breuer, the Chief Deputy

15   Attorney General of the United States in charge of the criminal  10:32:02

16   division; Phil Gordon, the mayor of Phoenix; and Brian Sands,

17   the executive chief of the MCSO.  The purpose of the alleged

18   conspiracy was apparently to covertly investigate the MCSO and

19   deprive the sheriff and the MCSO of the due process of law in

20   this particular case and in a related case brought against the   10:32:22

21   sheriff by the DOJ.

22           This Seattle operation work product seems to purport

23   that by allegedly using a database of information harvested by

24   the CIA and confiscated by him, Mr. Montgomery was able to

25   reproduce fragments of e-mails that had been sent in 2009 and    10:32:40

1   2010 between persons within the Department of Justice, Mayor

2   Gordon, and Brian Sands.

3         As it pertains to this Court, the Seattle operation

4   work product, which was apparently prepared and revised over a

5   number of months, not a few, it began apparently -- the first        10:32:56

6   contact was in September of 2013.  There were meetings in

7   December.  These documents began being created in December and

8   January, and at least their properties indicate that they have

9   been revised many times over a period of substantial months.

10        Anyway, the documents purport to track telephone calls         10:33:15

11  between this Court, Eric Holder, Lanny Breuer, and Dennis Burke

12  to reproduce those phone calls which occurred years earlier.

13  And between the Court and one of its former law clerks, who

14  apparently allegedly was supposed to have served as this

15  Court's liaison with the Department of Justice regarding this        10:33:35

16  case.

17        The documents appear to allege or suggest that this

18  Court had contact with the Department of Justice about this

19  case before the Court was ever assigned to it.  It further

20  seems to suggest that when Judge Murguia recused from this          10:33:48

21  case, the random selection process of this Court was subverted

22  so that the case was deliberately assigned to this Court.  The

23  documents further suggest that thereafter this Court had

24  conversations with Eric Holder and Lanny Breuer about this

25  case, and it also alleges that this Court issued an order to         10:34:05

1    tap the MCSO's phones after being assigned as the judge in this

2    case.

3            It also seems to allege that this Court had

4    conversations, as I've indicated, with the Department of

5    Justice, through one of its former law clerks as an                    10:34:19

6    intermediary.

7            Now, I will tell you I've looked at these documents

8    closely and I think there are a great deal of problems with

9    them.  But I don't intend to put them on the screen and go over

10   those problems because I believe that Sheriff Arpaio and              10:34:35

11   Chief Sheridan have both acknowledged that the materials

12   received from Montgomery are not credible and/or are junk.  So

13   I'm not presuming at this point that the MCSO is alleging that

14   anything the documents contain in this respect are true.

15           If, Ms. Iafrate, you're going to assert that, I will          10:34:53

16   tell you that I'm going to require good faith assertions that

17   any of that information is true, and I have a number of

18   questions that you will have to respond to.  Nevertheless,

19   assuming, as I do, that the sheriff and Chief Sheridan both

20   will say that those documents are not credible, the very             10:35:16

21   existence of these documents in the MCSO's files causes this

22   Court some concerns.

23           In addition to their tendency to suggest that previous

24   testimony offered in this matter may have been untruthful, the

25   Court wonders why, when the MCSO should have been spending          10:35:33

 1 | their time, money, and resources in implementing its order,

 2 | they were funding a confidential informant as well as three

 3 | MCSO deputies or posse members to be in Seattle, Washington,

 4 | and other places, accruing overtime, travel, and salary

 5 | expenses, as well as significant technology costs, attempting    10:35:51

 6 | to construct some bogus conspiracy theory to discredit this

 7 | Court.

 8 |         The Court notes that as of the monitor's last report,

 9 | the MCSO was only 29 percent in compliance with the injunctive

10 | order entered a year and a half ago, approximately the same    10:36:06

11 | time as this Seattle operation began.  There may be some

12 | explanation for all of this, I realize that these are only

13 | documents in MCSO's file, but I'm going to require you to

14 | address that in the hearing that's coming up in June.

15 |         I also want to say that when upon the death -- I think    10:36:25

16 | before I began questioning Sheriff Arpaio, I explained to him

17 | why I was questioning about these things and how I viewed this

18 | as being relevant to the contempt hearing, and I think it's

19 | relevant for reasons I've already stated.  But when upon the

20 | death of Deputy Armendariz it became clear to the Court that    10:36:46

21 | the members of the plaintiff class in this case may have been

22 | commonly subjected to deprivations not previously disclosed at

23 | or prior to trial, and that this information as well as a great

24 | deal of additional information sought prior to trial had never

25 | been provided, this Court suggested to the MCSO that it arrange    10:37:02

1    for an independent investigation of these matters.  Rather than

2    do so, the MCSO elected to conduct a self-investigation through

3    its own Professional Standards Bureau.

4         This Court's orders were violated at the very start of

5    that investigation, and that is part of the notice contempt.    10:37:19

6    And even though many of the allegations of misconduct arose --

7    that were at issue in the Armendariz investigation arose from

8    the conduct of the HSU, the MCSO transferred in as the new

9    captain of the Professional Standards Bureau the previous

10   captain of the special investigation divisions -- Special       10:37:37

11   Investigations Division, which was over the HSU.

12        There is evidence that before his transfer to the PSB,

13   Captain Bailey was sent an inquiry memoranda regarding seized

14   identifications from within the HSU, which memorandum and

15   documents were subsequently sent for destruction.  Further, the  10:37:56

16   Special Investigations Division had responsibilities for

17   operations like the Seattle operation and would likely have

18   played a role in the Grissom inquiries.

19        Of course, Captain Bailey was supervised at both the

20   SID and the PSB by Chief Deputy Sheridan and by Sheriff Arpaio.  10:38:14

21   The Court has held repeated hearings regarding its concerns

22   about the inadequate investigations conducted by the PSB of

23   these matters.  There is evidence that the PSB accepted

24   facially inadequate explanations for the confiscation of

25   identifications of the members of the plaintiff class.  There   10:38:31

1    is evidence that such seizure practices existed

2    department-wide.  There is further evidence that the MCSO

3    failed to adequately investigate and evaluate the seizure of

4    items of value from members of the plaintiff class, attempted

5    to destroy relevant evidence and manipulate internal and          10:38:46

6    independent investigations to exonerate those whom it may have

7    wished to clear, or to mitigate any possible discipline.

8         This evidence may thus tend to demonstrate that the

9    MCSO attempted to keep all matters pertaining to this case, its

10   speculative investigations into this Court, and to the           10:39:05

11   investigations triggered by the unfortunate death of Deputy

12   Armendariz, in the hands of a relative few people who may not

13   have been working to implement this Court's order in good

14   faith.

15        Further, it may tend to demonstrate that contemptuous       10:39:18

16   actions that have been noticed by this Court in its order to

17   show cause hearing were part of a pattern of knowing defiance

18   rather than inadvertence.  This may affect necessary remedies

19   for members of the plaintiff class in civil contempt.  It is

20   for these reasons that the Seattle operations materials may be   10:39:35

21   relevant to this action.

22        Nevertheless, the Montgomery materials are

23   considerable, and they have only been reviewed in small part.

24   When they are reviewed in more complete detail, it may suggest

25   other potential problems in the operations of the MCSO that are  10:39:54

1    beyond the scope of this contempt hearing and that I have no

2    intent to raise in this contempt hearing except to the extent

3    that it bears some relation to it.  I do not want to lose the

4    focus of obliging the MCSO to comply with its orders and to

5    cure the existing and admitted contempts that have impaired for        10:40:14

6    a very long time the rights of the plaintiffs' class.

7         I'm going to set forth my proposed solution to this

8    problem, and I will hear your comments on it if you have

9    suggestions.  I remind the parties that because of the

10   cooperation you made in the first week of the hearing where we        10:40:35

11   both -- where we were questioning witnesses at the same time,

12   we made substantial headway towards ending the hearing, and it

13   seems to me we shouldn't lose the focus on what the hearing is

14   about, recognizing that there now are other matters that may be

15   relevant.        10:40:56

16        But when the Armendariz investigation came forth I

17   made it clear, and it's on the record, and we have several

18   orders that supplement the monitor's original investigative

19   authority with his investigative authority to ensure the

20   integrity, the adequacy of MCSO's investigative operations.  He        10:41:12

21   has authority to investigate all matters pertaining to this

22   contempt hearing and to the MCSO self-investigations in the

23   previous orders.

24        I propose, and I am likely to order, that based upon

25   his ongoing review of the documents provided, that he be        10:41:36

1  allowed to investigate these matters that are pertinent to the

2  current contempt findings.  He will have to, of course, have

3  broad leeway in determining what those are.  He has authority

4  and I'm going to authorize him to conduct such investigations,

5  and the defendants will completely cooperate in those                    10:41:57

6  investigations.

7       Of course, when the monitor is conducting an interview

8  of an MCSO employee, counsel will be informed and may be

9  present if they wish to be.  And by "counsel" I don't just mean

10 defense counsel.  I mean plaintiffs' counsel; I, of course,              10:42:13

11 mean special appearing counsel; and Mr. Como, of course, you're

12 welcome.

13      Even if the monitor is conducting interviews of

14 persons who are not MCSO employees, all parties may have

15 transcripts of all of his interviews if they wish to pay for            10:42:29

16 them.  That does not prohibit the parties from looking at the

17 documents and seeking to obtain additional depositions if they

18 wish to do so, or making additional document production

19 requests.

20      Certainly, you may proceed with the depositions of the            10:42:48

21 attorneys that I've already basically authorized.  But before

22 conducting such depositions, I'm going to require you to check

23 with the monitor and obtain his approval to make sure that it

24 does not foul up his investigative plan.

25      As we approach the hearing, if his investigations make            10:43:10

 1    me believe that I am going to have to have information on this

 2    record that isn't on the record in an admissible form, I will

 3    indicate to the parties what information I'm interested in and

 4    what individuals I think need to testify, and then you can

 5    determine whether you can stipulate to facts, whether you can          10:43:31

 6    call witnesses without, or just based on the monitor's

 7    investigation or whether you need additional depositions.

 8            Again, to the extent that during the course of the

 9    monitor's or the parties' investigations you become aware of

10    matters that may implicate other concerns about misconduct that        10:43:50

11    you believe needs to be addressed, you can raise the matter for

12    the Court.  And I've indicated, based on the monitor's

13    inquiries, I will provide the parties, if they wish, areas in

14    which I'm interested in inquiring at the hearing, and we will

15    work out a way that that will happen.  Either I'll call my             10:44:11

16    monitor to testify or I will directly make sure that witnesses

17    appear to be questioned by the parties and then by me.

18            That is my proposal as to how to proceed.

19            Ms. Wang, any comment on that?

20            MS. WANG:  Your Honor, plaintiffs would agree that            10:44:28

21    that would be a good way to proceed.  As the Court knows, we

22    began our questioning about internal investigation processes at

23    MCSO during the April hearing dates.  We intend to do so,

24    continue to do so during the June dates.

25            We already have a tentative list of depositions we           10:44:50

1    would like to take before the June dates, but those have been

2    subject to revision as we are still getting documents from the

3    defendants.  So we would, I guess when we're ready to do that,

4    submit the list of proposed depositions to the Court.

5              THE COURT:  Ms. Iafrate.                              10:45:09

6              MS. IAFRATE:  Your Honor, I have a couple questions.

7              The investigative areas that you're talking about

8    currently involves PSB, correct?

9              THE COURT:  I'm not going to limit it.

10             MS. IAFRATE:  Well, is there any way for us to         10:45:22

11   understand the list of areas of investigations?

12             THE COURT:  Well, the monitor will inform you who he

13   wants to investigate.  I don't know, do you want -- do you want

14   to know anything else?

15             MS. IAFRATE:  I want to know the issues that are being 10:45:35

16   investigated.

17             THE COURT:  Well, they're going to be relevant to

18   the -- I suppose if you're saying -- well, I'm not going to

19   limit the monitor's authority, and I'm not going to require him

20   to provide you with advance notice of what he wants to inquire  10:45:48

21   into.

22             MS. IAFRATE:  Well, so, Your Honor, essentially

23   anything that the monitor wants to investigate, he can

24   investigate.

25             THE COURT:  No.  You have the right to object if you  10:45:59

 1  believe he's getting into areas that have no relation to his

 2  authority to investigate as based in the orders I've already

 3  entered, or as it relates to this contempt hearing, and if you

 4  make that objection, I'll rule on it.

 5          MS. IAFRATE:  Very well.  I understand that there will    10:46:12

 6  be some depositions regarding certain issues prior to the June

 7  hearing.  Last time there was a lot of confusion regarding the

 8  monitor's interviews and whether they are compelled statements

 9  or not compelled statements; whether Garrity applies, whether

10  it doesn't.    10:46:34

11          THE COURT:  The monitor has no Garrity authority, and

12  he can't require compelled statements unless you're aware of

13  something I'm not.

14          CHIEF WARSHAW:  No.

15          MS. IAFRATE:  Your Honor, are you --    10:46:44

16          THE COURT:  So there's not Garrity.  They're not

17  compelled.  You're witnesses can take the Fifth.  They have all

18  the rights that they otherwise have.  We will be recording all

19  of the interviews and making transcripts, as I've said,

20  available to all parties.    10:46:58

21          MS. IAFRATE:  Well, Your Honor, I feel that I am

22  compelled to object to this procedure because I believe that

23  this OSC has morphed into something quite different than the

24  original OSC that my clients were noticed about.  There were

25  three distinct --    10:47:16

1          THE COURT:  Well, let me --

2          MS. IAFRATE:  -- issues that were noticed for these --

3          THE COURT:  When I get to talk, I get to interrupt

4    you.

5          MS. IAFRATE:  Sorry, Your Honor.                              10:47:21

6          THE COURT:  I know it's not polite; I'll let you

7    finish.

8          MS. IAFRATE:  My clients were noticed of three

9    distinct areas regarding the OSC.  They were given notice and

10   we put on the trial -- or the evidentiary hearing as best we    10:47:32

11   could.  I understand that there are more documents.  I

12   understand that you have inherent authority to explore certain

13   things.  I'm not indicating that you have overstepped your

14   bounds, but I'm saying that as a due-process situation, in an

15   OSC hearing there is a notice component and also the right to   10:47:50

16   defend.  So now if what you're telling me is that your monitor

17   may investigate as he sees fit and we don't have notice of

18   what's going to be investigated, and how, and with whom, then I

19   believe that my client's due process rights are being violated.

20         THE COURT:  All right.  I'm going to overrule your         10:48:11

21   objection, but I will tell you that we will -- and I've just

22   stated, I think, in my -- I've just stated what I view to be

23   the bounds of the relevance here, and I've given you the right

24   to object to relevance.  But if you're asking that my monitor

25   put forth in advance the topics he's going to ask your          10:48:25

1    witnesses about, it ain't happening --

2            MS. IAFRATE:  No, Your Honor, I --

3            THE COURT:  -- but you can object to it.

4            MS. IAFRATE:  Your Honor, I was asking you to provide

5    us with a list of what areas, what issues, what are at issue as    10:48:34

6    we approach this June OSC continuation.

7            THE COURT:  Well --

8            MS. IAFRATE:  What are the issues?  My clients have a

9    right to know what they are.

10           THE COURT:  I think I indicated to you that as we    10:48:49

11   approach the June hearing, I'll tell you what issues I believe

12   are relevant and concern me.  But I don't know that now,

13   because I have not had the opportunity to know everything

14   that's in Mr. Montgomery's files.  And it is, I assure you, it

15   is not my intent to explore all the various things that may or    10:49:04

16   may not be in there except as they relate to the order to show

17   cause.

18           However, the monitor also has independent

19   investigative authority pertaining to previous orders, and I'm

20   not going to unduly shackle him as long as it falls within his    10:49:22

21   authority under those previous orders to prevent him from doing

22   his investigation.

23           MS. IAFRATE:  Well, Your Honor --

24           THE COURT:  Nevertheless, if you have objections, you

25   can make them.    10:49:35

1          MS. IAFRATE:  Very well.  Your Honor, is there a

2    time frame by which we'll know what the issues are?

3          THE COURT:  I wish there were.

4          Oh, you mean from me?

5          MS. IAFRATE:  Yes.                                        10:49:44

6          THE COURT:  Well, one of the advantages -- you know,

7    this is a morphing thing.  One of the advantages of the weekly

8    status conferences is as soon as I know I'm going to be

9    interested in something, I'll tell you.  I'm not going to

10   play -- I'm not going to hold out on you till a week before the  10:49:55

11   hearing.  If we come across materials in that file that I want

12   him to investigate into, I may allow him to notice his

13   investigations and go, but I'll let you know.

14         MS. IAFRATE:  Just one --

15         THE COURT:  And by the way, I don't think I'm playing   10:50:10

16   hide-and-seek, because I laid it out pretty clearly just now

17   what I saw that concerns me.  I'm not trying to prevent you

18   from knowing my very great concern about the documents that

19   I've seen, and I'm not going to operate otherwise.

20         MS. IAFRATE:  Very well, Your Honor.  Just one more    10:50:24

21   statement that I may make for the record.

22         Your Honor, my understanding when I came into this

23   case in December was that the monitors were selected to

24   encourage compliance pursuant to the Court's orders.

25         THE COURT:  Um-hum.                                        10:50:47

1          MS. IAFRATE:  Now what I'm hearing is that the

2    monitors are investigating in order to provide further topics

3    as it relates to the OSC.

4          THE COURT:  The monitors are relating -- are

5    investigating pursuant to their authority.                    10:51:02

6          MS. IAFRATE:  Provided by you, I understand that.

7          THE COURT:  That's right.  And before you entered this

8    case, we had all the Armendariz matters come up.  We had all

9    the matters relating to concerns about MCSO's internal

10   investigations, and at that time I think it's very clear I made  10:51:17

11   it clear that the monitor was overseeing all of those

12   investigations since MCSO wanted to do it itself.  And he has

13   that full authority and he maintains that full authority, and

14   if you make objections that fall within that scope of the

15   authority, I'm going to deny them.                            10:51:36

16          Nevertheless, I do recognize the potential that these

17   documents will have stuff that might be fun to investigate but

18   don't have anything to do with this case, and I'm going to

19   allow you, certainly, to make any objections.  And I'll -- you

20   know, I'll be very receptive to them, but I'm going to give him  10:51:51

21   his full scope of authority within the authority he has.

22          MS. IAFRATE:  So Your Honor, I'm sorry, but I'm trying

23   to understand this procedure.  Will I have the opportunity to

24   object prior to the investigation or subsequent to the

25   investigation?                                                10:52:10

1          THE COURT:  Well, you can have the opportunity to

2   object during the investigation.  If it's a witness that is

3   subject to your direction and you want to instruct them not to

4   answer, you can instruct them not to answer.  But one of the

5   things that you will know is I will be paying attention to this    10:52:24

6   case.  You instruct a witness not to answer, I will interrupt

7   as soon as I can whatever I'm doing and I'll make the

8   determination whether or not this is an area of investigation

9   that can be gone into.

10          So if you're going to do that, and if it's one of your    10:52:37

11  witnesses over which you have the authority to instruct not to

12  answer, set forth on the record the basis for your instruction

13  and then all of you just call me and see if you can trundle on

14  over here or get on the phone, and if I'm available I'll decide

15  it right then.  And if I'm not available, I'll get available as    10:52:52

16  soon as I can so that you can finish the investigation if I'm

17  going to allow it or you can move on to other investigations.

18          MS. IAFRATE:  Thank you.

19          THE COURT:  Okay.

20          MR. WALKER:  Your Honor, for the record, the County --    10:53:05

21  I have to consult with my client on this, and I am meeting with

22  the board on Monday, so I'm not really in a position to take a

23  firm position one way or the other on what the Court has

24  proposed.  But for the record, I would express on behalf of the

25  board of supervisors a concern about what you and Ms. Iafrate    10:53:26

1    have both referred to as the morphing.  And I would also use

2    the word "mushrooming" and attendant costs as well as the due

3    process implications.

4           MR. COMO:  Your Honor, I just have one related

5    concern, which is Chief Sands was noticed on one discrete issue   10:53:53

6    regarding the failure to ensure that all the MCSO employees

7    were informed of the Court's preliminary injunction order.

8           It seems like this new development potentially opens

9    up other hearings, more --

10          THE COURT:  Well, it may, but it's not going to change   10:54:19

11   the scope of this hearing, and that's all Chief Sands has to

12   worry about.

13          MR. COMO:  Okay.  What I would hope, Your Honor, is

14   that at these hearings in June, that the evidence regarding the

15   issue that Mr. Sands is noticed on, that the parties would rest   10:54:33

16   at that time on that issue so that this -- he is retired,

17   obviously, he would like to move on with his life, and I think

18   that --

19          THE COURT:  I understand that.

20          And Mr. Birnbaum, you don't even have to say it.  You   10:54:48

21   have the same concern with respect to Chief MacIntyre.

22          And I assume, Mr. Eisenberg, you have the same concern

23   with respect to Lieutenant Sousa.

24          MR. EISENBERG:  Correct, Your Honor.

25          THE COURT:  I promise you that as part of this ongoing   10:55:01

 1    process where we meet every week -- and we just can't do it now

 2    because we don't yet know what everything is, but you're

 3    invited to look.  But as we can go, as we can narrow issues and

 4    identify issues, eliminate issues, and include issues, so that

 5    we can have a very effective process and get it over with, and          10:55:16

 6    it may be that other matters spring up out of this that don't

 7    have anything to do with this, that's fine.  They're not going

 8    to have anything to do with this now.  We'll take care of it.

 9         Yes, Ms. Wang.

10         MS. WANG:  Thank you, Your Honor.  I just want to make          10:55:33

11    one point in response to Ms. Iafrate's presentation on this

12    procedure.  I think the Court was very clear before we began

13    the April hearing that there were the issues charged as grounds

14    for civil contempt in the order to show cause, but there were

15    also other issues that came to light as a result of the          10:55:50

16    Armendariz matters that might give rise to the need for

17    plaintiffs to move for additional injunctive relief.  We had

18    made those representations very early on when we first learned

19    of the Armendariz search and those events, and I think the

20    Court was very clear that we would take the opportunity during          10:56:13

21    the evidentiary hearing dates set in April and now continuing

22    to June that those matters could all be addressed.

23         One suggestion that plaintiffs would make is to the

24    extent that the Court is going to address any requests for

25    additional injunctive relief that come out of the monitor's          10:56:32

1  investigations as just outlined, that the monitor issue a

2  report pursuant to Federal Rule of Civil Procedure 53 that both

3  parties, or all parties, can comment on and raise objections

4  to.  And, of course, any issues that relate to additional and

5  new injunctive relief would have to be properly teed up before          10:56:53

6  the Court before they could be ruled on.

7        So I guess plaintiffs' response to Ms. Iafrate's point

8  about due process is that as far as plaintiffs are concerned,

9  there's been no -- nothing suggested here that would violate

10 anyone's due process rights, and as we proceed, the defendants          10:57:11

11 and individual named contemnors, charged contemnors, will have

12 every opportunity to respond to any action that plaintiffs

13 would be proposing.

14        THE COURT:  Anybody have anything else to raise at

15 this time?                                                              10:57:29

16        Let me just say, I think this weekly status conference

17 idea is a good thing, because -- I know that because on

18 Thursday night I'm starting to realize I don't get any sleep,

19 because you all file everything Thursday night.  We have a

20 status hearing set next Friday.  Right now there is nothing on           10:57:47

21 the agenda except for what may develop with my monitor over the

22 following week.  If you have ideas or you have things you want

23 to address, raise them.  I would appreciate it if they were

24 raised sometime before Thursday at 5 o'clock.

25        MS. IAFRATE:  Your Honor, we have a pleading due                  10:58:07

1   tomorrow regarding an issue that we discussed last week.

2           THE COURT:  What is it?  I've forgotten.  I'm sorry.

3           MS. IAFRATE:  It's regarding the expansion of the

4   class.  And so that will be -- that will be filed tomorrow.

5           THE COURT:  Okay.  Well, that will be helpful.  And        10:58:20

6   we'll try and get that resolved.

7           MS. IAFRATE:  Can you tell me that one more time?  I

8   didn't hear you.

9           THE COURT:  I just said we'll try and get that

10  resolved next week.                                              10:58:30

11          MS. IAFRATE:  Very well.

12          MR. YOUNG:  Your Honor, we will try to file our

13  opposition to that, as we indicated earlier, as soon as

14  possible, and before Thursday at 5:00.  We would not

15  characterize it as an expansion of the class, but, rather, a    10:58:41

16  disagreement over what the class definition --

17          THE COURT:  Yes.

18          MR. YOUNG:  -- means.

19          THE COURT:  Well, please be assured, Mr. Young, that I

20  recognize that your side as well as Ms. Iafrate's side, in       10:58:52

21  pleadings and characterization of issues, are very good

22  lawyers, and you're both going to phrase things the way that

23  are most advantageous to your client to do it well.  That

24  doesn't mean I believe either one of you.  I see it the way I

25  see it, with all due respect.                                    10:59:10

1            Yes.

2            MR. WALKER:  Your Honor, we haven't spoken about this

3    directly, but it was my intention to file a brief on this

4    subject as well, so I guess I'm requesting leave to do so.

5            THE COURT:  You can, but you're subject to the same        10:59:20

6    deadlines as I gave Ms. Iafrate.

7            MR. WALKER:  I understand.  Thank --

8            THE COURT:  All right.

9            MR. WALKER:  -- you, Your Honor.

10           MS. WANG:  Your Honor, we do have the motion to compel      10:59:27

11   teed up, hopefully --

12           THE COURT:  Oh, that's true.

13           MS. WANG:  -- before next Thursday.

14           THE COURT:  Motion to compel.  And if you can resolve

15   that we'll take it off, but if you can't, I'll rule on it.         10:59:32

16           MS. WANG:  Thank you, Your Honor.

17           THE COURT:  All right.  See you next Friday.

18           (Proceedings concluded at 10:59 a.m.)

19

20

21

22

23

24

25

1

2                   C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 14th day of May,

18   2015.

19

20

21                       s/Gary Moll

22

23

24

25



**EXHIBIT 13**

1

2

3

4

5

6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8

9 Manuel de Melendres, et al.,                    No. CV-07-02513-PHX-GMS

10                     Plaintiffs,        **ORDER**

11 v.                                      **[FILED UNDER SEAL]**

12 Maricopa, County of, et al.,

13                     Defendants.

14

15          On April 27, 2015, District Judge G. Murray Snow referred to this Court an in

16 camera review of two documents to determine whether those documents are protected

17 from disclosure by the attorney-client privilege and/or work-product immunity.  (Doc.

18 1033.)  On April 29, 2015, Thomas Liddy and Karen Clark, ethics counsel for Thomas

19 Casey, each submitted to Magistrate Judge Boyle: (1) an October 23, 2013 letter from

20 Mr. Casey to an outside private investigator, Don Vogel; and (2) a November 6, 2013

21 letter from Mr. Casey to Sheriff Joseph Arpaio, copied to Chief Deputy Jerry Sheridan,

22 Deputy Chief John MacIntyre, and Mr. Liddy.

23          As detailed below, the Court finds that the letters are not protected by the attorney-

24 client privilege or, to the extent the privilege attaches, the privilege has been waived.

25 Additionally, the Court finds that the work-product immunity applies to both letters.   Mr.

26 Casey's mental impressions and opinions in the November 6, 2013 letter regarding

27 litigation strategy based on the information provided by the Grissom-investigation

28 materials and findings are protected from disclosure as opinion work-product, and that

0607

immunity has not been waived.  The Court will therefore redact those mental impressions and opinions.  However, the immunity as to remaining portions of the letters has been waived.

## I.   Attorney-Client Privilege

"Where legal advice of any kind is sought from a professional legal advisor in his capacity as such, communications relating to that purpose, made in confidence by [a] client are, at his instance[,] permanently protected from disclosure by himself or by the legal advisor, unless the protection be waived."  *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) (internal numbering omitted).

The attorney-client privilege conceals only those communications and advice that the client has a reasonable expectation will remain solely within the knowledge of the client, the attorney, and the necessary agents of each.  *Id.* at 212; *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) (finding a client's communication to his attorney was not "made in confidence" where it was made for the purpose of transmission to outside auditor).  Confidentiality must be affirmatively established by the privilege proponent and is not presumed.  *See Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) ("[T]he burden of proving that the attorney-client privilege applies rests . . . with the party asserting it."); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 354 (4th Cir. 1994) ("[T]he mere relationship between the attorney and the client does not warrant a presumption of confidentiality.").

Additionally, "[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice.  If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist."  *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *Weil*, 647 F.2d at 24).  "'What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal advice from the lawyer*.'"  *United States v. Gurtner*, 474 F.2d 297, 288-99 (9th Cir. 1973) (emphasis in original) (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).

- 2 -

1      Finally, when the client voluntarily discloses privileged communications to

2  someone outside the attorney-client relationship, the privilege is waived.  *Tennenbaum v.*

3  *Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996).  The voluntary disclosure of a

4  privileged communication may also destroy the privilege as to other communications

5  relating to the same subject matter that, in fairness, ought to be considered together.

6  *Weil*, 647 F.2d at 24; Fed. R. Evid. 502(a).

7              **a.  October 23, 2013 Letter**

8      The October 23, 2013 letter is authored by Mr. Casey and addressed to Mr. Vogel,

9  an outside private investigator retained by Mr. Casey as authorized by MCSO and Sheriff

10  Arpaio.  The letter details Mr. Casey's retention of Mr. Vogel as an investigator and the

11  scope of Mr. Vogel's investigation.  Based on the letter, Mr. Casey engaged Mr. Vogel to

12  conduct an investigation of allegations made by Ms. Grissom, including conducting

13  interviews of third parties, obtaining witness statements, and assessing the credibility of

14  the allegations.

15      Even assuming Mr. Casey's October 23, 2013 communication to Mr. Vogel was

16  sufficiently made in confidence and the privilege attaches, the Court finds that the

17  privilege was waived by Sheriff Arpaio's and Chief Sheridan's hearing testimony.

18  Sheriff Arpaio testified that: (1) he received an email from Ms. Grissom regarding a

19  comment allegedly made about him in a restaurant by Judge Snow's wife; (2) Mr. Casey

20  retained a private investigator to conduct an investigation of the information provided by

21  Ms. Grissom; (3) as part of that investigation, the private investigator interviewed alleged

22  witnesses; and (4) the results of the investigation were that the investigator confirmed the

23  alleged comment was made.  (Doc. 1027 at 647:19-648:9, 654:6-655:12.)  By voluntarily

24  making these disclosures in open court, and by failing to object to questions and

25  testimony about these topics, Sheriff Arpaio waived any attorney-client privilege as to the

26  October 23, 2013 letter containing much of the same information.  *Tennenbaum*, 77 F.3d

27  at 341; *United States v. Sanders*, 979 F.2d 87, 92 (7th Cir. 1992) (holding that failure to

28  object during testimony constitutes waiver); *Nguyen v. Excel Corp.*, 197 F.3d 200, 206

- 3 -

0609

1   (5th Cir. 1999) ("A client waives the attorney-client privilege, however, by failing to

2   assert it when confidential information is sought in legal proceedings."); Fed. R. Evid.

3   502(a).

4          Further, Ms. Iafrate, Sheriff Arpaio's and MCSO's attorney, elicited these and

5   additional details regarding the Grissom investigation—the same subject matter discussed

6   in the October 23, 2013 letter—from Chief Sheridan during his testimony.  (Doc. 1030 at

7   960:21-964:6, 966:24-967:9.)  Therefore, any attorney-client privilege as to the October

8   23, 2013 letter was also waived by Chief Sheridan's testimony in response to Ms.

9   Iafrate's questions.

10          **b.  November 6, 2013 Letter**

11          The November 6, 2013 letter from Mr. Casey to Sheriff Arpaio was copied to

12   Deputy Chief MacIntyre.  There is no basis for this Court to find that Deputy Chief

13   MacIntyre needed to receive the November 6, 2013 letter and, therefore, the Court finds

14   that the attorney-client privilege does not attach to the November 6, 2013 letter.  *See*

15   *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)

16   (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 n.24 (D.C.

17   Cir. 1977)) ("The test . . . is whether the agency is able to demonstrate that the

18   documents, and therefore the confidential information contained therein, were circulated

19   no further than among those members 'of the organization who are authorized to speak or

20   act for the organization in relation to the subject matter of the communication.'").  This

21   conclusion is consistent with Judge Snow's previous ruling that the privilege did not

22   attach to different communications distributed to Deputy Chief MacIntyre.  (*See* Doc.

23   986.)  Further, even if the privilege attached to the November 6, 2013 letter, for the

24   reasons explained above, the privilege was waived by Sheriff Arpaio's and Chief

25   Sheridan's hearing testimony on the same subject matters.

26   **II.   Work-Product Immunity**

27          To qualify for work-product protection, documents must: (1) be "prepared in

28   anticipation of litigation or for trial" and (2) be prepared "by or for another party or by or

- 4 -

for that other party's representative." *In re Grand Jury Subpoena, Mark Torf/Torf Envtl. Mgmt.*, 357 F.3d 900, 907 (2003); Fed. R. Civ. P. 26(b)(3).  The party asserting the work-product immunity has the burden of demonstrating that the at-issue documents are work-product.  *Hernandez v. Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010) (recognizing burden is on party invoking work-product immunity).

The Court finds that both of the letters were prepared by Mr. Casey in anticipation of litigation, as each letter was prepared because and in the course of the underlying litigation.  *In re Grand Jury Subpoena*, 357 F.3d at 907 (citing Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024 (2d ed. 1994)).  Further, portions of the November 6, 2013 letter contain Mr. Casey's mental impressions and opinions regarding litigation strategy.  *See Hickman v. Taylor*, 329 U.S. 495, 522 (1947) (Work-product protection is designed to prevent parties from "perform[ing] its functions either without wits or on wits borrowed from the adversary."); *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992). Therefore, both letters are covered by the work-product immunity.

Below, the Court addresses whether the letters are nonetheless subject to disclosure based on waiver and/or a compelling need.

### a. Waiver

Work-product protections may be waived by voluntary disclosures or using the at-issue materials as evidence at trial.  *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 239 (1975); *Hernandez*, 604 F.3d at 1100 (9th Cir. 2010) (finding that the work-product protection for attorney's notes of a witness interview was waived with regard to the subject matter covered).  The disclosure of work-product materials to a third party can result in waiver if "the material is disclosed in a manner inconsistent with keeping it from an adversary."  *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (citation and quotations omitted); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).  Further, pursuant to Rule 502(a) of the Federal Rules of Evidence, waiver of work-product may extend to undisclosed materials if: "the disclosed and

- 5 -

undisclosed communications or information concern the same subject matter; and [] they ought in fairness to be considered together."

However, the work product doctrine "is distinct from and broader than the attorney-client privilege."  *Nobles*, 422 U.S. at 238 n.11.  "Work product immunity furthers the client's interest in obtaining complete legal advice and creates 'a protected area in which the lawyer can prepare his case free from adversarial scrutiny.'"  *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024-25 (7th Cir. 2012) (citing *Hickman*, 329 U.S. at 511).  "Accordingly, 'disclosure of some documents does not necessarily destroy work-product protection for other documents of the same character.'"  *Id.* (quoting 8 Wright & Miller, Federal Practice & Procedure, § 2024).

Here, the Court finds that Sheriff Arpaio's and Chief Sheridan's disclosures regarding the retention of Mr. Vogel, the scope of the Grissom investigation, and the investigation findings, including findings regarding whether the Grissom information is credible, constitute a waiver of the work-product immunity covering those portions of the October 23, 2013 and November 6, 2013 letters that relate to the same subject matters.

However, the Court finds that the waiver does not extend to Mr. Casey's mental impressions and opinions in the November 6, 2013 letter regarding litigation strategy based on the information provided by the Grissom investigation materials and findings.[1] First, the testimony did not cover Mr. Casey's mental impressions and opinions on that issue.  *See Hernandez*, 604 F.3d at 1100 ("The work product privilege is also only waived 'with respect to matters covered in . . . testimony.'") (quoting *Nobles*, 422 U.S. at 239-40).  Second, Defendants have not thus far used the Grissom investigation information in these proceedings.  Further, Mr. Casey's mental impressions and opinions regarding litigation strategy based on that information do not relate to Defendants' failures to implement the Court's Orders and the Court's determination of the appropriate remedies for such failures.  Therefore, those portions of the November 6, 2013 letter do not relate

---

[1] The Court identifies the subject matter of the protected mental impressions and opinions contained in the November 6, 2013 letter so that the parties are clear as to the scope of the Court's findings.

1   to the issues in the current contempt proceedings, and, need not in fairness be disclosed.

2   *See* Fed. R. Evid. 502(a).

3       The Court will redact those mental impressions and opinions from the November

4   6, 2013 letter.  *See United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010)

5   (remanding to the district court "for the purpose of independently assessing whether the

6   document was entirely work-product, or whether a partial or redacted version of the

7   document could have been disclosed"); *United States v. $1,379,879.09 Seized From Bank*

8   *of America*, 374 Fed. Appx. 709, 711 (9th Cir. 2010) (unpublished) ("records should be

9   redacted only to the extent absolutely necessary to protect information covered by the

10  attorney-client privilege or the work-product doctrine").

11      **b. Mental Impressions at Issue and Compelling Need—Opinion Work-Product**

12      Finally, the opinion work-product in the November 6, 2013 letter that has not been

13  waived may still be subject to disclosure under limited circumstances.  *Holmgren*, 976

14  F.2d at 577.  Specifically, a party seeking opinion work-product must show that "mental

15  impressions are *at issue* in a case and the need for the material is compelling."  *Id.*  This

16  standard requires "a showing beyond the substantial need/undue hardship test required

17  under Rule 26(b)(3) for non-opinion work product."  *Id.* (citing *Upjohn Co. v. United*

18  *States*, 449 U.S. 383, 401-02 (1981)).

19      Here, as stated above, Mr. Casey's mental impressions regarding litigation

20  strategy based on the Grissom information and investigation findings does not relate to

21  the issues in the current contempt proceedings.  Therefore, the other parties do not have a

22  compelling need for those portions of the November 6, 2013 letter.[2]

23

24

25

26  [2] Because, as discussed above, the Court finds that the immunity has been waived as to
    the other work-product in the two letters, the Court need not address whether any party
    has established a "substantial" or "compelling" need for those portions of the letters.

27  Fed.R.Civ.P. 26(b)(3) (A party may obtain non-opinion work-product upon a showing
    "that it has substantial need for the materials to prepare its case and cannot, without

28  undue hardship, obtain their substantial equivalent by other means."); *Holmgren*, 976
    F.2d at 577.

- 7 -

1

**III.     Conclusion**

2       Based on the above, the Court finds that the attorney-client privilege (to the extent

3   it attaches) has been waived as to both letters.  Further, Mr. Casey's mental impressions

4   and opinions regarding litigation strategy based on the Grissom information and

5   investigation findings, which are contained in the November 6, 2013 letter, are protected

6   from disclosure as opinion work-product, and that immunity has not been waived.  The

7   work-product immunity as to the remaining portions of the letters has been waived.

8       The Court encloses with this sealed Order a sealed, redacted version of the

9   November 6, 2013 letter.  Unless the Court receives objections regarding lifting the seal

10  by **Tuesday, May 13, 2015 at 5:00 P.M.,** the Court will unseal this Order and the

11  appended, redacted document.

12      The Court further advises the parties that as discussed in Judge Snow's April 27,

13  2015 Order, they are still obligated to take any remedial measures required by Ethics

14  Rule 3.3 with regard to Sheriff Arpaio's hearing testimony.  (*See* Doc. 1033.)

15                          Dated this 7th day of May, 2015.

16

17

18                                          Honorable John Z. Boyle
                                            United States Magistrate Judge

19

20

21

22

23  cc:     Counsel for Plaintiffs
            Counsel for Defendants
24          Karen Clark
            Lee David Stein
25          Gregory Stephen Como
            Melvin McDonald
26          Gary Birnbaum
            David Eisenberg
27          Robert Warshaw

28

# SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

### ATTORNEYS AT LAW

**Timothy J. Casey**
e-mail: timcasey@azbarristers.com

Client No. 5754.030

October 23, 2013

## VIA HAND-PICK UP

Don Vogel
VOGEL INVESTIGATIONS, LLC
1334 Chandler Boulevard, Suite D-7
Phoenix, AZ 85048

> Re:   *Melendres, et al. v. Arpaio, et al. United States District Court, District of Arizona, CV-07-02513-PHX-GMS*

Dear Mr. Vogel:

I represent defendants Sheriff Joseph M. Arpaio and the Maricopa County Sheriff's Office ("MCSO") in the above-referenced litigation. In that capacity, I have been authorized by my clients, and the Maricopa County Attorney William Montgomery, to retain your investigation services.

The scope of your services are the following: (1) to interview Karen Morris Grissom (and possibly, her husband Dale Eugene Grissom) in order to learn the details of the attached communication from Mrs. Grissom to Sheriff Arpaio's *Facebook* page that occurred on or about August 21-22, 2013, and to learn her motivations and timing for communicating with Sheriff Arpaio; (2) to voluntarily obtain, if possible, a recorded and/or sworn statement about the same from Mrs. Grissom and/or her husband; (3) to provide me with your candid assessment of the credibility of Mrs. Grissom (and possibly her husband); and (4) to provide me with your findings and any statement(s) from the Grissoms.

If during the course of the foregoing investigation, it becomes necessary or appropriate to reasonably expand your investigation based on information learned or discovered and if time is of the essence, you are authorized to pursue such investigatory leads subject to keeping me reasonably informed about such leads.

It is my understanding that your hourly rate is $125 plus costs and expenses. This is agreeable on behalf of my clients. Please send your invoice to me and I will make payment.

Thank you for your assistance on this matter.

Sincerely,

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

0615

Timothy J. Casey

TJC:eh

Encl.

# SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

### ATTORNEYS AT LAW

Timothy J. Casey
e-mail:  timcasey@azbarristers.com

Client No.: 5754.030

November 6, 2013

**_ATTORNEY-CLIENT PRIVILEGED/ATTORNEY WORK PRODUCT_**
**_PRIVILEGED/CONFIDENTIAL/NOT SUBJECT TO A PUBLIC RECORDS REQUEST_**

**VIA HAND-DELIVERY**

Hon. Joseph M. Arpaio
MARICOPA COUNTY SHERIFF'S OFFICE
100 W. Washington St., Suite 1900
Phoenix, Arizona 85003-1812

> Re:   *Melendres v. Arpaio, CV2007-02513-PHX-GMS (United States District Court for the District of Arizona)*

Dear Sheriff Arpaio:

This letter provides the following information for your consideration: (1) the transcripts of private investigator Don Vogel regarding Karen Morris Grissom, Dale Eugene Grissom, and Scott Grissom; (2) the potential legal options available to you and the MCSO based on the Grissom investigatory materials; and (3) my analysis and recommendation to you and defendant MCSO regarding the Grissom information.

Upon my receipt later this week of the balance of Mr. Vogel's investigation report, I will forward the same to you immediately.

## A.   EXECUTIVE SUMMARY

Karen and Dale Grissom, husband and wife, had a chance encounter at a Tempe restaurant with a woman who was, in fact, Judge Murray Snow's wife. Mrs. Snow mistook Karen for her sister Irene. This encounter probably occurred in May of 2012. The encounter led to a conversation between Ms. Grissom and Mrs. Snow in the presence of Dale Grissom and Scott Grissom (the adult son of Karen and Dale Grissom). The fact that the woman was married to Judge Snow came up in the conversation. Mrs. Snow made a comment that Karen and Dale interpreted as hostile, negative, or unfavorable toward you. Karen Grissom reported to you the contact with Mrs. Snow 14 months after it happened. According to investigator Mr. Vogel, Karen and Dale Grissom present as sincere and truthful in their statements about what they believe they heard from Mrs. Snow ("the Grissom information").



**B.   BACKGROUND INFORMATION**

   To place this letter and its advice in context, some background information and key dates in this case are important to know.

   **1.   Key Litigation Dates**

   The bench trial in this matter took place on July 19, July 24-26, July 31, August 1, and August 2, 2012 before the Honorable Murray Snow.  The trial received daily local and national print and television media attention.

   On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law (Dkt#579).  The Court held that defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendment to the United States Constitution.  The Court, therefore, issued various permanent injunctions as set forth in that Order.  The Court's Order received considerable local and national media attention.

   On June 14, 2013, the Court held a status hearing with the parties.  The parties advised the Court of their mutual desire to try to negotiate the terms of a consent decree to ensure defendants' compliance with the Court's injunction.  The Court also indicated its current intention to implement certain elements into any final order (i.e., a monitor).  This hearing was

2

0618

covered extensively by the local and national media.

On August 16, 2013, the parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement and terms on which they could not agree. The parties' proposal also received significant coverage in the media.

On or about August 21-22, 2013, a person named Karen Morris Grissom sent you a private message on your *Facebook* page purporting to have had a conversation in 2012 with Judge Snow's wife wherein Mrs. Snow reported that her husband, Judge Snow, did not like you and wanted you out of office.

On August 30, 2012, the Court held a hearing to discuss the terms agreed-upon by the parties and to hear oral argument on the terms the parties could not agree to. Argument was extensive. This hearing was covered by the media.

On October 2, 2013, the Court issued its Supplemental Permanent Injunction/Judgment Order (Dkt#606). Again, this Order was extensively covered in the media.

## 2.  Karen Morris Grissom Message to Sheriff Arpaio

On or about August 21-22, 2013, Karen Morris Grissom sent the following private[1] message to you on your *Facebook* page:

> "Karen Morris Grissom
> Judge Snow I know his wife and talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

(Lack of punctuation and spelling not changed).

Upon being advised of the foregoing and directed by your office to do so, I began to try to locate Ms. Grissom and interview her. I eventually sent a message to Ms. Grissom on her *Facebook* page and she called me on my cell telephone on August 28, 2013.

I spoke with Ms. Grissom around 3:00 p.m. on August 28, 2013 and explained the reason for contacting her. She advised that she and her husband (Dale) were driving to a job interview for her in Avondale (a teaching assistant position), she was experiencing poor cell phone connection, and we talked for a period of time and each time I lost the cell phone connection with her I called her back and she answered my call.

In short summary, and as you may recall from my prior oral report, Ms. Grissom, age 63, reported that she grew up in Yuma, Arizona, she went to the same church as Judge Snow's wife when she was a single woman, the judge's wife (as a single woman) was her piano teacher at one

---

1   The message was private to you only. The message was not publicly posted. ████████████████
████████████████████████████████████████████████████████████████████████████████████████████

3

time, and something to the effect that the Judge's wife had a step-mother that was murdered in Yuma years ago.

Ms. Grissom advised that on an unknown date in 2012 she and her husband were eating at a *Some Burros* Mexican food restaurant at Baseline Road and Mill Road in Tempe, Arizona when a middle-aged woman came into the restaurant with a younger woman (they left a dog outside) and walked up to her and her husband. The woman asked Ms. Grissom if she was "Irene." Ms. Grissom believed that the date of this encounter was sometime before school started, so likely in July or August 2012. The woman was tall, thin, with short hair, and light brown-colored hair. Ms. Grissom said that she was not Irene, that Irene was her younger sister (age 55), and the woman began to tell Ms. Grissom that she was friends with Irene, that she (the woman) eventually went to BYU, was a teacher, she married a man that was now a federal judge, and her husband was ruling on a case involving Sheriff Arpaio. According to Ms. Grissom, the woman volunteered that her husband "wanted to burn the Sheriff because he did not like him."

Ms. Grissom advised that her husband, Dale, was present and heard the same exchange. *She did not remember the woman's first name, or her maiden name.* She was firm in what she claimed to have heard, and that she was speaking the truth. We discussed the reasons she waited over a year to disclose this information to you. Ms. Grissom advised that the woman's statement "bothered [her] at the time but eventually [she] needed to share this." Ms. Grissom stated that she viewed your public services very favorably but had never met or interacted with you.

I wanted to meet Ms. Grissom in person to evaluate her credibility, and obtain from her either a recorded statement or a statement under oath before a court reporter. Ms. Grissom advised that she was willing to meet with me in person, to provide a statement under oath, and that she would call me back after her job interview. She was adamant that she was telling the truth about what the judge's wife had said to her. She expressed no fear or reservation about telling the truth. Ms. Grissom again told me she would call me back after her job interview. The call ended.

As I reported initially to you and Chief Sheridan, Ms. Grissom came across telephonically as sincere and credible (despite not knowing the date of the encounter, the name of the woman, and the 12-13 month delay in reporting the incident) but I reserved final credibility judgment until I could meet her in person and speak with her in detail.

Ms. Grissom, however, did not call me back after the job interview. She also did not take my two separate telephone calls to her around 5:30 pm that same date (08/28/13).

Over the next four weeks, Ms. Grissom and I had no contact despite my occasional telephone call into her. It appeared to me that Ms. Grissom did not wish to talk further for whatever reason. I reported the same to you and your chiefs and further shared my prior historical experience with witnesses sometimes being willing to say certain things privately on a telephone call to an attorney and then decline further involvement or more formal documentation of the substance of the earlier communication. The absence of further contact from Ms. Grissom after August 28, 2013 led me to personally conclude the matter was over and the information from Ms. Grissom lacked substance or merit.

### 3.  Retention of Vogel Investigations

Pursuant to the conversation we had at your office on October 17, 2013 with Chief Sheridan regarding Ms. Grissom, I formally retained on October 23, 2013 investigator Don Vogel. The scope of Mr. Vogel's services were the following: (1) to try to interview Ms. Grissom (and possibly, her husband Dale Eugene Grissom) in order to learn the details of the communication from Ms. Grissom to your *Facebook* page that occurred on or about August 21-22, 2013, and to try to learn her motivations and timing for communicating with you; (2) to voluntarily obtain, if allowed, a recorded and/or sworn statement about the same from Ms. Grissom and/or her husband; (3) to provide me with Mr. Vogel's candid assessment of the credibility of Ms. Grissom (and possibly her husband); and (4) to provide me with Mr. Vogel's findings and any statement(s) from the Grissoms.

## C.   THE INFORMATION FROM INVESTIGATOR VOGEL

Attached for your review and file are the transcripts of Mr. Vogel's recorded interviews with the Grissoms.

### 1.  Karen Grissom

Mr. Vogel showed up unannounced to the Grissom residence on Saturday, October 26, 2013. Dale Grissom was not at home. Karen Grissom, however, agreed to talk to Mr. Vogel and provide a recorded statement. The recorded statement lasted 20 minutes and 29 seconds.

Ms. Grissom is supportive of you and your law enforcement policies. While the precise details and context of the statement are contained on the attached transcript and audio, Ms. Grissom, her husband Dale, and their adult son, Scott, visited a *Some Burros* restaurant in Tempe Arizona on an unknown date in 2012. A woman entered the restaurant and approached Ms. Grissom and asked if she was Irene, the sister of Ms. Grissom. Irene and Karen apparently look very similar even though they differ in age by about a decade. The woman introduced herself as Sherry Snow; that name meant nothing to Ms. Grissom and the woman then mentioned her maiden name was Smock (or Smoch). The woman then described her background and that she was married to a federal judge. She presented as proud of her husband serving as a judge. Somehow the subject of Sheriff Arpaio surfaced in the conversation. The operative part of Ms. Grissom's statement is where Mrs. Snow is reported to have said to Ms. Grissom in response to a question by Ms. Grissom that **"my husband does not like him [Arpaio] and wants him out of office."**

Mr. Vogel's separate report will assesses Ms. Grissom's credibility from his perspective.

### 2.  Dale Grissom

Mr. Vogel arranged to meet with Dale Grissom the following Monday.

Mr. Vogel interviewed and took a recorded statement of Dale Grissom on Monday, October 28, 2013. Mr. Grissom is age 64, but will turn 65 in a few weeks. The recorded

0621

statement lasted 20 minutes and 41 seconds. Dale Grissom is supportive of you and your law enforcement policies. The details and context of the statement are contained on the attached transcript and audio. The operative part of Dale Grissom's statement is where Mrs. Snow is reported to have said in his presence to Karen Grissom sometime in late April or May of 2012 that **"my husband wants to get him [Arpaio] or wants him to go down"** or something negative to that effect.

Mr. Grissom does not remember the precise details about what was said. He does not recall Mrs. Snow ever reporting that her husband had actually said that her statements or views were those held by her husband but Mr. Grissom assumed that Mrs. Snow got her information or positions from her husband. While he does not remember the details of the conversation, and would be unable to personally identify Mrs. Snow in person or by photograph, he remembers that whatever precisely was said was negative toward you. Mr. Grissom also reported that there may have been two people with Mrs. Snow, a younger female and a younger male.

Mr. Grissom followed the *Melendres* case in the media stories as they were published or aired. Eventually, he learned that you and Judge Snow were "at odds."

Mr. Grissom was unaware of whether Karen Grissom had returned any of my telephone calls. He thought she had on an occasion but was uncertain.

Mr. Vogel's separate report will assesses Mr. Grissom's credibility from his perspective.

### 3.  Scott Grissom

Mr. Vogel interviewed and took a recorded statement of Scott Grissom on Monday, October 28, 2013. Scott Grissom is the adult son (age 40) of Karen and Dale Grissom. He was visiting his parents and recalls eating a meal at *Some Burros*. The details and context of the statement are contained on the attached transcript and audio. The operative part of Scott Grissom's statement is where he remembers hearing, despite the noise in the restaurant, someone saying something to the effect of **"I'm going to get him or somebody's going to get him."** This occurred while his mother was speaking with an unknown woman. Scott Grissom remembers very little else about that date or the characteristics of the woman. He has no idea what or who the woman was talking about.

Mr. Vogel's separate report will assesses Scott Grissom's credibility from his perspective.



7



8



9



10



11



12



13



I am available at your convenience to discuss or answer any questions you might have regarding the foregoing analysis or recommendation.

Sincerely,



SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

Timothy J. Casey

TJC:eh

Encls.

cc:   Chief Jerry Sheridan, via hand-delivery w/encl.
      Chief Jack MacIntyre, via hand-delivery w/encl.
      Tom Liddy, via e-mail w/o encl.

0630



**EXHIBIT 14**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) |
| Plaintiffs, | ) CV 07-2513-PHX-GMS ) |
| vs. | ) Phoenix, Arizona ) April 24, 2015 |
| Joseph M. Arpaio, et al., | ) 8:41 a.m. ) |
| Defendants. | ) ) ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Evidentiary Hearing Day 4, pages 818-1030)

Court Reporter:          Gary Moll
                         401 W. Washington Street, SPC #38
                         Phoenix, Arizona   85003
                         (602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

```
 1                        A P P E A R A N C E S

 2

 3    For the Plaintiffs:        Cecillia D. Wang, Esq.
                                 AMERICAN CIVIL LIBERTIES UNION
 4                               FOUNDATION
                                 Immigrants' Rights Project
 5                               39 Drumm Street
                                 San Francisco, California  94111
 6                               (415) 343-0775

 7                               Stanley Young, Esq.
                                 Hyun S. Byun, Esq.
 8                               COVINGTON & BURLING, L.L.P.
                                 333 Twin Dolphin Drive, Suite 700
 9                               Redwood Shores, California  94065
                                 (650) 632-4700
10
                                 Daniel J. Pochoda, Esq.
11                               Joshua D. Bendor, Esq.
                                 AMERICAN CIVIL LIBERTIES
12                               FOUNDATION OF ARIZONA
                                 3707 N. 7th St., Suite 235
13                               Phoenix, Arizona  85014
                                 (602) 650-1854
14
                                 Andre I. Segura, Esq.
15                               AMERICAN CIVIL LIBERTIES UNION
                                 FOUNDATION
16                               Immigrants' Rights Project
                                 125 Broad Street, 17th Floor
17                               New York, New York  10004
                                 (212) 549-2676
18
      For the Defendants:        Michele M. Iafrate, Esq.
19                               IAFRATE & ASSOCIATES
                                 649 N. 2nd Avenue
20                               Phoenix, Arizona  85003
                                 (602) 234-9775
21
      For the Defendant Maricopa County:
22
                                 Richard K. Walker, Esq.
23                               WALKER & PESKIND, P.L.L.C.
                                 16100 N. 71st Street
24                               Suite 140
                                 Scottsdale, Arizona  85254
25                               (480) 483-6336
```

1                      A P P E A R A N C E S

2

3    For the Defendant Arpaio:   A. Melvin McDonald, Esq.
                                 JONES, SKELTON & HOCHULI, P.L.C.
4                                2901 N. Central Avenue, Suite 800
                                 Phoenix, Arizona  85012
5                                (602) 263-1700

6    For Chief Deputy Sheridan:  Lee D. Stein, Esq.
                                 MITCHELL STEIN CAREY
7                                One Renaissance Square
                                 2 North Central Avenue
8                                Suite 1900
                                 Phoenix, Arizona  85004
9                                (602) 358-0290

10   For Executive Chief Sands:  Greg S. Como, Esq.
                                 LEWIS BRISBOIS BISGAARD
11                               & SMITH, L.L.P.
                                 Phoenix Plaza Tower II
12                               2929 N. Central Avenue
                                 Suite 1700
3                                Phoenix, Arizona  85012-2761
                                 (602) 385-1040
14
     For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
15                               DICKINSON WRIGHT, P.L.L.C.
                                 Attorneys at Law
16                               1850 N. Central Avenue, Suite 1400
                                 Phoenix, Arizona  85004
17                               (602) 285-5000

18   For Lieutenant Sousa:       David S. Eisenberg, Esq.
                                 DAVID EISENBERG, P.L.C.
19                               2702 N. 3rd Street
                                 Suite 4003
20                               Phoenix, Arizona  85004
                                 (602) 237-5076
21
     ALSO PRESENT:               Chief Robert Warshaw
22                               Chief John Girvin
                                 Chief Raul Martinez
23                               Karen Clark, Esq.
                                 Ralph Adams, Esq.
24

25

1                                I N D E X

2    Witness:                                              Page

3    GERALD SHERIDAN

4    Direct Examination by Ms. Wang                          821
     Cross-Examination by Ms. Iafrate                        922
5    Direct Examination by the Court                         965
     Cross-Examination Continued by Ms. Iafrate             966
6    Further Examination by the Court                        967

7

8                              E X H I B I T S

9    No.      Description                                  Admitted

10   147      Azcentral opinion article by Jerry Sheridan,    906
              Here are the facts in profiling suit vs.
11            MCSO dated 1/12/2014

12   204C     Video Clip 3 of October 18, 2013 Crime          911
              Suppression Briefing
3
     204D     Video Clip 4 of October 18, 2013 Crime          913
14            Suppression Briefing

15   204E     Video Clip 5 of October 18, 2013 Crime          914
              Suppression Briefing
16
     204G     Video Clip 7 of October 18, 2013 Crime          916
17
              Suppression Briefing
18

19

20

21

22

23

24

_5

1          P R O C E E D I N G S

2

3          THE CLERK: All rise. Court is now in session, the

4     Honorable G. Murray Snow presiding.

5          THE COURT: Thank you. Please be seated.

6          THE CLERK: This is civil case number 07-2513,

7     Melendres v. Arpaio, on for continued evidentiary hearing.

8          THE COURT: We ready, Ms. Wang?

9          MS. WANG: Yes, Your Honor. Good morning.

10         THE COURT: Good morning.

11         MS. WANG: Plaintiffs call Gerard Sheridan.

12         THE CLERK: Step right up here, sir.

3          Please state your first and last name for the record.

14         THE WITNESS: Gerard Sheridan. G-e-r-a-r-d,

15    S-h-e-r-i-d-a-n.

16         THE CLERK: Thank you. Please raise your right hand.

17         (Gerard Sheridan was duly sworn as a witness.)

18         THE CLERK: Thank you. Please take our witness stand.

19         THE COURT: Please proceed, Ms. Wang.

20         MS. WANG: Thank you, Your Honor.

21                    GERARD SHERIDAN,

22    called as a witness herein, having been duly sworn, was

23    examined and testified as follows:

24                    DIRECT EXAMINATION

25    BY MS. WANG:

1   Q.  Good morning, Chief Sheridan.

2   A.  Good morning.

3   Q.  Chief, you're currently employed with the Maricopa County

4   Sheriff's Office, correct?

5   A.  Yes.

6   Q.  How long have you been with the MCSO?

7   A.  A little over 36 years.

8   Q.  And your current position is chief deputy, correct?

9   A.  That's correct.

10   Q.  That is the second in command of the entire agency?

11   A.  Yes, it is.

12   Q.  Before you were the chief deputy, what position did you

3   hold?

14   A.  I held the position of the director of detention.

15   Q.  You ran the entire MCSO jail system?

16   A.  Yes, ma'am.

17   Q.  And before that you held various positions in the

18   Patrol Division, is that right?

19   A.  Correct.

20   Q.  And you served as a patrol deputy earlier on in your

21   career, correct?

22   A.  I did.

23   Q.  Now, as chief deputy, is it true that you're responsible

24   for all of the operations of the MCSO?

_5   A.  That's correct.

1  Q.  But you answer to the sheriff, correct?

2  A.  I do.

3  Q.  And you report directly to the sheriff, correct?

4  A.  Yes.

5  Q.  You're the commander over all of the enforcement bureau, is

6  that right?

7  A.  Yes.

8  Q.  As well as the detention side of the MCSO, correct?

9  A.  Yes, ma'am.

10  Q.  As well as the administrative side of the MCSO, correct?

11  A.  Yes.

12  Q.  The only part of MCSO that is not under your direct command

3  is the public information office, is that correct?

14  A.  That's correct.

15  Q.  They report directly to the sheriff, correct?

16  A.  Yes.

17  Q.  Sir, about how many people are under your command as chief

18  deputy?

19  A.  Approximately 3500 paid employees and about 1100

20  volunteers, so a total of about 4600.

21  Q.  And of the 3500 paid employees, how many are sworn

22  deputies?

23  A.  Approximately 700 at this point.

24  Q.  So the MCSO's one of the largest law enforcement agencies

_5  in the United States.  Is that fair to say?

1    A.  We're probably the third- or fourth-largest sheriff's

2    office in the nation, yes.

3    Q.  And among all law enforcement agencies, MCSO is also among

4    the largest, correct?

5    A.  Yes.

6    Q.  Sir, on May 14th, 2014, you were right here in this

7    courtroom with a status -- during a status conference before

8    the Court, correct?

9    A.  I was.

10   Q.  And Judge Snow was presiding?

11   A.  He was.

12   Q.  And during that status conference there was discussion

3    about how to gather video recordings of traffic stops that had

14   been made by MCSO deputies, is that right?

15   A.  Correct.

16   Q.  And there was discussion among the parties and the Court

17   about how best to accomplish the gathering of those video

18   recordings, correct?

19   A.  Correct.

20   Q.  And the Court expressed a concern that those -- as many

21   video recordings as possible be gathered, correct?

22   A.  Yes, ma'am.

23   Q.  And the Court also noted that these recordings had not been

24   disclosed pretrial in this litigation, correct?

_5   A.  I don't recall that.

1  Q. All right. Now, you do recall, don't you, that Judge Snow

2  directed the MCSO to implement a plan to gather the video

3  recordings, correct?

4  A. Yes.

5  Q. And there was discussion about whether to gather the

6  recordings quietly, or to do it through more coercive measures

7  such as subpoenas issued by the Court.

8      You remember that, right?

9  A. I recall a discussion that contained many different

10  options.

11  Q. Well, you advocated for not issuing subpoenas, correct?

12  A. Correct.

3  Q. You preferred to gather the video recordings quietly, isn't

14  that right?

15  A. Right. I think we called that a softer approach.

16  Q. And you did that in court, correct?

17  A. Yes, ma'am.

18  Q. Now, Judge Snow addressed you directly, isn't that right?

19  A. Yes, he did.

20  Q. All right. And he asked you to come up with a, quote,

21  thought-through plan in which you can quietly gather the

22  videotapes, is that right?

23  A. That's correct.

24  Q. And Judge Snow also directed you to cooperate completely

5  with his monitor, Chief Warshaw, and directed that no

1  information will be withheld from him, isn't that right?

2  A.  That's correct.

3  Q.  And Judge Snow also directed that you should come up with a

4  plan that the monitor can approve that's your best thinking

5  about how you can, without resulting in any destruction of

6  evidence, gather all the recordings.

7       Isn't that what the judge ordered you to do?

8  A.  As I sit here today, yes, I know that to be correct.

9  Q.  Well, it was correct at the time the judge said it, is it

10 not?

11 A.  Yes.

12 Q.  And you were in the courtroom at the time, correct?

3  A.  Yes, I was.

14 Q.  Now, the judge also directed you, if there were any

15 disagreement with the monitor about the plan to gather video

16 recordings, to bring that disagreement to the Court.

17      Do you recall that?

18 A.  Yes.

19 Q.  And you agreed to do everything the Court directed you to

20 do, correct?

21 A.  Yes, ma'am.

22 Q.  And the sheriff was present as well, correct?

23 A.  Yes.

24 Q.  And he also agreed to do what the Court directed, correct?

.5 A.  Yes, he did.

1   Q.  And he delegated to you the responsibility to carry the

2   Court's orders out, correct?

3   A.  Yes.

4   Q.  Now, court ended that day at about 12:05 p.m., correct?  At

5   about noon?

6   A.  I -- that's what you say.  Yeah, I don't remember exactly.

7   It was a lengthy morning in court.

8   Q.  Okay.  Let's take a look at --

9           MS. WANG:  If the Court could please hand the witness

10  Exhibit 37, which is the transcript of the status conference on

11  May 14, 2014.

12          THE CLERK:  (Handing exhibit to witness.)

3           THE WITNESS:  Thank you.

14          THE CLERK:  You're welcome.

15  BY MS. WANG:

16  Q.  Just turn to the last page, page 103, sir.

17          Do you see the notation by the court reporter,

18  "Proceedings concluded at 12:05 p.m."?

19  A.  Yes, I do.

20  Q.  Do you have any reason to doubt that that's accurate?

21  A.  None whatsoever.

22  Q.  Thank you.

23          Now, immediately after court proceedings ended on May

24  14, 2014, you left the courthouse and went to a meeting in

.5  Sheriff Arpaio's office, is that right?

1  A.  Yes, I did.

2  Q.  And at that time the office was in the current MCSO

3  headquarters building, is that right?

4  A.  That's correct.

5  Q.  And that's less than a 10-minute walk from here?

6  A.  Right.

7  Q.  You walked there with the sheriff?

8  A.  I know I walked over.  I don't recall if the sheriff walked

9  with me or not.

10  Q.  All right.  Well, if -- if he took a vehicle to get to the

11  office, it would have been even faster than walking, correct?

12  A.  Sometimes I beat him back.

3  Q.  All right.  Fair enough.

14       Is it fair to say that the meeting in the sheriff's

15  office following court proceedings on May 14, 2014, probably

16  started by about 12:30 in the afternoon?

17  A.  Yes.

18  Q.  Now, who else was present at that meeting in the sheriff's

19  office?

20  A.  There was our counsel, Tim Casey; Tom Liddy, and Christine

21  Stutz.

22  Q.  Who's Christine Stutz?

23  A.  Christine Stutz is a deputy county attorney that represents

24  the sheriff's office in personnel matters.

25  Q.  All right.  And the sheriff was there as well, correct?

0642

1   A.   Oh, yes.  Sorry, yes.

2   Q.   Now, at that meeting there was discussion about how to

3   gather those video recordings, correct?

4   A.   Yes, ma'am.

5   Q.   And at one point Chief Trombi was summoned to that meeting,

6   is that right?

7   A.   Yes, he was.

8   Q.   And during that meeting you directed him to send an e-mail

9   out to various MCSO commanders directing them to gather the

10  video recordings, is that right?

11  A.   Yes.

12  Q.   And before directing Chief Trombi to do that, you did not

3   consult with the court-appointed monitor, Chief Warshaw, or any

14  member of his team, is that right?

15  A.   That's correct.

16  Q.   That was a violation of Judge Snow's order, was it not?

17  A.   As I know it today, yes, that was a violation of the

18  Court's order, yes.

19  Q.   Is it your contention that at the time you directed

20  Chief Trombi to send the e-mail to gather the video recordings

21  to a wide distribution list, that you did not understand that

22  to be a violation of the Court's order?

23  A.   That's correct.

24  Q.   You had gone directly from court to the sheriff's office

_5  where this meeting occurred, correct?

1  A.  Correct.

2  Q.  And he had just given you all the directions that we just

3  went through, correct?

4  A.  Correct.

5  Q.  And you contend that when you directed Chief Trombi to send

6  out that e-mail, you were not aware that you were violating the

7  Court's order?

8  A.  That's exactly what I'm saying.

9  Q.  All right.  Let's go on and find out what happened later.

10         Now, very soon after the meeting in Sheriff Arpaio's

11  office you then went to meet with the monitor, correct?

12  A.  Yes, ma'am.

3  Q.  You went very soon after the end of the first meeting in

14  the sheriff's office, correct?

15  A.  Yes, I did.

16  Q.  You had a quick bite to eat in between, right?

17  A.  Yes.

18  Q.  That was just in the office, maybe at your desk?

19  A.  Yes.

20  Q.  Now, do you agree that the meeting with the monitor team

21  started at about 2:30 in the afternoon?

22  A.  I don't recall what time the meeting started, but it sounds

23  like about that time.

24  Q.  So the meeting -- the first meeting, the one in the

25  sheriff's office, at which the monitor was not present, took

0644

1    perhaps two hours, a little more than two hours?

2    A.  Approximately, yes.

3    Q.  All right.  And you went very quickly to the meeting with

4    the monitor after that, correct?

5    A.  Yes, ma'am.

6    Q.  Who was at the meeting with the monitor?

7    A.  Chief Warshaw, Chief Martinez.

8    Q.  He's the deputy monitor?

9    A.  Yes, ma'am.

10   Q.  Who else?

11   A.  Myself, Christine Stutz, I believe --

12   Q.  Was Captain Holmes there?

3    A.  Captain Holmes.

14   Q.  At that time who was Captain Holmes, or what was his

15   assignment?

16   A.  Captain Holmes was the commander over the Internal Affairs

17   division.

18   Q.  And was there another member of the monitor team,

19   Ms. Ramirez, there?

20   A.  I don't recall.

21   Q.  Okay.  Do you recall anyone else being there?

22   A.  I seem to remember there was some other people in the room,

23   but I don't remember who they were.

24   Q.  All right.  Is it that you don't remember who they were

25   now, or you did not recognize them at the time and they were

1    not introduced to you?

2    A.   I just don't remember today.

3    Q.   All right.   Now, Sheriff Arpaio was present for part of

4    that meeting with the monitor team, correct?

5    A.   Yes, ma'am.

6    Q.   During the meeting there was discussion about how best to

7    gather the video recordings, correct?

8    A.   Yes.

9    Q.   Fair to say that you disagreed with the monitor about how

10   best to gather the video recordings?

11   A.   Yes, I did.

12   Q.   In fact, you argued with the monitor team about how best to

3    gather the video recordings?

14   A.   Argued's a strong word.   I think we just disagreed on the

15   process.

16   Q.   All right.   I deposed you on March 20th of 2015, correct?

17   A.   Yes.

18   Q.   Well, let me ask you this:   Is it fair to say that you

19   strongly disagreed with the monitor about the best way to

20   gather the video recordings?

21   A.   Yes.

22   Q.   The monitor wanted to take a coercive approach involving

23   the Internal Affairs division, correct?

24   A.   Yes.

_5   Q.   And you preferred a softer approach, is how you put it?

1   A.   Yes, ma'am.

2   Q.   Why did you prefer that approach?

3   A.   It was my belief that's the conclusion that we reached with

4   the Court.

5   Q.   You believed that the Court had agreed to a softer

6   approach?

7   A.   Yes, ma'am.

8   Q.   All right.  Well, you understood that the discussion during

9   court early in the morning had involved the question of whether

10  the Court should issue subpoenas, correct?

11  A.   Correct.  There were many discussions that morning, we went

12  back and forth, and it was my recollection that day that the

3   final decision was the Court wanted us to take a softer, quick,

14  efficient approach to get the videos, and that's what we were

15  doing.

16  Q.   Well, the Court directed you to come up with a

17  thought-through plan that you would seek the monitor's approval

18  to implement, correct?

19  A.   The way I remember that piece of it was he offered the

20  Court -- excuse me, sir -- the Court offered the monitor's

21  assistance in doing that.  I don't recall that morning the

22  Court saying that I needed his permission or his authorization

23  with the plan.

24  Q.   Okay.  Sir, do you have Exhibit 71 in front of you?

25           Exhibit 71 is the transcript of proceedings before

1    this Court on --

2    A.   Yes.

3    Q.   -- May 14, 2014?

4    A.   Yes, I do.

5              MS. WANG:   I believe this is in evidence.  Your Honor,

6    could I request that we publish page 75 of the transcript?

7              THE COURT:   You may.

8              MS. WANG:   I'm sorry.  This is not Exhibit 71.

9              I beg your pardon, Your Honor.  Can I consult with

10   co-counsel --

11             THE COURT:   You may.

12             MS. WANG:   -- to determine which is the correct

13   exhibit?

14             (Pause in proceedings.)

15             MS. WANG:   I beg your pardon.  It's Exhibit 37.  I

16   apologize.

17   BY MS. WANG:

18   Q.   Can we go to page 61.  And let's highlight lines 6

19   through 9.

20   A.   I'm sorry, was that Exhibit 37?

21   Q.   That's correct.

22             THE COURT:   It's up on your screen, Chief.

23             THE WITNESS:   Oh.

24   BY MS. WANG:

25   Q.   Oh.  Actually, let's look at page 75, I'm so sorry, at

1    lines 18 through 24.

2           All right, Chief.  Are you with us?  It's on the

3    screen now.  This is a transcript of the status conference on

4    May 14th, 2014, and the Court said:  Well, I'm going to direct

5    the monitor to work with you on a plan that he can approve

6    that's your best thinking about how you can, without resulting

7    in any destruction of evidence, gather all the recordings, and

8    then based on what you find, and/or maybe beginning before you

9    can assess what you find, depending on your thoughts, you

10   result in an appropriate and thorough investigation.

11          Do you see that?

12   A.   I do.

3    Q.   So the Court clearly directed you to work on a plan with

14   the monitor, correct?

15   A.   That's correct.

16   Q.   And that the monitor was going to approve that plan,

17   correct?

18   A.   Yes, he did.

19   Q.   Now, going back to the meeting that you had with the

20   monitor team later in the day, you began by taking the view

21   that a soft approach would be most appropriate, correct?

22   A.   Yes.

23   Q.   And that was because it's your view that intimidation is

24   not the best way to elicit information from law enforcement

25   officers.  Is that your view?

1  A.  Yes, ma'am.

2  Q.  And the monitor team believed that using Internal Affairs

3  to go and try to gather the evidence in a more coercive way

4  would be more appropriate, correct?

5  A.  That's correct.

6  Q.  And was the view that there was a concern expressed by the

7  Court that if word got out that this effort was underway, any

8  deputies who had recordings that were incriminating might try

9  to destroy those recordings, correct?

10  A.  Correct.

11  Q.  And was that the view that was conveyed during that meeting

12  by members of the monitor team?

3  A.  I don't recall that, but I also know that was my concern

14  also.

15  Q.  But you were not worried about sending out an e-mail to

16  numerous people in the MCSO to do that?

17  A.  To this day, after having many, many hours to think about

18  the issue on how best to gather videos that are in the hands of

19  700 individuals spread over 9,226 square miles, once we asked

20  one deputy sheriff for the videos, how we could prevent anyone,

21  if they had the thought, desire, to destroy a video, how we

22  could ever prevent that.

23          The only way I could come up with that is if we served

24  700 search warrants all at once, and I don't think that would

5  even work.  So in my mind, there was going to be no perfect

1    way, if I had a corrupt deputy sheriff that was going to

2    destroy video, to collect that video.

3    Q.  Sir, so you're saying that you're sticking to your guns to

4    this day, that the e-mail sent out by Chief Trombi was the best

5    way of gathering the video recordings?  That's your view

6    sitting here today?  Yes or no.

7    A.  That's not a yes or no --

8    Q.  All right.

9    A.  -- answer.

10   Q.  Go ahead and answer it.

11   A.  The answer is no, it wasn't, because it was in violation of

12   the Court's other.

3    Q.  Okay.  But setting aside the issue of whether it violated

14   the Court's order, as a law enforcement evidence gathering

15   matter alone, setting aside whether it was the right way to

16   carry out the Court's order, do you believe, from an evidence

17   gathering point of view sitting here today, that Chief Trombi's

18   e-mail was the best way to do it?

19   A.  Yes, considering the fact that there was no policy in

20   effect concerning the preservation of those videos, and the

21   fact that we have collected approximately 8,900 videos from

22   deputy sheriffs, yes, I do believe that was the best, most

23   efficient way to do it, albeit I violated the Court's order, as

24   I know it as I'm sitting here today, during that process.

_5   Q.  So in short, yes, to this day, you believe it was the best

1  way to do that from an evidence gathering point of view?

2  A.  With that caveat, yes.

3  Q.  All right.  Sir, you were aware that this effort to gather

4  video recordings arose because it was discovered after Deputy

5  Armendariz was arrested and his home searched that he had a

6  very large volume of video recordings, correct?

7  A.  Correct.

8  Q.  And you were familiar with his history with the Human

9  Smuggling Unit, correct?

10  A.  I need a time period to be able to answer that question.

11  Q.  On May 14th, 2014, you were aware of Deputy Armendariz's

12  history with the HSU, correct?

13  A.  Not really.

14  Q.  Well, you were aware that he was with the HSU as of May 14,

15  2014, correct?

16  A.  Yes, I did.

17  Q.  At that point you were the primary representative of MCSO

18  for purposes of this litigation, correct?

19  A.  Correct.

20  Q.  You were the main contact for -- for the lawyers in this

21  case?

22  A.  At that point I was, yes.

23  Q.  On May 14, 2014, right?

24  A.  Yes, ma'am.

25  Q.  You are aware that Deputy Armendariz testified at the trial

1   in this matter back in the summer of 2012, right?

2   A.  Yes.

3   Q.  Now, you knew that -- did it occur to you that maybe you

4   would want to try to first gather video recordings from members

5   of HSU through a coercive approach, and focus on the people who

6   were most likely to have video recordings for this litigation?

7   A.  No.

8   Q.  That did not occur to you?

9   A.  No.

10  Q.  All right.  Going back to the meeting with the monitor

11  team, there was this disagreement between you and members of

12  the monitor team about the best way to gather the video

13  recordings, is that right?

14  A.  Correct.

15  Q.  At the end of the meeting was it agreed upon that a more

16  coercive approach would be taken?

17  A.  I believe so, yes.

18  Q.  Sir, that was at odds with your direction to Chief Trombi

19  sending out an e-mail to multiple commanders in MCSO, correct?

20  A.  That's correct.

21  Q.  During the meeting with the monitor team, you did not

22  mention that you had already directed Chief Trombi to send out

23  the e-mail, did you?

24  A.  That's correct, I did not.

25  Q.  So you had over a two-hour meeting with members of the

1  monitor team where you disagreed about the right approach to

2  gather the video recordings, correct?

3  A.  Correct.

4  Q.  You argued back and forth about how best to do it, fair to

5  say?

6  A.  Correct.

7  Q.  At the end of the day a consensus was reached, is that

8  right?

9  A.  Yes.

10  Q.  And during that entire time you did not mention that you

11  had already set in motion your earlier plan that was developed

12  in a meeting without the monitor, isn't that right?

3  A.  That's right.

14  Q.  And that violated the Court's order, correct?

15  A.  Yes, it did.

16  Q.  Now, sir, I'm going to have you take a look at Exhibit 38.

17  That is in evidence already.

18         And let's turn to the -- it's just one page.  Let's

19  enlarge that.  Thank you.

20         Sir, take a look at that.  Is that Chief Trombi's

21  e-mail that he sent out in response to your order?

22  A.  Yes, ma'am.

23  Q.  And he sent that at 3:41 p.m., correct?

24  A.  Correct.

.5  Q.  That was while you were in the meeting with the monitor

1    team, correct?

2    A.   I believe so.

3    Q.   It was after you started the meeting with the monitor team,

4    correct?

5    A.   Correct.

6    Q.   Now, I counted up 27 recipients of this e-mail.

7         Does that look about right to you?

8    A.   Yes.

9    Q.   And you've been present at the defense table watching this

10   hearing this week, correct?

11   A.   I have.

12   Q.   And you heard Chief Trombi testify that the 27 recipients

13   of this e-mail are all of the division commanders, and each

14   division commander's second in command, correct?

15   A.   Correct.

16   Q.   Now, when I deposed you on March 20th of 2015, you did not

17   know who all those people were.  Is that fair to say?

18   A.   I believe there's one or two on there that I -- I didn't

19   recall.

20   Q.   Well, is it fair to say you also, in addition to that, you

21   didn't know where some of these people were assigned as of May

22   14, 2014?

23   A.   That's correct.

24   Q.   And so when I tried to get a sense from you during your

25   deposition of what rhyme or reason Chief Trombi used to develop

1  the list of recipients, you were not aware of that, correct?

2  A.  Correct.

3  Q.  Sir, would you agree that sending out an e-mail to this

4  list of 27 people was not a way of quietly gathering video

5  recordings?

6  A.  Again, I'll go back to my answer from earlier.  There

7  really is no quiet way to ask 700 people stretched over the

8  size -- a county the size of Maricopa, to ask them for their

9  videos without enlisting the commanders of those divisions and

10  units that they work in.  There is no other way to do it.

11  Q.  Well, sir, I'd like you to answer my question, which is:

12  Do you believe that Chief Trombi's e-mail was a way of quietly

13  gathering video recordings?

14  A.  Yes.

15  Q.  Sir, wouldn't you agree that e-mail is not a secure form of

16  communication?

17  A.  Yes.

18  Q.  E-mails can be forwarded, right?

19  A.  Yes.

20  Q.  Chief Trombi, in his May 14, 2014, e-mail, did not direct

21  the recipients not to forward this e-mail, isn't that right?

22  A.  That's right.

23  Q.  It could have been forwarded to anyone, correct?

24  A.  Possible.

25  Q.  In fact, it likely was, right?

1   A.   It's possible.

2   Q.   Since these commanders were told to gather the

3   video recordings, but weren't told that this was an effort to

4   do so quietly, correct?

5   A.   Yes.

6   Q.   Is that "yes"?

7   A.   Yes.

8   Q.   Thank you.

9        Now, after you left the meeting with the monitor -- so

10  that would have been quite late in the afternoon by that point,

11  maybe 4:30, is that right?

12  A.   Might have even been a little bit later, closer to 5:00.

3   Q.   All right. After you left the meeting with the monitor you

14  met separately with Christine Stutz and Chief Trombi, is that

15  right?

16  A.   That's correct.

17  Q.   What did you discuss during that meeting?

18       MS. IAFRATE:  Objection, Your Honor, attorney-client

19  privilege.

20       MS. WANG:  Your Honor, Ms. Iafrate elicited testimony

21  from Chief Trombi on the subject of this very conversation, and

22  the privilege was waived.

23       THE COURT:  Do you have any response to that,

24  Ms. Iafrate?

.5       MS. IAFRATE:  I did not discuss the content of the

0657

1 communication.

2     MS. WANG: I believe she did, Your Honor.

3     THE COURT: Do you have a copy of the transcript?

4     MS. WANG: I think I do. I'll try to find the page

5 and line reference.

6     THE COURT: All right.

7     MS. WANG: It's on page 115 of the April 21st

8 transcript, Your Honor.

9     THE COURT: Can you bring it up, Gary?

10     MS. WANG: Your Honor, I can give you a copy of the

11 relevant page.

12     (Pause in proceedings.)

13     THE COURT: I'm going to sustain the objection.

14     And the reason I'm going to do so, Ms. Wang, is in the

15 transcript you provided me, the questioning was about the

16 conversation between Chief Trombi and deputy -- or Chief Deputy

17 Sheridan, and so I don't believe the attorney-client privilege

18 was implicated by anything they discussed, because there was no

19 indication that anybody was asking for legal advice.

20     So if you want to -- if you want to ask chief -- or if

21 you want to ask Chief Deputy Sheridan about what he said to

22 Chief Trombi that doesn't relate to the request of legal

23 advice, I'm going to -- I'll let you do that, but -- and

24 maybe -- I didn't look at your precise question. Maybe your

25 precise question doesn't implicate the attorney-client

1  privilege. But clearly, any communication with Ms. Stutz, or

2  any request to Ms. Stutz about legal advice or legal counsel,

3  is not waived by what you've just shown me.

4        The other part of my ruling, though, is what you've

5  just shown me doesn't implicate the attorney-client privilege

6  at all. I don't know if that's clear for you.

7        Do you understand my ruling?

8        MS. WANG: I think I understand, Your Honor, but my --

9  well, perhaps I should ask the witness a few more questions

10 and --

11       THE COURT: Yes, please do.

12       MS. WANG: Okay.

3        THE COURT: Because as I understand it, the

14 attorney-client privilege does not relate to all communications

15 in which an attorney is present. It only relates to

16 communications where legal advice is sought or received. And

17 it does not seem to me that the testimony that was elicited

18 from Chief Trombi discussed any -- even though Ms. Stutz was

19 present, does not implicate the attorney-client privilege.

20       MS. WANG: All right. Thank you, Your Honor.

21 BY MS. WANG:

22 Q. Chief Sheridan, when you left the monitor's office you met

23 with two people, correct?

24 A. Yes, ma'am.

_5 Q. Christine Stutz and Dave Trombi, correct?

1    A.   Yes.

2    Q.   The three of you met together, is that right?

3    A.   Yes.

4    Q.   Were you seeking Ms. Stutz's legal advice during that

5    meeting?

6    A.   No.

7              MS. WANG:  Your Honor, I believe that it was not a

8    privileged communication at all and that --

9              THE COURT:  It doesn't sound like it was.

10             MS. WANG:  All right.  Thank you.

11   BY MS. WANG:

12   Q.   So, Chief, what happened during that meeting with Stutz and

3    Trombi?

14   A.   I called Dave Trombi in and told him that I needed him to

15   implement this decision that we had made during the meeting

16   with the monitors, and he looked at me and he said, You told me

17   to send out an e-mail earlier, and I already did it.

18   Q.   Okay.  Did Ms. Stutz say anything during that conversation?

19   A.   Yes, she did.

20   Q.   What did she say?

21   A.   She told me that I didn't tell the monitor that I had told

22   Trombi to do something different during the meeting.

23   Q.   Did she suggest that you tell the monitor what had

24   happened?  Or was that your idea?

_5   A.   Well, I think it was a combination of both our ideas right

1  away, because I knew that Chief Warshaw, because he just told

2  us that he was walking over to talk to the Court, to tell

3  them -- to tell the Court what we had just decided to do to

4  collect the videos. And that was different than what I had

5  instructed Chief Trombi to do.

6  Q. Was anything else said during this meeting that you had

7  with Christine Stutz and Dave Trombi?

8  A. Just a couple of expletives on my part that I had forgotten

9  to tell the monitor that I had given Chief Trombi direction.

10  Q. All right. Ms. Stutz was present during the meeting with

11  the monitor, you testified, correct?

12  A. Correct.

3  Q. I believe she was also in court that morning of May 14,

14  2015, isn't that right?

15  A. Yes, ma'am.

16  Q. Now, you called Chief Warshaw after you finished your

17  meeting with Christine Stutz and Dave Trombi, correct?

18  A. Yes.

19  Q. It was about 5:15 p.m.?

20  A. Approximately.

21  Q. And you revealed that you had directed Chief Trombi to send

22  out the e-mail, correct?

23  A. Correct.

24  Q. When you spoke with the monitor, you told him that

_5  Chief Trombi had sent the e-mail without your knowledge, isn't

1  that right?

2  A.  Correct.

3  Q.  That was a lie, right?

4  A.  No.

5  Q.  Well, you had just talked to Dave Trombi and he had just

6  told you, remember, you directed me to send the e-mail.

7      You had just had that conversation with Chief Trombi

8  before you called Chief Warshaw, correct?

9  A.  Yes.

10  Q.  But you told Chief Warshaw immediately after that that

11  Trombi sent the e-mail without your knowledge.

12  A.  Well, first of all, be careful about calling me a liar.

3  Chief Trombi sent that e-mail, like you pointed out to me a few

14  minutes ago, at 3:41 p.m. when I was in the meeting with

15  Chief Warshaw.  I wasn't aware that he sent that e-mail out.

16  Q.  Chief, you were aware at the point you spoke with

17  Chief Warshaw that you were the one who directed Chief Trombi

18  to send the e-mail, is that right?

19  A.  That's correct.

20  Q.  When you went to the meeting with the monitor at about 2:30

21  in the afternoon, you knew you had given that direction,

22  correct?

23  A.  That's correct.

24  Q.  But when you spoke to Chief Warshaw, you said that

.5  Chief Trombi had sent the e-mail without your knowledge, when

0662

1  in fact you had directed him, is that right?

2  A.  You're mixing apples and oranges.

3  Q.  What are the apples, sir?

4  A.  Apples and oranges, just because I told him to send an

5  e-mail doesn't mean that I knew he had already sent it.

6  Q.  Sir, you told Chief Warshaw that Chief Trombi sent the

7  e-mail without your knowledge, isn't that right?

8  A.  Yes.

9  Q.  And you knew at the point you told Chief Warshaw that that

10  you were the one who directed him to do it, isn't that right?

11  A.  Yes.

12  Q.  You didn't tell Chief Warshaw during that telephone

3  conversation that you had directed Chief Trombi, did you?

14  A.  It wasn't a very lengthy conversation with Chief Warshaw.

15  Q.  Sir, do you agree with me that it was a fair implication

16  from your statement that Trombi sent the e-mail without your

17  knowledge, that someone hearing that would infer that you were

18  certainly not the one who directed him to do it?

19       MS. IAFRATE:  Objection, Your Honor, speculation;

20  argumentative.

21       THE COURT:  I'm going to allow it.

22       THE WITNESS:  No.

23  BY MS. WANG:

24  Q.  You don't think that's a fair inference?

_5  A.  No.

1  Q.  You don't think someone who hears, someone sent an e-mail
2  without my knowledge, implies that you certainly did not direct
3  the person to do it?

4  A.  Of course I directed him to do it, but I didn't know that
5  he accomplished it.

6  Q.  Well, you did not tell Chief Warshaw that you had directed
7  Chief Trombi, but you were unaware that he had already sent it,
8  right?

9  A.  That's correct.  I didn't tell him all the details of the
10  incident.  I said it was a very short conversation.  I was very
11  embarrassed, because I had forgotten to tell Chief Warshaw
12  about telling Chief Trombi to start gathering the information,
3  and Chief Warshaw appeared -- or sounded very angry and excited
14  about that, and he says, well, I'm going to have to tell the
15  Court about this, and don't go anywhere.  I'll be back.

16         And that was a very quick conversation I had, or that
17  I recall having with Chief Warshaw.

18  Q.  So you left out the fact that you were the one who directed
19  Chief Trombi to send the e-mail out, right?

20  A.  Again, it wasn't a lengthy discussion about all the
21  incidents that led up to that.

22  Q.  My only question, Chief, is you left out the fact that you
23  were the one who directed Dave Trombi to send out the e-mail
24  when you spoke to Chief Warshaw, right?

_5  A.  Agreed.

0664

1  Q. Now, at about 6 o'clock, maybe 45 minutes later, you spoke

2  with Chief Martinez from the monitor team by phone, is that

3  right?

4  A. I believe so, yes.

5  Q. And is it true that during that phone call with Chief

6  Martinez it was the first time that you revealed to the monitor

7  team that there had been this earlier meeting in the sheriff's

8  office before the meeting with the monitor team?

9  A. I don't recall the contents of that conversation.

10  Q. You don't recall that you revealed that you had had the

11  meeting with the sheriff earlier in the day before meeting with

12  the monitor team?

3  A. Well, I know at some point later on in the evening that we

14  sat down and we had a full discussion about all the issues that

15  occurred that day. I don't recall whether it was during that

16  phone conversation or when Chief Warshaw and Chief Martinez

17  came over and we talked in person or it was on the phone, but

18  we had a full discussion describing exactly what had occurred.

19  Q. Okay. But I'm sticking to this phone call you had with

20  Chief Martinez for now.

21        Are you saying you don't recall having that phone

22  conversation, or you don't recall what happened during that

23  conversation?

24  A. I remember having a conversation with him; I just don't

5  recall the contents of it.

1  Q.  All right.  So you had a meeting later in the evening with

2  members of the monitor team, is that right?

3  A.  Yes, ma'am.

4  Q.  And Chief Warshaw was present?

5  A.  Yes.

6  Q.  Chief Martinez was present?

7  A.  Yes.

8  Q.  During that meeting you told them that you had no

9  recollection of Dave Trombi being directed to send his e-mail,

10  is that right?

11  A.  Can you say that again?

12  Q.  Did you tell them that you had no recollection of Dave

3  Trombi being directed to send the e-mail?

14  A.  During the meeting that I had with them?

15  Q.  Yes, correct.

16  A.  Correct.

17  Q.  And you told them that this was due to fatigue, stress, and

18  distractions on your part?

19  A.  That's correct.

20  Q.  Now, that night, May 14, 2014, you wrote a letter to

21  Chief Warshaw on the subject of how all this came to be,

22  correct?

23  A.  Yes, ma'am.

24  Q.  I'd like to have you take a look at Exhibit 39.  This is in

.5  evidence.

1            Is that the letter that you sent to Chief Warshaw on

2   May 14, 2014?

3   A.  Yes, it is.

4   Q.  Okay.  The first paragraph you wrote:  This letter is in

5   response to your request to account for the circumstances

6   surrounding a meeting that occurred on Wednesday, May 14, 2014,

7   at approximately 1200 hours.

8            Do you see that?

9   A.  Yes, I do.

10  Q.  Okay.  Let's skip to the third paragraph on this page.

11           And again, you're describing what happened during your

12  meeting in the sheriff's office in this letter, correct?

13  A.  That's correct.

14  Q.  Okay.  You wrote:  After a somewhat lengthy discussion a

15  decision was made to have chief -- excuse me -- Deputy

16  Chief David Trombi come into the meeting so action could be

17  taken to move forward on securing the required video

18  information, as almost all enforcement deputies are in his

19  chain of command.

20           I want you to focus on the next sentence, sir.  You

21  wrote:  He was directed, by whom he does not recall and quite

22  frankly, neither do I, to contact his commanders and have them

23  secure all video recordings and then have them forwarded to

24  Internal Affairs.

25           And then in parentheses you wrote:  In preparation for

1   this letter I specifically asked David -- Deputy Chief Trombi

2   who told him to do this, and his response was it was a

3   collective decision of all the parties.

4           Do you see that?

5   A.  Yes, I do.

6   Q.  In your letter to Chief Warshaw on the evening of May 14,

7   2014, you wrote that you did not recall who directed him to

8   send the e-mail, is that right?

9   A.  That's correct.

10  Q.  But you already knew by that point that you were the one

11  who directed him to do it, isn't that right?

12  A.  I -- this is a very difficult question to answer, okay, so

3   it might take me a second.

14          I wrote this that night.  Okay?  And in writing this

15  that night, this was my best recollection at the time.  But as

16  you start to think about issues later and machinate them over a

17  period of time, I realized that I was probably the one that

18  told him to do that.

19          But I wanted to try and be as accurate as possible,

20  because I knew Judge Snow wanted to see this letter first thing

21  the next morning, I wanted to be as accurate as possible, and I

22  did contact Chief Trombi and asked him.  And this -- the day I

23  wrote that, the night I wrote that, I believe it was probably

24  11 o'clock at night, was my best recollection of what happened

5   that evening.

1  Q. Chief, I'm going to name some facts and I'd ask you to let
2  me know if they're correct.

3      Number one, you did direct Chief Trombi to send the
4  e-mail during your meeting in the sheriff's office that began a
5  little after 12 o'clock that day, correct?

6  A. I'm sure I did.

7  Q. Number two, after leaving the meeting with the monitor
8  team, you met with David Trombi and Christine Stutz, correct?

9  A. Yes.

10 Q. Number three, during the meeting with David Trombi and
11 Christine Stutz, David Trombi reminded you that you were the
12 one who directed him to send the e-mail, is that correct?

3  A. Yes.

14 Q. And now you're telling me that at 11 o'clock at night,
15 after you, I think the word you used was "machinate," after you
16 machinated on the subject, you decided to write to
17 Chief Warshaw that Dave Trombi did not recall who directed him
18 to send the e-mail, and quite frankly, you did not recall,
19 either, is that correct?

20 A. That's correct.

21 Q. That was not true at the time you wrote it, was it?

22 A. Yes, it was.

23 Q. You knew quite well who directed Dave Trombi to send the
24 e-mail at the time you wrote that letter, didn't you?

.5 A. You know, even -- even to this day it's difficult to

0669

1    determine exactly who told Trombi.  I was in a meeting with

2    four other people -- three lawyers, the sheriff, myself -- and

3    I know it's going to be hard for you to believe, but in that

4    room I'm the lowest man on the totem pole.

5              And when we called Chief Trombi in -- and I assume I

6    did, because he's a direct report to me -- I assume I'm the one

7    that told him what to do, but I also believe that other people

8    were not just mute and silent during that time period and we

9    all probably had something to tell Chief Trombi.

10             So that's why I was thinking about this issue and

11   trying to be as accurate as possible.  Because let's not

12   forget, I had been in front of this Court, the last time I'd

13   been in front of the this Court before this day it was not a

14   very pleasant experience for me, and so I did not want to make

15   a mistake again.  So --

16   Q.  So --

17   A.  -- my answer to your question is this was as accurate as I

18   could put down on paper.

19   Q.  Even though Dave Trombi had reminded you that you were the

20   one who told him to send the e-mail?

21   A.  I'm sure I had something to do with that, yes.  Again, I --

22   Q.  Are you backing away from that now?

23   A.  No.

24   Q.  Are you questioning whether you were the one to direct him?

25   A.  No.  Please don't put words in my mouth.  No, I'm not

1  backing away from that. I'm sure I did. He directly reports

2  to me.

3  Q. And so you would likely have been the one to order him to

4  send the e-mail, correct?

5  A. Absolutely.

6  Q. The only people in the meeting in the sheriff's office who

7  are MCSO commanders were you and the sheriff, correct?

8  A. Correct.

9  Q. No one else in that room could give Dave Trombi an order,

10  is that right?

11  A. We take direction and advice from our counsel all the time.

12  Q. But you would have been the one to direct Dave Trombi to

13  send the e-mail, right?

14  A. But believe me, if one of the counsel that was present told

15  Dave Trombi to do something, I'm sure I would not override that

16  direction.

17  Q. Well, you would have the power to override it, correct?

18  A. Of course I would.

19  Q. If you were in a meeting with counsel and a subordinate and

20  the counsel told the subordinate to do something you did not

21  agree with, you would not let that happen, right?

22  A. Well, not if it's legal advice. I'm not a lawyer.

23  Q. Was this legal advice?

24  A. No.

25  Q. So in that room there were only two people who had the

1  power to order Dave Trombi to do something, you or the sheriff,

2  correct?

3  A.  Correct.

4  Q.  So, sir, do you agree sitting here now that you were the

5  one who directed Dave Trombi to send the e-mail?

6  A.  I believe I was, and I believe I've said that like five

7  times.

8  Q.  Thank you, sir.

9         I want to stay with this letter, though, because you

10 not only wrote to Chief Warshaw that you did not recall who

11 directed Chief Trombi to send the e-mail, you wrote that Dave

12 Trombi did not recall who directed him to send the e-mail,

13 isn't that right?

14 A.  That's correct.

15 Q.  But you knew when you sent this letter that Dave Trombi

16 recalled that you were the one who directed him to send the

17 e-mail, right?

18 A.  I don't know.

19 Q.  I guess we'll leave it at that, sir.

20        Now, at the time you wrote this letter to Chief

21 Warshaw, these events had just happened over the course of that

22 same day, correct?

23 A.  Correct.

24 Q.  And you explained to Chief Warshaw that this all happened

.5 because you had a lapse of memory, correct?

1  A. Correct.

2  Q. And you said that you were suffering from fatigue and

3  confusion, is that right?

4  A. That's correct.

5  Q. Is there any other reason why you felt that this happened

6  that you didn't mention in the letter to Chief Warshaw?

7  A. Yes.

8  Q. What's that?

9  A. I suffer from migraine headaches. I take medication every

10  night to prevent -- help prevent those headaches from

11  occurring. That medication has some side-effects that I don't

12  really wish to talk about, and I had a slight migraine that

13  day.

14  Q. You did not mention that among your excuses for what

15  happened in your letter to Chief Warshaw on May 14, 2014, did

16  you?

17  A. It's not an excuse, ma'am. I suffer from migraine

18  headaches, and I've been suffering from them for approximately

19  40 years. And I deal with them on a fairly frequent basis, and

20  it's not something that I use as an excuse.

21  Q. Well, I'm sorry to hear that, sir, but my question is: In

22  your letter of May 14, 2014, you told Chief Warshaw that the

23  explanation for what had happened was that you were suffering

24  from fatigue and confusion, right?

25  A. That could be a symptom of a migraine headache.

1  Q.  You did not mention that you had been suffering from a

2  migraine headache that day, did you?

3  A.  I did not.

4  Q.  Now, Chief, you finally admitted in court, in this

5  courtroom, on November 20th, 2014, that you were the one who

6  told Dave Trombi to send the e-mail, correct?

7  A.  I'm sorry, can you repeat that?

8  Q.  The first time you admitted that you were the one who

9  directed Dave Trombi to send his e-mail was on November 20th,

10  2014, here in this courtroom, correct?

11  A.  Yes.

12  Q.  And that was through your counsel that -- your

13  then-counsel, Tim Casey, correct?

14  A.  Correct.

15  Q.  You were here with him, correct?

16  A.  I was.

17  Q.  And he sought your permission to make that admission in

18  court, correct?

19  A.  Correct.

20  Q.  And he got it, right?

21  A.  Yes.

22  Q.  Now, sir, you're aware that the monitor, Chief Warshaw, has

23  written a report that covers the events of May 14, 2014,

24  correct?

25  A.  I don't believe so.  I know you referenced that during my

1  deposition.

2  Q.  All right.  Well, are you aware that the monitor found

3  your claims about the events of May 14, 2014, not credible?

4  A.  Yes, you told me that.

5  Q.  What's your reaction to that?

6  A.  Chief Warshaw doesn't know who Jerry Sheridan is.

7  Q.  You've spent quite a lot of time with him over the course

8  of your involvement in this litigation, correct?

9  A.  Well, at this point.  In May I think he'd only been the

10  monitor for a short period of time.

11  Q.  Do you know when he was appointed the monitor?

12  A.  He was appointed, I believe, in January.  We had a first

3  meeting maybe in February, March, sometime there.  I'd only met

14  him a few times before this.

15  Q.  You'd had meetings with him, though, correct, before May

16  14, 2014?

17  A.  Yes.

18  Q.  And you'd had meetings with him after that, correct?

19  A.  Yes.

20  Q.  Many meetings, in fact, correct?

21  A.  Yes.

22  Q.  Sir, the judge's order related to a very serious

23  investigation, right?

24  A.  Yes.

.5  Q.  The investigation arose from a situation with Deputy

1  Armendariz, an MCSO deputy, correct?

2  A.  Correct.

3  Q.  And you were aware that the investigation could lead to

4  evidence of wrongdoing by Deputy Armendariz, correct?

5  A.  That's correct.

6  Q.  Possibly many other MCSO deputies, correct?

7  A.  Correct.

8  Q.  And there could be very broad implications arising from

9  this video evidence, correct?

10  A.  Yes, ma'am.

11  Q.  Implications affecting the Maricopa County Sheriff's

12  Office?

3  A.  Yes.

14  Q.  And you knew that a federal judge was watching this

15  investigation closely, right?

16  A.  Yes, ma'am.

17  Q.  And you heard the federal judge express concerns that this

18  investigation should be carried out carefully and quietly,

19  correct?

20  A.  Yes, ma'am.

21  Q.  And that was to minimize the risk that deputies would

22  destroy video recordings.  You understood that, right?

23  A.  I did.

24  Q.  The sheriff delegated that responsibility to you, right?

_5  A.  He did.

1  Q.  And you have over 36 years of experience in law

2  enforcement, right?

3  A.  I do.

4  Q.  You've been at the chief level at MCSO for over 20 years,

5  correct?

6  A.  Yes.

7  Q.  And you've been the second in command, the chief deputy,

8  for five years, correct?

9  A.  Yes.

10  Q.  Sir, I believe I've heard you say that you consider

11  yourself to be an expert on law enforcement ethics, is that

12  right?

3  A.  Yes, ma'am.

14  Q.  You've taught law enforcement ethics at colleges?

15  A.  I do.

16  Q.  Sir, is it fair to say that a law enforcement officer needs

17  to have a sharp memory and recall for details?

18  A.  They do.

19  Q.  You have to be able to recall events clearly in order to

20  write reports, right?

21  A.  Yes.

22  Q.  Possibly to testify in court, correct?

23  A.  Yes.

24  Q.  A law enforcement officer's memory can make or break life

_5  or death matters, is that right?

1  A.  I don't know about that.

2  Q.  You don't think that a law enforcement officer's memory

3  might relate to life or death matters?

4  A.  Maybe I don't understand your question.  Could you restate

5  it?

6  Q.  Law enforcement officers sometimes have to deal with life

7  or death situations, right?

8  A.  Absolutely.

9  Q.  They bring a lot of skills to bear in that kind of

10 situation, correct?

11 A.  Yes.

12 Q.  And their memory might be one of those things, correct?

3  A.  Well, usually life and death matters happen in the blink of

14 an eye, so I don't think there's much memory involved.

15 Q.  Those life or death matters could extend to courtroom

16 proceedings, isn't that right?

17 A.  Yes, it's possible.

18 Q.  All right.  Now, sir, you're the executive of one of the

19 largest law enforcement agencies in the United States, right?

20 A.  Yes, ma'am.

21 Q.  You have thousands of people under your command, correct?

22 A.  I do.

23 Q.  You supervise a very wide variety of functions, right?

24 A.  Yes.

_5 Q.  You're asked to hold a lot of information in your head at

1   one time, correct?

2   A.   I do.

3   Q.   And you do hold a lot of information in your head at any

4   given time, correct?

5   A.   I try.

6   Q.   The chief deputy of the Maricopa County Sheriff's Office

7   should be an intelligent and capable person.

8        Do you agree with that?

9   A.   Yes.

10  Q.   And don't worry about being modest here, because, I mean,

11  this is a serious question.  You are an intelligent and capable

12  person, are you not?

3   A.   I don't know about the intelligent part, but capable, yes.

14  Q.   Do you mean that seriously, Chief Deputy?  Because I mean

15  it as a serious question.

16  A.   I believe that I am a conscientious, humble, competent,

17  educated law enforcement officer.

18  Q.   And do you believe that you are intelligent enough to serve

19  as the second in command of your agency?

20  A.   Yes.

21  Q.   Yet you claim you forgot about Judge Snow's orders later of

22  the day -- later in the day on May 14, 2014?

23  A.   No.   What I claim is that I recall them differently than

24  the written record reflects.

.5  Q.   Do you challenge the accuracy of the transcript?

1    A.   Absolutely not.

2    Q.   You were paying attention in court that day, were you not?

3    A.   Yes, ma'am.

4    Q.   Now, you've referred in your testimony to the fact that you

5    previously had had an uncomfortable appearance before Judge

6    Snow in the case, correct?

7    A.   Yes, I did.

8    Q.   You were called into court to account for some

9    misstatements you had made about the judge's orders, previous

10   orders in the case, correct?

11   A.   Yes, I did.

12   Q.   You remembered that when you walked into court on May 14,

3    2014, correct?

14   A.   Oh, yes.

15   Q.   So you understood it was very important to pay close

16   attention to a Court's orders, right?

17   A.   Yes, ma'am.

18   Q.   Make sure you follow them, right?

19   A.   Absolutely.

20   Q.   Now, sir, I know you listened to Chief Trombi's testimony

21   on Tuesday of this week.  He testified that in February of 2014

22   you directed them to gather some information about

23   video cameras being used at MCSO.

24        Do you recall that testimony?

_5   A.   Yes, I do.

1    Q.   Back in February of 2014 you had ordered Chief Trombi to

2    find out information about who at MCSO was using video cameras,

3    correct?

4    A.   Correct.

5    Q.   And the reason you did that is because you were looking

6    into whether MCSO could get some state grant money to purchase

7    additional video cameras, is that right?  Or to report on a

8    grant that you were given for video cameras?

9    A.   I believe that either we had been accepted for the grant or

10   the cameras had been delivered.

11   Q.   And you were required to provide some information about

12   existing camera usage for purposes of grant reporting?

3    A.   There was something to that effect.

14   Q.   All right.  But in any event, you do know that you directed

15   Chief Trombi, in February of 2014, to gather information about

16   who was using video cameras at MCSO, and for what purposes,

17   correct?

18   A.   Correct.

19   Q.   Now, on May 14, 2014, the subject of video recordings was

20   central, correct?

21   A.   Correct.

22   Q.   You did not mention in your meeting with the monitor team

23   that just three months earlier you had already been engaged in

24   an effort to gather information about video cameras, correct?

.5   A.   Correct.

1    Q.    That would have been very useful information to have if

2    your job on May 14, 2014, was to gather video recordings,

3    correct?

4    A.    Correct.

5    Q.    But you didn't bring it up.

6    A.    I did not.

7    Q.    So we saw Exhibit 38, which was the May 14, 2014, e-mail

8    that Dave Trombi sent out, right?

9          I'm going to ask you now to turn to Exhibit 36,

10   please.

11         Do you have it in front of you, sir?

12   A.    Yes, ma'am.

3    Q.    Okay.  This is an e-mail -- well, it looks like it was sent

14   out by Larry Farnsworth on May 17, 2014, but in the text of the

15   e-mail it says from Deputy Chief Trombi.  Do you see that?

16   A.    Yes, I do.

17   Q.    Who's Larry Farnsworth?

18   A.    Larry Farnsworth was the commander of the court compliance

19   implementation division at the time.

20   Q.    And he was sending -- well, first, were you aware of this

21   e-mail at the time that it went out?

22   A.    I'm not sure.

23   Q.    Do you understand the e-mail, based on your review of it

24   now, to be from Chief Trombi?

5    A.    Yes.

1    MS. WANG: Can we publish this, please.

2  BY MS. WANG:

3  Q. In the text of it, Chief Trombi writes: As a follow-up to

4  my previous directive regarding collection of video captured

5  through the use of personally owned and county-issued body or

6  vehicle cameras.

7    Do you see that?

8  A. Yes.

9  Q. Do you understand this to be a follow-up to Dave Trombi's

10  May 14, 2014, e-mail?

11  A. Yes.

12  Q. All right. And this e-mail, the May 17 e-mail, went to a

3   broader distribution group than the May 14 e-mail, correct?

14  A. That's correct.

15  Q. And it was requesting that all MCSO personnel respond to a

16  survey about their video recording practices and video

17  recordings, correct?

18  A. Correct.

19  Q. Now, in this e-mail Chief Trombi gave a direction that each

20  of the recipients should provide a memo with information about

21  the recordings by May 21st, 2014, by 1700 hours.

22    Do you see that?

23  A. Yes, I do.

24    MS. WANG: It's actually, for -- for Mr. Klein, it's

.5  the earlier reference to that date. Thank you.

1  BY MS. WANG:

2  Q.  By May 21, 2014, Chief Trombi had not received 100 percent

3  compliance with this order, correct?

4  A.  Correct.

5  Q.  Indeed --

6        MS. WANG:  Your Honor, may I consult with Ms. Iafrate?

7  There is an exhibit in evidence that is marked attorneys' eyes

8  only, and I just want to ask her about that.

9        THE COURT:  You may.

10        MS. WANG:  Okay.

11        (Pause in proceedings.)

12  BY MS. WANG:

3  Q.  Okay, sir.  Let's turn to Exhibit 42.  Ms. Iafrate advises

14  me there's no issue with publishing that.

15        Let's look at the first page.

16        Highlighting the top, you see that this is a

17  memorandum from Lieutenant Dave Munley, who was deputy

18  commander of Internal Affairs, to Captain Steve Bailey, who was

19  the commander of Internal Affairs, correct?

20  A.  Yes, ma'am.

21  Q.  And it's dated June 13, 2014, correct?

22  A.  Yes.

23  Q.  It's about a month after Dave Trombi's initial e-mail

24  seeking video recordings, right?  May 14 to June 13, about a

5  month?

1    A.    Yes.

2    Q.    Okay.    I'm going to call your attention to the

3    second-to-last paragraph that begins:    "As of June 12th, 2014,"

4    all right?

5            Lieutenant Munley wrote to his commander,

6    Captain Bailey:    "As of June 12, 2014 there are 644 current

7    sworn employees.    As of June 12, 2014 at 0900 hours, 468

8    persons, sworn and volunteers, had reported on whether they had

9    used or had access to audio/video recordings devices during

10   traffic stops from 2007 to present," as stated in the Court's

11   May 15 order.

12           Do you see that?

3    A.    Yes, ma'am.

14   Q.    He then writes:    "Of those 468 persons reporting, 384

15   reported having county-issued devices, and 127 reported having

16   personal devices."

17           Do you see that?

18   A.    Yes, I do.

19   Q.    And he wrote:    "157 memos were pending and put into the

20   system database."

21           Do you see that?

22   A.    Yes.

23   Q.    All right.    And in the next paragraph, beginning on June

24   5th, Lieutenant Munley writes that there is an attachment to

.5   this memo that's a spreadsheet listing employees who had not

1 submitted memos, and that was in response to Chief Trombi's
2 order, correct?

3 A. Correct.

4 Q. Now, sir, did there come a time in June where you had to
5 send out an e-mail to order MCSO personnel to respond to
6 Chief Trombi's order of May 14?

7 A. I vaguely remember something like that.

8 Q. Okay. Let's turn to the second page of this exhibit up on
9 the screen, Exhibit 42. Let's highlight the second paragraph.

10 Lieutenant Munley wrote to Captain Bailey: "On June
11 10, 2014, at 1802 hours, an e-mail message with attached
12 documents was sent out by Chief Deputy Jerry Sheridan to all
3 those employees who had not responded to the directive to
14 submit memos regarding the audio/video device surveys. Chief
15 Deputy Sheridan again directed sworn employees to submit their
16 memos using the attached format no later than Thursday, June
17 12, 2014, by 1500 hours."

18 Do you see that?

19 A. Yes.

20 Q. And you in that e-mail threatened that noncompliance would
21 result in immediate disciplinary action.

22 Do you see that?

23 A. I do.

24 Q. So do you recall now sending out that e-mail on June 10,
.5 2014?

1    A.    Vaguely, ma'am.

2    Q.    Is it fair to say that you had left it to Chief Trombi to

3    send out the orders regarding the collection of video

4    recordings between May 14 and June 10, 2014?

5    A.    Yes.

6    Q.    But on June 10, 2014, you apparently had to step in

7    personally to send out an e-mail, is that right?

8    A.    Yes.

9    Q.    Is it fair to say that is because as the chief deputy, the

10   second in command, you expected people would -- who had so far

11   not complied, would take your directive more seriously since

12   you're a more senior commander?

3    A.    I recall being very angry that we weren't getting the

14   responses quickly enough, and how important this issue was, and

15   that I remember telling Chief Trombi that not only were the

16   deputies who did not respond going to receive discipline, but

17   also their commanders.

18   Q.    Sir, is it true that at the time I deposed you on March

19   20th, 2015, you still had not received responses from all

20   people who were directed to send in a response?

21   A.    I believe so.

22   Q.    To this day, have you received 100 percent responses from

23   those ordered to turn in a memo?

24   A.    I believe there are a few outstanding.

5    Q.    So the answer is no, you have not received 100 percent

1    response rate?

2    A.    That would be correct.

3    Q.    Has anyone been disciplined for noncompliance with the

4    directive to send in video recordings?

5    A.    I don't know.

6              THE COURT:  Ms. Wang, are you at a breaking point?

7              MS. WANG:  I can, yes, Your Honor.

8              THE COURT:  All right.  I think that we need to get

9    Mr. McDonald to his funeral.

10             And so, Mr. McDonald, if you need to leave, we will

11   let you go.  I promise you there will be no more testimony, but

12   I do have an item of business.

3              As I indicated yesterday, I was going to require

14   Ms. Iafrate, Mr. Walker, to give a point of contact so we could

15   have attorney review and production of documents today that I

16   required to be delivered yesterday.

17             I've just been informed that the document

18   representative that Mr. -- that's been provided, I assume they

19   were attorneys you both provided, advised that he's been

20   directed by deputy chief -- or Chief Deputy Sheridan to not

21   release anything until all items are Bates stamped and

22   Ms. Iafrate has seen all items and she approves the release.

23             For reasons I stated yesterday -- and I understand

24   your desire for document control, but for reasons I stated

.5   yesterday, it's incredibly important, I think, first that we

1  get our hands around the documents. I mean, we're talking

2  about some of the issues that we have.

3       And so I'm going to require that those documents be

4  released immediately. I mean, not without your review.

5  Whoever your designated attorney is, get over there and review

6  them. We'll make some sort of a list of the documents that

7  have been provided, and then we can -- we can match them up

8  when you Bates stamp them. But I want those documents

9  provided.

10      Do you have an issue with that, Chief, that we need --

11 that we need to discuss or concerns that you wanted to raise

12 that I should consider?

3       THE WITNESS: No, sir.

14      THE COURT: Okay. Is that okay with you?

15      THE WITNESS: Yes, sir.

16      THE COURT: All right. Do you have any issues,

17 Ms. Iafrate?

18      MS. IAFRATE: Your Honor, it does not take long to

19 Bates stamp documents, and I think that because of the control

20 issues that I have been having regarding releasing documents,

21 that's the safest way to document what's in there.

22      THE COURT: Well, I appreciate that. But nothing that

23 you've tried so far has worked very well, and we don't have

24 documents that we should have had prior to this proceeding. So

5  what I propose is, again, you turn them over. You identify the

1    documents.  We'll give you the receipt.  We'll list the

2    number of pages.  And then we can match them up and Bates stamp

3    them all once we have a control set.

4               Are you okay with that?

5               MS. IAFRATE:  I am, except that I would like to

6    clarify that I believe that what I have been doing has been

7    working since I've started on this case.

8               THE COURT:  Well, and again, I didn't mean by my

9    comment to impugn you in any way, but we certainly don't have

10   all the documents that I ordered to be delivered in February,

11   and here we are at the end of March.  That's my concern.

12              And there has been nothing throughout this case, only

3    a small part of which you've been privy to, that makes me

14   believe that we still have all the documents that are relevant

15   to this case, and I'm not going to put up with it any more, and

16   so we're going to proceed in that way.

17              I appreciate your desire for document control, and I

18   don't mean for my frustration to be reflected upon you

19   personally.  I have no reason to think that you haven't used

20   your best efforts, and I appreciate your belief and your view

21   about Bates stamping documents.

22              We will proceed in the way I've suggested so that we

23   can match up documents and Bates stamp them and get a good

24   control.  But I want those documents delivered immediately

5    while my monitor team is here.

1        THE WITNESS: Excuse me, Your Honor. Can I confer

2   with my counsel for one second? Because I think there's a

3   little confusion.

4        THE COURT: Yeah, absolutely. Absolutely.

5        (Pause in proceedings.)

6        (Off-the-record discussion between the clerk and the

7   Court.)

8        THE COURT: For the record, my deputy clerk informs me

9   that I said we're at the end of March. I do realize we're at

10  the end of April. I'm not a very good detective, either.

11       MS. IAFRATE: We have nothing to add, Your Honor.

12       THE COURT: All right. Thank you.

`3       Then I think we agreed we'll be back at 1:30. Is that

14  a -- we'll see you back at 1:30.

15       THE CLERK: All rise.

16       (Recess taken.)

17       THE CLERK: All rise. Court is now in session.

18       THE COURT: Please be seated.

19       Mr. McDonald, thank you for being back timely.

20       MR. McDONALD: That you think very much, Your Honor,

21  for accommodating me.

22       THE COURT: Before we begin, apparently there's been a

23  miscommunication. Chief, I know you were over trying to

24  facilitate or getting those documents over the noon hour, and

.5  as soon as you left, folks indicated they wouldn't give the

 1  documents until Ms. Iafrate had a chance to review them and

 2  they were Bates stamped, which I think we had already resolved

 3  prior to lunch.

 4          Is there anything you can do to facilitate that

 5  production right away, Chief?  Who is the captain that said he

 6  wouldn't give them?

 7          CHIEF MARTINEZ:  Chief Knight.

 8          THE COURT:  Chief Knight.

 9          MS. IAFRATE:  Your Honor --

10          THE COURT:  Yes, Ms. Iafrate.

11          MS. IAFRATE:  -- may I make a call?

12          THE COURT:  Sure.

 3          MS. IAFRATE:  May I make a call?

14          THE COURT:  Sure, if you don't mind.

15          I'm really trying -- the thought occurred to me over

16  lunch, Chief.  I'm not trying to use these today.  There's

17  going to be too much other stuff.  But I really do think it's

18  important to secure the documents.  So I'm still going to hold

19  to that order, unless you have some reason, Chief, why I

20  shouldn't.  I think it's very important, in light of the

21  history of the case, that we get the documents in a set today.

22          MS. IAFRATE:  From what I understand, Your Honor, at

23  one point there were three requests, and now I think that there

24  are way more requests --

 5          THE COURT:  Yeah, it --

1              MS. IAFRATE:  -- so it's a moving target.

2              THE COURT:  Yeah, it wouldn't surprise me if the

3      requests are coming in fast and furious, because my folks want

4      to get their arms around everything today.  So that may be part

5      of the confusion.  But I'm sure I was clear, and I suspect that

6      the chief deputy went over to try the facilitate that, and

7      there must be some confusion, so if you'll call Chief Knight

8      and we'll wait for you.

9              MS. IAFRATE:  Okay.  And just for your edification,

10     there are three attorneys over there facilitating it also,

11     so --

12             THE COURT:  I appreciate that very much.

3              THE WITNESS:  That might be the confusion, Your Honor,

14     the three attorneys.

15             THE COURT:  They probably need five, right?

16             I'll be back as soon as you return, Ms. Iafrate.

17             (Recess taken.)

18             THE COURT:  Ms. Iafrate.  Thank you.  I understand

19     that the problem's been resolved.

20             MS. IAFRATE:  Thank you.

21             THE COURT:  Appreciate that.

22             Ms. Wang.

23             MS. WANG:  Thank you, Your Honor.

24     BY MS. WANG:

.5     Q.  Good afternoon, Chief Sheridan.

1  A.  Good afternoon.

2  Q.  Chief, would you agree with me that the effort that started

3  on May 14, 2014, to gather video recordings has not

4  successfully gathered all video recordings at MCSO?

5  A.  No.

6  Q.  You would not agree with me?

7  A.  No.

8  Q.  So you contend that the effort that started on May 14th of

9  last year has successfully gathered all video recordings at

10  MCSO?

11  A.  "All" is a very difficult word to define, so when you use a

12  word that is -- and I'm searching for the proper word to

3  describe it -- something that's inclusive of everything, I -- I

14  would not agree with that.

15         I would say that those that were available, those that

16  are available, I would agree with that. I would agree that

17  there are videos, 8,900 of them. I would say it's probably

18  pretty close to all.

19  Q.  So you do agree with me that the effort that started May

20  14, 2014, has not successfully gathered all video recordings of

21  traffic stops at MCSO, right?

22  A.  I don't know if we can ever use the word "all," ever.

23  Q.  Does that mean that you do agree with that statement?

24  A.  Under the context of the question you just asked me, yes.

5  Q.  Now, sir, are you aware that HSU in particular has had

1  problems gathering its video recordings?

2  A. Yes.

3  Q. I'd like to have you take a look at Exhibit 43, which is in

4  evidence.

5        MS. WANG: And if we can publish that, Your Honor.

6        Let's enlarge the top of the memo.

7  BY MS. WANG:

8  Q. Sir, is this a memo from Glenn Powe of the Special

9  Investigations Division to Brian Jakowinicz, also of the

10 Special Investigations Division?

11 A. Yes, it is.

12 Q. Dated June 6th of 2014, correct?

`3 A. Correct.

14 Q. And if we look at the first paragraph that's visible there

15 on the screen, Sergean Powe writes -- first he says that he's

16 been -- the HSU has been tasked with researching how many

17 traffic stop videos they have in their possession and getting

18 the videos to IA.

19        Do you see that?

20 A. Yes, ma'am.

21 Q. And then Sergeant Powe wrote: "This has been a monumental

22 task because members of HSU were issued several methods for

23 recording their contacts."

24        Do you agree that that was true?

.5 A. Yes.

1    Q.   And turning to the next paragraph, Sergean Powe wrote:

2    "Complicating this search is the fact that the HSU squad was

3    developed in 2006, and many of those assigned during the early

4    years have either transferred, resigned, or been terminated

5    since that time."

6         Do you agree with that?

7    A.   Yes.

8    Q.   And later in that paragraph, after he lists the current

9    makeup, or the then-current makeup as of June 6th, 2014:   "I

10   have no knowledge of what system, if any, was in place during

11   those years to track, collect, review, or store these videos."

12        Do you see that and do you agree with it?

13   A.   Yes, ma'am.

14   Q.   And he goes on to say in the last sentence of that

15   paragraph:   "This lack of continuity makes it difficult to

16   ascertain what tracking system was in place over the past eight

17   years."

18        Do you see that?

19   A.   Yes, I do.

20   Q.   And in the next paragraph he also comments on the fact that

21   HSU had previously been housed in the Enforcement Support

22   building and then moved, leaving workstations behind.

23        Do you see that?

24   A.   Yes.

.5   Q.   And do you agree with Sergeant Powe's conclusion that that

1   complicated the search for videos?

2   A.   Yes.

3   Q.   Thank you.

4        Chief Deputy Sheridan, if a commander who is

5   subordinate to you did what you did on May 14th, 2014, what

6   would you do?

7   A.   What is it you're accusing me of doing?

8   Q.   I'm just asking you what you would do if one of your

9   subordinates, a commander, had been in court, taken direction

10  from a federal judge, and then left the courthouse, took action

11  contrary to the direction, and then made statements in a letter

12  to the court-appointed monitor that were not true.

13       What would you do if one of your subordinate

14  commanders did that?

15  A.   I believe we discussed this issue during my deposition, and

16  I would do the same thing that we discussed that day.

17  Q.   And what would that be, sir?

18  A.   I would take a look at the totality of the circumstances,

19  what that individual knew at the time.  I would take the

20  individual's mindset, and in my case -- this isn't a

21  hypothetical situation.  We're talking about me and what my

22  mindset was.  And I know that I believed that I was following

23  the Court's order, and I was doing it as quickly as possible.

24  And there were some other mitigating issues that complicated

.5  the situation -- for example, forgetting to advise the monitor

0697

1  about what I told Chief Trombi to do -- and I would take no

2  action.

3  Q.  All right.  You said that you would take some intermediate

4  steps between taking no action.

5      I'm sorry.  You said that you would take some steps

6  before concluding that you should take no action, is that

7  right?

8      Why don't we do this?  Can we please play the video of

9  your deposition on March 20th, page 58, lines 2 to 9.  This is

10  clip Sheridan 1.

11      (Video clip played as follows:)

12      "Question:  Okay.  What would you -- tell me exactly

3  what steps you would take if someone -- let's say you were the

14  sheriff, and your second in command did what you did on May

15  14th and you found out about it.  What steps would you take?

16      "Answer:  Well, the short answer is probably nothing."

17      (Video clip concluded.)

18  BY MS. WANG:

19  Q.  Sir, do you stand by that testimony?

20  A.  Yes, ma'am.

21  Q.  And if you were the sheriff and your chief deputy did what

22  you did on May 14th, you would take his word for it that what

23  he did was a matter of fatigue, confusion?

24  A.  Yes.  Because if in this hypothetical situation I was the

.5  sheriff for 22 years and I worked very closely with this

1    individual who was the chief deputy for 20 of those 22 years

2    and he's never given me one reason to ever doubt his integrity,

3    his credibility, his work ethic, or any other reason

4    whatsoever, yes, I would take his word.

5    Q.  Do you believe that undivided loyalty should be rewarded in

6    that situation?

7    A.  I don't believe that's what we're talking about here is

8    loyalty.  What we're talking about is knowing an individual's

9    integrity level.

10   Q.  And based on someone's past record, you would take their

11   word for when they give you a version of events --

12   A.  Yes.

3    Q.  -- is that right?

14   A.  Yes, ma'am.

15   Q.  You would not investigate?

16   A.  No, I would not.

17   Q.  Sir, I'm going to turn to the subject of the Court's

18   preliminary injunction order now.

19          On December 23rd, 2011, you were the chief deputy,

20   correct?

21   A.  Yes, ma'am.

22   Q.  And are you aware sitting here now that Judge Snow issued a

23   preliminary injunction order on that date?

24   A.  Yes, I am.

5    Q.  When did you become aware of that preliminary injunction

1  order for the first time?

2  A.  The first time I recall being aware of that was during a

3  deposition that I gave in March of 2014 with the Department of

4  Justice.

5  Q.  And that was a deposition you gave in the United States

6  versus Maricopa County case?

7  A.  That's correct.

8  Q.  So your testimony is that the judge issued his order on

9  December 23rd of 2011, and you did not find about it -- find

10 out about it in 2012, or 2013, or in 2014 until your deposition

11 in March?

12 A.  I'm saying that's the first time I recall hearing about it

13 and actually seeing the document itself.

14 Q.  Sir, I'm going to have you --

15       Do you have Exhibit 187 in front of you?

16       MS. WANG:  This is in evidence, so, Your Honor, I'd

17 ask that this be published.

18       THE COURT:  It may be published.

19       MS. WANG:  Thank you.

20       Let's enlarge the first half of this.

21 BY MS. WANG:

22 Q.  Sir, do you see that this is an e-mail that Tim Casey wrote

23 to you and others on Friday, December 23rd, 2011, at 5:22 p.m.?

24 A.  Yes, ma'am.

25 Q.  And do you also see that this e-mail indicates that the

1  order, the judge's order, was attached?

2  A.  Yes.

3  Q.  And do you also see that Tim Casey marked this e-mail as

4  being of high importance?

5  A.  Yes.

6  Q.  Do you contend that you never saw this e-mail at the time

7  it was sent?

8  A.  That's correct.

9  Q.  Now, I note that in the first sentence Mr. Casey wrote --

10  he indicates that this is a follow-up to his recent telephone

11  call.

12        Do you see that?

13  A.  Yes.

14  Q.  Do you recall having a telephone conversation with

15  Mr. Casey on the subject of this litigation?

16  A.  No, ma'am.

17  Q.  Or the motions that led up to the Court's order on December

18  23rd, 2011?

19  A.  No, ma'am, I don't.

20  Q.  Well, as of that date you knew who Mr. Casey was, correct?

21  A.  Yes.

22  Q.  You knew that he was the lawyer representing the MCSO and

23  Sheriff Arpaio, correct?

24  A.  I did.

5  Q.  And as of December 23rd, 2011, you were aware of this

1    lawsuit, right?

2    A.   Yes.

3    Q.   And you were aware that it is a proposed class action

4    alleging MCSO was engaged in a pattern and practice of racial

5    profiling, correct?

6    A.   No.

7    Q.   Did you know the case was about racial profiling?

8    A.   No.

9    Q.   Did you consider this lawsuit to be a serious matter as of

10   December 23rd, 2011?

11   A.   Well, any lawsuit is serious, but my understanding of the

12   lawsuit was different than what I know it to be today.

'3   Q.   Well, what did you think it was about on December 23rd of

14   2011?

15   A.   It's a little bit of a long story, because when I first

16   heard about the lawsuit I was the chief of custody running the

17   jails, and there was some discussion about Mr. Melendres being

18   stopped during a traffic stop, and he was detained because he

19   was here on a visitation visa.  Our 287(g) deputies noticed

20   that he was attempting to gain work, and that they called ICE,

21   and ICE asked them to bring Mr. Ortega down to their

22   headquarters, which was downtown Phoenix, and I believe they

23   were in Cave Creek --

24   Q.   And you believed the lawsuit was limited to the facts of

5    that particular stop?

1  A.  Yes.  Can I finish?

2  Q.  Of course.

3  A.  Okay.  And that when Mr. Ortega was brought down to ICE

4  headquarters in Phoenix, they let him -- they released him.

5  And that's what my understanding was what this lawsuit was

6  about.

7  Q.  All right.  So you understood the lawsuit did relate to

8  HSU's immigration enforcement activities?

9  A.  Yes, ma'am.

10  Q.  And were you aware at the time that Tim Casey represented

11  the sheriff and MCSO in a number of other lawsuits, is that

12  right?

3  A.  I'm not sure about that.  I don't believe so.

14  Q.  Well, you understood that Tim Casey was an attorney who

15  represented MCSO and the sheriff, correct?

16  A.  I knew he did in this case.

17  Q.  And so you knew that this litigation existed as of the date

18  of the judge's order, correct?

19  A.  That's correct.

20  Q.  And you, I believe, just testified that every lawsuit

21  against MCSO is a serious matter, correct?

22  A.  Yes.

23  Q.  But your testimony is that when you got an e-mail from an

24  attorney representing MCSO in a lawsuit, you did not look at

_5  it?

1    A.   That's correct.

2    Q.   Sir, this was not the only e-mail that you received from

3    Mr. Casey about this lawsuit at around the December 2011 to

4    January 2012 time frame, is it?

5    A.   I don't know.

6    Q.   Let me show you -- if you have in front of you Exhibit 34.

7    This is a privilege log that your attorneys produced to the

8    plaintiffs in this case.  And I believe -- let me just

9    double-check that this is in evidence.

10             MS. WANG:  It is in evidence, Your Honor, and I'd ask

11   that it be published.

12             THE COURT:  It is published.

3              MS. WANG:  Thank you.

14   BY MS. WANG:

15   Q.   Let's turn to the second page.  Sir, do you see that in the

16   second-to-last line of this privilege log it indicates that Tim

17   Casey sent you an e-mail on January 30th, 2012?

18             Do you see that?

19   A.   Yes, ma'am.

20   Q.   And the subject matter of the e-mail was settlement

21   discussions with plaintiffs --

22             THE COURT:  Ms. Wang, I have an objection.

23             MS. WANG:  Oh.

24             MS. IAFRATE:  May we have a discussion sidebar

.5   regarding a potential serious matter that I have overlooked?

1            THE COURT: Yes.

2            Do you need to bring a document with you or something?

3            MS. IAFRATE: I do not.

4            (Bench conference on the record.)

5            THE COURT: What's up?

6            MS. IAFRATE: Your Honor, Tim Casey is in the

7     courtroom.

8            THE COURT: Yeah.

9            MS. IAFRATE: At one time he was on plaintiffs'

10    witness list. Now, with the recent assertion regarding

11    attorney-client privilege --

12           THE COURT: I think that's a legitimate point.

13           MS. WANG: Should I exclude him?

14           THE COURT: Yes.

15           MS. WANG: We don't have any objection, Your Honor.

16           MS. IAFRATE: I'm sorry to interrupt, but --

17           THE COURT: No, I think it's timely raised.

18           (Bench conference concluded.)

19           THE COURT: Mr. Casey, you, as a member of the public,

20    would normally have every right to be here. However, there is

21    a dispute about whether or not you will be a witness in this

22    matter as to the extent of any waiver of the attorney-client

23    privilege and other matters that may -- that have been alleged

24    and asserted about which I have not yet decided.

.5           Because you are a potential witness in this matter and

1    the rule of exclusion has been invoked, while we appreciate

2    your attendance, we're going to excuse you.

3              Do you understand that?

4              MR. CASEY:  I do, sir.

5              THE COURT:  Thank you very much.

6              MS. CLARK:  Does that include me, Judge?

7              THE COURT:  No, it does not include you.

8              MR. CASEY:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10             Ms. Wang.

11             MS. WANG:  Thank you, Your Honor.

12   BY MS. WANG:

3    Q.  So, Chief, we were looking at the second page of

14   defendants' privilege log and I was asking whether you

15   recognize that it indicates that on January 30th, 2012, you

16   received an e-mail from Tim Casey regarding settlement

17   discussions with plaintiffs referencing relief previously

18   granted by the Court.

19             Do you see that?

20   A.  Yes, ma'am.

21   Q.  Do you contend that you did not look at that e-mail from

22   Tim Casey?

23   A.  I -- I don't recall getting an e-mail.

24   Q.  Sir, at that time you were the chief deputy, correct?

_5   A.  Yes.

1  Q.  Could this litigation have been settled without your

2  approval?

3  A.  Certainly.

4  Q.  Does the sheriff have to approve settlements of lawsuits

5  against MCSO and him?

6  A.  That would normally be who would decide the ultimate

7  decision.

8  Q.  And your testimony is that you would not have been involved

9  in that decision as of January of 2012?

10  A.  I could or could not be.  Sometimes the insurance carrier

11  makes decisions on settlement of lawsuits and doesn't consult

12  the sheriff or myself.

3  Q.  Well, was there any -- let me ask you this:  You've

14  testified, I believe, during depositions, that the sheriff does

15  not handle operational matters of the MCSO, correct?

16  A.  Correct.

17  Q.  He delegates that to you, correct?

18  A.  Yes, ma'am.

19  Q.  This lawsuit concern -- even on your understanding as of

20  January of 2012, this lawsuit concerned operations of MCSO,

21  correct?

22  A.  Yes.

23  Q.  All right.  Sir, you sat through the testimony throughout

24  this hearing, correct?

_5  A.  I did.

1    Q.   Did you hear Sergeant Mike Trowbridge testify that --

2                (Pause in proceedings.)

3                MS. WANG:   Your Honor, I apologize for interrupting

4    the testimony.   I do believe that because of the privilege

5    issues that are in dispute and about to be teed up in briefing

6    that Mr. Liddy probably should be excluded from the courtroom

7    as well.

8                THE COURT:   Objections?

9                MS. IAFRATE:   No, Your Honor.

10               MR. COMO:   I have no objection, Your Honor.

11               MR. WALKER:   No objection, Your Honor.

12               THE COURT:   Well, let me ask:   I haven't yet granted

3    Mr. Liddy's motion to withdraw, and so is there going to be any

14   objection to his motion to withdraw?   If he -- if I granted the

15   motion to withdraw I can hardly exclude him.

16               (Pause in proceedings.)

17               MS. WANG:   Your Honor --

18               THE COURT:   I suppose that doesn't preclude his

19   testimony if I in fact determine he's waived the privilege, but

20   it does preclude my excusing him from the courtroom at this

21   point.

22               MS. WANG:   Your Honor, we would withdraw our request

23   to exclude him, based on the reasons that Your Honor just laid

24   out.   And if he does end up testifying as a witness, then Your

.5   Honor can take into account the fact he has been here for -- up

1    until now, largely.

2           THE COURT:  All right.  Mr. Liddy, did you want to be

3    heard, since you're still an attorney in this matter?

4           MR. LIDDY:  Your Honor, I've been waiting all week to

5    hear this.

6           THE COURT REPORTER:  I didn't hear that very well,

7    Judge.

8           THE COURT:  Mr. Liddy said that he has been waiting

9    all week to hear this.

10          You may proceed.

11          MS. WANG:  Thank you, Your Honor.

12          THE COURT:  Did you want to be heard, Mr. McDonald, on

3    something?

14          MR. McDONALD:  Yes.  I didn't want Mr. Liddy to be

15   excluded.  I hate to rain on his parade, but the potential down

16   the road, I think Mr. Liddy needs to be here.

17          THE COURT:  Well, I --

18          MR. McDONALD:  I'm not sure whether you told him to

19   leave or not.

20          THE COURT:  I said he could stay.

21          MR. McDONALD:  Oh.  Okay.

22          MR. LIDDY:  Your Honor, does that mean I'm prohibited

23   from leaving?

24          THE COURT:  Although I appreciate the break in the

.5   serious nature of this suit, I'll remind everybody that it's

1    not a stand-up routine.

2            MR. LIDDY:   No, Your Honor, I'm quite serious.

3            THE COURT:   Are you?  You are not prohibited from

4    leaving, Mr. Liddy.  As I said, we -- we've got you in sort of

5    a strange capacity.  I excused you from counsel table based on

6    your assertion that you had ethical problems, and as far as I

7    know you haven't been participating in the defense actively

8    other than to assist the parties with respect to documents,

9    information, preparation, and other matters.  And I assume that

10   you'll continue to do that in good faith as you indicated to

11   the Court you would.  But that doesn't mean --

12           MR. LIDDY:   I have an ethical obligation to do so,

3    Your Honor.

14           THE COURT:   But that does not mean that I'm

15   prohibiting you from leaving, as long as you can come or go

16   consistent with your ethical obligations.

17           MR. LIDDY:   Thank you, Your Honor.

18           THE COURT:   Ms. Wang.

19           MS. WANG:   Thank you, Your Honor.

20   BY MS. WANG:

21   Q.  Sir, you heard Sergeant Trowbridge testify earlier this

22   week that he attended a meeting in Sheriff Arpaio's office

23   where the preliminary injunction was discussed and that you

24   were present.

.5           Do you recall that testimony?

1    A.  Yes, ma'am.

2    Q.  Do you disagree with Sergeant Trowbridge's testimony?

3    A.  I don't recall being at that meeting.

4    Q.  Do you generally know Sergeant Trowbridge to be truthful?

5    A.  Yes.

6    Q.  Sir, you also heard Chief Sands testify that he had a

7    meeting with you and Sheriff Arpaio to discuss the preliminary

8    injunction order.

9         Do you recall that testimony?

10   A.  I do.

11   Q.  And do you recall being in such a meeting with Sheriff

12   Arpaio and Chief Sands discussing the preliminary injunction

3    order?

14   A.  I do not.

15   Q.  Do you generally know Chief Sands to be honest and

16   truthful?

17   A.  I guess so.

18         MS. CLARK:  Excuse me.  I'm asking for a sidebar with

19   Your Honor and counsel.

20         THE COURT:  This is an exciting afternoon.  Sidebar,

21   please.

22         (Pause in proceedings.)

23         THE COURT:  It will be my inclination, Mr. McDonald,

24   to let you join, but first -- and any other limited-purpose

_5   counsel who wants to, I'm going to check to see if there's any

1   objection to that request.

2           (Bench conference on the record.)

3           THE COURT:  Any objection to having limited purpose

4   counsel join?

5           MS. IAFRATE:  None.

6           THE COURT:  Anybody else?

7           MS. WANG:  No.

8           (End bench conference.)

9           THE COURT:  All limited purpose counsel who'd care to

10  join may do so.

11          Let me tell you, Ms. Clark, as they're coming up, this

12  microphone is not terrifically sensitive, so you're going to

3   need -- there's white noise in the courtroom --

14          MS. CLARK:  Oh, okay.

15          THE COURT:  -- but I'm going to need to have you come

16  up close --

17          MS. CLARK:  Okay.

18          THE COURT:  -- and speak low enough that not everybody

19  can hear, but loud enough that this assemblage can hear.

20          All right?

21          MS. CLARK:  Thanks for the tip.  Judge, it's really

22  just some guidance that I'm seeking for you.  Just a few

23  minutes ago Mr. Casey was excluded from the courtroom --

24          THE COURT:  Yes.

_5          MS. CLARK:  -- because he may be a potential

1   witness --

2          THE COURT:  That's correct.

3          MS. CLARK:  -- in a future proceeding.  And I'm his

4   counsel, and as far as I know, an attorney can't keep secrets

5   from their client.  So if I'm staying and listening to the

6   proceedings, I think I have a problem, because I can't keep

7   what I hear from my client.

8          So I guess if the Court orders me to keep it secret

9   from my client, then I'm under a court order to do so, but in

10  the absence of that, I don't want Mr. Casey to lose his chosen

11  counsel. .

12         On the other hand, I'm here to attend the proceedings

3   to represent Mr. Casey and his interests, and I've notified

14  counsel that I may be asking to address the Court today on

15  Mr. Casey's behalf.

16         THE COURT:  Is there any objection -- I mean, the rule

17  of exclusion has been invoked, and I think properly so,

18  Ms. Iafrate.  Do you have an objection to Ms. Clark staying in

19  the room, even though she feels like she might have to give

20  summaries of what she hears to her client?

21         MS. IAFRATE:  I do not have an objection.

22         THE COURT:  Does anyone else have such an objection?

23         MR. WALKER:  No objection .

24         MS. WANG:  No, your Honor.

.5          THE COURT:  Well, first off, would you please identify

1  yourself, Mr. Walker, for the record?  Otherwise, Gary has no

2  idea who you are.

3          MR. WALKER:  Richard Walker on behalf of the County.

4  We have no objection.

5          MS. WANG:  Cecillia Wang on behalf of plaintiffs.  No

6  objection.

7          MR. STEIN:  Lee Stein on behalf of Chief Sheridan.  No

8  objection.

9          MR. McDONALD:  Mel McDonald on behalf of Sheriff Joe

10 Arpaio.  No objection.

11         MR. EISENBERG:  David Eisenberg on behalf of

12 Lieutenant Sousa.  No objection.

3          MR. COMO:  Greg Como, no objection.

14         THE COURT:  All right.

15         MS. CLARK:  Okay.  Thank you very much.

16         (Bench conference concluded.)

17         THE COURT:  Before we try to resume again examination,

18 is there anybody else who wants to be heard on anything?

19         Ms. Wang.

20         MS. WANG:  Thank you, Your Honor.

21 BY MS. WANG:

22 Q.  Sir, do you believe that it is important for you to stay

23 current on local news in the Phoenix and Arizona areas?

24 A.  Yes.

_5 Q.  It could be important for your work as a law enforcement

1   executive, correct?

2   A.  Yes.

3   Q.  And as of December 23rd, 2011, you subscribed to The

4   Arizona Republic newspaper, correct?

5   A.  I did.

6   Q.  You had it delivered to your home?

7   A.  Yes.

8   Q.  Sir, I'm going to have you take a look at Exhibits 120,

9   122, and 124.  These are not in evidence, and I actually don't

10  intend to move them into evidence.

11          Do you see that -- well, first let me ask you:  Are

12  you aware sitting here today that the hearing on the motions

3   that led to the preliminary injunction order took place on

14  December 22nd of 2011?

15  A.  No.

16  Q.  You are not aware of that sitting here right now?

17  A.  No.

18  Q.  Okay.  You should see in front of you that on December 22nd

19  of 2011, The Arizona Republic ran an article on the front page

20  of the Valley and State section.

21  A.  I'm sorry, which --

22  Q.  Exhibit 120, sir.

23  A.  Can you repeat your question, please?

24  Q.  Yes, sir.  Do you see there that based on Exhibit 120, you

.5  can see that on December 22nd of 2011 The Arizona Republic ran

1. a story on the front page of the Valley and State section that
2. concerned this litigation.

3.          Do you see that?

4. A.   Yes, ma'am.

5. Q.   Do you also see on the second page of Exhibit 120 that the
6. article mentions that the hearing in this case was happening
7. just one week after the U.S. Department of Justice released its
8. finding that MCSO had engaged in a wide-ranging pattern of
9. discrimination against Latinos?

10.          Do you see that?

11.          MS. IAFRATE:   Objection, Your Honor, hearsay.

12.          MS. WANG:   I'm asking him if he sees that on
3. Exhibit 120.

14.          THE COURT:   I'll overrule the objection.   I don't
15. think it's asking for the truth of the matter asserted.

16.          MS. WANG:   Thank you, Your Honor.

17.          THE WITNESS:   Yes, I do.

18. BY MS. WANG:

19. Q.   Now, sir, you were very much engaged in MCSO's response to
20. that Justice Department investigation, correct?

21. A.   Yes, I was.

22. Q.   And is it your testimony you did not see this page B1
23. article in The Arizona Republic on December 22nd, 2011?

24. A.   I don't recall seeing it.

_5. Q.   Take a look at Exhibit 122.

1        Exhibit 122 indicates that on December 23rd, 2011, The

2  Arizona Republic ran another page B1 -- excuse me -- article

3  that also discussed this litigation.

4        Do you see that?

5  A.  Yes.

6  Q.  And do you contend that you didn't see this article either?

7  A.  I don't recall seeing it, no.

8  Q.  All right.  Take a look now at Exhibit 124.

9        Sir, Exhibit 124 indicates that on December 24th,

10  2011, The Arizona Republic ran a front-page story, page A1

11  story, that had a headline:  Judge curbs MCSO tactics.

12  A.  I'm sorry, you said 120- --

3  Q.  124, I believe it is.

14  A.  Maybe 121?

15  Q.  Let's see.  I beg your pardon, it's 123.

16        Thank you, Mr. Young.

17        Exhibit 123, sir.

18  A.  I have 121 and 124.  I don't see 123.

19        MS. WANG:  Oh, I beg your pardon.  Could I ask the

20  clerk to hand over Exhibit 123?  Apologies.

21        THE CLERK:  (Handing exhibit to witness.)

22        THE WITNESS:  Thank you.

23        THE CLERK:  You're welcome.

24        THE WITNESS:  Okay.

_5  BY MS. WANG:

1   Q.  Do you see it now, sir?

2   A.  Yes.

3   Q.  So you see that this Exhibit 123 indicates that on December

4   24th, 2011, The Arizona Republic ran a front-page story titled:

5   Judge curbs MCSO tactics?

6   A.  I do.

7   Q.  And it reflects on Judge Snow's preliminary injunction

8   order that issued the previous day, the 23rd?

9   A.  Yes.

10   Q.  And did you see this when the article ran in The Republic

11   on the front page?

12   A.  I'm sorry, I don't recall.

3   Q.  Is it possible you saw these articles at the time they were

14   published?

15   A.  I could have.

16   Q.  Now, are you aware sitting here now that the sheriff filed

17   an appeal of the preliminary injunction order in January 2012?

18   A.  I'm sorry. Can you state that again?

19   Q.  Are you aware sitting here now that the sheriff filed an

20   appeal to the U.S. Court of Appeals for the Ninth Circuit of

21   Judge Snow's preliminary injunction order --

22   A.  Yes.

23   Q.  -- and that -- and that appeal was filed in January 2012?

24   A.  Yes, I'm aware of that.

_5   Q.  Do you contend you did not know about the filing of that

1    appeal at the time?

2    A.   I -- I don't recall anything about that.

3    Q.   And are you aware sitting here now that the U.S. Court of

4    Appeals affirmed Judge Snow's order in September of 2012?

5    A.   Yes, I'm --

6    Q.   In other words, MCSO lost its appeal.  Do you understand

7    that?

8    A.   Yes, ma'am.

9    Q.   Do you contend you were not aware that MCSO lost a case in

10   the U.S. Court of Appeals on the preliminary injunction order

11   in September of 2012?

12   A.   That's what I'm saying.

3    Q.   And -- well, you were aware, I believe, that Judge Snow

14   heard the trial in this case in the summer of 2012.

15                   Do you know that?

16   A.   I knew there was a trial, yes.

17   Q.   You were aware that the trial was happening?

18   A.   Yes, ma'am.

19   Q.   And are you also aware that in May of 2013, Judge Snow

20   issued his trial ruling?

21   A.   Yes.

22   Q.   And you read that order, correct?

23   A.   I did.

24   Q.   You read the whole thing?

_5   A.   Yes, ma'am.

1    Q.  And after reading it you still were not aware that there

2    was an earlier preliminary injunction order?

3    A.  That's correct.

4    Q.  Sir, you have -- in January of 2014 you printed an op-ed

5    piece in The Arizona Republic, correct?

6    A.  I did.

7    Q.  Can you please take a look at Exhibit 147.  And let me know

8    if that is your op-ed piece in The Arizona Republic dated

9    January 12th, 2014.

10   A.  Yes, it is.

11          MS. WANG:  Your Honor, I'd move the admission of

12   Exhibit 147 into evidence.

3           MS. IAFRATE:  No objection, Your Honor.

14          MR. WALKER:  No objection.

15          MR. COMO:  No objection.

16          THE COURT:  Exhibit 147 is admitted.

17          (Exhibit No. 147 is admitted into evidence.)

18   BY MS. WANG:

19   Q.  Sir, in this article -- excuse me, this op-ed you

20   mischaracterized or misstated the Court's findings of fact,

21   correct?

22   A.  I did.

23   BY MS. WANG:

24   Q.  And you also said that MCSO was appealing the trial ruling,

_5   correct?

0720

1  A.  I did.

2  Q.  You criticized the U.S. District Court, correct?

3  A.  Unfortunately, I did.

4  Q.  And you criticized the U.S. Court of Appeals for the Ninth

5  Circuit, correct?

6  A.  Yes, ma'am.

7  Q.  All right.  Now, a few months earlier, October 18th and

8  19th, 2013, MCSO conducted a saturation patrol.

9       Do you recall that?

10  A.  I do.

11  Q.  You spoke at a briefing before that operation?

12  A.  Yes.

3  Q.  And you got in trouble with the Court for some statements

14  you made during that, correct?

15  A.  That would be an understatement, yes.

16  Q.  Okay.  I would like to ask you some very specific questions

17  about what you said at that briefing, sir, and I will try to be

18  as brief as I can.

19       Now, the -- the briefing was for MCSO deputies who

20  were participating in that saturation patrol, correct?

21  A.  Correct.

22  Q.  They were going to be making traffic stops during that

23  patrol, correct?

24  A.  Yes, ma'am.

25  Q.  And this patrol happened just a few days after the Court

1  issued its supplemental injunction, the October 2013 order,

2  correct?

3  A.  That's right.

4  Q.  And during this briefing for deputies you -- again you

5  mischaracterized the findings in of fact in the Court's order

6  correct?

7  A.  I did.

8  Q.  You called the Court's order ludicrous and crap, is that

9  right?

10  A.  I did.

11  Q.  And you said that it was Judge Snow who violated the

12  Constitution, is that right?

3  A.  I did.

14  Q.  Now, here's where I get to the specific questions.  I'm

15  going to play some of the statements you made.

16          MS. WANG:  Can we please play clip 240C?

17          MR. COMO:  What's the number, Judge?  I don't think

18  that's been admitted into evidence, and I don't even have it on

19  my list.

20          MS. WANG:  I believe -- oh, it's 204.  I'm so sorry.

21  I'm having problems with exhibits today.  I apologize to the

22  Court and to everyone.  204C.

23          THE COURT:  Maybe you wouldn't make much of a

24  detective, either.

5          MS. WANG:  That might be right.  Maybe on a better

1  day.

2        THE COURT:  Still don't have 204 admitted.

3        MS. WANG:  Oh, that's right.  It's not admitted.

4        Your Honor, I would ask that as we did with the

5  sheriff, that we could play a short segment of it and ask the

6  chief deputy if he recognizes himself.

7        THE COURT:  Okay.

8        MS. WANG:  204C, please.

9        (Video clip played as follows:)

10       CHIEF DEPUTY SHERIDAN:  One thing I wanted to point

11  out when Captain Lopez was talking --

12       (Video clip stopped.)

3  BY MS. WANG:

14  Q.  Chief, do you recognize yourself on this video?

15  A.  Yes, ma'am.

16  Q.  And does this appear to be the briefing that we've been

17  talking about?

18  A.  Yes, it does.

19       MS. WANG:  Okay.  Your Honor, I'd ask that we play

20  the -- the clip and then I can ask him questions about it.

21       THE COURT:  Any objection?

22       MS. IAFRATE:  Just the rule of inclusion, Your Honor.

23       THE COURT:  Again, as with previous clips, if you want

24  to show more of it, I'm happy to have you do more on your

.5  cross-examination.  And I'll request that plaintiffs make it

1  available to Ms. Iafrate if she desires to do that.

2  MS. WANG: I believe we did exchange with the

3  defendants all of the exhibits, including the entire video.

4  THE COURT: Thank you.

5  MS. WANG: Okay. Could we start from the very

6  beginning.

7  THE COURT: Yes.

8  (Video clip played as follows:)

9  CHIEF DEPUTY SHERIDAN: One thing I wanted to point

10  out when Captain Lopez was talking about filling out the

11  ethnicity on the contact form, there's two areas where we're

12  concerned about ethnicity on people. Now, the Court doesn't

3  want us to ask. I think it's absurd that we're supposed to

14  guess. They wanted us -- originally the ACLU wanted us to use

15  the last name. Well, I don't know about you, but if you're a

16  female and you're a, let's say, a black female and you marry a

17  Hispanic male, you're going to have the last name of a

18  Hispanic -- you know, you don't know. So the bottom line was

19  the compromise with the judge was guess. So it's perceived

20  ethnicity.

21  The reason we're asking you to do it twice, the first

22  time is prior to the traffic stop.

23  Matter of fact, is anybody outside

24  that (indiscernible). I don't want the media to hear.

_5  (Video clip concluded.)

1    BY MS. WANG:

2    Q.  All right.  At the very end of this clip, sir, it's a

3    little bit hard to hear it, but I heard you move toward the

4    door and say:  Is anybody out there?  And then:  I don't want

5    the media to hear this.

6         Did you say that?

7    A.   Yes.

8    Q.  Is it true that -- well, you did not want the media to hear

9    what you were about to say next?

10   A.   That's correct.

11        MS. WANG:  Your Honor, I'd move the admission of

12   Exhibit 204C.

13        THE COURT:  Any objection?

14        MS. IAFRATE:  I thought it already was and I objected

15   to the rule of inclusion on this --

16        THE COURT:  You know, I think what Ms. Wang has done

17   is broken it up into parts, and she's moving them in by parts.

18        MS. IAFRATE:  Oh, okay.  Well, same objection.

19        THE COURT:  All right.

20        MR. COMO:  None, Your Honor.

21        MR. WALKER:  No objection.

22        THE COURT:  204C is admitted.

23        (Exhibit No. 204C is admitted into evidence.)

24   BY MS. WANG:

25   Q.  And before you said that you didn't want the media to hear,

1  you were about to start talking about recording the race and

2  ethnicity of motorists at two points during a traffic stop, is

3  that right?

4  A.  That's correct.

5  Q.  All right.  And this was all to implement Judge Snow's

6  supplemental injunction, correct?

7  A.  Yes, ma'am.

8  Q.  Which had just recently issued, correct?

9  A.  That's correct.

10  Q.  All right.  That order Judge Snow gave did not require race

11  or ethnicity to be recorded twice, correct?

12  A.  That's correct.

3  Q.  That was MCSO's own decision.

14  A.  Yes, ma'am.

15       MS. WANG:  All right.  I would ask that we now play a

16  short clip from 204D, and we'll just stop it again to make sure

17  that Chief Deputy Sheridan recognizes the video.

18       (Off-the-record discussion between the Court and the

19  clerk.)

20       (Video clip played as follows:)

21       CHIEF DEPUTY SHERIDAN:  We want you to do it twice.

22  Before you make a traffic stop.  I've made a few traffic stops

23  in my career.  It's hard to tell who's in that car.  Right?

24  It's hard to tell until you pull them over.  So if you don't

5  know, write down what?

1          A VOICE: "Don't know."

2          CHIEF DEPUTY SHERIDAN: A no. Thank you.

3          You walk up to the car. You talk to Wayne. Well, I'm

4     not guessing what this guy is, let's say I don't know.

5          My perceived ethnicity of this guy, I'm not sure.

6          Oh, there's no -- there's no (laughter). Right? So

7     if you don't know, it's unknown.

8          (Video clip concluded.)

9     BY MS. WANG:

10    Q. Sir, in this video --

11         MS. WANG: Oh, I'd move the admission of 204D, please.

12         MS. IAFRATE: Same objection.

13         MR. WALKER: No objection, Your Honor.

14         MR. COMO: No objection.

15         THE COURT: 204D is admitted.

16         (Exhibit No. 204D is admitted into evidence.)

17         MS. WANG: Thank you, Your Honor.

18    BY MS. WANG:

19    Q. Chief, you were giving the deputies in the room an

20    instruction, correct?

21    A. I assume so. Yeah, I could see where they could say that

22    it was instruction, sure.

23    Q. You were briefing the deputies in preparation for a

24    saturation patrol, correct?

.5    A. That, among other things, yes.

1          MS. WANG:  All right.  I'd now like to play

2     Exhibit 204E.

3          (Video clip played as follows:)

4          CHIEF DEPUTY SHERIDAN:  That's why we're asking you to

5     do it twice.  Once prior to the traffic stop, and two, after

6     the stop is over.  That way, we'll be able to defend ourselves.

7          (Video clip concluded.)

8          MS. WANG:  Your Honor, I'd move for the admission of

9     204E.

10         MS. IAFRATE:  May I just have a standing objection?

11         THE COURT:  You certainly may.

12         MS. IAFRATE:  Thank you.

13         MR. WALKER:  No objection.

14         MR. COMO:  None.

15         THE COURT:  204E is admitted.

16         (Exhibit No. 204E is admitted into evidence.)

17         MS. WANG:  Thank you, Your Honor.

18    BY MS. WANG:

19    Q.  Sir, you were directing deputies to record race or

20    ethnicity twice so that MCSO could defend itself, is that

21    correct?

22    A.  Yes, ma'am.

23    Q.  And you stated in this briefing that it's difficult to tell

24    what race or ethnicity a motorist is until you get up close to

25    them after you've pulled them over, is that right?

1    A.   Yes, ma'am.

2    Q.   And do you believe that's true?

3    A.   I do.

4    Q.   You're aware that MCSO argued in court in this case that

5    deputies can't see the race of people in cars before they

6    actually walk up to the car, is that right?

7    A.   Yes, ma'am.   Over the many years that I was a deputy

8    sheriff in a patrol car, or even driving home today, you know,

9    I play a little game with myself:   Do I know who's in that car?

10   It's very difficult to tell who's in that vehicle until you

11   actually walk up to that car.

12   Q.   So is it fair to say that you expected that if deputies

3    followed your direction, they would generally record "unknown"

14   at the took outset of the stop for the race or ethnicity of the

15   driver?

16   A.   I could expect them to be accurate and honest with their

17   description.

18   Q.   But you believe that in general it's difficult to see the

19   race or ethnicity of a motorist at the point the deputy decides

20   to initiate the stop?

21   A.   Yes.

22   Q.   So isn't it true you could expect that, for the most part,

23   deputies might write "unknown" unless they happen to be able to

24   see the race or ethnicity?

5    A.   Yes.

1        MS. WANG:  And I have one last clip.  Could we play

2    Exhibit 204G.

3            (Video clip played as follows:)

4        CHIEF DEPUTY SHERIDAN:  So i'm sorry you have to do

5    this, I wish we didn't have to waste our time doing this, but

6    it's a necessary evil to fix this.

7            So the other thing and the last thing I'll say is I do

8    not want you to be distracted from what you're doing, from your

9    safety, from watching the hands of the individuals in that

10   vehicle, by all this other outside crap.  I want you to be

11   safe.  The sheriff has already said that once, I'm repeating it

12   again.

3            (Video clip concluded.)

14   BY MS. WANG:

15   Q.  All right, sir.  In that --

16           MS. WANG:  Oh, I'd move the admission of Exhibit 204G.

17           THE COURT:  Admitted subject to continuing objection.

18           (Exhibit No. 204G is admitted into evidence.)

19           MS. WANG:  Thank you, Your Honor.

20   BY MS. WANG:

21   Q.  Chief, in that video you said to the deputies "I'm sorry

22   you have to do this."  By the word "this" you meant record race

23   and ethnicity data as required under the Court's order,

24   correct?

5    A.  No.

1   Q.   What did you mean by "this"?

2   A.   All the documentation, the distractions of the new order,

3   the confusion, the disharmony among the troops. I was very

4   concerned with their safety. That's the reason maybe I was

5   overboard and emotional. It's not my proudest hour during my

6   career. As a matter of fact, I have very few regrets during my

7   entire life on this planet, but this is probably the number one

8   regret. Okay? It was not my finest hour. And to quote, I

9   think it was Albert Einstein, we learn more from our mistakes

10  than we do from our successes.

11         But what I was attempting to do was get their morale

12  back up because we had been given a huge blow in how we were

3   now going to conduct business. A lot of demands were going to

14  be placed and them, a lot of distractions, and I'm very

15  concerned -- I was very concerned about their personal safety

16  during one of the most dangerous things that a deputy does on a

17  daily basis: a routine traffic stop.

18  Q.   So, sir, when you said, "I'm sorry you have to do this," by

19  the word "this" you meant comply with the judge's supplemental

20  injunction, more broadly, not just the race data requirement?

21  A.   Well, if you want to interpret what I just said to that,

22  yes.

23  Q.   Well, I'm asking you for your interpretation.

24  A.   My interpretation was the amount of confusion, the amount

.5  of lack of morale that was permeated through the office caused

1  by the injunction, yes.

2  Q.  All right.  Thank you.

3       Now, at the -- towards the end of the clip you said

4  that you did not want the deputies to be distracted by all this

5  outside crap.  By the words "this outside crap," you were

6  referring to the same issue with, generally, compliance with

7  the judge's supplemental injunction?

8  A.  Yes, ma'am.

9       MS. WANG:  Your Honor, I have more for Chief Deputy

10  Sheridan, but I recognize I've gone over my estimated time.  I

11  know that others have questions.  Some of the matters I want to

12  question him about have to do with matters that are currently

3  confidential, so I would request that I be able to question

14  Chief Deputy Sheridan about those in June, and I can bring my

15  examination to a close now.

16       THE COURT:  All right.  Any objection?

17       MS. IAFRATE:  The procedure, I believe, will be that

18  plaintiffs will not close today?  Is that my understanding?

19       THE COURT:  That seems to be what Ms. Wang is

20  indicating.

21       MS. IAFRATE:  And then in June they will continue with

22  their case in chief and close, and then I can proceed with

23  my --

24       THE COURT:  Yes, with the assumption that, as far as I

.5  know, Ms. Iafrate, every witness that has been called has been

1  called by both parties, which is why I've allowed the unusual

2  double row procedure. So I don't view you as having a

3  case in chief or the plaintiffs as having a case in chief.

4  You're both in your case in chief.

5      MS. IAFRATE: Right. However, I do have other

6  witnesses that --

7      THE COURT: And I'm certainly not precluding you from

8  calling them when we convene in June.

9      MS. IAFRATE: I just wanted to make certain that the

10  procedure was that if they had further in their proving the

11  burden, that they would continue on in June first and then

12  close so that then I would start mine.

13      THE COURT: Yeah, I presume that's the case. If

14  you're thinking about, for instance, making motions, you can't

15  make them yet because you haven't produced the documents, and

16  as we've discussed before, that's the deal.

17      And apparently we've got Ms. Wang, who wants to sit

18  down, has other questions that pertain to matters that she

19  wants to be cautious about still being under seal. I think

20  that's actually to the department's benefit at this point, but

21  I don't make those calls, you do. I want to give you the

22  opportunity to object.

23      MS. IAFRATE: Ms. Wang and I have already discussed

24  it, and I agreed.

.5      THE COURT: All right.

1          Mr. Walker?

2          MR. WALKER:  No objection, Your Honor.

3          MR. COMO:  I have no objection, Your Honor.

4          THE COURT:  All right.

5          MS. WANG:  All right.  I have nothing further right

6    now.

7          THE COURT:  Ms. Iafrate.

8          MS. IAFRATE:  Your Honor, I have one housekeeping

9    matter before I start.

10         THE COURT:  Yes.

11         MS. IAFRATE:  Your Honor, yesterday you asked some

12   questions of Sheriff Arpaio and handed -- I don't know if you

3    handed him an article, but we received it at counsel table.

14         THE COURT:  Yeah.  Yeah, I -- I gave the sheriff a

15   copy, too, just to refresh his recollection.  Because I used it

16   to refresh his recollection and it did refresh his

17   recollection, I didn't introduce it into evidence.  I have no

18   problem if you want to do that to indicate what it was.

19         MS. IAFRATE:  Well, I --

20         THE COURT:  I think I did say it was a Stephen Lemons

21   New Times article.  I think I gave the date of the article, and

22   I've got a copy right here if you need me to identify it again.

23         MS. IAFRATE:  I would prefer to have it entered into

24   evidence, Your Honor, at least marked as an exhibit, not

5    entered into evidence.  But my question to you is this.

1          THE COURT:  Um-hum.

2          MS. IAFRATE:  You had some very specific questions for

3    Sheriff Arpaio as it related to certain matters.

4          THE COURT:  Yes.

5          MS. IAFRATE:  I do not know if you have those same

6    questions for Chief Sheridan, or if I should go into those or

7    wait until you have your opportunity and then to follow up.

8          THE COURT:  Well, you know, I think it's most

9    appropriate, Ms. Iafrate, and the only time I ask questions is

10   if I -- about matters that haven't been raised, is if counsel

11   haven't raised them.  I think it's most appropriate for you to

12   raise them if you have issues that you'd like to put on the

3    record.

14         Sheriff Arpaio's testimony is not a mystery to anybody

15   here.  I certainly would expect you would want to address -- or

16   if -- and if you wanted to address them, that is certainly fine

17   with me.

18         MS. IAFRATE:  Okay.  So let -- may I find the article

19   before I start?

20         THE COURT:  Sure.  Do you want -- I have a copy.

21         MS. IAFRATE:  Okay.  That would be great.

22         THE COURT:  But do you know what, though?  My copy

23   does have a highlighted date on it.

24         THE CLERK:  I've got a copy, Judge.

_5         THE COURT:  You've got a copy?

1           MS. IAFRATE:   Just so that we can refer to it by

2   exhibit number.   Thank you, Your Honor.

3           THE COURT:   Would you then please give it an exhibit

4   number.

5           We'll enter it as a defendants' exhibit, Ms. Iafrate.

6           MS. IAFRATE:   That's fine.

7           THE COURT:   Okay.

8           It's just marked.   If anybody wants to admit it they

9   can try later, but right now it's just marked.

10          (Pause in proceedings.)

11                          CROSS-EXAMINATION

12  BY MS. IAFRATE:

3   Q.   Good afternoon.

14  A.   Good afternoon.

15  Q.   I'm having a hard time hearing you, Chief Deputy.   Do you

16  think that you could move that microphone a little bit closer

17  to you?

18  A.   Certainly.

19  Q.   Thank you.

20          Chief, we went through the morning, the entirety of

21  your deposition in the morning talking about May 14, 2014,

22  correct?

23  A.   Yes, ma'am.

24  Q.   You were shown exhibits regarding May 14, 2014, correct?

.5  A.   Correct.

1  Q.  And you were shown transcripts regarding the Court and you

2  on May 14, 2014, correct?

3  A.  Yes.

4  Q.  I want to start with -- well, let me just go on.

5      And then this afternoon we watched some video clips of

6  you giving a briefing, correct?

7  A.  Yes, we did.

8  Q.  Now, those video clips that talk about statements that you

9  made regarding Judge Snow and the order, Judge Snow already

10  heard about that, correct?

11  A.  Oh, yes, he did.

12  Q.  You know that how?

3  A.  Because I already stood in front of the judge concerning

14  those statements in that video.

15  Q.  You owned up to those statements in that video, correct?

16  A.  Yes, ma'am.

17  Q.  And the judge reprimanded you, correct?

18  A.  Yes, ma'am.

19  Q.  Did you apologize for your misstatements?

20  A.  Yes, ma'am.

21  Q.  So the judge was already aware of that evidence, correct?

22  A.  Yes, he is.

23  Q.  I want to show you what's in evidence as Exhibit 71.

24      Do you recognize this document?

.5  A.  Yes, ma'am, I do.

1  Q.  Was this a document that you reviewed?

2  A.  Yes, I did.

3  Q.  Did you agree with it?

4  A.  Yes.

5  Q.  Did you know that it was being filed?

6  A.  I did.

7  Q.  Okay.  Could you turn to page 2.  Just at the top,

8      Chief Sheridan, do you see the date that it was filed?

9  A.  Yes.

10 Q.  What is it?

11 A.  March 17th, 2015.

12 Q.  So over a month ago this was filed with the Court, correct?

3  A.  That's correct.

14 Q.  And if you'd look at the first complete sentence it says:

15     "Defendants acknowledge and appreciate that they have violated

16     the Court's orders and that there are consequences for these

17     violations."

18          Do you see that?

19 A.  I do.

20 Q.  Do you agree with that?

21 A.  Yes, ma'am.

22 Q.  You agree that you acknowledge and appreciate that you have

23     violated the Court's orders, correct?

24 A.  That's correct.

.5 Q.  So the testimony this morning regarding May 14, 2014,

1    you've -- excuse me, May 14 -- you've already admitted to that,

2    correct?

3    A.   I have.

4    Q.   If you go to page 3 of Exhibit A of this same document --

5             Keep going.

6             Down at the bottom of page 3 talks about the May 14,

7    2014, hearing, correct?

8    A.   Yes, ma'am.

9    Q.   And it lays out your admissions violating the Court order

10   as to May 14, 2014, correct?

11   A.   It does.

12   Q.   This was filed with the Court?

3    A.   Yes, it was.

14   Q.   Even before all of the exhibits and transcripts shown to

15   you this morning, correct?

16   A.   Correct.

17   Q.   If you look page 2 of Exhibit A of the same exhibit, it

18   talks about the pretrial discovery violations, talking about

19   the gathering of evidence.  You admitted that pretrial

20   discovery --

21             THE COURT:  Ms. Iafrate?

22             MS. IAFRATE:  Yes.

23             THE COURT:  I may be wrong about this, but I don't

24   think I noticed --

5             MS. IAFRATE:  You did not.  You did not.

1    THE COURT: So I don't want him to admit to something

2  that he's not even up for.

3    MS. IAFRATE: He's admitting regarding MCSO, Your

4  Honor.

5    THE COURT: Ah, thank you.

6    MS. IAFRATE: So maybe I'll make my question a little

7  bit clearer, just so everyone is more comfortable.

8  BY MS. IAFRATE:

9  Q. You are aware that documents were requested of MCSO,

10  correct?

11  A. Yes, ma'am.

12  Q. And documents, certain documents that should be provided

3  were not provided.

14    Are you aware of that now?

15  A. I am.

16  Q. And that's in this document as well as it relates to the

17  admissions, correct?

18  A. That's correct.

19  Q. That was done in March of this year, correct?

20  A. Yes.

21  Q. Okay. Let's go to page 1 of the same document.

22    And on page 1 of the same document that was filed with

23  the Court you admit that you violated the Court's orders by

24  failing to disseminate and make certain that the members of

5  MCSO were knowledgeable and were complying with the preliminary

1    injunction, correct?

2    A.   That's correct.

3          MS. IAFRATE:  I want to go back to page 2 of the body

4    of the exhibit, so go up.

5    BY MS. IAFRATE:

6    Q.   So we were talking about before, it goes on to say "There's

7    nothing defendants can do to change what has already been

8    done."

9          Do you agree with that statement?

10   A.   I do.

11   Q.   "But through the entry of an order finding them in civil

12   contempt and by implementing remedies discussed herein,

3    defendants can express sincere remorse to the Court and to the

14   plaintiff."

15         Do you agree with that?

16   A.   Very much so.

17   Q.   When you say "very much so," are you talking about the

18   sincere remorse?

19   A.   Yes, ma'am.

20   Q.   "Begin to make amends to those who have been injured and

21   take affirmative steps to ensure nothing like this occurs in

22   the future."

23         Do you agree with that statement?

24   A.   Wholeheartedly.

5    Q.   Then this paragraph finally ends with "Defendants respect

1  the Court and the Court's orders."

2      Do you, Chief Sheridan, respect this Court?

3  A.  I never meant no disrespect, ma'am.

4  Q.  And how about the Court's orders?

5  A.  Never.

6  Q.  And how about do you respect the Court monitors and their

7  instruction via the judge?

8  A.  Absolutely.  I consider them an extension of the Court.

9  Q.  So all of this testimony that we heard elicited by

10  plaintiffs you'd already admitted to that, correct?

11  A.  That's correct.

12  Q.  When Ms. Wang was talking to you about the May 14, 2014,

3  order, you believed that she was saying that you lied, right?

14  A.  I did.

15  Q.  Do you believe that you lied?

16  A.  No, ma'am.

17  Q.  How do you feel about being accused of lying?

18  A.  It's a very emotional issue for me.  I've been a law

19  enforcement officer for 36 years and never been accused of

20  being dishonest, never been accused of using excessive force,

21  never been accused of unlawfully arresting anyone, unethical

22  behavior, never been under an internal investigation.

23      The only thing that I thought -- excuse me -- I would

24  walk away from this career with was my integrity, and that was

.5  questioned today in this court.

1    Q.  When you make a mistake, do you own up to it?

2    A.  Yes, ma'am.

3    Q.  Did you intentionally or willfully violate the Court's

4    orders?

5    A.  No, ma'am.

6    Q.  Let's just talk specifically about the May 14, 2014, court

7    hearing.  Okay?  You attended the May 14, 2014, hearing,

8    correct?

9    A.  I did.

10   Q.  It was a status conference?

11   A.  I did.

12   Q.  And in fact you spoke at it, correct?

13   A.  Yes.

14   Q.  When you walked away from the May 2014 status conference,

15   what did you understand the directive of the Court was?

16   A.  I believed that the direction the Court gave us was to get

17   the videos that were out there the most efficient way possible,

18   the quickest way possible, in the most unobtrusive way, so we

19   could collect the videos with the minimum of destruction of

20   evidence, so people wouldn't destroy evidence, so we could get

21   a true, honest representation of what was out there.

22   Q.  What did you believe the monitor's role would be when you

23   left that May 14, 2014, status conference?

24   A.  I believed his role was to help us in any way they could

25   and to meet with them.

1          MS. IAFRATE:  May I have the projector on?

2              Thank you.

3     BY MS. IAFRATE:

4     Q.  I'm going to show you -- this is the transcript that you

5     and Ms. Wang looked at earlier today.  It's the May 14, 2014,

6     status conference.

7              Do you see that?

8     A.  Yes.  What exhibit number is that, ma'am?

9     Q.  37.

10             THE CLERK:  Counsel, did you want this published?

11             MS. IAFRATE:  Yes.

12    BY MS. IAFRATE:

3     Q.  Sir, you were read certain portions of this transcript this

14    morning, correct?

15    A.  Correct.  What page are we on?

16    Q.  I'm on page 59.

17             Now, one of the things that you discussed was you

18    wanted to make certain that it was done quietly, correct?

19    A.  Correct.

20    Q.  And this is the Court, starting at line 20, it says:  "And

21    so it might be better, to the extent that you and the sheriff

22    can feel comfortable doing so, quietly collecting the data.

23    But I would also want to know if it can be quietly collected,

24    to not make a big fuss.  I would also want to know where it

.5    came from, where they are storing that data, and if they claim

1  to have deleted any such data, when they claim to have deleted

2  it."

3        Did I read that accurately?

4  A.  Yes, ma'am.

5  Q.  Then as you go down on page 60, you see where you are

6  addressing the Court, correct?

7  A.  Yes, ma'am.

8  Q.  And you say: "Yes, sir.  I would ask the Court to allow us

9  to do it in a softer manner than subpoenas.  I think we'll be

10  more productive.  I understand your concerns, and I think we

11  share the same concerns about the documentation of

12  where/when/how this information has been stored, because I

3  would -- I'm guessing that not all those videos have been

14  stored properly in the evidence and property room."

15        Did I read that accurately?

16  A.  Yes.

17  Q.  And that was what you believed you should do is gather it

18  quietly and quickly?

19  A.  Yes, ma'am.

20  Q.  Then one more section I want to address with you, and it's

21  the Court responding to what you just said.

22        It says:  "That would seem to be an assumption that I

23  would share.  And so I will tell you that I will have my

24  monitor work with you to develop a pro -- if you want his

.5  assistance."

1    Did I read that accurately?

2    A.   Yes, ma'am.

3    Q.   Did you believe that it was mandatory that you get the

4    blessing of the monitor on what procedure to use when you left

5    that status hearing on May 14, 2014?

6    A.   I did not.

7    Q.   When you left the status hearing on May 14, did you believe

8    that you were following the orders, the verbal orders of the

9    judge?

10   A.   Not only did I feel that I had a good understanding of what

11   the Court wanted us to do, I also felt that because of the

12   interaction that I had with the judge, it was a lot different

3    than the last time I was before him.  I felt that we had -- I

14   know this might sound silly, but I felt that we had kind of

15   bonded a little bit, had an understanding.  We had a great

16   conversation about this issue, and I thought that I was

17   following his direction.

18        And I remember the word he wanted it done right away

19   also, he wanted it done quickly, so I wanted to make sure we

20   got this done quickly.  I did not want to ever repeat having to

21   be in front of him again under the circumstances I was

22   concerning that video.

23   Q.   Now, let's be fair.  I'm showing you a transcript from May

24   2014, correct?

5    A.   Correct.

 1  Q.  When you left the courtroom on May 2014, you didn't have a

 2  copy of this transcript, correct?

 3  A.  I did not.

 4  Q.  Did you have written orders from the judge?

 5  A.  No, ma'am.

 6  Q.  But you took the verbal order seriously, didn't you?

 7  A.  Yes, and I didn't have notes, either.  I didn't take notes.

 8  Q.  Now, there was a meeting with the monitors following your

 9  meeting where you instructed Chief Trombi to send out an

10  e-mail, correct?

11  A.  Correct.

12  Q.  I want to talk about that meeting with the monitors, and

 3  we're going out of chronology just a little bit.

14          When you met with the monitors, what was their

15  suggested approach to gather videos?

16  A.  The discussion the way I recall it, it was very similar to

17  the discussion we had with the Court, very similar to the

18  discussion we had in the sheriff's office, and it was almost

19  the same type of brainstorming what the best way was.  He had a

20  different viewpoint, and I brought -- we talked about that this

21  morning about, you know, having Internal Affairs go out and

22  meet deputies and do those kind of things --

23  Q.  Okay, let me stop you there, because that wasn't discussed

24  this morning.  So let's go back and tell me what -- what was

 .5  the monitor's suggested approach?

0747

1   A.   It was a more intrusive approach to have Internal Affairs

2   go out and obtain the videos.

3   Q.   How?

4   A.   To meet deputies in the parking lot as they show up for

5   work.

6   Q.   For what purpose?

7   A.   And talk to them and get the videos from them at the time

8   they showed up for work.

9   Q.   Why -- I don't understand this process.  And we haven't --

10  we haven't heard about this, so what I'm trying to understand

11  is why would I go out to the parking lot of a district to

12  gather videos?  They wouldn't be in the -- the videos wouldn't

3   be in the parking lot, right?

14  A.   No, ma'am.

15  Q.   Okay.  So what was the purpose of going to the parking lot

16  of the districts?

17  A.   Because of the inherent coercive nature of Internal

18  Affairs, they would be more likely to succeed in obtaining

19  videos.

20  Q.   How many videos, ultimately, has MCSO collected?

21  A.   Approximately 8,900.

22  Q.   How many different districts are there for Maricopa County

23  Sheriff's Office?

24  A.   Seven.

.5  Q.   What's the mile span of the territory that that

1    encompasses?

2    A.    Maricopa County is 9,226 square miles.

3    Q.    So how many people in PSB?

4    A.    Guessing around 15, maybe.

5    Q.    So if PSB went out to the parking lot of a district to

6    gather videos, would that be the best process to quietly,

7    without a fuss, as the judge mentioned, quietly and quickly and

8    efficiently collect the videos?

9    A.    Not in my opinion, no.

10   Q.    Why not?

11   A.    Because it wouldn't be very quiet when Internal Affairs'

12   investigator shows up in the parking lot.  That would be --

13   spread like wildfire among the deputies.

14   Q.    Why did you want a softer approach than this?

15   A.    It would be much more effective to have their commanders,

16   who they're normally used to seeing and working with every day,

17   that they would trust, to get the videos from them.

18   Q.    Was it to allow people to destroy videos?

19   A.    Absolutely not.

20   Q.    Now, we've seen Exhibit 38 several times and you saw it

21   this morning, so can we look at it one more time.

22            MS. IAFRATE:    May I please switch back?

23            Thank you.

24   BY MS. IAFRATE:

25   Q.    You had a day of meetings on May 14, 2014, didn't you?

0749

1  A.  I'm sorry. Can you repeat that?

2  Q.  You had a day full of meetings on May 14, 2014, didn't you?

3  A.  Yes, ma'am.

4  Q.  First you met with the Court, correct?

5  A.  Correct.

6  Q.  Then you had a meeting at MCSO with counsel, correct?

7  A.  Yes.

8  Q.  Then you had a meeting with the monitors, correct?

9  A.  Yes.

10  Q.  Then you had another meeting with counsel, correct? With

11  Christine Stutz?

12  A.  Yes.

3  Q.  Then you called the monitor, and he came back and you had

14  yet another extensive meeting, correct?

15  A.  That's correct.

16  Q.  So showing you what is Exhibit 38 -- and you've been shown

17  this several times now -- do you recognize this e-mail?

18  A.  I do.

19  Q.  Did you dictate the language that was in this e-mail?

20  A.  No.

21  Q.  Why did you direct Chief Trombi to send this e-mail?

22  A.  For all the reasons I stated a few minutes ago. I thought

23  that having Chief Trombi organize the collection of the videos

24  would be the best route. I believe it was a collaborative

.5  effort of the five of us in the room with the meeting in the

1  sheriff's office to do it that way.  And I still think to this

2  day it was the best way to go about collecting the videos.

3  Q.  However, knowing -- knowing now the specifics in the

4  judge's transcript and also his ultimate order, would you have

5  done this the same way?

6  A.  Oh, no.

7  Q.  There was some discussion regarding Ms. Wang accusing you

8  of lying to the monitors.

9       Do you recall that?

10  A.  Yes, ma'am.

11  Q.  There was some discussion regarding that Trombi sent the

12  e-mail without your knowledge.

3       Do you recall that?

14  A.  Yes, ma'am.

15  Q.  As you sit here now, you know that Chief Trombi was ordered

16  to send out that e-mail, correct?

17  A.  Correct.

18  Q.  What were you referring to when you were saying that it was

19  out -- without your knowledge?

20  A.  Well, that he'd already done it already.

21  Q.  You thought maybe you could get to Chief Trombi and say,

22  Hold on, I'd forgotten, and I just agreed with the monitors to

23  handle it a different way"?

24  A.  I was surprised that he had done it that quick when I found

.5  out that he'd done it.

1    Q.   Why?

2    A.   Because knowing Dave, he doesn't do anything that fast,

3    usually.

4    Q.   So there was a letter that you sent to Chief Warshaw, and

5    it's Exhibit 39, which is in evidence.  Following the meetings

6    of the day you drafted this letter, correct?

7    A.   I did.

8    Q.   Did anyone review it before you sent it?

9    A.   No, ma'am.

10   Q.   Did you seek counsel's advice before you sent it?

11   A.   I tried to.

12   Q.   How did you try?

3    A.   I tried to contact Mr. Casey by phone, Mr. Liddy by phone,

14   and Christine Stutz by phone, and no one answered.

15   Q.   Without getting counsel's review of this, why did you send

16   this letter on May 14, 2014?

17   A.   I felt very intimidated by Chief Warshaw in the manner he

18   told me to complete this letter to him, and he wanted it

19   immediately because Judge Snow wanted to see it that next

20   morning as soon as his eyes opened.

21   Q.   That was the directive from the monitor?

22   A.   Yes, ma'am.

23   Q.   And, therefore, you complied?

24   A.   Yes, ma'am.

.5   Q.   Let's go down to the third paragraph, if we could.

1    THE COURT:  Do you know, Ms. Iafrate -- well, if

2    you're still on the letter, that's fine.  I'll just tell you

3    I'm looking for a stopping point for an afternoon break when it

4    doesn't otherwise interrupt your questioning.

5            MS. IAFRATE:  Let me just do one more question.

6            THE COURT:  Sure.

7    BY MS. IAFRATE:

8    Q.  If you look at the third paragraph in the parenthetical,

9    second-to-last sentence, it talks about a collective decision

10   of the parties.

11           Do you see that?

12   A.  I'm sorry.  Which paragraph?

13   Q.  It's the third paragraph.  Starts out with "after a

14   somewhat lengthy discussion."

15           Do you see that paragraph?

16   A.  Yes.  I'm sorry.

17   Q.  That's okay.  And then in the parenthetical it talks about

18   a collective decision of all the parties.

19           Do you see that?

20   A.  Yes, ma'am.

21   Q.  Was it a collective decision on how to proceed?

22   A.  Yes, ma'am.

23   Q.  And the collection of parties were three attorneys, you,

24   and the sheriff?

.5   A.  It was.

1  Q.  The person that stated to send out an e-mail was you,

2  right?

3  A.  I believe it was, yes.

4  Q.  After a conversation with the collected parties, correct?

5  A.  Yes.

6         MS. IAFRATE:  I'm good to take a break.

7         THE COURT:  All right.  Let's reassemble at 3:30,

8  please.  Thank you.

9         (Recess taken.)

10        THE CLERK:  All rise.  Court is now in session.

11        THE COURT:  Everybody ready?  Please be seated.

12        MR. STEIN:  Your Honor.

3         THE COURT:  Yes.

14        MR. STEIN:  Sorry for interrupting.  I wonder if,

15  before Ms. Iafrate starts, I could be heard briefly at sidebar.

16        THE COURT:  Yes.

17        (Bench conference on the record.)

18        THE COURT:  You don't oppose if everybody else comes

19  before?

20        MR. STEIN:  No.

21        THE COURT:  Okay.

22        MR. STEIN:  This is Lee Stein, counsel for Chief

23  Deputy Sheridan.  My understanding is that Ms. Iafrate is about

24  to begin examining the chief deputy on issues that the Court

.5  raised with the sheriff yesterday.

1           THE COURT:  Right.

2           MR. STEIN:  I have no problem with that examination.

3    My concern is that I think it should be done under seal.  And

4    the reason why I think it should be done under seal is the

5    evidence is developing in front of us, its credibility has not

6    been tested, and frankly, I think the testimony could end up

7    being somewhat salacious, embarrassing, gossipy, and we should

8    avoid that if at all possible.

9           THE COURT:  You think that the chief will have

10   salacious, gossipy testimony?

11          MR. STEIN:  I think that his reporting of the facts

12   could be embarrassing, unnecessarily so.

13          THE COURT:  To parties, or to me, or to my wife, or

14   what?

15          MR. STEIN:  To Your Honor.  And I don't want to feed

16   any unnecessary theatrics in a case that's already getting a

17   lot of attention.

18          THE COURT:  I appreciate --

19          MR. STEIN:  I don't have any problems with the

20   examination.

21          THE COURT:  I appreciate it.  It seems to me that I

22   don't have -- I mean, you know, you never know what somebody

23   might find out about you and --

24          MR. STEIN:  Right.

.5          THE COURT:  -- it's always embarrassing, but I -- I've

 1  opened that can of worms.  So I appreciate your courtesy,

 2  Mr. Stein.

 3          MR. STEIN:  Okay.  I wanted to raise it with the

 4  Court.

 5          THE COURT:  Thank you.

 6          (Bench conference concluded.)

 7          THE COURT:  Mr. Stein has indicated and requested that

 8  this hearing go under seal.  And he's done it out of courtesy

 9  to the Court because he says that Chief Deputy Sheridan has

10  some information that he believes may be embarrassing to the

11  Court.  I appreciate Mr. Stein's courtesy in that respect.

12          I, of course, have no idea what the information may or

13  may not be or the allegations may or may not be, but I believe

14  that I don't have a basis to put the hearing under seal, and if

15  one develops, it develops.  But I -- I think my self-protection

16  is not a basis to do that.

17          So proceed, Ms. Iafrate.

18          MS. IAFRATE:  Could I have one more housekeeping

19  matter?

20          THE COURT:  Yes.

21          MS. IAFRATE:  During the break I was approached by

22  plaintiffs' counsel.  They indicated that the information that

23  Mr. Liddy provided at sidebar where plaintiffs were not invited

24  to attend is part of the transcript that they received.  They

.5  have not read it, but we were wondering how best to protect

1  that area that was said at sidebar regarding information that

2  we were keeping from plaintiffs' counsel.

3          THE COURT:  I'm not sure I understand what you said.

4          MS. IAFRATE:  Mr. Liddy had a sidebar with you in

5  which I was invited to attend, but plaintiffs were not.  At the

6  sidebar he put on the record the information of why he

7  perceived a conflict.

8          THE COURT:  Yes.

9          MS. IAFRATE:  That information is in the transcript

10  that was provided to plaintiffs.  They have not read it, out of

11  courtesy, but they are saying that that information is in the

12  transcript.

3          THE COURT:  All right.

14          MS. IAFRATE:  So I would ask that that portion be

15  sealed as it relates to the information that was addressed by

16  Tom Liddy at the sidebar.

17          THE COURT:  All right.  It can be sealed.

18          Without objection?

19          MR. WALKER:  No objection, Your Honor.

20          MR. COMO:  No objection, Your Honor.  We've received

21  the transcript, but I don't -- I haven't looked at it yet, so I

22  don't know whether we have it, but if we do, I will not read

23  it.

24          THE COURT:  All right.  Thank you.

.5          MS. IAFRATE:  So Your Honor, should I file something

1    in writing regarding the portion that should be sealed?

2            THE COURT:  Yes, please.

3            MS. IAFRATE:  Okay.

4            THE COURT:  The transcript can go to Ms. Iafrate and

5    to Mr. Casey, but no one else can receive it.

6            MS. IAFRATE:  Thank you, Your Honor.

7    BY MS. IAFRATE:

8    Q.  Chief Sheridan, before we broke for afternoon break we were

9    talking about the collection of videos based on the May 14,

10   2014 status conference.

11           Do you recall that?

12   A.  Yes, ma'am.

3    Q.  The chronology of events that we've discussed regarding the

14   meetings, and the e-mail, and the further meetings, made it to

15   the monitor's quarterly report.

16           That's what Ms. Wang told you, correct?

17   A.  I don't remember that.

18   Q.  Okay.  Let me go back, then.  There was -- there was some

19   indication that Chief Warshaw said that he did not believe your

20   chronology of events.

21           Are you aware of that?

22   A.  Oh, yes.  I'm sorry, yes, I do.

23   Q.  And again imputing your integrity, correct?

24   A.  Correct.

5    Q.  What you said in response to that was Chief Warshaw doesn't

1    know Sheridan.

2          What did you mean by that?

3    A.   Well, what I took that from, I tried to take where

4    Chief Warshaw was coming from.  And some of the law enforcement

5    agencies in his experience as a monitor, he brings a vast pool

6    of knowledge with him, and he's been the monitor for some law

7    enforcement agencies that have had major issues and problems

8    and are known for corruption, violent acts of their officers

9    and those kinds of things.

10         And then he came here to the Maricopa County Sheriff's

11   Office, and I assume that he was bringing those experiences to

12   this organization with him.  And now he was dealing with Jerry

13   Sheridan, who he doesn't know, he doesn't know who I am as an

14   individual, as a law enforcement officer.  And because I had

15   that lapse of memory, I feel he jumped to the conclusion that I

16   was trying to allow my deputies to destroy videos and that I

17   was not being truthful with him.

18   Q.   And that was not accurate, correct?

19   A.   Absolutely not.

20   Q.   Before we leave the idea of videos, I want to talk to you

21   about a February 2014 e-mail that was discussed with you on

22   direct examination with Ms. Wang.

23         Do you recall that?

24   A.   Yes, ma'am.

.5   Q.   That was an e-mail from Chief Trombi to a variety of

0759

1  people?

2  A.  Yes.

3  Q.  Explain to me and the Court why Chief Trombi generated that
4  e-mail, if you know.

5  A.  As I recall, we had a little gathering in the hallway.  We
6  were talking with Chief Freeman, who was the administrative
7  chief, concerning some grants, some -- you know, that may have
8  concerned some videos.  And as the conversation progressed, I
9  asked the question:  Do we already have these videos,
10  video recording devices?  Where are they?  Who has them?  Is
11  there a policy in place for their usage?  And the -- I don't
12  recall the answer to if we had them or not, but I definitely
3  recall the answer that there was no policy in place for their
14  usage.

15  So I told Chief Trombi, I gave him a direct order that
16  no one is to use a video recording device for any reason other
17  than in an interrogation room where we have policies covering
18  those things -- for example, in patrol -- until we have a
19  policy in place.

20  Q.  That was once you identified an issue, you implemented a
21  process to start gathering information and then generating a
22  policy?

23  A.  Correct.

24  Q.  I want to jump backward in time a little bit.

.5  How long have you been with the Maricopa County

1    Sheriff's Office?

2    A.  As a paid employee, over 36 years.

3    Q.  There was a time where you became interim deputy -- or

4    chief deputy, excuse me, correct?

5    A.  Correct.

6    Q.  Were your job descriptions the same where you were interim

7    chief deputy as when you were promoted to chief deputy?

8    A.  Yes, ma'am.

9    Q.  So explain just basically -- I don't want to hear every

10   duty that you have, but just generally what is your job

11   description.

12   A.  I oversee the daily operations of the entire sheriff's

'3   office, three-quarters of which is the jail system.  So

14   75 percent of my duties cover the jail system; the other

15   25 percent is the enforcement side.

16   Q.  So when you say 75 percent jail, 25 percent enforcement

17   side, is that how you divide your time?

18   A.  Not lately.

19   Q.  When you became interim chief, that was in September of

20   2010, correct?

21   A.  That's correct.

22   Q.  And then you became chief deputy in May 2011, correct?

23   A.  Yes, ma'am.

24   Q.  Describe for me what you spent your time on, the majority

.5   of your time on back when you first started at chief deputy.

1          Did you understand that question?

2     A.   Yes.   The reason I shook my head is because it was a

3     Wednesday evening, sheriff called me in his office, told me he

4     was putting Chief Hendershott on leave, and he looked at me and

5     he said, "Jerry, I need you to help me fix this."

6          And what he meant by that was we had an issue where we

7     had a very broken relationship with the Maricopa County Board

8     of Supervisors, we had little to no communications with them

9     for approximately three years.   There were many problems in

10    dealing with that.   We need to work hand in hand for the good

11    of the public.

12         And so I spent -- I guess I was naive.   I thought

13    well, we could get this done in a couple months, but it took a

14    few years' worth of every day spending vast majority of my time

15    and Chief Freeman with people from the county, county

16    administrators, the board members themselves, where we would

17    work to repair those relationships.

18         And there were pending lawsuits.   One of the very

19    first things that I did after I became the interim chief deputy

20    was attend a meeting, I think it was in November of 2010, with,

21    I think, six to eight lawyers from the Department of Justice,

22    and to try and hammer out some of those issues.   So I became

23    very involved in that litigation.

24         There were audits that the county ordered.   There were

.5    audits by the state auditor general.   I was very involved in

1    all those issues. And this is on top of the daily operations

2    of the third largest sheriff's office in the country, which

3    includes all personnel issues that come to my level, internal

4    investigations that come to my level, and budget matters,

5    budget issues, decisions. I don't know where to stop. But I

6    hope that gives you an idea of the magnitude of the things that

7    I was dealing with on a daily basis.

8    Q. Were you dealing with the Melendres litigation on a daily

9    basis?

10   A. No, ma'am, not at all.

11   Q. Did you have meetings with the attorneys regarding the

12   Melendres litigation prior to trial?

13   A. No. In fact, I did not even talk to Tim Casey until the

14   end of the trial in August of 2012. I knew who he was, but I

15   don't ever recall having a conversation with him even once.

16   Q. I want to show you what's in evidence as Exhibit 187.

17          Let me stop there.

18          So there was a lot of discussion on direct examination

19   regarding this e-mail from Tim Casey to a variety of

20   individuals, including you, correct?

21   A. Correct.

22   Q. Can you explain why it is that you testified that you did

23   not become aware of the preliminary injunction until March 14

24   when you were being deposed for the DOJ case?

5    A. Well, there's several reasons.

1   Q.   Okay.

2   A.   First of all, because of what I just explained to you, my

3   workload, Chief Sands was in charge of the enforcement side.

4   Chief Sands was the next in the chain of command. Chief Sands

5   had this case, as far as I knew, from the very beginning, when

6   Chief Deputy Hendershott was in charge. He was, as far as I

7   knew, involved in the litigation from the very beginning, and

8   that he was in contact with Mr. Casey, and so I left that

9   delegation with him. That's the primary reason.

10          The secondary reason is I get a hundred e-mails every

11  day, and so I triage them. This was not one of the issues that

12  was something that I was dealing with, and I knew that --

13  again, Chief Sands and Mr. Casey were dealing with this, so...

14          It also came out on December 23rd after 5 o'clock. I

15  don't even know if I was in the office. A week later after

16  this e-mail came out there was an inmate death, a high profile

17  inmate death, Marty Atencio in intake, that I was dealing with.

18          A week after that, January 8th, 2012, we had a deputy

19  sheriff, Bill Coleman, shot and killed in a very violent gun

20  battle. There was a funeral a week after that. And so I am

21  not aware of ever opening, remembering, that e-mail, for those

22  reasons.

23  Q.   Now, Chief, in response to my answer, you were talking

24  about the priorities that you were dealing with, correct?

5   A.   Yes, ma'am.

1   Q.  You're not excusing the fact that MCSO did not properly

2   disseminate the preliminary injunction, are you?

3   A.  Not at all.  And I believe a little earlier I even took

4   responsibility for that.

5   Q.  On this Exhibit 187 from Tim Casey the first sentence

6   starts out with:  "In follow-up to my recent telephone call."

7          You were here when Chief Sands testified, correct?

8   A.  Yes, ma'am.

9   Q.  And Chief Sands testified that he had a telephone call with

10  Tim Casey shortly after the preliminary injunction was issued?

11  A.  Yes.

12  Q.  He said no one else was on that telephone call, correct?

13  A.  I believe so.

14  Q.  Were you on that telephone call between Tim Casey and Brian

15  Sands?

16  A.  No.

17  Q.  Let me ask you this:  How is it that you normally get

18  information regarding lawsuits?

19  A.  Usually an e-mail and a follow-up phone call from counsel.

20  Q.  When you were involved, you had mentioned in response to

21  one of my answers the DOJ case, right?

22  A.  Yes.

23  Q.  What were you actively involved in that case?

24  A.  Yes, ma'am.

25  Q.  Were you deposed?

1    A.    Yes, ma'am.

2    Q.    Did you talk to attorneys frequently?

3    A.    Yes.

4    Q.    Did you know the process that that case was going through?

5    A.    Yes.  And we talk to this day on a frequent basis.

6    Q.    In the Melendres case, did you talk to the attorneys in

7    preparation for trial?

8    A.    No, ma'am.  As I stated a minute ago, I'd never talked to

9    either Tim Casey or Tom Liddy about the Melendres case until

10   after it was concluded.

11   Q.    In the Melendres case were you deposed?

12   A.    No, ma'am.

'3   Q.    Did you testify?

14   A.    No, ma'am.

15   Q.    Did you make the determination of whether or not to appeal

16   or not --

17   A.    No, ma'am.

18   Q.    -- the preliminary injunction?

19   A.    No, ma'am.

20   Q.    Now, we already talked about the videos of the briefing,

21   and the fact that you already stood before the Court and you

22   were reprimanded for the things that you said, correct?

23   A.    Yes, ma'am.

24   Q.    And in fact, you said you had few regrets in your life, not

5    just your career but your life, and that was number one regret.

1    You take it that seriously?

2    A.  Out of the two regrets I have in my life, that's

3    number one, yes.

4    Q.  I couldn't help but notice that during that briefing you

5    were somewhat demonstrative. .

6    Would you agree or disagree with that?

7    A.  I would agree.

8    Q.  And why -- why were you briefing the troops in that way?

9    A.  I don't know if you noticed or not, but I'm a very

10   emotional person.  It's hard for me to hide those emotions.  I

11   was angry.  I was excited.  I was worried about their safety.

12   And I was trying to show them that they had the support of

13   their chief deputy.  And not to worry about anything other than

14   going out there and being safe.

15   Q.  That was a briefing for what purpose?

16   A.  It was a briefing after the briefing.  Captain Lopez -- if

17   you watch that whole video, Captain Lopez, I believe

18   Lieutenant Sousa, laid out the directions, the new paperwork,

19   all the other issues that were necessary to comply with the

20   order, and they impromptly asked me to speak to the group, and

21   so that's what I did.

22   Q.  So that was a briefing that dealt with portions of the

23   preliminary injunction?

24   A.  Yes, ma'am.  That's primarily what it was, the new

.5   procedures for collecting data and some other issues

1 surrounding it about racial profiling, to remind them about

2 the -- the order itself, about the detaining individuals, so

3 on, so forth.

4 Q. Do you know who Chief MacIntyre is?

5 A. Yes, ma'am.

6 Q. He's not a sworn officer, correct?

7 A. Correct.

8 Q. Has he ever been in charge of a sworn division?

9 A. No, ma'am.

10 Q. You were deposed on March 20th, 2015, correct?

11 A. Yes.

12 Q. And you were deposed by Ms. Wang?

3 A. Yes.

14 Q. She asked you what Chief MacIntyre's role was, correct?

15 A. Correct.

16 Q. I want to show you --

17        MS. IAFRATE:  Could we switch back to this?  Thank

18 you.

19        MS. WANG:  Your Honor, objection, hearsay.

20        THE COURT:  Are you asking what Ms. Wang asked the

21 chief at deposition?

22        MS. IAFRATE:  Yes.

23        THE COURT:  Are you asking for the truth of the matter

24 asserted?

5        MS. IAFRATE:  I'm asking did she ask this question and

1    he provided her with that information, yes.

2            THE COURT:  I think the objection's sustained.  You

3    can just ask him now.

4    BY MS. IAFRATE:

5    Q.  Chief Sheridan, you know who Chief MacIntyre is?

6    A.  I do.

7    Q.  And he's sitting in the courtroom, correct?

8    A.  Yes.

9    Q.  What is Chief MacIntyre's role in the Ortega Melendres

10   litigation?

11   A.  None.

12   Q.  There were some questions by the judge yesterday regarding

3    certain issues that -- that may or may not be encompassed in

14   the order to show cause, but were relevant to his

15   decision-making.

16           You heard that exchange between the judge and Sheriff

17   Arpaio, correct?

18   A.  Yes, ma'am.

19   Q.  I want to start out by asking you:  Who chose to transfer

20   Captain Bailey to PSB?

21   A.  Me.

22   Q.  Why did you do that?

23   A.  I don't remember if it was a conversation with the monitor

24   team, or if it was just I got the feeling from them that

_5   Captain Holmes wasn't moving fast enough.  A lot was going on.

1          When we discovered the issue surrounding

2    Deputy Armendariz it created a firestorm, a frenzy of activity.

3    Chief Holmes -- excuse me, Captain Holmes is more methodical

4    and slow.  I knew Captain Bailey very well.  He is a

5    high-energy, competent, experienced detective and leader, and

6    that he would be the best choice under those circumstances to

7    lead that investigation.

8    Q.   Did you know what division Captain Bailey was being

9    transferred from?

10   A.   Yes, ma'am.

11   Q.   Where was that?

12   A.   That would be Special Investigations.

3    Q.   Was Captain Bailey in charge of HSU?

14   A.   He was at the time, but it was for a very short period of

15   time.  Just a matter of maybe a couple of months at the most.

16        And I left something out, too.  One of the other main

17   concerns I had was Captain Bailey, then Lieutenant Bailey, was

18   in charge of the HIDTA team, that's the high intensity drug

19   trafficking.  And during that time he had a former HSU deputy

20   that worked for him, Deputy Navarrette, who he obtained

21   information that deputy Navarrette was dealing drugs with a

22   drug cartel.

23        He came to me, Lieutenant Bailey came to me when I was

24   the chief deputy, told me this information, and I sent him to

.5   investigate the matter using a wiretap.  He did a very lengthy

Page 957

1   wiretap over many months.  Deputy Navarrette is now in prison.

2         There was another deputy that was caught up in that,

3   again another former HSU deputy, that was implicated in the

4   wiretap that he was selling guns to several of these cartel

5   members.  Unfortunately, we didn't have enough evidence to file

6   criminal charges against him, but we were able to terminate him

7   for truthfulness.

8         So with that kind of background I -- I'm -- I didn't

9   think -- I know that's an impeccable background for somebody to

10  be the leader of our Internal Affairs division.

11  Q.  Even though he was briefly in charge of HSU?

12  A.  Yeah, to me that inconsequential --

3   Q.  Why?

14  A.  -- compared to everything I just told you about him.

15  Q.  How about the fact that as head of PSB, and HSU was in the

16  hot seat, that he would have to investigate -- or his unit

17  would have to investigate individuals that he was most recently

18  the supervisor of?

19  A.  Well, now I'm remembering another piece.  There was another

20  piece, too.  Captain Bailey also came to me, and I don't

21  remember if he was a lieutenant or not, but HSU was in that

22  division but didn't work for Lieutenant Bailey.  It must have

23  been when he got promoted to captain, because we did discuss

24  the duties of HSU.  And we made the decision that they were no

.5  longer going to do any kind of human smuggling, those kinds of

1  things.  We pretty much sidelined them from doing that kind of

2  activity.  That was Captain Bailey's idea.

3         So he understood, he understood the Court's order.  He

4  understood how HSU was to operate and not to operate.  He took

5  a look at the grant that funded a lot of the HSU operations.

6  We tailored HSU operations to only do drug interdictions, and

7  so HSU, in its prior form, didn't exist under Captain Bailey's

8  command like it had prior.

9  Q.  I want to show you an exhibit that the Court showed Sheriff

10  Arpaio yesterday.  It's Exhibit 522.

11         THE CLERK:  Correct.

12         MS. IAFRATE:  Would you mind, please, giving that to

3  the witness?  Thank you.

14         THE CLERK:  (Handing exhibit to witness.)

15         THE WITNESS:  Thank you.

16  BY MS. IAFRATE:

17  Q.  Chief, have you seen that article before?

18  A.  Yes, ma'am.

19  Q.  Is it accurate?

20  A.  Is what accurate?

21  Q.  The article.

22  A.  Absolutely not.

23  Q.  I want to talk to you about some of the items that were

24  discussed yesterday with Sheriff Arpaio.  Okay?

.5  A.  Do I have a choice?

1  Q.  No, you do not.

2  A.  Okay.

3  Q.  It's either me or the judge, so I'll go first.

4      There was an investigation that was discussed, someone

5  called it the Seattle investigation.

6.     Do you know what I'm referring to?

7  A.  Yes, ma'am.

8  Q.  What is it?

9  A.  In a nutshell, the Seattle investigation was where we had a

10 confidential informant that had information about computer

11 tampering crimes, where he had information that the CIA hacked

12 into individual bank accounts, I think there were approximately

13 50,000 of them, Maricopa County residents.  He had their names,

14 their bank account numbers, and their dollar amounts.

15 Q.  Who made the determination to investigate these issues?

16 A.  Sheriff and I.

17 Q.  When you made that determination, did you seek anyone

18 else's advice on how to proceed with this investigation?

19 A.  Yes, ma'am.

20 Q.  Who?

21 A.  We went to the Arizona Attorney General with this

22 information.

23 Q.  And following your conversation did you ensue an

24 investigation?

.5 A.  Yes.

1  Q.  What became of that investigation?

2  A.  Eventually, nothing.

3  Q.  Why is that?

4  A.  Because we found it difficult to determine the credibility

5  of the informant.

6  Q.  The credibility of an informant in attempting to make a

7  criminal case is vital, correct?

8  A.  Yes, ma'am.

9  Q.  So if you were doubting the credibility of the confidential

10  informant, the investigation went nowhere?

11  A.  That's correct.

12  Q.  There was some discussion regarding how you pay

3  confidential informants.  Do you know the source of the money

14  for that confidential informant?

15  A.  I do.

16  Q.  Where?  What was the source?

17  A.  RICO funds.

18  Q.  And who is responsible for determining what fund is used?

19  A.  It's normal standing operating procedure that we pay

20  informants using those RICO funds.

21  Q.  There was another investigation that the judge queried

22  Sheriff Arpaio about.  Do you recall that?

23  A.  Yes, ma'am.

24  Q.  The question that I think -- and I don't mean to put words

.5  in his mouth, but what the judge asked was:  Do you know of

1    anyone that investigated Judge Snow or a family member?

2         Do you recall that question?

3    A.   Yes, ma'am.

4    Q.   Do you know of anyone that investigated Judge Snow or a

5    family member of Judge Snow?

6    A.   The reason I'm hesitating in answer -- answering the

7    question is because I've been around lawyers for the last five

8    years and I know words mean certain things.  We did not

9    investigate Judge Snow's wife.

10   Q.   Who was investigated?

11   A.   We contacted an individual that talked to Judge Snow's

12   wife.

13   Q.   How did you find out about this conversation with an

14   individual and Judge Snow's wife?

15   A.   An individual sent a private Facebook page message to

16   Sheriff Arpaio in August of 2013.

17   Q.   And what was the content of that Facebook message?

18   A.   I'd rather not say.

19   Q.   Well, I'm asking you what it said.  If I sit down and the

20   judge chooses to ask that very same question, are you going to

21   answer it?

22   A.   I will answer the question if the Court orders me to answer

23   that question.

24         THE COURT:  Well, let me ask you, was it about me?

25         THE WITNESS:  Yes, sir.

0775

1        THE COURT: And did it make allegations that I was

2    doing something illegal?

3        THE WITNESS: No, sir.

4        THE COURT: Did it make allegations that I was biased

5    in this litigation?

6        THE WITNESS: Yes, sir.

7        THE COURT: All right. You may go ahead and answer.

8    BY MS. IAFRATE:

9    Q.  Do you remember the question?

10   A.  Could you please repeat it?

11   Q.  Sure. You were talking about this Facebook message that

12   went to the sheriff's office, and I asked you what was the

13   content of the message.

14   A.  Yes. I can't quote it verbatim, but it was -- I know

15   Judge Snow's wife. She told me he hates you and he wants to

16   see you out of office.

17   Q.  Did you identify who that message was from?

18   A.  Yes. The header from the individual that it came from was

19   Karen Grissom.

20   Q.  Did you learn -- subsequently learn more about how

21   Ms. Grissom came to get this information that Judge Snow's wife

22   said that Judge Snow hates the sheriff and wants to get him out

23   of office?

24   A.  Yes, ma'am.

.5   Q.  What did you -- what did you learn subsequently?

```
 1  A.   I learned that Ms. Grissom was at a restaurant in the
 2  East Valley with her husband and her adult son.  They were met
 3  by Judge Snow's wife and his daughter near the counter to pay
 4  the cashier.  Apparently, they knew each other from when they
 5  were children growing up in Yuma, I believe, and that
 6  Judge Snow's wife recognized her as childhood friends, but
 7  actually she mistook her for her other -- for Ms. Grissom's
 8  sister, and they had a conversation about life, they hadn't
 9  seen each other for years, and then this conversation occurred.
10  Q.   So why -- why was Ms. Grissom being investigated?
11  A.   I'm sorry, what was that question?
12  Q.   Why was Ms. Grissom being investigated?
13           THE COURT:  If I understood correctly, Ms. Iafrate,
14  Ms. Grissom was not being investigated.  She was the person who
15  wrote the e-mail to the sheriff.
16           MS. IAFRATE:  She was the person who wrote the e-mail
17  to the sheriff and then subsequently was investigated.
18           THE COURT:  Oh, I didn't know that.
19           THE WITNESS:  Well, no one was investigated.
20  BY MS. IAFRATE:
21  Q.   Okay.  The investigator spoke to her?
22  A.   She was interviewed, her husband was interviewed, her son
23  was interviewed, for the veracity of Ms. Grissom's Facebook
24  message to the sheriff.
25  Q.   And were the husband and the son present when -- supposedly
```

1  present when this statement by Ms. -- by Judge Snow's wife was

2  made?

3  A.  Yes, as well as His Honor's daughter, also.

4  Q.  Ultimately, following the interviews of these individuals

5  was the statement deemed credible?

6  A.  Yes.

7          THE COURT:  Maybe we ought to go back.  I missed the

8  whole investigation.

9          MS. IAFRATE:  Okay.

10         THE COURT:  It probably makes sense to only go through

11 this once.

12         MS. IAFRATE:  Yes.

3          THE COURT:  So I got that Karen Grissom, who is an

14 acquaintance or a friend of my -- childhood friend of my wife

15 from Yuma, met my wife and daughter in a restaurant, said

16 something about what I supposedly feel about Sheriff Arpaio.  I

17 didn't hear -- and then you said there was an investigation.

18         Who did the investigation?

19         MS. IAFRATE:  Okay, so let me back up.  I used the

20 wrong verb, Your Honor.

21         THE COURT:  Okay.

22 BY MS. IAFRATE:

23 Q.  You said an investigator interviewed Ms. Grissom.

24         THE COURT:  Can we go back?  Can we jointly ask these

.5 questions?

1        MS. IAFRATE:  Sure.

2        THE COURT:  Who hired the investigator?

3        THE WITNESS:  Mr. Casey.

4        THE COURT:  All right.  And so do you mind if I ask a

5   question?  You can interrupt me.

6        MS. IAFRATE:  I will not interrupt you.

7        THE COURT:  Please do.

8        MS. IAFRATE:  I will not.

9        THE COURT:  In all seriousness, Ms. Iafrate, I think

10   that if you have objections or if anybody else does, they ought

11   to make them, even though I -- I'm asking questions.

12                              EXAMINATION

13   BY THE COURT:

14   Q.   I take it, then, that the sheriff discussed this e-mail

15   with his counsel?

16   A.   That's correct, Your Honor.

17   Q.   All right.  And I take it, then, that the decision was

18   made, by whom I don't know, that there should be an

19   investigator that would contact Ms. Grissom.

20   A.   That's correct.

21   Q.   All right.  And it's your understanding -- or do you know

22   that Mr. Casey hired that investigator?

23   A.   I do know that, yes, he did.

24   Q.   All right.  Are you aware that Mr. Casey has filed a press

.5   release which, while acknowledging -- I read the press release

1  because he sent it to my office. You're aware that Mr. Casey,

2  while acknowledging that he has duties to you and not

3  commenting on it, denies that he was involved in any way, or he

4  says -- he doesn't deny anything, but he says something to the

5  effect that he's confidant that when the materials are

6  evaluated he was not involved in any way in the investigation

7  of me or a member of my family.

8         And is it your view that you were at a conversation in

9  which that just simply isn't true? That if I read it that way,

10  my understanding is wrong?

11  A.  Your Honor, that -- that's where I started out saying it

12  depends on how you define "investigated your wife," because

3  no one, no one ever went any further than just verifying that

14  conversation --

15  Q.  All right.

16  A.  -- occurred.

17  Q.  Mr. Casey hired, if not an investigator, somebody?

18  A.  That's correct.

19  Q.  And that somebody went and talked to Ms. Grissom?

20  A.  Correct.

21         THE COURT:  Okay.

22                CROSS-EXAMINATION CONTINUED

23  BY MS. IAFRATE:

24  Q.  And also spoke to her husband and her grown son?

.5  A.  Correct.

1   Q.   Who also heard the statements?

2   A.   Who verified her statement, yes.

3            THE COURT:   Okay.   I'm with you.   Go ahead.

4   BY MS. IAFRATE:

5   Q.   Okay.   So based on this investigation, what was done with

6   this information?   I don't want you to reveal attorney-client

7   privilege, but ultimately, what was the end game of these

8   interviews with these individuals?

9   A.   Nothing.

10           MS. IAFRATE:   I believe I'll stop there, Your Honor.

11           THE COURT:   Okay.   Thank you.

12           Do you have any more?   You're through with your

3   examination?

14           MS. IAFRATE:   Yes.

15           THE COURT:   All right.

16           Mr. Walker?

17           MR. WALKER:   Your Honor, I would like to defer on this

18   witness also, particularly since he's going to be coming back

19   in June in any event.

20           THE COURT:   All right.

21           Mr. Como.

22           MR. COMO:   I don't have any questions at this time,

23   Your Honor.

24                        FURTHER EXAMINATION

.5   BY THE COURT:

1    Q. You know, I've got some questions that may be helpful for

2    both of us in terms of where we're going. You and I have had

3    some unpleasant interactions; I think you indicated that early

4    on.

5    A. Yes, sir.

6    Q. I think you've done some wrong things and I told you so,

7    did I not?

8    A. Yes, sir, you have.

9    Q. I also have mentioned when I thought you did things that

10   were praiseworthy, have I not?

11   A. I've also noted that, too, thank you.

12   Q. All right. You talked about people needing to know who

3     Jerry Sheridan is. And I do need to know who Jerry Sheridan is

14   to some extent, as I'm required to make the decisions that I'm

15   required to make.

16           You understand that?

17   A. I do, Your Honor.

18   Q. It strikes me that you're a person who values loyalty.

19           Is that a fair statement?

20   A. Yes, sir.

21   Q. Let me tell you that in your testimony this morning you

22   said something that I want to talk to you a little bit about

23   before we go on with other questions, because I don't want to

24   give you the impression that I want you to dump on anybody, but

5     I also don't want to give you the impression that I want you to

1   take responsibility for the actions of other people.

2          And this morning, in testimony when you were

3   discussing the conversation which is the third article of

4   contempt that I've talked about, which is the conversation that

5   you had with Chief Trombi in directing him to send out e-mail?

6          You know what I'm talking about?

7   A.  Yes, sir.

8   Q.  And you have accepted responsibility for giving that

9   direction, but this morning I think you said something like:

10  Well, I accept responsibility for giving the direction, but I

11  think we were all discussing it.

12         Do you remember that, when you said something like

3   that?

14  A.  Yes, sir.

15  Q.  All right.  I'm not sure that I'll ask you all my questions

16  today, but I think it would be profitable for us to at least

17  start.

18         When I ask you questions, I understand that you have

19  a -- or I believe that you value loyalty.  If it is true that

20  you were alone responsible for decisions or things that I'm

21  asking you about, I want you to tell me that.  But if it is

22  true that you, in addition to others, participated in

23  decisions, I want you to tell me that, too.  In other words, I

24  want you to tell me the truth and the whole truth.  Okay?

_5  A.  Yes, sir.

1  Q.  And the whole truth sometimes means that if you did it,

2  and -- or if you did something and you did it alone, you say

3  so.  But I don't want you to, for example, assume

4  responsibility alone if that's not your responsibility.

5          Can we agree to that?

6  A.  Yes, sir.

7  Q.  And by that I'm not trying to suggest that you dump on

8  Sheriff Arpaio, either.  I just -- I just want the truth.

9          As I did with him, I just want to be sure that you're

10 conceding the civil contempt on the preliminary injunction

11 order.  You're conceding that you are in civil contempt for

12 violating that order, is that correct?

13 A.  That's correct, Your Honor.

14 Q.  And if I understand correctly, you're also conceding that

15 you're in contempt for the communication you had with Sheriff

16 Trombi that resulted in the large dissemination, not

17 necessarily because it was a bad way of doing things in your

18 mind, but because it violated my order, is that correct?

19 A.  That's correct, Your Honor.

20 Q.  You've already talked about, and I don't know that we have

21 to spend a lot of time talking about, the fact that SID was

22 where -- well, I'm now on the May 14th time frame, right?

23         You and I had the discussion on May 14th -- this

24 wasn't the bad discussion where I held your feet to the fire,

25 but this is where you came forward, you showed me all the stuff

1    that was in the Armendariz house, I told you -- and we had the

2    discussion about quietly gathering stuff.

3          You're there with me?

4    A.   Yes.

5    Q.   All right. I did express to you in this discussion, do you

6    remember this, that I had concern about you conducting the

7    investigation because there were so many potential conflicts of

8    interest.

9    A.   Correct.

10   Q.   Do you remember that?

11   A.   Yes, sir.

12   Q.   And you knew that a lot of the de -- a lot of the

13   investigation would have to be done by your internal

14   investigation folks, which I think you call the PSB?

15   A.   We do now, yes.

16   Q.   Was it then still Internal Affairs?

17   A.   Yes, sir.

18   Q.   All right. And as we've said, Bailey came from Special

19   Investigations.

20   A.   Yes.

21   Q.   And that's the person that you put in charge of Internal

22   Affairs shortly after you -- shortly after our May 14

23   conversation, within a month or so.

24   A.   That's correct.

25   Q.   All right. And in his role as the -- at Special

1  Investigations, he had supervisorial responsibility for

2  Deputy Armendariz for a short period of time, right?

3  A.  Yes.

4  Q.  And I think it was, like, three months.  That sound about

5  right?

6  A.  It may not have even been that long, Your Honor, because

7  I -- I know he was the one that actually got Charley

8  transferred out of HSU.

9  Q.  Well, you understood, and we'll go through this in a

10  minute, but you understood that we're concerned about the

11  supervision of Deputy Armendariz, and that that was one of the

12  things that was eventually investigated and that is still being

.3  investigated, correct?

14  A.  Correct.

15  Q.  And you also understood that we had all this array of

16  material in the Armendariz home that apparently came from what

17  looked to be like his HSU responsibilities, correct?

18  A.  Correct.

19  Q.  And that among those things there were a bunch of

20  identifications.  There were Mexican identifications, there

21  were other identifications from other areas of the country,

22  there were all kinds of identifications and other things.

23       You understood that, correct?

24  A.  Yes, sir.

25  Q.  In addition to those identifications, there was Mexican

1   money in various denominations in the Armendariz home, was

2   there not?

3   A.   I believe there was.

4   Q.   There was a bunch of drugs?

5   A.   Yes.

6   Q.   There were credit cards?

7   A.   Yes.

8   Q.   And there were bank cards and debit cards and gift cards?

9   A.   Yes, sir.

10   Q.   And there were passports, license plates, all kinds of

11   things.

12   A.   Yes, sir.

3   Q.   All right. Now, when he came to PSB he brought with him

14   Sergeant Tennyson, right? Or do you know?

15   A.   I don't know. I -- I don't know, sir.

16   Q.   Is Sergeant Tennyson a homicide investigator? I will tell

17   you, I may be wrong, but I'm under the impression that he

18   brought Sergeant Tennyson with him from the homicide

19   department.

20   A.   I don't recall, sir, sorry.

21   Q.   There are divisions within the PSB as you've now set it up,

22   right?

23   A.   Yes. There's the criminal division, and then there's the

24   administrative division, and that's been that way for a long,

5   long time.

1   Q.  All right.  And unlike other police departments, if a

2   police officer committs a crime, let's say, for example,

3   aggravated assault, it's not -- pardon me -- it's not

4   investigated by the normal investigators, it's investigated by

5   the PSB.  In other words, it's not investigated by somebody who

6   would investigate me for aggravated assault.

7   A.  That's correct, Your Honor.  It would be investigated by

8   the criminal section of our Professional Standards Bureau.

9   Q.  All right.  So you have a criminal section and you have

10  what you call the administrative section, right?

11  A.  Yes, sir.

12  Q.  So the criminal section investigates officers who are

3   actually under suspicion for crimes.  And it does the -- it

14  does those investigations as opposed to the assault and battery

15  unit.  I know that's not a unit, but you know what I'm saying?

16  A.  Yes, sir.

17  Q.  And then you have the administrative unit.  What does the

18  administrative unit investigate?

19  A.  They would investigate citizens' complaints, policy

20  violations, those types of things, personnel issues.

21  Q.  And they would investigate to see things for violations of

22  MCSO policy?

23  A.  Yes, sir.

24  Q.  And MCSO policy violations can result in internal

25  discipline, but not criminal prosecution.

1  A.  Correct.

2  Q.  When a complaint comes in, who determines which will be

3  assigned to what? I mean, who determines whether the complaint

4  is assigned to criminal or to administrative?

5  A.  Captain Bailey and myself would make that decision, sir.

6  Q.  All right. So you're pretty involved in the operation of

7  PSB?

8  A.  Yes. Captain Bailey reports directly to me.

9  Q.  And so when a matter comes in, Captain Bailey brings it to

10  you. You and he decide whether it's going to be assigned to

11  the criminal or to the administrative.

12  A.  Yes, sir.

3  Q.  Who assigns an officer to investigate?

14  A.  That would be Captain Bailey's decision.

15  Q.  Ultimately, in the criminal division who decides whether a

16  criminal matter should be taken to the county attorney?

17  A.  I'm not sure I understand your question, Your Honor.

18          Are you talking now about just a normal somebody from

19  General Investigations Division, or normal --

20  Q.  No, no, no, no, no. If you in the PSB criminal division

21  decide that there ought to be a criminal prosecution for

22  something that an officer has done, you have to take that to

23  the county attorney for a decision, right?

24  A.  Yes, sir.

25  Q.  Who makes that decision?

1    A.   That would be, again, made with discussion between the

2    detective that's investigating the crime, the captain, and

3    myself, usually.

4    Q.   And then you'd take it to the county attorney?

5    A.   Yes, sir.

6    Q.   Or I'm not saying you, but somebody in that group would

7    take it to the county attorney for a charging decision.

8    A.   Yes.   The detective that investigated the incident.

9    Q.   Now, do you make the final decision on administrative

10   discipline as well?

11   A.   No, sir.

12   Q.   Who does?

3    A.   That's delegated to -- for the deputies, Deputy Chief

14   Lopez, or for the detention side it would be Deputy Chief John

15   Marshon.

16   Q.   Okay.   Now we -- I think I heard testimony, I know I heard

17   testimony that suggested that if you delay too long in

18   completing an administrative investigation, that limits the

19   dis -- pardon me -- the disciplinary options that can be

20   imposed on an officer, even if they have violated a Maricopa

21   County -- or MCSO policy.

22   A.   Yes and no, Your Honor.   There -- it's -- there is a

23   timeline that is set by state statute that we could still

24   discipline someone.   However, upon appeal by that individual,

25   most likely it would be overturned if they appealed their

1    discipline.

2    Q.  So if an administrative investigation goes too long, you

3    just don't impose discipline.  Or you don't impose -- impose

4    serious discipline.

5    A.  For the most part, no.  We -- we haven't really run into

6    that too much.

7    Q.  But a delay in conducting an administrative investigation

8    would be important and unfortunate?

9    A.  That's correct.  I know I had to sign some letters for

10   Mr. Vogel because the investigation was going beyond the time

11   period.  That extends that time period.  That doesn't absolve

12   us of exceeding that time period, but it would be arguable

3    during the personnel hearing that we followed some due process,

14   and it would be up to the -- the board, the merit commission,

15   to decide whether that discipline would stand if it was major

16   discipline or not.

17          But we have never had that challenged as yet.

18   Q.  In any case, Sergeant Tennyson, whether he was a homicide

19   detective or what, was assigned to do a criminal investigation

20   for the materials found in the Armendariz home.

21   A.  That's correct.

22   Q.  And he was subject to the oversight of my monitor staff,

23   correct?

24   A.  Correct.

25   Q.  And my monitor staff didn't think he did a very good job,

1    did they?

2    A.   No, sir.

3    Q.   And in fact, they issued a report to me about which I held

4    a hearing, and you were present at that hearing, and it was in

5    late October, right?  Do you remember it?

6    A.   I remember the hearing, sir.

7    Q.   That was part of the one -- that was part of the same

8    hearing where I was --

9    A.   I try and forget those kinds of things, but yes, I

10   remember.

11   Q.   All right.  And do you remember that at the beginning of

12   that hearing I had my monitor, and I'm not going to read it all

3    to you, but I had him outline some of the concerns he had with

14   the criminal investigation that had been performed by Captain

15   Tennyson. You remember that?

16   A.   Yes, sir.

17   Q.   I'm just going to read you one paragraph.  I'd like at this

18   time to emphasize -- this is Mr. Warshaw -- in our collective

19   judgment as a monitoring team, and we have hundreds of years of

20   experience, we have never seen, having seen a good number of

21   the interviews that occurred as part and parcel of that

22   criminal inquiry, we had never seen a more deficient,

23   unprofessional set of aimless interviews, interviews replete

24   with extraordinary familiarities, informalities, and apologetic

25   treatment towards those who are being interviewed.  This, in

1    our view, Your Honor, called into question the seriousness in

2    which the MCSO had taken the order of this Court.

3          He said that, right?  Or you remember him saying

4    something like that?

5    A.  I remember something like that, yes, sir.

6    Q.  And do you remember that I indicated in that hearing that

7    I'd actually watched a videotape of one of Sergeant Tennyson's

8    interviews and I was very unimpressed?

9    A.  I do remember that, yes, sir.

10   Q.  And do you remember that there were a number of other

11   problems that we discussed relating to the investigation as I

12   perceived it, and we moved forward?  Or we -- we had a long

3    hearing then.

14          Do you remember some of those things?  And I've lost

15   my notes.  You remember that?

16   A.  Yes, sir.

17   Q.  Do you remember that one of the things we raised in that

18   hearing is it became clear to us at that time that Detective

19   Bailey had, in fact, directly supervised Sergeant Armendariz.

20          You remember that?

21   A.  Yes, sir.

22   Q.  We raised it with him?

23   A.  Yes, sir.

24   Q.  And then do you remember that Chief Warshaw called you the

.5   next day and said:  You can't have Bailey interviewing

 1  Armendariz about -- or Armendariz was dead by that time, but

 2  you can't have Bailey conducting his own interview of himself

 3  for his supervision of Armendariz and for all that may have

 4  happened in his home.  And he suggested -- or I don't know

 5  whether he suggested or directed that you get an outside

 6  investigator to handle that investigation.

 7        Do you remember that?

 8  A.  Yes, sir.

 9  Q.  And within a day or two you wrote him back and said that

10  you'd hired Detective Vogel to do the -- to be an independent

11  investigator.

12  A.  Yes, sir.

 3  Q.  Do you also recall that in the course of that --

14  approximately that time -- and I don't know if you've seen

15  this, Chief, but I'm going to give it to you anyway.

16        THE COURT:  And I'm going to have my clerk mark it.

17  It's materials -- mark it as an exhibit, please.

18        I'm not going to introduce it because I'm not sure the

19  chief has the foundation, but I'm going to show it to you.

20        We were -- my monitor was provided this incident

21  report.  I've got copies for all counsel.  It's MELC028130 --

22  these are the Bates numbers -- through MELC028159.

23        If you'd just distribute that to counsel, Ms. Iafrate,

24  I'd appreciate it.

 5        I need one, Kathleen.  I just gave away all mine.  If

1   you can pull one back.

2   BY THE COURT:

3   Q.   And have you seen this before?

4   A.   No, I have not.

5   Q.   Are you capable of recognizing Sergeant Whelan's signature?

6        Do you know it or not?

7   A.   I -- I don't know it, but it looks like probably

8   Sergeant Dimitri Whelan.

9   Q.   And this -- what is this?

10       MS. IAFRATE:   Your Honor, could I just clarify?   This

11  is not Sergeant Dimitri Whelan.

12       THE COURT:   Oh, okay.   I don't know who it is.

3        MS. IAFRATE:   Okay.   I just wanted to clarify so that

14  that wasn't on the record.

15  BY THE COURT:

16  Q.   And what is this?   What does it look like it is?

17  A.   This is an incident report for found property.

18  Q.   And it looks like the found property was dropped off at

19  property and evidence for destruction, correct?

20  A.   That's correct.

21  Q.   And it is Sergeant Frei who says --

22  A.   Oh, reviewed by, okay.

23  Q.   Is it "Fray" or "Fry"?   Am I mispronouncing it?

24  A.   I'm not familiar with him.

֊5       MS. IAFRATE:   Your Honor --

1          THE COURT:  Neither one of us know --

2          MS. IAFRATE:  -- Sergeant "Fry."

3   BY THE COURT:

4   Q.  Okay, Sergeant "Fry."  And he has been holding on to all of

5   these identifications for five years, and he's being -- and

6   he's dropping them off for destruction, and he says the

7   identifications were used for training purposes only, as most

8   of the criminal employment unit was certified in document

9   examination and had some training in forged fraudulent

10  questioned documents.

11         Do you see where he's saying that?

12  A.  Yes, sir.

3   Q.  And he says he's attaching the identifications, and they

14  have been attached.

15         And do you see those?

16  A.  I do.

17  Q.  But the very first page is not identifications, is it?

18  A.  No, sir.

19  Q.  It's a memo from Sergeant Frei to Captain Bailey written in

20  May when Captain Bailey was still the Special Investigations

21  division, right?  Or that's what it looks like?

22  A.  That -- yes, sir.

23  Q.  And it says, gosh, I've got all these identifications.  And

24  see the attached photocopies.  And so it looks like Sergeant

_5  Frei has written this memorandum to Captain Bailey, right?

1    A.   Yes, sir.

2    Q.   And then there's a bunch of identifications that are

3    attached.

4            You see that?

5    A.   I do.

6    Q.   And again, Sergeant Frei says that these identifications

7    were used for training purposes only, as most of the Criminal

8    Employment Unit is certified in documentation -- document

9    examination or has had some training in

10   forged/fraudulent/questioned documents.

11           You see that?

12   A.   I do.

13   Q.   Did you know that my monitor asked for any training that

14   your folks had had in document examination and training for

15   forged/fraudulent/questioned documents, and they received only

16   one person who had ever done such training in response?

17           Did the monitor team ever tell you that?

18   A.   I'm not aware of that, no, sir.

19   Q.   All right.  Now, if you'll look at all these documents --

20   just look at the first page, but I think it's fairly

21   representative -- most of these documents are, like, Mexican

22   consular identifications, driver's license from individual

23   states in Mexico, various other Mexican identifications.

24   There's a social security card and a couple of Arizona driver's

25   licenses.  Do you see that?

1  A.  I do.

2  Q.  Do you have any idea why people would assume that

3  identifications were fraudulent if they'd taken them from

4  people they'd arrested as illegal aliens and all they did was

5  show that they were Mexican?

6  A.  I don't, Your Honor.

7  Q.  In fact, all of -- a great number of these documents, as

8  you look through them, are Mexican identifications, aren't

9  they?  And it wouldn't make any -- any sense for somebody to

10  fabricate Mexican identification documents if they wanted to

11  pass themselves off as an American citizen, would it?

12  A.  Correct, it would not.

13  Q.  So it looks like the -- well, the date that was -- they

14  were transmitted to be destroyed was November 6th, correct?

15  A.  Yes, sir.

16  Q.  And my monitor team, when it received a copy of these

17  documents, I think, called and stopped the destruction so that

18  they were not destroyed.  I'm not sure about that, maybe some

19  other reason.  But the documents do seem to indicate that they

20  were provided to Captain Bailey when Captain Bailey was SID

21  captain, and that -- it just would be problematic to have him

22  investigating seized documents when he received such a document

23  earlier.  Wouldn't you agree?

24  A.  I would agree.

25  Q.  All right.  Then you knew that I -- you knew that I had

1    questions with Sergeant Tennyson's investigative techniques and

2    determinations?

3    A.  Yes, sir.

4    Q.  And we had another hearing on November 20th.

5          Do you remember that one?

6    A.  Not specifically, Your Honor.

7    Q.  It's the one where Mr. Casey withdrew.

8          Oh, he's not in the courtroom any more.

9    A.  Yes.

10   Q.  It's the one where Mr. Casey withdrew.

11   A.  I remember that.

12   Q.  All right.  I'm going to give you another document and I'm

3    going to have my courtroom deputy mark that one, too.

14         This one I think you might remember.

15         THE CLERK:  You need a copy?

16         THE COURT:  Yes, let's give chief the marked exhibit.

17         MS. IAFRATE:  Your Honor?

18         THE COURT:  Yes.

19         MS. IAFRATE:  While this is being marked, could I just

20   raise one objection regarding --

21         THE COURT:  Yes, surely.

22         MS. IAFRATE:  To my knowledge, Chief Sheridan has

23   never seen that document that you provided to me, or the

24   attachments.

.5         THE COURT:  I didn't purport to say that he had, and I

1  haven't moved it in evidence.

2        This hearing for me is serving multiple purposes, and

3  part of them is to demonstrate part of my frustration with

4  what -- what appear to be deficiencies in the ongoing

5  operations of MCSO. And I, like Ms. Wang, am not going to get

6  into matters that are under seal, but I'm going to start with

7  matters that are out of seal so that --

8        MS. IAFRATE:  My --

9        THE COURT:  -- everyone can be informed of what my

10  concerns are during the break, including Chief Sheridan.  Then

11  I'll have a few final questions on some other matters, and then

12  we can end for the weekend and discuss scheduling.

3        MS. IAFRATE:  My only objection is that there were

14  some statements that Chief Sheridan made in order to agree with

15  you regarding certain things and they weren't accurate.  The

16  rationale for that is he has never seen that set of documents

17  before.

18        THE COURT:  Fair enough, and you've preserved any such

19  objections.

20  BY THE COURT:

21  Q.  Did you have the marked exhibit, Chief?  Have you been

22  given that yet?

23  A.  Yes, sir, I have.

24  Q.  What's the number on it?

.5  A.  Number 1001.

1    Q.  All right. If you turn to the back page of number 1001 it

2    has a handwritten notation in what looks to me to be your

3    signature.

4    A.  That's correct.

5    Q.  Is that your signature?

6    A.  Yes, sir.

7    Q.  And is that your handwritten notation?

8    A.  It is, sir.

9    Q.  And do you remember receiving this report from

10   Sergeant Tennyson?

11   A.  I do.

12   Q.  Now, part of the reason that we had the October hearing is

3    that Sergeant Tennyson had closed the criminal investigation,

14   and my monitor folks didn't like that, right?

15   A.  That's correct.

16   Q.  And we had the October hearing, and then this is a new

17   memorandum closing the October -- or still closing the

18   Armendariz criminal investigation, right?

19   A.  Yes, sir.

20   Q.  And you have signed off on that closure.

21   A.  Yes, I did.

22   Q.  All right. If you would be so kind as to turn to the

23   second page and -- skip the first paragraph, but do you see

24   where it says Most recently the Professional Standards Bureau

25   Criminal Division investigated a claim made by Cisco -- a

1    former deputy who was Cisco Perez.

2         Do you remember that?

3    A.   Yes, sir.

4    Q.   And it says we interviewed 45 officers and -- and there was

5    just a bunch of identifications involved, and so we wrote a

6    memorandum to Keith Manning of the Maricopa County Attorney's

7    Office for review and possible prosecutorial consideration of

8    the Cisco Perez matter.

9    A.   I see that, yes, sir.

10   Q.   And is that what you recall reading?

11   A.   Yes, sir.

12   Q.   And then if you turn to the next page, he quotes, actually,

3    what Mr. Manning, who's the law enforcement liaison, told him.

14   And I'm going to summarize it.  If you don't like what I say,

15   correct me; I'm trying to move along, okay?

16   A.   Okay.

17   Q.   Mr. Manning said:  Look, this isn't good that they've got

18   this stuff, that the deputies have this stuff, but we can't

19   identify victims for these identifications, and they're not

20   worth anything, so there's no criminal action to be had here,

21   is that correct?

22   A.   It's correct.

23   Q.   And so he said then, in the next paragraph, which is part

24   of his memo to you, Sergeant Tennyson said, well, one of the --

.5   he seems to suggest that one of the reasons Armendariz might

1  have had all this stuff in his home is because he's a packrat,

2  right?

3  A.  Yes, sir.

4  Q.  And then he says in the next paragraph we had a female

5  detention coworker who says he took stuff, and he accused her

6  of bringing stuff to his home, but she denies it, basically, is

7  what he says, right?

8  A.  Correct.

9  Q.  And then the third paragraph, you remember when

10  Chief Warshaw talked about the overfamiliarity and lack of

11  critical judgment that seemed to take place in these

12  investigations is one of his concerns?

3  A.  Sergeant Tennyson's investigations, correct?

14  Q.  Yeah.

15  A.  Yes, sir.

16  Q.  You see this third paragraph?  "It is with great respect

17  for those Deputies associated with the MCSO Human Smuggling

18  Unit the following be noted.  Based on this inquiry as well as

19  the aforementioned criminal investigation HSU Detectives

20  invested much effort carrying out duties as they related to

21  Human Smuggling Operations.  With every effort not to

22  overshadow the tremendous work of the Detectives and

23  Supervisors in the unit..."

24          Then he says it looks like they've done some wrong

5  things, right.

1  A.  Yes, sir.

2  Q.  Doesn't that seem to be strange language for somebody who's

3  just supposed to be investigating whether or not they engaged

4  in criminal conduct?

5  A.  It would be, Your Honor, if that was placed in their -- in

6  a criminal report.  This is a -- a memorandum that

7  Sergeant Tennyson wrote to me concerning the overall findings

8  of his investigation and the County Attorney's turndown.

9        There was a lot of thought and discussion that went

10  into me signing off on this on that day.

11  Q.  Was there a lot of thought?

12  A.  Yes, sir.

3  Q.  I'm going to tell you a couple of problems I have with it,

14  so you'll know.  And you'll see these and some of my

15  criticisms, and I'll have others that express my real concerns

16  about how MCSO's doing some things.  These are fairly minor,

17  but I thought they would be illustrative.

18        You see the next paragraph when it says we've made all

19  investigative efforts to determine why some of the

20  identification documents ended up in Deputy Armendariz's home

21  and we just can't come to any conclusion.  So it's not clear

22  why the items did not remain with the arrestee or why the items

23  were not placed into property and evidence.

24        Do you see that?

.5  A.  Yes, sir.

1  Q.  Do you agree with that conclusion?

2  A.  Well, from a --

3  Q.  Let me ask it this way, Chief, and I'm sorry, I know I'm

4  interrupting you.  You're aware that I subsequently authorized

5  my monitors to do an independent investigation of the number of

6  investigations that were within the MCSO.

7       You're aware of that?

8  A.  Yes, sir.

9  Q.  And you're aware that even though this was characterized by

10  the MCSO deputies as we were just holding a few of these for

11  training for fraudulent -- training purposes to dem -- show

12  people fraudulent identification, that they couldn't identify a

'3  single training where they had used them to show fraudulent

14  identification.  And as I said, most of these identifications

15  people would rightfully own, since they were Mexican consular

16  identifications, and my monitor subsequently determined that it

17  was a widespread practice, and I'm not saying everybody or even

18  the majority of people did it, but it was a widespread practice

19  to seize -- seize these sorts of identifications --

20  A.  Um-hum.

21  Q.  -- without turning them in to property and evidence, and

22  throwing them into bins in all the districts.  It wasn't just

23  HSU, it was widespread throughout the department, wasn't it?

24  A.  Yes, sir.

5  Q.  And so Deputy Perez's allegations and why Sergeant

1   Armendariz would have a bunch, and we found Powe and Gandar and

2   Frei had a bunch, that's just not that uncommon at the time in

3   the MCSO, was it?

4   A.   That's correct.

5   Q.   Now, the last paragraph.   "Based on the criteria provided

6   by the Maricopa County Attorney's Office regarding elements

7   needed for the criminal offense of theft as defined by Arizona

8   State Law has not been met."

9        And so he's referring, at least I understand him to be

10  referring to Keith Manning's conclusion that we don't have a

11  crime or we don't have an identifiable victim, and the

12  property's not worth anything, right.

3   A.   Correct.

14  Q.   And you agree with that conclusion as it pertains to the

15  Armendariz investigation, right?

16  A.   I do, Your Honor.

17  Q.   And so you closed the criminal investigation.

18  A.   Yes.

19  Q.   But the Armendariz investigation is different from the

20  Perez investigation, wasn't it?

21  A.   Yes, it was.

22  Q.   Because it wasn't just identifications we were dealing

23  with.   There was money, and there were credit cards, and there

24  were gift cards, and there were debit cards.

25        Those things have value, don't they?

1  A.  Yes, sir.

2  Q.  And they can -- the victims of those things can be

3  identified because their name's right on the credit card.

4  A.  Correct.

5  Q.  And so Attorney Manning's conclusions that there wasn't an

6  identifiable victim and the thing wasn't worth value, although

7  in fairness it applies to, perhaps, many of the identifications

8  in the Armendariz investigation, doesn't apply to them all,

9  does it?

10  A.  No, sir.  Can I -- can I be heard?

11  Q.  You certainly may.

12  A.  Okay.  The thought process --

3  Q.  Let me ask you first:  Did you have a thought process or

14  did you just assume that the investigation was the same?

15  A.  I had a thought process.

16  Q.  All right.  Let's hear it.

17  A.  Okay.  I'm the one that ordered an -- criminal

18  investigation into this issue of the ID cards for all the

19  members from the Human Smuggling Unit.  It was fairly close to

20  the beginning of the administrative investigation after Charley

21  Armendariz, all those items were found in his garage that

22  had -- basically was in its infancy at that point.

23      When we discovered comment from former Deputy Perez,

24  who, again, I just want to emphasize, was terminated by us for

25  truthfulness, and only because we couldn't prove the fact that

1 he was actually running guns, even though he had made

2 statements to that on the wiretap. We had some good statements

3 from him, but it wasn't good enough to charge him criminally

4 working with the drug cartels.

5 So with that information from former Deputy Perez, I

6 ordered a criminal investigation for all the deputies that were

7 in HSU, because he had made the comment that we took things

8 from crime scenes and that kind of thing.

9 And when we did so, I was told by Captain Bailey that

10 he was questioned by one of the monitor teams: Why are you

11 doing that? And basically questioning the wisdom of doing a

12 criminal investigation on these issues. And my assumption was

3 that it was, Why are you wasting your time with that when we

14 have this huge Armendariz investigation going on, because this

15 was going to be very time-consuming. We had to stop the

16 administrative investigation for HSU and the spin-off for

17 Charley Armendariz because we cannot commingle the criminal

18 investigation while there's an administrative investigation.

19 We have to complete the criminal investigation first.

20 Q. I get that. And the criminal investigation tolls the

21 administrative one from running, tolls the time limit on the

22 administrative investigation?

23 A. Well, it certainly doesn't help when you have that.

24 Q. Let me ask you another question, if I can.

25 A. Your Honor, can I --

1   Q.   Yeah.

2   A.   Can I finish?

3   Q.   Sure.

4   A.   Okay.

5   Q.   You know what, though?  There is one area I wanted to get

6   to.  We're after 5 o'clock, I told you we might run a little

7   over, and I'll dispense with all my other questions, but I do

8   have one area I still want to cover with you.

9   A.   Okay.

10   Q.   Okay?

11   A.   My wife came in, so I think she'll give me permission to

12   stay late.

3   Q.   Hope so.

14   A.   Okay.  So with that in mind, we -- and I know there was a

15   lot of discussion with how the questions were to be asked by

16   the monitor team, and there was tension between Sergeant

17   Tennyson, who, contrary to some -- the opinion of the Court,

18   has a very good reputation as a criminal investigator, did run

19   this by the County Attorney's Office, who felt that there was

20   no value, there was no intent to deprive anyone of anything of

21   value, and the fact was we could not interview Charley

22   Armendariz because he was dead.

23          So the Armendariz part of this criminal investigation

24   was what we would call exceptionally cleared because we can't

25   interview the suspect.  And so therefore, it would be --

1   Q.  Can I interrupt?  I think I understand what your answer is.

2   But the truth was that the property found at Armendariz's house

3   was often not seized by Armendariz, was it?  It was seized by

4   other deputies.

5          Did you not know that?

6   A.  I know there was some -- there was an allegation to that

7   effect.  I'm not sure --

8   Q.  I'll tell you that it's since been confirmed by your own --

9   A.  Okay.

10   Q.  -- investigation.

11         So terminating the criminal investigation just because

12   Armendariz is dead terminates the investigation as to all the

3   other deputies who did the seizure of the property that was in

14   Armendariz's house.  And would you acknowledge, and I don't --

15   you know, I don't -- you can object if you want, Ms. Iafrate --

16   your memo doesn't say -- doesn't take into account that the

17   property seized in the Armendariz investigation is -- isn't

18   just identifications, it's valuable items, even if you view

19   identifications as not valuable, with identifiable victims that

20   distinguishes this investigation from the investigation you

21   were relying on with Keith Manning, doesn't it?

22   A.  I guess I'm a little bit confused --

23   Q.  Well, we'll leave this --

24   A.  Okay.

25   Q.  -- because I want to go to something else.

1  A.  Okay.

2  Q.  We can take it up again another time.

3       Let's talk about the Montgomery investigation.

4  A.  Yes, sir.

5  Q.  Chief -- or Sheriff Arpaio yesterday said that you were in

6  charge of that investigation.  Is that true?

7       MR. WALKER:  Your Honor --

8       THE COURT:  Sure.

9       MR. WALKER:  Just so the record is clear, when we use

10  the word -- the name Montgomery, can we make it clear it's

11  Dennis Montgomery?

12       THE COURT:  Yes.  I'm sorry, that's correct.  It's

3  Dennis Montgomery, who is the confidential informant.

14       THE WITNESS:  Yes, sir.

15  BY THE COURT:

16  Q.  And I have some questions on this.  Sheriff Arpaio said

17  you -- folks reported to you.

18  A.  Yes, sir.

19  Q.  You seemed hesitant about that.

20  A.  Well, I'm only hesitant because when you said that I'm in

21  charge of, the detective, Brian Mackiewicz, ·I would consider

22  him to be in charge of an investigation.

23  Q.  All right.  And so he is in charge of the investigation?

24  A.  Correct.

25  Q.  He's a sergeant?

1    A.    Yes, sir.

2    Q.    There is -- is it Sergeant Anglin as well?

3    A.    Yes, sir.  For a short time he was involved in the case.

4    Q.    And somebody from your posse?

5    A.    Yes, sir.

6    Q.    And they spent a lot of time in Seattle?

7    A.    Yes, sir.

8    Q.    Did you report to Sheriff Arpaio about what they were

9    doing?

10   A.    Yes, sir.

11   Q.    How often did you report to Sheriff Arpaio about what they

12   were doing?

13   A.    We got weekly updates, sometimes twice a week.

14   Q.    Think he understood what they were doing?

15   A.    I would think so, yes.

16   Q.    You heard him yesterday say that the DOJ was wiretapping me

17   and other judges, and that that was part of that investigation.

18         You heard that testimony, didn't you?

19   A.    Yes, sir.

20   Q.    I didn't hear you say anything about that.  Was that part

21   of the investigation?

22   A.    I -- it's my recollection that I don't believe you were.

23   There were wiretaps.  I know that there were wiretap numbers

24   that were from my phone and the sheriff's phone in about 2008.

25   I certainly don't recall yours.

1        What maybe the sheriff was confusing that with, there

2    were -- there was information that Dennis Montgomery gave us

3    that certain law offices, Jones, Skelton & Hochuli, Ogletree

4    Deakins, two law firms that represented us in the DOJ case,

5    were breached.  One in particular with Mr. Popolizio, who was

6    representing us.

7    Q.   Well, let's go back to my question.

8    A.   I'm getting there, Your Honor.

9    Q.   Okay.

10   A.   Because you're next.

11   Q.   Okay.

12   A.   And also there was some information that your e-mail from

3    the court was possibly there -- there might have been an e-mail

14   from the -- the DOJ to you.

15       But understand, Dennis Montgomery gave us no evidence

16   that showed the contents of any of those e-mails except one

17   sentence from Mr. Popolizio's e-mail that talked about

18   something about his daughter and a soccer game.

19       It's a very long story.  I don't think you have

20   time -- I can tell it in --

21   Q.   I don't want to hear it, but I will let you tell it later

22   because we'll decide if we're going to take this up later.

23       But in your description of the investigation I didn't

24   hear anything about the DOJ at all.  So why would

25   Mr. Montgomery have been looking at my computer to see if the

1    DOJ was sending me e-mails?

2    A.   Okay.   Here's where the plot thickens a little bit with

3    Mr. Montgomery.   Mr. Montgomery worked for the CIA.   And I

4    don't remember the years, but it was '07 to '10 for a few

5    years, and he took --

6    Q.   When you say '7 to '10 for a few years, I don't -- I didn't

7    understand that.

8    A.   2007 to 2010, sometime -- I may have the dates wrong,

9    because this has been a few years, and I've had other things on

10   my mind since this thing kind of got cold.

11           He would -- when he worked for the CIA, he pulled data

12   from American citizens for the CIA.   I mean, we heard a lot

3    about this a few years ago; it was very much in the media.   And

14   he said he was one of the individuals that was tasked with

15   doing that, and he knew that was incorrect, it was wrong, and

16   so he made backup copies that he took and he kept.   And he was

17   mining that data to find these e-mail breaches, to find the

18   bank information that he originally came to us with.

19   Q.   Well, so he found information that the DOJ had sent a

20   communication to my computer?

21   A.   Something to that effect, yes.

22   Q.   And he brought that to you, and did he have the actual

23   content of the communication?

24   A.   No, sir.

25   Q.   How did he know -- how did he arrive at the conclusion that

1  the DOJ had accessed my computer?

2  A.  Again, we were always very skeptical of what he was giving

3  us.  However, he was giving us information on occasion that was

4  credible.

5       We had a seated justice in Washington -- I can't

6  recall his name; I have it written down on my pad, Your

7  Honor -- that is a member of the FISA court in Washington, D.C.

8  We had Mr. Mon -- because the sheriff and I were concerned

9  about the CIA wiretapping our phones.  This justice actually

10  confirmed that these were typical wiretap numbers, and so it

11  did give Mr. Montgomery a little more credibility with us.

12       And we continued to work with him, we continued to

3   keep him on our informant payroll, so to speak, as he was

14  producing information.  But it became very slow, it became very

15  stale, and we finally realized that he was stringing us along.

16  Q.  You know, with all due respect, we did hear the sheriff say

17  yesterday that he -- some pretty critical comments about the

18  Department of Justice.  Do you remember those?

19       Maybe I misremember.  I'll scratch that.

20       Let me ask you this:  If in fact the sheriff thought

21  there might have been some improper collusion between me and

22  the Department of Justice, can you blame him if he wanted to

23  investigate that further?

24  A.  Could I blame the sheriff?

25  Q.  Yeah.

1  A.  Well, there was -- there was really nothing to think that

2  there was any collusion.

3  Q.  Well, I certainly agree with that, but Mr. Montgomery was

4  an expensive proposition for the MCSO, was he not?

5  A.  He was.

6  Q.  Did you ever hear the sheriff describe his work as an

7  investigation of a conspiracy, or something of that nature,

8  between the Department of Justice and me?

9  A.  No, sir.

10  Q.  Did you ever hear him describe it as an investigation of me

11  to anyone at the MCSO?

12  A.  No, sir.  As a matter of fact, I made quite sure, and I

3  believe in the presence of the sheriff, with detective --

14  Sergeant Anglin and Detective Mackiewicz when this information

15  came forward that they were not, it was -- and I don't normally

16  do this because it's not my style, but I told them:  This is a

17  direct order from me.  You are not to investigate any

18  information involving Judge Snow.  If any further information

19  comes up, I want to know immediately.  Nothing ever did

20  materialize.

21  Q.  So Montgomery brought you some information?

22  A.  Initial.  And when we say "information," what Montgomery

23  would do, because -- I'll try and give you the two-second

24  version.  When you send an e-mail, it goes out in bits and

25  pieces and it could go all over the world.  It could go to

1    Indonesia and back within seconds. And it comes back in your

2    computer, the system puts it back together.

3            Montgomery has that data, or he says he does, in

4    those -- in that format. He needs -- or he says he needed

5    supercomputers to put that information together. He doesn't

6    have one. He's got this huge one in his garage, and it takes

7    forever to run programs. And so he would come back with

8    information.

9            Our primary focus, Your Honor, was the fraud, the bank

10   fraud, the -- excuse me, the computer fraud of him hacking into

11   person -- people's personal bank accounts.

12   Q. Are you uncomfortable telling me who the target of this

3    investigation was?

14   A. No, because there were about 50,000 people. Some of them

15   very prominent people.

16   Q. Well, the sheriff told me that the target was the

17   Department of Justice. Do you remember that?

18   A. I -- I'm sorry, I don't.

19   Q. Oh. Who would have had to sign off on these

20   investigations?

21   A. I don't --

22   Q. When I say the target of the investigation, in other words,

23   he thought the Department of Justice was doing the bugging. Do

24   you remember that? And the investigation was trying to find

25   out the Department of Justice's bugging of judges and your

1  defense attorney and your offices.

2        Do you remember him saying that?

3  A.  I -- I don't remember.

4  Q.  He didn't mention anything about banks, that I recall.

5  A.  Well, when I think it's Dennis Montgomery and what we were

6  doing with him, it was really the bank fraud, it was the DOJ

7  wiretapping our phones going into the e-mail accounts of our

8  counsel, and there was something in there about your e-mail

9  also.

10        So, you know, the DOJ was on our radar screen because,

11  you know, personally if they did do an illegal wiretap on my

12  phone, I would have liked to -- I would like to know that.

3  Q.  I would, too.  You didn't call me.

14  A.  Probably good thing.

15        And so that's how -- that's how that happened.  So

16  when you say sign off on it, now, we were working with the

17  Arizona Attorney General's Office, as they were going to

18  prosecute this case if we were ever able to bring it to a

19  conclusion.

20        And it was also our intent and it is also our intent

21  to gather -- to complete gathering this information, because

22  Montgomery has promised us -- we're no longer paying him, we

23  haven't been paying him for a while -- some further

24  information, and to package this up and forward it to the

25  Federal Bureau of Investigation.  That was going to be our --

1  our final conclusion to tie up this case.

2  Q.  Let me ask you, Montgomery's simply a computer consultant,

3  isn't he?

4  A.  Well, that's what he is now.  He did work for, and this had

5  been verified, and you can google his name and find all kinds

6  of crazy stuff about him, but there were some pieces of

7  information that were verified and credible also.  So like many

8  informants that we deal with, there's a very shady side of them

9  and then there's also a very credible side for them.

10  Q.  Well, why in the world did you have to designate him as a

11  confidential informant if there isn't anything he was doing

12  that was confidential was there?

3  A.  Well, he was working with us confidentially.

14  Q.  Well, why can't you just hire him as a consultant?

15  A.  Because he was -- well, I don't know.  This is the way we

16  handled him.

17  Q.  Well, you don't have -- there's certain protections from

18  disclosure if you designate somebody as a confidential

19  informant, aren't there?

20  A.  Yes, sir.

21  Q.  That don't apply to just consultants?

22  A.  That's correct.

23  Q.  So I can do a public information request, you gotta give me

24  your consultants, but you don't have to give me your

25  confidential informants, do you?

1  A.  No, but when the -- somebody leaks to members of the media

2  who he is, he's no longer confidential.

3  Q.  Well, but what was he doing that he needed to be

4  confidential for?

5  A.  Well, it could have shown --

6  Q.  He hadn't infiltrated organized crime, had he?

7  A.  Could have shown that either the Department of Justice or

8  the CIA was breaching American citizens' personal information,

9  and he had at least 50,000, that I remember, of citizens that

10  lived here in Maricopa County.

11  Q.  But I still don't understand. Do you have a definition of

12  what a confidential informant is anywhere in your operations

3  manual?

14  A.  Yes, sir, we do.

15  Q.  And is it written so broadly that Dennis Montgomery

16  qualifies?

17  A.  I believe so.

18  Q.  Who all has to sign off -- you purchased a bunch of

19  equipment for him.

20  A.  We did, but we never gave it to him.

21  Q.  You authorized travel and overtime and pay for your

22  detectives to go to Seattle?

23  A.  Yes, sir.

24  Q.  Why were you doing this out of Seattle?

25  A.  That's where he lives.

1 Q. Why did your detectives have to go to Seattle?

2 A. That's where his massive computer system is.

3 Q. Who -- did they have to be there with him?

4 A. Well, that was always the discussion, because we wanted to

5 be there when he found the information. And he worked a lot

6 harder when our detectives were there than when they weren't.

7 Q. Was it worth paying their overtime and travel and all those

8 expenses?

9 A. Well, now that we look back, and hindsight's 20/20,

10 probably not.

11 Q. Let me ask this: Did you ever get any referrals that you

12 handled within PSB related to this investigation?

3 A. I don't believe so, no, sir.

14 THE COURT: Well, I thank you for your patience. We

15 will probably be resuming this matter in June, but I think it's

16 time to let you go. Thank you.

17 THE WITNESS: Thank you, Your Honor.

18 MS. WANG: Your Honor, I did have redirect. Do you

19 want me just to defer that till June?

20 THE COURT: I had assumed you were going to redirect.

21 How long is it? I assumed you were going to defer. I'm sorry.

22 MS. WANG: I'm happy to defer the redirect, Your

23 Honor.

24 THE COURT: I think it makes sense. We've gone pretty

25 late in the day.

1           MS. WANG:  Happy to do that.

2           THE COURT:  Thank you.

3           MS. WANG:  Thank you.

4           THE COURT:  So you can step down.

5           Do you know, do we want to set a status conference on

6       what we're going to do and how we're going to handle things

7       for, say, how about May 8th?  I'll --

8           MS. WANG:  Your Honor --

9           THE COURT:  Go ahead.

10          MS. WANG:  I'm sorry, Your Honor.  May we do that

11      telephonically, for those of us who are out of town?

12          THE COURT:  Yes.

3           MS. WANG:  Thank you.

14          THE COURT:  Ms. Clark, did you need to be heard?

15          MS. CLARK:  There's a record I need to make with the

16      Court.

17          THE COURT:  Come forward.

18          (Pause in proceedings.)

19          THE COURT:  Ms. Clark would like to make a record with

20      the courtroom cleared, so I'm going to do our scheduling first

21      and then we'll hear from Ms. Clark.

22          How about May 8th?  That's Friday, May 8th.

23          MR. McDONALD:  I leave for Iowa --

24          THE COURT:  Can you get a microphone?

25          MR. McDONALD:  Yes.

1          I leave for Iowa on May 8th, will be back May 13th.  I

2    leave -- my flight leaves at 3 o'clock.  Perhaps if we --

3          THE COURT:  At 3:00 in the morning or 3:00 in the

4    afternoon?

5          MR. McDONALD:  Not 3:00 in the morning.

6          THE COURT:  How about 10 o'clock in the morning?

7          MR. McDONALD:  10 o'clock would work.

8          THE COURT:  Well, let's do it at 10 o'clock.

9          MR. EISENBERG:  Your Honor, if I may.

10         THE COURT:  Yes.

11         MR. EISENBERG:  I have to appear telephonically

12   because I'll be at a CLE somewhere else.

3          THE COURT:  Well, are you willing to do that?

14         MR. EISENBERG:  I am, Your Honor.

15         THE COURT:  I don't think you'll have a lot to do, but

16   you may.  So we're always glad --

17         MR. EISENBERG:  No, but I --

18         THE COURT:  -- to have you, Mr. Eisenberg.

19         MR. EISENBERG:  -- I'd like to be part of it.

20         MR. COMO:  No problem, Your Honor.

21         MS. WANG:  Your Honor, one other scheduling matter.

22   Could we ask the Court for the briefing schedule on the

23   privilege --

24         THE COURT:  Yes, when will you -- when will you have

25   your brief available?

1          MS. WANG: Could we have till next Friday, Your Honor?

2          THE COURT: And next Friday is the 1st? May 1st, I

3     think? Anybody who wants to respond to Ms. Wang's motion, I

4     guess, re the attorney-client privilege, how long are you going

5     to need?

6          MS. IAFRATE: Ms. Wang and I discussed that if she got

7     hers in by Friday I would be able to get mine in the following

8     Friday.

9          THE COURT: Okay. So the 8th.

10         MS. WANG: I have one amendment, Your Honor, given

11     that you've now set a status conference for the 13th. How

12     about if we --

3          MR. YOUNG: The 8th.

14         THE COURT: It's for the 8th.

15         MS. WANG: How about if we move those back a day

16     earlier so that if we need to meet and confer about anything

17     before the status conference we have a chance to do that?

18         THE COURT: Acceptable to you?

19         MS. IAFRATE: Well, is the status conference going to

20     address the attorney-client privilege argument? I mean, I

21     don't know -- I don't know why those two interact that way. I

22     would just like to stick with the schedule that Ms. Wang and I

23     discussed.

24         THE COURT: Well, you can do that, but I think that it

25     might make some sense, because if I grant the motion, then

1  you're going to have to schedule the deposition of Mr. Casey

2  and/or possibly Mr. Liddy.  And that might be something that

3  needs some scheduling.  So it might make sense if we have

4  Ms. Wang file hers on the 30th, yours on the 6th --

5          Or is it the 7th?

6          MS. IAFRATE:  7th.

7          THE COURT:  7th.  And then I don't promise to, but

8  I'll try to have a ruling for you by the 8th.

9          MS. IAFRATE:  Okay.

10          THE COURT:  Will that work?

11          MS. IAFRATE:  I will make it work.

12          THE COURT:  All right.  Thank you.

13          Now, one other thing that I think is pretty important,

14  and that is we need to know when your administrative -- when

15  your PSB internal investigations are going to be done.

16          MS. IAFRATE:  I know, Your Honor.  I've reached out to

17  get a date certain, and I have not heard back with a date

18  certain.  I know that Mr. Vogel is done with two of his four

19  and they are over at MCSO.  I am trying to get confirmation

20  from MCSO when they'll be done with those.

21          And I also know that there are many, many, spin-off

22  investigations that you are inquiring about.  Originally, the

23  date was given to me that was unacceptably too far away.

24          THE COURT:  Well, how about we do this?  If you can

25  get an idea and let us know, there may be some that are minor

1    enough that they won't prevent us from going forward.  I don't

2    know that, but it seems to me to be possible, because some of

3    them are quite narrowly defined.

4              MS. IAFRATE:  Yes.  Yes.

5              THE COURT:  And so if you could have an idea and

6    communicate that to the other parties prior to the status

7    conference, I think it would be helpful.

8              MS. IAFRATE:  Okay, I will.

9              THE COURT:  Because that -- I mean, frankly, what it

10   will be involve, just so everybody -- this is how I envision it

11   going forward.  When the internal administra- -- when the IA or

12   the PSB investigations are completed, I'm going to have my

3    monitor -- I've already had him try to start in this visit --

14   do the evaluations of the adequacy, and you've seen some of --

15             MS. IAFRATE:  I have.

16             THE COURT:  -- what you're likely to see.

17             I would like to have a chance for you to have a full

18   opportunity to review his conclusions before the hearing.  And

19   to do that, we're going to need to give him some time and give

20   you some time.  And so again, take whatever time you need, but

21   realize that one of the things that he's going to be evaluating

22   you on is your expediency.

23             MS. IAFRATE:  Um-hum.

24             THE COURT:  For a lot of the reasons I've just

25   reviewed with Chief Deputy Sheridan.

1          MS. IAFRATE:  Understood.

2          MS. WANG:  Your Honor, to clarify, I assume

3   plaintiffs' team will also have access to both the findings --

4          THE COURT:  Absolutely.

5          MS. WANG:  -- and the monitor's report?

6          Thank you.

7          THE COURT:  All right.  I appreciate Ms. Iafrate for

8   raising the issue that I did speak to her and Mr. Liddy at

9   sidebar under seal, and I didn't invite you all to come up

10  here.  The court reporter's just informed me that everybody

11  who's ordered transcripts, and it's apparently quite a number,

12  have access to that sidebar.  Please don't look at it.

13         But I will tell you, if it gives you any comfort, that

14  there isn't anything that took place at the sidebar that I

15  didn't fully describe in what I said in open court.

16         And I see Mr. Liddy and Ms. Iafrate both nodding.

17         I gave a complete, I think, substantive description of

18  the positions that were communicated to me at sidebar.

19         So I don't want to make you feel like you're not

20  seeing anything, but just for purposes of clarity, I think

21  Ms. Iafrate raises a good point.

22         Anything else?

23         MR. COMO:  Nothing from me, Your Honor.

24         MR. WALKER:  Nothing from the County, Your Honor.

25         MS. IAFRATE:  No, Your Honor.

1           MR. LIDDY:  Excuse me, Your Honor --

2           THE COURT:  Do you know, Mr. Liddy, gotta have you

3      come to a microphone.

4           MR. LIDDY:  Your Honor, only to note that I have filed

5      a supplemental motion for withdrawal for myself and the other

6      two attorneys who have appeared in this litigation that are

7      employed at the Maricopa County Attorney's Office with this

8      Court today.

9           THE COURT:  All right.  So do you want an expedite --

10     anybody who wants to oppose that motion, get the opposition on

11     file by the 6th of May.

12          MR. WALKER:  When did you say, Judge?

3           THE COURT:  6th of May.

14          MR. WALKER:  Thank you.

15          THE COURT:  Gary has just reminded me that if somebody

16     else orders that transcript, the sidebar portion will be

17     deleted, or be redacted.

18          MR. WALKER:  Your Honor, I don't remember what the

19     date of the sidebar conference was.

20          THE COURT:  You know, I don't either, Mr. Walker.

21     Good luck.

22          MR. WALKER:  But I do note that I've seen docket

23     entries indicating that copies of some of the portions of the

24     transcript have been ordered by members of the press.

25          THE COURT:  They don't have them, but thanks for

1  letting -- thanks for raising that.

2          MS. IAFRATE:  Your Honor, the sidebar was the first

3  day of the hearing.

4          THE COURT:  Thank you.  First day.

5          MR. SEGURA:  Second day.

6          MS. IAFRATE:  Second day?

7          THE COURT:  It was the second day.  Perhaps the third

8  day.

9          MS. IAFRATE:  No, you want to know what?  They are

10  correct, because the motion to withdraw was made orally the

11  first day, and then that night something was filed, and then

12  Mr. Liddy came in and we had that sidebar the second day, so I

3  stand corrected.

14          THE COURT:  All right.

15          Anything else anybody needs to raise?

16          MS. CLARK:  Your Honor?

17          THE COURT:  Yes, Ms. Clark.  You wanted to make a

18  record under seal?

19          MS. CLARK:  Correct.

20          THE COURT:  I will allow you to do that.  We'll clear

21  the courtroom and the parties may remain behind.

22          (Courtroom cleared.)

23          THE COURT:  I'm sorry, I don't know who you folks are

24  there on the first row.

25          MS. WANG:  I was just about to announce them, Your

1    Honor.  In the first row is Julie Romanow, who's a paralegal at

2    Covington & Burling.  And she's with our plaintiffs' counsel

3    team.  Emily Doan you know.  She is a witness in the case but

4    also is on our plaintiffs' counsel team.  And Brooke Bischoff

5    and Amanda Bradley are legal interns with the ACLU of Arizona

6    who who have been working on our team as well.

7             THE COURT:  All right.  Do we have anybody else that

8    anybody's concerned about?

9             MR. ADAMS:  Your Honor, if I may, I've not previously

10   announced.  My name is Ralph Adams.  I'm a partner of Karen

11   Clark.

12            THE COURT:  All right.  Thank you.

3             Ms. Clark.

14            MS. CLARK:  Thank you, Judge.

15            Has the courtroom been cleared?

16            THE COURT:  I'm sorry?

17            MS. CLARK:  Has the courtroom been cleared?

18            THE COURT:  Well, I will tell you --

19            Sir, who are you?

20            UNIDENTIFIED SPEAKER:  I'm with Mr. Walker's office.

21            THE COURT:  All right.  Thank you.

22            Does anybody, looking around, see anybody who is not a

23   party?  Or an attorney for a party?

24            All right.  Do we have the door locked?  Thanks.

25            Go ahead, Ms. Clark.

1          (Sealed proceedings omitted.)

2

3

4

5

6

7

8

9

10

11

12

3

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5

6           I, GARY MOLL, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

3   was prepared under my direction and control.

14

15

16           DATED at Phoenix, Arizona, this 25th day of April,

17  2015.

18

19
                            s/Gary Moll
20

21

22

23

24

25