## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona, | No. |
| Defendant/Petitioner, | U.S. District Court No. CV 07-02513-PHX-GMS |
| and GERARD A. SHERIDAN, | |
| Specially appearing non-party/Petitioner, | |
| vs. | |
| UNITED STATES DISTRICT COURT for the District of Arizona, | |
| Respondent Court, | |
| and | |
| MANUEL DE JESUS ORTEGA MELENDRES, et al., | |
| Plaintiffs/Real Parties in Interest. | |

---

## EXHIBITS TO PETITION FOR WRIT OF MANDAMUS
## VOLUME IV OF VII -- (EXHIBIT 15)

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone:  602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County, Arizona

EXHIBITS TO PETITION FOR WRIT OF MANDAMUS

**<u>VOLUME IV:</u>**

| <u>EX.</u> | <u>DOCUMENT</u> | <u>PAGES</u> |
|---|---|---|
| 15. | Reporter's Transcript of Proceedings, April 23, 2015 District Court Evidentiary Hearing Day 3, pages 512-817 [Dist. Ct. Docket No. 1027] | 0833-1138 |

RESPECTFULLY SUBMITTED this 6th day of August, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES


By /s/ John T. Masterson (w/permission from)
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson (w/permission from)
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Specially appearing counsel for
    Petitioner Joseph M. Arpaio in his
    official capacity as Sheriff of Maricopa
    County, Arizona

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing EXHIBITS TO PETITION FOR WRIT OF MANDAMUS – VOLUME IV OF VII (Exhibit 15) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 6th day of August, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

                         /s/ Karen Gawel



*EXHIBIT 15*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV 07-2513-PHX-GMS |
| vs. | ) ) ) | Phoenix, Arizona April 23, 2015 8:34 a.m. |
| Joseph M. Arpaio, et al., | ) ) | |
| Defendants. | ) ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Evidentiary Hearing Day 3, pages 512-817)

Court Reporter:              Gary Moll
                            401 W. Washington Street, SPC #38
                            Phoenix, Arizona   85003
                            (602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

```
 1                    A P P E A R A N C E S

 2

 3   For the Plaintiffs:          Cecillia D. Wang, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
 4                                FOUNDATION
                                  Immigrants' Rights Project
 5                                39 Drumm Street
                                  San Francisco, California  94111
 6                                (415) 343-0775

 7                                Stanley Young, Esq.
                                  Hyun S. Byun, Esq.
 8                                COVINGTON & BURLING, L.L.P.
                                  333 Twin Dolphin Drive, Suite 700
 9                                Redwood Shores, California  94065
                                  (650) 632-4700
10
                                  Daniel J. Pochoda, Esq.
11                                Joshua D. Bendor, Esq.
                                  AMERICAN CIVIL LIBERTIES
12                                FOUNDATION OF ARIZONA
                                  3707 N. 7th St., Suite 235
`3                                Phoenix, Arizona  85014
                                  (602) 650-1854
14
                                  Andre I. Segura, Esq.
15                                AMERICAN CIVIL LIBERTIES UNION
                                  FOUNDATION
16                                Immigrants' Rights Project
                                  125 Broad Street, 17th Floor
17                                New York, New York  10004
                                  (212) 549-2676
18
     For the Defendants:          Michele M. Iafrate, Esq.
19                                IAFRATE & ASSOCIATES
                                  649 N. 2nd Avenue
20                                Phoenix, Arizona  85003
                                  (602) 234-9775
21
     For the Defendant Maricopa County:
22
                                  Richard K. Walker, Esq.
23                                WALKER & PESKIND, P.L.L.C.
                                  16100 N. 71st Street
24                                Suite 140
                                  Scottsdale, Arizona  85254
25                                (480) 483-6336
```

0834

1                     A P P E A R A N C E S

2

3   For the Defendant Arpaio:   A. Melvin McDonald, Esq.
                                 JONES, SKELTON & HOCHULI, P.L.C.
4                                2901 N. Central Avenue, Suite 800
                                 Phoenix, Arizona   85012
5                                (602) 263-1700

6   For Chief Deputy Sheridan:  Lee D. Stein, Esq.
                                 MITCHELL STEIN CAREY
7                                One Renaissance Square
                                 2 North Central Avenue
8                                Suite 1900
                                 Phoenix, Arizona   85004
9                                (602) 358-0290

10  For Executive Chief Sands:  Greg S. Como, Esq.
                                 LEWIS BRISBOIS BISGAARD
11                               & SMITH, L.L.P.
                                 Phoenix Plaza Tower II
12                               2929 N. Central Avenue
                                 Suite 1700
3                                Phoenix, Arizona   85012-2761
                                 (602) 385-1040
14
    For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
15                               DICKINSON WRIGHT, P.L.L.C.
                                 Attorneys at Law
16                               1850 N. Central Avenue, Suite 1400
                                 Phoenix, Arizona   85004
17                               (602) 285-5000

18  For Lieutenant Sousa:       David S. Eisenberg, Esq.
                                 DAVID EISENBERG, P.L.C.
19                               2702 N. 3rd Street
                                 Suite 4003
20                               Phoenix, Arizona   85004
                                 (602) 237-5076
21
    ALSO PRESENT:               Chief Robert Warshaw
22                               Chief John Girvin
                                 Chief Raul Martinez
23

24

25

1                               I N D E X

2    Witness:                                                    Page

3    JOSEPH M. ARPAIO

4    Direct Examination Continued by Mr. Young                   518
     Cross-Examination by Ms. Iafrate                            587
5    Redirect Examination by Mr. Young                           614
     Examination by the Court                                    625
6
     JOSEPH SOUSA
7
     Direct Examination by Ms. Wang                              661
8    Cross-Examination by Ms. Iafrate                            757
     Cross-Examination by Mr. Como                               779
9    Redirect Examination by Ms. Wang                            789
     Recross-Examination by Ms. Iafrate                          797
10

11

12
                            E X H I B I T S
3
     No.       Description                                  Admitted
14
     78        MCSO News Release, Sheriffs Deputies Raid        561
15             Phoenix Business for Employees using False ID,
               All Arrested Suspected of Being in US Illegally
16             dated 9/20/2012

17   84        MCSO News Release, Sheriffs Deputies Execute      565
               Search Warrant at Concrete Company in Glendale
18             dated 10/18/2012

19   85        MCSO Shift Summary (Sonoran Concrete)             565
               DR 12-156907 dated 10/18/2012
20             (MELC157123 - MELC156125)

21   87        MCSO News Release, 72st Operation Targeting       570
               False Identifications Used to Gain Employment
22             dated 3/14/2013

23

24

25

1                        E X H I B I T S

2    No.      Description                                        Admitted

3    88       MCSO Shift Summary (America's Taco Shop)              571
             DR 12-108378, DOJ Ex. 284 dated 3/14/2013
4            (MCS001291219 - MCS001291221)

5    132      E-mail chain from Sousa re "FW: Updated stats"        756
             and attaching "Criminal Employments stats
6            03-28-12.doc; 03-28-12.doc" dated 3/28/2012
             (MELC114928 - MELC1 14931)
7
     168      MCSO Memorandum from Sousa re "Document               706
8            Production Request Regarding Request IAM-22"
             dated 1/12/2015 (MELC 114948)
9
     169      E-mail chain from Sousa re "Current HSU Ops           677
10           Manual" originally dated March 27, 2012, then
             January 13, 2015, and attaching HSU ops manual
11           (MELC114960 - MELC114967)

12   180      MCSO News Release, West Valley                        568
             Asian/International Supermarket Under
3            Investigation by Sheriff's Office, Arpaio
             Says dated 1/17/2013 (MELC109370 - MELC109371)
14
     182      MCSO News Release, 6 Adults and One Juvenile          572
15           Detained in Human Smuggling Operation dated
             5/18/2013 (MELC167859 - MELC167860)
16
     193A     A Video Clip 1 of Story re Crime Sweep,               580
17           October 19, 2013

18   193B     Video Clip 2 of Story re Crime Sweep,                 582
             October 19, 2013
19
     193C     Video Clip 3 of Story re Crime Sweep,                 582
20           October 19, 2013

21   195A     Video Clip 1 of KNVX after 1070 Decision,             527
             June 25, 2012
22
     196A     Video Clip 1 of Fox Latino at Republican              545
23           Convention, August 31, 2012

24

_5

1                          E X H I B I T S

2    No.      Description                                      Admitted

3    196C     Video Clip 3 of Fox Latino at Republican            547
              Convention, August 31, 2012
4
     196D     Video Clip 4 of Fox Latino at Republican            548
5             Convention, August 31, 2012

6    196E     Video Clip 5 of Fox Latino at Republican            550
              Convention, August 31, 2012
7
     197A     Video Clip 1 of Fox News after after 1070           536
8             Decision, June 26, 2012

9    198A     Video Clip 1 of Univision after 1070 Decision,      529
              June 25, 2012
10
     198B     Video Clip 2 of Univision after 1070 Decision,      530
11            June 25, 2012

12   199A     Video Clip 1 of CNN June 25, 2012                   533

3    199B     Video Clip 2 of CNN June 25, 2012                   534

14   200A     Video Clip 1 of Fox Cavuto June 25, 2012            539

15   201A     Video Clip 1 of Maldonado Interview published       521
              April 13, 2012
16
     201B     Video Clip 2 of Maldonado Interview published       524
17            April 13, 2012

18   203      Video Excerpt from The Joe Show, released           585
              February 26, 2014
19
     212`     Email Chain from J. Sousa to J. Spurgin, et.        725
20            al., re "Master Stat Sheet for Op Desert Sky"
              dated March 31, 2011 (MELC172485 - MELC172503)
21            Sousa Depo Exhibit 192

22   216      Email from J. Sousa to M. Trowbridge, et al.,       668
              re "The Saving of Emails for Ongoing Lawsuits
23            per Att Tim Casey" dated March 27, 2012
              (MELC173868 - MELC173870)
24

25

1           P R O C E E D I N G S

2

3           THE CLERK:  All rise.  The United States District

4    Court for the District of Arizona is now in session, the

5    Honorable G. Murray Snow presiding.

6           THE COURT:  Please be seated.

7           THE CLERK:  Civil case number 07-2513, Melendres v.

8    Arpaio, on for continued evidentiary hearing.

9           THE COURT:  Do we have any matters of business,

10   housekeeping to take up?

11          MR. YOUNG:  Nothing from plaintiffs, Your Honor.

12          MS. IAFRATE:  No, Your Honor.

3           MR. WALKER:  Nothing from the County at this time,

14   Your Honor.

15          MR. COMO:  No, Your Honor.

16          THE COURT:  Please proceed, Mr. Young.

17          MR. YOUNG:  Thank you, Your Honor.

18                      JOSEPH M. ARPAIO,

19   recalled as a witness herein, having been previously duly

20   sworn, was examined and testified further as follows:

21                      DIRECT EXAMINATION

22   BY MR. YOUNG:

23   Q.  Good morning, Sheriff.

24   A.  Good morning.

25   Q.  In the early part of 2012 you believed that illegal

1    immigration was your job, and you continued -- and you intended

2    to continue to do that job, correct?

3    A.    Certain functions, yes.

4    Q.    You focused on illegal immigration because many people

5    thought it was important, right?

6    A.    I can't hear you.  Could you repeat that?

7    Q.    You did that because many people thought that illegal

8    immigration was an important issue, is that right?

9    A.    That's one of the reasons.  The other reason is to enforce

10   the laws.

11   Q.    You did an interview with Hector Maldonado of Conservative

12   TV Online in April 2012, correct?

3    A.    I don't recall.

14   Q.    Well, I'm going to ask you to take a look at PX --

15   Exhibit 201A.

16   A.    Is that in here?

17            THE COURT:  Do you want it played, Mr. Young?

18            MR. YOUNG:  Yes.  We're having a little trouble with

19   the sound, Your Honor, apologies.

20            (Video clip played as follows:)

21            SHERIFF ARPAIO:  So I have a job to do, illegal

22   immigration.

23            (Video clip stopped.)

24            MS. IAFRATE:  This is not in evidence.

.5            THE COURT:  Yes.  Shall we deal with -- I'm going to

 1  propose that we deal with it the way we did yesterday,

 2  recognizing that it's not in evidence, but if the sheriff

 3  doesn't remember it, we need to show it to him, for him to see

 4  if he can recognize it as an interview he took part in.

 5          MS. IAFRATE:  I understand that, Your Honor, but is it

 6  to be published to the courtroom?

 7          THE COURT:  No, we can just publish it to him and to

 8  the parties until we admit it, if we do.  Please.

 9          MR. YOUNG:  Well, Your Honor, may the sheriff listen

10  to the video?

11          THE COURT:  Absolutely.

12          MR. YOUNG:  Okay.

 3          So is there a way to do that consistent with your

14  instruction just now?

15          THE COURT:  Yes.

16          MR. YOUNG:  Okay.  Can we play Exhibit 201A for the

17  sheriff?

18          THE COURT:  Well, it's going to be -- everybody's

19  going to hear it.  I'm just not going to admit it, nor will

20  people see it.

21          (Pause in proceedings.)

22          MR. YOUNG:  Your Honor, Sheriff, we're having a little

23  bit of technical discussion here, if you would hold on for --

24  allow us those minutes.

25          (Pause in proceedings.)

1          MR. YOUNG: Your Honor, since there is no jury in this

2    case, I'm not sure what the distinction is as to publication or

3    nonpublication.

4          THE COURT:  Thank you.

5          THE CLERK:  Let me try one other thing.

6          (Video clip played as follows:)

7          SHERIFF ARPAIO:  So I have a job to do.  Illegal

8    immigration is a high priority not only here, but across the

9    nation.  The people want something done about it.  But we do

10·   other --

11         (Video clip concluded.)

12         THE COURT:  If he recognizes it, that's fine.

3    BY MR. YOUNG:

14   Q.  Sheriff, do you recognize that as yourself?

15   A.  Yes.

16         MR. YOUNG:  I move for the admission of 201A.

17         MS. IAFRATE:  No objection, Your Honor.

18         MR. WALKER:  No objection.

19         MR. COMO:  No objection.

20         THE COURT:  201A is admitted.

21         (Exhibit No. 201A is admitted into evidence.)

22         THE COURT:  You can now publish.

23         MR. YOUNG:  Actually, if we can publish it from the

24   beginning so the sheriff can hear the whole clip.

25         (Video clip played as follows:)

1          SHERIFF ARPAIO:  So I have a job to do.  Illegal
2    immigration is a high priority, not only here, but across the
3    nation.  The people want something done about it.

4          But we do other crime.  We lock up murderers and
5    everything else, but I get all the heat from these critics and
6    demonstrators that demonstrate 10,000 at a time.  Everywhere I
7    go, whether it's New York, New Hampshire, California, I have
8    demonstrators following me around.  Every day they're in front
9    of this building at my headquarters.  Let them do it.  You
10   know, let them -- it's freedom of speech.  Let them go after --
11   me call me racist, Hitler, every name in the book, but when
12   they can't stop you, they have to throw the race card into the
3    mix.

14          (Video clip concluded.)

15   BY MR. YOUNG:

16   Q.   Sheriff, were those your views in the early part of 2012?

17   A.   I don't know if this is the whole interview.

18   Q.   It's a part of your interview with Hector Maldonado.

19          But the part that we just heard represented your views
20   in the early part of 2012, correct?

21   A.   Well, it could be.  I don't know what the full context of
22   the interview was.

23   Q.   You received and anticipated receiving campaign
24   contributions from people who supported your views and your
5    actions on illegal immigration, correct?

0843

1   A.   I receive campaign contributions for my overall

2   performance, I would guess.

3   Q.   And letting people know about your views on immigration

4   issues and your actions on immigration issues was part of the

5   reason you put out press releases, right?

6   A.   I put out press releases on everything that we do.

7   Q.   I'm going to play another section of that same interview,

8   201B, and ask if you recognize it.

9           (Video clip played as follows:)

10          INTERVIEWER:  You have a really, really high approval

11  rating from your county, not just here, down along the border

12  with the folks down where the front lines against the

3   trafficking is.  They appreciate what you're doing.

14          SHERIFF ARPAIO:  Not being egotistical, this state,

15  the country, and the world.  I have the support across the

16  nation as evidenced by the big bucks I'm raising for my next

17  campaign.

18          INTERVIEWER:  Um-hum.

19          SHERIFF ARPAIO:  They don't give you money if they

20  don't believe in you.

21          INTERVIEWER:  Right.

22          SHERIFF ARPAIO:  Also, I've been on 4,000 profiles

23  overseas.  I'm just talking about overseas.  So I have an

24  open-door policy.  They call me a publicity hound.  But how do

25  I get my message out?

1          INTERVIEWER:  Right.

2          SHERIFF ARPAIO:  I don't run a CIA secret

3     organization.  I want everybody to know what I do.  That's why

4     when I have these raids sending 200 volunteer posse and

5     deputies on the streets of Phoenix, which the mayor hates me

6     for -- I won't get into all the politics.  We do have some

7     politicians that don't like me --

8          INTERVIEWER:  Um-hum.

9          SHERIFF ARPAIO:  -- but that's okay with me.  It

10    doesn't bother me at all.

11         INTERVIEWER:  Yeah.

12         SHERIFF ARPAIO:  I know I'm doing the job.

3          (Video clip concluded.)

14    BY MR. YOUNG:

15    Q.  Sheriff, that's you, isn't it?

16    A.  Yes.

17         MR. YOUNG:  I move for the admission of 201B.

18         MS. IAFRATE:  No objection.

19         MR. WALKER:  No objection, Your Honor, but I would

20    again note that this is the first time I'm seeing these videos.

21         MR. COMO:  No objection, Your Honor.

22         THE COURT:  201B is admitted.

23         (Exhibit No. 201B is admitted into evidence.)

24    BY MR. YOUNG:

25    Q.  You mentioned in the video clip in April of 2012 the big

1  bucks that you were getting.  Do you know how much you had

2  received for your reelection campaign that year by that time,

3  April 2012?

4  A.  Was this 2012?

5  Q.  Yes.

6  A.  Are you talking about illegal immigration campaigns or my

7  campaigns?  I didn't separate it.

8  Q.  Well, just generally.  Do you remember how much you had for

9  your reelection campaign in 2012 as of April of that year?

10  A.  I think it was around $8 million.

11  Q.  Now, in June, 2012, you'll recall that the United States

12  Supreme Court decided the case involving SB 1070, in which it

13  upheld the "show me your papers" provision of that law,

14  correct?

15  A.  I don't think the whole 1070 was -- you talking about

16  upheld by the Supreme Court?

17  Q.  Yeah.  Well, many -- many parts of it were struck down --

18  A.  Yes.

19  Q.  -- but one part of it was upheld which is what people know

20  as the "show me your papers" provision.  Do you recall that?

21  A.  Yes.

22  Q.  And you recall that you appeared on a few television news

23  shows right after that opinion came out?

24  A.  I may have.

25  Q.  Okay.  I'm going to ask you whether you recognize

1   Exhibit 195A.  If we could show that.

2              (Video clip played as follows:)

3              INTERVIEWER:  How will this change how you do

4   business?

5              SHERIFF ARPAIO:  Well, you know, I supported 1070.

6   However, we've been doing it anyway.  Nothing has changed.  Of

7   course, the Justice Department has accused me of racial

8   profiling, went to court, but we do the right thing.  We've

9   been doing it.  And we'll continue to enforce the laws.

10             (Video clip concluded.)

11  BY MR. YOUNG:

12  Q.   That's you, Sheriff?

3   A.   Yes.

14             MR. YOUNG:  I move for the admission of 195A.

15             MS. IAFRATE:  Your Honor, objection, rule of

16  completion.

17             THE COURT:  Well, overruled.  As I've indicated, on

18  your cross-examination, if you believe that there is context

19  required, you can demonstrate that to me and I'll allow it to

20  be played.

21             And for -- for reasons I think Mr. Young earlier

22  identified, I don't see any purpose of playing the whole thing

23  and not having the video at this point.  There is no jury, so I

24  will have -- I'll be glad to direct him to play a small portion

25  and then see if he recognizes it before we play the video.

1          But if you want to proceed in that manner, Mr. Young,

2     go ahead.

3          And you can have -- I don't think we need to specify

4     every time, Ms. Iafrate.  If you believe the rule of completion

5     requires more context, you can demonstrate that to me or handle

6     the matter on your cross-examination.

7          With that being said, 195A is admitted.

8          (Exhibit No. 195A is admitted into evidence.)

9     BY MR. YOUNG:

10    Q.   Sheriff, you said in that interview in June -- actually, on

11    June 25, 2012, which is about six months after the injunction

12    issued in this case, that nothing has changed and you will

3     continue to enforce the laws.

14         Was that your view as of that time?

15    A.   Enforce the laws.

16    Q.   Now, you did another interview with Jorge Ramos of

17    Univision in June 2012, correct?

18    A.   I don't have -- I've done several with him, so I don't know

19    which is which.

20    Q.   Well, let's see if we can refresh your memory, and I'm

21    going to ask you to look at Exhibit 198A and see whether you

22    recognize that.

23         (Video clip played as follows:)

24         INTERVIEWER:  Let me tell you, I mean, civil rights

25    organizations in Arizona say that Latinos are more likely to be

1   stopped by your sheriffs than non-Hispanic whites.  How do you

2   explain that?

3         SHERIFF ARPAIO:  Well, Jorge, I didn't hear you that

4   much, but if people -- if you said when we stop people on

5   violations of the law, and then we have suspicion that that

6   person could be here illegally, then we call ICE.

7         And by the way, I predicted this morning that ICE will

8   refuse to pick up those people that are stopped under this

9   Supreme Court decision except if they're vicious, violent, or

10   felonies.  So if you stop the illegal aliens and you have

11   suspicion, what good is doing that if ICE will not participate

12   and take these people under custody and deport them?

3         INTERVIEWER:  So what you're saying is that ICE is not

14   cooperating with you?  What you're telling us is that ICE

15   doesn't want to cooperate with you?

16         SHERIFF ARPAIO:  ICE has always cooperated with us

17   locally, I'm sure not nationally.  But now an article came out

18   today, this afternoon, which I predicted this morning, is now

19   they're going to be very selected -- selective who they take

20   off the hands of law enforcement.  So if they refuse to take

21   minor violators off our hands, that means:  What do you do with

22   the illegal alien?  Dump him on the street?  Probably.

23         So that's a form of amnesty.  As far as I'm concerned,

24   it shows the arrogance of the Justice Department to now stop

25   law enforcement from cooperating with ICE.

1        (Video clip concluded.)

2    BY MR. YOUNG:

3    Q.   You recognize yourself in that video, Sheriff?

4    A.   Yes.

5             MR. YOUNG:   I move for the admission of 198A.

6             THE COURT:   198A.

7             MS. IAFRATE:   No objection.

8             MR. WALKER:   No objection, with the same notation.

9             MR. COMO:   No objection.

10            THE COURT:   198A is admitted.

11            (Exhibit No. 198A is admitted into evidence.)

12   BY MR. YOUNG:

3    Q.   So Sheriff, in June of 2012 you were worried about the

14   issue of whether you had to dump on the street people who were

15   illegal immigrants but for whom you had no state charges on

16   which you could hold them, is that right?

17   A.   I had a concern.

18   Q.   And your desire was that you be able to hand such people

19   over to ICE so that they could be deported.  Was that your view

20   at that time?

21   A.   Under the cir -- right circumstances, yes.

22   Q.   So I'm going to ask you whether you recognize another

23   portion of that same interview, which is Exhibit 198B.

24            (Video clip played as follows:)

25            INTERVIEWER:   Sheriff Arpaio, is something going to

1  change after this, after what happened today in the Supreme

2  Court? Are you going to change your methods, or it's just,

3  again, a vindication of what you've been doing all along?

4      SHERIFF ARPAIO: No, nothing's going to change. We've

5  been doing it anyway. The Supreme Court just affirmed our

6  program, so, you know, I'm happy with that, but we're going to

7  continue doing what we've been doing the last four or five

8  years.

9      (Video clip concluded.)

10  BY MR. YOUNG:

11  Q.  Sheriff, that's you on that video, right?

12  A.  Yes.

13      MR. YOUNG: I move for the admission of 198B.

14      MS. IAFRATE: No objection.

15      MR. WALKER: No objection, same notation.

16      MR. COMO: None.

17  BY MR. YOUNG:

18  Q.  Now, Sheriff --

19      THE COURT: 198B is admitted.

20      MR. YOUNG: I'm sorry, Your Honor. Thank you.

21      (Exhibit No. 198B is admitted into evidence.)

22  BY MR. YOUNG:

23  Q.  Sheriff, in June 2012 your intention was to keep doing what

24  you had been doing for the four or five previous years, is that

25  right? Isn't that what you said in the video?

1 A. Yeah, we were doing several type of enforcement, including

2 the -- the employer sanction, including the human smuggling,

3 so -- and also including the allowing ICE in our jails so they

4 could check the status of everyone arrested. So that was part

5 of our illegal immigration program, too.

6 Q. In the video you said nothing changes, and that you would

7 continue doing what you had been doing for the last four, five

8 years. You had not changed and did not plan to change anything

9 about what you were doing for the last four or five years

10 leading up to June 2012, correct?

11 A. I was relating, again, to our authority to enforce the

12 human smuggling and the employer sanction.

3 Q. You know what the word "nothing" means, right?

14 A. Depends what the reason of that word is.

15 Q. Well, you --

16 A. You have to remember I am on national television quite

17 frequently, and sometimes when you talk on television you say

18 things, part of the questions that are asked, and sometimes

19 they're taken out of context.

20 Q. Well, sometimes on television you say what you mean,

21 correct?

22 A. Try to.

23 Q. Okay. And what you said in June 2012 was that nothing had

24 changed and nothing would change, right?

_5 A. Yes, that's what I said.

1    Q.   Now, you also did an interview on that same day with CNN,

2    and I'm going to ask you whether you recognize Exhibit 199A.

3              (Video clip played as follows:)

4              INTERVIEWER:  Or how you're saying that the numbers do

5    not support racial profiling.

6              SHERIFF ARPAIO:  No, it does not.  We -- we arrest

7    anybody that violates the law.  We don't care where they're

8    from.  It just happens we're close to the border, and a lot of

9    the people coming in come from Mexico and they're here

10   illegally.  That's not my problem.

11             So we're just enforcing all the laws and we're going

12   to continue to do it regardless of the new policy that I hear

3    over the airwaves, which I predicted early this morning, that

14   they're not going to pick up those that we arrest or law

15   enforcement arrests unless they're serious criminals.  So I

16   guess there's another issue of amnesty right now without going

17   to Congress and getting laws changed.

18             (Video clip concluded.)

19   BY MR. YOUNG:

20   Q.   Now, you referred there -- is that you, Sheriff?

21   A.   Yes.

22             MR. YOUNG:  I would move for the admission of 199A.

23             MS. IAFRATE:  No objection.

24             MR. WALKER:  No objection, same notation.

_5             MR. COMO:  No objection.

1          THE COURT:  199A is admitted.

2          (Exhibit No. 199A is admitted into evidence.)

3     BY MR. YOUNG:

4     Q.  Sheriff, the Congress that you refer to, that's the United

5     States Congress, right?

6     A.  Yes.

7     Q.  And they make federal laws, including federal immigration

8     laws, correct?

9     A.  Yes.

10    Q.  And at that time you weren't intending to just dump people

11    on the streets, right?  You were looking for -- trying to

12    figure out some other way that you could prevent releasing

3     people who were illegal immigrants, but for whom you had no

14    state charges, is that right?

15    A.  Well, when I'm speaking, I'm speaking for the national

16    problem, too, as a spokesman.  They come to me for my opinion,

17    not just in Arizona, but across the nation.  So I'm talking in

18    general terms about this illegal immigration problem.

19    Q.  The only agency that you had any control over was your own,

20    right?  You didn't have control over agencies elsewhere in the

21    country, right?

22    A.  That's correct.

23    Q.  I'm going to ask you to look at 199B and see whether you

24    recognize that.

25          (Video clip played as follows:)

1          INTERVIEWER:  One final question.  The "show me your
2    papers" provision which was upheld today, based on police
3    stopping people due to, quote, reasonable suspicion.  What is
4    reasonable suspicion?  Is it just traffic stops?  How else do
5    you define it?

6          SHERIFF ARPAIO:  Well, the traffic stop is not
7    reasonable suspicion, it's a stop that's made on a crime or a
8    traffic violation of the law, and then you determine if the
9    person here with suspicion is here illegally, and then you talk
10   to ICE about that problem and ICE, I presume, will pick them
11   up.  And now I predict they're not going to pick them up.

12         So what do we do, we dump them on the streets even
3    though they're here illegally?  That's something I will face, I
14   have a couple ideas, and I'll face that issue when it comes up.

15              (Video clip concluded.)

16   BY MR. YOUNG:

17   Q.  Sheriff, is that you?

18   A.  Yes.

19              MR. YOUNG:  I move for the admission of 199B.

20              MS. IAFRATE:  No objection.

21              MR. WALKER:  No objection, same notation.

22              MR. COMO:  No objection.

23              THE COURT:  199B is admitted.

24              (Exhibit No. 199B is admitted into evidence.)

25   BY MR. YOUNG:

 1    Q.   Now, what you were thinking of in June 2012 was what later

 2    became the backup plan that you had to take to the Border

 3    Patrol people whom ICE would not accept, is that right?

 4    A.   I'm not sure if that occurred at that time about a backup

 5    plan.

 6    Q.   Did you have other backup plans or other possible

 7    strategies in mind at that time?

 8    A.   I don't recall.

 9    Q.   Well, you were thinking of something, right?  You just

10    don't remember what it is now?

11    A.   Yes.

12    Q.   On June 26, 2012, you did an interview with Fox News, and

 3    I'm going to ask you whether you recall doing that, after

14    looking at Exhibit 197A.

15              (Video clip played as follows:)

16              INTERVIEWER:  You have to rely on the feds.  When

17    you're -- when you're checking the license and registration,

18    aren't you calling the feds to say:  All right.  Is Joe Smith,

19    is this person here illegally or not?  If the feds want to make

20    that stop take extra long before they get back to you with the

21    information, thus causing constitutional problems, they can do

22    it, can they not?

23              SHERIFF ARPAIO:  Yeah, I guess they could, but the

24    worst part of it is they may not respond to pick up the illegal

25    aliens.  They have a new policy only felons and, you know,

1  murderers and that type of category. So what happens when we

2  stop these people with no state charge, we call the feds and

3  they say, No, we're too busy, what do we do, let them back on

4  the streets?

5      I guess that's what's going to happen, and that's sad.

6  I'm going to have to try to work around this, come up with some

7  of my own ideas within the Constitution and the laws. But you

8  know, the government is now trying to cut our throats here in

9  Arizona.

10          (Video clip concluded.)

11  BY MR. YOUNG:

12  Q.  Sheriff, that was you, right?

3   A.  Yes.

14          MR. YOUNG: I move for admission of 197A.

15          MS. IAFRATE: No objection.

16          MR. WALKER: No objection, same notation.

17          MR. COMO: No objection.

18          THE COURT: 197A is admitted.

19          (Exhibit No. 197A is admitted into evidence.)

20  BY MR. YOUNG:

21  Q.  Sheriff, you talked about your having to think about what

22  to do, having to find a work-around with respect to illegal

23  immigrants that you encountered, your office encountered, where

24  there was no state charge, correct?

25  A.  Yes.

1   Q.  The situation where you had illegal immigrants, but no

2   state charge, was the situation that this Court's preliminary

3   injunction addressed, correct?

4   A.  Yes.

5   Q.  You recall doing another interview on June 25, 2012 -- you

6   did a lot of interviews, I admire you -- with Neil Cavuto of

7   Fox News?

8   A.  What day?

9   Q.  June 25, 2012.

10  A.  I don't recall, but I'm sure that it happened if I'm going

11  to see myself on the TV.

12  Q.  All right.  Well, let's do that, and let's play 1 --

3   actually, 200A.  This is a video that lasts several minutes, so

14  I'm going to just stop at one minute and 23 seconds, so let's

15  play the first part of 200A.

16         (Video clip played as follows:)

17         SHERIFF ARPAIO:  No.  The big point here, Neil, is the

18  fact you can detect these people, the illegals, every hour on

19  the hour, but if ICE doesn't accept them, what do you do with

20  them?

21         INTERVIEWER:  They stay, right?  Then what do you

22  do --

23         SHERIFF ARPAIO:  Dump them on the streets.

24         INTERVIEWER:  What do you do?

25         SHERIFF ARPAIO:  Well, I got a couple strategies in

1    mind, I'm not going to reveal it now, but we're going to

2    continue to lock up the human smugglers, raid businesses, crime

3    suppression.  I'm not stopping.  I got state laws that I can

4    enforce.

5            INTERVIEWER:  So excuse my legal ignorance then,

6    Sheriff.  If you, let's say, stop a car, and you suspect that

7    the driver or the occupants might be illegal, and you -- you

8    ask for papers as the Supreme Court says you can, and they

9    don't have any -- any such papers, the Supreme Court says it

10   kind of ends there, if I'm interpreting what they decided today

11   correctly.

12           What does Joe Arpaio do after that?

3            SHERIFF ARPAIO:  Well, I'm going to tell you one thing

14   I'm going to do if it's a state, some type of criminal crime:

15   They're going to jail.  If they're illegal, okay, they're going

16   to jail.

17           Number two, we're going to try to call ICE to take

18   them off our hands, which they've been doing, great cooperation

19   locally.  They've been taking these illegal aliens off our

20   hands when we have no state charge against them.

21           (Video clip concluded.)

22   BY MR. YOUNG:

23   Q.  Sheriff, is that you?

24   A.  Yes.

25           MR. YOUNG:  I move for the admission of 200A.

1           MS. IAFRATE:  No objection.

2           MR. WALKER:  No objection, same notation.

3           MR. COMO:  No objection.

4    BY MR. YOUNG:

5    Q.  Now, Sheriff --

6           THE COURT:  200A is admitted.

7           MR. YOUNG:  I apologize, Your Honor.

8           .(Exhibit No. 200A is admitted into evidence.)

9    BY MR. YOUNG:

10   Q.  Sheriff, you were well aware in June of 2012 of the

11   distinction between illegal immigrants whom you could charge

12   with state crimes, whom you could put in jail, and other

3    illegal immigrants for whom there were no state charges that

14   you could bring, right?  You were aware of that distinction?

15   A.  Yes.

16   Q.  In fact, that's the distinction that you were just

17   discussing on the clip that we just saw, correct?

18   A.  No, I was -- all these interviews were geared towards ICE,

19   the policies of ICE, if you look at the interviews.  And the

20   remarks that I made that I'm going to still enforce the human

21   smuggling and the employer sanction laws.

22   Q.  I'm going to play the rest of the video at this point, so

23   could we just keep going in 200A?

24           (Video clip played as follows:)

25           SHERIFF ARPAIO:  But I predicted this will stop, and

1   this is the first shot by taking away that cooperative 287(g)
2   program from all law enforcement in Arizona, they took away
3   mine about two years ago, and then they took it away from our
4   jails --

5           INTERVIEWER:  I think it's got you in a little bit of
6   a limbo.  I can feel for what you're now facing, because I
7   don't know what you're facing.  But Governor Brewer, while she
8   called the decision a victory for the rule of law, she went on
9   to say, I'm confident our officers are prepared to carry out
10  this law responsibly and lawfully.

11          Back to this law, what are you carrying out if you are
12  allowed to ask for, let's say, identifying papers that prove
3   you're a citizen or a legal resident of this country, and
14  they're not required to have the paperwork, so it's sort of
15  like, yeah, you can ask, but they don't have to show because
16  they don't have to have.

17          SHERIFF ARPAIO:  Well, that's not the point.  Once
18  again, if you prove the -- you have to go to the immigration --
19          INTERVIEWER:  Yeah, but what if they have nothing to
20  show you?  The court seems to be saying, Sheriff, well, you
21  know, that's a pass.

22          SHERIFF ARPAIO:  Well, there's other criteria.

23          INTERVIEWER:  Like what?

24          SHERIFF ARPAIO:  Suspicion.  I'm not going to get into
25  all that, Neil.  There's a whole list of them to show that they

 1  may be --

 2       INTERVIEWER:  You're not afraid that you're being

 3  backed into a legal corner, Sheriff, and that this might be

 4  taken advantage of by feds, ICE, some of these others, maybe

 5  the Obama administration itself, the Justice Department itself,

 6  to land you in jail?

 7       SHERIFF ARPAIO:  No, I'm -- I'm in a political

 8  quandary.  This is all politics, and it's bad -- bad decisions

 9  that the Homeland Security and the White House is making,

10  because I'll tell you why.  They want amnesty.  And if they're

11  not going to accept people here illegally that we show have

12  probable cause or suspicion, that means they're hitting the

 3  streets.  That's what the problem is, they're getting a pass.

14  That's what it's all about.  And it's going to continue, and

15  the criteria will be different as time goes on by the federal

16  government.  So this is amnesty, period.

17       INTERVIEWER:  All right, Joe Arpaio.  It's always a

18  pleasure, Sheriff.  Thank you very much.

19       SHERIFF ARPAIO:  Thank you.

20       (Video clip concluded.)

21  BY MR. YOUNG:

22  Q.  Sheriff, is that you?

23  A.  Yes.

24       MR. YOUNG:  I move for the admission of -- well,

25  actually, 200A is already admitted.

1    BY MR. YOUNG:

2    Q.   Sheriff, Mr. Cavuto asked you a question about possibly

3    going to jail.  Your intention at the time that you spoke to

4    him in June 2012 was to keep doing what you were doing,

5    notwithstanding what he asked you about as a possibility in

6    that regard, correct?

7    A.   I don't know where he came up with that, but that was his

8    comments.

9    Q.   I'm asking about your intention.  Your intention at that

10   time when he asked you that question was to keep doing what you

11   had been doing, correct?

12   A.   Well, I had no intentions of violating the law, so that

3    breezed right by me, his comment.

14   Q.   But you intended to keep doing what you were doing, right?

15   That's what you'd been saying all along and that's what you

16   kept doing?

17   A.   On certain parts of our authority.

18   Q.   You thought that the possibility of violating the law in a

19   way that would send you to jail was just politics?

20   A.   Can you repeat that?

21   Q.   Yes.  I'm referring to what you just said to Mr. Cavuto

22   back in June 2012.  You believed that the possibility of

23   violating the law and going to jail for it was just a matter of

24   politics, correct?

25   A.   I'm just responding to his comment.  He's the one that said

1    it.

2    Q.   Well, you're the one who said this is all politics, right?

3    A.   Through the whole illegal immigration program.

4    Q.   And that comment --

5    A.   Very complex.

6    Q.   Your response accurately reflected your view at that time,

7    is that right?

8    A.   I was speaking for the policies of the United States and

9    Arizona.  Or their, let me just say their policies, their

10   decisions emanating from Washington.

11   Q.   Did you take your oath of office so lightly that when you

12   were asked whether you could go to jail for violating the law,

3    you said it was just politics, and that was the way you felt?

14   A.   I don't think I was responding to that question by

15   politics.  I think I said follow the Constitution and the laws,

16   some of these interviews, so I was responding to his question

17   to the best way I could.

18   Q.   Following the law and following the orders of the Court,

19   that's not just politics, right?  Doesn't that rise above the

20   level of politics, or shouldn't it?

21   A.   Yes, it's very important to follow the Court's decisions

22   and the laws, and --

23   Q.   And court orders, too, right?

24   A.   Yes, court orders.

25            You know, I've been in the -- a top federal official

1    for 22 years.  I have a deep respect for the courts, federal

2    courts, and the federal judges.  And I didn't know all the

3    facts of this court order, and it really hurts me to have after

4    55 years, 55 years, to be in this position.

5         So I want to apologize to the judge that I should have

6    known more of his court orders.  It slipped through the cracks.

7    So that's what I'm responding to your oath of office comment.

8    Q.  Well, speaking of politics, Sheriff, you attended the

9    Republican National Convention in August 2012, correct?

10   A.  Yes.

11   Q.  Okay.  I'm going to show you a part of an interview that

12   you did with Fox News Latino.  It's Exhibit 196A.

3              (Video clip played as follows:)

14             INTERVIEWER:  You know, when you talk to the Hispanic

15   community they point to this platform and they pick two names.

16   It's Kansas Secretary of State Kris Kobach and Sheriff Joe

17   Arpaio that are the problem with the immigration tone, and are

18   the reason why the Hispanics aren't voting for Republicans.

19   What's your response to that?

20             SHERIFF ARPAIO:  First of all, what's the problem?  I

21   don't make the laws.  I'm the sheriff.  I enforce the laws and

22   I'm enforcing state laws and federal laws.  I enforce all the

23   laws.  I don't think that's a problem.  Now I'm the poster boy

24   from Washington from the president on down, but is it because

25   I'm just doing my job?

1          (Video clip concluded.)

2     BY MR. YOUNG:

3     Q.   Sheriff, that was you?

4     A.   Yes.

5          MR. YOUNG:   I move for the admission of 196A.

6          MS. IAFRATE:   No objection.

7          MR. WALKER:   No objection, same notation.

8          MR. COMO:   No objection.

9          THE COURT:   196A is admitted.

10         (Exhibit No. 196A is admitted into evidence.)

11    BY MR. YOUNG:

12    Q.   So Sheriff, in August of 2012 you continued to believe that

3     part of your job was enforcing federal law with respect to

14    immigration?

15    A.   I think I said enforcing all the laws.

16    Q.   And in your view, your position that you were taking and

17    telling the public, was that included federal law, right?

18    A.   Yes, we can enforce federal laws.

19    Q.   I'm going to ask that you be shown 196C, which is from the

20    same interview.

21         (Video clip played as follows:)

22         SHERIFF ARPAIO:   Everywhere I go all these delegates

23    come up to me and say thank you --

24         (Video clip concluded.)

25         MR. YOUNG:   I'm sorry, Your Honor?

1           THE COURT:  Did you want this published, since it's

2   part of the same interview?

3           MR. YOUNG:  It is part of the same interview.

4           THE COURT:  I'll allow it to be published.

5           MR. YOUNG:  Thank you, Your Honor.

6   BY MR. YOUNG:

7   Q.  Well, actually, before we play that, you did believe that

8   people supported you because of your immigration activities,

9   right? ·

10  A.  No.  I think the people supported me for my 20 years as the

11  sheriff on many, many different programs.

12  Q.  Let's take a look at 196C.

3           (Video clip played as follows:)

14          SHERIFF ARPAIO:  Everywhere I go all these delegates

15  come up to me and say thank you.  So evidently I'm doing

16  something right.  So they didn't throw me out.  I'm here, and

17  I'm -- and all these delegates like -- they like me not because

18  I'm tall, dark, and handsome, but they like me because I'm

19  enforcing the illegal immigration laws.  So I think that should

20  send a message that I am doing what the people elected me to

21  do.

22          INTERVIEWER:  Do you ever think about, you know,

23  changing the tone?  Or is this -- if the problem is the tone

24  and not the actual policy, have you ever thought about, okay,

25  let me take back on the rhetoric a little bit?

1          SHERIFF ARPAIO: I'm talking to you. I'm not backing

2     down. Why should -- I'm doing my job. I talk to the media. I

3     don't run a CIA secret operation and hide, so I talk to you.

4     Sometimes it gets me in trouble, but no, I'm not doing -- I'm

5     doing what I've been doing. I'm not toning down anything.

6          (Video clip concluded.)

7     BY MR. YOUNG:

8     Q.   Was that you, Sheriff?

9     A.   Yes.

10          MR. YOUNG: I move for the admission of 196C.

11          MS. IAFRATE: No objection.

12          MR. WALKER: No objection, same notation.

3          MR. COMO: No objection.

14          THE COURT: 196C is admitted.

15          (Exhibit No. 196C is admitted into evidence.)

16    BY MR. YOUNG:

17    Q.   Did that video clip in which you said you were not going to

18    back down or tone anything accurately reflect your views as of

19    August 2012?

20    A.   I'm not -- are you referring to the immigration comments?

21    Q.   Yes.

22    A.   I had that philosophy of enforcing all the laws, not just

23    immigration.

24    Q.   Now, you received some admiration there, which I think you

_5    refer to. You also were receiving campaign contributions due

 1    to your enforcement of the immigration laws, right?

 2    A.    I've been receiving contributions for 22 years.

 3    Q.    Let's take a look at Exhibit 196D and tell me whether you

 4    recognize it.

 5              (Video clip played as follows:)

 6              INTERVIEWER:   And at the end of the day do they win

 7    Florida, you think, Republicans or --

 8              SHERIFF ARPAIO:   I think they're going to win.  I get

 9    a sense here how they support me.  I've raised seven and a half

10    million just to run for sheriff, and a lot of that money comes

11    from Florida.  So evidently if they send me money, they must

12    like what I'm doing.  If they like what I'm doing that should

 3    translate to Mitt Romney, not to Obama, because he's trying to

14    curtail everything I'm doing.

15              (Video clip concluded.)

16    BY MR. YOUNG:

17    Q.    Sheriff, that's you?

18    A.    Yes.

19              MR. YOUNG:   I move for the admission of 196D.

20              MS. IAFRATE:   No objection.

21              MR. WALKER:   No objection, same notation.

22              MR. COMO:   No objection.

23              THE COURT:   196D is admitted.

24              (Exhibit No. 196D is admitted into evidence.)

_5    BY MR. YOUNG:

1  Q.  By the end of your 2012 reelection campaign you had gotten

2  about $8 million in contributions, and you told those donors,

3  among other things, that you were adamant in continuing to

4  enforce the immigration laws, correct?

5  A.  I had a campaign, a fund-raiser that raises the money, but

6  if that's what was said.  But I'm going to say again, I've been

7  raising money for many different issues.  That happened to be

8  one issue.

9  Q.  And your campaign people told you that one of the reasons

10  that people contributed to your campaign was your position on

11  illegal immigration, correct?

12  A.  That may be true, yes.

3  Q.  In fact, you're collecting campaign contributions right now

14  based on your claim that you were doing enforcement of the

15  laws, both of this state and of the country, with respect to

16  immigration, is that right?

17  A.  Well, that may be so.  I didn't read the letter.

18  Q.  Let's take a look at the last part of that -- or the last

19  part I'm going to play, anyway, of that same interview at the

20  Republican National Convention, 196E.

21              (Video clip played as follows:)

22              SHERIFF ARPAIO:  They want to call me all the names,

23  let them do it.  I know in my heart what I am.  I'm just

24  enforcing the law, took an oath of office, and I don't back

.5  down, and I will continue to do what I've been doing.  If they

 1  don't like it, I highly recommend that they go to Congress, get

 2  their congressman to change the laws or make new laws, highly

 3  recommend that.  Don't go after this sheriff that's just

 4  enforcing the laws.  I'm just enforcing the laws.  So change

 5  the laws.  Doesn't bother me at all.

 6          (Video clip concluded.)

 7  BY MR. YOUNG:

 8  Q.  Sheriff, that was you and reflected -- it reflected your

 9  views, correct?

10  A.  Yes.

11          MR. YOUNG:  I move for the admission of 196E.

12          MS. IAFRATE:  No objection.

13          MR. WALKER:  No objection, same notation.

14          MR. COMO:  No objection.

15          THE COURT:  196E is admitted.

16          (Exhibit No. 196E is admitted into evidence.)

17  BY MR. YOUNG:

18  Q.  Sheriff, in that video the only laws you were talking about

19  were federal laws, right?

20  A.  Several laws?

21  Q.  Federal laws.  The ones made by Congress and congressmen.

22  A.  It -- that may be a connection if we're talking about

23  Congress passing federal laws, it may be related to the

24  immigration.

25          THE COURT:  Sheriff?

1          THE WITNESS: Yes, sir.

2          THE COURT: If you're having trouble hearing well --

3          THE WITNESS: I'm sorry, I have a --

4          THE COURT: You can use one of these headsets.

5     They're very good. They'll help you hear if you're having any

6     trouble.

7          THE WITNESS: This here?

8          THE COURT: No.

9          THE WITNESS: Oh.

10         (Pause in proceedings.)

11         THE COURT: Okay. I'm going to test that. Does that

12    help you hear?

3          THE WITNESS: That's good. Thank you.

14         MR. YOUNG: Did we admit 196E?

15         THE COURT: I believe we did. If we didn't, I'm going

16    to admit it now.

17         MR. YOUNG: Thank you.

18    BY MR. YOUNG:

19    Q. Exhibit 51 has already been admitted. It's a press release

20    of yours, Sheriff. I'm going to ask you to look at that.

21         And maybe we should look at the first page on the

22    screen. If you have it there in front of you on paper, feel

23    free to look at that.

24    A. What number --

5     Q. 51. It's a September 21, 2000 news release from your

1    office.

2    A.   Yes.

3    Q.   You have that?

4    A.   Yes.

5    Q.   And there you're talking about a human smuggling operation,

6    and there were a number of people who were detained.  And if

7    you look at the second page at the first full paragraph, you

8    see in the middle of that paragraph, quote:  Sheriff's

9    detectives were unable to gather enough evidence on the

10   remaining two suspects to charge them with a state crime of

11   human smuggling, and attempted to turn the suspects over to ICE

12   as had -- as has been the practice during the last six years.

3    ICE agents, after asking a series of questions, refused to take

14   the suspects from sheriff's detectives.

15             You see that?

16   A.   Yes.

17   Q.   Now, you could have released those people since they were

18   at that point in the middle of Phoenix, right?

19   A.   Yes.

20   Q.   Instead -- well, let's look at the next paragraph to see

21   what you did do instead.

22             You said, quote:  I expected that it would happen

23   eventually, so I had a backup plan in place, which was to take

24   these illegal immigrants not accepted by ICE to the Border

_5   Patrol, end quote.

1            And then your press release goes on to say:  So as

2    directed by the Sheriff, last night deputies took the two

3    suspects to the Border Patrol.

4            Do you see that?

5    A.   Yes.

6    Q.   Now, that -- you set the policy for your office, right?

7    A.   Yes.

8    Q.   And where it says in your press release "as directed by the

9    Sheriff," that indicates that you had established a general

10   direction or plan, or instruction, as to what deputies in your

11   office would do if ICE refused to take suspected illegal

12   immigrants, correct?

3    A.   Yeah, it wasn't a written policy, it was somewhat of a

14   verbal policy depending what the individual situation was.

15   Q.   I'm going to ask you to look at some video of

16   Lieutenant Jakowinicz's deposition and I'm going to ask you

17   whether his testimony is correct.

18           (Video clip played as follows:)

19           "Question:  So when he asked you, what are you going

20   to do if you don't have state charges for someone, but ICE

21   refuses them, did you respond?

22           "Answer:  No, I don't recall responding.  I remember

23   him posing the question.  I kind of looked at him, and he said,

24   you call Border Patrol.  That's my order.  I'm the sheriff.  I

_5   want you calling Border Patrol."

1          (Video clip concluded.)

2   BY MR. YOUNG:

3   Q.   Sheriff, do you think there's something wrong with

4   Lieutenant Jakowinicz's testimony?

5   A.   Well, you know, I don't remember telling my subordinates

6   that I give you orders, so I don't know where that's coming

7   from.   I don't give orders.   I may have a suggestion, but I

8   don't give orders.   I mean, I'm not in the military.

9          So when he talks about orders, I don't -- that's his

10  opinion.   I may have suggested the Border Patrol, but I didn't

11  order.   I let my deputies make their decisions depending on the

12  circumstances.

3   Q.   So you're saying that you didn't order Lieutenant

14  Jakowinicz to take those people to Border Patrol in that

15  situation, you merely suggested that he do that.   Is that what

16  you're saying?

17  A.   That's my recollection.

18  Q.   Do you always merely suggest things to your subordinates

19  within your office?

20  A.   Many occasions.

21  Q.   What you think of as a suggestion some people might

22  perceive as an order.   Would you agree with that?

23  A.   It's possible, but I think they understand who the sheriff

24  is and my management ability.

_5  Q.   Since people understand who the sheriff is, you'd agree

1    with me that since they serve under the sheriff, they should do
2    what you tell them to do, correct?

3    A.   I'm very flexible.  I do recommend many times to my
4    subordinates.

5    Q.   Did you ever tell Lieutenant Jakowinicz, while he was at
6    the human smuggling unit, that he was doing a good job and that
7    he should keep up the good work?

8    A.   I may have.

9    Q.   Now, in this same press release, going back to Exhibit 51,
10 .  you said that you would continue to enforce -- and I'm looking
11   at the third page now.  So if you go to the third page of
12   Exhibit 51, the last page.

3         You said, quote:  Regardless of the Obama
14   administration's policy, I'm going to continue to enforce all
15   of the illegal immigration laws, end quote.  And you say some
16   more things, but that was an accurate reflection of your views
17   on September 21, 2012, right?

18   A.   It should have said that I have the authority to do.  When
19   you said "all immigration laws," I didn't really mean that.  I
20   meant that I had the authority to enforce.

21   Q.   Well, you testified earlier that where you're quoted, you
22   read the quote in order to make sure that it reflects your
23   views, right?

24   A.   And I also said that sometimes it's not always accurate.
_5   Q.   Well, when you read this quote you didn't change it or add

1  any language, right?

2  A.  No, but the intention was those laws, of course, that I had

3  the authority to enforce.

4  Q.  Do you often say things that you don't mean?

5  A.  Say things that I don't mean?

6  Q.  That's my question.  Do you often say things that you don't

7  mean?

8  A.  It depends if -- what forum.  When you were talking about

9  Florida, it was a political meeting, politics all around me, so

10  sometimes I was voicing my own opinion, not necessarily the

11  opinion of my office.

12  Q.  So do you lie to people sometimes when you're on the media

3  just because you're talking in the media?

14  A.  No.  I think the media knows that I don't lie and I'm very

15  out front.

16  Q.  Do you lie in your press releases?

17  A.  I don't -- I don't intentionally lie in the press releases.

18  Q.  In September 2012 you were running for reelection, right?

19  A.  Yes.

20  Q.  That would turn out to be a relative -- relative to your

21  other reelection campaigns, a relatively close reelection

22  campaign, correct, against Paul Penzone?

23  A.  Well, if you call 4 or 5 percent close, then okay, it's

24  close.

5  Q.  It was closer than your prior reelection campaigns turned

1    out to be, right?

2    A.    You mean my six prior?

3    Q.    Yes, your six prior elections.    The 2012 election was

4    closer than those other elections, right?

5    A.    Yes.

6    Q.    At the time that you issued your September 21 press release

7    in 2012 declaring your backup plan, you knew that this Court's

8    preliminary injunction was still in place, correct?

9    A.    I knew that there was an injunction, yes.

10   Q.    You do not recall receiving any legal advice on the backup

11   plan that was -- that you discuss in that press release,

12   correct?

3    A.    I think I mention, and I -- I can't remember who, but I --

14   on something like this I would definitely ask other people's

15   opinions.

16   Q.    Well, going back to your March 25, 2015, deposition,

17   Sheriff, at page 79, at lines 17 to 19 -- I'd ask that to be

18   put on the screen for you -- you were asked this question:

19          "Do you recall receiving any legal advice on the

20   backup plan?

21          "Answer:  No."

22          Was that testimony correct?

23   A.    Well, once again, I recall re -- running this by someone,

24   and I don't recall if it was a lawyer or law enforcement.    I

_5   think I just said that previously.

1  Q.  Well, you ran it by Lieutenant Jakowinicz, right, when you

2  made the suggestion to him, pounding your fist on the table,

3  that he should take those people to the Border Patrol.

4  A.  I don't recall what -- what incident that was, what the

5  circumstances were, or pounding my fist, I sure don't remember

6  that.

7  Q.  Did you consult with Lieutenant Jakowinicz about that

8  issue?

9  A.  I don't recall if I consulted with him, but when we were

10  talking about the Border Patrol I'm sure that I ran it by

11  someone, and I don't recall who it was.

12  Q.  Well, you said that you made a suggestion rather than

3  giving an order to Lieutenant Jakowinicz, and that you did

14  consult with people about your backup plan.

15        Did you consider your interaction with Lieutenant

16  Jakowinicz to be a consultation?

17  A.  No.

18  Q.  So you weren't looking for advice from Lieutenant

19  Jakowinicz, right?

20  A.  No.

21  Q.  In fact, you don't recall thinking about whether you should

22  get legal advice on whether your backup plan complied with the

23  injunction, is that right?

24  A.  Once again, I'm -- I don't have -- I can't recall.  It

_5  possibly could have happened.

1  Q.  But you don't recall one way or the other whether you have

2  ever even thought about whether you should get legal advice on

3  whether your backup plan complied with the injunction, is that

4  right?

5  A.  I'm going to say I may have talked on some legal aspects,

6  but I don't recall who and when.

7  Q.  Or whether, is that right?  You don't recall whether.

8  A.  You can throw that in there, too.

9  Q.  And you did not think about whether you should ask the

10  Court whether your backup plan complied with its injunction

11  order, is that right?

12  A.  That's correct.

3  Q.  Let's take a look at another press release that you issued

14  at about the same time, dated September 20.  It's Exhibit 78.

15          THE COURT:  Is this in evidence?

16          MR. YOUNG:  Not yet, Your Honor.

17          THE COURT:  All right.

18  BY MR. YOUNG:

19  Q.  Now, this is a press release involving an employer raid,

20  correct?

21  A.  Yes.

22          MR. YOUNG:  Okay.  I move for the admission of

23  Exhibit 78.

24          MS. IAFRATE:  Relevance, Your Honor.

.5          THE COURT:  Overruled.

1          MR. WALKER:  Same objection, Your Honor.  May I be

2    heard?

3          THE COURT:  Sidebar.

4          (Bench conference on the record.)

5          MR. WALKER:  I apologize if this is because of my late

6    entry and ignorance of things like before, but wasn't -- isn't

7    "class" defined as people who have had problems, vehicular

8    stops?

9          THE COURT:  Class is defined as people, and you can

10   look it up, but it says people who are stopped, detained, or

11   whatever --

12         MR. WALKER:  Right.

13         THE COURT:  -- within a motor vehicle on a public

14   roadway or in a parking area in Maricopa County.

15         MR. WALKER:  Right.

16         THE COURT:  As I indicated, it seems to me that

17   plaintiffs have a very good argument that as soon as the

18   sheriff takes somebody in a motor vehicle in Maricopa County,

19   they become a member of the class.  And even if I didn't feel

20   that, it is clearly relevant to the sheriff's policies overall,

21   this stuff.  So your objection's overruled for that reason.

22         MR. WALKER:  Okay.  Well, it's just a -- I just had a

23   question about just an issue developing if there's no member of

24   the class, it would be -- it would have a claim based on an

25   employment situation.

1          THE COURT:  Well, you know, it's too late to retry the

2     case.

3          MR. WALKER:  Okay.

4          THE COURT:  The Ninth Circuit has already affirmed the

5     class definition; the class definition says what it says.

6          MR. WALKER:  Right.

7          THE COURT:  And, you know, I can't quote it to you

8     here right now, but as I recall it relates to persons of Latino

9     ancestry who are in motor vehicles in Maricopa County on public

10    roadways or stopped areas or something like that.  And so to

11    the extent that the sheriff takes anybody from these raids,

12    puts them in motor vehicles and transports them on public

3     roadways in Maricopa County or to the Maricopa County Sheriff's

14    Office and they're detained, it at least seems to me like

15    plaintiffs have a good argument that they're members of the

16    class.  So I'm overruling your relevancy objection.

17         MR. WALKER:  Okay.  Thank you.

18         (Bench conference concluded.)

19         THE COURT:  Objection's overruled.

20         MR. YOUNG:  Your Honor, is Exhibit 78 admitted?

21         THE COURT:  Yes.

22         You had no objection?

23         MR. COMO:  No objection, Your Honor.

?4         THE COURT:  Yeah.  Exhibit 78 is admitted.  Thank you.

25         (Exhibit No. 78 is admitted into evidence.)

1  BY MR. YOUNG:

2  Q.  Now, some of the people that your office would take to

3  either ICE or the Border Patrol would be people that your

4  office encountered at workplace raids where your office

5  believed them to be illegal immigrants, but did not have

6  grounds to bring state charges, correct?

7  A.  Yes.

8  Q.  And in that situation you issued a press release, which is

9  Exhibit 78, and I want you to look at the first paragraph on

10  page 2.

11  And there you said, quote:  "The arrest of illegal

12  aliens who are employed using fake names and false Social

.3  Security numbers opens up employment opportunities for those

14  who are in the country legally."

15  You see that?

16  A.  Yes.

17  Q.  Now, that was a political comment, right?

18  A.  Yes.

19  Q.  And you -- you do make political comments in your other

20  press releases that talk about your office's operations, right?

21  A.  Well, I'm not sure about what is political or not, but

22  you're talking about this one, it's making a personal and

23  political comment.

?4  Q.  Let's go now to Exhibit 52.  This has been admitted.  And

25  this is another employment raid at United Construction where,

1 according to the paragraph at the bottom of the page, the first

2 page, the bottom of the first page, quote:

3      "Arpaio refused to allow the suspected illegal aliens

4 to be released into the streets and ordered the deputies to

5 transport these two suspects to the United States Border

6 Patrol."

7      Do you see that?

8 A.  Yes.

9 Q.  That's in accordance with your office's general policies

10 and your general directives, right?

11 A.  At that time, yes.

12 Q.  Now, the next page you say again that what you were doing

3 would, quote, "Open up employee opportunities for businesses

14 and help increase employment for those in the country legally,"

15 end quote.

16      Do you see that?

17 A.  Yes.

18 Q.  And that's the same political comment that you made in your

19 earlier press release, right?

20 A.  Yes.

21 Q.  Let's look at Exhibit 92 -- no, 82, I'm sorry.  82.  That's

22 also been admitted previously.

23      This is an October 9, 2012, press release where you

^4 say that your backup plan is still in place.  And the place

25 where you say that is in the second-to-last paragraph.

1        Do you see that?

2   A.   Yes.

3   Q.   Okay.  Now, you say that in that same paragraph that you,

4   quote:  "... continue to enforce the laws, but keep running

5   into roadblocks," end quote.

6        Do you see that?

7   A.   Yes.

8   Q.   You did not consider this Court's preliminary injunction to

9   be a roadblock, right?

10  A.   No.

11  Q.   Now let's take a look at Exhibit 84.  This is another

12  employer raid at Sonoran Concrete, and you talk about, in the

3   second paragraph, if we could take a look at Exhibit 84 in the

14  second paragraph --

15       MS. IAFRATE:  Your Honor --

16  BY MR. YOUNG:

17  Q.   -- six --

18       MS. IAFRATE:  -- this exhibit is not in evidence.

19       THE COURT:  Thank you.

20       MR. YOUNG:  Oh, I apologize.  I thought it was.

21  BY MR. YOUNG:

22  Q.   Is this a press release issued by your office, Sheriff?

23  A.   Yes.

24       MR. YOUNG:  I move for admission of Exhibit 84.

25       MS. IAFRATE:  Relevance.

1          MR. WALKER: Same objection.

2          THE COURT: Leave that up on the screen, please, so I

3     can see it.

4          THE COURT: Overruled. Exhibit 84 is admitted.

5          (Exhibit No. 84 is admitted into evidence.)

6     BY MR. YOUNG:

7     Q.   In the second paragraph of your October 2012 press release

8     you note that six illegal aliens were turned over to ICE for

9     deportation. You see that?

10    A.   Yes.

11    Q.   Now, I'm going to ask you to look at Exhibit 85, which

12    is -- well, I'm going to ask you to look at it and tell me

3     whether that is a shift summary generated by your office.

14    Exhibit 85.

15    A.   Yes.

16         MR. YOUNG: Your Honor, I move for the admission of

17    Exhibit 85.

18         MS. IAFRATE: Relevance.

19         MR. WALKER: Same objection.

20         THE COURT: Overruled. Exhibit 85 is admitted.

21         (Exhibit No. 85 is admitted into evidence.)

22    BY MR. YOUNG:

23    Q.   Now, Sheriff, on the second page of that shift summary,

24    which is about the Sonoran Concrete raid that you discussed in

25    your press release, at the bottom there's a list of six people

1  who were turned over to ICE due to lack of evidence for state

2  charges.

3        Do you see that?

4  A.  Yes.

5  Q.  And the fact that they, those individuals, were turned over

6  to ICE due to lack of evidence for state charges was consistent

7  with your general instructions, correct?

8  A.  Yes.

9  Q.  Let's move into January 2013 with Exhibit 180.

10        This is a press release that you issued on that date,

11  correct?

12  A.  On the date of the offense?

3  Q.  Yes, which is January 17, 2013.

14  A.  I got a different -- I got a different date here.

15  Q.  Let's only look at -- I'm sorry, 180 is the exhibit.  If I

16  said something different, I apologize.

17        180 is January 17, 2013, news release.

18        Okay.  Well, let's put it on the screen.

19        MS. IAFRATE:  Your Honor -- my apologies.

20  BY MR. YOUNG:

21  Q.  Is Exhibit 180 a press release that your office issued on

22  January 17, 2013?

23  A.  Yes.

?4        MR. YOUNG:  I move for the admission of Exhibit 180.

25        MS. IAFRATE:  Relevance.

1          MR. WALKER:  County joins.

2     BY MR. YOUNG:

3     Q.   Now, on the second page --

4               THE COURT:  Wait a minute.

5               MR. YOUNG:  I'm sorry, Your Honor, I keep forgetting.

6               THE COURT:  What's the basis of your relevance

7     objection?

8               MS. IAFRATE:  Me?

9               THE COURT:  Yes.

10              MS. IAFRATE:  May I argue, or only say a certain

11    number of words?

12              THE COURT:  Well, I'll open it up.  I'll let you argue

3     this time.  But I'm asking -- I'll break my usual rule.

14              MS. IAFRATE:  Okay.  Thank you, Your Honor.

15              THE COURT:  If it is simply that this is an employee

16    raid, then you can have a continuing objection on that basis.

17              MS. IAFRATE:  My argument is that the members that are

18    discussed in this news release are not part of the defined

19    class that was certified in this case originally.

20              THE COURT:  Okay.  And you can have a continuing

21    objection on that basis.

22              MS. IAFRATE:  Thank you.

23              MR. WALKER:  And may I also have one?

?4              THE COURT:  You can also have a continuing

25    objection --

1          MR. WALKER:  Thank you.

2          THE COURT:  -- Mr. Walker.  I would note that even if

3    I agreed with your objection, which I don't for reasons I

4    explained at sidebar, I would still believe that this is

5    relevant information as it pertains to the defendant -- the

6    defendants' policies and procedures, even if it does apply to

7    members that are outside the defined class, because it

8    indicates the defendant's policies and procedures that do apply

9    to the defined class.

10         With that being said, that's the basis for my

11   overruling your objection, and I will give you a continuing

12   objection on that basis.

13         MR. WALKER:  Thank you, Your Honor.

14   BY MR. YOUNG:

15   Q.  Sheriff --

16         MR. YOUNG:  Sorry.  Your Honor, was Exhibit 180

17   admitted?

18         THE COURT:  Exhibit 180 is admitted.

19         (Exhibit No. 180 is admitted into evidence.)

20         THE COURT:  The objection's overruled.

21         MR. YOUNG:  Thank you, Your Honor.

22   BY MR. YOUNG:

23   Q.  In the second page on the third paragraph you're quoted as

24   saying, quote:  "Until the laws are changed, my deputies will

25   continue to enforce state and federal immigration laws," end

1   quote.  That was your view as of January 2013, right?

2   A.  Yes.

3   Q.  And further on down on that same page you said, in the

4   paragraph that begins "but I draw the line" --

5          Do you see that paragraph, Sheriff?

6   A.  Yes.

7   Q.  You said that you disagreed with the view that, quote,

8   "local police agencies should be stopped from enforcing federal

9   immigration laws," end quote.

10         Do you see that sentence?

11  A.  I continue on.  It's not end -- that quote comes way at the

12  bottom.  You said "end quote."

3   Q.  Well, I realize that the quote goes on.  I'm asking you

14  about that part of your quote -- let me just ask you about the

15  part that I'm -- want you to answer a question about, which is,

16  that you believed that local police agencies should not be

17  stopped from enforcing federal immigration laws, is that right?

18  A.  Yes.  Yes.

19  Q.  Now, by January 2013 you knew that the Ninth Circuit Court

20  of Appeals had affirmed this Court's December 23, 2011,

21  injunction, right?  That decision was in September 2012, so by

22  January 2013 you knew that the injunction had been affirmed, is

23  that right?

?4  A.  What date was the injunction?

25  Q.  The Ninth Circuit injunction -- the Ninth Circuit decision

1    affirming the injunction was issued September 25, 2012.  My

2    question to you now is, by January 2013 when you issued this

3    press release, you knew that the injunction had been affirmed,

4    correct?

5    A.  Yes.

6    Q.  Let's look at Exhibit 87.

7         Now, Exhibit 87 is a press release that you issued on

8    March 14, 2013, correct?

9    A.  Yes.

10        MR. YOUNG:  I move for the admission of Exhibit 87.

11        MS. IAFRATE:  Same objection.

12        MR. WALKER:  Same objection.

3         MR. COMO:  No objection.

14        THE COURT:  The exhibit is admitted.

15        (Exhibit No. 87 is admitted into evidence.)

16   BY MR. YOUNG:

17   Q.  Now, there you talk about a number of people in that first

18   paragraph under Narrative who are turned over to ICE.

19        Do you see that?

20   A.  Yes.

21   Q.  In the bottom paragraph you talk about your hope that the

22   nation's leaders will iron out a comprehensive immigration

23   reform deal that will alleviate the problem of non-citizens

?4   working with false documents in our neighborhood work sites.

25        Do you see that?

1  A.  Yes.

2  Q.  Is that another political comment in one of your news

3  releases?

4  A.  That was my personal, if you want to call it political,

5  yes.

6  Q.  Now, Exhibit 88 is another shift summary, and that -- it

7  relates to this America's Taco Shop operation.  It has some

8  redactions which were made by the Department of Justice.  In

9  this proceeding, actually, your office hasn't provided a copy

10 of this, so we're going to use this redacted version.

11         Is this a shift summary generated by your office?

12 A.  Yes.

3          MR. YOUNG:  I move for the admission of Exhibit 88.

14         MS. IAFRATE:  Same objection.

15         MR. WALKER:  Same objection.

16         MR. COMO:  No objection.

17         THE COURT:  Overruled.  The exhibit is admitted.

18 Exhibit 88 is admitted.

19         (Exhibit No. 88 is admitted into evidence.)

20 BY MR. YOUNG:

21 Q.  The top paragraph on page 2 refers to, in the third line, a

22 lack of evidence for state charges for the people who were

23 turned over to ICE.

24         Do you see that?

25 A.  The third line in paragraph 2?

1    Q.    The third line in that top paragraph of page 2.

2          So look at page 2, and the first paragraph on that

3    page, the third line refers to a lack of evidence for state

4    charges.

5          Do you see that?

6    A.    Yes.

7    Q.    So the fact that those people were turned over to ICE was

8    consistent with your policy as of March 2013, correct?

9    A.    Yes.

10   Q.    Let's now look at Exhibit 182.  That's another press

11   release that your office issued on May 18, 2013, correct?

12   A.    Yes.

3           MR. YOUNG:  I move for the admission of Exhibit 182.

14          MS. IAFRATE:  No objection.

15          MR. WALKER:  No objection.

16          MR. COMO:  No objection, Your Honor.

17          THE COURT:  Exhibit 182 is admitted.

18          (Exhibit No. 182 is admitted into evidence.)

19   BY MR. YOUNG:

20   Q.    Now, this press release talks about a human smuggling

21   operation where four people were turned over to ICE.

22          Do you see that --

23   A.    Yeah --

24   Q.    -- on page 2?

25   A.    Yes.

1  Q. And at the bottom you said that, quote, "As a duly sworn

2  sheriff I take my oath to enforce all the laws seriously," end

3  quote.

4      Do you see that?

5  A. Yes.

6  Q. Okay. Now, you cannot give an answer, you're unable to say

7  whether you consider your violation of this Court's injunction

8  to be a violation of your oath, is that right?

9  A. I did not intend to violate my oath.

10  Q. Okay. Listen to my question, Sheriff. My question is

11  whether or not you're able to answer the question, whether your

12  violation of the Court's order is a violation of the oath that

3  you took as sheriff.

14  A. I had no intention of violating that order.

15  Q. Again, Sheriff, listen carefully to my question. Are you

16  able to answer the question of whether you consider, whether

17  you think your violation of the Court's injunction is a

18  violation of the oath that you took as a sheriff to enforce all

19  the laws seriously?

20  A. I'm going to say I had no intention of violating my oath,

21  which I've taken many during my 55 years.

22  Q. All right, Sheriff. I'm going to play a video as part of

23  your deposition on April 14, 2015, at page 319, lines 10

24  through 23. And it's Arpaio video number 3.

25      (Video clip played as follows:)

1          "Question: My question is, if you violated a judge's

2   order, would you consider that to be a violation of the oath

3   that you took as a duly sworn sheriff?

4          "Answer: I can't answer that. I don't have an answer

5   to that.

6          "Question: Why not? Why can't you answer that

7   question?

8          "Answer: Very complex legal, confusing question that

9   you asked me.

10         "Question: I'm not asking you a legal question. I'm

11  asking you whether it's your view that the oath that you took

12  includes enforcing orders of the court.

3          "Answer: I don't know. The contempt situation is not

14  a felony, not a misdemeanor. So this is a tough one to

15  answer."

16         (Video clip concluded.)

17  BY MR. YOUNG:

18  Q.   Was that your testimony, Sheriff?

19  A.   Yes.

20  Q.   I want to shift to the issue of the May 14, 2014, orders of

21  the Court. You were present on that day when Judge Snow

22  ordered your office to cooperate with the monitor to quietly

23  collect videos of traffic stops?

24  A.   Yes.

25  Q.   And just to remind you, on Exhibit 72, on page 24, there is

1   a colloquy or discussion that you had with the Court. And I

2   don't think you have it in front of you, but I'm going to show

3   it on the screen. So it's Exhibit 72, on page 24.

4           And you see there, you told the Court that you would

5   cooperate completely with his monitor?

6   A.  Yes.

7   Q.  You said that -- you told the Court, you represented and

8   committed to the Court that no information would be withheld

9   from the monitor --

10  A.  Yes.

11  Q.  -- correct?

12  A.  Yes.

3   Q.  Now, on May 14, later that same day, you were part of the

14  meeting that included yourself, Chief Sheridan, Tim Casey, Tom

15  Liddy, and Christine Stutz, to decide what to do in response to

16  the Court's order about collecting videos of traffic stops.

17          Do you recall that?

18  A.  Yes.

19  Q.  And at the time of the -- and you were part of the

20  decision, actually, that was made at that meeting, the decision

21  to have Chief Trombi send his e-mail that resulted in violating

22  the Court's orders of that day, is that right? You were part

23  of that decision, is that right?

24  A.  I was in the room.

25  Q.  And you were part of the decision, correct?

1    A.    I didn't object.

2    Q.    At the time of the decision to have Chief Trombi send the

3    e-mail, you had not forgotten about the hearing that took place

4    earlier that same day, right?

5    A.    I knew there was a hearing, yes.

6    Q.    And you remembered the commitment at the time that you were

7    in the room where the decision was made to have Chief Trombi

8    send the e-mail, you remembered the commitment that you had

9    made to the judge that same morning earlier that day to

10    cooperate with the monitor, correct?

11    A.    It was a long hearing, I think two and a half hours, but I

12    did not remember at the time we had that meeting about the

3    monitor situation.

14    Q.    I'm going to ask you to take a look on the screen at page

15    238 of your deposition, lines 15 through 21.  And this is the

16    deposition you gave several weeks ago on March 25.

17           There you were asked:  "Okay.  And when you were in

18    the meeting where Chief Trombi was told to send his e-mail, you

19    had not forgotten about that commitment you had made to the

20    judge; is that right?"

21           Your answer was:  "Yes."

22           Was your testimony accurate?

23    A.    That's right.  But can you repeat my answer I previously

?4    just gave you?

?5    Q.    I'll let your attorney ask you to -- ask for that to be

1  done.

2  A.  All right.

3  Q.  Okay.  So you knew that the monitor was not there in the

4  meeting where you and others decided to have Chief Trombi send

5  the e-mail, right?

6  A.  Yes.

7  Q.  And you knew that the monitor was not there when

8  Chief Trombi came in and was told to send the e-mail, right?

9  A.  Yo.

10  Q.  The monitor would have no way of knowing about the

11  instruction to Chief Trombi unless someone told him, is that

12  right?

3  A.  Yes.

14  Q.  You never told the monitor, despite your commitment that

15  you made to the Court earlier that day, you never told the

16  monitor about the instruction that Chief Trombi was given to

17  send the e-mail, correct?

18  A.  No.

19  Q.  And you -- that means you never -- you did not tell him, is

20  that right?

21  A.  I did not tell him.

22  Q.  And you never told anyone else in the meeting -- Sheridan,

23  Trombi, Casey, Liddy, or Stutz -- that someone ought to check

?4  with the monitor before Trombi sent his e-mail, is that right?

25  A.  I never said that, yes.

1   Q.   You never told anyone, is that right?

2   A.   Yes.

3   Q.   And you did not check with anyone or ask anyone to see

4   whether the monitor would be informed or consulted about the

5   decision to send -- to have Chief Trombi send that e-mail,

6   right?

7   A.   You talking about that meeting?

8   Q.   Any time.  Did you ever check with anyone or ask anyone to

9   see whether the monitor would be informed or consulted about

10  that decision to have Chief Trombi send that e-mail?

11  A.   I personally did not.

12  Q.   Now, just switching subjects a little bit here, it's --

.3  it's possible that it would be better to have the monitor take

14  over the authority for disposing of disciplinary action

15  investigations for violations of the Court's orders, correct?

16  A.   When you say "disposing" I'm confused.

17  Q.   Well, I'm going to ask you to look at page 258 of your

18  deposition, at lines 15 to 19.

19          You were asked:  "Well, wouldn't it be better if the

20  monitor were to take over the authority for dispositions on

21  discipline actions for violations of the Court's orders?"

22          You answered:  "That would be a possibility."

23          Was that accurate?

24  A.   Yes.

25  Q.   In October 2013 this Court issued a supplemental injunction

1    that called for various changes in your office and appointed --

2    or said it would appoint a monitor, is that right?

3    A.   Yes.

4    Q.   And at that time, anyway, the Court was also requiring some

5    form of community outreach for your office, correct?

6    A.   Yes.

7    Q.   Okay.  You didn't like that part of the order, right?

8    A.   I don't know --

9    Q.   And the judge later -- later canceled that part of the

10   order, but at the time that that order was issued, you didn't

11   like the part that called for community outreach, is that

12   right?

3    A.   When you say "like," I had a management decision that I

14   felt that maybe we should do it, but I had -- I'm not opposed

15   to the monitor doing it.

16   Q.   Not long after that decision by the Court you held a

17   saturation patrol in an area where one of your officers had

18   been murdered, is that right?

19   A.   Yes.

20   Q.   And you made some statements to the press at that

21   saturation patrol, correct?

22   A.   I may have.

23   Q.   Let's take a look at 193A.  I'm going to ask you whether

24   you recognize it.

25              (Video clip played as follows:)

1          THE CLERK:  Is there audio with this?

2          Hold on one moment.

3          (Video clip concluded.)

4          (Pause in proceedings.)

5          THE CLERK:  Okay.

6          (Video clip played as follows:)

7          INTERVIEWER:  It's a controversial operation labeled

8  as a crime sweep.

9          SHERIFF ARPAIO:  Some courts want community outreach.

10  I just started it.

11          (Video clip concluded.)

12  BY MR. YOUNG:

13  Q.  Sheriff, when you were referring to courts wanting you to

14  do community outreach, you were referring to this Court,

15  correct?

16  A.  Yes.

17  Q.  That's you on that video, right?

18  A.  Yes.

19          MR. YOUNG:  I move to admit 193A.

20          MS. IAFRATE:  No objection.

21          MR. WALKER:  No objection.

22          MR. COMO:  No objection.

23          THE COURT:  193A is admitted.

24          (Exhibit No. 193A is admitted into evidence.)

25          MR. YOUNG:  Now, 193B, let's take a look at that.

1    That's from the same news segment.

2          THE CLERK:   You have to give me just a minute to

3    switch, because I can't turn that off separately.

4          Okay.

5          (Video clip played as follows:)

6          SHERIFF ARPAIO:   That's the law enforcement aspect.

7    The political aspect is that I'm not backing down.

8          (Video clip concluded.)

9    BY MR. YOUNG:

10   Q.   Did that accurately reflect your views at that time,

11   Sheriff?

12   A.   I don't know what sequence, when I said I'm not backing

3    down, backing down from what?

14   Q.   Well, that's you on that video, right?

15   A.   Yes.

16         MR. YOUNG:   I'd move for the admission of 193B.

17         MS. IAFRATE:   Same objection.   The rule of inclusion,

18   Your Honor.

19         THE COURT:   Okay.

20         MR. WALKER:   Same objection, same notation.

21         MR. COMO:   No objection.

22         THE COURT:   193B is admitted.

23         (Exhibit No. 193B is admitted into evidence.)

24   BY MR. YOUNG:

25   Q.   Let's take a look at 193C, again from that same newscast.

1          (Video clip played as follows:)

2          INTERVIEWER:  Arpaio told me he hopes it sends a

3    message that this is his county.

4          SHERIFF ARPAIO:  I'm an elected constitutional

5    sheriff, and no one is going to take away my authority that I

6    have under the Constitution.

7          (Video clip concluded.)

8    BY MR. YOUNG:

9    Q.  That's you, Sheriff, correct?

10   A.  Yes.

11         MR. YOUNG:  I move to admit 193C.

12         MS. IAFRATE:  Objection, rule of inclusion.

3          MR. WALKER:  Same objection, same notation.

14   BY MR. YOUNG:

15   Q.  Now, when you said that no one would --

16         THE COURT:  Mr. Young.  193C is admitted.

17         (Exhibit No. 193C is admitted into evidence.)

18         MR. YOUNG:  Thank you, Your Honor.  Again, apologies

19   for jumping the gun.

20   BY MR. YOUNG:

21   Q.  Sheriff, when you said no one would take away your

22   authority, you were including anyone who might try to take away

23   your authority, correct?

24   A.  No.

25   Q.  I'm sorry, your answer?

1  A.  No.

2  Q.  You mentioned the Constitution.  You realize that this

3  Court has found that your saturation patrols violated the

4  Constitution, your saturation patrols and other operations.

5  Let's focus on saturation patrols.

6       You realize that this Court, in May 2013, found that

7  your saturation patrols violated the Constitution, the Fourth

8  Amendment, and the Fourteenth Amendment, correct?

9  A.  That could be.  I don't remember the order.  But let me

10 ex -- can I make a comment on --

11 Q.  Actually, I have another question.

12 A.  Sure, I won't do it.

3  Q.  Now, you appealed that order, right?  The finding of

14 violations in May 2013, you appealed that decision, is that

15 right?

16 A.  I believe my lawyers did.

17 Q.  Okay.  And last week the Ninth Circuit mostly affirmed this

18 Court's May 2013 order, is that right?

19 A.  Yes.

20 Q.  Now, in the process of that appeal, you did not contest

21 this Court's findings that your saturation patrols violated the

22 Constitution, is that right?

23 A.  Yes.

24 Q.  One of those saturation patrols occurred in Guadalupe in

25 2008, correct?

1   A.  Yes.

2   Q.  In September 2014 you told an Associated Press reporter

3   with respect to the Guadalupe saturation patrol, quote, "With

4   the same circumstances, I'd do it all over again," end quote.

5        Is that correct?

6   A.  Yes.  Under the same circumstances.

7   Q.  You were interviewed, Sheriff, for a movie called The Joe

8   Show that was released in 2014 last year, correct?

9   A.  Yes.

10   Q.  In fact, you attended the Hollywood premier of that movie?

11   A.  It was a documentary.

12   Q.  Well, a documentary movie, but in any case you attended the

3   premier in Hollywood of that documentary movie, correct?

14   A.  Yes.

15   Q.  I'm going to play Exhibit 203 and ask you whether you

16   recognize yourself there.

17        (Video clip played as follows:)

18        SHERIFF ARPAIO:  I'm probably the greatest politician

19   that ever lived, because everybody says we love him because

20   he's not a politician.  Think of that.  Think of that.  Analyze

21   that statement.  Everybody says we love you, Sheriff, because

22   you're not a politician.  Yeah, I may be the best politician in

23   history.

24        Well, is it wrong to say I'm a politician?  I guess

25   when you run for office you're a politician.  And yet I'm not a

1    typical politician.  But I know how far I can go.  It's amazing

2    what I say and what I do and what I get away with.  It's

3    amazing.

4              (Video clip concluded.)

5              THE WITNESS:  It's the movie.

6    BY MR. YOUNG:

7    Q.  That is you in that video, is that correct?

8    A.  That was probably eight years ago.  This has been going on

9    for nine years, this documentary.

10   Q.  That is you, though, right?

11   A.  Yes.

12             MR. YOUNG:  I move for the admission of Exhibit 203.

3              MS. IAFRATE:  No objection.

14             MR. WALKER:  No objection, same notation.

15             MR. COMO:  No objection.

16             THE COURT:  Exhibit 203's admitted.

17             (Exhibit No. 203 is admitted into evidence.)

18   BY MR. YOUNG:

19   Q.  Sheriff, you were hoping to get away with detaining people

20   who had no state charges so that you could continue to win

21   votes and gather campaign contributions, correct?

22   A.  Absolutely not.

23   Q.  Well, you're now hoping that the benefits of violating the

24   Court's order will outweigh -- end up outweighing the costs of

25   violating that order, is that right?

1   A.   Can you repeat that question?

2   Q.   You're hoping that the benefits of violating the Court's

3   order will end up in the -- at the end of the day, outweighing

4   the costs of violating that order for you, is that right?

5   A.   No.

6   Q.   Well, you've offered to pay a hundred thousand dollars to a

7   charitable cause here in Phoenix as part of your effort to get

8   the Court not to proceed with this hearing, is that right?

9   A.   Yes.

10   Q.   That's not as much as the $8 million in campaign

11   contributions that you took in in 2012 while you were violating

12   the injunction, is that right?

3   A.   I don't think the money would be coming out of any campaign

14   funds.

15   Q.   Well, my question is:  $8 million is more, actually a lot

16   more, than a hundred thousand dollars.  Would you agree with me

17   on that simple math?

18   A.   Yes.

19   Q.   Do you think that you're going to get away with your

20   violations of this Court's orders?

21   A.   That's not for me to say.

22            MR. YOUNG:  Sheriff, thank you for your time.

23            THE WITNESS:  Thank you.

?4            THE COURT:  What's your pleasure, Ms. Iafrate?  You

25   want to start for about 20 minutes, or would you rather take

1    the morning break now?

2            MS. IAFRATE:  I'd rather take a break.

3            THE COURT:  All right.  Let's be back at 10:30.  Thank

4    you.

5            (Recess taken.)

6            THE CLERK:  All rise.  Court is now in session.

7            THE COURT:  Ms. Iafrate.

8            MS. IAFRATE:  Thank you, Your Honor.

9                     CROSS-EXAMINATION

10   BY MS. IAFRATE:

11   Q.  Good morning, Sheriff.

12   A.  Good morning.

3    Q.  I want to show you what's in evidence as Exhibit 71.  And

14   if you look on the screen, it's in evidence.

15           Can you go back to the first page, just so that we can

16   verify what it is.

17           Sheriff, this is a document that was filed on your

18   behalf, correct?

19   A.  Yes.

20   Q.  With your permission?  With your permission?

21   A.  Yes.

22   Q.  With your understanding, correct?

23   A.  Yes.

24   Q.  Can you hear me okay?  Sheriff, can you hear me okay now?

25   A.  This thing's not working too well.

1          Go ahead.

2  Q.  Can you hear me now?

3  A.  Yeah.

4  Q.  Do you want to try a different one?

5  A.  Let me go back to this.  Try it.

6  Q.  Okay.  Can you hear me now?

7  A.  Yes.

8  Q.  Okay.  We were talking about Exhibit 71.  That was filed on

9  your behalf, correct?

10  A.  Yes.

11  Q.  With your permission?

12  A.  Yes.

3  Q.  You understood it before it was filed?

14  A.  Yes.

15  Q.  Okay.  I want to go to page 2 of Exhibit 71.

16          I want you to concentrate on that top paragraph.  It

17  says:  "Defendants acknowledge and appreciate that they have

18  violated the Court's orders and that there are consequences for

19  these violations."

20          Do you see that?

21  A.  Yes.

22  Q.  Do you agree with that statement?

23  A.  Yes.

24  Q.  You acknowledge and appreciate what you know now that you

25  violated the Court's orders, correct?

1  A.  Yes.

2  Q.  The next sentence says:  "There's nothing defendants can do

3  to change what has already been done, but through the entry of

4  an order finding them in civil contempt and by implementing

5  remedies discussed herein, defendants can express sincere

6  remorse to the Court and to plaintiffs, begin to make amends to

7  those who have been injured, and take affirmative steps to

8  ensure nothing like this occurs in the future."

9          Do you agree with that statement?

10  A.  Yes.

11  Q.  Do you express sincere remorse for the activities that

12  occurred?

3          MR. YOUNG:  Objection, leading.

14          THE WITNESS:  Yes, especially to --

15          THE COURT:  Sheriff, when there's an objection, you

16  need to wait until I rule on the objection.

17          I'm going to ask you to rephrase the question,

18  Ms. Iafrate, if you would.

19  BY MS. IAFRATE:

20  Q.  Sheriff, did I read that sentence correctly?

21  A.  Yes.

22  Q.  Why don't you explain to the Court what you mean in that

23  sentence that you express sincere remorse.

24  A.  Well, I have to get into a personal situation with my 22

25  years as a top federal official and never have faced this

1  before.  So I do have respect for the federal courts and

2  judges, so this somewhat hurts me a little that this occurred,

3  but it wasn't intentional.

4  Q.  Sheriff, let's just go into your background a little bit.

5  Just briefly explain your career in law enforcement.

6  A.  Well, I joined the army when the Korean War broke out,

7  1950.  Became a police officer in D.C. for four years.  Went to

8  Las Vegas Police Department.  Then joined the DEA, which was

9  the Bureau of Narcotics, spent 27 years with the federal Drug

10  Enforcement Administration.  And then I ran for sheriff January

11  1, took office January 1, 1993.

12  Q.  And you've ran for sheriff subsequently since 1993,

3  correct?

14  A.  Yes.

15  Q.  When you run for office, does that require money?

16  A.  Yes.

17  Q.  Where do you get that money to run for office?

18  A.  From the people.

19  Q.  There was some discussion regarding that you were -- you

20  had raised approximately $8 million for reelection.

21       Do you recall that?

22  A.  Yes.

23  Q.  Can you spend that money on just anything that you want to

24  spend it on?

25  A.  No.

1    Q.   Are there rules for that?

2    A.   Yes.

3    Q.   Could you spend it on yourself?

4    A.   No.

5    Q.   One of the -- let me ask you something.  This is a matter

6    of public record, but it's also personal.  Can you tell me what

7    you make annually as sheriff of Maricopa County?

8    A.   Hundred thousand dollars.  A hundred thousand and one

9    hundred.

10             THE COURT:  Is that $100,100?

11             THE WITNESS:  Yes.

12             THE COURT:  Thank you.

3    BY MS. IAFRATE:

14   Q.   One of the recommendations that you had regarding finding

15   you in civil contempt was a remedy that would essentially

16   require you to pay one full year's salary out of your own

17   pocket, correct?

18   A.   Yes.

19   Q.   Sheriff, throughout your law enforcement career have you

20   ever intentionally violated a court order?

21   A.   No.

22   Q.   Have you ever intentionally violated a law?

23   A.   No.

24   Q.   There was discussion regarding your oath of office.  You

25   take an oath of office to enforce all laws, correct?

1    A.   Yes.

2    Q.   So breaking a law would not be congruent with your oath of

3    office, correct?

4    A.   No.

5    Q.   I want to show you what is in evidence as Exhibit 67.

6              Can you go to the top so that we can just see the

7    date.

8              Sheriff, are you familiar with an order by this Court

9    that was filed on December 23, 2011?

10   A.   There's been many orders.  I'm not sure about this one

11   unless you --

12   Q.   Well, I'm not going to have you read the whole thing.

13             You're aware that we're here today regarding this

14   Court's preliminary injunction, correct?

15   A.   Oh, okay, this order, yes, the December 23, yes.

16   Q.   2011.

17   A.   Yes.

18   Q.   Do you recall receiving that preliminary injunction?

19   A.   I -- initially I was out of state when that came out, or

20   the day after, but I don't think I received it for many, many

21   months later.

22   Q.   Did you ever get a paper copy that you read?

23   A.   No, until many months later, I believe.

24   Q.   Were you involved with a phone call with Brian Sands and

25   Tim Casey on the date the order was issued?

1  A.  No.  Which -- let me clarify that.  It was not on an e-mail

2  that he sent out.

3  Q.  No, understood.  So you didn't receive it by e-mail,

4  correct?

5  A.  I didn't receive the message by e-mail that there was this

6  order.

7  Q.  And you -- you don't get e-mails, do you?

8  A.  No.

9  Q.  And you didn't receive a phone call on the date that it was

10  issued regarding that order, correct?

11  A.  I don't recall.

12  Q.  You didn't read this order on the date that it was filed,

3  correct?

14  A.  No.

15  Q.  Do you ever recall reading the order?

16  A.  May have been many, many months later.

17  Q.  When a court issues orders, not just in this case, but

18  generally, how do you normally get informed of the order?

19  A.  You talking about lawsuits or an order?

20  Q.  Just generally.

21  A.  I may have -- people may have mentioned it to me, but --

22  Q.  Sheriff, generally, if an order comes down or lawsuit gets

23  filed, how do you get informed of that?

'4  A.  I don't get all of them, but when I do, I just give them to

25  the subordinates.  I don't get involved.  Usually my attorneys

1  look into it.

2  Q.  So when you say your attorneys, you're talking about people

3  from the Maricopa County Attorney's Office?

4  A.  Or those that are hired by the County Attorney's Office.

5  Q.  What they call outside attorneys?

6  A.  Yes.

7  Q.  So you rely on your attorneys to give you information

8  regarding issues in lawsuits, correct?

9           MR. YOUNG:  Objection, leading.

10          THE WITNESS:  Information, or if they need --

11          THE COURT:  Sheriff --

12          THE WITNESS:  I'm sorry.

3           THE COURT:  Sustained.

14  BY MS. IAFRATE:

15  Q.  So my question is:  How is it that you generally get the

16  information regarding what's going on in the lawsuits?

17  A.  It's usually the attorney that will mention it, I guess, at

18  the appropriate time.

19  Q.  Do you recall who told you about the preliminary

20  injunction?

21  A.  No.

22  Q.  Do you recall when you were told about the preliminary

23  injunction?

?4  A.  As far as being told, and there's a little confusion

25  because I left the state day after Christmas and was not back

1  to the office till after New Year's, but I don't recall if

2  someone mentioned that there was an order.  Possibly, yes.

3  Q.  Did you meet with attorneys regarding the preliminary

4  injunction?

5  A.  At what time?

6  Q.  Ever.

7  A.  I may have once or twice, I can't remember, but not

8  constantly.

9  Q.  You mentioned something earlier that when you got

10  information or lawsuits, you would give it to your

11  subordinates.  What did you mean by that?

12  A.  Well, we have a legal division.  It would go down to the

13  legal division, our internal legal division -- excuse me -- and

14  then I presume the County would appoint an attorney to handle

15  the lawsuit.

16  Q.  Let me go back.  When you say "legal division," do you have

17  in-house lawyers in that legal division?

18  A.  No.  We have people that process legal documents.

19  Q.  Do they make legal decisions in that legal department?

20  A.  No.

21  Q.  You were shown many press releases and video clips, some

22  dating back all the way to 2008.  You would agree that you are

23  in the media frequently?

24  A.  Am I in the media frequently?

25  Q.  Yes.

1  A.  Yes.

2  Q.  Not just about illegal immigration?

3  A.  No.

4  Q.  There are video clips and press releases regarding

5  enforcement of other laws during that time period also,

6  correct?

7  A.  Yes.

8  Q.  Were you just enforcing illegal immigration laws between

9  2008 and 2013?

10. A.  No.

11  Q.  Let me just show you one of the press releases that was

12  shown to you.  It's Exhibit 75.

.3      This is in evidence.  It's dated December 30, 2011,

14  correct?

15  A.  Yes.

16  Q.  Sheriff, do you write the press releases?

17  A.  Usually my public information office does.

18  Q.  Do you ever personally write the press release itself?

19  A.  No.

20  Q.  In this press release it talks about the Human Smuggling

21  Unit, correct?

22  A.  Yes.

23  Q.  And it talks about some enforcement that was done on

24  December 30, 2011, correct?

25  A.  Yes.

1  Q.  In Gila Bend?

2  A.  Yes.

3  Q.  In a drop house?

4  A.  Yes.

5  Q.  This press release was issued from your office, correct?

6  A.  Yes.

7  Q.  Seven days after the preliminary injunction was filed,

8  correct?

9  A.  Yes.

10  Q.  Did you know that any activities that you were doing on

11  this date violated the preliminary injunction?

12  A.  Could you repeat that?

3  Q.  Did you know that any of the activities that were performed

14  on December 30, 2011, violated the preliminary injunction?

15  A.  No.

16  Q.  Do you know that to be the truth now?

17  A.  Can you move that up a little?

18          (Pause in proceedings.)

19  BY MS. IAFRATE:

20  Q.  Sheriff --

21  A.  I don't know what happened to the other four.  It says 28

22  and 14 were booked into jail.

23  Q.  So if -- what you're talking about is if they were arrested

24  on state charges and put into jail, that wouldn't violate the

25  preliminary instruction, correct?

1  A.  Yes.

2  Q.  But if they were detained and removed by ICE or Border

3  Patrol, that would violate the preliminary injunction, correct?

4  A.  Yes.

5  Q.  Let me show you -- look at the bottom line that was shown

6  to you on direct examination.  Says:  "I will continue to

7  enforce illegal immigration laws."

8       Do you see that?

9  A.  Yes.

10  Q.  Do you agree with that statement?

11  A.  As it relates to the other jurisdiction on the human

12  smuggling, which is part of the illegal immigration problem.

3  Q.  So there still were laws on the books that you could

14  enforce, correct?

15  A.  Yes.

16  Q.  Turning to --

17       You can take that down, thanks.

18       Turning to the media attention, how many interviews

19  over your career do you think that you have participated in?

20  A.  My career?

21  Q.  Yes.

22  A.  As the sheriff?

23  Q.  As the sheriff.

24  A.  Well, I'm sure it's into the thousands --

25  Q.  As the sheriff --

1    A.   -- worldwide.

2    Q.   As the sheriff, how many press releases has your office

3    disseminated during the time that you were sheriff?

4    A.   I would say in the thousands.

5    Q.   I'm going to show -- well, you were shown a -- many video

6    clips during your direct examination, correct?

7    A.   Yes.

8    Q.   Some of them talked about SB 1070, correct?

9    A.   Yes.

10   Q.   And SB 1070 was what some called "show me your papers"

11   provision.  Do you recall that?

12   A.   Yes.

13   Q.   That was one area that was upheld that you could enforce,

14   correct?

15   A.   Yes.

16   Q.   That was one of the areas where when you say that you will

17   continue to enforce the immigration laws, that was a piece

18   where you could continue to enforce, correct?

19   A.   Yes.

20   Q.   You were shown some press release regarding a backup plan.

21        Do you recall that?

22   A.   Yes.

23   Q.   Explain what you mean by a backup plan.

24   A.   Well -- excuse me -- that's when ICE, there was a lot of

25   controversy around the nation about ICE not releasing -- or not

1  picking up from law enforcement those that were here illegally.

2  I was concerned about that, that they changed their policy, and

3  I was speaking about that issue more of a national than a local

4  problem.

5  Q.  Well, there was some testimony from Sergeant Palmer where

6  you and he had a discussion over the telephone.

7      Do you recall --

8      First of all, let me ask you:  Do you recall that

9  telephone call with Sergeant Palmer?

10 A.  Now I do, yes.

11 Q.  After hearing about it you recall it now?

12 A.  Yes.

3  Q.  Did you tell Sergeant Palmer to hold some suspects at

14 Enforcement Support till you got there?

15 A.  I may have, yes.

16 Q.  Did you know back then that that was in violation of the

17 preliminary injunction?

18 A.  No.

19 Q.  Do you know now that that was a violation of the

20 preliminary injunction?

21 A.  Yes.

22 Q.  Sergeant Palmer wanted to have the individuals transported

23 to Border Patrol.  Do you recall that?

24 A.  Yes.

25 Q.  Was that in violation of the preliminary injunction?

1        MR. YOUNG:  Objection, legal conclusion, Your Honor,

2   and foundation with this witness.

3        THE COURT:  I'm going to allow it.

4        THE WITNESS:  Could you repeat?

5   BY MS. IAFRATE:

6   Q.  Sure.  We were talking about the telephone call between you

7   and Sergeant Palmer.  You wanted the individuals held at

8   Enforcement Support.  You now know that was a violation of the

9   preliminary injunction, correct?

10  A.  Yes.

11  Q.  Sergeant Palmer testified that he wanted to remove them and

12  transport them to Border Patrol.  Do you recall that?

3   A.  Yes.

14  Q.  Was that in violation of the preliminary injunction?

15  A.  Yes.

16  Q.  Did you know that back when you were talking to

17  Sergeant Palmer?

18  A.  No.

19  Q.  Did anyone tell you that the backup plan was in violation

20  of the preliminary injunction?

21  A.  No.

22        Are you -- what period are you talking about, Counsel?

23  At that time or what?

24  Q.  At that time.

25  A.  No.

1    Q.   Sheriff, at the sheriff's office there's a chain of

2    command, correct?

3    A.   Yes.

4    Q.   And you're the top link in that chain of command?

5    A.   Yes.

6    Q.   And you have people that report to you, correct?

7    A.   Yes.

8    Q.   Back in 2011, can you tell me which chiefs directly

9    reported to you?

10   A.   I believe it was Chief Deputy Sheridan.  He was the chief

11   deputy.

12   Q.   And then would he be the only direct report to you, or did

3    others directly report to you?

14   A.   I believe I had the public information officer reporting

15   directly to me.  We do have about 4500 employees, plus 8,500 in

16   the jails that I'm responsible for, but I do it through

17   delegating authority.

18   Q.   There was a group called the Human Smuggling Unit.  Are you

19   familiar with that unit?

20   A.   Yes.

21   Q.   Who was the supervisor of that unit?

22   A.   I believe it was Chief Brian Sands.

23   Q.   Did he directly report to you?

24   A.   No.

25   Q.   In the human -- the Human Smuggling Unit wasn't housed in

1    the same building that you were at, correct?

2    A.  No, it was not.

3    Q.  How did you get your information regarding what was

4    occurring with the Human Smuggling Unit?

5    A.  Well, sometimes I would get it from our public information

6    officer that would receive calls on these type of situations,

7    and sometimes I would probably get it from Brian Sands.

8    Q.  Did you ever go out to the Human Smuggling Unit where they

9    were housed?

10   A.  I may have a couple times.

11   Q.  Did you receive briefings from anyone from the Human

12   Smuggling Unit?

3    A.  May have, but I don't recall.

14   Q.  I want to show you what was shown to you in direct

15   examination, Exhibit 78.

16        Sheriff, are you familiar with the different types of

17   duties that occurred at the Human Smuggling Unit?

18   A.  Are you referring to the rank?

19   Q.  No.  For example, what they did.  You -- we've heard about

20   interdictions, correct?

21   A.  Yes.

22   Q.  Traffic stops?

23   A.  Yes.

?4   Q.  And then also there were search warrants executed regarding

25   employer ID and identity thefts, correct?

1  A.  Yes.

2  Q.  Those employer search warrants regarding identity thefts,

3  that was another area of the law that you could continue to

4  enforce, correct?

5  A.  Yes.

6  Q.  These search warrants, for example, the ID theft raid

7  discussed in this Exhibit 78, that wasn't the result of a

8  traffic stop, correct?

9  A.  No.

10  Q.  Sheriff, when did you become aware that some of your

11  previous actions from MCSO violated the preliminary injunction?

12  A.  I don't have the time frame, but it was, as I say, many,

3  many, many months later.  Could have been before the -- around

14  the time of the -- was it 1913, May 1913?

15  Q.  2013?

16  A.  2013.

17  Q.  When the judge issued its findings of fact and conclusions

18  of law?

19  A.  Yes.  And that's the time I sent a newsletter to all the

20  employees regarding the judge's decision.

21  Q.  You're saying that you sent out a newsletter.  Are you

22  talking about some sort of Briefing Board?

23  A.  Yes.

24  Q.  And why did you send out a Briefing Board in May 2013?

25  A.  It had to do with detainment and also using race.  Those

0925

1    are two issues that I wanted to get across to our people.

2    Q.   Well, explain more.  What were you trying to get across to

3    your people in May 2013 regarding --

4    A.   That it should not be done.

5    Q.   That what should not be done?

6    A.   By using race or detaining people illegally.

7    Q.   You were not familiar with those concepts in the

8    preliminary injunction until May 2013?

9    A.   No.

10   Q.   My statement was accurate?

11   A.   Yes.

12   Q.   There came a time where a monitor was appointed, correct?

3    A.   Yes.

14   Q.   Did you express what your involvement with the monitor

15   would be to your organization?

16   A.   If I recall, I think the monitor came to my office, I

17   believe it was around January 1914 -- 2014.  We had a nice

18   discussion.  He has a law enforcement background, so we had

19   something in common.

20          And I believe he mentioned that he would rather deal

21   with my staff, realizing that I had a large organization to

22   run, and I said, you know, that's a good idea.  Talk to my

23   staff.  And I believe that's what's been going on ever since.

24   Q.   Since the monitor has been appointed have you done anything

25   to block him from doing his job?

1   A.   No.

2   Q.   Have you been open and honest with him?

3   A.   Yes.

4   Q.   Have you encouraged your staff to be open and honest with

5   him?

6   A.   Yes.

7   Q.   There was a portion of the 2014 order that called for

8   community outreach.

9        Do you recall that?

10  A.   Yes.

11  Q.   And it was ordered that your office was to do some meetings

12  regarding community outreach.

3        Do you recall that?

14  A.   Yes.

15  Q.   And your lawyers objected to that based on the First

16  Amendment and your First Amendment to either speak or not

17  speak, correct?

18  A.   Yes.

19  Q.   And ultimately the judge rescinded that piece of the order,

20  correct?

21  A.   Yes.

22  Q.   On direct examination you were played an approximately

23  10-second clip in which you talked about community outreach.

24       Do you recall that?

25  A.   Yes.

1    Q.  Although it was a small clip, do you recall what you meant
2    by that statement?

3    A.  Is that the one where I had an officer that was killed?

4    Q.  Yes.  And on the tape, the portion that was played for you
5    talked about community outreach.

6            Do you recall what you were referring to?

7    A.  I was really occurring -- talking about myself, because
8    whether you want to call it outreach or not, I personally
9    stopped two vehicles with the four Hispanics in each vehicle.
10   They had no problems.  They were very friendly.  Came out,
11   wanted my photograph.  I let them take my pictures.

12           I call that my outreach where I actively got involved,
3    because I was there trying to give support to my deputies to
14   get intelligence on gang members that we believe killed my
15   officer.

16   Q.  Investigating a shooting of one of your officers didn't
17   violate the preliminary injunction, did it?

18   A.  No.

19   Q.  Trying to find who killed that officer didn't violate the
20   preliminary injunction, did it?

21   A.  No.

22   Q.  Were you involved in any way prior to the original trial in
23   gathering evidence?

24   A.  No.

25   Q.  Did anyone ever ask you to review documents and videos in

1  preparation for the original trial?

2  A.  No.

3  Q.  When a request for documents and/or videos comes into the

4  sheriff's office, where does it normally go?

5  A.  It would -- are you talking about legal documents?

6  Q.  So there's a request that someone in your agency gather

7  documents.  Where would that request go?

8  A.  I presume if it's legal it will go to our legal office.  If

9  it's other situations, it would go to the people responsible

10  for that request, I guess.

11  Q.  You don't get involved in the gathering and disseminating

12  of discovery requests?

3  A.  No.

14  Q.  That's up to your legal liaison's office, normally?

15  A.  Yes.

16  Q.  Those are the people that process the paperwork?

17  A.  Yes.

18  Q.  I want to talk to you about the May 2014 hearing that you

19  attended.

20      Do you recall that?

21  A.  Yes.

22  Q.  It was a hearing that you attended, and you had interaction

23  with Judge Snow, correct?

24  A.  Yes.

25  Q.  And you all were talking about gathering some videotapes.

1    Do you recall that?

2    A.    Yes.

3    Q.    Do you recall what Judge Snow's directive was of you in

4    relation to gathering those videotapes?

5    A.    Well, if I recall, it was like a two-and-a-half-hour

6    session, but I believe he mentioned something about the

7    monitor, cooperate with the monitor.

8    Q.    Then following that hearing, where did you go?

9    A.    I went back to my office.

10   Q.    And what did you do there?

11   A.    Well, eventually we had a meeting, I believe, with the

12   chief deputy, counsel Tom Liddy and Tim Casey, and I believe

3    there was another lawyer in the room.

14   Q.    Christine Stutz?

15   A.    Yes.

16   Q.    At some point we heard Chief Trombi say that he was

17   summoned into the room.

18        Do you recall that?

19   A.    Yes.

20   Q.    And he was told to send out an e-mail.

21        Do you recall that?

22   A.    Yes.

23   Q.    You weren't the one that told him to send out an e-mail,

24   correct?

25   A.    I did not.

1  Q.  Chief Sheridan told him to send out the e-mail?

2  A.  I believe he did.

3  Q.  Did anyone in the room object to that directive?

4  A.  No.

5  Q.  Not even counsel?

6  A.  No.

7  Q.  Do you know what happened as a result of that e-mail that

8  was sent out by Chief Trombi?

9  A.  You mean after the fact?

10  Q.  Yes.

11  A.  Well, I don't directly know, but I believe they were trying

12  to obtain videos.

3  Q.  Do you know if videos were obtained?

14  A.  I believe they were.

15  Q.  Sheriff, on direct examination you were asked do you think

16  there should be consequences for your actions.

17        Do you recall that?

18  A.  Yes.

19        MS. IAFRATE:  And in fact, can you put up 71, page 2.

20  BY MS. IAFRATE:

21  Q.  This was the document that we started your testimony with.

22  In fact, in this document that was filed, with your permission

23  and your consent, says, on the second line, that there are

24  consequences for these violations, correct?

25  A.  What number --

1  Q.  It's the --

2  A.  -- paragraph?

3  Q.  -- first full sentence.

4  A.  Yes.

5  Q.  You admit that there should be consequences, correct?

6  A.  Yes.

7  Q.  Sheriff, you weren't hiding that the Human Smuggling Unit

8  continued to do interdictions, correct?

9  A.  Hiding?

10  Q.  Right.

11  A.  No.

12  Q.  You weren't -- you weren't -- you were continuing to talk

3  about it to the press, correct?

14  A.  Yes.

15  Q.  The Human Smuggling Unit continued to generate paperwork as

16  a result of their operations, correct?

17  A.  Yes.

18  Q.  You didn't direct anyone not to talk about it, correct?

19  A.  No.

20  Q.  With all this press releases and documents that were

21  generated, were you willfully violating the Court's order, the

22  preliminary injunction?

23  A.  No.

24  Q.  Were you knowingly violating the Court's preliminary

25  injunction?

1    A.  No.

2    Q.  There is a statement that was read to you that said, "If I

3    had to do it all over again under the same circumstances, I'd

4    do it again."  Do you recall that?

5    A.  Yes.

6    Q.  What did you mean by that?

7    A.  I believe it had to do with an operation in Guadalupe,

8    could have been 2008.  Had information about violence, so we

9    did a crime suppression operation.

10          In the meantime, we had the authority under 287(g) to

11   enforce that type of law.  We had two top officials from

12   Washington there doing this operation.  We arrested about 45

3    people for different types of crimes, and six or seven were

14   here illegally that were booked in for those state charges, and

15   I believe two others we did not have any state law, so they

16   were turned over to ICE pursuant to our 287(g) authority.

17          But that operation had to do with violent crime --

18   Q.  So --

19   A.  -- and when the news media asked me I did say, I may have

20   been wrong, but I was talking about in that same circumstance

21   way back in those years where we had the authority, or we

22   always had the authority to go after those that commit crimes,

23   that I would have done it over again.

24   Q.  In 2008 you had the authority to do what you did pursuant

25   to the laws, correct?

1    A.    Yes.

2    Q.    Okay.  So now, knowing what you know regarding the

3    preliminary injunction, knowing what you know now, would you

4    have done the exact same things, activities, from 2011 to 2013

5    that your Maricopa County Sheriff's Office was conducting

6    interdictions and either holding people or turning them over to

7    ICE or Border Patrol?

8    A.    We still would do the crime operations, but as far as that

9    part of it is yes, you're right, we would not do it now.

10   Q.    You wouldn't do it the same.

11   A.    No.

12   Q.    You know that that violates the preliminary injunction?

3    A.    Yes.

14          MS. IAFRATE:  I have nothing further.

15          THE COURT:  Mr. Walker.

16          MR. WALKER:  Your Honor, I was up to the wee hours of

17   this morning and came to the conclu- -- two conclusions.

18   Number one, that it just was not possible for me to prepare

19   competently to examine this witness at this time.  And I've

20   spoken to all counsel.  I'd like to take the Court up on its

21   offer to be able to recall the witness and potentially take his

22   deposition in the interim.

23          THE COURT:  Well, Mr. Walker, I -- I think that I will

24   at least allow you to make that request.  I'm not going to rule

25   on it now.  And the reason why is, as I think I've indicated

1   more or less clearly since the beginning, I'm not sure that you

2   have independent status here other than being, according to the

3   Ninth Circuit order, the appropriate party, represented for all

4   practical purposes in this matter by Ms. Iafrate.

5           Nevertheless, in order not to prejudice the County, I

6   am allowing your participation. And that participation --

7   especially if you've spoken to all other counsel and they have

8   no objection -- is to allow you to participate, for the time

9   being, in these proceedings.

10          So if no other counsel have any objection to you

11  taking the deposition of Sheriff Arpaio in the interim, I

12  don't, either, but I'm going to allow them to make such an

3   objection if they wish to do so.

14          Is that acceptable to you?

15          MR. WALKER:  Certainly.

16          THE COURT:  All right.

17          Mr. Como?

18          MR. COMO:  I have no questions, Your Honor.

19          THE COURT:  All right.  Redirect.

20          MR. YOUNG:  Yes, Your Honor.

21                      REDIRECT EXAMINATION

22  BY MR. YOUNG:

23  Q.  Sheriff, Ms. Iafrate asked you about the Guadalupe

?4  saturation patrol --

25  A.  Yes.

1    Q.    -- in 2008?

2    A.    Yes.

3    Q.    In 2008 did you have authority to violate the Constitution?

4    A.    No.

5    Q.    Ms. Iafrate also asked you about some discovery document

6    collection issues.  Do you recall that?

7    A.    Yes.

8    Q.    Now, you have a personal immigration file that's in a

9    closet next to your office, right?

10   A.    Yes.

11   Q.    Okay.  And that immigration file contains documents that

12   have been relevant in this lawsuit, correct?

13   A.    To Guadalupe?

14   Q.    No, I'm no longer asking about Guadalupe.  I'm now asking

15   about the immigration file that you keep in a closet next to

16   your office.

17   A.    Yes.

18   Q.    That file has had documents in it that have been relevant

19   to this lawsuit, correct?

20   A.    Yeah, I believe the lawsuits -- the other documents go way

21   back that I may file national documents pertaining to

22   immigration and so on.

23   Q.    You personally put things into that file, right?  Press

24   clippings, handwritten notes --

25   A.    My secretary sometimes will give me some information, and

1   sometimes I'll pick up The New York Times and cut it out and

2   put it in there.

3   Q.  All right.  Now, you remember earlier in this lawsuit that

4   your deposition was taken, and Mr. Bodney discovered during

5   that deposition that you had that file, but nothing from it had

6   been produced in this lawsuit?

7   A.  Mr. Bodney?

8   Q.  Yeah, David Bodney, who was an attorney in this case

9   previously.

10          Do you remember your immigration file needing to be

11  searched late, that is, after documents should have been

12  produced, and as a result you had to have another deposition?

3   A.  What years are we --

14  Q.  2009-2010.

15  A.  2009 and --

16  Q.  Right.

17  A.  -- I don't recall.

18  Q.  Okay.  Well, you wouldn't disagree with me if I told you

19  that at that earlier time your personal immigration file should

20  have been examined, and documents turned over for this lawsuit,

21  but it didn't happen.

22          You wouldn't disagree with that, right?

23  A.  I believe they did go through it, someone did.

24  Q.  Well, late; they went through it late, right?

25  A.  Late?  I don't know.  What do you mean by "late"?

0937

 1  Q.  Well, let's shift to this year.  There was an order in

 2  February that documents that were responsive or relevant to

 3  this contempt process ought to be turned over.

 4       Do you recall that?

 5  A.  Yes.

 6  Q.  And we had your deposition in March, late March of this

 7  year, March 25, right?

 8  A.  Yes.

 9  Q.  Okay.  And I asked you whether that same immigration file

10  had been searched for documents relevant to this contempt

11  process and you told me no.

12       Do you recall that?

 3  A.  Yes.  I think I said that those documents would have been

14  somewhere else also, except a few personal ones that I put in

15  there.

16  Q.  Well, before each of those depositions, the two depositions

17  that you've had in this case, maybe more than two, you talked

18  with attorneys to prepare for the deposition, right?

19  A.  Yes.

20  Q.  Okay.  But you didn't tell any of those attorneys that you

21  had this personal immigration file that was next to your office

22  so that they could go through it to see whether relevant

23  documents would need to be produced, right?

 4       MS. IAFRATE:  Objection, Your Honor, attorney-client

25  privilege.

1          THE COURT:  Sustained.

2          MR. YOUNG:  I'll rephrase the question, Your Honor.

3     BY MR. YOUNG:

4     Q.   Before each of those depositions of you personally --

5          And you're a party in this case, right?

6     A.   Yes.

7     Q.   In your official capacity you're a party?

8     A.   Yes.

9     Q.   And before those depositions you met with your attorneys,

10    right?  To prepare for those depositions.

11    A.   Yes.

12    Q.   But you did not make available to those attorneys your

13    immigration file, the one that you personally maintain in the

14    closet next to your office, is that right?

15    A.   Well, I'm sure that they asked for it.  I don't recall

16    whether they should be turned over.  They've been turned over

17    on other federal matters, so it wasn't any secret.

18    Q.   Okay.  Well, it would be a secret to your attorney in this

19    contempt hearing.  Would you agree with that?  It was,

20    actually.

21    A.   Well, I don't recall if I ever told the attorneys.  I may

22    not have.  It didn't come to my mind, since other attorneys had

23    all those records.

24    Q.   Well, you'd agree with me that if there are relevant

25    documents in your personal immigration file, and it doesn't

1  come to your mind that people should look at that to see

2  whether there's relevant evidence there, that's a problem,

3  isn't it?

4  A.  No.  Anybody can look at it.  I'm not trying to withhold

5  any evidence.  It's just there.

6  Q.  Well, they won't look at it if you don't tell them it's

7  there and they don't know that it's there.

8      Would you agree with me on that?

9  A.  That's correct.

10  Q.  Now, you talked about community outreach, and you described

11  to Ms. Iafrate in October of 2013 that what you meant by

12  community outreach was stopping two cars.  Do you recall that?

3  A.  Yes.

14  Q.  Did you turn your flashing lights on to stop those cars?

15  A.  I had a sergeant driving the car.  I was a passenger.

16  Q.  And did the sergeant turn on the flashing lights in order

17  to effect this community outreach?

18  A.  He may have.

19  Q.  Did the sergeant turn the siren on in order to effect this

20  community outreach?

21  A.  I didn't hear any siren.

22  Q.  You said that each of the cars had four Hispanics in it?

23  A.  Yes.

?4  Q.  Did you stop any cars as part of your community outreach

25  that did not have Hispanics in it?

1    A.    I only stopped two, and they -- each one had four Hispanics

2    in the vehicle, that I didn't know about until I approached the

3    car.

4    Q.    Now, Ms. Iafrate asked you about your salary.

5          Do you recall those questions?

6    A.    Yes.

7    Q.    Okay, how much money you make.

8          Do you make money from speaking fees going to

9    audiences?   Have you ever been paid to have -- to go speak to

10   people would want to hear your views?

11   A.    I think one time I received a fee.   I don't accept fees

12   when I speak across the nation.

13   Q.    Well, the one time you did accept fees, where was that?

14   A.    I believe it was Kansas City, but I told them to donate

15   that money to my youth assistance foundation, which they did,

16   and that's it.

17   Q.    Now, you also sell books, too, right?   You've had books

18   that you've written, at least two of them?

19   A.    Many years ago.

20   Q.    Okay.   Well, and people pay money for those books, correct?

21   A.    I didn't make much money off the books.

22   Q.    Well, that wasn't my question, Sheriff.   People do pay

23   money --

24   A.    Yes.

25   Q.    -- to buy your books.   And in fact, you go to, at least on

1   the last book that you published called Joe's Law, you did a
2   number of bookstore book signings where you spoke to audiences,
3   and you spoke on radio, other media shows about your book to
4   sell your book, right?

5   A.   Yes.

6   Q.   Now, I've been meaning to ask you this for some time.

7        You remember back in July 2012 we were here in this
8   courthouse and I asked you some questions about that book?

9   A.   I don't remember, but --

10  Q.   Okay.  Well, I'm going to show you some pages from the
11  trial transcript about -- with questions about that book, and
12  I'll refer you first to page 348 and page 349 of the transcript
.3  of the trial in this matter.  The date was July 24, 2012.

14       MR. YOUNG:  And I'm going to ask the -- that you have
15  from line 23 on page 348 to line 9 on page 349.

16  BY MR. YOUNG:

17  Q.   And you were asked about some differences that were
18  described in your book where you refer to your parents.

19       You do refer to your parents who immigrated legally
20  from Italy in that book, right?

21  A.   Yes.

22  Q.   And you also said in the book that like all other
23  immigrants, exclusive of those from Mexico, your parents held
?4  to certain hopes and truths.  Do you recall that being in your
25  book and being asked about that passage in 2012?

1  A.  Yes.

2  Q.  And your answer at that time was, quote:  "Once again I

3  will say that my co-author wrote much of the items you're

4  reading."

5       Do you recall giving that testimony under oath here in

6  2012?

7  A.  Yes.

8  Q.  Now let's look at page 350 and 351; 350, starting on line

9  24, and going to line 13 on page 351.  And you were asked about

10  a passage in that book that said:  There was a growing movement

11  among not only Mexican nationals, but some Mexican Americans --

12  and this is a paraphrase -- who contended that the United

3  States stole the territory that is now California, Arizona, and

14  Texas, and that massive immigration would guaranty the

15  reconquista of those lands, returning them to Mexico.

16       There's a passage about that subject in your book,

17  too, right?

18  A.  Written by my co-author.

19  Q.  Okay.  Well, that's what you said --

20  A.  That's what my co-author said.  I think I mentioned that.

21  Q.  And then I asked you about that passage, whether it was

22  your view, and you said that it was not, correct?

23  A.  That's correct.

24  Q.  Okay.  You said that under oath, right?

25  A.  Yes.

 1  Q.  Here in this court?

 2  A.  That what?

 3  Q.  You said that under oath in this court, is that right?

 4  A.  About the California, Arizona, and all that?

 5  Q.  No.  You said that your co-author wrote that passage and

 6  that it was not your view, right?

 7  A.  No, it's not my view.

 8  Q.  All right.  And you testified to that under oath in this

 9  court in 2012 --

10  A.  Yes.

11  Q.  -- you testified it was not your view, is that right?

12         MS. IAFRATE:  Your Honor --

 3         THE COURT:  Yes, ma'am.

14         MS. IAFRATE:  -- objection.  This is beyond the scope

15  of my cross.  This is supposed to be limited to just --

16         MR. YOUNG:  It goes to credibility of the witness,

17  Your Honor.

18         THE COURT:  I still think it's beyond the scope of

19  cross.  I'm going to sustain the objection.

20         You could have raised this in the initial, I think, so

21  it's beyond the scope of cross.  Move on, please.

22         MR. YOUNG:  All right.

23  BY MR. YOUNG:

24  Q.  Sheriff, when you talk to audiences about how you testify

25  in court, do you tell them the truth?

1    A.    Can you repeat that?

2    Q.    When you -- well, strike that.

3          You told a big audience at a Barnes & Noble that you

4    wrote your book, the book that we've been talking about, the

5    same way that you testify in court, is that right?

6          MS. IAFRATE:    Your Honor, I'm going to object, beyond

7    the scope of cross.

8          THE COURT:    I'm going to sustain the objection.

9          MR. YOUNG:    All right.

10         Sheriff, thank you very much for your time.

11         Thank you, Your Honor.

12         THE COURT:    Thank you.

13         Sheriff, as you know, now is the time when I have

14   questions, that I ask them, and that will give Mr. Young the

15   opportunity to ask questions and give all the others

16   opportunity to ask questions based on my questions.

17         Normally, I try to ask questions that are only based

18   on what other attorneys have asked, but I do feel some

19   responsibility to make sure that the authority of this Court is

20   upheld, and so I have a few questions that weren't asked by the

21   other parties and I intend to ask them to you.

22         THE WITNESS:    Thank you.

23         THE COURT:    Do you want to pull that microphone up,

24   and can you hear me all right?

25         THE WITNESS:    Yes, sir.

1    EXAMINATION

2    BY THE COURT:

3    Q.   I do appreciate that you have indicated that you have

4    respect for the federal court and for judges.  I assume that I

5    was intended to be included among that group when you said it?

6    A.   Yes, sir.

7    Q.   I want you to know that while we have disagreements, and I

8    think some sharp ones in the past, I respect you in your

9    position as the sheriff of Maricopa County, and recognize that

10   you have been elected by the people of this county and I want

11   to afford you that same respect.

12        So I'm going to have some questions, some of them may

3    be difficult to answer, and I'm going to certainly let your

14   attorneys participate if they have concerns, but I'm going to

15   try to ask you my questions with respect, and I hope you'll

16   afford me the same in response.

17   A.   Yes, sir.

18   Q.   Now, we began by discussing -- or you began your

19   testimony -- I can't even remember whether it was this morning

20   or last night -- by discussing the scope of the matters that

21   you had -- in which you admit that you're in civil contempt.

22   And there were actually three matters that I specified in my

23   order to show cause.

24        Do you remember those?  Do you remember what they

25   were?  Three separate matters that related to civil contempt.

1   And the first was the violation of my preliminary injunction.

2   A.   Yes.

3   Q.   And do you admit that you're in civil contempt of that

4   order?

5   A.   Yes.

6   Q.   And the second was I discussed all of the documents,

7   videos, other things, that were requested prior to the

8   underlying trial of this matter that were not -- that were

9   apparently not provided by the MCSO.  And in that one I said

10  that it was in contempt of court rules, and that in addition to

11  the contempt authority, it also -- the Court had power to make

12  remedies based on its own inherent authority and for the

13  violation of court rules.

14          So I'm going to ask the first one, first question:  Do

15  you admit that you are in contempt for your failure to provide

16  requested materials prior to the underlying trial of this

17  matter?

18          MS. IAFRATE:  Your Honor, may I object just as to the

19  way that the question is worded?  Could we include civil

20  contempt?

21          THE COURT:  Surely.

22          MS. IAFRATE:  Thank you.

23  BY THE COURT:

24  Q.   I'll amend that to include civil contempt.

25  A.   Your Honor, I run this organization.  I'm really not

1  involved in that situation, but I'm still in charge of this
2  organization, so I take responsibility.

3  Q.  And does that mean that you admit that you're in civil
4  contempt for the failure to provide the requested documents and
5  other materials prior to trial?

6  A.  On the -- on what I said, I am in charge of this
7  organization and take responsibility.

8  Q.  Does that mean yes, that you admit that you are in civil
9  contempt?

10  A.  Yes.

11  Q.  All right.  And do you recognize that I also have inherent
12  authority, and are you conceding that, to create remedies for
13  that violation, even to the extent that contempt is not an
14  issue, but your violation of the court rules?

15       That's a poor question.

16       Do you also admit that you are in violation of court
17  rules that would have required you to produce those documents
18  and those materials prior to trial?

19  A.  Yes, because I'm responsible for the organization.

20  Q.  Okay.  And do you acknowledge that I have that the
21  authority to make remedies for that violation?

22  A.  Yes, sir.

23  Q.  Let me just ask a few questions about this.  I don't want
24  to ask a lot of questions about things that you're going to
25  admit to, but I have a few questions both about the preliminary

1  injunction, just to clarify, and then I have just a few about

2  the documents and other materials that were requested.

3        I will tell you that in -- there's been a lot of paper

4  in this matter. It's gone on for years. In some of the recent

5  paper that's gone across my desk in discovery disputes I have

6  seen responses to interrogatories served, I think, by

7  Chief Sands, but it might have been by the plaintiffs, in which

8  Mr. Casey provided his time records, and indicated that he

9  spoke with you, I think about -- he specified about this

10 preliminary injunction order, on December 26th, 2011, so that

11 must have been before you left town.

12       Do you have any recollection discussing the

3  preliminary injunction order with Mr. Casey on December 26,

14 2011?

15 A.  Your Honor, I was on an airplane, I think 10:00 in the

16 morning heading to Iowa. I don't recall speaking with him.

17 Q.  You don't recall a call from him, you just don't think you

18 had any communication with him on that date?

19 A.  I don't recall.

20 Q.  All right. Now, with respect to the failure to -- I mean,

21 does it strike you that it's a pretty big deal to not comply

22 with my preliminary injunction for 18 months?

23 A.  Yes, sir.

?4 Q.  And if you delegated this to somebody, have you taken any

25 actions to hold anyone responsible?

1    A.  Not -- no, no, sir.

2    Q.  With respect to the documents, do you have any idea if your

3    department has any policies whatsoever about how to go about

4    retrieving materials that have been requested in litigation?

5    A.  I don't know the mechanics, but I do know there's been a

6    lot of work, a lot of personnel, trying to abide by your order

7    to get those documents.

8    Q.  I have a different question, and that is:  Do you have any

9    policies in your office that guide employees about how they

10    should go about responding to requests for materials and

11    documents in litigation?

12    A.  I don't know.  I may not have, but we're still going to --

3    we're going to be doing it and do a lot of corrections.

14    Q.  Now, you've heard testimony, I think from the paralegal in

15    this matter, at least, that there were a whole lot of documents

16    that were turned over that would have been responsive, and it

17    appears to me that there's been other testimony that other

18    recordings existed that may -- recordings and other documents

19    existed that may have been destroyed.  And you recognize that

20    that's a pretty serious problem, don't you?

21    A.  Yes, sir.

22    Q.  And you do, as the sheriff's office, have a responsibility

23    to the public to let them know what your operations are.

24    A.  Yes.

25    Q.  And if in fact -- it's inevitable that any sheriff's going

1    to get sued.  I have suits in front of me that name you all the

2    time.  And that doesn't necessarily mean you're responsible,

3    but you get sued, and it's -- it's very important for your

4    office to be open and to respond in a responsible way to

5    litigation requests.  You recognize that?

6    A.  Yes, sir.

7    Q.  Now, the third matter that I ordered up contempt on was

8    about the May 14th hearing.  And in that hearing you did appear

9    in front of me, so did Deputy Chief Sheridan.  He did most of

10   the talking, but to his credit, to the credit of your

11   department, you brought forward some very disturbing facts that

12   you became aware of as a result Deputy Armendariz -- a search

3    of Deputy Armendariz's home after his decease.

14            Do you remember that?

15   A.  Yes.

16   Q.  And you remember that during that hearing you actually

17   played for me a number of stops that were videotaped by Deputy

18   Armendariz that I think you car -- and when I say "you," I

19   don't mean you personally, but in that hearing you

20   characterized for me as problematic stops.

21            Do you recall that?

22   A.  Did I personally, or --

23   Q.  Do you recall that happening here?

24   A.  I believe so, yes.

25   Q.  All right.  And do you recall that in one of those

1    problematic stops I asked if there were any supervisors that

2    appeared to have been present while Deputy Armendariz was

3    engaging in problematic behavior. And do you recall that I was

4    told that Lieutenant Sousa was present during one of those

5    stops?

6    A.   I don't recall, but --

7    Q.   That's all right. If you don't recall, you don't recall.

8            And do you remember then that I had a colloquy with

9    Chief Deputy Sheridan about how it would be much more desirable

10   to quietly collect videotapes and audiotapes, because if

11   officers were engaged in misbehavior, they weren't going to

12   voluntarily turn them over if they knew that they had

3    videotapes that showed them in misbehavior.

14           Do you remember that?

15   A.   Your Honor, I believe what happened, but I'm not sure --

16   Q.   If you don't remember --

17   A.   -- if I was there.

18   Q.   Oh, you were there.

19   A.   Did I see the videos and so on?

20   Q.   We've got a transcript.

21   A.   Yeah.

22   Q.   I'm just asking if you remember, and if you don't remember,

23   you don't have to --

24   A.   But I believe what you're saying.

25   Q.   Then I called you up. Do you remember that?

1  A.  Yes.

2  Q.  And you reviewed some of that with Mr. Young, but a part

3  you didn't review is you indicate that you delegate all that to

4  Chief Deputy Sheridan.  And you may not have said him directly,

5  but I think you did say him directly.

6       Do you remember doing that?

7  A.  Yes.

8  Q.  And do you remember that my response to you was that I

9  understood that somebody in your position had to delegate

10  things to people they could trust, but that didn't change the

11  fact that you were the party to this lawsuit and that you were

12  responsible to see that your department engaged in responsible

3  behavior and I would hold you responsible.

14       Do you remember that?

15  A.  Yes.

16  Q.  And I expected you to set the proper tone and you told me

17  you would.

18       Do you remember that?

19  A.  Yes.

20  Q.  Would you agree that the tone that you set in responding to

21  the Court's orders is very important?

22  A.  Yes.

23  Q.  And you would agree, without me having to review it with

24  you, that I was very disappointed, up until that point, in some

25  of the statements that you, Chief Deputy Sheridan,

1    Chief Trombi, and others, had said that were just flat

2    misstatements of my court rulings.

3           Do you recall that?

4    A.  Yes.

5    Q.  And so I'm very interested in tone.  Would you agree that

6    tone is very important going forward?

7    A.  Yes.

8    Q.  Now, in the May 14 hearing do you recall what Chief Deputy

9    Sheridan -- or in the May 14 meeting that you had after --

10   immediately after this hearing, do you recall what Chief Deputy

11   Sheridan said to Chief Trombi?

12   A.  I believe he wanted to do something right away pursuant to

.3   your order and --

14   Q.  And you didn't ever stop him and say:  Wait.  We're going

15   to review this with the monitor?

16   A.  No.

17   Q.  Did you ever discipline Chief Deputy Sheridan or

18   Chief Trombi for violating my orders?

19   A.  No, sir.

20   Q.  Do you admit that you are in contempt for what happened on

21   May 14th in violating my orders?  Civil contempt.

22   A.  On the Trombi situation?

23   Q.  Yes.  In other words, sending out the e-mail to all of the

24   MCSO informing them, when I had asked you and instructed you to

25   quietly correct them after having formulated a plan with the

1    monitor.

2    Do you agree that you're in contempt, civil contempt,
3    for that?

4    A.    I have all the information on it.  I was in the room and
5    they made a decision how to retrieve the evidence.

6    Q.    Let me tell you why I'm asking.

7    A.    Yeah.

8    Q.    I'm going to have to make legal rulings, and I've ordered
9    up several matters for contempt, and one of them is that you
10   and the chief deputies, Trombi, are in civil -- the allegation
11   is that you're in civil contempt for failing to abide my -- or
12   abide my instructions that I gave you that morning.

13   And so I just want to know, do you acknowledge that
14   you are in civil contempt for that order, or am I going to need
15   to make a determination regarding it?

16   A.    If you're saying I did not speak up when they --

17   Q.    Well --

18   A.    -- did the procedure to order the evidence?

19   Q.    I'm just saying for what you did and failed to do in the
20   meeting that violated my instructions, do you admit you're in
21   contempt or not?  I just want to understand.

22   A.    Well, if I do admit, it wasn't intentional.

23   Q.    All right.  Again, I'm only talking about civil contempt,
24   and civil contempt does not mean that you had an intent to
25   violate my order, but it does mean that you didn't take

1    reasonable steps to enforce my order.

2         Do you admit under that guideline that you are in

3    contempt for failing to -- to abide by the May 14th hearing

4    instructions I gave you?

5    A.   I would have to say yes.

6    Q.   All right.  Now, it's important for me to understand when

7    I'm evaluating what kind of relief -- and I am going to give

8    some relief, clearly, to the plaintiff class, and it may be

9    quite extensive or it may be limited.  And it's something that

10   I've got to consider in conjunction with the parties, and I

11   think it's going to require some careful thought.

12        But to me it is very important whether that contempt

3    that you and perhaps Chief Deputy Sheridan -- civil contempt --

14   committed on May 14 was an isolated incident or was a pattern

15   that reflects a hesitancy on the sheriff's office, on the

16   sheriff's department and on your part, or even a desire to

17   subvert the orders of this Court, so I'm going to ask you some

18   more questions about that.

19        Did you -- I may have already asked you.  Did you

20   impose any discipline on Chief Deputy Sheridan for violating my

21   order and giving that direction to Chief Deputy Trombi?

22   A.   No, sir.

23   Q.   Has there been any investigation regarding that?  I know

24   there have been some investigations that my monitor and I have

25   insisted on, and there were a few investigations that were

1  limited that you began.  But was there any investigation about

2  the orders given by Chief Deputy Sheridan to Chief Trombi?  To

3  your knowledge.

4  A.  I don't know.  I think there's been some internal affair

5  investigation --

6  Q.  But you don't know?

7  A.  I don't know the results.

8  Q.  You did understand that one of my concerns when you came in

9  here on the May 2014 hearing, and I -- and I disclosed -- I

10  discussed this, I think it was Chief Deputy Sheridan, but you

11  were present, that I thought it might be wiser for you to turn

12  over the investigation of all the matters that related -- or

13  that arose from the Armendariz findings to another agency, so

14  you wouldn't have any conflicts.

15        Do you remember that?

16  A.  Yes.

17  Q.  And do you remember that Chief Deputy Sheridan insisted --

18  and I don't mean to be too strong about that, but I couldn't

19  direct you to do that; I don't have any authority to tell you

20  you have to give that to another agency.  But I told him it

21  might be wise.  He asserted the privilege to conduct that

22  investigation, and when he did, I said, well, my monitor's

23  going to be looking over your shoulder, which is why the

24  cooperation was required.

25        Do you remember that?

1  A.  Yeah.

2  Q.  Now, you understood when you were doing that investigation,

3  perhaps you didn't understand at the moment, but you understood

4  that that investigation might go very much more deep than just

5  what was in Deputy Armendariz's garage, right?

6  A.  Yes.

7  Q.  And you understood that to the extent you were doing the

8  investigation, your Professional Standards Bureau would be

9  the -- is it a division?  Within the MCSO?

10  A.  Yes.

11  Q.  It would be the division that was in charge of that

12  investigation.

3  A.  Yes.

14  Q.  And that in order to conduct an adequate and thorough

15  investigation it was going to require a very adequate and

16  professional investigation done by the Professional Standards

17  Bureau.

18  A.  Yes.

19  Q.  Shortly after you assumed the responsibility to do that

20  investigation you replaced the captain in charge of the

21  Professional Standards Bureau.

22        Do you remember that?

23  A.  I believe so.

24  Q.  It had been Captain Holmes, right?

25  A.  Yes.

1   Q. And you replaced Captain Holmes with Captain Bailey.

2   A. The chief deputy did, yes.

3   Q. Did the chief deputy do that on his own?

4   A. Well, I'm sure that he made the selection. He may have ran

5   it by me.

6   Q. Would he normally change the captains in a division without

7   running it by you and getting your approval?

8        That's a pretty big deal, isn't it? Especially when

9   you know you're under my supervision and it pertains to matters

10  that are extremely serious.

11  A. Yes.

12  Q. Did he run it by you?

3   A. I believe he mentioned the change.

14  Q. And did you approve it?

15  A. Directly or indirectly, I did, yes.

16  Q. All right. But was the -- then I guess I want to get a

17  clear idea, you approved it at some level, but it was Chief

18  Deputy Sheridan that made that decision?

19  A. Yes.

20  Q. Do you know Captain Bailey?

21  A. He worked in the agency for many years. I know him as

22  official, not personally.

23  Q. Do you know what his previous assignment was?

24  A. I believe he was involved in the drug enforcement issues.

25  Q. What if I told you that he was the commander of the Special

1 Investigations Division? Would that -- would you say that that

2 couldn't be correct?

3 A. Yes, that's correct -- yeah.

4 Q. And when I say commander of SID, if I say SID we're talking

5 about special investigation --

6 A. Yes, sir.

7 Q. If I say commander of SID -- I had this question with

8 Chief Trombi -- that's the captain of SID, right?

9 A. Yes.

10 Q. Is that the bureau chief, or is the bureau chief higher up?

11 A. The bureau chief or chief, deputy chief, is higher up.

12 Q. All right. Who would be the bureau chief over SID? Who

3 would the commander of SID report to?

14 A. Probably the deputy chief.

15 Q. And that would be Chief Sheridan?

16 A. No, he's the chief deputy. It would be the deputy chief.

17 Q. And who would have been the deputy chief at that time?

18 A. Could have been Dave Trombi.

19 Q. All right. And what is the Special Investigations unit in

20 charge of?

21 A. They do the drugs and other types of investigations.

22 Q. They were over the Human Smuggling Unit at the time, right?

23 A. I believe so.

?4 Q. So Captain Bailey had been over the Human Smuggling Unit,

25 and you knew at the time -- well, maybe you didn't.

1    Captain Bailey, for a time, had been over the Human

2  Smuggling Unit, because he was the head of the SID Special

3  Investigations Division which is over the Human Smuggling Unit,

4  correct?

5  A.  Yes.  I don't know the time span.

6  Q.  All right.  But the Human Smuggling Unit was part of the

7  focus of the investigation in terms of, you may remember issues

8  like lots of ID's and there were lots of concerns about

9  deputies taking property that may or may not belong to them,

10  just keeping it and not reporting it in property.

11    Do you remember that?

12  A.  After the fact, yes.

3  Q.  Do you remember that after I got word that you'd appointed

14  Captain Bailey, I expressed concern about his conflict of

15  interest.  Do you remember that?

16  A.  I don't remember that, but it could have happened.

17  Q.  Nobody ever told you that?  I'm not sure whether you were

18  here at the hearing, but I did express concern about his

19  conflict of interest.

20    You don't recall that anybody ever raised that to you?

21  A.  Not really.

22  Q.  Human Smuggling Unit was pretty important to you.  We've

23  heard that.  Is that true?

24  A.  Yes.

25  Q.  So you'd have -- you'd want to have a lot of confidence in

1   the director that you appointed to be over the -- or the

2   captain that you put in charge of SID in part because that was

3   over the Human Smuggling Unit?

4   A.  Yes.

5   Q.  And so when you transferred him to PSB, that's because you

6   have a lot of personal confidence in him, I suppose?

7   A.  And also my chief deputy.

8   Q.  How long was Bailey with SID, do you remember?

9   A.  No.

10   Q.  Do you know Sergeant Tennyson?

11   A.  Name is familiar.

12   Q.  Let me ask, does SID -- we've had some reference to some of

3   the more atypical investigations you've done as sheriff, like

14   you investigated the -- some of the county supervisors,

15   correct?

16   A.  Yes.

17   Q.  And you investigated some sitting judges in the Maricopa

18   County Superior Court?

19   A.  The county attorney and my office together worked that.

20   Q.  All right.  And your office participated in that

21   investigation?

22   A.  Yes.

23   Q.  And that may have been called the anticorruption unit at

24   the time, is that right?

25   A.  Yes.

1  Q.  Was that under the SID, Special Investigations Division?

2  A.  I'm not sure.

3  Q.  Does the Special Investigations Division do investigations

4  with confidential informants?  Are they -- do they handle

5  confidential informants?

6  A.  Yes.

7  Q.  And does the captain of SID have to approve investigations

8  involving confidential informants in terms of payments to them?

9  A.  Your Honor, I don't know how far down it goes for that

10  authority, whether it's a lieutenant or the captain or deputy

11  chief.

12  Q.  Okay.  But somebody in the SID has to approve payments that

3  are made to confidential informants?

14  A.  Yes.

15  Q.  Are there any exceptions to that policy?

16  A.  I'm not sure.

17  Q.  Well, do you remember that right at the time -- and it was,

18  as I recollect, in June of 2014 -- that you named

19  Captain Bailey to become captain over the Professional

20  Standards Bureau instead of the Special Investigations

21  Division, that there was a newspaper article, maybe a blog,

22  that was published by somebody named Stephen Lemons?

23  A.  I know who he is.

24  Q.  Do you usually read the articles that he writes about you?

25  A.  Once in a while, yes.

1    Q.    Do you remember him writing about investigations that he

2    had sources were telling him your office was doing out of

3    Seattle involving confidential informants?

4    A.    He may -- I may remember that, yes.

5    Q.    Let me just give you -- I've copied the article.  Let me

6    give it to you and see if it helps to refresh your recollection

7    that you've read it.

8              Do you want to distribute that?

9              (Off-the-record discussion between the Court and the

10    clerk.)

11              THE COURT:   Hand it to the attorneys.

12              THE WITNESS:   It's a long article.

3    BY THE COURT:

14    Q.    It is a long article, and if you need to take the time to

15    read it, you can do that.  But I'm just asking if you have any

16    recollection, now having me give it to you, if you ever read

17    it.

18              I will tell you that in the article he says he talked

19    to you about some of the materials in the article, and that's

20    kind of on the last page, if that will help you.

21              (Pause in proceedings.)

22    BY THE COURT:

23    Q.    Do you remember reading this article?

24    A.    I believe I read it.

25    Q.    And I just want to ask you some questions about the article

1    and some of the things that it states.

2          I recognize, and I believe Mr. Lemons does in the

3    article, too, that he can't personally vouch for everything

4    that the article says, it's just what he's had some sources

5    tell him.

6          So I don't mean to suggest one way or another that the

7    article is accurate.  I just want to ask about some of the

8    things that it says so I understand them.  And I trust that

9    you'll tell me the truth, and you understand you're under oath,

10   correct?

11          Did you detail some of your personnel to conduct

12   investigations that resulted in their frequent trips and stays

13   in the Washington state area beginning in 2013 or 2014?

14   A.   We had a couple investigations -- investigators go up

15   there, yes.

16   Q.   And who were those investigators?

17   A.   I think it was Zullo and Brian Mackiewicz.

18   Q.   And Mackiewicz is --

19   A.   A detective.

20   Q.   Is he in your -- is he assigned to you personally, your

21   risk detail?

22   A.   Well, we had a lot of threats on me and --

23   Q.   I understand that.  Is that generally his assignment, to

24   protect you and assess risks that come against you?

25   A.   Yes.

1   Q.  And so you were aware when he was gone to the Seattle area?

2   A.  Yes.

3   Q.  And what about -- I think there's a Mr. Anglin mentioned in

4   the article.  Was he also an officer that was assigned to go to

5   Seattle as well?

6   A.  I think for a short period of time he did.

7   Q.  And is zoo -- did you say Zulu?  Zullo.  Is he a posse

8   member?

9   A.  Yes.

10  Q.  And did you pay funds from Maricopa County for Mr. Zullo to

11  go to the Washington area?

12  A.  Yes.

3   Q.  And then I assume you paid Anglin and Mackiewicz their

14  travel costs?

15  A.  We don't pay for Zullo, but --

16  Q.  But you paid Mackiewicz and Anglin.

17  A.  Yes.

18  Q.  And did you also hire a consultant in the Washington state

19  area to help you with this investigation or investigations that

20  Mackiewicz and Zullo were working with?

21  A.  Not that I know of.  May have.

22  Q.  Did you have a confidential informant in the Washington

23  area that they were working with?

24  A.  Yes.

25  Q.  And does the article accurately identify who that

Page 646

1 confidential informant was?

2    It says the name is Dennis Montgomery. Is that the
3 confidential informant?

4 A. Yes.

5 Q. And so when Mr. Montgomery was a confidential informant, he
6 was some sort of a computer consultant?

7 A. Yes.

8 Q. And as a confidential informant, his fees would have to be
9 paid, or approved, if in fact it was before the transfer of
10 Captain Bailey, his fees would have had to have been approved
11 by Captain Bailey, or any payments to him would have had to
12 have been approved by Captain Bailey?

3 A. I'm not sure at the time period, Your Honor.

14 Q. Now, the article says that you were personally conducting
15 these investigations and personally aware of them.

16    Were you?

17 A. Well, on a certain issue I was.

18 Q. And what issue was that?

19 A. It was the president's birth certificate.

20 Q. Okay. So you were -- Mr. Montgomery was doing research
21 into the president's birth certificate. Did Mr. Montgomery
22 ever tell you -- or, well, did you ever use Mr. Montgomery to
23 investigate anything about the Department of Justice?

24 A. I don't believe that Montgomery was involved in the birth
25 certificate. It was other violations that he was looking into.

0967

1  Q.  And what were those?

2  A.  Had to do with computer tampering and also bank fraud, that

3  type of thing.

4  Q.  Did you ever -- you see that the article says that what

5  Montgomery was actually doing was investigating me.

6      You see that that's what the article says?

7  A.  It's not true.

8  Q.  All right.  Are you aware that I've ever been investigated

9  by anyone?

10  A.  You investigated?

11  Q.  Yes.

12  A.  No.  No.

3  Q.  Any of my activities?

14  A.  No.

15  Q.  Any of my family members?

16  A.  That have been investigated?

17  Q.  Yes.

18  A.  Not by our office.

19  Q.  Are you aware of anybody who's investigated any of my

20  family members by any -- any office.  Or anybody.

21  A.  I believe there was an issue, but once again, it wasn't my

22  office.

23  Q.  Well, whose office was it?

24  A.  It was an outside investigator not hired by us.

25  Q.  Who hired the outside investigator?

1  A.  Could have been counsel.

2  Q.  "Counsel" meaning your counsel?

3  A.  Yes.

4  Q.  And would that have been Mr. Casey or Ms. Iafrate?

5  A.  I believe it would have been Mr. Casey.

6  Q.  And who did he hire?

7  A.  It was the counsel.

8  Q.  I'm sorry?

9  A.  Mr. Casey.

10  Q.  Mr. Casey.  Who did Mr. Casey hire?

11  A.  Pardon?

12  Q.  Who did Mr. Casey hire?  To investigate me or a member of

3  my family, or members of my family.

14  A.  We weren't investigating you, Your Honor.

15  Q.  Well, who were you investigating?

16  A.  We were investigating some comments that came to our

17  attention.

18  Q.  Okay.  And how did they come to your attention?

19  A.  Through e-mail.

20  Q.  And do you know who the author of the e-mail was?

21  A.  I don't have the name right now.

22  Q.  Okay.  Let me ask, in his article Mr. Lemons indicates --

23  well, let me get -- let me get this clear.  Your testimony is

24  that Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, never were involved

25  in any investigation of the Department of Justice or of me, is

1    that correct?

2    A.  Not -- no, not of you.

3    Q.  Well, were they involved in an investigation of the

4    Department of Justice?

5    A.  I'm not sure.

6    Q.  Were they trying to determine whether the Department of

7    Justice had contacted me in any way?

8    A.  I'm not sure about that.

9    Q.  You're not sure about that?

10   A.  No.

11   Q.  And would Mr. Montgomery have been involved in assisting

12   them to determine whether the Department of Justice had

3    contacted me in any way?

14   A.  No.  I believe there was information about many judges

15   being infiltrated or wiretaps and that type of thing.  That's

16   what the informer said that right now we don't have much

17   confidence in.

18   Q.  Well, who was the informer and what did the informer say?

19   A.  We're speaking about Montgomery.

20   Q.  All right.  Montgomery said that judges had been

21   infiltrated?

22   A.  That many judges -- if I recall, that they're wire -- their

23   phones were tapped, e-mails, that type of thing.

24   Q.  By the Department of Justice?

25   A.  By someone.

1   Q.  And so Mr. Montgomery proposed to -- who did he propose to

2   at the MCSO that the DOJ was inappropriately --

3          I assume it was of interest to you if they were

4   wiretapping my phone, among others?

5   A.  Yes.  And mine, too.

6   Q.  And yours, too.

7          And so were you conducting this investigation?

8   A.  No.

9   Q.  Who was in your department?

10  A.  This is Zullo and I think Mackiewicz.

11  Q.  What rank does Mackiewicz have?

12  A.  He's a detective.

3   Q.  Who did he report to about this investigation?

14  A.  I think he and Zullo worked together.

15  Q.  And who did they report to?

16  A.  And Jerry Sheridan.

17  Q.  They reported to Deputy Chief Sheridan?

18  A.  At one time, but let me just say that the information

19  we're -- we've been getting is the informer's not very viable.

20  Q.  Well, I understand that, I think the article itself says,

21  that you became aware after a considerable amount of time that

22  the reporter was giving you junk.  Is that fair to say?

23  A.  Yes.

24  Q.  Or the informer was giving you junk?

25  A.  Yes.

1    Q.   How much money did you spend on the informant?

2    A.   I don't recall.

3    Q.   How much money did you spend on the investigation?

4    A.   I don't have the figures.

5    Q.   Do you -- does the -- I guess I want to straighten some

6    things out to make sure that I understand them.

7         It's typical that confidential informants get control

8    numbers?

9    A.   I believe so.

10   Q.   And that they are maintained in a confidential informant

11   log and monitored by the Special Investigations Division

12   commander or his designee?

3    A.   I believe so.

14   Q.   And that for the time that this matter was going to be

15   investigated, or was being investigated, that would have been

16   Captain Bailey, correct?

17   A.   I'm still not sure on the time -- time frame, or whether he

18   knew about it.

19   Q.   Well, I will tell you that the article suggests that the

20   investigation began in October of 2013.  And Mr. Lemons, in the

21   article, says that as of January 2015 he kept making document

22   requests to the MCSO, and the MCSO continued to say this is an

23   ongoing investigation, we're not going to give you anything.

24        So is this investigation still ongoing, or have you

25   determined pretty much that the informant was unreliable and

1   it's not worth proceeding?

2   A.  Well, it's almost finished.

3   Q.  I'm sorry?

4   A.  It's almost finished on -- especially on his reliability.

5   Q.  All right.  Are you investigating him now?

6   A.  I'm not sure.

7   Q.  Well, I want to understand exactly what it is that

8   Mr. Mont -- your understanding of what it is that

9   Mr. Montgomery told you DOJ was doing that you were

10  investigating.

11  A.  Once again, he seemed to indicate that someone was

12  penetrating in the e-mails of our local attorneys and others,

3   judges, that type of thing, which we can't prove.

14  Q.  All right.  And was I one of those judges?

15  A.  I think you were one of the judges.

16  Q.  And were you concerned then that that might be affecting my

17  judgment or neutrality in this lawsuit?

18  A.  No.

19  Q.  Who else was named by Mr. Montgomery as being targets of

20  this DOJ investigation?

21  A.  I believe the -- our local law firm, the attorneys working

22  for us on the Department of Justice lawsuit.

23  Q.  Who else?

24  A.  You mean other judges around -- I don't remember.

25  Q.  Anybody that Mr. Montgomery said that -- that the DOJ was

1   bugging their phones, or otherwise intruding into their private

2   communications.

3   A.   Well, I know I was.

4   Q.   You were one.  Your law firm was one.

5   A.   Jerry Sheridan, I believe.  And there's other local

6   officials.

7   Q.   And I was?

8   A.   You -- yes.

9   Q.   Did you keep any of the materials that Mr. Montgomery has

10  provided you?

11  A.   I don't have them.

12  Q.   Who does?

3   A.   I believe Zullo does.

14  Q.   And is he subject to your control --

15  A.   Yes.

16  Q.   -- as a member of your posse?

17  A.   Yes.

18  Q.   I'm going to direct you that you tell Mr. Zullo that he

19  keep all those documents.  All right?

20  A.   He what?

21  Q.   He keep and maintain all of those documents.

22  A.   Yes.

23  Q.   I'm going to direct you that nothing pertaining to any of

24  this investigation be destroyed, including confidential

25  informant numbers.

1    Do you understand that direction?

2    A.  Yes.

3    Q.  Who else was aware of these investigations within the MCSO?

4    A.  I'm not sure.  Because of the sensitivity, we were trying

5    to keep it quiet.

6    Q.  Now, I think in addition to the investigation that may have

7    involved me and my phone or any contact or tapping by the

8    Department of Justice, you indicated that there were

9    investigations made into members of my family.

10    Did you indicate that?

11    A.  That had nothing to do with Montgomery.

12    Q.  What did it have to do with?

3    A.  I believe there was a, as I say, e-mail that came to me.

14    Q.  And do you still have that e-mail?

15    A.  We may have it, yes.

16    Q.  I'm going to direct you to keep that e-mail.

17    What did the e-mail say, to the best of your

18    recollection?

19    A.  I think it mentioned that Judge Snow wanted to do

20    everything to make sure I'm not elected.

21    Q.  Do you recall who the author of that e-mail was?

22    A.  I believe it was someone named Grissom.

23    Q.  Grissom?

24    A.  Grissom.

25    Q.  Okay.  And how did this person purport to know that?

1    A.   The person met your wife in a restaurant, and she's the one

2    that made those comments.

3    Q.   According to whatever Mr. Grissom said.

4    A.   There was other witnesses, yes.

5    Q.   Okay.  And so you turned that over to your counsel and

6    counsel hired a private investigator, and what did the

7    investigator do?

8    A.   He investigated it.

9    Q.   And what was the result of the investigation?

10   A.   Results were that he confirmed that your wife was in that

11   restaurant and con -- I guess talked to the witnesses, three or

12   four, that confirm that remark was made.

3    Q.   All right.  And do you have any materials pertaining to

14   that investigation?

15   A.   We should have.

16   Q.   Okay.  Will you save those as well?

17   A.   Yes.

18   Q.   All right.  Thank you.

19        Who has told you that the information that

20   Mr. Montgomery provide -- or how is it that you've come to

21   conclude that the information you were getting from

22   Mr. Montgomery is not reliable?

23   A.   I think the investigators, as time progressed, figured that

24   he may not be reliable.

25   Q.   Did the MCSO also purchase computer equipment for

1  Mr. Montgomery or for the investigation?

2  A.  That's possible.

3  Q.  Well, I'm going to direct you, to the extent that any of

4  this material is in your control, that it be maintained.

5      Do you understand that direction?

6  A.  Yes.

7  Q.  Would Captain Bailey have been involved in any of these

8  investigations?

9  A.  I don't believe so.

10  Q.  But if he was the commander of Special Investigations

11  Division, he would have been aware of the investigations?

12  A.  I'm not sure.

3  Q.  The commander of the Special Investigations Division would

14  have to sign off on payments made to confidential informants?

15  A.  Yes, normally.

16  Q.  And would they have to sign off on payments made for

17  investigations in which confidential informants were involved?

18  A.  I'm not sure if he would do it, or a lieutenant, or who

19  would do that.

20  Q.  Who is currently the director of the Special Investigations

21  Division?  Or the commander or the captain.

22  A.  I can't re -- I can't remember his name.  It's an Italian

23  name, but -- I know that Trombi is the top guy in charge of all

24  these elements.

25  Q.  Will you make sure that everybody in your division that has

1  anything to do with any of this maintains all these records?

2  A.  Yes.

3      THE COURT:  I think, Sheriff, for the time being,

4  those are my questions.  It's probably time for us to break for

5  lunch, so could you be back in an hour?  We'll have an hour

6  lunch break.

7      THE WITNESS:  Yes, sir.

8      THE COURT:  I appreciate your answers.

9      THE WITNESS:  Thank you.

10     (Lunch recess taken.)

11     THE CLERK:  All rise.  Court is now in session.

12     THE COURT:  Thank you.  Please be seated.

3      You ready to proceed?

14     MS. WANG:  Yes, Your Honor.

15     THE COURT:  Sheriff, I just wanted to --

16     Oh, I'm sorry.

17     MS. IAFRATE:  Yes, Your Honor.

18     THE COURT:  I just wanted to reiterate some of the

19 things I said during my questioning of you to make sure

20 everybody was clear.  I was told over lunch that posse funds

21 like Mr. Zullo -- Mr. Zullo's the head of one of your posses.

22     THE WITNESS:  Yes.

23     THE COURT:  Is it the Cold Case posse?

24     THE WITNESS:  Yes.

25     THE COURT:  I was told that you also have various

1   sources of funding within the MCSO, like the Cold Case posse

2   has its own funds.  Is that possible?

3              THE WITNESS:  No.

4              THE COURT:  Okay.  Do you know what the possible

5   funding sources were for the investigations that were related

6   to the Seattle operation?

7              When I say "operation," I mean the one involving

8   Mr. Montgomery and the investigations with Brian Mackiewicz and

9   Mr. Anglin.

10             THE WITNESS:  I'm not sure if it was our RICO, which

11  is drugs seized -- I mean moneys seized from drug peddlers, or

12  our general funds.

3              THE COURT:  Were there other possible funds that might

14  be involved that fund various like, for example, the Cold Case

15  posse?

16             THE WITNESS:  They're independent 501(c) --

17             THE COURT:  501(c)(3).

18             THE WITNESS:  -- and they raise their own money.

19             THE COURT:  All right.  And you don't have any control

20  over those funds?

21             THE WITNESS:  No.

22             THE COURT:  What about asset forfeiture funds, would

23  any asset forfeiture funds have been involved in funding this

24  operation?

25             THE WITNESS:  I don't know where their funding came

1    from.

2          THE COURT:  Well, the point is this, and I think I

3    made it clear, but I just want to make sure that I've made it

4    clear, to the extent that you have any control over any funding

5    records, over any reports, over any communications, over any

6    overtime records, travel documentation, any e-mails of any and

7    all people involved in the threat assessment unit or anywhere

8    else, any communications from and to Montgomery, any computers

9    or phones, cell phones or other information that in any way is

10   relevant or related to this investigation, I want you to direct

11   your people to put a hold on it immediately and preserve it.

12   And that includes any documentation or numbers that would

3    relate to Mr. Montgomery's confidential status.

14          You understand that?

15          THE WITNESS:  Your Honor, are you referring to this

16   investigation with the monitors and --

17          THE COURT:  No, no.  I'm referring to the

18   investigation that Mr. Montgomery was undertaking with

19   Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, anybody else from your

20   staff, anybody else from the MCSO, or anyone else from the

21   posse.  I want all records that in any way relate to it, all

22   electronic data or anything else, or the financing, funding of

23   that operation, all phone records, e-mails, reports, I want it

24   all preserved.

25          And I think I will send the monitor to begin taking

1    possession of those records and we'll do it confidentially,

2    imminently.  But I don't want in the interim any of those

3    records lost, inadvertently or otherwise.

4            You understand what I'm saying?

5            THE WITNESS:  Yes.

6            THE COURT:  And you'll so direct your people?

7            THE WITNESS:  Yes.

8            THE COURT:  All right.  Thank you, sir.

9            Mr. Young?

10           MR. YOUNG:  No further questions, Your Honor.

11           THE COURT:  Ms. Iafrate?

12           MS. IAFRATE:  Nothing, Your Honor.

3            MR. WALKER:  Subject to my earlier reservation,

14   nothing, Your Honor.

15           MR. COMO:  I have no questions, Your Honor.

16           THE COURT:  You may step down, Sheriff.  Thank you.

17           Next witness.

18           MS. WANG:  Your Honor, plaintiffs call Joseph Sousa.

19           THE CLERK:  Can you please state and spell your first

20   and last name for the record.

21           THE WITNESS:  Joseph Sousa, J-o-s-e-p-h, S-o-u-s-a.

22           (Joseph Sousa was duly sworn as a witness.)

23           THE CLERK:  Can you please take our witness stand.

24           THE COURT:  Please, Ms. Wang.

25           MS. WANG:  Thank you, Your Honor.

1           JOSEPH SOUSA,

2    called as a witness herein, having been duly sworn, was

3    examined and testified as follows:

4                    DIRECT EXAMINATION

5    BY MS. WANG:

6    Q.   Good afternoon, Lieutenant Sousa.

7    A.   Good morning, ma'am.  Or good afternoon, I'm sorry.

8    Q.   Sir, are you employed with the Maricopa County Sheriff's

9    Office?

10   A.   Yes, ma'am.

11   Q.   And what is your current assignment?

12   A.   SWAT division lieutenant, tactical commander.

13   Q.   And you're command over the SWAT unit?

14   A.   I'm the deputy commander, the division commander.

15   Q.   Thank you.

16            Between 2007 and 2012 were you the lieutenant

17   commanding the Human Smuggling Unit of MCSO?

18   A.   Yes, ma'am.

19   Q.   And so during that period of time that you commanded the

20   Human Smuggling Unit, Judge Snow's preliminary injunction order

21   issued, is that correct?

22   A.   Yes, ma'am.

23   Q.   Sir, looking back over the entire time that you were

24   command -- commander of HSU, were you ever told to preserve

25   documents relating to this litigation?

1  A.  Yes, ma'am.  After the fact I was made aware that there was

2  a preservation letter.

3  Q.  Do you recall when the first time that you were told to

4  preserve documents relating to this litigation happened?

5  A.  It was -- I believe it was after the depositions, attorney

6  Tim Casey called me and made me aware of it.

7  Q.  So is it fair to say that when you were first notified that

8  HSU should be preserving documents in relation to this

9  litigation, HSU was already called out for not preserving

10  documents?

11  A.  Prior to me being made aware of the letter there was the

12  business that we weren't saving notes or saving stat sheets or

13  saving things that we would have had to have saved under the

14  letter.

15  Q.  So just to be clear, by the time Mr. Casey informed you

16  that you were obligated to save documents, that notice was late

17  in coming to you.  Is that fair to say?

18  A.  Yes, ma'am.

19  Q.  HSU should have been notified earlier on that it had to

20  save documents relating to this case?

21  A.  Yes, ma'am.

22  Q.  At a certain point were you also told to search for

23  documents in relation to this case?

24  A.  Yes, ma'am.

25  Q.  And to turn those over for purposes of giving to us on the

1  plaintiffs' team?

2  A.  At first we were complying with the -- the policy that you

3  go through the legal liaison so they can actually do what they

4  do is make copies, and then make logs of everything that was

5  being turned over.

6  Q.  Okay.  When you first were told to gather up documents and

7  turn those over for purposes of this litigation, you worked

8  with a group called the legal liaison unit of MCSO?

9  A.  In the beginning, yes, ma'am, I believe.

10  Q.  And was there a particular person that you worked with in

11  that unit?

12  A.  I don't remember who was head of the unit, but it could

13  have been any detention officer or deputy that might have been

14  working there.

15  Q.  But I'm asking about the legal liaison unit.  Was there an

16  individual there that you worked with?

17  A.  I don't remember a specific name, ma'am.

18  Q.  All right.  Was there a Commander Shaw who was in charge of

19  the legal liaison unit?

20  A.  She could have been.  I don't remember, ma'am.

21  Q.  All right.  And I believe you implied in your testimony a

22  minute ago that there came a point in time when you were told

23  not to work through the legal liaison unit, is that correct?

24  A.  Yes, ma'am.

5  Q.  And can you tell me about when that happened?

1  A.  I don't have a time frame.  It was probably early on.  I

2  got a phone call to bypass the legal liaison, that it was

3  taking too long to get stuff to our attorney.

4  Q.  Who did you get that call from?

5  A.  Chief Sands.

6  Q.  And you mentioned that during the time period in which you

7  worked with the legal liaison unit, the legal liaison unit

8  would log documents that you turned over, is that correct?

9  A.  I believe that was the procedure, ma'am.

10  Q.  And once you were told to bypass the legal liaison unit, do

11  you know whether documents were logged?

12  A.  No, ma'am, I don't believe it was done consistently.

.3  Q.  In addition to searching for documents related to this

14  litigation, were you told to search for documents, HSU

15  documents, for other purposes?

16  A.  For the other -- other lawsuits?

17  Q.  Were there other lawsuits you --

18  A.  Yes, ma'am.

19  Q.  All right.  Was there a large volume of such requests for

20  you?

21  A.  Yes, ma'am.

22  Q.  Is it also true that the MCSO public information office

23  made requests to you for documents?

?4  A.  All the time, ma'am.

25  Q.  Did the PIO also make a very high volume of requests for

1  documents to you as the lieutenant in charge of HSU?

2  A.  Yes, ma'am.

3  Q.  In fact, Lieutenant, fair to say that dealing with document

4  preservation and document production became a very large part

5  of your job as the lieutenant overseeing HSU?

6  A.  Yes, ma'am, overwhelming.

7  Q.  It was a burden to you?

8  A.  Yes, ma'am.

9  Q.  You had other responsibilities as the commander of HSU,

10  correct?

11  A.  Three squads and only two sergeants, no captain, yes,

12  ma'am.

3  Q.  And MCSO was also doing a lot of media work at that time

14  relating to the illegal immigration interdiction activities of

15  HSU, correct?

16  A.  Constantly being called by PIOs for information, ma'am.

17  Q.  For documents relating to HSU's illegal immigration

18  interdiction efforts?

19  A.  Whether it be documents, or just information verbally

20  passing it along.

21  Q.  But on the subject of the illegal immigration interdiction

22  efforts?

23  A.  Yes, ma'am.

24  Q.  Sir, were you given adequate resources by your chain of

25  command to deal with the volume of document production

1    requests?

2    A.    No, ma'am.

3    Q.    Do you think that affected your ability to command HSU

4    appropriately?

5    A.    Absolutely, ma'am.

6    Q.    Lieutenant, once you were told to save documents relating

7    to this litigation, did you notify people under your command at

8    HSU?

9    A.    Yes, ma'am.

10   Q.    How did you do that?

11   A.    Usually by -- was the question when I had to get

12   information from individuals?

13   Q.    No, I'm sorry.  The question is about when you -- when you

14   first were told that HSU should preserve documents relating to

15   this litigation --

16   A.    Yes.

17   Q.    -- did you notify your subordinates in HSU?

18   A.    I'm sorry, I'm tracking now.  I would -- I believe I --

19   once that letter came out, I was pretty upset that I was

20   getting chewed out over the phone about something I didn't know

21   about.  So immediately when I got back into the office I'm

22   pretty sure I brought everybody together and I verbally told

23   everybody.  And I also put out e-mail after e-mail and reminder

24   after reminder.

25   Q.    Okay.  Did you send out an initial e-mail that listed the

1  kinds of documents that HSU personnel were supposed to save?

2  A.  Yes, ma'am.

3  Q.  I deposed you a couple of times in preparation for this

4  hearing, correct?

5  A.  Yes, ma'am.

6  Q.  And during those depositions we did not have a copy of that

7  original e-mail with the document preservation notice, correct?

8  A.  I believe not.  I believe one was more -- I believe I had

9  an e-mail that was more detailed.

10  Q.  Okay.  But we were missing that detailed e-mail, is that

11  right?

12  A.  I believe so, unless I'm wrong.

13  Q.  Okay.  I think I've found it.  If I could ask the clerk to

14  please hand you Exhibit 216.

15        THE CLERK:  (Handing exhibit to witness).

16  BY MS. WANG:

17  Q.  This document is not in evidence, so I'm going to ask you

18  to take a look at it and let me know if you recognize that.

19        (Pause in proceedings.)

20        THE WITNESS:  Yes, ma'am.

21  BY MS. WANG:

22  Q.  All right.  So Lieutenant Sousa, this is an e-mail chain,

23  correct?

24  A.  Yes, ma'am.

25  Q.  And looking at the earlier of the e-mails in the chain

1    dated December 8, 2009, is this the e-mail that you sent out

2    initially directing HSU to save documents?

3    A.   Yes, ma'am.

4    Q.   All right.

5              MS. WANG:  Your Honor, I'd move the admission of

6    Exhibit 216 into evidence.

7              MS. IAFRATE:  No objection.

8              MR. WALKER:  No objection, Your Honor.

9              MR. COMO:  No objection, Your Honor.

10             THE COURT:  216 is admitted.

11             MS. WANG:  Thank you.

12             (Exhibit No. 216 is admitted into evidence.)

13   BY MS. WANG:

14   Q.   So Lieutenant, you see there's a large number of recipients

15   of your e-mail of December 8, 2009, correct?

16   A.   Yes, ma'am.

17   Q.   Are those the personnel in HSU as of that date?

18   A.   HSU and other divisions.

19   Q.   Which other divisions are included among the recipients of

20   that e-mail?

21   A.   Because human -- because human smuggling was housed out of

22   Enforcement Support Division, I copied their personnel, too,

23   just in case they happened to be helping us with something.

24   Q.   All right.  Thank you.

25             So the subject line is the saving of e-mails for

1    ongoing lawsuits per attorney Tim Casey.

2         Do you see that?

3    A.   Yes, ma'am.

4    Q.   Was it your understanding that this lawsuit, Ortega

5    Melendres versus Arpaio, was among the lawsuits you were

6    referring to?

7    A.   Yes, ma'am.

8    Q.   Okay.  Now, the last sentence that is visible on this view

9    is that the following incoming and outgoing e-mails need to be

10   saved by all personnel.

11        Do you see that?

12   A.   Yes, ma'am.

13   Q.   And this was your description of all the documents that

14   needed to be saved by HSU personnel, correct?

15   A.   Yes, ma'am.

16   Q.   Okay.  Let's scroll down to the next page of the document.

17        And this is the list, correct?

18   A.   Yes, ma'am.

19   Q.   All right.  So the first question I have for you is that

20   you refer only to e-mails in this document, isn't that right?

21   A.   Yes, ma'am.

22   Q.   You did not refer to any documents that are not e-mails in

23   your preservation list, correct?

24   A.   I seem to remember, because I remember one of the e-mails

25   said no, even -- even if they're notes, handwritten notes, you

1  need to save them.

2  Q.  Okay.  I'm just focused on this --

3  A.  Okay.  Yes, ma'am.

4  Q.  -- for now.

5       Let's look at the first bullet point.  You asked HSU

6  members to save all e-mails reference crime

7  suppression/saturation patrols/dates, times/manpower requests.

8  When in doubt, save it.  Do you see that?

9  A.  Yes, ma'am.

10  Q.  The second bullet reads, all e-mails reference interdiction

11  patrol, shift summaries, times, dates, where to meet, and so

12  on.

3        Do you see that?

14  A.  Yes, ma'am.

15  Q.  The understood bullet point says all e-mails reference

16  operations being run in the field, and in parentheses you

17  wrote, warrant details, vendor details, underage alcohol, just

18  some examples.

19       Do you see that?

20  A.  Yes, ma'am.

21  Q.  Do the words in those parentheses refer to examples of

22  operations being run in the field?

23  A.  Yes, ma'am.

24  Q.  And the fourth bullet point you wrote is all e-mails

25  reference search warrants we were serving.

1    Do you see that?

2  A.  Yes, ma'am.

3  Q.  In this e-mail in Exhibit 216 you do not ask deputies in

4  HSU to save e-mails referring to traffic stops, is that

5  correct?

6  A.  Not specifically, ma'am.

7  Q.  Well, do you generally?

8  A.  Excuse me?

9  Q.  Is there any general reference to traffic stops in your

10  list of documents to be preserved?

11  A.  Well, I think I'm thinking is I'm pretty sure, I mean, it's

12  not an e-mail, but when in doubt, you need to save it.

.3  Q.  Okay.  But where you wrote when in doubt refers to all

14  e-mails reference crime suppression/saturation patrols/dates,

15  times/manpower requests, isn't that right?

16  A.  Yes, ma'am.

17  Q.  All right.  You don't refer anywhere on this list to saving

18  e-mails relating to traffic stops, is that correct?

19  A.  No, ma'am.

20  Q.  So if a deputy made a traffic stop that was not during a

21  saturation patrol, he might not save it under this particular

22  e-mail, is that right?

23  A.  If he sent an e-mail reference a traffic stop he made?

24  Q.  Correct.

25  A.  Yes, ma'am.

1  Q.  All right.  The next paragraph after your four

2  bullet points reads:  If you receive an e-mail that has nothing

3  to do with operations, you are not required to save it.

4       Do you see that?

5  A.  Yes, ma'am.

6  Q.  Now, you testified at trial, correct?

7  A.  Yes, ma'am.

8  Q.  And were you aware that there was testimony during the

9  trial about certain so-called joke e-mails that were circulated

10  among HSU personnel around that time frame?

11  A.  I remember the six-hour deposition on it, ma'am.

12  Q.  And so you do remember those e-mails that were circulated?

3  A.  I don't remember every specific one, but I remember there

14  was those -- there were e-mails.

15  Q.  And, sir, is it fair to characterize those e-mails as

16  racist joke e-mails?

17  A.  Agreed, yes, ma'am.

18  Q.  Under this e-mail direction you gave, those e-mails were

19  not fairly encompassed in your document preservation notice, is

20  that correct?

21  A.  Based on this, yes, ma'am.

22  Q.  Okay.  We can take that exhibit down.

23       Sir, as a general matter while you were at HSU, you

?4  were asked to search for documents in response to lit -- to

25  document production requests in this litigation, to reiterate,

1   correct?

2   A.  Yes, ma'am.

3   Q.  When you were asked to do that, did you search your own

4   computer and paper files?

5   A.  Yes, ma'am.

6   Q.  You generally did not search other HSU personnel's files

7   and computers, is that correct?

8   A.  No, ma'am.

9   Q.  Did you sometimes go to your sergeants to ask them to

10   search for documents?

11   A.  Yes, ma'am.

12   Q.  You relied on them to carry out those searches?

3   A.  Yes, ma'am.

14   Q.  You did not stand over their shoulder to watch them search

15   for documents?

16   A.  No, ma'am.

17   Q.  And you generally did not ask individual deputies for

18   documents in response to litigation requests, is that right?

19   A.  I would probably go through my sergeants, ma'am.

20   Q.  All right. And in general, you believed that the documents

21   that were responsive to requests in this litigation were

22   centrally located in your files, is that right?

23   A.  Quite a bit of it, yes, ma'am.

24   Q.  Did you believe that almost all the documents were within

25   your own files?

1  A.  From what I recall, ma'am, the majority of what I was asked

2  to turn over was in most of the files I had.  I kept a filing

3  cabinet in my room with all the shift summaries and all the

4  cases we worked on the criminal employment side, which is a lot

5  of the stuff that was also being asked for.

6  Q.  Well, we know that up until the point you got the document

7  preservation request from Mr. Casey, there were certain

8  documents that related to HSU operations that were being

9  destroyed in the regular course of business, correct?

10  A.  Yes, ma'am.

11  Q.  All right.  You kept -- you did your best to keep your own

12  files on operations after you were informed to do so, correct?

3  A.  Yes, ma'am.

14  Q.  And again I'll ask you:  You generally believed that it was

15  not necessary to go to individual deputies in HSU to search for

16  documents in response to requests in this litigation?

17  A.  I never personally searched for them, ma'am.

18  Q.  Thank you.

19        Now, at some point while you were commander over HSU,

20  HSU deputies, or at least some of them, began to record their

21  traffic stops, is that right?

22  A.  Yes, ma'am.

23  Q.  And when -- when you first found out about that, it had

24  been going on for some time, is that right?

25  A.  I believe it had been going on before I found out about it,

1    ma'am.

2    Q.   You yourself were issued a video camera by MCSO at some

3    point, correct?

4    A.   Yes, ma'am.

5    Q.   Was that in about 2009?

6    A.   That sounds about right, ma'am.

7    Q.   While you were commander over HSU is it true that HSU

8    deputies might have been using their own personally purchased

9    video cameras to record their activities?

10   A.   I became aware of that, ma'am.

11   Q.   Sitting here now you're aware of that?

12   A.   Yes, ma'am.

3    Q.   And at the time you first found out about that it had

14   already been going on for some time?

15   A.   Yes, ma'am.

16   Q.   And that could have happened well before MCSO issued

17   video cameras to HSU, is that right?

18   A.   I believe that is the -- that's correct.

19   Q.   There was no policy against it at that time?

20   A.   No, ma'am.

21   Q.   Sir, as of 2011, HSU had an SOP or an operations manual, is

22   that right?

23   A.   Yes, ma'am.

24   Q.   Okay.

25             MS. WANG:   Could we please give the witness

1    Exhibit 169?  That's in evidence already.

2            THE CLERK:  Do you have other exhibits you'd like me

3    to pull?

4            MS. WANG:  Yes.  Do you want me to make a list for

5    you?

6            THE CLERK:  Yes.

7            MS. WANG:  Okay.

8            Your Honor, could I just take minute?

9            THE COURT:  Yes.

10           THE WITNESS:  Are we done with this one, ma'am?

11           MS. WANG:  Yes, you can keep that one there.

12           THE CLERK:  (Handing exhibit to witness.)

3            (Pause in proceedings.)

14           MS. WANG:  Thank you, Your Honor.  I apologize.  I

15    should have done that earlier.

16           And Ms. Iafrate has informed me that I am incorrect

17    and that Exhibit 169 is not in evidence, and she's correct

18    about that.  I apologize.

19    BY MS. WANG:

20    Q.  Sir, could you take a look at Exhibit 169, please, and let

21    me know if you recognize that.

22    A.  Yes, ma'am.

23    Q.  Explain what that is, please.

24    A.  It's the operation manual for human smuggling.

25    Q.  Okay.  And is the effective date of it February 19, 2008?

 1    Withdrawn.

 2         That was last revised on May 9th, 2011, is that

 3    correct?

 4    A.   Yes, ma'am.

 5    Q.   Okay.  And the first page of Exhibit 169 there's an e-mail.

 6         Do you see that?

 7    A.   Yes, ma'am.

 8    Q.   Can you explain what that e-mail is?  Are you familiar with

 9    it?

10    A.   Based on who I sent it to, it sounds like a request from

11    the court compliance sergeant, Ben Aller.

12    Q.   Okay.  Can you take a look at the next e-mail down.

 3    A.   Oh, I'm sorry.  It's me forwarding the current ops manual

14    to my replacement.

15    Q.   So the HSU ops manual that is attached to this e-mail was

16    current as of March 27, 2012, is that correct?

17    A.   I believe so, ma'am.

18    Q.   All right.

19              MS. WANG:  I'd move the admission of 169 into

20    evidence.

21              MS. IAFRATE:  No objection.

22              MR. WALKER:  No objection, Your Honor.

23              MR. COMO:  No objection.

24              THE COURT:  Exhibit 169 is admitted.

25              (Exhibit No. 169 is admitted into evidence.)

1    MS. WANG: Thank you.

2    BY MS. WANG:

3    Q.   Okay.  I'm going to ask that you turn to page 3 of the ops

4    manual, which is Bates labeled MELC114964.  The last -- last

5    two paragraphs there from the use of Scorpion Micro.

6    A.   I'm there, ma'am.

7    Q.   Okay.  Thank you.

8         So, sir, as of -- well, let me ask you this first.

9    When you sent this e-mail to Brian Jakowinicz on March 27th,

10   2012, you were about to transfer out of HSU, is that correct?

11   A.   Yes, ma'am.

12   Q.   And Lieutenant Jakowinicz was about to transfer in as your

3    successor in office, correct?

14   A.   Yes, ma'am.

15   Q.   All right.  So you were conveying to him with this e-mail

16   what the current operations policies of HSU were, correct?

17   A.   Yes, ma'am.

18   Q.   All right.  So turning back to the third page of the ops

19   manual, is it correct that as of that date, the ops manual

20   provided for the recording of traffic stops?

21   A.   Yes, ma'am.

22   Q.   And the SOP here, document here, refers to a main purpose

23   of using those cameras.  Do you see that?

24   A.   Yes, ma'am.

25   Q.   And the main purpose for HSU in recording traffic stops is

1  to protect deputies from false and frivolous allegations, is

2  that correct?

3  A. Yes, ma'am.

4  Q. And there was also a secondary purpose of the recording of

5  traffic stops at HSU indicated here, is that right?

6  A. Yes, ma'am.

7  Q. That was when the footage might be used in a criminal case,

8  is that right?

9  A. Yes, ma'am.

10 Q. Okay. And turning to the next page, when the doc -- when

11 the recordings were needed for a criminal case, your operations

12 manual provided that the deputy would put the media containing

13 that recording, or just the footage that applies to the

14 criminal case, into evidence, is that right?

15 A. Yes, ma'am.

16 Q. So if a particular piece of video footage was going to be

17 needed as evidence to make a criminal case, HS deputy -- HSU

18 deputies were to log that into the property and evidence

19 division, is that right?

20 A. When you say "footage," unless I put -- used the wrong term

21 in here, I would expect the entire video to be put into

22 property evidence.

23 Q. Of that particular stop?

24 A. Yes, ma'am.

25 Q. Okay. Well, you wrote here in the sentence that carries

1  over from page 3 to page 4, under these circumstances, the

2  deputy would place the CD or DVD containing only the footage

3  that applies to that case into evidence.

4       So your -- your position is that that referred -- that

5  would refer to the entire recording?

6  A.  Yes, ma'am.

7  Q.  Is that perfectly clear from this operations manual?

8  A.  No, ma'am, it's not.

9  Q.  Now, you wrote underneath here, there are four

10 bullet points which read:  HSU deputies will record the traffic

11 stops when practical.  HSU deputies will be limited by the

12 capabilities of the device, battery life, memory storage,

3  access to a computer to download footage.

14       Do you see that?

15 A.  Yes, ma'am.

16 Q.  Were you here when Sergeant Palmer testified earlier this

17 week?

18 A.  Yes, ma'am.

19 Q.  Did you hear him describe some of the limitations of the

20 video cameras that were issued to HSU?

21 A.  Yes, ma'am.

22 Q.  Would you agree with those limitations?

23 A.  Yes, ma'am.

?4 Q.  All right.  So it would be actually physically impossible

25 for HSU deputies to record all of their traffic stops even

1001

1  during a given shift, is that right?

2  A.  Yes, ma'am.

3  Q.  You agree with that.  Was that a yes?

4  A.  I'm sorry.  Yes, ma'am.

5  Q.  All right.  The second through third bullet points read:

6  All footage must be downloaded onto DVD or CD and saved.

7  Deputies will place their name and the date of the footage on

8  the DVD or CD and turn it in to the admin officer.  And the

9  Human Smuggling Division admin officer will be responsible for

10  maintaining a copy of all footage on file.

11       Do you see that?

12  A.  Yes, ma'am.

3  Q.  So is it true that HSU deputies turned over video

14  recordings of their traffic stops to an admin officer?

15  A.  As I sit here now, I'm aware that some of them didn't.

16  Q.  All right.  And that admin officer was Perla Plata, is that

17  correct?

18  A.  Yes, ma'am.

19  Q.  All right.  Under policy, they were supposed to turn in any

20  recordings that they made, correct?

21  A.  Yes, ma'am.

22  Q.  And you sit -- as you sit here today, you're aware now that

23  some of them did not follow that policy?

24  A.  Yes, ma'am.

25  Q.  Sir, the -- this version of the operations manual for HSU

1   was last revised on May 9th, 2011.

2           Do you see that on the first page of it?

3   A.  Yes, ma'am.

4   Q.  Are you aware that at an earlier point in time, HSU

5   deputies were recording their traffic stops, but there was no

6   written policy in place?

7   A.  Yes.

8   Q.  You're aware of that?

9   A.  Yes, ma'am.

10  Q.  Okay.  Were you aware of it at the time?

11  A.  I believe when I be -- I believe when we actually purchased

12  cameras for everybody, that's when I developed this, I believe.

3   Q.  Was there a period of time in which you were aware the

14  deputies were recording stops, but -- and you also knew that

15  there was no written policy in place?

16  A.  Yes, ma'am.

17  Q.  I'd like to show you Exhibit 154, which is already in

18  evidence.

19          Sir, you recall that in May of 2014, that is last

20  year, there was an effort made to collect video recordings of

21  traffic stops throughout MCSO.

22          Do you recall that?

23  A.  Yes, ma'am.

24  Q.  Okay.  So I'll tell you that Exhibit 154 collects some of

25  the memoranda that MCSO personnel wrote to their commanding

1  officers in response to that effort.  All right?

2      I'm going to ask you to turn to the first memo that's

3  in this collection in Exhibit 154.  The author of it is Deputy

4  E.A. Quintero, and it's written to Captain Dan Whelan.

5      Do you see that?

6  A.  Yes, ma'am.

7  Q.  Do you know who Deputy Quintero is?

8  A.  Yes, ma'am.

9  Q.  Was he once under your command at HSU?

10  A.  Yes, ma'am.

11  Q.  All right.  I'm going to focus your attention on the middle

12  paragraph that starts "In 1109."

3      Do you see that?

14  A.  Yes, ma'am.

15  Q.  So Deputy Quintero writes:  In 1109 I was issued a Scorpion

16  digital audio/video camera.  Upon the issuance of this device I

17  attempted to familiarize myself with the use of this device and

18  ascertain the best way to secure this device on my person in

19  case I needed to use it.  This was done in a non-patrol

20  setting, and while doing so I determined that this device was

21  not user friendly.

22      Since the use of this device was optional, I attempted

23  to use this device on one or two traffic stops, but chose not

24  to use this device any further because I deemed it unfeasible,

25  as I would forget to turn it on, or when I did, the battery

1  life on the device was useless.

2       Do you see that?

3  A.  Yes, ma'am.

4  Q.  So do you understand Deputy Quintero to be saying that

5  while he was at HSU, he didn't use his MCSO-issued Scorpion

6  brand video camera?

7  A.  That's what he's saying, ma'am.

8  Q.  Were you aware of that at the time?

9  A.  No, ma'am.

10 Q.  The next paragraph reads:  If I did use this device, I

11 would have transferred these footages to CD/DVDs, and would

12 have given them to Officer P. Plata to be placed into the HSU

3  files per Lieutenant J. Sousa.

14      To my recollection, being this was a new directive

15 issued verbally by Lieutenant Sousa, and there was no written

16 policy on the preservation as of -- to which footages were to

17 be kept.  The directive was vague as to all footages, even if

18 they had no evidentiary purpose or just those resulting in an

19 arrest, citation, or other legal action.

20      Do you see that?

21 A.  Yes, ma'am.

22 Q.  Is that -- is what Deputy Quintero wrote a fair

23 characterization of the unwritten policy, prior to its

?4 memorialization in the operations manual?

25 A.  I don't recall, ma'am.  I believe, just like with the

1   collection of the evidence, I talked to these folks in person

2   and gave them my expectations before we have it in writing, but

3   I'm not going to be able to be a hundred percent unless it's

4   written.

5   Q.  Okay.  Did you give an oral instruction to HSU deputies at

6   one point before there was a written policy on recording stops?

7   A.  Yes, ma'am.

8   Q.  And do you have any argument -- well, do you disagree with

9   Deputy Quintero's characterization that the directive was

10   vague?

11   A.  The directive would have been if you -- to use the in --

12   the directive would have been to use it when you can and put

3   the video -- and turn the videos over.

14   Q.  Well, Deputy Quintero seems to have thought it was vague.

15         Do you think he was wrong about that?

16   A.  I don't believe I was vague.

17   Q.  I'm sorry, I didn't hear you.

18   A.  I don't believe I was vague.

19   Q.  All right.  Okay.  We can put Exhibit 154 away.

20        Lieutenant, while you were at HSU, your standard

21   operating policies required that certain actions taken by

22   deputies needed to be memorialized in some kind of document,

23   correct?

4   A.  Yes, ma'am.

25   Q.  So for example, if you had a saturation patrol, there would

1    have been a departmental report written up about that, correct?

2    A.   If we clarify, usually when we did a saturation patrol, it

3    would just -- we would coordinate it all by e-mail.

4    Q.   Would there be a departmental report generated after a

5    saturation patrol?

6    A.   An after action report?

7    Q.   A departmental report.

8    A.   That covered the entire patrol?

9    Q.   Yes.

10   A.   No, ma'am.

11   Q.   All right.  A saturation patrol might generate a

12   departmental report or multiple reports, depending on actions

3    that were taken, correct?

14   A.   Yes, ma'am.

15   Q.   If someone were arrested during a saturation patrol, there

16   would be a departmental report, correct?

17   A.   Yes, ma'am.

18   Q.   While you were at HSU, in general, was an ordinary traffic

19   stop that did not result in an arrest required to be written up

20   in a departmental report?

21   A.   No, ma'am.  At the time we could do verbal warnings.

22   Q.   While you were at HSU, HSU was engaged in doing immigration

23   interdiction patrols, correct?

24   A.   Human smuggling patrols?

25   Q.   Correct.  Thank you for the correction.

1        Was HSU engaged in human smuggling patrols?

2    A.  Yes, ma'am.

3    Q.  And that's -- we've heard testimony about how that happened

4    already this week, correct?

5    A.  Yes, ma'am.

6    Q.  So an HSU deputy might patrol the roads and look for load

7    vehicles carrying people who were being smuggled into the

8    United States?

9    A.  Yes, ma'am.

10   Q.  During the time period you were at HSU was it always

11   required -- withdrawn.

12       During some of those interdiction patrols would it

3    sometimes happen that a deputy suspected a vehicle of being a

14   smuggling load, but upon conducting a traffic stop the deputy

15   would determine that it was not a smuggling load?

16   A.  Yes, ma'am.

17   Q.  In those situations, did HSU deputies have to write any

18   kind of report to document the stop?

19   A.  I could be wrong.  I believe at first, no.  And then I

20   believe later on we had -- we were writing reports.

21   Q.  So there was some period of time while you were at HSU

22   where that situation would not generate a report?

23   A.  I believe so.  It would -- unless it was when we were

?4   287(g) it would probably be ICE, in the ICE database, 'cause we

25   would book them ourselves, but at some point I believe you have

1    to generate one.

2    Q.  Okay.  Are you testifying that while MCSO had a 287(g)

3    agreement, there would have been a report generated out of such

4    a traffic stop not leading to any arrest?

5    A.  I'm sorry.  If -- if we made a traffic stop -- maybe I'm

6    confusing myself.

7           If we made a traffic stop, we determined there was

8    nobody in the vehicle that was illegal -- I mean in the country

9    illegally and -- and we just let them go on their way, no,

10   there wouldn't be a report.

11   Q.  Okay.  Let's take the second situation you mentioned.

12          If a deputy on patrol suspected a smuggling load

3    vehicle pulled over the vehicle and determined that there were

14   no criminal charges to be brought, but that there were

15   undocumented immigrants in that vehicle and turned those people

16   over to ICE, was a report required to be generated in that

17   situation?

18   A.  To my -- the best of my recollection, at first our agency

19   report, I don't believe so.  I believe at some point we made it

20   that if you thought it was a suspected load, but we have to

21   turn it over or let it go, you would do a report.  I can't be

22   certain.  It's been a while.

23   Q.  Okay.  Thank you.

24          But that's your best recollection?

25   A.  Yes, ma'am.

1    Q.   Sir, I'm going to switch gears a little bit.  Are you aware

2    that there is an internal investigation ongoing about the

3    improper handling of evidence by HSU?

4    A.   Yes, ma'am.

5    Q.   Involving events during your command of HSU?

6    A.   While I was there, yes, ma'am.

7    Q.   And are you aware that in November of 2014 it was

8    discovered that there was a large number of identification

9    cards in a former -- found in a former office of HSU?

10   A.   Yes, ma'am, I was made aware of it during the

11   investigations.

12   Q.   And are you aware that it does appear that those

3    identification documents may have been seized by HSU deputies

14   during traffic stops?

15   A.   That's my understanding now, yes, ma'am.

16   Q.   And you're aware there also is an investigation into the

17   keeping of license plates in the HSU office while --

18   A.   Yes.

19   Q.   -- you were commander?

20   A.   Yes, ma'am.

21   Q.   And those also were likely seized during traffic stops by

22   HSU, correct?

23   A.   Yes, that's what I was made aware of, ma'am.

^4   Q.   And there was also -- that same investigation also covers

25   certain other property that was found in former HSU offices

1   that may have been seized by -- from individuals during traffic

2   stops.  You're aware of that?

3   A.  I believe, yes, ma'am.

4   Q.  Sir, while you were in command of HSU, were you aware that

5   deputies were keeping large numbers of individuals'

6   identification documents in the office?

7   A.  No, ma'am.

8   Q.  Was that consistent with HSU operations procedures?

9   A.  No, ma'am.

10  Q.  Is that a violation of MCSO policy?

11  A.  Yes, ma'am.

12  Q.  And were you aware that HSU personnel kept license plates

3   nailed to the wall?

14  A.  I was made aware of it, ma'am.

15  Q.  Sir, was your office in the HSU office with all of your

16  subordinates?

17  A.  Yes, ma'am.

18  Q.  And are -- is it your contention you didn't see the license

19  plates tacked on the wall?

20  A.  Ma'am, I never noticed.  As I sit here today I don't

21  remember, I never noticed it.  I did a walk through SWAT

22  division just three weeks ago, and I could probably barely

23  describe what's in their offices.

24  Q.  Good thing you're not a detective.  Withdrawn.  I

25  apologize.

1        THE COURT: I'll allow you to withdraw it.

2        MS. WANG: I'm sorry, Judge.

3        THE WITNESS: We're good. We're family. We've been

4    together for about three or four days talking.

5        MS. WANG: I apologize, Lieutenant.

6        THE WITNESS: It's okay, ma'am.

7    BY MS. WANG:

8    Q. So those -- those items, the identification cards, the

9    license plates, whatever other property was found in those old

10   HSU offices, those were obviously not turned over as discovery

11   in this case, is that right?

12   A. Yes, ma'am.

3    Q. Sir, we've already briefly touched on an effort to gather

14   video recordings among MCSO personnel that started in May of

15   last year. Do you recall that?

16   A. Repeat that question?

17   Q. I said are you aware that in May of last year, May of

18   2014 --

19   A. Probably talking about the goat rope.

20   Q. I'll get to the goat rope.

21   A. I gotcha. I'm sorry.

22   Q. Okay. So you're aware that in May of 2014 there was an

23   effort underway at MCSO to try to gather video recordings made

24   by MCSO personnel, correct?

25   A. Yes, ma'am.

1  Q.  Okay.  And you became aware of that effort through your

2  chain of command, correct?

3  A.  Yes, ma'am.

4  Q.  You were already assigned to SWAT division at that point,

5  correct?

6  A.  Yes, ma'am.

7  Q.  So you heard from your commanding officer, Captain

8  Kleinheinz, is that right?

9  A.  I think we both got the e-mail, but we both talked about

10  it.

11  Q.  All right.  Let's take a look at Exhibit 38, which is

12  already in evidence.  Take a look at that and let me know if

13  that might be the e-mail that you're referring to.

14  A.  I believe this is the second one.

15  Q.  Okay.  Why don't you take a look also at Exhibit 36.

16       Is it -- do you agree that Exhibit 38 might be the

17  first notice on May 14th, 2014, and Exhibit 30 -- I think I've

18  just misspoke.

19       Do you agree with me that Exhibit 38 is the earlier

20  e-mail on May 14, 2014, seeking information about past video

21  recordings, and Exhibit 36 is a later e-mail on May 17th, 2014,

22  on the same subject?

23  A.  Yes, ma'am.

24  Q.  All right.  And you received both of those e-mails,

25  correct?

1    A.    I just need a second here.

2    Q.    Let me help you out.  On Exhibit 38, take a look on the

3    third line among the recipients toward the right.  Maybe we can

4    have -- Mr. Klein can highlight that, Joseph Sousa.

5          Do you see that, sir?  You can look at the monitor.

6    A.    I saw it.

7    Q.    Okay.  Did you receive Exhibit 38?

8    A.    Yes, ma'am.

9    Q.    And Exhibit 36 is the May 17, 2014, e-mail.  On that one,

10   look about halfway down the large number of recipients on the

11   left-hand side about halfway down.

12   A.    I see my name, ma'am.

3    Q.    So fair to say that there were two e-mails sent asking for

14   information about video recordings, one on May 14, 2014, and

15   one on May 17, 2014, correct?

16   A.    Yes, ma'am.

17   Q.    And you were one of a large number of recipients of those

18   e-mail requests, correct?

19   A.    Yes, ma'am.

20   Q.    You -- when I first asked you about this you immediately

21   said, Oh, the goat rope.  And let me just ask you, because I

22   think some people in the room may not know that term, is a goat

23   rope when you try to undertake some effort and it gets very

24   messed up?

25   A.    Yes.  There's another military term I can't use, it usually

1   goes cluster F, and I'm cleaning that up, but yeah.

2   Q.   Thank you, sir.

3        So what happened?  Why do you characterize this effort

4   to gather video recordings as a goat rope?

5   A.   From what I remember, the very first time we got the

6   request and I saw it I conferred with my captain.  We wanted to

7   jump on it right away, and the first response was to get -- get

8   all the videos or audios of traffic stops, get them on disks,

9   follow the procedures, and put them into property and evidence

10  for safekeeping, which was time-consuming, and quite a few of

11  us in the SWAT division, I just -- we just jumped on it, just

12  so hours later or the next day they told us to stop, don't do

3   that.

14  Q.   Did you jump on that task immediately after getting the

15  first e-mail on May 14, 2014?

16  A.   It was fairly immediate, ma'am.

17  Q.   And then when did the message to stop what you were doing

18  and stop gathering videos happen?

19  A.   Either later that afternoon or the next day.  I'm not sure.

20  Q.   Right.  And did anything happen after that with regard to

21  the collection of videos?

22  A.   And then eventually we got the new directive to collect

23  them, get them on disk, and get them up to Professional

24  Standards, Sergeant Mike Reese.

25  Q.   And is Professional Standards Bureau the new name for the

1  Internal Affairs department?

2  A.  Yes, ma'am.

3  Q.  Sir, do you believe that this was an effective way to

4  gather all the video recordings that MCSO personnel had?

5  A.  I need a second to think about it.  I didn't give it much

6  thought.  I'm still thinking about the goat rope.

7          If I'm thinking back and thinking it's going to be

8  reference an investigation, you probably want investigators to

9  go seize the property.  Thinking back, that would probably be

10  the best way to do it.

11  Q.  Lieutenant, while this so-called goat rope was ongoing

12  during the day or two that people were given these

13  instructions, did you hear people within MCSO talking about the

14  directives to gather video recordings?

15          MS. IAFRATE:  Objection, Your Honor, hearsay.

16          MS. WANG:  Your Honor, it's not offered for the truth.

17          THE COURT:  Overruled.

18          THE WITNESS:  Myself and deputies that complied

19  immediately were frustrated that we wasted all that -- those

20  man-hours doing something for nothing.

21  BY MS. WANG:

22  Q.  Are you aware that there were other personnel who had not

23  yet complied with the request?

24  A.  Within my division, yes.

25  Q.  So there were people who did not jump on the directive to

1    gather video recordings.

2    A.    I only addressed the folks that were there at that time.

3    Q.    Okay.  But you are aware that there were personnel at MCSO

4    who did not immediately move to gather their video recordings.

5    A.    My division, no; in the SWAT division, no.

6    Q.    Lieutenant, you've worked at MCSO for a long time, right?

7    A.    18 years in July, ma'am.

8    Q.    How long have you been a lieutenant?

9    A.    Ten, eleven years.  Could be wrong.  I'm bad with time.

10   Q.    You've commanded --

11   A.    Like you said, I'm not a detective.

12   Q.    You've commanded a number of -- a number of different units

3    within MCSO?

14   A.    As a lieutenant I was a watch commander in the City of

15   El Mirage, and then commanded human smuggling, and then in SWAT

16   now as the XO, second in command, the tactical commander, over

17   three years.

18   Q.    And while you were at HSU you were very much involved in

19   gathering records, correct?

20   A.    Yes, ma'am.

21   Q.    Lieutenant, in your opinion, could the May 2014 effort

22   possibly have resulted in collecting all of the video

23   recordings that were in the hands of MCSO personnel?

?4          MS. IAFRATE:  Objection, Your Honor, foundation.

25          THE COURT:  Overruled.

1          THE WITNESS: I couldn't say that with a

2    hundred percent, ma'am, based on other things that have

3    happened.

4    BY MS. WANG:

5    Q. Well, do you think it's likely that those efforts that

6    began in May 2014 collected all of the video recordings that

7    existed at MCSO?

8    A. No, I don't believe. I can't say with a hundred percent

9    that all of them were collected. There's no way I could be

10   certain.

11   Q. Do you think it's likely that not all of them were

12   collected?

3    A. If I was a betting man I would bet on unlikely.

14   Q. Now, sir, you -- you personally turned over some recordings

15   of your traffic stops, correct?

16   A. Yes, ma'am.

17   Q. All right. I'm going to ask you to turn to Exhibit 164.

18             I believe this is in evidence.

19             And let's highlight the top.

20             This is a memo that you wrote to Captain John

21   Kleinheinz as of May 19th, 2014, correct?

22   A. Yes, ma'am.

23   Q. And was this your memorandum in response to that -- the May

?4   14 and May 17 e-mails from captain -- from Chief Trombi?

25   A. Yes, ma'am.

1  Q. All right. So you note here that you did not record any

2  stops since your assignment to the SWAT division, correct?

3  A. No, ma'am.

4  Q. You didn't use a video recording device generally, correct?

5  A. I believe the video recording devices I still had, I think

6  I used them in training out at the range. I don't -- I know I

7  didn't use them to record traffic stops.

8  Q. Okay. Or any other operations while you were at SWAT,

9  correct?

10  A. Not that I remembered, ma'am.

11  Q. Okay. But you did turn over some disks containing videos

12  that you would have made while you were at HSU, is that

3  correct?

14  A. Yes, ma'am.

15  Q. And feel free to count them up, but I think you turned in a

16  total of recordings of 20 stops, is that right?

17  A. Looks about right, ma'am.

18  Q. Lieutenant, is it fair to say that you participated in far

19  more than 20 traffic stops in your career at MCSO?

20  A. Yes, ma'am.

21  Q. Is it fair to say that you participated in far more than 20

22  traffic stops while you were a lieutenant at HSU?

23  A. Yes, ma'am.

24  Q. Now, looking at Exhibit 164, you had some descriptions of

25  the time elapsed on each of these recordings, correct?

1  A.  Yes, ma'am.

2  Q.  And you noted the date stamp, I believe, of each of these

3  recordings, is that right?

4  A.  Yes, ma'am.

5  Q.  Some of the dates indicate that the recording was made in

6  the year 2068 or 2069, so that must have been some kind of

7  malfunction, correct?

8  A.  It's obvious, ma'am, that -- that it was a malfunction or

9  it wasn't set correctly.

10  Q.  And so there's no way to really know when that recording

11  was made?

12  A.  No, ma'am.

3  Q.  And also on Exhibit 164, turning to the second page, the

14  last paragraph -- sorry, paragraph F, you indicated that you do

15  not recall deleting any recordings, but there's always a chance

16  something got deleted accidentally.

17          Do you see that?

18  A.  Yes, ma'am.

19  Q.  So you can't guaranty that there weren't other recordings

20  that were lost?

21  A.  It's hard to be a hundred percent about anything in life.

22  Q.  Okay.  So I'd like you to take a look at Exhibit 166.  This

23  is not in evidence.  This -- tell me if you recognize that.

24  A.  Which one, ma'am?

25  Q.  Exhibit 166.

1          MS. WANG:  And Ms. Iafrate tells me that is in

2     evidence.

3          I'm going to try to move that into evidence because

4     I'm not sure if it is or not.

5          THE COURT:  Any objection on 166?

6          MS. IAFRATE:  No, Your Honor.

7          MR. WALKER:  No objection, Your Honor.

8          MR. COMO:  No objection.  I have that being already

9     in.

10         THE COURT:  So do we.  It's already in evidence.

11         MS. WANG:  All right.  Thank you, Your Honor.

12    BY MS. WANG:

3     Q.  So Lieutenant, did you write this memo to your captain on

14    May 21st, 2014?

15    A.  Yes, ma'am.

16    Q.  Couple days after your initial memo to him, correct?

17    A.  Yes, ma'am.

18    Q.  And you advised him that you remembered that you needed to

19    check a Scorpion brand body-mounted camera that was in your

20    take-home vehicle, correct?

21    A.  Yes.

22    Q.  And when you went to go check that, you realized the camera

23    was missing.

24    A.  Yes, ma'am.

25    Q.  And you used that camera -- or withdrawn.

1      You had initially been issued that camera while you

2  were still at HSU?

3  A.  Yes, ma'am.

4  Q.  Sir, I'm going to have you take a look at Exhibit 165.

5  This is in evidence, so we can show it.

6      And I explained to you in deposition that this is a

7  partial view of a spreadsheet of video recordings collected

8  from MCSO personnel, and this reflects recordings that were

9  associated with your name.

10  A.  Yes, ma'am.

11  Q.  Does that look like a fair description?

12  A.  Yes, ma'am.

3  Q.  Do you notice that in the far right-hand column, several of

14  the recordings have the comment:  The disk would open.

15  However, no files exist?

16  A.  Yes, ma'am.

17  Q.  Did anyone ever follow up with you after you turned in your

18  DVDs to let you know that there were some files that were

19  blank?

20  A.  I don't recall, but Sergeant Fax from PSB came down and

21  actually took my external drive.

22  Q.  All right.  Did he tell you that he was going to be

23  checking to see -- to see if there were other versions of those

?4  recordings?

25  A.  I don't remember, ma'am.

1    Q.   So nobody actually spoke to you about the files that were

2    blank?

3    A.   I don't -- I don't recall.  They could have, I just don't

4    remember.

5    Q. · All right.  I'm going to have you take a look at

6    Exhibit 167.  This one's also in evidence.  This was a memo

7    from Sergeant Manny Madrid to you dated June 5th, 2014.

8         Do you see that?

9    A.   Yes, ma'am.

10   Q.   And Sergeant Madrid, is he currently under your command at

11   SWAT division?

12   A.   Yes.  He's the bomb sergeant.

3    Q.   And he was under your command as a -- as a sergeant when

14   you both were at HSU, correct?

15   A.   Yes, ma'am.

16   Q.   Okay.  And he finally turned in his memorandum in response

17   to the May 14 e-mail from Chief Trombi on June 5th of 2014,

18   correct?

19   A.   Yes, ma'am.

20   Q.   All right.  I'm going to call your attention to the third

21   paragraph:  To the best of my memory, I have not used a digital

22   audio or video recorder or digitally recorded any individuals

23   on any traffic stops.  Do you see that?

24   A.   Yes, ma'am.

25   Q.   And he was stating here that even while he was at HSU he

1  did not record traffic stops?

2  A.  Yes, ma'am.

3  Q.  Hadn't you issued an SOP directing HSU deputies generally

4  to record their traffic stops?

5  A.  Yes, ma'am.

6  Q.  And he did not follow that directive, is that correct?

7  A.  Yes, ma'am.

8  Q.  Were you aware of that while you were both at HSU?

9  A.  No, ma'am.

10  Q.  You found out about it for the first time when he sent you

11  this memo in 2014?

12  A.  Yes, ma'am.

3  Q.  Did you say anything to him about not following your --

14  A.  Oh, correction, ma'am.  I --

15  Q.  Sorry.

16  A.  I don't believe I picked up on it.  The first time I was

17  aware of it was during the deposition.

18  Q.  I see.  Have you talked to Sergeant Madrid about the fact

19  that he didn't follow your SOP on video recordings while at

20  HSU?

21  A.  Yes, ma'am.  I told him he might have to come in here and

22  testify.

23  Q.  Did you do anything else about it?

24  A.  No, ma'am.

25  Q.  All right.  Sir, sitting here now, are you aware that this

1    court issued an order on February 12th of 2015 directing the

2    defendants to produce certain documents to the plaintiffs in

3    this case?

4    A.  As I sit here now, yes, ma'am.

5    Q.  Okay.  I'm going to have you take a look at Exhibit 100.

6    That is in evidence.  And let's turn to the second page.

7         Sir, do you see paragraphs A through E on page 2 of

8    the Court's February 12, 2015, order?

9    A.  Yes, ma'am.

10   Q.  Sir, you were not asked to search for any of those

11   documents until after your first deposition on April 2nd, 2015,

12   is that right?

13   A.  Yes, ma'am.

14   Q.  You were not asked to search for those documents until the

15   day before we reopened your deposition on April 14, 2015,

16   correct?

17   A.  I didn't search for them.  Ms. Iafrate and Captain Skinner

18   are the ones that searched for it.

19   Q.  All right.  But that happened on April 13th, 2014 -- 2015?

20   The day before your reopened deposition?

21   A.  That sounds about right, ma'am.

22   Q.  Now, is it true that you gave defendants' counsel a copy of

23   files that you had saved while at HSU onto an external

24   hard drive?

25   A.  When PSB took my external hard drive, I believe it's

1  mirrored, they made a copy of it, and Ms. Iafrate took that

2  with her.

3  Q. So you gave her copies of what you had retained while you

4  were at HSU, is that right?

5  A. I never ordered it. PSB told me that it was a complete

6  copy, so I was -- I believe it's a complete copy. I can't be a

7  hundred percent. I didn't copy it or order it.

8  Q. I see. This external hard drive, when you were at HSU you

9  had a regular practice of saving certain documents onto that

10  hard drive, right?

11  A. Yes, ma'am.

12  Q. You sometimes also saved documents on the local hard drive

3  on your desktop computer at HSU, correct?

14  A. Most likely, yes, ma'am.

15  Q. When you left HSU and transferred to SWAT you did not take

16  that desktop computer with you, did you?

17  A. No, ma'am.

18  Q. Sir, is it fair to say that you cannot be certain that all

19  the documents you saved on that desktop were on the Buffalo

20  external hard drive?

21  A. That would be safe to say.

22  Q. And to your knowledge, has anyone gone to search for

23  documents on that desktop computer you used while at HSU?

24  A. Not to my knowledge.

25  Q. Sir, I'm going to have you turn to Exhibit 168.

1          This -- this is not in evidence.

2          Take a look at that and let me know if you recognize

3    that.

4    A.   Yes, ma'am.

5    Q.   This is -- Your Honor -- well, can you describe what it is?

6    A.   It's a memo from me to Captain Skinner letting him know how

7    many e-mails I found reference a monitor's request.

8          MS. WANG:   Okay.   Your Honor, I move the admission of

9    Exhibit 168.

10         MS. IAFRATE:   No objection, Your Honor.

11         MR. WALKER:   No objection.

12         MR. COMO:   No objection.

3          THE COURT:   Exhibit 168 is admitted.

14         (Exhibit No. 168 is admitted into evidence.)

15   BY MS. WANG:

16   Q.   Lieutenant Sousa, is this a memo that you wrote to Captain

17   Skinner relating to a request for documents from the

18   court-appointed monitor?

19   A.   Yes, ma'am.

20   Q.   And you indicated in the request -- let me ask you this:

21   Was this in response to a request that you specifically turn

22   over e-mails between you and Lieutenant Jakowinicz in the

23   two-month time frame around the time that you transferred

24   command at HSU to him?

25   A.   Yes, ma'am.

1    Q.   And you wrote here that you found 12 e-mails, is that

2    correct?

3    A.   Yes, ma'am.

4    Q.   And you noted chances are there were more e-mails for the

5    time frame in question and you did not save them.  Was that

6    correct?

7    A.   Yes, ma'am.

8    Q.   All right.  We can take that down.  I'm going to switch

9    gears now.

10             Lieutenant, you're aware that this Court issued a

11   preliminary injunction order on December 23rd of 2011?

12   A.   Yes, ma'am.

3    Q.   And when did you first find out about that preliminary

14   injunction order?

15   A.   The day it was sent to me, I was copied on it or sent to me

16   by attorney Tim Casey, or the next day, so very close.

17   Q.   Okay.  I'm going to show you Exhibit 187, which is in

18   evidence.  Sir, take a look at that and let me know if that's

19   how you found out about the preliminary injunction order.

20   A.   Yes, ma'am.

21   Q.   You were one of the recipients of this?

22   A.   Yes, ma'am.

23   Q.   And did you read the preliminary injunction order when you

24   received it?

25   A.   It was my routine to read everything Mr. Casey sent me.

1    Q.   Because you knew who he was, correct?

2    A.   Yes, ma'am.

3    Q.   You had been working with him on issues relating to this

4    litigation?

5    A.   Yes, ma'am.

6    Q.   And you considered this litigation very important, correct?

7    A.   Yes, ma'am.

8    Q.   And you would not leave one of Tim Casey's e-mails unread,

9    correct?

10   A.   No, ma'am.

11   Q.   Did you speak to anyone else who was a recipient of this

12   e-mail around the time that you got it?

3    A.   Either when I had it -- when I got the e-mail, within a

14   very short time frame I spoke with Chief Sands on the phone.

15   Q.   And did anyone else -- did you convey information about the

16   preliminary injunction order to anyone else around the time

17   that you got it?

18   A.   I believe I spoke with Tim Casey.

19   Q.   Did you speak to Sergeants Palmer and Trowbridge?

20   A.   I'm -- I'm sure I forwarded it to them.

21   Q.   And did you speak with the sheriff about the Court's

22   preliminary injunction order?

23   A.   Sometime in that time frame before I left I ran into him

?4   and we spoke.

25   Q.   So within a day or two of the order?

1  A.  I -- I can't be sure of when I spoke to the sheriff.

2  Q.  You said you spoke to the sheriff before he left.  What do

3  you mean by that?

4  A.  Before I left.

5  Q.  Before you left?

6  A.  I'm sorry, before I transferred out.

7  Q.  Before you transferred out of HSU in March?

8  A.  Yes, ma'am.

9  Q.  I beg your pardon, in April of 2012?

10  A.  Yes, ma'am.

11  Q.  Sir, do you recall whether you spoke to the sheriff about

12  the Court's preliminary injunction order during the month after

3  it issued?

14  A.  I'm not sure of the time frame, ma'am.

15  Q.  All right.  Did you speak to him about it more than once?

16  A.  I just have a memory of speaking to him once.  I could

17  have.  I just have a memory of one time.

18  Q.  Okay.  When you learned of the preliminary injunction

19  order, did you think that MCSO needed to take steps to carry it

20  out?

21  A.  Ma'am, when I reviewed the order, it was my personal

22  opinion, based on how we were doing things, that we were not in

23  violation.

?4  Q.  Okay.  But did you believe that MCSO needed to take steps

25  as a result of the judge's order?

1    A.    Yes.

2    Q.    Okay.  You said when you read it yourself you did not think

3    you were in violation of it?

4    A.    Yes, ma'am.

5    Q.    Sitting here now, do you understand that that is incorrect?

6    A.    Yes, ma'am.

7    Q.    All right.  And do you understand now that federal courts

8    issue preliminary injunctions to stop behavior that's ongoing?

9    A.    Yes, ma'am.

10   Q.    Did you think that the judge's -- withdrawn.

11          Did you think that MCSO needed to take steps with

12   regard to the Court's preliminary injunction order just with

3    respect to HSU?

14   A.    No, I -- I believed something needed to be put out formally

15   office-wide.

16   Q.    And why did you think that?

17   A.    I had a personal belief that we weren't violating it, but

18   with that said, the training -- the training still needed to go

19   out so everybody was aware of it.

20   Q.    So you believed that MCSO should put out training on the

21   judge's preliminary injunction order?

22   A.    Yes, ma'am.

23   Q.    Okay.  Did you think that because deputies in the

?4   Patrol Division were also detaining people, or might be

25   detaining people based on suspected illegal presence in the

1  United States?

2  A.  There was plenty of deputies out there.  We had -- I can't

3  remember the numbers -- over a hundred deputies that were

4  trained in 287(g), and they could have easily been, as I sit

5  here today, making those phone calls and unintentionally

6  violating the judge's order.

7  Q.  Well, as of December 23rd, 2011, MCSO had not had a 287(g)

8  agreement with ICE for about two years, is that right?

9  A.  Correct.

10  Q.  So you had some concern that there still might be some

11  deputies in the Patrol Division who were still acting as if

12  they needed to detain people who were suspected of being in the

3   United States illegally?

14  A.  Once we lost the 287(g), ma'am, I believe it was

15  office-wide that if you made a traffic stop and if you -- if

16  you had reasonable suspicion somebody was in the country

17  illegally during the course of that traffic stop, you could

18  make the call to ICE.

19  Q.  And that was the MCSO-wide practice as of December 23rd,

20  2011?

21  A.  Yes, ma'am.

22  Q.  So you believed that MCSO needed to put out training in

23  light of the judge's order, correct?

24  A.  Yes, ma'am.

25  Q.  I'm going to ask you to look at Exhibit 189.  This is also

1  in evidence.

2       Just take a look at it and ascertain what it is, and

3  I'm going to ask you to turn to the earliest e-mail in the

4  chain, which starts on the second-to-last page labeled page

5  405.

6  A.  The one that starts "Brett, per our conversation"?

7  Q.  Correct.

8  A.  I'm there, ma'am.

9  Q.  Okay.  Thank you.

10       Now, in this e-mail which is dated January 11, 2012,

11  you were directing Sergeant Brett Palmer to develop some

12  training materials in reference to the judge's order, correct?

3  A.  Yes, ma'am.

14  Q.  And you wrote down below here a summary of Judge Snow's

15  order.

16       Do you see that?

17  A.  I -- I think I actually cut and pasted it out of

18  Mr. Casey's e-mail.

19  Q.  Okay.  And you took the initiative to direct

20  Sergeant Palmer to do this, correct?

21  A.  Reading the e-mails, that's what I believe.

22  Q.  Because you believed that MCSO needed to take agency-wide

23  action in light of Judge Snow's order, correct?

24  A.  Yes, I -- we needed something documented reference the

25  order.

1  Q.  Okay.  And turning to the next e-mail in the chain, which

2  is a long one, there are a couple lines of it that start on

3  page 1 of 5 and it continues on, this was Sergeant Palmer's

4  response to you, correct?

5  A.  Yes, ma'am.

6  Q.  Now, turning back to the first page, you then sent

7  Sergeant Palmer's draft training materials to Tim Casey, is

8  that right?

9  A.  Yes, ma'am.

10  Q.  And you copied Brian Sands, David Trombi, Rollie Seebert,

11  Brian Jakowinicz, and John MacIntyre, is that right?

12  A.  Yes, ma'am.

3  Q.  Okay.  You believed that the chain of command needed to

14  approve this training material, correct?

15  A.  I didn't have the authorization to put out training

16  office-wide.

17  Q.  Okay.  Were you generally familiar with how training would

18  be put out MCSO-wide?

19  A.  Yes, ma'am, in general.

20  Q.  Okay.  And you knew that the chain of command needed to do

21  that, correct?

22  A.  Yes, ma'am.

23  Q.  You couldn't take it upon yourself as a lieutenant,

24  correct?

25  A.  I can't take it upon myself to put out a Briefing Board or

1034

1   anything office-wide without someone at headquarter's approval.

2   Q.  Okay.  Well, was there anything wrong -- withdrawn.

3       Did it violate MCSO policy for you to suggest this?

4   A.  No, ma'am.

5   Q.  Did you get a response to your e-mail to Tim Casey?

6   A.  No, ma'am.

7   Q.  Did you get a response from any of the commanders that you

8   copied on this e-mail?

9   A.  Not that I'm aware of, ma'am.

10  Q.  Let's turn to Exhibit 156.  This is also in evidence.

11      Looking at the first e-mail up at the top, this

12  e-mail's dated March 27, 2012, correct?

3   A.  Yes, ma'am.

14  Q.  And you were sending it to Brett Palmer and copying Brian

15  Jakowinicz?

16  A.  Yes, ma'am.

17  Q.  And you wrote:  Hi Brett.  We still need to address the

18  listed e-mails.  Once Tim signs off on the scenarios, Brian can

19  make sure Chief Sands and Trombi are good with you getting with

20  training and putting out the training via E learning.  Thanks,

21  Joe.

22      Do you see that?

23  A.  Yes, ma'am.

?4  Q.  As of March 27, 2012, you were right about to transfer out

25  of HSU, correct?

1035

1    A.    I believe that was my last week.

2    Q.    Okay.  Now, we've seen a handful of e-mails about this

3    proposed training that you directed Sergeant Palmer to draft.

4    Do you believe that there were other e-mails that must have

5    been sent and received around that same time frame about this

6    training?

7    A.    I made every effort to save everything that I could, and

8    obviously this is the last e-mail, one of the last e-mails I

9    even sent before I left human smuggling, so I think I would

10   have made every effort.  So I believe this is the last one.

11   Q.    But could --

12   A.    I could be wrong.

3    Q.    Could there have been other e-mails between various people

14   at MCSO about this training between January of 2012 and March

15   of 2012?

16   A.    That I was copied on?

17   Q.    Either.  Either that you were copied on or not copied on.

18   A.    Yeah, it could have been.

19   Q.    And I believe during your deposition -- withdrawn.

20         Do you think it's likely, looking at this e-mail

21   chain, that you were making phone calls to various people

22   trying to make this training happen?

23   A.    I usually do a lot of things by phone, so if I'm writing

24   e-mails, I'm confident I was making phone calls.

25   Q.    So you -- sitting here now, you believe you were making

1   phone calls to try to make this training happen?

2   A.   Knowing how I do business, yes, ma'am.

3   Q.   Who would you have made such phone calls to?

4   A.   Probably to Tim Casey, trying to get through the first

5   hurdle.   I have no recollection as I'm sitting here, though.

6   Q.   Would you have -- you just mentioned that calling Tim Casey

7   would have been the first hurdle.   Would you -- would you

8   have -- well, did you think you needed to wait for Tim Casey to

9   respond before you talked to others at MCSO about this, or

10   could you have been pursuing those channels simultaneously?

11   A.   I could have, ma'am.   I -- I don't recall.

12   Q.   All right.   Lieutenant, in fact, no training like this ever

3   went out at MCSO, is that right?

14   A.   Nothing went out office-wide that I know of.

15   Q.   And in fact, no MCSO-wide notice of Judge Snow's

16   preliminary injunction order went out, is that right?

17   A.   I never saw anything office-wide, ma'am.

18   Q.   Sir, you felt it was important for the training on the

19   judge's preliminary injunction order to happen, correct?

20   A.   Yeah, if it's one of the -- it's -- I believe this is the

21   only work product e-mail that I sent that I was working on.   I

22   believe all the other e-mails I sent were just statistical

23   information, the SOPs.   This was the only work product I had

24   that was holding.

25   Q.   And you communicated with Tim Casey about this proposed

1037

1   training, correct?

2   A.   I'm sure I did per the e-mail strings.

3   Q.   And you communicated with your chain of command about this

4   proposed training?

5   A.   Chances are I did, ma'am.

6   Q.   Well, we saw some e-mails where you certainly did, correct?

7   A.   Yes.   I'm talking oral communication.

8   Q.   I see.   I'm referring to any kind of communication at this

9   point.

10   A.   I'm sorry.   Yeah, written communication for sure.

11   Q.   Okay.   And you may also have communicated orally with your

12   chain of command about this proposed training?

3   A.   Yeah, may have, ma'am.

14   Q.   You were familiar with the chain of command, correct?

15   A.   Yes, ma'am.

16   Q.   You were familiar generally with the procedures that needed

17   to be followed to get the training out, correct?

18   A.   General procedures, yes, ma'am.

19   Q.   And based on all of those communications and your knowledge

20   about how training happens at MCSO, do you have an

21   understanding about why the training never happened?

22   A.   No, ma'am.

23   Q.   Sir, during your deposition didn't you tell me that you

?4   believed the failure to put out the training was due to a

25   policy failure on the part of the chain of command?

1  A.  I don't even remember that question, ma'am.

2  Q.  Okay.

3  A.  I'm sorry.

4  Q.  Let's take a look at your deposition of April 2nd, 2015.

5  Page 103, let's start with line 3.

6  A.  Okay.

7  Q.  Okay?  Why don't we -- can we put that on the screen?

8       You were asked during your deposition:  "And after the

9  Court's December 2011 order, did that practice continue?"

10       Your answer was:  "From when I got -- read the order

11  up until I transferred out, nothing changed.  There was no

12  training.  There was no directives to do anything different,

3   that I know of.

14       "Question:  Okay.  And in your view, who is

15  responsible for the failure to do any training on the Court's

16  December 2011 order?

17       "Answer:  Ultimately, as I sit here today and -- and

18  think back, you know, three years ago, I mean, the bottom line

19  is this was a policy decision and affected the office -- I mean

20  the entire office.  So to me it falls on the sheriff and the

21  chief deputy to make those decisions and get them done."

22  A.  I'm sorry, ma'am.  I remember that.  When you said

23  "policy," I thought you were talking like a written policy.

24  I'm sorry.  I thought you meant like a written policy.

25  Q.  Lieutenant, was that your testimony?

1    A.  Yes, it was, ma'am.

2    Q.  Do you stand by that testimony?

3    A.  Yes, ma'am.

4    Q.  Thank you.

5         Sir, as of December 23rd, 2011, HSU's regular practice

6    was that if a deputy suspected someone was illegally in the

7    United States, the deputy should contact ICE or CBP to confirm

8    immigration status, is that correct?

9    A.  The regular -- that was the regular process in the course

10   of the traffic stop.

11   Q.  And while awaiting the results of that confirmation with

12   the federal immigration agency, the deputy would keep the

3    person detained, correct?

14   A.  For the traffic stop, as long as it took to finish the

15   traffic stop.

16   Q.  Okay.  Well, was there a rule at that time that traffic

17   stops could take up to 20 minutes?

18   A.  Yes, ma'am.  All the training prior to the recent training

19   that we had based on the judge's order was that we had up to 20

20   minutes was reasonable to handle a civil type traffic stop.

21   Q.  And that was a general rule of thumb at MCSO?

22   A.  That's the way I understood it and a lot of deputies, yes,

23   ma'am.

24   Q.  Some traffic stops really take much less than 20 minutes,

25   correct?

1040

1    A.    Yes, ma'am.

2    Q.    But in all cases the rule was it's reasonable to hold

3    someone up to 20 minutes, correct?

4    A.    That's what I believe, ma'am.

5    Q.    Okay.  And that applied during the time period of December

6    of 2011, correct?

7    A.    Yes, ma'am.

8    Q.    Now, if ICE or CBP confirmed that an individual was in fact

9    in the United States illegally, HSU deputies would transport

10   the individual to ICE or CBP, correct?

11   A.    Yes, ma'am.

12   Q.    And obviously the deputy would have to maintain custody of

3    the person while transporting them, right?

14   A.    At the fed's instructions, yes, ma'am.

15   Q.    Okay.  Well, let me ask you this:  Were there occasions

16   where the federal agency would simply say that person is

17   illegally in the United States, but not give the direction to

18   transport?

19   A.    There was times where ICE refused, if that's what you're

20   asking.

21   Q.    And in those situations, we've heard testimony already this

22   week, the deputy might try another federal immigration agency,

23   CBP, correct?

24   A.    Yes, ma'am.

25   Q.    And maintain custody over the individual during the

1   meantime?

2   A. Yes, ma'am.

3   Q. Now, after the judge's order of December 23rd, 2011, HSU

4   continued that practice of detaining people suspected only of

5   being illegally in the United States, correct?

6   A. Based on what I just described, that was the -- as far as I

7   know, there was no change up until I transferred out.

8   Q. And at the time you transferred out, HSU was still

9   continuing what -- that practice we just described, correct?

10   A. Yes, ma'am.

11   Q. And you received no directives from your chain of command

12   for HSU to change what it was doing?

3   A. No, ma'am.

14   Q. Sir, we already looked at Exhibit 169. This was an e-mail

15   that you sent to Lieutenant Jakowinicz when he was succeeding

16   you as the commander of HSU, correct?

17   A. Yes, ma'am.

18   Q. And you already testified that you were basically handing

19   him this current HSU standard operating procedures, correct?

20   A. Which one are we looking at, ma'am?

21   Q. 169.

22   A. Sorry, ma'am. I got a little disorganized up here.

23   Q. That's all right. Take your time.

24   A. Sorry about that. 169.

25   Q. This is the HSU ops manual.

1    A.   Yes, ma'am.   That's what I'm looking for.

2    Q.   So my question was:   You already testified the -- you were

3    handing Brian Jakowinicz what was then the current HSU ops

4    manual, correct?

5    A.   Yes, ma'am.

6    Q.   Turn to page 3 of the ops manual.

7    A.   I have still not found it.

8    Q.   I'm sorry.

9    A.   Sorry.

10   Q.   Why don't we put it on screen.   Can we turn to page 3?

11              I beg your pardon, page 2.   The bottom half of that

12   page has a heading that says --

3               Can we see -- there we go.

14              "Contacts with suspected illegal aliens during traffic

15   stops."

16              Do you see that?

17   A.   Yes, ma'am.

18   Q.   This was about a so-called LEAR policy, is that right?

19   A.   Yes, ma'am.

20   Q.   And that's the practice we were just talking about, right?

21   A.   Yes, ma'am.

22   Q.   So you were conveying to Lieutenant Jakowinicz that the

23   LEAR policy was then in effect, correct?

24   A.   Yes, ma'am.

25   Q.   I'm going to turn now to a new exhibit.   This is something

1  else that you gave to Brian Jakowinicz when he was taking over

2  HSU. 212 is not in evidence, so take a look at that first and

3  let me know if that looks familiar to you.

4  A.  Is this the one that -- is this the one that says update

5  Operation Desert Sky?

6  Q.  Correct.

7  A.  I'm here, ma'am.

8  Q.  Okay. Sir, was this -- I'm sorry. This is -- I've

9  described this incorrectly. This is an e-mail that you sent to

10  Jesse Spurgin --

11  A.  Spurgin.

12  Q.  -- on March 21st, 2011. Who is Jesse Spurgin?

.3  A.  PIO, ma'am.

14  Q.  And you've copied a number of people on this e-mail.

15        Do you see that?

16  A.  Yes, ma'am.

17  Q.  And is it fair to say that Exhibit 212 consists of various

18  Human Smuggling Division statistics that you compiled over the

19  course of your time there?

20  A.  On page 2, ma'am?

21  Q.  Well, just the whole document. Were these various kinds of

22  statistics that you compiled as the lieutenant commanding HSU?

23  A.  Yes, ma'am, if I can just have a minute.

?4  Q.  Sure, please.

25  A.  Thank you, ma'am.

1      MR. COMO:  Your Honor, I don't believe this has been

2  admitted into evidence.

3      THE COURT:  I think that's what Ms. Wang indicated.

4      MS. WANG:  Right.  I'm trying to get there.

5      THE WITNESS:  Yes, ma'am.

6  BY MS. WANG:

7  Q.  So it is a collection of statistics that you would put

8  together while you were at HSU?

9  A.  Yes, ma'am.

10 Q.  And you were sending this collection to MCSO's PIO, is that

11 right?

12 A.  All these attachments were attached to one e-mail?

.3 Q.  That's how we received it, yes.

14 A.  If that -- yeah, if that was the case, yes, ma'am.

15 Q.  Okay.  I'm going to ask you to turn to page 3 of the

16 document.  It's an e-mail --

17     MS. WANG:  Oh.  I'd like to move the admission of the

18 exhibit into evidence, please.

19     MS. IAFRATE:  Relevance.

20     MR. WALKER:  Join.

21     MR. COMO:  I'll join.

22     MS. WANG:  Your Honor, I'm going to refer the witness

23 specifically to the third page, the e-mail from Sousa to Trombi

24 dated March 7, 2012.

25     THE COURT:  Do you want to bring it up so I can take a

1    look at it?

2            Overruled.

3            MS. WANG:  Thank you, Your Honor.

4            THE COURT:  The exhibit is admitted.  Exhibit 212 is

5    admitted.

6            (Exhibit No. 212 is admitted into evidence.)

7    BY MS. WANG:

8    Q.  Okay, Lieutenant, take a look at the exhibit.  Are you

9    there on the third page of the exhibit?

10   A.  Yes, ma'am.

11   Q.  The subject matter was human smuggling arrests and loads.

12           Do you see that?

13   A.  Yes.

14   Q.  And you address this to Chiefs Trombi and Sands, correct?

15   A.  Yes, ma'am.

16   Q.  They were both in your chain of command as of that date,

17   correct?

18   A.  Yes, ma'am.

19   Q.  And you wrote:  Chiefs, I did a comparison on arrests for

20   the year compared to the arrests for last year at this time.

21   The following are the results, huge drop-off.

22           Do you see that?

23   A.  Yes, ma'am.

24   Q.  And looking at this document, is it fair to say that you

25   were comparing various statistics for HSU for the period from

1    January 1st to March 31st, 2011, and comparing that to the same

2    year-to-date January 1st, 2012, to March 7, 2012.

3           Do you see that?

4    A.  Yes, ma'am.

5    Q.  Okay.  Now I want to call your attention to -- first to the

6    line that says Smuggling Arrests.

7           Do you see that?

8    A.  Yes, ma'am.

9    Q.  So in the first two and a half months of 2011, HSU had made

10   117 arrests under the Arizona human smuggling criminal statute.

11          Is that fair to say?

12   A.  Yes, ma'am.

3    Q.  Based on your count?

14   A.  Yes, ma'am.

15   Q.  And do you think that was accurate?

16   A.  Fairly accurate, yes, ma'am.

17   Q.  Okay.  And in the same, you know, year-to-date time frame,

18   roughly, for 2012, there were only 22 criminal arrests.

19          Do you see that?

20   A.  Yes, ma'am.

21   Q.  Okay.  Now, I want to skip down to the line that says "to

22   ICE."

23          Do you see that?

24   A.  Yes, ma'am.

25   Q.  So my first question about this is:  Does that indicate

1   people who were transferred by HSU from MCSO custody to ICE

2   custody?

3   A.   Yes, ma'am.

4   Q.   Would any of those people have been charged with an Arizona

5   state crime?

6   A.   If they're being turned over, no, ma'am.

7   Q.   Okay.  So it's fair to say that where you see the phrase

8   "to ICE" in your HSU statistical compilations, those people did

9   not have state criminal charges, is that right?

10  A.   That's what I believe, ma'am.

11  Q.   Okay.  And you were telling Chiefs Trombi and Sands that

12  the year-to-date as of March 11, 2011, was 125 people turned

3   over to ICE, is that right?

14  A.   Yes, ma'am.

15  Q.   And then for the same time period from January 1, 2012, to

16  March 7, 2012, there were 30 people turned over to ICE,

17  correct?

18  A.   Yes, ma'am.

19  Q.   So those 30 people all would have been detained in

20  violation of Judge Snow's preliminary injunction order,

21  correct?

22  A.   As I understand it today, yes, ma'am.

23  Q.   All right.  Now, you were telling the chiefs in your chain

?4  of command that there was a huge drop-off -- those were your

25  words -- in the year-on-year comparison from 2011 to 2012,

1048

1  correct?

2  A.  Yes, ma'am.

3  Q.  Did you speak to your chiefs about that?

4  A.  Yes, ma'am.

5  Q.  Is it fair to say that while you were commander at HSU you

6  occasionally were told by your chain of command to keep your

7  HSU numbers up, is that right?

8  A.  Why -- I have no recollection of anyone telling me to -- I

9  didn't have a quota, if that's what you're asking --

10  Q.  No, I wasn't asking you about a quota.

11  A.  Okay.

12  Q.  I was asking you whether you ever had conversations with

3   the chain of command about HSU's arrest numbers.

14  A.  I'm sure I have.

15  Q.  Did you get praise from your chain of command when HSU made

16  a lot of arrests?

17  A.  Yeah, yes, ma'am.

18  Q.  And that would include people who were charged with human

19  smuggling offenses?

20  A.  I would get -- it would be like overall, I --

21  Q.  So if you -- and when you got praise for a lot of arrests

22  by HSU, that would also include people who were turned over to

23  ICE, correct?

24  A.  Yes, ma'am.

25  Q.  I'm going to ask you now to turn to the last page of that

1049

1    document, Exhibit 212. Now, about in the middle of the page

2    there's a heading that says Cumulative Totals From 2006 to

3    Date (since program started).

4        Do you see that?

5    A.   Can you repeat that, ma'am?

6    Q.   In the middle of the page there's a heading that says

7    Cumulative Totals From 2006 to Date (since program started).

8    A.   Yes, ma'am.

9    Q.   Okay. You wrote here, total subjects state and federal,

10   5,401.

11       Do you see that?

12   A.   Yes, ma'am.

3    Q.   Does that indicate the total number of people arrested by

14   MC -- by HSU from 2006 when HSU was created till the date you

15   created this document?

16   A.   It's been a -- I'm just going to take a peek at it, ma'am.

17   It's been a while since I've actually looked at this.

18   Q.   Sure.

19   A.   I believe so. It's in parentheses "state and federal," so

20   it's probably both totals added up.

21   Q.   Okay. And then the next line says turned over to ICE/BP

22   effective 10-15-09.

23       Do you see that?

24   A.   Yes, ma'am.

25   Q.   Is 10-15-09 the date that HSU or that MCSO lost its 287(g)

1    agreement?

2    A.  I'm not sure, ma'am.

3    Q.  Well, looking at this document, can you infer that?

4    Because you were talking about the number of people turned over

5    to ICE or Border Patrol.

6    A.  It was 2009, I believe, when we lost the 287(g).  I just

7    don't know what month.

8    Q.  Well, the next line says federal administrative 287(g)

9    arrests no longer in effect.

10         Do you see that?

11   A.  Oh, yes, ma'am.

12   Q.  So I inferred from that that turned over to ICE/BP

13   effective 10-15-09 was the number of people who were turned

14   over to ICE or CBP after HSU lost its 287(g) agreement, is that

15   right?  Fair inference?

16   A.  Fair, ma'am.

17   Q.  Okay.  Now, I want you to take a look at the previous page.

18         Hold on.  Before we do that, up at the top of this

19   last page of Exhibit 212 you see total statistical recap as of

20   12-29-11.  Is 12-29-11 the date that you created this document,

21   or it was the last date for which you had statistics in this

22   document?

23   A.  Probably the last date it was updated.

24   Q.  Okay.  So let's now turn back to the previous page in

25   Exhibit 212, and let me know if that is a similar document, but

1  with the last update of the day before, 12-28-11.

2  A.  Yes, ma'am.

3  Q.  We've got the wrong document on the screen.

4          There we go.

5          So comparing these two pages, as of 12-28-11, the

6  total number turned over to ICE/BP on 12-28-11 was 977.

7          Do you see that?

8          Lieutenant, let me try to help you out here.

9  A.  Yeah, I was trying to --

10  Q.  Compare the two last pages in the exhibit.  Okay?  One's

11  dated 12-28-11 and one's dated 12-29-11.

12  A.  Yes, ma'am.

3  Q.  Now, in the middle of the page on each of them there is a

14  number associated with the heading Turned Over to ICE/BP.

15          Do you see that?

16  A.  That's what I'm looking for.  I'm sorry.

17          Okay.  I see it, ma'am.  I'm sorry.

18  Q.  Okay.  So as of 12-28-11 there were 977 people turned over

19  to ICE or CBP?

20  A.  I'm sorry, where I'm looking it says 403.

21  Q.  No, go down to Cumulative Totals.

22  A.  Ah, there we go.  I'm sorry.

23  Q.  Okay.

24  A.  Sorry.

25  Q.  Do you see that 977?

1    A.   I see it, yes, ma'am.

2    Q.   Okay.  And on the next page as of 12-29-11, the next day,

3    that same number is 985?

4    A.   Yes, ma'am.

5    Q.   So looks to me like there were eight people who were

6    arrested in that one day and turned over to ICE, is that right?

7    A.   Yes, ma'am.

8    Q.   And none of those people would have had state criminal

9    charges against them?

10   A.   That's what I believe, ma'am.

11   Q.   Let me go over with you -- turn to Exhibit 170, please.

12            THE COURT:  Do you know, Ms. Wang, wherever you think

3    it's a good place for an afternoon break.

14            MS. WANG:  Now would be fine, Your Honor.

15            THE COURT:  All right.  Why don't we take 15 minutes

16   and be back at 3:20.

17            THE CLERK:  All rise.

18            (Recess taken.)

19            THE COURT:  Please be seated.

20            MS. WANG:  May I proceed?

21            THE COURT:  Ms. Wang.

22            MS. WANG:  Thank you, Your Honor.

23   BY MS. WANG:

24   Q.   Lieutenant, I'm going to have you turn to Exhibit 132.

25   This is not in evidence.

1    Lieutenant, why don't you take a look at Exhibit 132.

2    Let me know if you recognize that.

3    A.  Yes, ma'am.

4    Q.  Lieutenant, is this an e-mail that you sent to Perla Plata

5    and Brian Jakowinicz on March 28th, 2012?

6    A.  Yes, ma'am.

7    Q.  And Perla Plata, we've already said, was the administrative

8    officer for HSU, correct?

9    A.  Yes, ma'am.

10   Q.  And Brian Jakowinicz was the lieutenant who was taking over

11   command of HSU in that time frame?

12   A.  Yes, ma'am.

3    Q.  And you were conveying to both of them the stat sheets that

14   you would send out to something you called the -- your e-mail

15   stat group, is that correct?

16   A.  Yes, ma'am.

17   Q.  And the attachment is -- do those statistic gen --

18   statistics generally reflect accurate -- an accurate report of

19   arrests by HSU as of March 28th, 2012?

20   A.  Yes, ma'am.

21   Q.  So I only have a couple of questions about this.

22       First is, you were sending this to

23   Lieutenant Jakowinicz because you anticipated that he would

?4   have to compile similar statistics, correct?

25   A.  Yes, ma'am.

1    Q.   And that he would also need to send it to the same e-mail

2    stat group, correct?

3    A.   Yes, ma'am.

4    Q.   The second e-mail here dated March 28th, 2012, are the

5    recipients of that e-mail the e-mail stat group?

6         Is that who you would regularly send statistics of

7    this sort to?

8    A.   Yes, ma'am, except for Frank Munnell.  I'm not sure why

9    he's in here.

10   Q.   Okay.  Frank Munnell was a chief at that time, is that

11   right?

12   A.   Yes, ma'am.

3    Q.   And the others on this recipient list, some of them

14   belonged to the public information unit of MCSO, is that right?

15   A.   Yes, ma'am.

16   Q.   Including Lisa Allen, who was the head of the PIO, correct?

17   A.   Yes, ma'am.

18   Q.   Do you know whether Lisa Allen worked very closely with the

19   sheriff, in general?

20   A.   Yes, ma'am, she did.

21   Q.   Sir, when you were lieutenant in charge of HSU, you had an

22   unusual chain of command, is that correct?

23   A.   Yes, ma'am.

?4   Q.   You were a lieutenant reporting to two chiefs, correct?

25   A.   Yes, ma'am.

1    Q.  Most lieutenants report to a captain in MCSO, is that

2    right?

3    A.  99 percent of them, yes, ma'am.

4    Q.  It was unusual for the head of a division to be a

5    lieutenant reporting directly to a chief, correct?

6    A.  Not the norm.

7    Q.  And in fact, it was also unusual that you had two chiefs

8    you reported to, correct?

9    A.  Against policy.

10   Q.  Say that again?

11   A.  It was against policy.

12   Q.  It was against policy for you to report to two chiefs.

3    A.  Yes, ma'am.

14   Q.  How did it affect your work to have two chiefs you were

15   reporting to?

16   A.  Confusing.

17   Q.  It was confusing for you?

18   A.  Yes, ma'am.

19   Q.  Do you think it was confusing for other people?

20   A.  Yes, ma'am.

21   Q.  Did you have an understanding as to who Chief Sands --

22   well, let me go back and make sure we understand this.

23            You reported to both Chief Sands and Chief Trombi,

?4   right?

25   A.  Yes, ma'am.

1   Q.  Did you have an understanding about who Chief Sands

2   reported to for purposes of HSU activities?

3   A.  My assumption was always the sheriff.

4   Q.  Why did you make that assumption?

5   A.  Any time we were doing operations or serving search

6   warrants, Chief Sands was with the sheriff.

7   Q.  And were there other things he said to you that gave rise

8   to your understanding that he reported directly to the sheriff

9   when it came to HSU matters?

10   A.  As I sit here, ma'am, it's just my -- it was only an

11   assumption based on what I saw.

12   Q.  Well, did you tell me during your deposition that when he

13   spoke to you about HSU operations, he would say "the boss wants

14   this" or "the boss wants that"?

15   A.  When he would call me sometimes and direct me to do

16   something, it would be -- he would use the term "the boss," and

17   that's the only person he called the boss.

18   Q.  Was the sheriff?

19   A.  Yes, ma'am.

20   Q.  Now, Lieutenant, when you were in charge of HSU you

21   sometimes directly briefed the sheriff, is that right?

22   A.  Yes, ma'am.

23   Q.  And in fact, on occasion the sheriff would directly talk to

24   the sergeants under your command in HSU about HSU work,

25   correct?

1    A.   It wasn't unusual.

2    Q.   And in 2012 is it fair to say that Sheriff Arpaio continued

3    to be very interested in the work of HSU?

4    A.   Yes, ma'am.

5    Q.   And the sheriff, you understood, had strong opinions that

6    MCSO should be fighting illegal immigration, isn't that right?

7    A.   Yes, ma'am.

8    Q.   And that was true in 2012?

9    A.   Yes, ma'am.

10   Q.   And that was true in 2013?

11   A.   Yes, ma'am.

12   Q.   Did you ever get a directive from your chain of command to

3    record conversations with ICE agents?

14   A.   Yes, ma'am.

15   Q.   Can you explain what that directive was specifically?

16   A.   I was informed by Chief Sands that Chief Hendershott wanted

17   me to call ICE agents that we had been working with for a while

18   when they were -- if they refused -- while we were recording

19   all their conversations based on us making the phone call, so

20   that in case they refused, they wanted us to record them and

21   have them recorded.

22            And then later that night I got called by Chief

23   Hendershott.  I got the sense that he knew -- he kind of sensed

4    I didn't want to do it, and was pretty much told to do it.

25   Q.   Let me go back and ask you some more about this.  So to be

1  clear, the directive was you were to record the ICE agents

2  surreptitiously without their knowledge?

3  A.  Yes, ma'am.

4  Q.  And you said you did not want to do that, correct?

5  A.  Correct, ma'am.

6  Q.  Now, you mentioned that Chief Hendershott was involved.

7       Was that when he was the chief deputy?

8  A.  Yes, ma'am.

9  Q.  So that would have been sometime before September of 2010?

10  A.  Yes, ma'am.

11  Q.  So back then, ICE would sometimes refuse to take suspected

12  undocumented immigrants from MCSO?

.3  A.  At some point they stopped, yes, ma'am.

14  Q.  And how did -- did you have a conversation directly with

15  Chief Hendershott about this?

16  A.  It was about 1 o'clock in the morning and he called me.  I

17  don't remember the exact words, but he said, You're gonna do

18  it.  And it wasn't unlawful.  It wasn't an unlawful order, so I

19  had to do it.

20  Q.  You didn't feel happy about it, though?

21  A.  It's the first time in my career I thought about resigning.

22  Q.  And at that time did you have an understanding -- well, let

23  me ask you this:  Did you have conversations on other occasions

?4  with Chief Hendershott during that time frame?

25  A.  I've spoken to Chief Hendershott maybe just three or four

1    times.  And another conversation, see if I can remember this,

2    I'm pretty sure I told you about this.

3    Q.  Was it about a worksite raid?

4    A.  Yes, ma'am.  I'm sorry, yeah.

5    Q.  Okay.

6    A.  Yes.  Thank you.

7    Q.  And what was that conversation about?

8    A.  It was the -- it was the operation that resulted in the

9    Mora lawsuit.  It was HMI -- we had a -- the operations plan,

10   we had it all ready to go.  The operation went off.  We had a

11   chaotic scene; people were running everywhere.  We were trying

12   to get the scene contained, at which time I got a call from

13   Chief Hendershott ordering me to go serve the County with some

14   letters -- not search warrants, not subpoenas, just letters

15   asking for their cooperation -- and he wanted me to do it that

16   very minute.

17   Q.  Did the letters that were addressed to the County have to

18   do with the sheriff's immigration efforts?

19   A.  I believe the letters had to do with would they be willing

20   to turn over copies of the County contracts or paperwork

21   reference the contracts with HMI.

22   Q.  I see.  So they related to this particular operation?

23   A.  Yes, ma'am.

24   Q.  And the sheriff was accusing the County of having some role

25   in what was going on at that particular employer?

1  A.   I don't remember the specifics exactly what was in the

2  letter, but it was -- it was just a letter asking for some

3  County records.

4  Q.   Okay.  Sir, during that time frame, when Chief Hendershott

5  was the chief deputy and you were at HSU, did you have an

6  understanding about what would cause him to contact you

7  directly?

8  A.   I have an opinion and a perception.

9  Q.   And what was that?

10  A.   He was kind of like the enforcer.  You always felt if -- if

11  you weren't doing exactly what he wanted, Hendershott would

12  call.

13  Q.   When you weren't doing what the sheriff wanted?

14  A.   Or what he wanted done.

15  Q.   And so Hendershott was the enforcer for the sheriff's

16  wishes.

17  A.   That's how I perceived it.  I have no fact, but that's how

18  I perceived it.

19  Q.   Was that generally known among HSU?

20  A.   I don't know about HSU, but I know I've had these kind of

21  conversations with other folks throughout the office.

22  Q.   All right.  Now, Lieutenant, you heard the sheriff publicly

23  vowing to appeal Judge Snow's preliminary injunction order,

24  correct?

25  A.   I'm aware of it.

1  Q.  And you saw that as political rhetoric, is that right?

2  A.  Yes, ma'am.

3  Q.  And you're aware that others at MCSO also heard the sheriff

4  vowing to appeal the preliminary injunction order, is that

5  right?

6  A.  I believe I heard that from a third party that works for

7  the office, sorry.

8  Q.  After the preliminary injunction order, did the sheriff

9  ever tell you to stop detaining people based only on suspicion

10  that they're illegally in the United States?

11  A.  The 2011 order?

12  Q.  Correct.

.3  A.  No, ma'am.

14  Q.  After the December 2011 preliminary injunction order, did

15  the sheriff ever tell you HSU should back off on fighting

16  illegal immigration?

17  A.  No one told me to change anything, ma'am.

18  Q.  Did the sheriff ever tell you, after Judge Snow's

19  preliminary injunction order in 2011, that you should release

20  suspected undocumented immigrants if you could not make state

21  criminal charges against them?

22  A.  No, he did not, ma'am.

23  Q.  And you were aware that the sheriff at that time was making

24  public statements criticizing the federal government on

25  immigration issues, is that right?

1    A.   I was aware of the rhetoric, yes, ma'am.

2    Q.   And I believe you've told me before that the sheriff's

3    political rhetoric about immigration was over the top.   Was

4    that your view?

5    A.   Yes, ma'am.

6    Q.   Now, by the time you left HSU you had briefed the sheriff

7    many times, correct?

8    A.   Yes, ma'am.

9    Q.   You've heard him speaking about immigration enforcement

10   publicly?

11   A.   Yes, ma'am.

12   Q.   You've also heard him speaking about it during MCSO

13   meetings, correct?

14   A.   I'm sure I have, ma'am.

15   Q.   And you were very familiar with the sheriff's views about

16   immigration enforcement as it related to MCSO, correct?

17   A.   Yes, ma'am, all the rhetoric.

18   Q.   And you've spoken with him directly on the subject many

19   times, correct?

20   A.   About HSU operations in criminal employment, yes, ma'am.

21   Q.   And about the issue of MCSO enforcing immigration laws

22   generally?

23   A.   Yes, ma'am.

24   Q.   Now, you told us earlier that the training that --

25   materials that you directed Sergeant Palmer to draft never were

1   implemented in training for MCSO, is that right?

2   A.  Yes, ma'am.

3   Q.  Lieutenant, based on everything you know, from your

4   conversations with the sheriff and your years commanding HSU,

5   if the training that Sergeant Palmer drafted on the preliminary

6   injunction order had actually taken place, how do you think the

7   sheriff would have felt about that?

8   A.  He wouldn't have been happy, ma'am.

9   Q.  Sir, has the sheriff or the public information office ever

10  directed you to speak at a press conference?

11  A.  Yes, ma'am.  Not -- I don't think it was the PIOs, though.

12  Q.  Do you think it was the sheriff?

3   A.  I don't remember.  When we lost our 287(g), I didn't expect

14  to have to speak, and somebody just told -- I can't remember

15  who asked me to.

16  Q.  Okay.  Someone in your chain of command asked you to do it?

17  A.  I don't remember, ma'am.

18  Q.  All right.  It wasn't your idea to give a press conference?

19  A.  No.  I didn't set up the press conference for when we lost

20  the 287(g), and I didn't know I was going to even speak.

21  Q.  Okay.  Was this a press conference that you became kind of

22  notorious for?

23  A.  Which -- there was two.  Which one's the notorious one,

?4  ma'am?

25  Q.  There were two press conferences you became notorious for?

1    A.  There was the one with returning ICE credentials, and then

2    there was the one -- and then there was the one about the

3    mayor, yeah, yes, ma'am.  Is that the one you're talking about?

4    Q.  Well, let -- we could talk about either of them.

5    A.  Okay.

6    Q.  Let's talk about the mayor first.

7    A.  All right.

8    Q.  There was a press conference in which you were criticizing

9    the then-mayor of Phoenix, Phil Gordon, is that right?

10   A.  Yes, ma'am.

11   Q.  And you were dealing with his concerns that MCSO was

12   engaged in racial profiling of Latinos, is that right?

3    A.  Yeah, his rhetoric, ma'am.

14   Q.  Okay.  Well, he was -- he was accusing MCSO of racial

15   profiling, correct?

16   A.  Yes, ma'am.

17   Q.  And you appeared at a press conference to address Mayor

18   Gordon's allegations, correct?

19   A.  Yes, ma'am.

20   Q.  And you said emphatically during that press conference that

21   Mayor Gordon should shut up, correct?

22   A.  Yes, ma'am.

23   Q.  Was your speaking at that press conference your idea?

ᐟ4   A.  I believe, I think, as I sit here today, I think it was

25   Chief Hendershott, I think.

1    Q.  You mentioned another press conference in which -- for

2    which you became notorious.  That was when MCSO lost its 287(g)

3    agreement?

4    A.  Yes, ma'am.

5    Q.  And you state -- you also spoke at that press conference?

6    A.  Yes, ma'am.

7    Q.  Was it your idea to speak at that press conference?

8    A.  No, ma'am.

9    Q.  Whose idea was it?

10   A.  I don't remember, ma'am.

11   Q.  It came to you through the chain of command?

12   A.  Oh, I was sitting in the back, and somebody told me to go

3    up there and talk.

14   Q.  Who else was speaking at that press conference?

15   A.  The sheriff.

16   Q.  Sir, in October of 2013 you were already assigned to the

17   SWAT division, correct?

18   A.  Yes, ma'am.

19   Q.  And are you aware that MCSO conducted a saturation patrol

20   on October 18th and 19th of 2013?

21   A.  Yes, ma'am.

22   Q.  And that -- you're aware that that happened just a few days

23   after Judge Snow issued another order, the supplemental

24   injunction which appointed a monitor, among other things?

25   A.  I believe so.

1    Q.   And you actually participated in that saturation patrol in

2    your capacity as the commander of SWAT, correct?

3    A.   Myself and my captain were at the CP.

4    Q.   At the --

5    A.   Command post, I'm sorry.

6    Q.   And, sir, are you aware that, I think as you put it, the

7    sheriff was putting out political rhetoric around illegal

8    immigration at that saturation patrol?

9    A.   I believe so, ma'am.

10   Q.   Sir, I'm going to turn to a different topic.  While you

11   were a lieutenant at HSU, Deputy Charley Armendariz was under

12   your command, right?

3    A.   Yes, ma'am.

14   Q.   He had a very high number of civilian complaints, is that

15   right?

16   A.   Yes, ma'am.

17   Q.   You were aware of that before he transferred into HSU,

18   correct?

19   A.   Yes, ma'am.

20   Q.   He had a reputation as a poor deputy, is that right?

21   A.   I believe -- I believe I used "high maintenance."

22   Q.   A high maintenance deputy?

23   A.   Yes.

?4   Q.   And by that you meant he generated a large number of

25   civilian complaints?

1  A.  Large number of complaints, and basically high maintenance

2  as in a supervisor had to spend a lot of time with him and

3  dealing with him.

4  Q.  Okay.  You disagreed with the decision to transfer someone

5  with his record into HSU, correct?

6  A.  Yes, ma'am.

7  Q.  You did not think someone with that record should be in a

8  specialized unit like HSU?

9  A.  Yes, ma'am.

10  Q.  And after Deputy Armendariz was transferred into HSU, he

11  continued to generate a very high volume of civilian

12  complaints, correct?

3  A.  Yes, ma'am.

14  Q.  Now, at that time that Deputy Armendariz was transferred

15  into HSU, the MCSO policy for dealing with civilian complaints

16  was that the immediate supervisor should contact the

17  complainant and see if it could be worked out, correct?

18  A.  At the time for minor complaints, rudeness, that type of

19  nature, it was a phone call and try to resolve it.  But

20  supervisors were still required to take some handwritten notes.

21  Q.  Okay.  And was it up to the supervisor to determine whether

22  it was a minor matter?

23  A.  It was -- the policy said the supervisor could try to

?4  resolve it with a phone call.

25  Q.  All right.  At a certain point did you direct Deputy

1    Armendariz to record his traffic stops?

2    A.   At some point out of frustration I told him:  I want you to

3    record every traffic stop, because I want to see every single

4    citizen's complaint.  And I told him:  I don't care if I have

5    to give you three cameras.

6    Q.   Did you review the videos of his traffic stops after that?

7    A.   The ones that he -- when I gave that order, the ones --

8    this is probably before I left, probably, yes, if he got a

9    citizen's complaint, I wanted to see it.

10   Q.   So you only reviewed the videos if there was a civilian

11   complaint?

12   A.   Yes, ma'am.

3    Q.   You didn't review his traffic stops generally?

14   A.   No, ma'am.

15   Q.   After he died you became aware that he actually was not

16   turning in all of his video recordings, is that right?

17   A.   I became aware, yes, ma'am.

18   Q.   You weren't at HSU at the time he died?

19   A.   No, I was not, ma'am.

20   Q.   And you did not know, while you were in his chain of

21   command at HSU, that he was not turning in all the recordings

22   of his traffic stops?

23   A.   No, I did not know, ma'am.

24   Q.   He was essentially picking and choosing which recordings to

25   turn in, correct?

1  A.  That's what it appears like, ma'am.

2  Q.  Did you ever direct Armendariz's supervising sergeant to

3  take other steps to address the high volume of civilian

4  complaints against him?

5  A.  I believe they were told to document every single

6  complaint, regardless of how minor, and also I believe -- I

7  don't know if it was at my direction, but Sergeant Madrid was

8  spending a little more time going to his traffic stops.  I

9  don't know if I directed that or Sergeant Madrid did it on his

10 own.

11 Q.  Okay.  He spent a little bit more time directly supervising

12 traffic stops?

3  A.  Going to his traffic stops, yes, ma'am.

14 Q.  Okay.  So when Armendariz called in that he was at a

15 traffic stop, Sergeant Madrid would respond on scene?

16 A.  I believe he increased that frequency of doing that at some

17 point.

18 Q.  Sergeant Madrid didn't witness every one of Deputy

19 Armendariz's traffic stops?

20 A.  Oh, absolutely not.

21 Q.  That would have been impractical, in your view?

22 A.  That would have been impossible.  Out in the field live,

23 yes.

?4 Q.  You're right.  Or by video.  Sergeant Madrid was not

25 reviewing videos generally of Armendariz's traffic stops, was

1  he?

2  A.  I don't know for sure.  I'm not sure.  I don't -- I don't

3  believe so.

4  Q.  Okay.  You did not direct him to do that?

5  A.  No, ma'am.

6  Q.  While you were at HSU, is it fair to say that you really

7  could not come up with a satisfactory solution to deal with the

8  problems that Armendariz was having?

9  A.  No, ma'am.

10  Q.  Your chain of command did not assist you in coming up with

11  a satisfactory response?

12  A.  When I was there I had at least two complaints that I

.3  looked into that came through Chief Sands, and one through

14  Chief Trombi.  And I'm sure during those conversations I

15  mentioned they had a -- he had a volume of complaints.  I don't

16  recall ever them giving me any suggestions or remedies.

17  Q.  Sir, while you were commander of HSU were you aware that

18  Charley Armendariz was the principal, that is, the

19  investigative target, of any Internal Affairs investigations?

20  A.  After my deposition, I believe I -- based on some of the

21  stuff you -- some of the paperwork you showed me, I believe,

22  one was a use of force, and then the other one was a missing

23  DR.

24  Q.  Okay.  Well, as to the incident involving excessive use of

25  force, you actually had referred that matter to Internal

1    Affairs, correct?

2    A.  Yes, based -- I didn't recall it till you showed it to me,

3    ma'am.

4    Q.  Okay.  But you saw from the documents that in fact you had

5    referred him?

6    A.  Yes, ma'am.

7    Q.  All right.  And are you aware of what discipline, if any,

8    was imposed on him for that incident?

9    A.  I don't believe any.  I believe it was not sustained, based

10   on what I read.

11   Q.  Would you have been notified by the Internal Affairs

12   division at that time you were at HSU of the outcome of

13   Internal Affairs' investigations of deputies under your

14   command?

15   A.  I don't recall being notified.  That's not to say I wasn't.

16   Q.  Okay.  I'm going to ask you about the other incident that

17   you -- that you mentioned.

18        Turn to Exhibit 177.  This is not in evidence.  It's

19   an Internal Affairs division file on one of those -- the other

20   investigation.

21        And, sir, I did show this to you during your

22   deposition.  Had you ever seen this before your deposition?

23   A.  No, ma'am.

24   Q.  Okay.  I'm just going to ask you some -- to react to some

25   of the things in it, or ask you some questions about whether

1    you're aware of certain things in it.

2    A.   Sure, ma'am.

3    Q.   So just to sum up, in this investigation, the issue was

4    that Deputy Armendariz had come up on the missing DR list,

5    correct?

6    A.   I believe so, yes, ma'am.

7    Q.   Okay.  And there has been previous testimony about what

8    missing DR means, earlier this week.  Do you recall that?

9    A.   Yes, ma'am.

10   Q.   Okay.  And that was generally familiar to you?

11   A.   Yes, ma'am.

12   Q.   All right.  Now, turn to -- if you look at the bottom of

3    each page there's a number that starts with MELC.

14   A.   Yes, ma'am.

15   Q.   Turn to page MELC3875, please.

16        Are you there?

17   A.   Yes, ma'am.

18   Q.   Okay.  I'm going to read you part of it and ask you whether

19   anyone ever informed you of this information.  Okay?  This is

20   part of his interview with the Internal Affairs investigator,

21   and Deputy Armendariz said:  But I remember talking to, you

22   know, Brett Palmer, and I told him, I said I -- I don't -- I

23   don't have paperwork for this.

24        He's referring to that missing DR there.  Okay?

25   A.   Yes, ma'am.

1  Q.  Do you understand that?

2  A.  Um-hum.

3  Q.  I don't have paperwork for this and I don't really remember

4  it, you know.  I knew it involved a guy, an employee, but that

5  was it.  I don't know who they were and what they were, and it

6  was just kind of mentioned, you know, if you don't have it or

7  you don't know it or you don't know what happened, you know,

8  just write a DR taken in error, and a lot of us did down, you

9  know, down in Enforcement to CLE.

10      There is he referring to Enforcement Support?

11  A.  I don't know, ma'am, what "CLE" means.

12  Q.  Okay.  What about Enforcement, does that seem like he's

3  referring to Enforcement Support?

14  A.  I don't know.  That could be patrol.  That could be

15  Enforcement Support.

16  Q.  Okay.  Continuing on, Deputy Armendariz said:  You know, it

17  was -- you know it was said, you know, if you -- if you don't

18  remember, just write a DR taken in error and give it back to

19  me, and you know I'll just sign it off and he'll walk it to

20  records so that it can be taken off of the missing DR list.

21      And on the next page there's a note by the IA

22  investigator that Sergeant -- Deputy Armendariz was referring

23  to Sergeant Palmer giving him an instruction to just take a

24  missing DR -- a DR number filed in error.

25      Okay.  So my question to you, sir, is:  Did anyone in

1   the 2009 or 2010 time frame ever tell you, as the lieutenant of

2   HSU, that a deputy had accused Sergeant Palmer of making that

3   instruction to take a missing DR in error?

4   A.  Ma'am, to the best of my recollection, this is the first

5   time I've heard -- know anything about this.

6   Q.  Okay.  If Deputy Armendariz's allegation was true, would

7   that have been a violation of MCSO policy at that time?

8   A.  I believe that should have led to another IA.

9   Q.  Of Sergeant Palmer?

10  A.  Yes, ma'am.

11  Q.  Now, to be fair, Sergeant Palmer was also interviewed and

12  he denied what Deputy Armendariz said, and said he would not

3   have done that.  But nobody ever called to your attention that

14  Sergeant Palmer and Deputy Armendariz had made these statements

15  to Internal Affairs?

16  A.  No, ma'am.  To the best of my recollection, he was called

17  up for this IA, and I knew it had something to do with a

18  missing DR.  I don't remember ever being kept in the loop in

19  the status.

20  Q.  Did you inquire of anyone in your chain of command about

21  the issue?

22  A.  I don't remember, ma'am.

23  Q.  At the time that you were commander of HSU, were you aware

24  that HSU frequently had missing DRs or came up on the missing

25  DR report?

1  A.  Yeah, I would -- I would look at the missing DR list,

2  ma'am, and also I came up with the policy that -- because we

3  were turning the same DRs in over and over and over again, that

4  I actually went down there once and hand-delivered DRs myself

5  and made them sign for it.

6          And while I was down in records, ma'am, I saw a bunch

7  of re -- I saw a bunch of reports on a table, and I asked them:

8          Have those reports been accounted for?

9          They said no.

10         I asked them:  Well, why are you sending out a missing

11  DR list until you account for all the reports?

12  Q.  So are you testifying that the missing DR list was a

3  product of the records division's errors?

14  A.  Sometimes the records division, sometimes a radio, and

15  sometimes the deputies.

16  Q.  Okay.  So sometimes deputies really should have submitted a

17  DR but failed to do so?

18  A.  Oh, absolutely, ma'am.

19  Q.  And are you aware that while you were commander of HSU, HSU

20  tended to have a high number of missing DRs reported?

21  A.  Based on -- in my deposition when you showed me that

22  missing DR, which I recall, yeah, there was a lot of people

23  listed there.

24          MS. WANG:  Thank you, Lieutenant.  I have nothing more

25  for you right now.

1076

1              THE COURT:  Ms. Iafrate.

2              MS. WANG:  Your Honor, before Ms. Iafrate begins, my

3    co-counsel notes that I forgot to move the admission of

4    Exhibit 132.  I apologize.

5              MR. COMO:  No objection.

6              MS. IAFRATE:  Relevance, Your Honor.

7              THE COURT:  Actually, bring 132 up so I can look at

8    it.

9              MS. WANG:  I'm sorry, Your Honor, and I apologize to

10   opposing counsel as well.

11             THE COURT:  Mr. Walker.

12             MR. WALKER:  I'm just refreshing my memory about what

3    it is, Your Honor.

14             I join Ms. Iafrate's objection.

15             THE COURT:  Did you say you join the objection?

16             MR. WALKER:  Yes.

17             THE COURT:  Thank you.

18             Overruled.  Exhibit 132 is admitted.

19             (Exhibit No. 132 is admitted into evidence.)

20             MS. IAFRATE:  Your Honor, it's multipaged.

21             THE COURT:  Well, show me all the -- well, it's

22   overruled.  The objection is overruled.  The exhibit is

23   admitted.

24             MS. WANG:  Thank you, Your Honor.

25             THE COURT:  Please proceed.

1          MS. IAFRATE:   Thank you.

2                    CROSS-EXAMINATION

3     BY MS. IAFRATE:

4     Q.   Good afternoon, Lieutenant.

5     A.   Good afternoon, ma'am.

6     Q.   You were read a portion of your transcript -- a portion of

7     one of your answers in your transcript, but not read the entire

8     thing.

9     A.   Yes, ma'am.

10    Q.   I want to show you the rest of your answer.

11              This is the front sheet of your deposition, correct?

12    A.   Yes, ma'am.

3               THE COURT:   Do you want this published, Ms. Iafrate?

14              MS. IAFRATE:   Oh, yes, please.

15              THE COURT:   Sure.

16    BY MS. IAFRATE:

17    Q.   What happened was Ms. Wang asked you:   "And after the

18    Court's December 2011, did that practice continue?"

19              And you responded:   "From when I got read the order up

20    until I transferred out, nothing changed.   There was no

21    training.   There was no directives to anything different, that

22    I knew of.

23              "Okay.   In your view, who is responsible for the

24    failure to do any training on the Court's December 2011 order?"

25              And Ms. Wang read to you:   "Ultimately, as I sit here

1  today and -- and think back, you know, three years ago, I mean,

2  the bottom line is this was a policy decision and affected the

3  office -- I mean, the entire office. So to me it falls on the

4  sheriff and the chief deputy to make those decisions and get

5  them done."

6        And that's where Ms. Wang stopped, right?

7  A. Yes, ma'am.

8  Q. But there's more to your answer, correct?

9        It goes on to say: "I look at how we're handling

10  things right now after the 2013 order. Everything is going

11  out. It's very matter of fact. The Briefing Boards are broken

12  down into cop talk, not a lot of lingo -- legal lingo. I mean,

3  we're not lawyers. We're cops. None of that happened in

14  2011."

15        Did I read that accurately?

16  A. Yes, ma'am.

17  Q. And that was your testimony, correct?

18  A. Yes, ma'am.

19  Q. One of the things that you said to Ms. Wang during your

20  direct examination was, "nobody told me to change anything."

21        That was in 2011, correct?

22  A. Yes, ma'am.

23  Q. Did that include counsel? Counsel didn't tell you to

24  change anything?

25  A. Yes, ma'am.

1  Q.  I want to show you what is marked as Exhibit 187.  It's in

2  evidence.

3          MS. IAFRATE:  May I please have it changed back?

4          Thank you.

5          So if you could go ahead and scroll down.

6  BY MS. IAFRATE:

7  Q.  This is an e-mail to Tim Casey -- from Tim Casey to a

8  variety of people, including you, correct?

9  A.  Yes, ma'am.

10  Q.  And it provided a quick summary, correct?

11  A.  Yes, ma'am.

12  Q.  And it provided the preliminary injunction?

13  A.  Yes, ma'am.

14  Q.  When you received the preliminary injunction, what did you

15  do?

16  A.  I spoke with Chief Sands.

17  Q.  Before or after you read it?

18  A.  After I read it.

19  Q.  Did you understand it when you read it?

20  A.  I -- I understood it, I thought, then.  As we sit here now

21  today, I got it wrong.

22  Q.  Okay.  So after you read it you spoke to Chief Sands?

23  A.  Yes, ma'am.

24  Q.  And did the two of you discuss the preliminary injunction?

25  A.  I can't remember the exact words, but I gave him my opinion

1   of what I thought.

2   Q.   The opinion of how you interpreted the preliminary

3   injunction?

4   A.   In 2011, yes, ma'am.

5   Q.   Okay.   What was your interpretation?

6   A.   My interpretation that we weren't violating it because it

7   was 280- -- when we lost the 287(g), it was so ingrained in me

8   that we couldn't make the federal arrests, and we did it, and

9   during the course of a traffic stop we would call ICE.

10  Q.   Okay.   I'm a little bit confused.   Let's go back.

11           In 2011, you believed that nothing needed to change.

12  A.   Personally, yes, ma'am.

13  Q.   And when you talked to Chief Sands, did you share that

14  opinion with him?

15  A.   Yes, ma'am.

16  Q.   And did he agree or disagree with you?

17  A.   I don't -- I don't -- he did not disagree, ma'am.

18  Q.   Did you talk to anyone else regarding the preliminary

19  injunction?

20  A.   I talked to Mr. Casey.

21  Q.   Did you share with him your opinion regarding nothing

22  needed to change?

23  A.   Yes, ma'am.

24  Q.   Did he agree or disagree with you?

25  A.   I don't remember his exact words, but he did not tell me to

1  change anything I was doing.

2  Q.  So based on your conversations with Chief Sands and Tim

3  Casey, did you change the way that HSU was operating?

4  A.  No, ma'am.

5  Q.  You also mentioned to Ms. Wang that there was a point where

6  you had a quick conversation with Sheriff Arpaio regarding the

7  preliminary injunction.  Do you recall that?

8      MS. WANG:  Objection, Your Honor, leading, and I think

9  it mischaracterizes the testimony.

10      THE COURT:  I'll allow the question to stand.  I

11  remember the testimony pretty well.

12      THE WITNESS:  Yes, ma'am.

3  BY MS. IAFRATE:

14  Q.  What was discussed during that conversation?

15  A.  I gave him my -- my personal opinion.

16  Q.  That nothing needed to change?

17  A.  Yes, ma'am.

18  Q.  And you had already had that conversation with counsel in

19  the case, correct?

20  A.  Yes, ma'am.

21  Q.  And your chief in your chain of command, correct?

22  A.  Yes, ma'am.

23  Q.  One of your chiefs?

?4  A.  Yes, ma'am.

25  Q.  Did you discuss it with Chief Trombi?

1082

1  A.  I have no recollection of speaking to Chief Trombi.  I'm

2  sure I did, but I have no recollection.

3  Q.  When you shared your interpretation of the preliminary

4  injunction, did the sheriff agree or disagree with you?

5  A.  He didn't disagree, ma'am.

6  Q.  I want to go to Exhibit 136, which is in evidence.

7      Can you go to the bottom of the second page.

8      It's really faint on the right-hand side.  Can you see

9  that this is July 2007?

10  A.  Yes, ma'am.

11  Q.  And we have already had some testimony regarding this.

12      This is an organizational chart?

13  A.  Yes, ma'am.

14  Q.  Can you go back to the page that we were just on.

15      The one that we were just on.

16      Okay.  So this is Enforcement Support.  This is the

17  chain of command, correct?  Enforcement Operations Command.

18      At the very top --

19  A.  Oh, yes, ma'am.

20  Q.  Who's the chief of Enforcement Operations Command?

21  A.  Chief Sands.

22  Q.  Who was the chief of -- in the chain of command for the

23  Human Smuggling Unit?

24  A.  Chief Trombi.

25  Q.  And then who was over him?

1   A.   Who was over Chief Trombi?

2   Q.   Yes.

3   A.   Chief Sands.

4   Q.   Was there some sort of dual supervision of the Human

5   Smuggling Unit?

6   A.   I reported to two chiefs.

7   Q.   Was there any demarcation of when you reported to one

8   versus the other?

9   A.   Chief Trombi explained to me that operationally I reported

10   to Chief Sands and administratively I reported to him.

11   Q.   So what does "operational" mean?

12   A.   Good question.  That's where the confusion comes in.

3   Q.   How about "administrative," what does that mean?

14   A.   Same thing.  Good question.  It would get confusing.

15   Q.   Did Chief Sands ever go out to any of the operations?

16   A.   Yes, ma'am.

17   Q.   Did Chief Trombi ever go out to any of the operations?

18   A.   Yes, ma'am.

19   Q.   Did you ever report directly to Chief Sands regarding

20   operations?

21   A.   Yes, ma'am.

22   Q.   Were you ever called by Chief Sands and given orders from

23   him on what to do?

?4   A.   Often.

25   Q.   When you say "often," can you tell me per week?

1  A.  I probably spoke to Chief Sands, it probably would average

2  out on phone, sometime -- I would say safe estimate would be at

3  least once a day by phone.

4  Q.  And how about your communication with Chief Trombi, was it

5  more frequent or less frequent?

6  A.  Probably less frequent.

7  Q.  You had some discussion with Ms. Wang on direct examination

8  regarding -- let me just finish up that line of questioning.

9       As it related to HSU, who was the point person to talk

10  to, was it Chief Sands or Chief Trombi?

11  A.  If I was dealing with -- if I was dealing with paperwork

12  issues, sending paperwork, it would go to Trombi.  Trombi was

3  actually the chief of record officially, because that's who

14  wrote my eval.  If it was about an operation or a search

15  warrant, I would speak with Chief Sands.

16  Q.  Did you ever speak to Chief Deputy Sheridan regarding

17  operations?

18  A.  I don't recall, ma'am.

19  Q.  Was he actively involved in HSU?

20  A.  When I was there?

21  Q.  Yes.

22  A.  During one of my -- during my deposition I was shown an

23  e-mail that I had a conversation, he was thanking me for

24  sending him something.  Other than that, I can't think of

25  anything.

1    Q.   You recall one contact with him?

2    A.   Based on my deposition, that's it.

3    Q.   Did you have --

4    A.   According to -- reference HSU matters when I was there.

5    Q.   I'm sorry, I didn't hear you.

6    A.   Reference HSU matters when I was there.

7    Q.   Did you have conversations with Director MacIntyre

8    regarding HSU activities?

9    A.   I don't remember ever talking to Director MacIntyre other

10   than, Hello, how you doing?

11   Q.   During your direct examination you were discussing a

12   preservation letter.  Do you recall that?

3    A.   Yes, ma'am.

14   Q.   When do you first recall getting a preservation letter in

15   the Melendres matter?

16   A.   I couldn't give you a date.  I just remember I was on my

17   way to the gym.  It was a Friday or a Saturday, and -- and he

18   called me and he was pretty upset.

19   Q.   Who?

20   A.   Tim Casey.

21   Q.   He called you regarding the preservation letter?

22   A.   Yes, ma'am.

23   Q.   Once you learned of the preservation letter, what did you

24   do?

25   A.   I -- I can't say immediately, 'cause it was a Friday, I --

1    I would have probably made phone calls, made sure my sergeants

2    knew about it, because I wasn't in the office.

3    Q.  I want to show you what is marked as Exhibit 216.  This is

4    in evidence.

5           Can you go down to the bottom?

6           Okay.  So this is an e-mail drafted by you, correct?

7    A.  Yes, ma'am.

8    Q.  And sent to a variety of people who -- how did you

9    determine who to send this to?

10   A.  Can I review, ma'am?

11   Q.  Yes.

12   A.  It looks like everybody that worked out of the Enforcement

3    Support -- Support building to include Enforcement Support,

14   human smuggling, and then the chiefs.

15   Q.  And after your conversation with Tim Casey, do you see that

16   that occurred on December 7, 2009?  In the body of the e-mail?

17   A.  Yes, ma'am.

18   Q.  And then you had a follow-up conversation with Chief Sands

19   on the next day, correct?

20   A.  Yes, ma'am.

21   Q.  Following those two conversations, you generated this

22   e-mail.  Do you see the date of the e-mail that you sent it?

23   A.  December 8th, 2009.

24   Q.  And this is the one that talks about saving e-mails,

25   correct?

1          Can you scroll down?

2   A.  Yes, ma'am.

3   Q.  Can you go back up to the "To" and "From."

4          You also sent this e-mail to Tim Casey, correct?

5   A.  Yes, ma'am.

6   Q.  Following the generation of this e-mail and sending it to

7  the group, as well as Tim Casey, were you advised that this

8  e-mail that you sent was in error?

9   A.  No, ma'am.

10   Q.  Were you advised that it wasn't sufficient?

11   A.  No, ma'am.

12   Q.  Can you go -- scroll up, please.

3          On March 27, 2012, you generated another e-mail,

14  correct?

15   A.  Yes, ma'am.

16   Q.  Why did you do that?

17   A.  I wanted to -- it sounded like my good-bye -- my good-bye

18  and save everything.

19   Q.  So for one of the last tasks that you did to say good-bye,

20  why did you feel that you needed to again remind everyone to

21  save everything?

22   A.  Because this was a very big heartache in my life at the

23  time when this all happened, and it is something I thought

24  about all the time.

25   Q.  Did you think it was important?

1   A.  Very important.

2   Q.  So you wanted to make certain that you did what you could?

3   A.  Yes, ma'am.

4   Q.  One of the -- one of the e-mails that was discussed with

5   Ms. Wang was a joke e-mail.  Do you recall that?

6   A.  During the deposition, yes, ma'am.

7   Q.  And she also mentioned it on your direct examination about

8   ·a joke e-mail.  Do you recall that?

9   A.  Deposition or just now?

10   Q.  Just now.

11   A.  Oh, I don't even remember.

12   Q.  Okay.

3   A.  That happens.  I'm sorry.

14   Q.  That's okay.  It's been a long day.

15   A.  Yeah.

16   Q.  You talked about a specific one that you remembered.

17         Does that refresh your memory?

18   A.  That's today?

19   Q.  Yes.

20   A.  Oh.  A specific e-mail.

21   Q.  Okay.  Let -- let me go back.

22   A.  Okay.

23   Q.  Instead of referencing what happened today, are you aware

?4   of a specific joke e-mail that was generated from someone in

∠5   HSU?

1  A.  Yes, Sergeant Palmer.

2  Q.  When did you become aware of that joke e-mail?

3  A.  I believe I became aware of that when we did -- when I did

4  a deposition on the Melendres case, and it was strictly about

5  e-mails, as I saw a bunch of inappropriate e-mails on a

6  deposition.

7  Q.  When you saw that joke e-mail by Sergeant Palmer, did you

8  do anything?

9  A.  I put out a -- I believe I put out an e-mail to the entire

10  Human Smuggling that that would not be tolerated, and

11  progressive discipline would apply if I see anything else like

12  that or I find out anything else about that, and I'm pretty

3  sure I brought everybody together and laid into everybody that

14  I wanted that to stop.

15      And right after that particular deposition I also

16  remember talking to Chief Sands and making him aware of what I

17  had dealt with during that deposition.

18  Q.  How about dealing with Sergeant Palmer directly?  Did you

19  have -- as a supervisor, did you do anything with him?

20  A.  I'm pretty sure I spoke with him directly.

21  Q.  Did he receive the e-mail from you regarding progressive

22  discipline?

23  A.  It went to everybody assigned to human smuggling.

24  Q.  I want to talk to you about the gathering of

25  video recordings.  Okay?

1  A.  Yes, ma'am.

2  Q.  Were you aware why you were being asked to gather

3  video recordings at the time that Chief Trombi's e-mail went

4  out?

5  A.  If I remember correctly, I don't think there was an

6  explanation.

7  Q.  When you're given an order to do or not do something, is

8  that common, to not have an explanation why or why not?

9  A.  Most of the time you're told.

10  Q.  I'm going to show you what is marked as Exhibit 38.  This

11  is in evidence.  Do you recognize this as an e-mail from

12  Chief Trombi to a variety of people regarding gathering of

3  videos?

14  A.  Yes, ma'am.

15  Q.  And it indicates all video is to be preserved.  Do you see

16  that in all caps in the body?

17  A.  Yes, ma'am.

18  Q.  Did you receive this e-mail?

19  A.  Yes, ma'am.

20  Q.  When you received the e-mail did you take it seriously?

21  A.  Yes, ma'am.

22  Q.  What did you do?

23  A.  We immediately went to work on it.  It became the priority

24  for us in SWAT.

25  Q.  You mentioned to Ms. Wang that at one point you were told

1  to stop collecting?

2  A.  At some point we were told to stop -- stop what we were --

3  stop what we were doing.

4  Q.  Who told you that?

5  A.  I don't -- I don't recall how it came down.

6  Q.  Did you stop?

7  A.  We stopped, yes.

8  Q.  And then you were ultimately told to begin collecting

9  again, correct?

10  A.  Yes, ma'am.

11  Q.  I want to show you what's in evidence as Exhibit 151, which

12  was not shown to you earlier.

3  Can you go down just a little bit further.  Right

14  there.

15  This is in evidence.  It's an e-mail from Chief Trombi

16  to a variety of people in February 2014.  Do you see that?

17  A.  Yes, ma'am.

18  Q.  And were you -- was it sent to you?

19  A.  Yes, ma'am.

20  Q.  This is requesting information regarding recording devices,

21  correct?

22  A.  Yes, ma'am.

23  Q.  Do you know why Chief Trombi was attempting to gather

24  information regarding recording devices?

25  A.  As I sit -- as I sit here, I didn't, ma'am.

1  Q.  When you read this you didn't, and as you sit here you

2  don't know why --

3  A.  As I sit here, I don't recall if I knew -- knew back then,

4  but the e-mail doesn't say.

5  Q.  Did you take this e-mail seriously?

6  A.  We take all the directives serious going from the chiefs.

7  Q.  Did you respond to it?

8  A.  Yes, I believe I -- I know I responded to it.

9  Q.  In the collection of --

10  A.  Correction.  Either I responded to it or I directed someone

11  to respond to it.

12  Q.  Very good.

3  In your response to the collection of videos, do you

14  know of anyone that destroyed videos rather than provide them

15  as directed?

16  A.  I'm unaware, ma'am.

17  Q.  Did you direct anyone to destroy videos?

18  A.  No, ma'am.

19  Q.  Did you destroy any of your own videos?

20  A.  No, ma'am.

21  Q.  Now, you talked about some of the things that you did

22  yourself once you received the preliminary injunction.  That's

23  how we started this conversation, correct?

24  A.  Yes, ma'am.

25  Q.  I want to show you what's in evidence as Exhibit 189.

1       Can you go down to the bottom.

2       Keep going.  Okay.  Keep -- go all the way down.

3       This was shown to you by Ms. Wang during direct,

4  correct?

5  A.  Yes, ma'am.

6  Q.  This was an e-mail to -- or from you to Brett Palmer,

7  correct?

8  A.  Yes, ma'am.

9  Q.  Who -- whose idea was it to develop training scenarios?

10  A.  Reviewing -- sorry -- reviewing this, I just assume I

11  initiated it.

12  Q.  No one directed you to do this?

3  A.  Based on my review, I don't believe so.

14  Q.  Why did you think it was a good idea for you to task Brett

15  Palmer with coming up with training scenarios?

16  A.  I wanted something in writing and something to go out

17  office-wide because we had received an order from a judge.

18  Q.  And one of the things that it says is, "I will have Tim

19  review what you write up."

20       And is Tim -- are you referring to Tim Casey?

21  A.  Yes, ma'am.

22  Q.  And then the second step would be to have Chief Sands sign

23  off on it?

24  A.  Yes, ma'am.

25  Q.  Could you go up.

1       Do you recognize these scenarios as the training

2  scenarios that Brett Palmer developed?

3  A.   Those were the rough drafts, yes, ma'am.

4  Q.   Okay.  Those training -- stop.

5       Those training scenarios were sent from Brett Palmer

6  to you on January 19, 2012, correct?

7  A.   Yes, ma'am.

8  Q.   Could you scroll down.  Stop.

9       Those were also sent to Tim Casey, correct?

10  A.   Yes, ma'am.

11  Q.   Can you scroll up.  Then stop, please.

12       On January 24, 2012, you reached out to Tim Casey

3  again, correct?

14  A.   January 24th, ma'am?

15  Q.   January 24, 2012.

16  A.   Yes, ma'am.

17  Q.   Why did you reach out to Tim Casey regarding these e-mails?

18  A.   As our counsel on this case, I needed to know if we were in

19  the ball park, did we need to change anything, what we needed

20  to do.

21  Q.   Did you receive a response to this e-mail?

22  A.   No, ma'am.

23  Q.   Would you scroll up.

?4       Ultimately, on January 24 you received an e-mail from

25  Tim Casey, correct?

1   A.  Yes, ma'am.

2   Q.  Did he respond to any feedback or revisions regarding the

3   scenarios that were sent to him?

4   A.  No, ma'am.

5   Q.  I want to go back to the preliminary injunction for a

6   moment.  When you received the preliminary injunction and you

7   determined nothing changed, did you read the part of the

8   preliminary injunction that talked about detaining individuals?

9   A.  I reviewed the entire order, ma'am.

10  Q.  When MCSO conducted a traffic stop and there wasn't

11  probable cause for a state charge, and ICE was called, whose

12  detention was that, MCSO's or ICE's detention?

3   A.  The way I believed it was back then, I believed that once I

14  said they wanted him and detained him, it was their detention.

15  Q.  You know that not to be accurate now, though?

16  A.  I know exactly what the judge meant now, it's not accurate.

17  Q.  But back then that was your interpretation?

18  A.  Yes, ma'am.

19  Q.  Lieutenant, when you were the lieutenant at HSU, were you

20  proud of your job?

21  A.  In my first three years, very.

22  Q.  Did you feel like you were doing good work?

23  A.  Yes, ma'am.

?4  Q.  Did you feel like you were making a difference?

25  A.  We saved a lot of lives.

1    Q.  That would be good work, right?

2    A.  Yes, ma'am.

3    Q.  That's part of your job description --

4    A.  Yes, ma'am.

5    Q.  -- right?  And you were passionate about your work?

6    A.  In my first three years, yes, ma'am.

7    Q.  Ultimately, you wanted to be transferred out of HSU,

8    correct?

9    A.  Yes, ma'am.

10   Q.  Why is that?

11   A.  It was taking a mental toll.

12   Q.  Because why?

3    A.  It was just nonstop, and there wasn't enough time in the

14   day to try to keep up with everything I had to do between

15   production, PIOs, FOIAs, chiefs calling.  I've got three

16   squads.  Two of them work swing shift.  I need to be available

17   during daytime hours.  It was just -- and then if I wanted to

18   spend time with the human smuggling squad I'd have to work an

19   extra long shift just so I'd go out in the field.  It just got

20   very taxing.

21   Q.  You were churning a lot of paper at that time?

22   A.  Excuse me, by turning?

23   Q.  Churning.  You were being requested to provide a lot of

24   documents to a lot of different areas, correct?

25   A.  Yes, ma'am.

1   Q.  Concerning gathering of documents, the normal procedure at

2   MCSO was to go through the legal liaison's office, correct?

3   A.  Correct.  The legal liaison would send us the formal

4   request from the attorneys and we would fill it.  We would read

5   it and provide whatever was listed and then send that material

6   through the legal liaison's office.

7   Q.  Is that what occurred in the Melendres matter?

8   A.  Early on, but then it stopped.

9   Q.  What do you mean it stopped?

10   A.  I was directed by Chief Sands, I believe he said that Tim

11   Casey was complaining he wasn't getting things fast enough from

12   the legal liaison, to deal directly with his office.

13   Q.  And so when you were requested documents, where did you

14   send them?

15   A.  If they were paper, we hand-delivered them to his office.

16   If they were electronic, I would -- I believe I e-mailed the

17   most to his paralegal, Eileen, I think.

18   Q.  And when you say "him" and "his," you're talking about Tim

19   Casey?

20   A.  Yes, ma'am.

21   Q.  Did anyone keep a running tab of what was being turned over

22   to Tim Casey?

23   A.  As fast as they wanted it, we would have to go through the

24   legal liaison, 'cause I didn't have the staff to do it.

25   Q.  So did you -- in the beginning there was a log, correct?

1  A.  Yes, ma'am.

2  Q.  But when it was being generated directly by HSU to Tim

3  Casey, HSU didn't log it?

4  A.  No, ma'am.

5  Q.  Did anyone tell you not to implement or generate those

6  training scenarios?

7  A.  No, ma'am.

8  Q.  Did anyone tell you to stop trying to get training going?

9  A.  No, ma'am.

10  Q.  Do you know why the training scenarios didn't get

11  implemented?

12  A.  My personal opinion is I wanted -- I needed a ruling from

3  our -- Tim Casey, our lawyer, so I could have a baseline to

14  develop these.  Was I in the ball park?  Wasn't I in the

15  ball park?

16  Q.  And that never occurred.

17  A.  No, ma'am.

18  Q.  Do you think that when you were at HSU, processes for

19  disseminating information could have been better?

20  A.  Could have been a lot better.

21  Q.  And how about generating responses?  When you were in HSU

22  do you think that that could have been better also?  The

23  processes.

?4  A.  As in re -- like folks responding back to me?

25  Q.  No.  You receive a request, and you yourself are forced to

1    gather and not log, and then provide it to someone.

2         Could the process be better?

3    A.   No, the process was flawed.

4    Q.   Was what?

5    A.   It was flawed.  Because the only way I could get things

6    quick enough to the lawyer was -- is to not do what legal

7    liaison was doing 'cause it was taking too much time.

8    Q.   And that was -- you were directed to do it that way?

9    A.   That was my understanding from Chief Sands, because Tim

10   Casey's office just was not getting things fast enough.

11        MS. IAFRATE:  I have nothing further, Your Honor.

12        THE COURT:  All right.  Mr. Walker.

3         MR. WALKER:  I have no questions at this time for this

14   witness, Your Honor.

15        THE COURT:  Mr. Como.

16        MR. COMO:  Thank you, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. COMO:

19   Q.   Good afternoon, Lieutenant.

20   A.   Good afternoon.

21   Q.   I'd like to start off by going back to your testimony about

22   your belief that you took the initiative to put together the

23   training scenarios.

?4   A.   Yes, ma'am.  I mean, sorry, sir.  No offense.

?5   Q.   Been a long day.  No offense taken.  As we said, you're not

1   a detective, so --

2   A.   I think that's pretty clear today.

3   Q.   Is it possible that Chief Sands directed you to do that?

4   A.   It's -- I have no -- I don't have a hundred percent

5   recollection, so it's -- it's definitely possible.

6   Q.   Chief Sands testified, I guess it was yesterday, it seems

7   like a week ago, but testified that shortly after the

8   preliminary injunction was issued he had a telephone call with

9   you where he told you that Chief Deputy Sheridan wanted you and

10  Mr. Casey to get together and instruct the HSU deputies on the

11  order.

12          Do you have any memory of that phone call?

3   A.   I don't recall it.  Not to say it didn't happen, I just

14  don't remember, sir.

15  Q.   Fair enough.

16          If you'd take a look at Exhibit No. 35, please, which

17  is in evidence.  These are interrogatory answers that your

18  lawyers have provided in this case.

19          If you'd turn to page 8.  Have you seen these

20  interrogatory answers, by the way?

21  A.   I don't remember if I did or didn't, ma'am.  Sir.

22  Q.   That's fine.

23  A.   I apologize.

?4  Q.   On page 8, if you go down to -- well, the interrogatory

25  number 10 is asking about the date, time, and location of

1  meetings regarding the Court's preliminary injunction. And the

2  response is on December 26, Tim Casey conferred with the

3  following individuals, and on the fourth -- line 16 of that it

4  says Lieutenant Joseph Sousa for approximately 27 to 32

5  minutes.

6        Do you see that?

7  A.  Yes, sir.

8  Q.  Okay.  Is that consistent with your recollection that you

9  spoke with Mr. Casey shortly after the injunction was issued?

10 A.  I don't know if that's the conversation, sir.

11 Q.  That's fine.  But you're not disputing that that

12 conversation took place, right?

3  A.  No, I'm not.

14 Q.  Okay.  And then immediately beneath that, it says on

15 December 30, 2011 -- just for context, that was a week after

16 the injunction was issued -- Tim Casey confers with Lieutenant

17 Joseph Sousa and former Chief Brian Sands for approximately one

18 hour and five minutes.

19       Do you see that?

20 A.  Yes, sir.

21 Q.  You don't have any recollection, I take it, of that

22 meeting.

23 A.  I don't, sir.

24 Q.  All right.  But you're not disputing that that may have

25 occurred, right?

1    A.   I'm not disputing it, sir.

2    Q.   Okay.  So now we go to Exhibit 189, which is the e-mail

3    chain about the training scenarios?

4    A.   You have to give me a sec, sir.  I think I'm out of order

5    now.

6    Q.   I'd like you to turn to the next-to-last page on

7    Exhibit 189.  This is that January 11, 2012, e-mail from you to

8    Brett Palmer.  We've already looked at this a few times today,

9    right?

10   A.   Yes, sir.

11   Q.   Okay.  So just to put this in context, according to the

12   interrogatories, you'd already spoken with Tim Casey at least

3    twice prior to sending this e-mail to Sergeant Palmer, right?

14   A.   Correct.

15   Q.   Okay.  And you had an hour-long meeting with Mr. Casey and

16   Chief Sands about 10 days before this, correct?

17   A.   That's what it says, yes, sir.

18   Q.   All right.  So this e-mail lays out a pretty specific plan

19   for developing training materials, correct?

20   A.   Yes.

21   Q.   And the training materials were to go out by E learning,

22   according to this e-mail, right?

23   A.   Yes, sir.

24   Q.   And that would have been an office-wide program?

25   A.   Yes, sir.

1   Q.  And there's basically four steps are outlined.  The first

2   step is that Brett Palmer would put together some train -- some

3   scenarios, correct?

4   A.  Yes, sir.

5   Q.  And that he would do so in conversations with Tim Casey,

6   right?

7   A.  Yes, sir.

8   Q.  The next step is that Tim Casey would review what Palmer

9   had put together, correct?

10   A.  Yes, sir.

11   Q.  The third step is that Chief Sands would sign off on it.

12   A.  Yes, sir.

3   Q.  And then the fourth step, it would go to the training

14   division, where it would be put in its final form, correct?

15   A.  Final development.

16   Q.  Okay.  So there was four steps outlined in your e-mail,

17   right?

18   A.  Yes, sir.

19   Q.  And I assume those four steps were probably agreed to

20   between you and Chief Sands and Mr. Casey?

21   A.  I don't recall.

22   Q.  All right.  And the people that would have been involved at

23   all four of those steps were basically copied on your e-mail,

24   right?

25   A.  Yes, sir.

1  Q.  Including the training division.

2  A.  Yes, sir.

3  Q.  Okay.  So then we have this -- the training scenarios, and

4  those are sent by Mr. Palmer to you about a week later,

5  correct?

6  A.  Yes, sir.

7  Q.  From Sergeant Palmer.

8      And Tim Casey's copied on that and Trowbridge is

9  copied on that, right?

10 A.  Let me catch up to you now.

11 Q.  I'm sorry.  I'm going through this quickly so we can finish

12 up today.

.3 A.  What page are you on?

14 Q.  If you could take a look at page 2 of Exhibit 189, please.

15 The very top.

16 A.  Yes, sir.

17 Q.  That indicates in that first paragraph under Lieutenant

18 Sousa, it says:  I constructed this in accordance with the many

19 conversations you and I have had, as well as taking into

20 account the information conveyed to us both from Tim Casey

21 concerning Judge Snow's order.

22     Do you see that?

23 A.  Yes, sir.

24 Q.  Would that indicate to you that in addition to those

25 initial two discussions that the interrogatories reflect, you

1  may have had additional considerations with Mr. Casey and Brett

2  Palmer?

3  A.  I would speak with Tim Casey often by phone.

4  Q.  Okay.  So then you turn around and on January 24, that this

5  is -- I'm sorry, page 1 of Exhibit 189.  You send that e-mail

6  along to Tim Casey asking for his input, correct?

7  A.  Yes, sir.

8  Q.  All right.  And if you'd turn now, please, to Exhibit 156.

9          THE COURT:  Mr. Como, can you give me the number of

10  the last exhibit, please?

11          MR. COMO:  That was 189, Your Honor.

12          THE COURT:  Thank you.

13  BY MR. COMO:

14  Q.  Do you have that in front of you?

15  A.  Yes.  Sorry I took so long.

16  Q.  Okay.  The first page of Exhibit 156 is an e-mail string

17  again, and if we go to the bottom of that first page there's an

18  e-mail from you to Mr. Casey dated February 27, 2012.

19          Do you see that?

20  A.  Yes, sir.

21  Q.  And it's redacted on the next page, but is it your belief

22  that you were following up on your e-mail from a month earlier

23  about these training scenarios?

24  A.  Yes, sir.

25  Q.  And we get a response, it looks like, the following day

1    from Mr. Casey. It looks to be about a one-line response.

2    Would you agree with that?

3           It's redacted again. It's above your e-mail. I'm

4    sorry, on the first page, sir.

5    A.  Yes, sir.

6    Q.  You didn't -- you did not receive his substantive input on

7    those training scenarios at this time, did you?

8    A.  No, sir.

9    Q.  And then at the top of this -- and by the way, on that

10   February 27, 2012, e-mail that you sent to Mr. Casey, you did

11   not copy Brian Sands or anyone else on that one, correct?

12   A.  On the first page?

3    Q.  Yes, I'm sorry, on the first page.

14   A.  No, I did not.

15   Q.  Okay. And then on the -- let's go up one -- one -- to the

16   top e-mail on Exhibit 156 at the top of the first page.

17          This is the e-mail that you sent to Sergeant Palmer as

18   you were preparing to transition back into SWAT, right?

19   A.  Yes, sir.

20   Q.  And you told Sergeant Palmer at that time that you were

21   still waiting for Tim Casey's input on training scenarios,

22   right?

23   A.  Yes, sir.

24   Q.  So basically, out of the four steps that were outlined back

25   in January, we're still stuck at step number 2 waiting for

1    Mr. Casey, correct?

2    A.    Yes, sir.

3    Q.    To your knowledge, did Mr. Casey ever provide a response

4    regarding his input on those training scenarios?

5    A.    To my knowledge, no.

6    Q.    Now, how would you describe your work ethic, sir?

7    A.    Sir, I do what -- if I'm given lawful orders, I follow

8    them.

9    Q.    Are you somebody that's very goal oriented?

10    A.    Yes, sir.

11    Q.    When you're given a task, or when you assume a task, do you

12    typically do everything you need to to follow it to completion?

3    A.    Yes, especially if it's a high-ranking person.

14    Q.    And if it's -- and if it's a superior that's giving you

15    that direction, is it your practice to try and do everything in

16    your power to complete that task without having to go back to

17    the superior frequently?

18    A.    Yes, sir.

19    Q.    I assume if you -- you had a roadblock, you're not opposed

20    to going back to the superior if you're not able to solve the

21    problem yourself, is that right?

22    A.    Not opposed to it.

23    Q.    Okay.  Now, do you have any memory at any point in time of

?4    going back to Chief Sands and saying:  Chief, we're kind of

25    stuck on these training scenarios.  They've been sent to

1   Mr. Casey and he's never responded?

2   A.   I don't recall that, sir.

3   Q.   And there's no indication from the papers, the e-mails and

4   so forth that we've seen, that that -- you ever went back to

5   him, correct?

6   A.   There's nothing here that indicates that, sir.

7   Q.   Okay.   When this was trans -- transitioned to

8   Lieutenant Jakowinicz in March -- or April, 2012, did you

9   assume that he would pick up the ball and move it along?

10  A.   Yes, this is the only unfinished assignment that I had --

11  Q.   You -- I'm sorry.   I interrupted you.

12          When you sent him this e-mail that's Exhibit 156, is

3   that your way of letting Lieutenant Jakowinicz know, Hey, this

14  is unfinished business.   Please pick it up and move it along?

15  A.   Yes, I received my -- replaced the -- the lieutenant in

16  SWAT, it was the same thing.   I picked up and he let me know

17  what he was working on.

18  Q.   And would it be your expectation that if Lieutenant

19  Jakowinicz was unable to get an adequate response from

20  Mr. Casey that he should have gone back to Chief Sands to

21  either follow it up himself or gone back to Chief Sands to try

22  to get around that problem?

23  A.   At some point, yes, we would -- we would have had to have

24  made it a priority.

25  Q.   Okay.   I mean, Chief Sands would really have no way of

1  knowing about this roadblock if no one went back to him and

2  told him about it, right?

3  A.  Correct.

4  Q.  Chief Sands never told you to disregard the Court's order,

5  correct?

6  A.  Correct.

7  Q.  He never told you to violate the Court's order in any way,

8  correct?

9  A.  Correct.

10       MR. COMO:  I have nothing further.  Thank you.

11       THE COURT:  Thank you.

12       Ms. Wang.

3                REDIRECT EXAMINATION

14  BY MS. WANG:

15  Q.  Lieutenant, when I was asking you questions, you said that

16  you believed, based on your reading of the preliminary

17  injunction order, that training needs to go out MCSO-wide,

18  correct?

19  A.  Yes, ma'am.

20  Q.  When Ms. Iafrate was asking you questions, you said

21  something different.  You said that in your opinion, nothing

22  needed to change, right?

23  A.  When I originally read the order, my opinion was that we

24  didn't need -- I didn't think we were violating the order.  And

25  at some point we started to develop the -- the training to make

1    sure that I was -- that I wasn't wrong.

2    Q.  And when you say you didn't believe we were violating the

3    order, do you mean HSU?

4    A.  Oh, just the order in general, the sheriff's office wasn't

5    violating it, that was my opinion.

6    Q.  Okay.  Will you turn to Exhibit 189 and look at what

7    Sergeant Palmer drafted in response to your request.  Let's

8    start with the first paragraph of that e-mail to you.

9         Do you have it in front of you now?

10   A.  Yes, ma'am.

11   Q.  All right.

12        THE COURT:  What exhibit was that, again?

3         MS. WANG:  189.

14        THE COURT:  Thank you.

15   BY MS. WANG:

16   Q.  Sergeant Palmer says in the first paragraph that he

17   constructed this in accordance with the many conversations that

18   he and you had, correct?

19   A.  Correct.

20   Q.  And also taking into account the information conveyed by

21   Tim Casey, correct?

22   A.  Correct.

23   Q.  All right.  Take a look at what Sergeant Palmer drafted

24   labeled Scenario 1.  All right?

25        He writes:  A patrol deputy --

1111

1          MS. WANG:  Can we publish this?

2          THE COURT:  Yes.

3          MS. WANG:  Thank you.

4     BY MS. WANG:

5     Q.  He writes Scenario 1:  A patrol deputy working at 2 a.m. is

6     patrolling a residential area known to have been hit recently

7     with car burglaries.  The deputy comes across an adult male

8     walking in the area and decides to make contact.  The deputy

9     quickly finds this person speaks no English, and the only ID he

10    has is a Mexico driver's license issued by Mexico.

11         After talking with this person for several minutes, he

12    determines there is no crime being committed under state law,

3     but the deputy reasonably believes, based on the two indicators

14    listed above, that this person may be an illegal alien in the

15    United States.

16         Do you see that?

17    A.  Yes, ma'am.

18    Q.  And the two factors that gave rise to reasonable suspicion

19    that the person is a, quote, illegal alien, are that they don't

20    speak English or have difficult or broken English, and that the

21    person has no ID, or no ID issued by the United States, is that

22    correct?

23    A.  Yes, ma'am.

?4    Q.  Okay.  Continuing on with the scenario Sergeant Palmer

25    writes:  Do not detain that person.  Correct?

1    A.   Yes, ma'am.

2    Q.   Now, if Scenario 1 had been implemented as training after

3    Judge Snow's December 2011 order, wouldn't that have

4    represented a change from what MCSO was doing?

5    A.   On Scenario 1, I don't believe so, because you're not

6    making a traffic stop, you're just going up to talk to

7    somebody.  That person can just walk away.  They don't have to

8    talk to you.

9    Q.   Okay.  Let's look at Scenario 2.

10       Scenario 2 is about a traffic stop and he writes:   A

11   patrol deputy conducts a traffic stop on a vehicle for

12   speeding.  The deputy finds the vehicle is occupied by four

3    adult male subjects.  The driver speaks only Spanish and

14   provides a valid Arizona driver's license as his ID.  As a

15   matter of good policing practice, the deputy asks for ID from

16   the three passengers.  All three passengers provide Mexico

17   consular cards issued by the Mexican consulate as ID, not

18   a U.S. ID.  All three passengers speak only Spanish.

19       Within about 15 minutes, the deputy has determined no

20   criminal offense has, is, or is about to be committed.   The

21   only violation is the civil speeding.  However, the deputy does

22   reasonably believe based on the two indicators listed above

23   that the three passengers may be illegal aliens in the United

24   States.  And Sergeant Palmer writes again:  Do not detain.

25       Do you see that?

1    A.    Yes, sir.   I mean yes, ma'am, I'm sorry.

2    Q.    If this training, Scenario 2, had been implemented, that

3    would have been a change from what MCSO was doing in December

4    of 2011, correct?

5    A.    It doesn't -- the problem here is it doesn't address

6    whether -- it says the deputy does not detain.   It doesn't

7    address can the deputy make the phone call or not make the

8    phone call to ICE.

9    Q.    Well, Sergeant Palmer goes on to write:   The deputy has no

10   articulable indicators of a crime under state law.   The deputy

11   cannot detain based solely on the reasonable suspicion these

12   passengers may be illegal aliens.   In this scenario the deputy

3    should use their discretion to either issue a written citation

14   or a verbal warning to the driver --

15              Deal with the speeding, right?

16   A.    Right.

17   Q.    -- and release the vehicle with all of the occupants.

18              So Sergeant Palmer said do not detain, and you release

19   the passengers that you suspect are undocumented immigrants,

20   correct?

21   A.    Correct.

22   Q.    That would have been a change from existing policy of MCSO

23   if it had been implemented, correct?

24   A.    Correct.   But once again, this is a rough draft, and I

25   don't know what the final product would have been because it

1    doesn't -- it doesn't address -- my big thing here is:  Can we

2    call ICE?  Can't we call ICE?  Can they make the detainment?

3    Because under -- when we lost the 287(g), once again, I know

4    I'm incorrect, but my belief was that I could make that phone

5    call, let it be their detainment.  So my question here would

6    be:  Can I make that phone call or can't I make that phone

7    call?

8    Q.  But what Sergeant Palmer drafted does not refer in any way

9    to calling ICE during the course of the traffic stop, does it?

10   A.  No, it does not.

11   Q.  He says release the passengers, correct?

12   A.  Correct, if you don't -- if you don't -- if you're not

3    calling the feds, you're going to have to let them go.

14   Q.  And so my only question, Lieutenant, is:  If Scenario 2 had

15   been implemented as training after December 23rd, 2011, it

16   would have been a change from existing MCSO practice, correct?

17   A.  Just --

18   Q.  Yes or no.

19   A.  Yes.

20   Q.  Thank you.

21        Ms. Iafrate asked you whether you told Chief Sands

22   about your interpretation of the preliminary injunction order,

23   correct?

24   A.  Yes, ma'am.

25   Q.  He was not seeking your legal advice on that, was he?

1    A.   No, ma'am.

2    Q.   You're not a lawyer, right?

3    A.   Correct, ma'am.

4    Q.   Ms. Iafrate also asked you whether you had talked to Tim

5    Casey about the preliminary injunction order, correct?

6    A.   Yes.

7    Q.   And she asked you whether you conveyed to Mr. Casey your

8    interpretation of the preliminary injunction order, is that

9    right?

10   A.   Yes.

11   Q.   Was Mr. Casey seeking your legal advice about the

12   preliminary injunction order?

3    A.   No.

14   Q.   Sir, when Mr. Como was questioning you, he referred to the

15   earliest e-mail in the chain in Exhibit 189.  That was your

16   original e-mail to Brett Palmer on January 11th.

17         Do you recall that?

18   A.   Yes, ma'am.

19   Q.   And Mr. Como asked you whether you had indicated there were

20   four steps required before this proposed training could take

21   place.

22         Do you recall that question?

23   A.   Yes, ma'am.

?4   Q.   Sir, you did not write that there were four steps in your

25   e-mail, did you?

1    A.    No.

2    Q.    You did not write that there was step 1, step 2, step 3,

3    and step 4, correct?

4    A.    Correct.

5    Q.    You did not need to wait for Mr. Casey to fully sign off on

6    the proposed training before you were also contacting people in

7    your chain of command about this idea that you had, correct?

8    A.    I contacted him via e-mail.

9    Q.    No, I'm sorry, my question may not have been clear.

10          You were contacting your chain of command about your

11   idea to put on this training MCSO-wide, correct?

12   A.    Correct.

3    Q.    And you did that starting soon after you learned of

14   Judge Snow's order, correct?

15   A.    Correct.

16   Q.    You didn't have to wait for Tim Casey to give you approval

17   to contact your chain of command about the training, did you?

18   A.    No, I did not.

19   Q.    Ms. Iafrate asked you whether Tim Casey gave you any

20   directions about this training.

21          Do you recall that?

22   A.    Yes.

23   Q.    Do you take direction from lawyers for the sheriff, or do

?4   you take directions from people in your chain of command?

25   A.    I take orders from my chain of command.

1      MS. WANG:  Thank you.  That's all I have.

2      THE COURT:  Ms. Iafrate, do you have much?

3      MS. IAFRATE:  No.

4                  RECROSS-EXAMINATION

5  BY MS. IAFRATE:

6  Q.  Lieutenant, when you received the preliminary injunction,

7  do you believe that you did everything that you could in order

8  to implement it?

9  A.  Yes.

10 Q.  When you were requesting -- when you -- people were

11 requesting documents from you regarding PIOs, lawsuits,

12 attorneys, the legal liaison.  Do you believe that you were

3  taking all reasonable steps within your power to provide the

14 responsive documents in property?

15     MS. WANG:  Objection, Your Honor, it's beyond the

16 scope of my cross-examination -- or redirect.

17     THE COURT:  I think that's fair.  But I'll allow it

18 this once.

19     THE WITNESS:  Can you repeat it, ma'am?

20 BY MS. IAFRATE:

21 Q.  Sure.  When you were requested to provide documents and

22 evidence, did you take all reasonable steps in order to be

23 responsive to those requests?

24 A.  I believe I did, based on the staff I had.

25     MS. IAFRATE:  I have nothing further.

1          THE COURT:  Thank you.

2          Mr. Walker?

3          MR. WALKER:  No questions, Your Honor.

4          THE COURT:  Mr. Como?

5          MR. COMO:  I have no questions, Your Honor.

6          THE COURT:  All right.  Thank you.  You can step down.

7          THE WITNESS:  Thank you, sir.

8          THE COURT:  Where are we at for tomorrow?

9          MS. WANG:  Your Honor, plaintiffs have one more

10    witness to call tomorrow, Chief Deputy Sheridan.

11          THE COURT:  All right.

12          And how long do you anticipate with Chief Deputy

3     Sheridan?

14          MS. WANG:  For my direct, Your Honor, I'm guessing

15    between an hour and a half and two hours.  I'll do my best to

16    be as fast as possible.

17          THE COURT:  All right.

18          Ms. Iafrate, how long on cross?

19          MS. IAFRATE:  Hour and a half, Your Honor.

20          THE COURT:  Mr. Walker?

21          MR. WALKER:  Your Honor, I'm probably going to need to

22    make the same request with respect to Chief Deputy Sheridan

23    that I made with respect to sheriff.  I'll do my best to be

?4    ready to go, but -- and if I am ready, at this time I would

25    anticipate maybe a half an hour.

1            THE COURT:   Okay.

2            Mr. Como?

3            MR. COMO:   10 minutes.

4            THE COURT:   Mr. McDonald, do you wish to be heard?

5            MR. McDONALD:   Yes, Judge.   We had talked a little bit

6   about the accommodation that I appreciate you gave me.   In

7   light of some of your questions to the sheriff and some of the

8   information that I believe will be coming out tomorrow through

9   deputy sheriff, I feel very strongly that having somebody

10  that's unfamiliar with the case be a potted plant in this chair

11  doesn't serve the sheriff.

12           At least as to the area where your inquiries went, I

3   would like to be here, whether it's earlier in the morning or

14  whether it's after the funeral that I can come back.   But I

15  would ask that some scheduling modification, I'd originally

16  asked for time off from 10:00 to 2:00 and agreed that I could

17  be here at 8:00 and be here after 2:00.

18           If we had to even shorten the time between the two, I

19  just feel strongly that in light of the questions that you

20  asked, I need to and should be here to hear that testimony from

21  Chief Sheridan.

22           THE COURT:   All right.   Well, let me ask this.   It

23  does occur to me, based on what's happened, that clearly we're

24  going to need to use the time that we've docketed in June.   We

25  may need to use the time that we've got -- we may need to use

1    time in May, but we've set aside a week in June when we can

2    have the final discovery; when we can have the monitor's

3    assessment of the internal discipline and other things.

4           Do you anticipate and want to call somebody besides

5    Chief Sheridan -- I mean, after we finish Chief Sheridan,

6    deputy chief --

7           MS. IAFRATE:  Chief --

8           THE COURT:  Chief Deputy Sheridan, I'm sorry.

9           It looks to me like if we were going to do a normal

10   day, we would have time to call somebody else.  But it also

11   looks to me like conceivably, if you didn't have somebody that

12   you felt like you had to call tomorrow, we could make some

3    adjustments so that Mr. McDonald could attend his funeral and

14   be back before I do my questions, because I take his point.

15          MS. IAFRATE:  Your Honor, I intended to make a motion

16   to have Chief MacIntyre, Director MacIntyre, dismissed from

17   this civil contempt proceeding because there has been no

18   evidence regarding any contemptuous -- whether civil or

19   criminal -- behavior.

20          THE COURT:  Do you anticipate that's going to change

21   based on your testimony of -- or based on your examination of

22   Deputy Chief Sheridan?

23          Chief Deputy Sheridan.  I don't mean to be demoting

24   you, Chief.

25          MS. WANG:  Your Honor, I don't know the answer to

1    that. I would add that we would oppose such a motion to

2    dismiss any contempt charges against Chief MacIntyre on the

3    ground that we have seen that the discovery produced by

4    defendants has been woefully inadequate, and until we see the

5    full scope --

6            THE COURT: I'm not in -- I'll tell you, I'm not

7    inclined at this point to dismiss the discovery charges against

8    Chief MacIntyre, but I haven't heard a whole lot that ties him

9    in to the preliminary injunction violation order, and I think I

10   noticed him up as somebody on that basis.

11           Do you have any objection to my dismissing as to Chief

12   MacIntyre on the preliminary injunction charge? Or do you

3    think that your questioning of Chief Deputy Sheridan might

14   change that?

15           MS. WANG: Your Honor, I don't know whether

16   Chief Sheridan's testimony will change that. We would object

17   regardless of whether Chief Sheridan addresses Chief

18   MacIntyre's involvement or not. And the reason is that, as I

19   said already, the discovery has not been complete.

20           And Your Honor, I would further add --

21           THE COURT: Well, you know, you don't have to add any

22   more.

23           MS. WANG: Well, I do want -- I actually want to make

24   a point, Your Honor, which is that --

25           THE COURT: All right.

1    MS. WANG:  -- Ms. Iafrate, we believe, has waived the

2   attorney-client privilege as to the subject matter of Mr. Casey

3   and his involvement in the preliminary injunction order

4   matters, and perhaps other matters.  She's questioned

5   witnesses, including Chief Trombi, including Lieutenant Sousa,

6   about their conversations with Mr. Casey considering the

7   preliminary injunction order, and we've gone over some of the

8   documents on which we believe the privilege has been waived.

9        Given the new information, we do believe that there is

10  a subject matter waiver at this point, and we would seek to

11  depose Mr. Casey, and for full disclosure of all e-mails

12  concerning Mr. Casey's contact with his clients on these

3   subjects.

14       THE COURT:  All right.  So -- Ms. Iafrate, let me ask,

15  back to my original point.  I'm going to allow you to brief

16  that, because it does seem to me that that has certainly been

17  implicated and seemed to me that some, if not all of Sheriff

18  Arpaio's testimony was essentially an advice of counsel

19  defense, or at least that -- that issue is raised.  And I think

20  it's worth considering and carefully con -- carefully weighing.

21       But in terms of how we proceed tomorrow, so that we

22  can best position your case before our break, I guess what I'm

23  asking is:  Is it all right with you if we shape tomorrow so

?4  that Mr. McDonald can be here for all of Chief Deputy

25  Sheridan's testimony?  Even if that means you can't get

1    somebody else in here as a witness until the break.

2         Do you understand my question?

3         MS. IAFRATE:  I do not.

4         THE COURT:  Okay.  What I'm saying is Mr. McDonald

5    wants to be gone from 10:00 to 2:00 because of the personal

6    emergency -- it's not an emergency but it's a personal tragedy,

7    and he wants to be at the funeral, understandable.  Originally

8    I said we were going to make accommodations to make sure he

9    could be here for the testimony of Sheriff Arpaio, and I think

10   he was amenable to that.

11        I've asked Sheriff Arpaio some questions today, and

12   Sheriff Arpaio's answers make Mr. McDonald believe that it is

3    beneficial for his representation of Sheriff Arpaio to be here

14   for the testimony of deputy -- or Chief Deputy Sheridan.  It

15   seems to me, in light of the answers I heard, a reasonable

16   request.

17        In order to do that, though, we're going to have to

18   limit the testimony that we can actually have testimony

19   tomorrow, so that the only witness that we may accomplish is

20   Chief Deputy Sheridan.  I just want you to be positioned -- you

21   to be comfortable with that.  Are you comfortable with that?

22        MS. IAFRATE:  May I have just a moment?

23        THE COURT:  Yes.

24        Mr. Walker, Mr. Como, I'm asking you the same

25   question.

1124

1           MR. COMO:  I'm fine with that schedule, Your Honor.

2           THE COURT:  All right.  And that -- that does entail,

3   understanding that we're going to flexible about what we -- and

4   I'm going to talk to you early and often about how we're going

5   to spend the rest of our time in June, and maybe scheduling

6   other times if need be.

7           MR. WALKER:  The arrangement you propose, Your Honor,

8   is fine with me.

9           MS. IAFRATE:  Your Honor, I was just --

10          THE COURT:  Could you speak in a microphone,

11  Ms. Iafrate.

12          MS. IAFRATE:  The reason that I brought up Director

3   MacIntyre was because he would be my next witness.  So that's

14  why I even brought it up.

15          THE COURT:  I see.

16          MS. IAFRATE:  And so I was trying to understand -- I

17  intended to make that motion at the close of their

18  case in chief.

19          THE COURT:  And I understand that, Ms. Iafrate, but I

20  must tell you, I have reason to believe the discovery hasn't

21  been completely provided in this action.  And again, I don't --

22  I'm not impugning you, but I'm not going to dis -- and as I've

23  also said, at least as it pertains to the preliminary

24  injunction charge, I haven't yet heard anything that makes me

25  think that Chief MacIntyre is going to be liable on that

1    charge.

2        But I'm also not going to grant you a motion when

3    there's still discovery that's outstanding that plaintiffs

4    haven't seen.  So I'm denying that as it -- as it stands as a

5    request today.

6        MS. IAFRATE:  Okay.

7        THE COURT:  It may be that when you provide all the

8    discovery to plaintiffs' satisfaction, they may stipulate to

9    chief -- Chief MacIntyre's dismissal from the preliminary

10   injunction charge.

11       MS. IAFRATE:  So your question --

12       THE COURT:  And I don't think -- Chief MacIntyre's not

3    up on the third charge.  The only thing remaining would be the

14   discovery stuff.

15       MS. IAFRATE:  So Your Honor, your question to me is

16   would I be comfortable if I had witnesses to wait until June?

17       THE COURT:  Yes.

18       MS. IAFRATE:  That would be fine.

19       THE COURT:  All right.  We may -- tomorrow bring your

20   calendars.  We'll see if we can schedule other times to move

21   things quickly.

22       Mr. Birnbaum.

23       MR. BIRNBAUM:  Thank you, Your Honor.

24       Your Honor, I'm appearing specially for Deputy Chief

25   MacIntyre.  As you may recall, before these proceedings began

1   we filed a request with the Court to ask you -- and I'm really

2   not sure what you technically call it, but ask you to determine

3   that there would be no criminal referral as to -- as to

4   Mr. MacIntyre.

5          The effect of that order, we had hoped, would have

6   been to allow me to not appear here and allow deputy Chief

7   MacIntyre perhaps to save some expense.

8          THE COURT:   Um-hum.

9          MR. BIRNBAUM:   Ms. Iafrate would continue to represent

10  him.   The civil contempt proceeding would continue.

11         The Court denied that motion, and we understand it,

12  although I will point out we did, at your suggestion, ask the

3   plaintiffs if they would agree with that motion, and they said

14  no, because they wanted to proceed with the preliminary -- with

15  the OSC hearing as well.

16         Well, the importance of what Ms. Iafrate raises is

17  this, and this is why there is separate counsel.   I understand

18  and, of course, accept your ruling.   The civil contempt

19  proceeding will continue.   Deputy Chief MacIntyre will remain

20  in it.   Whatever discovery issues come about will come about.

21         But what I think is crystal clear now, or at least at

22  the end of Chief Deputy Sands' testimony -- Sheridan's

23  testimony, excuse me -- is that there is no criminal contempt

?4  referral evidence against Deputy Chief MacIntyre.   The

25  preliminary injunction you've already mentioned.   The

1  Armendariz element, there's -- he's not even charged in the
2  OSC.

3      And as to the second element, the discovery, whatever
4  the discovery may reveal, there's no suggestion that Deputy
5  Chief MacIntyre was in charge of, had responsibility for, or
6  authority over that discovery.

7      THE COURT: I'll tell you, Mr. Birnbaum, I have
8  sympathy for your motion. I'm not going to grant it. And the
9  reason I'm not going to grant it comes from, in part, Chief
10  MacIntyre's own affidavits and the various -- various
11  iterations of them. Because the very first affidavit he filed
12  he indicated he did have, in my view as I read it, some
3  responsibility for discovery. And I'm not going to make a
14  premature determination until I hear the evidence.

15      He can make whatever determination he wants in terms
16  of whether or not he wants to pay you to be here, and I'll say
17  that as it goes so far, I have not yet heard anything that
18  would cause me concern criminally about Chief MacIntyre. But
19  that's all I can tell you.

20      MR. BIRNBAUM: Your Honor, with all due respect,
21  this -- and I say this only because it's the second time this
22  has come up. On the three items in the order to show cause
23  there is no evidence of Deputy Chief MacIntyre's contemptuous
24  behavior, and there isn't going to be.

25      Now, you have twice mentioned the fact that a number

1    of years ago Deputy Chief MacIntyre acknowledged that he

2    received a discovery hold, whether it should have gone to him

3    or not, he did not rapidly disperse it, and he acknowledged

4    that fact, and the Court in fact sanctioned the sheriff's

5    office as a result of that.

6            With all due respect, Your Honor, one, that has

7    nothing to do with the discovery abuses alleged in connection

8    with the OSC; and two, it's not one of the three subjects that

9    the Court has directed us to address here.

10           So I do understand that -- that you believe there is a

11   history that shows that Mr. MacIntyre had some involvement in a

12   discovery hold back in I think it was 2008. But that's all

3    there is, Your Honor, and that's not evidence, let alone --

14           THE COURT: But with all due respect, Mr. Birnbaum --

15           MR. BIRNBAUM: Yes, sir.

16           THE COURT: And you've given me respect; I want to

17   give you respect. You're a very fine advocate.

18           -- I'm not going to do it. Because I do believe there

19   are issues of fact I want to hear from Chief Deputy MacIntyre,

20   although I haven't heard anything, and I'll say this, I haven't

21   heard anything yet that would suggest that there's any criminal

22   responsibility for contempt to be laid at Chief MacIntyre's

23   door.

24           What I will say is I've heard plenty of evidence that

25   the way that the MCSO goes about responding to discovery and

1    document production requests is abominable.  And we spent weeks

2    and resolved the trial based on only partial information

3    because requests were made and never answered.

4         Now, that may turn out not to be the case.  I'm not

5    prohibiting you, Ms. Iafrate, from -- from presenting your

6    evidence and argument to the contrary.

7         But if you're asking what I've heard to date, I've

8    certainly heard plenty that says that that was terribly,

9    terribly, terribly insufficient.  And I also have evidence that

10   Chief MacIntyre was involved at some level, and so I'm not

11   going to grant your motion.

12        MR. BIRNBAUM:  Well, Your Honor, one last try, if I

3    may, before we go home?

14        THE COURT:  Yes, but please make it quick.

15        MR. BIRNBAUM:  Two parts.  One, I don't know what

16   evidence you're referring to that Deputy Chief MacIntyre was

17   involved in the discovery issues that are in the OSC.  There is

18   no such evidence that we know.

19        And then finally, Your Honor, let me just say one

20   thing about the tactics of being a defense lawyer.  We believe,

21   and to some extent you've just confirmed, we believe that

22   there's no reason for us to call a witness in the defense of

23   Deputy Chief MacIntyre.  I don't want to call him, and I don't

24   believe, at least on these issues, MacIntyre's conduct, I don't

25   believe Ms. Iafrate sees any reason to call him.

1        So the temptation, of course, is to rest and to ask
2   the Court to dismiss the OSC, or certainly the criminal
3   referral element, against Chief Justice MacIntyre -- excuse me,
4   Deputy Chief MacIntyre.

5        THE COURT:   That's quite a promotion you just got
6   there, Chief.

7        MR. BIRNBAUM:   The salary's higher.

8        So it really is putting us, I believe, in an unfair
9   position, because the plaintiffs have not identified any
10  evidence.   The OSC suggests there might have been evidence, but
11  once the plaintiffs rest, the answer is no, there isn't, we
12  don't want to call Deputy Chief MacIntyre, and at that point
3   certainly at least the possibility of criminal exposure should
14  be removed by the Court and then the case can proceed.

15       THE COURT:   Do you know, it may be that once you
16  provided the -- once MCSO has done the document search and
17  provided them, you can convince plaintiffs that that's true.

18       Let me read you from Chief MacIntyre's affidavit:
19  However, I generally recall speaking with defense counsel in
20  the late summer of 2008 time period regarding this litigation.
21  MCSO documents, and the MCSO search for documents, is discussed
22  more fully below in paragraph 9.

23       It is my standard practice upon receiving requests for
?4  the production of MCSO documents in litigation, or requests to
25  preserve MCSO documents in litigation, such as in Exhibit A, to

1  forward such requests for handling to the MCSO legal liaison

2  division, and the appropriate personnel within the MCSO that

3  have professional responsibility for the overall and/or daily

4  management and supervision of those MCSO units that may have

5  documents potentially responsive to this particular request.

6  Based on the foregoing, he -- I'm sorry. Based on the

7  foregoing, it appears likely that I did not forward Exhibit A

8  to the MCSO legal liaison division or other MCSO personnel

9  pursuant to my standard practice. And he goes on.

10  Now, if that is on its face what it purports to be,

11  that's fine. But these document -- these are document

12  production requests that are the very document production

3  requests that resulted in nonproduction that's making us retry

14  this case.

15  MR. BIRNBAUM: I completely understand, Your Honor,

16  but we've now tried the case, or we will have, for four days --

17  THE COURT: And what I'm hearing in this is we may

18  have to retry the whole case.

19  MR. BIRNBAUM: Well, we know where the burden of proof

20  in the OSC hearing is, we know what that burden is, and with

21  all due respect, nobody is telling me that there's any evidence

22  which supports the burden of proof against Deputy Chief

23  MacIntyre, or again, Your Honor, at least with respect to the

24  possibility of a criminal referral.

25  THE COURT: You know, Mr. Birnbaum, you're skillful,

1    I'm sure we could spend the next 24 hours in this same

2    argument, but I've made my ruling.

3              MR. BIRNBAUM:  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Anything else that needs to be said?

6              Mr. Walker.

7              MR. WALKER:  Your Honor, just a couple of housekeeping

8    matters.  It came to my attention today that the minute entry

9    for the first day of this hearing reads:  Without objection,

10   the Court orders Maricopa County as a named party.  That does

11   not reflect the reservation of our right to challenge the Ninth

12   Circuit's decision --

3              THE COURT:  It doesn't reflect it, but the record

14   does, and I'm not going to pretend otherwise.

15             MR. WALKER:  Well, my request was that a

16   supplementation of a minute entry be made to reflect that.

17             THE COURT:  I have no problem with that.  I'll

18   supplement it, but I'm going to supplement it today instead of

19   making my clerk go back and supplement it then.  All right?

20             MR. WALKER:  That's perfectly fine, Your Honor.

21             THE COURT:  All right.

22             MR. WALKER:  Second issue is, during the break

23   Ms. Iafrate and I were approached by one of the representatives

24   of the monitor --

25             THE COURT:  Yes.

1          MR. WALKER:  -- and we were asked, because we're going

2     to be tied up in the hearing, to designate single points of

3     contact for our respective clients.  And I just wanted to say

4     the board of supervisors wants to cooperate in the inquiry that

5     the Court has on this matter, but I would like to note for the

6     record that in doing so, we're certainly not by any means

7     conceding that Maricopa County government, as represented by

8     the board of supervisors, is the proper party, or that it is

9     subject to the jurisdiction or the authority of the monitor.

10    But for purposes of this particular inquiry, we fully intend to

11    cooperate.

12         THE COURT:  I understand that you're not conceding it,

3     but please understand without equivocation I'm ordering it.

14    I'm ordering that you participate with the monitor.

15         MR. WALKER:  I understand.

16         THE COURT:  All right.

17         Anything else?

18         MR. COMO:  No, Your Honor.

19         THE COURT:  All right.

20         MS. WANG:  Nothing from plaintiffs, Your Honor.

21         THE COURT:  Then here's what I propose.  If you've got

22    an hour and a half to two, you think, how about we do this?

23         Did you say you need to leave by 10:00?

24         MR. McDONALD:  Yes.

25         THE COURT:  How about we start at 8:30, and then you

1   might be able to be done by 10:00, and if you're not, you're

2   not.  You need to be back as quickly as you can, we won't -- no

3   later than 2 o'clock, please.

4         MR. McDONALD:  Yes, I will make sure I'm here by

5   2 o'clock.

6         THE COURT:  All right.  Then we will resume at

7   2 o'clock.  That will give us three more hours.

8         It is true that depending upon the questions asked,

9   deputy -- or Chief Deputy Sheridan, I may also have questions

10  for Chief Deputy Sheridan as I had for Sheriff Arpaio today.

11  And so that may take some time, and I anticipate that it will

12  take perhaps the rest of the day, and we might even have to go

.3  a little past 5:00.

14        So I'd ask the parties to be prepared to do that, to

15  bring your calendars, because I think that we need to discuss

16  how we're going to handle this interim period and what's

17  actually going to happen during this interim period, and who

18  wants to do what.

19        I know you want to notice Mr. Casey's deposition and I

20  want to take into account both your arguments, and Ms. Iafrate,

21  I want to consider yours, and Mr. Walker and Mr. Como, of

22  course, your arguments on that point.

23        It seems to me that to the extent there may be

?4  501(c)(3) organizations over which the sheriff doesn't have

25  control that may have been involved in the financing of parts

1   of Mr. Montgomery's operation or the operation around it, that

2   we might need to serve third-party subpoenas or other matters.

3   We can just resolve those things. And then set a schedule to

4   have regular status, 'cause I have an idea we're going to need

5   to have regular statuses and figure out how to effectively use

6   our time.

7   MR. McDONALD: Judge, just one suggestion I would

8   make. I will try to be here at 1:30. I'd hate to be here at

9   1:30 and have everybody waiting around. I think if you set it

10  for 1:30 with the understanding I may be a few minutes late,

11  that may give us another half hour.

12  THE COURT: I'd love to do that. But I'm going to ask

.3  you to use your level best safe effort to be here by 1:30 if we

14  do it.

15  MR. McDONALD: I will.

16  THE COURT: Okay. So it will be 1:30.

17  MR. McDONALD: Thank you, Judge.

18  MS. WANG: Your Honor, did you want briefing on the

19  attorney-client privilege issue, the subject matter waiver

20  issue?

21  THE COURT: I think we should probably have briefing,

22  and I'll set the -- I'll set the briefing tomorrow, unless you

23  don't want it.

?4  Do you not want it, Ms. Iafrate, or would you like

25  briefing?

1          MS. IAFRATE:  No, I would like briefing.

2          THE COURT:  All right.  Well, we can -- we can discuss

3    that tomorrow.

4          MS. WANG:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          (Proceedings recessed at 5:25 p.m.)

7

8

9

10

11

12

3

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

3    cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 24th day of April,

18   2015.

19

20

21                            s/Gary Moll

22

23

24

25