# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona,<br><br>Defendant/Petitioner,<br><br>and GERARD A. SHERIDAN,<br><br>Specially appearing non-party/Petitioner,<br><br>vs.<br><br>UNITED STATES DISTRICT COURT for the District of Arizona,<br><br>Respondent Court,<br><br>and<br><br>MANUEL DE JESUS ORTEGA MELENDRES, et al.,<br><br>Plaintiffs/Real Parties in Interest. | No.<br><br>U.S. District Court<br>No. CV 07-02513-PHX-GMS |

---

## EXHIBITS TO PETITION FOR WRIT OF MANDAMUS
## VOLUME V OF VII -- (EXHIBITS 16 - 24)

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone:  602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County, Arizona

EXHIBITS TO PETITION FOR WRIT OF MANDAMUS

## VOLUME V:

| EX. | DOCUMENT | PAGES |
|-----|----------|-------|
| 16. | District Court ORDER that Defendants' Motions to Vacate (Docs. 948, 1003) are DENIED without prejudice. [Dist. Ct. Docket No. 1007] | 1139-1140 |
| 17. | Expedited Motion to Vacate Hearing and Request for Entry of Judgment filed in District Court, dated March 17, 2015 [Dist. Court Docket No. 948] | 1141-1156 |
| 18. | ORDER TO SHOW CAUSE setting an evidentiary hearing for April 21, 22, 23, and 24, 2015 dated February 12, 2015 [Dist. Ct. Docket No. 880] | 1157-1183 |
| 19. | ORDER Granting Stipulation To Amend Supplemental/ Permanent Injunction/Judgment Order – Granting Stipulation, dated October 10, 2014 [Dist. Ct. Docket No. 748] | 1184-1186 |
| 20. | District Court ORDER granting the [608] Motion for Attorney Fees and Non-Taxable Expenses, dated September 11, 2014 [Dist. Ct. Docket No. 742] | 1187-1193 |
| 21. | District Court's Supplemental Permanent Injunction/Judgment Order dated October 2, 2013 [Dist. Ct. Docket No. 606] | 1194-1252 |
| 22. | District Court's Findings of Fact and Conclusions of Law, dated May 24, 2013[Dist. Ct. Docket No. 579] | 1253-1394 |
| 23. | District Court ORDER affirming that trial will proceed on July 19, 2012 as scheduled, dated July 3, 2012 [Dist. Ct. Docket No. 542] | 1395-1404 |
| 24. | Defendants' Notice of Waiver on Limited Issue filed in District Court dated June 29, 2012 [Dist. Ct. Docket No. 541] | 1405-1407 |

RESPECTFULLY SUBMITTED this 6th day of August, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES


By /s/ John T. Masterson  *(w/permission from)*
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson  *(w/permission from)*
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Specially appearing counsel for
    Petitioner Joseph M. Arpaio in his
    official capacity as Sheriff of Maricopa
    County, Arizona

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing EXHIBITS TO PETITION FOR WRIT OF MANDAMUS – VOLUME V OF VII (Exhibits 16 - 24) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 6th day of August, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

_____ /s/ Karen Gawel _____

4397679.1



*EXHIBIT 16*

1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7                             FOR THE DISTRICT OF ARIZONA

8

9    Manuel de Jesus Ortega Melendres, on          No. CV-07-2513-PHX-GMS
     behalf of himself and all others similarly
10   situated; et al.                              **ORDER**

11                          Plaintiffs,

12   v.

13   Joseph M. Arpaio, in his individual and
     official capacity as Sheriff of Maricopa
14   County, AZ; et al.

15                          Defendants.

16

17          Before the Court are Defendants' Motions relating to the show cause hearing

18   scheduled to begin on April 21. On March 17, 2015, Defendants filed a Motion to vacate

19   the hearing and enter findings of civil contempt against Sheriff Joseph Arpaio, the

20   Maricopa County Sheriff's Office, and named contemnor Gerald Sheridan. (Doc. 948.)

21   Defendants filed a supplemental Motion to Vacate on April 10, 2015 (Doc. 1003), and

22   have now moved for an expedited hearing on these issues (Doc. 1005). Plaintiffs have

23   opposed Defendants' requests to vacate the evidentiary hearing. (Docs. 952, 1004.)

24          As the Court indicated during the March 20, 2015 status conference, it would

25   grant Defendants' request to vacate the contempt hearing upon its approval of the terms

26   of a global settlement of civil liability—if an agreement were timely reached between

27   Plaintiffs and the contemnors that mooted the need for a hearing on the civil charges. (*See*

28   Doc. 965 at 59–61.) According to Defendants' most recent filing, negotiations with

Plaintiffs have not been fruitful in this regard. (Doc. 1005 at 1.) In addition to outstanding questions regarding the liability of the other named contemnors, Plaintiffs indicate that they wish to present facts relating to the scope of, and circumstances surrounding, the admitted contempt of Sheriff Arpaio, MCSO, and Chief Deputy Sheridan, which are relevant to the appropriateness of any remedies the Court might order to address that civil contempt.  Plaintiffs may present evidence on these matters at the April hearing and/or, if necessary, during the supplemental hearing scheduled for June 16–19, 2015. Thus, the hearing to begin next week shall proceed as planned, as will any supplemental hearings.

In evaluating the need to refer the matter for criminal contempt hearings, the Court will keep in mind that Defendants Arpaio and Sheridan expressed willingness to settle the matter prior to the civil contempt hearing by publicly admitting to civil contempt, by voluntarily paying personal amounts to a charitable organization, and by seeking to facilitate other terms of settlement with the Maricopa County administration. The Court will complete its evaluation regarding the need to refer the matter for criminal contempt after the civil contempt hearing(s) have been completed.

**IT IS THEREFORE ORDERED** that Defendants' Motions to Vacate (Docs. 948, 1003) are **DENIED** without prejudice. Because oral argument is unlikely to materially add to the Parties' briefs, Defendants' Motion for a Hearing (Doc. 1005) is also **DENIED**.

Dated this 14th day of April, 2015.

Honorable G. Murray Snow
United States District Judge

- 2 -

1140



*EXHIBIT 17*

1   Michele M. Iafrate (#015115)
    miafrate@iafratelaw.com
2   IAFRATE & ASSOCIATES
3   649 North Second Avenue
    Phoenix, Arizona 85003
4   Telephone: (602) 234-9775

5
    WILLIAM G. MONTGOMERY
6   MARICOPA COUNTY ATTORNEY
    By Thomas P. Liddy (#019384)
7   Douglas A. Schwab (#019289)
8   Deputy County Attorney
    MCAO Firm No. 00032000
9   liddyt@mcao.maricopa.gov

10
11  Attorneys for Defendants Sheriff Joseph M.
    Arpaio and Maricopa County Sheriff's Office
12
                    UNITED STATES DISTRICT COURT
13
14                   FOR THE DISTRICT OF ARIZONA

15  Manuel de Jesus Ortega Melendres, et al.,   )   No. CV-07-2513-PHX-GMS
16                                              )
                          Plaintiffs,           )
17                                              )   **EXPEDITED MOTION TO VACATE**
18  v.                                          )   **HEARING AND REQUEST FOR**
                                                )   **ENTRY OF JUDGMENT**
19  Joseph M. Arpaio, et al.,                   )
20                                              )
                          Defendants.           )
21  ─────────────────────────────────────      )

22                        **Preliminary Statement**
23
            The purpose of this Motion is to convey to the Court and to Plaintiffs that
24
    Defendants Joseph M. Arpaio and Maricopa County Sheriff's Office, and identified non-
25
    party Chief Deputy Gerard Sheridan (collectively, "Defendants") consent to a finding of
26
    civil contempt against them and the imposition of remedies designed to address their
27
    conduct.  Under these circumstances, a 4-day evidentiary hearing, which would cost the
28
    county taxpayers hundreds of thousands of dollars, and which would consume significant

1   time of the Court, is unnecessary.  Defendants acknowledge and appreciate that they have

2   violated the Court's orders and that there are consequences for these violations.  There is

3   nothing Defendants can do to change what has already been done, but through the entry

4   of an order finding them in civil contempt and by implementing remedies discussed

5   herein, Defendants can express sincere remorse to the Court and to Plaintiffs, begin to

6   make amends to those who have been injured and take affirmative steps to ensure nothing

7   like this occurs in the future.  Defendants respect the Court and the Court's Orders.

8                                    **Discussion**

9          The Order to Show Cause identifies the following three areas of contemptuous

10  conduct:  (1) a "failure to abide by and apprise MCSO deputies of the terms of the

11  [December 23, 2011] preliminary injunction."  [Doc. 880 at 90];  (2) the failure to

12  disclose audio and video recordings made and maintained by MCSO deputies, as well as

13  other materials maintained by or relating to the MCSO HSU.  [Doc. 880 at 20]; and  (3)

14  the failure to cooperate with the Court's May 14, 2014 oral directives with respect to the

15  collection of recordings that were in the possession of patrol deputies.  [Doc. 880 at 21-

16  22].

17         The facts, with respect to each of these areas, have been discussed in detail in the

18  Order to Show Cause (Doc. 880) and the Plaintiffs' Memorandum of Law and Facts re

19  Contempt Proceedings and Request for Order to Show Cause (Doc. 843).  Defendants do

20  not intend to present any arguments or evidence which materially dispute these facts.

21  Thus, consuming the Court's time and the parties' time is unnecessary and wasteful.  *See*

22  *Thomas, Head and Greisen Employees Trust v. Buster*, 95 F.3d 1449, 1458-59 (9th Cir.

23  1996) (a finding of contempt without a hearing did not constitute a denial of due process

24  when alleged contemnors do not present any arguments which created any material issues

25  of fact); *Peterson v. Highland Music, Inc*., 140 F.3d 1313, 1324 (9th Cir. 1998) (district

26  court did not abuse discretion finding contempt on basis of affidavits submitted in

27  response to order to show cause when defendants did not controvert plaintiff's facts);

28  *New York State Nat'l Organization for Women v. Terry*, 732 F. Supp. 388, 396 n.3 (S.D.

-2-

1   N.Y. 1990)(hearing not necessary when no material facts in dispute; defendants did not

2   dispute the fact they blocked access to abortion clinic and did not dispute they had

3   knowledge of court order prohibiting them from doing so).[1]

4       Accordingly, Defendants will adopt and stipulate to the facts as stated in the

5   Court's Order to Show Cause, as well as to the entry of an order finding them in civil

6   contempt of court, as described in the Order to Show Cause.  To the extent the Court

7   believes that such a stipulation is not sufficient to establish an appropriate factual basis to

8   support an order finding Defendants in contempt, Defendants attach at Exhibit A a

9   proposed statement of facts, to which they will stipulate as well.

10       A necessary component of a civil contempt is the imposition of a remedy that

11   ensures compliance and compensates injured parties for harm they have suffered.  *Int'l*

12   *Union, United Mine Workers of Am. V. Bagwell,* 512 U.S. 821, 827-28 (1994).

13   Defendants and their legal counsel are committed to identifying and implementing

14   measures that accomplish both of these objectives.  In particular, Defendants

15   acknowledge that the remedies will encompass the identification and compensation of

16   individuals who were harmed by violations of the December 23, 2011 preliminary

17   injunction, as well as putting in place structural measures to ensure that the Court's

18   orders are disseminated and complied with in a timely fashion.  Defense counsel,

19   plaintiffs' counsel, and the court monitor can collectively meet and confer and present a

20   plan for Court.  Defendants further acknowledge that in order for some of the remedies to

21   be meaningful, they will need to be the responsibility of Defendants personally.  To that

22   / / /

23   / / /

24   / / /

25   / / /

26

27
28   [1] In addition, this ongoing litigation is taking a heavy toll on the manpower and resources of MCSO by diverting management from their law enforcement functions to the detriment of the public safety and welfare.

-3-

end, attached at Exhibit B is a proposed list of remedial measures to which Defendants are prepared to stipulate and implement.[2]

## Relief Requested

Defendants have been ordered to "appear before the Court and show cause . . . why the Court should not impose sanctions on them pursuant to 18 U.S.C. § 401 and/or Federal Rule of Civil Procedure 37(d)." [Doc. 880 at 26]  Because Defendants, by their stipulations, consent to the Court imposing sanctions upon them, there is no need for an evidentiary hearing.  Accordingly, Defendants request that the evidentiary hearing set for April 21 – 24, 2015 be vacated and that the Court enter orders finding Defendants in civil contempt and imposing the remedial measures identified in Exhibit B.  *See Mercer*, 908 F.2d at 769 n.11 ("When there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him.");  *U.S. v. Ayres*, 166 F.3d 991, 996 (9th Cir. 1999) (no need for hearing when defendant conceded contempt motion by explaining why he chose not to comply with court order rather than asserting he could not comply); *United States v. City of Yonkers*, 856 F.2d 444, 453 (2d Cir. 1988) (need for plaintiffs to present evidence to meet burden to establish defendants' contempt was obviated when defendants did not dispute the representation they had violated court's order); *In re Grand Jury Proceedings*, 795 F.2d 226, 234-35 (1st Cir. 1986) (evidentiary hearing not required where documentary evidence established the contempt and no material issues of fact about ownership of documents in question were raised); *Hush v. Taylor*, 995 N.Y.S. S.2d 336, 339 (2014) (no evidentiary hearing necessary on question whether defendants had

---

[2] The remedies proposed in Exhibit B are suggestions to the Court that the Court may adopt, reject or modify, at its discretion.  The remedies are designed to address the court's directives mentioned in the February 26, 2015 status conference in which the Court stated:  "I don't want to refer this matter to a criminal contempt hearing if I can have adequate assurance—if I can have adequate remedies for the victims of this case; if I can have, if I believe it is necessary, a punitive element to the individuals who may have been culpable of criminal contemptuous behavior such that it will not happen again."  See February 26, 2015 transcript pp. 62:20-63:1.

-4-

violated court order not to interfere with plaintiffs' use of rights-of-way and easements where defendants did not dispute factual allegations or challenge authenticity of underlying property deeds).

RESPECTFULLY SUBMITTED March 17th, 2015.

IAFRATE & ASSOCIATES

By:   *s:/Michele M. Iafrate*

Michele M. Iafrate
Attorneys for Sheriff Joseph M. Arpaio
and Maricopa County Sheriff's Office

MARICOPA COUNTY ATTORNEY
CIVIL SERVICES DIVISION

By:   *s:/Thomas P. Liddy (w/permission)*

Thomas P. Liddy
Douglas A. Schwab
Attorneys for Sheriff Joseph M. Arpaio
and Maricopa County Sheriff's Office

JONES SKELTON & HOCHULI

By:   *s:/A. Melvin McDonald (w/permission)*

A. Melvin McDonald
Attorney for Sheriff Joseph M. Arpaio

MITCHELL STEIN & CAREY

By:   *s:/Lee Stein (w/permission)*

Lee Stein
Barry Mitchell
Attorneys for Chief Deputy Sheridan

-5-

## **CERTIFICATE OF SERVICE**

I hereby certify that on March <u>17th</u>, 2015, I electronically transmitted the attached document using the CM/ECF system for filing, and which will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.


_s:/Jill Lafornara_____

1146

**EXHIBIT A**

**EXHIBIT A**

**Preliminary Injunction**

1.   In December 2007, Plaintiffs filed a class action against the Maricopa County
Sheriff's Office (MCSO) and Sheriff Joseph Arpaio, alleging that MCSO engaged
in a custom, policy, and practice of racially profiling Latinos, and a policy of
unconstitutionally stopping persons without reasonable suspicion that criminal
activity was afoot, in violation of Plaintiff's Fourth and Fourteenth Amendment
rights.

2.   On April 13, 2011, Plaintiffs filed a motion for summary judgment, which
included a request for entry of a preliminary injunction.

3.   On December 23, 2011, the Court granted the Plaintiffs' motion in part, and
entered a preliminary injunction, which was affirmed by the Ninth Circuit in
*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

4.   The December 23, 2011 preliminary injunction stated:

> MCSO and all of its officers are hereby **enjoined** from detaining any person
> based only on knowledge or reasonable belief, without more, that the person
> is unlawfully present within the United States, because as a matter of law
> such knowledge does not amount to a reasonable belief that the person
> either violated or conspired to violate the Arizona human smuggling statute,
> or any other state or federal criminal law.

5.   MCSO received notice of the preliminary injunction and failed to implement the
order, generally to its deputies, or more specifically to the Human Smuggling Unit
(HSU), which bore primary responsibility for enforcing state and federal
immigration laws and conducting interdiction patrols.

6.   As a result of the failure of MCSO to ensure that an office-wide notification
successfully communicated the preliminary injunction to all of its deputies, MCSO

1148

immigration enforcement activities that violated the preliminary injunction continued.

7. On December 23, 2011, Timothy Casey, then-counsel for MCSO and Sheriff Joseph Arpaio sent an email regarding the preliminary injunction to Chief Deputy Sheridan, Executive Chief (Ret.) Sands, Deputy Chief MacIntyre, and Lieutenant Sousa.

8. Although Sheriff Arpaio did not receive the email from Mr. Casey, he was informed of the preliminary injunction shortly after it was issued.

9. Despite being aware of the preliminary injunction, Sheriff Arpaio failed to take steps necessary to ensure that MCSO complied with the preliminary injunction.

10. Chief Deputy Sheridan, who is responsible for supervising all of MCSO's operations, failed to communicate the preliminary injunction to subordinate MCSO officers and failed to take any steps to ensure MCSO's compliance with the injunction.

**Pre-Trial Discovery Violations**

11. During the pre-trial phase of the litigation, Plaintiffs submitted formal discovery demands, including requests for admissions, requests for documents and interrogatories, for records relating to MCSO's traffic stops.

12. MCSO failed to comply with the Federal Rules of Discovery, which require parties to reasonably and diligently respond to discovery requests, when, with at least some knowledge of its existence, it failed to investigate and/or never disclosed to Plaintiffs the following requested materials or information:

   a. Some MCSO deputies had audio-recording devices issued to them as a matter of policy;

b.  Such audio-recording devices were in use during the relevant discovery periods;

c.  Some MCSO deputies had body-and/or vehicle-mounted video recording devices during the relevant discovery periods;

d.  Some MCSO deputies recorded their on-duty activities with privately purchased video equipment during the relevant discovery periods;

e.  HSU procedures apparently required some video recordings of traffic stops to be made;

f.  HSU maintained a catalog of DVD's containing recordings of traffic stops by officers; and

g.  Some MCSO deputies had video cameras issued to them as a supervisory measure to monitor their on-duty activities.

13.  Additionally, confiscated personal identifications and items of personal property, along with some written reports pertaining to HSU operations, were requested and never provided.

14.  As a named party, Sheriff Arpaio had an obligation to comply with the Federal Rules of Civil Procedure regarding discovery, but failed to do so when he failed to take steps to ensure that the materials or information enumerated above were disclosed to Plaintiffs.

### The May 14, 2014 Hearing

15.  On May 14, 2014, Defendants informed the Court that a former member of the HSU, Deputy Charley Armendariz, was found to be in possession of hundreds of personal items, many of which appear to have been appropriated from members of the Plaintiff class.  MCSO also informed the Court that it had discovered numerous video recordings of traffic stops Armendariz had conducted, some of which revealed what MCSO characterized as "problematic activity."

3

16.  At the May 14, 2014, hearing, Chief Deputy Sheridan acknowledged that some deputies made audio recordings of traffic stops and that there was reason to believe that some deputies video taped their traffic stops.

17.  In light of the revelations made by MCSO at the May 14, 2014 hearing, the Court directed Defendants to formulate a plan designed to quietly retrieve all recordings made by officers that might still be in existence.

18.  The Court stated that the substance of the hearing should not be shared with those outside of the courtroom.

19.  Shortly after the hearing, Chief Deputy Sheridan directed Deputy Chief Trombi to send an email to 27 Departmental Commanders directing them to gather all such recordings from their personnel.

20.  Deputy Chief Trombi sent the email as directed by Chief Deputy Sheridan.

21.  Later in the day on May 14, 2014, Chief Deputy Sheridan (and others) met with the Monitor to develop a retrieval strategy.  At no time during that meeting did Chief Deputy Sheridan inform the Monitor that he had directed Deputy Chief Trombi to send the email to the Departmental Commanders, as described above.

**EXHIBIT B**

**EXHIBIT B**

1. Sheriff Arpaio will appear in a public forum to acknowledge violations of the Court's orders.  The statement would be videotaped and disseminated for viewing by members of the public who are unable to attend the forum.  Costs associated with producing and distributing the videotape would not be at government expense.

   a. The Sheriff will acknowledge that he was aware of the Court's December 2011 injunction, and that despite the existence of the Order, he not only failed to take any steps to ensure his deputies complied with this order, but he allowed a continuation of the enjoined practice of detaining individuals on the basis of their suspected immigration status alone.

   b. The Sheriff will acknowledge that he is responsible for MCSO's violation of the Court's order of May 14, 2014, requiring that MCSO work cooperatively with the Monitor to develop a plan for the collection of video recordings of traffic stops made by MCSO deputies.

   c. The Sheriff will acknowledge that he bears ultimate responsibility for MCSO's violation of its discovery obligations to turn over documents relating to traffic stops to Plaintiffs before trial.

   d. Sheriff Arpaio will state that he will work collaboratively with the Court-appointed Monitor to ensure that violations will not recur, and describe the other remedies to be undertaken, including the creation of a compensation fund to compensate those whose rights were violated as a result of the agency's failure to follow the Court's December 23, 2011 preliminary injunction, and implementation of additional agency-wide policies to prevent future violations.

   e. The statement will identify other MCSO commanders whom the sheriff and/or the Monitor bear responsibility for the violations of the Court's orders.

    f.  The Sheriff will personally accept responsibility for himself and for the Maricopa County Sheriff's Office and offer an apology for the violations both to Plaintiffs and the Court.

2.  Sheriff Arpaio and MCSO will seek from Maricopa County the creation and initial funding of a significant reserve to compensate victims of MCSO's violations of the Court's December 2011 injunction.

    a.  It is anticipated that individuals detained without adequate justification and solely on the basis of their suspected immigration status will be compensated depending on the length of their detention.

    b.  Based on information produced by MCSO regarding three incidents in September and October 2012 noted in Plaintiffs' Request for Order to Show Cause, there are at least five individuals who were held in violation of the Court's December 2011 injunction.

    c.  Sheriff Arpaio and MCSO will request an initial fund of $350,000, but will seek to adjust this figure if it does not adequately cover all identified victims with valid claims.

    d.  Defendants will personally make a total cash payment of $100,000 to a civil rights organization based in Maricopa County approved by the court which, among other services, has, as one of its missions,  a commitment to protecting the constitutional and civil  rights of the Hispanic community.

3.  Defendants, working with Plaintiffs' counsel and the court monitor, and subject to approval of the Court, will develop and implement a plan to identify victims of violations of the Court's December 2011 order, including full cooperation with the Monitor, Plaintiffs, and federal agencies in seeking to identify all victims, who will be compensated out of the fund mentioned above.

4.  The Monitor or his designee shall have authority over any MCSO internal investigations, whether conducted by the Professional Standards Bureau ("PSB"),

1154

a district commander, or any other MCSO employee, that relate to any of this Court's orders, including but not limited to the improper use of race, the enforcement of federal civil immigration law, and any investigations begun in response to revelations concerning or otherwise related to former Deputy Charley Armendariz. For the purposes of these investigations, the Monitor's authority shall be co-extensive with that of the Sheriff and other MCSO commanders or PSB staff. This authority will last until the Court deems the Monitor is no longer necessary.  This authority shall include the following:

a. The Monitor may open new internal investigations or re-open previously closed investigations.

b. The Monitor may conduct, conclude, and follow up on internal investigations.

c. The Monitor shall decide whether such investigations shall be conducted by MCSO personnel, members of the Monitor team, or both. Any person who participates in such investigations, whether they are employed by MCSO or the Monitor team, shall ultimately be responsible to the Monitor's direction.

d. An MCSO employee who is the subject of a Monitor-directed internal investigation may appeal the findings and disciplinary action taken against him to the Court and exercise any other appellate rights afforded by law.

e. The Monitor shall make documents relating to investigations available to Plaintiffs' counsel in his discretion, and either Plaintiffs or Defendants may seek review of the Monitor's determinations pursuant to this subparagraph with the Court with timely notice given.

5. The Court may order additional injunctive and remedial relief consisting of the following:

a. New policies and training regarding the communication of court orders and other compliance-related matters to MCSO personnel.

3

1155

b.  Procedures for immediate notification and disclosure of documents to Plaintiffs' counsel and the Monitor of any unlawful detentions based on immigration status.

c.  New policies and training on the collection and retention of evidence.

d.  New policies and training on misconduct investigations and civilian complaints as previously proposed by Plaintiffs. *See* Doc. 592-1 at 32-33, 52-61.

6.  Sheriff Arpaio and MCSO will move to dismiss the pending appeal to the Ninth Circuit Court of Appeals entitled "*Melendres et. al. v. Arpaio et. al*, No. 13-16285 and 13-17238".

7.  Plaintiffs' reasonable attorneys' fees, that were  reasonably necessary to ensure compliance with the Court's orders, including reasonable fees and costs already expended, including fees and costs for the appeal that will be dismissed, will be paid.

1156



*EXHIBIT 18*

1
2
3
4
5
6
7
8

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

9  Manuel de Jesus Ortega Melendres, on            No. CV-07-02513-PHX-GMS
   behalf of himself and all others similarly
10  situated; et al.                                **ORDER TO SHOW CAUSE**

11                     Plaintiffs,

12  v.

13  Joseph M. Arpaio, in his individual and
    official capacity as Sheriff of Maricopa
14  County, AZ; et al.

15                     Defendants.

16
17          Pending before the Court is Plaintiffs' Request for an Order to Show Cause (Doc.

18  843) and the opposition thereto by Defendants and those non-parties who have specially

19  appeared in this action. (Docs. 838–42, 844.) For the reasons stated below, Plaintiffs'

20  Request is granted.

21                                    **BACKGROUND**

22          In December 2007, Latino motorists brought a class action under 42 U.S.C. § 1983

23  against the Maricopa County Sheriff's Office and Sheriff Joseph Arpaio, among others,

24  alleging that Defendants engaged in a custom, policy, and practice of racially profiling

25  Latinos, and a policy of unconstitutionally stopping persons without reasonable suspicion

26  that criminal activity was afoot, in violation of Plaintiffs' Fourth and Fourteenth

27  Amendment rights. (Doc. 1, *amended by* Doc. 26.) The Plaintiffs sought declaratory and

28  injunctive relief to prevent Defendants from engaging in racial profiling and exceeding

the limits of their authority to enforce federal immigration law. (Doc. 1 at 19–20.)

After pre-trial discovery was closed, the parties filed competing motions for summary judgment; Plaintiffs' motion included a request for the entry of a preliminary injunction. (Docs. 413, 421.) This Court granted the Plaintiffs' motion in part, and entered a preliminary injunction on December 23, 2011.[1] (Doc. 494.) The injunction prohibited MCSO from "detaining individuals in order to investigate civil violations of federal immigration law," and from "detaining any person based on actual knowledge, without more, that the person is not a legal resident of the United States." (*Id.* at 39.) The injunction further stated that, absent probable cause, officers may only detain individuals based on reasonable suspicion that "criminal activity may be afoot." (*Id.* at 5 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968).) The Court explained that being present in the country without authorization to remain does not, in and of itself, violate any criminal statute and, therefore, "actual knowledge, let alone suspicion, that an alien is illegally present is not sufficient to form a reasonable belief he has violated federal criminal immigration law." (*Id.* at 7.) Moreover, Hispanic appearance, an inability to speak English, and proximity to the border do not supply reasonable suspicion that a crime was being committed sufficient to stop a vehicle to investigate the immigration status of the occupants. (*Id.* at 6.)

Seventeen months later and following a bench trial, the Court issued its Findings of Fact and Conclusions of Law in May 2013 in which it found MCSO liable for a number of constitutional violations in its operations and procedures. (Doc. 579 at 115–31.) After allowing the Parties, at their request, to attempt to negotiate the terms of a consent decree, in October 2013 the Court ordered supplemental injunctive relief to remedy the violations it outlined in its Findings and Conclusions and defined enforcement mechanisms for such remedies. (Doc. 606.) This Court has continuing authority over the enforcement and implementation of that order.

---

[1] The Ninth Circuit affirmed the preliminary injunction in September 2012. *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

Around this time, Chief Deputy Jerry Sheridan was videotaped during an October 2013 training session for deputies about to engage in a large-scale patrol, where he referred to this Court's order as "ludicrous" and "crap," and incorrectly stated that this Court had found only a small number of officers had unconstitutionally used race as a factor in traffic stops. (*See* Doc. 662 at 22–23.) On the recording, which did not surface until early the next year, both Chief Deputy Sheridan and Sheriff Arpaio are seen apparently directing deputies not to take seriously the Court's requirement that they track the race and ethnicity of individuals whom they stop. (*Id.* at 23.) This Court has since held a number of hearings to address the repeated mischaracterization and condemnation of its Orders by MCSO officials. (*See* Docs. 662; 672; 776 at 61–68.) For example, at a March 2014 community meeting, Deputy Chief David Trombi told residents that the Court had only found that MCSO deputies detained Latinos fourteen seconds longer than other drivers, which was not in the Court's Findings of Fact. (Doc. 672 at 14.) In April 2014, Deputy Chief John MacIntyre made a statement to the press denying that the Court had concluded the Sheriff's Office had engaged in racial profiling. (Doc. 684 at 4.) In lieu of contempt, the Court entered an enforcement order requiring that a corrective statement summarizing the Court's holding and emphasizing that the order was to be followed, pending appeal, be distributed within MCSO. (Docs. 680, 684.)

On May 14, 2014, Defendants informed the Court that a former member of the Human Smuggling Unit, Deputy Charley Armendariz, was found to be in possession of hundreds of personal items, many of which appear to have been appropriated from members of the Plaintiff class. (*See* Doc. 700 at 12–13.) Deputy Armendariz was a regular participant in the HSU's saturation patrols, both large and small scale. He also testified at trial and was personally implicated by the allegations of two representatives of the Plaintiff class regarding his involvement in a 2008 immigration sweep in which two Hispanic American citizens were allegedly profiled and illegally detained on the basis of their suspected undocumented status. (Doc. 576.) After his apparent suicide, in addition to the numerous personal items apparently seized from persons he had stopped, MCSO

also discovered numerous video recordings of traffic stops Armendariz had conducted, apparently going back several years. (Doc. 700 at 11.) Some of those videos revealed what MCSO characterized as "problematic activity" on the part of Deputy Armendariz during the stops. (*Id.* at 35, 57.) Other officers, and at least one supervisor of Armendariz who also testified at the trial in this action, were depicted on these recordings during one or more problematic stops. (*Id.* at 35.)

Upon questioning by the Court, Chief Deputy Sheridan acknowledged that many, if not all, deputies made audio recordings of their traffic stops pursuant to departmental practice and had done so for some time. (*Id.* at 29–31.) Further, Sheridan stated that there was reason to believe that some deputies videotaped their own traffic stops, that there was no departmental policy that prevented deputies from doing so, and that some video devices had been purchased in earlier years by MCSO or through other government programs for use during traffic stops. (*Id.* at 21, 23–24.) Prior to May 2014, there was apparently no agency-wide policy that governed the collection and catalogue of such recordings. (*Id.* at 24.)

In light of the inappropriate activity observable on Deputy Armendariz's videotapes and the ambiguity surrounding other officers' use of video- and audio-recording devices during the time period in which pre-trial discovery in this case was occurring, the Court ordered Defendants to immediately formulate and obtain the Monitor's approval of a plan designed to quietly retrieve all recordings made by officers that might still be in existence. (*Id.* at 25–27.) The Court emphasized that the substance of the hearing was not to be shared with those outside the Courtroom. (*Id.* at 7, 50–51, 69.) Within two hours of this hearing, however, Chief Deputy Sheridan met with Sheriff Arpaio and attorneys for MCSO. An e-mail was circulated immediately thereafter by Deputy Chief Trombi (who was not present at the hearing), at the direction of Chief Deputy Sheridan, to twenty-seven Departmental Commanders—including the supervisor who had been present during one of Armendariz's problematic stops. (*See* Doc. 795, Attach. 1, at 3–4.) The e-mail advised MCSO commanders that they should "simply

gather" all such recordings from their personnel. (*Id.* at 4.) When, later that afternoon, the Monitor met with MCSO officials to develop a retrieval strategy, neither the Sheriff nor Chief Deputy Sheridan informed the Monitor that MCSO had already broadcast its collection efforts. (*Id.* at 4–5.) In the end, MCSO conducted a survey-approach of its present and past employees to collect any outstanding recordings (*Id.* at 4), incurring the additional risk that advertising their collection efforts might prompt officers to destroy existing recordings rather than surrender them to MCSO leadership.

Even so, the ensuing investigations unearthed previously undisclosed recordings of traffic stops undertaken by the HSU and at the apparent direction of other MCSO departments. They have also unearthed documents apparently requiring officers to make such recordings during the period of time relevant to Plaintiffs' claims. In addition, dozens of personal identifications have been found in offices formerly occupied by the HSU. There is evidence that, during the period relevant to this lawsuit, a number of deputies were also confiscating items of personal property—such as identifications, license plates, Mexican currency and passports, credit cards, cell phones, purses, and religious shrines—from individuals detained in conjunction with immigration enforcement activities. These items were apparently routinely retained by deputies, destroyed, or deposited in collection bins in the various administrative districts of MCSO.

While these materials appear to have been requested by Plaintiffs prior to the trial of this lawsuit, it does not appear that any of them were identified or provided to the Plaintiff class. There is also evidence that at least some recordings made during the period relevant to the Plaintiffs' claims are no longer in existence. Moreover, the Armendariz videotapes resulted in administrative interviews with MCSO personnel that have apparently revealed that Defendants, as a matter of regular practice and operation, continued actively enforcing federal immigration law by conducting immigration interdiction operations, and detaining persons after officers concluded that there was no criminal law basis for such detention, for at least seventeen months after this Court issued its preliminary injunction. Plaintiffs previously contacted Defendants in October 2012

about suspected violations of the injunction after MCSO published News Releases pertaining to three immigration enforcement endeavors. (Doc. 843, Ex. A, at A1–A5.) The Court also noted in its May 2013 Findings of Fact and Conclusions of Law that "as a matter of law . . . MCSO has violated the explicit terms of this Court's preliminary injunction set forth in its December 23, 2011 order because the MCSO continues to follow the LEAR policy and the LEAR policy violates the injunction." (Doc 579 at 114.)

## DISCUSSION

### I. Contempt Power

Federal courts have the authority to enforce their Orders through civil and criminal contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In addition to the Court's inherent power, Title 18, Section 401 of the United States Code provides:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> . . .
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401(3); *United States v. Powers*, 629 F.2d 619, 624 (9th Cir. 1980) ("Section 401 applies to both criminal and civil contempt."). Within the enumerated statutory limits of this power, a district court has wide latitude in determining whether there has been a contemptuous defiance of its orders. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992). Because an injunctive decree binds not only party-defendants but also those who are represented by them, are subject to their control, or are in privity with them, contempt charges may be brought against non-parties to the underlying litigation who are also bound by an injunction but fail to comply with its terms.[2] For non-party respondents to be held liable in contempt for violating a court's

---

[2] *See* Fed. R. Civ. P. 65(d)(2) (defining scope of individuals bound by a court order to include the parties, the parties' officers, agents, servants, employees, and attorneys; and other persons who are in "active concert or participation with" the parties and their officers, agents, etc., provided they receive actual notice of the order); Fed. R.

order, they must have had notice of the order and either abet the defendant or be legally identified with him. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998) (quoting *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977)). The Ninth Circuit's rule regarding contempt "has long been whether defendants have performed 'all reasonable steps within their power to insure compliance' with the court's orders." *Stone*, 968 F.2d at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)).

The moving party bears the initial burden of establishing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 466 (9th Cir. 1989). The burden then shifts to the contemnors to demonstrate why they were unable to comply. *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). The contemnors must show that they took every reasonable step to comply. *Sekaquaptewa*, 544 F.2d at 406. In assessing whether an alleged contemnor took "every reasonable step," a district court may consider a history of noncompliance. *Stone*, 968 F.2d at 857. A party's subjective intent is irrelevant to a finding of civil contempt.[3] *Id.* at 856.

A court's exercise of its contempt authority must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (internal quotation marks omitted). If contemptuous conduct is punished criminally, Federal Rule of Criminal Procedure 42(a) requires the appointment of a federal prosecutor, notice to the contemnor of the charges against him, and a trial. *See* Fed. R.

---

Civ. P. 71 (noting that the procedure for enforcing an order against a non-party is the same as against a party); *United States v. Baker*, 641 F.2d 1314 (9th Cir. 1981) (finding that non-party fishers were bound by and could be criminally prosecuted for contempt for non-compliance with an injunction issued by a federal court to manage the state salmon fishing industry, because the evidence was sufficient to prove that the defendants had notice of the injunction and violated it intentionally).

[3] "A party cannot disobey a court order and later argue that there were 'exceptional circumstances' for doing so. This proposed 'good faith' exception to the requirement of obedience to a court order has no basis in law." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987).

- 7 -

Crim. P. 42; *Powers*, 629 F.2d at 625. The Supreme Court has suggested that a trial judge should first consider the feasibility of prompting compliance through the imposition of civil contempt, utilizing criminal sanctions only if the civil remedy is deemed inadequate. *See Young*, 481 U.S. at 801. The Court does so through these proceedings.

## II.    Application

In their Request for an Order to Show Cause, as supplemented by the telephonic status conference held with the parties and specifically named non-parties on January 15, 2015, Plaintiffs have provided sufficient evidence that Defendants and their specified agents have committed contempt insofar as their conduct amounted to disobedience of (1) the Court's preliminary injunction; (2) the Federal Rules governing pre-trial discovery;[4] and (3) the Court's oral directives at the sealed hearing held on May 14, 2014.[5]

At its December 4, 2014 hearing, the Court expressed concern whether, if a contempt finding was appropriate, civil contempt alone would be sufficient to vindicate the constitutional substantive rights involved and compensate the Plaintiff class for its injuries resulting from the contemnors' behavior, particularly in light of the scope of individuals possibly affected by their contempt of the preliminary injunction. Nevertheless, out of deference to the elected office held by Sheriff Arpaio and because the "principle of restraint in contempt counsels caution" in this Court's exercise of its

---

[4] Plaintiffs' Request for an Order to Show Cause outlines two grounds for civil contempt: the violation of the preliminary injunction and the conduct surrounding the May 15, 2014 hearing and development of an evidence-retrieval plan with the Monitor. (Doc. 843 at 5.) After reviewing the briefs, the Court held a telephonic conference with the parties regarding the possible pre-trial discovery violations and whether or not any such violations should be included in these contempt proceedings. (See Doc. 858 at 14–18.) At that time, Plaintiffs orally moved for an Order to Show Cause on this basis, and Defendants consented to resolve any questions involving MCSO's obligation to disclose and produce audio and video evidence of traffic stops at the hearing in April. (*Id.*)

[5] The Court specifies below the factual basis on which it deems Plaintiffs have set forth evidence sufficient to present a prima facie case of contempt with respect to the various parties and non-parties named in this Order. Additional facts and/or persons subject to contempt may become known during the expedited discovery process that the Court concurrently authorizes. A failure to include facts in this Order does not prevent the parties from relying on them at the evidentiary hearing to the extent they relate to the grounds for which the parties and non-parties have been ordered to show cause.

1164

powers, the Court noted that it would hold civil contempt hearings first to assess the adequacy of civil remedies before referring the matter, if appropriate, for criminal contempt prosecution. *Id.*; *see also United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir. 1983). Accordingly, this Order to Show Cause and the noticed hearings to be held in April 2015 only contemplate civil contempt charges. If further action proves necessary, the Court will give separate notice, appoint a prosecutor pursuant to Rule 42, and initiate criminal proceedings that are separate from this matter.

### A.    Preliminary Injunction Violations

A party may be held in civil contempt when, after receiving notice, it fails to take all reasonable steps within its power to comply with a specific and definite injunctive decree. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The preliminary injunction detailed that MCSO lacked the authority to enforce civil federal immigration law and, concomitantly, lacked the authority to detain persons not suspected of violating any state or criminal law based on the belief, however reasonable, that such persons were present in the country unlawfully. (Doc. 494 at 39–40.) The Court orders the following individuals/entities to show cause why they should not be held in contempt for their failure to abide by and apprise MCSO deputies of the terms of the preliminary injunction:

### 1.    Maricopa County Sheriff's Office

Defendant MCSO does not appear to contest that it received notice of the injunction and that it failed to implement the order. By MCSO's own admission, the preliminary injunction was also not distributed within the HSU—the special operations unit which bore the primary responsibility for enforcing state and federal immigration laws and conducting interdiction patrols. (Doc. 804 at 5 ("MCSO has concluded[] that this Court's order was not communicated to the line troops in the HSU."); Doc. 843, Ex. F, at 62 (Dep. of Lt. Joseph Sousa at 178:6–23, *United States v. Maricopa Cnty.*, No. 2-12-cv-00981-ROS (D. Ariz. filed May 10, 2012) ("I don't remember a briefing board because it would be contradictory to the LEAR policy . . . .").).) Nor was the preliminary

- 9 -

1165

injunction communicated to any other MCSO patrol officer. (*See* Doc. 843 at 8 n.1.) As a result, MCSO immigration enforcement activities continued apace despite the issuance of the preliminary injunction.

While it continued this immigration enforcement activity in violation of the injunction, MCSO also wrongfully believed that it could consider Hispanic ancestry in making law enforcement decisions—such as whom to detain to investigate immigration violations. In addition to a Fourth Amendment violation, this error in belief would have resulted in the violation of the Fourteenth Amendment rights of persons of Hispanic ancestry who were detained and investigated by MCSO for immigration violations due to their ethnic heritage, regardless of whether the initial stop resulted in a further detention.

There is also evidence that, during the period relevant to this lawsuit, a number of deputies confiscated items of personal property—such as identifications, license plates, credit cards, cell phones, purses, Mexican currency and passports and religious shrines—from individuals detained in conjunction with immigration enforcement activities and who were members of the Plaintiff class. These items were apparently routinely kept by deputies, destroyed, or deposited in collection bins in the various administrative districts of MCSO. The confiscation of these items apparently continued during the period in which MCSO was enjoined from all immigration enforcement and illustrates further damage that was inflicted as a result of MCSO's violation of the preliminary injunction.

The MCSO officials who received notification of the injunction when it was issued via an e-mail from then-counsel Timothy Casey[6] have conceded that this failure was the result of inaction on their part. (Doc. 804 at 5–6.) As a result of these shortcomings, the order enjoining Defendant from enforcing federal immigration law, operating under the LEAR policy, and unconstitutionally detaining persons based solely on the belief that they were in the country without authorization was never implemented.

---

[6] Defendants have identified an e-mail from Casey to Chief Deputy Sheridan, Executive Chief (Retired) Brian Sands, Chief MacIntyre, and Lieutenant Sousa regarding the injunction shortly after its filing. (Doc. 804 at 5–6.)

1166

Plaintiffs have identified sufficient evidence confirming the occurrence of violations of this Court's injunction. The Armendariz videotapes, for example, demonstrate that Deputy Armendariz participated in immigration enforcement well after the issuance of the preliminary injunction and even the trial in this matter. (*See* Doc. 843 at 12.) The MCSO investigations that stemmed at least in part from the Armendariz videotapes resulted in an acknowledgement by Defendants that the HSU continued to conduct immigration interdictions as a part of its regular operations well after the issuance of the preliminary injunction and at least up to the entry by this Court of its Findings of Fact and Conclusions of Law. (Doc. 804 at 5.)

Plaintiffs have also provided evidence that civil immigration laws were being enforced by regular MCSO patrol deputies—e.g., including those not in the HSU—and that such immigration enforcement was occurring as a matter of MCSO policy and directive. (*See* Doc. 843, Ex. A, at A3–A8 (detailing three other possible violations of the preliminary injunction).) On September 20, 2012, MCSO deputies apparently detained five Mexican nationals on the belief that they were "clearly recent border crossers" and summoned HSU officers to the scene to question them. (*Id.*, Ex. 2, at A3–A4 (News Release, MCSO, ICE Refuses to Accept Illegal Aliens from Sheriff's Deputies During Human Smuggling Operation, Sept. 21, 2012).) The MCSO press release regarding the incident details that, after detectives were unable to charge two of the men for any state crimes, they nevertheless continued to detain these individuals and attempted to transfer them to U.S. Immigration and Customs Enforcement, "as [had] been the practice during the last six years." (*Id.* at A5.) In at least two other instances over the next few weeks, individuals stopped by MCSO deputies on the belief that they were in the country without authorization but who could not be charged with any crime were apparently detained pursuant to department policy until they could be transferred to ICE or U.S. Customs and Border Patrol. (*See id.*, Ex. B, at A4 (discussing MCSO's "back-up plan"); *see also id.*, Ex. B, at A8.) This course of action—detaining individuals based solely on suspected civil immigration violations pending an inquiry to federal authorities—would have been

- 11 -

in direct contradiction of the terms of the preliminary injunction. This is true regardless of whether deputies believed to be operating at the direction of federal officers, to the extent that obedience necessitated conduct that violated this Court's Orders. (*See id.*, Ex. B, at 2–3.)

2. **Sheriff Joseph M. Arpaio**

Defendant Joseph M. Arpaio is the head of MCSO, its chief policy maker, and has "final authority over all of the agency's decisions." (Doc. 530 at 6.) Moreover, as a named Defendant, he has been under a duty at all times during this litigation to take such steps as are necessary to reasonably ensure MCSO is in compliance with this Court's Orders. To this end, Sheriff Arpaio received a Notice of Electronic Filing through his lawyer when the injunction was issued. Sheriff Arpaio has confirmed under oath that he was aware of the order when it came out and "discussed it with [his] attorneys." (Doc. 843, Ex. B, at 31–32 (Dep. of Sheriff Joseph M. Arpaio at 65:13–67:20, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) A front-page article published in the Arizona Republic on December 24, 2011, the day after the injunction was filed, corroborates Arpaio's knowledge of the preliminary injunction, noting his intention to appeal it but nevertheless obey its terms in the meantime.[7]

Plaintiffs have proffered evidence that Arpaio failed to take reasonable steps to implement the preliminary injunction's proscriptions. *See Sekaquaptewa*, 544 F.2d at 406. In a related case brought by the U.S. Department of Justice, Sheriff Arpaio stated that he could not recall giving any instructions to ensure his office complied with the preliminary injunction's terms. (Doc. 843, Ex. B, at 32 (Arpaio Dep. at 67:25, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) Plaintiffs have also identified evidence that suggests, to the contrary, Sheriff Arpaio directed operations and promulgated policies that violated the terms of the preliminary injunction. For example the September 21, 2012 press release described above in which MCSO announced ICE's refusal to accept custody over

---

[7] *See* J.J. Hensley, *Judge Curbs MCSO Tactics*, Ariz. Republic, December 24, 2011, at A1.

two Mexican nationals against whom MCSO could bring no criminal charges, Sheriff Arpaio is credited with organizing a "back up plan" in which suspected illegal aliens not taken by ICE would be transferred to Border Patrol: "as directed by the Sheriff," the deputies took the two suspects detained near the Mexico border that could not be arrested to a CBP station. (Doc. 843, Ex. 2 at 7.) The press release further quotes Sheriff Arpaio as saying "Regardless of the Obama Administration['‍]s policy, I am going to continue to enforce all of the illegal immigration laws," (*id.* at 8), despite the preliminary injunction prohibiting him from doing so.

Similarly, according to another MCSO press release, on September 26, 2012 Sheriff Arpaio personally ordered deputies to transport two persons for whom no criminal charges could be brought to Border Patrol after ICE refused to take custody of them. (*Id.*, Ex. 2, at 9 (News Release, Sheriff's Deputies Execute Search Warrant at Construction Company, September 27, 2012).) An additional MCSO press release dated October 9, 2012 again emphasized that it was Sheriff Arpaio's personal directive that deputies detain persons believed to be in the country without authorization but who could not be charged with crimes until they could be transported to Border Patrol agents: "[m]y back up plan is still in place and we will continue to take these illegal aliens not accepted by ICE to the Border Patrol." (*Id.*, Ex. 2, at 11 (News Release, 2nd Time ICE Refuses to Accept Illegal Alien From Sheriff's Deputies Since September, October 9, 2012).)

Sheriff Arpaio's public pronouncements, in conjunction with MCSO's admission that the HSU continued to conduct immigration interdictions as part of its regular law enforcement activities, contextualize his July 12, 2012 trial testimony as reflecting a more problematic enforcement approach than just continuing the LEAR policy on an *ad hoc* basis—which itself violated the preliminary injunction. At trial, Arpaio testified that, despite the federal government revoking MCSO's 287(g) authorization in 2009, he believed his agency "still had the authority, pursuant to a legitimate arrest, to determine that person was here illegally. And then if there was no state charge to book that person into the jail, [to] turn that person over to ICE." (Doc. 572 at 502.) In response to

questioning by defense counsel, Sheriff Arpaio testified to some instances in which MCSO continued to retain custody of individuals who could not be lawfully detained on any criminal charges and attempt to transfer them to federal Border Patrol agents:

> Q:      And you have that authority today [July 24, 2012]. In any of your law enforcement actions can you, if you come across someone unlawful, detain them?
>
> A:      Yes. . . . I think probably in the last two weeks we've made over forty arrests of illegal aliens coming into our county, and a few we did not have the state charge, including some young children, and ICE did accept those people. . . . We haven't had any problem yet turning those that we cannot charge in state court over to ICE.

(*Id.* at 502–03.) From his testimony and other public statements he has made, a prima facie case has been made that Arpaio directed his deputies to carry out immigration enforcement operations and promulgated a policy within MCSO that individuals who could not lawfully be detained on any criminal charges should still be held solely on suspicion of unlawful presence for months after the Court enjoined such practices.

### 3.      Chief Deputy Gerald Sheridan

Sheridan has held the position of MCSO's Chief Deputy since November 2010. (Doc. 840 at 3.) The position is second-in-command in the department and is responsible for supervising all of MCSO's operations on both the enforcement and detention sides. (Doc. 530 at 6.) Neither MCSO nor Sheridan denies that he was a recipient of the e-mail from Timothy Casey to which the December 23, 2011 order was attached. (Doc. 840 at 4.) Nevertheless, in his Memorandum re: Criminal Contempt Sheridan asserts that he was not aware of the preliminary injunction when it was issued and it was not his responsibility to disseminate such information. (*Id.*)

Chief Deputy Sheridan's deposition testimony in *United States v. Maricopa County*, provided by Plaintiffs, appears to be inconsistent with these statements. Under oath, Sheridan indicated that it was his responsibility to communicate the injunction to inferior MCSO officers but that he assumed Executive Chief Sands would "deal with" it. (Doc. 843, Ex. D, at 46–49 (Dep. of Gerard Sheridan at 122:1–125:7, *Maricopa Cnty.*,

- 14 -

No. 2-12-cv-00981-ROS).) Sheridan concedes, however, that he never discussed this purported delegation with Sands. (*Id.*) Neither MCSO nor Sheridan took any steps to ensure MCSO's compliance with the injunction. (Doc. 840 at 4.)

In addition, the Court may evaluate Sheriff Arpaio and Chief Deputy Sheridan's history of non-compliance with respect to other and related orders of this Court in determining whether contempt is merited in this instance. *See Stone*, 968 F.2d at 857.

### 4.     Executive Chief Brian Sands

Before his retirement, Chief Sands was the Chief of Enforcement at MCSO and reported directly to the Chief Deputy. (Doc. 530 at 6.) With respect to the injunction's execution, Sands allegedly understood it to be the attorney's responsibility to communicate the order to his subordinates, but could not confirm whether or not any directives to this effect had actually been given. (Doc. 843, Ex. C, at 43 (Dep. of Brian Sands at 185:12–20, *Maricopa Cnty.*, No. 2-12-cv-00981-ROS).) Therefore, it appears that Executive Chief Sands may also have failed to take reasonable steps to communicate the injunction to the appropriate individuals within MCSO after receiving notice of it from defense counsel.

### 5.     Deputy Chief John MacIntyre

Deputy Chief John McIntyre acknowledges that he received notice of the preliminary injunction from Timothy Casey shortly after its issuance. (Doc. 839 at 3.) He further acknowledges that he did nothing to communicate the existence and/or terms of the order to patrol personnel. (*Id.*) MacIntyre justifies his inaction on the grounds that he believed to be under no obligation to implement the preliminary injunction within MCSO. (*Id.* at 3; Doc. 838 at 2.) However, as Plaintiffs note, there is evidence suggesting that Deputy Chief MacIntyre may bear accountability. In addition to his duties deriving from his rank as a commander, MacIntyre is an attorney who consults with the County Attorney's Office and outside counsel as needed in MCSO's defense. (Doc. 235, Ex. 1, at 12.) Furthermore, in 2009 at least MacIntyre appears to have been a principal contact within MCSO for outside counsel relating to matters involving the Melendres litigation.

1171

(Doc. 235 at 7.) MacIntyre also assumed responsibility for MCSO's disregard of the document retention notice sent to Casey as outside counsel for Defendants, (*see* Doc. 235 at 7–8, Ex. 3, at 3), that resulted in court-imposed sanctions for spoliation of evidence. (Doc. 261.) Thus, at some points over the course of this litigation, MacIntyre has apparently been under just such an obligation to ensure Defendants' compliance with its duties that he now contests. (*See* Doc. 838.)

### 6. Lieutenant Joseph Sousa

Beginning in 2007, Sousa was the unit commander for the HSU. (Doc. 530 at 7.) Lieutenant Sousa was noticed by Timothy Casey of the preliminary injunction and, in his role as a supervisor, had the ability to direct and oversee the routine policing of inferior officers including Deputy Armendariz. Based on the evidence Plaintiffs have presented of persistent immigration interdiction patrols being conducted by the HSU after December 2011, Plaintiffs have sufficiently demonstrated that Lieutenant Sousa may not have taken all reasonable steps as required to ensure the injunction was being complied with by line officers in his division.

------------------------

Defendants, joined by the specially appearing non-parties, argue that they had no fault for the deficiencies that resulted in the preliminary injunction not being shared with officers, citing "a lack of communication throughout the department." (Doc. 842 at 14, 18.) This argument lacks merit. Apart from the evidence in the record that MCSO and Sheriff Arpaio have had no difficulty communicating their enforcement priorities throughout the department, the nature of an injunction is such that compliance is mandatory even if it requires some effort by the party bound; the standard by which a party's efforts to comply are judged is one of reasonableness. *See Sekaquaptewa*, 544 F.2d at 406.

Rather than offering evidence that any reasonable steps were undertaken to encourage compliance with the injunction, Defendants insist that their subsequent "good faith" efforts to disseminate the terms of the May 2013 permanent injunction to MCSO

1172

personnel should excuse their noncompliance with the previous order. (Doc. 842 at 19.) As has been previously noted, bad faith is not a prerequisite to a finding of civil contempt. *Stone*, 968 F.2d at 856. Further it does little to ameliorate the harms incurred by the Plaintiff class in the seventeen months after the injunction was issued that in 2013—pursuant to a subsequent order—Defendants "implemented a new policy . . . to ensure all deputies received proper training and guidance to ensure compliance with the Court's Order." (*See* Doc. 842 at 19.) The history of MCSO's compliance with the permanent injunction, which incorporated and extended the terms of the preliminary injunction, does not illustrate good faith on the part of MCSO; rather, it illustrates and justifies, in part, the very necessity of this Order to Show Cause.

In evaluating the appropriateness of a contempt order, Defendants' record of compliance and non-compliance with this Court's previous orders may be considered. In March and April 2014, the Court held several hearings to address misrepresentations of its orders by multiple high-ranking MCSO officials, including Sheriff Arpaio and Chief Deputy Sheridan. (*See* Docs. 662, 672.) Sheridan, in addition to describing the permanent injunction as "ludicrous," averred that attorneys had informed him the Court's May 2013 order was unconstitutional—a statement that he later repudiated in a hearing before this Court. These hearings also confirmed that other MCSO command staff members, without having read this Court's orders, were repeating Sheridan's mischaracterizations to members of the general public. Sheriff Arpaio and Chief Deputy Sheridan both apologized to the Court, and agreed to sign and promulgate a corrective statement within MCSO. After the text of the statement was drafted by both parties and submitted to the Court for approval, however, Sheriff Arpaio rescinded his assent to sign and distribute it. In the end, the Court coerced the statement's transmission to and signature by all MCSO law enforcement personnel, other than Sheriff Arpaio or Chief Deputy Sheridan, via court order under the Monitor's supervision. (Doc. 680.) The Defendants' compelled circulation of the memorandum correcting their previous contemptuous mischaracterizations of this Court's orders, therefore, is not an example of past

- 17 -

compliance and in no way mitigates the need for the present hearings.

### B.    Pre-Trial Discovery Violations

The Federal Rules of Civil Procedure require parties to reasonably and diligently respond to discovery requests. As the Advisory Committee explains, "[i]f primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." Fed. R. Civ. P. 26(g) (Advisory Committee Notes); *cf. Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958-B, 2010 WL 1336937 (S.D. Cal. Apr. 2, 2010) (discussing the good faith and professional obligations inuring to litigants and counsel to search for and produce responsive documents). In addition to Rule 37, the Court possesses inherent powers to punish misconduct in discovery proceedings by an order finding the offending person in contempt. Fed. R. Civ. P. 37(d); *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Individuals who are not parties to a lawsuit may be held in contempt for their noncompliance with a discovery order. *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 79 (1988).

During the pre-trial phase of litigation Plaintiffs submitted a number of formal discovery demands, including requests for admissions, requests for documents, and interrogatories, for records on MCSO's traffic stops:

> Describe all documents that an MCSO officer may request, review, reference or create during, or as a result of, a Routine Traffic Stop, including the purposes of each document identified and the factors that guide the exercise of an officer's discretion, if any, to request such documents from a driver or passenger.

(Pls.' 1st Set Interrogs. at 5.)

> If incident histories or summaries of the traffic stops conducted in the above-listed operations are not contained with MCSO's computer aided dispatch (CAD) database that was produced to Plaintiffs, please explain in detail: (1) what documents would reflect those traffic stops; (ii) how such documents are created and maintained; and (iii) who would have access to, or control over, those documents.

(Pls.' 2d Set Interrogs. at 4.)

> [Produce] [a]ll documents relating to all traffic stops performed by every MCSO supervisor, officer, posse member or volunteer for years 2005 to present that may include one or more of the following [information][8] . . . [and] [a]ll documents relating to MCSO's policies, practices, instructions, or training pertaining to traffic stops of any type. . . .

(Pls.' 1st Req. Produc. at 7–8.)

> [Produce] [a]ll documents relating to MCSO's Human Smuggling Unit, Illegal Immigration and Interdiction Unit . . . or volunteer posses as they pertain to . . . MCSO's enforcement of federal immigration law, state immigration law . . . and [t]he performance of Routine Traffic Stops.

(*Id.* at 9.) The term "document" was defined broadly by Plaintiffs to include all

> matters, instruments or other tangible things, including any electronically stored information ("ESI") contained on computer diskette or other media, within the scope of Federal Rules of Civil Procedure 26 and 34, including, without limitation: any and all correspondence, memoranda, complaints, grievances, citations, booking papers, arrestee statements, arrest reports, incident reports, field reports, departmental reports, disciplinary reports or "write-ups," draft reports, preliminary reports, final reports and underlying materials, witness statements, witness interview summaries, field interrogation cards, meeting minutes, meeting agendas, notes of meetings, bulletins, written briefings, intra- and interoffice communications, including CAD and MDT reports, policies, manuals, training materials, books of account, worksheets, desk diaries, appointment books, daily logs, end-of-shift logs, expense accounts, and records of every type and description, all written, recorded and graphic matter of every type and description, electronic mail, electronic databases, radio logs, recordings, transcriptions of recordings, notes of conversations, telegraphic communications, pamphlets, schedules, studies, books, computer printouts, photographs and photographic records, maps, charts, tapes (including video tapes), transcriptions of tapes, and any other device or medium on or through which

---

[8] The location, time and duration of the stop; The specific reason(s) or justification(s) for the stop; any and all details about the vehicle, such as plate number, make, model and year; The names of driver(s) and passenger(s); The age, gender and race or ethnicity of the driver(s) and passenger(s); Whether any driver or passenger was questioned, warned, cited, searched, arrested, detained or investigated and the reason(s) therefor; The specific questions asked of driver(s) and passenger(s); Any database checks run on the driver(s), passenger(s) or vehicle; Whether a search was conducted and the basis therefor; If searched, whether any contraband was found; and Whether any driver or passenger was referred to, held for, or subsequently transferred to the custody of ICE and the reason(s) therefor. (Pls.' 1st Req. Produc. at 7–8.)

- 19 -

information of any type is transmitted, recorded, or preserved. The term "document" also means every copy of a document where such copy is not an identical.

(*E.g.*, *id.* at 3–4.) Despite these requests, Defendants apparently never disclosed to Plaintiffs that (1) some—if not the majority—of MCSO deputies had audio-recording devices issued to them as a matter of policy; (2) such audio-recording devices were in use during the relevant discovery periods; (3) at least some MCSO deputies had body- and/or vehicle-mounted video-recording devices issued to them during the relevant discovery periods; (4) at least some MCSO deputies recorded their on-duty activities with privately purchased video equipment during the relevant discovery periods; (5) HSU procedures apparently required some video recordings of traffic stops to be made; (6) HSU maintained a catalog of DVDs containing recordings of traffic stops by officers; and (7) at least some MCSO deputies had video cameras issued to them as a supervisory measure to monitor their on-duty activities. Defendants apparently never identified nor produced to Plaintiffs the associated physical copies of these audio and video recordings. In addition, dozens of personal identifications and items of personal property have been found in offices previously used by the HSU and elsewhere, along with a number of boxes of written reports pertaining to HSU operations. There is also no evidence that they were ever provided to the Plaintiffs as part of Defendants' pre-trial discovery obligations in this matter.

These materials appear to be relevant both to the merits of Plaintiffs' civil rights claims and for impeachment purposes, and their production prior to trial may have led to the admission at trial of evidence of additional infringements suffered by the Plaintiff class as a result of MCSO's actions. Such evidence may have resulted in a broader scope of injunctive relief ultimately entered by this Court. MCSO leadership has acknowledged that officers—both within the HSU and in other units—were regularly making audio recordings of their traffic stops pursuant to departmental practice and that some deputies even videotaped their traffic stops using devices purchased by MCSO for such purpose. (Doc. 700 at 21, 23–24.) There is also evidence that MCSO officers routinely confiscated

- 20 -

items of personal property from members of the Plaintiff class during periods that were either subject to discovery disclosure and/or during the time that the MCSO was violating the preliminary injunction. Plaintiffs have sufficiently demonstrated the likelihood that Defendants had at least some of this knowledge at a time in which they had an obligation under the Federal Rules of discovery to disclose it. For these reasons, Defendants MCSO and Sheriff Arpaio are ordered to show cause why the non-disclosure of this evidence does not constitute a contemptuous violation of Defendants' pre-trial discovery obligations.

In addition to the named Defendants, Deputy Chief MacIntyre is also ordered to show cause why he should not be held in contempt for abetting Defendants' discovery violations. MacIntyre has already once borne responsibility for evidence spoliation at an earlier stage in this litigation: in July 2008, counsel for Plaintiffs wrote a letter to Timothy Casey demanding the preservation of all MCSO records that had to do with immigration patrols since the initial putative class action complaint was filed and any subsequent crime suppression operations. Deputy Chief MacIntyre is an attorney who also served as Casey's contact within MCSO at this time and admitted that he "simply, albeit regrettably, forgot to forward [the demand for documents] to others at the MCSO. . . ." (Doc. 235, Ex. 3, at 3.) In an affidavit, MacIntyre explained that his

> standard practice upon receiving requests for the production of MCSO documents in litigation or requests to preserve MCSO documents in litigation . . . [is] to forward such requests for handling to the MCSO Legal Liaison Division, and the appropriate personnel within the MCSO that . . . may have documents potentially responsive to the particular request.

(*Id.* at 2–3.) His statements as to the role he played in MCSO's discovery process are sufficient evidence that he may also have been responsible for Defendants' failure to disclose the evidence at issue now.

## C.   Failure to Cooperate with May 14, 2014 Oral Orders

The third ground on which Plaintiffs assert that Defendants should be ordered to show cause relates to Defendants' non-compliance with the Court's May 14, 2014

- 21 -

Orders. In sealing the hearing in which the Armendariz evidence was disclosed, the Court commanded that the information discussed therein be kept confidential. (Doc. 700 at 7, 50–51, 69.) The Court then directed Defendants to "quietly" develop an evidence collection protocol to retrieve outstanding recordings, such as those made by Armendariz, that were in the possession of patrol deputies. (*Id.* at 25–27.) The following persons are ordered to show cause why their conduct subsequent to this hearing did not constitute contempt of Court:

### 1.    Maricopa County Sheriff's Office

The Maricopa County Sheriff's Office is responsible for its leaders' apparent sharing of confidential information discussed under seal with non-participants, in contravention of this Court's order. At the hearing, both MCSO and the Court acknowledged the need for confidentiality to preserve the efficacy of an ongoing criminal investigation and to discourage the destruction of evidence by culpable parties within MCSO. (*Id.* at 5, 22–23.) In the early afternoon, Deputy Chief Trombi was summoned into a meeting that included Sheriff Arpaio, Chief Deputy Sheridan, and MCSO's attorneys and directed to e-mail division commanders about collecting past video recordings of patrol operations. (Docs. 795, Attach. 1, at 4; Doc. 803 at 59.) Neither Trombi nor any of the twenty-seven MCSO commanders he subsequently notified by memorandum were present at this hearing.

The resulting e-mail from Trombi to division commanders, and the survey-approach strategy of collecting the recordings described in the e-mail and ultimately employed by MCSO, also apparently constituted disobedience to the Court. During the hearing, the Court indicated that what it expected from MCSO with respect to a video-retrieval course of action

> is a thought-through plan that is executed very quickly, because this is all, likely, already through part of the department, in which you can quietly gather up such material, such data, and that you can determine where it was held, when it was held, and if any particular officer says it was deleted, when that deletion occurred, and from where. Or destruction, if it was held on DVDs like Armendariz's.

1178

(Doc. 700 at 27.) At numerous points the Court discussed the Monitor's involvement in the development of a retrieval plan,[9] and near the end of the hearing the Court concluded,

> I'm going to direct the monitor to work with you on a plan *that he can approve* that's your best thinking about how you can, without resulting in any destruction of evidence, gather all the recordings, and then based on what you find, and/or maybe beginning before you can assess what you find, depending upon your thoughts, you result in an appropriate and thorough investigation.

(*Id.* at 41 (emphasis added).) Tim Casey, representing MCSO, affirmatively stated that the investigation was within the "purview" of the Monitor's authority: "[W]e agree that Bob Warshaw and his team, because of the Armendariz material, have the need, as an officer of the Court, to investigate those matters." (*Id.* at 39–40.) In the end, the executive leaders of MCSO and their legal counsel pursued an independent plan without consulting the monitoring team, communicated that plan to subordinate personnel, and failed to inform the Monitor at the first available opportunity that they had done so. Chief Deputy Sheridan and Christine Stutz, another attorney for MCSO who had been present during the earlier meeting with Trombi, later met with the monitoring team for several hours discussing investigative strategies for retrieving outstanding recordings without mentioning that a contrary decision had already been reached and implemented.

### 2.        Sheriff Joseph Arpaio

Sheriff Arpaio, a named Defendant in this case, was present at the hearing in which the Court ordered MCSO to develop a plan to comprehensively collect any outstanding recordings of traffic stops while minimizing the risk of evidence destruction. He was also apparently present at the meeting in which Deputy Chief Trombi was instructed by Chief Deputy Sheridan to e-mail commanders. In clear terms, the Court ordered Arpaio to take "full and complete steps to investigate who may have been aware

---

[9] (*See, e.g.*, Doc. 700 at 27 ("I will have my monitor work with you to develop a pro—if you want his assistance."); *id.* at 29 ("[D]o your best, and I mean your level best, come up with a plan, review it with the monitor if you will, if you need to, to recover all of that data.").)

- 23 -

that this activity was going on, no matter how high up the chain it goes," and "to be involved in the supervision and the understanding and the direction of . . ." such investigations. (*Id.* at 37.) Arpaio assented, and further acknowledged the role the Monitor would play:

| The Court: | All right. And you will cooperate completely with my monitor. |
| Arpaio: | Yes, I— |
| The Court: | And no information will be withheld from him. . . . You will cooperate with the monitor, Sheriff? |
| Arpaio: | Yes. If we have some differences . . . we will bring that forward and try to alleviate any problems. |
| The Court: | And do that in a timely fashion. But with–to me. But in the meantime, I believe that all records and all activity pursuant to any of these investigations is under his authority. And Mr. Casey, if you have any problem with that, it's time to let me know now. |
| Casey: | No. |

(*Id.* at 38–39.) Despite his statements to the Court, Sheriff Arpaio apparently failed to take such steps as were necessary to ensure MCSO was in compliance with this Court's May 14, 2014 orders as they related to evidence collection and administrative oversight. As MCSO's elected leader, Arpaio may delegate the authority vested in him by the residents of Maricopa County to his subordinates. Ultimately, however, he must bear responsibility for any deficiencies on their part that causes MCSO as an agency to violate this Court's directives.

### 3.    Chief Deputy Gerald Sheridan.

Chief Deputy Sheridan was also present at the May 14 hearing. Apparently at the direction of Sheriff Arpaio, Sheridan bore primary responsibility for collecting outstanding recordings and investigating MCSO personnel implicated by the tapes as having engaged in problematic police practices. (*Id.* at 37, 40.) Sheridan has admitted that, despite the sealed nature of the hearing and his admonition that he would work with

the Monitor, (*see id.* at 42), he instructed Deputy Chief Trombi to send the e-mail to commanding officers that countermanded the Court's order and preemptively undermined the arrangement subsequently agreed to in consultation with the monitoring team. (Doc. 803 at 59.)

## III.   Remedies

Civil contempt sanctions are imposed to coerce obedience to a court order, or to compensate injured parties for harm resulting from the defendant's contemptuous behavior, or both. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994). Given the remedial purpose of the sanction, a finding of civil contempt should be accompanied by conditions by which the contempt judgment may be purged. *United States v. Bright*, 596 F.3d 683, 696 (9th Cir. 2010). In contrast, a criminal contempt proceeding punishes intentional disobedience with a judicial order and, thus, vindicates the authority of the court. *Bagwell*, 512 U.S. at 828. The crime of contempt is completed when the contumacious conduct occurs, regardless of whether the subject later complies with the order he or she violated. The same conduct may give rise to both civil and criminal contempt. *Rylander*, 714 F.2d at 1001.

It is the Court's expectation that these contempt proceedings will allow for the development of an evidentiary record sufficient for the Court to evaluate whether it can fashion an appropriate judicial response that vindicates the rights of the Plaintiff class, and whether other remedies may be appropriate. To this end, the Parties have proposed a number of suggestions for providing remuneration to the individuals harmed by Defendants' violations of the injunction and/or an award of damages to the Plaintiff class as a whole. (Doc. 843 at 22–25.) However, the feasibility of these measures remains to be seen: Defendants have cautioned, for example, that the compensatory purpose of civil contempt could prove impractical under the circumstances. (Doc. 842 at 17; Doc. 858 at 30.) The viability of crafting suitable civil relief for each of the grounds on which contempt is charged will be of chief interest to the Court if Defendants, or their subordinates, are ultimately adjudged to be in contempt of court.

**CONCLUSION**

Based upon the foregoing facts, Plaintiffs have set forth sufficient evidence that MCSO and the aforementioned individuals acted in contempt of this Court's "lawful writs, processes, orders, rules, decrees, or commands" by (1) failing to implement and comply with the preliminary injunction; (2) violating their discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders. *See* 18 U.S.C. § 401(3).

After an appropriate hearing, the Court will determine whether these individuals have committed contempt of court and the sanctions for any such violations. In conjunction with this Order to Show Cause, an order has also been filed granting Plaintiffs' requests for expedited discovery in anticipation of an evidentiary hearing in these matters.

**IT IS THEREFORE ORDERED** setting an evidentiary hearing for **April 21, 22, 23, and 24, 2015.** Proceedings will begin daily at **9:00 a.m.** in Courtroom 602 of the Sandra Day O'Connor Courthouse at 401 W. Washington Street, Phoenix, Arizona 85003.

**IT IS FURTHER ORDERED** that the following parties are to appear before the Court and show cause, as indicated, why the Court should not impose sanctions on them pursuant to 18 U.S.C. § 401 and/or Federal Rule of Civil Procedure 37(d): the Maricopa County Sheriff's Office, Sheriff Joseph Arpaio, Chief Deputy Gerald Sheridan, Executive Chief (ret.) Brian Sands, Deputy Chief John MacIntyre, Lieutenant Joseph Sousa.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1      **IT IS FURTHER ORDERED** that the Clerk of the Court is **DIRECTED** to

2 submit a copy of this Order to Show Cause to the United States Marshal for service upon

3 the following: the Maricopa County Sheriff's Office, Joseph Arpaio, Gerald Sheridan,

4 Brian Sands, John MacIntyre, and Joseph Sousa. A copy of this Order shall also be

5 provided to the United States Attorney for the District of Arizona.

6      Dated this 12th day of February, 2015.

7

8                            Honorable G. Murray Snow

9                            United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1183



**EXHIBIT 19**

1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                        FOR THE DISTRICT OF ARIZONA
8

9   Manuel de Jesus Ortega Melendres, on          No. CV-07-2513-PHX-GMS
    behalf of himself and all others similarly
10  situated; et al.                              **ORDER GRANTING STIPULATION
                                                  TO AMEND SUPPLEMENTAL/
11                   Plaintiffs,                   PERMANENT INJUNCTION/
                                                  JUDGMENT ORDER**
12  v.

13  Joseph M. Arpaio, in his individual and
    official capacity as Sheriff of Maricopa
14  County, AZ; et al.

15                   Defendants.

16
17       The Court, having reviewed the Stipulation to Amend Supplemental/Permanent

18  Injunction/Judgment Order (Doc. 747) and good cause appearing,

19       **IT IS HEREBY ORDERED** that the Stipulation is granted as follows:

20       1.      Paragraph 61 of the Court's October 2, 2013 Supplemental/Permanent

21  Injunction/Judgment Order (Doc. 606) is amended as follows:

22       The MCSO will ~~install~~issue functional video and audio recording equipment to all

23  patrol deputies and sergeants who ~~in all traffic patrol vehicles that~~ make traffic

24  stops, and shall commence regular operation and maintenance of such video and

25  audio recording equipment. ~~MCSO shall prioritize the installation of such~~

26  ~~equipment Specialized Units that enforce Immigration Related Laws, and~~ Such

27  ~~installation~~ issuance must be complete within 120 days of the approval of the

28  policies and procedures for the operation, maintenance, and data storage for such

on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. ~~MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date.~~ Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.

2.    In addition, the word "in-vehicle" should be struck from the first sentence of Paragraph 62 of the Court's October 2, 2013, Order.

3.    The first sentence of Paragraph 57 of the Court's October 2, 2013, Order should be amended to replace the term "in-vehicle" with "on-person."

4.    Paragraph 1(r)(xv) of the Court's October 2, 2013, Order is amended as follows:

The MCSO has developed and implemented a system for the audio and video recording of traffic stops and a protocol for reviewing the recordings pursuant to Paragraphs 61–63 of this Order with the understanding that Full and Effective Compliance may be achieved once all ~~traffic patrol vehicles~~ patrol deputies and sergeants who ~~that~~ make traffic stops ~~used by Specialized Units~~ have been ~~mounted with the~~ issued on-person audio and video equipment~~, so long as the remaining vehicles are timely equipped with the audio and video equipment~~ and have been properly trained on the use of such equipment according to the requirements of those Paragraphs.

5.    The last sentence of Paragraph 63 of the Court's October 2, 2013 is substituted as follows:

MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to review by the District Court, to govern proper use of the on-person cameras; accountability

- 2 -

1185

measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiffs' counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras."

Dated this 10th day of October, 2014.

G. Murray Snow
United States District Judge

- 3 -



*EXHIBIT 20*

1
2
3
4
5
6      **IN THE UNITED STATES DISTRICT COURT**
7          **FOR THE DISTRICT OF ARIZONA**
8

| | |
|---|---|
| 9   Manuel de Melendres, et al., | No. CV-07-02513-PHX-GMS |
| 10         Plaintiffs, | **ORDER** |
| 11   v. | |
| 12   Maricopa, County of, et al., | |
| 13         Defendants. | |

14       Pending before this Court is Plaintiffs' Motion for Award of Attorneys' Fees and

15 Related Non-Taxable Expenses (Doc. 608).  As prevailing parties on their civil rights

16 claims, Plaintiffs qualify for an attorneys' fees award under the statute.  Defendants do

17 not contest that the Plaintiffs are so entitled.  Further, both Plaintiffs and Defendants

18 acknowledge that the "lodestar" method is the customary means used to calculate a

19 reasonable fee award.  *Morales v. City of San Rafael,* 96 F.3d 359, 363 (9th Cir. 1996).

20 Under that method of calculation, however, Defendants contest the hourly rates charged

21 by Plaintiffs' attorneys.  They further challenge the number of hours for which Plaintiffs'

22 attorneys seek to recover contending that they were not "reasonably expended" on the

23 case.

24     **1.**    **Hourly Rates**

25       "Generally, when determining a reasonable hourly rate, the relevant community is

26 the forum in which the district court sits. . . . '[R]ates outside the forum may be used if

27 local counsel was unavailable, either because they are unwilling or unable to perform

28 because they lack the degree of experience, expertise, or specialization required to handle

1   properly the case.'" *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 979 (9th Cir. 2008)

2   (quoting *Barjon v. Dalton,* 132 F.3d 496, 500 (9th Cir. 1997)).  Defendants contend that

3   in determining and awarding a reasonable hourly rate this Court should apply the

4   *Economics of Law Practice* published in 2013 concerning prevailing billing rates in

5   Maricopa County, Arizona.

6                    **a.      Covington & Burling**

7            Upon the withdrawal of Steptoe & Johnson from the Plaintiffs' representation, the

8   local ACLU and the ACLU Foundation Immigration Project ("the Project") made a

9   number of unsuccessful efforts to engage law firms in Maricopa County and southern

10  California to take over the Plaintiffs' representation.  Yet, as no party seems to contest,

11  and as no party could credibly contest, taking on a lawsuit of this size required a firm to

12  venture a large amount of resources to preparation and trial.  No local law firm either was

13  able or willing to undertake that level of commitment.  Hence, the closest firm both

14  capable and willing to undertake such an endeavor that Plaintiffs could locate was the

15  Silicon Valley, California office of Covington & Burling.  Thus, in this case, the Court

16  will base its award to Covington & Burling on what the Court believes to be Silicon

17  Valley rates that are reasonable under the circumstances.

18          The Court recognizes that Covington incurred a substantial risk of receiving no

19  reimbursement for its services in agreeing to undertake this case.  Covington also frankly

20  avowed, however, that it does, on occasion, charge clients rates that are lower than its

21  standard billing rates for matters in which significant amounts will be billed.  This is

22  certainly such a case.  Covington further acknowledged that it used this lawsuit to

23  provide its younger lawyers with experience in trial preparation and at trial, and that it

24  might not have always passed on such expense to a paying client at standard billable

25  rates.  While the Court commends Covington for providing training to young attorneys,

26  and is convinced that the services of those attorneys provided value that should be

27  compensated in this matter, the Court has made some slight downward adjustments in

28  Covington's billing rates to reflect the above realities.  Understandably, because the

1188

representation lasted for a considerable time, the timekeeper's rates often rose as did their level of experience.  The Court in setting the rates of reimbursement, took into account the value of experience and the rising rates of the attorneys, but also for the reasons reflected above, did not always make a correspondingly concomitant raise in rates.  Thus, the Court assigned to Covington's timekeepers billable rates at the following rates of pay[1]:

| Employee | Year(s) | Rate |
|---|---|---|
| Stanley Young | 2010–2011 | $630 |
| | 2012–2013 | $650 |
| Andrew C. Byrnes | 2010–2012 | $550 |
| | 2012–2013 | $570 |
| Lesli A. Rawles Gallagher | 2010 | $350 |
| | 2010–2011 | $375 |
| | 2012 | $400 |
| | 2013 | $425 |
| David R. Hults | 2012–2013 | $375 |
| Precilla C. Mandujano | 2012–2013 | $175 |
| Seth F. Kalman | 2010–2012 | $175 |
| Tammy Albarrán | 2010–2011 | $500 |
| | 2012–2013 | $550 |
| Krzysztof Bebenek | 2011–2012 | $300 |
| Stephen C. Chien | 2010–2011 | $450 |
| Kevin J. Hickey | 2010 | $300 |
| | 2010–2011 | $330 |
| Bhanu K. Sadasivan | 2010–2011 | $430 |
| | 2012 | $475 |
| Matthew J. Steilen | 2010 | $310 |
| | 2010–2011 | $340 |
| Paul N. Watkins | 2010 | $350 |
| | 2011 | $360 |
| Romeo B. Berana | 2010 | $175 |
| Ellen D. Chiulos | 2010 | $175 |
| Rohna R. Houston | 2010–2012 | $175 |
| Julie R. Romanow | 2010–2013 | $175 |

---

[1] The chart in Exhibit G also includes time entries from timekeepers Joel M. Frozena, Paul C. Saunders, Jeannie Lieu, and Joshua Hurwit that appear to have been included in the total fee requested. These were all small entries for a few hours per individual. Covington did not list these individuals in its brief or explain their role, and it indicated it was only seeking recover for fees from the described members. (Doc. 639-5.) Therefore, the fees for these four individuals are not awarded.

| Kim M. Sydorak | 2011–2012 | $175 |
| Emily D. Doan | 2010–2011 | $175 |
| Jacqueline K. Trinh | 2010 | $175 |
| Daisy Chen | 2010 | $110 |
| Cheryl A. Lam | 2012 | $50 |
| Maria Chavez | 2012 | $135 |
| Pierre E. Kressmann | 2011 | $175 |
| Benjamin E. Suess | 2010–2013 | $175 |
| Anthony V. Pazelt | 2010 | $175 |

**b.      The ACLU Foundation Immigrant Rights Project**

Considerations of a somewhat different nature apply to considering the appropriate legal rate of the ACLU Immigrant Rights Project ('the Project") and its lead counsel Cecillia Wang.  The Project is based in San Francisco and has discretion in the cases in which it chooses to intervene nationwide.   The Project, of course, did not need to intercede in Arizona if it did not believe the rates it would likely be awarded justified the intervention.   Nevertheless, the Court doubts that the Project determines whether to provide representation in a case primarily with reference to the amount of a possible fee award.  This case presented issues of immigrants' rights in which the Project has acquired demonstrated experience, expertise and specialization at a level that is otherwise unavailable in Maricopa County.  It provided significant value to the Plaintiff, both at and before trial. The Court will thus award the Project's attorneys' fees based on the Court's determination of what is a reasonable San Francisco rate which will be slightly adjusted for the comparative experience and rates of other attorneys on the Plaintiffs' team, and the value that the Court determined was provided by the Project's Counsel.

| Employee | Year(s) | Rate |
|---|---|---|
| Cecillia D. Wang | 2009 | $600 |
| | 2010–2011 | $620 |
| | 2012–2013 | $650 |
| | Adjusted Average[2] | $635 |

[2] The Adjusted Average is the rate the Court used to multiply by the total of Ms. Wang's hours for all years.  Although the Court has assigned hourly rates per year, the Project did not provide subtotals of the hours spent in each year.  The Adjusted Average was determined by calculating the average proposed hourly rate from the total fee and hours submitted, and then creating the Adjusted Average based on the adjusted yearly

- 4 -

1190

| | | |
|---|---|---|
| Andre I. Segura | 2011–2013 | $350 |

**c.     Mexican American Legal Defense and Educational Fund**

Plaintiffs were also represented in this action by attorneys from the Los Angeles Regional Office of the Mexican American Legal Defense and Educational Fund ("MALDEF").  MALDEF is a national nonprofit legal organization that specializes in civil rights impact litigation on behalf of Latinos in the areas of education, employment, political access and immigrants' rights.  It was, therefore, understandably interested in this lawsuit as it pertained to areas of MALDEF's special interest.  MALDEF has represented the Plaintiffs from the inception of this case.  While the expertise that MALDEF brought to the benefit of the Plaintiff class may be in many respects duplicative of the benefit provided to the Plaintiffs by the attorneys of the Project to the extent that it related to immigrants' rights, Defendants do not contest that MALDEF has expertise representing the political rights of Latinos, nor do they contest that this lawsuit presented important issues related to the disparate treatment of members of the Plaintiff class due to their ethnicity.  Any adjustments in the overall fee to be paid to all of the attorneys made by the Court due to their overlapping expertise, will be deducted in considering the overall reasonableness of the hours billed by the Plaintiffs' attorneys, and not in sharply adjusting legal rates.  It is appropriate under these circumstances for the Court to award MALDEF's fees based on its determination of what is a reasonable Los Angeles rate, especially when the rates sought by MALDEF are lower than those sought by the Northern California firms.

| Employee | Year(s) | Rate |
|---|---|---|
| Nancy Ramirez | 2010 | $500 |
| | 2011 | $525 |
| | 2012–2013 | $550 |
| Martha Torres | 2010 | $125 |

**d.     ACLU Foundation of Arizona**

The ACLU Foundation of Arizona is a small operation and was unable to handle

rates actually awarded.

- 5 -

this lawsuit without the assistance of other counsel.  Nevertheless, it did have counsel that provided significant and valuable work on this case.  Those counsel will be reimbursed at Maricopa County rates.

| Employee | Year(s) | Rate |
|----------|---------|------|
| Dan J. Pachoda | 2008–2013 | $350 |
| Kelly J. Flood | 2012 | $300 |
| Anne Lai | 2008–2009 | $175 |
| | 2010 | $260 |
| | 2011 | $275 |
| | 2012 | $300 |
| | 2013 | $310 |
| James Duff Lyall | 2011–2012 | $175 |
| Gloria A. Torres | 2011–2013 | $150 |

**2.    Reasonableness of Hours Billed**

With multiple attorneys from multiple entities representing the plaintiffs on this case, there was some significant overlap among the various counsel in Plaintiffs' preparation and litigation of this case.  As several examples offered by the Defendants demonstrate, the participation of multiple parties in the trial proceedings, and some of the significant matters proceeding to trial, resulted in expenses that while, perhaps understandable, were more than is reasonable and more than should be borne by Defendants.  For example, despite the limited number of witnesses in this case, nine different attorneys appeared at trial for the Plaintiffs.  Further, expenses on the pre-trial briefings were excessive even given the desire to obtain the expertise of various attorneys on this matter.  Further, there was some duplication of expense that occurred within Covington & Burling, which during the course of this lawsuit introduced a number of different attorneys to this case.

It is appropriate for a court to reduce the lodestar for duplicative work.  *Chemical Bank v. City of Seattle (In re Wash. Publ. Power Supply Sys. Sec. Litig.)*, 19 F.3d 1291, 1298 (9th Cir. 1994).  The parties indicated at oral argument that the request is a joint one, and that they should all bear the expense of any excessive duplication.  The Court, therefore has reviewed the invoices and made its best calculation of the amount of the

- 6 -

1  overlap and has reduced by 20% the hours billed by all counsel to account for excessive

2  or duplicative work.

3       **3.**    **Costs**

4       The costs sought are similarly reduced by 20% to avoid unnecessary duplication in

5  the fee caused by the multiple counsel involved in the litigation for the same reasons as

6  set forth above.

7       This award covers fees incurred by the parties up and through October 2, 2013 and

8  is without prejudice to further requests by Plaintiffs as was further set forth at the hearing

9  on this Motion.  For the reasons stated above the Court grants Plaintiffs' Motion.

10       **IT IS THEREFORE ORDERED** granting the Motion for Attorney Fees and

11  Related Non-Taxable Expenses (Doc. 608) and awards the following amounts to the four

12  Plaintiffs' counsel as follows:

13
14       1.    Covington & Burling, $3,304,038.80 in attorney's fees and $150,036.16 in

15  non-taxable expenses for a total of $3,454,074.96;

16       2.    The Project, $420,331.92 in attorney's fees and $8,954.78 in non-taxable

17  expenses for a total of $429,286.70;

18
19       3.    MALDEF, $159,678.00 in attorney's fees and $7,670.62 in non-taxable

20  expenses for a total of $167,348.62;

21       4.    ACLU of Arizona, $383,356.40 in attorney's fees and $5,174.98 in non-

22  taxable expenses for a total of $388,531.38.

23       Dated this 11th day of September, 2014.

24

25  _A. Murray Snow_

26  _____

27  G. Murray Snow
   United States District Judge

28



**EXHIBIT 21**

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., | No. CV-07-02513-PHX-GMS |
| Plaintiffs, | **SUPPLEMENTAL PERMANENT INJUNCTION/JUDGMENT ORDER** |
| v. | |
| Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al., | |
| Defendants. | |

## <u>BACKGROUND</u>

On May 24, 2013, the Court issued Findings of Fact and Conclusions of Law after conducting a bench trial in this matter. (Doc. 579.) The Court held that Defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

The Court permanently enjoined Defendants from the following:

(1) Detaining, holding or arresting Latino occupants of vehicles based on a reasonable belief, without more, that such persons are in the country without authorization;

(2) Following or enforcing its "LEAR" policy, as currently written, against any Latino occupant of a vehicle in Maricopa County;

(3) Using race or Latino ancestry as a factor in determining whether to stop any vehicle;

(4) Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle may be in the country without authorization;

(5) Detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of the vehicle's occupants have committed or are committing a violation of federal or state criminal law;

(6) Detaining, holding, or arresting Latino occupants of a vehicle for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that the necessary elements of the crime are present; and

(7) Detaining, arresting, or holding persons who are occupants of motor vehicles based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

After issuing the injunctions, the Court held a status conference with the Parties on June 14, 2013. (Doc. 582.) The Parties desired to negotiate the terms of a consent decree to ensure Defendants' compliance with the injunctions. On August 16, the Parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement, and terms on which they could not agree. (Doc. 592.) The Court held a hearing on August 30 at which it discussed both the terms agreed upon and the disputed terms with the Parties. (Doc. 599.) As a result of the trial and the subsequent proceedings, the Court orders the following supplemental injunctive relief.

## REMEDIES

### I.     DEFINITIONS

1.     The following terms and definitions shall apply to this Order:

   a.   "Boilerplate" means language that is stock, formulaic, appears repeatedly in different reports, and fails to attest to the unique facts of an incident;

   b.   "CAB" means the Community Advisory Board;

   c.   "CAD" means  "Computer Aided Dispatch," the electronic system that tracks communications between MCSO deputies and dispatch while on patrol;

   d.   "CBP" means U.S. Customers and Border Protection;

1195

e.  "Complainant" means any person, including a member of the public, MCSO deputy, detention officer, civilian employee, or posse member, who makes a complaint against MCSO;

f.  "Complaint" means any allegation of improper conduct made by a member of the public or MCSO personnel regarding MCSO services, policy or procedure, that alleges dissatisfaction with or misconduct by MCSO personnel;

g.  "Order" means this Order;

h.  "County" means Maricopa County, including its agents and employees;

i.  "Court" means the United States District Judge for the District of Arizona presiding over this case;

j.  "Defendants" means defendants in the above-captioned action, i.e., Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, and the MCSO;

k.  "Deputy" or "deputy" means any sworn law enforcement officer employed by or working for MCSO, including Supervisors, patrol and reserve officers;

l.  "Discipline" means a personnel action for violation of any law, regulation, rule, or MCSO policy, including, but not limited to, an admonishment, written reprimand, suspension, demotion or termination;

m.  "Discriminatory Policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on a person's actual or perceived race or ethnicity.  Discriminatory Policing does not include using a person's race or ethnicity in any reliable suspect-specific description or for purposes of data collection;

n.  "District" refers to one of the seven police service areas of MCSO;

o.  "Effective Date" means the day this Order is entered by the Court;

p.  "Exigent Circumstances" means emergencies in which a reasonable person would believe that imminent death or bodily harm to a person or persons or the destruction of evidence is likely or as otherwise defined by law;

q.  "EIS" means Early Identification System;

r.  "Full and Effective Compliance" means compliance with all relevant provisions of this Order. The Defendants shall begin to be in Full and Effective Compliance with this Order when all of the following have been both completed and consistently maintained:

    i.  A Monitor has been appointed pursuant to Paragraphs 119–121 of this Order.

    ii.  The MCSO has formed an Implementation Unit pursuant to Paragraph 9 of this Order.

    iii.  The MCSO has developed, and, pursuant to Paragraph 30, either the Monitor or the Court has approved, and the MCSO has fully implemented the Policies and Procedures and amendments to Policies and Procedures set out in Section V of this Order.

    iv.  The MCSO has developed curriculum and training materials that have, pursuant to Paragraph 46 of this Order, been approved by the Monitor or the Court.

    v.  The MCSO has developed and implemented a training schedule pursuant to Paragraph 44 of this Order.

    vi.  The MCSO has trained all existing MCSO Supervisors, Deputies, and posse members pursuant to Paragraphs 41–53 of this Order.

    vii.  The MCSO has developed proposed protocols, including draft templates and instructions for Significant Operations and Patrols as set out in Section VI of this Order that have, pursuant to Paragraph 37, been approved by the Monitor or the Court, and have been implemented.

    viii.  The MCSO has provided an adequate number of Supervisors as well as proper Deputy assignments pursuant to Paragraphs 82 and 84 of this Order.

    ix.  The MCSO has developed and implemented a system for performance evaluations pursuant to Paragraph 98 of this Order.

    x.  The MCSO has developed and implemented eligibility criteria for assignment to specialized units pursuant to Paragraph 101 of this Order.

xi. The MCSO has developed and implemented an audit check plan to detect Deputy misconduct pursuant to Paragraph 103 of this Order.

xii. The MCSO has developed and implemented a system to collect traffic stop data and a protocol for audit checks of that system pursuant to Paragraphs 54–59 of this Order.

xiii. The MCSO has developed and implemented a protocol for the periodic analysis of the traffic stop data pursuant to Paragraph 64 of this Order.

xiv. The MCSO has developed and implemented a system for electronic data entry by Deputies pursuant to Paragraph 60 of this Order.

xv. The MCSO has developed and implemented a system for the audio and video recording of traffic stops and a protocol for reviewing the recordings pursuant to Paragraphs 61–63 of this Order with the understanding that Full and Effective Compliance may be achieved once all traffic patrol vehicles that make traffic stops used by Specialized Units have been mounted with the audio and video equipment, so long as the remaining vehicles are timely equipped with the audio and video equipment according to the requirements of those Paragraphs.

xvi. The MCSO has formed a Unit to aid in the development and implementation of the EIS, developed and implemented the EIS, and trained all MCSO personnel on the use of the EIS pursuant to Paragraphs 72–81 of this Order.

xvii. The MCSO has developed and implemented a community outreach program pursuant to Paragraphs 107–112 of this Order.

xviii. The MCSO has selected or hired a Community Liaison Officer pursuant to Paragraphs 113–114 of this Order.

xix. The MCSO has worked with Plaintiffs' representatives and community representatives and created a Community Advisory Board pursuant to Paragraphs 115–116 of this Order.

- 5 -

xx. The MCSO has conducted at least one comprehensive internal assessment pursuant to Paragraphs 12–13 of this Order.

xxi.     The Monitor has conducted a comprehensive assessment pursuant to Paragraphs 13 or 138 and has certified that the MCSO is in compliance with all of the scheduled obligations described above in Paragraph 1 and in compliance with all other periodic and/or continuing obligations in this Order since the Effective Date.

s.   "IA" means Internal Affairs, the MCSO unit charged with conducting internal and administrative investigations of MCSO deputies, agents, and employees;

t.   "ICE" means U.S. Immigration and Customs Enforcement;

u.   "Immigration-Related Law" means any civil or criminal offense related to immigration status;

v.   "Immigration-Related Crime" means any statute imposing criminal punishment in which immigration status is an element of the offense;

w.   "include" or "including" means "include or including, but not limited to";

x.   "Investigatory Stop," "Investigatory Contact," or "Investigatory Detention"  means a detention short of an arrest in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968);

y.   "LEAR Policy," means the MCSO policy described on page 2 and 113 of the Court's May 24, 2013 Findings of Fact and Conclusions of Law of detaining persons believed to be in the country without authorization but whom they cannot arrest on state charges, in order to summon a supervisor and communicate with federal authorities;

z.   "MCSO" means the Sheriff of the Maricopa County Sheriff's Office acting in his or her official capacity, including the MCSO's agents, deputies, detention officers, Supervisors, employees (both sworn and unsworn), and posse volunteers;

aa. "MCSO Implementation Unit" means the unit created by the MCSO and consisting of MCSO Employees to facilitate implementation of this Order;

- 6 -

bb. "MCSO Personnel" or "MCSO Employee" means all MCSO Employees, contractors and volunteers, including command staff, deputies, detention officers, civilian employees and posse volunteers;

cc. "MDT" means Mobile Data Terminal, the computerized system used in MCSO vehicles to conduct inquiries on individuals encountered on patrol;

dd. "Monitor" means a person or team of people who shall be selected to assess and report on the Defendants' implementation of this Order;

ee. "On-site Observation" means first-hand observation by the Monitor of MCSO activities, e.g., ride-alongs with Deputies on patrol or attendance at MCSO meetings or trainings;

ff. "Parties" means Plaintiffs and Defendants collectively in the above-captioned action;

gg. "Patrol Operations" means all MCSO law enforcement operations conducted by Deputies in a law enforcement support or patrol capacity which involves motor vehicle traffic stops, including Significant Operations as defined below. Jail or detention facility operations are not a part of Patrol Operations;

hh. "Plaintiffs" means plaintiffs in the above-captioned action;

ii. "Policies and Procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of MCSO personnel, and providing specific direction in how to fulfill those duties, functions, or obligations. All Policies and Procedures should be available in hardcopy and electronically;

jj. "Sheriff" means the current and future sheriffs of MCSO;

kk. "Significant Operation" or "Significant Patrol" means any pre-planned Patrol Operation that will involve traffic stops of vehicles within Maricopa County involving 10 or more MCSO Personnel excluding posse members;

ll. "Specialized Unit" means a temporary or permanent organization of deputies within MCSO whose operational objectives are focused on a specific law enforcement purpose beyond general patrol or criminal investigations;

mm.   "Supervisor" or "supervisor" means a sworn MCSO employee at the rank of sergeant or above (or anyone acting in those capacities) with oversight responsibility for MCSO personnel;

nn. "Training" or "training" means MCSO instruction that aspires towards industry best practices and includes adult-learning methods that incorporate realistic role-playing scenarios, interactive exercises, traditional lecture formats, and testing and/or writings that indicate that MCSO personnel taking the Training comprehend the material taught;

oo. "Vehicle stop" means any instance where a MCSO Deputy directs a civilian operating a motor vehicle of any type to stop and in which the driver and any passengers are detained for any length of time.

## II.    EFFECTIVE DATE, JURISDICTION AND PARTY REPRESENTATIVES

2.    This Order shall become effective upon entry by the Court.

3.    To ensure that the requirements of this Order are properly and timely implemented, the Court will retain jurisdiction over this action for all purposes until such time as the Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three years.

4.    The Parties may agree to jointly ask the Court to terminate this Order if the Parties agree that Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three continuous years.  If the Parties disagree on whether Defendants have achieved Full and Effective Compliance for no less than three continuous years, either Party may seek to terminate this Order. If Defendants move to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so at least 60 days prior to filing a motion to terminate. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court.  If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or

- 8 -

interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order.  If the Defendants move for termination of this Order, Plaintiffs will have 60 days after the receipt of the Defendants' motion to object to the motion.  If Plaintiffs do not object, the Court may grant the Defendants' motion.  If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

5.  After Defendants have reached Full and Effective Compliance, Defendants shall also have the right to move to terminate any part, portion, or term of this Order if they believe that they have maintained compliance with such portion, part, or term of this Order for no less than three continuous years. At least 60 days prior to filing a motion to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court.  If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order.  Plaintiffs shall have the right to oppose such motion within 60 days after receipt of the Defendants' motion. If Plaintiffs do not object, the Court may grant the Defendants' motion.  If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

6.  At all times, the Defendants shall bear the burden of demonstrating Full and Effective Compliance with this Order.

7.  This Order shall run against the Sheriff in his official capacity, as well as the MCSO. For purposes of implementation and enforcement of the Order, the representatives for the Parties shall be:

a.  Plaintiffs: The American Civil Liberties Union of Arizona ("ACLU-AZ") and any other representative(s) designated by the ACLU-AZ;

   b.   Defendants: Chief David Trombi and Captain Larry Farnsworth (or other designee
        selected by the Sheriff).

8.   The Court, upon 60 days' notice to the Parties, retains the right to modify or terminate
     this Order in whole or in part if it is satisfied that the Defendants have substantially
     complied with any or all of the terms of the Order for a period of three years, or if it is
     otherwise satisfied that a modification is justified.

### III.   MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT

9.   Defendants shall hire and retain, or reassign current MCSO employees to form an inter-
     disciplinary unit with the skills and abilities necessary to facilitate implementation of this
     Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison
     between the Parties and the Monitor and shall assist with the Defendants' implementation
     of and compliance with this Order.  At a minimum, this unit shall: coordinate the
     Defendants' compliance and implementation activities; facilitate the provision of data,
     documents, materials, and access to the Defendants' personnel to the Monitor and
     Plaintiffs representatives; ensure that all data, documents and records are maintained as
     provided in this Order; and assist in assigning implementation and compliance-related
     tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will
     include a single person to serve as a point of contact in communications with Plaintiffs,
     the Monitor and the Court.

10.  MCSO shall collect and maintain all data and records necessary to: (1) implement this
     order, and document implementation of and compliance with this Order, including data
     and records necessary for the Monitor to conduct reliable outcome assessments,
     compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the
     areas addressed by this Order.  At a minimum, the foregoing data collection practices
     shall comport with current professional standards, with input on those standards from the
     Monitor.

11.  Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due.  The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.

12.  The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.

13.  The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the

- 11 -

determination.  Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).

### IV.     MONITOR REVIEW PROCESS

14.    In any place where this Order provides for Defendants to submit policies, procedures, protocols or other materials to the Monitor for his or her review, Defendants shall submit such materials to the Monitor and provide a copy to Plaintiffs' representatives within the specified time.

15.    Plaintiffs shall have an opportunity to provide any comments or recommendations on the materials within 14 days of receipt. The Monitor shall thereafter communicate to the Parties the results of its review. If the Monitor has any concerns or recommendations regarding the materials, it will include those concerns or recommendations. The MCSO may then amend the materials and resubmit them to the Monitor within 14 days for further review. Either Party may apply to the Monitor for an extension of the deadlines in this Paragraph. In conducting its review, the Monitor may take into account industry best practices and the record in this litigation.

16.    If the Monitor approves the matter submitted, the Monitor will make a record of his or her approval and inform both parties.  In cases where neither party objects to the Monitor's action, the Monitor's determination will be final.  When the Monitor approves such matter, no further action is needed before the MCSO implements the relevant policies, procedures, protocols or materials. The MCSO shall do so promptly and without delay.

17.    If either Party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute. The non-moving Party may

- 12 -

respond to such motion within 14 days of filing. The moving Party may file a reply within 7 days after that. Any policies, procedures, protocols or other materials subject to the dispute need not be implemented until the Court makes a determination.

## V.  POLICIES AND PROCEDURES

18.  MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.

19.  To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.

20.  The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.

### a.  Policies and Procedures to Ensure Bias-Free Policing

21.  The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:

a.  define racial profiling as the reliance on race or ethnicity to *any* degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;

b.  prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;

c.  prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;

- 13 -

d.  specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and

e.  include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.

22.  MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.

23.  Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.

24.  The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.

**b.  Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

25.  The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:

a.  prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;

b.   provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;

c.   prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d.   prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e.   prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f.   require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g.   prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;

h.   require the duration of each traffic stop to be recorded;

i.   provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

j.   instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.

c.   **Policies and Procedures to Ensure Bias-Free Detentions and Arrests**

26.   The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:

a.   require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;

b.   require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;

c.   provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;

d.   require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an  identity document;

e.   prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and

f.   prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).

**d.   Policies and Procedures Governing the Enforcement of Immigration-Related Laws**

27.   The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.

28.   The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:

a.   specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;

- 16 -

1209

b.  prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;

c.  prohibit officers from initiating a pretextual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;

d.  prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);

e.  prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

f.  unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

- 17 -

g.  prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop  unless a request to do so has been voluntarily made by the individual;

h.  require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time Supervisor approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**e.      Policies and Procedures Generally**

29.    MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.

30.    Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.

31.    Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.

32.    The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to

policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations.  The MCSO shall apply policies uniformly.

33.   MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.

34.   MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.

## VI.   PRE-PLANNED OPERATIONS

35.   The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.

36.   The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.

37.   The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in

Section IV within 90 days of the Effective Date.  In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.

38.     If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:

    a.   documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);

    b.   information that triggered the operation and/or selection of the particular site for the operation;

    c.   documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;

    d.   documentation of command staff review and approval of the operation and operations plans;

    e.   a listing of specific operational objectives for the patrol;

    f.   documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;

    g.   any operations plans, other instructions, guidance or post-operation feedback or de-briefing provided to participating MCSO Personnel;

    h.   a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;

    i.   arrest lists, officer participation logs and records for the patrol; and

    j.   data about each contact made during the operation, including whether it resulted in a citation or arrest.

1213

39.     The MCSO shall hold a community outreach meeting no more than 30 days after any Significant Operations or Patrols in the affected District(s).  MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.

40.     The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation.  In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.

## VII.     TRAINING

### a.     General Provisions

41.     To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.

42.     The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.

43.     The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training

- 21 -

shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.

44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order.  Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training.  Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.

45. The Training may incorporate adult-learning methods that incorporate role-playing scenarios, interactive exercises, as well as traditional lecture formats.

46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.

47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.

**b.      Bias-Free Policing Training**

48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.

49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a.   definitions of racial profiling and Discriminatory Policing;

- 22 -

    b.   examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;

    c.   the protection of civil rights as a central part of the police mission and as essential to effective policing;

    d.   an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;

    e.   constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;

    f.   MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

    g.   MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

    h.   police and community perspectives related to Discriminatory Policing;

    i.   the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

    j.   methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

    k.   methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

    l.   methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

    m.  cultural awareness and how to communicate with individuals in commonly encountered scenarios;

    n.   problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

- 23 -

o.   the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.   the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.   background information on the *Melendres v. Arpaio* litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio*, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.   instruction on the data collection protocols and reporting requirements of this Order.

**c.      Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws**

50.   In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.

51.   The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a.   an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;

b.   guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;

c.   guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;

d.  constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;

e.  MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

f.  the circumstances under which a passenger may be questioned or asked for identification;

g.  the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.  the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.  the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.  a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.  a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or

apparent race or ethnicity, speaking Spanish,  speaking English with an accent, or appearance as a day laborer;

l.   an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n.   provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio* and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o.   instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**d.      Supervisor and Command Level Training**

52.   MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.

53.   The Supervisor-specific Training shall address or include, at a minimum:

a.   techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;

b.   how to conduct regular reviews of subordinates;

c.   operation of Supervisory tools such as EIS;

d.   evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;

e.   how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;

f.   how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;

g.   incorporating integrity-related data into COMSTAT reporting;

h.   how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;

i.   how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;

j.   how to respond to and investigate allegations of Deputy misconduct generally;

k.   evaluating Deputy performance as part of the regular employee performance evaluation; and

l.   building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.

## VIII.   TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a.   Collection of Traffic Stop Data

54.   Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:

a.   the name, badge/serial number, and unit of each Deputy and posse member involved;

b.   the date, time and location of the stop, recorded in a format that can be subject to geocoding;

c.   the license plate state and number of the subject vehicle;

- 27 -

d.  the total number of occupants in the vehicle;

e.  the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);

f.  the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);

g.  an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;

h.  the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;

i.  time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;

j.  whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and  if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;

k.  whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;

l.  whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

m.  the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

55.     MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.

56.     The traffic stop data collection system shall be subject to regular audits and quality control checks.  MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.

57.     MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.

58.     The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties.  If the Parties cannot agree, the Court shall make the determination.

59.     Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.

**b.     Electronic Data Entry**

60.   Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically.  Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.

**c.     Audio-Video Recording of Traffic Stops**

61.   The MCSO will install functional video and audio recording equipment in all traffic patrol vehicles that make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment.  MCSO shall prioritize the installation of such equipment in all traffic patrol vehicles that makes traffic stops used by Specialized Units that enforce Immigration-Related Laws, and such installation must be complete within 180 days of the Effective Date.  MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date.  Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.

62.   Deputies shall turn on any in-vehicle video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is non-functioning within a reasonable time shall be subject to Discipline.

63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.

   **d.    Review of Traffic Stop Data**

64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.

65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.

66. MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.

67.   In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:

a.   racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;

b.   evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

c.   a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

d.   indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and

e.   other indications of racial or ethnic bias in the exercise of official duties.

68.   When reviewing collected patrol data, MCSO shall examine at least the following:

a.   the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;

b.   the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;

c.   the tactics employed during the Significant Operation and whether they yielded the desired results;

d.   the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity

- 32 -

and  the surname information captured or provided by the persons stopped, detained or arrested;

e.   the resource needs and allocation during the Significant Operation; and

f.   any Complaints lodged against MCSO Personnel following a Significant Operation.

69.   In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy.  Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit

70.   If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation.   Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity.  If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff.  All interventions shall be documented in writing.

71.   In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.

## IX.    EARLY IDENTIFICATION SYSTEM ("EIS")

### a.    Development and Implementation of the EIS

72.    MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.

73.    Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").

74.    MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.

75.    The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:

a.    all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e,, any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);

b.    all internal investigations of alleged or suspected misconduct;

c.   data compiled under the traffic stop data collection and the patrol data collection mechanisms;

d.   all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;

e.   all arrests;

f.   all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;

g.   all arrests in which the individual was released from custody without formal charges being sought;

h.   all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;

i.   all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;

j.   all disciplinary action taken against employees;

k.   all non-disciplinary corrective action required of employees;

l.   all awards and commendations received by employees;

m.   Training history for each employee; and

n.   bi-monthly Supervisory observations of each employee.

76.   The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).

- 35 -

77.  MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.

78.  MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS.  On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.  No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.

79.  The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date.  Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.

**b.      Training on the EIS**

80.  MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command.  Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following

the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries.  MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.

**c.      Protocol for Agency and Supervisory Use of the EIS**

81.    MCSO shall develop and implement a protocol for using the EIS and information obtained from it.  The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit.  Additional required protocol elements include:

a.   comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;

b.   identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:

  i.   failure to follow any of the documentation requirements mandated pursuant to this Order;

  ii.  racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;

  iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

  iv.  a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

- 37 -

1230

v.   Complaints by members of the public or other officers; and

vi.  other indications of racial or ethnic bias in the exercise of official duties;

c.   MCSO commander and Supervisor review, on a regular basis, but not less than bi-monthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;

d.   a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;

e.   identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;

f.   a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and  not solely on the number or percentages of incidents in any category of information recorded in the EIS;

g.   a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;

h.   an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and

- 38 -

i.    mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.

## X.    SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE

82.    MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and  laws of the United States and State of Arizona, MCSO policy, and this Order.  First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.  To achieve these outcomes, MCSO shall undertake the following duties and measures:

### a.    General Duties of Supervisors

83.    MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.  Effective supervision requires that Supervisors:  respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.

84.    Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.

85.    First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order.  This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.

1232

86.     On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.

87.     MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.

**b.      Additional Supervisory Measures**

88.     To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.

89.     A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.

90.     MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred.

- 40 -

Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information.  Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.  Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.

91.     As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

92.     Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  Supervisors shall notify IA.  The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations.  The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.

93.     Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift.  MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.

94.     As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that

- 41 -

indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

95.     Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.

96.     A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.

97.     MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).

**d.      Regular Employee Performance Review and Evaluations**

98.     MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance

- 42 -

to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.

99.   The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.

100.  The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.

101.  Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.  Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.

# XI.     MISCONDUCT AND COMPLAINTS

### a.     Internally-Discovered Violations

102.   MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.

### b.     Audit Checks

103.   Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including:  Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.

### c.     Complaint Tracking and Investigations

104.   Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.

105.   Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.

106.   Records of Complaints and investigations shall be maintained and made available, unredacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.

## XII.   COMMUNITY ENGAGEMENT

### a.   Community Outreach Program

107.   To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the period that this Order is in place. To this end, the MCSO shall create the following district community outreach program.

108.   Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.

109.   As part of its Community Outreach and Public Information program, the MCSO shall hold a public meeting in each of MCSO's patrol Districts within 90 days of the Effective Date, and at least one meeting in each District annually thereafter. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

110.   The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.  MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.

111.   English- and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the

- 45 -

Community Liaison Officer (described below) shall participate in the meetings. Plaintiffs' representatives shall be invited to attend.

112.   The meetings shall be held in locations convenient and accessible to the public.  At least one week before such meetings, the MCSO shall widely publicize the meetings using English and Spanish-language television, print media and the internet.

**b.      Community Liaison Officer**

113.   Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.

114.   The CLO shall have the following duties:

a.   to coordinate the district community meetings described above in Paragraphs 109 to 112;

b.   to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118;

c.   to compile any Complaints, concerns and suggestions submitted to CLO by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;

d.   to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and

e.   to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.

**c.      Community Advisory Board**

115.   MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the

- 46 -

MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

116.   The CAB shall have six members, three to be selected by the MCSO and three to be selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case.  However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB. The CAB shall continue for at least the length of this Order.

117.   The CAB shall hold public meetings at regular intervals of no more than four months. The meeting space shall be provided by the MCSO. The CLO shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.

118.   During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and make reasonable efforts to address such concerns. Members will also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.

## XIII.   INDEPENDENT MONITOR AND OTHER PROCEDURES REGARDING ENFORCEMENT

### a.   Selection of the Monitor

119.   The Court shall appoint an Independent Monitor to assist with implementation of, and assess compliance with, this Order. Within 60 days of the Effective Date, the Parties shall agree on the selection of a Monitor to be appointed by the Court.

120.   The Parties shall have an opportunity to separately interview prospective candidates if they choose, as well as request additional information about prospective candidates' background and experience, proposed annual fees and costs, proposed annual budget,

- 47 -

including references and a list of recent consulting or monitoring work and the fees and costs from that prior consulting or monitoring work as well as information as to whether the candidate meet or exceeded any budgets for that prior consulting or monitoring work.

121.  If the Parties are unable to agree on a Monitor or an alternative method of selection within 60 days of the Effective Date, each Party shall, no later than 70 days from the Effective Date, submit the names and resumes of three candidates with experience as law enforcement practices experts or monitors to the Court, and the Court shall select a Monitor from among the qualified candidates.

122.  The Monitor shall be appointed for the term of this Order.  In the event a Monitor is to be replaced, the Parties shall select a new Monitor by the same process as above.   The Court may order the removal of the Monitor for any reason sua sponte, or upon Motion by any party.

123.  Defendants shall provide the Monitor with permanent office space and reasonable office support such as office furniture, secure internet access, telephones, secure document storage, and photocopying, faxing and scanning equipment. Defendants shall bear all reasonable fees and costs of the Monitor. However, the Parties recognize the importance of ensuring that the fees and costs borne by Defendants are reasonable.  In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, Defendants, Plaintiffs, and the Monitor shall attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.  All Parties shall be included in any communications related to such a dispute.

124.  The Monitor, at any time after his or her initial selection, may request authorization from the Court to be allowed to hire or employ or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Order or by the Court. The Monitor shall submit to the Court the task to be performed by the proposed additional person or entity, the scope of the work to be performed, the project fees and expenses associated with such work, the expected length of time for such work, and the reasons the Monitor is unable to perform such work and requires the

assistance of the additional person or entity and why existing MCSO personnel cannot perform the task requested by the Monitor.  Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Order shall be subject to the provisions of this Order.  The Monitor shall notify the Defendants and Plaintiffs' representatives in writing if the Monitor wishes to hire such additional persons or entities. The notice shall identify and describe the qualifications of the person or entity to be hired, the monitoring tasks to be performed, the estimated cost and length of time of the task, and explain why existing MCSO personnel cannot perform the task requested or desired by the Monitor.  If the County and Plaintiffs agree to the Monitor's proposal, the Monitor shall be authorized to hire or employ such additional persons or entities.  The County or Plaintiffs have 15 business days to state any disagreement with the proposal. If the County and Plaintiffs are unable to reach agreement within 15 business days of receiving notice of the disagreement by the other Party, the Court shall resolve the dispute.

125.    Should any Party determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by this Order, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors. The Party or Parties, as the case may be, shall attempt to resolve such disputes cooperatively prior to seeking the assistance of the Court. All Parties shall be included in any communications related to such a dispute.

**b.      Role of the Monitor**

126.    The Monitor shall be subject to the supervision and orders of the Court, consistent with this Order. The Monitor shall have the duties, responsibilities and authority conferred by the Court and this Order, including, but not limited to: (1) reviewing the MCSO Patrol Operations Policies and Procedures provided for by this Order and making recommendations to the Court regarding the same; (2) reviewing a protocol with the

- 49 -

Parties to ensure that any Significant Operations conducted by the MCSO are conducted in a race-neutral fashion; (3) reviewing the curriculum, materials and proposed instructors for Training required by this Order; (4) reviewing the collected traffic stop data and the collected Saturation Patrol data to determine whether the data required to be gathered by this Order is, in fact, being collected by the MCSO; (5) reviewing protocols regarding the collection, analysis, and use of such data and determining whether the MCSO is in compliance with those protocols; (6) reviewing the collected data to determine whether, in the opinion of the Monitor, MCSO is appropriately reviewing the collected data to determine possible isolated or systemic racial profiling occurring, and if so, reporting the factual basis supporting that judgment to the Parties and the Court; (7) evaluating the effectiveness of the MCSO's changes in the areas of supervision and oversight and reporting the same to the parties and the Court; (8) reviewing the corrective action taken by the MCSO concerning any possible violations of this Order or MCSO policy and procedures and reporting the same to the parties and the Court; (9) evaluating the MCSO's engagement with the communities affected by its activities as set forth by this Order; and (10) assessing the MCSO's overall compliance with the Order.

127.  To assess and report on the Defendants' implementation of this Order and whether implementation is resulting in the constitutional and professional treatment of individuals by MCSO, the Monitor shall conduct the audits, compliance reviews and outcome assessments specified below, and such additional audits and assessments as the Monitor or the Parties deem appropriate.

128.  The ultimate arbiter of compliance is the Court and Parties may make their own submissions regarding compliance separate from the Monitor's reports.  In any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution.

129.  In carrying out these duties, the Monitor shall be permitted to have ex parte communications with the Parties.

c.      **Monitoring Plan and Review Methodology**

130.   The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

a.   a description of the work conducted by the Monitor during the reporting period;

b.   a listing of each Order requirement which indicates whether each requirement has been addressed by the MCSO, is the subject of sufficient Training, and whether the MCSO is in compliance with that requirement of the Order in the judgment, opinion, and experience of the Monitor;

c.   the methodology and specific findings for each audit or review conducted;

d.   for any requirements that were audited and reviewed and found not to have been fully implemented in practice in the judgment, opinion, and experience of the Monitor, the Monitor's recommendations to the Court regarding necessary steps to achieve compliance;

e.   in the judgment, opinion, and experience of the Monitor an assessment of MCSO's progress in achieving the desired outcomes for each area covered by the Order, noting issues of concern or particular achievement;

f.   the methodology and specific findings for each outcome assessment conducted; and

g.   a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Order.

131.   The Monitor's reports shall be public except for information covered by privacy laws or that is otherwise confidential. If any information is redacted from the Monitor's report, an unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit, review or assessment need not be made publicly available but shall be retained by the Monitor and provided to either or both Parties upon request.

132.   The Monitor shall provide a copy of quarterly reports to the Parties in draft form at least 21 business days prior to filing them with the Court to allow the Parties to provide written comment on the reports.  The Monitor shall consider the Parties' responses and make any

- 51 -

changes the Monitor deems appropriate before issuing the report. The Monitor shall

attach to his or her report copies of any comments submitted by the Parties.

133.    Within 60 days of his or her appointment, the Monitor shall develop a plan for

conducting the above audits, reviews and outcome assessments, and shall submit this plan

to the Parties for review and approval. In the event that the Parties cannot agree, the plan

will be submitted to the Court for final approval. This plan shall:

a.   clearly delineate the requirements of the Order to be assessed for compliance,

indicating which requirements will be assessed together;

b.   set out a schedule for conducting an initial audit or review of each requirement of the

Order, and periodic audits and reviews thereafter;

c.   set out a schedule for conducting initial outcome assessments for each area of the

Order, and periodic assessments thereafter.

134.    Where the Monitor recommends and the Parties agree, the Monitor may refrain from

conducting an audit or review of a requirement previously found to have been fully

implemented in practice by the Monitor, or refrain from conducting an outcome

assessment if previous assessments indicate that the outcome intended by a requirement

has been achieved.

135.    At least 30 days prior to the initiation of any audit, review or assessment, the Monitor

shall submit a proposed methodology to the Parties. The Parties shall submit any

comments or concerns regarding the proposed methodology to the Monitor within 15

days of the proposed date of the assessment, review or audit. The Monitor shall modify

the methodology as necessary to address any concerns or shall inform the Parties in

writing of the reasons it is not modifying its methodology as proposed. If Parties do not

agree with the proposed methodology, the Monitor shall then file with the Court the

proposed methodology for approval.

136.    In conducting the outcome assessments, the Monitor should measure not only the

MCSO's progress in implementing the provisions of this Order, but the effectiveness of

the reforms. To do so, the Monitor shall take into account the following performance-based metrics and trends:

a.  Deputies' awareness and comprehension of issues addressed by departmental policies and Training;

b.  data relating to the race and ethnicity of individuals stopped, detained and arrested by the MCSO, including the rate at which investigations result in a citation or arrest;

c.  data related to the documented reasonable suspicion or probable cause to stop, detain or arrest individuals encountered on traffic stops, broken down by the actual or perceived race or ethnicity of the person(s) stopped/arrested;

d.  the use and deployment of Specialized Units;

e.  the execution of any significant operations, including planning and site selection, tactics employed, staffing and units involved, and the intended and actual results of such operations;

f.  the amount and quality of supervision provided by the MCSO's chain of command;

g.  the prevalence of civilian Complaints regarding biased policing or unlawful detentions and arrests by MCSO Patrol Operation deputies;

h.  the number and rate of Complaints that are accepted, sustained and not sustained, overall and broken down by type, unit, geographic area and the actual or perceived race or ethnicity of Complainants;

i.  disciplinary outcomes for any violations of departmental policy;

j.  whether any Deputies are the subject of repeated misconduct Complaints, civil suits, or criminal charges, including for off-duty conduct; and

k.  the level of MCSO engagement and participation with the community advisory board;

137.  To facilitate the Monitor's outcome assessments, the Monitor may also conduct his or her own periodic analysis of the traffic stop and Significant Operations data collected by the MCSO pursuant to this Order, subject to the terms of this Order as to the Monitor's proposed hiring of assistance. The Monitor shall retain an individual or entity with

- 53 -

expertise in social science research and statistics to conduct the survey if the Monitor does not have this expertise him/herself.

138. The Monitor shall conduct a comprehensive re-assessment each year after the Effective Date to determine whether and to what extent the outcomes intended by this Order have been achieved, and any modifications to the Order that he/she believes are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of a requirement.  This re-assessment shall also address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating Full and Effective Compliance.  Based upon this comprehensive re-assessment, the Monitor may recommend to the parties and the Court modifications to the Order that he/she believes are necessary to achieve and sustain intended outcomes.

**d.     Monitor Recommendations and Technical Assistance**

139. The Monitor may make additional recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with this Order and its underlying objectives.  Such recommendations may include a recommendation to change, modify, or amend a provision of the Order, a recommendation for additional Training in any area related to this Order, or a recommendation to seek technical assistance. In addition to making recommendations, the Monitor may also, at the request of the Parties, provide technical assistance directly to the MCSO consistent with the Monitor's responsibilities under this Order. In the event that full and effective implementation of this Order requires technical assistance beyond the scope of what the Monitor can provide, Defendants shall reasonably arrange for prompt initiation of such technical assistance consistent with the terms of this Order.

**e.     Communication between Monitor and Parties**

140. The Monitor shall maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of Defendants' implementation of and compliance with this Order.

- 54 -

**f.     Public Statements, Testimony, Records, and Conflicts of Interest**

141.    Except as required or authorized by the terms of this Order or the Parties acting together: neither the Monitor, nor any agent, employee, or independent contractor thereof, shall make any public statements, outside of statements to the Court as contemplated in this Order, with regard to any act or omission of the Defendants, or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to the Order.  Any press statement made by the Monitor regarding its employment or monitoring activities under this Order shall first be approved by the Parties.

142.    Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Maricopa County or its departments, Deputies, agents or employees.

143.    The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.

144.    The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Order.

**g.     Access and Confidentiality**

145.    Defendants shall ensure that the Monitor has timely, full and direct access to all personnel, documents, facilities and Order-related Trainings and meetings that the Monitor reasonably deems necessary to carry out its duties. The Monitor shall cooperate with the Defendants to access people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations. To facilitate his or her monitoring responsibilities, the Monitor may conduct On-Site

Observations, visits and assessments without prior notice to the Defendants absent Exigent Circumstances.

146.  Defendants may withhold from the Monitor any documents or data protected by the attorney-client privilege. Should the Defendants decline to provide the Monitor access to documents or data based on attorney-client privilege, the Defendants shall inform the Monitor and Plaintiffs that it is withholding documents or data on this basis and shall provide the Monitor and Plaintiffs with a log describing the documents or data.

147.  Defendants shall ensure that Plaintiffs' representatives and their consultative experts and agents shall have full and direct access to all Defendants' staff, employees, facilities, documents and data relevant to this Order upon reasonable notice.   Plaintiffs' representatives and their consultative experts and agents shall cooperate with the Defendants to access involved personnel, facilities, and documents in a reasonable manner that, consistent with Plaintiffs' responsibilities to enforce this Order, minimizes interference with regular duties.

148.  The Monitor and Plaintiffs shall provide the Defendants with reasonable notice of a request for copies of documents.  Upon such request, the Defendants shall provide in a timely manner copies (electronic, where readily available) of the requested documents.

149.  The Monitor shall have access to all records and information relating to criminal investigations relevant to this Order as permissible by law. The Monitor shall treat such records as confidential and shall not disclose the same to any third party. The Monitor and Plaintiffs shall have access to all documents in concluded or closed MCSO criminal investigation files. The Monitor shall also have reasonable access to all arrest reports, warrants, and warrant applications whether or not contained in open criminal investigation files absent Exigent Circumstances.

150.  The Parties may make use of protective orders or agreements to ensure the confidentiality of any non-public information as appropriate and necessary. Other than as expressly provided herein, this Order shall not be deemed a waiver of any privilege or right the Defendants may assert, including those recognized at common law or created by statute,

- 56 -

rule or regulation, against any other person or entity with respect to the disclosure of any document.

### h.      Modification and Enforcement of the Order

151.   Where the Parties agree with the Monitor's recommendations to change a provision of the Order, the Parties may apply to the Court via stipulated Motion or other appropriate filing to make the desired change.

152.   Plaintiffs' representatives may seek enforcement of this Order if they determine that the Defendants have failed to fully comply with any provision contained herein. Plaintiffs' representatives are not required to prove that the MCSO is engaged in racial profiling in order for the Court to find that Defendants have failed to fully comply. Plaintiffs may demonstrate that the MCSO has failed to fulfill a particular obligation under this Order or failed to make sustained and continuing progress on applicable performance-based metrics.

153.   The Parties shall first attempt to resolve any dispute informally by notification and conferral. If a dispute cannot be resolved informally, Plaintiffs' representatives may apply to the Court for appropriate relief, up to and including the imposition of contempt sanctions. Interventions short of an imposition of contempt sanctions may include, but are not limited to, additional oversight, further restrictions on agency activities, and additional Training or reporting requirements.

154.   Defendants may move the Court for a protective order and/or other appropriate relief if they reasonably believe Plaintiffs' representative is abusing its rights under this Order or acting solely to annoy or harass Defendants.  Prior to moving for any such protective order or other relief, Defendants shall be required to provide Plaintiffs with notice of their intent to do so and shall confer with Plaintiffs in good faith to resolve any such dispute.

155.   The Parties shall notify each other of any court or administrative challenge to this Order. In the event any provision of this Order is challenged in any local or state court, removal to a federal court shall be sought by the Parties and transfer of venue to this District will be sought.

1250

156.   The Defendants agree to promptly notify Plaintiffs if any term of this Order becomes subject to collective bargaining consultation and to consult with Plaintiffs in a timely manner regarding the implications of any collective bargaining consultation in relation to this Order.

157.   Defendants shall pay reasonable fees and costs incurred as a result of having to initiate litigation to secure enforcement, should Plaintiffs prevail in such litigation. Nothing in this provision affects the right of Plaintiffs to seek fees and costs for work performed in the case prior to the Effective Date or in connection with any appeal taken by Defendants of the Court's May 24, 2013 Findings of Fact, Conclusions of Law and Order.

158.   Defendants reserve the right to move the Court to alter, amend, modify, or terminate this Order at any time based on an adverse decision of an appellate court of competent jurisdiction ruling on the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

159.   Nothing in this Section, nor in this Order is intended to, nor shall, constitute a waiver, termination, abrogation, or ending of the appeal rights of the Defendants to challenge the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

**IT IS THEREFORE ORDERED** that the Court's injunction of December 23, 2011 is made permanent. The Court's injunction of May 24, 2013 shall remain permanent.  For removal of doubt, both the December 23, 2011 injunction and the May 24, 2013 injunction shall survive the termination of this Order until and unless specifically dissolved or modified by the Court or an appellate court of competent jurisdiction.

**IT IS FURTHER ORDERED** that this Order is an appealable final judgment. The Clerk of Court is directed to enter judgment accordingly.

/ / /

/ / /

/ / /

1251

1    **IT IS FURTHER ORDERED** that this Court retains jurisdiction over this case for the

2  purposes of implementing this Order.

3    Dated this 2nd day of October, 2013.

4

5

6    _____

7    G. Murray Snow

8    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



*EXHIBIT 22*

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. PHX-CV-07-02513-GMS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

At issue in this lawsuit are: 1) the current policies and practices of the Maricopa County Sheriff's Office ("MCSO") by which it investigates and/or detains persons whom it cannot charge with a state crime but whom it believes to be in the country without authorization, and 2) the operations the MCSO claims a right to use in enforcing immigration-related state criminal and civil laws, such as the Arizona Human Smuggling Statute, Ariz. Rev. Stat. ("A.R.S.") § 13-2319 (Supp. 2010), and the Arizona Employer Sanctions Law, A.R.S. § 23-211 *et seq*. (Supp. 2010). According to the position of the MCSO at trial, it claims the right to use the same type of saturation patrols to enforce state laws that it used during the time that it had authority delegated from the federal government to enforce civil violations of federal immigration law.

During the time relevant to this lawsuit, the Immigration and Customs Enforcement Office of the Department of Homeland Security ("ICE") delegated authority to enforce federal immigration law to a maximum of 160 MCSO deputies pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g) ("the 287(g) program"). In the 287(g) training that ICE provided, and in other policies and procedures

promulgated by the MCSO, MCSO deputies were instructed that they could consider race or "Mexican ancestry"[1] as one factor among others in making law enforcement decisions during immigration enforcement operations without violating the legal requirements pertaining to racial bias in policing. Pursuant to its 287(g) authority, the MCSO used various types of saturation patrols described below in conducting immigration enforcement. During those patrols, especially the large-scale saturation patrols, the MCSO attempted to leverage its 287(g) authority by staffing such operations with deputies that both were and were not 287(g) certified.

ICE has since revoked the MCSO's 287(g) authority. In response, the MCSO trained all of its officers on immigration law, instructed them that they had the authority to enforce it, and promulgated a new "LEAR" policy. The MCSO continues to follow its LEAR policy, which requires MCSO deputies to detain persons believed to be in the country without authorization but whom they cannot arrest on state charges. Such persons are either delivered directly to ICE by the MCSO or detained until the MCSO receives a response from ICE as to how to deal with them. Until December 2011, the MCSO operated under the erroneous assumption that being an unauthorized alien in this country established a criminal violation of federal immigration law which the MCSO was entitled to enforce without 287(g) authorization. However, in the absence of additional facts, being within the country without authorization is not, in and of itself, a federal criminal offense. The LEAR policy, however, remains in force.

Pursuant to this policy and the MCSO's enforcement of state law that incorporates immigration elements, the MCSO continues to investigate the identity and immigration

---

[1] Historically, there is no separate racial designation for persons of Hispanic or Latino ancestry. Nevertheless, to the extent that such persons are separately classified for purposes of distinctions in their treatment by the government, courts have applied the strict scrutiny analysis that is reserved for racial distinctions. *Johnson v. California*, 543 U.S. 499, 502 (2005); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205, 227 (1995); *U.S. v. Ochoa–Ochoa*, 114 Fed. App'x 295, 296 (9th Cir. 2004).

status of persons it encounters in certain situations. In undertaking such investigations, MCSO deputies continue to apply the indicators of unlawful presence (including use of race as one amongst other factors) they received in the 287(g) training from ICE. Further, in enforcing immigration-related state laws, the MCSO either continues to use, or asserts the right to continue to use, the same type of saturation patrols that it used when it had full 287(g) authority. Those saturation patrols all involved using traffic stops as a pretext to detect those occupants of automobiles who may be in this country without authorization. The MCSO asserts that ICE's termination of its 287(g) authority does not affect its ability to conduct such operations because a person's immigration status is relevant to determining whether the Arizona state crime of human smuggling—or possibly the violation of other state laws related to immigration—are occurring.

Plaintiffs challenge these policies and practices. The Court certified a Plaintiff class of "[a]ll Latino persons who, since January 2007, have been or will be in the future stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County Arizona." *Ortega-Melendres v. Arpaio,* 836 F. Supp. 2d 959, 992 (D. Ariz. 2011) (internal quotation marks omitted). The issues in this lawsuit are: (1) whether, and to what extent, the Fourth Amendment permits the MCSO to question, investigate, and/or detain Latino occupants of motor vehicles it suspects of being in the country without authorization when it has no basis to bring state charges against such persons; (2) whether the MCSO uses race as a factor, and, if so, to what extent it is permissible under the Fourth Amendment to use race as a factor in forming either reasonable suspicion or probable cause to detain a person for being present without authorization; (3) whether the MCSO uses race as a factor, and if so, to what extent it is permissible under the equal protection clause of the Fourteenth Amendment to use race as a factor in making law enforcement decisions that affect Latino occupants of motor vehicles in Maricopa County; (4) whether the MCSO prolongs traffic stops to investigate the status of vehicle occupants beyond the time permitted by the Fourth Amendment; and (5) whether being in this country without authorization

provides sufficient reasonable suspicion or probable cause under the Fourth Amendment that a person is violating or conspiring to violate Arizona law related to immigration status.

As is set forth below, in light of ICE's cancellation of the MCSO's 287(g) authority, the MCSO has no authority to detain people based only on reasonable suspicion, or probable cause, without more, that such persons are in this country without authorization. The MCSO lost authority to enforce the civil administrative aspects of federal immigration law upon revocation of its 287(g) authority. And, in the absence of additional facts that would provide reasonable suspicion that a person committed a federal criminal offense either in entering or staying in this country, it is not a violation of federal criminal law to be in this country without authorization in and of itself. Thus, the MCSO's LEAR policy that requires a deputy (1) to detain persons she or he believes only to be in the country without authorization, (2) to contact MCSO supervisors, and then (3) to await contact with ICE pending a determination how to proceed, results in an unreasonable seizure under the Fourth Amendment to the Constitution.

Further, in determining whom it will detain and/or investigate, both with respect to its LEAR policy, and in its enforcement of immigration-related state law, the MCSO continues to take into account a suspect's Latino identity as one factor in evaluating those persons whom it encounters. In Maricopa County, as the MCSO acknowledged and stipulated prior to trial, Latino ancestry is not a factor on which it can rely in arriving at reasonable suspicion or forming probable cause that a person is in the United States without authorization. Thus, to the extent it uses race as a factor in arriving at reasonable suspicion or forming probable cause to stop or investigate persons of Latino ancestry for being in the country without authorization, it violates the Fourth Amendment. In addition, it violates the Plaintiff class's right to equal protection under the Fourteenth Amendment to the Constitution and Title VI of the Civil Rights Act of 1964.

Moreover, at least some MCSO officers, as a matter of practice, investigate the identities of all occupants of a vehicle when a stop is made, even without individualized

reasonable suspicion. Further, MCSO policy and practice allow its officers to consider the race of a vehicle's occupants in determining whether they have reasonable suspicion to investigate the occupants for violations of state laws related to immigration, or to enforce the LEAR policy. In some instances these policies result in prolonging the traffic stop beyond the time necessary to resolve the issue that initially justified the stop. When the deputies have no adequate reasonable suspicion that the individual occupants of a vehicle are engaging in criminal conduct to justify prolonging the stop to investigate the existence of such a crime, the extension of the stop violates the Fourth Amendment's prohibition against unreasonable seizures.

Finally, the knowledge that a person is in the country without authorization does not, without more, provide sufficient reasonable suspicion that a person has violated Arizona criminal laws relating to immigration, such as the Arizona Human Smuggling Act, to justify a *Terry* stop for purposes of investigative detention. To the extent the MCSO is authorized to investigate violations of the Arizona Employer Sanctions law, that law does not provide criminal sanctions against either employers or employees. A statute that provides only civil sanctions is not a sufficient basis on which the MCSO can arrest or conduct *Terry* stops of either employers or employees.

For the reasons set forth above, Plaintiffs are entitled to injunctive relief to protect them from usurpation of rights guaranteed under the United States Constitution. Therefore, in the absence of further facts that would give rise to reasonable suspicion or probable cause that a violation of either federal criminal law or applicable state law is occurring, the MCSO is enjoined from (1) enforcing its LEAR policy, (2) using Hispanic ancestry or race as any factor in making law enforcement decisions pertaining to whether a person is authorized to be in the country, and (3) unconstitutionally lengthening stops. The evidence introduced at trial establishes that, in the past, the MCSO has aggressively protected its right to engage in immigration and immigration–related enforcement operations even when it had no accurate legal basis for doing so. Such policies have apparently resulted in the violation of this court's own preliminary injunction entered in

- 5 -

this action in December 2011. The Court will therefore, upon further consideration and after consultation with the parties, order additional steps that may be necessary to effectuate the merited relief.

**FINDINGS OF FACT**

**I.      General Background**

      **A.      Maricopa County**

According to the trial evidence, approximately 31.8% of the residents of Maricopa County are Hispanic or Latino.[2] (Tr. at 157:21–158:4.)[3] As even the testimony of Defendant's expert demonstrated, the considerable majority of those residents are legal residents of Maricopa County and of the United States.[4] (*Id.* at 1301:14.) Due to the large

---

[2] *Cf.* United States Census, State & County QuickFacts, Maricopa County, Arizona, http://quickfacts.census.gov/qfd/states/04/04013.html (last visited May 21, 2013) (reporting 30.0% of the population as of Hispanic or Latino origin). The Defendant's expert placed the Hispanic population at 30.2% for the relevant period. Ex. 402 at 3. Throughout this litigation, both parties have used the term "Hispanic" and "Latino" interchangeably. A recent study by the Pew Hispanic Center found that "a new nationwide survey of Hispanic adults finds that these terms ["Hispanic" and "Latino"] still haven't been fully embraced by Hispanics themselves." Paul Taylor et al., Pew Hispanic Center, *When Labels Don't Fit: Hispanics and their Views of Identity* 2 (2012). The Court will principally use the term Hispanic because most of the testimony and evidence presented at the trial on this matter used the term Hispanic rather than Latino. Still, where the evidence principally uses the term "Latino," the Court will likewise use "Latino." Both words are used interchangeably in this Order.

[3] "Tr." refers to the continually paginated trial transcript.

[4] At trial, Defendants' expert Dr. Steven Camarota noted that his estimate as to the percentage of the Arizona population not legally present within the United States had been cited by the United States Supreme Court in *Arizona v. United States*, ___ U.S. ___, ___, 132 S. Ct. 2492, 2500 (2012). In that study Dr. Camarota concluded that 8.9% of the population of the state of Arizona was made up of unauthorized immigrants. *See* Camarota & Vaughan, Center for immigration Studies, *Immigration and Crime: Assessing a Conflicted Situation* 16 (2009). During his trial testimony, Dr. Camarota testified that he assumed that his state-wide estimate would also apply to Maricopa County. His trial testimony was consistent with the figure cited in *Arizona* as he noted that he assumed that approximately one in three Hispanic residents of Maricopa County

- 6 -

number of authorized residents of Maricopa County who are Latino, the fact that someone is Latino in Maricopa County does not present a likelihood that such a person is here without authorization.

Nevertheless, it is also true that the overwhelming majority of the unauthorized aliens in Maricopa County are Hispanic. As Defendant's expert report notes, the Pew Hispanic Center estimates that 94% of illegal immigrants in Arizona are from Mexico alone.[5] (Ex. 402 at 14.)

As trial testimony further demonstrated, MCSO officers believe that unauthorized aliens are Mexicans, Hispanics, or Latinos. (Tr. at 359:11–14, 991:23–992:4.) As Defendants acknowledged at the summary judgment stage and in their post-trial briefing, many MCSO officers—as well as Sheriff Arpaio—testified at their depositions that most of the unauthorized immigrants they have observed in Maricopa County are originally from Mexico or Central or South America.[6] (Doc. 453 at 150, 151 ¶¶ 28–30, 36.)

**B.     The MCSO**

The MCSO is a law enforcement agency operating within the confines of Maricopa County. (Doc. 530 at 4 ¶ 1.) It employs over 800 deputies. (*Id.* ¶ 17.) Sheriff Joseph Arpaio serves as the head of the MCSO and has final authority over all of the

---

was here without authorization. (Tr. at 1301:9–11.) In *Arizona,* however, the Supreme Court also cited a study of the Pew Hispanic Center that determined that 6% of the state's population was unauthorized. 132 S. Ct. at 2500. Nevertheless, if Dr. Camarota's testimony is applied, and one assumes that virtually all of the unauthorized residents in the state are of Latino ancestry, about 73% of the Latino residents of Maricopa County are legal residents of the United States. If the Pew Hispanic Center's estimates are applied, and the same assumptions are made, about 81% of the Latino residents of Maricopa County are legal residents. In either case, a great majority of the Latino residents of Maricopa County are authorized to be in the United States.

[5] "Ex." denotes the number of the exhibit admitted at trial.

[6] "Doc." denotes the number at which the document can be found on the Court's docket.

1259

agency's decisions. (*Id.* ¶ 18.) He sets the overall direction and policy for the MCSO. The MCSO is composed of multiple bureaus, including the detention bureau, the patrol bureau, and the patrol resources bureau.  (*Id.* ¶ 19.)

The Sheriff of Maricopa County is elected, thus the Sheriff has to be responsive to his constituents if he desires to remain in office. In the words of the MCSO's Chief of Enforcement Brian Sands, Sheriff Arpaio is a political person, who receives significant popular support for his policies. (Tr. at 808:14–809:12.) A chief element of Sheriff Arpaio's popular support is his prioritization of immigration enforcement. (*Id.*) The MCSO receives federal funding and federal financial assistance. (Doc. 530 at 4 ¶¶ 173–74.)

### C.      Prioritization of Immigration Enforcement and the ICE Memorandum

In 2006, the MCSO created a specialized unit—the Human Smuggling Unit ("HSU")—to enforce a 2005 human smuggling law, A.R.S. § 13-2319 (2007). (Doc. 530 at 4 ¶¶ 27–28.) The HSU is a division within the patrol resources bureau and makes up a part of the larger Illegal Immigration Interdiction Unit (the "Triple I" or "III"). (*Id.* ¶¶ 27–29.) The HSU unit consisted of just two deputies when it was created in April of 2006. (*Id.* ¶ 44.)

In 2006, the Sheriff decided to make immigration enforcement a priority for the MCSO. In early 2007, the MCSO and ICE entered into a Memorandum of Agreement ("MOA") pursuant to which MCSO could enforce federal immigration law under certain circumstances. (*Id.* ¶ 40.) After the MOA was signed, the HSU grew. By September of 2007 it consisted of two sergeants, 12 deputies, and four detention officers, all under the leadership of a lieutenant. (*Id.* ¶ 44.) In September 2007, Lieutenant Sousa assumed command of the HSU. (Tr. at 988:13–14.) He remained in charge of the unit and later the Division including the unit, until April 1, 2012. (Tr. at 988:12–23.) He reported to Chief David Trombi, who is the commander of the Patrol Resources Bureau. (Doc. 530 at 1, ¶ 33.) Chief Trombi reported to Chief of Enforcement Brian Sands. (*Id.* ¶ 31.) For most of the period relevant to this lawsuit, Chief Sands reported to Deputy Chief David

1260

Hendershott, who reported directly to Sheriff Arpaio. (*Id.* ¶¶ 21, 23.)

Sergeant Madrid was one of the two supervising sergeants from the founding of HSU until he was transferred in February 2011. (*Id.* at 1131:19–25.) Sergeant Palmer was the other HSU supervising sergeant. He joined the HSU in April of 2008, apparently succeeding Sergeant Ryan Baranyos. He remained as a supervising sergeant until May of 2012. (*Id.* at 661:20–21.) According to the testimony of Sgts. Madrid and Palmer, each of them supervised their own squad of deputies and also cross-supervised the other's squad. (*Id.* at 663:23–25.)

The MOA permitted up to 160 qualified MCSO officers to enforce administrative aspects of federal immigration law under the 287(g) program.[7] (Ex. 290.) It required MCSO deputies that were to be certified for field operations to complete a five-week training program. (*Id.*) Witnesses who took the training program testified that the topic of race in making decisions related to immigration enforcement covered an hour or two of the five-week course. (Tr. at 948:8–20, 1387:23–1388:7.)

All or virtually all of the deputies assigned to the HSU became 287(g)-trained and certified. A number of other MCSO deputies did as well. The MCSO generically designated all non-HSU officers who were certified under 287(g) as members of the Community Action Team or "CAT." According to an MCSO policy memo "CAT refers to all 287g trained deputies who are not assigned to HSU." (Ex. 90 at MCSO 001887–88.) Members of the HSU, CAT and MCSO detention officers who were 287(g) certified constituted the Triple I Strike Team. (*Id.*)

Nevertheless, according to ICE Special Agent Alonzo Pena, under the MOA, 287(g) certified officers could not use their federal enforcement authority to stop persons or vehicles based only on a suspicion that the driver or a passenger was not legally

---

[7] The 160 maximum persons included both deputies trained for field enforcement and the MCSO personnel who worked "solely in a correctional facility or ICE detention facility." (Ex. 290.)

1261

present in the United States. (Tr. at 1811:15–16, 1854:8–11, 1856:15–23.) Rather, the 287(g) power was appropriately used as adjunct authority when Sheriff's deputies made an otherwise legitimate stop to enforce provisions of state law. (*Id.*) Special Agent Pena further testified that he "would definitely be concerned if traffic stops were being used as pretext" to investigate immigration violations. (*Id.* at 1859:17–22.)

Still, nothing in the text of the MOA prohibits the MCSO from making pre-textual traffic stops in order to investigate the immigration status of the driver of a vehicle. The MCSO Triple I Strike Team Protocols, however, did specify that before investigating a person's immigration status, a 287(g)-trained deputy "must have probable cause or reasonable suspicion" to stop a person for violation of "state criminal law and civil statutes." (Ex. 92 at MCSO 001888.) As the testimony at trial also established, MCSO deputies are generally able, in a short amount of time, to establish a basis to stop any vehicle that they wish for some form of Arizona traffic violation. (Tr. at 1541:8–11 (Armendariz: "You could not go down the street without seeing a moving violation."), 1579:20–23 ("Armendariz: [I]t's not very difficult to find a traffic violation when you're looking for one."); *see also* Doc. 530 at ¶ 86 ("Deputy Rangel testified that it is possible to develop probable cause to stop just about any vehicle after following it for two minutes.").)

The necessity of having a state law basis for the stop prior to engaging in immigration enforcement did not appear in MCSO news releases. At the February 2007 press conference announcing the partnership between MCSO and ICE, Sheriff Arpaio described the MCSO's enforcement authority in the presence of ICE officials as unconstrained by the requirement that MCSO first have a basis to pursue state law violations. He stated: "Actually, . . . , ours is an operation, whether it's the state law or the federal, to go after illegals, not the crime first, that they happen to be illegals. My program, my philosophy is a pure program. You go after illegals. I'm not afraid to say that. And you go after them and you lock them up." (Tr. at 332:19–25; Ex. 410d.)

/ / /

Upon completion of the first 287(g) training course for deputies in March 2007, Sheriff Arpaio described the duties of CAT certified patrol deputies in a news release as "arresting suspects even solely for the crime of being an illegal alien, if they are discovered during the normal course of the deputies' duties." (Ex. 184.) In July 2007, in describing the MCSO as "quickly becoming a full-fledged anti-illegal immigration agency" he also announced that MCSO had created a dedicated hotline for citizens to "use to report illegal aliens" to the MCSO. (Ex. 328.) In this same news release, the Sheriff further announced a policy that when his deputies stopped any vehicle for suspicion of human smuggling, the immigration status of all of the occupants of the vehicle would be investigated. (*Id.*)

### D.    MCSO's Immigration Enforcement Operations

In approximately July of 2007, at the same time it implemented its illegal immigrant hotline, the MCSO also announced that the HSU would begin conducting "saturation patrols," in which MCSO officers would conduct traffic enforcement operations with the purpose of detecting unauthorized aliens during the course of normal traffic stops. (Tr. at 1136:7–9.) There were several different types of traffic saturation patrols, including day labor operations, small-scale saturation patrols, and large-scale saturation patrols. HSU deputies sometimes recruited other deputies and MCSO posse members to assist in day labor and small-scale saturation patrols. Other deputies were always a part of large-scale saturation patrols. There is no evidence that all deputies participating in such patrols from other units were 287(g) certified. All of these saturation patrols were supervised by the HSU command structure, and HSU deputies conducted, or at least participated in, all of the saturation patrols at issue in this lawsuit.

### 1.    Day Labor Operations

In a typical day labor operation, undercover HSU officers would station themselves at locations where Latino day laborers assembled and identify vehicles that would pick up such day laborers. Once a vehicle was identified, the undercover officers notified patrol units that were waiting in the area. (*Id.* at 242:7–23; Exs. 123, 126, 129,

131.) The patrol units located the vehicle, followed it, and "establish[ed] probable cause for a traffic stop." (*Id.*) Once the MCSO deputy had stopped the vehicle, HSU deputies would proceed to the scene to investigate the immigration status of any passengers. (Tr. at 242:24–244:6.) The patrol officer would either issue a traffic citation or give the driver a warning, while the HSU deputies would investigate the immigration status of the passengers and detain them if there was a basis to do so.

Day labor operations took place on: (1) September 27, 2007, at the Church of the Good Shepherd of the Hills in Cave Creek, (2) October 4, 2007, in Queen Creek, (3) October 15, 2007, in the area of 32nd Street and Thomas ("Pruitt's Furniture Store") in Phoenix, and (4) October 22, 2007, in Fountain Hills. (Exs. 123, 126, 129, 131.)

According to the arrest reports of the four day labor operations, all of the 35 arrests were for federal civil immigration violations, and the arrestees were turned over to ICE for processing. (*Id.*) None of the 35 persons were arrested for violating state laws or municipal ordinances. (*Id.*) Further, they were all passengers in the vehicle, not drivers. (*Id.*) Thus, their identity and immigration status were investigated during the course of a stop based on the driver's violation of traffic laws, even when that stop resulted in the driver only receiving a warning. The MCSO made 14 total traffic stops, 11 of which resulted in the 35 arrests. (*Id.*) Thus, only three of the 14 stops did not result in immigration arrests, all of those coming from the Fountain Hills operation. (*Id.*)

None of the arrest reports of these operations contains any description of anything done by the passengers once the vehicle was stopped that would create reasonable suspicion that the passengers were in the country without authorization. The stops were made purely on the observation of the undercover officers that the vehicles had picked up Hispanic day laborers from sites where Latino day laborers were known to gather. It was the nature of the operation that once the stop had been made, the HSU officers proceeded to the scene to conduct an investigation of the Latino day laborer passengers.

The two news releases that covered the day labor operations communicated that the operations were designed to enforce immigration laws, ("Starting at 4:00 am this

1264

morning, September 27, 2007, Sheriff's deputies began cracking down on illegal immigration in Cave Creek"), and were directed at day laborers whom the MCSO perceived as coming from Mexico (quoting Sheriff Arpaio to the effect that "[a]s far as I am concerned the only sanctuary for illegal aliens is in Mexico"). (Exs. 307–08.) They further encouraged citizens to report day labor locations to the MCSO as part of its illegal immigration enforcement operations. (*Id.*)

### 2.    Small-Scale Saturation Patrols

There was testimony and evidence introduced at trial concerning 25 patrols that were described as saturation patrols but were neither explicitly identified as day labor operations nor as one of the 13 large-scale saturation patrols whose arrest reports were admitted at trial. During 15 of the 25 small-scale saturation patrols, all of the persons arrested were unauthorized aliens.[8] During six of the patrols, the great majority of all persons arrested were unauthorized aliens.[9] During four of these patrols, the MCSO made very few total arrests and of that number only a few of the arrests or no arrests were of unauthorized aliens.[10]

---

[8] The 2007 patrols in which all persons arrested were unauthorized aliens occurred on October 30 (ten of ten arrests), November 7 (eight of eight arrests), November 15 (nine of nine arrests), November 21 (12 of 12 arrests), November 29 (nine of nine arrests), December 1 (eight of eight arrests), December 5 (13 of 13 arrests), December 14 (26 of 26 arrests), and December 22 (two of two arrests). (Exs. 80, 81, 114, 120.) The 2008 patrols in which all persons arrested were unauthorized aliens occurred on January 4 (six of six arrests), January 5 (four of four arrests), January 31 (two separate patrols) (six of six arrests), February 4 (three of three arrests), and September 4 (11 of 11 arrests). (Exs. 112, 114.)

[9] The 2007 patrols in which the great majority of all persons arrested were unauthorized aliens occurred on December 8 (16 of 17 arrests), and December 10 (five of eight arrests). (Ex. 114.) The 2008 patrols in which the great majority of all persons arrested were unauthorized aliens occurred on February 29, (eight of 11 arrests), May 6–7 (14 of 18 arrests), July 8 (18 of 19 arrests), and August 19 (12 of 16 arrests). (Exs. 108, 117, 119.)

[10] The 2008 patrols in which no arrests were made of unauthorized aliens occurred

- 13 -

The small-scale saturation patrols seem to be divisible into two different types of operations. As with day labor operations, many of these small-scale saturation patrols, particularly those conducted before May 2008,[11] show an extremely high correlation between the total number of traffic stops executed in an operation and the number of those stops that resulted in one or more immigration arrests. These small-scale patrols with high arrest ratios seem to have been either day labor operations or had targeting elements very similar to day labor operations in that the patrols targeted vehicles that picked up Latino day laborers.

The second type of small-scale patrol (post-May 2008) appears to principally rely on traffic patrols which, while using traffic stops as a pretext for enforcing immigration laws, did not uniquely target vehicles who picked up day laborers. These patrols thus had a higher number of stops during the operation. Both types of small-scale patrols were conducted at locations either where the MCSO had previously conducted day labor operations or day laborers were known to congregate. (Exs. 76, 80, 81, 108, 112, 114, 117, 119, 120, 125, 175, 286.)

Participating deputies kept track of certain figures during their patrols. Although there was some variation in the categories of information kept by the deputies, the deputies were always required to keep track at least of the number of persons arrested for federal immigration violations and the number of unauthorized aliens who were arrested on state charges. (*See, e.g.*, Exs. 97, 102, 111.) After the patrol, supervising officers would collect the individual stat sheets and summarize the activity during the patrol by

---

on February 25 (zero of two arrests) and on October 10 (zero of one arrest). (Exs. 114, 125.) The 2009 patrols in which a majority of the arrests made were of other than unauthorized aliens occurred on January 23 (one of five arrests) and May 29 (three of 11 arrests). (Exs. 175, 286.)

[11] One exception is the December 2007 traffic operation at Aguila, Wickenburg, and Wittmann. (Ex. 76.)

- 14 -

statistical category.[12] (Tr. at 1009:11–23.) After the patrol statistics were tallied, Lt. Sousa, Sgts. Madrid or Palmer, or another MCSO officer would send out an e-mail briefing describing the total officer activity during the patrol. (*Id.* at 1010:7–12, 1133:13–14, 690:23–691:3.) Sgt. Madrid would brief Sheriff Arpaio personally on how many unauthorized aliens had been arrested during the patrol. (*Id.* at 1133:13–15.) He would relay the number of people arrested for not being legally present in the country up his chain of command, because he was asked for this information by his supervisors. (*Id.* at 1153:16–25.) Sgt. Palmer would do likewise. (*Id.* at 690:23–691:3.)

During both types of small-scale patrols, the MCSO issued news releases that emphasized that their purpose was immigration enforcement.

### a.    Small-Scale Patrols with High Arrest Ratios

After the day labor operation at Pruitt's Furniture Store, the Pruitt's area remained a focal point for activists. In response to the protests and the continuing presence of day laborers, the MCSO conducted 11 small-scale traffic saturation patrols in that area in the months between November 2007 and February 2008.[13] Its first two large-scale saturation patrols were also centered on the same area.[14]

---

[12] Although most of the deputies' actual statistics sheets have been destroyed, a few remain and are in the record, although there was some variance between in the categories of information requested for various patrols. (Doc. 235-3, Exs. 9–11.) Many if not all of the summary sheets remain and are in the record.

[13] October 30, November 7, November 21, December 1, December 8, December 10, and December 22, 2007, and January 5, January 31, February 4, and February 25, 2008. The exhibit for the January 5 patrol reports two separate small-scale saturation patrols occurring on the same day—one at Pruitt's and one in Avondale. The operation at Pruitt's had one stop that resulted in two immigration arrests with a citation issued to the driver.

[14] At the Court's request, the parties filed a stipulation concerning exhibits that contained arrest information associated with particular MCSO operations. That stipulation omitted three follow-up operations that occurred at Pruitt's on December 22, 2007, (Ex. 114 at MCSO 014904), January 5, 2008, (Ex. 114 MCSO 014693), and February 25, 2008 (Ex. 114, MCSO 014533). Although, as will be detailed below, none

- 15 -

As a whole, the individual reports of the small-scale operations around Pruitt's show an extremely high correlation between total stops and stops that resulted in immigration arrests. Only about half of the Pruitt's arrest reports kept track of the exact number of stops made during an operation. Others made general estimates of the total number of stops, stated the number of immigration arrests resulting from the total stops, or stated the number of citations issued to other vehicles from which no arrest was made. This information is probative of the correlation that existed between total stops and stops that resulted in immigration arrests during these operations.

Reports of the October 30 and November 7 operations were written by Sgt. Baranyos, who preceded Sgt. Palmer at HSU. These reports, while not specifying the total number of stops,[15] nevertheless show that all recorded stops resulted in one or more immigration arrests.[16] (Ex. 114.)

of these reports resulted in significant arrests either on immigration or state criminal charges, they apparently were saturation patrols, even if small ones, and the Court thus considers them.

[15] To the extent that the reports authored by Sgt. Baranyos state that "numerous" stops were made during an operation, the Court notes that he may have had a generous understanding of the word "numerous." Note for example his report of the October 30 operation in which he stated that "numerous" traffic violations occurred that resulted in four traffic stops. (Ex. 114 at MCSO 014678.) Further, in his November 15 report of a saturation patrol in Mesa, Sgt. Baranyos noted that "numerous traffic stops were conducted in the area with the following results," and then sets forth three traffic stops that resulted in the issuance of three citations and six immigration arrests. (Ex. 120.) His use of the term numerous thus suggests that for Sgt. Baranyos four stops were "numerous" stops.

[16] In the October 30 report, Sgt. Baranyos stated that HSU "conducted four traffic stops for numerous traffic violations" and that the four stops resulted in the arrest of ten illegal immigrants. All ten were arrested for violating federal immigration law and turned over to ICE for administrative processing. While the report does not establish that each traffic stop resulted in the arrest of at least one illegal immigrant, it does establish a high number of arrests of illegal aliens for a relatively low number of traffic stops. The drivers of all four vehicles were issued civil citations, and there is no other record of arrests or citations issued during the operation. (Ex. 114 at MCSO 014678.) Similarly, in the

- 16 -

The next four of the small-scale operations at Pruitt's (taking place between November 21 and December 10) specified both the total number of traffic stops made during each operation and the number of traffic stops that resulted in the arrest of unauthorized aliens. 24 stops were made, and 21 resulted in immigration arrests.[17] (*Id.*)

After the first six operations, the number of stops and immigration arrests at Pruitt's declined.[18] (*Id.*)

These reports suggest that as the Pruitt's location became known for constant

_____

November 7 operation, Sgt. Baranyos stated that "Detectives conducted numerous traffic stops in the area "with the following results." He then set forth four stops which resulted in the eight immigration arrests. Sgt. Baranyos noted no other traffic citations issued or arrests occurring during the operation. All eight persons arrested were passengers in their respective vehicles. (*Id.* at MCSO 014672–73.)

[17] The MCSO made four traffic stops during its November 21 operation. (*Id.* at MCSO 014893.) All four of them resulted in the arrest of persons who were in the country illegally. (*Id.*) In the December 1, 2007 operation, the MCSO made five stops each of which resulted in at least one federal immigration arrest. (*Id.* at MCSO 014665–67.) In its December 8 operation, nine out of ten total traffic stops resulted in the arrest of at least one unauthorized resident. (*Id.* at MCSO 014663–64.) In its December 10 operation three out of five stops resulted in the arrest of five unauthorized persons. (*Id.* at MCSO 014659.)

[18] In the December 22 summary report, Sgt. Madrid noted that one stop resulted in both immigration arrests made during the operation where "several stops were made" resulting in six other traffic citations being written to U.S. citizens. (*Id.* at MCSO 014909.) In its January 5, 2008 operation two out of four total traffic stops resulted in arrests of unauthorized aliens. (*Id.* at MCSO 014693.) In his reports for January 31, February 4, and February 25, Sgt. Madrid noted, apparently as a matter of form, that "several traffic stops were made." On January 31, one of these 'several stops" resulted in the arrest of two unauthorized aliens, on February 4, two of these "several stops" resulted in the arrests of three unauthorized aliens. "[A] few other stops" were made "that resulted only in traffic citation." (*Id.* at MCSO 014519, 014525.) In the final Pruitt's operation, on February 25, 2008, none of the several stops resulted in the arrest of an unauthorized alien—some stops resulted in traffic citations, one driver was arrested for driving on a suspended license, and another was arrested for possessing drug paraphernalia. (*Id.* at MCSO 014533.)

1269

immigration patrols, both small and large scale, the success rate of such operations declined. But prior to that time, the MCSO made an extraordinary number of immigration arrests per vehicle pulled over. The MCSO kept the public apprised of its efforts to combat illegal immigration at Pruitt's. (Ex. 309 ("Illegal immigration activists have protested at Pruitt's every Saturday in the last six weeks since Sheriff Arpaio's deputies began patrolling the vicinity of the furniture store near 36th Street and Thomas Road. Already, 44 illegal aliens have been arrested by Sheriff's deputies, including eight illegals arrested this past Saturday during the weekly protest.").)

Several of the remaining small-scale saturation patrols that occurred in the same time frame, but did not occur at Pruitt's, such as the small-scale patrols at Mesa,[19] Cave Creek and Bell Roads,[20] 35th Avenue and Lower Buckeye Road,[21] and in Avondale,[22]

---

[19] Three successive Mesa patrols occurred in the same general neighborhood on November 15, November 29 and December 5, 2007. (Exs. 120, 80, 81.) For the November 15 operation, Sgt. Baranyos's report details that "numerous" traffic stops and one observed drug transaction resulted in four stops during which MCSO made nine immigration arrests. (Ex. 120.) Reports for the November 29 and December 5 Mesa small-scale saturation patrols were written by Sgt. Madrid. (Exs. 80, 81.) As he did with the last Pruitt's reports, Sgt. Madrid noted in each report that "several traffic stops were made." (*Id.*) During the November 29 operation, nine immigration arrests occurred in the five stops detailed in the report—thus five of "several" traffic stops—that were all processed by ICE. (Ex. 80.) During the December 5 Mesa operation, 13 immigration arrests occurred in seven of "several" traffic stops, and all arrestees were processed by ICE. (Ex. 81.)

[20] The operation at 24th Street and Bell Road took place on January 4, 2008. (Ex. 114 at MCSO 014512.) During this patrol, the MCSO arrested six unauthorized aliens in three traffic stops during an operation in which five total traffic citations were issued. (*Id.*) A total of two civil traffic citations were written to United States Citizens that did not result in immigration arrests during the operation. (*Id.*)

[21] On January 31, 2008, the MCSO conducted a saturation patrol "in the area of the Durango complex" at 35th and Lower Buckeye roads. (*Id.* at MCSO 014519.) Three stops at or close to that intersection each resulted in the immigration arrests of a total of four persons, all of whom were unauthorized but most, if not all, of whom were arrested on unspecified state charges. (*Id.*) There were "a few other stops" made during this

- 18 -

similarly involved operations that demonstrated a remarkably high correlation between the number of stops made by deputies in an operation and the number of stops that result in an immigration arrest.

Based on the high arrest to stop ratios in the 17 small-scale saturation patrols discussed above, if the MCSO was not conducting day labor operations, it was conducting operations very similar to them with comparable targeting elements.[23] As with the day labor operations, these high-ratio small-scale saturation patrols all involve only "several" stops at most. Yet the MCSO deputies participating in these operations made immigration arrests on a considerable majority of their recorded traffic stops. Many of the stops resulted in the arrest of multiple illegal aliens for each stop. All or a considerable number of these small-scale patrols may in fact have been day labor operations. But even if not, the high stop to arrest ratio leads the Court to conclude that the targeting factors used by the MCSO in these operations to determine whether to stop the vehicles included the race and work status of the vehicle's occupants.

### b.     Small-Scale Operations Without High Arrest Ratios

operation that "resulted only in traffic citation." (*Id.*) Note that this report was filed as a joint report for saturation operations that occurred both at the Durango complex and at Pruitt's on the same day. The Pruitt's operation resulted in one stop that resulted in two arrests of unauthorized persons. The Durango operation resulted in three stops that resulted in four arrests of unauthorized persons. Both operations resulted in the arrest of six persons, who were not authorized to be in the country, but five out of the six were arrested on state charges, one was turned over to ICE. (Ex. 114 at MCSO 014519.)

[22] On February 29, 2008, the MCSO conducted a saturation patrol in District 2 in Avondale and made seven total traffic stops. Four of those stops resulted in eight arrests of unauthorized aliens. (Ex. 119.)

[23] 13 of the 25 small-scale operations reflect a high ratio of total stops to stops that resulted in immigration arrests. Four more Pruitt's operations were the final small-scale operations conducted at Pruitt's after it would have become apparent that MCSO was conducting repeated enforcement out of that location.

1271

1   The remaining eight operations[24] continued, for the most part, to be located in

2   areas where, based at least on their past operations, the MCSO knew Latino day laborers

3   assembled. While many arrests were made, they arose out of a smaller percentage of total

4   stops.

5   For example, the December 14, 2007 Aguila operation produced 29 arrests, 26 of

6   which were for immigration violations with all the immigration arrests processed

7   administratively through ICE. (Ex. 76.)[25] Those arrests, however, came from only five of

8   the 35–40 stops. (*Id.*) Still, the nature of the arrests demonstrates that the operation, no

9   matter how it was carried out, was designed to engage in immigration enforcement.

10   Therefore, the persons who were stopped, contacted or cited, were all contacted with the

11   premier goal of enforcing immigration laws.

12   On May 6–7, 2008, the MCSO returned to Fountain Hills, where it had previously

13   conducted a day labor operation, and conducted a two-day saturation patrol there. During

14   the first day of this operation, MCSO made seven traffic stops with four of those seven

15   stops resulting in immigration arrests, thus reflecting a high ratio of stops to immigration-

16   related arrests. (Ex. 108.) Seven of the eight unauthorized persons arrested were

17   processed through ICE while one was arrested on state charges for an outstanding felony

18   warrant and an ICE detainer was attached. (*Id.*) During the operation's second day, Sgt.

19   Palmer estimated that MCSO made approximately 20 stops. (*Id.*) Only seven of those

20

21   [24] The December 14, 2007 operation in Aguila; the May 6–7, 2008 operation in

22   Fountain Hills; the Cave Creek operations on July 8, August 19, and September 4, 2008;
the two operations at 7th Street and Thunderbird operations occurring on October 10,

23   2008 and January 23, 2009; and the May 29, 2009 operation in Avondale.

24   [25] The MCSO conducted this saturation patrol with the primary focus on the town

25   of Aguila and a secondary focus on the City of Wickenburg and the Town of Wittmann.
As the earlier October 4, 2007 MCSO news release demonstrates, an earlier saturation

26   patrol had occurred in the Wickenburg area at which approximately 25 unauthorized

27   aliens were arrested. (Ex. 308.)

28

- 20 -

stops resulted in arrests. (*Id.*) Four of those seven stops resulted in the immigration arrest of seven unlawful residents who were processed through ICE. (*Id.*) While eight of the total of approximately 27 stops that occurred during the two-day operation may still be an impressive ratio of stops to immigration arrests, it is not as high as the ratios for the other small-scale saturation patrols previously discussed.

That trend continued during the subsequent Cave Creek,[26] 7th Street and Thunderbird,[27] and Avondale[28] operations. The MCSO had previously conducted day labor operations in Cave Creek, and Avondale was the site of a prior small-scale patrol and two large-scale patrols. Of note is that during the September 4, 2008 operation in

---

[26] In the first Cave Creek patrol, on July 8, 2008, the MCSO made 59 stops and arrested 19 people. 18 of the 19 persons arrested were unauthorized aliens. (Ex. 117.) During the August 19 saturation patrol, the MCSO made 47 stops that resulted in 16 arrests, 12 of whom were unauthorized aliens. (Ex. 109.) During the September 4 saturation patrol, the MCSO arrested 11 persons on 33 stops with all of the persons arrested being unauthorized aliens. (Ex. 114.)

[27] The 7th Street and Thunderbird operations took place on October 10, 2008, and January 23, 2009. The October 10 saturation patrol was made in response to vandalism complaints, and only one arrest was made for a liquor violation warrant. (Ex. 125.) During the January 23 saturation patrol, five arrests were made, only one of which was of an unauthorized alien booked on state charges. (Ex. 286.)

[28] The May 29, 2009 Avondale patrol was apparently not planned in advance, but was conducted "[d]ue to the vendor detail being rescheduled." (Ex. 175.) On that date, the MCSO made 11 arrests, three of whom were unauthorized aliens and all of whom were arrested on state charges ranging from driving on a suspended license to open container. (*Id.*) A vendor detail was apparently an operation in which MCSO targeted "unpermitted food vendors, which are generally peddlers using shopping carts or modified bicycles selling food." (Ex. 100.) One of the goals of the operation was to enforce the County Health Code, but such operations were also targeted at unauthorized aliens as the same instructions about contacting a suspect about his immigration status that were eventually given in large-scale saturation patrols were also given to deputies participating in such operations. (*Id.*) Because food vendors are not by definition members of the Plaintiff class as certified in this action, the Court does not further consider such operations.

- 21 -

Cave Creek, ten of the 11 persons arrested provided their names, all of which were Hispanic.[29] (Ex. 112.) The single person arrested who did not provide his name was nevertheless arrested on immigration charges, as were the ten others. (*Id.*) All were administratively processed through ICE. (*Id.*)

Despite the lower stop to immigration arrest ratios, the MCSO specifically identified some of these operations in news releases as an integral part of Sheriff Arpaio's "illegal immigration stance." (Ex. 316; *see also* Exs. 315 (May 8, 2008 news release describing arrests of "illegal aliens" in Fountain Hills), 186 (July 8, 2008 news release describing Sheriff's Illegal Immigration Interdiction Unit responding to complaints from Cave Creek citizens and announcing that "in a matter of five hours, deputies conducted 81 interviews, in the process of making 59 traffic violation stops. During those traffic stops, 19 people were arrested and taken into custody, including the 18 illegal aliens"), 332 (news release dated September 4, 2008 stating, "Early this morning Sheriff Arpaio's Illegal Immigration Interdiction unit (Triple I) saturated the towns of Cave Creek and Carefree. In four short hours, eleven illegal aliens were arrested; . . . In the last two weeks deputies have arrested twenty three illegal aliens in Cave Creek.").)

### 3.    Large-Scale Saturation Patrols

The first 13 large-scale saturation patrols that the MCSO conducted were the principal focus of trial testimony. The large scale saturation patrols were preceded by,

---

[29] At trial, the parties introduced a list of Hispanic surnames from the 1980 U.S. census. (Ex. 320.) If a surname or part of a hyphenated surname appeared on the census list of Hispanic surnames, the Court concluded that the name was a Hispanic name. If the name did not appear on the list, the Court did not count it as a Hispanic surname even if it was a close alternate spelling or the name otherwise appeared to be Hispanic. At trial, the MCSO noted that Hispanic surnames are not a flawless indicator of Hispanic identity. Several deputies noted, for example, that Sgt. Madrid's wife is not Hispanic although she now has a Hispanic surname. The Court accepts that Hispanic names are not a perfect indicator of Hispanic identity. A Hispanic surname is nevertheless probative of Hispanic identity.

and to some extent conducted simultaneously with, the smaller-scale saturation patrols. The large-scale saturation patrols began in January 2008. They continued until well after the period that arrest reports for such operations were provided in evidence. Like the last eight small-scale saturation patrols discussed above, large-scale saturation patrols mostly consisted of enforcing traffic and other laws.  Participating deputies made stops for minor infractions of the traffic code that departed from MCSO's normal traffic enforcement priorities. Again, once a vehicle was stopped, the deputies would determine whether to investigate the identities of the occupants of the vehicle.

Unlike the small-scale saturation patrols, the large-scale operations involved many more patrol deputies and covered larger areas. Lt. Sousa, who supervised the HSU as of September 2007, oversaw most of the large-scale saturation patrols either as Operations Commander or Deputy Operations Commander. The two HSU supervising sergeants— for most such patrols, Sgts. Madrid and Palmer, and before Sgt. Palmer, Sgt. Baranyos— were typically "Operations Supervisors" for such patrols. Deputies participating in the large scale patrols were frequently assigned from multiple divisions of the MCSO, whether or not the deputies were 287(g) certified. (Tr. at 697:19–23, 1135:20–24.) Both HSU and non HSU deputies who participated in such patrols investigated the identity of a vehicle's passengers.[30] If non-287(g) certified officers encountered persons they believed to be in the United States without authorization, they were supposed to detain the person and place a radio call for a 287(g) certified deputy to respond and handle the matter.

Deputies assigned to participate in large-scale saturation patrols were expected to sign-in at a briefing that would take place at the command post prior to the patrol and

---

[30] Deputies Kikes and Beeks, who testified at trial, were not 287(g) certified at the time that they participated in all or most of the saturation patrols, but they nevertheless made immigration arrests in each such patrol. Deputy Kikes participated in at least three saturation patrols, Deputy Beeks participated in at least four. They both were noted as the arresting officer in making 287(g) arrests during operations in which they were not authorized to make such arrests. (Ex. 82 at MCSO 001851; Tr. at 1477:3–10.)

1  read all or parts of the operation plans at that time. (*Id.* at 995:6–11.) Lt. Sousa did not

2  distribute many copies of such operation plans because he did not want them to become

3  available to the general public. (*Id.* at 1059:2–12.) Deputies were also frequently given an

4  oral briefing at the command post by Lt. Sousa, or other members of the MCSO

5  command structure at the time of sign-in. Not all participating deputies attended the

6  briefings, signed in to the operation, or read all of the operations plans.[31]

7      After conducting each large-scale saturation patrol, MCSO created records

8  documenting arrests made on those patrols. (Exs. 77, 79, 82, 87, 90, 97, 102, 111, 168,

9  170, 174, 176, 179–82.) There are not complete arrest records for all such patrols, but the

10  arrest reports generally contain the names of the persons arrested, the charges on which

11  they were arrested, the initial reason for stopping the vehicle in which the arrested

12  person(s) were occupants, and whether the person was an unauthorized alien.

13      The first two large-scale patrols are exceptions. The report for the January 18–19,

14  2008 large-scale saturation patrol at Pruitt's contains no names of arrestees, arresting

15  officers, or the probable cause that justified the initial stop. (Ex. 77.) Consequently, that

16  report is not included in many of the calculations that appear later in this Order. The

17  report for the second large-scale saturation patrol at Pruitt's (March 21–22, 2008)

18  contains a list of arrestees that includes their names, but it does not identify arresting

19  officers or the probable cause supporting the initial stop.[32] (Ex. 79.)

20      The reports from the 11 large-scale patrols that took place between March 27,

21

---

22  [31] The arrest records demonstrate that not infrequently an officer made an arrest
23  who did not sign in. For example, Deputy Kikes conducted an arrest during the saturation
    patrol on March 27, 2008, but never signed the roster. (Tr. at 616:3–15; Ex. 82.) And
24  while virtually every HSU officer would participate in the saturation patrols, (*id.* at
    683:18–21), members of the HSU would typically not attend the briefings conducted
25  prior to the saturation patrols (*Id.* at 1501:18–25).

26  [32] Although the arrest sheets give the name of 43 people arrested, the tally sheet
27  suggests that 44 people were arrested. (Ex. 79.)

28

- 24 -

2008, and November 18, 2009, generally include the name of an arresting officer, the alleged probable cause supporting the stop, the name of the person arrested, the charge for which the person was arrested, and whether the person was processed under 287(g) for not being legally present in the country.[33] (Exs. 82, 87, 90, 97, 102, 111, 168, 170, 174 178.)

Most of the MCSO administrators and deputies who testified acknowledged that immigration enforcement was at least a primary purpose—if not the primary purpose—of such operations. Insofar as any MCSO officers testified that there was no particular purpose associated with the large scale saturation patrols at issue other than general law enforcement, their testimony is outweighed by substantial, if not overwhelming, evidence to the contrary.[34]

As with the day labor operations and small-scale saturation patrols, participating

---

[33] The report for the saturation patrol on September 5, 2009, does not record the alleged probable cause supporting the stop. (Ex. 170). The reports for the October 16–17, 2009, and November 16–18, 2009, saturation patrols again include the name of an arresting officer, the alleged probable cause for the stop, and the charge for which a person was arrested. (Exs. 174, 178.) Because the MCSO's 287(g) field authority had been revoked by this time, they do not indicate the use of 287(g) authority, although they do indicate that some detainees were turned over to ICE. (*Id.*)

[34] For example, Sgt. Madrid readily acknowledged that the principal purpose of such patrols was immigration enforcement. (Tr. at 1136:11–20.) Sheriff Arpaio testified that in addition to using the patrols to enforce federal immigration laws, he used the saturation patrols to enforce the state human smuggling and employer sanctions laws. (*Id.* at 330:9–12.) Chief Sands testified, although somewhat reluctantly, that immigration enforcement was one of the purposes of the saturation patrols. (*Id.* at 786:14–18, 787:5–6.) Sgt. Palmer, while not acknowledging that immigration enforcement was a purpose of such patrols, did acknowledge that he expected to arrest a large number of people who were not lawfully present in the country on 287(g) authority during such patrols. (*Id.* at 688:9–11.) Lt. Sousa and Deputy Rangel denied that immigration enforcement was a purpose of such patrols and testified that the saturation patrols were "based on citizens' complaints referenc[ing] criminal activity or criminal nuisance." (*Id.* at 993:24–994:1, 943:15–16.)

deputies were required to keep track of the number of unauthorized aliens they arrested during the large-scale patrols and report these figures to their supervising sergeants. The supervising sergeants compiled and summarized these figures to emphasize the number of unauthorized aliens arrested and sent the reports to the MCSO command structure, including the public relations department.

The MCSO public relations department issued news releases discussing the large-scale saturation patrols that either emphasized that their purpose was immigration enforcement, or prominently featured the number of unauthorized aliens arrested during such operations. (Exs. 310 (dated January 18, 2008, announces Central Phoenix operation in which "Illegal Immigration Arrests [are] Anticipated"), 311 ("The Thomas Road crime suppression operation around Pruitt's Furniture Store occurred over a two month time period and resulted in 134 people arrested, 94 of whom were determined to be in the United States illegally."), 312 (dated March 28, 2008, announces ongoing Bell Road Operation and announces 21 arrests, 12 of whom are illegal immigrants five of whom were arrested on state charges), 313 (dated April 3, 2008, announcing crime suppression operation in Guadalupe because "tensions are escalating between illegal aliens and town residents," and further referring to Bell Road/ Cave Creek and 32nd Street and Thomas operations at which 79 of 165 arrests were determined to be illegal aliens), 314 (dated April 4, 2008, announcing 26 arrests of which five were of suspected illegal aliens), 316 (dated June 26, 2008, describing Mesa "illegal immigration" operation, and recent similar operations in Phoenix, Guadalupe and Fountain Hills), 330 (dated July 15, 2008, describing Mesa crime suppression/illegal immigration operation), 331 (dated August 13, 2008, describing West Valley operation designed to capture human smugglers and their co-conspirators), 333 (dated January 9, 2009, announcing Buckeye operation to capture human smugglers and their co-conspirators, and "in the course of their law enforcement duties, where illegal immigrants are found, they will be arrested and booked into jail"), 334 (dated April 23, 2009, announcing Avondale operations targeting "criminal violations including drugs, illegal immigration and human smuggling"), 349 (dated

- 26 -

October 16, 2009, announcing operation in Northwest Valley targeting "all aspects of illegal immigration laws such as employer sanctions, human smuggling, and crime suppression), 350 (dated October 19, 2009, announcing 66 arrests, 30 of whom were suspected of being in the country illegally).)

### a.    Operations Plans

The operations plans for the first three large-scale saturation patrols (two at Pruitt's, and the third at Cave Creek and Bell Roads) were very rudimentary. Those plans did not include any language regarding officers' use of race, or their discretion (or lack thereof) in making stops and arrests. (Exs. 75, 79, 82.) They included the following instructions: 1) "All criminal violations encountered will be dealt with appropriately," and 2) "Contacts will only be made with valid PC". (*Id.*; *see also* Tr. at 996:14–17.)

The operations plan for the MCSO's fourth large-scale saturation patrol on April 3–4, 2008, at Guadalupe contained more detail. It gave brief instruction on the primary (criminal and traffic enforcement) and secondary (public relations contacts with citizens in the community) objectives of the patrol. (Ex. 86.) It provided separate paragraphs on "**Conducting traffic stops on saturation patrol,**" and "**Conducting interviews reference a contact or violator's citizenship**." (*Id.* (emphasis in original).) The revised instructions also included a sentence that required MCSO officers to book anyone that they observed committing a criminal offense. (*Id.*)

### 1)    Instructions on Conducting Stops

A paragraph in the instructions specified that "[a]ll sworn personnel will conduct all traffic stops in accordance with MCSO Policy and Procedures, as well as training received at the basic academy level. **Note:** At no time will MCSO personnel stop a vehicle based on the race of the subjects in the vehicle (racial profiling is prohibited)." (Ex. 86.) That general instruction remained in operation plans for many of the operations thereafter, (Exs. 90, 97, 102, 111, 169, 174), and was further incorporated into the Triple I team protocols, (Ex. 90 at MCSO 001888).

/ / /

## 2) Instructions on Investigating Citizenship

The next paragraph in the operations plans contained specific instructions both to officers who were 287(g) certified, and those who were not, about "**[c]onducting interviews reference a contact or violator's citizenship**" during a large scale saturation patrol. (Ex 86 (emphasis in original).) Certified 287(g) officers were instructed that they could conduct interviews regarding a person's citizenship status only "when indicators existed per the U.S. Immigration and Nationality Act, Title 8 U.S.C. § 1324, 287g and training received during the 287g training course." (Exs. 86, 90, 97, 102, 111, 169.) The plans did not include the indicators set forth in § 1324, but provided as an example that "[t]he violator does not have a valid identification and does not speak English."[35] (Ex. 86.)

"287g" refers to the section of the act, codified at 8 U.S.C. § 1357(g), that authorizes ICE to certify local law enforcement authorities to enforce federal immigration law. That section itself, however, provides no indicators as to unauthorized presence. Nonetheless, as will be further discussed below, the plan's reference to "training received [by MCSO officers] during the 287(g) training course" explicitly authorized MCSO

---

[35] In fact, while in appropriate circumstances an inability to speak English and an inability to provide a drivers' license may be indicators of unauthorized presence, neither is an indicator listed under § 1324. Section 1324 is the federal criminal smuggling statute, which provides criminal penalties to anyone who "knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry." 8 U.S.C. § 1324(a)(1)(A)(i) (2006). To determine whether the person being smuggled in such circumstances is an alien, the statute provides that any of the three following indicators shall be evidence "that an alien involved in the alleged violation had not received prior official authorization to come to, enter, or reside in the United States": a) records of proceedings in which it was determined that a person was not lawfully present, b) official State Department documents showing that the person was not granted authorization to enter the country, or c) testimony by a federal immigration officer with personal knowledge that a person is not legally present in the country. *Id.* § 1324(b)(3)(A–C). The statute is silent on civil immigration violations or factors like not speaking English or not carrying identification.

1280

deputies to consider race as one factor among others in forming reasonable suspicion in an immigration enforcement context that a person is in the country without authorization.

The instructions also noted that a non-287(g) certified officer could detain persons she or he believed were violating immigration law pending the arrival of a 287(g) officer, but "at no time" could such a "deputy call for a 287(g) certified deputy based on race." (Exs. 86, 97.) However, this instruction was modified for subsequent saturation patrols to indicate that "at no time will a deputy call for a 287g certified deputy based *just* [or *only*] on race." (Exs. 90 at MCSO 001898, (Mesa saturation patrol in June 26–27, 2008) (emphasis added), 102 (Sun City saturation patrol in August 2008) ("at no time will a deputy call for a 287g certified deputy based just on race"), 111 (January 2009 in Southwest Valley), 169 (September 2009 in Southwest Valley) ("at no time will a deputy call for a 287g certified deputy based only on race").) These instructions were also incorporated into the III strike team protocols. (Ex. 90 at MCSO 001888.) This modification made the MCSO's policy on how race could be considered consistent with the instructions given to 287(g) certified officers about conducting interviews.

When presented with an operation plan which stated that officers could not call for a 287(g) certified deputy "based just on race," Sgt. Palmer confirmed that this meant that officers could call a 287(g) certified officer based on race in combination with other factors. (Tr. at 783:3.)

### 3)      Instruction to Book All Criminal Offenders

The operation plan also contained limited instruction concerning those individuals deputies were required to arrest during saturation patrols. This instruction specified in bold print that "**All criminal offenders will get booked**." (Ex. 87.) These instructions, then, while not indicating how deputies should handle civil violations, presumably removed the discretion to issue criminal citations or give only warnings for minor criminal conduct. According to the instruction, if the deputy witnessed or became aware of criminal conduct during the operation, she or he must arrest and book the criminal offender. A similar instruction appeared in the operation plans for many of the large-scale

1281

1  saturation patrols thereafter. (Exs. 86, 90, 97, 102, 111, 169, 174.)

2  **b.  Large-Scale Saturation Patrol Results**

3  By the Court's count, of the 727 arrests recorded during large scale saturation
4  patrols, 347—nearly half—were of persons who were not in the country legally. (Exs. 77,
5  79, 82, 87, 90, 97, 102, 111, 168, 170, 174, 176, 179–82.) The MCSO itself arrived at an
6  even higher figure. (Ex. 359 (March 18, 2010 news release stating that, "[a]ccording to
7  the Sheriff, the 13 previous two-day crime-suppression operations netted a total of 728
8  arrests. Some legal U.S. residents were arrested but of the 728 total arrests, 530 or 72%
9  were later determined to be illegal aliens.").)

10  During the large scale saturation patrols for which arrest records were placed in
11  evidence and last names were available, 496 out of 700 total arrests or 71% of all persons
12  arrested, had Hispanic surnames. (Exs. 79, 82, 87, 90, 97, 102, 111, 168, 170, 174, 176,
13  179–82.) 341 of those arrests involved immigration-related offenses. (*Id.*) Of the 583
14  people who were arrested during saturation patrols that took place while the MCSO had
15  287(g) authority, and where records of the last names were kept, 414, or 71%, appeared
16  to have Hispanic surnames. (Exs. 79, 82, 87, 90, 97, 102, 111, 168, 170.) That percentage
17  remained consistent after ICE revoked the MCSO's 287(g) authority—even then, 82 of
18  the 117 arrests (70%) involved a person with a Hispanic surname. (Exs. 174, 176, 179–
19  82.)

20  **c.  ICE's Revocation of the MCSO's 287(g) Authority**

21  Prior to the actual revocation of 287(g) authority (announced in early October and
22  effective on October 16, 2009) MCSO began noting in its news releases that "a move is
23  underway to suspend [Sheriff Arpaio's] 287 G agreement." (Ex. 353.) ICE began
24  refusing to accept some of the persons that were arrested during MCSO saturation
25  patrols. (Exs. 128, 342.) And in saturation patrols the MCSO began for what appears to
26  be the first time to arrest some unauthorized aliens on the charge of conspiring to violate
27  the Arizona human smuggling law instead of making an arrest on federal immigration
28  charges. (Ex. 168.)

- 30 -

Moreover, sometime before July 15, 2009, Chief Sands asked Sgt. Palmer to conduct legal research into whether the MCSO had authority to enforce immigration law absent the authorization of the Department of Homeland Security. (Tr. at 702:19–24.) Sgt. Palmer conducted an internet search, and copied his findings into an e-mail to Chief Sands on July 15, 2009. (*Id.* at 703:11.) The e-mail stated that "State and local law enforcement officials have the general power to investigate and arrest violators of federal immigration statutes without INS knowledge or approval, as long as they are authorized to do so by state law." (Ex. 269.) It continued, "[t]he 1996 immigration control legislation passed by Congress was intended to encourage states and local agencies to participate in the process of enforcing federal immigration laws." (*Id.*) The e-mail provided as a citation for this proposition "8 U.S.C. § 1324(a)(1)(A)(iv)(b)(iii)."[36]

That section of the United States Code did not then and does not now exist. Nevertheless, it apparently provided the impetus for Sheriff Arpaio's public statements that the MCSO maintained the authority to make immigration arrests despite ICE's suspension of 287(g) authority. In his interview with Glenn Beck a few days after the effective date of the ICE revocation, Sheriff Arpaio stated that MCSO officers retained the authority to enforce federal immigration law because it had been granted by "that law in 1996, part of the comprehensive law that was passed, it's in there." (Tr. at 364:24–363:5.)

In such interviews the Sheriff stated that the revocation of 287(g) authority did not end the MCSO's attempts to enforce federal immigration law. At the time of the revocation the MCSO had approximately 100 field deputies who were 287(g) certified. (Exs. 356, 359, 360.) Shortly after the revocation of his 287(g) authority, Sheriff Arpaio

---

[36] Sgt. Palmer also wrote an email to Lt. Sousa which claimed that "all violations of the INA are federal criminal violations." (Tr. at 708:16–19.) During his 2010 deposition, Sgt. Palmer testified that the MCSO had inherent authority to enforce immigration laws, based on training he had received from Kris Kobach. (*Id.* at 698:23–699:7.)

decided to have all of his deputies trained on illegal immigration law. According to the MCSO, that training enabled all MCSO deputies to make immigration arrests. An MCSO news release dated March 18, 2010 notes:

> Arpaio recently ordered that all 900 sworn deputies be properly trained to enforce illegal immigration laws, a move made necessary after the recent decision by Department of Homeland Security to take away the federal authority of 100 deputies, all of whom had been formally trained by ICE (Immigration and Customs Enforcement) to enforce federal immigration laws.

> 'They took away the ability of 100 federally trained deputies to enforce immigration laws, and so I replaced them with 900 sworn deputies, all of whom are now in a position to enforce illegal immigration laws in Maricopa County," Arpaio said.

(Ex. 359; *see also* Exs. 356, 358 (MCSO news release dated March 1, 2010 stating that "[t]hese arrests are a result of Sheriff Joe Arpaio's recent promise to ensure that all 900 of his sworn deputies receive training on the enforcement of illegal immigration laws."), 360, 362.)

This training erroneously instructed MCSO deputies that a person within the country without authorization was necessarily committing a federal crime, and they thus maintained the authority to detain them for criminal violations. (Tr. 699:3–700:17.) Sgt. Palmer continued to provide such instruction and training until December 2011, when this Court entered its injunctive order preventing the MCSO from detaining persons on the belief, without more, that those persons were in this country without legal authorization. *Ortega-Melendres*, 836 F. Supp. 2d at 994.

At the same time, Sheriff Arpaio gave interviews to the national and local press in which he asserted that if a person is in the country without authorization that person has necessarily committed a criminal offense. "They did commit a crime. They are here illegally." (Tr. at 362:17–21.)

After the revocation of his 287(g) authority the Sheriff continued to run numerous saturation patrols that focused on arresting unauthorized immigrants. (Exs. 350

- 32 -

("[D]eputies turned over a total of 19 of the 30 suspected illegal aliens who were not charged for any state violations to Immigration and Custom Enforcement officials without incident."), 358, 359 (in the 13 previous operations 530 of 728 arrests were of illegal aliens), 361, 362 (in the 14 previous operations, 436 of 839 arrests were of illegal aliens, 78 of 111 arrests in most recent operation were of illegal aliens), 363 (63 of 93 arrests of illegal aliens), 367.) In such operations he continued to arrest and turn over to ICE the unauthorized aliens that his deputies arrested during these patrols. (Ex. 360 (MCSO news release noting that 47 of 64 people arrested in a post-revocation saturation patrol were illegal aliens. 27 of those 47 were arrested on state charges with the remainder being turned over to ICE").) At trial, Sheriff Arpaio testified that he has continued to enforce "the immigration laws, human smuggling, employer sanction" as he did previously. (Tr. at 473:23–474:2.)

In sum, according to the Sheriff, the loss of 287(g) authority did not affect how the MCSO conducted its immigration related operations, including the saturation patrols. (*Id.* at 469:23–470:5). The Sheriff still maintains the right and intention to conduct such operations today. (Tr. at 330:9–14, 469:20–470:2; 473:5–474:7; 474:20–24.) Sheriff Arpaio testified that the last saturation patrol the MCSO conducted prior to trial occurred during October 2011 and was conducted in southwest Phoenix. (*Id.* at 474:8–13.) Nevertheless, the Sheriff testified that the MCSO continues to engage in immigration enforcement even though not using saturation patrols to do so. (*Id.* at 474:14–24.) He noted during his testimony that in the two weeks prior to trial, the MCSO arrested approximately 40 unauthorized aliens, and those that it couldn't charge with a state violation it successfully turned over to ICE. (*Id.* at 502:25–503:6.)

Once the MCSO lost its 287(g) authority, it revised its operation plans for saturation patrols. *See* Section I.D.3.a, *supra*. While the MCSO continued to assert the authority to arrest and detain persons it believed to be in the country without authorization but could not arrest on state charges, it had no practical authority to process

them absent the participation of ICE.[37] Neither the MCSO, nor any state authority, had any prerogative to initiate removal proceedings, authorize voluntary departure or, in appropriate cases, bring criminal immigration charges against such persons. *See, e.g.*, *Arizona v. United States*, ___ U.S. ___, ___, 132 S. Ct. 2492, 2506–07 (2012); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–484 (1999) (federal government retains exclusive discretion on these matters); *Martinez-Medina v. Holder,* 673 F.3d 1029, 1036 (9th Cir. 2011).

Accordingly, the MCSO revised its operation plans for the large scale saturation patrols. Lt. Sousa directed either Sgt. Palmer or Sgt. Madrid to draft what became known as the LEAR Protocol. (Tr. at 1056:14–23.) The LEAR protocol states that "IF a Deputy Sheriff believes with reasonable suspicion he has one or more illegal aliens detained AND there are no state charges on which to book the subject(s) into jail THEN the Deputy will follow the LEAR Procedures outlined below." (Ex. 174.) An officer is to call a field supervisor to location when he "has indicators as outlined above leading him to believe (Reasonable Suspicion) a violator or other subject he is in lawful contact with is in fact an illegal alien in the United States." (*Id.*) Thus the LEAR protocol authorized the deputy to detain the individual prior to further processing from ICE.

Thereafter, the protocol requires the MCSO field supervisor to obtain and "provide a brief summary of the contact, including how the contact was made and what indicators exist that lead to the belief the person is an illegal alien."[38] (*Id.*) The operational plans

---

[37] In a press interview, Sheriff Arpaio apparently stated, however, that if ICE refused to take them he would "load them on a bus and drive them to the border."(Ex. 348.) But aside from this comment in a newspaper article admitted into evidence, there is no evidence that the MCSO actually did, or is doing so.

[38] The LEAR procedures require the field supervisor to ensure that a detailed written record of the encounter is made that includes "all information concerning the contact with any illegal aliens as well as any LEAR contact." (Ex. 174.) It specifies that "information that will be recorded includes . . . the full and complete name of the illegal alien(s), the alien's DOB, full descriptors, an address in AZ if obtainable, the Deputy's

- 34 -

continue to specify that "ICE LEAR will want to talk with the suspected illegal alien via cell phone in order to confirm illegal alien status in the United States. ICE LEAR will determine if their unit will respond to take custody of the illegal alien." (*Id.*) The policy further specifies that "[a]ny person detained solely for illegal alien status in the U.S. whom LEAR refuses to respond for AND for which there is no other probable cause to detail WILL be immediately released from custody." (*Id.*)

MCSO drafted, placed in effect, and trained all of its deputies on this policy. (Tr. at 1055:14–1056:13, 1069:17–1070:18, 1076:11–18.) This policy remains in force at the MCSO. In determining who may be present without authorization for purposes of application of the LEAR Policy, Lt. Sousa noted that MCSO officers "still had the [287(g)] training," so they could "definitely" still use the indicators from that training in carrying out the LEAR policy. (*Id.* at 1007:6–11.)

## II.    SPECIFIC FINDINGS

Based on the facts presented at trial, the Court draws the following factual conclusions:

### 1.    The purpose of the saturation patrols discussed above was to enforce immigration laws.

Many MCSO administrators and deputies who testified acknowledged that immigration enforcement was at least a primary purpose, if not the primary purpose, of saturation patrols. During all types of saturation patrols discussed above, all participating deputies were required to keep track of the number of unauthorized aliens they arrested and report these figures to their supervising sergeants. The supervising sergeants compiled and summarized these figures to emphasize the number of unauthorized aliens arrested and the reports were sent to the MCSO command structure, including the public relations department.

---

name and serial number making the original contact, a phone number to reach the Deputy" and "the person the supervisor spoke to at LEAR." (*Id.*)

The MCSO public relations department issued news releases discussing the saturation patrols. These news releases either emphasized that the patrols' purpose was immigration enforcement, or prominently featured the number of unauthorized aliens arrested during such operations. Most of the time, the reports ignored any other arrests that took place.

The large-scale operation plans contained instructions on initiating investigations into the citizenship status of persons contacted during the operation.

The arrest records also support this conclusion. Every person arrested during the day labor operations was arrested on immigration charges. The vast majority of persons arrested during small-scale saturation patrols were unauthorized aliens. Finally, a significant number of persons arrested during the large-scale saturation patrols were unauthorized aliens.

> **2.      ICE trained HSU officers that it was acceptable to consider race as one factor among others in making law enforcement decisions in an immigration context.**

The testimony of MCSO officers and deputies makes clear that ICE training allowed for the consideration of race as a factor in making immigration law enforcement decisions. At trial, Sgt. Palmer testified that ICE training permitted the use of race as one factor among many in stopping a vehicle, (Tr. at 715:3–19), and that ICE trained him that "Mexican Ancestry" could be one among other factors that would provide him reasonable suspicion that a person is not lawfully present in the United States (*id.* at 715:9–12). Sgt. Madrid testified that he was trained by ICE that a subject's race was one relevant factor among others that officers could use to develop reasonable suspicion that a subject was unlawfully present in the United States. (*Id.* at 1164:4-12.)

Lt. Sousa testified at his deposition that since he was not 287(g) certified and his sergeants were, when it came to what ICE taught in 287(g) training regarding the use of race, "I would have to rely on my sergeants," and that "when we start getting into all the specifics, that's when I lean on my sergeants." (Doc. 431-1, Ex. 90 at 56:15–19.)

- 36 -

Nevertheless**,** Lt. Sousa testified at trial that it was his understanding that ICE officers taught MCSO deputies in their 287(g) training that while race could not be used even as one factor when making an initial stop, it could be used as one of a number of indicators to extend a stop and investigate a person's alienage. (Tr. at 1016:3–7.)

Similarly, the ICE 287(g) training manual expressly allows for consideration of race. The 287(g) training manual for January 2008 that was admitted in the record cites to *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), for the proposition that "apparent Mexican ancestry was a relevant factor" that could be used in forming a reasonable suspicion that a person is in the country without authorization "but standing alone was insufficient to stop the individuals." (Ex. 68 at 7.) In referring to *Brignoni-Ponce,* the ICE materials go on to observe that "[t]his is an administrative case but it also applies in criminal proceedings" and further notes that "[a]n example of this in action in the criminal context is that a LEA Officer cannot stop a vehicle for an investigation into smuggling just because the occupants appear Mexican." (*Id.*)

Alonzo Pena, ICE's Special Agent in Charge of Arizona at the time that ICE began its 287(g) certification training of MCSO officers, testified that it was his understanding that officers with 287(g) authority can form a reasonable suspicion that a person is unlawfully present when "several factors in combination" are present, with race being one of those factors. (Tr. at 1831:17–832:19.) Agent Pena does not believe that race is sufficient in and of itself to give rise to such suspicion, but he does believe that race can be a factor in forming such a suspicion. (*Id.*)

**3.**      **In an immigration enforcement context, the MCSO did not believe that it constituted racial profiling to consider race as one factor among others in making law enforcement decisions. Its written operational plans and policy descriptions confirmed that in the context of immigration enforcement, the MCSO could consider race as one factor among others.**

The MCSO has no general written policy concerning racial profiling. (*Id.* at 465:18–24.) In his trial testimony the Sheriff acknowledged that he had earlier testified

that the MCSO does not need a training program to prevent racial profiling because he did not believe the MCSO engages in racial profiling. (*Id.* at 466:16–19.) He further testified that he believes that the MCSO is "the most trained law enforcement agency in the country with the five weeks of training from the government, [presumably the 287(g) training for those deputies who received it], academy training, in-house training." (*Id.* at 465:21–24.)

The large-scale saturation patrol operation plans written after April 2008 refer deputies to the MCSO Academy training they received about racial profiling. MCSO witnesses who testified concerning the Academy training stated that they received brief and generalized instruction regarding racial profiling, but could remember nothing else about it.[39] There was no testimony that such training defined racial profiling or provided any instruction to officers on how to proceed in the circumstances present in Maricopa County when the MCSO decided to enforce immigration laws.

In addition to the Academy training, Sgt. Madrid testified that Lt. Sousa would also "yell" at the briefings prior to the large-scale saturation patrols that "we don't racially profile . . . several times to make sure everybody was clear." (*Id.* at 1191:5–7.) Again, no definition of "racial profiling" was provided during those instructions, and no

---

[39] Deputy Rangel testified that he was trained not to "racially profile" as part of a course on criminal law, and received no further academy or in-service training from the MCSO on racial bias. (Tr. at 899:4–10.) Deputy Armendariz believed the MCSO training was part of a basic ethics class, and described it as follows: "I believe it was short and sweet, and we don't racial profile." (*Id.* at 1549:17–20.) He remembers being told not to racially profile, but has never received a definition of what "racial profiling" meant. (*Id.* at 1151:18–21.) Deputy DiPietro does not recall how the term "racial profiling" was defined during his training prohibiting racial profiling. (*Id.* at 320:3–5.) When asked if he was trained at the MCSO academy regarding the prohibition on racial profiling, Sgt. Palmer stated that he "believe[s] there was" such training. (*Id.* at 753:3–6.) Sgt. Madrid states that he is "sure there was" training at the academy level prohibiting racial profiling, but that "I don't specifically remember it now." (*Id.* at 1214:17–19.)

- 38 -

1290

examples of what would constitute "racial profiling" were offered. (*Id.* at 1215:5–12.) Further, as Lt. Sousa himself testified, when he issued such oral instruction he also told those assembled that he knew that they were not racially profiling, but that he was giving the briefing "to remind you of what people are saying out there and being proactive." (*Id.* at 1024:18–21, 1025:6–8.) According to his testimony a primary reason he issued the instruction was not because he deemed it necessary, but so he could demonstrate to the public that his officers were receiving such instruction and testify during this lawsuit that he had in fact issued such instructions. (*Id.* at 1025:12–17.)

The MCSO introduced in evidence an electronic bulletin board posting on the MCSO's electronic "Briefing Board" for October 21, 2008, where the MCSO published its Illegal Immigration Enforcement Protocols. That posting repeated the instruction that also appeared in the large-scale saturation patrol operations plans after April 2008. "At no time will sworn personnel stop a vehicle based on the race of any subject in a vehicle. ***Racial profiling is <u>prohibited</u> and will not be tolerated***." (Ex. 92 at 3 (emphasis in original).) All those who testified in this lawsuit agreed that it constituted impermissible "racial profiling" for a law enforcement officer to stop a person for a law enforcement purpose based *uniquely or primarily* on a person's race.[40] Nevertheless, a number of

---

[40] Sheriff Arpaio testified when presented with a hypothetical example of a law enforcement officer stopping a person solely because of his race, that "that would be racial profiling." (*Id.* at 468:21–469:5.) MCSO's police practices expert, former Dallas Police Chief Bennie Click defined "racial profiling" as "the unlawful, discriminatory practice of treating race, ethnicity or skin color as a *primary* indication of criminal conduct." (Ex. 1070 at 43 (emphasis added).) Agent Pena defined "racial profiling" as "picking an individual for law enforcement action based solely on his race and no other particular criteria," and understood that ICE 287(g) certification process included training that racial profiling was prohibited under this definition. (Tr. at 1818:24–1819:3.) Agent Jason Kidd of ICE defined "racial profiling" as "the use of race as a determining factor for a law enforcement activity." (*Id.* at 1388:15–16.) Lt. Sousa went so far as to testify that it would constitute "racial profiling" to make a law enforcement contact based on race, even as one among other factors. (*Id.* at 1015:7–11.) Deputy Kikes testified that when instructed not to engage in racial profiling, that meant that "[y]ou don't just pick on the—the Chinese, the Americans, the whites, the blacks, the browns, the greens.

1  MCSO witnesses also testified it was appropriate to consider race as one factor among

2  others in making law enforcement decisions in an immigration enforcement context.

3       As the operations plans themselves and other public pronouncements of the

4  MCSO make plain, while officers were prohibited from using race as the only basis to

5  undertake a law enforcement investigation, they were allowed as a matter of policy and

6  instruction to consider race as one factor among others in making law enforcement

7  decisions in the context of immigration enforcement. For example, while prohibiting

8  racial profiling generally, the operations plans simultaneously instruct MCSO officers

9  that they may consider the race of persons they encountered as one factor among others

10  in making law enforcement decisions. First, according to the operations plans, a 287(g)

11  certified officer should initiate investigations into a person's citizenship status "when

12  indicators existed per . . . the training received during the 287g training course." (Exs. 86,

13  90, 92, 97, 102, 111, 169.) The testimony at trial was uniform that during their 287(g)

14  training course MCSO officers were taught that they could use race as one indicator

15  among others in forming reasonable suspicion that a person was in the country without

16  authorization.

17       Second, the operations plans instructed MCSO officers who were not 287(g)

18  certified that they should not summon a 287(g) certified officer to the scene to investigate

19  a person's immigration status based only on that person's race. (Ex. 90 at MCSO 001898;

20  Exs. 102, 111, 169.) In discussing this instruction at trial, both Sgts. Palmer and Madrid

21  testified that, under such instruction, MCSO officers could consider the race of the

22  subject as one factor among others in making such a determination; they just could not

23

24  Anybody and everybody who had a violation was to be stopped; was to be cited; was to
    be pulled over." (*Id.* at 612:10–13.) Deputy Armendariz, an HSU deputy, testified that

25  ICE training provided a list of indicators with which to do investigations. He does not
    recall if race was one of the indicators. (*Id.* at 1486:19–1487:13.) Deputy Ratcliffe stated

26  that during his 287(g) training, he was taught that there was "no place for" the use of race

27  in making law enforcement decisions. (Tr. at 1355:8–10.)

28

- 40 -

consider the subject's race as the only factor. (Tr. at 782:8–11, 783:3, 1162:14–23, 1170:5–15.) This testimony reasonably acknowledged the obvious: that while MCSO policy prohibits using race as the only or sole factor, it still permits an officer to use race as a factor in making a law enforcement decision.

The MCSO's frequently-issued news releases reflect this understanding. In one, the MCSO described its policy pertaining to decisions about whom to pull over during these operations. (Ex. 342.) Like the operation plans, the policy described in the news release prohibits racial profiling without defining the term, while at the same time permitting the use of race as a factor in an officer's decision to pull over a vehicle. (*Id.*) In the news release the Sheriff is quoted as saying, "All stops will be made in full accordance with Sheriff's Office policy and procedures and at no time will any vehicle be stopped *solely* because of the race of the occupants inside that vehicle. Racial profiling is strictly prohibited, Arpaio says." (*Id.* (emphasis added).) In interpreting similar language in the operations plans that governed when a non-certified deputy should summon a certified deputy to initiate an immigration investigation, Sgts. Palmer and Madrid noted that in prohibiting such a deputy from acting solely based on the race of the subject, the policy permitted the deputy to consider race as one factor among others in deciding to act. (Tr. at 782:8–11, 783:3, 1162:14–23, 1170:5–15.) This same understanding would apply to the MCSO policy that prohibits using race as the sole factor in deciding to pull over a vehicle during a saturation patrol. (Ex. 342.)

Further, as is discussed below, both Sgts. Palmer and Madrid testified that so long as there was a legitimate basis for an officer to pull over a vehicle for a traffic infraction, there was by definition no racial profiling involved in the stop. For example, Sgt. Palmer testified that if, in reviewing arrest reports, he saw that a deputy had reported that he had reasonable suspicion to justify a stop that meant the deputy did not engage in "racial profiling." (Tr. at 724:22–725:1.) Sgt. Madrid testified that if he determined that an officer had probable cause to make a stop, he "wouldn't even suspect" that the officer had engaged in racial profiling. (*Id.* at 1172:20–23.)

- 41 -

Thus, as illustrated by these operation plans and news releases, while the MCSO did prohibit racial profiling, it understood racial profiling to mean making law enforcement decisions based exclusively on racial factors. The MCSO did not understand this term, in an immigration context, to prohibit the use of race as a factor among others in making a law enforcement decision. Thus, MCSO deputies could consider race as one factor in stopping a vehicle or initiating an investigation so long as race was not the sole basis on which deputies made that decision. Accordingly, the Court finds that the MCSO operated pursuant to policies that, while prohibiting "racial profiling," did not require MCSO officers to be race-neutral in deciding how to act with respect to immigration investigations; the policies merely required that race not be the sole reason for their decision.

### 4. The MCSO considered Latino ancestry as one factor among others in choosing the location for saturation patrols.

The MCSO almost always scheduled its day labor and small-scale saturation patrols where Latino day laborers congregated; the same is true for a considerable number of its large-scale saturation patrols.

The MCSO witnesses uniformly testified that there is nothing about being a day laborer per se that is illegal. But, as both the testimony at trial and a number of MCSO's news releases demonstrate, in selecting locations for day labor, small-scale and large-scale saturation patrols, the MCSO equated being a day laborer with being an illegal alien. (Exs. 307 (news release describing a crackdown on illegal aliens at a day labor center), 308 (news release entitled "Sheriff Arpaio Goes After Day Laborers"), 309 (news release referring to "illegal immigrant day laborers" and "pro-illegal day laborer supporters" who "continue to protest the Sheriff's MCSO policies at Pruitt's Furniture Store"), 310 (anticipating the arrest of many unauthorized aliens in the Pruitt's location because it remains a popular spot for day laborers), 311 (news release which noted "there are two legal day laborer centers in the Bell Road area which are 'magnets for more illegal aliens'")); *see also* Doc. 453 at 150 ¶ 36 (the MCSO acknowledges that many

- 42 -

MCSO officers thought day laborers were illegal aliens).) It is presumably for this reason that the MCSO news releases invited Maricopa County citizens to report day laborers to the MCSO on its immigration hotline. (Ex. 309 ("The Sheriff recently initiated an Illegal Immigration Hot Line . . . to help citizens report information regarding illegal aliens. Since the tip line was implemented, over 120 calls of 2,100 have been received specifically about day laborers.").)

Theoretically, the MCSO could have selected sites for operations due only to the presence of day laborers absent any racial considerations. A day laborer is neither necessarily Latino nor unauthorized. And there is nothing about being a day laborer that is, in and of itself, illegal. (Tr. at 386:17–22, 1193:8–9, 864:2–4.) But the MCSO did not conduct operations in which it simply checked the identity and immigration status of all day laborers. Nor did it present at trial evidence that would suggest that during the time it had 287(g) authority, it had a reasonable basis on which to form a suspicion that any day laborer, regardless of race, was an unauthorized alien. Rather, pursuant to at least its own policy, the MCSO had to have a basis under Arizona law to stop and question persons prior to checking their immigration status. When the MCSO's underlying purpose was immigration enforcement and not traffic enforcement it implemented that policy by directing patrol vehicles to follow and strictly enforce all requirements of the traffic code against vehicles that picked up Latino day laborers. Sgt. Madrid, and Deputies Rangel and DiPietro confirmed that the purpose of the day labor and small-scale operations was "to investigate day laborers for their immigration status." (Tr. at 1152: 12–14, 792:1–24, 908:8–11, 1137:6–8.)

The evidence demonstrates that the MCSO specifically equated being a Hispanic or Mexican (as opposed to Caucasian or African-American) day laborer with being an unauthorized alien. (Exs. 308 (MCSO news release asserting that the only sanctuary for illegal alien day laborers is in Mexico), 310 (MCSO news release asserting that despite the anticipated arrest of many "illegal aliens" the MCSO is not engaged in racial profiling.), 311; *see also* Doc 453 at 150 ¶¶ 28–30 (the MCSO acknowledging that the

- 43 -

Sheriff and MCSO deputies believed the overwhelming number of illegal aliens in Maricopa County are from Mexico and South America.) In his testimony Sheriff Arpaio acknowledged that he would not investigate Caucasians for immigration compliance because it would not have occurred to him that they were in the country without authorization. (Tr. at 441:22–442:3.) For the totality of all of the MCSO operations in which it targeted and arrested day laborers, Chief Sands could not identify a single instance in which the MCSO arrested a day laborer who was not Hispanic on any charge. (Doc. 530 at 1 ¶ 84.) Similarly, there is no evidence that undercover officers directed patrol officers during day labor operations to stop vehicles that had picked up day laborers that were not Latino. Thus, the Court concludes as a matter of fact that MCSO officers, who believed that Latino day laborers were unauthorized, centered day labor operations in locations where specifically Latino day laborers assembled, and where MCSO deputies perceived they had a higher likelihood of encountering persons present in the country in violation of immigration laws. The logistics of such operations, together with other evidence introduced at trial, show that the MCSO used this combination of race and work status in determining where to locate operations in which it would target vehicles for pretextual enforcement of traffic regulations to investigate immigration status.

However, several MCSO witnesses testified that the locations for these operations were selected in response to complaints about day laborers being involved in other illegal activity, and not principally to enforce immigrations laws against Hispanics. While the Court recognizes that a single law enforcement operation can serve multiple purposes, and that law enforcement officials are entitled to considerable deference in locating and conducting their operations, the Court does not credit such testimony because, among other reasons, there are in the record some direct connections between a citizen complaint regarding Hispanics and Latinos congregating in a certain area and an MCSO enforcement action.

///

- 44 -

### A. The Cave Creek day labor operation was not in response to public safety issues presented by the gathering of day laborers.

According to the news release issued by the MCSO after the first Cave Creek operation, the genesis for that operation was "tips received on [Sheriff Arpaio's] newly implemented illegal immigration hotline" about a local church providing assistance to day laborers. (Ex. 307.) According to the news release, the day laborers also caused "public safety issues along Cave Creek Road." (*Id.*) However, on September 19 and 22, 2007, several days previous to the September 27 operation, Latino HSU officers went undercover to the church, signed up for work, and verified the presence of day laborers inside the church parking lot. The undercover reports detailed that the Good Shepherd of the Hills congregation allowed day laborers to "sign-in" and wait "inside their property" to be employed, in turn, by those who wished to hire day laborers. (Ex. 122.) The Church would post a sign outside on the street, noting the availability inside the property of day laborers for hire. (*Id.*) The undercover investigation discovered "no information pertaining to forced labor, human smuggling, or possible 'drop houses.'"[41] (*Id.*) And, of course, the reports contained nothing about the day laborers in the church parking lot causing public safety problems along Cave Creek Road. Nevertheless, on the September 27, the MCSO conducted a day labor operation at the church.

As the undercover reports indicated, the day laborers gathered inside the parking lot of the church. Thus, the day labor operation at the church was not conducted because the day laborers presented public safety issues on Cave Creek Road. Further, no arrests were made or citations issued during the operation on such a basis.[42] Thus while the

---

[41] In an email sent on September 24, 2007, Deputy Sean Ross informed Lt. Sousa that Deputies Rangel and Gonzalez had gone to the church undercover. (Ex. 122.) At trial, Deputy Rangel denied that he had done so. (Tr. at 908:12–19.)

[42] There is evidence that day laborers gathered at other locations in Cave Creek that may have caused such problems. For example, when a day labor operation was scheduled for a Cave Creek location several weeks later, deputies discovered that the problem along Cave Creek Road was at least temporarily cured by a Cave Creek anti-

- 45 -

Court credits the news release to the extent that it announced the results of an operation launched at a Church that assisted day laborers, it does not credit the statement that the operation was in response to traffic problems along Cave Creek Road.

## B. The Queen Creek day labor operation was a response to citizen complaints about the presence of Hispanic day laborers.

The second day labor operation in Queen Creek on October 4, 2007, was also connected to a specific complaint regarding Hispanic day laborers. Two days before the operation, the Queen Creek Town Manager had forwarded a complaint to Lieutenant D'Amico—who was the MCSO lieutenant in charge of the MCSO district incorporating Queen Creek—that had been originally sent to the Queen Creek Mayor and town council.[43] (Ex. 219.) In the complaint, the author states that a Hispanic man jeered at her on the corner of Ocotillo and Ellsworth. (*Id.*) According to the e-mail "He then ran back to another Hispanic man and exchanged high fives while both laughed." (*Id.*) The e-mail further stated "[t]hen as I turned right another Hispanic man on the same corner, gave me what I would describe as a very intimidating look. Kids passing this area when on the school bus have seen Hispanic man [sic] take out cell phones and look like they were taking a picture of the kids. These men have whistled or made other noises at very young teenage girls." (*Id.*)

The next day, October 3, Lieutenant D'Amico forwarded the complaint to Lieutenant Sousa, the commander of the HSU. (*Id.*) The day after that, October 4, the HSU conducted a day labor operation at the corner detailed in the complaint—Ocotillo

---

loitering ordinance that had recently become effective and the MCSO presence in the area. As a result they engaged in no day labor operations and the only person on whom they conducted a traffic stop was apparently not eligible for "287g action." (Ex. 121.) Follow-up patrols took place at both the church and along the Carefree Highway in Cave Creek during the following year. (*See, e.g.*, Ex. 186.)

[43] The Town Manager appears to have forwarded the complaint at the request of Lieutenant D'Amico. (Ex. 219.)

- 46 -

and Ellsworth. (*Id.*)

When he was presented with the exhibit containing the e-mail complaint and its transmission history at trial, Sheriff Arpaio testified that he could not tell whether any of the conduct complained of in the exhibit was criminal, but would have referred the matter for investigation. (Tr. at 390:16–391:5.) He further testified that the e-mail complaint would not have resulted in the Queen Creek operation by the MCSO without some conclusion that a crime had been committed because the MCSO does not just "go grabbing people on street corners unless we have a crime committed." (*Id.* at 392:14–15.) He further testified that the MCSO would not have had time to mount the Queen Creek operation between the time that it received the complaint and the time that the operation occurred two days later, because it takes three to four weeks to plan such an operation. (*Id.* at 393:6–14.) At any rate, he testified, those who were arrested in the Queen Creek operation were arrested by the MCSO for committing state crimes, (*id.* at 392:16–93:5), and thus their arrest presumably did not demonstrate that MCSO was conducting operations against Latino day laborers purely on the basis that they were Latino day laborers.

However, as the contemporaneous records and other testimony demonstrate, Sheriff Arpaio's testimony in this respect is incorrect. On the same day as the Queen Creek operation, Lt. Sousa forwarded the e-mail complaint to Paul Chagolla, who ran the MCSO's public relations, with a designation of high importance. The MCSO swiftly issued a news release that day titled "Sheriff Arpaio Goes After Day Laborers." It confirmed that the operation was in response to the citizen's complaint. The news release noted: "[t]oday, Maricopa County Sheriff's Joe Arpaio's Office [sic] Illegal Immigration Interdiction Unit (Triple I), responding to Queen Creek citizen complaints regarding day laborers harassing school children at a bus stop, arrested 16 more illegal aliens under the federal immigration laws." The news release further noted "[c]itizens complained that day laborers are shouting at the children and photographing them at the bus stop.

Sheriff's deputies contacted the 16 illegals during traffic investigations."[44] (Ex. 308.)

The news release directly refers to the complaint received by Lieutenant Sousa only a day before as the reason for the operation regarding Hispanic day laborers, and notes that the operation was run by the Illegal Immigration Interdiction Unit. (*Id.*) As the news release also states, the 16 persons were arrested not for state crimes, but for federal immigration violations and turned over to ICE. (*Id.*; Ex. 129.) Thus, the evidence demonstrates that on October 4, 2007, the MCSO conducted a small-scale saturation patrol on the corner of Ellsworth and Ocotillo, based on a complaint transmitted to the MCSO on October 2 that Hispanic day laborers congregated there.

### C. The Pruitt's day labor operations were a response to complaints of day laborers and illegal immigration.

By October 2007, the MCSO had been aware for two years that the area around Pruitt's Furniture Store was a significant gathering spot for Latino day laborers. In late November 2005, the Sheriff received a letter from the Minuteman Civil Defense Corps, a group of citizens concerned about illegal immigration who conducted "protest rallies" at day labor sites and pick up points throughout the valley. (Ex. 385.) In their letter to Sheriff Arpaio they identified two significant day laborer centers, one at 36th Street and Thomas ("Pruitt's"), and the other at Cave Creek and Bell Roads. (*Id.*) The letter described how the past weekend there had been around 100 day laborers, 30 minuteman protestors, six members of the American Civil Liberties Union ("ACLU"), and members of the media to report on "the day['s] activities" at the Pruitt's site. (*Id.*) The letter further

---

[44] This news release also refers to the Sheriff's previous enforcement efforts in Wickenburg and Cave Creek that resulted in 34 arrests of unauthorized persons. Because the September 27 Cave Creek operation resulted in 9 arrests, the Court infers, pursuant to its Order, (Docs. 261, 493) that a previous day labor operation at Wickenburg resulted in the arrest of 25 unauthorized aliens. The news release further claims that "[s]ince the hot line began operating 96 illegal aliens have been arrested by Sheriff's deputies." (Ex. 308.) The Court thus infers that other operations occurred in which 46 other unauthorized aliens were arrested.

- 48 -

informed the Sheriff that "[w]e will hold these rallies every Saturday until the end of the year," and complained that neither Phoenix Police nor ICE would respond to the Minutemen's request to investigate day laborers. (*Id.*)

The letter, which equated day laborers with illegal immigrants, stated that the Minutemen "want to work with an organization that is willing to investigate and deport illegal immigrants when they are spotted in our cities," and further asked "[i]s it unreasonable to ask our police to question day laborers about their immigration status?" (*Id.*) Sheriff Arpaio suggested an internal meeting about how to respond to this group. (Tr. 329:7–11; Ex. 385.) Although the MCSO's actions at these locations almost two years after the date of the letter is hardly a direct response to the letter, the letter and Sheriff Arpaio's notations on it demonstrate the MCSO's knowledge of the group, the day labor centers of which it complained, and that these locations were areas of activism and press coverage regarding immigration issues.

The Friday before the Monday, October 15 operation occurred, MCSO Detective Gabriel Almanza had a conversation with a doctor whose office was located in the commercial complex adjacent to Pruitt's and who was also aware of an apparent successful operation previously conducted by the MCSO at the day labor locations at Cave Creek and Bell Road. The detective asked the doctor to send him an e-mail memorializing their conversation. (Ex. 124.) The doctor did so.

After commenting that "what you did out at 25th St. and Bell was wonderful!"[45] the e-mail complained of the high concentration of day laborers who were illegal immigrants and congregated in the commercial complex at 36th Street and Thomas. (*Id.*) According to her e-mail, the day laborers were all illegal "because they admit it when asked." (*Id.*) She complained that they harassed her patients, made sexual innuendos,

---

[45] The MCSO was thus apparently involved in similar unreported operations at 25th St. and Bell Roads. The Court therefore infers, pursuant to its order, (Docs. 261, 493), that previous day labor operations occurred at 25th St. and Bell Roads.

1301

trespassed, loitered, littered, blocked sidewalks, urinated and defecated on the property and "showed their bellies" to everyone. (*Id.*) The doctor also complained that the neighborhood had become a focal point in which neighborhood residents had regular showdowns with Hispanic Rights advocates since the owner of Pruitt's Furniture Store had forced the day laborers off of his property. (*Id.* ("Reza & Gutierrez staged a large chanting protest at Pruitt's to shut Pruitt's out of business for kicking them off his property," and "Salvador Reza & Alfredo Gutierrez come out here every other week & tell these workers they can do anything they want anytime and are protected. We know this because [O]fficer Ruelas said they told him this & we see Reza out here all the time.").)

The following Monday, October 15, 2007, the HSU conducted a day labor patrol in this location. (Ex. 131.) Although MCSO successfully sought to have the complainant document her complaint in an e-mail, MCSO's resulting operation was not targeted at those persons who committed the acts complained of. Rather, during the day labor operations at Pruitt's, just as with the previous operations, the MCSO targeted vehicles picking up day laborers and arrested them only on federal immigration charges. (*Id.*)

A week later, the MCSO also conducted a day labor operation in Fountain Hills based on information provided by local businesses that day laborers were in the area with no other specific complaint being made. (Doc. 123)  All persons were arrested on federal violations and turned over to ICE.

Despite the yield from the Pruitt's operation being disappointing to Sgt. Madrid, (*see, e.g.*, Ex. 131 ("It should be noted that this area had far less day laborers in the area than our two previous details completed by HSU.")), the MCSO continued to run its small-scale saturation patrols at and around that location because of the activism and resulting media focus that the location had drawn. (Ex. 309.)

In its December 5, 2007 news release, the MCSO noted that Sheriff "Arpaio is set to increase the presence at Pruitt's of his Illegal Immigration Interdiction Unit (Triple I) this weekend, as pro-illegal immigration demonstrators and illegal immigrant day

1302

laborers continue to protest his illegal immigration policies on the driveways of the Pruitt's Furniture Store." (Ex. 309.) The news release further observed that "[i]llegal immigration activists have protested at Pruitt's every Saturday in the last six weeks since Sheriff Arpaio's deputies began patrolling the vicinity." (*Id.*) In response, Sheriff Arpaio pledged to keep running such operations until the activists stopped their protests. "This weekend, I will increase the number [of] deputies to patrol the Pruitt's area, and I promise that my deputies will arrest all violators of the state and federal immigration laws. . . . I will not give up. All the activists must stop their protest before I stop enforcing law in that area.'" (*Id.*; *see also* Ex. 124 (noting the repeated presence of press, and Hispanic activists Alfredo Gutierrez and Salvador Reza).) This scheduling of small-scale patrols in response to the activities of activists may be equally or more indicative of Sheriff Arpaio's desire to generate media attention of his immigration enforcement activity than of the MCSO's use of race in selecting locations for patrols. Nevertheless, the selection of this location because of the presence of Hispanic activists is indicative of the MCSO's focus on illegal immigration on conducting patrols, and its general association of day laborers with illegal immigration.

### D. The Mesa small-scale patrols were in response to complaints about illegal immigration and "Mexicans."

Contemporaneous with the small-scale operations scheduled at Pruitt's, the MCSO began conducting similar small-scale patrols in Mesa in response to citizen complaints. In late September 2007, Sheriff Arpaio reviewed transcribed comments from the MCSO's immigration hot line. One of the callers stated: "[w]e have called the non-emergency and illegal hot line numerous times and nobody gets all the Mexicans hanging out at Mesa Dr. between Southern and Broadway. Why isn't anything being done?" (Ex. 375.) The Sheriff highlighted that hot line entry and sent the comment and his annotation to Chief Sands and Deputy Sheriff Hendershott, and placed a copy of the comment in his immigration file. (*Id.*)

Beginning on November 15, 2007, the MCSO conducted three separate saturation

patrols in that same neighborhood (Broadway and Stapley), with stops and arrests occurring in the several square miles surrounding that intersection. Almost all persons arrested during these operations were transported to ICE and processed for violating federal immigration law, although a few were also processed on state charges.

### E.   The large-scale patrols were conducted to target Hispanic unauthorized immigrants.

As with the day labor and small-scale saturation patrols, many of the large-scale saturation patrols were centered either on locations where day laborers gathered, or on locations that had a high concentration of Latino residents. Chief Sands testified at trial that although he would take direction from Sheriff Arpaio if he ever gave it in designating a location for a large-scale saturation patrol, it was generally Chief Sands that selected the locations. (Tr. at 707:16–18, 809:20–810:3, 814:21–815:1, 824:24–825:6.) He acknowledged that in selecting some of the locations he considered complaints from members of the public and from businesses about day labor activity. (*Id.* at 790:5–791:11, 814:21 25.) However, he testified that that he would not conduct a saturation patrol based solely on a complaint that did not allege violations of law. (*Id.* at 795:18–21.)

When considered in light of the reasons the MCSO contemporaneously gave in the news releases that announced the pending operations, this testimony is not quite as persuasive. As the news release announcing the first large scale saturation patrol demonstrates, the principal reason the site was chosen was because, even after the departure of the activists, the location remained a gathering spot for day laborers which the MCSO knew to be Hispanic. The news release quoted the Sheriff as saying that

> [t]he protestors who support the illegal immigration movement may have left the area, but the problems that caused Pruitt's Furniture Store to contract with the Sheriff's Office for security still exist. . . . The posse volunteers and deputy sheriffs will not racially profile anyone in this operation . . . . Still, I anticipate that many illegal immigrants will be arrested as this central Phoenix neighborhood remains a popular spot for day laborers. All criminal violations will be subject to arrest which means if we come across illegals, properly trained officers will be there to enforce the state and federal immigration laws.

- 52 -

(Ex. 310.) The next large-scale saturation patrol operation likewise centered on this same location.

When the MCSO initiated its third large-scale saturation patrol at the intersection of Cave Creek and Bell Road, the MCSO news releases again demonstrate that this site was chosen because of the presence of Latino day laborers. The MCSO stated that the site had two day laborer centers which are "magnets for more illegal aliens" and which create an atmosphere detrimental to business. (Ex. 311 ("Hundreds of the Sheriff's volunteer armed posse member and deputies will migrate today . . . from central Phoenix and the Thomas Road area to 25th Street and Bell Road" to assist with the atmosphere detrimental to business created by "the growing number of day laborers in the area.").) The news release goes on to note that the operation would address at least "two day laborer centers in the Bell Road area which are 'magnets for more illegal aliens.'"[46] (Id.) Further, this was the location that, together with the Pruitt's location, the Minuteman had identified to the MCSO two years earlier as a frequent day labor location. Finally, the MCSO had previously conducted the January 4, 2008 small-scale saturation patrol at this location (Ex. 114) and at least one earlier operation for which records were not submitted at trial.

The fourth large-scale saturation patrol occurred on April 3–4, 2008, at Guadalupe. (Ex. 87.) The MCSO also considered race as one factor among others in selecting Guadalupe as the site for a large-scale saturation patrol. Although the news release announcing the operation stated that Guadalupe was selected because "tensions are escalating between illegal aliens and town residents," (Ex. 313), there was no

---

[46] Chief Sands testified that he planned a saturation patrol on Bell Road and Cave Creek Road because Sheriff Arpaio requested that he conduct a saturation patrol there after receiving a written request from ten business owners. (Tr. at 797:15–20.) Chief Sands is not aware of any effort made by the MCSO to investigate the claims made by the small business owners, interview them, or check the sources of the letter in any way before planning and executing the saturation patrol. (Id. at 797:24–798:15.)

testimony or evidence as to how the MCSO came to that conclusion. Chief Sands testified that he does not necessarily consult crime data to select saturation patrol locations, and would not use an increase in crime to determine where to have a saturation patrol. (Tr. at 787:25–788:8.) He testified that any crime analysis he did conduct would be attached to the saturation patrol operation plans. (*Id.* at 789:10–13.) The operations plans for the saturation patrol in Guadalupe have no crime analysis attached.[47]

Further, the only document in evidence that even suggests a reason for the operation is an e-mail written by Lt. Siemens to various contacts in the police departments of the adjacent municipalities in advance of the patrol that describes the operation as a response to the MCSO District 1 Commander's complaint of increased criminal and gang activity in the area. (Ex. 87 at MCSO 001876–7.) No mention of "illegal aliens" is made.

It is also clear that the MCSO did not conduct the saturation patrol at the request of the town. In fact, during the middle of the operation, the town mayor asked the MCSO to cease the operation and leave. (Ex. 314 (dated April 4, 2008, announcing that the results of the first day of the saturation patrol, and further noting that the Mayor had asked the Sheriff to leave town).) In response to the Guadalupe Mayor's request to leave, the MCSO issued a news release quoting Sheriff Arpaio as saying that "the Sheriff still has jurisdiction here and I will still enforce the illegal immigration laws in Guadalupe."

---

[47] Chief Sands acknowledged that, although occasionally he assembled crime statistics for the areas in which a large-scale saturation patrol was planned, the locations for such operations were not typically selected as a result of comparing crime rates among different valley locations, (Tr. at 789:19–22), or an increase or spike in crime in any particular location (*id.* at 787:16–788:8). The nature of crime statistics and analysis attached to those plans that have them vary: some provide local crime statistics indicating a spike in a particular area (Ex. 168 at MCSO 057002–03), some provide only statistics on the raw numbers of major crimes in a city over the past quarter (Exs. 90 at MCSO 001890, 97 at MCSO 001937), some provide information on immigration enforcement in an area (Ex. 111 at MCSO 001557–58), and some, like Guadalupe, include no crime data at all (Ex. 102).

(*Id.*) This appears to be a more frank assessment of the MCSO's purpose for the operation. Because the MCSO's purpose for the operation was to enforce immigration law, and it believed that the vast majority of illegal immigrants in Maricopa County were Hispanic, the Court concludes the MCSO desired to conduct such an operation in a neighborhood densely populated with Hispanic residents. [48]

After conducting its small-scale patrols in Guadalupe, the MCSO conducted the fifth and sixth large scale operations in Mesa,[49] the eighth and ninth large scale saturation patrols in Avondale (MCSO's District II)[50] (Ex. 111), and the eleventh large-scale patrol,

---

[48] According to the 2010 United States Census Bureau, 62.2% of the residents of Guadalupe are of Hispanic or Latino origin. *State & County Quickfacts: Guadalupe (town), Arizona*, http://quickfacts.census.gov/qfd/states/04/0430270.html. A court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Ninth Circuit has determined that census data meets these requirements. *United States v. Esquivel,* 88 F.3d 722, 727 (9th Cir. 1996).

[49] In addition to the hotline complaint, Ex. 375, that prompted the initial Mesa small-scale saturation patrols in November and December 2007, (Exs. 80, 81, 121), Sheriff Arpaio had received, and referred to Chief Sands for action, additional communications about day labor locations in the City of Mesa that associated such locations with Latinos before holding the large-scale saturation patrols there. (Exs. 223 (May 8, 2008 letter complaining that illegal immigrants "know little to nothing about this country other than the fact that welfare is better here than in Mexico," and noting that "[l]iving in Mesa, I can drive down any of the streets where day laborers (most of whom, I would believe to be here illegally) gather and wait for work" yet Mesa city police do not inquire about their citizenship), 244 (May 24, 2008 letter complaining of Mesa declining to investigate illegals due to Hispanic head of Mesa police union and MCSO Hispanic deputies, and also complaining of the "30+ illegals that were on all four corners" at Norton's corner and other Mesa and southeast valley locations). In his operations plans, the Sheriff also noted that he was responding to the invitations of East Valley legislators in scheduling his large-scale saturation patrols in Mesa. (Exs. 90 at MCSO 001881, 97 at MCSO 001929.)

[50] A second, and apparently impromptu, small-scale saturation patrol again occurred there on May 29, 2009, (Ex. 175), after these two large-scale patrols.

- 55 -

in the Durango area on the 35th Ave. corridor in September 2009 (Exs. 169–70).[51] Due to its previous day labor and small-scale saturation operations, the MCSO at least knew that Latino day laborers assembled in these areas. Unlike the first three large-scale saturation patrols, however, there is no evidence in the record that these patrols were covered by advance news releases that directly stated that the reason for the site selection was the presence of day laborers. To the extent that these large-scale patrols included more officers and covered larger geographic areas than the small-scale patrols that preceded them, the fact that the large-scale operations covered areas in which the MCSO had previously conducted successful smaller-scale operations makes considerations of race in their selection somewhat more attenuated.

Of the additional large-scale patrols that followed, the record is clear that at least three of them—the seventh and twelfth in the far northwest valley and the tenth in the southeast valley—occurred in locations for which the Sheriff had received previous complaints about the presence of Mexicans or day laborers or both. The MCSO held the first of its two operations in the Sun City area on August 13–14, 2008, and the second slightly more than a year later on October 16–17, 2009. (Exs. 102, 103, 174.) While this general area had not been the location of a reported small-scale saturation patrol, the operation occurred slightly more than a week after Sheriff Arpaio reviewed correspondence from two separate constituents. The first correspondence, dated August 1, 2008, came from a Sun City woman who complained of Spanish being spoken in a McDonald's at Bell Road and Boswell and requested that the Sheriff rid the area of illegal immigrants. (Ex. 237.) The Sheriff annotated the memorandum indicating he would look into it and copied it to Brian Sands on August 5, noting that the letter was "for our operation." (*Id.*) On August 8, 2008, the Sheriff was sent another e-mail that

---

[51] The MCSO had earlier conducted a small-scale saturation patrol at 35th Ave. and Lower Buckeye Road with high arrest ratios on January 31, 2008. (Ex. 114 at MCSO 014519.)

stated, "I would love to see an immigrant sweep conducted in Surprise, specifically at the intersection of Grand and Greenway. The area contains dozens of day workers attempting to flag down motorists seven days a week." The Sheriff reviewed the e-mail on August 13 and had a copy sent to Brian Sands and Lita at the PLO on that same date. (Ex. 235.)

The first day of the two-day operation, however, was on the same day the Sheriff annotated the second e-mail and sent it to Chief Sands. Thus, he would not have had time to plan the operation after having read the e-mail. Further, Sheriff Arpaio's notation on August 5 that the complaint was "for our operation," suggests that an operation had already been planned and that the letter served to justify it, rather than serving as the motivation for the site selection. Moreover, in announcing the operation, the MCSO news release stated in part that during the operation it would be "traveling well known smuggling routes" on I-17 in the north county area. (Ex. 331.) The operation did appear to result in the arrest of five separate human smuggling loads with at least three of those loads being stopped on I-17 and thus not in locations that were the subject of the correspondence. (Ex. 102 at MCSO 001974.)

The tenth saturation patrol occurred on July 23–24, 2009, in the Southeast valley. (Exs. 128, 168.) To be sure, the Sheriff had received and referred for action at least one previous letter which complains of day labor locations in the southeast valley areas that were covered by this patrol. (Ex. 244.) Nevertheless, the letter had been sent a full year earlier. (*Id.* (dating the letter at May 25, 2008).) Thus, while the MCSO was aware of day labor locations in the southeast valley area covered by the patrol, the July 23–24, 2009 patrol was not a direct response to the May 24, 2008 complaint.

The thirteenth and final large-scale saturation patrol discussed in detail at trial occurred on a countywide basis. (Ex. 176.) Such a generalized location can support no inference that it was selected as a result of the race of the persons who inhabit it.

At trial, Plaintiffs attempted to draw a direct link between citizen complaints received by the MCSO that referred to racial or ethnic characteristics of persons in particular locations and the corresponding scheduling by MCSO of a saturation patrol in

1309

those locations. Plaintiffs have established such a direct link between the day labor operations in Cave Creek and Queen Creek in October 2007, and the three small-scale saturation patrols in Mesa in November and December 2007. In those patrols, the MCSO responded directly with saturation patrols to complaints about the gathering of "Hispanic" and "Mexican" day laborers without sufficient indication that they were otherwise engaged in violations of state or municipal law. To the extent that Plaintiffs attempted to establish such a direct link between citizen complaints about operations in Sun City and or elsewhere, they have not met their burden of proof that the operations were planned in response to the specific citizen complaints about ethnicity. Nevertheless, due to the MCSO's conflation of racial and work status indicators in locating these operations, Plaintiffs have established that as a whole, in the site selection for all of the MCSO's day labor operations, most of their small-scale patrol operations, and many of their large-scale patrol operations, race was a factor, among others, to the extent that the MCSO sought to base such operations around locations at which Latino day laborers were known to assemble.

### 5. All saturation patrols relied on pre-textual stops as a basis to investigate the occupants of a vehicle.

Even when it had 287(g) authority, the MCSO, pursuant to its own policy, did not directly stop persons that it believed to be in the country without authorization.

> 287g trained deputies can't contact someone just because they think they are here illegally. 287g deputies can only screen people reference their immigration status that they come across during their duties as a Deputy Sheriff and then indicators must exist per the US Immigration and Nationality Act, Title 8 USC, 287g, before screening can take place (must have probable cause or reasonable suspicion to contact a violator or suspect for state criminal and civil statutes).

(Ex. 92.)

Thus, even when the purpose of an operation was to enforce federal immigration laws, as with the operations at issue in this lawsuit, MCSO deputies first needed a basis in state law to contact and detain the persons they sought to screen. The saturation patrols at

- 58 -

issue in this lawsuit all involved traffic stops used as a pretext to detect those occupants of automobiles who may be in this country without authorization. (Tr. at 837:1–17.) Defendants have never asserted that they stopped vehicles during the saturation patrols based solely on a reasonable suspicion that the drivers or passengers were not legally present in the country. Instead, they stopped the vehicles because of traffic violations and then investigated occupants for immigration offenses once the stops had been made.

> **6.** **During saturation patrols, participating deputies conducted many stops for minor violations of the traffic code, including minor equipment violations. This departs from MCSO's traffic enforcement priorities during regular patrols.**

The MCSO so stipulated prior to trial. (Doc. 530 ¶ 85 at 12.)

> **7.** **Generally, MCSO officers had no difficulty in finding a basis to stop any vehicle they wished for a traffic infraction.**

MCSO witnesses who testified at trial acknowledged that "if you follow any vehicle on the roads of this country for even a short amount of time, you will be able to pull that person over for some kind of violation." (Tr. at 696:17–21, 1541:8–11 ("You could not go down the street without seeing a moving violation."), 1579:20–23; Doc. 530 at ¶ 86 ("Deputy Rangel testified that it is possible to develop probable cause to stop just about any vehicle after following it for two minutes.").) Chief Sands also testified that it is not feasible to require officers to stop every driver whom they observe committing a traffic violation. (Tr. at 830:10–14.)

> **8.** **The MCSO provided no race-neutral criteria for deputies to use in determining whom to pull over for traffic violations during the three types of saturation patrols.**

One of the MCSO's chief defenses against the arguments of the Plaintiff class was that during saturation patrols it used a zero tolerance policy that required participating MCSO officers to pull over every vehicle that they observed committing any traffic infraction, no matter how slight. The MCSO represented to the Court that this policy ensured that there was no racial bias in the selection of vehicles that MCSO pulled over during saturation patrols. After having reviewed the evidence of the parties and heard the

1311

testimony, the Court concludes that no such policy was ever clearly promulgated or understood by MCSO deputies participating in such patrols.

As an initial matter, no written instructions were given for small-scale saturation patrols or day labor operations. (*Id.* at 1155:10–20.) The first several large-scale saturation patrols also occurred before the promulgation of any policy that was subsequently identified as a zero tolerance policy. (*Id.* at 996:15–17.) Even after the large-scale saturation patrol instructions were modified in April 2008, they specified only that all persons committing a criminal violation should be booked. (*Id.* at 996:21–25.) The operations plans contained no specific instruction to deputies about how to determine, in a race-neutral way, which vehicles to pull over for traffic or equipment infractions.[52]

Other than the written instructions explaining that all criminal offenders should be booked, there was no consistent understanding about the substance of any zero tolerance policy. Lt. Sousa, who identified himself as the author of the policy, testified that it pertained only to what a deputy could do after he had already made a stop. He testified: "[I]f we made a lawful traffic stop, and you had a criminal defendant with an arrestable charge, they would get booked. And whoever we stopped, we would write a citation for the probable cause for the stop."[53] (*Id.* at 996:21–25.) He testified that the policy did not

---

[52] The HSU officers and others who participated in small-scale patrols may have been aware of such instructions once they were developed for the large-scale saturation patrols, but even assuming the deputies would have applied such instructions to small-scale patrols, such plans were not written until April of 2008. By then all but the last seven small-scale patrols discussed at trial had occurred. These last patrols, together with the December 2007 operation in Aguila, were the patrols with the lower stop to arrest ratios.

[53] The revised plans contain no instructions concerning citing those who were stopped. Nor do they require patrol deputies to pull over every vehicle that they observe that is committing a traffic infraction. And, as a practical matter, the shift summaries and trial testimony demonstrate that MCSO officers did not issue citations to every vehicle they stopped. For example, during the January 9–10, 2009 saturation patrol in the

- 60 -

remove officer discretion as to making the decision as to which cars to stop in the first instance. (*Id.* at 998:18–25, 999:4–7.)

The testimony of other command personnel and deputies participating in saturation patrols varied considerably as to what the zero tolerance policy was. Sheriff Arpaio, Chief Sands and Deputies Armendariz, Beeks, and DiPietro described the policy as did Lt. Sousa—it did not specify which vehicles deputies should stop and deputies retained discretion on that matter.

Sheriff Arpaio, for example, in an MCSO news release, described a "zero tolerance law enforcement operation" as requiring deputies to arrest any person found to have committed a criminal offense. "All violators of any law . . . will be booked into his jails with no one getting a 'get out of jail free card.'" (Ex. 342.) Chief Sands testified that the policy did not require officers to stop every vehicle they observed violating the traffic laws, but that officers were required to arrest any person whom they had probable cause to believe committed a criminal offense. (Tr. at 830:18–831:8.) Unlike Lt. Sousa, he testified that deputies were not required to issue a citation to every vehicle they stopped for violating the traffic law. (*Id.*) He further testified that the MCSO did not analyze officer activity to determine whether officers in fact followed this definition of the "zero tolerance" policy. (*Id.* at 831:1–4.) Lt. Sousa expressly conceded that one of the reasons he included language prohibiting racial profiling in operations plans and directives was so that he could testify to it in any subsequent litigation. (*Id.* at 1025:12–1026:7.) Chief Sands confirmed that the phrase "zero tolerance" policy is "rhetoric used by Lt. Sousa."

---

Southwest Valley, officers stopped 473 and 246 cars, respectively, and arrested or cited only 320 and 167 people, suggesting that at least 232 vehicle stops over the two days resulted in neither a citation nor an arrest. (Ex. 111.) Further, as David Vasquez testified, he was pulled over for a cracked windshield during the first large-scale Mesa saturation patrol, but was neither cited nor arrested. (Tr. at 201:1–5.)

1   (*Id.* at 831:1.)

2       Although Deputy Armendariz could not remember what he was instructed as to

3   the particulars of the "zero tolerance" policy, (*id.* at 1581:2–21), he testified that he

4   understood that he still had discretion as to whether or not to stop a particular vehicle, (*id.*

5   at 1579:24–1580:2). Nevertheless, it was his understanding that the policy required him

6   to take a person into custody instead of issuing a citation when "an arrest is likely." (*Id.* at

7   1581:17–21.) Deputy Beeks agreed that the zero tolerance policy did not take away a

8   deputy's discretion when it came to deciding which traffic offender to stop. He

9   understood that under the "zero tolerance" policy, "[w]e were told to be proactive, and if

10  we saw violations, to address them," but that "[w]e were given discretion" to make stops.

11  (*Id.* at 1475:2–6.) Deputy DiPietro testified that while on saturation patrols, he was not

12  given any instruction about which vehicle to pull over and answered affirmatively when

13  asked whether the decision to stop a vehicle on a saturation patrol was "completely

14  within your discretion." (*Id.* at 303:24–25.)

15      On the other hand, both HSU sergeants and Deputies Rangel and Kikes offered

16  definitions of a zero tolerance policy that dictated to deputies on patrol who must be

17  pulled over in the first place. Sgt. Palmer testified that the "zero tolerance" policy

18  required officers to stop any car which they observed to be in violation of any traffic law,

19  and to issue a citation for that violation. (*Id.* at 694:2–6.) Sgt. Madrid also stated that the

20  "zero tolerance" policy took away the "ordinary officer discretion to let things slide" and

21  required officers to pull over any vehicle on the road that had committed any traffic

22  infraction. (*Id.* at 1155:21–1156:6.) Sgts. Madrid and Palmer did not often participate in

23  arrests during large-scale saturation patrols, however, as they were both engaged in

24  supervisory functions with Sgt. Madrid mostly stationed at the command post and Sgt.

25  Palmer doing field supervision. (*Id.* at 1160:5–8, 759:4–10.)

26      Deputies Rangel and Kikes also described the policy as removing discretion from

27  the deputies as to which vehicles to stop. Deputy Rangel testified that, under the policy,

28  he would stop every person he saw committing a traffic violation, ask every person in the

car for identification, and investigate those passengers who did not provide identification. (*Id.* at 944:4–947:11.) Deputy Kikes testified that under the policy officers were to stop "anybody and everybody who had a violation," and issue citations. (*Id.* at 612:10–19.)

Both officers who testified that the "zero tolerance" policy required them to stop every car that committed any traffic infraction, and other MCSO officers who testified, acknowledged, however, that such a policy would be impossible to enforce because it would involve stopping nearly every car on the road. For example, Deputy Kikes testified that so many people on the road commit minor traffic or equipment infractions that stopping every person who commits a violation, and therefore following the policy as he understood it, is "impossible." (*Id.* at 613:3–6.) Sgt. Palmer acknowledged that "if you follow any vehicle on the roads of this country for even a short amount of time, you will be able to pull that person over for some kind of violation." (*Id.* at 696:17–21.) Chief Sands testified that it is not feasible to require officers to stop every driver whom they observe committing a traffic violation. (*Id.* at 830:10–14.)

Deputy Kikes' own arrest record while participating on saturation patrols suggests that in practice he followed no such policy. Deputy Kikes participated in at least three large-scale saturation patrols over the course of at least four days.[54] There is no record of any civil citations he issued during the patrol, because the MCSO kept no such records, but, according to the operations plans, he was under an obligation to arrest anyone for any criminal violation he observed during any part of his patrols including traffic stops. In the three saturation patrols in which Deputy Kikes participated, comprising at least four patrol days, he arrested a total of five people. All of the persons he arrested had Hispanic surnames and all arrested were classified as 287(g) and thus in the country

---

[54] Deputy Kikes testified that he does not recall if he worked both days of all patrols, but knows that he worked a full day on every day that he did work. (Tr. at 608:23–609:3.) The arrest records demonstrate that he made arrests on four separate days during such patrols.

without authorization. (Exs. 82, 87, 111.) To accept Deputy Kikes's testimony in its entirety would mean that Deputy Kikes spent at least four days on traffic patrol in an environment where so many people commit traffic or equipment infractions it would be impossible to stop them all. He nevertheless followed the zero tolerance policy and stopped "anybody and everybody" he could. (Tr. at 612:12–13.) Once he made a stop, he arrested every person with an outstanding warrant or who was otherwise committing a criminal violation. (*Id.* at 14–23.) And all of that resulted in five arrests over four days, all of which just happened to be of Hispanic persons who were in the country without authorization. The Court rejects such a factual proposition. In the face of such facts, the Court concludes that Deputy Kikes, in fact, was not following the zero tolerance policy that he described during trial.

The same is true, although less starkly so, for Deputy Rangel. Deputy Rangel participated in at least seven large-scale saturation patrols, some of which took place over multiple days. By the Court's calculations, 54 of the 60 arrests made by Deputy Rangel during the large-scale saturation patrols, or 90% of the total arrests he made, were of persons with Hispanic names.[55] If the human-trafficking loads intercepted by Deputy Rangel during the August 2008 Sun City and the November 2009 countywide patrols are

---

[55] During the large-scale saturation patrol at Cave Creek and Bell he arrested a total of two people, one of whom had a Hispanic surname. (Ex. 82.) During the large-scale patrol at Guadalupe he arrested five people, four of whom had Hispanic surnames. (Ex. 87.) During the first large-scale Mesa patrol he arrested six people, three of whom had Hispanic names. (Ex. 90.) During the second large-scale Mesa patrol he arrested two people both of whom had Hispanic surnames. (Ex. 97.) During the first large-scale Sun City patrol in August 2008 he arrested 33 people, 32 of whom had Hispanic names.[55] (Ex. 102.) Although the probable cause listed on the arrest report for stopping this vehicle was "lane change," no one was arrested for the state law charge of human smuggling, but all were arrested and processed through ICE on federal immigration charges. (*Id.*) During the second Sun City patrol of October 16, 2009 he arrested one person who had a Hispanic surname. (Ex. 174.) During the November 16, 2009 countywide patrol he arrested eleven people, all of whom had Hispanic surnames. (Ex. 180.) These eleven persons were all turned over to ICE based on the MCSO's LEAR policy.

excluded, then 11 of 16 arrests or 68.7% had Hispanic names. To accept Deputy Rangel's testimony in its entirety would mean that Deputy Rangel spent at least nine to ten days on traffic patrol in an environment where so many people commit traffic or equipment infractions it would be "possible to develop probable cause to stop just about any vehicle after following it for two minutes." (Doc. 530 at ¶ 86.) In accordance with the zero tolerance policy, Deputy Rangel stopped all such vehicles, and investigated the identity of every passenger in every vehicle he stopped. He subsequently arrested every person with an outstanding warrant or who were otherwise committing a criminal violation. Nevertheless, during the nine to ten days, he made only 16 arrests (excluding the four van loads from two patrols that resulted in 44 arrests). Of the 16 arrests 11 just happened to be of Hispanic persons who were in the country without authorization, and four of them were arrested on immigration charges. In the face of such facts, the Court concludes that Deputy Rangel, in fact, was not following the zero tolerance policy that he described during trial.

A look at the arrest reports in general also demonstrates that officers exercised individual discretion regarding stops. More often than not, the disparities of arrest rates between officers participating in saturation patrols cannot be easily explained. For example, 47 officers signed in for the July 14, 2008 saturation patrol in Mesa. (Ex. 97.) Of these 47, 13 arrested at least one person, and 41 total people were arrested.[56] (*Id.*) Deputy Armendariz arrested 18 of the 41 people arrested, including the drivers and passengers of 11 different cars. (*Id.*) 11 of the persons arrested by Deputy Armendariz, and five of the six of the passengers he arrested, were processed for not being legally present in the country. (*Id.*) Ten of the arrestees had Hispanic surnames.[57] (*Id.*) The next-

---

[56] Another officer made an arrest, but did not sign in. (Ex. 97.)

[57] The name of the eleventh person arrested as being unauthorized, Minerva Vujando, also strongly suggests that this person was of Hispanic ancestry. Nevertheless, the name did not appear as in Exhibit 320. Hence the Court did not count it as an Hispanic name.

highest arrest total for any officer was for Deputies Silva and Roughan, who both arrested four people. (*Id.*) Six of the eight people whom Deputies Silva and Roughan arrested had Hispanic surnames, and seven were processed for not being legally present in the country.[58] (*Id.*) These statistics again do not suggest that officers were following a zero tolerance policy in which they pulled over every vehicle for an infraction no matter how small and arrested every person they encountered who had committed a criminal violation.

Further, the activity of at least some officers suggests a definite focus on vehicles with Hispanic occupants. For example, during the April 23, 2009 operation in Avondale, Deputy Armendariz arrested 12 people, 11 of whom had Hispanic surnames and 10 of whom were processed through the 287(g) program. (Ex. 111.) These arrests came from a total of seven vehicle stops, and included the arrests of five passengers, all of whom were Hispanic and all of whom were processed through the 287(g) program. (*Id.*) The deputies arresting the next-highest number of people during this saturation patrol arrested only two. (*Id.*)

Few of the "stat sheets" documenting the activity of individual officers remain. Those stat sheets that do remain, however, also suggest that the number of stops made by individual officers varied widely during the same saturation patrol. For example, individual stat sheets for the November 16, 2009 saturation patrol, which were preserved, show that officers working the same patrol during the same twelve-hour shift made the following number of traffic stops: 5, 15, 0, 9, 5, 6, 0, 4, 12, 2, 3, 12, 4, 2, 6, 24, 10, and 10. (Doc. 235, Ex. 10.) If an officer could stop virtually any vehicle for a traffic infraction after following it for a minute or two, these statistics demonstrate that no zero tolerance policy was uniformly followed that would provide neutral criteria about which

---

[58] Again the name of the seventh person arrested as being unauthorized, Jario Olampo, also strongly suggests that this person was also Hispanic. Nevertheless, the name did not appear as Hispanic in Exhibit 320, and hence was not counted as such.

- 66 -

cars should be stopped by participating deputies. The reports, therefore, establish that MCSO personnel were not following the zero tolerance policy as described by Sgts. Palmer and Madrid.

Based upon the contradictory testimony regarding the effect and definition of the zero tolerance policy, that the MCSO shredded individual officers stat sheets while under a discovery obligation to preserve them, that most witnesses testified that it would be impossible to follow a policy that required them to stop every vehicle they observed committing a traffic or equipment violation, that the MCSO conducted no analysis to determine whether officers were in fact following any "zero tolerance" policy, and that those records which were preserved suggest that officers did not follow a "zero tolerance" policy based on any of the definitions suggested, the Court concludes that to the extent any "zero tolerance" was in effect, it was merely the sentence of instruction contained in the operation plans that required MCSO deputies to book all criminal offenders, and contained no race-neutral criteria for deputies to follow in saturation patrols.

**9.    The MCSO used race as one factor among others in making law enforcement decisions during saturation patrols.**

**A.    The MCSO used race as a factor in choosing vehicles to pull over during day labor and high-ratio small-scale operations.**

As has been previously set forth in the discussion relating to the selection of locations for saturation patrols, during the day labor and small-scale saturation patrols with high arrest ratios, participating MCSO officers determined which vehicles they would pull over for traffic enforcement based, at least in part, on their observations of the Latino ancestry of the persons that entered the vehicles. After the vehicles were pulled over, the immigration status of the Latino passengers was investigated as a matter of course.

The arrest statistics from the day labor operations demonstrate that race was used as such a factor in a way that does not merely rely on the total number or total percentage

1319

of Hispanics arrested during such operations. All 35 arrests of unauthorized persons resulted from 11 traffic stops. A total of 14 traffic stops were made during all day labor operations. It is extraordinary that with only 9% of the Maricopa County population being unauthorized, the MCSO could make arrests of unauthorized aliens on 11 of the 14 traffic stops it made, with virtually all such stops resulting in multiple arrests. This extremely high ratio of stops resulting in immigration arrests to the total stops made during the operations shows that the MCSO used targeting factors including both race and work status to achieve this ratio.

The same is true for the small-scale saturation patrols with high arrest ratios, in which 115 out of 124 arrests were of persons unauthorized. *See* Section I.D.2.a, *supra*. While an exact number of total stops resulting in these arrests of unauthorized persons is not specifically ascertainable based on the reports, the reports do reveal that a great majority of all stops during such operations resulted in the arrest of unauthorized aliens and frequently multiple unauthorized aliens per stop. *Id.* The day labor and small-scale saturation patrols with high arrest ratios, due to the nature of the operations, considered race and work status as factors of a vehicle's occupants in determining which ones would be stopped.

### B.     The MCSO used race as a factor in determining whom to investigate and arrest during the small-scale patrols without high arrest ratios.

The arrest reports for these eight operations did not, for the most part, permit the Court to determine the number of stops that resulted in immigration arrests. To the extent that such determinations could be estimated by the reports kept, with one exception, they did not demonstrate the high ratio between stops and arrests that the previous operations had demonstrated.[59] Thus the evidence that verified that the MCSO used race in the day

---

[59] During six hours on the first day of the Fountain Hills operation, the HSU (assisted by the Enforcement Support ("ES") Unit) made a total of seven traffic stops, four of which resulted in seven arrests of unauthorized aliens. (Ex. 108.) Such statistics, including the low number of total stops, seem to bear out that the first day of the

- 68 -

labor and small-scale saturation patrols with high arrest ratios was not present in these eight operations.

Nevertheless, the arrest reports provide strong evidence that the purpose of most such operations was arresting unauthorized aliens. 85 out of 107 persons arrested were unauthorized aliens. *See* Section II.D.2.b, *supra*. To the extent it was disclosed by the reports, the remaining 22 authorized residents arrested during such operations were arrested for driving on a suspended license, or having outstanding misdemeanor or felony warrants. *Id.* There is little to no evidence in the record that would indicate how many of these authorized residents arrested were Latino.

Still, three of the eight arrest reports from these operations provide information from which the number of passengers actually arrested from an estimated number of stops can be derived. Two of those three reports further list the names of all persons arrested.[60] They demonstrate that during these three operations MCSO deputies stopped a total of approximately 95 to 100 vehicles. During these stops a total of 55 persons were arrested. 51 of the 55 persons were unauthorized aliens, and 36 of these were passengers.[61] During the two operations for which the names of persons arrested were

---

operation may have been a day labor operation. Nevertheless on the next day Sgt. Palmer estimates in the arrest report that of twenty stops, only four resulted in immigration arrests. The total operation, therefore, did not have a high arrest ratio as did previous operations.

[60] The arrest reports for the Aguila (Ex. 76), Fountain Hills (Ex. 108), and September 4, 2008 Cave Creek (Ex. 112), operations provide information concerning the estimated total number of stops made during each operation and specific information concerning the stops that resulted in immigration arrests. The Fountain Hills and Cave Creek arrest reports also provide the names of persons arrested.

[61] The Aguila arrest report designates that the driver was cited for each of the five stops that resulted in the arrest of unauthorized aliens. (Ex. 76.) It also lists the number of aliens detained. (*Id.*) The Court assumed that one of the persons detained for each of the vehicles was the driver. If this is not true it does not serve to change the number of total persons arrested, it merely increases the percentage of those who were passengers. The

- 69 -

kept, all passengers and drivers arrested for immigration offenses had Hispanic names.

Thus the Court can conclude from the three saturation patrols with sufficient records that 51 of the 55 arrests were of unauthorized persons, most if not all of whom had Hispanic surnames. 52 of these persons have names that indicate Latino descent. There is no evidence from these arrest reports from which it can be determined that the MCSO investigated or arrested any passenger during these operations who was not of Latino descent. Of the three persons arrested without Hispanic names, two had to be drivers because they were arrested for driving without a license. The reports provide no information about the other person, including whether she was in a motor vehicle at all, or, if so, whether she was a driver or a passenger, other than that she was arrested on an outstanding felony warrant.[62] While these numbers do come from a limited sample, and

Fountain Hills report explicitly distinguishes between drivers and passengers arrested in the narrative. It also discusses the arrest of two more unauthorized residents during the welfare check of a residence. Because these arrests did not result from a motor vehicle stop they were not counted in the Court's totals. (Ex. 108.) The third page of the Cave Creek report, designates whether a person arrested was a passenger. (Ex. 112.) However, two persons were arrested for failing to provide identification during a single stop, and neither was designated as a passenger. (*Id.*) Since a vehicle can have but a single driver, the Court has also counted one of those two persons as a passenger and the other as a driver in arriving at the above estimated totals. (*Id.*)

[62] The narrative arrest report of the Aguila operation only discusses the arrest of 26 persons—all unauthorized. (Ex. 76.) The narrative arrest report of the September 4 Cave Creek operation only discusses the arrest of 11 persons—all unauthorized. (Ex. 112.) It is possible, however, to read the summary total sheets of these operations to conclude that three additional people were taken into custody during the Aguila operation and four were taken into custody during the Cave Creek operation. Nevertheless, the narrative report of the Cave Creek operation plainly states that only 11 total arrests were made during the operation—all of unauthorized aliens, and the sheet listing the names of all persons arrested contains only 11 names. If the Aguila summary total sheet, or the Cave Creek summary total sheet, means to suggest that additional persons were arrested other than those listed in the narrative report, they provided no information about such persons or their arrest. If additional arrests were made, but not otherwise discussed in either narrative report or the total summary sheet, it only confirms that the deputies participating were principally focused on the arrest of unauthorized aliens, as they

- 70 -

are not definitively indicative of racial bias, they do strongly suggest that in at least these three operations the MCSO was both: (1) principally looking to arrest unauthorized aliens whom they believed to be Hispanic persons; and (2) they were more likely to investigate the identities of Hispanic passengers than non-Hispanic passengers.

### C.   The MCSO used race as a factor in law enforcement decisions during large-scale saturation patrols.

As discussed, beginning in April 2008, the large-scale saturation patrols were subject to different and more specific instructions than were small-scale or day labor saturation patrols. The operational plans were revised in at least three important particulars, and a comparison of those revisions with the patrol results shows that the MCSO relied on race as a factor in making law enforcement decisions.

### 1.   During large-scale patrols, participating MCSO deputies were instructed to not racially profile and were obliged to book all criminal offenders. Yet arrest records show a disproportionate number of arrests of persons with Hispanic surnames.

Because the purpose of the saturation patrols was to arrest unauthorized aliens, and because the great majority of unauthorized aliens in Maricopa County are persons of Hispanic descent, it would not be in and of itself indicative of a racial bias in an operation for a disproportionate number of Hispanic persons to be arrested. Nevertheless, when the plans prohibit racial profiling, and further require that all persons committing crimes be arrested regardless of race, and yet a highly disproportionate percentage of the persons arrested during the operation are nevertheless persons with Hispanic names, the disconnect between the operational plans and instructions and the observable results of the large-scale patrols demonstrates that the deputies are not following their instructions, or that a racial bias is permitted, or even systematically implemented, in such

---

omitted non-immigration arrests from their reports or summaries.

- 71 -

1 operations.[63]

2       The overall arrest rates of persons with Hispanic names arising from the large-

3 scale saturation patrols are very disproportionate to the population as a whole. Beginning

4 with the large scale patrol held near Pruitt's on March 21–22, 2008, 42 out of the 43

5 arrests (97%) were of persons with Hispanic names. (Ex. 79.) For the Cave Creek

6 operation on March 27–28, 2008, 36 of the 54 arrestees (67%) of the arrestees had

7 Hispanic names. (Ex. 82.) (These two operations, however, were conducted prior to the

8 issuance of the new instructions). At the Guadalupe patrol of April 3–4, 2008, the

9 operation during which the new instructions were first implemented, 33 of the 47

10 arrestees (70%) had Hispanic names. (Ex. 87.) At the first large-scale Mesa patrol, the

11 deputies arrested 63 people, 35 (57%) of whom had Hispanic names (Ex. 90); during the

12 second Mesa patrol, 26 out of 41 persons arrested (63%) had Hispanic names (Ex. 97).

13 During the first Sun City patrol, 88 of the 105 arrests (84%) were of persons with

14 Hispanic names.[64] (Ex. 102.) In the first Southwest Valley operation on January 9–10,

15 2009, 34 of 53 arrests (64%) had Hispanic names. (Ex. 111.) In the West Valley

16 operation on April 23-24, 2009, 30 of 41 arrests (73%) were of persons with Hispanic

17 names. (*Id.*) During the Southeast Valley operation of July 23–24, 2009, 30 of the 41

18 arrestees (59%) had Hispanic surnames. (Exs. 128, 168.) Then, in the operation at

19 Durango and 35th Ave. on September 5–6, 2009, 37 of the 51 persons arrested (72%) had

20 Hispanic surnames. (Ex. 170.)

21       Two more large-scale patrols occurred following revocation of the MCSO's

22 287(g) authority. In the October 2009 Sun City operation, 45 out of 66 persons arrested

---

24 [63] Even if MCSO deputies were particularly looking for undocumented immigrants
without regard to race in these large-scale saturation patrols, the percent of
25 undocumented immigrants in Maricopa County is, at most, 8.9%. *See* note 4, *supra*.

26 [64] During this patrol the MCSO interdicted five vans that were transporting
27 undocumented individuals.

(68%) had Hispanic surnames. (Ex. 174.) During the final county-wide operation for which arrest reports were filed, 37 out of the 51 persons (73%) arrested had Hispanic surnames. (Exs. 176, 178–82.) In total 700 offenders were arrested during these operations.[65] 496 out of 700 arrests or 71% of all persons arrested, had Hispanic surnames. This 71% arrest rate occurred in a county where between 30 and 32% of the population is Hispanic, and where, as the MCSO's expert report acknowledges, the rates of Hispanic stops by the MCSO are normally slightly less than the percentage of the population that they comprise. (Ex. 402 at 3.) This arrest rate further occurred in operations in which deputies were instructed to arrest all persons committing any kind of criminal offense, and were instructed that they should not racially profile.

While a disproportionate number of persons with Hispanic names were generally arrested during such operations, that gulf widens when the arrest rate of Latino passengers is considered. According to the large-scale saturation patrol arrest reports, 184 passengers in vehicles were arrested on some charge other than the traffic pre-text given for stopping the vehicle. 175 of these passengers, or 95%, had Hispanic surnames. Even removing all of passengers who were arrested on immigration charges from the equation (141 total, 140 Hispanic),[66] 35 of the 43, or 81% of the passengers arrested on non-immigration charges had Hispanic surnames. Only nine passengers who did not have a Hispanic surname were ever arrested on any charge. The Court recognizes that there were several human smuggling loads that the MCSO intercepted: some on the August 2008 Sun City patrol (70 passengers), the October 2009 Sun City patrol (20), and the November 2009 countywide patrol (25). (Exs. 102, 174, 178–82.) Exclude the passenger

---

[65] As discussed above, the Court has excluded the first large-scale saturation patrol at Pruitts (January 2008), where 27 arrests were made (six for 287(g)), because no surname data was included. (Ex. 77.)

[66] One passenger in a vanload interdicted by Officer Rangel did not have a name listed in Ex. 320 (Gerseldiade Rugio) and was not counted as Hispanic.

tallies from those vanloads (115, 114 of which were Hispanic), and 61 of the 69 passengers (88%) were Hispanic. Clearly a disproportionate number of passengers with Hispanic surnames were arrested during the large-scale saturation patrols. This indicates that the MCSO was more likely to investigate and arrest passengers if they were Hispanic.

In sum, a remarkably high percentage of arrests during the large scale patrols were of people with Hispanic surnames. These results occurred while the MCSO claimed to be operating under a policy that forbade racial profiling and required deputies to arrest all criminal offenders. In light of the arrest numbers, the Court finds that either the MCSO was in fact not operating under those policies during the large-scale saturation patrols or MCSO's policy forbidding racial profiling nevertheless permitted the consideration of race as a factor in executing the operations.

### 2. MCSO officers were instructed that during large-scale saturation patrols they could use race, as one factor among others, in initiating investigations into the immigration status of a person contacted.

And, in fact, the MCSO deputies operated under the idea that they were allowed to consider race in making immigration-related law enforcement decisions. The large-scale saturation plans contained a paragraph prohibiting racial profiling and specifically prohibiting deputies from making a decision to stop a vehicle based on the race of its occupants. Nevertheless, as previously discussed, the MCSO determined that it did not constitute racial profiling to base decisions in part on race, so long as race was not the sole basis for that decision. The operations plans for the large-scale saturation patrols explicitly instructed the MCSO officers who were 287(g) certified that they could use the indicators taught them in their 287(g) training in deciding whether to initiate investigations into a contact's immigration status. And all MCSO officers testified that ICE taught them that one such indicator, among others, was a person's race. The operations plans also instructed non-287(g)-certified officers that they should not summon a 287(g) officer to initiate such an investigation based on race alone. But, as at

1  least Sgts. Palmer and Madrid testified, this instruction meant that officers could consider
2  race as one amongst a number of factors in making such a determination.

3         Further, all of the MCSO command staff including Sheriff Arpaio, Chief Sands,
4  Lt. Sousa, and Sgts. Madrid and Palmer, acknowledged that the MCSO uses race as one
5  factor in assessing whether an immigration investigation should be conducted after a stop
6  has been made. At trial, Sheriff Arpaio was referred to media interviews in which he
7  commented that a factor the MCSO considered in evaluating whether a person is in the
8  country legally is whether "they look like they came from another country," (Ex. 410b),
9  or "look like they just came from Mexico," (Ex. 410c). He explained that when he made
10 these comments he meant that such appearance could be a factor for an MCSO officer to
11 consider in determining whether further investigation of immigration status was
12 appropriate once a vehicle had already been stopped. (Tr. at 498:22–503:6.) Chief Sands,
13 Sgt. Madrid, and Sgt. Palmer also acknowledged that the MCSO did use and continues to
14 use Hispanic ancestry in this manner in deciding which occupants of a vehicle should be
15 investigated for immigration compliance. Chief Sands confirmed that the MCSO does not
16 prohibit officers from relying on the race of a vehicle's occupant as one factor when
17 initiating an immigration investigation once the vehicle has been stopped, so long as race
18 was not a factor in the stop itself. (*Id.* at 782:5–16.) Lt. Sousa testified at trial that it was
19 his understanding that ICE officers taught MCSO deputies in their 287(g) training that
20 while race could not be used even as one factor when making an initial stop, it could be
21 used as one of a number of indicators to extend a stop and investigate a person's alienage.
22 (*Id.* at 1016:3–6.)

23        The Court thus determines that as a matter of both policy and practice, the MCSO
24 allowed its deputies participating in saturation patrols to consider race as one factor
25 among others in determining whom it should investigate during large-scale saturation
26 patrols.

27 / / /

28 / / /

- 75 -

**3.** **MCSO officers were instructed that they could use race as one factor among others in making a decision to stop vehicles during large-scale saturation patrols, and did so.**

As indicated above, the large-scale saturation plans contained a paragraph specifically prohibiting deputies from making a decision to stop a vehicle based on the race of its occupants. Nevertheless, as has been previously discussed, the MCSO determined that it did not constitute racial profiling to base decisions to stop a vehicle in part on the race of its occupants, so long as race was not the sole basis for that decision. When the MCSO described its own policy as it pertained to stops during such operations, it stated that MCSO officers in making stops during saturation patrols, could not use race as the sole factor on which to pull a vehicle over so as to avoid "racial profiling." (Ex. 342 ("at no time will any vehicle be stopped solely because of the race of the occupants inside that vehicle").) It pointedly did not prohibit officers from using race as *a* consideration in deciding to make such a stop.

Sgt. Palmer testified that if there was a legitimate basis to pull a vehicle over, for a traffic infraction or otherwise, then, by definition, a deputy would not be racially profiling. (Tr. at 724:22–725:1.) And Sgt. Madrid testified that so long as there was a legitimate basis to pull over a vehicle, it would never occur to him that a deputy could be racially profiling by doing so.[67] (*Id.* at 1172:20–24.)

With such understandings, once an MCSO deputy had identified a particular vehicle with Hispanic occupants, he or she could develop a legitimate basis under the Arizona traffic code to pull over that vehicle with very little difficulty without "racially profiling." Once they observed a traffic infraction, MCSO deputies had a factor in addition to race on which to pull the vehicle over. Their decision would never be

---

[67] At any rate, all of the MCSO command personnel acknowledged that they never examined their arrest statistics or otherwise made any effort to determine whether their deputies were engaging in racial profiling in the stops and arrests they made during saturation patrols.

1328

reviewed nor racial bias suspected by their supervising sergeants because the stop was not made solely on the basis of race.

At trial, Sheriff Arpaio and much of the rest of the MCSO command staff testified that the MCSO could use race as a factor in deciding to interrogate vehicle passengers once a vehicle had been pulled over, but could not use race as a factor in deciding whether to pull the vehicle over. That distinction, however, is a very fine one. There is no evidence, in the operations plans or otherwise, that once MCSO deputies had been instructed that it was acceptable to consider race as one factor among others in an immigration context, they were further instructed that they nevertheless could not consider race as any factor in determining whether to stop a vehicle. Further, Sheriff Arpaio's testimony in this respect seems contradictory to his quote from the MCSO news release, in which he indicates it would constitute racial profiling if the *only* reason a vehicle was pulled over was because of the race of the occupants. (Ex. 342.)

Despite Lt. Sousa's understanding to the contrary, at least one of his sergeants testified that ICE specifically trained MCSO deputies that they could use race or Mexican ancestry as one consideration among others in deciding whether or not to stop a vehicle, and that MCSO deputies in fact did so. (Tr. at 715:3–19, 1164:4–12.) And Sgt. Madrid acknowledged that he could not know whether one of his deputies used race as a factor in making a stop unless he was actually present at the stop. (*Id.* at 1171:10–14.) He also testified that he would not typically be present at a stop during saturation patrols, since he was usually assigned to the command post during such operations. (*Id.* at 1160:1–25.)

Nevertheless, Deputy Rangel, and to some extent Sgt. Madrid, testified that due to tinted windows and headrests an officer could not always perceive the race of the occupants of vehicles before making a stop. (*Id.* at 927:9–21, 1192:4–15.) Thus, the MCSO argues, it was impossible for its officers to be racially profiling. While the Court accepts the testimony of Deputy Rangel and Sgt. Madrid, it rejects the assertion that such obstructions always or even regularly prevented deputies from making an assessment of the race of the occupants of a vehicle in which they are interested. The large-scale patrols

1329

were conducted in an environment in which MCSO deputies knew that the operations were designed to enforce immigration laws. (*Id.* at 1136:15–20; *see also id.* at 786:14–18, 787:5–14, 901:4–902:17.) The deputies were required to keep track of the number of unauthorized aliens they arrested during such patrols and report that figure to their supervisors. (*See, e.g.*, Exs. 102 at MCSO 001978–001986, 111 at MCSO 056988–056998; *see also* Tr. at 690:23–691:1, 1153:13–18.) They correctly believed that the vast majority of unauthorized residents of Maricopa County are of Hispanic origin. They were trained to use race as one factor among others when investigating immigration status. While some MCSO pronouncements indicated that it constituted racial profiling to stop vehicles based on the race of its occupants, others stated that it constituted racial profiling only when race was the sole consideration in making the decision to stop a vehicle. Further, their supervising sergeants did not believe that racial profiling could exist in a stop so long as there was a legitimate basis to stop the vehicle. And every time Lt. Sousa instructed participants in large scale saturation patrols not to racially profile, he assured them that he knew they were not doing so. (*Id.* at 1025:6–8.) There was no policy or race-neutral criteria that governed which vehicles to stop on saturation patrols. Due to the pervasive nature of traffic or equipment infractions that exist on the road, an MCSO deputy could stop virtually any vehicle he or she wished to stop on a legitimate basis. Based upon these policies, practices, and, to a lesser extent, the arrest records from the operations, the Court finds that MCSO officers emphasized the enforcement of traffic and vehicle infractions against vehicles that had Hispanic occupants, and in so doing, considered and incorporated the use of race as a factor in deciding which vehicle to pull over during large-scale saturation patrols.

This determination is fortified by the testimony of Dr. Ralph Taylor. Dr. Taylor conducted a study of the MCSO's CAD records related to MCSO large-scale saturation patrols to determine whether stops during large scale saturation patrols focused on vehicles with Hispanic occupants. The MCSO's CAD database provides detail of those incidents during which MCSO officers contact their dispatch. (*Id.* at 69:4–9.) When an

MCSO deputy asks dispatch to run a name through the MCSO database, the name is captured in the CAD database. The CAD database also records categories for individual stops, and type "T" is the category for a traffic stop or a traffic violation. (*Id.* at 69:8–9.) A stop that begins as a traffic stop but during which an officer makes an arrest on another charge, such as a drug arrest, will have a different final call than type T. (*Id.* at 130:22.) Thus, presumably, stops during which any arrests, including immigration arrests, were made, were not counted in the totals arrived at by Dr. Taylor. This means that Dr. Taylor's statistics reflecting an increase in inquiries in Hispanic names during large-scale saturation patrols did not include those stops in which Hispanic names were checked and immigration arrests resulted.

Dr. Taylor only had complete information on 11 of the 13 large-scale saturation patrols on which testimony was offered at trial. (*Id.* at 76:24–77:3.) He had no information concerning the individual officers signed in to the first two large-scale saturation patrols at Pruitt's on which to run an analysis.[68] In addition to the CAD database, Dr. Taylor relied on independent U.S. Census data correlating the likelihood that a person with any given name self-identified as Hispanic. He did a differential analysis that focused particularly on names whose owners identified as Hispanic more than 90% of the time, more than 80% of the time, and more than 70% of the time. (*Id.* at 193:2–7.) He also included names whose owners self-identified as Hispanic at a 60% threshold as "a type of robustness analysis."[69] (*Id.* at 193:6–7.)

---

[68] Nevertheless, records produced at trial demonstrate that during the first Pruitt's large-scale patrol there were six of 27 arrests that were of unauthorized persons. (Ex. 77.) During the second Pruitt's large-scale operation 42 of 43 people arrested were unauthorized persons. (Exs. 79, 82.)

[69] Dr. Taylor's statistics in this respect were, apparently, more sophisticated than those provided in the 1980 census list of Spanish surnames. (Ex. 320.)

1     Dr. Taylor compared the names that MCSO officers called in to central dispatch

2 during saturation patrols to the names called in by MCSO officers during non-saturation

3 patrol days. (*Id.* at 99:22–100:3.)[70] He also compared the names called in by MCSO

4 officers who worked on saturation patrols, regardless of whether they were working a

5 saturation patrol, to the names called in by MCSO officers who did not work on

6 saturation patrols. (*Id.* at 100:25–101:6.) Further, he compared the names called in on

7 days when saturation patrols took place, regardless of whether the name was called in as

8 part of a saturation patrol, to names called in on all other days. (*Id.* at 155:1–4.) Finally,

9 Dr. Taylor studied the relative lengths of stops involving at least one likely-Hispanic

10 surname.

11     He concluded that, depending on which threshold of Hispanic surname was used,

12 names checked by an officer participating in a saturation patrol during a saturation patrol

13 were between 46% and 54% more likely to be Hispanic than those checked by other

14 officers operating on the same day. (*Id.* at 96:12–20.) He also found that, depending on

15 the name threshold, names checked by all MCSO officers on saturation patrol days were

16 between 26% to 39% more likely to be Hispanic than names checked on non-saturation

17 patrol days. (*Id.* at 91:22–25.) Compared to names checked one week before and one

18 week after a saturation patrol, names checked on a saturation patrol day were between

19 28.8% and 34.8% more likely to be Hispanic, (*id.* at 93:20–25), and names checked by

20 saturation patrol officers operating on saturation patrol days were between 34% and 40%

21 more likely to be Hispanic than names checked by officers who were never involved in a

22 saturation patrol, (*id.* at 97:22–98:5). Finally, Dr. Taylor found that stops in which an

23

24     [70] As previously stated, in all patrol operations for the relevant period, the
25 percentage of vehicles that the MCSO pulled over with Hispanic occupants is slightly
      lower than the percentage of the population of Maricopa County that is Hispanic. (Ex.
26 402 at 3.)

27

28

1   officer checked at least one Hispanic name lasted between two and three minutes longer

2   than comparable stops in which no Hispanic names were run. (*Id.* at 109:14–16.)

3          Defendants called Dr. Steven Camarota to rebut Dr. Taylor's conclusions.

4   Although, for the most part, Dr. Camarota did not take issue with Dr. Taylor's tabulations

5   from the CAD records maintained by the MCSO, he did question several of the

6   assumptions underlying Dr. Taylor's analysis and the adequacy of the information on

7   which it was based. He further offered alternative explanations for the results of Dr.

8   Taylor's analysis.

9          While Dr. Camarota did not independently verify Dr. Taylor's findings, he agreed

10  that officers checked Hispanic names at a higher rate during saturation patrols. (*Id.* at

11  1310:6–9.) He further agreed that the Hispanic surname tables Dr. Taylor used are

12  reliable. (*Id.* at 1305:22–1306:2.) In his own analysis, Dr. Camarota found that on days in

13  which a saturation patrol was underway, the share of names checked that was Hispanic

14  was 4.8% higher than on other days of the year. (*Id.* at 1309:22–1310:1.) Dr. Camarota

15  speculated that different poverty rates could result in disparate stop rates between

16  Hispanics and non-Hispanics, because "people with low incomes are going to have more

17  difficulty. . . meeting the equipment standards." (*Id.* at 1260:16–21.) Dr. Camarota

18  presented no analysis of the stop rates corrected for poverty rates to support his

19  speculation.

20         As between Dr. Taylor and Dr. Camarota in this respect, the Court credits the

21  opinion of Dr. Taylor. Dr. Camarota testified that his opinions were based in part on Lt.

22  Sousa's description to him of the zero tolerance policy that was followed on saturation

23  patrols. Dr. Camarota testified that Lt. Sousa told him that on such patrols officers

24  "attempt when practicable, and when it's viable, to pull over during saturation patrol

25  anybody they see in violation making equipment violations or violating the rules of the

26  road." (*Id.* at 1334:22–1335:5.) As the Court has already determined, however, the

27  MCSO followed no such policy during large-scale saturation patrols, and the description

28  of the zero tolerance policy Dr. Camarota testified that he received from Lt. Sousa is

different than Lt. Sousa's description given during trial. Thus, Dr. Camarota's conclusions that relied on the existence of the zero tolerance policy as he understood it are impaired. Dr. Camarota himself acknowledged in his testimony that if his understanding of the zero tolerance policy was inaccurate and if "that's not what happens during a saturation patrol, then that can matter" with respect to his analysis that socioeconomic factors could account for different stop rates. (*Id.* at 1336:4–15.) The Court, therefore, gives more weight to the opinion of Dr. Taylor.[71]

Regarding the length of stops, Dr. Camarota suggested that the need to translate information for the person stopped may contribute to stops of Hispanics taking more time. (*Id.* at 1297:11–15.) Dr. Taylor agreed that if officers translate information during a stop, the stop could take longer than a stop where no translation is required. (*Id.* at 175:9–17.) Dr. Camarota testified that Hispanics are more likely to have hyphenated last names, which would require officers to check both alternate last names and could also increase the length of a stop. (*Id.* at 1298:9–23.) While the Court agrees that both of these alternative explanations carry weight, as multiple MCSO officers admitted, once they stopped a vehicle with Latino passengers, they used the race of the occupants of the vehicle as one factor among others to prolong the stop and investigate the immigration status of the vehicle's passengers. The Court believes that the MCSO's pursuit of this practice, even if it did not ultimately result in an arrest, is a more likely explanation for the increased stop time resulting from stops with Hispanic names.

Further, Dr. Camarota testified that missing data could affect the reliability of Dr.

---

[71] Defendants' police practices expert, Bennie Click, similarly opined in his report that there was no impermissible racial profiling occurring during saturation patrols due to a zero tolerance policy that limited the discretion of MCSO deputies in whom they could pull over. (Ex. 1070 at 46.) He arrived at this conclusion based on a description of the zero tolerance policy provided him by Sgt. Madrid. (*Id.*) The Court similarly rejects Mr. Click's conclusion based on his misassumption regarding a zero tolerance policy that was never effectively implemented at the MCSO.

1334

Taylor's conclusions. In conducting his analysis, Dr. Taylor recorded only those stops in which the CAD Database recorded the fact that an officer had checked at least one name. (*Id.* at 75:17–19.) In approximately 30% of the recorded stops in the CAD Database, the officer did not check any names at all. (*Id.* at 1236:9–10.) In conducting his analysis, Dr. Taylor included only those stops in which the CAD Database recorded that the stop was categorized as final call type T. (*Id.* at 75:14–15.) Slightly over 80% of the stops for each year were categorized as final call type T. (*Id.* at 78:15.) Dr. Taylor's data set therefore did not include data for a number of stops conducted by the MCSO, apparently including those that would have resulted in immigration arrests. Further, the MCSO does not review the CAD data for quality control, and makes no attempt to verify the accuracy of the CAD data. (*Id.* at 1265:20–25, 1252:19–24.)

While the Court does weigh the incompleteness of the available information, there is no question that all of the information used was provided to the Plaintiffs by the MCSO, and was all the information that it kept on the topic.[72] Since the data that was excluded did not include any name that could be evaluated, the Court concludes that drawing conclusions from limited data sets is still probative when complete data are not available. Further, the non-T stops that were excluded from Dr. Taylor's analysis involved a collection of stops which, in the aggregate, involved a lower degree of officer discretion than stops designated as a traffic stop or a traffic violation. The Court thus credits Dr. Taylor's analysis and finds it credible and probative as to whether MCSO deputies used race as a factor among others in stopping vehicles with Latino occupants on saturation patrols.

Despite the voluminous evidence to the contrary, the MCSO argues that a number

---

[72] The MCSO's police practices expert acknowledged that the MCSO fell below the standard in not keeping more complete records of its officer's encounters during this period. (Tr. at 1752:6–24, 1753:17–1754:1.)

of specific deputies testified at trial that they never used race in the law enforcement decisions they made, even in an immigration context. For example, Deputy Armendariz testified that he never used race or ethnicity to make a decision to stop a vehicle, detain a driver or occupant, or to initiate questioning of anyone. (*Id.* at 1507:11–20.) Similarly, Detective Beeks testified that race and ethnicity are not criteria for a traffic stop. (*Id.* at 1436:8–10.) Deputy Kikes also testified that he never tries to determine anything about the race, ethnicity, or demographics of vehicle occupants in deciding who to pull over. (*Id.* at 625:10–14.) Deputy Rangel joined Deputy Armendariz in testifying that, as a matter of course, they and other deputies investigate the identity of every occupant of every vehicle they stop, regardless of race. (*Id. at* 1518:14–19, 1543:4–12 (Deputy Armendariz testifies that its typical for all law enforcement officers to ask all passengers to volunteer their identification after pulling over a car, and he always does this whether it's a routine traffic stop or a saturation patrol), 931:2–13, 944:9–16 (Deputy Rangel testifies that he asks everybody in a vehicle for identification as a matter of habit, and not only while conducting saturation patrols).)

While the Court does not doubt the work ethic of these deputies, nor their desire to follow the various directives pertaining to their operations, it is difficult to reconcile their testimony in this respect with their actual performance during large-scale saturation patrols**.** That analysis demonstrates that it is unlikely that Deputy Armendariz, Deputy Rangel, Deputy Beeks, or Deputy Kikes engaged in the race-neutral policing that they claimed.

Deputy Armendariz participated in at least nine of the large-scale saturation patrols, some of which took place over multiple days. 75 of the 97 arrests made by Deputy Armendariz during the large-scale saturation patrols, or 77.3% of his total arrests, were of persons with Hispanic names.[73] Further, at least 35 of these arrests were made of

---

[73] During the large-scale saturation patrol at Cave Creek and Bell he arrested a total of four people, all of whom had Hispanic surnames. (Ex. 82.) During the first large-scale Mesa patrol he arrested five people, all of whom had Hispanic names. (Ex. 87.)

- 84 -

passengers. 33 of them were determined to be unauthorized aliens, although only 32 of them had names that are listed as Hispanic in Exhibit 320.[74] Deputy Armendariz did arrest two passengers with non-Hispanic names.

Such statistics as exist regarding Deputy Armendariz's performance in small-scale patrols are even more indicative of racial disproportionality, albeit in a smaller sample.[75] Looking at the records for those operations that identify arresting officers, Officer

During the second large-scale Mesa patrol he arrested 18 people, ten of whom had Hispanic names (Actually, eleven persons were designated in the arrest report as being unauthorized aliens, however, the name of the eleventh, Minerva Vujando, was not included in Ex. 320 as an Hispanic name, so the Court does not count it here). (Ex. 97.) During the first Sun City patrol he arrested 17 persons on one arrest, all of whom had Hispanic names. (Ex. 102.) Although the probable cause listed on the arrest report for stopping this vehicle was a violation of Arizona's Human Smuggling Act, all persons in this arrest processed with ICE on federal immigration charges. While the arrest was not made on the state charge, the Court is willing to assume that, due to the large number being transported, there was sufficient probable cause to pull the persons over for a violation of state law, even if Deputy Armendariz had not considered race as a factor. During the first Southwest Valley saturation patrol, he arrested nine people over the course of two days, five of whom had Hispanic surnames. (Ex. 111.) On the April 23–24 West Valley patrol, he arrested 16 people, 14 of whom had Hispanic surnames. (*Id.*) On the July 23–24 Chandler Southeast Valley patrol, he arrested 17 people, 11 of whom had Hispanic surnames. (Exs. 128, 168.) On the September 5, 2009 patrol at Durango and 35th Ave, he arrested eight people, six of whom had Hispanic surnames. (Ex. 170.) During the November 16, 2009 countywide patrol he arrested three people, all of whom had Hispanic surnames. (Exs. 176, 178–82.)

[74] During the August 2008 Sun City large-scale patrol, Deputy Armendariz pulled over a vehicle with 17 occupants. The passengers were arrested for federal immigration violations. However, even if those arrests are removed from the equation as having sufficient probable cause to investigate and arrest absent Deputy Armendariz's use of race as a factor in making the stop, then 58 of 80 his arrests, or 72.5%, had Hispanic names, and 16 of 19 passengers arrested had Hispanic names.

[75] Although technically speaking the operation plans prohibiting racial profiling and requiring all possible arrests applied only to large-scale saturation patrols, Deputy Armendariz testified that he never considered race in any aspect of his law enforcement. Thus, if true, his arrests should reflect that reality.

- 85 -

Armendariz participated in at least the first day of the Fountain Hills operation, and in the September 2008 Cave Creek operation. The Fountain Hills operation lasted six hours. (Ex. 108.) During those six hours, seven stops were made, four of which resulted in immigration arrests. (*Id.*) Of the four stops that resulted in immigration arrests, three were made by Deputy Armendariz, the other was made by Deputy Cosme. (*Id.*) All of the recorded stops made by Deputy Armendariz resulted in the arrest of unauthorized aliens.[76] (*Id.*)

The records for the September 2008 Cave Creek operation also reveal which officers made the stops that resulted in immigration arrests. Four of the 33 stops made on that day resulted in immigration arrests. (Ex. 112.) Deputy Armendariz made two of those four stops. (*Id.*) The ratio of stops to immigration arrests made does not serve to demonstrate whether Deputy Armendariz may have been using race as a criteria on which to stop traffic violators. Nevertheless, during these two days of operations, Deputy Armendariz made five traffic stops that resulted in ten arrests of unauthorized residents. (*Id.*) All of the persons arrested by Deputy Armendariz had Hispanic surnames and each of them was arrested on federal immigration charges. (*Id.*) At least six, but possibly as many as eight of these persons were passengers in vehicles. (*Id.*) During these two days, it is clear that Deputy Armendariz made no effort to pull over every vehicle he observed committing a traffic violation because during the entire first day of the Fountain Hills operation, both units of the MCSO pulled only over seven vehicles. During the September 2008 Cave Creek operation, although more vehicles were stopped, and more vehicles may have been stopped by Deputy Armendariz, he never arrested anyone on either day, other than Hispanic drivers or passengers. (*Id.*)

When asked to explain his disparate arrest rate of Hispanic persons, Deputy

---

[76] On the second day of the Fountain Hills operation no record was kept of the officers who made the stops, so it is not possible to know if Deputy Armendariz participated, or how many of the stops he made.

Armendariz testified that the majority of Maricopa County's population is Hispanic. (Tr. at 1504:10–1505:2.) That assertion is simply wrong. Approximately 30% of the population of Maricopa County is Hispanic. *See* United States Census, State & County QuickFacts, Maricopa County, Arizona, http://quickfacts.census.gov/qfd/states/04/ 04013.html (last visited May 21, 2013). Approximately 77% of the arrests made by Deputy Armendariz during large-scale saturation patrols had Hispanic surnames. 100% of the persons he arrested during the limited sampling of small-scale patrols had Hispanic surnames. The Court concludes that Deputy Armendariz considered race as one factor among others in making law enforcement decisions during both large- and small-scale saturation patrols.

Deputy Beeks participated in at least four of the large-scale saturation patrols. (*Id.*) From the Court's calculations 14 of the 15 arrests made by Deputy Beeks during the large-scale saturation patrols, or 93.3% of the total arrests he made were of persons with Hispanic names.[77] Further, during these large scale saturation patrols, Deputy Beeks arrested 11 passengers. (Exs. 82, 90, 174.) Nine of them were determined to be unauthorized aliens, and all of them had names that are listed as Hispanic in Exhibit 320. It is likely that the ten arrests Deputy Beeks made during the second Sun City patrol stemmed from a human smuggling load. All ten came from the same vehicle.[78] (Ex. 174.) Excluding those numbers, Deputy Beeks made five other arrests, four of whom had

---

[77] During the large-scale saturation patrol at Cave Creek and Bell he arrested one person, and that person had a Hispanic surname. (Ex. 82.) During the first large-scale Mesa patrol he arrested three people, all of whom had Hispanic surnames. (Ex. 90.) During the April 2009 West Valley patrol he made one arrest of a person who did not have a Hispanic surname. (Ex. 111.) During the second Sun City patrol of October 17, 2009, he arrested ten people. (Ex. 174.) All of them had Hispanic surnames.

[78] Three of the ten were arrested on state charges and seven of the ten were turned over to ICE under MCSO's LEAR policy, presumably meaning there was no basis to arrest on state charges.

Hispanic last names and were in the country without authorization. The Court concludes that Deputy Beeks considered race as one factor among others in deciding whom he would stop.

The large-scale patrol arrest statistics for both Deputy Rangel and Deputy Kikes have been previously discussed. *See* Section II.8, *supra*. As noted, Deputy Kikes participated in three large-scale saturation patrols over four days and made a total of five arrests on all such patrols. All five had Hispanic names. Thus 100% of all persons he arrested during a minimum of three days of saturation patrols were Hispanic. Similarly, Deputy Rangel participated in seven large-scale saturation patrols in which 54 out of the 60 people he arrested had Hispanic surnames.[79] The Court concludes that Deputies Kikes and Rangel considered race as one factor among others in making law enforcement decisions in an immigration context.

To the extent that the MCSO invites the Court to find that the MCSO saturation patrols did not incorporate racial bias in design or execution based on the testimony of these officers that they did not so engage, the Court declines to do so. The great weight of the evidence is that all types of saturation patrols at issue in this case incorporated race as a consideration into their operations, both in design and execution, the vehicles the deputies decided to stop, and in the decisions made as to whom to investigate for immigration violations.

The day labor operations and similar small-scale patrols with high arrest ratios specifically required the investigation of passengers that were Latino day laborers, which

---

[79] If the human-trafficking load(s) arrested by Deputy Rangel during the August 2008 Sun City patrol are removed from the equation, then 11 of 16 arrests or 68.7% of his total arrests are of persons with Hispanic names. During the nine days, he made 60 (or 16) arrests. Of the 60 (or 16) arrests, 54 (or 11) just happened to be of Hispanic persons who were in the country without authorization, and 47 (or 4) of them were on immigration charges. The Court rejects the proposition that Deputy Rangel was not considering race in the vehicles he stopped or the passengers he investigated and arrested.

- 88 -

meant a disproportionate number of Latino passengers had their identities investigated, regardless of whether that investigation resulted in arrest. The number and types of resulting arrests for each of these operations demonstrates that their principal purpose was the investigation and arrest of persons likely to be unauthorized residents. As shown above, members of the MCSO believe that virtually all unauthorized residents in Maricopa County are Hispanic. Because (1) the MCSO was involved in an operation whose principal purpose was to investigate and arrest unauthorized residents, (2) it was trained by ICE that it could take into account Hispanic background as one factor among others leading to the reasonable suspicion that a person is not here legally, and (3) individual deputies were required during such operations to keep track specifically of the number of people they arrested who were not authorized, the Court concludes that those deputies emphasized stopping and investigating the identities of Hispanic persons during such operations.

In the large-scale patrols, MCSO policy instructed officers to rely on their 287(g) certification training in making similar decisions and consequently allowed the officers to consider the passenger's race in making the decision to investigate the passenger's identity. That direction would have resulted in the disproportionate investigation of passengers of Latino background, regardless of whether probable cause or reasonable suspicion otherwise existed to justify such a search. Dr. Taylor's analysis confirms that Hispanic names were more likely to be checked. During the T-Stops that included names called into dispatch during the 11 operations that were the subject of Dr. Taylor's analysis, 308 people were arrested for being present in the country without authorization. (Tr. at 1311:20-1313:3). Further, according to Dr. Taylor, depending on the threshold of name used, between an additional 1,312 and 1,988 Hispanic names were checked during the CAD stops that he monitored. (*Id.* at 90:12–16.)

Further, as demonstrated below, in its ongoing enforcement of state laws related to immigration and the LEAR policy, the MCSO continues to consider race as one indicator, among others, that a person is in the country without authorization. Therefore,

- 89 -

MCSO officers continue to stop and check the identities of a disproportionate number of Hispanic persons.

**10.     The MCSO stops a vehicle for the length of time it takes to investigate its occupants, not the amount of time necessary to dispose of the traffic infraction that resulted in the stop.**

MCSO traffic stops at issue lasted as long as it took to check the identity of the Hispanic occupants of a vehicle. Some of these stops lasted much longer than it would have taken to handle the traffic infraction that justified pulling the vehicle over in the first place. This is demonstrated by comparing two similar stops during which the MCSO took the same enforcement action.

At trial, David Vasquez testified that he was pulled over by Deputy Ratcliffe of the MCSO during the first large-scale saturation patrol in Mesa. (Tr. at 199:20–22, 201:24–202:2.) Mr. Vasquez acknowledged that the stated purpose for the stop was a very small if not imperceptible chip in his windshield. (Ex. 54.) Mr. Vasquez is Hispanic and his wife is not Hispanic. (Tr. at 198:15–17, 1992–3.) Deputy Ratcliffe asked Mr. Vasquez for his identification but did not make the same inquiry of his wife. (*Id.* at 200:21–201:6.) After Deputy Ratcliffe checked Mr. Vasquez's identification, he was released without being issued a citation for the chipped windshield or any other reason. (*Id.* at 201:1–6.) Although Mr. Vasquez estimated in his testimony that the stop took ten or 15 minutes, he was confronted on cross-examination with the CAD record of the stop that demonstrated that it took just over four minutes. (*Id.*) Upon cross-examination Mr. Vasquez acknowledged that the stop could have taken as little as four minutes. (*Id.* at 206:13–14, 208:2–7.) The Court credits the CAD record.

By contrast, although the stop that resulted in the arrest of Jose de Jesus Ortega-Melendres also resulted in only an oral warning to the driver, it lasted approximately 40 minutes. Considerable trial testimony concerned that stop. On that day, Deputy Louis DiPietro, a member of the canine unit, was recruited by the HSU and assigned to follow cars the HSU officers targeted until he could develop probable cause to stop the car for a

1342

traffic violation. (*Id.* at 242:10–20.) Members of the undercover team observed Mr. Ortega-Melendres and other Hispanic individuals get into a vehicle, and radioed to Deputy DiPietro that he should follow the car and develop probable cause to stop it. (*Id.* at 244:18–24.) Deputy DiPietro followed the car for between one and three miles, then pulled it over for speeding. (*Id.* at 245:8–24.)

The evidence established that Sgt. Madrid and Deputy Rangel, both HSU officers, came to the scene after they heard that Deputy DiPietro had stopped the car. Deputy DiPietro testified that he did not believe that he had probable cause to detain the passengers for any state crime,[80] but he held all of the occupants of the vehicle pending the arrival of Sgt. Madrid and Deputy Rangel and their completion of an investigation into the immigration status of the passengers. (*Id.* at 256:9–18.) It took up to ten minutes for Deputy Rangel and Sgt. Madrid to arrive.[81] The Court so concludes because Deputy Rangel testified that the driver would have been at the scene a total of between 30 and 40 minutes, and that the driver would have been at the scene for approximately 30 minutes after Deputy Rangel arrived. (*Id.* at 952:4–6.) It then took Deputy Rangel and Sgt. Madrid, operating in tandem, approximately 30 minutes to conduct their investigation into the immigration status of the three passengers that were in the car before placing the passengers under arrest. (*Id.* at 952:9–11.) Deputy DiPietro then released the driver. (*Id.* at 246:6–8.)

Upon arrival, Deputy Rangel, who had no reason to believe that the passengers

---

[80]  DiPietro did testify that he believed the majority of day laborers to be unauthorized immigrants. However, when questioned further, he admitted that he did not form this belief until he participated in the day labor operation that resulted in the Ortega-Melendres stop. (Tr. at 299:14-300:17.)

[81] To the extent that Deputy DiPietro testified he made any independent analysis as to whether the passengers were unlawfully present or breaking any laws, the Court concludes that pursuant to the operation, HSU officers would have arrived regardless of Deputy DiPietro's conclusions. (Ex. 129; *see also* Ex. 126.)

- 91 -

had violated any state law accordingly to his own testimony, asked the passengers in the vehicle for their identification.[82] (*Id.* at 910:3–20.) Deputy Rangel and Sgt. Madrid began questioning the passengers. Sometime thereafter they received from Mr. Ortega-Melendres his B-1/B-2 visa. They may have also received from him his valid I-94 form.[83] (*Id.* at 910:19–25.) At some point, after examining the documentation provided by Ortega-Melendres and the information provided by his fellow passengers, Deputy Rangel determined to arrest the Hispanic passengers. He handcuffed them and arranged for their transportation to ICE. (*Id.* at 915:5–7.)

Neither Deputy Rangel nor Deputy Madrid ever spoke to the driver. Deputy DiPietro alone had contact with him. (*Id.* at 952:14–15, 246:20–25, 247:23–24.) Deputy Rangel testified that he never spoke with the driver because it was not HSU's job to clear the driver. (*Id.* at 910:11–18.) Although Deputy DiPietro vacillated several times in his testimony, and was confronted with contrary testimony from his deposition, the Court ultimately credits Deputy DiPietro's testimony that he held the driver until HSU had completed its investigation. Therefore, 40 minutes after the initial stop, after the investigation of the vehicle's passengers was complete and the HSU had determined to

---

[82] Deputy Rangel, who is and was at all times relevant to this lawsuit a member of the MCSO's Human Smuggling Unit, has not been trained in the human smuggling statute, although he has read it. (Tr. at 953:19–25.) He has never been trained that day laborers are committing criminal violations by seeking or accepting labor. (*Id.* at 935:12–17.) Deputy Rangel did not believe that the vehicle that Deputy DiPietro stopped was involved in human smuggling. (*Id.* at 938:19–22.) Deputy Rangel does not believe that transporting a day laborer implicates the human smuggling statute, even if the person transporting the day laborer knows or has reason to believe that the day laborer is not authorized to be in the country. (*Id.* at 953:5–954:2.)

[83] Deputy Rangel disputes that Ortega Melendres ever produced an I-94 form. According to ICE documentation, however, when he was presented at the ICE detention facility, "Ortega-Melendres did have his I-94 in his wallet." (Ex. 1093.) After being held for several more hours at ICE pending investigation Ortega-Melendres was released without further action being taken against him.

1344

detain the passengers, Deputy DiPietro gave the driver a verbal warning and let him go. (*Id.* at 246:11–16.) Yet, as the stop of Mr. Vasquez demonstrates, it would only have taken approximately four minutes to issue a warning to the driver. That Deputy DiPietro retained the driver until the investigation of the passengers was complete does not establish that it would have reasonably taken forty minutes to give the driver an oral warning for speeding.

A brief review of the arrest reports shows that a great number of the arrests during the saturation patrols involved the arrest of multiple passengers during a stop when drivers received only a traffic warning or citation. In many such cases, merely investigating the identities of the passengers would have dwarfed the amount of time necessary to issue a traffic citation. For example, during the first day labor operation at Cave Creek, Deputy DiPietro issued only warnings to both drivers he stopped. As with the driver of the Ortega-Melendres vehicle, Deputy DiPietro also issued only a traffic warning to the second driver he stopped on that day. There were, however, six passengers who were investigated and arrested during that stop. (Ex. 126.) The Court finds that it would have taken longer than 40 minutes, and certainly longer than four, for the MCSO officers to investigate the identities of those six passengers.

Similarly, during the balance of the day labor operations, and apparently the small-scale saturation patrols, many of the immigration arrests arose from traffic stops during which multiple passengers were arrested. (Exs. 76, 80, 81, 108, 112, 114, 117, 119, 120, 123, 125, 129, 131, 175, 286.) Based on the Ortega-Melendres stop, it would take three deputies approximately 40 minutes to issue a citation or a warning to the driver and investigate the identity of three passengers who did not have ready identification in their possession. Thus, the Court finds that many of the traffic stops conducted during those operations would have taken around 40 minutes.

There was, however, additional evidence about how much time it takes to investigate the identity of a passenger. Deputies Rangel and Armendariz both testified about the process. As discussed above, they testified that MCSO deputies ask all

- 93 -

passengers for identification during every traffic stop. If an occupant provides them with identification they run the identification through the standard database accessible from their patrol vehicles. If a passenger provides no identification, they next ask the passenger to provide his or her name and date of birth. They then run the provided name and date of birth in the standard database.

Deputy Rangel testified that if the standard MVD database contained no information concerning a person with that name and date of birth, he returns and asks the vehicle's occupant(s) for another form of identification and/or asks questions concerning their identity and status. (Tr. at 946:5–9.) If he received no further identification, and Deputy Rangel was on a saturation patrol, he would then arrest the person for an immigration violation. (*Id.* at 947:2–20.) Since the termination of MCSO's 287(g) authority, when he encounters an individual who he suspects is undocumented but he has no basis to take into custody for violation of a state crime, he takes that person into MCSO custody, pending their transfer to ICE. (*Id.* at 958:23–959:7.)

Deputy Armendariz testified that if the database accessible from his patrol vehicle provided no information on a person with the name and date of birth supplied, he then takes the person into custody until their identity could be ascertained. (*Id.* at 1544:7–9, 1585:7–1586:12.) In such a circumstance, he accesses other databases that may or may not be available through the MVD database such as the JWI, NCIC, and ACIC. (*Id.* at 1520:25–1524:4.) If these databases are not accessible to him from his patrol vehicle, or if, for other reasons it would be beneficial to have dispatch run the searches, he contacts dispatch and has dispatch run the supplied identity through other databases, including PACE—a system maintained by the City of Phoenix. (*Id.* at 1526:21–24.) He acknowledged that such a process takes time, and it would be impossible to calculate an average. Nevertheless, he testified that such an inquiry takes

> a while because the dispatchers—the dispatcher that we have that we run on that particular channel runs information for the entire county. . . You have to base it on the fact that when—we're on the satellite or we're on a mobile system and the computers run real slow. There

- 94 -

1

are a lot of cases where DPS, the DPS system itself is down and the queue is down.

2

3

There is when we go to our info channel and we run them on our information channel where the dispatcher is backlogged because, as I said, she runs – it's one dispatcher for the entire county, whoever transfers over to that channel that needs information.

4

5

6

And also I request a PACE check, which is through the City of Phoenix. So she has to call—the dispatcher that is to contact the City of Phoenix for more information.

7

8

(*Id.* at 1525:21–23, 1526:12–24.)

9    Deputy Armendariz acknowledged that while he is waiting for a response, he

10   returns to the vehicle and asks further questions to the passenger, or requests other forms

11   of identification including the passenger's social security number. (*Id.* at 1525:4–14,

12   1585:23–1586:12.) He further noted, consistent with other testimony, that such inquiries

13   can prolong the stop because Hispanic surnames are often hyphenated, requiring a check

14   of each permutation of the same name. (*Id.* at 1508:4–1509:3, 1527:13–18.)

15   Deputy Armendariz does not believe that it has ever taken him more than a half

16   hour to run such a database check, but acknowledged that an identification check would

17   run approximately fifteen minutes. (*Id.* at 1590:5–12.) Deputy Armendariz then twice

18   confirmed that it is still his practice to go through this process of investigating passengers

19   during all of his stops. (*Id.* at 1526:1–3, 1546:3–17.) After the lunch break in his

20   testimony, however, he seemed to contradict himself in part when he testified that now

21   that he does not have 287(g) authority, if he is unable to figure out a passenger's identity

22   he just lets them go. (*Id.* at 1589:12–18.) The Court finds that such testimony is not

23   credible especially in light of the LEAR policy, discussed below, which would require

24   Deputy Armendariz to detain such persons if he develops reasonable suspicion that they

25   are not in the country legally.

26   As the investigation of Deputy Rangel and Sgt. Madrid into the identity of Mr.

27   Ortega-Melendres and his fellow passengers demonstrates, investigating the identity of

28   multiple persons per stop extends the duration of the time that it takes to conduct such

stops, even when multiple officers are conducting the inquiries.

While writing a citation would take somewhat longer than issuing a warning, it would not take considerably longer. Many cases suggest that such stops last around ten minutes. *See, e.g., Illinois v. Caballes*, 543 U.S. 405, 406 (2005) (noting that the issuance of a warning ticket, arrival of another officer, tour around the car with a narcotics-detection dog, search of the trunk and resulting arrest took "less than 10 minutes" in total). Yet, Deputy DiPietro estimated that it typically could take up to twenty minutes to issue a citation. (Tr. at 297:16–22.) Even accepting this higher estimate, many of the arrests during saturation patrols resulted in the arrest of multiple passengers, and thus their investigation would have taken significantly more time than it would have taken to issue a ticket to the driver. Although most arrest reports of the operations show that a traffic stop resulted in at most a citation to the driver, during a few the driver was arrested on criminal charges. Even so, the majority of the evidence indicates that investigating the identities of passengers occurred frequently during MCSO operations and that such investigations took significantly longer than it would take to warn or cite the driver. Thus, the Court finds that for most stops conducted by the MCSO, the length of the stop lasted the time it took to investigate the passengers rather than to deal with the traffic citation.

> **11.    Some MCSO deputies claim to conduct identity checks on all vehicle occupants. Due to MCSO policy that allows officers to consider race in determining whether to initiate an immigration investigation, vehicle occupants who are Latino are more likely to have their identity checked as a matter of operational procedure and policy.**

The MCSO acknowledges that there is no legal requirement in this state that passengers in vehicles carry identification. Nevertheless, Sheriff Arpaio stated in a national press interview that when persons were passengers in a vehicle with a driver stopped on criminal suspicion, MCSO deputies were entitled to investigate the passengers in the vehicle as a matter of course. (Ex. 410a (stating that if unauthorized aliens were passengers in a vehicle with a driver stopped for an immigration violation or other crime, "we have the right to talk to those people").) Some MCSO witnesses at trial, including

- 96 -

Deputy Armendariz, testified that, as a matter of continuing practice, MCSO officers investigate the identity of all passengers in every vehicle they stop regardless of whether the stop was made during a saturation patrol. (Tr. at 1518:14–19, 1543:4–12 (Deputy Armendariz testifies that its typical for all law enforcement officers to ask all passengers to volunteer their identification after pulling over a car, and he always does this whether it's a routine traffic stop or a saturation patrol), 923:12–14, 931, 944:9–16 (Deputy Rangel testifies that he asks everybody in a vehicle for identification as a matter of habit, and not only while conducting saturation patrols).) Further, Chief Click stated in his report that it was his understanding that "all passengers in vehicles that had been stopped would be contacted" because of the zero tolerance policy. (Ex. 1070 at 46.) At least some deputies understood the purpose of saturation patrols to be making contact with as many people as possible during the course of each traffic stop. (Tr. at 302:16–22.) Thus, many stat sheets requested the number of contacts made during patrol stops. To the extent that the deputies understood this to be the purpose of saturation patrols, they would have likely asked for the identity of every person stopped as a matter of course, as Deputy Armendariz suggested.

Regardless of whether individual officers routinely investigated the identity of every person in every car they stopped, Sgt. Madrid testified that officers participating in day labor operations were instructed that when they responded to a vehicle that had been stopped, they were to investigate all passengers for immigration violations. (*Id.* at 1144:1–14.) As set forth above, investigating passengers' identities was a basic element of a day labor operation. None of the reports made any attempt to set forth reasonable suspicion to investigate the passengers once a stop was made.[84] Rather, they confirm that

---

[84] At trial, Deputy DiPietro testified that the HSU officers were en route to the scene once they heard he stopped the vehicle. (Tr. at 256:9–18.) Thus, as an operational matter, the deputies were not looking to establish independent reasonable suspicion to investigate the passengers once the vehicle was stopped, even if they could have established it.

the investigation of the passengers' identifies followed the traffic stop as a matter of course. (Exs. 123, 129, 131.) Three of the four reports state:

> traffic stops [were] made from UC [undercover] vehicles relaying that day laborers were picked up from the area. Once the pick up vehicle was located by MCSO marked patrol units, detectives would establish probable cause for a traffic stop. Once the vehicle was stopped HSU detectives would interview the subjects in the vehicles in reference to their legal status to be in the US.

(Exs. 123, 129, 131; Tr. at 1144:1–8; 1151:4–11.)

As with the reports of the day labor operations, the great majority of the small-scale saturation patrol reports, especially those with high arrest ratios, set forth for every traffic stop that resulted in the arrest of an unauthorized alien: (1) the basis for the traffic stop, (2) whether and for what the driver was cited and/or arrested, (3) the number of unauthorized aliens arrested during the stop, and (4) the number of persons, including unauthorized aliens, that were arrested on state charges as opposed to federal immigration charges. It is clear from these arrest reports that officers investigated passengers because many of the stops resulted in multiple arrests per stop. In any small-scale patrol where the deputy developed reasonable suspicion during the traffic stop that another state crime was being or had been committed, the MCSO arrested the vehicle's occupant on that basis. The reports, however, do not state any observations made after the vehicle was pulled over that would provide reasonable suspicion that the passengers were in the country without authorization.

The arrest reports for large-scale saturation patrols confirm that separate probable cause or reasonable suspicion as to passengers was not considered a necessity prior to investigating their identities. Those reports contain a column listing the probable cause that lead to each arrest. Again, in almost all cases involving passengers who were arrested, the only probable cause listed is that the person was a passenger in a vehicle stopped for a traffic violation. (Exs. 79, 82 (particularly the arrests of Deputies Ruiz, Almanza, Smith, Calderon, Armendariz, Romney, Sloup and Seclacek), 90, 97

(particularly the arrests of Deputies Armendariz, Schmizer, Doyle, Beeks, Brockman, Trombi, Komoroski, Cosme, Templeton, Silva, Summers, Roughan and Rangel); 102, 111, 174, 178, 180.) Thus, as with the small-scale patrols, these arrest reports do not delineate any individualized reasonable suspicion or probable cause on which an MCSO deputy could detain a passenger or prolong a stop to investigate a passenger's authorization for being in the United States.

Based on the weight of the evidence and testimony, the Court concludes that officers in the MCSO operations frequently detained passengers to investigate their immigration status as a matter of course, whether based in part on the race of the occupants or otherwise. In some of those stops, some officers may have had an objectively reasonable suspicion with respect to individual passengers sufficient to prolong detention for a reasonable time to conduct a brief investigation. Nevertheless, MCSO practice and some of its operational procedures do not require its deputies to have such suspicion beyond the initial traffic stop or to document their bases to routinely investigate the identities of a vehicle's occupants.

### 12.   The MCSO never made an evaluation to determine whether its saturation patrols were being implemented with racial bias.

MCSO command personnel uniformly testified that they did not conduct any sort of investigation or monitoring to determine whether the saturation patrols were being implemented in a racially-biased fashion. For example, Chief Sands testified that the MCSO does not collect data on those people it stops or detains to determine whether officers are engaging in racial profiling.[85] (*Id.* at 833:6–8.) Sgt. Palmer testified that if he

---

[85] Chief Click, the MCSO's standard of care expert at trial, testified that any supervisor who wanted to minimize racial profiling would have to take active steps to combat it by reviewing records, investigating unusual findings, and retraining officers as needed. (Tr. at 1746:24–1747:5, 1750:20–1751:9, 1754:4–13.) He testified that "anything that would raise the specter of racial profiling needs to be investigated and looked at further." (*Id.* at 1765:12–14.)   Chief Click testified that to determine whether or not officers are improperly using race during a saturation patrol, a department would not merely look to see if there was probable cause for a particular stop, but "look at the

saw that a deputy had reported that he had reasonable suspicion to justify a stop, he knew that the deputy did not engage in "racial profiling." (*Id.* at 724:22–725:1.) He further testified that he socializes with other officers in the MCSO off-duty, and based on knowing them socially and knowing them as well as he does, he knows that they do not engage in "racial profiling." (*Id.* at 778:25–779:2.) He also testified that he believes there is no need to investigate whether MCSO officers improperly use race in the course of their law enforcement duties because "quite frankly, sir, I know my brothers, and we abide by the law."[86] (*Id.* at 779:17–18.) Because he is certain that the other members of the HSU would never engage in racial profiling, Sgt. Palmer never took any action to determine whether HSU deputies engaged in racial profiling and never put any system in place to monitor for racial profiling. (*Id.* at 780:15–22.)

Sgt. Madrid has never reviewed his deputies' incident reports for the purpose of checking whether they are engaged in racial profiling. (*Id.* at 1172:12–15.) If Sgt. Madrid

---

bigger picture, how many people did either the individual deputy stop or how many were stopped, how many total people were stopped during the patrol?" (*Id.* at 1764:23–1765:1.)

[86] The deputies that Sgt. Palmer supervised in the HSU are, apparently the same ones with whom he exchanged e-mails demeaning Mexicans. (Exs. 18, 29.) Sgt. Palmer, considering the e-mails a "joke," forwarded them to the deputies he supervised in the HSU. (Tr. at 735:11–13.) Although Sgt. Palmer believes he was disciplined for sending the emails, he remained a supervising sergeant in the Human Smuggling Unit. (*Id.* at 737:17–18.) A year later, Sgt. Palmer circulated to the HSU a fictional article from the Los Angeles Times purporting to be about immigration which contained baseless statistics regarding the unauthorized population in California. (Ex. 2.) Sgt. Palmer did not investigate whether the statistics in the e-mail were true before sending it to his subordinates. (Tr. at 729:21–23.) Sgt. Palmer forwarded the e-mail to his deputies in the Human Smuggling Unit as factual information for training purposes. (*Id.* at 732:2–6.) Sgt. Palmer later learned that the statistics in the e-mail were not from the Los Angeles Times and were not factual, but does not recall ever sending an e-mail to his deputies mentioning that the earlier e-mail was a hoax. (*Id.* at 732:13.)

determined that an officer had probable cause to make a stop, he "wouldn't even suspect" that the officer had engaged in racial profiling. (*Id.* at 1172:20–24.) Lt. Sousa did not review citations, stat sheets, or any other documents to determine whether racial profiling was occurring in the Human Smuggling Unit because he believed that racial profiling was a "nonissue." (*Id.* at 1022:12–16.) Lt. Sousa is not aware of the MCSO ever disciplining an officer for racial profiling. (*Id.* at 1023:23–25.)

> **13.    After the revocation of its 287(g) status, the MCSO erroneously trained all of its 900 deputies that they could enforce federal immigration law. The MCSO further erroneously trained its deputies that unauthorized presence in the country, without more, was a criminal as opposed to an administrative violation of federal immigration law. The MCSO operated under that misunderstanding during most of the period relevant to this lawsuit.**

Until December 2011, the MCSO continued to operate under the erroneous premise that being an unauthorized alien in this country in and of itself established a criminal violation of federal immigration law which the MCSO was entitled to enforce without 287(g) authorization. (Tr. at 699:3–702:17.) At the time of revocation, the MCSO had approximately 100 field deputies who were 287(g) certified. (Exs. 356, 359, 360.) Shortly after the revocation of his 287(g) authority, Sheriff Arpaio decided to have all of his deputies trained on immigration law. Being so trained, the MCSO asserted, all MCSO deputies could make immigration arrests. (Exs. 359 (MCSO news release dated March 18, 2010 stating that because ICE revoked the ability of 100 287(g)-trained officers to enforce immigration law, the MCSO would now use all 900 of its deputies to enforce immigration laws in Maricopa County), 356, 358 (MCSO news release dated March 1, 2010 stating that "[t]hese arrests are a result of Sheriff Joe Arpaio's recent promise to ensure that all 900 of his sworn deputies receive training on the enforcement of illegal immigration laws"), 360, 362.)

This training erroneously instructed MCSO deputies that a person within the country without authorization was necessarily committing a federal crime, and the MCSO thus maintained the authority to detain them for criminal violations. (Tr. at 699:3–

702:17.) Further, Sheriff Arpaio gave interviews to the national and local press in which he asserted that if a person is in the country without authorization, that person has necessarily committed a criminal offense. (*Id.* at 362:17–21 ("[T]hey did commit a crime. They are here illegally.").) Sgt. Palmer continued to provide such instruction and training until December 2011, when this Court enjoined the MCSO from detaining persons on the belief, without more, that those persons were in this country without legal authorization. *Ortega-Melendres*, 836 F. Supp. 2d at 994.

Moreover, the Sheriff continued to run numerous saturation patrols focused on arresting unauthorized immigrants generally. (Exs. 350 ("[D]eputies turned over a total of 19 of the 30 suspected illegal aliens who were not charged for any state violations to Immigration and Custom Enforcement officials without incident."); 358–62 (emphasizing the number of illegal immigrants arrested in these operations).) In such operations, he continued to arrest and turn over to ICE the unauthorized aliens that his deputies arrested during these patrols. (Ex. 360 (MCSO news release noting that 47 of 64 people arrested in a post-revocation saturation patrol were illegal aliens. 27 of those 47 were arrested on state charges with the remainder being turned over to ICE).)

### 14. When enforcing state laws related to immigration the MCSO continues to use race as an indicator, among others, of unauthorized presence, as it did in its previous operations.

At trial, Sheriff Arpaio testified that the loss of 287(g) authority did not affect how the MCSO conducted its immigration related operations, including the saturation patrols. (Tr. at 469:23–470:5.) He has continued to enforce "the immigration laws, human smuggling, employer sanction" as he did previously. (*Id.* at 473:23–474:1.) The Sheriff maintains the right and intention to conduct such operations in the future. (*Id.* at 469:20–470:2, 473:5–474:7, 474:20–24.) Sheriff Arpaio testified that the last saturation patrol the MCSO conducted prior to trial occurred during October 2011 in southwest Phoenix. (*Id.* at 474:8–13.) He testified that although the MCSO had not conducted a saturation patrol in the eight months prior to trial, he has not re-evaluated the propriety of the patrols based

1354

on the current litigation or other litigation. (*Id.* at 474:14–475:1.) Further, the MCSO continues to make immigration arrests. As the Sheriff testified, they arrested about 40 unauthorized persons in Maricopa County in the two weeks prior to trial. They charged those they could with state law violations and they successfully turned the rest over to ICE. (*Id.* at 503:3–11.) The Sheriff reaffirmed that the MCSO "will continue to do all that we can to reduce the number of illegal aliens making their way into the United States and Maricopa County." (*Id.* at 336:23–337:8.)

Several officers and deputies likewise affirmed that, essentially, nothing has changed. Chief Sands testified that he does not believe that the revocation of 287(g) authority had any impact on MCSO's ability to conduct saturation patrols or Human Smuggling operations. (*Id.* at 845:14–22, 837:6–7.) Chief Sands testified that, the MCSO will "continue enforcement of immigration issues." (*Id.* at 837:6–7.)

Sgt. Madrid also testified that ICE's termination of the MCSO's 287(g) authority does not affect the MCSO's ability to conduct immigration enforcement operations because a person's immigration status is relevant to determining whether there has been a violation of the Arizona state crime of human smuggling, or possibly other state laws related to immigration. (*Id.* at 1157:17–1158:6.) As discussed above, Sgt. Madrid testified that, in enforcing the state human smuggling statute, MCSO officers continue to consider race as one factor among many "in deciding whether someone is suspected of being an undocumented immigrant in a smuggling load." (*Id.* at 1164:4–12.) In reviewing a report prepared by an MCSO deputy under his supervision in which the deputy stated that he was suspicious that passengers in a vehicle were unauthorized immigrants based on, among other factors, "[t]he Hispanic decent [*sic*] of his passengers the pungent body odor and the lack of luggage for traveling," (Ex. 157 at MCSO 024667), Sgt. Madrid stated that he would not conduct any corrective follow up on the officer who submitted it based on the use of race as a factor in forming his original suspicion, (Tr. at 1170:22–1171:3.)

Sgt. Palmer similarly testified that MCSO policy allows officers to "decide to

initiate an investigation during a stop based on race or ethnicity, among other factors." (*Id.* at 717:2–4.) He specifically testified a passenger's race could be used to determine whether the vehicle was a human smuggling load. (*Id.* at 721:18.) He stood by his sworn deposition testimony that he believed a subject's race was one relevant factor among others that officers could use to develop reasonable suspicion that the subject was unlawfully present in the United States. (*Id.* at 726:1–15.) Further, when presented with the same report that Sgt. Madrid had reviewed in which a deputy described the suspect's Mexican descent as a basis, among others, for his belief that the suspect was in the country illegally, Sgt. Palmer stated that "[a]mong the other indicators listed there I don't see a problem with that, no." (*Id.* at 721:1–2.)

Finally, Deputy Rangel testified that he currently uses the 287(g) factors to determine whether he has reasonable suspicion that someone is unlawfully present. (*Id.* at 956:25–957:5.)

> **15.    MCSO deputies continue to follow the LEAR policy, which directs them to detain persons whom they cannot arrest on state charges, but whom they believe to be in the country without authorization, pending direction from, or delivery to, ICE.**

The MCSO continues to arrest those it believes to be unauthorized aliens, charges those it can on state charges, and turns the rest over to ICE. At trial, Sheriff Arpaio testified that "in the last two weeks we've made over 40 arrests of illegal aliens coming into our county, and a few we did not have the state charge, including some young children, and ICE did accept those people." (*Id.* at 503:3–6.) He specified that the state charge to which he referred was the Arizona Human Smuggling Act and then noted that when the MCSO arrested unauthorized aliens that could not be charged under the Act, "we haven't had any problem yet turning those that we cannot charge in state court over to ICE." (*Id.* at 503:10–11.) Although the LEAR policy as written does not require ICE to accept such persons, according to Sheriff Arpaio, there is no problem with ICE doing so. Nevertheless, the Sheriff has apparently stated in press interviews that if he encounters a problem with ICE agreeing to accept the unauthorized aliens he arrests, the Sheriff will

have the MCSO transport such persons back to Mexico. (Ex. 348.)

Similarly, according to Chief Sands under MCSO's current practice "[i]t's the ones that you possibly can't determine there's enough evidence to charge them with the state law, and then you would turn them over to ICE." (*Id.* at 845:15–17.)

Deputy Rangel similarly testified that MCSO initially "take[s] into custody" and then turns over to ICE "an individual that you suspect is an illegal immigrant but for which you do not have probable cause of a state crime." (*Id.* at 958:23–959:14.) He repeated that the individual would be "detained by the MCSO until the MCSO . . . receives a response from ICE as to whether ICE wants the individual or wants them to be released." (*Id.*)

Likewise, Lt. Sousa testified at trial that after the Department lost its 287(g) authority, its officers continued to detain people whom they believed to be unlawfully present in the country and "make that phone call to ICE if they didn't have the state charge." (*Id.* at 1007:9–11.)

Sgt. Madrid also testified that after the MCSO lost its 287(g) authority, MCSO deputies would continue to arrest persons that they believed were present without authorization and turn such people over to ICE. (*Id.* at 1161:14–19 (testifying that his practice was to detain a suspected illegal immigrant and "make a call to ICE and let them make that determination"), 1226:8–23 (testifying that, after the loss of 287(g) authority, HSU continued to operate in the same way except that they would have to call ICE after detaining a suspected illegal immigrant rather than arresting that person with their own 287(g) authority).)

Sgt. Palmer testified that MCSO officers who encounter people they believe are unlawfully present in the country "ha[ve] to wait for contact with an ICE agent." (*Id.* at 698:8–11.) MCSO has drafted, placed in effect, and trained all of its deputies on this policy. (*Id.* at 1055:14–24, 1056:9–13, 1070:1–10, 1076:11–18.) Deputy DiPietro testified that he received "some online training" on the effect of the loss of 287(g) authority, and that "we were to call ICE, because we didn't have our 287(g) any longer."

(*Id.* at 291:22–23.) Deputy Armendariz stated that it is his current practice to conduct "investigative detentions" of vehicle passengers to determine whether they are in the country legally. (*Id.* at 1519:13–15; 1544:7–9, 1585:8–1586:9.) He also testified that if the database accessible from his patrol vehicle provided no information on a person with the name and date of birth supplied, he then takes the person into custody until their identity could be ascertained. (*Id.*)

The Court thus concludes that it is current MCSO policy to detain people on the reasonable suspicion, without more, that they are not legally present in the country while MCSO deputies attempt to or do contact MCSO field officers and/or ICE personnel to investigate the detainee's alienage. (*Id.* at 1590:1–12, 959:3–14, 503:3–11, 845:7–22, 1161:7–19, 1162:6–22, 1205:10–1206:9, 1226:5–14, 958:23–959:2, 1055:14–24, 1056:9–13, 1070:1–10, 1076:11–18.)

**16.    In following its LEAR policy, the MCSO continues to use race as an indicator of unauthorized presence.**

Pursuant to its LEAR policy, MCSO deputies continue to apply the indicators of unlawful presence that were identified in the 287(g) training their officers received from ICE to determine whether there is reasonable suspicion that someone is in the country without authorization. Lt. Sousa stated that in implementing the LEAR policy, the formerly certified 287(g) officers "still had that training, so they would definitely know the indicators." (*Id.* at 1007:9–10.) Sgt. Madrid testified that agents continue to look for indications of unauthorized presence during stops and that they are trained to use race as one of those indicators. (*Id.* at 1162:6-1164:12.) Deputy Rangel testified that he currently uses the 287(g) factors to determine whether he has reasonable suspicion that someone is unlawfully present. (*Id.* at 957:1–5.) The MCSO therefore continues to pursue the same policies and practices it did before it lost 287(g) authority.

**17.    The MCSO arrests and/or detains all persons it believes to be unauthorized, and it remains the regular practice of some of MCSO deputies to investigate all the occupants of every vehicle they stop.**

The MCSO continues to investigate the identity and immigration status of persons

- 106 -

it detains during vehicle stops. (*Id.* at 503:9–12 (Arpaio), 845:14–22 (Sands), 1007:9–11 (Sousa), 1226:8–23 (Madrid), 698:8–11 (Palmer), 958:23–959:7 (Rangel) 1526:1–3, 1546:3–17 (Armendariz), 291:22–23 (DiPietro).) Deputy Armendariz twice confirmed that it is still his practice to go through this process of investigating passengers during all of his stops. (*Id*. at 1526:1–3, 1546:3–17.)

Sgt. Madrid testified that agents continue to look for indications of unauthorized presence during stops and that they are trained to use race as one of those indicators. (*Id.*)

Further, once a vehicle has been stopped, MCSO policies allow MCSO deputies to consider the Latino ancestry of a vehicle's occupants, as one factor among others, in deciding whether to inquire into the immigration compliance of persons stopped.

## CONCLUSIONS OF LAW

## I.   PROPRIETY OF INJUNCTIVE RELIEF

In this action, Plaintiffs seek injunctive relief only. To obtain such relief, Plaintiffs have the burden of establishing that, not only have they been wronged, but there is "a sufficient likelihood that [they] will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). To the extent the MCSO has ongoing policies or practices that violate the constitutional protections of the Plaintiff class, such policies or practices constitute a sufficient possibility of ongoing harm to support an injunction. *See LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985); *Thomas v. Cnty. of L.A.*, 978 F.2d 504, 508 (9th Cir. 1992); *Walter v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998).

When it had 287(g) enforcement authority, the MCSO implemented operations, policies and practices to take full advantage of its expanded authority to enforce federal administrative immigration regulations and enhance the efficiency of its enforcement operations against unauthorized aliens. Because the federal government has terminated the MCSO's 287(g) authority, and because Plaintiffs seek injunctive relief only, the MCSO's policies, operations, and practices adopted to implement its 287(g) authority would not otherwise be relevant except that, as was made clear by the testimony of the Sheriff and other members of the MCSO command staff at trial, nothing has changed: the

MCSO both uses these same policies, operations and practices, and claims the right to continue to use them in its enforcement of both immigration-related state law and its LEAR policy.

Plaintiffs challenge a number of aspects of the policies, operations and practices that the MCSO has used and continues to use. The MCSO stipulated that Sheriff Arpaio is its ultimate policy maker. A policy, endorsed by an officer who claims he has final decisionmaking authority, combined with statements by officers who are responsible for implementing the policy, provides evidence that the MCSO made "a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing *final policy* with respect to the subject matter in question." *Meehan v. Cnty. of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (emphasis in original).

Thus, to the extent such practices violate the constitutional rights of the Plaintiff class, Plaintiffs are entitled to injunctive relief. *See LaDuke*, 762 F.2d at 1326 (holding that plaintiffs "do not have to induce a police encounter before the possibility of injury can occur" because stops are the result of an "unconstitutional pattern of conduct"); *Thomas*, 978 F.2d at 508 (stating that injunctive relief is appropriate when plaintiffs show that police misconduct "is purposefully aimed at minorities and that such misconduct was condoned and tacitly authorized by department policy makers").

To the extent the MCSO asserts that, despite any potential future harm to the certified class resulting from its policies, Plaintiffs cannot prevail because none of the class representatives demonstrated at trial that they suffered personal harm, its argument is not well-founded. It is true that to gain class certification, named plaintiffs must "allege and show that they personally have been injured." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). However, when the claims of named plaintiffs are not proven at trial, unnamed class members may be awarded relief so long as a "controversy" still exists between the unnamed class members and the defendants. *Sosna v. Iowa*, 419 U.S. 393, 402 (1975). ("The controversy may exist, however, between a named defendant and a member of the

- 108 -

class represented by the named plaintiff, even though the claim of the named plaintiff has become moot."); *see also Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 753 (1976) (granting relief to class members in multiple subclasses even though the named class representative's claim failed, because "[t]he unnamed members of the class . . . have such a personal stake in the outcome of the controversy . . . as to assure that concrete adverseness") (internal quotations and citation omitted). The evidence demonstrates that such a controversy exists between Defendants and unnamed class members here.

At any rate, as discussed in greater detail below, Mr. Ortega-Melendres's Fourth and Fourteenth Amendment claims succeed, so he "personally [has] been injured" and is an appropriate class representative. *Warth*, 422 U.S. at 502.

## II.     SPECIFIC CONCLUSIONS

### A.     The MCSO is enjoined from enforcing its LEAR policy.

Mere unauthorized presence in this country, without more, is not a criminal offense. It is true that use of unauthorized methods of entry into this country generally constitutes at least misdemeanor or petty criminal violations of federal immigration law. *See, e.g.*, 8 U.S.C. § 1325 (2005) (making it a federal misdemeanor to enter or attempt to enter the United States at "any time or place other than as designated by immigration officers."). However, aliens may enter the country legally, but become subject to removal either by staying longer than authorized or otherwise acting in excess of their authorization. Although a number of such aliens are here without or in excess of authorization, they have only committed a civil, as opposed to a criminal, violation of federal law. As the Supreme Court recently explained "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States*, ___ U.S. ____, ____, 132 S. Ct. 2492, 2505 (2012) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)).

This Court preliminarily enjoined the MCSO on December 23, 2011 from detaining persons based only on a suspicion that they were in this country without

- 109 -

authorization in the absence of additional facts. The MCSO appealed the preliminary

injunction to the Ninth Circuit. In affirming the preliminary injunction, the Ninth Circuit

reiterated these principles:

> We have long made clear that, unlike illegal entry, mere unauthorized
> presence in the United States is not a crime. *See Martinez-Medina v.
> Holder,* 673 F.3d 1029, 1036 (9th Cir. 2011) ("Nor is there any other
> federal criminal statute making unlawful presence in the United States,
> alone, a federal crime, although an alien's willful failure to register his
> presence in the United States when required to do so is a crime, and other
> criminal statutes may be applicable in a particular circumstance.") (citation
> omitted); *Gonzales v. City of Peoria*, 722 F.2d 468, 476–77 (9th Cir. 1983)
> (explaining that illegal presence is "only a civil violation"), *overruled on
> other grounds by Hodgers-Durgin*, 199 F.3d 1037. The Supreme Court
> recently affirmed that, "[a]s a general rule, it is not a crime for a removable
> alien to remain present in the United States." *Arizona v. United States*, 132
> S.Ct. at 2502.

*Ortega-Melendres v. Arpaio* (*Ortega-Melendres II*), 695 F.3d 990, 1000 (9th Cir. 2012).

As demonstrated by the testimony of every MCSO officer at trial, the MCSO's

LEAR policy directs its deputies to detain persons believed to be unauthorized aliens but

whom they cannot arrest on state charges. The focus of the LEAR policy on detaining

*any* removable alien as opposed to aliens who have committed criminal offenses

necessarily means that the MCSO is detaining persons based only on its suspicion that

they have committed a civil infraction of federal immigration law. As a local law

enforcement agency without 287(g) authority, the MCSO has no statutory, inherent, or

constitutional authority to detain people for civil violations of federal immigration law.

*See Martinez-Medina*, 673 F.3d at 1036 ("[U]nlike illegal entry, which is a criminal

violation, an alien's illegal presence in the United States is only a civil violation.") (citing

*Gonzales*, 722 F.2d at 476).

As the Supreme Court explained in *Arizona*, removable aliens are subject to

administrative removal proceedings that are civil in nature. 132 S. Ct. at 2499. Thus,

"Congress has put in place a system in which state officers may not make warrantless

arrests of aliens based on possible removability except in specific, limited

1    circumstances."[87] *Id.* at 2507. After the termination of its 287(g) authority, the MCSO

2    offers no legal authority that would place it, or its LEAR policy, in one of those

3    circumstances. When the MCSO merely suspects a person of being in the country without

4    authorization, it does not, in the absence of additional facts that would make the person

5    guilty of an immigration-related crime, have a basis to arrest or even engage in a brief

6    investigatory detention of such persons.

7         In affirming this Court's preliminary injunction, not only did the Ninth Circuit

8    establish that the MCSO has no power to arrest such persons under such circumstances, it

9    made clear that the MCSO has no power to detain them to investigate their immigration

10   status. It is the existence of a suspected *crime* that gives a police officer the right to detain

11   a person for the minimum time necessary to determine whether a *crime* is in progress.

12   "[P]ossible criminality is key to any *Terry* investigatory stop or prolonged detention. . . .

13   Absent suspicion that a 'suspect is engaged in, or is about to engage in, criminal activity,'

14   law enforcement may not stop or detain an individual." *Ortega-Melendres II*, 695 F.3d at

15   1000 (quoting *United States v. Sandoval*, 390 F.3d 1077, 1080 (9th Cir. 2004).[88]

16        In the absence, then, of any reasonable suspicion of a possible crime, there is no

17   basis on which the MCSO can make an investigative detention—let alone an arrest—

18   based only on the belief that someone is in the country without authorization. *See also*

19   *Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (holding that an investigatory stop is

20   justified at its inception only when an officer "reasonably suspects that the person

21   apprehended is committing or has committed a criminal offense").

---

22

23        [87] As an example, the Court cited the Attorney General's authority to enter into a

24   287(g) agreement. *Arizona*, 132 S. Ct. at 2506. Other examples include an "imminent mass influx of aliens off the coast of the United States." 8 U.S.C. § 1103(a)(10).

25        [88] In *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82 (1975) the Supreme

26   Court extended the authority to conduct *Terry*-like stops to civil immigration contexts for those who had authority to investigate such violations. But, after revocation of its 287(g)

27   authority, the MCSO cannot claim such authority or benefit from this extension.

28

The MCSO's LEAR policy is not saved by that part of the Supreme Court's decision in *Arizona* that upheld, as against a preemption challenge, a provision in SB 1070 which provides that, "[f]or any lawful stop, detention or arrest made by a law enforcement official . . . a reasonable attempt shall be made, when practicable, to determine the immigration status of the person." A.R.S. § 11-1051(B); *see Arizona*, 132 S. Ct. at 2515-16. The threshold requirement is a "lawful" stop or detention. As explained above, any stop or detention based only on a reasonable suspicion that a person is in the country without authorization, without more facts, is not lawful. Thus, the LEAR policy does not fall under the ambit of A.R.S. § 11-1051(B).

Further, while 8 U.S.C. § 1357(g)(10) does not require a 287(g) agreement for a local law enforcement agency to report "that a particular alien is not lawfully present in the United States," or to "cooperate in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," such statutory language does not negate constitutional guarantees or authorize local law enforcement agencies to unilaterally arrest such individuals. As the Supreme Court said in discussing this statutory authorization, "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Arizona*, 132 S.Ct. at 2509. Thus, in describing the cooperation anticipated by the statute, the Supreme Court observed:

> There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government. The Department of Homeland Security gives examples of what would constitute cooperation under federal law. These include situations where States participate in a joint task force with federal officers, provide operations support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities. . . . State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody. . . . But, . . . unilateral state action to detain . . . goes far beyond these measures, defeating any need for real cooperation.

*Id.* at 2507.

The LEAR policy requires the arrest of the subject encountered by the MCSO. As Sheriff Arpaio testified, the MCSO continues to arrest all persons that it comes across that it believes to be unauthorized aliens. When the MCSO finds some aliens that it cannot charge with a violation of state law, it turns them over to ICE (and has done so consistently without problem). Of course, his testimony highlights the fact that once such persons come into the custody of the MCSO, they are not free to leave and are hence under arrest. His testimony in this respect is supported by the similar testimony of a number of other MCSO witnesses. Chief Sands, Deputy Rangel, and others testified that such persons are taken into custody first, and only those that cannot be charged on state charges are then turned over to ICE. Such persons are investigated and apprehended upon the prerogative of the MCSO and not at the direction of ICE. And such apprehensions occur despite the lack of any authority on the part of the MCSO to investigate or arrest for civil immigration violations.

Even if this Court accepted the MCSO's argument that the application of the LEAR policy involves only a detention of the subject pending contact with ICE, it would not make the detention constitutional. In the absence of a reasonable suspicion that a crime has been committed, the MCSO lacks authority to engage in a detention of someone pending such contact. As stated above, a law enforcement officer must suspect that an individual is "engaged in, or is about to engage in, criminal activity," before he or she can stop or detain that individual. *Ortega-Melendres II*, 695 F.3d at 1000. To the extent the MCSO actually follows the written requirements of the LEAR policy, it requires the MCSO deputy to summon an MCSO supervisor to the scene and requires the supervisor to obtain certain information, contact ICE, pass along the information to ICE, await an ICE response, and/or deliver the arrestees to ICE. This inevitably takes time in which the subject is not free to leave regardless of whether the detention is officially termed an arrest. If the cooperation clause in 8 U.S.C. § 1357(g)(10) were to be read broadly enough to countenance such arrests as cooperation, there would be no need for the 287(g) authorization and training which the same statute authorizes. *Cf. Christensen*

*v. C.I.R.*, 523 F.3d 957, 961 (9th Cir. 2008) (stating that courts should avoid interpretations "that would render . . . subsections redundant").

In the MCSO's operations, there appears to be no practical difference between how it presently implements the LEAR policy and how it performed when it had full 287(g) authority. Even after the revocation of its 287(g) authority, the MCSO continues to look for indications of unauthorized presence using its 287(g) training, which taught officers that race could be used as an indicator. The MCSO further continues to take credit in the press for unauthorized aliens that it arrested but could not charge and thus turned over to ICE pursuant to its LEAR policy.

The MCSO's LEAR policy is not authorized by *Arizona v. United States*, 8 U.S.C. § 1357(g)(10), or any other case or statute. The policy is further in excess of the MCSO's constitutional authority because the policy's focus on removable aliens as opposed to aliens who have committed criminal offenses violates the strictures against unreasonable seizures set forth in the Fourth Amendment.[89] The Court therefore concludes as a matter of law that when MCSO detains a vehicle's occupant(s) because a deputy believes that the occupants are not legally present in the country, but has no probable cause to detain them for any other reason, the deputy violates the Fourth Amendment rights of the occupants. *See Arizona*, 132 S. Ct. at 2509 ("Detaining individuals solely to verify their immigration status would raise constitutional concerns.") (citation omitted). The Court further concludes, as a matter of law, that the MCSO has violated the explicit terms of this Court's preliminary injunction set forth in its December 23, 2011 order because the MCSO continues to follow the LEAR policy and the LEAR policy violates the injunction. *See Ortega-Melendres v. Arpaio* (*Ortega-Melendres I*), 836 F. Supp. 2d 959,

---

[89] The Fourth Amendment's application to unauthorized aliens is unclear and may vary based on the alien's ties to the country. *See U.S. v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990). However, it is clear that law enforcement actions may not "diminish the Fourth Amendment rights of citizens who may be mistaken for aliens." *Brignoni–Ponce*, 422 U.S. at 884.

994 (D. Ariz. 2011). The MCSO is thus permanently enjoined from enforcing its LEAR policy with respect to Latino occupants of motor vehicles in Maricopa County.

### B. The MCSO is enjoined from using Hispanic ancestry or race as any factor in making law enforcement decisions.

The day labor, small-scale, and large-scale saturation patrols either incorporate racial considerations into their operational structure, as is the case with day labor operations, or the MCSO explicitly allows its deputies to consider the race of subjects as one factor among others in forming reasonable suspicion that the subjects are unauthorized aliens. The MCSO presently claims the right to enforce state law with the same operations guided by the same policies that it used to enforce federal immigration law. Sheriff Arpaio and others specifically claim that the Arizona Human Smuggling Act and the Employer Sanctions laws afford the MCSO the right to pursue unauthorized aliens. Because they follow the same policies and procedures as they did previously, the MCSO and its officers continue to consider race as an indicator of illegal presence in enforcing state laws related to immigration, and in enforcing the MCSO's LEAR policy.

There are, however, at least two problems with the methods in which the MCSO pursues these enforcement prerogatives that render those methods unconstitutional.

### 1. The MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the Fourth Amendment.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). However, the Fourth Amendment is satisfied if an officer's action is supported by "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30).

During a so-called "*Terry* stop," an officer's reasonable suspicion that a person

may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. *Terry*, 392 U.S. at 24. Under Ninth Circuit law, the race of an individual cannot be considered when determining whether an officer has or had reasonable suspicion in connection with a *Terry* stop, including for immigration investigation. *See, e.g.*, *Montero-Camargo,* 208 F.3d 1122 (9th Cir. 2000); (Doc. 530 at 23 ¶ c). Nevertheless, analysis under the Fourth Amendment, including that relating to reasonable suspicion, is wholly objective, and "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *See Whren v. United States*, 517 U.S. 806, 813 (1996).

All parties to this action stipulated as a matter of law that "[r]ace cannot be considered as a factor for reasonable suspicion." (Doc. 530 at 23 ¶ c.) The parties' stipulation comes from the following legal background. In *Brignoni-Ponce,* 422 U.S. at 881–82, the Supreme Court held that the Border Patrol had to have reasonable suspicion that a person was in the country without authorization prior to stopping a vehicle to question its occupants about their immigration status. Even then, absent consent or the development of probable cause, it could only make a brief *Terry*-like stop to conduct a quick and limited inquiry. In that case, the Court further held that the Hispanic race of the occupants of a vehicle being driven in close proximity to the border did not, without more, provide reasonable suspicion to stop a car at all.

> Even if [the officers] saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.

*Id.* at 886–87. *Brignoni-Ponce* thus generally stands for the proposition that a person's

1368

Mexican ancestry, even when that person is in proximity to the border, does not provide sufficient reasonable suspicion, on its own, to justify even a brief investigative detention. However, the opinion's observation in dicta that "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor" has been interpreted by ICE to mean that a person's Hispanic appearance can be used as one amongst a number of factors in establishing the requisite quantum of reasonable suspicion to justify a brief investigative detention. The 287(g) training manual for January 2008 that was used by ICE in training the MCSO cites to *Brignoni-Ponce* for the proposition that "apparent Mexican ancestry was a relevant factor" that could be used in forming a reasonable suspicion that a person is in the country without authorization but standing alone was insufficient to stop the individuals. (Ex. 68 at 7.)

ICE failed to take into account that its interpretation of the *Brignoni-Ponce* dicta in this respect was rejected by the en banc Ninth Circuit 13 years ago in *United States v. Montero-Camargo,* 208 F.3d 1122 (9th Cir. 2000) (en banc). In *Montero-Camargo*, the Ninth Circuit held, at a minimum, that in locations where a significant portion of the legal resident population is of Hispanic ancestry, Hispanic descent was not a permissible factor to consider, either alone or in conjunction with other factors, in forming reasonable suspicion justifying the detention of a suspect based on his or her suspected unauthorized presence. *Id.* at 1131–33.

In that case, the Border Patrol had stopped the drivers of two vehicles who reversed course and headed back in the direction of Mexico after passing a sign indicating that an upcoming border patrol facility, previously closed, was now open again. *Id.* at 1126–27. The location where the drivers reversed their direction was 50 miles north of the border, not visible from the border patrol facility, and had been frequently used to exchange illegal immigrants or drugs. *Id.* Border Patrol agents began following the vehicles after they observed them change their direction. *Id.* To the agents trailing the vehicles from behind, the occupants of the vehicles appeared to be Hispanic. *Id.* They thus pulled the vehicles over and asked the occupants about their citizenship. *Id.*

A subsequent search of the cars revealed quantities of marijuana, and the drivers were arrested and convicted for, among other things, possession with intent to distribute marijuana. *Id.* Both the district court and the Ninth Circuit panel allowed reliance upon the Hispanic appearance of the vehicle's occupants as one factor among others giving rise to reasonable suspicion to justify the stop. *Id.* at 1131. While the en banc Ninth Circuit also affirmed the convictions, it emphasized that the defendants' Hispanic appearance was not a proper factor to consider in determining whether the Border Patrol agents had reasonable suspicion to stop the vehicles. *Id.* In so holding, the Ninth Circuit noted that for reasonable suspicion to exist, the totality of the circumstances "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime."[90] *Id.* at 1129 (citing *United States v. Cortez,* 449 U.S. 411, 418 (1981) (emphasis in original). The court went on to note that:

> [t]he likelihood that in an area in which the majority—or even a substantial part—of the population is Hispanic, any given person of Hispanic ancestry is in fact an alien, let alone an illegal alien, is not high enough to make Hispanic appearance a relevant factor in the reasonable suspicion calculus. As we have previously held, factors that have such a low probative value that no reasonable officer would have relied on them to make an investigative stop must be disregarded as a matter of law.

*Id.* at 1132; *see also Gonzalez-Rivera*, 22 F.3d at 1446. The court concluded its opinion

---

[90] The court observed that it was permissible for police in making an arrest in a specific crime to consider a description of the particular suspect including race for purposes of forming probable cause in making an arrest. *Montero-Camargo,* 208 F.3d at 1134 n.21 ("Nor do we preclude the use of racial or ethnic appearance as *one* factor relevant to reasonable suspicion or probable cause when a particular suspect has been identified as have a specific racial or ethnic appearance, be it Caucasian, African-America, Hispanic or other.") (emphasis in original). It held, however, as had previous courts before it, that it is not appropriate for law enforcement to consider race as being an indicator that a person is more likely to be a perpetrator of a generic class of crime. *See id.* at 1122 n.10 (citing *United States v. Rodriguez-Sanchez,* 23 F.3d 1488, 1492 (9th Cir. 1994) (holding that reasonable suspicion cannot be based "on broad profiles which case suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped")).

- 118 -

by noting "at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required." *Id.* at 1135.

The MCSO stipulated that Ninth Circuit law prohibits its officers from using race or Hispanic appearance in determining "whether an officer has or had reasonable suspicion in connection with a *Terry* stop, including for immigration investigation." (Doc. 530 at 23 ¶ c.) To the extent the Court finds that the MCSO nevertheless uses and has used race or Hispanic appearance as a factor in forming reasonable suspicion, the MCSO urges the Court to "determine whether the actions taken were justified based upon other factors constituting the totality of the circumstances." (Doc. 562 at 30 n.29.) It suggests that "[t]o do otherwise, would be contrary to the holding in *Montero-Camargo*" in which the Ninth Circuit, while rejecting the use of race as any criteria in arriving at reasonable suspicion, nevertheless recognized that there were sufficient facts independent of race to provide reasonable suspicion justifying the stop. (*Id.*)

To the extent that there was a legitimate, pretextual traffic basis for the original stop that does not involve race, it does not matter to Fourth Amendment analysis that the officer's underlying decision to make the stop may have subjectively been based on considerations of race. *See Whren*, 517 U.S. at 813. Further, to the extent that other factors in combination, and excluding race as a consideration, were sufficient to justify reasonable suspicion for the stops, there is no Fourth Amendment violation. *See United States v. Manzo-Jurado*, 457 F.3d 928, 934–36 (9th Cir. 2006). As discussed below, however, such motivations do make a difference to the equal protection analysis.

As to the investigation and arrests of vehicle occupants for unauthorized presence, with few exceptions, the arrest reports contain insufficient facts on which this Court could determine that, even absent their consideration of race, MCSO deputies could have formed reasonable suspicion that an occupant of the vehicle was in the country without

1    authorization. That is true for most of the MCSO's operations at issue in this trial.[91] *See,*

2    *e.g.*, *Manzo-Jurado*, 457 F.3d at 932 (holding that an "individual['s] appearance as a

3    member of a Hispanic work crew, [his] inability to speak English, [his] proximity to the

4    border, and unsuspicious behavior," cannot together provide law enforcement with

5    reasonable suspicion to investigate his immigration status).

6         The problem with the MCSO's policies and procedures is that they institutionalize

7    the systematic consideration of race as one factor among others in forming reasonable

8    suspicion or probable cause in making law enforcement decisions. To the extent that

9    officers do consider the race of a person in making law enforcement decisions that result

10   in his or her seizure, they necessarily consider race as a factor in forming the reasonable

11   suspicion or probable cause that led to their arrest. It is true that in any given factual

12   setting there may be other facts independent of race sufficient to justify reasonable

13   suspicion that a state statute related to immigration has been violated. But, that possibility

14   does not justify the MCSO's systematic policy in using race as a factor in forming

15   reasonable suspicion. Further, it is apparent that allowing the MCSO to consider race as

16   one factor among others in forming reasonable suspicion will produce irreparable injury

17   to the Plaintiff class. The MCSO is thus enjoined from promulgating, implementing,

18   continuing, or following any such policy or practice.

19            **2.      The MCSO's use of Hispanic ancestry or race as a factor in**

20            [91] In a few cases, however, there are such facts. In the few examples noted in the

21   footnotes, for instance, the Court has presumed, based on the sheer number of persons

22   arrested from a single vehicle that there was at least reasonable suspicion to believe that

23   the state crime of human smuggling was occurring. Further, a few arrest reports do

24   demonstrate that MCSO officers made a stop that resulted in the driver being taken into

25   custody. In such cases, it would be within the scope of the arrest, even if not within the

26   basis for the original stop, for the MCSO deputies to investigate the identity of a

27   passenger to see if he or she could drive the vehicle away from the scene. If ICE had

28   placed a detainer on the passenger, the resulting arrest would have originated from the

     investigation into his or her identity that would have been within the scope of the original

     arrest. *United States v. Diaz-Castaneda*, 494 F.3d. 1146 (9th Cir. 2007).

**forming reasonable suspicion that persons have violated state laws relating to immigration status violates the Equal Protection Clause of the Fourteenth Amendment.**

The MCSO's consideration of race or ethnicity as a factor in developing probable cause or reasonable suspicion also gives rise to equal protection issues. The Equal Protection Clause provides that no state shall "deny any person within its jurisdiction the equal protection of the law." U.S. Const. Amend. XIV, § 1. The Clause is "a direction that all persons similarly situated should be treated alike."[92] *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

The Equal Protection Clause is violated by governmental action undertaken with intent to discriminate against a particular individual or class of individuals. See *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–72 (1979). Discriminatory intent may be demonstrated by statutory language, or by governmental action that creates a disparate impact on the individual or class and there is direct or circumstantial evidence of a discriminatory purpose. *Id.* at 272–74; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

The MCSO's policies and practices, some of which it apparently received from ICE, expressly permitted officers to make racial classifications. Such racial classifications are subject to strict scrutiny, and the policies here fail to withstand that scrutiny, for the reasons described below. *See Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007). Nevertheless, the MCSO, consistent with its argument that the Plaintiff class has been unable to demonstrate that the representatives of the class suffered any harm, argues that there is no evidence that Deputies DiPietro or Rangel had any racial motivation for stopping the vehicle in which Mr. Ortega-Melendres was a

---

[92] The text of the Fourteenth Amendment makes explicit distinctions between citizens and persons in the rights it protects. The right to the equal protection of the laws applies to persons and not just citizens of the United States. U.S. Const. amend. XIV; *Plyler v. Doe*, 457 U.S. 202, 211.

passenger. That argument, however, fails to address the most relevant facts. Those facts reveal an institutionalized consideration of race in MCSO operations.

According to the news release issued by the MCSO after the first Cave Creek operation at which Mr. Ortega-Melendres was arrested, the genesis for that operation was "tips received on [Sheriff Arpaio's] newly implemented illegal immigration hotline" about a local church providing assistance to day laborers." (Ex. 307.) As has been discussed above, the MCSO had solicited such complaints from citizens because it sought to enforce federal immigration laws against Hispanic day laborers. Other courts have found an equal protection violation when "plaintiffs' status as day laborers was inextricably intertwined with race in the minds of . . . law enforcement officials." *Doe v. Vill. of Mamoraneck*, 462 F. Supp. 2d 520, 552 (S.D.N.Y. 2006).

On September 19 and 22, 2007, several days previous to the September 27 operation, Latino HSU officers went undercover to the church, signed up for work, and verified the presence of day laborers inside the church parking lot. They then held their operation there, in part, based on the racial makeup of the day laborers who were present. Thus, the location for the operation was selected, at least in part, based on racial makeup of the day laborers that were present there. When locations are selected, in whole or in part, because they will enhance enforcement of the law against a specific racial component of the community, that selection involves racial classification and must meet the requirements of strict scrutiny. As an MCSO witness acknowledged, it would be "racial profiling for deputies to aggressively enforce traffic laws in predominantly Latino neighborhoods because of an assumption that illegal immigrants live or work there." (Tr. at 1152:20–24.)

As is also explained above in some detail, Deputy DiPietro received his instruction to stop the vehicle from the undercover officers based in part on their observation that Mr. Ortega-Melendres and those who entered the truck with him were Latino. Therefore, regardless of whether Deputy DiPietro or even Deputy Rangel were able to observe the racial makeup of the occupants of the vehicle, the direction to develop a basis to stop the

vehicle in which Mr. Ortega-Melendres was a passenger was based, in part, on his race.

Similarly, in day labor and small-scale operations, MCSO undercover officers routinely directed that vehicles that picked up Hispanic day laborers be targeted for pre-textual traffic enforcement. And, pursuant to MCSO policy and practice in other operations, MCSO deputies, in determining which vehicles they will stop for traffic enforcement purposes, emphasize those vehicles that have Hispanic occupants. As the supervising sergeants noted, according to their understanding, it would be impossible for a deputy to commit racial profiling if he has a legitimate reason to pull over a vehicle. This is clearly a limited and incorrect understanding.

Further, having pulled over a vehicle with Hispanic occupants, MCSO deputies are further authorized by policy, operation plans, and continuing practice to consider the race of the occupants in deciding which ones they will investigate for immigration-related violations of state law. The fact that Mr. Ortega-Melendres's vehicle was stopped and his identity investigated, based at least in part on racial considerations, makes Mr. Ortega-Melendres an adequate representative for persons in the class that were subjected to similar policies or practices.

Any government policy or practice that discriminates based upon race is subject to strict judicial scrutiny. In such cases, the racial distinction must be narrowly tailored to serve a compelling governmental interest. *See Parents Involved*, 551 U.S. at 720 (holding that "when the government distributes burdens . . . on the basis of individual racial classifications that action is reviewed under strict scrutiny."); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (holding that "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (same). Government decisions are further subject to equal protection review when race is merely one factor that motivates action, even if it is not the predominant factor. A government policy is presumed to be racially discriminatory when it is "based *in part* on reports that referred to explicit racial characteristics." *Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (emphasis added)

- 123 -

(Kennedy, J.). In *Grutter*, the Supreme Court applied strict scrutiny to a policy which involved race as one factor among many even though plaintiff's expert conceded that "race is not the predominant factor" in the policy. 539 U.S. at 320; *see also Arlington Heights*, 429 U.S. at 263 (subjecting government action to equal protection review on "proof that a discriminatory purpose has been a motivating factor in the decision").

The enforcement of immigration-related civil or criminal offenses amounts to a compelling governmental interest. Yet Defendants have not argued that this policy is narrowly tailored to meet that interest. Given the facts surrounding the presence of Hispanics in Maricopa County, the MCSO could not successfully do so. The great majority of Hispanic persons in the county are citizens, legal residents of the United States, or are otherwise authorized to be here. Thus the fact that a person is Hispanic and is in Maricopa County is not a narrowly-tailored basis on which one could conclude that the person is an unauthorized alien, even if a great majority of the unauthorized persons in Maricopa County are Hispanic. Further, as has been explained above, in the Ninth Circuit, race cannot be used under the Fourth Amendment to form probable cause or reasonable suspicion that a crime has been committed. Thus, there is no legitimate basis for considering a person's race in forming a belief that he or she is more likely to engage in a criminal violation, and the requisite "exact connection between justification and classification," *Gratz*, 539 U.S. at 270, in focusing on Hispanic persons in immigration enforcement is lacking. [93]

Despite the presence of express racial classifications in the policies, practices, and

---

[93] Plaintiffs' Title VI claim differs from the Equal Protection Clause claim only in that Title VI provides that covered entities may not discriminate based on national origin in addition to race. Some officers testified about the use of "apparent Mexican ancestry" in the use of law enforcement, but no evidence was presented that any MCSO policy had a disparate impact on people of Mexican ancestry as opposed to on Hispanics generally. The Title VI claim thus succeeds only with respect to the Equal Protection Clause concerning racial discrimination.

procedures followed by the MCSO, it argues that a plaintiff challenging law enforcement policies on equal protection grounds must show "both that the . . . system had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. U.S.*, 470 U.S. 598, 608 (1985) (citation omitted); *see also Arlington Heights*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").[94] But the discriminatory intent requirement arises when law enforcement operations that are race-neutral nevertheless produce racially disparate results. *Feeney*, 442 U.S. at 272. In those circumstances, the Supreme Court has determined that such policies are not violations of the Fourteenth Amendment if there is no discriminatory intent. *Id.* at 280–81. As discussed above, however, the operations in this case are not race-neutral. They expressly incorporate racial bias. The MCSO's policies at issue here make overt racial classifications because they permit the consideration of race as one factor among others in making law enforcement decisions. In such circumstances, according to *Wayte*, "[a] showing of discriminatory intent is not necessary." 470 U.S. at 609 n.10.

In light of the facts found above, the Plaintiffs have sufficiently established a basis for injunction on equal protection grounds without the need for additional analysis. Nevertheless, even if Plaintiffs were required to show additional indicia of discriminatory intent, they have sufficiently done so. A "sensitive inquiry into such circumstantial .and direct evidence of intent as may be available," *Arlington Heights*, 429 U.S. at 266, demonstrates that the MCSO discrimination against Hispanics was intentional, even if it was done to be responsive to some elements of the electorate.

The Court finds direct evidence of discriminatory intent based on the MCSO's policies, operations plans and procedures. Although such discrimination must be intentional in a disparate impact case, it need not be based on ill-will. That is, although

---

[94] Title VI similarly authorizes a private right of action only in cases involving intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

the MCSO permits its officers to make overt racial classifications in making law enforcement decisions, it does not necessarily follow that such policies and practices are based on overt antipathy towards Hispanics. The policies, at least originally, may have been based on a desire to produce the most efficient immigration enforcement.[95] Yet, to the extent the MCSO intended and does discriminate based on race, through its policies, the lack of racial antipathy as a motivation makes no difference in the constitutional analysis. The Supreme Court has noted that their "cases clearly reject the argument that motives affect the strict scrutiny analysis." *Parents Involved*, 551 U.S. at 741 (2007) (collecting cases). According to the Supreme Court, "all governmental action based on race—a *group* classification long recognized as 'in most circumstances irrelevant and therefore prohibited'—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) (emphasis in original).

In addition to the explicit policies and practices of the MCSO discussed above, there is circumstantial evidence of discriminatory intent. The MCSO further made changes in its policies and instructions to present the appearance of racially-neutral operations without actually implementing such operations. One such measure was the so-called "zero tolerance policy." No officer could provide a consistent definition of that policy as instituted by the MCSO for large-scale saturation patrols. At best, it did not limit in any way a deputy's discretion as to whom to pull over for traffic violations during an operation. By Lt. Sousa's own admission, the zero tolerance policy was specifically designed to "avoid the perception of racial profiling." (Tr. at 998:5–17.). Lt. Sousa expressly conceded that one of the reasons he included language prohibiting racial

---

[95] Nevertheless, after fielding reports and critiques from some within the Hispanic community about its policies, the MCSO's response to those critiques reflects a confrontational attitude, including its response to the protests at Pruitt's.

profiling in operations plans and directives was so that he could testify to it in any subsequent litigation. Chief Sands himself referred to this policy as "rhetoric." (*Id.* at 830:23–831:1.)

Further, Lt. Sousa periodically instructed deputies at pre-operational briefings that they should not racially profile. At the same time, however, Lt. Sousa told them he was sure that they were not racially profiling. Coincident with these self-assuring instructions and assurances, the MCSO continued to implement policies and operations plans regarding saturation patrols that instructed officers that while race could not be the only basis on which to base law enforcement action, it was a legitimate factor, among others, on which they could base decisions pertaining to immigration enforcement. The MCSO did so in spite of criticisms from the media and other sources that its officers were engaging in racial profiling.

In addition to its policies that permitted the consideration of race as a factor in making law enforcement decisions, the MCSO did no monitoring to determine whether operations as a whole, or individual officers participating in operations, demonstrated patterns of racial bias. Based on the Court's review of the arrest statistics and shift summaries, the Court concludes that a cursory review of the shift summaries after the HSU operations would have demonstrated high disparities of Hispanic surnames among those arrested during saturation patrols, even for non-immigration related offenses. It would further have revealed a high incidence of Hispanic surnames among passengers arrested, even for non-immigration related offenses. Such a review would have suggested to the MCSO the possibility that such stops and arrests were being effectuated in a manner that was not race-neutral.

Chief Click, the MCSO's standard of care expert at trial, testified that any supervisor who wanted to minimize racial profiling would have to take active steps to combat it by reviewing records, investigating unusual findings, and retraining officers as needed. He testified that "anything that would raise the specter of racial profiling needs to be investigated and looked at further." (*Id.* at 1765:12–14.) Despite the presence of arrest

reports, stat sheet summaries, and other records that raised the specter of racial profiling, Sgts. Madrid and Palmer, Lt. Sousa and Chief Sands took no action to investigate racially biased policing during the saturation patrols.

Chief Click testified that to determine whether or not officers are improperly using race during a saturation patrol, a department would not merely look to see if there was probable cause for a particular stop, but "look at the bigger picture, how many people did either the individual deputy stop or how many were stopped, how many total people were stopped during the patrol?" (*Id.* at 1764:23–1765:1.) Yet both supervising sergeants testified that as long as there was probable cause to stop a particular vehicle, they would have no suspicion of racially-biased policing in an operation.

When asked about a policy to prevent racial profiling, Chief Click stated that, "I think if it was solely, 'I trust them, so I therefore don't have to monitor them,' that would fall below the standard of care." (*Id.* at 1754:11–13.) Sgt. Palmer testified that he simply trusted his deputies not to engage in racial profiling, even as he exchanged e-mails that denigrated people of Mexican ancestry and Spanish-speakers with those very deputies. Although he claimed to have been subject to unspecified discipline for such e-mails, he was not removed from his position. Sgt. Palmer's e-mails to his deputies would have led those deputies to believe that racial insensitivity towards Hispanics was practiced and endorsed within the HSU. *See DeWalt v. Carter*, 224 F.3d 607, 612 n.3 (7th Cir. 2000) (holding that the use of racially offensive language does not constitute a per se constitutional violation, but it "is strong evidence of racial animus").

Further, the MCSO did not have its deputies make a record of all their stops during saturation patrols, even though, as testified to by Chief Click, it is a standard reasonable practice for a law enforcement officer to document any law-enforcement related stop he or she has with any person. (Tr. at 1778:4–13.) Thus, the MCSO's failure to monitor its deputies' actions for patterns of racial profiling was exacerbated by its inadequate recordkeeping, which made it more difficult to conduct such monitoring.

During the time that the MCSO was aware that ICE was contemplating

terminating its 287(g) certification, it relied, in significant part, on the internet research of Sgt. Palmer to determine whether it could continue to enforce federal immigration law without 287(g) authority. The sergeant supplied to his command staff a non-existent federal law obtained from the internet, by which the MCSO erroneously concluded that it had legal authority to continue to enforce federal immigration law. After MCSO's 287(g) authority was revoked, Sheriff Arpaio, on national television, professed MCSO's erroneous position that it could continue to enforce federal immigration law absent federal authorization based on this non-existent statute as justification. In relying on Sgt. Palmer's unverified internet research, the MCSO did not make any competent effort to ensure that its legal positions were in compliance with controlling authority, and therefore made no real effort to ensure that its deputies were following the law pertaining to the rights of minorities during such operations.[96]

Further, Sheriff Arpaio's public statements about the HSU operations and the saturation patrols signaled to MCSO deputies that the purpose of those operations and patrols was to arrest people who were not legally present in the United States. As the chief policymaker within the MCSO, Sheriff Arpaio's public comments may have created the impression both in and out of the MCSO that considering a person's race when evaluating whether that person was legally present in the United States was appropriate and endorsed by the MCSO.

At trial, Sheriff Arpaio testified that he did not agree with his statements on CNN or the Glenn Beck show. (*Id.* at 363:17; 365:17.) Yet later on in his testimony he inconsistently explained that when he made these comments he only meant that such appearance could be a factor for an MCSO officer to consider in determining whether

---

[96] The MCSO did eventually base its training concerning its deputies continued authority to enforce federal immigration law on the legal theories of Kris Kobach. (*See, e.g.,* Tr. At 747:18–24.) Mr. Kobach is apparently legally trained, but it is not clear that MCSO sought his legal counsel on whether his theories were in compliance with the law in this jurisdiction.

further investigation of immigration status was appropriate once a vehicle had already been stopped. (*Id.* 498:22-503:6.) Whether or not he believed at the time or believes now the statements that he made during these nationally-televised interviews is not relevant to the question of whether the interviews would have led MCSO officers to believe that the sentiments were the policy of the MCSO. Defendants stipulated that Sheriff Arpaio "has final authority over all the agency's decisions," and "sets the overall direction and policy for the MCSO." (Doc. 513 at 8.) Sheriff Arpaio's statements and the attendant news releases shed light not only on "[t]he historical background of the decision," but also provide "contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 267–68.

Finally, after December 2011, when this Court entered its preliminary injunction prohibiting the MCSO from detaining persons based solely on a belief that the person was in the country without authorization, the MCSO continued to conduct its LEAR policy in violation of the explicit terms of that injunction. Its officers continued to race as a factor in doing so.

The MCSO asserts that it had no discriminatory purpose in promulgating its policies because they were based on training received by ICE. Even assuming this is true, the MCSO cannot suggest that it can continue system-wide policies applying racial classifications, because even though they are legally erroneous and facially discriminatory, the MCSO believed in good faith that they were permissible at the time of their adoption. Such reliance does not prevent the Equal Protection Clause from barring the future use of such facially discriminatory systemic classifications, even assuming they were implemented in good faith.

Defendants cite numerous cases holding that advice of counsel is a defense to an equal protection claim. They do not cite any evidence that the ICE officers conducting the training were attorneys providing legal advice to the MCSO.[97] And again, even

---

[97] Defendants also cite *U.S. v. Lopez-Moreno*, 420 F.3d 420, 434 (5th Cir. 2005),

assuming that counsel wrongfully advised the MCSO that it could promulgate system-wide policies in enforcing state laws related to immigration, the MCSO has a constitutional responsibility to refrain from wrongfully using race in law enforcement decisions independent of any advice provided by another law enforcement agency, even ICE. U.S. Const. amend. XIV, § 1

Based on the factors set forth in *Arlington Heights* and discussed above, Plaintiffs have established that the MCSO had sufficient intent to discriminate against Latino occupants of motor vehicles. Further, the Court concludes that the MCSO had and continues to have a facially discriminatory policy of considering Hispanic appearance probative of whether a person is legally present in the country in violation of the Equal Protection Clause. The MCSO is thus permanently enjoined from using race, or allowing its deputies and other agents to use race as a criteria in making law enforcement decisions with respect to Latino occupants of vehicles in Maricopa County.

### C.   The MCSO is enjoined from unconstitutionally lengthening stops unless during the legitimate course of the stop it develops reasonable suspicion, based on permissible factors, that a state crime is being committed.

In appropriate circumstances, it is acceptable for law enforcement to engage in pre-textual traffic stops to investigate other potential criminal acts. *See Whren*, 517 U.S. at 810–813. Analysis under the Fourth Amendment is wholly objective, and "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813. However, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005);

in which the Fifth Circuit denied an equal protection claim when it found that an officer who questioned the Hispanic passengers of a vehicle whose driver was unresponsive to the officers' questions had not demonstrated the requisite intent to discriminate. This out-of-circuit case involved an individual officer and not a department policy.

*Florida v. Royer*, 460 U.S. 491, 500 (1983) (holding that the scope of the stop "must be carefully tailored to its underlying justification"); *United States v. Turvin*, 517 F.3d 1097, 1099, 1104 (9th Cir. 2008) (same).

When the driver of their vehicle is stopped, passengers are legally seized for the same time it takes the officer to resolve the basis for the stop with the driver. *Brendlin v. California*, 551 U.S. 249, 257–58 (2007). Yet, stopping a driver for a traffic violation provides no "reason to stop or detain the passengers." *Maryland v. Wilson*, 519 U.S. 408, 413 (1997). The deputy cannot prolong the stop to investigate a passenger unless the deputy through his or her observations obtains particularized reasonable suspicion that the passenger is committing a violation that the deputy is authorized to enforce. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981). In such cases, the deputy is only allowed to prolong the stop for the brief time sufficient to investigate the existence of the crime. *Arizona*, 132 S. Ct. at 2528. When the MCSO deputies were 287(g) authorized, that authority presumably extended to include administrative and hence non-criminal violations of federal immigration law. Such authority, however, no longer exists.

Even in the absence of reasonable suspicion, however, an officer may make inquiries of the driver and passengers concerning "matters unrelated to the justification for the traffic stop." But again, such inquiries may not "*measurably extend the duration of the stop*." *Johnson*, 555 U.S. at 323 (emphasis added). *See also Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("Mere police questioning does not constitute a seizure" unless it prolongs the detention of the individual) Even if a simple request for passenger identification is thus within the scope of a traffic stop for a minor infraction to the extent it does not extend the stop, see *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007), detaining passengers to investigate their immigration status once they have either provided or not provided identification runs into the Fourth Amendment. Detaining a passenger while running his or her identification through an MCSO database is not "reasonably related in scope" to the traffic infraction and therefore requires independent reasonable suspicion. *Caballes*, 543 U.S. at 407; *Terry*, 392 U.S. at 20. "Detaining

- 132 -

1   individuals solely to verify their immigration status" raises "constitutional concerns."

2   *Arizona*, 132 S. Ct. at 2509.

3       The evidence demonstrates that during many saturation patrol stops, officers

4   investigated the identities of and arrested multiple passengers on immigration violations,

5   while also being responsible for issuing a citation to the driver. In such circumstances,

6   based on the amount of time it took to resolve the stop of Mr. Ortega-Melendres, together

7   with the process testified to by Deputies Armendariz and Rangel, the Court concludes

8   that the investigation of the passengers would have frequently taken significantly more

9   time than it generally took to issue a traffic citation to a driver.[98]

10      As the facts summarized above indicate, at least some MCSO deputies claim that

11  they investigate the identities of all of the passengers of the vehicles they stop as a matter

12  of course. The arrest reports do not generally support this proposition. Nevertheless, to

13  the extent that MCSO officers investigate the identity of all vehicle occupants as a matter

14  of course, they do so without determining whether there is reasonable suspicion with

15  respect to the individual occupants that would justify their extension of the stop. The

16  same is also true to the extent that: (1) Sheriff Arpaio claimed the right for the MCSO to

17  investigate all the passengers in a vehicle when the driver was pulled over, and (2) during

18  day labor operations, during which participating deputies were instructed to investigate

19  the immigration status of all of the occupants of a vehicle.

20      Even if some officers participating during saturation patrols extended the duration

21  of the stop only upon obtaining reasonable suspicion as they saw it that some or all of the

22  vehicle's occupants were unauthorized, they had been erroneously instructed that in

---

[98] As discussed above, the traffic stops would only have taken longer once 287(g) authority was revoked. A passenger pulled over under the MCSO's LEAR policy would have to wait for the deputy to resolve the traffic violation and contact a supervisor, for the supervisor to arrive and conduct additional investigation into the passenger's identity, and for any additional time he or she might spend in custody if an officer determined to hold him or her while waiting for a response from ICE.

- 133 -

doing so they could use race as one factor among others in forming that reasonable suspicion. *Montero-Camargo*, 208 F.3d at 1135 (holding that Hispanic appearance, for example, is "of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required"). Thus, to the extent that officers considered race as a necessary factor in forming the reasonable suspicion on which they prolonged the stop, they had insufficient basis for both the reasonable suspicion and the prolonged stop.

As a result of its enforcement of state law related to immigration and its LEAR policy, MCSO deputies continue to screen the occupants of vehicles they stop for immigration compliance despite the revocation of their 287(g) authority. In doing so, they are either prolonging a stop to investigate a civil violation of federal law which they have no authority to enforce, or, as demonstrated by their past activities, present a substantial likelihood that they will prolong the stop beyond the time reasonably necessary to resolve the traffic stop. The MCSO, in so operating and claiming a right to so operate, presents a likelihood that it will violate the Fourth Amendment rights of the Plaintiff class, and is thus prohibited from prolonging stops in the absence of reasonable suspicion, formed on a permissible basis, that a separate crime is or is about to be committed.

**D.   The MCSO is enjoined from using reasonable suspicion of unauthorized presence, without more, as probable cause or reasonable suspicion that the Human Smuggling Act or Employer Sanctions Law has been violated sufficient to justify an investigatory detention or arrest.**

As is stated above, the MCSO has no probable cause to arrest or even hold a person that it only believes has committed a civil infraction of state or federal laws.[99] At trial, Sheriff Arpaio testified to two specific state statutes that he claims give the MCSO authority to continue to engage in ongoing enforcement operations—the Arizona Employers Sanction Law and the Arizona Human Smuggling Statute.

---

[99] Of course, an MCSO officer can detain someone for purposes of issuing a civil traffic or other citation to the extent authorized to do so by state law.

1386

The Arizona Employer Sanctions Law, A.R.S. § 23-211 (2010) *et seq.*, explicitly authorizes the "county sheriff or any other local law enforcement agency to assist in investigating a complaint" filed pursuant to that law. A.R.S. §§ 23-212, 23-212.01. But the law contains only civil, and not criminal, sanctions against employers. It imposes no criminal sanction against unauthorized aliens. The law thus provides no basis for the MCSO to criminally cite, arrest, or engage in investigatory detentions of persons whom it believes to be in the country without authorization based upon a reasonable suspicion that they have violated the Employer Sanctions Law or are conspiring with others to do so. As the Ninth Circuit has already noted, "possible criminality is key to any *Terry* investigatory stop or prolonged detention. . . . Absent suspicion that a 'suspect is engaged in, or is about to engage in, criminal activity,' law enforcement may not stop or detain an individual." *Ortega-Melendres II*, 695 F.3d at 1000 (quoting *United States v. Sandoval*, 390 F.3d 1077, 1080 (9th Cir. 2004). The Arizona Employer Sanctions Law, a non-criminal law, thus provides the MCSO with no basis to stop or detain any person that it believes to be in the country without authorization.

By contrast, the Arizona Human Smuggling Act provides criminal sanctions against those who smuggle unauthorized persons. The Act specifies that "[i]t is unlawful for a person to intentionally engage in the smuggling of human beings for profit or commercial purpose." A.R.S. § 13-2319. As defined by the Act, "smuggling of human beings" means:

> [1] the transportation, procurement of transportation or use of property or real property
>
> [2] by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are
>
>> [a] not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or
>>
>> [b] have attempted to enter, entered or remained in the United States in violation of law.

A.R.S. § 13-2319(F)(3).

There is nothing in the Act that criminalizes unauthorized presence. The Act criminalizes smuggling an unauthorized alien. Even to the extent that an unauthorized alien could be charged for committing the crime of conspiracy to violate the Arizona Human Smuggling Act with his or her smuggler, an MCSO officer could only have reasonable suspicion sufficient to detain the unauthorized alien on conspiracy charges if he had reasonable suspicion under the "totality of the circumstances" that both the crime of human smuggling is being committed and the unauthorized alien *conspired* in its commission. *Montero-Camargo*, 208 F.3d at 1129.

Having reasonable suspicion that the Arizona state crime of human smuggling is being violated requires considerably more facts than merely having reasonable suspicion that a person is in the country without authorization. There must be, at the least, a reasonable suspicion under all of the circumstances of the conjunction of the elements necessary for the crime to be present. Aside from the other elements, an MCSO officer would have to have reasonable suspicion that the person who was transporting the unauthorized alien "knew or had reason to know that the [unauthorized alien was] not [a] United States Citizen[], permanent resident alien[], or person[] otherwise lawfully in this state." A.R.S. § 13-2319(F)(3).

One does not have reason to *know* that an alien is unauthorized merely because he or she is unauthorized. To offer an example from the facts of the present case, Deputy DiPietro set forth no legitimate basis on which he could have formed a reasonable suspicion that the driver of the vehicle in which Ortega-Melendres was a passenger knew or had reason to know that the persons he was transporting were not lawfully in this state. When Deputy DiPietro himself was asked how he came to the opinion that the day laborers were likely to be unauthorized, he testified that he did not form that belief until after participating in the operation during which he arrested Ortega-Melendres.

When a 287(g)-trained MCSO deputy participating in an HSU operation did not purport to have the experience to form a reasonable suspicion that day laborers in general were unauthorized aliens until *after* the operation in which he made the arrest that is

- 136 -

subject to question, it is not clear how he could successfully attribute to the driver of the vehicle he stopped during the operation "reason to know" that day laborers were likely to be "unauthorized aliens." Even if he had this experience, the idea that day laborers are usually unauthorized aliens is unsupported by any statistics presented at trial, and, as discussed above, is typically compounded with an unconstitutional association between work status and race, at least within the MCSO.[100]

Further, the MCSO acknowledges that, at the time of his arrest, Ortega-Melendres was in possession of a visa that was validly issued and, on its face, authorized his presence on the day of his arrest. Thus, even assuming that he did not have his I-94 document in his possession and/or was otherwise "out-of-status" with the federal immigration requirements of his visa, the status violation was a violation of federal civil immigration regulations, and did not constitute a violation of the Arizona Human Smuggling Act. Pursuant to his existing and validly issued visa, Ortega-Melendres was lawfully in this state. To the extent that he was lawfully in this state, but out of compliance with federal immigration regulations, that is an issue presented by the federal immigration regulations, and not state law, and thus not within the jurisdiction of MCSO officers after the revocation of their 287(g) authority.

Additionally, the MCSO cannot use Ortega-Melendres's Hispanic origin as any basis for arguing that the driver of his vehicle had reason to know that he was in the

---

[100] A section of the Human Smuggling Act does state that "[n]otwithstanding any other law, in the enforcement of this section a peace officer may lawfully stop any person who is operating a motor vehicle if the officer has reasonable suspicion to believe the person is in violation of any civil traffic law." A.R.S. §13-2319(E). This section of the statute does nothing more than to allow peace officers to stop drivers of motor vehicles who have committed traffic infractions. Nothing in the text of the statute allows a peace officer to prolong a traffic stop to investigate a potential violation of the Arizona Human Smuggling Act in the absence of reasonable suspicion that the Act is being violated. A reasonable suspicion that a person is in violation of a civil traffic law, does not, in and of itself, provide reasonable suspicion that a driver has violated the Act. Any interpretation of the statute to the contrary would create constitutional problems.

country without authorization. If an MCSO officer cannot use Hispanic ancestry as a reason on which to base reasonable suspicion that a crime is being committed, then he or she cannot use it to establish that a human smuggler had reason to know that he was transporting an unauthorized alien.[101]

Thus, a reasonable suspicion that someone is in the country without authorization does not alone constitute sufficient reasonable suspicion to detain someone on the basis that the Arizona Human Smuggling Act is being violated. The preliminary injunction entered by this Court on September 23, 2011 is made permanent. Further, suspected violations of the Arizona Employer Sanctions Law provides the MCSO with no basis to conduct investigatory detentions of persons that it believes to be in the country without authorization. The MCSO is thus enjoined from detaining persons on the belief that they are involved with a violation of, or have otherwise conspired to violate, the Arizona Employer Sanctions Law. The MCSO is further permanently enjoined from detaining persons based only on the belief that they are in the country without authorization, for the reasons set forth in this Court's order of December 23, 2011.

## CONCLUSION

Injunctive relief in a class action must be properly tailored to the actual harm proven at trial. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) ("It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will immediately suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and Constitution."). Plaintiffs are entitled to injunctive relief necessary to remedy the Fourth and Fourteenth Amendment violations caused by MCSO's past and continuing

---

[101] To the extent that the officers systematically only held and investigated the Hispanic persons being smuggled for conspiracy to commit human smuggling and released the alleged Caucasian smugglers, as they apparently did in the case of Ortega-Melendres and other day labor operations, that would present equal protection problems additional to those already discussed.

operations. The MCSO is thus permanently enjoined from: (1) detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization, (2) following or enforcing its LEAR policy against any Latino occupant of a vehicle in Maricopa County; (3) using race or Latino ancestry as a factor in determining to stop any vehicle in Maricopa County with a Latino occupant; (4) using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle in Maricopa County may be in the country without authorization; (5) detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of them have committed or are committing a violation of federal or state criminal law; (6) detaining, holding or arresting Latino occupants of a vehicle in Maricopa County for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present; (7) detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

The permanent injunctive relief ordered above is immediately effective. But, as the Court previously discussed with the parties at the end of trial, it will confer with them before ordering any further relief that the evidence demonstrates to be necessary to effectuate this relief. In considering the necessity and extent of such additional relief, and in addition to the other matters discussed at length during this order, the Court has determined that the MCSO is aggressively responsive to the wishes of a significant portion of the Maricopa County electorate that desires vigorous law enforcement operations against unauthorized residents by state and local law enforcement authorities. The MCSO continues to engage in law enforcement efforts against unauthorized aliens, and continues to aggressively assert its authority to do so. In doing so, the MCSO erroneously trained its patrol deputies that, despite the revocation of its 287(g) authority,

the MCSO nevertheless had authority to enforce federal immigration law. It further violated and continues to violate the terms of this court's preliminary injunction entered on December 23, 2011 by enforcing its LEAR policy.

To the extent that the MCSO implemented faulty instruction from ICE through the racially-biased policies and practices governing its enforcement operations, its own implementation of those operations was also significantly flawed by its failure to observe normal standards of police conduct as defined by its own practices expert. Among other things the MCSO implemented a "zero tolerance" policy without meaningful effect to mollify those concerned about the racial disparity caused by MCSO operations, and thus failed to have a clear policy that required execution of the saturation patrols and other enforcement efforts in a race neutral manner; made no efforts to determine whether its officers were engaging in racially-biased enforcement during its saturation patrols, and failed to comply with standard police practices concerning record-keeping maintained by other law enforcement authorities engaged in such operations.

The Court will entertain any proposals that are mutually acceptable to the parties in implementing steps to ensure compliance with its above orders, but in the absence of such proposals will proceed to enter such orders as are necessary to effectuate the above relief.  In determining what authority may be necessary to provide such relief, the Court is particularly interested in the views of the parties concerning the following questions: (1) To what extent, if any, should any law enforcement operations of the MCSO that have the potential to involve members of the Plaintiff class be subject to the direct oversight and pre-approval? (2) To what extent, if any, should the MCSO be required to provide training to all of its personnel including posse members concerning the inappropriate use of race as an indicator of legal violations? (3) To what extent, if any, should the MCSO be required to provide training to all of its personnel concerning the elements of the Arizona Human Smuggling Statute and the requirements necessary to have reasonable suspicion that the statute is being violated? (4) To what extent, if any, does the MCSO still hold itself out to the general public as enforcing laws against illegal aliens or as

currently engaged in immigration enforcement? (5) To what extent should the MCSO be required to keep publicly available records of all persons with whom it has law enforcement contact in vehicles so long as it is engaged in the enforcement of state laws that have immigration-related elements such as the state Human Smuggling Act? (6) To what extent should those records be required to contain the purpose of any law enforcement stops, the names of persons contacted, and the resulting length of the stop?

As further guidance for the proceeding, the Court asks the parties to consider the following stipulations of settlement in place in other jurisdictions:

1) *Daniels v. New York*, No. 99 Civ. 1695 (S.D.N.Y. Sept. 24, 2003), *available at* http://ccrjustice.org/files/Daniels_ StipulationOfSettlement_12_03_0.pdf

2) *United States v. Los Angeles*, No. 00-11769 GAF (C.D. Cal. June 15, 2001), *available at* http://www.lapdonline.org/assets/pdf/final_consent_decree.pdf

3) *United States v. State of New Jersey*, Civil No. 99-5970 (D.N.J. Dec. 30, 1999), available at http://www.nj.gov/oag/jointapp.htm.

**IT IS THEREFORE ORDERED** that Plaintiffs are entitled to injunctive relief necessary to remedy the Fourth and Fourteenth Amendment violations caused by MCSO's past and continuing operations. The MCSO is thus permanently enjoined from**:**

1.     Detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization.

2.     Following or enforcing its LEAR policy against any Latino occupant of a vehicle in Maricopa County.

3.     Using race or Latino ancestry as a factor in determining to stop any vehicle in Maricopa County with a Latino occupant.

4.     Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a  vehicle in Maricopa County may be in the country without authorization.

5.     Detaining Latino occupants of vehicles stopped for traffic violations for a

period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of them have committed or are committing a violation of federal or state criminal law.

6.    Detaining, holding or arresting Latino occupants of a vehicle in Maricopa County for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present.

7.    Detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

**IT IS FURTHER ORDERED** setting a hearing at which the above matters will be discussed for **Friday, June 14, 2013 at 9:30 a.m.** in Courtroom 602, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151.

Dated this 24th day of May, 2013.

*A. Murray Snow*
_____
G. Murray Snow
United States District Judge

1394



*EXHIBIT 23*

1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Manuel de Jesus Ortega Melendres et al.,)     No. CV-07-2513-PHX-GMS
                                            )
10              Plaintiffs,                  )     **ORDER**
                                            )
11  vs.                                      )
                                            )
12                                           )
    Joseph M. Arpaio, in his individual)
13  capacity as Sheriff of Maricopa County,)
    Arizona, et al.,                         )
14                                           )
                Defendants.                  )
15                                           )
                                            )
16  _____)

17          The Court held a status conference in this matter to discuss issues implicating the

18  Court's obligations under 28 U.S.C. § 455(a) (2006) and Canon 3C(1)(d)(iii) of the Code of

19  Conduct for United States Judges as informed by Advisory Opinion No. 58 of the United

20  States Committee on Codes of Conduct. For the reasons discussed below, the Court

21  determines that it may hear this case, and the case may proceed to trial.

22                                **BACKGROUND**

23          This lawsuit was filed on December 12, 2007 on behalf of Manuel de Jesus Ortega

24  Melendres and others. (Doc. 1). The case was originally before the Honorable Mary H.

25  Murguia. (*Id.*). On July 15, 2009, Judge Murguia issued an order granting Defendants'

26  Motion to Recuse. (Doc. 138). Describing the issue as "a close call," Judge Murguia found

27  that a reasonable person could question her impartiality because her identical twin sister was

28  the president and CEO of an organization that had published disparaging material about one

1  party, and therefore Judge Murguia recused herself. The case was subsequently assigned to

2  this Court. (Doc. 144). This Court conducted various proceedings and issued various orders

3  incident to the processing of the case, including orders granting Plaintiffs' motions for

4  sanctions regarding discovery issues. (Docs. 227, 290).

5      On June 17, 2010, after some discovery sanctions were ordered but before specific

6  award values were calculated, and before a determination was made as to whether other

7  sanctions were appropriate, Plaintiffs' attorneys from the law firm of Steptoe & Johnson LLP

8  (the "Steptoe Attorneys") withdrew from the case with the Court's permission, and attorneys

9  from the Redwood Shores, California office of Covington & Burling LLP (the "Covington

10  Attorneys") were substituted for them (Doc. 313).  As is set forth in greater detail in its

11  previous order the Court's brother-in-law, Keith Teel, is a partner in the Washington, D.C.

12  office of Covington & Burling (Doc. 537).  The Court thus considered at that time whether

13  it should recuse itself.

14      Federal statutory law requires that "[a]ny justice judge, or magistrate of the United

15  States shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality

16  might reasonably be questioned." 28 U.S.C. § 455(a) (2006). The Code of Conduct for

17  United States judges similarly requires a judge to disqualify himself or herself when "the

18  judge's impartiality might reasonably be questioned." Code of Conduct for United States

19  Judges, Canon 3C(1). The Code further specifies that a judge's impartiality might reasonably

20  be questioned when the spouse of a person related to the judge is "known by the judge to

21  have an interest that could be substantially affected by the outcome of the proceeding." *Id.*,

22  Canon 3C(1)(d)(iii). The commentaries to the canons note that "[t]he fact that a lawyer in a

23  proceeding is affiliated with a law firm with which a relative of the judge is affiliated does

24  not itself disqualify the judge." *Id.*, Commentary to Canon 3C(1)(d)(iii). But, the commentary

25  offers no further guidance defining what constitutes an interest substantially affected by the

26  outcome of the proceeding.

27      The Court at the time researched what it believed to be the relevant decisional law

28  under § 455 and some opinions filed by state judicial ethics advisory committees that

- 2 -

1396

construed identical or similar ethical provisions for judges. In its research, the Court did not locate or consider Advisory Opinion No. 58 of the United States Committee on Codes of Conduct.  The advisory opinions of the state courts reviewed by the Court that interpreted identical provisions in state codes of conduct generally determined that there was no per se rule with respect to when a relative of the judge affiliated with a law firm appearing before him or her would have an "interest that could be substantially affected by the outcome of the proceeding," such that the judge's recusal would be required. Rather, the state advisory committees generally opined that such determinations be made on a case-by-case basis after the court considered various factors. These factors generally included: whether the relative was a partner in the firm, the size of the firm, whether the relative would receive a bonus from the case, the size of the community, the nature of the fee being sought, and the administrative burdens of recusal. *See, e.g.,* Colo. Supreme Court Judicial Ethics Advisory Board, Op. 2005-02 (June 3, 2005), Ill. Judicial Ethics Comm., op. 94-18 (Aug. 25, 1994) Tenn. Judicial Ethics comm., Op. 04-01 (Feb. 17, 2004), Wash. Ethics Advisory Comm. Op. 88-12 (Aug. 30, 1988).

As set forth in greater detail in its previous order (Doc. 537), the Court considered that its brother-in-law was a partner in the Washington D.C. office of Covington & Burling engaged in a different practice area than Plaintiffs' attorneys. The Court also considered that Covington & Burling was an international firm with multiple offices, over 200 partners and hundreds of other attorneys who were either associates or of counsel to the firm. The Court also considered the nature of Covington & Burling's representation of the Plaintiff class, the nature of the injunctive relief which was the sole relief sought by the class, the statutory prerequisites on Covington & Burling's ability to seek reasonable reimbursement for the time and costs its lawyers expended in representing the Plaintiffs, and the speculative and small nature of any benefit that its brother-in-law could conceivably receive as a result of any possible fee award to the firm. The Court also considered the administrative burden on the Court in light of the national firms that had been willing to assume Plaintiff's representation, and the possible resulting recusals. After having considered these factors, the Court

1   concluded that "a reasonable person with knowledge of all the facts," *Pesnell v. Arsenault,*

2   543 F.3d 1038, 1043 (9th Cir. 2008) (quoting *United States v. Hernandez,* 109 F.3d 1450,

3   1454 (9th Cir. 1997)) would not believe that the Court's brother-in-law had an interest in the

4   proceeding that could be substantially affected by its outcome. Thus, the Court continued to

5   hear the case.

6       Nevertheless, when Plaintiff's counsel recently advised the Court upon learning of

7   Mr. Teel's relation, that Mr. Teel was unaware of the proceeding, and would receive no

8   distribution from it, the Court again reviewed the question. When it did, it located Advisory

9   Opinion No. 58 by the United States Committee on Codes of Conduct (June 2009). The

10  Court noticed a status conference on the matter and requested the parties "to be ready to

11  discuss the extent, if any, to which Advisory Opinion No. 58 issued by the United States

12  Committee on Codes of Conduct in June of 2009, affects this Court's obligations under 28

13  U.S.C. § 455(a) (2006)."

14      At the hearing on June 29th, all parties argued that recusal in this matter was neither

15  mandated nor appropriate. All parties agreed that Advisory Opinion 58 was predicated on the

16  conclusion that "an equity partner in a law firm *generally* has 'an interest that could be

17  substantially affected by the outcome of the proceeding.'" United States Comm. on Codes

18  of Conduct. Op. 58 (June 2009) (emphasis added). All parties further agree that such a

19  presumption would not be appropriately applied consistent with the applicable Canon when

20  no interest of a relative of the Court may be substantially affected. All parties agreed that

21  pursuant to the facts here, Mr. Teel's interest would not be substantially affected by the

22  outcome of the proceeding, and that therefore no reasonable objective observer could

23  conclude that the judge would be impartial or biased based on his relationship to Mr. Teel.

## ANALYSIS

24

25  **1. Canon 3C(1)(d)(iii), Its Commentary and Advisory Opinion No. 58**

26      In determining its ethical obligations, the Court is obliged to follow the text of the

27  Canons that make up the Code of Conduct for United States Judges.  There is official

28  commentary that accompanies the Canons. That commentary specifies that "the Canons are

rules of reason, they should be applied consistently . . . in the context of relevant circumstances." Code of Conduct for United States Judges, Commentary to Canon 1. As a further interpretive aid, "[t]he judicial conference has authorized its Committee on Codes of Conduct to render advisory opinions about this Code only when requested by a judge to whom this Code applies." *Id.*, Introduction.

In those instances in which an advisory opinion requested by an individual judge in one case would contradict, or exceed, the text of the Canon as applied to the facts of another, the Court is obliged, in determining what is ethically appropriate, to follow the text of the Canon rather than the contradictory advice contained in the advisory opinion. Further, the official commentary is entitled to precedence over a contrary advisory opinion in interpreting a Court's ethical obligation in a given circumstance. This is especially the case when extending the obligation to recuse beyond that contemplated by the Canons themselves would cause the Court to violate its existing obligations under the Canons to "hear and decide matters assigned, unless disqualified." *Id.* Canon 3(A)(2); *see also Clemens v. U.S. Dist. Court for the Central Dist. of California*, 428 F.3d 1175, 1179 (9th Cir. 2005) (holding that a judge has "as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and the facts require").

Of course, even though an opinion of the United States Commission on Codes of Conduct is advisory in nature, it should be considered carefully. Advisory Opinion 58, issued in June of 2009, which is in many relevant respects similar to its predecessors, "advises that if the relative . . . is an equity partner in a law firm that represents a party, the judge must recuse," because it "concludes that an equity partner in a law firm generally has 'an interest that could be substantially affected by the outcome of the proceeding' in all cases where the law firm represents a party before the court." United States Comm. on Codes of Conduct. Op. 58 (June 2009). It further notes that if a judge's relative is an equity partner of a firm appearing before him, "the remittal procedures of Canon 3D are not available," and that "[r]ecusal is required." *Id.*

- 5 -

1399

1    While such a cautious approach may have value as a prophylactic rule, to the extent
2    that this advisory opinion is interpreted or attempts to create a per se rule of recusal whenever
3    a Court has a firm appearing before it in which a relative or the spouse of a relative is an
4    equity partner, the opinion would extend the rule beyond the text of the Canon or the official
5    commentary to it. The advisory opinion itself seems to recognize as much. To the extent that
6    it states that an equity partner's interest "generally," rather than "always" could be affected
7    by the outcome of the proceeding, it implicitly recognizes that there are some circumstances
8    in which an equity partner's interest in a law firm will or may not be substantially affected
9    by the outcome of a proceeding before a judge. If the facts involve a circumstance in which
10   the equity partner's interest would not be substantially affected by the outcome of the
11   proceeding, then Canon 3C(1)(d)(iii) provides no basis for the Court's recusal.  In such
12   circumstances, the Advisory Opinion's per se rule is contrary to the Code of Conduct and the
13   commentaries thereto which make clear that "[t]he fact that a lawyer in a proceeding is
14   affiliated with a law firm with which a relative of the judge is affiliated does not of itself
15   disqualify the judge." Commentary to Canon 3C(1)(d)(iii), Code of Conduct for United
16   States Judges.

17   The Canon requires recusal when an interest is substantial, and "whether an interest
18   is substantial is necessarily a fact sensitive inquiry." *In re Mercedes-Benz Antitrust*
19   *Litigation*, 226 F. Supp. 2d 552, 555 (D. N. J. 2002). Other courts have previously
20   recognized, as this Court did in its original analysis, that "[i]t would simply be unrealistic to
21   assume, . . . that partners in today's law firms invariably 'have an interest that could be
22   *substantially affected* by the outcome of' any case in which any other partner is involved.'"
23   *Pashaian v. Eccelston Props., Inc.*, 88 F.3d 77, 83 (2d Cir. 1996) (emphasis in original). All
24   parties to this case, being made familiar with the facts and the previous determinations of this
25   Court, have made clear their position that Mr. Teel has no interest that can be substantially
26   affected by the outcome of these proceedings. Plaintiffs are not seeking damages, but the
27   court "in its discretion, may allow the prevailing party, other than the United States, a
28   reasonable attorney's fee." 42 U.S.C. § 1988(b) (2006). The award of such a fee is both

1400

speculative and very small as it might apply to augment the salary of an equity partner in Covington & Burling. The outcome of the proceeding therefore would not substantially affect an interest of Mr. Teel even if he were not walled off from any participation in, or benefit from, this case.

Nevertheless, even should Plaintiffs prevail, and even should the Court thereafter exercise its discretion to award fees, Mr. Teel will not receive any financial benefit due to the further steps subsequently taken by Covington & Burling to screen him from this case. And, as this Court set forth in its previous order, the Court cannot identify any other interest that Mr. Teel has that would be substantially affected by the outcome of these proceedings.[1] None of the parties, after having been fully apprised of the facts, have identified such an interest. As such, while the Court acknowledges that "an equity partner in a law firm *generally* has 'an interest that could be substantially affected by the outcome of the proceeding,'" in the facts particular to this case, Mr. Teel's interest cannot be so affected. United States Comm. on Codes of Conduct. Op. 58 (June 2009) (emphasis added). In such circumstances, the Court has an obligation to follow the language of the Canons themselves, not merely the per se rule of the advisory opinion. Because the Court has "as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and the facts require," recusal would not merely be unwarranted, it would itself violate that duty. *Clemens*, 428 F.3d at 1179. To the extent that the Advisory Opinion's per se rule attempts to extend the preclusive effect of Canon 3C(1)(d)(iii) beyond its actual terms, the Court will abide by the Code in determining its ethical responsibilities.

---

[1] The Court has considered the impact this case may have on Covington & Burling's reputation, and therefore the reputation on that firm's partners, whether they are involved in the case or not. Although the case is a significant one, it is significant principally in Arizona, where Covington & Burling does not have an office. To the extent that there is some attention to the case nationwide, the Court concludes, like the district court in *Pashaian*, that the impact of a single case is "not of the significance to either add or detract from its reputation . . . even in the nation or perhaps the world." *Pashaian*, 88 F.3d at 84. Mr. Teel's reputation at Covington & Burling, where he practices in a different area and a different city than Plaintiffs' attorneys, will not be "substantially affected" by the outcome of this case.

- 7 -

1    **2. 28 U.S.C. § 455**

2    Advisory Opinion No. 58 acknowledges that it does not serve to interpret 28 U.S.C.

3    § 455. But, as the Committee also notes, Canon 3C of the Code closely tracks the language

4    of § 455, and the Committee is authorized to provide advice regarding the application of the

5    Code. *Id.*

6    Federal circuit courts have twice had the opportunity to interpret the predecessor of

7    Advisory Opinion 58 in the context of the recusal statute. In 1980, the Fifth Circuit adopted

8    the per se rule of the Advisory Opinion, holding that "when a partner in a law firm is related

9    to a judge within the third degree, that partner will *always* be 'known by the judge to have

10   an interest that could be substantially affected by the outcome' of a proceeding involving the

11   partner's firm." *Postashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980)

12   (quoting 28 U.S.C. § 455(b)(5)(iii)) (emphasis in original). In *Potashnick*, three factors

13   weighed in favor of recusal: "(1) the judge was so connected with [plaintiff's] law firm Hand,

14   Arendall, Bedsole, Greaves & Johnston (Hand, Arendall) and with [plaintiff's] chief trial

15   counsel . . . that his impartiality might reasonably be questioned; (2) the judge was being

16   personally represented in other matters by Hand, Arendall and by [plaintiff's chief trial

17   counsel]; and (3) the judge's father was a partner in Hand, Arendall." *Potashnick*, 609 F.2d

18   at 1106. The Circuit declined to find that the judge's actual rulings demonstrated any bias in

19   favor of the plaintiff, who was represented by the judge's personal lawyer, working at a mid-

20   sized Mobile law firm in which the judge's father was a senior partner, but concluded that

21   a per se rule "will serve to promote public confidence in the integrity and impartiality of the

22   judiciary in general and of the participating judge in particular." *Potashnick*, 609 F.2d at

23   1114.

24   The rise of national law firms led the Second Circuit to reconsider the appropriateness

25   of the Advisory Opinion's per se rule sixteen years later. Considering whether recusal was

26   required when a judge's brother-in-law was an equity partner in a 200-lawyer national firm

27   but had played no role in the case before the judge, the Second Circuit found that relying on

28   a predecessor to Advisory Opinion 58 in the recusal context was "dubious because the

- 8 -

advisory opinion is a nonbinding interpretation of a different rule." *Pashaian v. Eccelston Props., Inc.*, 88 F.3d 77, 84 (2d Cir. 1996). In *Pashaian*, the Second Circuit wrote that "[i]t would simply be unrealistic to assume, with *Potashnick*, that partners in today's law firms invariably 'have an interest that could be *substantially affected* by the outcome of' any case in which any other partner is involved.'" *Id.* at 83 (emphasis in original). The Second Circuit approved of the district court's "reasonable conclusions" that the interest one partner in an international law firm with gross revenues in excess of $100 million could not be "substantially affected" by the outcome of any particular case. *Id.* at 84.

Although district courts in the Fifth Circuit continue to follow the per se rule of the advisory opinion and *Potashnick*, at least one "has noted that it some serious problems with the advisory opinion and with the appellate court interpretations." *Southwest Louisiana Healthcare System v. MBIA Ins.*, 2006 WL 724809, at *3 (Mar. 14, 2006). In that case, the court noted that associates and partners alike see some benefit from the firm's success: partners in the form of their equity interest and associates in the form of bonuses, which are "determined by the amount of profits realized by the total practice of the firm." *Id.* The court decided that the proper inquiry was whether the individual actually had a substantial interest in the proceeding at hand, and found that the individual in question (the judge's father, who was of counsel to the firm before the judge) "has been completely insulated from any participation whatsoever in this case" and that he "will receive no funds on the profits of [the client]," rendering recusal unwarranted. *Id.* at 4. A district court in New Jersey has likewise held that relevant precedents "teach that section 455(b)(5)(iii) cannot be applied as a *per se* bar to firms whose partners are related to the judiciary." *In re Mercedes-Benz Antitrust Litigation*, 226 F. Supp. 2d 552, 555 (D. N. J. 2002). "Whether an interest is substantial is necessarily a fact sensitive inquiry, and it cannot fairly be answered by a mechanical 'no partners' application of section 455(b)(5)(iii)." *Id.* at 555–56..

Under the particular circumstances of this case, for the reasons previously set forth, no "reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Clemens*, 428 F.3d at 1178 (quoting

1  *Herrington v. Cty. of Sonoma*, 834 F.2d 1488, 1502 (9th Cir. 1987)). In this case, even more

2  than in *Pashaian*, the relative in question is a partner at a large international law firm, who

3  has played and will play no role in this matter. Mr. Teel's relationship to this matter is also

4  more remote than the brother-in-law's was in *Pashaian*, because Mr. Teel has been excluded

5  from *any* financial gain that may accrue to Plaintiffs in this suit, substantial or otherwise. All

6  parties to this suit have acknowledged that the *Pashaian* precedent arising from the Second

7  Circuit is the appropriate precedent to follow and urge this Court not to recuse. Recusal under

8  28 U.S.C. § 455(a) is therefore not warranted. The Court finally notes that the decision on

9  whether to recuse is here made in circumstances that greatly favor resolution of this lawsuit:

10  the case was filed four and one-half years ago, plaintiffs are represented by their third set of

11  attorneys, and one federal judge has already recused herself.  Therefore,

12      IT IS ORDERED affirming that the trial will proceed on **July 19, 2012 at 8:30 a.m.**,

13  as scheduled.

14      Dated this 3rd of July, 2012.

15

16  _____

17  G. Murray Snow
    United States District Judge

18

19

20

21

22

23

24

25

26

27

28

- 10 -



*EXHIBIT 24*

1   Timothy J. Casey (#013492)
    James L. Williams (#026402)
2   SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
    1221 East Osborn Road, Suite 105
3   Phoenix, AZ 85014-5540
    Telephone: (602) 277-7000
4   Facsimile:  (602) 277-8663
    timcasey@azbarristers.com
5   Counsel for Defendants Joseph M. Arpaio and
    the Maricopa County Sheriff's Office
6
    Thomas P. Liddy (#019384)
7   MARICOPA COUNTY ATTORNEY'S OFFICE
    Civil Services Division
8   222 N. Central, Suite 1100
    Phoenix, Arizona 85004
9   602-506-8066
    Co-counsel for Defendants Joseph M. Arpaio and
10  the Maricopa County Sheriff's Office

11              **IN THE UNITED STATES DISTRICT COURT**

12                **FOR THE DISTRICT OF ARIZONA**

13  Manuel de Jesus Ortega Melendres, et al.,

14                          Plaintiffs,        No. CV 07-02513-PHX-GMS

15  vs.                                        **DEFENDANTS' NOTICE OF WAIVER**
                                                **ON LIMITED ISSUE**
16  Joseph M. Arpaio, et al.,

17                          Defendants.

18

19          In follow-up to the Status Conference heard this date (Dkt#540), defendants Joseph

20  M. Arpaio ("Arpaio") and the Maricopa County Sheriffs Office ("MCSO") hereby waive any

21  and all appeal issues regarding only the Court's potential bias, impartiality, and/or conflict of

22  interest as set forth in the Court's Order dated June 19, 2012 (Dkt#537).  This waiver is

23  authorized by Arpaio on his own behalf and on behalf of the MCSO.

            Arpaio and MCSO expressly reserve the right to appeal any other issue(s).

24
            DATED this 29th day of June, 2012.
25
                                        SCHMITT SCHNECK SMYTH CASEY & EVEN,
26                                      P.C.

27                                      */S/Timothy J. Casey*_____
                                        Timothy J. Casey
28                                      James L. Williams

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

1405

1221 E. Osborn Rd., Suite 105
Phoenix, Arizona 85014
Telephone: (602) 277-7000
Facsimile:(602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and the
Maricopa County Sheriff's Office

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, California 94065
Counsel for Plaintiffs

Daniel Pochoda, Esq.
Annie Lai, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Counsel for Plaintiffs

Cecillia Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Counsel for Plaintiffs

Andre Segura, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Counsel for Plaintiffs

Nancy Ramirez, Esq.
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Counsel for Plaintiffs

1
2
3
4

Thomas P. Liddy
Deputy County Attorneys, Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100
Phoenix, Arizona 85004
Co-counsel for Defendants Joseph M. Arpaio and
the Maricopa County Sheriff's Office

5
6
7

_/S/Eileen Henry_____ _____
Eileen Henry, Paralegal
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28