## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona,

Defendant/Petitioner,

and GERARD A. SHERIDAN,

Specially appearing non-party/Petitioner,

vs.

UNITED STATES DISTRICT COURT for the District of Arizona,

Respondent Court,

and

MANUEL DE JESUS ORTEGA MELENDRES, et al.,

Plaintiffs/Real Parties in Interest.

No.

U.S. District Court
No. CV 07-02513-PHX-GMS

---

## EXHIBITS TO PETITION FOR WRIT OF MANDAMUS
## VOLUME VI OF VII -- (EXHIBITS 25 - 30)

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
(602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone:  602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners
Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7847
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County, Arizona

# EXHIBITS TO PETITION FOR WRIT OF MANDAMUS

## VOLUME VI:

| EX. | DOCUMENT | PAGES |
|---|---|---|
| 25. | District Court ORDER Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, dated December 23, 2011 [Dist. Ct. Docket No. 494] | 1408-1447 |
| 26. | Plaintiffs' Motion for Partial Summary Judgment filed in District Court, dated April 29, 2011 [Dist. Ct. Docket No. 421] | 1448-1486 |
| 27. | Defendants Motion for Summary Judgment filed in District Court, dated April 29, 2011 [Dist. Ct. Docket No. 413] | 1487-1521 |
| 28. | District Court ORDER Granting Defendants' Motion for Recusal dated July 15, 2009 [Dist. Ct. Docket No. 138] | 1522-1548 |
| 29. | AMENDED COMPLAINT filed in District Court, dated September 5, 2008 [Dist. Ct. Docket No. 26] | 1549-1620 |
| 30. | COMPLAINT filed in District Court dated December 12, 2007 [Dist. Ct. Docket No. 1] | 1621-1677 |

RESPECTFULLY SUBMITTED this 6th day of August, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES


By /s/ John T. Masterson  (w/permission from)
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson  (w/permission from)
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
    Specially appearing counsel for
    Petitioner Joseph M. Arpaio in his
    official capacity as Sheriff of Maricopa
    County, Arizona

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing EXHIBITS TO PETITION FOR WRIT OF MANDAMUS – VOLUME VI OF VII (Exhibits 25 - 30) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 6th day of August, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

_____/s/ Karen Gawel_____



*EXHIBIT 25*

1    **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                 FOR THE DISTRICT OF ARIZONA

8

9    Manuel de Jesus Ortega-Melendres, et al.,)    No. CV-07-2513-PHX-GMS
                                             )
10              Plaintiffs,                   )    **ORDER**
                                             )
11   vs.                                      )
                                             )
12                                            )
     Joseph M. Arpaio, in his individual)
13   capacity as Sheriff of Maricopa County,)
     Arizona, et al.,                         )
14                                            )
                Defendants.                   )
15                                            )
                                             )
16   _____)

17

18          Pending before the Court are Defendants' Motion for Summary Judgment (Doc. 413),

19   Plaintiffs' Renewed Motion for Class Certification (Doc. 420), Plaintiffs' Motion for Partial

20   Summary Judgment (Doc. 421), and Defendants' Motion for Leave to File Sur-Reply. (Doc.

21   469). At oral arguments on December 22, 2011, Plaintiffs moved for summary judgment on

22   Ortega-Melendres's Fourth Amendment claims. (Doc. 490). For the reasons stated below,

23   Defendants' motion for summary judgment is granted in part and denied in part, Plaintiffs'

24   motion for partial summary judgment on the Equal Protection claims is denied, Plaintiffs'

25   motion for summary judgment on the Fourth Amendment claims is granted in part and denied

26   in part, Plaintiffs' motion for class certification is granted, and Defendants' motion for leave

27

28

1  to file a sur-reply is dismissed as moot.[1]

2  **BACKGROUND**

3  **1. Factual Background**

4       This putative class action civil rights suit alleges that the Maricopa County Sheriff's

5  Office ("MCSO") engages in a policy or practice of racial profiling, and a policy stopping

6  persons without reasonable suspicion that criminal activity is afoot, in violation of Plaintiffs'

7  rights under the Fourteenth and Fourth Amendments. (Doc. 26 ¶ 2). Under an agreement with

8  the Department of Immigration and Customs Enforcement ("ICE"), certain MCSO deputies

9  had been certified to enforce federal civil immigration law. (Doc 413, Ex. 5). The agreement

10  between MCSO and ICE operated pursuant to section 287(g) of the Immigration and

11  Nationality Act ("INA"), and the participating officers were therefore said to be 287(g)

12  certified. 8 U.S.C. § 1357(g) (2006). On October 16, 2009, the agreement between MCSO and

13  ICE was modified so that MCSO officers no longer had authority to enforce federal civil

14  immigration violations in the field, but could continue to do so in the jails. (Doc. 422 ¶ 10).

15  Plaintiffs allege that under the guise of enforcing immigration law, MCSO officers are in fact

16  engaged in a policy of racially profiling Latinos. (Doc. 26 ¶ 3).

17       The five named Plaintiffs were stopped by MCSO officers during three incidents, on

18  September 27, 2007, December 7, 2007, and March 28, 2008. (*Id.* ¶¶ 53–119). In addition,

19  Somos America ("Somos"), a non-profit membership organization, claims that it and its

20  members have been harmed by the alleged policy. (*Id.* ¶ 10). In Count One, Plaintiffs claim

21  that MCSO has violated and is violating the Equal Protection Clause of the Fourteenth

22  Amendment. (*Id.* ¶¶ 128–37). In Count Two, they allege that MCSO's stops of the named

23  Plaintiffs violated the Fourth Amendment, as applied to MCSO through the Fourteenth

24  Amendment. (*Id.* ¶¶ 138–43). In Count Three, they allege that those same stops also violated

25  _____

26       [1] Plaintiffs' motion for sanctions (Doc. 416) was granted in an order issued earlier

27  today. (Doc. 493). A discussion of the history of discovery issues in this case is contained
   in that order.

28  - 2 -

the search and seizure protections of Article II, Section 8 of the Arizona State Constitution. (*Id.* ¶¶ 144–47). In Count Four, they argue that MCSO's policy violates Title VI of the Civil Rights Act of 1964, which forbids race discrimination in federally funded programs. (*Id.* ¶¶ 148–54). Plaintiffs seek certification of a class consisting of "All Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona." (Doc. 420 at 1). Plaintiffs seek only equitable relief, in the form of a declaratory judgment, an injunction against Defendant, attorneys' fees, and "such other relief as the Court deems just and proper." (Doc. 26 at 28–29).

Defendants now move for summary judgment on all counts. First, they argue that the Plaintiffs are not likely to suffer future injury, and that they therefore lack standing to obtain equitable relief under the test established in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). (Doc. 413 at 14–17). Next, they argue that the vehicle traffic stops of the named Plaintiffs were supported by probable cause, and that the Fourth Amendment and Arizona Constitutional claims therefore fail under *Whren v. U.S.*, 517 U.S. 806 (1996). (Doc. 413 at 18–22). Finally, they claim that the record shows that MCSO does not engage in intentional discrimination, and that the Fourteenth Amendment and Title VI claims therefore fail. (Doc. 413 at 23–31). Plaintiffs seek summary judgment on Claim One and Claim Four, and certification of their proposed class. (Docs. 416, 420, 421).

**2. Legal Background**

In 1952, Congress passed the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, which set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization." *De Canas v. Bica*, 424 U.S. 351, 353 (1976). The INA contains both criminal and civil provisions regarding those who either enter the United States without legal authority or enter with legal authority but remain after that authority expires. *See*, *e.g.*, 8 U.S.C. §§ 1302, 1306, 1325 (2006) (criminal provisions); 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B)–(C) (2006) (civil provisions regarding admissibility and

- 3 -

1    deportation). The Supreme Court, referencing specific criminal provisions of the INA, has

2    written that "entering or remaining unlawfully in this country is itself a crime." *I.N.S. v.*

3    *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). The criminal provisions cited in *Lopez-*

4    *Mendoza* set forth with particularity what actions constitute "entering or remaining

5    unlawfully." For example, entering or attempting to enter the United States other than at a

6    legal border crossing is a federal crime. 8 U.S.C. § 1325. A non-citizen who remains within

7    the United States and willfully fails to register or be fingerprinted after thirty days, or who

8    knowingly files a fraudulent application, has also committed a federal offense. 8 U.S.C.

9    §§1302, 1306. All aliens over the age of 18, moreover, must carry their registration papers

10   at all times, under penalty of a criminal misdemeanor. 8 U.S.C. § 1304(e). There is no

11   provision in the INA or any other federal law, however, that specifically criminalizes mere

12   presence in the United States without authority to remain.[2] The Supreme Court has

13   acknowledged that "[a] deportation proceeding is a purely civil action to determine eligibility

14   to remain in this country." *Lopez-Mendoza*, 468 U.S. 1032.

15          Being present in the country without authorization to remain "is only a civil

16   violation." *Gonzales v. City of Peoria*, 722 F.2d 468, 476 (9th Cir. 1983) *overruled on other*

17   *grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). Nothing in *Lopez-*

18   *Mendoza* alters this law. In a recent decision, the Ninth Circuit found that a state trooper did

19   not commit an "egregious violation" of the Fourth Amendment sufficient to trigger the

20   exclusionary rule in a civil proceeding because the language of *Lopez-Mendoza* was such that

21   "a reasonable officer could have interpreted that statement to mean an alien's unlawful

22   presence in this country is itself a crime." *Martinez-Medina v. Holder*, 616 F.3d 1011, 1017

23   (9th Cir. 2010). In amending and superceding that opinion, the court clarified that

24   _____

25          [2] It is also a crime for a person who has previously been denied admission, excluded,
     deported or removed to be present in the United States unless the Attorney General expressly
26   consents to the person's reapplication for admission or the alien establishes that he was not
     required to obtain such advance consent. 8 U.S.C. § 1326(a).
27

28                                          - 4 -

1    "[a]lthough a reasonable officer could have been confused by these statements in *Lopez-*

2    *Mendoza* and *Martinez* . . . a close reading of those cases demonstrates that neither meant to

3    suggest that an alien's mere unauthorized presence is itself a crime." *Martinez-Medina*, ___

4    F.3d ___, 2011 WL 855791, at *6 (9th. Cir. Mar. 11, 2011). The panel went on to emphasize

5    that "*Gonzales*'s observation that 'an alien who is illegally present in the United States . . .

6    [commits] only a civil violation,' . . . remain[s] the law of the circuit, binding on law

7    enforcement officers." *Id*. (quoting *Gonzales*, 722 F.2d at 476–77). An alien who "overstays

8    a valid visa or otherwise remains in the country after the expiration of a period authorized

9    by the Department of Homeland Security," therefore, although he may be subject to

10   deportation, has violated no criminal statute. *Martinez-Medina*, ___ F.3d at ___, 2011 WL

11   855791, at *5 n.4.

12       Officers enforcing the immigration laws must comply with the Fourth Amendment,

13   which protects the right of the people to be free from "unreasonable searches and seizures."

14   U.S. Const. amend IV. Probable cause to arrest a person will flow when "the facts and

15   circumstances within the knowledge of the arresting officers and of which they had

16   reasonably trustworthy information were sufficient to warrant a prudent man in believing that

17   [the person arrested] had committed or was committing an offense." *United States v. Jensen*,

18   425 F.3d 698, 704 (9th Cir. 2005). Absent probable cause, when circumstances require

19   "necessarily swift action predicated upon the on-the-spot observations of the officer on the

20   beat,"officers may make brief investigatory seizures based only on reasonable suspicion that

21   "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 20, 30 (1968). An investigatory

22   stop is lawful if an officer "reasonably suspects that the person apprehended is committing

23   or has committed a criminal offense." *Arizona v. Lemon Montrea Johnson*, 555 U.S. 323, 326

24   (2009). Stopping a vehicle is usually "analogous to a so-called '*Terry* stop'";officers

25   ordinarily may stop a vehicle based on reasonable suspicion of criminal activity. *Berkemer*

26   *v. McCarty*, 468 U.S. 420, 439 (1984).

27       Federal ICE officers have the power to investigate and enforce both criminal and civil

28

- 5 -

immigration law, including the power to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Authorized officers may stop vehicles pursuant to this authority so long as "they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Reasonable suspicion for a federal officer to stop a car to investigate the immigration status of the occupants depends upon the "totality of the circumstances." *U.S. v. Arvizu*, 534 U.S. 266, 277 (2002) (border patrol agent had reasonable suspicion to stop a minivan when (1) it had turned onto a dirt road frequently used by smugglers to avoid a checkpoint, (2) it had slowed when the driver saw the officer, (3) the children sitting in the back began to wave mechanically, and (4) the children had their knees propped up, as though there was cargo beneath them).

In considering the totality of the circumstances, however, "an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population." *U.S. v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). Hispanic appearance, for example, is "of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required." *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000). Moreover, while an inability to speak English is probative of immigration status, it does not supply reasonable suspicion unless "other factors suggest that the individuals are present in this country illegally." *Manzo-Jurado*, 457 F.3d at 937. The Ninth Circuit has also held that "individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior," taken together, do not provide a federal immigration officer reasonable suspicion to conduct a stop. *Id.* at 932.

Local law enforcement officers who have been certified under section 287(g) may "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). They are therefore

- 6 -

permitted to enforce civil violations of federal immigration law. Officers certified under the 287(g) program may make traffic stops based upon a reasonable suspicion, considering the totality of the circumstances, that people in the vehicle are not authorized to be in the United States. *Brignoni-Ponce*, 422 U.S. at 884.

Local law enforcement officers, however, do not have the "inherent authority" to investigate civil immigration violations, including status violations. *U.S. v. Arizona*, 641 F.3d 339, 362 (9th Cir. 2011).[3] Since the MCSO lost its 287(g) field authority after October 16, 2009, the only immigration laws its officers can investigate are federal criminal laws or state laws that have not been enjoined. *Gonzales*, 722 F.2d at 476–77.

Local law enforcement officers, even those not certified under 287(g), are generally not prohibited from investigating and enforcing federal criminal law. *Ker v. California*, 374 U.S. 23, 37 (1963). The Ninth Circuit has held that local law enforcement officers, therefore, may investigate and enforce "the criminal provisions of the [INA]." *Gonzales*, 722 F.2d at 477.[4] Non-287(g) officers may detain those whom they have reasonable suspicion to believe have illegally crossed a border in violation of § 1325, fraudulently filed an immigration application under § 1306, failed to carry documentation of their immigration status under § 1304(e), or committed other criminal immigration violations.

Moreover, actual knowledge, let alone suspicion, that an alien is illegally present is not sufficient to form a reasonable belief he has violated federal criminal immigration law.

---

[3] The Supreme Court has granted a writ of certiorari to review the Ninth Circuit's decision. *U.S. v. Arizona*, 641 F.3d 339, 362 (9th Cir. 2011), *cert. granted* 60 U.S.L.W. 3090 (U.S. Dec. 12, 2011) (No. 11-182). The question presented in that case is whether federal laws impliedly preempt four provisions of SB 1070 on their face. *Id.* The Supreme Court has not been asked to decide whether states have an *inherent* authority to enforce civil provisions of the immigration law. At oral argument, Defendants conceded that they had no authority to enforce federal civil immigration law.

[4] Plaintiffs stated at oral argument that local law enforcement officers do not have the inherent authority to enforce federal criminal immigration law. They cited no authority for this proposition, which is in conflict with *Gonzales*, upon which they otherwise rely.

- 7 -

The Ninth Circuit recently affirmed that "an alien's 'admission of illegal presence . . . does not, without more, provide probable cause of the criminal violation of illegal entry,'" precisely because the criminal sections of the INA contain additional elements, such as crossing a border without authorization, willfully refusing to register, or filing a fraudulent application. *Martinez-Medina*, ___ F.3d ___, 2011 WL 855791, at *6 (quoting *Gonzales*, 722 F.2d at 476–77).[5] MCSO officers, none of whom are now 287(g) certified, therefore have no power to detain or investigate violations such as those "regulating authorized entry, length of stay, residence status, and deportation." *U.S. v. Arizona*, 641 F.3d at 362. Seizing a civilian pursuant to such a violation, absent reasonable suspicion of criminal activity, violates the Fourth Amendment.

Local law enforcement officers can investigate violations of state law, including validly enforceable state laws that involve immigration matters. The State of Arizona, in response to "rampant illegal immigration, escalating drug and human trafficking crimes, and serious public safety concerns," along with a perceived failure by the federal government to enforce federal immigration law, has passed a number of state laws involving immigration issues. *U.S. v. Arizona*, 703 F. Supp. 2d 980, 985 (D. Ariz. 2010). Some of the provisions of Senate Bill ("SB") 1070, one of the laws in question, have been enjoined, but some portions of the law remain valid.

Portions of SB 1070 that have not been enjoined allow local law enforcement officials to turn over those who have been convicted of a state crime to federal authorities to determine their immigration status. Ariz. Rev. Stat. ("A.R.S.") § 11-1051(C)–(F); *See U.S. v. Arizona*, 703 F. Supp. 2d at 985 (D. Ariz. 2010) (upholding the provisions). Additionally,

---

[5] The Tenth Circuit has found that officers have probable cause to believe people have crossed a border without authorization when their car was stopped legally, the driver of the vehicle failed to provide a valid driver's license, the driver and his passenger admitted they were not legally present in the country, and the driver and passenger "indicated they were coming from Mexico." *U.S. v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001).

a person who is "in violation of a criminal offense" commits a further offence if he transports or moves an unauthorized alien "if the person recklessly disregards" that person's unlawful status. A.R.S. § 13-2929(A)(1) (2010). However, no one may determine the transported alien's status except for a federal officer or a "law enforcement officer who is authorized by the federal government to verify or ascertain an alien's immigration status." A.R.S § 13-2929(D)(1)–(2). Officers without such authorization cannot therefore collect evidence to satisfy a key element of the crime.[6]

In addition, some Arizona state immigration laws predate SB 1070. The Legal Arizona Workers Act of 2007 allows state courts to suspend or revoke the license to do business of any employer who knowingly or intentionally employs an alien who is not authorized to work. A.R.S. §§ 23-211, 212, 212.01 (2007). It has been held to be constitutional by the Supreme Court. *See Chamber of Commerce of U.S. v. Whiting*, 131 S.Ct. 1968, 1977 (2011) (upholding the measure). However, the law explicitly provides an enforcement process by which individuals file written complaints to the Attorney General,

---

[6] SB 1070 also includes provisions prohibiting stopping a vehicle "to hire or pick up passengers for work at a different location if the motor vehicle blocks or impedes the normal movement of traffic," or for someone to enter a vehicle for such a purpose while the vehicle blocks or impedes traffic. A.R.S. § 13-2928(A)–(B). These provisions have not been enjoined, but their status remains uncertain. In upholding them, the district court found that "the June 9, 2010, decision of the Ninth Circuit Court of Appeals in a case contesting a virtually identical local ordinance in Redondo Beach, California forecloses a challenge." *U.S. v. Arizona*, 703 F. Supp. 2d at 1000 (citing *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178, 1184–93 (9th Cir. 2010)). An *en banc* decision of the Ninth Circuit has since overturned that panel decision and found that the Redondo Beach ordinance, Redondo Beach Mun. Code § 3–7.1601(a), is "a facially unconstitutional restriction on speech," since soliciting work as a day laborer is protected First Amendment activity. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 940 (9th Cir. 2011) (en banc). It is therefore not clear whether local law enforcement officers, including MCSO officers, can enforce A.R.S. § 13–2928(A) or § 13–2928(B). In an unrelated lawsuit, a preliminary injunction is currently being sought against A.R.S. § 13–2928(A) and § 13–2928(B) based on the *en banc* ruling in *Redondo Beach*. *See Friendly House, et al. v. Whiting, et al.,* CV-10-01061-SRB.

who in turn conducts an investigation before a license is revoked. A.R.S. § 23-212. It has no provisions through which enforcement actions can be taken against employees, and specifically exempts independent contractors from its definition of "employee," suggesting that it cannot be enforced against those who hire day laborers as independent contractors. A.R.S. § 23-211(3)(b).

Since 2005, human smuggling has been an Arizona state crime. A.R.S. § 13-2319 (2010). The human smuggling statute reads: "It is unlawful for a person to intentionally engage in the smuggling of human beings for profit or commercial purpose." A.R.S. § 13-2319(A). The statute defines "smuggling of human beings" as "the transportation, procurement of transportation or use of property or real property by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or have attempted to enter, entered or remained in the United States in violation of law." A.R.S. § 13-2319(F)(3). In order for the elements of the crime to be satisfied, therefore, a person must 1) transport, procure transportation for, or harbor a person, 2) know or have reason to know that the person is not legally in the country, and 3) do so for profit or commercial purpose.[7] If a driver does not know or have reason to know that his passengers are not legally in the country, no one has violated the statute. If the transportation is not being conducted for profit or a commercial purpose, no one has violated the statute. People who cross the international border at an unauthorized location have violated 8 U.S.C. § 1325, but have not violated or conspired to violate the human smuggling statute unless the other

---

[7] A current lawsuit in the District Court of Arizona challenges a policy in which "non-smuggler migrants" are "arrest[ed], detain[ed], and punish[ed] . . .for conspiring to transport themselves." *We are America/Somos America, Coalition of Arizona v. Maricopa Cty. Bd. of Supervisors*, ___ F. Supp. 2d. ___, 2011 WL 3629352 (D. Ariz. Aug. 18, 2011, CV-06-02816-RCB). For the purposes of this order, the Court assumes, without deciding, that those who are smuggled may be prosecuted for conspiring to smuggle themselves, so long as all elements of the statute are satisfied.

1    elements of A.R.S. § 13-2319 are met.

2        A law enforcement officer must have a reasonable suspicion that the smuggling is

3    "afoot" to conduct a brief investigatory stop to enforce the human smuggling law. *Terry*, 392

4    U.S. at 20. Therefore, an officer must have reasonable suspicion that 1) a person is being

5    transported or harbored, 2) by a person who knows or has reason to know that the person

6    being transported or harbored is not legally present in Arizona or the United States, and 3)

7    that the person is currently being transported or harbored "for profit or commercial purpose."

8    A.R.S. § 13-2319(A)–(F). The fact that a law enforcement officer suspects, or even knows,

9    that a vehicle passenger is not legally present in the country does not in and of itself provide

10   reasonable suspicion that the passenger was or is being "smuggled." Moreover, a passenger's

11   lack of legal status, standing alone, is in no way probative as to whether the driver is

12   transporting the passenger for profit or commercial purpose. Since "an alien's 'admission of

13   illegal presence . . . does not, without more, provide probable cause of the criminal violation

14   of illegal entry,'" knowledge of illegal presence, standing alone, can likewise not provide

15   reasonable suspicion or probable cause that the human smuggling statute has been violated

16   sufficient to justify a *Terry* stop. *Martinez-Medina*, 2011 WL 855791, at *6.

17       A minor traffic infraction provides officers sufficient probable cause to stop a motor

18   vehicle. *Whren v. U.S.*, 517 U.S. 806, 810 (1996). When officers stop a car for probable

19   cause, the fact that they actually intend to investigate another crime for which they lack

20   probable cause is irrelevant—the "ulterior motive" does not "serve to strip the agents of their

21   legal justification" to conduct the initial stop. *Id.* at 813. While an ulterior motive does not

22   remove objective probable cause for a car stop, neither it nor the initial probable cause

23   provides limitless authority to detain passengers for unrelated crimes or civil violations. This

24   is because while "[t]here is probable cause to believe that the driver has committed a minor

25   vehicular offense, . . . there is no such reason to stop or detain the passengers." *Maryland v.*

26   *Wilson*, 519 U.S. 408, 413 (1997).

27       For any detention to be valid under the Fourth Amendment, "[t]he scope of the

28                                    - 11 -

1    detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460

2    U.S. 491, 500 (1983). Applied to the car stop context, this principle means that officers may

3    question a driver who has been lawfully stopped if the questioning does "not unreasonably

4    prolong the duration of the stop." *U.S. v. Turvin*, 517 F.3d 1097, 1099, 1104 (9th Cir. 2008)

5    (when officer recognized driver as previously arrested drug dealer, asking for driver's

6    consent to search a box in the vehicle that "look[ed] very odd" did not prolong the stop).

7    During this questioning, however, "unless the detainee's answers provide the officer with

8    probable cause to arrest him, he must then be released." *Berkemer*, 468 U.S. at 439–440.[8]

9           Vehicle passengers are legally "seized" based on the reasonable suspicion that

10   provided justification for the stop—an officer "need not have, in addition, cause to believe

11   any occupant of the vehicle is involved in criminal activity." *Lemon Montrea Johnson*, 555

12   U.S. at 327. To question or search a passenger beyond the scope of investigating the cause

13   for the original stop, however, an officer needs suspicion particular to that passenger—for

14   example, in order to frisk a passenger, an officer needs reasonable suspicion independent of

15   the reason for the stop that "the person subjected to the frisk is armed and dangerous." *Id.*[9]

16          Local law enforcement officers may therefore not detain vehicle passengers based

17   upon probable cause, or even actual knowledge, without more, that those passengers are not

18   _____

19          [8] Defendants' reliance on *Muehler v. Mena*, 544 U.S. 93 (2005) for the proposition

20   that "[a] traffic violation provides probable cause to stop the vehicle and to reasonably detain
     a driver and other occupants of the vehicle," is unavailing. (Doc. 413 at 5). In *Muehler*, there

21   was no traffic stop; rather, Mena was handcuffed and asked about her immigration status
     while her house was searched for weapons pursuant to a valid warrant. *Mueler*, 544 U.S. at

22   96. The Supreme Court held that the detention was reasonable in light of the nature of the

23   search, and that an interrogation that did not prolong the search did not constitute an
     independent Fourth Amendment seizure. The officers who asked about Mena's immigration

24   status were federal immigration officers. *Id.*

25          [9] The Fourth Circuit has held that, without extending the duration of the stop, officers

26   may direct very limited requests to passengers, writing that a "request for identification from
     passengers falls within the purview of a lawful traffic stop and does not constitute a separate

27   Fourth Amendment event." *U.S. v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007).

28                                          - 12 -

1    lawfully in the United States, since such knowledge does not provide officers with reasonable

2    suspicion that the passengers are violating any law that local law enforcement officers can

3    enforce. *Martinez-Medina*, 2011 WL 855791, at *6. This prohibition holds true even when

4    the car has been reasonably stopped for other cause, such as a traffic violation, because such

5    cause provides "no such reason to stop or detain the passengers." *Wilson*, 519 U.S. at 413.

6        Defendants, citing *Terry* and its progeny, claim that if an officer has reasonable

7    suspicion that a person has satisfied one significant element of a criminal statute, the officer

8    may stop that person to develop reasonable suspicion that the person has violated the other

9    elements. A line of Ninth Circuit cases has emphasized that since probable cause is an

10   objective standard relying upon the totality of the circumstances, an officer may have

11   probable cause to arrest or search when he does not have "probable cause for every element

12   of the offense." *U.S. v. McCarty*, 648 F.3d 820, 839 (9th Cir. 2011) (When airport traveler

13   opened his bag and photographs of nude children fell out, TSA did not need probable cause

14   that the photographs met the precise definition of child pornography in order to have

15   probable cause to search bags further). Nevertheless, officers still need an "objectively

16   reasonable belief that [a person] has committed a crime" before they have probable cause to

17   proceed further. *Id.* Although "[p]robable cause does not require the same type of specific

18   evidence of each element of the offense as would be needed to support a conviction," *Adams*

19   *v. Williams*, 407 U.S. 143, 149 (1972), officers must have some reliable information that a

20   person has committed a crime, usually including violating its key elements. *See*, *e.g.*, *Gasho*

21   *v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (finding that while "an officer need not

22   have probable cause for every element of the offense . . . when specific intent is a required

23   element, the arresting officer must have probable cause for that element in order to

24   reasonably believe that a crime has occurred."). Regardless of whether some crimes contain

25   some elements for which an officer need not have probable cause in order to have probable

26   cause that the crime has been committed, in the immigration context, "an alien's 'admission

27   of illegal presence . . . does not, without more, provide probable cause of the criminal

28                                          - 13 -

1   violation of illegal entry.'" *Martinez-Medina*, 2011 WL 855791, at *6.

2       To justify a *Terry* stop, an officer must have *reasonable* suspicion that a crime is

3   about to be committed, and a person has not committed a crime if the necessary elements

4   have not been satisfied. *Cf. In re Winship*, 397 U.S. 358, 361 (1970) (To convict a person of

5   a crime, a prosecutor must "convince the trier of all the essential elements of guilt.") (internal

6   quotation omitted). If the totality of the circumstances do not provide reasonable suspicion

7   that a person is about to commit or is committing a crime, then the officer cannot stop the

8   person. Moreover, an officer cannot conduct a *Terry* stop in order to acquire the reasonable

9   suspicion necessary to justify the stop itself; the "demand for specificity in the information

10  upon which police action is predicated is the central teaching of [the Supreme Court's]

11  Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 22 n.18 (collecting cases).

12      Defendants also cite *U.S. v. Cortez*, 449 U.S. 411 (1981), *Scarbrough v. Myles*, 245

13  F.3d 1299 (11th Cir. 2001), and a number of cases in which officers frisked individuals for

14  weapons during a legally justified stop, including *U.S. v. Orman*, 486 F.3d 1170 (9th Cir.

15  2007), *Lemon Monrea Johnson*, and *Terry* itself. *Cortez* involved federal immigration

16  officers stopping a vehicle after an extended field investigation and overnight surveillance;

17  since federal immigration officers may stop vehicles based on reasonable suspicion that

18  passengers have violated federal civil immigration law, there were no criminal elements that

19  needed to be satisfied. *U.S. v. Cortez*, 449 U.S. at 421–22. *Scarbrough* was a qualified

20  immunity case. In that case, the court held that Officer Myles had "arguable probable cause"

21  that defendants had committed of a crime, and therefore met the lower standard necessary

22  to be afforded qualified immunity. *Scarbrough*, 245 F.3d at 1303. It in no way suggests that

23  a *Terry* stop is justified without reasonable suspicion that a crime has been committed, or that

24  essential elements can remain unsatisfied.[10]

25

26      [10] Cases detailing the standards for conducting a frisk are not relevant to this

27  complaint, and need not be discussed in detail.

28

1     As a matter of law, belief without more that a person is not legally authorized to be

2  in the country cannot constitute reasonable suspicion to believe that he or she has violated

3  the state human smuggling law. The Ninth Circuit has held that actual knowledge that a

4  person is not lawfully in the country does not provide probable cause that the person has,

5  additionally, crossed the border at an unauthorized place. *Martinez-Medina*, 2011 WL

6  855791, at *6. If an officer does not have reasonable suspicion that criminal activity is afoot,

7  he does not have reason to detain someone under *Terry*.

**DISCUSSION**

8

9  **I. Legal Standard**

10    Summary judgment is appropriate if the pleadings and supporting documents, viewed

11  in the light most favorable to the non-moving party, "show that there is no genuine issue as

12  to any material fact and that the moving party is entitled to judgment as a matter of law."

13  FED. R. CIV. P. 56(c). A dispute is genuine "if the evidence is such that a reasonable jury

14  could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

15  242, 248 (9th Cir. 1986). In considering such evidence, "at the summary judgment stage the

16  judge's function is not himself to weigh the evidence and determine the truth of the matter

17  but to determine whether there is a genuine issue for trial." *Id.* at 249.

18    The party moving for summary judgment bears the initial burden to identify the

19  portions of the record "it believes demonstrate the absence of a genuine issue of material

20  fact." *F.T.C. v. Stefanchick*, 559 F.3d 924, 927 (9th Cir. 2009) (quoting *Celotex Corp. v.

21  Cartrett*, 477 U.S. 317, 323 (1986)). Should the moving party meet this burden, the non-

22  moving party then must "set forth, by affidavit or as otherwise provided in Rule 56, specific

23  facts showing that there is a genuine issue for trial." *Horphang Research Ltd. v. Garcia*, 475

24  F.3d 1029, 1035 (9th Cir. 2007) (internal quotations omitted). District courts "rely on the

25  nonmoving party to identify with reasonable particularity the evidence that precludes

26  summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

27    Affidavits must be made "on personal knowledge, not information and belief" in order

28

- 15 -

1   to be considered at summary judgment. *Taylor v. List*, 880 F.2d 1040, 1046 n.3 (9th Cir.

2   1989). Expert testimony may be considered unless it consists of a "legal conclusion." *U.S.*

3   *v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999). The Ninth Circuit "has refused to find a genuine

4   issue where the only evidence presented is uncorroborated and self-serving testimony."

5   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (internal quotations

6   omitted).

7   **II. Analysis**

8       **A. Search and Seizure Claims**

9       A plaintiff does not have standing to seek injunctive relief, even if he has suffered

10  harm, unless that harm is accompanied by "continuing, present adverse effects." *O'Shea v.*

11  *Littleton*, 414 U.S 488, 496 (1974). Continuing, present adverse effects may be found when

12  a plaintiff demonstrates that there is "a sufficient likelihood that he will again be wronged

13  in a similar way." *Lyons*, 461 U.S. at 111. Standing for injunctive relief will not flow,

14  however, if an injury is "contingent upon [plaintiffs'] violating the law." *Spencer v. Kemna*,

15  523 U.S. 1, 15 (1998). Plaintiffs have no standing to enjoin police conduct, therefore, if by

16  "conduct[ing] their activities within the law" they will avoid "exposure to the challenged

17  course of conduct." *Lyons*, 461 U.S. at 103 (quoting *O'Shea*, 414 U.S. at 497). To have

18  standing to seek an injunction on their Fourth Amendment claims, Plaintiffs must present a

19  genuine question as to whether they are likely to be seized again in violation of the Fourth

20  Amendment, not merely that the traffic stops are conducted in a discriminatory fashion or are

21  pretextual efforts to enforce other law. *See Wren v. U.S.*, 517 U.S. at 810.

22      In the unique circumstances of this case, Defendants' assertions about the scope of

23  their authority to stop persons to investigate potential violations of the state smuggling statute

24  establish that plaintiffs are sufficiently likely to be seized in violation of the Fourth

25  Amendment to provide them with standing to seek injunctive relief. MCSO has conceded

26  that it has no authority, inherent or otherwise, to enforce federal civil immigration law, but

27  now claims the authority to detain persons it believes are not authorized to be in the country

28  - 16 -

1   based on its ability to enforce Arizona's human smuggling statute. A.R.S. § 13-2319.

2   Defendants claim, therefore, that their authority to stop people to investigate violations of the

3   state human smuggling statute is the same as a federal immigration officer's authority to

4   enforce federal civil immigration law. In supplemental briefing and at oral argument,

5   Defendants asserted that MCSO officers could briefly detain people "based only upon a

6   reasonable suspicion, without more, that the person is not legally present within the United

7   States." (Doc. 488 at 17).

8        The fact that a person is unlawfully present, without more, does not provide officers

9   with reasonable suspicion that the person is currently being smuggled for profit, nor does it

10  provide probable cause that the person was at some point in the past smuggled for profit. *Cf.*

11  *Martinez-Medina*, 2011 WL 855791, at *6. To the extent that Defendants claim that the

12  human smuggling statute, or any Arizona or federal criminal law, authorizes them to detain

13  people based solely on the knowledge, let alone the reasonable suspicion, that those people

14  are not authorized to be in the country, they are incorrect as a matter of law.

15       The likelihood that any particular named Plaintiff will again be stopped in the same

16  way may not be high. However, if MCSO detains people, as they claim a right to do, without

17  reasonable suspicion that they have violated essential elements of a criminal law—either

18  state or federal—exposure to that policy is both itself an ongoing harm and evidence that

19  there is "sufficient likelihood" that Plaintiffs' rights will be violated again. *Lyons*, 461 U.S.

20  at 111. Although some MCSO officers were certified under 287(g) to enforce civil provisions

21  of the federal immigration law during the incidents that gave rise to the complaint, since that

22  authority has been revoked they may no longer do so. In *Lyons* itself, the court wrote that a

23  victim of police misconduct could seek an injunction if he could show that department

24  officials "ordered *or authorized* police officers to act in such manner." *Id.* at 106 (emphasis

25  added). MCSO affirmatively alleges that its officers are authorized to stop individuals based

26  only on reasonable suspicion or probable cause that a person is not authorized to be in the

27  United States. This assertion establishes the standing of all named Plaintiffs to seek

28

- 17 -

1    injunctive relief. Further, because this assertion is wrong as a matter of law, named Plaintiffs

2    (and all members of the putative class) are entitled to partial summary judgment on their

3    Fourth Amendment claims, to the extent that Defendants are detaining persons without

4    reasonable suspicion that the state human smuggling statute has been violated. Defendants

5    need not be enjoined from enforcing federal civil immigration law because they concede that

6    they have no authority to enforce such law.

7         To be granted injunctive relief, a plaintiff must establish four elements. A plaintiff

8    must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable

9    harm in the absence of preliminary relief, that the balance of equities tips in his favor, and

10   that an injunction is in the public interest." *Winter v. Nat't Res. Def. Council*, 555 U.S. 7, 20

11   (2008); *see* FED. R. CIV. P. 65. The loss of constitutional rights "unquestionably constitutes

12   irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The balance of equities and

13   public interest both favor enforcing class members' Fourth Amendment rights. Injunctive

14   relief is appropriate.

15        To the extent that named Plaintiffs claim a right to additional injunctive relief on

16   summary judgment based on the facts of their individual detentions, those detentions are

17   discussed below.

18                          **1. Ortega-Melendres**

19        On September 19, and September 22, 2007, undercover MCSO deputies went to a

20   church in Cave Creek posing as day laborers. (Doc. 433, Ex. 139). The officers discovered

21   that the church maintained a sign-in sheet for those looking for work "in order to fairly

22   distribute the jobs among the day laborers." (*Id.*). An email to Lieutenant Joseph Sousa of

23   MCSO's Human Smuggling Unit ("HSU") detailing the officers' undercover operation

24   concluded that "[o]n both days, there was no information discovered pertaining to forced

25   labor, human smuggling or possible 'drop houses.'" (*Id.*). On September 27, MCSO

26   conducted an operation "related exclusively to stopping for probable cause following traffic

27   violations only those vehicles that were observed to have picked up people congregating at

28                                  - 18 -

the church property and that had left the property." (Doc. 453 ¶ 172).

Plaintiff Manuel de Jesus Ortega-Melendres, a Mexican national who was legally in the United States at the time, along with two other men, entered a vehicle from the parking lot. (Doc. 413, Ex. 1 ¶ 14). Deputy DiPietro was participating in the operation, which he understood to be focused on "a church parking lot that had day laborers working from it or being picked up by people." (Doc. 413, Ex. 4 at 46, ln 22–25). Officers of the HSU who were monitoring the church contacted Deputy DiPietro and told him to follow the vehicle Ortega-Melendres had entered and attempt to develop probable cause to stop it. (Doc. 413, Ex. 1 ¶ 15). DiPietro followed the truck for a mile and a half, and then pulled it over for traveling above the speed limit. (Doc. 422 ¶ 177). DiPietro spoke to the driver of the vehicle and to the passengers, and formed, in his own words, "reasonable suspicion from that they were day laborers and here illegally." (Doc. 413, Ex. 4 at 49, ln 18–20). When asked whether he believed that the passengers had committed any state crime, he stated, "I'm not sure what the employer sanction laws and when they came into effect or not. But I had reason to believe that they were here illegally." (Doc. 413, Ex. 4 at 49–50).[11] When asked specifically if he was concerned about human smuggling, he stated, "There was a concern of—when I found out that this church was doing this, you know, allowing day laborers to be worked out, there's a *possibility* that it *could have been* some type of human smuggling type of—some type of criminal activity *could have been* going on out of that parking lot." (Doc. 413, Ex. 4 at 120, ln 6–11) (emphasis added). DiPietro decided not to give the driver of the vehicle a traffic ticket, and summoned Deputy Rangel, who was 287(g) certified and spoke Spanish, to investigate the immigration status of the passengers of the truck, including Ortega-Melendres. (Doc. 413, Ex. 1 ¶¶ 20–22). Defendants and Plaintiffs agree that Melendres

---

[11] As discussed above, Arizona's employer sanctions law contains no provision for penalties of any sort levied on employees, rather than employers, and specifically exempts independent contractors from its definition of "employee." *See* A.R.S §§ 23-211, 212, 212.01.

provided Rangel with his tourist visa, but disagree as to whether he also provided his I-94 form. (Doc. 456 ¶ 26). The driver was allowed to leave with a warning.[12] (Doc. 422 ¶ 178). After between fifteen and twenty-one minutes of questioning, Ortega-Melendres and the other passengers were taken to an MCSO substation, where they were detained for roughly two hours, and then transported to an ICE Detention and Removal Office, where Ortega-Melendres was held for six more hours. (Doc. 453 ¶ 185). After he was seen by an ICE agent, Ortega-Melendres was released. (Doc. 453 ¶ 184).

It is not clear from the record that the HSU officers who first radioed Deputy DiPietro were themselves certified under the 287(g) program to enforce federal immigration law. Assuming that they were, they would only have had reasonable suspicion to stop the vehicle if the facts and reasonable inferences drawn from those facts could "reasonably warrant suspicion that the vehicles contain[ed] aliens who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884. They did not stop the vehicle themselves, and instead requested that Deputy DiPietro do so.

Defendants assert that in training 287(g) officers, ICE informs them that race or apparent ancestry may be used as one factor in evaluating whether officers have reasonable suspicion to stop an individual, although it cannot be considered the sole factor. (Doc. 452 at 15; Doc. 453, Ex. 9 at 19, ln 10–21). Whether or not such information is provided by ICE to local law enforcement officers during their 287(g) training, the law in the Ninth Circuit is clear: "Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens." *Montero-Camargo*, 208 F.3d at 1134. Defendants cite *Montero-Camargo* for the proposition that the courts do not "preclude the use of racial or ethnic appearance as one factor relevant to reasonable suspicion or probable cause," but

---

[12] To the extent that Defendants now assert that Deputy DiPietro detained Orgeta Melendres pursuant to his authority to enforce Arizona's human smuggling statute, they offer no explanation why he did not also detain the driver for violating that same statute.

fail to quote the sentence in its entirety, which limits this use to "when a *particular suspect* has been identified as having a *specific racial or ethnic appearance*." *Id.* at 1134 n.21 (emphasis added). Defendants at no time claim that Ortega-Melendres matched a particular description of a suspect of any specific crime before his vehicle was stopped. Assuming that Ortega-Melendres was dressed as a member of a work crew, his appearance would be inadequate to justify a stop. *Manzo-Jurado*, 457 F.3d at 932.

In addition to his dress and his appearance, Ortega-Melendres gathered at an area where day laborers were known to congregate and entered a vehicle with others from the same location. The Ninth Circuit has yet to consider whether this type of behavior provides officers with reasonable suspicion to investigate immigration status, and it is not necessary to consider that question in this Order. The HSU officers who observed Ortega-Melendres enter the vehicle did not stop the vehicle themselves to determine his immigration status; rather they requested that Deputy DiPietro follow the vehicle and develop probable cause to stop it.

Deputy DiPietro stopped the vehicle for traveling 34 miles per hour in a 25 mile per hour zone, but Plaintiffs' claim does not rest on whether he had probable cause to effect the initial traffic stop. DiPietro himself acknowledges that he dismissed the driver but called Deputy Rangel to investigate the immigration status of the vehicle's passengers because "I had reasonable suspicion . . . that they were day laborers and here illegally." (Doc. 453, Ex. 13 at 49, ln 18–21). In their original briefing on the pending motion, Defendants conceded that "Deputy DiPietro had no reason to believe that any passengers of the truck had committed any violation of criminal law." (Doc. 453 ¶ 176). In their supplemental briefing, however, in which the Court asked them to respond to specific questions concerning Plaintiffs' Fourth Amendment claims, they now assert that DiPietro had formed a reasonable suspicion that Ortega-Melendres had violated the human smuggling statute and was

1  conspiring to smuggle himself.[13] Even assuming that Ortega-Melendres's behavior or

2  DiPietro's conversation with the driver provided reasonable suspicion that Ortega-Melendres

3  was in the United States without authorization, no evidence has been offered suggesting that

4  DiPietro had reasonable suspicion that any other elements of a federal or state crime had been

5  satisfied. *See Martinez-Medina*, ___ F.3d ___, 2011 WL 855791, at *6 (2011). Previous

6  undercover work by MCSO had revealed no evidence of human smuggling or drop houses,

7  and there is no evidence to suggest probable cause that Ortega-Melendres had previously

8  been transported for profit or commercial purpose. (Doc. 433, Ex. 139). DiPietro's statement,

9  based on no evidence in the record, that the church might possibly have been engaged in

10  human smuggling or other undefined criminal activity, constitutes merely a "inchoate and

11  unparticularized suspicion or 'hunch'" and did not objectively provide him reasonable

12  suspicion that Ortega-Melendres in particular was committing, or conspiring to commit, any

13  crime. *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27).

14        Further, that the stop itself may have been justified did not provide reasonable

15  suspicion to detain Ortega-Melendres. Officer DiPietro was justified under *Whren* in

16  stopping the car, and was permitted to question the driver without reasonable suspicion so

17  long as he did "not unreasonably prolong the duration of the stop." *Turvin*, 517 F.3d at 1099.

18  During that questioning, however, "unless the detainee's answers provide the officer with

19  probable cause to arrest him, he must then be released." *Berkemer*, 468 U.S. at 439–440.

20        Defendants argue that "it was completely proper for MCSO deputies to make traffic

21  stops of motorists under Arizona law and then call for a 287(g) certified deputy to determine

22

23        [13] To the extent that they also claim, relying on *Martinez-Medina*, that Deputy

24  DiPietro could have reasonably concluded that unauthorized presence in the United States

25  is a crime, DiPietro's reasonable but wrong belief would be relevant only in determining

26  whether to afford him qualified immunity in a suit for damages. Whether he in fact violated

27  the Fourth Amendment is a purely objective question. *See Whren*, 517 U.S. 806, 813

   (discussing cases that "foreclose any argument that the constitutional reasonableness of

   traffic stops depends on the actual motivations of the individual officers involved").

28        - 22 -

if someone in the stopped vehicle might be unlawfully in the country." (Doc. 452 at 11). For this proposition, they cite to the deposition of Alonzo Pena, the Special Agent in Charge for ICE Phoenix. In his deposition, however, Special Agent Pena states that a local officer may call a federal or 287(g) officer to check a detainee's immigration status, but "that he has to have the legal basis to detain that person on his own state charges." (Doc. 453, Ex. 1 at 98, ln 8–9). Of course, state officers may summon federal officers to investigate the immigration status of those who have been convicted of state crimes. A.R.S. § 11-1051(C)–(F). However, MCSO had no legal basis under state criminal law on which to detain Ortega-Melendres or the other passengers while Deputy DiPietro called Deputy Rangel, nor to detain Ortega-Melendres once MCSO allowed the driver to leave. Passengers in a vehicle are technically seized when the vehicle is stopped, and thus may challenge a stop under the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 259 (2007). Any argument, however, that the probable cause used to stop the vehicle provided DiPietro with reasonable suspicion to detain and investigate the passengers in that vehicle is pure bootstrapping. *Id.* at 413 ("There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers."). DiPietro had no reasonable suspicion that Ortega-Melendres and the other passengers were committing, or probable cause that they had committed, any state or federal crime.

DiPietro's stated reason for detaining the passengers was that he suspected that they were in the country without authorization. As a 287(g) certified officer, he had the authority to detain them if this suspicion was reasonable. 8 U.S.C. § 1357(g). Certain material facts that would resolve this question are currently still in dispute. For example, the parties dispute whether the driver provided DiPietro with information adequate to support reasonable suspicion that Ortega-Melendres was not in the country legally, and they dispute whether Ortega-Melendres produced documentation verifying his status to Deptuy Rangel. (Doc. 413, Ex. 1 ¶ 18; Doc. 456 ¶ 26). Therefore, summary judgment in favor of Ortega-Melendres is appropriate to the extent that it enjoins MCSO from detaining persons for further

1430

1    investigation without reasonable suspicion that a crime has been or is being committed. On

2    Ortega-Melendres's underlying claims, however, granting either party summary judgment

3    would be inappropriate at this juncture.

4    **2. Plaintiffs Jessika and David Rodriguez–Claims Two and Three**

5    On December 7, 2007, David and Jessika Rodriguez were driving on Bartlett Dam

6    Road when they were stopped by Deputy Matthew Ratcliffe of the MCSO. (Doc. 422 ¶

7    186–87). The road had been closed by the Maricopa County Department of Transportation

8    and a "Road Closed" sign had been posted on it. (Doc. 413, Ex. 1 ¶ 40; Doc 413, Ex. 9). Mr.

9    and Mrs. Rodriguez claim that they approached in a manner that would not have allowed

10   them to see the sign. (Doc. 453 ¶ 189). Deputy Ratcliffe pulled over the vehicle. (Doc. 422

11   ¶ 187). Although the parties disagree as to whether Deputy Ratcliffe asked Mr. Rodriguez

12   for his social security card, it is undisputed that he issued Mr. Rodriguez a citation. (Doc. 453

13   ¶ 193). Deputy Ratcliffe had stopped other vehicles that day; he states that he turned the

14   drivers over to the Tonto National Forest Rangers, while Mr. and Mrs. Rodriguez state the

15   other drivers were only given warnings, not citations. (Doc. 453 ¶¶ 197–98).

16   Since the Rodriguezes were driving on a road that had been closed by the Department

17   of Transportation, Deputy Ratcliffe had probable cause to stop them, whether or not they had

18   seen the sign. *See Wren*, 517 U.S. at 810. For the purposes of Defendants' motion for

19   summary judgment, it must be assumed that Deputy Ratcliffe asked the Rodriguezes for a

20   social security card, not merely for a social security number as Defendants allege. (Doc. 456

21   ¶ 52). Furthermore, for the purposes of this motion, Plaintiffs' claim that requesting a social

22   security card or number is not standard practice within MCSO when issuing traffic citations

23   may be presumed. (Doc. 422 ¶ 195). Nevertheless, when a traffic stop is supported by

24   probable cause, "whether the officer's conduct deviated materially from usual police

25   practices" is immaterial for the purposes of Fourth Amendment analysis. *Wren*, 517 U.S.

26   at 814. The MCSO's *Arizona Traffic Ticket and Complaint* form has a space in which to

27   enter a suspect's social security number, and a social security card is a commonly understood

28

document for verifying that number. (Doc. 413, Ex. 7). Plaintiffs offer no evidence suggesting that the Rodriguez stop took any longer than it would have had Deputy Ratcliffe not requested the card. Their claim that Deputy Ratcliffe enforced the traffic laws selectively in choosing their vehicle to stop and ticket does not bear on the Fourth Amendment analysis. *Whren*, 517 U.S. at 813. Moreover, their claim that Deputy Ratcliffe followed their vehicle after issuing a summons does not state a Fourth Amendment claim, since people "traveling in an automobile on public thoroughfares ha[ve] no reasonable expectation of privacy in [their] movements from one place to another." *U.S. v. Knotts*, 460 U.S. 276, 281 (1983).

Therefore, partial summary judgment in favor of the Rodriguezes is appropriate to the extent that in enjoins MCSO from detaining persons for further investigation without reasonable suspicion that a crime has been or is being committed. On their remaining underlying claims, however, the Court grants summary judgment to Defendants.

### 3. Plaintiffs Manuel Nieto and Velia Meraz–Claims Two and Three

On March 28, 2008, MCSO officers were conducting special operations in North Phoenix. (Doc. 453 ¶ 200). On that date, Manuel Nieto and Velia Meraz drove into a convenience store where MCSO Deputy Charley Armendariz was standing by another vehicle that he had stopped. (Doc. 422 ¶ 201). Plaintiffs and Defendants disagree about the details of the encounter between Armendariz, Nieto, and Meraz, but agree that Deputy Armendariz ordered Nieto and Meraz to leave and that he radioed for backup. (Doc. 453 ¶ 202). By the time backup officers arrived, Nieto and Meraz had in fact left the vicinity of the convenience store. (Doc. 453 ¶ 203). The backup officers pursued Nieto and Meraz's vehicle, which pulled into the parking lot of a nearby auto repair shop owned by Nieto's father. (Doc. 456 ¶ 87). Plaintiffs and Defendants dispute much of what Nieto, Meraz, and the officers did during the course of this second encounter, but agree that Deputy Michael Kikes forcibly removed Mr. Nieto from the vehicle and handcuffed him while checking his identification. (Doc. 453 ¶ 212). Mr. Nieto was released from custody without being charged. (Doc. 453 ¶ 213).

1    Summary judgment on Nieto and Meraz's claim would be improper because many
2    material facts are in dispute. (Doc. 456 ¶¶ 70–72, 74–83, 87, 92). Defendants and Plaintiffs
3    disagree about Nieto and Meraz's behavior when they first pulled into the convenience store
4    near Deputy Armandariz. (Doc. 456 ¶¶ 70–72). They disagree about whether Nieto and
5    Meraz immediately obeyed Deputy Armandariz's order to leave the area. (Doc. 456 ¶¶
6    74–76). They disagree about the nature of the later stop by Deputy Kikes and about Nieto's
7    behavior before he was forcibly removed from the vehicle. (Doc. 456 ¶¶ 87, 92). The parties
8    offer drastically different versions of the stop, each supported by deposition testimony. The
9    disputed facts are material to the question of whether the MCSO officers had probable cause
10   for the initial stop, whether they had probable cause to remove Nieto from the car, and
11   whether they had probable cause to handcuff him.

12    Therefore, partial summary judgment in favor of Nieto and Meraz is appropriate to
13   the extent that in enjoins MCSO from detaining persons for further investigation without
14   reasonable suspicion that a crime has been or is being committed. On their underlying claims,
15   however, granting either party summary judgment would be inappropriate at this juncture.

16    **B. Discrimination Claims–Counts One and Four**

17    Just as Plaintiffs needed to demonstrate standing to seek injunctive relief on their
18   Fourth Amendment Claims, so too must they demonstrate a "sufficient likelihood" that their
19   Equal Protection rights will be violated again in order to seek equitable relief on Claim One
20   and Claim Four. *Lyons*, 461 U.S. at 111. Courts have consistently held that a racially
21   discriminatory law enforcement policy constitutes ongoing harm, and thereby supports
22   standing to seek an injunction. *See LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985);
23   *Thomas v. Cty of L.A.*, 978 F.2d 504, 508 (9th Cir. 1992); *Rodriguez v. California Highway*
24   *Patrol*, 89 F. Supp. 2d 1131 (N.D. Cal. 2000); *Committee for Immigrant Rights of Sonoma*
25   *v. Cty. of Sonoma*, 644 F. Supp. 2d 1177 (N.D. Cal. 2009). Plaintiffs demonstrate a sufficient
26   likelihood that they will again be wronged when they "do not have to induce a police
27   encounter before the possibility of injury can occur" because stops are the result of an

28    - 26 -

"unconstitutional pattern of conduct." *LaDuke*, 762 F.2d at 1326. Injunctive relief is appropriate when plaintiffs show that police misconduct "is purposefully aimed at minorities and that such misconduct was condoned and tacitly authorised by department policy makers." *Thomas*, 978 F.2d at 508. A plaintiff challenging law enforcement policies on Equal Protection grounds must show "both that the . . . system had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. U.S.*, 470 U.S. 598, 608 (1985); *see also Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."). Likewise, Title VI authorizes a private right of action only in cases involving intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Consideration of race need not be the "dominant or primary" purpose of a policy for it to be discriminatory. *Arlington Heights*, 429 U.S. at 265. Instead, a finder of fact must determine whether a discriminatory purpose was "a motivating factor" in the policy. *Id.* at 266. Plaintiffs may demonstrate that a policy was intentionally discriminatory if they can show that it "was based in part on reports that referred to explicit racial characteristics." *Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (Kennedy, J.). Frequent stops of minorities can serve as evidence of a discriminatory policy, but the Ninth Circuit has held that a single stop, even if discriminatory, does not alone provide sufficient evidence of a discriminatory policy to support standing to seek an injunction. *Hodgers-Durgin v. de la Vina*, 199 F. 3d 1037, 1044 (9th Cir. 1999).

Plaintiffs here provide evidence from which a finder of fact could conclude that MCSO racially profiles Latinos. Sheriff Arpaio has made public statements that a fact finder could interpret as endorsing racial profiling, such as stating that, even lacking 287(g) authority, his officers can detain people based upon "their speech, what they look like, if they look like they came from another country." (Doc. 426, Ex. 4 at 274). Moreover, he acknowledges that MCSO provides no training to reduce the risk of racial profiling, stating "if we do not racial profile, why would I do a training program?" (Doc. 426, Ex. 4 at 41).

1    In addition, Sheriff Arpaio keeps a file containing letters and news clippings that a

2    reasonable fact finder could determine advocate or support racial profiling. Sample

3    sentiments include, "Stopping Mexicans to make sure they are legal is not racist," "If you

4    have dark skin, then you have dark skin! Unfortunately, that is the look of the Mexican

5    illegal," and a person who stated that her mother, who had been profiled during World War

6    II, believed that profiling was "the right thing to do." (Doc. 427, Exs. 22, 23, 36). Arpaio

7    wrote personal thank-you letters to a number of the authors. (Doc. 435, Exs. 184–85 ). In

8    addition, the file contains clippings of letters to the editors of local papers advocating racial

9    profiling that included the following statements: "Call it 'racial profiling' but if there are 12

10   million illegals that fit a 'profile' then it is what it is," "I'd say they should be looking for

11   Mexicans," and "Hooray for profiling." (Doc 427, Ex. 18; Doc. 428, Ex. 37). Arpaio also

12   underlined key phrases in an email regarding this case which referred to the Honorable Mary

13   Murguia, the original judge in this matter, as "the 'token' Hispanic female judge that sits in

14   your so-call [*sic*] 'federal' court in Sand Land," and suggested that she had made rulings in

15   this case in exchange for "Dinero? Favors? Human smuggling money?" He ordered three

16   copies of the email made for himself, and had it forwarded to four other staff members. (Doc.

17   427, Ex. 16).

18   The available documentary evidence could further lead a reasonable finder of fact to

19   conclude that MCSO's special operations were conducted in response to citizen requests that

20   it engage in law enforcement operations based on race. The department received a number

21   of citizen communications asking MCSO to conduct special operations in places where the

22   writers described Latinos congregating, but did not provide evidence of a crime. (Doc. 428,

23   Exs. 25–26, 28). The letters were forwarded, sometimes by Sheriff Arpaio, to people who

24   planned the special operations, among them Chief Brian Sands, with annotations that

25   included phrases such as "for our operations," and "I will be going to Mesa." (*Id.*). MCSO

26   subsequently conducted special operations in the areas described by the letter writers and the

27   Sheriff's annotations. (Doc. 453 ¶¶ 65–68). Chief Sands stated in a deposition that if Sheriff

28

- 28 -

Arpaio instructed him to conduct special operations in a particular location, he would do so. (Doc. 453, Ex. 14 at 75, ln 17). In addition, MCSO officers, including officers associated with the special operations, circulated emails that compared Mexicans to dogs, ridiculed stereotypical Mexican accents, and portrayed Mexicans as drunks. ( Doc. 431, Exs. 96, 103, 105). From the totality of this evidence, along with the adverse inferences that the finder of fact will be permitted to make at trial, it would be possible for a fact finder to conclude that the MCSO engaged in an intentional policy of racial discrimination.

A finder of fact here could determine that MCSO engaged in a policy that had both a discriminatory effect and a discriminatory intent. Defendants challenge Plaintiffs' expert report supporting discriminatory effect, but fail to show that no reasonable fact finder could credit it. (Doc. 424; Doc. 453 ¶ 233). If a fact finder determines that MCSO had a policy of conducting special operations solely in response to citizen complaints that referred to racial characteristics rather than reports of crime, as it could based on this evidence, MCSO engaged in intentional discrimination. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *see also U.S. v. City of Yonkers*, 96 F.3d 600, 612 (2nd Cir. 1996) ("Even assuming . . . that the actions of the municipal officials are only responsive . . . the Equal Protection Clause does not permit such actions where racial animus is a significant fact or in the community position to which the city is responding."). *Cf. Watkins v. U.S. Army*, 875 F.2d 699, 730 (9th Cir. 1989) ("[E]qual protection doctrine does not permit notions of majoritarian morality to serve as compelling justification for laws that discriminate against suspect classes.").

Further, if a fact finder determines the MCSO operations were conducted based upon the citizen emails and as described publicly by Sheriff Arpaio even after MCSO lost its 287(g) authority, Plaintiffs would not be able to prevent being stopped by "conduct[ing] their activities within the law." *Lyons*, 461 U.S. at 103. They could invite investigation by speaking Spanish in restaurants, by dressing like "day laborers," or by looking like "they

1    came from another country." (Doc. 428, Exs. 25–26, 28; Doc. 426, Ex. 4 at 274, ln 23).

2    Moreover, the fact that the individual Plaintiffs have not been stopped again during the

3    course of this litigation does not preclude standing to seek injunctive relief. In *Hodgers-*

4    *Durgin*, the plaintiffs drove "every day" through a region in which INS officers were

5    patrolling "all over the place." 199 F.3d at 1044. They lacked standing not because they had

6    only been stopped once in ten years, but more precisely because a single stop provided no

7    evidence that INS had a policy of racial profiling. *Id.* They had produced no additional

8    evidence that INS racially profiled anyone, and the single stop, even if improper, did not

9    demonstrate that a policy existed. As discussed above, Plaintiffs here have presented

10   sufficient evidence aside from the stops themselves.

11          If such a policy exists, it presents a "sufficient likelihood" that the named Plaintiffs

12   will suffer ongoing harm. Continued, ongoing harm results from "a pattern or practice of

13   constitutional violations or policies promoting constitutional violations, including racial

14   profiling."*Committee for Immigrant Rights*, 644 F. Supp. 2d at 1195 (N.D. Cal 2009); *see*

15   *also Thomas*, 978 F.2d at 508. The named Plaintiffs have standing to seek injunctive relief

16   for their Equal Protection claims.

17          Given the fact that the Plaintiffs involved in the stops have standing, it is not

18   necessary to determine whether Somos America has standing as well. "The general rule

19   applicable to federal court suits with multiple plaintiffs is that once the court determines that

20   one of the plaintiffs has standing, it need not decide the standing of the others." *Preminger*

21   *v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008) (quoting *Leonard v. Clark*, 12 F.3d 885, 888 (9th

22   Cir. 1993)).

23          The fact that Plaintiffs have demonstrated that there is a genuine issue of material fact

24   as to whether MCSO has a racial profiling policy not only grants them standing, but

25   precludes a finding in favor of Defendants' summary judgment motion with regards to Claim

26   One and Claim Four. However, it would be equally improper to find for Plaintiffs at this

27   stage. Defendants allege that they do not consider race when making traffic stops or deciding

28                                          - 30 -

where to conduct special operations. Both Chief Sands and Lieutenant Sousa state that the operations are conducted based upon multiple criteria, including crime data, rather than solely on citizen complaints. (Doc. 453, Ex. 14 at 79, ln 14–22; Doc. 453, Ex. 5 at 88, ln 17–22). While the deposition statements by MCSO deputies that they had alternate reasons for conducting operations cannot form the sole basis for granting summary judgment in their favor, *Villiarimo*, 281 F.3d at 1061 (no genuine issue exists when "the only evidence presented is uncorroborated and self-serving testimony") (internal quotations omitted), intent to discriminate is required to establish an equal protection violation, and the states of mind of MCSO officers is therefore relevant to Claims One and Four. The officers' statements about their intent raise sufficient issues of material fact to defeat Plaintiffs' motion for summary judgment. Lieutenant Sousa, for example, claims that complaints of people stepping into the street and littering, while not mentioned in the MCSO's undercover investigation of the Cave Creek church, were relevant factors in deciding to conduct special operations there on September 27, 2007. (Doc. 453, Ex. 5 at 100, ln 8–13). Determining whether MCSO was relying in some degree upon the citizen complaints that contained no description of criminal activity, and therefore had a policy of racial discrimination, "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Such an inquiry is best conducted by a finder of fact at trial, not by the court at summary judg2ment. *See Sluimer v. Verity, Inc.*, 606 F. 3d 584, 587 (9th Cir. 2010) ("Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are . . . not those of a judge . . . ruling on a motion for summary judgment.") (quoting *Anderson*, 477 U.S. at 255).

### C. Class Certification

Plaintiffs move for class certification on all of their claims. A class may not be certified unless it meets each of the four requirements of Rule 23(a), ordinarily referred to as numerosity, commonality, typicality, and adequacy of representation. FED. R. CIV. P. 23(a). In addition, a class action must satisfy at least one of the three requirements of Rule 23(b), one

- 31 -

of which is that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate regarding the class as a whole." FED. R. CIV. P. 23(b)(2). The party seeking certification bears the burden of demonstrating that it has met all of these requirements, and "the trial court must conduct a 'rigorous analysis'" to determine whether it has met that burden. *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996)). Defendants claim that class certification is not appropriate because Plaintiffs lack standing to seek injunctive relief and because their claims fail as a matter of law. (Doc. 444 at 6–7). As discussed above, the named Plaintiffs have established that they have standing to seek injunctive relief on their Search and Seizure claims because MCSO has publicly stated that it may stop persons based solely on a belief that they are not legally present in the country, and on their Equal Protection claims because they have brought forth evidence suggesting that MCSO engages in a policy or practice of racial profiling. *LaDuke*, 762 F.2d at 1326. Should it be determined after trial that Plaintiffs lack standing to seek injunctive relief on any claim, the class may then be de-certified or partially de-certified. FED. R. CIV. P. 23(c)(1)(C).

Defendants do not dispute that Plaintiffs' proposed class is sufficiently numerous, but claim that Plaintiffs have not demonstrated commonality, typicality, or adequacy of representation. (Doc. 444 at 7–13). They further claim that Plaintiffs have not demonstrated that the class satisfies the requirements of Rule 23(b)(3). (Doc. 444 at 13–14). Finally, Defendants claim that the proposed class is overbroad. (Doc. 444 at 14–16).

To satisfy the commonality prong, class members need not allege that they "have all suffered a violation of the same provision of law," but their claims "must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Although the factual circumstances of the individual stops involving the named Plaintiffs differ, they claim generally that MCSO has a policy of racial profiling, in violation of the Fourteenth

1  Amendment, which leads officers to detain individuals without reasonable suspicion that they

2  committed a crime, in violation of the Fourth Amendment. (Doc. 26 ¶ 2–4). In a civil rights

3  suit, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy

4  that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th

5  Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005)

6  (citing *LaDuke*, 762 F.2d at 1332). As other courts have noted, commonality in cases alleging

7  racial profiling is satisfied when "the injuries complained of by the named plaintiffs allegedly

8  resulted from the same unconstitutional practice or policy that allegedly injured or will injure

9  the proposed class members." *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y.

10  2001).

11      Likewise, differences in the subjective motivations between MCSO officers conducting

12  stops does not defeat typicality of claims alleging a departmental policy of violating

13  constitutional rights, whether under the Fourth or the Fourteenth Amendments. "In assessing

14  typicality, the court considers 'the nature of the claim or defense of the class representative,

15  and not . . . the specific facts from which it arose or the relief sought.'" *Winkler v. DTE, Inc.*,

16  205 F.R.D. 235, 241 (D. Ariz. 2001) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

17  508 (9th Cir. 1992)). Defendants further argue that the individual claims are subject to unique

18  defenses because some officers were acting pursuant to their authority under 287(g) of the

19  INA. (Doc. 444 at 12). It is true that state officers acting pursuant to 287(g) "shall be

20  considered to be acting under color of Federal authority for purposes of determining the

21  liability, and immunity from suit, of the officer or employee in a civil action brought under

22  Federal or State law," but acting under color of federal law does not provide them an adequate

23  defense to alleged Constitutional violations. 8 U.S.C. § 1357(g)(8) (2006); *see generally*

24  *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388

25  (1971). At any rate, no MCSO officer has had 287(g) authority since October of 2009, and

26  none could assert this defense going forward; since Plaintiffs seek only prospective relief,

27  these potential defenses are irrelevant. Moreover, MCSO concedes that it believes it has legal

28

authority to detain persons, if only briefly, to investigate possible criminal violations based only on a reasonable suspicion that they may be in the country without authorization. Plaintiffs' claims that they were and continue to be subject to an unconstitutional practice or policy by MCSO are typical of class members' claims.

Representation is adequate when named plaintiffs will pursue the action vigorously on behalf of the class and when they have no conflicts of interest with other class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Defendants claim that Plaintiffs have a conflict of interest because "the named Plaintiffs lack standing; they lack a valid Fourth Amendment claim under the facts presented; and they lack a valid intentional discrimination claim." (Doc. 444 at 13). These substantive arguments are addressed elsewhere in this order, and they lack merit. The failure of the Rodriguezes' underlying Fourth Amendment claim does not create a conflict of interest with putative class members, especially when they, like other named representatives, argue that MCSO does not have authority to stop people to the extent that MCSO asserts. Defendants do not challenge Plaintiffs' contention that they will prosecute the case vigorously and on behalf of the class. Plaintiffs have met the requirements of Rule 23(a).

Plaintiffs may seek certification under Rule 23(b)(2) "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 131 S.Ct. at 2557. The rule does not require, as does Rule 23(b)(3), that common issues of law and fact "predominate," but only that class members "complain of a pattern or practice that is generally applicable to the class as a whole." *Walters v, Reno*, 145 F.3d 1032, 1047 (9th Cir. 1988). Moreover, "[e]ven if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Id.* Plaintiffs have alleged a prototypical Rule 23(b)(2) suit, one in which a single injunction or declaratory judgment would provide all class members relief from MCSO's allegedly unconstitutional policy. *Wal-Mart*, 131 S.Ct at 2257. Defendants do not challenge Plaintiffs' argument that class certification is proper under Rule 23(b)(2), but instead claim that Plaintiffs have not met the

1   predominance requirement of Rule 23(b)(3). This rule, however, is not applicable to the

2   nature of the class sought to be certified. *Walters*, 145 F.3d at 1047 ("Although common

3   issues must predominate for class certification under Rule 23(b)(3), no such requirement

4   exists under 23(b)(2)."). Plaintiffs have demonstrated that their proposed class meets the

5   requirements for certification.

6        Finally, Defendants challenge the class as overbroad. (Doc. 444 at 14–16). The rule

7   that class definitions not be overbroad is "designed to protect absentees." *Amchem Prods.,*

8   *Inc. v. Windsor*, 521 U.S. 591, 620 (1997). When a class is certified under Rule 23(b)(2),

9   notice need not be given to individual class members, and members do not have the

10  opportunity to "opt-out" of the litigation. FED. R. CIV. P. 23(c)(2). There remains a risk after

11  a Rule 23(b)(2) certification, therefore, that "individuals who may never learn of the

12  pendency of [the] case might encounter difficulty in pursuing meritorious individual

13  litigation in the future, on the basis of *lis pendens*, *res judicata*, or collateral estoppel." *Rice*

14  *v. City of Philadelphia*, 66 F.R.D. 17, 21 (E.D. Pa. 1974). Regarding the equitable relief

15  sought by Plaintiffs in Count One and Count Four, such concerns are mitigated and "it is

16  usually unnecessary to define with precision" the members of a 23(b)(2) class. *Id.* at 19; *see*

17  *also Crawford v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994) ("In a Rule 23(b)(2) class

18  action for equitable relief, the due process rights of absent class members generally are

19  satisfied by adequate representation alone.").

20       The Fourth Amendment class, however, presents an overbreadth issue that the Equal

21  Protection class does not. In considering the preclusive effect of class actions, "the general

22  rule is that a class action suit seeking only declaratory and injunctive relief does not bar

23  subsequent individual damage claims by class members, even if based on the same events."

24  *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996). Here, however, Ortega-Melendres was

25  originally seeking damages in addition to injunctive relief, and only dropped his damages

26  claims in the amended complaint. (Doc. 1 at 20; Doc. 26 at 29–30). Since class members may

27  not opt-out of a 23(b)(2) class, individuals who may have legitimate damages claims against

28                                            - 35 -

MCSO for violating the Fourth Amendment could potentially face difficulty pursuing their claims because courts could find that the class members' initial damages claims may be *res judicata* to their suit. No class member other than Ortega-Melendres ever sought damages in this action. Further, the Ninth Circuit has found that class notice, rather than the original complaint, determines whether class actions certified under Rule 23(b)(2) are *res judicata* to subsequent damages claims. *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) ("[N]otice in [the earlier suit] was not sufficient under Rule 23 to preclude monetary claims in later suits, for the class in [the earlier suit] was certified and given notice as a Rule 23(b)(2) 'injunction' class action."). In other circuits, class actions that have been certified under Rule 23(b)(2), even when they contain ancillary damages claims that are ruled on in litigation, have been found not to bar subsequent damages claims by class members who were "not notified that participation in the class action would preclude a subsequent individual damage action." *Wright v. Collins*, 766 F.2d 841, 848 (4th Cir. 1985). The class in this case is being certified pursuant to Rule 23(b)(2), and at this point in the litigation no damages claims are being sought. No class is certified as to any damages claim and this litigation does not preclude future damages claims against MCSO or its officers.

In a case seeking injunctive relief, "[t]he fact that the class includes future members does not render the class definition so vague as to preclude certification." *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). Moreover, the class definition is not overbroad in a case alleging racial discrimination when the Plaintiffs, as here, "define the class by the activities of defendants." *Int'l. Molders and Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457, 464 (N.D. Cal 1983)."[14]

---

[14] The class certified in *International Molders* consisted of "all persons of Hispanic or other Latin American ancestry, residing or working within the jurisdiction of the San Francisco District Office of the United States Immigration and Naturalization Service (INS) and/or the Livermore Border Patrol Sector, who have in the past, are now, or may in the future be subjected to the policies, practices and conduct of INS and/or the Border Patrol during the course of INS area control operations directed at places of employment." 102

1  The Plaintiffs' proposed class is therefore certified as "All Latino persons who, since

2  January 2007, have been or will be in the future, stopped, detained, questioned or searched

3  by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area

4  in Maricopa County, Arizona." As in all class actions, the Court has the right to tailor or

5  amend the class definitions should future events suggest that it is appropriate to do so. FED.

6  R. CIV. P. 23(c)(1)(C).

7  **D. Motion for Sur-Reply**

8  Defendants have filed a motion for leave to file a sur-reply, claiming that Plaintiffs

9  presented new evidence in their reply supporting their partial summary judgment motion.

10  (Doc. 469). Since Plaintiffs' partial summary judgment motion has been denied, Defendants'

11  motion is dismissed as moot.

12  **E. Relief**

13  Any justification the MCSO had in detaining Ortega-Melendres relied solely on

14  DiPietro's status as a 287(g)-certified officer, a status that no MCSO officer currently has.

15  Regardless of whether federal law pre-empts specific provisions of SB 1070, "states do not

16  have the inherent authority to enforce the civil provisions of federal immigration law." *U.S.*

17  *v. Arizona*, 641 F.3d at 362. Even knowledge, let alone reasonable suspicion, that a person

18  is not legally in the country does not provide probable cause that the person has violated

19  federal criminal immigration law or state criminal law. *Martinez-Medina*, ___ F.3d at ___,

20  2011 WL 855791, at *6; A.R.S. § 13-2319(A).

21  Therefore, for the reasons previously stated, the certified class is presently entitled to

22  partial injunctive relief enjoining Defendants from detaining any person based solely on

23  knowledge, without more, that the person is in the country without lawful authority. To be

24  clear, the Court is not enjoining MCSO from enforcing valid state laws, or detaining

25  individuals when officers have reasonable suspicion that individuals are violating a state

26  _____

27  F.R.D. at 460.

28

1444

1   criminal law. Instead, it is enjoining MCSO from violating federal rights protected by the

2   United States Constitution in the process of enforcing valid state law based on an incorrect

3   understanding of the law.

4       A policy of detaining people pursuant to laws that MCSO has no authority to enforce,

5   or detaining them without reasonable suspicion that they are violating laws it can enforce

6   constitutes "continuing, present adverse effects" and therefore merits injunctive relief.

7   *O'Shea*, 414 U.S at 496. MCSO and its officers need not be enjoined from detaining

8   individuals in order to investigate civil violations of federal immigration law, because they

9   concede that they have such authority. MCSO and all of its officers are, however, enjoined

10  from detaining any person based on knowledge, without more, that the person is unlawfully

11  present within the United States. It follows of course that MCSO may not stop any person

12  based on reasonable suspicion or probable cause, without more, that the person is unlawfully

13  present within the United States. Nor may they seek to develop reasonable suspicion that a

14  person is violating state law by detaining them to ask questions in the absence of reasonable

15  suspicion that they are committing a crime.

16      While MCSO officers can, of course, continue to investigate federal and state criminal

17  law, including immigration-related criminal law, to stop people pursuant to such law, officers

18  must have reasonable suspicion that the person is violating that law, or probable cause that

19  the person has violated that law. MCSO does not have reasonable suspicion that a person is

20  violating or conspiring to violate the state human smuggling law or any other state or federal

21  criminal law because it has knowledge, without more, that the person is in the country

22  without legal authorization.

23                              **CONCLUSION**

24      Plaintiffs are granted partial summary judgment on their Fourth Amendment claims

25  to the extent that they claim MCSO's stated position that it has the authority to detain persons

26  based on reasonable suspicion, without more, that they are not legally present in the country

27  will cause them future harm. Material questions of fact exist as to whether the underlying

28                              - 38 -

1    stops of Ortega-Melendres and Nieto and Meraz were justified under the authority MCSO

2    had at the time, so summary judgment on those claims is inappropriate. The stop of the

3    Rodriguezes was objectively supported by probable cause, and was not prolonged even if

4    Deputy Radcliffe requested their social security cards, so partial summary judgment is

5    granted to Defendants on the Rodriguezes' underlying search and seizure claims.

6        Plaintiffs have demonstrated that there is a genuine issue of fact as to whether MCSO

7    engages in a policy or practice of considering race during its operations. They therefore have

8    standing to seek equitable relief for their equal protection claims, which therefore cannot be

9    dismissed at the summary judgment phase. Because the question of whether MCSO engaged

10   in a policy of intentional discrimination requires credibility determinations best suited to a

11   trial, however, Plaintiffs will also not be granted summary judgment on their equal protection

12   claims.

13       Plaintiffs have met their burden for class certification under Rule 23. The litigation

14   is certified as a class action, with the following certified class: "All Latino persons who,

15   since January, 2007, have been or will be in the future, stopped, detained, questioned or

16   searched by MCSO agents while driving or sitting in a vehicle on a public roadway or

17   parking area in Maricopa County, Arizona."

18       Since Plaintiffs' Motion for Summary Judgment is denied even considering the record

19   presented, there is no need to consider Defendants' Motion to File a Sur-Reply, which is

20   dismissed as moot.

21       MCSO acknowledges that enforcing immigration law is one of the purposes of the

22   special operations. Local law enforcement agencies, such as the MCSO, may not enforce

23   civil federal immigration law. Defendants are therefore enjoined from detaining individuals

24   in order to investigate civil violations of federal immigration law, including those "regulating

25   authorized entry, length of stay, residence status, and deportation." *U.S. v. Arizona*, 641 F.3d

26   at 362. They are further enjoined from detaining any person based on actual knowledge,

27   without more, that the person is not a legal resident of the United States.

28

**IT IS THEREFORE ORDERED:**

1) Defendants' Motion for Summary Judgment (Doc. 413) is **granted in part** and **denied in part**. Summary judgment is **granted** with regards to Plaintiffs Jessika and David Rodriguez's underlying claims under Claim Two and Claim Three, which are hereby **dismissed**. Summary judgment is **denied** with regards to the underlying claims of Plaintiffs Melendres, Nieto, and Meraz under Claim Two and Claim Three. Defendants' motion for summary judgment is **denied** with regards to Claim One and Claim Four.

2) Plaintiffs' Motion for Class Certification (Doc. 420) is **granted**. The litigation is certified as a class action, with the following defined class for the purposes of the equal protection claim: "All Latino persons who, since January, 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona."

3) Plaintiffs' Motion for Partial Summary Judgment on Claim One and Claim Four (Doc. 421) is **denied**.

4) Plaintiffs' Motion for Summary Judgment on Claim Two and Claim Three (Doc. 490) is **denied in part** as it relates to the underlying claims, and **granted in part** as it relates to future enforcement actions of the MCSO.

4) Defendants' Motion for Leave to File Sur-Reply (Doc. 469) is **dismissed as moot**.

5) MCSO and all of its officers are hereby **enjoined** from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States, because as a matter of law such knowledge does not amount to a reasonable belief that the person either violated or conspired to violate the Arizona human smuggling statute, or any other state or federal criminal law.

Dated this 23rd day of December, 2011

_A. Murray Snow_
/G. Murray Snow
United States District Judge

- 40 -



**EXHIBIT 26**

COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile:  (650) 632-4800

Stanley Young (Pro Hac Vice)
syoung@cov.com
Andrew C. Byrnes (Pro Hac Vice)
abyrnes@cov.com
*Attorneys for Plaintiffs (Additional attorneys*
*for Plaintiffs listed on next page)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | No. CV 07-2513-PHX-GMS |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Joseph M. Arpaio, et al., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | The Honorable Judge G. Murray Snow |

*Additional Attorneys for Plaintiffs:*

COVINGTON & BURLING LLP
1 Front Street
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091
Tammy Albarran (*Pro Hac Vice*)
talbarran@cov.com
Kevin Hickey (Pro Hac Vice)
khickey@cov.com
Matthew Steilen (Pro Hac Vice)
msteilen@cov.com
Lesli Gallagher (Pro Hac Vice)
lgallagher@cov.com

ACLU FOUNDATION OF ARIZONA
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376
Daniel Pochoda (021979)
dpochoda@acluaz.org
Anne Lai (330036*)
alai@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0775
Facsimile:  (415) 395-0950
Cecillia Wang (Pro Hac Vice)
cwang@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512
Facsimile:  (213) 629-0266
Nancy Ramirez (Pro Hac Vice)
nramirez@maldef.org

1449

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................1

II. FACTUAL BACKGROUND ...............................................................3

    A.  Sheriff Arpaio Announces "Crackdown" on Illegal Immigration and Begins Saturation Patrols in Effort to Get "Illegals"............................3

    B.  Sheriff Arpaio and MCSO Officers Endorse and Encourage Racial Profiling in Connection with Immigration Enforcement ........................6

    C.  The MCSO's Immigration Enforcement Activities Have Led to Discriminatory Treatment of Hispanics in Maricopa County ...............8

    D.  Hispanics are Stopped at Significantly Higher Rates During Saturation Patrols ....................................................................................................10

III. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF ON THEIR CLAIM THAT DEFENDANTS' POLICIES AND PRACTICES VIOLATE THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE.................12

    A.  Legal Standards ................................................................................12

        1.  Summary Judgment .................................................................12

        2.  Equal Protection Violations Under the Fourteenth Amendment ...........13

    B.  The Undisputed Record Shows Sheriff Arpaio and the MCSO Acted with Discriminatory Intent ........................................................................14

        1.  Sheriff Arpaio's Statements Incorporate and Endorse Explicit Calls for Targeting Hispanics in Immigration Enforcement.........................15

        2.  MCSO Saturation Patrols and Other Immigration Enforcement Operations Are Responsive To Race-Based Requests for Action.................20

        3.  The Practices Adopted by MCSO on Saturation Patrols Encouraged Racial Profiling ..............................................................................24

        4.  MCSO's Failure to Adequately Train and Oversee its Officers Demonstrates its Acceptance of Racial Profiling............................28

    C.  Statistical Evidence and the Stops of Putative Class Members Demonstrate that MCSO's Operations Disparately Impact Hispanics ...........31

IV. CONCLUSION................................................................................34

- - -

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Manuel de Jesus Ortega Melendres, Jessica Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr. and Somos America/We Are America (hereinafter "Plaintiffs"), on behalf of themselves and a putative class of similarly situated persons,[1] respectfully request summary judgment on the issue of liability for violations of the Fourteenth Amendment to the United States Constitution.  (*See* First Claim for Relief:  Equal Protection, First Amended Complaint at 25-26, Dkt. No. 26.)

## I.    INTRODUCTION

Under the guise of illegal immigration enforcement, Defendants Sheriff Joseph M. Arpaio and the Maricopa County Sheriff's Office (the "MCSO") have instituted a policy, pattern and practice of targeting Hispanic[2] drivers and passengers in Maricopa County during traffic stops.  In particular, Sheriff Arpaio and the MCSO have relied on race and ethnicity in the decision to conduct saturation patrols or so-called "crime suppression operations," and in the implementation of those patrols.  As a result, Hispanic drivers and passengers in Maricopa County are singled out for investigation for potential immigration violations, and are disproportionately subjected to stops, detentions, questioning, searches, and other forms of law enforcement action.  Such selective enforcement is unconstitutional.

The undisputed evidence shows that considerations of race and ethnicity have infected the MCSO's immigration enforcement operations at all levels, from the policy decisions to "go after illegals, not the crime first" and to use saturation patrols as a primary tactic in the MCSO's "crackdown," to the planning of saturation patrols by MCSO leadership based on racially charged citizen complaints, down to the systemic pattern of discriminatory traffic stops by MCSO deputies.  In the face this pattern,

---

[1] Plaintiffs concurrently bring (1) a renewed motion for class certification, based on the pattern and practice of racially discriminatory traffic stops shown herein, and (2) a motion for issue sanctions based on Defendants' prior willful destruction of relevant emails and stat sheets.

[2] Plaintiffs intend the terms "Hispanic" and "Latino" to be synonymous.

1451

Sheriff Arpaio and MCSO supervisors have refused to adopt routine law enforcement measures to protect against racial profiling.  Indeed, Sheriff Arpaio and MCSO supervisors have instead taken steps that actually *impede* the detection of discriminatory conduct.

Sheriff Arpaio's inflammatory public statements—in speeches, interviews and his own book—equate undocumented immigrants with Mexicans and Hispanics, and disparage these groups.  Sheriff Arpaio's statements are simply false as an assertion about the Hispanic population in Maricopa County, the large majority of whom are actually U.S. citizens or legal residents; they also encourage and condone racial profiling.  By his own admission, Sheriff Arpaio has also endorsed and distributed for use by his subordinates in the MCSO explicit calls for racial profiling sent to him by members of the public, asking him to take action against dark-skinned Hispanics and people speaking Spanish.  In just one example out of many, Arpaio received a letter asking him to do a "round-up" at 29th Street and Greenway in Phoenix and stating "If you have dark skin, then you have dark skin.  Unfortunately, that is the look of the Mexican illegals who are here illegally."  Rather than correct the sender or ignore the request to focus on dark-skinned people, Sheriff Arpaio, believing that the letter was relevant "intelligence," passed it on to Chief Brian Sands with a note instructing Sands, "Have someone handle this."   Sheriff Arpaio's racially explicit statements and instructions supporting race-based policing, coupled with the absence of adequate training and supervision within the MCSO, foster the unlawful use of race in the MCSO's immigration enforcement policies, especially during saturation patrols aimed at apprehending undocumented immigrants.

As a result, Plaintiffs, putative class members, and members of Plaintiff Somos America have been stopped and detained on the basis of their perceived ethnicity.  All of the named Plaintiffs are United States citizens or lawfully present in this country.  The discrimination that they have suffered is typical.  Indeed, the data that is available shows that Hispanics are stopped at significantly higher rates by MCSO during saturation

1452

patrol operations than at other times, that officers involved in saturation patrols stop Hispanics at significantly greater rates than those who are not so involved, and that, on average, stops of Hispanics lasted significantly longer than stops of non-Hispanics. Defendants' own statistical expert does not contradict these findings. This undisputed evidence of the MCSO's racially discriminatory intent, including undisputed evidence of the disparate impact of the MCSO's policies and practices, warrants summary judgment in favor of Plaintiffs on their equal protection claim.

Plaintiffs do not object to the enforcement of the immigration laws. However, the Constitution requires that such enforcement be free from racial and ethnic discrimination. MCSO's saturation patrols are unlawfully motivated by racial considerations and, both by design and in practice, target Hispanics in the hopes of finding illegal immigrants, resulting in systematic discrimination against Hispanics and those who appear Hispanic. MCSO's actions thus violate our nation's fundamental principle of equal treatment under laws, regardless of race.

## II.    FACTUAL BACKGROUND

As recounted in greater detail in the separate Statement of Facts in support of this motion ("SOF"), filed herewith pursuant to Local Rule 56.1, the undisputed facts demonstrate that MCSO has relied intentionally and unlawfully on race and/or ethnicity as a factor in saturation patrols and other immigration enforcement activities, with resulting disparate effects on Hispanics.

### A.    Sheriff Arpaio Announces "Crackdown" on Illegal Immigration and Begins Saturation Patrols in Effort to Get "Illegals"

Starting in 2006, Sheriff Arpaio announced a new focus for his over 3,000-person agency: to find and lock up "illegals." SOF 1. When he made this policy decision, Sheriff Arpaio made clear that he equated "illegals" with Hispanics generally and persons from Mexico in particular. He has stated, for example, that "the only sanctuary for illegal immigrants is in Mexico." SOF 2. In a magazine interview, Sheriff Arpaio

1453

stated that he "rarely run[s] across people other than Hispanics crossing the border illegally."  SOF 12.  Speaking at a press conference, addressing allegations that his agency was targeting Hispanics, he added, "I have to tell you something . . . . Where do you think 99 percent of the people come from?"  SOF 14.

According to Sheriff Arpaio's public statements, these Mexican and Hispanic immigrants were taking over the southwestern United States in "epidemic" proportions, bringing with them cultural disruption and disease.  SOF 18-20.  In his 2008 book, *Joe's Law: America's Toughest Sheriff Takes on Illegal Immigration, Drugs and Everything Else That Threatens America*, Sheriff Arpaio writes that Mexicans and Hispanics are different from any other immigrant group known in American history because they maintain "language[,] customs [and] beliefs" separate from the "mainstream."  SOF 16.  Sheriff Arpaio posits that Hispanics are trying to "reconquer" American soil through their migration to the United States; he distinguishes them from his own parents, who immigrated from Italy, writing, "My parents did not regard any inch of American soil as somehow belonging to Italy, so their arrival here never constituted a 'reconquest.'"  SOF 16.  Sheriff Arpaio's book describes what he does as a law enforcement official, and he admits that there is no firm line between his business as Sheriff and what he says in his book, which he actively promotes.  SOF 17.  Sheriff Arpaio has also stated that illegal immigration from Mexico is impacting "our" culture due to Mexicans' perceived "failure to assimilate," SOF 18, and has described immigrants coming over the Mexican border as "dirty" and bringing disease into the United States.  SOF 19-20.

In light of the purported threat that this group of immigrants posed, Sheriff Arpaio determined it was necessary to respond by launching a "crackdown" on illegal immigration.  SOF 3.  To implement this new priority, the Sheriff made several large-scale changes at great financial and manpower cost to his agency.  SOF 21.  First, he sought and secured an agreement with U.S. Immigration and Customs Enforcement (ICE) to cross-certify 160 of his officers to arrest persons based on a suspected violation of the federal immigration laws, pursuant to Section 287(g) of the federal immigration

1454

code.  SOF 3.[3]  Second, Sheriff Arpaio created a specialized unit within MCSO to find and arrest illegal immigrants, called the Human Smuggling Unit ("HSU").  SOF 4-5. Third, he created and advertised a hotline where citizens of Maricopa County could call with complaints about suspected illegal immigrants.  SOF 6.  And finally, as discussed in more detail below, he began conducting regular large-scale saturation patrols, known as "crime suppression operations," where deputies and posse would "saturate valley cities" in the hunt for illegal immigrants.  SOF 7, 53.

While illegal immigration was not new to law enforcement in Maricopa County, Sheriff Arpaio explicitly distinguished the MCSO's immigration enforcement program from those of other law enforcement officials:  Rather than targeting immigrants who were also criminal offenders, MCSO's program would "go after illegals, not the crime first."  SOF 8; *see also* SOF 15.  Sheriff Arpaio believes that the Hispanic illegal immigrants, "by and large" have "certain appearances," including "brown . . . skin color."  SOF 13.  They can be spotted, according to him, based on their "speech [and] what they look like."  SOF 11.  In Sheriff Arpaio's view, with his "pure program," it was possible to simply send some deputies "right down there to the main street in Mesa and arrest some illegals," SOF 9, and that is exactly what the Sheriff set out to do.

During the MCSO's high-profile saturation patrols, which commenced in 2007 and continue to this day, the agency deploys "the full resources of the Sheriff's Office" to find and arrest significant numbers of purported illegal immigrants.  SOF 7, 53. Some saturation patrols have focused on "day laborer" areas, SOF 53, 112, which makes perfect sense, since groups of Hispanic men waiting on the corner for day work are the most visible manifestation of the growing Latino population in Maricopa County.  The MCSO refers to these areas as "magnets for [] illegal aliens."  SOF 53.  During these

---

[3] In October 2009, MCSO lost this authority with respect to the enforcement of federal immigration laws in the field (the authority was retained for detention officers who process inmates in the jails).  SOF 10.  Despite the revocation of the agency's 287(g) field authority, and despite being aware of this lawsuit, MCSO has made clear that Sheriff Arpaio will not change any of his illegal immigration policies; indeed, MCSO has continued to conduct large-scale saturation patrols.  SOF 10; 225-26.

1455

operations, MCSO officers follow vehicles that appear to have picked up day laborers, develop probable cause of a traffic violation to conduct a traffic stop, and then continue the investigation from there.  SOF 117.  MCSO officers could not know if the men being picked up were illegal immigrants, or even day laborers, but believed that most day laborers were Hispanic.  SOF 113.  Indeed, Chief Sands could not think of an instance where the MCSO arrested a day laborer who was not Hispanic.  SOF 89.

The MCSO also employs the tactic of using pretextual traffic stops for minor traffic violations to screen drivers and passengers for potential violations of the immigration laws in other saturation patrols.  SOF 114-15.  The HSU still takes a lead role, preparing the operations plans and giving the briefings.  SOF 58-59.  Officers are encouraged to stop vehicles they observe violating any traffic or motor vehicle law, regardless of the seriousness or triviality of the infraction.  SOF 118.  MCSO officers testified that they could find a violation in almost every case, even within two minutes. SOF 116.   Unlike on a regular patrol, where they prioritize more serious traffic violations, MCSO officers are given wide latitude on saturation patrols to conduct traffic stops for minor violations. SOF 118, 124.   They are also encouraged to maximize contacts with drivers and passengers and request identification, including from passengers who have not committed any violation of the law.  SOF 118, 126-28.

By the end of 2009, MCSO had conducted at least 13 large-scale saturation patrols, as well as a number of smaller operations.  SOF 60-73.

**B.     Sheriff Arpaio and MCSO Officers Endorse and Encourage Racial Profiling in Connection with Immigration Enforcement**

Sheriff Arpaio's decision to launch a crackdown on illegal immigration was based on having "heard the people speak."  SOF 22.  Indeed, Sheriff Arpaio regularly receives letters and emails advocating racial profiling as an effective tool for immigration enforcement.  SOF 25, 45; *see also* SOF 27-49.  Much of this material is crude, racially and ethnically derogatory, and contains no information about criminal activity.  *Id.*   Despite its offensive content and irrelevance to any legitimate law

- 6 -

1456

enforcement purpose, Sheriff Arpaio retains this material as part of his personal "immigration file," duplicates it, and circulates endorsed copies to MCSO command staff.  SOF 25-26, 44-46; *see also, e.g.,* SOF 26-43, 47-49.

The record reveals a number of instances where Sheriff Arpaio circulated within MCSO materials expressing explicit anti-Hispanic or anti-Mexican sentiments.  SOF 44-46; *see also* 25-43, 47-49.  Examples include concerns about the destruction of the American way of life due to the influx of Hispanic immigrants, reference to Ninth Circuit Judge Mary Murguia (who previously was the district judge assigned to this case) as a "token female Hispanic judge," and a set of fabricated immigration "statistics" that present a derogatory picture of Spanish speakers and Mexicans.  SOF 44, 48-49.  In most instances, Sheriff Arpaio wrote thank-you notes in response to these materials, some of which were personalized and lengthy.  SOF 26, 45, 47.  Beyond these personal responses, Sheriff Arpaio also endorsed the sentiments in such materials by sending copies to Chief Sands and others in the MCSO's leadership.  *See, e.g.*, SOF 45-49.

Sheriff Arpaio also received and circulated to MCSO leadership materials explicitly promoting racial profiling in immigration enforcement.  SOF 26-43, 76-83, 85, 87, 93, 96-97, *see also* SOF 51.  Many of these letters include requests for Sheriff Arpaio or the MCSO to take action against individuals whom the sender apparently believes are illegal immigrants based on the color of their skin, the language they speak, or other characteristics associated with Hispanic ethnicity.  SOF 25, 27, 29, 31, 33-34, 37-43, 76, 78, 80-84, 87, 90-92, 96.  Most of these requests do not describe any actual criminal activity or trigger any need for police action.  SOF 25, 27, 29, 31-34, 37-38, 39-43, 76-78, 80-84, 97-88, 91, 96-97.  The record shows numerous instances in which Sheriff Arpaio annotated such requests and forwarded them to other members of the MCSO leadership, primarily Chief Brian Sands, who is charged with selecting sites for saturation patrol operations.  SOF 26, 28, 30, 32-33, 36-37, 39, 42-43, 74-75, 77, 79, 81-82, 85, 90, 93, 97.  In some cases, Arpaio has told his staff that the directive is "for our operation," or used similar language to indicate his intent.  SOF 79, 85, 90, 93, 97.  On

1457

several occasions, letters espousing racial antipathy were indeed followed shortly thereafter by saturation patrol operations in the areas requested.  SOF 79, 86, 91, 95, 98.

A number of MCSO officers, including officers in the HSU, and posse members also distributed inappropriate materials—emails containing offensive images targeting "Mexicans" or making exaggerated claims about undocumented immigrants or Mexicans—using their county email accounts.  SOF 145-151.  To name just two examples out of many, HSU Sergeant Palmer forwarded the same "statistics" as Sheriff Arpaio and also sent an email with an attachment entitled, "Indian yoga versus Mexican yoga" depicting a man in a yoga pose with the subtitles "Indian Yoga" "Requires years of practice to achieve," and a man who appears to be passed out from intoxication with the subtitle "Mexican Yoga" "Requires about 3-4 hours to achieve."  SOF 147-148.

## C.   The MCSO's Immigration Enforcement Activities Have Led to Discriminatory Treatment of Hispanics in Maricopa County

The treatment of the Plaintiffs in this case—and of other individuals in Maricopa County who have suffered similar harms—provide vivid examples of the impact of the MCSO's policies on Hispanics in Maricopa County.

During one of the earlier suppression patrols in September 2007, Plaintiff Manuel de Jesus Ortega Melendres was stopped by the MCSO after an undercover unit identified the vehicle he was riding in as having picked up several men who appeared to be day laborers at a church in Cave Creek.  SOF 171-72, 174-75, 177.  Prior to the patrol, the MCSO had conducted an undercover investigation at the church, but discovered no information pertaining to human smuggling, drop houses or even illegal immigration.  SOF 173.  Detectives knew only that Hispanic men were using the church to find day work.  *Id*.  Deputy Louis DiPietro, who stopped the vehicle, did not have reason to believe that any of the Hispanic passengers had committed any violation of the law (other than the fact that he believes most day laborers look Hispanic and are illegal immigrants), but he detained the passengers so that HSU Deputy Carlos Rangel could come and "check the[ir] status."  SOF 113, 176, 179, 181-82.  He did not cite or further

1458

detain the white driver of the vehicle, who was allowed to leave the scene.  SOF 178; *see also* SOF 180.  Deputy Rangel's investigation resulted in Mr. Ortega Melendres being erroneously detained for seven to eight hours before his eventual release by ICE. SOF 183-85.

Plaintiffs David and Jessika Rodriguez were also treated differently based on their ethnicity.  As the Rodriguezes were taking their children down to Bartlett Lake in December 2007, they were stopped by 287(g)-certified Deputy Matthew Ratcliffe and cited for failing to heed a "Road Closed" sign. SOF 139, 186-87, 193.  Deputy Ratcliffe issued Mr. Rodriguez a citation even though Mr. Rodriguez informed him that they must have entered the road past the point of the sign, and even though none of the other, non-Hispanic motorists driving on that same stretch of road were receiving citations.  SOF 189, 190-93; *see also* 197-98.  Deputy Ratcliffe then demanded that Mr. Rodriguez provide his Social Security number for the citation, even though MCSO policy does not require this. SOF 188, 193-196.

Plaintiffs Manuel Nieto and Velia Meraz were stopped at gunpoint during one of MCSO's large immigration saturation patrol operations in March 2008.  SOF 200, 209. After 287(g)-certified Deputy Ramon Charley Armendariz heard them advising two of his detainees to "remain silent" and "ask for a lawyer" in Spanish, he sent backup officers to pursue Mr. Nieto and Ms. Meraz though they had left the scene.  SOF 140, 201-05.  The backup officers had no reason to think that the pair were dangerous.  SOF 204-06.   Nevertheless, they pulled them over, drew their weapons, and forcefully removed Mr. Nieto from the vehicle.  SOF 207-10.  Mr. Nieto and Ms. Meraz were released without any citation or charge after deputies learned that they were U.S. citizens. SOF 211-13.

In addition to the named Plaintiffs, other putative class members have been subject to selective enforcement and aggressive police action based on their race or ethnicity. *See, e.g.,* 215-224 (detailing additional stops).  For example, Jorge Urteaga was stopped during a saturation patrol in Buckeye in January 2009.  SOF 215.  Despite

1459

having provided a valid drivers license, the officer asked him where he was from and whether he could "prove" that he was a U.S. citizen. *Id*. The citation he received for an alleged registration violation was later dismissed. *Id*. Jerry Cosio was also stopped and arrested during a saturation patrol, in July 2009 in the Southeast Valley. SOF 219. When he was waiting at a substation, he overhead the MCSO officer telling another that "he doesn't count because he's American." *Id.*

Daniel and Eva Magos were stopped in December 2009 after an officer made eye contact with Mr. Magos. SOF 216. The officer had to make a sudden U-turn to pull them over. *Id.* Mr. Magos and his wife were asked to provide identification, but Mr. Magos was told that his registration "wasn't important." *Id.* He received no citation and was eventually released, but not before the officer conducted a baseless pat down. *Id.* When he asked the officer for his badge number, even though he could have been complaining about any number of problems with the stop, the officer told him, "Don't go thinking this is racial profiling." *Id.*

Lino Garcia has been stopped multiple times in or near his neighborhood of Avondale. SOF 217. Each time, his girlfriend (who is also Hispanic) was also asked to provide identification. *Id.* Mr. Garcia was often stopped for a minor violation such as having a license plate light that was "too dark" or "too bright." *Id.* He was not cited on any occasion, but was once asked for his Social Security number. *Id.*

Sergio Martinez Villaman was stopped during a saturation patrol in June 2008 in Mesa. SOF 218. Although he provided a valid visa and an Arizona identification card, the officer still arrested him for "failure to provide ID." *Id.* Mr. Villaman's passenger was also asked whether he had identification or spoke English. *Id.* Mr. Villaman's case was never prosecuted, but he spent almost two weeks in jail. *Id.*

### D. Hispanics are Stopped at Significantly Higher Rates During Saturation Patrols

At Plaintiffs' request, Dr. Ralph B. Taylor conducted a study based on the names called into MCSO's Computer Aided Dispatch (CAD) database, which records

1460

1    information from calls by MCSO officers to central dispatch made during MCSO traffic

2    stops, to determine the ethnic composition of individuals stopped by the MCSO.  SOF

3    227-30, 233, 236.  Dr. Taylor determined whether the surname was Hispanic using data

4    from the U.S. Census on the most common Hispanic surnames, which is a generally

5    accepted technique for determining Hispanic ethnicity.  *See* SOF 234-35.  Dr. Taylor

6    focused on traffic stop activity on days in which a major saturation patrol operation was

7    conducted by MCSO ("saturation patrol days"), as compared to other, non-saturation

8    patrol control days.  SOF 237, 239-43.  He also examined the traffic stop patterns of

9    officers who were actively working on a saturation patrol, as compared to other MCSO

10   officers.  SOF 238, 244-47.

11        Dr. Taylor made three key undisputed findings:  (1) MCSO officers were more

12   likely to stop Hispanics[4] on saturation patrol days as compared to control days; (2)

13   MCSO officers assigned to saturation patrols were more likely to stop Hispanics than

14   were other MCSO officers who were not involved in saturation patrols, particularly on

15   saturation patrol days; and (3) stops involving Hispanic individuals were significantly

16   longer than stops where no Hispanic surname was called into dispatch.  SOF 239-49.

17        Comparing MCSO activity on saturation patrol days to all non-saturation patrol

18   days, Dr. Taylor found that Hispanic individuals were between 26% to 29.9%[5] more

19   likely to be stopped on saturation patrol days as compared to all other days.  SOF 241.

20   Using dates one week before and one week after a saturation patrol as controls, Dr.

21        [4] To be more precise, because of the nature of MCSO's Computer-Aided
22   Dispatch (CAD) data, Dr. Taylor looked at the names checked by MCSO officers during
     traffic stops when an MCSO officer calls a name into dispatch.  *See* SOF 235-26.  For
23   simplicity, and because Defendants' expert uses the same methods to determine the
     ethnic composition of persons stopped by the MCSO, SOF 252, this motion will refer to
24   "Hispanic persons stopped" as opposed to "Hispanic names checked" when
     summarizing Dr. Taylor's results.  Similarly, although it is possible that an individual
25   with a "Hispanic" name might not be Hispanic, and vice versa, these effects roughly
     cancel each out to produce an accurate estimate in the aggregate, SOF 234; indeed,
26   Defendants' own statistical expert relies on the same widely-used surname-based
     analysis to infer the ethnicity of persons stopped and to detect patterns in those stops.
27   SOF 252.

          [5] The percentage ranges presented depend on the particular percentage cutoff used
28   to define whether a surname is Hispanic.  *See* SOF 235.

1461

Taylor found that Hispanic individuals were 28.8% to 34.8% more likely to be stopped on saturation patrol days.  SOF 239.  When compared to control dates precisely one year before the saturation patrol day, the differences were even larger: Hispanics were 36.2% to 39.5% more likely to be stopped on saturation patrol days.  SOF 240.

Further, when analysis was limited only to the MCSO officers known to have participated in saturation patrols,[6] those actively working in a saturation patrol operation were 34.1% to 40% more likely to stop Hispanic persons as compared to officers never involved in saturation patrol operations.  SOF 244.  Looking to activity just on saturation patrol days, the MCSO officers actively working a saturation patrol operation were 46% to 53.7% more likely to stop Hispanic persons than the MCSO officers also working on those days but not involved in the saturation patrol.  SOF 245.

Dr. Taylor's report also reveals that stops where at least one Hispanic name was checked were 21% to 25% longer than stops in which no Hispanic surname was checked.  SOF 248-49.  This result controls for both the disposition of stop (e.g., whether it concludes in an arrest), and for the number of names checked during a stop.  *Id.*  All the results reported above are highly statistically significantly at the $p < .001$ level, meaning there is a less than one in a thousand odds that they could have occurred purely by chance.  SOF 242-43, 246-48.

## III.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF ON THEIR CLAIM THAT DEFENDANTS' POLICIES AND PRACTICES VIOLATE THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE

### A.   Legal Standards

#### 1.   Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Only disputes

---

[6] An MCSO officer's participation in a given saturation patrol is determined by whether the officers' name appears on MCSO's "Sign-in Roster" or "Arrest List" for the particular saturation patrol.  SOF 238.

1462

over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001) (en banc). If the movant meets its burden with a properly supported motion, the burden then shifts to the non-movant to present specific facts that show there is a genuine issue for trial. *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819-20 (9th Cir.1995). The non-movant may not rest on mere allegations and denials, but must present evidence of specific, disputed facts. *See Anderson,* 477 U.S. at 248.

### 2. *Equal Protection Violations Under the Fourteenth Amendment*

Plaintiffs assert that Sheriff Arpaio and the MCSO have applied facially neutral policies and traffic laws in an intentionally discriminatory manner against Hispanics. To succeed on a claim of selective enforcement in violation of the Equal Protection Clause, Plaintiffs must prove that the Defendants' actions "had a discriminatory effect and [were] motivated by a discriminatory purpose." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002) (citing *Wayte v. United States,* 470 U.S. 598, 608 (1985)); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). "In addition to the showing of discriminatory purpose and effect, plaintiffs seeking to enjoin alleged selective enforcement must demonstrate the police misconduct is part of a policy, plan, or a pervasive pattern." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007) (internal quotation marks and citation omitted).

To show discriminatory purpose, Plaintiff need only demonstrate that impermissible considerations, such as race or ethnicity, were one "motivating factor" in

1463

the enforcement decisions of Sheriff Arpaio and the MCSO.  *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977).  It is not required that Plaintiffs show that the challenged action rested *solely*, or even primarily, on racially discriminatory purposes.  *See id*. at 265.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266; *accord Washington v. Davis*, 426 U.S. 229, 242 (1976) (finding that discriminatory purpose "may often be inferred from the totality of relevant facts").  In *Arlington Heights*, the Supreme Court identified the following non-exhaustive list of areas of inquiry where the Court may find evidence of discriminatory intent:   (1) discriminatory impact; (2) the historical context; (3) the sequence of events leading to challenged conduct; (4) substantive and procedural departures from norms; and (5) the contemporary statements of decisionmakers.  429 U.S. at 266-68; *see also Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 547-48 (S.D.N.Y. 2006) (applying *Arlington Heights* factors to Village's campaign against day laborers).

### B.   The Undisputed Record Shows Sheriff Arpaio and the MCSO Acted with Discriminatory Intent

The undisputed facts in this case, as established through documentary evidence, deposition testimony, expert opinions, and any adverse inferences entered by the Court,[7] demonstrate that the actions of Sheriff Arpaio and the MCSO are motivated by a discriminatory purpose and have a discriminatory effect on Hispanic motorists and passengers in Maricopa County.  Sheriff Arpaio and the MCSO instituted a pattern or

---

[7] While the undisputed evidence presented herein shows discriminatory intent alone, Plaintiffs are also entitled to rely on any adverse inferences entered by the Court against the Defendants for their willful spoliation of evidence, as additional evidence further supporting that conclusion.  Those inferences include, but are not limited to, the fact that: (1) that MCSO has followed a pattern of conducting saturation patrols based on citizen complaints that describe no criminal activity and express ethnic animus; (2) MCSO's decision to "crack down" on illegal immigration is motivated by citizen communications that describe no criminal activity and express ethnic animus; and (3) MCSO's saturation patrol policies were motivated by anti-Hispanic sentiments and negative stereotypes of persons of Mexican descent.

1464

practice of selecting locations for saturation patrols based, in part, upon racially-charged citizen complaints and in an effort to target individuals of Mexican and Hispanic ethnicity, whom Arpaio publicly and explicitly equates to "illegals".   The record contains both direct and circumstantial evidence of discriminatory intent, including strong statistical evidence of discriminatory effect.

The undisputed record shows that the MCSO, led by Sheriff Arpaio: (1) launched and publicized a "crackdown" on illegal immigration in which Hispanic or Mexican individuals were targeted; (2) distributed, endorsed and acted upon materials advocating racial profiling, requesting police action based on nothing more than Hispanic appearance, and containing inaccurate and derogatory characterizations of Hispanics; (3) selected locations for saturation patrols in reliance upon such materials, specifically intending to go after Hispanics; and yet, despite these actions, (4) has done little to nothing to prevent or detect unlawful racial profiling, thereby departing from normal practices in law enforcement agencies.   Based on the undisputed evidence, the MCSO has, and continues to, act with discriminatory intent, resulting in discrimination against the named Plaintiffs and the class they represent.

### 1. Sheriff Arpaio's Statements Incorporate and Endorse Explicit Calls for Targeting Hispanics in Immigration Enforcement

As detailed above, Sheriff Arpaio's public statements and other evidence demonstrate that his immigration "crackdown" is focused on a single ethnic group—Hispanics.   *See supra* Section II.A.   Sheriff Arpaio has repeatedly equated illegal immigration with having Mexican ancestry, speaking Spanish, or being Hispanic, SOF 2, 11-14, failing to acknowledge the fact that a majority of Hispanics in Maricopa County are, indeed, not illegal immigrants.   According to him, a focus on Hispanics is justified, because "Where do you think 99 percent of the people come from?"  SOF 14.

The record demonstrates that Sheriff Arpaio's decision to fundamentally shift his agency's priorities in the direction of immigration enforcement was made "because of" its adverse effects on Hispanics, not "in spite of" them.   *McKlesky v. Kemp*, 481 U.S.

1465

279, 298 (1987) (internal quotation and citation omitted).  The historical backdrop of his decision, the growing resentment of Hispanics among Sheriff Arpaio's constituency, and Arpaio's contemporaneous statements provide ample insight into his discriminatory purpose.  *See Arlington Heights*, 429 U.S. at 266-68.

When Sheriff Arpaio announced his unprecedented "crackdown," he stated that he was responding to the people's "frustration" and that he had "heard the people speak."  SOF 22.  Indeed, Sheriff Arpaio maintains a file of newspaper clippings, letters, and emails from constituents about illegal immigration.  SOF 23.  Sheriff Arpaio chooses what goes into this file himself, and often passes materials contained therein to others within the MCSO.  SOF 24, 26, 45-49; *see also* SOF 27-43, 51, 76-83, 85, 87, 93, 96-97.  The contents of the file include a large collection of letters expressing anti-Hispanic sentiments, SOF 25-49, and reveal that the "frustrations" and sentiments of the people the Sheriff was responding to when he initiated the saturation patrols were directed towards Mexican and Hispanic individuals in particular, as opposed to illegal immigration in general.

For example, one letter complains about "Mexicans…on the corner…peddling their old corn, peanuts, etc.," and expressed frustration "at how the police officers ignore these Mexicans when they are speeding right by them."  SOF 31.  Though there was no information about the peddlers' immigration status, Sheriff Arpaio responded with a note stating that he would "give the info to *my illegal immigration OFFICERS* to look into."  SOF 32 (emphasis added).  Prior to the implementation of the MCSO's "crackdown" on illegal immigration, Arpaio forwarded to Chief Hendershott a 2005 letter from the Minutemen Project asking him to "investigate and deport illegal immigrants when they are spotted in our cities," and asking why it was that "day laborers stand on our cities street corners every day of the year without fear of being questioned?"  SOF 39.  Sheriff Arpaio's directive to Chief Hendershott was that they "should have a meeting (internally) and decide how to respond."  *Id*.

1466

Additional materials in Sheriff Arpaio's file include crude comparisons between Hispanics and "wild feral animals," predictions that "AZ would now also be facing a 70% population of Hispanics and Spanish language domination," and claims that Hispanic immigrants "would destroy our historical 'American way of life'" and fail to practice "American values." SOF 44, 47. Sheriff Arpaio also endorsed and circulated to Chief Sands a set of false "statistics" that Sheriff Arpaio felt were relevant to Sands' enforcement activities, SOF 49, despite having reason to doubt their veracity. Under "illegal alien contributions," these "statistics" listed the number of Spanish language radio stations in Phoenix and the number of Spanish speakers in Los Angeles County, along with a claim that 83% of warrants for murder in Phoenix are for illegal aliens—a number that even Sheriff Arpaio later said "does not sound right." *Id.*[8] Sergeant Brett Palmer, an HSU supervisor, also circulated the same set of fabricated "statistics" to his officers without bothering to verify their validity. *Id.*; *see also* SOF 147.

By responding to these sentiments, Sheriff Arpaio put his imprimatur on his constituents' sentiments against Hispanics and their views that Hispanics should be targeted for law enforcement based upon their race or ethnicity. This conduct violates the Equal Protection Clause, which flatly prohibits government officials from responding to popular racial prejudice" by "effectuating the desires of private citizens" where officials are "aware of the [racial] motivations of the private citizens." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224-25 (2d Cir. 1987) (quoting *United States v. City of Birmingham, Mich.*, 538 F. Supp. 819, 828 (E.D. Mich. 1982). Indeed, Plaintiffs need not even prove that Sheriff Arpaio himself held racial animus in order to establish racially discriminatory intent if he adopted his policies in response to public sentiment that he knew was racially inspired. *Id.*[9] While "[p]rivate biases may be

---

[8] Sheriff Arpaio admits that he never checked the validity of the numbers before circulating them. SOF 49. An article in the Los Angeles Times debunked the fake statistics before Arpaio forwarded them to MCSO personnel. *Id.*

[9] Plaintiffs, of course, also offer proof that Sheriff Arpaio's actions were motivated by his own racial prejudice.

1467

outside the reach of the law," a governmental body may not sidestep the Equal Protection Clause by "bowing to the hypothetical effects of private prejudice that they assume to be both widely and deeply held." *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (citing *Palmer v. Thompson*, 403 U.S. 217, 260-261 (1971)).

The rhetoric employed by the authors and endorsed by Sheriff Arpaio is precisely the type of "'camouflaged' racial expressions" that courts have found to prove discriminatory intent. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1063-66 (4th Cir. 1982) (discussing references, for example, to the "influx of 'undesirables'"); *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 648 F. Supp. 2d 805, 810-12 (E.D. La. 2009) (finding discriminatory intent based on statements from residents that proposed housing development tenants would not share the same "values" and would threaten the community's "way of life" and admission by planning commission chair that he was voting in consideration of the "health and welfare" concerns raised by the public).

Sheriff Arpaio has not only adopted the racial sentiments of his constituents, he has expressed them as his own in public statements gratuitously stigmatizing undocumented immigrants from Mexico. Sheriff Arpaio went out of his way to emphasize that the illegal immigration issue had become an "epidemic," and that immigration from Mexico is impacting our culture due to a failure to "assimilate" into "mainstream" America. SOF 16, 18-20. He pointed out to the media that immigrants from Mexico were "all dirty" and brought disease. SOF 19-20. This serves as additional evidence that his policy decisions are motivated by such attitudes. *Village of Mamaroneck,* 462 F. Supp. 2d at 549 (stigmatizing statements by public officials about day laborers constituted "some evidence of racism"). Similarly, the circulation of similar materials by others within the MCSO, and in particular HSU, demonstrate that their individual actions are also motivated by such attitudes. SOF 145-151.

In addition to circulating racially derogatory materials through the MCSO, Sheriff Arpaio forwarded to his staff materials from constituents explicitly advocating

racial profiling in immigration enforcement.  SOF 26-43, 76-83, 85, 87, 93, 96-97, *see also* SOF 51.  By doing so, Sheriff Arpaio was communicating both his agreement with these messages and his intent to see them realized in MCSO's anti-illegal immigration enforcement activities.  For example, in response to a letter from one constituent opining that Arpaio has the "right" to "investigate people based on the color of their skin," relaying that her Italian mother had been profiled during World War II, and explaining that she felt racial profiling was "the right thing to do," Sheriff Arpaio wrote a personal thank-you letter, stating "I especially enjoyed reading the story of your Italian grandmother and her experiences after coming into the country *legally*."  SOF 40 (emphasis in original).  In response to another letter co-authored by two of Sheriff Arpaio's constituents explaining that "[s]topping Mexicans to be sure they are legal is not racist…our state is a border state to Mexico, so of course, there will be more Mexican illegals here than any other ethnic group!" Sheriff Arpaio sent a thank-you letter to the authors, sent a copy to Chief Sands, and requested three copies for himself. SOF 43.  Sheriff Arpaio also forwarded Chief Sands a letter stating that "[t]heir claim about your profiling in doing your job is ridiculous.  Where else would you look for illegal aliens except in neighborhoods where they reside?"  SOF 27-28.  And when a constituent suggested that Muslim terrorists may be hiding amongst dark skinned Hispanic immigrants, Sheriff Arpaio again sent a thank-you letter and forwarded a copy to Chief Sands  SOF 33.

Sheriff Arpaio also maintained in his file, and circulated to others, a number of emails from an individual who writes actively on illegal immigration issues and whom Sheriff Arpaio has met personally.  SOF 34-38.  In one such email, this individual writes, regarding Hispanics, that "What our open border crowd calls racial profiling is what I call reasonable suspicion and probable cause, both of which are legal grounds for further reaction . . . . If it walks like a duck and quacks like a duck . . . ."  SOF 34. Sheriff Arpaio retained two copies of the email for himself and forwarded a copy to Chief Sands.  SOF 36.

1469

The sheer number of times Sheriff Arpaio did this demonstrates that his circulation of the materials was no accident. *See Keyes v. Sch. Dist.*, 413 U.S. 189, 207 (1973) ("The prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." (internal quotation omitted)).   Furthermore, the sentiments expressed in these letters were also reflected in Sheriff Arpaio's own statements.   By definition, it is impossible to tell a person's immigration *status*, which is a complex issue of federal administrative law depending on multiple factual circumstances, based on observable behaviors (absent seeing the person cross the border or finding the person hiding in a smuggling load).   But Sheriff Arpaio had a solution to this problem:   His deputies could "take care of the situation" by selecting who to target for investigation based on their "speech, what they look like, if they look like they came from another country."   SOF 10-11.   This type of message from the head of an agency inevitably influenced operations in the field. *See Mamaroneck*, 462 F.Supp.2d at 543 ("[T]he law recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law . . . will rarely if ever fail to achieve its purpose.").   Sheriff Arpaio believes that illegal immigrants from Mexico "by and large" have "certain appearances," including "brown…skin color."   SOF 13; *see also* SOF 14.   MCSO therefore cast a broad net in its quest to apprehend more undocumented immigrants, capturing many Hispanic individuals legally residing in Arizona—including citizens—who shared these same characteristics.

    2.  *MCSO Saturation Patrols and Other Immigration Enforcement Operations Are Responsive To Race-Based Requests for Action*

Apart from the decisions to use saturation patrols as a way to investigate Hispanics for potential immigration law violations, Sheriff Arpaio's files reveal that he passed on numerous directives to others within the MCSO leadership to respond to citizen requests for police action against Hispanics at particular locations, a practice that is undisputedly contrary to generally accepted law enforcement practice.   SOF 25-43,

1470

50, 52, 76-97, 101.  In particular, many messages are sent to Chief Sands, who is in charge of planning saturation patrols, and who understands that he is to do "whatever[he] can" about the these citizen complaints.  SOF 26, 28, 30, 32-33, 36-37, 39, 42-43, 74-75, 77, 79, 81-82, 85, 90, 93, 97.  For example, one letter stated that "dark skin" is "the look of the Mexican illegals who are here illegally," urged Sheriff Arpaio to "come over to 29th Street/Greenway Parkway area and round them all up"— suggesting pointedly that immigration enforcement should target dark skinned people. SOF 78.  Sheriff Arpaio forwarded this letter onto Chief Sands with a note that said, "Have someone handle this," because, according to him, he was "building up intelligence on crime areas in the city."  SOF 79.  MCSO conducted several saturation patrols in the area near 29th Street and Greenway.  *Id*.

Sheriff Arpaio also received a complaint from a constituent about "a large amount of these Mexicans" in a parking lot who "swarmed around my car, and I was so scared and alarmed, and the only alternative I had was to manually direct them away from my car."  SOF 80.  Sheriff Arpaio forwarded the letter on to Chief Deputy Trombi with a note for him to keep a file on these complaints, and also to have someone contact the author.  SOF 81.  Arpaio admits that the letter refers to no crime, SOF 87, thus it appears his instruction was based on the constituent having been scared of "these Mexicans."  Sheriff Arpaio received and passed along numerous additional requests for saturation patrols from citizens who complained about day laborers "attempting to flag down" prospective employers, or Mexicans "hanging out . . . on the corner," by letter and phone.  SOF 76-77, 82.

MCSO witnesses candidly admit that the agency often relies on citizen complaints in planning immigration enforcement.  Both Chief Sands and Lieutenant Sousa of the HSU testified that saturation patrols are regularly initiated based on citizen complaints.  SOF 75.  Sheriff Arpaio testified that he sends requests to Chief Sands because they "may assist him in the future on any operation he has."  SOF 99.  Chief

1471

1  Sands confirmed, "We respond to citizen's complaints on a lot of things.  Sometimes we

2  have crime suppressions, sometimes they're handled in a different way."  SOF 100.

3          The record contains several instances where enforcement operations directly

4  followed racially charged requests for sweeps in the same area.  Here, saturation patrols

5  followed closely in time after Arpaio received racially motivated citizen complaints and

6  forwarded them to Sands and other subordinate officials.  In addition, Sheriff Arpaio

7  issued contemporaneous statements that the patrols were initiated in response to

8  complaints from the public.  This constitutes highly compelling proof that the saturation

9  patrols were motivated by discriminatory intent.  *Arlington Heights*, 429 U.S. at 266-68;

10  *see also Yonkers Bd. of Educ.*, 837 F.2d at 1224-25; *Greater New Orleans Fair Housing*

11  *Action Center*, 648 F. Supp. 2d at 810-12.

12          For example, in August of 2008 Sheriff Arpaio received a letter complaining

13  about people speaking Spanish at a McDonald's and suggesting to Sheriff Arpaio that he

14  should "check out Sun City."  SOF 83.  The letter clearly equates speaking Spanish with

15  illegal alien status.  SOF 83-84.  At least one circuit court has cautioned that placing any

16  criminal significance on the fact that a person speaks Spanish can be a pretext for

17  discrimination due to the "close connection between the Spanish language and a specific

18  ethnic community."  *Farm Labor Organizing Comm.* 308 F.3d 523 at 539-40.  However,

19  rather than informing the author that speaking Spanish is not illegal, or ignoring the

20  request, Sheriff Arpaio wrote a note on the letter stating that he would "look into it" and

21  passed the letter on to Chief Sands with a handwritten notation, "for our operation."

22  SOF 84-85.  Two weeks later, on August 13-14, 2008, the MCSO conducted a saturation

23  patrol in Sun City.  SOF 86.

24          Sheriff Arpaio received a letter dated May 8, 2008, from a constituent in Mesa

25  stating that he "ha[s] yet to see the police stop in order to determine whether these day

26  laborers are here under legitimate circumstances," and "believe[d]" that they were in the

27  country illegally."  SOF 87.  Sheriff Arpaio sent the letter to Sands and marked it to

28  draw Sands' attention to the portion quoted above as "intelligence," even though, as he

1472

admits, the letter does not describe any violation of the law.  SOF 88-90.  On May 24, 2008, Sheriff Arpaio received another letter urging that Mesa "needs" a "sweep," noting that the head of Mesa's police union is Hispanic, and commenting "[t]his is what you get from Mesa."  SOF 91.  Sheriff Arpaio wrote, "I will be going into Mesa" and sent a copy to Chief Sands.  SOF 93.  Chief Sands testified that he assumes that the author believed that the individuals were undocumented immigrants because they were "dark-complected people."  SOF 92.  Soon thereafter, the MCSO conducted two saturation patrol operations in the Mesa area.  SOF 95.  In an MCSO news release announcing the first operation, Arpaio stated that he was sending his officers in "[i]n keeping with his promise to the public."  *Id*.

In another example, MCSO officials received an October 2, 2007 email that had been forwarded to them by John Kross, the Town Manager of Queen Creek.  SOF 96.  The author complained of Hispanic men loitering on the corner "being silly," "jeering" at her and making people in the town feel "uncomfortable."  *Id*.  Sheriff Arpaio testified that he could not tell if a crime had been committed based on the email, but nevertheless he passed it on to his people "to look into" because the MCSO "would be remiss in our duties not to respond."  SOF 97.  The MCSO did a sweep in Queen Creek on October 4, 2007.  SOF 98.  In the Operations Plan for the sweep, MCSO described the operation as having been based on "emails from the town council in reference to the day laborers in the city."  SOF 98.

Sheriff Arpaio and other MCSO commanders repeatedly acknowledged that these constituent letters did not describe any criminal activity and that any supposed "crimes" were never investigated.  SOF 81, 84, 88, 97.  It follows, then, that when the MCSO says it initiated saturation patrols based on citizen complaints, they were relying on these and other similar complaints that contained only racial stereotyping and no information about specific criminal activity.  *See Keyes*, 413 U.S. at 207-08 ("[A] finding of illicit intent as to a meaningful portion of the item under consideration has substantial probative value on the question of illicit intent as to the remainder.").  The

1    failure to subject the complaints to any real scrutiny serves as additional evidence of

2    improper purpose.  *See, e.g., Mamaroneck*, 462 F. Supp. 2d at 531, 554 ("To the extent

3    Village officials did receive complaints from residents concerning the behavior of the

4    day laborers, the Village took no steps to investigate and determine whether those

5    complaints were genuine . . . .").

6           Further, the selection of neighborhoods in Maricopa County where Hispanic day

7    laborers were known to gather further evidences a discriminatory intent.  SOF 53 (citing

8    to MCSO news releases about the sites of saturation patrols), SOF 112, 117.  The

9    description of those areas as hot spots for crime, "unless properly limited and factually

10   based, can easily serve as a proxy for race or ethnicity."  *United States v. Montero-*

11   *Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to

12   ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or

13   communities in which members of minority groups go about their daily business, but is

14   limited to . . . locations where particular crimes occur with unusual regularity.").

15          These instances show a pattern of Sheriff Arpaio receiving racially charged

16   requests for action and MCSO acting on them.  It is clear, then, that the MCSO's

17   saturation patrols were initiated to target a particular protected group, Hispanics, and not

18   to target any actual criminal activity.

19                   *3.      The Practices Adopted by MCSO on Saturation Patrols*

20                           *Encouraged Racial Profiling*

21          MCSO's practices on saturation patrols constitute a stark departure from both the

22   MCSO's past practice and the typical practice of American law enforcement agencies

23   with respect to saturation patrol operations.  Such departures from the norm can "afford

24   evidence that improper purposes are playing a role."  *Arlington Heights*, 429 U.S. at

25   267.  Substantive departures from norms are particularly probative of discriminatory

26   intent when the "factors usually considered important to the decisionmaker" favor the

27   opposite decision than the one actually taken.  *Id*.

28

1474

Saturation patrols are a tactic historically used by law enforcement agencies to combat a spike in a particular type of crime or to address a sudden concern about violent crime in a limited geographical area, such as that which would arise from a gang turf war. SOF 104-05. During such operations, officers are provided with information about a particular criminal activity or a pattern of criminal activity, and directed to go out and target individuals who officers have reason to believe are involved in that activity. SOF 105. Prior to Sheriff Arpaio's institution of the recent spate of saturation patrols, MCSO acted in accord with this generally accepted practice, focusing such patrols on known problems with DUI or some other specific criminal activity. SOF 103. Conducting saturation patrols without such a focus would be counterproductive, as they require agencies to devote a significant amount of resources to a particular area for a particular period of time. *See* SOF 21, 104-105.

In contrast, however, the MCSO saturation patrols that are at issue in this case were not spurred by any identified need for such a substantial use of agency resources, such as comparative crime analysis or analysis of traffic hazards. SOF 107. HSU Lieutenant Sousa confirmed that the saturation patrols were not prompted by any spike in traffic problems. SOF 109. Even Defendants' police practices expert, Mr. Bennie Click, testified that he did not see any indication that the patrols were concerned with DUI or traffic problems. SOF 108. Contrary to the normal practice for such operations, MCSO officers also do not appear to have been briefed on any specific criminal targets for the operations, or provided with any intelligence on specific crimes. SOF 105-06. Officers were simply instructed to go out and "enforce the laws." SOF 102.

The MCSO has thus apparently taken the position that the saturation patrols were focused on crime generally. *Id.* This claim is contrary to the logic of saturation patrols and serves as an indication that "improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. MCSO's protestation shows that Defendants are self-conscious about the inherent problems associated with operations that simply attempt to "round up" or "sweep [up]" illegal immigrants. *See* SOF 56-57. Based on the

1475

undisputed evidence, however, there is no doubt that saturation patrols were focused on illegal immigration.   That was their genesis, and the sentiment was regularly reinforced by Sheriff Arpaio's own statements.   SOF 53-55.   Though supervisors might not have discussed the purpose of the saturation patrols explicitly in briefings, officers understood by the time they got into the field who they were supposed to look for.   SOF 110. Indeed, Defendants' expert agreed that the purpose of the operations was to impact illegal immigration.   SOF 111 (statement by Mr. Click that "[T]he general information to officers . . . was that this is a—an illegal immigration enforcement effort."); *see also* SOF 125 (agreement by Plaintiffs' expert, Mr. Robert Stewart).

Other departures from the norm serve as additional evidence of improper purposes. *Arlington Heights*, 429 U.S. at 267.   In the field, during the saturation patrols, officers conduct pretextual traffic stops for minor violations as a launching point for investigations into citizenship and immigration status.   Such low-level traffic stops are contrary to MCSO's written guidelines on traffic enforcement and officers' approach on regular patrol. SOF 118, 124.   Further, the practice during saturation patrols of contacting passengers and asking them for identification is unusual.   SOF 126-28. Given that the lack of identification is considered by the MCSO to be grounds for initiating questioning about citizenship and immigration status, SOF 182, both of these practices appear to have been adopted in order to maximize opportunities for immigration screenings.   Mr. Ortega Melendres, for example, was detained and questioned about his documents for no reason other than the fact that he was riding as a Hispanic passenger in a vehicle that had been pulled over by MCSO.   SOF 179, 181. Several Hispanic individuals who provided declarations, including those stopped on saturation patrols, also reported that their passengers were asked to produce identification even though there was no reason to think they had violated the law.   SOF 216-18, 222 (describing the experience of Diona Solis, whose son and three other young boys aged 9 to 13 were asked for identification returning from a Boy Scout camping

1476

trip).  In addition, Mr. Rodriguez and Mr. Garcia were asked for their Social Security numbers, another potential indicator of immigration status.  SOF 188, 217.

The experiences of named Plaintiffs and putative class members who—after being stopped—were never issued citations or whose alleged infractions were never pursued provide further evidence that the stops were pretextual.  *See* SOF 206 (Mr. Nieto and Ms. Meraz were released after Deputy Armendariz told officers that there was no reason to hold them), SOF 216-17, 221 (describing the experience of Garrett Smith, whose Hispanic family was stopped when he allegedly exceeded the speed limit by 5 mph during a saturation patrol, but whom the deputy declined to cite after he satisfied himself that Mr. Smith's 14-year old son was not being smuggled), SOF 223 (describing the experience of Julio Mora, who was stopped with his father for no reason); *see also* SOF 215 (Mr. Urteaga's citation dismissed), 218 (Mr. Villaman's citation never filed), 220 (describing the experience of Lorena Escamilla, who was pushed against her car "belly first" while she was five months pregnant and whose charges were "crossed out" by the deputy by the time she got to court).  Such conduct has been found to be probative evidence of racial profiling.  *Farm Labor Organizing Comm.*, 308 F.3d at 535-36 (officer questioned driver and two passengers about their immigration status after deciding not to issue a speeding citation).

The MCSO's assertion that it instituted a "zero tolerance" policy that eliminated discretion on certain operations does not stand up to scrutiny.  While some MCSO witnesses testified that there was a zero tolerance policy that required officers to *stop* any vehicle they observed violating the traffic code, SOF 118, other witnesses stated this was not in fact possible and backed away from this position.  SOF 120 (citing to testimony of Lieutenant Sousa and Chief Sands that zero tolerance policy did not extend to the initial decision to stop a vehicle and testimony of Deputies Armendariz and Kikes that there is no way to avoid using discretion); *see also* SOF 121.  Further, the MCSO does not do any monitoring or follow up to make sure that its officers are applying the zero tolerance policy equally, or at all.  SOF 123.  It appears that the policy was merely

1477

adopted in name, as a defensive measure to deflect allegations of racial profiling.  SOF 119.  In fact, in the opinion of Mr. Stewart, a zero tolerance policy under these circumstances would actually allow officers to make *more* traffic stops of Hispanics for minor traffic violations without fear of reprimand.  SOF 122.

> 4.    *MCSO's Failure to Adequately Train and Oversee its Officers Demonstrates its Acceptance of Racial Profiling*

The MCSO has failed to institute basic law enforcement safeguards to prevent racial profiling, and has even taken steps to hinder its own ability to detect and address racial profiling.  The MCSO's refusal to take these standard measures is yet another departure from law enforcement norms and evidence of discriminatory intent.  *Arlington Heights*, 429 U.S. at 267.  The failure to adopt generally accepted measures to detect racial profiling in particular suggests an effort on the MCSO's part to conceal unlawful practices and implicitly allow them to continue.  *See Chavez v. United States*, No. 01-000245, 2010 WL 3810629, at *4 (D. Ariz. June 21, 2010) (denying motion to dismiss plaintiffs' allegations of racial profiling).

Contrary to generally accepted practice, the MCSO does not have any agency-wide written policy concerning racial profiling.  SOF 129-30, 143.  To the extent that some of the MCSO's informational bulletins or unit-wide policies include a prohibition on racial profiling, they do not provide officers with any definition of racial profiling.  SOF 131.  Such a definition would be crucial.  SOF 143.  The Arizona Peace Officer Standards and Training Board (AZ POST) materials, which the MCSO produced as evidence that MCSO officers receive training on racial profiling, prohibits only profiling based *solely* on race.  SOF 133.  Saturation patrol operation plans that mention racial profiling also only prohibit profiling based *solely* on race in the decision about whether or not to call a 287(g) officer to investigate an individual's immigration status.  SOF 132.  MCSO officers admittedly use race as a factor in determining whether individuals are illegally in the United States.  SOF 135-136 (officers rely on "apparent Mexican ancestry" as a factor in immigration investigations); *see also* SOF 137 (citing to

- 28 -

1478

testimony of Sergeant Palmer that "speak[ing] only Spanish" and presence in an "illegal alien locale" are additional bases for investigation).  A proper written definition of racial profiling would have made clear to MCSO officers that *any* reliance on race or ethnicity is inappropriate, even in immigration investigations, unless it pertained to a specific suspect description.[10]  *See Chavez v. Ill. State Police*, 251 F.3d 612, 647 (7th Cir. 2001) (existence of a policy prohibiting racial profiling not sufficient if message is "not always clear . . . What really matters, ultimately, is how official policies are interpreted and translated into actual practice[] . . . .") (quoting *State v. Ballard*, 752 A.2d 735, 744 (N.J. Super. Ct. App. Div. 2000)).

In addition, based on the testimony of MCSO officers, it appears that MCSO has not attempted to provide its officers with any in-house training on racial profiling. There is also no requirement that officers receive regular training on this issue.  SOF 142.  As a result, the most that officers could recall learning about profiling came from their basic academy training or, for a small subset of officers, the "brief training block" in ICE's 287(g) training.  SOF 134, 138-41.  This level of training wholly failed to equip officers for the challenges of conducting immigration enforcement in the largely-urban context of Maricopa County, where many Hispanic motorists are U.S. citizens and legal residents.  SOF 144.

MCSO supervisors exhibited a cavalier attitude towards their supervisory duties. The MCSO makes no effort to document the race or ethnicity of individuals stopped or contacted by officers on traffic stops.  SOF 155.  To the extent that citizen contacts are recorded by officers, those notes have been intentionally destroyed.  SOF 156, 162. Saturation patrol operations plans detail no specific role for supervisors, SOF 159, and supervisors merely stay at the command post rather than being out on traffic stops.  *See, e.g.*, SOF 158.  Yet, despite having no means of verifying whether or not officers are

---

[10] *See Montero-Camargo*, 208 F.3d at 1132 & n. 22 ("Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens.").

1479

engaging in racial profiling, supervisors stated that they simply "trust" their subordinates not to racially profile.  SOF 157-58, 164-65; *see also* 166 (no officer ever disciplined for racial profiling).  Though they acknowledge that selective enforcement of the traffic laws is a possibility, supervisors said that as long as there was a reason for the traffic stop (i.e., a traffic violation, however minor), that "ended the inquiry" for them.  SOF 157.  This statement is particularly disturbing given the tremendous amount of latitude that officers are given in conducting traffic stops on saturation patrols.  SOF 168.

When presented with data that all but one of the motorists arrested on a saturation patrol were Hispanic, HSU's Sergeant Madrid and Lieutenant Sousa both dismissed this disparity, stating, respectively, that "it means nothing" and "[i]t's not a concern."  SOF 160.  No meaningful after-action debriefings have been conducted with officers to provide an opportunity for incidents of concern to be addressed.  SOF 163.  And when citizens have attempted to file complaints arising from their traffic stops, they have been given the run-around and have eventually gave up.  SOF 214, 216, 220; *see also* SOF 199 (cursory investigation of Rodriguez stop).  These failures in supervision do not meet generally accepted practices.  SOF 167-68.  Even Defendants' expert agreed that the attitude expressed by Sergeant Palmer and shared by other supervisors is not "generally acceptable."  SOF 169.[11]

One particularly egregious example of the MCSO's lack of oversight can be seen in the regular circulation of inappropriate emails by MCSO officers using their county email accounts.  For example, one officer circulated a photo of a mock driver's license for a state called "Mexifornia," which included a photograph depicting stereotypical Mexican facial features and attire.  SOF 145.  Sheriff Arpaio acknowledged that this email could be offensive, *id.*, but could not say whether its circulation violated a department policy.  SOF 152.  Multiple officers distributed "Mexican Word of the Day"

---

[11] The fact that ICE was occasionally on scene and made aware of the saturation patrols provides no comfort that racial profiling was not occurring.  ICE officials have made it clear that they had no basis to evaluate whether MCSO was engaged in racial profiling or not.  SOF 170.

1480

emails making fun of Mexican accents.  SOF 146.  Still others circulated fake statistics or jokes about Mexicans or Mexican culture.  SOF 147-48. Posse members also sent emails dehumanizing immigrants, including one email praising an anti-immigration program from the 1950s known as "Operation Wetback."  SOF 151.

Many of these emails were circulated or forwarded by officers and even supervisors that were centrally involved in the saturation patrols or stops of named plaintiffs.  SOF 148-50.  For example, Sergeant Palmer sent the email about "Mexican Yoga."  SOF 148.  Such emails are direct evidence of the officers' racial bias.   In addition, the fact that these emails were allowed to circulate over a sustained period of time demonstrates MCSO's tolerance for such attitudes within its agency.  SOF 154.  The examples of such inappropriate material that was circulated are too numerous for Plaintiffs to fully catalogue here.  But it is undisputed that such materials have no place in a professional police organization.  Even Defendants' expert agreed that such emails are racially derogatory and should "absolutely" be dealt with by a law enforcement agency "as soon as it surface[s]."  SOF 153.

## C.   Statistical Evidence and the Stops of Putative Class Members Demonstrate that MCSO's Operations Disparately Impact Hispanics

There is little doubt that the MCSO's immigration enforcement operations— and saturation patrols in particular—have had a marked effect on Hispanic drivers and passengers in Maricopa County.  Such evidence proves discriminatory effect and also provides additional evidence of discriminatory intent.  *Arlington Heights*, 429 U.S. at 266; *Bradley v. United States*, 299 F.3d 197, 206 & n.11 (3d Cir. 2002); *Chavez*, 251 F.3d at 637-45; *State v. Soto*, 734 A.2d 350, 360-61 (N.J. Super. Ct. 1996) (finding unrebutted statistical evidence of racial profiling established discriminatory purpose).  Courts have permitted statistical evidence to prove discriminatory effect to address "the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated."  *Chavez*, 251 F.3d at 638.

1481

As detailed in Section II.D above, Dr. Taylor's analysis of MCSO's CAD database revealed three principal findings about the effect of saturation patrols on the stopping of Hispanics:   (1) MCSO officers are more likely to stop Hispanics on saturation patrol days as compared to other days; (2) MCSO officers actively working on a saturation patrol are much more likely to stop Hispanics than other MCSO officers; and (3) stops involving a Hispanic individual were significantly longer than other stops. SOF 239-49.

MCSO officers actively working on a saturation patrol were approximately 50% more likely to stop Hispanics than other officers working that very same day.  SOF 245. These results are highly statistically significant and were found across a number of different models.  SOF 242-43, 246-47.  In all cases, stops of Hispanics were shown to be more likely to be stopped on saturation patrol days and by officers working a saturation patrol as compared to MCSO activity on other days.  SOF 239-41, 244-45. This pattern is consistent with the other evidence that Hispanics are targeted on saturation patrol days.  Moreover, stops involving Hispanics were about 25% longer on average than other stops, SOF 248, which suggests that MCSO officers investigate Hispanic individuals more closely in an effort to find undocumented immigrants.

Dr. Taylor's analysis draws strength from the use of internal benchmarking.  *See Chavez*, 251 F.3d 644-45 (discussing importance of accurate benchmarking); *Anderson v. Cornejo*, 355 F.3d 1021, 1024 (7th Cir. 2004) (same).  That is, instead of comparing MCSO traffic stops patterns to some external measure—such as the overall percentage of Hispanics in Maricopa County—Dr. Taylor's models compare (1) MCSO stop activity on saturation patrols days to MCSO stop activity on other days, and (2) MCSO stop activity by saturation patrol involved officers to stop activity by other MCSO officers.  SOF 250.  In this way, Taylor's methodology controls for various factors, such as socioeconomic variables or differential rates of offending or exposure to law enforcement officials by Hispanic individuals—because such factors are likely to remain constant as between saturation patrol days and non-saturation patrols days.

1482

1    Dr. Taylor's basic conclusions are undisputed.  Defendants' statistical expert, Dr.

2    Steven Camarota, a researcher for the Center for Immigration Studies, a think tank that

3    advocates for greater restrictions on immigration, SOF 251, does not directly refute Dr.

4    Taylor's findings; indeed, he did not try to replicate Dr. Taylor's analysis of the effect of

5    saturation patrols on Hispanic stop rates.  SOF 256.  Rather, he tries to point out

6    deficiencies in the data and in the way Dr. Taylor handled it.  But Dr. Camarota

7    acknowledges that meaningful conclusions about MCSO's activity can be found by

8    examining the CAD database.  SOF 252.  In fact, Dr. Camarota *admits* that the disparity

9    in the stop rate of Hispanics on saturation patrol days exists, and that Hispanics are in

10   fact more likely to be stopped on saturation patrol days.  SOF 253.  Dr. Camarota also

11   acknowledges that higher stop rates for Hispanics can indicate that Hispanics are being

12   targeted.  SOF 254.  Dr. Camarota also does not deny that MCSO stops involving

13   Hispanic persons lasted longer than stops involving non-Hispanics.  SOF 255.

14   Other statistical evidence corroborates the disparate impact demonstrated in Dr.

15   Taylor's analysis of the MCSO stop data.  HSU Sergeant Madrid acknowledges that all

16   but one of the persons arrested in a March 2008 saturation patrol operation in North

17   Phoenix appeared to have Hispanic surnames.  SOF 160.  Even assuming that MCSO

18   was intent on seeking out undocumented immigrants, and that all of the undocumented

19   immigrants had Hispanic surnames, this only accounts for a portion of the arrestees with

20   Hispanic surnames.  Only about two-thirds of the arrestees were suspected of being

21   undocumented immigrants—the rest were for other crimes, such as DUI.  SOF 62.

22   Unless Hispanic individuals commit such crimes at significant greater frequency than

23   other groups, this disparity suggests that Hispanics are being stopped and investigated in

24   greater frequency.  Similarly, Chief Sands acknowledged that 90 percent of arrests made

25   during smaller saturation patrols in Fountain Hills were Hispanic, even though that area

26   is predominantly "non-Hispanic."  SOF 161.

27   In sum, the traffic stop patterns in the MCSO's CAD database reveal that

28   Hispanics are stopped at significantly greater rates during saturation patrols than would

1483

be expected in the absence of racial targeting.  It is difficult to imagine more direct evidence of discriminatory impact that the extensive statistical analyses conducted by Dr. Taylor, and Defendants' put forward no evidence, beyond speculation, that directly refutes these results.

As discussed, MCSO's practices have also exacted a human cost in the form of the discriminatory impact on the named Plaintiffs and other putative class members. Some of the Plaintiffs and class members were clearly treated differently than non-Hispanics.  Mr. Ortega Melendres, for example, was detained for further investigation into his immigration status while the Caucasian driver was released without a citation. SOF 178-79, 181; *see also* 180.  The Rodriguezes were cited while the other drivers on the same stretch of road were not.  SOF 192, 197-98.  The Smith family was singled out from others on the road disobeying the speed limit.  SOF 221.  Yet despite this pattern, individuals like Mr. Magos are told by officers, "[D]on't go thinking this is racial profiling."  SOF 216.  Plaintiffs and class members have expressed decreased trust in law enforcement as a result, which is why racial profiling is anathema to our criminal justice system:

> For many law-abiding citizens their only contact with the criminal justice system is via interaction with the police, predominantly during traffic stops. Any hint of racism in policing erodes the public support so necessary to law enforcement efforts. The reality is that very few innocent victims of racial profiling ever come forward with complaints. Instead, these victims simply retain vivid memories of their police encounter for future reference.

*Martinez v. Vill. of Mount Prospect*, 92 F. Supp. 2d 780, 782 (N.D.Ill. 2000).  These actions are unlawful, and should not be allowed to continue.

## IV.   CONCLUSION

For all the reasons stated herein, Plaintiffs respectfully request that the court grant summary judgment in their favor on the claim that Sheriff Arpaio and MCSO are violating the Fourteenth Amendment to the United States Constitution.

RESPECTFULLY SUBMITTED this 29th day of April, 2011.

By  */s/ Stanley Young*  _____

1484

Stanley Young (*Pro Hac Vice*)
Andrew C. Byrnes (*Pro Hac Vice*)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065-1418

Tammy Albarran (*Pro Hac Vice*)
Lesli Gallagher (*Pro Hac Vice*)
Kevin J. Hickey (*Pro Hac Vice*)
Matthew Steilen (*Pro Hac Vice*)
1 Front Street
San Francisco, CA 94111-5356

ACLU FOUNDATION OF ARIZONA
Daniel Pochoda
Annie Lai
3707 N. 7th St., Ste. 235
Phoenix, Arizona 85014
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376

ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
Cecillia Wang
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0775
Facsimile:  (415) 395-0950

MEXICAN AMERICAN LEGAL
DEFENSE & EDUCATIONAL FUND
Nancy Ramirez
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266
*Attorneys for Plaintiffs*

1

2

## CERTIFICATE OF SERVICE

    I hereby certify that on the 29th day of April, 2011 I caused the attached

3 document to be electronically transmitted to the Clerk's Office using the CM/ECF

4 System for filing and transmittal of a Notice of Electronic Filing to the following

5 CM/ECF Registrants:

6                     Thomas P. Liddy
                    tliddy@mail.maricopa.gov

7                     Maria R. Brandon
                    brandonm@mail.maricopa.gov

8

9                     Timothy P. Casey
                    timcasey@azbarristers.com'

10                     *Attorneys for Defendant Sheriff Joseph Arpaio and the*
                    *Maricopa County Sherriff's Office*

11

12                     */s/ Stanley Young*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-

1486



**EXHIBIT 27**

Timothy J. Casey (#013492)
SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile:  (602) 277-8663
timcasey@azbarristers.com

Maria Brandon (#0004249)
Thomas P. Liddy (#019384)
MARICOPA COUNTY ATTORNEY'S OFFICE
Deputy County Attorneys
Litigation Practice Group
Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Co-counsel for Defendants Arpaio and MCSO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, et al., | No. CV 07-02513-PHX-GMS |
| Plaintiffs, | |
| vs. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Joseph M. Arpaio, et al. | |
| Defendants. | (Oral Argument Requested) |

Pursuant to Rule 56(b), Federal Rules of Civil Procedure, Defendants Joseph M. Arpaio ("Arpaio") and the Maricopa County Sheriff's Office ("MCSO") respectfully move the Court for its Order granting summary judgment in their favor and against Plaintiffs' claims.  Arpaio and the MCSO move for summary judgment because:

1.     Plaintiffs lack standing to obtain their requested equitable remedies because the undisputed and well developed evidentiary record shows that Plaintiffs have not, and cannot, demonstrate a real and immediate threat of future injury despite being exposed since 2007 to the Defendants' allegedly racially discriminatory policy, custom, or practice;

2.     Plaintiff's Fourth Amendment claim (Second Claim for Relief) and Plaintiffs'

claim under Article II, Section 8 of the Arizona Constitution (Third Claim for Relief) fail as a matter of law because the undisputed facts establish that each of the Plaintiffs' traffic stops made by MCSO deputies was preceded by, and based on, probable cause or reasonable suspicion that they, or the driver of the vehicle in which he/she was a passenger, had violated Arizona law; and

3.      Plaintiffs' Fourteenth Amendment claim (First Claim for Relief) and Title VI of the Civil Rights Act of 1964 claim (Fourth Claim for Relief) fail as a matter of law because the evidentiary record demonstrates that there are no genuine issues of material fact as to whether Plaintiffs were subjected to intentional discrimination – that is whether any MCSO deputy that had stopped, questioned, detained, or interacted with the Plaintiffs in any manner acted with racially discriminatory intent or motive, or that any alleged policy, custom, or practice of the Defendants had a discriminatory intent or motive.

This Motion is supported by the following Memorandum of Points and Authorities, the concurrently filed supporting Statement of Facts and accompanying exhibits, the concurrently filed (under seal) supporting Supplemental Statement of Facts Re: Testimony of ICE Witnesses and accompanying exhibits, the Court's entire file in this matter, and any oral argument the Court may wish to hear.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Plaintiffs have sued Arpaio and the MCSO for alleged violations of the Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution, alleged violations of the Plaintiffs' rights under Arizona Constitution Article II, Section 8, and alleged violations of Plaintiffs' right to be free of racial discrimination pursuant to Title VI of the Civil Rights Act of 1964.  *See* Defendants' Statement of Facts ("SOF") at ¶ 1. More specifically, each of the individual Plaintiffs allege that during the operation of a motor vehicle on a public roadway in Maricopa County they have been stopped, detained, questioned, and/or searched by MCSO deputies allegedly in violation of their constitutional and statutory rights.  *Id*. at ¶ 2.

The Plaintiffs' First Amended Complaint asserts that the individual Plaintiffs were

stopped, detained, questioned, and/or searched by MCSO officers allegedly pursuant to an officially-sanctioned MCSO policy, pattern, and practice of racially profiling, targeting, or otherwise discriminating against Latinos during motor vehicle traffic stops. *Id*. at ¶ 3. Plaintiffs further allege that Defendants' purported policy, practice, pattern, and practice is manifested not only on a "day-to-day" basis during routine traffic stops conducted by MCSO deputies, but also during traffic stops made during "crime suppression sweeps" or law enforcement saturation patrols or crime suppression operations. *Id*. at ¶ 4.

The gravamen of Plaintiffs' lawsuit is the charge that MCSO deputies are racially profiling Latinos by making "pre-textual and unfounded [traffic] stops," and following those stops, then engage in "racially motivated questioning, searches and other treatment, and often [make] baseless arrests." *Id*. at ¶ 5. The Plaintiffs, therefore, seek declaratory and injunctive relief against the Defendants. *Id*.

After extensive written and deposition discovery conducted since the lawsuit's initial filing on December 12, 2007, the evidentiary record now amply demonstrates that the Plaintiffs' charges are factually unsupported and legally deficient as set forth below.

## II.  BACKGROUND FACTS

To assist the Court in better understanding the factual predicate for this Motion, it is essential to set forth the factual background about each of the Plaintiffs' respective traffic stops, questioning, and/or detention.

### A.  The Traffic Stop Involving Mr. Melendres.

#### 1.  Mr. Melendres Visits the United States.

The first named individual plaintiff is Manuel de Jesus Ortega Melendres. Mr. Melendres is a citizen of the Republic of Mexico. *Id*. at ¶ 6. He legally entered the United States and visited Maricopa County as a tourist for the time period between September 6, 2007 and September 27, 2007. *Id*. at ¶ 7. Pursuant to federal law, during Mr. Melendres' visit to Maricopa County he was required to keep with him at all times his B-1/B-2 tourist visa and an I-94 Form (that allowed him to travel more than 25 miles north of the U.S. border with Mexico). *Id*. at ¶ 8. If a visiting foreign national, such as Mr. Melendres, does not keep his tourist visa and/or I-94 Form with him (i.e., on his person), that person is legally

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

"out-of-status" and a local law enforcement officer certified under the federal government's 287(g) program may lawfully question and detain such a person without a warrant in order to determine his entry status, and/or in order to deliver him to the United States Immigration and Customs Enforcement ("ICE") for its determination of the person's lawful presence in the United States.[1] *Id.* at ¶ 9. In addition, a person visiting the United States with a tourist visa is not lawfully permitted to work for compensation or otherwise have employment. *Id.* at ¶ 10. If a foreign national visiting the United States on a tourist visa tells an ICE agent or a 287(g) certified law enforcement officer that he/she is working while visiting as a tourist, that foreign national is considered "out of status" and may be detained without warrant and transported to ICE. *Id.* at ¶ 11.

## 2.    The MCSO Operation on September 26, 2007

On September 26, 2007, the MCSO Human Smuggling Unit ("HSU") was in Cave Creek, Arizona investigating a particular church building/parking lot in response to citizen complaints that the church or its grounds may be serving as a possible "drop house" for human smuggling and because "day laborers" congregating or loitering near the church were stepping into the traffic lanes of Cave Creek Road and causing traffic problems. *Id.* at ¶ 12. As such, the HSU conducted surveillance on the church and its property, and conducted a narrow traffic patrol that related exclusively to stopping for probable cause following traffic violations only those vehicles that were observed to have picked up people congregating at the church property and that had left the property. *Id.*

On that same date, Mr. Melendres testified that he wanted to travel to an unknown location in Scottsdale to take photographs, that he needed a ride there, and that a friend named "Jorge Morales" from Mexico offered to arrange to have an unknown person in a white colored pickup truck give him the ride. *Id.* at ¶ 13. Mr. Melendres sat in the right front seat of the white colored truck, an unknown Caucasian person drove the truck, and Mr.

---

[1] Local law enforcement personnel that are trained and certified pursuant to ICE's 287(g) program are expressly authorized to investigate and enforce federal immigration law. More specifically, the MCSO personnel certified with 287(g) authority by the federal government under the February 2007 ICE-MCSO Memorandum of Agreement are expressly allowed to stop and interrogate any person "*believed*" by a MCSO 287(g) certified officer to be an alien as to his/her right to be or remain in the United States. *See* 8 U.S.C. § 1357; 8 C.F.R. § 287.5, *et seq.* They are also permitted to make warrantless arrests. *Id.*

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

1
2
3
4

Morales and another unknown person sat in the second row in the extended cab pick-up truck and drove on Cave Creek Road. *Id.* at ¶ 14. *Mr. Melendres and the other persons were picked up by the driver of the white colored truck at the church that was under HSU surveillance. Id.* at ¶ 15.

### 3.     The Actual Traffic Stop of the Melendres Truck.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

When a HSU surveillance unit observed the white truck stop at the church and pick up Mr. Melendres and three other men it radioed MCSO Deputy Louis DiPietro in his patrol car and assigned him to follow the truck (in which Mr. Melendres was a passenger) and to look for probable cause to make a traffic stop of the truck. *Id.* at ¶ 16.  Deputy DiPietro followed the truck and observed no equipment violations on the truck and, therefore, "paced" the truck for roughly 1.5 miles and determined it was speeding (34 mph in a 25 mph zone) and that he had probable cause to lawfully stop the truck for a violation of the traffic code. *Id.* at ¶ 17; *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (A traffic violation provides probable cause to stop the vehicle and to reasonably detain a driver and other occupants of the vehicle); *Whren v. United States,* 517 U.S. 806, 810 (1996) (same, regardless of the subjective intentions or motivations of the stopping officer in making the traffic stop); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (a traffic violation results in probable cause to stop the vehicle).  Once the truck was stopped, Deputy DiPietro contacted the truck's driver, and based on information provided by the driver, formed reasonable suspicion that the truck's occupants may have been in the country unlawfully.  SOF at ¶ 18.  Deputy DiPietro, therefore, called on his radio for a 287(g) MCSO deputy to assist at the stop to investigate the truck's occupants. *Id.* at ¶ 19.

### 4.     The Role of Deputy Rangel.

22
23
24
25
26
27

MCSO Deputy Carlos Rangel arrived at the traffic stop within *one minute* of receiving the call for a 287(g) deputy. *Id.* at ¶ 20.  Deputy Rangel was then a 287(g) certified officer. *Id*.  Deputy DiPietro told Deputy Rangel that the passengers in the truck did not speak English and asked if he would talk to the passengers. *Id.* at ¶ 21.  Deputy Rangel, a Latino himself and a fluent Spanish speaker, asked the passengers for identification. *Id.* at ¶ 22.  Deputy Rangel questioned the truck's passengers *while* Deputy DiPietro was

28

*simultaneously questioning* the driver of the truck.  *Id.* at ¶ 23; *see also Muehler*, 544 U.S. at 101("mere police questioning [regarding identification] does not constitute a seizure unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop."); *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) (holding that officers did not need reasonable suspicion to ask questions of an individual or to ask to examine the individual's identification); *United States v. Turvin*, 517 F.3d 1097, 1100-1104 (9th Cir. 2008) (reasonable suspicion is not required to ask questions unrelated to purpose of an initially lawful stop); *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (*Muehler* applies equally to traffic stops); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500-501 (4th Cir. 2007) ("request for identification from passengers falls within purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event.").

As a 287(g) certified officer, Deputy Rangel had broad authority to question the truck's occupants to determine whether they were lawfully present in the United States.  *See* 8 U.S.C. § 1357; 8 C.F.R. § 287.5, *et seq.*  As set forth in the 2007 Memorandum of Agreement between the MCSO and ICE, a 287(g) deputy has:

> the power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1))… [and] [t]he power to arrest without warrant any alien entering or attempting to unlawfully enter the United States, or any alien in the United States, if the officer has **reason to believe** the alien to be arrested is in the United States in violation of law and is **likely to escape before a warrant can be obtained**. INA § 287(a)(4) and 8 C.F.R. § 287(c)(2).

SOF at ¶ 24 (emphasis added).

Deputy Rangel, as a 287(g) officer, looked for ICE approved indicators of unlawful presence in the United States such as the questioned person providing him with a foreign identification card, not having any identification documents issued from anywhere in the United States, and the inability to speak the English language.  *Id*. at ¶ 25.  Based on those indicators, a 287(g) officer is permitted to question persons about their country of origin and whether they are lawfully present in the United States.  *Id*.

Deputy Rangel questioned Mr. Melendres.  According to Deputy Rangel, Mr.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

Melendres provided him with a tourist visa but did **not** provide an I-94 Form. *Id.* at ¶ 26. Mr. Melendres, therefore, was "out-of-status." Deputy Rangel then asked the passengers whether they were going to work, and two of the passengers responded "yes," with one of the responders being Mr. Melendres. *Id.* at ¶ 27. Mr. Melendres, therefore, also was "out-of-status" based on his statement about working on his tourist visa. Deputy Rangel then instructed the truck's passengers, including Mr. Melendres, to exit the truck. *Id.* at ¶ 28.

### 5.   Deputy Rangel used his 287(g) Authority to Detain Melendres.

Based on the identification information and statements provided by Mr. Melendres and the other passengers, Deputy Rangel began to try to determine whether the passengers were in the United States legally. *Id.* at ¶ 29. Mr. Melendres told Deputy Rangel that Mr. Melendres had lawfully entered the United States through a legitimate port of entry, had obtained an I-94 Form**, but did not have the I-94 Form with him at the moment**. *Id.* at ¶ 30.[2]   Based on Mr. Melendres not having his I-94 Form on him at the time and his statement that he was working, Deputy Rangel detained Mr. Melendres with handcuffs and directed that he be delivered to ICE for handling and/or verification of status. *Id*. at ¶ 32.

Deputy Rangel advised Mr. Melendres that he was being detained because he did not have his I-94 Form with him. *Id*. at ¶ 33. Deputy Rangel was polite to Mr. Melendres at all times. *Id*. The total amount of time Deputy Rangel spent questioning the truck's passengers was *fifteen (15) minutes. Id.* at ¶ 34. All of the truck's passengers were detained. *Id*. at ¶ 35. The passengers/detainees were taken to an MCSO substation and held for roughly two hours, and then the MCSO transported them to ICE's Detention and Removal Office near Central Avenue and McDowell Road where Mr. Melendres waited in federal detention for six to seven hours for federal officials. *Id*. at ¶ 36.

ICE eventually released Mr. Melendres from detention. The ICE agent that determined Mr. Melendres' status told Deputy Rangel that ICE released Mr. Melendres because it concluded that there was insufficient evidence that Mr. Melendres was actually

---

[2]   Mr. Melendres testified that he gave his I-94 Form to the deputy that questioned him at the time of the stop. SOF at ¶ 31. Mr. Melendres, however, has never produced a copy of the I-94 Form that he supposedly had on September 26, 2007 and the one copy of an I-94 Form produced in the litigation does not include or cover the date of his September 26, 2007 stop and detention. *Id*. Regardless, this factual dispute is *immaterial* to the resolution of this Motion as Deputy Rangel had other grounds to detain Mr. Melendres under the 287(g) authority.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1493

working during his visit to the United States, and that he had an I-94 Form issued to him despite him being "out-of-status" at the time of the traffic stop (i.e., not having the I-94 Form on him when questioned by Deputy Rangel). *Id.* at ¶ 37.[3]

### B.    The Traffic Stop Involving Mr. and Mrs. Rodriquez.

The next set of individual plaintiffs is the married couple of David Rodriguez and Jessika Rodriguez.

Deputy Matthew Ratcliffe is an eight-year veteran of the MCSO.  In 2007 he worked in the MCSO Lake Patrol Division.  The Lake Patrol Division is responsible for policing the recreational areas within Maricopa County and the Tonto National Forest.  SOF at ¶ 39. Lake Patrol deputies conduct traffic-related patrol duties near the recreational areas, perform searches and rescues and dive missions in the lakes and rivers, and conduct ATV patrols.  *Id.*

On Sunday, December 2, 2007, the Maricopa County Department of Transportation ("MCDOT"), in order to protect the public's safety, closed the Bartlett Dam Road, the road to Bartlett Lake, because storm damage had caused heavy flooding on it, washed away parts of the road, and left debris on the road.  *Id.* at ¶ 40.  There was a "*Road Closed*" sign posted by the MCDOT across Bartlett Dam Road indicating to approaching drivers that the road was closed.  *Id.* at ¶ 41.

Deputy Ratcliffe was on regular patrol that day in a marked MCSO SUV.  *Id.* at ¶ 42. Neither Deputy Ratcliffe nor anyone from the MCSO conducted a saturation patrol on that date.  *Id.* at ¶ 43.  In the early afternoon, Deputy Ratcliffe observed a dark colored truck driving toward his parked position on the closed Bartlett Dam Road and then observed that it suddenly made a "u-turn" as it approached him and another MCSO officer.  *Id.* at ¶ 44. Deputy Ratcliffe determined that the truck had committed a traffic violation by driving on the closed road, and decided to stop the truck and issue a citation to its driver.  *Id.* at ¶ 45. Before deciding to conduct the traffic stop and issue a citation, Deputy Ratcliffe did *not* see

---

3  Plaintiffs' Complaint asserts that an MCSO deputy made allegedly crude and derogatory remarks to Mr. Melendres about lotion found in his pocket. SOF at ¶ 38.  Mr. Melendres, however, does not speak or understand English well and did not personally hear such alleged comments.  *Id.*  The alleged remarks were reported to Mr. Melendres by his friend Jorge Morales while they were in custody.  *Id.*  Deputies DiPietro, Rangel, and Madrid deny making or hearing such comments.  *Id.*  Regardless, to the extent any factual dispute on this issue exists from the hearsay statement, it is neither material nor germane to the resolution of this Motion for Summary Judgment.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

the race of the truck's driver or of any of the truck's occupants. *Id*. at ¶ 46.

Mr. David Rodriguez was driving the truck, his wife, Jessika, was sitting in the front right passenger seat, and the Rodriguez' children were seated in the truck's back row. Deputy Ratcliffe stopped the truck and asked Mr. Rodriquez for his driver's license, vehicle registration, and proof of insurance documents. *Id*. at ¶ 47. He also asked Mr. Rodriquez for his Social Security *number* so he could complete the MCSO citation form which includes a space for recording such information. *Id*. at ¶ 48. Deputy Ratcliffe denies asking Mr. Rodriguez for his Social Security card. *Id*. at ¶ 49.[4] Indeed, Deputy Ratcliffe never asks any driver for his Social Security card. *Id*.

After obtaining Mr. Rodriguez' identification, Deputy Ratcliffe asked him why he was driving his truck on the closed Bartlett Dam Road. *Id*. at ¶ 50. **Mr. Rodriguez stated that "he had driven around the [road closed] sign and was taking the kids down to the lake."** *Id*.[5] Mr. and Mrs. Rodriguez asked Deputy Ratcliffe why he asked for David's Social Security number. *Id*. at ¶ 52. Deputy Ratcliffe explained that it was for identification purposes only and to fill in the blanks on the MCSO citation form. *Id*. Deputy Ratcliffe performed via radio a records check on the Rodriguez' truck and then issued a citation to Mr. Rodriguez for failure to obey a traffic control device (i.e., the "*Road Closed*" sign). *Id*. at ¶ 53. He determined that a citation was appropriate in his discretion because of the safety risk inherent in driving on the closed road. *Id*.

Upon receipt of the citation, Mr. Rodriguez asked Deputy Ratcliffe what possible affect such a citation would have on his commercial driver's license, and either Mr. or Mrs. Rodriguez then told Deputy Ratcliff that he/she did not see any other drivers on the closed road receiving citations. *Id*. at ¶ 54. Deputy Ratcliffe responded by telling Mr. and Mrs. Rodriguez that he was only dealing with them and not dealing with other drivers at that time. *Id*. It was at this time that Mrs. Rodriguez accused Deputy Ratcliffe of "selective

---

[4]   Mr. Rodriguez testified that Deputy Ratcliffe asked for his Social Security card. This conflict in testimony is immaterial to the resolution of this Motion for the same reasons set forth below in footnote 5.

[5]   Mr. Rodriguez admits that he saw a "*Road Damaged*" sign but drove past it. SOF at ¶ 51. He denied ever seeing a "*Road Closed*" sign. *Id*. This conflict in testimony is *immaterial* to the resolution of this Motion because it is undisputed that Mr. Rodriguez was actually driving on a closed road, and as will be shown below, it is undisputed that Deputy Ratcliffe had probable cause to stop the truck driven by Mr. Rodriguez.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

enforcement" in issuing the traffic citation to her husband. *Id.* at ¶ 55. Mrs. Rodriguez became "argumentative" with Deputy Ratcliffe. *Id.* According to Deputy Ratcliffe, neither Mr. nor Mrs. Rodriguez ever told him that they had not seen the "*Road Closed*" sign, or that they were off-road driving and must have missed seeing the sign. *Id.* at ¶ 56.[6] The total time for the Rodriguez traffic stop was approximately ten (10) minutes. *Id.* at ¶ 58.

After completing the traffic stop, Deputy Ratcliffe drove behind the Rodriguez' truck as it left the area. He was behind the Rodriquez truck for roughly two miles, not to escort them out, or to harass or intimidate them, but in order for Deputy Ratcliffe to reach the location where he could take a picture of the "*Road Closed*" sign. *Id.* at ¶ 59. "Due to the argumentative nature of the passenger in the vehicle [Mrs. Rodriguez], [Deputy Ratcliffe] wanted to take photographs of the '*Road Closed*' sign and the '*Road Closed Ahead*' signs for later defense in court." *Id.* Mr. Rodriguez later pled responsible to the citation. *Id.*

## C. The Traffic Stop of Ms. Meraz and Mr. Nieto.

The last set of individual Plaintiffs are siblings, Mr. Manuel Nieto, Jr. and Ms. Velia Meraz.

### 1. The Role of Deputy Armendariz.

Deputy Ramon Armendariz is a member of the MCSO HSU and is 287(g) certified. SOF at ¶ 61. Deputy Armendariz' first language is Spanish and he is fluent in speaking that language. *Id.* at ¶ 62. On March 28, 2008, the MCSO was conducting a saturation patrol in north Phoenix. Deputy Armendariz worked the saturation patrol in the capacity of a patrol officer and his role was to conduct traffic stops and write citations. *Id.* at ¶ 63. Around 2:00 p.m., Deputy Armendariz made a traffic stop of a car on North Cave Creek Road and that car pulled into a convenience mart/gas station located at the southwest corner of North Cave Creek Road and East Nesbit Road. *Id.* at ¶ 64. Deputy Armendariz parked his patrol car behind the stopped car. *Id.* at ¶ 65. The stopped car contained two men, and Deputy Armendariz conducted a radio check on them. *Id.*

---

[6] The Rodriguez' claim they were off-road driving and must have missed the *Closed Road* sign. SOF at ¶ 57. As in footnotes 4-5, this factual dispute also is immaterial to the resolution of this Motion as Mr. Rodriguez was stopped and cited for committing a traffic violation for driving on a closed road, and to which Mr. Rodriguez later pled responsible. SOF at ¶ 60.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional Corporation

Following his radio check, Deputy Armendariz took both men into custody. *Id*. at ¶ 66. He arrested the car's driver for driving with a suspended license, placed him in handcuffs, and sat him inside his MCSO patrol car. *Id*. For security reasons because he was the only officer at the scene, Deputy Armendariz placed handcuffs on the car's passenger, and had the passenger sit down on the front bumper of the MCSO patrol car. *Id*. at ¶ 67. At that moment a dark colored vehicle pulled into the convenience mart/gas station and parked *directly* behind Deputy Armendariz' patrol car. *Id*. at ¶ 68. Deputy Armendariz was standing in front of his patrol car handling the detained passenger of the car he stopped. *Id*.

The dark colored vehicle was playing load music, the passenger side windows were down, and Deputy Armendariz could see a female passenger (later known to be Ms. Meraz) and a male driver (later known to be Mr. Nieto). *Id*. at ¶ 69. The female passenger started *yelling repeatedly* in Spanish out her window at Deputy Armendariz' detainee sitting on the bumper of the patrol car, "no diga nada,' 'no diga nada,' … which means don't – 'don't say anything,' 'don't say anything'; 'pida un abogado,' 'pida un abogado,' which means ….'ask for a lawyer,' 'ask for a lawyer.'" *Id*. at ¶ 70.

At first, Deputy Armendariz tried to ignore the yelling, but the female passenger in the dark colored vehicle kept yelling and he began to fear for his safety. *Id*. at ¶ 71. Deputy Armendariz, therefore, ordered the driver of the vehicle to leave his vicinity and to stay out of the way. *Id*. In response to Deputy Armendariz' command, the female passenger **yelled** several times that 'we're not going anywhere!" *Id*. at ¶ 72. Deputy Armendariz again ordered that they leave. *Id*. at ¶ 73. The dark vehicle, however, would not leave. Then the female passenger started **yelling** at Deputy Armendariz "fucking Sheriff Joe, fucking Nazi," and "you guys don't have a right to do this." *Id*. at ¶ 74.

Deputy Armendariz was worried about his safety and the safety of the two men he had in custody. *Id*. at ¶ 75. Because the vehicle with the yelling passenger would not leave, Deputy Armendariz called on his radio for back-up. *Id*. at ¶ 76.[7]

---

[7]  MCSO Deputy Douglas Beeks heard Deputy Armendariz' radio call for back-up and described Deputy Armendariz' voice as sounding "excited" and "agitated". *Id*. at ¶ 77. Deputy Beeks also recalls hearing words used by Deputy Armendariz that led Deputy Beeks to believe in good faith that "a vehicle had tried to run over or hit Deputy Armendariz as it left the area" and that a crime may have been committed. *Id*. Accordingly, Deputy Beeks was concerned for the safety of Deputy Armendariz. *Id*. MCSO Deputy Michael Kikes also heard Deputy Armendariz' radio call for

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1   Despite Deputy Armendariz' repeated commands for them to leave, the male in the

2   dark colored vehicle then opened his door and started to get out.  *Id*. at ¶ 78.  Deputy

3   Armendariz believed that the male was going to get out of the car to "try to kick my ass."  *Id*.

4   The vehicle occupants appeared very "angry" and were acting "very threatening."  *Id*. at 79.

5   "[T]heir actions towards [Deputy Armendariz] were as if it was personal towards [him]."  *Id*.

6   Deputy Armendariz testified as to his state of mind when he saw the male in the vehicle open

7   his door and start to get out:

8   I had other responsibilities that I was taking care of.  I had two people that I was in --
    that I had in custody that I was responsible for.  I didn't know if he [Mr. Nieto] was
9   going to come out with a gun.  I didn't know if he was going to come out with a knife.
    Am I going to have to -- am I going to have to defend myself while protecting my
10  suspect that I have in custody?  You know, is this going to turn into -- is he going to
    get out with a knife?  Am I going to have to shoot him?  Is he going to come out with
11  a gun?  Am I going to have to spray -- you know, pepper spray to get him away from
    me?  I mean, just the array of, you know, "what-ifs."  That situation could have gone
12  bad, really bad, really quick.

13

14  *Id*. at 80.[8]

15   Seeing this, Deputy Armendariz grew more worried, in fact he was afraid, and

16  ordered the man to stay in his car or he would be arrested for disorderly conduct.  *Id*. at ¶ 82.

17  In short, the occupants of the vehicle (Ms. Meraz and Mr. Nieto) made "a big scene" at the

18  convenience mart/gas station.  *Id*. at ¶ 83.

19   Finally, the vehicle's occupants complied with Deputy Armendariz' command and

20  left the scene while yelling profanities at him.  After the vehicle was out of Deputy

21  Armendariz' sight, other MCSO deputies arrived on scene in response to his radio call for

22  assistance.  Deputy Armendariz identified the vehicle to MCSO motorcycle Deputy Michael

23  Kikes and then pointed Deputy Kikes in the general direction of the departed vehicle.

24  Deputy Beeks, in a patrol car, followed Deputy Kikes.  Deputy Armendariz returned to the

25  work of safely handling his arrestees.

---

26  assistance and believed, based on the pitch of Deputy Armendariz' voice, that something was wrong at the time of
    Deputy Armendariz' call.  *Id*.

27  [8]  Deputy Armendariz' caution about Mr. Nieto's anger and behavior was sound.  Although unknown to Deputy
28  Armendariz at the time, Plaintiff Manuel Nieto is a three-time convicted felon who spent 3.5 years in prison for domestic

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1498

1

2.     **The Role of Deputies Kikes and Beeks.**

2

Deputy Kikes quickly spotted the dark colored vehicle driving on North Cave Creek

3

Road and activated his motorcycle's lights and siren.  *Id*. at ¶ 84.  Deputy Kikes believed in

4

good-faith that he had probable cause to stop the dark colored vehicle because he believed

5

there was an emergency situation of some type involving Deputy Armendariz.  *Id*. at ¶ 85.

6

Due to the vehicle's window tinting, Deputy Kikes could <u>not</u> see the race, sex, or other

7

characteristics of the vehicle's occupants.  *Id*. at ¶ 86.   The driver of the vehicle (i.e., Mr.

8

Nieto) would <u>*not*</u> stop in response to Deputy Kikes' signals (in itself a violation of the traffic

9

law), and he drove another 300 feet until he turned left into an auto shop instead of pulling

10

over on the right side of the public roadway as required by law.  *Id*. at ¶ 87.   Deputy Kikes

11

was concerned about the driver's behavior, where he parked, and what that behavior meant.

*Id*. at ¶ 88.

12

Once the vehicle pulled into the auto repair shop, the driver (Mr. Nieto) refused to

13

exit his vehicle.  *Id*. at ¶ 89.  He also refused to roll down his window to speak with Deputy

14

Kikes.  *Id*. at ¶ 90.  At this time, two unknown men in mechanic's clothing immediately

15

came out from the auto repair shop and were "angry", "yelling" and "cursing" at Deputy

16

Kikes.  *Id*. at ¶ 91.  Deputy Beeks, now at the scene, saw the driver acting very "belligerent",

17

"non-compliant", and "almost hostile in nature" toward Deputy Kikes, and Deputy Beeks

18

thought that the driver might drive his vehicle forward or backward; therefore, Deputy Beeks

19

pulled his handgun to his side for safety purposes.  *Id*. at ¶ 92.  Finally, Deputy Kikes opened

20

the vehicle's door, grabbed the driver, and removed him from the vehicle where he then

21

handcuffed him.  *Id*. at ¶ 93.  Deputy Kikes moved the driver to the rear of the vehicle away

22

from the angry mechanics and obtained his driver's license information.  *Id*. at ¶ 94.

23

Deputy Kikes conducted a radio check on the driver's status (Mr. Nieto's) and it came

24

back clear.  *Id*. at ¶ 95.  Deputy Beeks then contacted Deputy Armendariz to determine what

25

had actually occurred between him and the vehicle occupants.  *Id*. at ¶ 96.  Following that

26

communication, Mr. Nieto was released without being charged with either a traffic violation

(i.e., failure to stop when directed) or for obstructing Deputy Armendariz.  *Id*. at ¶ 97.[9]

27

28

violence and was released from prison only one month earlier in February 2008.  SOF at ¶ 81.

[9]  Mr. Nieto and Ms. Meraz deny making many of the comments and acting with the behavior attributed to them by

1    Deputies Kikes and Beeks left the auto repair shop.

2    **III.     PLAINTIFFS LACK STANDING TO OBTAIN EQUITABLE RELIEF AND**
3    **SUMMARY JUDGMENT IS REQUIRED.**

4           To have standing to seek equitable relief, a plaintiff must satisfy the case-or-
5    controversy requirement under Article III of the Constitution and demonstrate a real and
6    immediate threat of future injury. *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1040-45
7    (9th Cir. 1999). "It is the responsibility of the [plaintiff] clearly to allege facts demonstrating
8    that he is a proper party to invoke judicial resolution of the dispute and the exercise of the
9    court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). Standing cannot be
10   "inferred argumentatively from averments in the pleadings." *Grace v. American Cent. Ins.*
11   *Co.*, 109 U.S. 278, 284 (1883). **Standing "must affirmatively appear in the record."**
12   *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citations omitted) (emphasis
13   added) (overruled on other grounds in *City of Littleton v. Z. J. Gifts D-4, L.L.C*, 541 U.S.
14   774, 781 (2004)); *see also Althin v. W. Suburban Kidney Ctr.*, 874 F. Supp. 837(N.D. Ill.
15   1994). "System-wide injunctive relief is not available based on alleged injuries to unnamed
16   members of a proposed class." *Hodges-Durgin*, 199 F.3d at 1045; *see also Lewis v. Casey*,
17   518 U.S. 343, 357 (1996). After extensive discovery, the evidentiary record now
18   demonstrates that Plaintiffs have failed to meet their burden of proof for establishing that
     they have standing to continue this lawsuit. As such, summary judgment is required.

19        **A.     Plaintiffs Have Failed to Demonstrate a Real and Immediate Threat of**
20        **Future Injury.**

21          A plaintiff seeking to invoke the jurisdiction of the federal courts must demonstrate an
22   actual case or controversy to satisfy the jurisdictional requirement under Article III of the
23   Constitution. *Flast v. Cohen*, 392 U.S. 83, 94-101 (1968). To satisfy the case-or-
24   controversy requirement under the Constitution, **a plaintiff seeking *equitable relief* must**

25   ───────────────────────────────────────────

26   Deputies Armendariz, Kikes, and Beeks in their depositions. These denials, however, do *not* create genuine issue of
     material fact on the issues pending before the Court on this Motion as shown below. Additionally, Ms. Meraz'
27   truthfulness is at issue for several reasons, including the fact she has a prior felony conviction for fraudulent schemes and
     artifices for writing money orders to herself while she was employed at Catholic Social Services as an immigration case
28   worker. SOF at ¶ 98. Because those credibility issues are not germane to the Court's ruling on this Motion, they are not
     addressed further in this Motion.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

**demonstrate a "credible" and "genuine" threat of suffering the same harm or injury again in the future.** *Ellis v. Dyson*, 421 U.S. 426, 434-435 (1975); *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 and 502 (1974) ("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief;" to obtain equitable relief, the plaintiff must establish "the likelihood of substantial and immediate irreparable injury."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (in the context of a party seeking injunctive relief, the plaintiff must prove that he is "likely to suffer future injury.")

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 299 (1998) (citation and internal quotation omitted). "[F]ailure to establish a likelihood of future injury similarly renders . . . [a] claim for declaratory relief unripe. Ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought." *Hodgers-Durgin*, 199 F.3d at 1044 (clarifying that "[i]n suits seeking both declaratory and injunctive relief against a defendant's continuing practices, the ripeness requirement serves the same function in limiting declaratory relief as the imminent-harm requirement serves in limiting injunctive relief.") (citation omitted).

Here, the Plaintiffs allege that since 2007 they have been subjected to the MCSO's alleged official policy, pattern, and practice of stopping, questioning, searching, and sometimes arresting Latino persons without probable cause or reasonable suspicion simply on the basis of their race. SOF at ¶ 99. They further alleges that the MCSO's challenged conduct occurs not only as a general practice of the MCSO when making traffic stops, but also through making traffic stops during saturation patrols or so called "crime suppression sweeps." *Id.*

Plaintiffs have completely failed, however, to prove a credible and genuine threat of the MCSO stopping, questioning, searching, detaining or otherwise harming ***them again*** in the future. *Lyons*, 461 U.S. at 103-106 (and the cases cited therein); *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 95 F.Supp.2d 723, 731 (N.D. Ohio 2000); *see also Huss v. Spokane County*, 2007 U.S. Dist. LEXIS 27667, *4-8 (E.D.Wash. 2007) ("plaintiff seeking to challenge an unconstitutional policy must show a genuine threat of enforcement

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

of the policy against the plaintiff"). Indeed, the **extensive evidence garnered during this litigation amply shows that although the Plaintiffs have been long exposed to MCSO scrutiny under its alleged "racial profiling" policy since 2007, they have nevertheless experienced no additional traffic stop encounters with the MCSO of which they can complain of, or at all.**

Mr. Melendres is a Mexican national and lives in Ciudad Obregon, Sonora, Mexico, about a seven (7) hour bus trip from the border at Nogales, Mexico. SOF at ¶ 100. As a citizen of Mexico, Mr. Melendres is **not** likely to again encounter the MCSO while he lives in Mexico. In addition, Mr. Melendres has returned to Maricopa County "once or twice" since his September 2007 traffic stop. *Id*. at ¶ 101. When he has visited Maricopa County on those occasions, Mr. Melendres stays only for "some days or maybe a week." *Id*. at ¶ 102. During his one or two visits to Maricopa County after the 2007 traffic stop, Mr. Melendres has **not** again been stopped, questioned, detained, arrested, searched, or investigated by the MCSO. *Id*. Moreover, Mr. Melendres' own statistics expert, Ralph Taylor, Ph.D., has *no opinion* as to whether Mr. Melendres is likely to again face a future traffic stop by the MCSO. *Id*. at ¶ 146. Mr. Melendres, therefore, cannot prove a "credible" and "genuine" threat of future interaction with the MCSO, let alone likely future harm caused by the MCSO. He lacks standing to seek the equitable relief set forth in the First Amended Complaint.

As to Mr. and Mrs. Rodriguez, they each testified that since their December 2007 traffic stop on Bartlett Dam Road by Deputy Ratcliffe, and although they live and work in Maricopa County, they each have had **no other traffic stop encounters** with the MCSO. *Id*. at ¶ 103. Indeed, Mrs. Rodriquez drives 20 miles roundtrip to work every day and estimates that she drives roughly 20,000 miles on her personal car every year in Maricopa County but has never again been stopped by the MCSO. *Id*. at ¶ 104. Dr. Taylor also has *no opinion* as to whether Mr. and Mrs. Rodriguez are likely to again face a future traffic stop by the MCSO. *Id*. at ¶ 147. Mr. and Mrs. Rodriquez, therefore, cannot demonstrate a "credible" and "genuine" threat of future interaction with the MCSO, or any likely future harm by the MCSO. As such, they lack standing to seek the equitable relief set forth in the First

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1   Amended Complaint.

2         Likewise, Ms. Meraz and Mr. Nieto are hard-pressed to prove that that they have a

3   "credible" and "genuine" threat of the MCSO again stopping, questioning, searching, or

4   detaining them in the future.  Ms. Meraz testified that since her March 2008 traffic stop by

5   the MCSO she has had **no other personal experience** with the MCSO stopping her in any

6   vehicle at any time for any reason.  *Id*. at ¶ 105.  Her brother, Mr. Nieto, testified that he also

7   has had **no traffic stop encounters with the MCSO** since the March 2008 traffic stop.  *Id*.

8   at ¶ 106.  Once again, Dr. Taylor also has no opinion as to whether Ms. Meraz and Mr. Nieto

9   are likely to again face a future traffic stop by the MCSO.  *Id*. at ¶ 148.  As a consequence,

10  Ms. Meraz and Mr. Nieto cannot demonstrate a "credible" and "genuine" threat of future

11  traffic stop interaction with the MCSO, or any likely future harm by the MCSO.  They also

   lack the standing to seek equitable relief.

12        The sole organizational Plaintiff, Somos America, also can show no credible or

13  genuine threat of future injury.  Somos America's Rule 30(b)(6) representative, Ms. Lydia

14  Guzman, has never experienced a traffic stop by the MCSO.  *Id*. at ¶ 150.  Somos America is

15  a non-profit advocacy organization, with no paid staff, no membership dues, and any person

16  or entity that attends its monthly meetings may consider itself a member of Somos

17  American.  *Id*. at ¶ 151.  It has only 35 members such as *Latino American Citizens*, *No More*

18  *Deaths*, *MECHHA*, and various labor unions, and there is no admissible evidence that any

19  Somos America member -- or employee of a member organization -- has been subject to an

20  MCSO traffic stop.  *Id*. at ¶ 152.

21        In summary, the evidentiary record shows that "it is not sufficiently likely that [the

22  Plaintiffs] will again stopped by the" MCSO.  *Hodgers-Durgin*, 199 F.3d at 1044.  In other

23  words, Plaintiffs are not sufficiently "likely to suffer future injury" because of the MCSO's

24  alleged racial profiling policy.  *Lyons*, 461 U.S. at 105.  The Plaintiffs lack standing to

25  request or receive the injunctive relief they seek against the Defendants.  The Court,

   therefore, should dismiss their claims.[10]

26

27     [10]  There is another reason the Plaintiffs lack standing.  Plaintiffs can avoid future traffic stop encounters with the MCSO by avoiding

28  future unlawful conduct, such as violating the Arizona motor vehicle code or, as in the case of Ms. Meraz and Mr. Nieto, complying
   with the lawful instructions of a peace officer.  "[S]tanding is inappropriate where the future injury could be inflicted only in the event

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

**IV.  PLAINTIFFS' FOURTH AMENDEMENT AND ARIZONA CONSTITUTIONAL CLAIMS FAIL BECAUSE EACH OF THEIR TRAFFIC STOPS WITH THE MCSO WERE PRECEDED BY, AND BASED ON, PROBABLE CAUSE OR REASONABLE SUSPICION THAT THEY, OR THE VEHICLES IN WHICH THEY WERE PASSENGERS, HAD VIOLATED ARIZONA LAW.**

The existence of probable cause or reasonable suspicion supporting the traffic stops of each of the Plaintiffs defeats their Fourth Amendment and Arizona Constitution Article II, § 8 claims. *Virginia v. Moore*, 553 U.S. 164, 171 (2008) (a seizure based on probable cause does not violate the Fourth Amendment); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (no Fourth Amendment violation arises out of seizure for minor traffic infraction where police officer has probable cause to believe seized person violated law); *Edgerly v. City and County of San Francisco*, 599 F.3d 946, 959 (9th Cir. 2010) (the existence of probable cause renders a seizure reasonable under the Fourth Amendment); *Cabrera v. Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (probable cause defeats a § 1983 claim for false arrest); *United States v. Choudhry*, 461 F.2d 1097, 1101 (9th Cir. 2006) (no Fourth Amendment violation for traffic stop based on reasonable suspicion); *cf. Malmin v. State*, 246 P. 548, 548-49 (Ariz. 1926) (Article II, § 8 of Arizona Constitution "although different in its language, is of the same general effect and purpose as the Fourth Amendment, and, for that reason, decisions on the right of search under the latter are well on point."); *see also State v. Reyna*,  71 P.3d 366, 369-70 & n.5 (Ariz. App. 2003); *State v. Teagle*, 170 P.3d 266, 271 n.3 (Ariz. App. 2007).

Law enforcement officers may stop a moving vehicle if they have probable cause or reasonable suspicion that a moving violation has occurred. *Whren*, 517 U.S. at 810. Probable cause determinations present mixed question of law and fact in which the legal issues predominate. *Orenelas v. United States*, 517 U.S. 690, 697-98 (1996).  In determining

---

of future illegal conduct by the plaintiff." *Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001). "Where a party can prevent all risk of constitutional injury by controlling his conduct (without sacrificing any of his rights, privileges, or immunities), his claim of standing, which is predicated on a future unlawful act on his own part, is of dubious legitimacy." *Farm Labor*, 95 F.Supp.2d at 731, n. 6 (citing *O'Shea*, 414 U.S. at 497). "It is to be assumed that (plaintiffs) will conduct their activities within the law and so avoid . . . exposure to the challenged course of conduct said to be followed by [police officials]." *Lyons,* 461 U.S. at 103. Even  Plaintiffs' expert Dr. Taylor admits that future behavior by Plaintiffs is a  variable that will determine whether it is likely that Plaintiffs will ever again be stopped by the MCSO. SOF at ¶ ¶  146 and 149.

18

whether there is probable cause to defeat a Fourth Amendment claim, courts do **not** consider a stopping officer's actual motivation for effectuating the traffic stop.  *Whren*, 517 U.S. at 812-13; *see also United States v. Robinson*, 414 U.S. 218, 221 n.1 (1973) ("a traffic violation arrest would not be rendered invalid under the Fourth Amendment by the fact that it was a mere pretext for a narcotics search."); *United States v. Ramirez*, 473 F.3d 1026, 1030-31 (9th Cir. 2007) (pre-textual traffic stops based on probable cause that are also motivated by some other reason do not violate Fourth Amendment); *United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005) (same);  *Rodriquez v. California Highway Patrol*, 89 F.Supp.2d 1131, 1139 (N.D. Cal. 2000) (same).  Instead, "[p]robable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime [or traffic offense] has been committed."  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009).

Reasonable suspicion is a less exacting standard than probable cause.  *United States v. Skolow*, 490 U.S. 1, 7 (1989).  When deciding whether a traffic stop was supported by reasonable suspicion, courts must consider whether "in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (internal quotation marks and citation omitted).

The undisputed evidence in this case demonstrates that ***each*** of the Plaintiffs' respective traffic stops was made on either probable cause or reasonable suspicion as required.  Plaintiffs' Fourth Amendment and Arizona Constitution Article II, § 8 claims, therefore, fail as a matter of law.

A.      **The Melendres Vehicle was Stopped for Probable Cause.**

Deputy DiPietro paced the truck, in which Mr. Melendres was a passenger, for 1.5 miles and determined it was speeding (i.e., going 34 mph in a zone marked for 25 mph) and that he had probable cause to lawfully stop the truck.  SOF at ¶ 17.  Speeding is a violation of Arizona law.  A.R.S. § 28-701; *see also* A.R.S. § 13-3883(B) ("A peace officer may stop and detain a person as is reasonably necessary to investigate an actual or suspected violation of any traffic law committed in the officer's presence…").  Even though Deputy DiPietro

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

1   wanted to stop the truck because he believed it may have passengers in the country

2   unlawfully, that subjective intent is irrelevant to the Fourth Amendment analysis.  *Whren*,

3   517 U.S. at 811 (rejecting "the principle that ulterior motives can invalidate police conduct

4   that is justifiable on the basis of probable cause.").

5        Although Mr. Melendres speculates that the truck in which he was a passenger was

6   not speeding, he has presented no admissible facts to dispute the probable cause

7   determination of Deputy DiPietro.  SOF at ¶ 107.  Defendants' law enforcement practices

8   expert witness, Bennie R. Click, opines that "Deputy DiPietro had probable cause to stop the

9   vehicle in which Mr. Melendres was a passenger.  Deputy DiPietro's actions in stopping the

10  vehicle conformed with standard police training and law enforcement practice, met the

11  requirements set for in [A.R.S. section] 13-3883 and were reasonable."  *Id*. at ¶ 108.  Even

12  Plaintiffs' law enforcement practices/racial profiling expert witness, Robert L. Stewart, has

    no factual basis to disagree with Deputy DiPietro's probable cause determination:

13      Q.    Based on all the evidence that you have reviewed, did Deputy Louis DiPietro

14             have probable cause to stop the truck in which Mr. Melendres was a

15             passenger?

16      A.    According to him.

17      Q.    Is that a yes or a no?

18      A.    **His record reflects that he did.**

19      Q.    Do you have any *direct* evidence rebutting Deputy DiPietro's testimony that he

20             had probable cause to stop the truck?

21      A.    **No, sir.**

22      Q.    Do you have any *circumstantial* evidence rebutting Deputy DiPietro's

23             testimony that he had probable cause to stop the truck?

24      A.    **No, sir.**

25

26  *Id*. at ¶ 109 (emphasis added).  The undisputed evidence, therefore, shows that the traffic

27  stop involving Mr. Melendres was based on probable cause and his Fourth Amendment and

28  Arizona Constitution Article II, § 8 claims fail as a matter of law.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1506

1
2
3
4
5
6
7
8
9
10
11
12
13

There is also no unreasonable seizure under the Fourth Amendment or Arizona Constitution Article II, § 8 for Deputy Rangel's detention of Mr. Melendres.  According to Deputy Rangel, the questioning of the truck's passengers, including Mr. Melendres, lasted only fifteen minutes while Deputy DiPietro was concurrently questioning the driver.  SOF at ¶ 34.  The reasonableness of a detention is evaluated "from the perspective of a reasonable officer on the scene."  *Graham v. Connor,* 490 U.S. 386, 387 (1989).  In addition, Mr. Melendres was out-of-status (in not having his I-94 Form on him at the time of the stop) and stated that he was working while on his tourist visa and such information allowed a 287(g) certified officer to detain Mr. Melendres.  *See* 8 U.S.C. § 1357; 8 C.F.R. § 287.5, *et seq.*; *see also* SOF at ¶¶ 24-30, 32-33.  Mr. Melendres was in a MCSO holding cell before removal to ICE for "probably about two hours."  SOF at ¶ 110.  He was held by ICE -- not the MCSO -- for another six to seven hours at an ICE facility.  *Id.*  As such, Mr. Melendres was properly detained pursuant to Deputy Rangel's 287(g) authority.  *See* 8 U.S.C. § 1357; 8 C.F.R. § 287.5, *et seq.*; *see also* SOF at ¶¶ 24 and 111.

14

### B.    The Rodriguez Vehicle was Stopped for Probable Cause.

15
16
17
18
19
20
21

Deputy Ratcliffe had probable cause to stop the Rodriguez truck because it was driving on a closed road.  SOF at ¶¶ 44-45, and 51-52.  Knowingly or unknowingly disobeying a traffic control sign is a violation of Arizona law.  A.R.S. § 28-644.  Mrs. Rodriguez *admits* there was probable cause to stop her vehicle.  *Id.* at ¶ 112.  Mrs. Rodriguez is not even critical of the actual traffic stop.  *Id.* at ¶ 113.  Defense expert Mr. Click testified that Deputy Ratcliffe had probable cause to stop the Rodriguez truck.  *Id.* at ¶ 114.  The opinion of Plaintiffs' own expert, Mr. Stewart, is in accord:

22
23
24

Q.    Based on all the evidence you've reviewed, did Deputy Ratcliffe have probable cause to stop the Rodriguez vehicle on the road?

A.    **Yes.**

25
26
27
28

*Id.* at ¶ 115 (emphasis added).  Moreover, the factual testimony from Mr. and Mrs. Rodriquez as to whether they ever saw the "*Road Closed*" sign is immaterial.  Their own liability expert, Mr. Stewart, testified that Deputy Ratcliffe had probable cause to stop the Rodriguez truck even if Mr. Rodriguez did not see the "*Road Closed*" sign.  *Id.* at ¶ 116.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

The undisputed evidence, therefore, shows that the traffic stop involving Mr. and Mrs. Rodriguez was based on probable cause and their Fourth Amendment and Arizona Constitution Article II, § 8 claims fail as a matter of law.

**C.    The Meraz-Nieto Vehicle was Stopped for Reasonable Suspicion and Probable Cause.**

Neither Deputy Armendariz nor Deputy Beeks stopped the Meraz-Nieto vehicle. They, therefore, could not have violated Ms. Meraz and Mr. Nieto's rights under the Fourth Amendment or Article II, § 8.  Deputy Kikes, however, stopped the Meraz-Nieto vehicle. SOF at ¶¶ 84-85.

Deputy Kikes testified that he had probable cause to stop the Meraz-Nieto vehicle. *Id*. at ¶ 117.   He made the stop because he believed in good faith that the occupants of the vehicle were involved in some type of crime involving Deputy Armendariz. *Id*.  Defense expert Mr. Click opines that Ms. Meraz and Mr. Nieto obstructed Deputy Armendariz in his investigation and arrest of the two stopped men, and that the MCSO could have arrested Ms. Meraz and Mr. Nieto for such obstruction. *Id*. at ¶ 118.

Mr. Click further testified that Deputy Kikes had reasonable suspicion to stop the Meraz-Nieto vehicle. *Id*.   Plaintiffs' expert Mr. Stewart ***agrees*** that Deputy Kikes had reasonable suspicion under the circumstances that allowed him to properly stop the Meraz-Nieto vehicle. *Id*. at ¶ 119.  It is, therefore, undisputed, that Deputy Kikes had reasonable suspicion, if not probable cause, to stop the Meraz-Nieto vehicle.  Ms. Meraz and Mr. Nieto's Fourth Amendment and Arizona Constitution Article II, § 8 claims fail as a matter of law.

Finally, to the extent the Plaintiffs claim that Deputy Kikes' post-traffic stop treatment of Mr. Nieto (i.e., removing him from the vehicle and handcuffing him) violated Mr. Nieto's Fourth Amendment rights, such a claim lacks merit.  Plaintiffs' expert Mr. Stewart testified that Deputy Kikes acted "reasonably" in his post-stop conduct and treatment of Mr. Nieto. *Id*. at ¶ 120; *see also Graham,* 490 U.S. at 387 (the reasonableness of a detention is evaluated "from the perspective of a reasonable officer on the scene."); *Michigan v. Summers*, 452 U.S. 692, 703, fn. 14 (1981) ("[T]he reasonableness of a

detention may be determined in part by whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon….") (internal citation and quotations omitted).

Based on the foregoing undisputed facts, the Court must dismiss the Plaintiffs' Fourth Amendment and Arizona Constitution Article II, § 8 claims.

## V.   THE EVIDENTIARY RECORD DEMONSTRATES THAT THE PLAINTIFFS HAVE FAILED TO PROVE THEY SUFFERED INTENTIONAL DISCRIMINATION AND THEREFORE THEIR EQUAL PROTECTION AND TITLE VI DISCRIMINATION CLAIMS FAIL AS A MATTER OF LAW.

A plaintiff asserting a Fourteenth Amendment equal protection claim or a Title VI racial discrimination claim must demonstrate not only that the challenged law enforcement policy, pattern, or practice "had a discriminatory effect" but also "that it was *motivated* by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (emphasis added); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-74 (1979); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66; *Washington v. Davis*, 426 U.S. 229, 239-42 (1976); *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (stating that "a long line of Supreme Court cases make clear that **the Equal Protection Clause requires proof of discriminatory intent or motive.**") (emphasis added); *Wilkins v. City of Tempe*, 2010 U.S. District LEXIS 843 (D. Ariz. Jan. 5, 2010).

"[A] violation of Title VI, like a violation of the Equal Protection Clause, requires a showing of **intentional** discrimination." *Alexander v Sandoval*, 523 U.S. 275, 280 (2001) (emphasis added). "It is beyond dispute… that [Title VI] prohibits only intentional discrimination… [and] proscribes those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Id.*; *see also Benally v. Kaye*, 2005 U.S. Dist. LEXIS 39751 at *19-20 (D. Ariz. 2005). Thus, "in the absence of proof of discriminatory animus," a Title VI plaintiff cannot be awarded declaratory or injunctive relief. *Gebray v. Portland Int'l Airport*, 2001 U.S. Dist LEXIS 22747 at *11 (D. Oreg. 2001); *see Meyers v. San Juan Sch. Dist*, 905 F. Supp. 1544, 1573 (D. Utah 1995). Plaintiffs, therefore, must prove that the "decision makers in [their] case acted with discriminatory purpose." *McClesky v. Kemp*, 481 U.S. 279, 292 (1987). "'Discriminatory purpose… implies more

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

than … intent as awareness of consequences.  It implies that the decision maker… selected or reaffirmed a particular course of action at least in part because of… its adverse effects upon an identifiable group.'"  *Id.* at 298 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. at 279).

To avoid summary judgment, a plaintiff "must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision… was racially motivated." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001); *see also Bingham v. City of Manhattan* Beach, 341 F.3d 939, 948-49 (9th Cir. 2003) (same); FDIC *v. Henderson*, 940 F.2d 465, 473 (9th Cir. 1991) (same); *Cornwell v. Electra Cen. Credit Union*, 439 F.3d 1018, 1028-29 n.6 (9th Cir. 2006) (explaining that a plaintiff may not defeat a defendant's motion for summary judgment "by relying solely on the plaintiff's subjective belief that the challenged action was [wrong].").  As demonstrated below, the Plaintiffs have failed to produce "evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the MCSO's conduct toward them] was racially motivated." *Keyser*, 265 F.3d at 754.

A. **There is Insufficient Evidence of MCSO's Alleged Traffic Stop Policy or Practice having a Discriminatory Effect on Latinos and no Material Factual Dispute Exists.**

The essence of Plaintiffs' Fourteenth Amendment and Title VI racial discrimination claims is summarized in the First Amended Complaint:

> Caucasian drivers and passengers involved in the same or similar acts or alleged violations are treated differently and their vehicles stopped at much lower rates than similarly situated Latino drivers and passengers pursuant to MCSO policy and practice.  Further Caucasian drivers and passengers are treated differently and less intrusively and detained for shorter periods of time after their vehicles are stopped by MCSO personnel than Latino drivers and passengers after being stopped.  Latino occupants are also treated differently and more intrusively by MCSO than Caucasian occupants of the same vehicle

SOF at ¶ 121.  In other words, Plaintiffs assert that the evidence will show that MCSO's challenged law enforcement practice "had a discriminatory effect" on Latinos. *Wayte*, 470 U.S. at 608.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

1510

The Plaintiffs, however, are mistaken for several reasons.  First, if Latinos were being racially targeted by MCSO personnel during traffic stops, then the percentage of traffic stops of Latinos would be expected to occur at a much greater percentage than their percentage of the general population.  This, however, is not happening.  Plaintiffs' own statistical expert, Dr. Taylor conducted a statistical analysis of *all* the MCSO traffic stops conducted from January 1, 2007 to October 31, 2009 and **concluded that Latinos in Maricopa County are stopped by MCSO personnel in roughly the same proportion to their share of Maricopa County's population.**  *Id*. at ¶ 122.  Defense expert statistician Steve Camarota, Ph.D., concurs:

> **[My] findings show that the Hispanic share of those stopped by the MCSO deputies is roughly equal to their proportion of the county and the state's overall population.**  About one-third of stops are of individuals with a Hispanic last name, which closely matches their share of the county and state populations.  Analysis at the sub-county level also tends to show stops in proportion to local population shares….  *Equally important, despite a significant increase in concern over illegal immigration in recent years in the county and state, there was no increase in the Hispanic share of those stopped by MCSO between 2005 and 2009.*  **Overall, the surname analysis shows Hispanics are being stopped at a rate that reflects their share of the population**

*Id*. at ¶ 123 (emphasis added).

Second, Dr. Taylor's additional opinions that there are disproportionate percentages of Latino's stopped during MCSO *saturation* patrols*, and that their traffic stop detentions are longer than non-Latinos, is factually suspect.  His saturation patrol analysis is irrelevant to the Plaintiffs' traffic stops because it does not consider the fact, as shown above already, that: (1) the traffic stop of Mr. and Rodriguez was *unrelated* to a saturation patrol, and (2) that the traffic stop of Ms. Meraz and Mr. Nieto, while occurring when a saturation patrol was simultaneously on-going in the area, was *unrelated* to that saturation patrol.  *Id*. at ¶¶ 43 (as to Mr. and Mrs. Rodriguez) and 64-88 (as to Ms. Meraz and Mr. Nieto).  The analysis also fails to take into account the fact that while Mr. Melendres' traffic stop technically could be considered as part of an MCSO saturation patrol, and was considered as such by Deputy DiPietro, the operation was actually a small HSU detail targeting only specific vehicles that had picked up persons from a suspected human smuggling drop house/day laborer location,

and did not involve the MCSO making general traffic stops of any vehicles other than those that had visited the church property and picked-up passengers and where probable cause was found to stop those particular vehicles.  *Id*. at ¶ 12.  Accordingly, **four of the five Plaintiffs were *not* stopped as part of an MCSO saturation patrol**, and it is questionable whether the final Plaintiff (Mr. Melendres) was stopped during the type of MCSO saturation patrol complained of in Plaintiffs' First Amended Complaint.

Dr. Taylor's saturation patrol opinions are factually suspect for another reason.  His study is admittedly "quasi-experimental" in nature.  *Id*. at ¶ 124.  His "quasi-experimental" study does not result in definitive findings or conclusions, only "inferences."  *Id*.  His saturation patrol analysis also: (1) fails to exclude those patrols that included a human smuggling interdiction component, or otherwise exclude human smuggling load vehicles found containing multiple illegal immigrants as occupants, which skews his saturation patrol results; (2) fails to exclude duplicate records in the MCSO Computer Aided Dispatch database, which skews his saturation patrol results; (3) excludes thousands of other cases that should have been included in the analysis, which artificially inflates his saturation patrol results (he admits that he excluded 18% of all MCSO traffic stops per year because they did not "align" with Plaintiffs' case theory or Plaintiffs' "concerns"); and (4) fails to account for any socio-economic variables that affected his saturation patrol model.  *Id*.

Third, Dr. Taylor's saturation patrol opinions are legally insufficient, standing alone, to avoid summary judgment.  Assuming, *arguendo*, that Dr. Taylor's saturation patrol opinions are reliable about the impact that MCSO saturation patrols has on Latinos in Maricopa County, the opinion still is immaterial to the issue of whether *these particular Plaintiffs* were the subject of racial profiling by MCSO personnel.  An official policy, practice, or act is **not** unconstitutional solely because it has a racially disproportionate impact.  *Castaneda v. Partida*, 430 U.S. 482, 493 (1971).  Dr. Taylor's saturation patrol opinions, at most, might show disparate impact but not disparate treatment.  An equal protection cause of action can only be based upon the latter.  *See Washington*, 426 U.S. at 242 ("Disproportionate impact… is not the sole touchstone of invidious racial discrimination….").  Moreover, only in "rare cases [has] a statistical pattern of

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1   discriminatory impact demonstrated a constitutional violation." *McCleskey*, 481 U.S. at 293
2   n.12 (citing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356
3   (1886)).

4       Finally, and perhaps most significant, the Defendants' analysis set forth above and
5   below regarding the factual circumstances surrounding the traffic stop of *each* Plaintiff
6   shows that there is ***no discriminatory effect on the Plaintiffs***.  Each of their vehicles,
7   whether they were driving the vehicles or were mere passengers, was stopped by MCSO
8   personnel based on probable cause or reasonable suspicion, and the Plaintiffs' race and/or
9   ethnicity had nothing to do with their traffic stops.

10      Based on the foregoing, the Plaintiffs have failed to produce "evidence sufficient to
11  permit a reasonable trier of fact to find by a preponderance of the evidence that" the
12  Plaintiffs have suffered a discriminatory effect as a result of the MCSO's conduct.  *Keyser*,
13  265 F.3d at 754.  There is no material issue of disputed fact on this point, and summary
    judgment is appropriate.

14      **B.    There is No Evidence that Any MCSO Personnel had Racially**
15          **Discriminatory Intent or Motive in Stopping, Questioning, or Detaining**
16          **the Plaintiffs.**

17      There is another reason summary judgment is appropriate on Plaintiffs' Fourteenth
18  Amendment and Title VI claims: there is no evidence that any MCSO personnel that
19  interacted with any of the individual Plaintiff had racially discriminatory intent or motive.

20          **1.    Melendres and Deputy DiPietro.**
21      There is no evidence creating a genuine issue of material fact as to whether Deputy
22  DiPietro had racially discriminatory intent or motive in stopping the Melendres vehicle.
23  Before Deputy DiPietro found probable cause to stop the truck in which Mr. Melendres was
24  a passenger, he did not know or see the race of the truck's driver or the race of the
25  passengers in the truck.  SOF at ¶ 125.  Race was not a factor in Deputy DiPietro's finding
26  that he had probable cause to stop the truck:

27      Q.    Did race of either the driver or the passengers of the truck play any role
            in your decision to find probable cause to stop this truck?

28

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

A.   No.

Q.   Do you ever use race to stop vehicles?

A.   No, I don't.

Q.   Do you ever use race to find probable cause for traffic stops?

A.   No.

*Id.* at ¶ 126.[11]   Even Mr. Melendres does not have an opinion on whether he was racially profiled:

> Q.   You also claim in your lawsuit that you have suffered unlawful discrimination. Do you believe that the deputies that you encountered on September 26, 2007, were intentionally trying to deprive you of your constitutional rights?
>
> A.   ***I cannot say that.  I can't be -- tell you for sure.***

*Id.* at ¶ 128 (emphasis added).

Defense expert Mr. Click opines that "[t]here is no evidence that Deputy DiPietro knew the race or ethnicity of the vehicle's occupants prior to the truck stopping or that race or ethnicity played any role in Deputy DiPietro's actions."  *Id.* at ¶ 129.  On the other hand, Plaintiffs' liability expert Mr. Stewart testified at one point in his deposition to the general conclusion that Deputy DiPietro must have had discriminatory intent or motive in stopping the truck in which Mr. Melendres was a passenger.  Mr. Stewart essentially "reasoned" that: (a)  Deputy DiPietro testified that, in his law enforcement experience in Maricopa County, most day laborers were illegal aliens from Mexico; (b) the MCSO operation that date was targeting a church suspected of being a drop-house for smuggled illegal aliens and a location for such illegal aliens to be picked-up for day labor jobs; (c) Deputy DiPietro was instructed to find probable cause for vehicles that picked-up passengers at the church and, before finding such probable cause for the Melendres vehicle, he already had the belief that anyone picked up at the church would be an illegal alien; and (d) because illegal immigrants from Mexico are Latinos by definition, Deputy DiPietro must have been intending to discriminate against Latinos.  *Id.* at ¶ 130.  In other words, *Mr. Stewart conflates the MCSO's targeting of crimes regarding human smuggling with the targeting of Latinos.*

---

11   Similarly, Deputy Carlos Rangel does not racial profile because it is morally wrong and illegal.  *Id.* at ¶ 127.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

A closer examination of Mr. Stewart's opinion, however, shows that he lacks factual support for his general conclusion.  The truth is Mr. Stewart admits that he lacks _any_ factual basis to support a conclusion that Deputy DiPietro acted with racially discriminatory intent or motive in stopping the Melendres truck:

> Q.    Do you *believe* that Louis DiPietro had discriminatory intent or motivation as to race in stopping the truck in which Mr. Melendres was a passenger?
>
> A.    **I don't know**.
>
> Q.    Is it your *opinion* that Deputy DiPietro had a racially discriminatory intent or motivation in stopping the truck in which Mr. Melendres was a passenger?
>
> A.    **I don't know.**
>
> Q.    Is there any evidence that Deputy DiPietro knew the race of the driver of the truck before stopping it?
>
> A.    **I don't know** whether that information was given to him by the observer.
>
> Q.    Is there any evidence that Deputy DiPietro knew the race of any occupants in the truck before stopping it?
>
> A.    **I don't recall** whether that information was given by the observer either.
>
> Q.    **Is there any evidence that Deputy DiPietro used race as a factor in any form to decide to stop the truck?**
>
> A.    **No, sir.**
>
> Q.    Is there any evidence that Deputy DiPietro knowingly harbored explicit bias towards specific groups of people?
>
> A.    **Not that I know of.**
>
> Q.    Is there any evidence that Deputy DiPietro had unconscious bias toward certain group of people?
>
> A.    **We don't know.**

*Id*. at ¶ 131 (emphasis added).   Based on the undisputed record before the Court, therefore, Plaintiffs have failed to prove with sufficient evidence that Deputy DiPietro was motivated

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1515

by racially discriminatory intent in making the traffic stop of the Melendres vehicle.  Mr. Melendres' Fourteenth Amendment and Title VI claims fail as a matter of law and the Court must dismiss those claims.

### 2.     Mr. and Mrs. Rodriguez and Deputy Ratcliffe.

Before making the decision to conduct the traffic stop of the Rodriguez' truck, and to issue a citation to the truck's driver, Deputy Ratcliffe did not see the race of the truck's driver or of any occupants of the truck.  *Id*. at ¶ 132.  Mrs. Rodriguez actually admits that Deputy Ratcliffe was not acting with racially discriminatory intent or motive:

> Q.     Do you believe that Deputy Ratcliffe was intentionally trying to deprive you of your constitutional rights?
>
> A.     **No.**

*Id*. at ¶ 133 (emphasis added).

Defense expert Mr. Click testified that there is no direct or circumstantial evidence that Deputy Ratcliffe racially profiled or otherwise acted with racially discriminatory intent or motive toward Mr. and Mrs. Rodriguez.  *Id*. at ¶ 134.  It is, therefore, not surprising that Plaintiffs' own expert, Mr. Stewart, has no opinion as to whether Deputy Ratcliffe had racially discriminatory intent or motive in stopping the Rodriguez vehicle:

> Q.     Is it your opinion that Deputy Ratcliffe had discriminatory intent or motive in stopping the Rodriguez vehicle?
>
> A.     **Don't know**.

*Id*. at ¶ 135 (emphasis added).

At the most, Mr. Stewart offers a speculative opinion that Deputy Ratcliffe **"maybe"** had racially discriminatory intent or motive *in issuing a traffic citation* to Mr. Rodriguez.  *Id*. at ¶ 136.  However, there are a number of problems with Mr. Stewart's "maybe" opinion.  First, the "maybe" opinion lacks the required degree of probability to make it reliable and therefore admissible.  *California ex rel. Brown v. Safeway, Inc*., 615 F.3d 1171, 1181 n.4 (9th Cir. 2010) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are inadmissible at trial and are inappropriate material for

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

consideration on a motion for summary judgment.") (citation omitted).  Second, even assuming the Fourteenth Amendment issue in this case is broadly construed to include whether Deputy Ratcliffe's issuance of a traffic citation to Mr. Rodriquez for an admitted traffic violation rises to the level of a constitutional violation, Mr. Stewart's foundation for his "maybe" opinion is built on unstable ground.  Mr. Stewart has no direct or circumstantial evidence showing that Deputy Ratcliffe used race as a factor in any form to decide to give a citation to Mr. Rodriguez.  *Id*. at ¶ 136.

Third, the sole basis for Mr. Stewart's "maybe" opinion is speculative and relies on an untenable interpretation of the evidence.  Mr. Stewart bases his "maybe" opinion on the reasoning that Deputy Ratcliffe stopped several non-Latino motorists on Bartlett Dam Road the same day he stopped Mr. and Mrs. Rodriguez, did not give the non-Latino drivers citations, referred the non-Latino drivers to a Tonto National Forest Ranger (who issued citations to the non-Latino drivers), and the only citation Deputy Ratcliffe actually issued was to Mr. Rodriguez, a Latino. *Id*. at ¶ 137.  As such, Mr. Stewart concludes that Deputy Ratcliffe intentionally treated Mr. Rodriguez differently than the non-Latinos drivers he pulled over by issuing a citation to Mr. Rodriguez but referring the non-Latinos to the Tonto National Forest Ranger for a determination on whether to issue a citation. *Id*.  However, Deputy Ratcliffe did *not* recall the race of the other drivers he referred to the Tonto National Forest Ranger, and he actually observed the Forest Ranger give citations to those other drivers regardless of their race. *Id*. at ¶ 138.

Fourth, another MCSO officer working Lake Patrol with Deputy Ratcliffe, Deputy Maltz, had on the same day allowed other motorists (of unknown races) to drive on the closed Bartlett Dam Road in order to go to the lake to repair either their recreational vehicles or boats that had been damaged in the storm. *Id*. at ¶ 139.  Deputy Maltz was responsible for deciding whether to cite or warn those drivers, not Deputy Ratcliffe. *Id*.  Deputy Ratcliffe has known Deputy Maltz for 2.5 years and does not believe that Deputy Maltz' decision to allow other people to use Bartlett Dam Road to repair their property without the issuance of a traffic citation was based in any way on racial considerations. *Id*. at ¶ 140.  Again, however, that was a decision of Deputy Maltz, not Deputy Ratcliffe and cannot, therefore, serve as a

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1517

basis for Mr. Stewart's opinion as to Deputy Ratcliffe's possible racially discriminatory motive.

Based on the foregoing, Plaintiffs have failed to provide sufficient evidence that Deputy Ratcliffe acted with racially discriminatory intent or motive toward Mr. and Mrs. Rodriguez.  Their Fourteenth Amendment and Title VI claims fail as a matter of law.

### 3.      Meraz and Nieto and Deputies Armendariz, Kikes, and Beeks.

Deputy Kikes had probable cause to stop the vehicle driven by Mr. Nieto and occupied by Ms. Meraz because he believed there was an emergency situation of some type involving Deputy Armendariz.  *Id*. at ¶ 85.  Due to the vehicle's window tinting, Deputy Kikes could not see the race, sex, or other characteristics of the vehicle's occupants.  *Id*. at ¶ 86.  While Mr. Nieto and Ms. Meraz are adamant that they were racially profiled, this speculative testimony is insufficient to avoid summary judgment.  *Cornwell*, 439 F.3d at 1028-29 n.6 (a plaintiff may not defeat a defendant's summary judgment motion "by relying solely on the plaintiff's subjective belief that the challenged action was [wrong]."

In stark contrast to the speculative testimony of Mr. Nieto and Ms. Meraz, their own liability expert's opinions justify summary judgment in favor of the Defendants on these Plaintiffs' racial discrimination claims.  Plaintiffs' expert, Mr. Stewart, admittedly has no evidence of racially discriminatory intent or motive by Deputy Armendariz.  *Id*. at ¶ 141. There is no evidence of racially discriminatory intent or motive by Deputy Beeks in drawing his weapon.  *Id*. at ¶ 142.  There is no evidence that Deputy Kikes had racially discriminatory intent or motive in making the traffic stop of the Meraz-Nieto vehicle.  *Id*. at ¶ 143.   Finally, Mr. Stewart testified that there is no evidence that Ms. Meraz and Mr. Nieto were racially profiled in either the traffic stop or during their subsequent treatment by the MCSO deputies.  *Id*. at ¶ 144.  All Mr. Stewart has is his unsupported "*suspicions*" and "*a strong hint that*" Deputy Kikes "*may have been*" racially motivated to make the traffic stop of Ms. Meraz and Mr. Nieto.  *Id*. at ¶ 145.  Such speculative testimony does not create a triable issue.  *Safeway, Inc*., 615 F.3d at 1181 n.4 (speculative opinions "are inappropriate material for consideration on a motion for summary judgment.")

Based on the foregoing, Plaintiffs have failed to provide sufficient evidence that

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

1  Deputies Armendariz, Kikes, or Beeks acted with racially discriminatory intent or motivation

2  toward Ms. Meraz and Mr. Nieto.  Their racial profiling claim is subject to summary

3  dismissal.

4  **VI.**    **CONCLUSION**

5         Although Plaintiffs have been subjected to the Defendants' allegedly wrongful policy,

6  pattern, and practice of targeting Latinos for years since the filing of this action, the

7  evidentiary record establishes that Plaintiffs do not have a credible and genuine threat of

8  future injury.  As a consequence, the Plaintiffs lack standing to seek the equitable remedies

9  pled in the First Amended Complaint.

10        The undisputed evidentiary record in this case further demonstrates that each of the

11  Plaintiffs' traffic stops were properly predicated upon probable cause or reasonable suspicion

12  that Arizona law had been violated by the driver of each vehicle.  As such, the Court must

13  dismiss the Plaintiffs' Fourth Amendment claim and the Arizona Constitution Article II, § 8

    claim as a matter of law.

14        Finally, the evidentiary record demonstrates that Plaintiffs have failed to come

15  forward with sufficient evidence that would allow a reasonable trier of fact to find by a

16  preponderance of the evidence that the Defendants' conduct toward Plaintiffs had a racially

17  discriminatory effect or that Defendants' conduct resulted from a racially discriminatory

18  intent.  Accordingly, summary judgment is appropriate as to Plaintiffs' Fourteenth

19  Amendment and Title VI claims.

20        DATED this 29th day of April, 2011.

21                                                    SCHMITT,  SCHNECK,  SMYTH  &  HERROD,
                                                      P.C.
22
                                                      *s/Timothy J. Casey*_____
23                                                    Timothy J. Casey
                                                      Schmitt, Schneck, Smyth & Herrod, P.C.
24                                                    1221 E. Osborn Rd., Suite 105
                                                      Phoenix, Arizona 85014
25                                                    Telephone: (602) 277-7000
                                                      Facsimile:(602) 277-8663
26

27                                                    MARICOPA COUNTY ATTORNEY'S OFFICE
                                                      Maria Brandon
28                                                    Thomas P. Liddy
                                                      Deputy County Attorneys

1
2
3
4

Litigation Practice Group
Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100
Phoenix, Arizona 85004
602-506-8066
Co-counsel for Defendants Arpaio and MCSO

5

**<u>CERTIFICATE OF SERVICE</u>**

6
7

I hereby certify that on April 29, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

8
9
10

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

11
12
13
14

Stanley Young, Esq.
Stephen Chien, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, California 94065
Counsel for Plaintiffs

15
16
17

Daniel Pochoda, Esq.
Annie Lai, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Counsel for Plaintiffs

18
19
20
21

Monica M. Ramirez, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Counsel for Plaintiffs

22
23
24

Nancy Ramirez, Esq.
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Counsel for Plaintiffs

25
26
27
28

Maria Brandon
Thomas P. Liddy
Deputy County Attorneys
Litigation Practice Group
Civil Services Division
Maricopa County Attorney's Office
222 N. Central, Suite 1100

1520

Phoenix, Arizona 85004
Co-counsel for Defendants Arpaio and MCSO

*s/Eileen Henry*_____
Eileen Henry, Paralegal
SCHMITT, SCHNECK, SMYTH & HERROD, P.C.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation



**EXHIBIT 28**

**WO**

1
2
3
4
5
6                IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8

9  Manuel de Jesus Ortega Melendres, et al.,)   No. CV-07-2513-PHX-MHM
                                          )
10          Plaintiff,                     )   **ORDER**
                                          )
11  vs.                                    )
                                          )
12                                         )
    Joseph M. Arpaio, et al.,              )
13                                         )
            Defendant.                     )
14                                         )
                                          )
15  _____)

16

17

18          Currently pending before the Court is Defendants Sheriff Joseph M. Arpaio, Maricopa

19  County, and the Maricopa County Sheriff's Office's Motion for Recusal. (Dkt.#63.)  After

20  reviewing the relevant documents and determining oral argument unnecessary, the Court

    issues the following Order.

21  **I.      PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

22          Having already issued two substantive Orders in this case (Dkt.##25, 60.), the Court

23  is intimately familiar with the underlying facts and sees no reason to go through them now

24  in great detail.  On December 12, 2007, Plaintiffs Manuel de Jesus Ortega Melendres, Jessica

25  Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., and Somos America

26

27

28

filed suit—on behalf of themselves and all others similarly situated[1]—against Defendants pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act, and Article II, § 8 of the Arizona Constitution alleging racial profiling and unlawful detention of persons of Hispanic appearance and/or descent during Defendants' attempt to enforce federal immigration laws.  On January 3, 2008, Defendants moved to dismiss the Complaint; Plaintiffs subsequently sought leave to amend. (Dkt.##12,17.)  On September 5, 2008, the Court granted leave to amend and denied as moot Defendants' motion to dismiss.  (Dkt.#25.)  Thereafter, Defendants renewed their dismissal motion.  On February 10, 2009, after holding oral argument, the Court denied Defendants' renewed motion to dismiss on the merits.  See Melendres v. Arpaio, 598 F. Supp. 2d 1025 (D. Ariz. 2009); (Dkt.#60.)  On February 23, 2009, thirteen days after the Court's Order was entered, Defendants moved to recuse the Court under both 28 U.S.C. § 144 and 28 U.S.C. § 455.

In support of their Motion for Recusal, Defendants submitted the affidavit of Mr. David Hendershott, Chief of the Maricopa County Sheriff's Office ("MCSO"), as well as supporting exhibits.  Plaintiffs responded in opposition with a declaration from Mr. Aaron Lockwood, an attorney with the law firm of Steptoe and Johnson, along with supporting exhibits. The factual background, as reflected in the filings made by the affiant and declarant, is as follows.

The Court has an identical twin sister, Janet Murguia.  Janet Murguia is currently President and CEO of the National Council of La Raza ("NCLR").  NCLR is the largest national Latino civil rights organization in the United States.  Janet Murguia previously served as Deputy Director of Legislative Affairs to President William J. Clinton, and as Executive Vice Chancellor for University Relations of the University of Kansas. Furthermore, one of the Court's older brothers, Ramon Murguia, an attorney in private

---

[1]Plaintiffs have filed a "Motion to Certify the Class," and that Motion is currently pending with the Court.  (See Dkt.#93.)

1523

1  practice in Kansas City, Kansas, has also been affiliated with NCLR, having served on the

2  organization's Board of Directors, including a term as its Chairman.

3      Defendants contend that it was not until February 11, 2009—the day after the Court

4  ruled against them in its first potentially dispositive Order—that they became aware of the

5  Court's relationship with her sister and her sister's connection to NCLR.  According to

6  Defendants, on February 11, 2009 the *Phoenix Business Journal* published an article entitled,

7  "Federal Court sides with ACLU against Arpaio in round 1 of profiling case."  Among other

8  things, this article mentioned that Janet Murguia is "president and CEO of the National

9  Council of La Raza, a leading Hispanic advocacy group."  (Dkt.#63, Exhibit 1.)  That same

10 day, an online version of the *Phoenix New Times* published an article commenting on the

11 Court's Order. Among other things, the *New Times* article noted that the Court is the "[f]irst

12 Latina judge appointed to the U.S. District Court in Phoenix." (Id. at Exhibit 2.)  Similarly,

13 on February 12, 2009, *The Arizona Republic* ran a story in its local section concerning the

14 instant case, in which it discussed the Court's personal background, along with that of her

15 sister. (Id.)

16     Through their affiant, Defendants contend that after these and other media sources

17 publicized the Court's personal background, including her sister's work at NCLR,

18 Defendants were contacted by members of the public—who were apparently looking to

19 express their disappointment with the Court's ruling in the instant case.  According to

20 Defendants, it was through these public comments that they were first alerted to the Court's

21 personal history.  Defendants also claim public  reaction to the Court's February 10, 2009

22 Order was alarming, since, according to Defendants, the public appeared to be more focused

23 on the relationship between the Court and her sister than on the underlying merits of the

24 action.  To this end, Defendants have submitted five 'reader comments' that were posted on

25 websites belonging to the *The Arizona Republic* and the *Phoneix Business Journal*. These

26 reader comments were posted alongside online versions of the newspapers' aforementioned

27 February 11, 2009 articles.  Defendants contend that these five reader comments typify the

28 sentiments communicated to them by members of the public, and that these selected reader

comments underscore what Defendants perceive to be the public's reaction to Court's continued role in this case. Defendants' proffered reader comments include the following:

- "Of course this Judge will let the lawsuit stand. Her sister is the President of La Raza. Can you say CONFLICT OF INTEREST!"

- "They [*The Arizona Republic*] seem to have left out that Judge Murguia is the sister of the head of La Raza. Kind of important fact to leave out, don't you think?"

- "Judge Murguia … is only making her sister's job easier."

- "Wrong is just WRONG…. I would have made the same ruling and MY sister is not connected to La Raza."

- "[Judge] Murguia is the twin sister of Janet Murguia, president and CEO of the National Council of La Raza, a leading Hispanic advocacy group. This judge should be impeached for not recusing herself. Peter Kozinets should be fired by the plaintiffs for tainting their lawsuit by getting a judge with such an obvious conflict of interest to the case. If they ever had a shred of legitimate claim, this blows it away."

Defendants additionally claim that while researching the Court's background they came upon a 2004 newspaper article published in the *Kansas City Star*. This article noted that the Court and Janet Murguia are the youngest of six children, and that the Court and her siblings constitute "one big chain," and "[i]f not for one, the chain would be broken." (See Dkt.#63, ¶ 11.) The article also describes the relationship between the Court and her identical twin sister as "close," reporting that they "talk constantly," and speak "to each other several times a week." (Id.)

Questioning Defendants' factual representations, Plaintiffs responded with their own submission. Specifically, Plaintiffs point out that on December 11, 2007, the day before the instant case was filed, *The Arizona Republic*—which is the State of Arizona's largest daily circulation newspaper—published a front page story detailing the Court's sibling relationship with Janet Murguia. Because this article contains quotes from Sheriff Arpaio as well as the

1525

1  Maricopa County Attorney, and because the article focused on another high profile federal
2  lawsuit involving many of the same Defendants, Plaintiffs argue that the article contradicts
3  Defendants' stated position that they were unaware of the Court's background until February
4  11, 2009.  (Dkt.#70, Exhibit A.)  Plaintiffs further note that this story was picked up and
5  reported nationally by the Associated Press.  (Id. at Exhibit B.)

6         With respect to Janet Murguia's work with NCLR, Defendants allege that NCLR has
7  continually offered public comments about the facts of this case, including published articles
8  and speeches by Janet Murguia herself.  For example, according to Defendants, NCLR is on
9  record as "strongly oppos[ing] efforts to make state and local police responsible for the
10 enforcement of federal immigration laws."  (See id. at Exhibit 7.) Similarly, according to
11 Defendants, NCLR has issued statements claiming that the local enforcement of federal
12 immigrations laws is "having a serious negative impact on Latino communities," and that
13 "delegation of immigration authority is likely to result in racial profiling, police misconduct,
14 and civil rights violations." (Id. at ¶ 15.)

15        Defendants have also submitted evidence that NCLR has a Phoenix office, and
16 therefore has a direct presence in Maricopa County.  (Id. at ¶ 19.)  Defendants also note that
17 NCLR's website directs individuals who believe that their rights have been violated to
18 contact one of NCLR's affiliate organizations.  Among the organizations listed as affiliates
19 are the American Civil Liberties Union ("ACLU") and the Mexican American Legal Defense
20 and Education Fund ("MALDEF").  Both the ACLU and MALDEF, while not parties to this
21 case, are providing legal representation to the named Plaintiffs.

22        Among the litany of reasons Defendants submit to support their recusal motion, one
23 concerns a recent public awareness campaign launched by NCLR, "We Can Stop the Hate."
24 (See www.wecanstopthehate.org.)   The We Can Stop the Hate campaign contains a
25 prominent picture of Janet Murguia, and links to several of her public speeches.  Specifically,
26 Defendants point to a February 4, 2009 article available on the website. This article addresses
27 actions taken by Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO").
28 Although the actions of Sheriff Arpaio and Maricopa County addressed in the article appear

1526

1    to be unrelated to the instant lawsuit,[2] Defendants point out that disparaging statements

2    directed towards Sheriff Arpaio and MCSO are included in the online publication. Examples

3    of such statements include the following: "[i]n true Arpaio form, his office sent a press

4    release to the media inviting them to this event, proving that he's more interested in drawing

5    attention to himself than actually doing his job." (Dkt.#63, at ¶ 17; Exhibit 9.)  Among an

6    assortment of epithets, Sheriff Arpaio is called "a relentlessly self-promoting caricature of

7    a sheriff (ever closer to 'I'm not a real Sheriff, I just play one on TV' territory), not an actual

8    law enforcement official. The march is yet another stunt to distract people from his

9    incompetent, lawsuit-riddled folly of a department." (Id.)  The article further refers to

10   members of the MCSO as "Arpaio and his thugs." (Id.)

11       The Court notes that after independently reviewing the We Can Stop the Hate

12   campaign's website, it encountered numerous other articles relating to Sheriff Arpaio and the

13   MCSO. For reasons that are altogether unclear, these articles were not made part of

14   Defendants' factual submission.   Interestingly, two such articles directly address the

15   underlying facts of the instant case.  Given the nature of the assertions that Defendants have

16   raised against the Court in their recusal motion, the absence of these highly relevant articles

17   from Defendants' factual submission is somewhat puzzling.  The first article encountered by

18   the Court is dated January 20, 2009 and entitled "Join a Call for an Investigation of Sheriff

19   Arpaio." In this article, NCLR asks members of the public to support a public call for an

20   immediate investigation by the federal government into the legality of the agreement between

21   U.S. Immigration and Customs Enforcement and MCSO, which permits MCSO to work with

22   federal law agencies to aid in the enforcement of federal immigration laws.  This agreement

23

24   ———————————

25       [2]Although the article refers to a "parade" of "hundreds of detained immigrants in
     shackles through the streets of Phoenix," which seemingly implicates and casts aspersions
26   on Defendants immigration enforcement policy, the thrust of the article is concerned with
     Sheriff Arpaio's general treatment of detained prisoners, rather than the legality of an
27   immigration detention and whether such detentions were predicated upon constitutional
28   violations. (Id.)

is referred to as the "§ 287(g)" agreement.[3]  In the instant lawsuit, Plaintiffs' claim Defendants have violated their civil rights in the course of carrying out their activities under the § 287(g) agreement, and Plaintiffs seek to enjoin Defendants from enforcing federal immigration laws pursuant to the 287(g) agreement.

The second article independently encountered by the Court is dated October 22, 2008 and is entitled "Sheriff Joe Strikes Again."[4]  In this article, NCLR refers to Sheriff Arpaio as "a man who has made a career of humiliating prisoners, harassing Latinos of every variety, wasting taxpayer dollars with dubious results, and having a less than stellar respect for civil rights and due process." (Id.)  The article goes on to characterize Sheriff Arpaio as "unrepentant, arrogant, and monumentally disingenuous." (Id.)  It also addresses the precise legal and factual issues of the instant lawsuit.  Specifically, this article alleges that Sheriff Arpaio and MCSO deputies have engaged in acts of racial profiling. The article states that "Arpaio claims he does not know what racial profiling is since he can't possibly define something he's never engaged in.  Here's a hint, Joe: the stuff you're doing to Latinos in Arizona—the ACLU noted in July that 'Arpaio has made no secret that he believes physical appearance alone is sufficient reason to stop and question individuals regarding their immigration status'—that's racial profiling." (Id.)

Another item in Defendants' factual submission concerns an April 16, 2008 speech by Janet Murguia entitled "Conventional Wisdom." This speech is also available on the We Can Stop the Hate website. (Id. at ¶ 18; Exhibit 10.)  While Janet Murguia's speech refers

---

[3]

See We Can Stop the Hate,
http://www.wecanstopthehate.org/site/latest/join_the_call_for_an_investigation_of_sheriff_arpaio (last visited June 1, 2009.)

[4]

See We Can Stop the Hate,
http://www.wecanstopthehate.org/site/latest/sheriff_joe_strikes_again (last visited June 1, 2009.)

1528

to "hate groups and extremists pulling the levers and turning the wheels," these comments were not directed towards any of the Defendants, and no reasonable person could infer that the speech was in any sense about them.  In fact, the "Conventional Wisdom" speech, for all practical purposes, appears to be completely unrelated to the instant case, other than the fact that it highlights Janet Murguia and NCLR's involvement in Latino civil rights issues. (Id.)

Lastly, Defendants point to Plaintiff Somos America's website, which lists the organization's political and social interests.  (See Dkt.#63, ¶ 21.) Defendants argue that Somos America's website demonstrates that it shares a common ideology with NCLR, and presumably with the Court's sister.  Defendants lastly state that Somos America's website contains a link to Janet Murguia's "Conventional Wisdom" speech.  (Id.) .

## II.   LEGAL STANDARD

Two statutes govern the recusal of district judges:  28 U.S.C. § 144 and 28 U.S.C. § 455(a)-(b) . Section 144 applies when a party to a proceeding believes that the district judge "has a personal bias or prejudice either against him or in favor of any adverse party[.]" 28 U.S.C. § 144.  "Section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit."  United States v. Sibla, 624 F.2d 864, 867 (9th Cir. 1980) (citations omitted).  Specifically, the statute provides:

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.  A party may file only one such affidavit in any case.  It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144.  When a party files a timely and legally sufficient affidavit pursuant to § 144 that plainly sets forth a compelling case for recusal, the district judge "shall proceed no further therein, but another judge shall be assigned to hear such proceeding."  Id.; Sibla, 624 F.2d at 867.  However, "if the motion and affidavit required by [§] 144 [are] not presented to the judge, no relief under [§] 144 is available."  Sibla, 624 F.2d at 868.

Section 455 has two recusal provisions.  The first provision, subsection (a), states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself [or herself]

- 8 -

in any proceeding in which his [or her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Subsection (b) provides that any justice, judge, or magistrate shall also disqualify themselves under the following situations:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

> * * *

> (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

> * * *

> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

> * * *

> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

28 U.S.C. § 455.

Unlike section 144, section 455 "sets forth no procedural requirements." Sibla, 624 F.2d at 867-68. Instead, that section is directed towards the judge, rather than the parties, and is self-enforcing on the part of the judge. Id. Moreover, "section 455 modifies section 144 in requiring the judge to go beyond [a] section 144 affidavit and consider the merits of the [recusal] motion pursuant to section 455[]." Id. at 868. The recusal standards under § 144 and § 455 are identical, and decisions interpreting one section are controlling in the interpretation of the other. Id.

## IV.   DISCUSSION

Because Defendants have moved to recuse the Court under both § 144 and multiple sub-sections of § 455, the Court will address each of these claims in turn. Before turning to

1530

1   the merits of Defendants' individual contentions, the Court will first address whether

2   Defendant's recusal motion has been timely filed.

3   **A.   Whether Defendants' Motion is Untimely**

4   Recusal motions brought under either § 144 and § 455 must be filed in a timely

5   manner. <u>See</u> 28 U.S.C. § 144(a) (motions "must be made in a timely fashion"); <u>Davies v.</u>

6   <u>Commissioner</u>, 68 F.3d 1129, 1131 (9th Cir. 1995) ( motions under § 455 must also "be made

7   in a timely fashion").  The recusal statute "is not intended to give litigants a veto power over

8   sitting judges, or a vehicle for obtaining a judge of their choice." <u>United States v. Cooley</u>,

9   1 F.3d 985, 993 (10th Cir. 1993).   Moreover, "where the facts are known before a legal

10  proceeding is held, waiting to file . . . a motion until the court has ruled against a party is

11  untimely." <u>Summers v. Singletary</u>, 119 F.3d 917, 921 (11th Cir. 1997).

12  Plaintiffs contend that the instant motion to recuse is untimely and has been brought

13  in bad faith, since this case was first assigned to the Court in December 2007 and Defendants

14  waited for over a year before moving for recusal.  Plaintiffs cite to examples where other

15  courts have rejected recusal motions when the delays at issue involved appreciably shorter

16  time periods than here.  <u>See e.g.</u>, <u>United States v. Simmons</u>, 1997 U.S. Dist. LEXIS 22658,

17  *17 (E.D. Cal. July 28, 1997) ("foreclos[ing] relief" for a 10-month delay); <u>Singer v.</u>

18  <u>Waldman</u>, 745 F.2d 606, 608 (10th Cir. 1984) (denying a recusal motion filed over one-year

19  after the complaint).

20  Plaintiffs also take issue with Defendants' assertion of prior ignorance regarding the

21  Court's family background. Plaintiffs argue that Defendants' contentions strain all credulity

22  and should be rejected.  According to Plaintiffs, the Court's background, including her

23  sister's position with NCLR, was a matter of public record as far back as 2001, when the

24  *Washington Post* printed an article discussing the Court's relationship with her twin sister.

25  Furthermore, Plaintiffs have submitted a December 2007 front page article from *The Arizona*

26  *Republic*, which details the Court's family history, including Janet Murguia's work at NCLR.

27  Notably, Plaintiffs also point to the fact that this article quoted both Sheriff Arpaio and the

28  Maricopa County Attorney at length.  Plaintiffs contend that because the article was focused

on MCSO's implementation of a controversial and well-known statewide law sanctioning Arizona employers who hire illegal workers, Defendants must have read the article and been aware of its contents. Plaintiffs argue that from the surrounding circumstances one could reasonably infer that Defendants have intentionally held on to this information, and are now seeking to recuse the Court after having lost the first round of substantive briefing. In other words, Plaintiffs have accused Defendants of knowing about the Court's sister and NCLR, and attempting to use this information as a proverbial ace in the hole, to be pulled out and played when it made convenient trial strategy to do so.

Plaintiffs also contend that if the Court is unwilling to make a determination that Defendants possessed actual knowledge regarding the Court's background around the time the lawsuit was filed, then Defendants should at least be charged with 'constructive knowledge' of all facts that were readily available and commonly known during that same period of time.  See Drake v. Birmingham Bd. of Edu., 476 F. Supp. 2d 1341, 1347 (N.D. Ala. 2007) (rejecting a recusal motion on timeliness ground where a party could have discovered through reasonable diligence that the judge was a deacon in the same church as plaintiff and her husband). This would, of course, include knowledge that the Court has a twin sister who serves as President and CEO of NCLR.

In their reply brief, Defendants adamantly deny that they intentionally waited to file their recusal motion until after the Court had ruled against them on their renewed motion to dismiss. Instead, Defendants claim that they were genuinely unaware of the Court's background during the early stages of the litigation. According to Defendants, the Court's February 10, 2009 ruling is relevant to the timing of their recusal motion only insofar as the Order was the catalyst for local and national media reporting, after which members of the public allegedly began to contact Defendants' offices. Defendants claim that, in actuality, their recusal motion was brought within days of discovering the Court's relationship with her sister.  According to Defendants, the Court's Order played little role in the timing of their motion because they were not expecting to win the motion anyway. As Defendants note, there is nothing particularly unusual about a district court denying a motion to dismiss

1532

1    brought under Fed. R. Civ. P. 12(b)(6), particularly when the facts are heavily disputed, as

2    they are here.  Defendants invoke the Ninth Circuit holding that  "[i]t is axiomatic that the

3    motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."

4    See Gilligan v. Jamco Dev. Corp., 108 F.3d 246 (9th Cir. 1997).

5         The Court finds that serious questions exist as to the veracity of the representations

6    made by Defendants, their affiant, and defense counsel as to whether Defendants were aware

7    of the Court's relationship with her twin sister prior to the February 10, 2009 Order.  The

8    Court agrees with Plaintiffs that the timing of Defendants' motion was bound to raise

9    significant questions as to whether the filing constitutes a bad faith litigation tactic,

10   particularly in light of the December 2007 front page article in *The Arizona Republic*, which

11   discussed the Court's personal history and includes quotes from a key Defendant and

12   counsel.  The Court further agrees that under the circumstances it seems implausible that

13   Defendants were unaware of the Court's sister's role at NCLR, and were not at least on

14   notice that there might be a familial relationship between Janet Murguia and the Court.

15   Indeed, Defendants' own arguments themselves undermine their claim to reasonable

16   ignorance.  Noting that the standard for recusal under 28 U.S.C. § 455(a) is applied by

17   considering "a reasonable person with knowledge of all the facts," Taylor v. Regents of

18   Univ. of Cal., 993 F.2d 710, 712 (9th Cir. 1993), cert. denied, 510 U.S. 1076 (1994),

19   Defendants argue that such a reasonable person would know about Janet Murguia and the

20   activities and interests of NCLR and would question the Court's impartiality based upon that

21   knowledge.  At the same time, Defendants assert that they themselves were not aware that

22   the Court had a twin sister who is the President and CEO of NCLR until some 15 months into

23   the litigation.  Effectively, then, Defendants ask this Court to find that they were less aware

24   of the relevant facts than a "reasonable person" would have been.  This strains credulity,

25   especially in light of the public record described earlier and the Defendants' participation in

26   the public debate surrounding the issues that underlie this case. Nevertheless, there is no

27   direct evidence conclusively demonstrating that Defendants or their counsel have made a

28

factual misrepresentation to the Court— notwithstanding the improbability of Defendants' claims.

Overall, the law supports the denial of Defendants' recusal motion as untimely. However, because the Court must abide by an unwavering commitment to the perception of fairness in the judicial process, it will not deny the petition on the basis of timeliness and will instead address the substantive questions raised by the request for recusal.

**B.    Whether The Court Is Actually Biased Against Defendants Under § 455(b)(1)**

Defendants' first substantive argument is that, pursuant to § 455(b)(1), the Court is actually and personally biased against Defendants.  The moving party carries a "substantial burden" of overcoming the presumption that a district court is free from bias.  United States v. Denton, 434 F.3d 1104, 1111 (8th Cir. 2006).  Under § 455(b)(1), actual bias is defined as "a personal animus or malice that the judge harbors against [a party] of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes."  Hook v. McDade, 89 F.3d 350, 355 (7th Cir. 1996).  Recusal for actual bias is required only if the moving party can prove by "compelling evidence" that "a reasonable person would be convinced the judge was biased."  Id.

Defendants set forth their bias argument by asserting, without reference to any evidence whatsoever, that the Court "has a natural, personal bias in favor of Plaintiffs, as well as [a] corresponding, natural prejudice against Defendants."  (Dkt.#63, at p. 14.)  This bare bones assertion, even in combination with similar statements peppered throughout Defendants' motion, falls well short of the "compelling evidence" standard promulgated by the Seventh Circuit in Hook.  See Hook, 89 F.3d at 355.  As Plaintiffs argue in their opposition brief, Defendants can point to nothing the Court has ever done to suggest that it holds an opinion of any party that is wrongful or inappropriate.

Moreover, Defendants, in particular Maricopa County and Sheriff Arpaio, are frequent litigants before this Court on a wide variety of civil matters.  It is not an overstatement to say that the Court has presided over a countless number of cases involving these Parties, and it

- 13 -

1    has ruled in Defendants' favor on scores of their dispositive motions.  The Court can think of

2    no other case involving either Maricopa County or Sheriff Arpaio where it has been accused

3    of harboring  a "personal animus or malice" towards either one of them.  See Hook, 89 F.3d

4    at 355.  In fact, as recently as September 2008, the Court presided over a bench trial where

5    Sheriff Arpaio was the only named Defendant.  See Mitchell v. Arpaio, CV-06-1963-PHX-

6    MHM; 2008 U.S. Dist. LEXIS 80179 (D. Ariz. Sept. 19, 2008).   After reviewing all

7    admissible evidence in that case, which included live in-court testimony given personally by

8    Sheriff Arpaio, the Court ruled in the Sheriff's favor, holding that "Defendant [was] entitled

9    to judgment dismissing the . . . Complaint with prejudice."  Id. at * 16.  Certainly, Sheriff

10   Arpaio's  victory  in  the  September  2008  Mitchell  bench  trial,  along  with  many  other

11   successfully  defended  civil  actions  before  this  Court,  undercuts  any  claim  of  actual  bias

12   towards him or any of the other Defendants.  See Alexander v. Primerica Holdings, 10 F.3d

13   155, 163-64 (3d Cir. 1993) (noting that there is heightened concern regarding judicial recusal

14   in a bench trial where the court is "deciding each and every substantive issue at trial").

15        In light of the record before the Court, Defendants' "natural bias" contention could

16   easily be interpreted as an argument that this Court's alleged bias somehow flows from her

17   racial heritage.  Obviously, such an argument would be unwarranted and baseless.  Beyond

18   that, the idea that an Hispanic judge should never preside over a controversial case concerning

19   alleged acts of racial profiling purportedly committed against Hispanics is repugnant to the

20   notion that all parties are equal before the law, regardless of race.  See Plessy v. Ferguson, 163

21   U.S. 537, 559 (1896) (Harlan, J., dissenting) ("Our Constitution is color-blind, and neither

22   knows nor tolerates classes among citizens.").[5]  Given the absence of any factual foundation

23

24        [5]In their reply brief, Defendants proclaim that the Court's race played no role in their
25   recusal motion, and that they are not contesting whether a Hispanic judge should ever sit on
     a case concerning Hispanic civil rights, only that this Court should not sit on this case given
26   the nature of her sister's work and the public positions advocated by her employer. (Dkt#.73
     at p. 2.)  However, Defendants main brief does not appear to be quite as measured as their
27   reply.  For example, Defendants, for reasons that are both unstated and unknown, quoted in
28   bold the following passage from an article found in the *Phoenix New Times*: "Hmm - we

- 14 -

1    supporting Defendants' claim of bias, and given the Court's extensive history of presiding

2    over disputes involving Sheriff Arpaio, MCSO and Maricopa County in a neutral and

3    impartial manner, the Court does not see how any reasonable attorney could set forth an

4    accusation of actual bias.  As the Second Circuit stated, in upholding the imposition of

5    sanctions under Rule 11 of the Federal Rules of Civil Procedure against an attorney, the

6    "suggestion that a judge cannot administer the law fairly because of the judge's racial and

7    ethnic heritage is extremely serious and should not be made without a factual foundation

8    going well beyond the judge's membership in a particular racial or ethnic group." See

9    MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,138 F.3d 33, 37 (2d Cir. 1998).

10       The Court therefore rejects the unsupported assertion that it is actually biased against

11   Maricopa County, Sheriff Arpaio or MCSO, in this or any other case.  Further, the Court

12   admonishes counsel for Defendants that in all future pleadings he should adhere scrupulously

13   to the requirements of Fed. R. Civ. P. 11(b) or be prepared to face sanctions for failing to do

14   so.

15       **C.**     **Whether The Court Has An Interest That Could Be Substantially Affected
              By The Outcome Of These Proceedings Under § 455(b)(4)**
16
         Under § 455(b)(4), a judge must recuse herself if "individually or as a fiduciary . . .
17
     [the court has] a financial interest in the subject matter in controversy or is a party to the
18
     proceeding, or any other interest that could be substantially affected by the outcome of the
19
     proceeding."  28 U.S.C. § 455(b)(4).
20
         Defendants contend that the Court's interest in the well being of her sister constitutes
21
     an "other interest" within the meaning of § 455(b)(4), since a victory on the merits for
22
     Plaintiffs would, according to Defendants, help to advance NCLR's stated social and political
23
     goals, and, in turn, advance Janet Murguia's career.  Plaintiffs respond by arguing that courts
24
     have narrowly defined "other interests" to include only financial or pecuniary interests of
25

26

27   can't but wonder what the first Latina judge appointed to the U.S. District Court in Phoenix
     thinks of the idea that 'physical appearance alone' should merit a police investigation." (See
28   Dkt.#63 at p. 4.)

1   some variety, see e.g., In re Virginia Elec. & Power Co., 539 F.2d 357, 367-68 (4th Cir.

2   1976), and that a purported interest in the career advancement of one's sibling does not square

3   with any accepted interpretation of the statute. See Guardian Pipeline, L.L.C. v. 950.80 Acres

4   of Land, 525 F.3d 554, 557 (7th Cir. 2008);   In re New Mexico Natural Gas Antitrust Litig.,

5   620 F.2d 794, 796 (10th Cir. 1980).  Defendants, in reply, cite to In re Virginia Elec. & Power

6   Co., arguing that Plaintiffs' reliance upon that case is misplaced, since in that case the Fourth

7   Circuit specifically stated:

8           Unlike [the term] 'financial interest' [found in § 455(b)(4)], the term 'any other
            interest' [also found in § 455(b)(4)] is not defined in terms of ownership or in
9           any other manner. It is not easy to conclude what the term means. But it must
            have been the congressional intent to make an interest of lesser degree than
10          ownership disqualify. That would seem to be so for otherwise there would be
            no purpose in defining financial interest in terms of ownership and failing to
11          apply such a limitation on any other interest.

12   In re Virginia Elec. & Power Co., 539 F.2d at 367 (emphasis added).

13          With respect to Defendants novel interpretation of § 455(b)(4), the Court does not

14   accept that a sibling relationship can constitute an 'interest' within the meaning of the recusal

15   statute. Notwithstanding Defendants' argument, the language of Virginia Elec. discusses 'any

16   other interest' in terms of the degree of ownership over something that is financial or

17   proprietary in nature.  See also E. & J. Gallo Winery v. Encana Energy Serv., Inc., 2004 U.S.

18   Dist. LEXIS 29380, *13-15   (E.D. Cal. Feb. 20, 2004) (citing to Virginia Elec. and

19   characterizing an 'other interest' as decidedly financial, albeit one that is indirect or remote

20   in nature).  Moreover, the Court is not aware of any case law that would tend to support

21   Defendants' proffered reading. The Court will not endorse an untethered expansion of the

22   recusal statute to the point where a litigant can engage in a broad based fishing expedition to

23   dig up potentially disqualifying 'interests' that a judge may be accused of having in a

24   particular case.  The Court therefore agrees with Plaintiffs that the term 'any other interests'

25   should be interpreted as being limited to financial or pecuniary interests, whether by

26   ownership or some other means.

27          Defendants go on to claim that even if the Court were to apply the more restricted

28   interpretation of § 455( b)(4) advocated by Plaintiffs—that the Court's interest must involve

- 16 -

1   "an investment or other asset whose value depends on the outcome, or some other concrete
2   financial effect"—recusal would still be warranted.  (See Dkt.#70 at p. 10.)  This, according
3   to Defendants, is because an adverse ruling here would likely cause an appreciable drop in the
4   amount of "public donations" to NCLR, since "the positions, causes and relationships it
5   advances and develops [may not be bearing] fruit in society's executive, legislative, or judicial
6   branches of government." (See Dkt.#72 at p. 8.)

7           There is nothing in the record, however, to support Defendants' speculation that the
8   Court's sister's career or her organization would be materially affected by the outcome of the
9   proceedings.  Similarly, there is nothing in the record to suggest that the Court has an interest
10   in her sister's well being that would somehow be inconsistent with the fair resolution of this
11   case, or that the Court has a personal stake in the advancement of her sister's career that
12   would create an untenable conflict of interest. Furthermore, even if a victory for Plaintiffs here
13   would somehow help to advance Janet Murguia's interests, nothing in the record suggests that
14   the Court itself would derive any type of financial, proprietary or otherwise tangible benefit
15   from her sister's potential career advancement.  Defendants' theory that NCLR might stand
16   to lose "public donations" depending on the outcome of this case is not actionable under the
17   relevant sub-section of the recusal statute, since § 455(b)(4) is directed towards interests held
18   by the Court, not its siblings or its siblings' employer.[6]

19   _____

20           [6]There is one final issue under § 455(b)(4) which, in an abundance of caution, the
     Court must raise, even though it was not addressed by either of the Parties.  This issue is
21   whether the Court is a potential member of Plaintiffs' proposed class, and if so, whether
     recusal is required.  In their First Amended Complaint, Plaintiffs redefined their proposed
22   class to include the following individuals: "all Latino persons who, since January 2007, have
     been or will be in the future, stopped, detained, questioned or searched by MCSO agents
23   while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County,
     Arizona." (See Dkt.#18 at p. 24.)  Although the Court can be fairly characterized as a "Latino
24   person," it has not, admittedly, been "stopped, detained, questioned or searched by MCSO
     agents" since January 2007.  Moreover, the Court does not foresee being stopped,
25   questioned, detained or searched in the near future, but must concede that it always remains
     a theoretical possibility, even if remote.  While the Court is mindful of the Ninth Circuit's
26   admonition that "no man can be the judge in his own case [or] try cases where he has an
27   interest in the outcome," Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994), the

- 17 -

1    Thus, the Court has no conceivable interest in this case that would serve as a grounds

2    for recusal under § 455(b)(4).

3         **D.    Whether The Court's Sister Has An Interest That Could Be Substantially
              Affected By The Outcome Of This Lawsuit Under § 455(b)(5)(iii)**

4         Under § 455(b)(5)(iii), recusal is mandated where "a person within the third degree of

5    relationship . . . [i]s known by the judge to have an interest that could be substantially affected

6    by the outcome of the proceeding."  28 U.S.C. § 455(b)(5)(iii).  The phrase "third degree of

7    relationship" has been to interpreted to include a judge's siblings.  See generally Harris v.

8    Champion, 15 F.3d 1538, 1571 (10th Cir. 1994) (finding that § 455(b)(5)(iii) should apply to

9    the district court's uncle).

10        Pursuant to this sub-section, Defendants broadly assert that the Court's sister has

11   "ideological, political, social and activist interests" in this lawsuit that are contrary to

12   Defendants' interests.  (See Dkt.#63 at p. 5.)  In response, Plaintiffs point to the Seventh

13   Circuit case of SCA Serv. v. Morgan, 557 F.2d 110, 116 (7th Cir. 1977), which held that a

14   partner's interest in the reputation and goodwill of his law firm fell within § 455(b)(5)(iii).

15   Id.  Plaintiffs argue that the connection between a business's reputation and goodwill and the

16   interests of one of its owners are obviously financial in nature, whereas "ideological, political,

17   social and activist interests" are obviously not.  As such, Plaintiffs argue that the definition

18   of 'interests' under § 455(b)(5)(iii) should be co-extensive with the meaning of 'interests'

19   under § 455(b)(4).  Plaintiffs note that Defendants have cited no examples where courts have

20   defined the term interests differently under § 455(b)(4) and § 455(b)(5)(iii).  See e.g.,

21   Guardian Pipeline, L.L.C., 525 F.3d at 557.

22

23   ─────────────────────

24   Court is not presently a member of Plaintiffs' proposed class and cannot state with any
     degree of certainty whether it will become a member in the future.  In any event, even under

25   the unlikely scenario that the Court becomes an unnamed class member, its interest in the
     outcome of the case would likely be de minimis and too insubstantial to necessitate recusal.

26   See In re New Mexico Natural Gas Antitrust Litig., 620 F.2d 794, 796 (10th Cir. 1980)

27   (holding that the district court's recusal under § 455(b)(4) was unwarranted where the judge,
     like all other consumers in New Mexico, may have benefitted from a lower gas and electric

28   bill in a class action lawsuit brought against a statewide utility company).

- 18 -

1    The Court agrees with Plaintiffs.  It is not at all clear how the word interests could be

2    given two different meanings in the same statute, when used in a nearly identical context.  See

3    Ratzlaf v. United States, 510 U.S. 135,143 (1994) ("A term appearing in several places in a

4    statutory text is generally read the same way each time it appears.").  Thus, if the term

5    interests is to be given a consistent meaning throughout § 455, then Defendants have failed

6    to show how the Court's sister has an interest in the instant lawsuit that can be reasonably

7    characterized as financial or proprietary in nature. And as previously stated, "ideological,

8    political, social and activist" interests are not generally recognized as actionable.

9    Additionally, Defendants have not even suggested, much less explained, how any

10   interest, even under the rejected "social, political, or ideological" standard, might be

11   "substantially" affected by the outcome of this case, particularly when the degree of any

12   potential impact on the interests of the Court's sister or NCLR seems indirect at best.  Neither

13   the Court's sister, nor her employer, are parties in this case, employed by a party in this case,

14   or have a direct affiliation with a party in this case or with their counsel. It is far too

15   speculative to suggest that because Janet Murguia and NCLR might arguably share common

16   values or pursue the same political or social goals as Plaintiffs and their counsel, that they

17   might be substantially affected by the outcome of this case.  See ESPN, 767 F. Supp. at 1080.

18   The Court therefore rejects § 455(b)(5)(iii) as a basis for recusal in this case.

19

20
     **E.    Whether The Court's Impartiality Might Reasonably Be Questioned under
21          §455(a)**

22   The more difficult question presented by this motion is whether the Court's impartiality

23   might reasonably be questioned under 28 U.S.C. §455(a).  The standard for recusal under

24   §455(a) is "whether a reasonable person with knowledge of all the facts would conclude the

25   judge's impartiality might reasonably be questioned." Taylor v. Regents of Univ. of Cal., 993

26   F.2d 710, 712 (9th Cir. 1993), cert. denied, 510 U.S. 1076 (1994).

27   The Court is acutely aware that it owes an independent duty to uphold the integrity of

28   the judicial system, see Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 860 (1988)

- 19 -

1   (recognizing that the purpose of § 455(a) is "to promote public confidence in the integrity of

2   the judicial process by avoiding even the appearance of impropriety whenever possible"),

3   even when a party's pleadings are bombastic and its position relies upon inflammatory and

4   meritless forms of argumentation. This Court will not dodge the critical question of whether

5   its continued role in this case is appropriate under the circumstances, even though it would

6   have been entirely justified in denying Defendants' recusal motion on timeliness grounds

7   alone.

8        Two competing concerns govern the Court's decision on the merits of this question.

9   First, of course, "[t]he test for recusal under [§ 455(a)] asks "whether a reasonable person with

10  knowledge of all the facts would conclude the judge's impartiality might reasonably be

11  questioned." Taylor, 993 F.2d at 712. Critically, "the judge's actual state of mind, purity of

12  heart, incorruptibility, or lack of partiality are not the issue." Nichols v. Alley, 71 F.3d 347,

13  351 (10th Cir. 1995) (internal quotations and citations omitted). The test is purely an

14  objective one, which focuses on "whether a reasonable person perceives a significant risk that

15  the judge will resolve the case on [any] basis other than the merits." In re Mason, 916 F.2d

16  384, 385 (7th Cir. 1990); Preston v. United States, 923 F.2d 731, 734 (9th Cir. 1991) ("The

17  inquiry is whether a reasonable person would have a reasonable basis for questioning the

18  judge's impartiality, not whether the judge is in fact impartial.").

19       It must be noted that in the recusal context, a reasonable person means a

20  "well-informed, thoughtful observer," as opposed to a "hypersensitive or unduly suspicious

21  person." In re Mason, 916 F.2d at 386. Thus, to the extent that the selected reader comments

22  left on the *Phoenix Business Journal* and *The Arizona Republic* websites have been offered

23  by Defendants to exemplify the public's reaction to the Court's continued involvement in this

24  case,[7] that position is rejected. Judges must decide whether to recuse themselves "not by

25

26       [7] Of course, not all of the comments cited by the Defendants supported their contention
    that the public's reaction to the Court's February 10, 2009 Order was one of suspicion and
27  mistrust. See e.g. these comments: "Wrong is just WRONG . . . I would have made the same
    ruling and MY sister is not connected to La Raza"; and "[t]his judge, like any judge in her

28

- 20 -

1    considering what a straw poll of the only partly informed man-in-the-street would show[,] but

2    by examining the record facts and the law, and then deciding whether a reasonable person

3    knowing and understanding all the relevant facts would recuse the judge."  In re Drexel

4    Burnham Lambert, Inc., 861 F.2d 1307, 1313 (2d Cir. 1988). "Articles and features in the

5    media suggesting impropriety cannot act as a barometer" of the reasonable person.  TV

6    Commc'ns Network, Inc. V. ESPN, Inc., 767 F. Supp. 1077, 1080 (D. Colo. 1991).

7    Obviously, no Court should permit anonymous bloggers to wield a veto power over its

8    participation in any case.

9           Second, courts have "a strong duty to sit" when there is no legitimate reason to recuse.

10   Clemens v. U.S. Dist. Ct. For the Cent. Dist. of Cal., 428 F.3d 1175, 1179 (9th Cir. 2005).

11   A judge should not recuse him or herself based "on unsupported, irrational, or highly tenuous

12   speculation; were he or she to do so, the price of maintaining the purity of appearance would

13   be the power of litigants or third parties to exercise a negative veto over the assignment of

14   judges."  In re United States, 666 F.2d 690, 694 (1st Cir. 1981).

15          As the Parties acknowledge in their filings, this is a high profile case, one that is not

16   likely to be free from controversy, regardless of who is presiding over it.  The issue of

17   whether Maricopa County, Sheriff Arpaio and MCSO ought to be enforcing federal

18   immigration laws elicits strong feelings, both within the local Phoenix community as well as

19   across the nation.  Further, allegations of violations of Constitutional rights often arouse

20   strong public passions.  These passions are no doubt shared by both those who allege the

21   violations and those who dispute them.  The Court also recognizes the controversial and

22   sensitive nature of the immigration issue generally within the country.  Nothing in this set of

23   circumstances would, by itself, warrant recusal under the appropriate standard.[8]

24   ───────────────

25   position, simply upheld the legal standard for a motion to dismiss. There were enough facts
     alleged to let the case go to the next step."
26

27          [8]In the Court's view this case is not about whether sound public policy—which is set
     by the political branches and not by the courts—favors having a local Sheriff and his
28   deputies enforce federal immigration laws. If it were, this case would never have withstood

1    Nonetheless, the Court recognizes its somewhat unique position, in that the Court's

2    twin sister plays a prominent public role in advocating policy positions that diametrically

3    oppose those taken by Defendants.   At the same time, the statute does not require the Court

4    to recuse itself from a matter merely because a case concerns Hispanic civil rights, our

5    nation's immigration policy, or some related matter.  Section 455(a) does not require such a

6    cautious approach on the part of a judge, and the Court must be careful to avoid allowing her

7    sister's public profile to serve as a proxy for a race-based recusal challenge.  Also providing

8    context to this inquiry is the rather unremarkable yet often overlooked proposition that "[a]

9    district judge is not a sterile creature who dons judicial robes without any prior contacts in the

10   community but rather is very likely to be a man or woman with a broad exposure to all kinds

11   of citizens of all shades of persuasion and background." United States v. Suren, 1992 U.S.

12   App. LEXIS 38216, *16 (9th Cir. Aug. 18 1992) (Memorandum Opinion) (quoting In re

13   Searches Conducted on March 5, 1980, 497 F. Supp. 1283, 1290 (E.D. Wis. 1980) (internal

14   citations omitted)).

15   Both Parties devote a great deal of space in their briefs to arguing over the proper

16   interpretation of two leading U.S. Supreme Court cases dealing with recusal motions brought

17   under § 455(a): Microsoft v. United States, 530 U.S. 1301 (2000) and Cheney v. United States

18   Dist. Ct., 541 U.S. 913 (2004).  Microsoft concerned whether Chief Justice Rehnquist should

19   have recused himself from a case where his son, a lawyer who represented Microsoft in

20   potentially related anti-trust matters, might have stood to gain from a favorable ruling towards

21   the company.  Id. at 1301-02.  After rejecting the possibility that his son might have an

22   interest that could be substantially affected by the outcome of the case, the Chief Justice

23   addressed whether his continued involvement created the appearance of impropriety.   Id.

24

25

26   even the flimsiest motion to dismiss.  Instead, this lawsuit concerns only whether Defendants
     have violated Plaintiffs' rights under the Fourth Amendment, Fourteenth Amendment, and
27   the Arizona State Constitution, while carrying out their otherwise lawful duties to enforce
     federal immigration laws.  The Court has not been asked to pass judgment on the wisdom of
28   the § 287(g) authorization, nor would it do so if asked.

- 22 -

1   Ultimately, Chief Justice Rehnquist decided against recusal.  In so doing, he noted that a

2   "decision by this Court as to Microsoft's antitrust liability could have a significant effect on

3   Microsoft's exposure to antitrust suits in other courts . . . [but] [e]ven our most unremarkable

4   decision interpreting an obscure federal regulation might have a significant impact on the

5   clients of our children who practice law." Id. at 1303.  The Chief Justice went on to comment

6   on the Supreme Court's unique  institutional role, stating:

7           [I]t is important to note the negative impact that the unnecessary
        disqualification of even one Justice may have upon our Court.  Here—unlike
8           the situation in a District Court or a Court of Appeals—there is no way to
        replace a recused Justice.  Not only is the Court deprived of the participation
9           of one of its nine members, but the even number of those remaining creates a
        risk of affirmance of a lower court decision by an equally divided court.

10  Id.

11          Cheney involved an attempt to force the recusal of Justice Scalia from a case

12  concerning whether the executive branch was required to disclose the identity of persons who

13  had served on the Vice President's energy task force. See Cheney, 541 U.S. at 914-16.  The

14  substance of the recusal motion focused on a hunting trip that Justice Scalia had taken with

15  Vice President Cheney and others.  At issue, among other things, was that the host of the trip

16  had ties to the energy industry and that members of the hunting party, including Justice Scalia,

17  had traveled to their final destination on the Vice President's government-issued airplane. Id.

18  In deciding against recusal, Justice Scalia stated that media commentary constituting "a blast

19  of largely inaccurate and uninformed opinion cannot determine the recusal question." Id. at

20  924.  Justice Scalia further commented that recusal might be advisable,  "if I were sitting on

21  a Court of Appeals," where the recused judge's place on the panel "would be taken by another

22  judge and the case would proceed normally."   Id. at 915.  Echoing the sentiments of Chief

23  Justice Rehnquist, Justice Scalia opined that the Supreme Court operated quite differently,

24  since, "[t]he Court proceeds with eight Justices, raising the possibility that, by reason of a tie

25  vote, it will find itself unable to resolve the significant legal issue presented by the case." Id.

26          The helpfulness of the Microsoft and Cheney opinions is debatable in this case. Chief

27  Justice Rehnquist's Memorandum, although quite informative in its analysis of when a close

28  family member's potential interest in a case might cast aspersions on a judge's apparent

1544

1   neutrality, is the writing of only one Justice. It is not the opinion of the Court. As such,

2   Microsoft is not binding precedent. Similarly, Justice Scalia's Memorandum in Cheney

3   discussing his personal friendship with Vice President Cheney and the media's coverage of

4   their hunting trip, is non-precedential.

5       More importantly, those cases do not deal with the recusal of a trial court judge. When

6   a federal district court judge recuses herself from a case, another judge can easily step into her

7   place. Because every district court judge has taken the same oath to faithfully apply the law,

8   which includes applying binding precedent from the U.S. Supreme Court as well as the law

9   of the relevant circuit, very little prejudice results from a district court judge's recusal.  On

10  the other hand, as Chief Justice Rehnquist and Justice Scalia have observed, the U.S. Supreme

11  Court is sui generis, or one of a kind.  There are only nine members, and when one recuses,

12  only eight will sit. As was noted, the votes of at least five Justices are required to overturn a

13  lower court opinion. Therefore, when that body is short one or more of its members, there is

14  a substantial risk that an important legal issue will go completely unresolved, without a

15  majority opinion. No other case, certainly not one from the federal district court, presents an

16  analogous situation.

17      One of the focal points of the Parties' arguments in this case is the notion that a judge

18  might be seen as unwilling to take a position inconsistent with her sibling's ideological,

19  political or social interests.  Defendants argue that a reasonable observer, one who is apprised

20  of all the facts, might assume that siblings, like the Court and her sister, share common

21  pursuits, points of view or even political ideology. Defendants further claim that siblings who

22  are personally close are likely to influence each other's thinking, even indirectly.  When the

23  siblings are twins, no less identical twins, according to Defendants, the likelihood of

24  confusion is even greater.  Plaintiffs respond by arguing that people frequently disagree with

25  their siblings, even with their identical twin, on a wide variety of issues and that no reasonable

26  person would question this Court's ability to do so here. Additionally, the Plaintiffs argue, the

27  mere fact that Janet Murguia is President and CEO of an organization that advocates for the

28  rights of Latinos would not cause a reasonable person to question the Court's impartiality.

1    In weighing the Parties' competing views, there is little, if any, guidance from case

2    law.  The Parties have not cited to—and the Court is not aware of—a similar case, where

3    nothing more than a sibling's political or social affiliations could arguably create the

4    appearance of impropriety for a judge under § 455(a).  Cognizant that a "reasonable person"

5    is well-informed and thoughtful, the Court agrees with Plaintiffs that no reasonable person

6    would automatically ascribe the views of one sibling to another.  It is certainly part of the

7    common experience that brothers and sisters often disagree about all sorts of issues, regardless

8    of how personally close they are or how often they speak on the telephone.  There is no reason

9    to believe that this reality would change when the siblings are identical twins.  A reasonable

10   and impartial observer apprised of all the facts would not conclude that identical twins are

11   more likely to share a common view point or interests than other siblings, much less that a

12   twin who is a judge would be incapable of impartiality. The Court is not aware of any

13   evidence that would tend to show that it has been unduly influenced by her sister's political

14   or social views.  Moreover, there is no proof that the Court, in light of her sister's stated

15   positions, would be hesitant to rule against Plaintiffs, if the law so required. That the Court's

16   identical twin is on record as opposing the enforcement of federal immigration laws by Sheriff

17   Arpaio and MCSO does not by itself mandate the Court's recusal under § 455(a).  If the only

18   grounds for recusal were Janet Murguia's role as President and CEO of NCLR and the public

19   comments that she has made pursuant to that role, the Court's inquiry would stop there.

20   However, this is not the case, as the Court must also address the issue of the We Can Stop the

21   Hate website, which was launched by NCLR while the Court's sister was serving as President

22   and CEO as a campaign to address acts of discrimination against Latino communities

23   throughout the United States.

24   Whether the Court's impartiality might reasonably be questioned based on the content

25   of these internet-based articles is a difficult issue.  Obviously, the Court has no connection to

26   the We Can Stop the Hate campaign.  There is also nothing in the record to suggest that the

27   Court's sister is the author of the offending articles or that she had any personal involvement

28

1    in their publication. Yet, the Court is mindful that it must be vigilant to avoid even the

2    slightest appearance of impropriety.

3        Without question, these articles greatly disparage MCSO deputies and personally

4    attack Sheriff Arpaio.  As has been previously pointed out, these articles refer to Sheriff

5    Arpaio as a "relentlessly self-promoting caricature," who has "less than stellar respect for civil

6    rights and due process," and who is "unrepentant, arrogant, and monumentally disingenuous."

7    With respect to the MCSO, its deputies are referred to as "thugs," while the department is

8    generally characterized as a "lawsuit-riddled folly" of an agency, among other things.  In the

9    context of a motion for recusal, when comments like these originate from a website that is

10   associated with the Court's sister or the organization that she leads, they cannot be taken

11   lightly.

12       Besides being insulting, the We Can Stop the Hate online articles speak directly to

13   MCSO's decision to enforce federal immigration laws pursuant to its § 287(g) authority.  In

14   fact, these articles specifically assert that MCSO has failed to adequately safeguard basic

15   constitutional rights through its departmental procedures, and that MCSO deputies have

16   engaged in wide-spread acts of racial profiling and have blatantly violated the Fourth

17   Amendment rights of detained immigration suspects by predicating stops on "physical

18   appearance alone."  The instant litigation sets out to determine these exact questions, i.e.,

19   whether the Fourth and Fourteenth Amendment rights of Latino persons in Maricopa County

20   have been violated.[9]

21       In applying the objective standard of § 455(a), the Court believes that whether a

22   reasonable person apprised of all relevant facts would question its impartiality based on

23   circumstances surrounding the publication of the We Can Stop the Hate website is a close call.

24   _____

25       [9]The Court must also note that a prominent picture of Janet Murguia sits immediately
     adjacent to each We Can Stop the Hate online article. Even though the picture is correctly
26   labeled as belonging to Janet Murguia and not the Court, the Court seeks to avoid the risk of
     confusing the Court's picture with that of her sibling. The Court must consider the possibility
27   that a reasonably well-informed and impartial observer might mistake the Court for her
28   identical twin sister.

1   On the one hand, the views of the Court's sister and her organization cannot be fairly imputed
2   to the Court, and there is nothing in the record to support an inference that the Court would
3   be unwilling to issue a ruling contrary to her sister's publicly-held positions. On the other
4   hand, much of the commentary contained in the articles is highly disparaging of specific
5   Defendants in this case, and the website takes a strong stand on disputed factual matters lying
6   at the heart of the litigation.

7   The United States Court of Appeals for the Ninth Circuit has instructed that when a
8   case is close, the balance should tip in favor of recusal. <u>United States v. Holland</u>, 519 F.3d
9   909, 911 (9th Cir. 2008) (quoting <u>United States v. Dandy</u>, 998 F.2d 1344, 1349 (6th Cir.
10   1993)). No Court should tolerate even the slightest chance that its continued participation in
11   a high profile lawsuit could taint the public's perception of the fairness of the outcome.
12   Certainly, this Court is unwilling to take such a risk. Thus, because at the district court level
13   all doubts should be resolved in favor of recusal when the issue is close, strictly on the sole
14   issue remaining—whether the Court's impartiality might reasonably be questioned under
15   Section 455 (a)—the Court, in an abundance of caution, will recuse itself from this matter.
16   **Accordingly,**

17   **IT IS HEREBY ORDERED** granting Defendants' Motion for Recusal. (Dkt.#63.)
18   **IT IS FURTHER ORDERED** directing that the Clerk reassign this case to another
19   judge in the District of Arizona by random lot.

20   DATED this 15th day of July, 2009.

23   Mary H. Murguia
United States District Judge

- 27 -



**EXHIBIT 29**

1    STEPTOE & JOHNSON LLP
     Collier Center
2    201 East Washington Street
     Suite 1600
3    Phoenix, Arizona 85004-2382
     Telephone: (602) 257-5200
4    Facsimile:  (602) 257-5299

5
     David J. Bodney (06065)
6    dbodney@steptoe.com
     Peter S. Kozinets (019856)
7    pkozinets@steptoe.com
     Karen J. Hartman-Tellez (021121)
8    khartman@steptoe.com
     Isaac P. Hernandez (025537)
9    ihernandez@steptoe.com

10    Attorneys for Plaintiffs
     (Additional Attorneys for
11    Plaintiffs listed on next page)

12

13            UNITED STATES DISTRICT COURT

14              DISTRICT OF ARIZONA

15    MANUEL   DE   JESUS   ORTEGA )
     MELENDRES, JESSICA QUITUGUA )  No. CV 07-02513-PHX-MHM
16    RODRIGUEZ, DAVID RODRIGUEZ, )
     VELIA MERAZ, MANUEL NIETO, )  **FIRST AMENDED COMPLAINT**
17    JR., on behalf of themselves and all )
     others similarly situated, and SOMOS )  **(Class Action)**
18    AMERICA, )
                           )  [Assigned to the Hon. Mary H.
19             Plaintiffs, )  Murguia]
20         vs. )
21    JOSEPH M. ARPAIO, in his official )
     capacity as Sheriff of Maricopa County, )
22    Arizona,   MARICOPA   COUNTY )
     SHERIFF'S OFFICE, and MARICOPA )
23    COUNTY, ARIZONA, )
                           )
24            Defendants. )

25

26

27

28

Additional Attorneys:

ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, Arizona 85011-0148
Telephone:  (602) 650-1854
Facsimile:  (602) 650-1376

Daniel Pochoda (021979)
dpochoda@acluaz.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0770
Facsimile:  (415) 395-0950

Robin Goldfaden*
rgoldfaden@aclu.org
Mónica M. Ramírez*
mramirez@aclu.org

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266

Kristina M. Campbell (023139)
kcampbell@maldef.org
Nancy Ramirez*
nramirez@maldef.org

*Pro Hac Vice Application to be filed

1550

Plaintiffs Manuel de Jesus Ortega Melendres, Jessica Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., on behalf of themselves and all others similarly situated, and Somos America (collectively, "Plaintiffs") allege as follows:

**PRELIMINARY STATEMENT**

1.    This is a class action to enforce the Fourth and Fourteenth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964; and Article II, § 8 of the Arizona Constitution.  Plaintiffs seek declaratory and injunctive relief against Defendants Sheriff Joe Arpaio ("Arpaio"), the Maricopa County Sheriff's Office ("MCSO") and Maricopa County, Arizona (collectively, "Defendants").

2.    As described below, Defendants have engaged in a widespread pattern and practice of racial profiling and other racially and ethnically discriminatory treatment in an illegal, improper and unauthorized attempt to "enforce" federal immigration laws against large numbers of Latino persons in Maricopa County without regard for actual citizenship or valid immigration status.

3.    Claiming authority under a limited agreement with U.S. Immigration and Customs Enforcement (ICE) that actually prohibits the practices challenged here, Defendants have launched a series of massive so-called "crime suppression sweeps" that show a law enforcement agency operating well beyond the bounds of the law.  During these sweeps, which have shown no signs of abating since Defendants began them in September 2007, large numbers of MCSO officers and volunteer "posse" members under Defendants' direction and control have targeted Latino persons for investigation of immigration status, using pretextual and unfounded stops, racially motivated questioning, searches and other mistreatment, and often baseless arrests.  Defendants' pattern and practice of racial profiling goes beyond these sweeps to include widespread, day-to-day targeting and mistreatment of persons who appear to be Latino.

4.    To curtail Defendants' illegal conduct, Plaintiffs bring this action as representatives of a class of Latino persons who, as a result of racial profiling, have been or will be stopped, detained, interrogated or searched by Arpaio and his agents in

1551

moving or parked vehicles in Maricopa County.  The moment Plaintiffs and those they represent were stopped by Defendants, they became the victims of "an all too familiar set of circumstances – an intrusive law enforcement stop and seizure of innocent persons on the basis of suspicions rooted principally in the race of the 'suspects.'"  *Washington v. Lambert*, 98 F.3d 1181, 1182 (9th Cir. 1996).  Plaintiffs seek judicial relief to enjoin Defendants' unlawful racial profiling and the attendant racially motivated mistreatment and constitutional injuries that Plaintiffs and the class will otherwise continue to endure.

**JURISDICTION AND VENUE**

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1343, 2201 and 2202, and to award attorneys' fees under 42 U.S.C. § 1988(b).

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

7.     Plaintiff Manuel de Jesus Ortega Melendres ("Mr. Ortega") is a citizen and resident of Mexico.  At the time of the events underlying this lawsuit, he was lawfully present in the United States.  He is of Latino descent and, by physical appearance, is a person of color.  He is a retired school teacher.

8.     Plaintiffs David and Jessica Rodriguez, husband and wife, are U.S. citizens and residents of Maricopa County.  The Rodriguezes are of Latino descent and, by physical appearance, are persons of color.

9.     Plaintiffs Velia Meraz and Manuel Nieto, Jr., siblings, are U.S. citizens and residents of Maricopa County.  They are of Latino descent and, by physical appearance, are persons of color.  They work for their family-owned business in Phoenix.

10.     Plaintiff Somos America/We Are America is a community-based non-profit membership organization, comprised of grassroots organizations, community and

1552

religious leaders, labor unions, students and others, established in March 2006 to mobilize for equal rights for immigrant communities in Arizona and for comprehensive immigration reform. Somos America's organizational mission includes seeking to combat racial discrimination directed at Latinos.  Plaintiff Somos America and its members have been injured by the pattern and practice of Defendants alleged in this Complaint.

11.  Upon information and belief, because of their race, color and/or ethnicity, Somos America members have been unlawfully targeted, stopped, questioned and/or detained by Defendants, and those they direct and control, as a result of Defendants' policy and practice of profiling and targeting persons whom they believe to be of Latino descent to determine their immigration status.  As a result of Defendants' policy and practice and failure to provide adequate training and supervision, Defendants' agents have pretextually, with racial motivation and without adequate cause stopped vehicles driven or ridden in by Somos America members and have subjected occupants to discriminatory, unreasonable and burdensome questioning and other differential treatment without individualized suspicion or any evidence of criminal activity.  Several individual members have reported to Somos that they have been stopped while driving in Maricopa County by MCSO officers without good cause and subjected to the mistreatment described herein.

12.  Because of Defendants' policies and pattern and practice of racially profiling persons in Maricopa County whom they believe to be of Latino descent, Somos America has experienced an increase in various requests for assistance from persons who have been negatively impacted by Defendants' actions.  In response, Somos America and its members have participated in monitoring Defendants' pattern and practice and assisting persons who have been unlawfully racially profiled by Defendants. Somos America is concerned that it will not be able to meet adequately this increased demand for assistance.  Already its limited sources have been, and continue to

1553

1   be, diverted and drained as a result of Defendants' policies and practices and the harm
2   they cause.

3       13.     Defendant Joseph M. Arpaio is the Sheriff of Maricopa County, Arizona,
4   and is sued in his official capacity.  He is the final decisionmaker for Maricopa County
5   in the area of law enforcement, and is responsible for setting and implementing the
6   policies and practices of the MCSO, including but not limited to creating and regulating
7   department policies regarding the stops and arrests and related treatment of individuals
8   in motor vehicles in Maricopa County.

9       14.     Defendant Arpaio, on behalf of the MCSO and with the Maricopa County
10  Board of Supervisors, is responsible for entering into a Memorandum of Agreement
11  (MOA) with U.S. Immigrations and Customs Enforcement (ICE) that purports to
12  authorize enforcement of federal immigration laws by specially nominated and cross-
13  trained MCSO Sheriff's deputies.   Defendant Arpaio, in his role as Sheriff, is
14  responsible for implementation and administration of the MOA.  He is also responsible
15  for directing MCSO immigration enforcement activity that is legally unauthorized and
16  conducted pursuant to his policy and practice of racial profiling.

17      15.     Upon information and belief, Arpaio participated in the authorization,
18  planning and supervision of the actions of the MCSO employees involved in the events
19  described in this Complaint.  Upon information and belief, Arpaio is also responsible for
20  recruiting, training, supervising and managing members of the MCSO's volunteer
21  "posse" that have carried out Defendants' policies and practices and have participated in
22  the events described herein without adequate selection processes, proper authority, or
23  adequate training and supervision.

24      16.     Upon information and belief, Arpaio is also responsible for the institution
25  of a telephonic "hotline" used to generate and pursue "tips" about suspected
26  immigration violations notwithstanding the complexity of immigration law, the general
27  lack of training, knowledge, and experience among the public in immigration law, and
28  the unfortunate reality that such a hotline invites individuals to equate race with

1554

immigration status and allows some to pursue personal grievances by way of a hotline complaint.   Arpaio established and has overseen an "Illegal Immigration and Interdiction" unit, known as the "Triple I Unit," to pursue hotline tips and other immigration enforcement activities carried out in the manner described herein.

17.   Upon information and belief, Arpaio failed to train MCSO personnel and volunteers adequately and to promulgate appropriate policies to prevent the unlawful stops of Plaintiffs and class members based on impermissible racial profiling and arbitrary and unreasonable stops and seizures.  Arpaio has also failed to develop criteria to avoid the abuse of the unchecked discretion he has afforded MCSO personnel, and has established, implemented and enforced illegal and unconstitutional policies and practices that have caused the unlawful treatment of Plaintiffs and class members by MCSO Deputies and other personnel and "posse" members.

18.   Defendant MCSO is a law enforcement agency in Maricopa County. Upon information and belief, MCSO programs and activities receive financial assistance through federal grants and other contributions from the U.S. Department of Justice ("DOJ") and other federal agencies.   As a recipient of federal financial assistance, MCSO is legally required to provide and conduct its programs and activities in a racially and ethnically non-discriminatory manner.

19.   Defendant Maricopa County, Arizona, is a political subdivision of the State of Arizona that can sue and be sued in its own name.  Upon information and belief, Maricopa County programs and activities receive federal financial assistance.   The County is therefore legally required to conduct its programs and activities in a racially and ethnically non-discriminatory manner.  By both its action and inaction, Defendant Maricopa County has agreed with, accepted, acquiesced in, and sanctioned Defendant Arpaio's focus on supposed enforcement of federal civil immigration laws at the expense of pursuit of criminal conduct and has done the same with regard to Defendants' policy and practice of employing illegal and improper racial profiling and other discriminatory treatment of Plaintiffs and other Latino persons in Maricopa

1555

County.  In fact, the Chair of the Maricopa County Board of Supervisors has praised as good law enforcement these policies and practices of Defendant Arpaio in the face of large-scale criticism that they specifically target Latinos.

## GENERAL ALLEGATIONS

### Limits on Defendants' Authority to Perform Immigration Functions

20.    In or around January 2007, Defendants Maricopa County and Arpaio entered into an MOA with ICE that provided for a maximum of 160 nominated, trained and certified personnel of the MCSO to perform certain immigration enforcement functions in limited circumstances.  (A true copy of the MOA is attached hereto as Exhibit A.)

21.    Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g) authorizes the Secretary of the U.S. Department of Homeland Security, of which ICE is a part, to enter into MOAs with state and local law enforcement agencies to train and permit designated officers to perform certain immigration enforcement functions. Under such agreements, the designated state and local officers are to be trained and supervised by appropriate ICE officers.

22.    According to ICE, "[t]he 287(g) program is designed to enable state and local law enforcement personnel, incidental to a lawful arrest and during the course of their normal duties, to question and detain individuals for potential removal from the United States, if these individuals are identified as undocumented illegal aliens and they are suspected of committing a state crime."  *Fact Sheet, Section 287(g) of the Immigration and Nationality Act* (September 24, 2007), *at* http://www.ice.gov/pi/news/factsheets/factsheet287gprogover.htm.  (A true copy of the Fact Sheet is attached hereto as Exhibit B.)

23.    ICE has made clear that "[t]he 287(g) program is not designed to allow state and local agencies to perform random street operations," and "is not designed to impact issues such as excessive occupancy and day laborer activities."  *Id.*  ICE guidelines state, "Police can only use 287(g) authority when people are taken into

1556

1   custody as a result of violating state or local criminal law.  Police cannot randomly ask
2   for a person's immigration status or conduct immigration raids," and "[**officers may
3   only] use their authority when dealing with someone who is suspected of a state
4   crime that is <u>more than a traffic offense</u>**."  *Id.*  (emphases added).

5       24.    Part I of the MOA provides that "the exercise of the immigration
6   enforcement authority granted under this MOA to participating LEA [Law Enforcement
7   Agency] personnel shall occur only as provided in this MOA."  Part V provides that the
8   immigration enforcement authority granted to Defendants is "subject to the limitations
9   contained in this MOA."  (Ex. A.)

10      25.    Part XV of the MOA provides in part that "[p]articipating LEA personnel
11  who perform certain federal immigration enforcement functions are bound by all federal
12  civil rights statutes and regulations, including the U.S. Department of Justice 'Guidance
13  Regarding The Use Of Race By Federal Law Enforcement Agencies' dated June 2003."
14  (Ex. A.)

15      26.    The DOJ Guidance states:  "'Racial profiling' at its core concerns the
16  invidious use of race or ethnicity as a criterion in conducting stops, searches and other
17  law enforcement investigative procedures."  It notes that "[r]acial profiling in law
18  enforcement is not merely wrong, but also ineffective."  (A true copy of the DOJ
19  Guidance is attached hereto as Exhibit C.)

20      27.    The DOJ Guidance directs that "[i]**n making routine or spontaneous law
21  enforcement decisions, <u>such as ordinary traffic stops</u>, Federal law enforcement
22  officers may not use race or ethnicity to any degree**, except that officers may rely on
23  race and ethnicity in a specific suspect description."  (Ex. C (emphases added).)

24      28.    Arpaio has utilized deputies trained under the MOA – and, on information
25  and belief has also used other MCSO deputies and other personnel and volunteers who
26  are not specially nominated and cross-trained to perform immigration duties – on and/or
27  in support of his "Triple I Unit."  In doing so (and in other ways), he has violated the
28  applicable ICE guidelines as to what a 287(g) agreement may allow.

- 9 -

29.    In short, Defendants' authority to enforce federal immigration law is constrained and limited by the U.S. and Arizona Constitutions, federal and state law, and the MOA.   Defendants have grossly exceeded these limits by devising and implementing an invidious and unconstitutional custom, policy and practice of racial profiling toward Latino persons in Maricopa County and an unconstitutional policy and practice of stopping Latino drivers and passengers, pretextually and without individualized suspicion or cause, and of subjecting them to different, burdensome, stigmatizing and injurious treatment once stopped.   Consequently, Defendants have violated the constitutional and civil rights of Plaintiffs and countless other Latino members of the Maricopa County community.

### Defendants' Racial Profiling and Immigration "Sweeps"

30.    Specifically, Defendants have adopted an unlawful, racially-biased policy of stopping, detaining, questioning and/or searching persons in vehicles in Maricopa County who are or appear to be Latino to interrogate them about their perceived immigration status based on nothing more than their race, color and/or ethnicity. Defendants have implemented this policy in Maricopa County in part through a series of so-called "crime suppression sweeps" that target persons who appear to be Latino for stops, questioning, arrests and other differential treatment that is not based on a constitutionally acceptable level of cause or suspicion and that is in any event racially motivated.

31.    However, as exemplified by the stops of several Plaintiffs described below, this racially-motivated and biased policy of targeting persons who appear to be Latino for immigration enforcement through pretextual and unfounded stops, interrogation, and arrests also applies and is followed as a general matter by MCSO personnel and is not limited to when "sweeps" are being conducted.   Persons who appear to be Latino, when driving or riding in a car, are at risk of being stopped and subjected to burdensome, time-consuming, harassing and stigmatizing interrogation, searches and other mistreatment that may culminate in an arrest and further detention.

1558

1    These stops and interrogations are frequently unsupported by reasonable suspicion or

2    probable cause, and in any event, are pretextual and racially motivated.

3        32.    Indeed, upon information and belief, Caucasian drivers and passengers

4    involved in the same or similar acts or alleged violations are treated differently and their

5    vehicles stopped at much lower rates than similarly situated Latino drivers and

6    passengers pursuant to MCSO policy and practice.  Further, Caucasian drivers and

7    passengers are treated differently and less intrusively and detained for shorter periods of

8    time after their vehicles are stopped by MCSO personnel than Latino drivers and

9    passengers after being stopped.  Latino occupants are also treated differently and more

10   intrusively by MCSO than Caucasian occupants of the same vehicle.

11       33.    Defendants' pattern and practice of racial profiling is evidenced by

12   numerous statements of Arpaio.  For example, Arpaio has claimed that physical

13   appearance alone is sufficient to question an individual regarding their immigration

14   status.  *See* Howard Witt, "Does Crackdown Cross Line? Arizona Efforts Stir Racial

15   Profiling Claims," *Chicago Tribune*, May 26, 2008.

16       34.    At a press conference last year, he described his operations as a "pure

17   program" designed "to go after illegals, not the crime first."  *See* Richard Ruelas,

18   "Arpaio Stays Silent on Real ICE Plan," *The Arizona Republic*, March 2, 2007, at B10.

19   Arpaio's practice is to "go after illegals . . . . You go after them, and you lock them up."

20   *Id.*  Arpaio and Maricopa County do not have legal authority under federal or state law

21   or the MOA to engage in such conduct, let alone to do so in a discriminatory manner.

22       35.    Defendants have targeted specific areas of Maricopa County that have

23   high Latino populations or large numbers of Latino day laborers for pretextual "crime

24   suppression operations."  On information and belief, large numbers of MCSO deputies

25   and hundreds of volunteer "posse" members, assisted by members of motorcycle clubs

26   such as the "American Freedom Riders," have been concentrated in such areas during

27   these "sweeps."  *See, e.g.*, Press Release, Maricopa County Sheriff's Office, "Sheriff's

28

1    Operation in Guadalupe Returns: Arpaio Disregards Mayor Jimenez's Request to Leave

2    Town" (April 4, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe%202008.pdf.

3        36.    Defendants' sweeps were launched in September 2007, have continued

4    through the present time, and show no signs of abating.

5        37.    On or about September 27, 2007,  Arpaio and MCSO initiated a "crime

6    suppression operation" in Cave Creek, Arizona, to investigate and arrest persons

7    deemed by them to be "illegal" immigrants and to disrupt a "day labor" center in the

8    parking lot of a local church where persons who are predominantly Latino gather.

9    Acting under color of law and Arpaio's orders, several MCSO officers detained,

10   questioned and arrested at least nine Latino individuals because they allegedly were

11   undocumented immigrants.  In the case of at least one vehicle that MCSO officers

12   stopped after it left the church parking lot, MCSO officers let the Caucasian driver leave

13   and did not issue a citation to him, but they questioned, detained and arrested the Latino

14   passengers in the Caucasian driver's vehicle.  *See* Press Release, Maricopa County

15   Sheriff's Office, "Sheriff's Office Not Waiting for Loitering and Soliciting Ordinance to

16   Take Effect" (September 27, 2007), *at* http://www.mcso.org/include/pr_pdf/CC.pdf.

17   Upon information and belief, the officers did not have reasonable suspicion or probable

18   cause to believe that any driver stopped or passenger questioned had committed a

19   violation of Arizona or federal law, and in any event, used a traffic violation to

20   investigate the immigration status of all Latino occupants.

21       38.    On October 4, 2007, Arpaio and MCSO initiated another "crime

22   suppression operation" in Queen Creek, Arizona.  Again, at least 16 Latino individuals

23   were detained, questioned and arrested on suspicion of being undocumented immigrants.

24   *See* Press Release, Maricopa County Sheriff's Office, "Sheriff Arpaio Goes After Day

25   Laborers" (October 4, 2007), *at* http://www.mcso.org/include/pr_pdf/Queen%20Creek

26   %20Day%20Laborers.pdf.   Upon information and belief, the officers did not have

27   reasonable suspicion or probable cause to believe that any driver stopped or passenger

28   questioned had committed a violation of Arizona or federal law, and in any event, used a

1560

1   traffic violation to investigate the immigration status of all Latino occupants.  Upon

2   information and belief, there were other persons who appeared to be Latino beyond the

3   number arrested who were also subject to pretextual, racially motivated stops and

4   questioning aimed at investigating them for immigration enforcement.

5          39.    For several months beginning in October 2007, Defendants Arpaio and

6   MCSO targeted the intersection of 34th Street and Thomas Road in central Phoenix

7   because of the presence of day laborers near Pruitt's Furniture Store.  *See, e.g.*, Press

8   Release, Maricopa County Sheriff's Office, "Arpaio Intensifies Presence at Pro-Illegal

9   Immigration    Protests    at    Pruitt's"    (December    5,    2007),    *at*

10  http://www.mcso.org/include/pr_pdf/Arrests%20120507.pdf.    Upon  information  and

11  belief, MCSO did not engage in these activities at the invitation or request of the City of

12  Phoenix Police Department, which has jurisdiction over this area.  Upon information

13  and belief, MCSO officers engaged in racial profiling and targeted Latino individuals

14  during this operation.   These officers stopped and questioned Latino drivers and

15  passengers prior to having adequate cause or suspicion that they were involved in

16  criminal acts, and in any event, for racially motivated reasons, singled them out for

17  investigation and enforcement and subjected them to different treatment.

18         40.    On December 5, 2007, Defendant Arpaio announced that he was

19  increasing the number of MCSO deputies patrolling the Pruitt's parking area.   *Id.*

20  Arpaio announced that he was acting in response to protests by members of the Latino

21  community about the policies of the MCSO and the Pruitt's owner.   During the

22  operation at Pruitt's, Arpaio and his officers stopped, detained, questioned and arrested

23  Latino persons in the vicinity of the store.  Upon information and belief, the officers did

24  not have reasonable suspicion or probable cause to believe that those stopped had

25  committed a violation of Arizona or federal law prior to making the stop, and in any

26  event, for racially motivated reasons, singled them out for investigation and enforcement

27  and subjected them to different treatment.  In an apparent effort to suppress the Pruitt

28

1   store protesters' exercise of their First Amendment rights, Arpaio announced that he
2   would continue to patrol the area until the protests ended.  *Id.*

3        41.   On or about January 18, 2008, Arpaio and MCSO conducted a "crime
4   suppression operation" between 16th and 40th Streets and McDowell and Indian School
5   Roads in Phoenix.  *See* Press Release, Maricopa County Sheriff's Office, "Sheriff
6   Mobilizes     Posse     in     Central     Phoenix"     (January     18,     2008),     *at*
7   http://www.mcso.org/include/pr_pdf/Sheriff%20Mobilizes%20Posse%20in%20Central
8   %20Phoenix.pdf.  Upon information and belief, MCSO did not engage in these activities
9   at the invitation or request of the Phoenix Police Department, which has jurisdiction
10  over this area.  Upon information and belief, MCSO officers engaged in racial profiling
11  and targeted Latino individuals during this operation.   To justify the massive use of
12  MCSO resources in the area bounded by 16th and 40th Streets and Indian School and
13  McDowell Roads in Phoenix, Defendant Arpaio stated:  "I anticipate that many illegal
14  immigrants will be arrested as the central Phoenix neighborhood remains a popular spot
15  for day laborers."  *Id.*  Such day laborers are predominantly Latino, but are by no means
16  exclusively noncitizens, let alone all undocumented.

17       42.   In late March 2008, Arpaio and MCSO conducted a "crime suppression
18  operation" at Cave Creek and Bell Roads in Phoenix because of the existence of the
19  Macehueli Day Labor Center, which is run by one of the leaders of the Pruitt's protests,
20  Salvador Reza.  *See* Press Release, Maricopa County Sheriff's Office, "Bell Road Crime
21  Suppression     Patrols"     (March     28,     2008),     *at*
22  http://www.mcso.org/include/pr_pdf/Bell%20Operations%2032808.pdf.     Upon
23  information and belief, MCSO did not engage in these activities at the invitation or
24  request of the Phoenix Police Department, which has jurisdiction over this area.  Upon
25  information and belief, MCSO officers engaged in racial profiling and targeted Latino
26  individuals during this operation.  Defendant Arpaio praised as "patriotic" the private
27  groups, including the American Freedom Riders, that on information and belief, had
28  been harassing all Latino persons entering and leaving this legal center.   Upon

1562

1   information and belief, Arpaio was aware of the anti-immigrant reputation of the
2   American Freedom Riders and the public use of racial epithets by their members.

3        43.     Between April 3 and April 6, 2008, Arpaio and MCSO conducted a "crime
4   suppression operation" in the Town of Guadalupe, Arizona.  *See* Press Release,
5   Maricopa County Sheriff's Office, "Sheriff's Crime Suppression Operation Moves to
6   Guadalupe" (April 3, 2008), *at* http://www.mcso.org/include/pr_pdf/Guadalupe
7   %20Operation.pdf.  Upon information and belief, MCSO officers engaged in racial
8   profiling, targeting individuals who appeared to them to be Latino during this operation.

9        44.     As MCSO is the law enforcement agency for the Town of Guadalupe,
10  Arpaio was aware that nearly all of the residents of Guadalupe are of Latino and/or
11  Native American descent.  In response to the criticism of his tactics and allegations of
12  racial profiling by the Mayor of Guadalupe, Rebecca Jimenez, Arpaio publicly labeled
13  her "a supporter of illegal immigration."  *See* Press Release, Maricopa County Sheriff's
14  Office, "Sheriff's Operation in Guadalupe Returns: Arpaio Disregards Mayor Jimenez's
15  Request to Leave Town" (April 4, 2008), *at*
16  http://www.mcso.org/include/pr_pdf/Guadalupe%202008.pdf.

17       45.     On April 4, 2008, after the commencement of the MCSO sweep in the
18  Town of Guadalupe, Phoenix Mayor Phil Gordon formally requested that U.S. Attorney
19  General Michael Mukasey launch a Justice Department investigation into the
20  "discriminatory harassment, improper stops, searches and arrests" of Latino persons in
21  Maricopa County by the MCSO.  (A copy of Mayor Gordon's letter is attached as
22  Exhibit D.)

23       46.     On or about May 7, 2008, Arpaio and MCSO conducted a "crime
24  suppression operation" in Fountain Hills, Arizona.  *See* Press Release, Maricopa County
25  Sheriff's Office, "Mesa Drop House" (May 8, 2008) *at*
26  http://www.mcso.org/include/pr_pdf/mesa%20drop%20house%2050808.pdf.  Upon
27  information and belief, MCSO officers engaged in racial profiling and targeted Latino
28  individuals during this operation as described above for other sweeps.

47.   On or about June 26, 2008, Arpaio and MCSO conducted a "crime suppression operation" in Mesa, Arizona, using nearly 200 deputies and posse members. *See* Press Release, Maricopa County Sheriff's Office, "Sheriff's Crime Suppression/Illegal Immigration Operation Moves Into Mesa" (June 26, 2008) *at* http://www.mcso.org/include/pr_pdf/Mesa%20Crime%20Suppression.pdf.         Upon information and belief, MCSO did not engage in these activities at the invitation or request of the City of Mesa Police Department, which has jurisdiction over this area. Upon information and belief, MCSO officers engaged in racial profiling and targeted Latino individuals during this operation as described above for other sweeps.

48.   On information and belief, the MCSO personnel involved in these "crime suppression sweeps" and in the vehicle stops of Plaintiffs and other Latinos in Maricopa County have targeted, stopped, interrogated, detained or arrested Latino persons based on their race, color and/or ethnicity, pretextually and not because of probable cause or reasonable suspicion that they had committed any crime.

<u>**Additional Indicia of Racial Bias**</u>

49.   In early 2008, Arpaio established a telephone hotline to facilitate MCSO's unlawful, racially-biased immigration enforcement tactics and its racial profiling of Latinos in Maricopa County.  Arpaio was aware that his policy of acting on anonymous citizen "tips" about alleged undocumented immigrants and his invitation for untrained members of the public to participate in his enforcement campaign would result in false, inaccurate, and racially motivated reports about Latino residents.  As opposed to law enforcement use of tips from the public which are based on suspected criminal activity and behaviors, a citizen report that an individual is "here illegally" will often be based solely on an individual's race, color and/or ethnicity.  On information and belief, this hotline has been used to further the policies and practices complained of herein and has increased their racially discriminatory impact.

50.   Racial profiling in law enforcement operations has been recognized as a serious and recurrent problem by elected officials and associations representing chiefs of

1564

police and other law enforcement professionals across the nation and beyond. Professional safeguards have been developed for law enforcement agencies to monitor and deter racially motivated practices when stopping and questioning the drivers of vehicles and any passengers.   These safeguards include:   collecting data for every vehicle stop, including data regarding the race of the persons affected, the identity of the officers involved, the reason for the stop and the actions taken; regularly analyzing this data for the agency and for particular units and officers; intervening if the resulting data indicate a problem of racial profiling or racial animus; requiring ongoing training of all personnel in the area of racial bias and sensitivity; disciplining personnel upon documented findings of racially improper actions; video and audio taping of all vehicle stops from start to finish; and making available to the public the results of the agency's monitoring efforts and its internal reviews of racial profiling or race discrimination complaints.

51.     On information and belief, Defendants have not adequately implemented, or even begun to implement, the foregoing safeguards.   Rather, Arpaio and other Defendants have remained steadfast in their resolve to continue their course.   As a result, Plaintiffs and those they seek to represent continue to be at risk for being subjected to pretextual stops, detention, questioning, searches and other mistreatment, without adequate cause or suspicion and because of the color of their skin.

### CLASS REPRESENTATIVES

52.     Defendants' behavior toward the following Plaintiffs starkly illustrates the unlawful policies, practices and conduct described above.

### The Unlawful Stop and Detention of Manuel de Jesus Ortega Melendres

53.     On September 6, 2007, Mr. Ortega legally entered the United States at the border station in Nogales, Arizona.

54.     Mr. Ortega possesses a U.S. Visa that is valid through August 23, 2016, and possessed a Permit issued by the U.S. Department of Homeland Security that was valid through November 1, 2007.

1565

55.     On or about September 26, 2007, at 6:15 a.m., Mr. Ortega was a passenger in a vehicle in Cave Creek, Arizona that was stopped by officers from the Maricopa County Sheriff's Office. The vehicle was being driven by a Caucasian male, but the passengers, including Mr. Ortega, were Latino men.

56.     The officers told the driver that he was being stopped for speeding, but they did not give him a citation or take him into custody.

57.     The officers looked at Mr. Ortega sitting in the vehicle and asked him to produce identification.

58.     Mr. Ortega showed them the following documents that he had in his wallet: (a) his United States Visa, which has his photograph and fingerprint on it; (b) his Mexican Federal Voter Registration card, which also has his photograph and fingerprint on it; and (c) a copy of the Permit he was given by the U.S. Department of Homeland Security with a stamp showing its validity through November 1, 2007.

59.     Although Mr. Ortega produced identification establishing his legal status, the officers told him to exit the vehicle.

60.     After exiting the vehicle, the officers pushed Mr. Ortega against a police vehicle and roughly patted him down over his entire body.

61.     The Sheriff's officers then took everything out of Mr. Ortega's pockets, including his wallet and a small bottle of lotion that Mr. Ortega occasionally applies to his face so that his skin does not become dry.

62.     The Sheriff's officers, upon removal of the small bottle of lotion from Mr. Ortega's pocket, asked Mr. Ortega in a confrontational manner, "How many times a week do you jack off?"

63.     Mr. Ortega was then handcuffed with his arms behind his back.  Mr. Ortega had a broken wrist years ago that did not heal correctly.  His wrist has a visible deformity and causes him pain.  Mr. Ortega asked the Sheriff's officers to please be careful in handcuffing him, but they handled him roughly.  The officers kept Mr. Ortega's hands handcuffed behind his back for approximately 40 minutes.

1566

64.     The officers then put Mr. Ortega in the back of a Sheriff's vehicle and took him to the Sheriff's office in Cave Creek where he was placed in a holding cell for four hours.

65.     Throughout the time that Mr. Ortega was seized from the vehicle, patted down, handcuffed, transported to the Sheriff's office, placed in the holding cell and left to remain in the holding cell, no one from the Sheriff's office explained anything to him, and no one offered to get a Spanish speaking officer or translator to assist in communicating with him.

66.     The officers did not advise Mr. Ortega of his Miranda rights.

67.     The officers did not give Mr. Ortega any opportunity to make a phone call.

68.     The officers did not tell Mr. Ortega what crime he allegedly committed, or if he was being charged with any crime.

69.     The officers did not say anything about what might happen to Mr. Ortega.

70.     The officers did not give Mr. Ortega any documents regarding his arrest or their putting him in jail.

71.     After the Sheriff's officers left Mr. Ortega in the jail for four hours, they placed him in handcuffs again and drove him to downtown Phoenix.  The driver of that vehicle spoke Spanish.  Mr. Ortega explained that his wrist was quite painful and asked if he could be handcuffed with his hands in front of him rather than behind him.  The driver said that he could not do that.

72.     The officers drove Mr. Ortega to the local ICE office.  They took him inside and removed the handcuffs.  Mr. Ortega's hands were swollen, and he was in pain.

73.     At the ICE office, Mr. Ortega was placed in a holding cell again and left unattended for more than an hour.

74.     Mr. Ortega was then taken to an ICE official who did not identify himself. The Sheriff's officers who arrested Mr. Ortega were also present.

1567

75.     The ICE official asked for Mr. Ortega's documents.  He took a quick look at the documents and said, "These documents are good."  The ICE official told Mr. Ortega he was free to leave.

76.     Mr. Ortega had been in custody for about nine hours.  During that time, Mr. Ortega was never: (a) given any water, (b) given any food, (c) told his rights, or (d) given the name of any of the officers involved.

77.     Mr. Ortega also was never given any paperwork, other than a case number, with any information about his: (a) being stopped, (b) being taken into custody by the Sheriff's officers, (c) being held in jail by the Sheriffs officers, (d) being transferred to the ICE office, (e) being held in jail at the ICE office, or (f) his being released from custody.

78.     After being released, Mr. Ortega had to make his own way from downtown Phoenix to Cave Creek.

79.     Because of Mr. Ortega' experience with the Maricopa County Sheriff's officers he is now afraid.  He is frightened to walk on the street or be seen in public in Maricopa County because he fears that the Sheriff's officers will come and arrest him again because he is Latino and does not speak English.

80.     Mr. Ortega is afraid that the Sheriff's officers will hurt him physically if they pick him up again.

81.     Mr. Ortega is afraid that he will be thrown in jail without any explanation, without any rights, and without any opportunity to get help even though the federal government of the United States has issued a Visa to him that gives him permission to be here.

**The Unlawful Stop and Detention of David and Jessica Rodriguez**

82.     On or about December 2, 2007, Mr. and Mrs. Rodriguez, along with their two young children, visited Lake Bartlett.

83.     As they were leaving the preserve, while driving on a paved road, they saw a sign that read, "Road Damaged."  They could then see that the road ahead was

1568

1   washed out by recent rains.  Two Sheriff's vehicles were parked on the opposite side of

2   the wash-out.

3          84.   Like the motorcycle rider behind him, Mr. Rodriguez decided to turn

4   around and head the other way.

5          85.   The two Sheriff's vehicles followed.  The deputies stopped Mr. Rodriguez,

6   the motorcycle (now in front of them) and another sedan.

7          86.   The deputies let the motorcycle and sedan go in short order, without

8   visibly exchanging any documentation.

9          87.   When Deputy Matthew Ratcliffe approached Mr. Rodriguez, however,

10  Deputy Ratcliffe asked for a social security card, driver's license, vehicle registration

11  and proof of insurance.

12         88.   Mrs. Rodriguez asked Deputy Ratcliffe why he needed to see a social

13  security card, to which he responded, "standard procedure."

14         89.   Deputy Ratcliffe then asked Mr. Rodriguez whether he had seen the "Road

15  Closed" sign.  Mr. Rodriguez explained that he had seen only a "Road Damaged" sign.

16  The Rodriguezes later discovered that there was a "Road Closed" sign, but on a part of

17  the paved road that they had not traveled.

18         90.   Deputy Ratcliffe took down Mr. Rodriguez's information and returned to

19  his vehicle.

20         91.   While they waited, the Rodriguezes watched another deputy pull over

21  several other vehicles, and from all appearances, the other drivers were being given only

22  warnings.

23         92.   When Deputy Ratcliffe returned, Mrs. Rodriguez asked if they could be

24  given a warning like everyone else.  He said no.

25         93.   Mrs. Rodriguez told Deputy Ratcliffe that this was selective enforcement.

26  She said that this looked like racial profiling.

27         94.   Deputy Ratcliffe became visibly angry and gave them a citation for failure

28  to obey a traffic control device.

1569

- 21 -

95.     Deputy Ratcliffe returned to his vehicle, turned on his siren and yelled over the loud speaker "you're free to go."

96.     As Mr. Rodriguez drove to the exit of the preserve, he finally saw the "Road Closed" sign.  He pulled over and waited on the side of the road.  Mr. Rodriguez was able to stop and speak with several drivers he had seen pulled over by Sheriff's deputies.  Not one of them had been asked for a social security card, and not one of them had been given a citation.  The other drivers were all Caucasian.

97.     The next day, Mrs. Rodriguez filed a formal complaint with the MCSO.  To date, she has not received a formal response.

**The Unlawful Stop and Detention of Velia Meraz and Manuel Nieto, Jr.**

98.     On or about March 28, 2008, a little before 3:00 p.m., Ms. Meraz and Mr. Nieto drove down the block from their family business, Manuel's Auto Repair, to the Quick Stop at the corner of N. Cave Creek and E. Nisbet Roads.

99.     They had the windows down, and Ms. Meraz was singing along to Spanish music.

100.     Pulling into the Quick Stop, they noticed a Sheriff's vehicle behind one of the vehicles at the pumps.  The officer, Deputy Alberto Armendariz, was speaking with two Latino-looking men in handcuffs.

101.     As soon as Mr. Nieto parked the car, Deputy Armendariz yelled over to them that they should leave.  Ms. Meraz asked why.

102.     Leaving the two handcuffed gentlemen, Deputy Armendariz approached Ms. Meraz and accused them of disturbing the peace.  Ms. Meraz explained that she was just singing to her music.

103.     Deputy Armendariz repeated that they had better leave before he arrested them for disorderly conduct.   Ms. Meraz said that they would leave, but asked the deputy for his badge number.

104.     The Deputy then starting speaking into his radio, evidently calling for additional officers.

1570

105.   As Mr. Nieto and Ms. Meraz pulled out of the Quick Stop, they noticed a motorcycle officer coming down Cave Creek Road.

106.   Deputy Armendariz waved at the motorcycle officer, directing him to follow Mr. Nieto and Ms. Meraz.

107.   Mr. Nieto then saw the motorcycle officer and three other Sheriff's vehicles behind them.  The motorcycle officer told Mr. Nieto to pull over and get out of the car.

108.   Mr. Nieto quickly dialed 9-1-1 and reported that he was being harassed by Sheriff's officers for no apparent reason.

109.   Mr. Nieto's family business was no more than 50 yards away, so he pulled into the parking lot there.

110.   The four police vehicles descended on them, blocking off the street and their business.  The officers jumped out of their vehicles and raised their weapons.

111.   Among the officers were Deputies Douglas Beeks and Cesar Brockman.

112.   An officer grabbed Mr. Nieto and pulled him out of the car.  He was pressed face first against his car.  His arms were twisted behind his back and he was handcuffed.

113.   An officer then asked Mr. Nieto if he had a driver's license.  He responded that he did.

114.   The sound of the commotion drew other people from the repair shop.  The officers told them to stay back.  The customers were told that they needed to leave or be arrested.

115.   Mr. Nieto was petrified that he was going to be arrested in front of his family, neighbors and customers, though he had done nothing wrong.

116.   Mr. Nieto's father, who had come out of the shop, called out to the officers that the repair shop was his business, that Mr. Nieto and Ms. Meraz were his children and that they all were U.S. citizens.

1571

117.   The officers immediately backed down and lowered their weapons.  Mr. Nieto was let out of the handcuffs.  The officers asked for his identification and ran it through their computer system.  They did not give him any citation.

118.   Mr. Nieto asked why the officers had subjected him and his sister to such treatment.  He was not given any explanation, nor any apology.

119.   Upon information and belief, Mr. Nieto and Ms. Meraz were targeted because they look Latino.  Upon information and belief, what happened to them was part of the sweep going on at that time on Cave Creek Road.

### CLASS ALLEGATIONS

120.   This is a class action seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2) on behalf of Plaintiffs and all other similarly situated individuals.

121.   The class that Plaintiffs seek to represent consists of all Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona.  This class is so numerous that joinder of all members is impracticable.

122.   There are questions of law and fact common to all members of the class and all class members have been directly affected by the challenged actions of Defendants.  Each putative class member has been or will be subjected to arbitrary, racially-motivated, discriminatory stops, questioning, detentions, arrests and/or searches conducted by Defendants.  Each putative class member has been or will be subjected to stops, detentions, interrogations and/or searches, pretextually, without consent, without any reasonable, articulable suspicion or probable cause that such class member had committed a crime or was engaged in criminal or other unlawful activity, and in a manner to which Caucasian drivers and passengers in vehicles in Maricopa County are generally not subjected.

1572

123.   The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of the class.

124.   The representative Plaintiffs will fairly and adequately protect the interests of the class.

125.   Defendants in this case have taken actions in violation of the class members' constitutional rights and/or refused to act in accordance with those rights, which are grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

126.   Plaintiffs' counsel is competent and experienced in class action litigation of the type brought here.

## REQUISITES FOR RELIEF

127.   As a result of the conduct of Defendants described above, Plaintiffs have been denied their constitutional and civil rights. Defendants' policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiffs, including but not limited to further violations of their constitutional and civil rights.   Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.   Plaintiffs therefore seek injunctive relief restraining Defendants from continuing to engage in and enforce the unlawful and unconstitutional policies, practices, conduct and acts described herein.

## FIRST CLAIM FOR RELIEF:  EQUAL PROTECTION
### (Fourteenth Amendment)

128.   Plaintiffs hereby incorporate by this reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

129.   As Latino persons, Plaintiffs are members of a protected class.

130.   As Latino persons, those individuals stopped, detained, questioned or searched by MCSO agents during the class period are members of a protected class.

1573

131.    Defendants, acting under color of law and in concert with one another, engaged, and continued to engage, in profiling and discriminatory treatment of Plaintiffs and other Latino individuals based on their race, color and/or ethnicity.

132.    Defendants have acted pretextually, with racial motivation and without reasonable suspicion or probable cause to stop, detain, question, search and/or arrest Plaintiffs or any of the other Latino individuals referred to above.

133.    By purposefully stopping, detaining, questioning, searching and/or arresting Plaintiffs and subjecting them to different, burdensome and injurious treatment because of their race, color and/or ethnicity, Defendants deprived Plaintiffs and members of the plaintiff class of the equal protection of the law within the meaning of the Fourteenth Amendment to the U.S. Constitution.  These actions violated Plaintiffs' and class members' Fourteenth Amendment rights and 42 U.S.C. § 1983.

134.    Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under state and federal law.

135.    By their conduct described above, Defendants in general, and Arpaio in particular, have devised and implemented a policy, custom and practice of illegally stopping, detaining, questioning or searching Latino individuals because of their race, color and/or ethnicity.

136.    Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

137.    As a direct, proximate result of Defendants' wrongful conduct, Plaintiffs and class members have suffered and will continue to suffer significant and substantial emotional harm and additional injuries.

**SECOND CLAIM FOR RELIEF:  UNREASONABLE SEARCH AND SEIZURE**
**(Fourth and Fourteenth Amendments)**

138.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

1574

139.    Pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution, state and local governments are prohibited from conducting unreasonable searches and seizures.

140.    Defendants, acting under color of law and in concert with one another, stopped, seized, searched, arrested and/or impermissibly extended stops of Plaintiffs, pretextually, for racially motivated reasons and without probable cause or reasonable suspicion that they had violated the law.  Such conduct violated the Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 42 U.S.C. § 1983.

141.    Upon information and belief, Arpaio and the other Defendants, acting under color of law and in concert with one another, have engaged in a custom, practice and policy of stopping, seizing, searching and arresting Latino individuals in Maricopa County, pretextually, for racially motivated reasons and without probable cause or reasonable suspicion that they had committed any crime.

142.    Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under state and federal law.

143.    Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

**THIRD CLAIM FOR RELIEF:  VIOLATION OF
ARIZONA CONSTITUTION ARTICLE II, § 8**

144.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

145.    Article II, § 8 of the Arizona Constitution provides:  "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

146.    By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated the rights guaranteed to

1575

Plaintiffs and other similarly situated individuals under Article II, § 8 of the Arizona Constitution.

147.    Defendants' actions have caused and will continue to cause Plaintiffs and other similarly situated individuals to suffer public humiliation and additional harms, and be subjected to unlawful discrimination unless these actions are stopped.

### FOURTH CLAIM FOR RELIEF:  RACE DISCRIMINATION IN FEDERALLY FUNDED PROGRAMS
### (Defendants MCSO and Maricopa County)

148.    Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

149.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:
   i.   [N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

150.    Defendant MCSO is the law enforcement agency for Maricopa County, Arizona, and receives federal funding and other financial assistance from the Department of Justice and other federal agencies.  As a recipient of federal financial assistance, MCSO is required to conduct its activities in a racially non-discriminatory manner pursuant to Title VI of the Civil Rights Act of 1964.

151.    Defendant County of Maricopa is a political subdivision of the State of Arizona and, as a recipient of federal funds, is required to conduct its activities in a racially non-discriminatory manner pursuant to Title VI of the Civil Rights Act of 1964.

152.    Federal regulations implementing Title VI further provide that no program receiving financial assistance through the DOJ shall utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color and/or ethnicity, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color and/or ethnicity.

1576

153.   The methods employed by Arpaio, MCSO and Maricopa County discriminate against individuals based on their race, color and/or ethnicity as described herein.

154.   Defendants MCSO's and Maricopa County's violations of 42 U.S.C. § 2000d and its implementing regulations have caused and will continue to cause Plaintiffs and other similarly situated individuals public humiliation and additional harms in that they will continue to be subjected to unlawful discrimination unless it is stopped.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of a class of all those similarly situated, respectfully demand judgment against Defendants awarding the following:

A.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race, color and/or ethnicity and denied Plaintiffs and plaintiff class equal protection of the laws in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983;

B.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' stops, interrogations, detentions, searches and/or arrests of Plaintiffs and other similarly situated individuals without probable cause or reasonable, articulable suspicion to believe that they had committed a crime violated the Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 42 U.S.C. § 1983;

C.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violate the rights of Plaintiffs and other similarly situated individuals provided by Article II, § 8 of the Arizona Constitution;

1577

1    D. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202

2 that Defendants engaged in race discrimination in violation of Title VI of the Civil

3 Rights Act of 1964 and 42 C.F.R. § 101 *et seq.*;

4    E. A preliminary and permanent injunction prohibiting Defendants

5 from continuing to engage in such race, color and/or ethnicity-based discrimination as

6 described herein and to put into place safeguards sufficient to ensure that such

7 discrimination does not continue in the future;

8    F. A preliminary and permanent injunction prohibiting Defendants

9 from exceeding the limits of their authority under the MOA and state and federal law;

10    G. An award of attorneys' fees and costs of suit, plus interest, pursuant

11 to 42 U.S.C. § 1988; and

12    H. Such other relief as the Court deems just and proper.

13    DATED this 16th day of July 2008.

14

15           STEPTOE & JOHNSON LLP

16

17          By /s/ David J. Bodney

18           David J. Bodney
            Peter S. Kozinets

19           Karen J. Hartman-Tellez
            Isaac P. Hernandez

20           Collier Center
            201 East Washington Street

21           Suite 1600
            Phoenix, Arizona 85004-2382

22

23          ACLU FOUNDATION OF ARIZONA
            Daniel Pochoda

24           P.O. Box 17148

25           Phoenix, Arizona 85011-0148
            Telephone:  (602) 650-1854

26           Facsimile:  (602) 650-1376

27

28

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
Robin Goldfaden
Mónica M. Ramírez
39 Drumm Street
San Francisco, California 94111
Telephone:  (415) 343-0770
Facsimile:  (415) 395-0950

MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
Kristina M. Campbell
Nancy Ramirez
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:  (213) 629-2512 x136
Facsimile:  (213) 629-0266

Attorneys for Plaintiffs

561437

1579

# Exhibit A

**Exhibit A**

## MEMORANDUM OF AGREEMENT
### C-50-07-055-2-00

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and Maricopa County, a political subdivision of the State of Arizona, pursuant to which ICE authorizes up to a maximum of 160 nominated, trained, and certified personnel of the Maricopa County Sheriff's Office (hereinafter interchangeably referred to as MCSO or the "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The MCSO represents Maricopa County in the implementation and administration of this MOA. It is the intent of the parties that these delegated authorities will enable the LEA to identify and process immigration violators in Maricopa County consistent with the terms of this MOA. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

### I.    PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter perform certain functions of an immigration officer within the LEA. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken by participating LEA personnel pursuant to this agreement.

### II.   AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), also codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of the Department of Homeland Security, acting through the Assistant Secretary of ICE, to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

### III.   POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating MCSO personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating MCSO personnel are subject to ICE supervision while performing immigration-related duties pursuant to this MOA. For the purposes of this MOA, ICE officers will provide supervision for participating MCSO personnel only as to immigration enforcement functions. MCSO retains supervision of all other aspects of the employment and performance of duties of participating MCSO personnel.

## IV.   ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory 5 week (4 week for LEA personnel functioning solely in a correctional facility or ICE detention facility) training in the enforcement of federal immigration laws and policies as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers.  Only participating LEA personnel who are selected, trained, authorized, and supervised, as set out herein, have authority pursuant to this MOA to conduct the immigration officer functions enumerated in this MOA.

Participating LEA personnel performing immigration-related duties pursuant to this MOA will be LEA officers assigned to the Violent Fugitive Apprehension Squad (VFAS), Criminal Investigations Section (CIS), Anti-Gang Unit, Drug Enforcement Unit and Community Action Teams (CAT).   Participating LEA personnel will be exercising their immigration-related authorities during the course of criminal investigations involving aliens encountered within Maricopa County.  Any combination of these officers or others may be assigned and/or co-located as task force officers to assist ICE agents with criminal investigations.

The mission of these various LEA assignments are summarized as follows:

Violent Fugitive Apprehension Squad (VFAS): The LEA personnel assigned to the VFAS unit are charged with the responsibility of identifying high-risk felons who are wanted for crimes or offenses that represent a significant threat to public safety.

Criminal Investigation Section (CIS): The LEA personnel assigned to CIS by statute are charged with the responsibility of identifying criminal enterprises and other forms of organized criminal activities.

Anti-Gang Unit: The LEA personnel assigned to the anti-gang unit engage in law enforcement actions that are targeted against gang activity.

Drug Enforcement Unit: The LEA personnel assigned to these various drug enforcement units are involved with illegal trafficking in narcotics investigations, quite often they encounter individuals who may be in the country illegally.

Community Action Teams (CAT): The LEA personnel assigned to the Community Action Teams are officers who have been assigned to these special units and charged with the responsibility of assisting local authorities in urban areas who have requested assistance due to pervasive criminal activity occurring in hot spots within their communities.

## V.   DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel will be authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1)) and to process for immigration violations those individuals who are convicted of State or Federal felony offenses;

- The power to arrest without warrant any alien entering or attempting to unlawfully enter the United States, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. 287.5(c)(1).

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2).

- The power to serve warrants of arrest for immigration violations under 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required criminal alien processing, to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

- The power and authority to prepare charging documents (INA Section 239, 8 C.F.R. 239.1; INA Section 238, 8 C.F.R. 238.1; INA Section 241(a)(5), 8 C.F.R 241.8; INA Section 235(b)(1), 8 C.F.R. 235.3) including the preparation of the Notice to Appear (NTA) application or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors;

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for processing aliens in categories established by ICE supervisors; and

- The power and authority to detain and transport (8 C.F.R. § 287.5(c)(6)) arrested aliens to ICE-approved detention facilities.

## VI.   DETENTION ISSUES

The LEA is expected to pursue to completion prosecution of the state or local charges that caused the individual to be taken into custody.  ICE will assume custody of individuals who have been convicted of a State or local offense only after such individuals have concluded service of any sentence of incarceration.  ICE will also assume custody of aliens with prior criminal convictions and when immigration detention is required by statute.  The ICE Detention and Removal Field Office Director or designee will assess on a case-by-case basis the appropriate removal vehicle to be employed and/or whether to assume custody of individuals that do not meet the above criteria based on special interests or other extenuating circumstances after processing by the LEA.  The immigration laws provide ICE Detention and Removal Operations (DRO) with the discretion to manage limited DHS detention resources, and ICE Field Office Directors may exercise this discretion by declining to detain aliens whose detention is not mandated by federal statute.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which, the LEA will provide, for a reimbursable fee, detention of incarcerated aliens in LEA facilities, upon the completion of their sentences.  The LEA facility will be expected to meet the ICE detention standards for either a less than 72-hour or over 72-hour facility as determined by ICE, and consistent with the anticipated detention period.

The parties understand that the LEA will not continue to detain an alien after that alien is eligible for release from the LEA's custody in accordance with applicable law and LEA policy, except for a period of up to 48-hours, excluding Saturday, Sunday, and any holiday, pursuant to an ICE detainer issued in accordance with 8 C.F.R. § 287.7, absent an IGSA in place as described above.

Upon completion of processing and release from MCSO detention facilities of an individual who participating MSCO personnel have determined to be a removable alien, the alien will be transported by MCSO on the same day to the ICE detention office located at 2035 N. Central Ave., Phoenix, Arizona 85004 or another ICE designated office or facility, after notification to and coordination with the ICE supervisory officer, so that no further detention costs will be incurred by ICE.

## VII.   NOMINATION OF PERSONNEL

The Sheriff of Maricopa County will nominate candidates for initial training and certification under this MOA.  For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA.  All candidates must be United States citizens.  All candidates must have at least two years of LEA work experience.  All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any future expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties, but will be subject to all the requirements of this MOA.

## VIII.   TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory 4 and 5 week training tailored to the immigration functions to be performed. Training will take place at a mutually designated site in Maricopa County, utilizing ICE-designed curriculum and competency testing.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) Civil Rights laws; (vi) the U.S. Department of Justice "Guidance Regarding the Use Of Race By Federal Law Enforcement Agencies" dated June 2003; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law and the Vienna Convention on Consular Relations to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XX below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX.   CERTIFICATION AND AUTHORIZATION

The ICE Training Division will certify in writing to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of Training Division certification, the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of one year from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time by ICE or the LEA. Such revocation will require immediate notification to the other party to this MOA. The Maricopa County Sheriff and the ICE Special Agent in Charge and ICE Field Office Director in Phoenix will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XX below, shall constitute revocation of all immigration enforcement authorizations delegated hereunder.

## X.    COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material.

ICE will provide the instructors and training materials. The LEA is responsible for the salaries and benefits, including overtime, for all of its personnel being trained or performing duties under this MOA, and for those personnel performing the regular functions of the participating LEA personnel while they are receiving training. LEA will cover the costs of all LEA candidates' travel, housing, and per diem affiliated with the training required for participation in this agreement. ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which the LEA will provide, for a reimbursable fee, transportation for all incarcerated aliens in the LEA's facilities, upon the completion of their sentences, or upon completion of processing in those circumstances in which state or local prosecution is not available, to a facility or location designated by ICE. If ICE determines that it is necessary, the LEA will provide ICE, at not cost, with an office within each participating LEA facility for ICE supervisory employees to work.

ICE agrees to be responsible for the purchase, installation, and maintenance of technology (computer/IAFIS/Photo and similar hardware/software) necessary to support the investigative functions of participating LEA personnel at each LEA facility with an active 287(g) program. The use of this equipment is to be limited to the performance of responsibilities authorized by this MOA under section 287(g) of the INA by participating LEA personnel. ICE also agrees to provide the necessary technological support and software updates for use by participating LEA personnel to accomplish the delegated functions. Such hardware, software, and other technology purchased or provided by ICE, shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, or when deemed necessary by the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

## XI.    ICE SUPERVISION

Immigration enforcement activities conducted by the participating LEA personnel will be supervised and directed by ICE supervisory officers or the designated team leader in Phoenix. Participating LEA personnel are not authorized to perform immigration officer functions, except when working under the supervision of an ICE officer. Participating LEA personnel shall give timely notice to the ICE supervisory officer within 24 hours or any detainer issued under the authorities set forth in this MOA.

In the correction setting, participating MCSO personnel shall give notice to the ICE supervisory officer as soon as practicable after, and in all cases within 24 hours of, any detainer issued under the authorities set forth in this MOA. In the field setting, participating MCSO deputies will contact an ICE duty officer at the time of exercising the authority in this MOA for guidance. The actions of participating MCSO personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to the ICE Special Agent in Charge and ICE Field Office Director in Phoenix, or designees, and the Sheriff of Maricopa County, or designee, when circumstances safely allow the concern to be raised. The Special Agent in Charge, the ICE Field Office Director in Phoenix, and the Sheriff of Maricopa County shall attempt to resolve the conflict.

Whenever possible, MCSO will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Office of Investigations (OI) or ICE's Office of Detention and Removal (DRO) prior to taking any enforcement action. This deconfliction will, at a minimum, include wants/warrants, criminal history, and a person, address, and vehicle check through TECS II.

MCSO participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE agents with criminal investigations.

## XII.   REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII.   LIABILITY AND RESPONSIBILITY

If any participating LEA personnel are the subjects of a complaint of any sort that may result in that individual receiving employer discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by state law, immediately notify ICE of the existence and nature of the complaint. The resolution of the complaint shall also be promptly reported to ICE. Complaints regarding the exercise of immigration enforcement authority by participating LEA personnel shall be handled as described below.

Except as otherwise noted in this MOA or allowed by federal law, the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personnel expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will only be treated as federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function as authorized by this MOA. 8 U.S.C. § 1357(g)(7). It is the understanding of the parties to this MOA that participating LEA personnel will enjoy the same defenses and immunities available to ICE officers from personal liability arising from tort lawsuits based on actions conducted in compliance with this MOA. 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. Such requests must be made in writing directed to the Attorney General of the United States, and will be handled in coordination with the ICE Special Agent in Charge and/or the ICE Field Office Director in Phoenix. Requests for representation must be presented to the ICE Office of the Chief Counsel at 2035 N. Central Avenue, Phoenix, AZ 85004. Any request for representation and related correspondence must be clearly marked "Subject to Attorney-Client Privilege." The Office of the Chief Counsel will forward the individual's request, together with a memorandum outlining the factual basis underlying the event(s) at issue in the lawsuit, to the ICE Office of the Principal Legal Advisor, which will forward the request, the factual memorandum, and an advisory statement opining whether such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Torts Staff, Civil Division, Department of Justice. ICE will not be liable for defending or indemnifying acts of intentional misconduct on the part of participating LEA personnel.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with Garrity v. New Jersey, 385 U.S. 493 (1967).

As the activities of participating LEA personnel under this MOA are undertaken under federal authority, the participating LEA personnel will comply with federal standards and guidelines relating to the Supreme Court's decision in Giglio v. United States, 405 U.S. 150 (1972), and its progeny, which relates to the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

## XIV.   COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, with regard to activities undertaken under the authority of this MOA, is included at Appendix B.

## XV.   CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice "Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies" dated June 2003.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter.  Qualified foreign language interpreters will be provided by the LEA as needed.

## XVI.   STEERING COMMITTEE

The ICE Special Agent in Charge, the ICE Field Office Director, and the Sheriff of Maricopa County shall establish a steering committee that will meet periodically to review and assess the immigration enforcement activities conducted by the participating LEA personnel and to ensure compliance with the terms of this MOA.  The steering committee will meet periodically in Maricopa County at locations to be agreed upon by the parties, or via teleconference.  Steering committee participants will be supplied with specific information on case reviews, individual participants' evaluations, complaints filed, media coverage, and, to the extent practicable, statistical information on increased immigration enforcement activity in Maricopa County.  An initial review meeting will be held no later than nine months after certification of the initial class of participating LEA personnel under Section IX, above.

## XVII.   COMMUNITY OUTREACH

The LEA may, at its discretion, engage in community outreach with individuals and organizations expressing an interest in this MOA.  ICE may participate in such outreach upon the LEA's request.

## XVIII. RELATIONS WITH THE NEWS MEDIA

LEA may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA.  This MOA also describes the complaint procedures available to members of the public regarding actions taken by participating LEA personnel pursuant to this agreement.

The LEA hereby agrees to coordinate with ICE before releasing information to the media regarding actions taken under this MOA. The points of contact for ICE and MCSO for this purpose are identified in Appendix C.

## XIX.   MODIFICATION OF THIS MOA

Modifications to this MOA must be proposed in writing and approved by the signatories.

## XX.   DURATION AND TERMINATION OF THIS MOA

This MOA will be in effect from the date of signing until it is terminated by either party. Either party, upon written notice to the other party, may terminate the MOA at any time. A termination notice shall be delivered personally or by certified or registered mail and termination shall take effect immediately upon receipt of such notice.

Either party, upon written or oral notice to the other party, may temporarily suspend activities under this MOA when resource constraints or competing priorities necessitate. Notice of termination or suspension by ICE shall be given to the Sheriff of Maricopa County. Notice of termination or suspension by MCSO shall be given to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

Except for the provisions contained in Section XIII, this MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create, any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, and accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

Date: 2/24/07                          Date: _____

Julie Myers
Assistant Secretary
Immigration and Customs Enforcement
Office of Homeland Security

(See attached page 10A)
Maricopa County
Board of Supervisors

Date: Jan 19, 2007

Joe Arpaio
Sheriff
Maricopa County

Maricopa County Board of Supervisors

_(signature)_ 2-7-07

~~Acting~~ Chairman of the Board          Date

ATTEST:

_(signature)_ 2-7-07

Clerk of the Board          Date

APPROVED AS TO FORM AND WITHIN THE POWERS AND AUTHORITY
GANTED UNDER THE LAWS OF THE STATE OF ARIZONA TO MARICOPA
COUNTY

_(signature)_ 1-25-07

Deputy County Attorney

This signature page is added and made part of
The Memorandum of Agreement (MOA) between
United States Immigration and Customs Enforcement (ICE)
and Maricopa County

(10A)

1591

# APPENDIX A

## POINTS OF CONTACT

The ICE and MCSO points of contact for purposes of implementation of this MOA are:

For MCSO:          David A. Hendershott
Chief Deputy, Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ 85003
(602) 876-1824

For ICE DRO:      Jon Gurule
Assistant Field Office Director
Detention and Removal Operations
2035 N. Central Avenue
Phoenix, AZ 85004   (602)379-6696

For ICE OI:        Troy Henley
Deputy Special Agent in Charge
400 N. 5th Street, 11th Floor
Phoenix, AZ 85004
(602) 514-7392

## APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between DHS/ICE and the Maricopa County Sheriff's Office, hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under Federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

The MOA sets forth the process for designation, training, and certification of certain LEA personnel to perform certain immigration enforcement functions specified herein. Complaints filed against those personnel in the course of their non-immigration duties will remain the domain of the LEA and be handled in accordance with the LEA Manual of Policy and Procedures. The LEA will also handle complaints filed against personnel who may exercise immigration authority, but who are not designated and certified under this MOA. The number and type of the latter complaints will be monitored by the Steering Committee established under Section XVI of the MOA.

In order to simplify the process for the public, complaints against participating LEA personnel relating to their immigration enforcement can be reported in a number of ways. The ICE Headquarters Office of Professional Responsibility (OPR) and the LEA's Internal Affairs Division will coordinate complaint receipt and investigation.

The ICE OPR will forward complaints to the Department of Homeland Security's Office of Inspector General (DHS OIG) as appropriate for review, and ensure notification as necessary to the U.S. Department of Justice Civil Rights Division (DOJ CRD). The ICE OPR will coordinate complaints related to participating personnel with the LEA Internal Affairs Division as detailed below. Should circumstances warrant investigation of a complaint by the DHS OIG or the DOJ CRD, this will not preclude the DHS OIG, DOJ CRD, or ICE OPR from conducting the investigation in coordination with the LEA's Internal Affairs Division, when appropriate.

The ICE OPR will adhere to established procedures relating to reporting and resolving allegations of employee misconduct, and the LEA's Internal Affairs Division will follow applicable LEA policies and procedures, personnel rules, Arizona statutes, and collective bargaining agreement requirements.

1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures.

Complaints will be accepted from any source (e.g.: ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints can be reported to federal authorities as follows:

A.     Telephonically to the ICE OPR at the Joint Intake Center (JIC) in Washington, D.C. at the toll-free number 1-877-246-8253; or

B.     Telephonically to the Resident Agent in Charge of the ICE OPR office in Tucson, AZ at (520) 407-2200; or

C.     Via mail as follows:

> U.S. Department of Homeland Security
> U.S. Immigration and Customs Enforcement
> Office of Professional Responsibility
> 425 I Street, NW
> Room 3260
> Washington, D.C. 20536

Complaints can also be referred to and accepted by any of the following LEA entities:

A.     The LEA Internal Affairs Division; or

B.     The supervisor of any participating LEA personnel; or

C.     The LEA Internal Affairs Division as follows:
> Commander
> Internal Affairs Division.
> Maricopa County Sheriff's Office
> 100 W. Washington Street, Suite 1900
> Phoenix, AZ  85003

## 2. Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR.  The ICE OPR will verify participating personnel status under the MOA with the assistance of the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

3. Complaint Resolution Procedures

Upon receipt of any complaint, the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above, the ICE OPR will adhere to existing ICE reporting requirements as they relate to the DHS OIG and/or the DOJ CRD. Complaints will be resolved using the existing procedures, supplemented as follows:

A. Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B. Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the Maricopa County Sheriff's Office shall be honored. If appropriate, an individual may be removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C. Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

## APPENDIX C

### PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section XVIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

For MCSO:

Lt. Paul Chagoya
Public Information Office
Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ  85003
(602) 525-6239

For ICE:

Virginia Kice
Western Regional Communications Director/Spokesperson
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Western Region Public Affairs
24000 Avila Road
Laguna Niguel, CA  92677
(949) 360-3096

# Exhibit B

**Exhibit B**

  **U.S. Immigration and Customs Enforcement**

- Skip Navigation
- Home
- Site Map
- Español

Search                     Go

Home
About Us
Partners
International Students
Public Information
Careers
Español

- Public Information
- Topics of Interest
- Annual Report
- News Releases
- Fact Sheets
- Speeches & Testimonies
- Email Sign Up
- Newsletters
- FOIA
- FAQs

**Protecting National Security and Upholding Public Safety**

# Fact Sheets

September 24, 2007

## Delegation of Immigration Authority Section 287(g)
## Immigration and Nationality Act

## Section 287(g) of the Immigration and Nationality Act

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA), effective September 30, 1996, added Section 287(g), performance of immigration officer functions by state officers and employees, to the Immigration and Nationality Act (INA). This authorizes the secretary of the U.S. Department of Homeland Security (DHS) to enter into agreements with state and local law enforcement

1598

agencies, permitting designated officers to perform immigration law enforcement functions, pursuant to a Memorandum of Agreement (MOA), provided that the local law enforcement officers receive appropriate training and function under the supervision of sworn U.S. Immigration and Customs Enforcement (ICE) officers.

The cross-designation between ICE and state and local patrol officers, detectives, investigators and correctional officers working in conjunction with ICE allows these local and state officers: necessary resources and latitude to pursue investigations relating to violent crimes, human smuggling, gang/organized crime activity, sexual-related offenses, narcotics smuggling and money laundering; and increased resources and support in more remote geographical locations.

# Memorandum of Agreement

The MOA defines the scope and limitations of the authority to be designated. It also establishes the supervisory structure for the officers working under the cross-designation and prescribes the agreed upon complaint process governing officer conduct during the life of the MOA. Under the statute, ICE will supervise all cross-designated officers when they exercise their immigration authorities. Once the scope of limitations of the MOA has been reached, the assistant secretary of ICE, and the governor, a senior political entity, or the head of the local agency may sign the MOA, requesting the cross-designation.

# Officer Selection Requirement

- U.S. citizen;
- Current background investigation completed;
- Minimum two years experience in current position; and
- No disciplinary actions pending.

# Training Requirements

ICE offers two training programs including a five-week program for field level law enforcement officers and a four-week program for correctional personnel. The U.S. Immigration and Customs Enforcement Academy sets standards and testing. Certified instructors conduct the training.

# 287(g) Signed MOAs as of 9-19-07 : 28

- AL Alabama State Police
- AZ Department of Corrections
- AZ AZ Department of Public Safety
- AZ Maricopa County Sheriff's Office
- CA Los Angeles County Sheriff 's Department
- CA Orange County Sheriff's Office
- CA Riverside County Sheriff 's Office
- CA San Bernardino County Sheriff 's Office
- CO CO Dept. of Public Safety
- CO El Paso County Sheriff 's Office
- FL Collier County Sheriff's Office
- FL Florida Department of Law Enforcement

1599

Case 2:07-cv-02513-GMS    Document 26-1    Filed 09/05/08    Page 21 of 41

- GA Department of Public Safety
- GA Cobb County Sheriff's Office
- MA Department of Corrections
- MA Framingham Police Department
- MA Barnstable County Sheriff's Office
- NC Alamance County Sheriff's Office
- NC Cabarrus County Sheriff's Office
- NC Gaston County Sheriff's Office
- NC Mecklenburg County Sheriff's Office
- NH Hudson City Police Department
- OK Tulsa County Sherrif's Office
- TN Davidson County Sheriff's Office
- VA Herndon Police Department
- VA Prince William-Manassas Adult Detention Center
- VA Rockingham County Sheriff's Office
- VA Shenandoah County Sheriff's Office

- Number of Task Force MOAs in Field: 10
- Number of Jail MOAs in Field: 14
- Number of Joint MOAs in Field: 4
- Number of Officers Trained to date: 485
- Number of Arrests: More than 25,000

## Criminal Alien Program (CAP)

Under current MOAs, 287(g) participants in Arizona , California , and North Carolina currently ensure that criminal aliens incarcerated within federal, state and local facilities are not released into the community upon completion of their sentences. ICE is working to expand 287(g) authority to local and county correctional facilities that are not operational within normal ICE jurisdictions. The expansion of the 287(g) program into smaller county and local correctional facilities will act as a force multiplier for CAP and have a positive impact on this important program.

## A Law Enforcement Partnership

Terrorism and criminal activity are most effectively combated through a multi-agency/multi-authority approach that encompasses federal, state and local resources, skills and expertise. State and local law enforcement play a critical role in protecting our homeland security because they are often the first responders on the scene when there is an incident or attack against the United States . During the course of daily duties, they will often encounter foreign-born criminals and immigration violators who pose a threat to national security or public safety.

## Frequently Asked Questions

## What is the program designed to do?

The 287(g) program is designed to enable state and local law enforcement personnel, incidental to a lawful arrest and during the course of their normal duties, to question and detain individuals for potential removal from the United States, if these individuals are identified as undocumented illegal aliens and

1600

they are suspected of committing a state crime.

# What is the program not designed to do?

The 287(g) program is not designed to allow state and local agencies to perform random street operations. It is not designed to impact issues such as excessive occupancy and day laborer activities. In outlining the program, ICE representatives have repeatedly emphasized that it is designed to identify individuals for potential removal, who pose a threat to public safety, as a result of an arrest and /or conviction for state crimes.

# How do I participate in the 287(g) Delegation of Authority program?

The interested agency must send a letter addressed to the U.S. Immigration and Customs Enforcement (ICE), attention Assistant Secretary, requesting participation in the 287(g) Delegation of Authority program. A sample letter can be obtained from the local 287(g) SAC point of contact.

# A law enforcement agency has requested to participate in the 287 (g) Delegation of Authority program, what's next?

ICE with assistance from the requesting law enforcement agency (LEA) conducts a field survey. This must be completed to determine the infrastructure required to support the request. If the local ICE office demonstrates they have the capability to fully support the request, it will then go to our ICE headquarters for further review. The final approval must come from the Assistant Secretary. An approved request requires the LEA enter into a Memorandum of Agreement (MOA) with ICE. The MOA defines the scope and limitations of the authority to be designated to the LEA. Once the MOA is signed and the parameters of the agreement are defined, ICE will train the LEA officers.

# What type of training is involved for participating agencies?

ICE offers two training programs including a five-week program for field-level law enforcement officers, and a four-week program for correctional/detention personnel. ICE sets standards and provides certified instructors to conduct the training. Training topics include such areas as immigration and criminal law, document examinations, cross-cultural communications and intercultural relations, alien status, ICE operations, statutory authority, removal charges, ICE Use of Force policy and avoidance of racial profiling. Upon successful completion of the training, officers receive official certification from ICE entitled "287(g) Authority." Re-certification is also required. After certification, ICE continues to provide supervision and support. By requirement, all grants of 287(g) authority must be supervised ICE to help state/local officers determine the appropriate response once they determine a suspect to be an immigration violator.

# Who Will Pay for Training?

ICE will pay for expenses associated with the training of officers under the 287(g) Delegation of Authority program.

1601

# Who will pay for the salary of state/local officers while they attend training?

The LEA is required to pay its officers' salary.

# Who Will Pay for the Information Technology (Computer and Network Systems) Needed to Access the ICE Databases?

ICE will fund the costs associated with the Information Technology needed to access the ICE databases.

# What Are the Requirements for an Officer to Be Selected?

The officer must be a U.S. citizen, must have a background investigation completed by ICE, must have a minimum of two years experience in their current position, and have no disciplinary actions pending.

# What Role Does ICE Perform with 287(g) Trained State and Local Officers?

ICE will supervise the 287(g) trained officers while conducting immigration enforcement activities. ICE will also provide annual training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions.

# Can 287(g) Trained Officers Determine Alienage of any Person Suspected of Being an Illegal Alien?

The 287(g) trained officers are focused on identifying and processing criminal aliens for removal and on investigating criminal immigration violations.

# Does a person need to be convicted of a state crime for officers to use the 287(g) authority?

Officers trained and certified in the 287(g) program may use their authority when dealing with someone suspected of a state crime that is more than a traffic offense. If the person's identity is in question, the officer will be able to make an inquiry to the ICE system for help in making a positive identification. Officers can only use their 287(g) authority when dealing with persons suspected of committing state crimes and whose identity is in question or are suspected of being an illegal alien. While enforcing immigration law is primarily a federal responsibility, the 287(g) program provides a mechanism for enlisting the help of state and local law enforcement in this effort with a minimal impact on their normal duties.

# Will the police conduct raids looking for illegal aliens?

Police can only use 287(g) authority when people are taken into custody as a result of violating state or local criminal law. Police cannot randomly ask for a person's immigration status or conduct immigration

raids.

# Do LEAs receive special grants from ICE to fund their participation in the 287(g) program?

There are currently no ICE grants or payments made to LEAs for participation in the 287(g) program.

# Will participation in the 287(g) program allow LEAs to arrest any undocumented alien?

Incidental to an arrest for a state violation, 287(g) trained officers identify and process criminal aliens for removal from the U. S.

# Will LEA participation in the 287(g) program resolve all undocumented alien problems?

By providing training and assistance to LEAs across the country, 287(g) acts as a force multiplier for both the LEA and ICE to enforce the provisions of the INA. The requesting LEA should work closely with the local OI and DRO offices to identify the right mix of ICE services, which may or may not include 287(g) training, to address the local LEA concerns.

# What successes have 287(g) Delegation of Authority officers had?

ICE has established 22 Memorandum of Agreement's and has trained 349 law enforcement officers under the 287(g) program. These trained officers have arrested approximately 20,000 individuals under the 287(g) Delegation of Authority program. From January 19, 2007, thru March 18, 2007, Orange County, California, detention officers trained in 287(g) conducted approximately 1,508 interviews that resulted in 1,004 immigration detainers, Approximately 659 were for felony charges and approximately 345 were for misdemeanors. 71 of those detentions were affiliated with street gangs. In November 2005, the Arizona Department of Corrections (ADC) began processing alien inmates at their Intake Center as part of the 287(g) program. ADC estimates Arizona taxpayers have saved $9 million by accelerating ICE's removal of eligible state inmates.

# Contact Information

For more information on Section 287(g) of the Immigration and Nationality Act, you may request an information packet via the Section 287g form.

U.S. Immigration and Customs Enforcement (ICE) was established in March 2003 as the largest investigative arm of the Department of Homeland Security. ICE is comprised of five integrated divisions that form a 21st century law enforcement agency with broad

responsibilities for a number of key
homeland security priorities.

Last Modified: Tuesday, October 16, 2007

- About Us
- Partners
- International Students
- Public Information
- Careers
- Home
- Site Map
- DHS
- USA.gov
- FOIA
- Privacy & Usuage Policy
- Español
- Get Plugins

U.S. Immigration and Customs Enforcement (ICE)

# Exhibit C

**Exhibit C**

U.S. Department of Justice
Civil Rights Division

**GUIDANCE REGARDING THE**

**USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES**

**June 2003**

**INTRODUCTION AND EXECUTIVE SUMMARY**

In his February 27, 2001, Address to a Joint Session of Congress, President George W. Bush declared that racial profiling is "wrong and we will end it in America." He directed the Attorney General to review the use by Federal law enforcement authorities of race as a factor in conducting stops, searches and other law enforcement investigative procedures. The Attorney General, in turn, instructed the Civil Rights Division to develop guidance for Federal officials to ensure an end to racial profiling in law enforcement.

"Racial profiling" at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures. It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity.

Racial profiling in law enforcement is not merely wrong, but also ineffective. Race-based assumptions in law enforcement perpetuate negative racial stereotypes that are harmful to our rich and diverse democracy, and materially impair our efforts to maintain a fair and just society. [1]

The use of race as the basis for law enforcement decision-making clearly has a terrible cost, both to the individuals who suffer invidious discrimination and to the Nation, whose goal of "liberty and justice for all" recedes with every act of such discrimination. For this reason, this guidance in many cases imposes more restrictions on the consideration of race and ethnicity in Federal law enforcement than the Constitution requires. [2] This guidance prohibits racial profiling in law enforcement practices without hindering the important work of our Nation's public safety officials, particularly the intensified anti-terrorism efforts precipitated by the events of September 11, 2001.

**I. Traditional Law Enforcement Activities.** Two standards in combination should guide use by Federal law enforcement authorities of race or ethnicity in law enforcement activities:

- **In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.**
- **In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that**

1606

links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.

**II. National Security and Border Integrity.** The above standards do not affect current Federal policy with respect to law enforcement activities and other efforts to defend and safeguard against threats to national security or the integrity of the Nation's borders, [3] to which the following applies:

- **In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.**

Any questions arising under these standards should be directed to the Department of Justice.

## THE CONSTITUTIONAL FRAMEWORK

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, for example, the decision of federal prosecutors "whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" [4] *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). The same is true of Federal law enforcement officers. Federal courts repeatedly have held that any general policy of "utiliz[ing] impermissible racial classifications in determining whom to stop, detain, and search" would violate the Equal Protection Clause. *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001). As the Sixth Circuit has explained, "[i]f law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). "A person cannot become the target of a police investigation solely on the basis of skin color. Such selective law enforcement is forbidden." *Id.* at 354.

As the Supreme Court has held, this constitutional prohibition against selective enforcement of the law based on race "draw[s] on 'ordinary equal protection standards.'"*Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, impermissible selective enforcement based on race occurs when the challenged policy has "'a discriminatory effect and . . . was motivated by a discriminatory purpose.'"*Id.* (quoting *Wayte*, 470 U.S. at 608). [5] Put simply, "to the extent that race is used as a proxy" for criminality, "a racial stereotype requiring strict scrutiny is in operation." *Cf. Bush v. Vera*, 517 U.S. at 968 (plurality).

## I. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES

### A. Routine or Spontaneous Activities in Domestic Law Enforcement

In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers

**may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.**

Federal law enforcement agencies and officers sometimes engage in law enforcement activities, such as traffic and foot patrols, that generally do not involve either the ongoing investigation of specific criminal activities or the prevention of catastrophic events or harm to the national security. Rather, their activities are typified by spontaneous action in response to the activities of individuals whom they happen to encounter in the course of their patrols and about whom they have no information other than their observations. These general enforcement responsibilities should be carried out without *any* consideration of race or ethnicity.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer notices that nearly all vehicles on the road are exceeding the posted speed limit. Although each such vehicle is committing an infraction that would legally justify a stop, the officer may not use race or ethnicity as a factor in deciding which motorists to pull over. Likewise, the officer may not use race or ethnicity in deciding which detained motorists to ask to consent to a search of their vehicles.

Some have argued that overall discrepancies in certain crime rates among racial groups could justify using race as a factor in general traffic enforcement activities and would produce a greater number of arrests for non-traffic offenses (*e.g.*, narcotics trafficking). We emphatically reject this view. The President has made clear his concern that racial profiling is morally wrong and inconsistent with our core values and principles of fairness and justice. Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by federal law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping. It casts a pall of suspicion over every member of certain racial and ethnic groups without regard to the specific circumstances of a particular investigation or crime, and it offends the dignity of the individual improperly targeted. Whatever the motivation, it is patently unacceptable and thus prohibited under this guidance for Federal law enforcement officers to act on the belief that race or ethnicity signals a higher risk of criminality. This is the core of "racial profiling" and it must not occur.

The situation is different when an officer has specific information, based on trustworthy sources, to "be on the lookout" for specific individuals identified at least in part by race or ethnicity. In such circumstances, the officer is not acting based on a generalized assumption about persons of different races; rather, the officer is helping locate specific individuals previously identified as involved in crime.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer receives an "All Points Bulletin" to be on the look-out for a fleeing bank robbery suspect, a man of a particular race and particular hair color in his 30s driving a blue automobile. The Officer

may use this description, including the race of the particular suspect, in deciding which speeding motorists to pull over.

**B. Law Enforcement Activities Related to Specific Investigations**

**In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.**

As noted above, there are circumstances in which law enforcement activities relating to particular identified criminal incidents, schemes or enterprises may involve consideration of personal identifying characteristics of potential suspects, including age, sex, ethnicity or race. Common sense dictates that when a victim describes the assailant as being of a particular race, authorities may properly limit their search for suspects to persons of that race. Similarly, in conducting an ongoing investigation into a specific criminal organization whose membership has been identified as being overwhelmingly of one ethnicity, law enforcement should not be expected to disregard such facts in pursuing investigative leads into the organization's activities.

Reliance upon generalized stereotypes is absolutely forbidden. Rather, use of race or ethnicity is permitted only when the officer is pursuing a specific lead concerning the identifying characteristics of persons involved in an *identified* criminal activity. The rationale underlying this concept carefully limits its reach. In order to qualify as a legitimate investigative lead, the following must be true:

- The information must be relevant to the locality or time frame of the criminal activity;
- The information must be trustworthy;
- The information concerning identifying characteristics must be tied to a particular criminal incident, a particular criminal scheme, or a particular criminal organization.

The following policy statements more fully explain these principles.

**1. *Authorities May Never Rely on Generalized Stereotypes, But May Rely Only on Specific Race- or Ethnicity-Based Information***

This standard categorically bars the use of generalized assumptions based on race.

  o *Example*: In the course of investigating an auto theft in a federal park, law enforcement authorities could not properly choose to target individuals of a particular race as suspects, based on a

:

Case 2:07-cv-02513-GMS   Document 26-1   Filed 09/05/08   Page 31 of 41

generalized assumption that those individuals are more likely to commit crimes.

This bar extends to the use of race-neutral pretexts as an excuse to target minorities. Federal law enforcement may not use such pretexts. This prohibition extends to the use of other, facially race-neutral factors as a proxy for overtly targeting persons of a certain race or ethnicity. This concern arises most frequently when aggressive law enforcement efforts are focused on "high crime areas." The issue is ultimately one of motivation and evidence; certain seemingly race-based efforts, if properly supported by reliable, empirical data, are in fact race-neutral.

- o **Example**: In connection with a new initiative to increase drug arrests, local authorities begin aggressively enforcing speeding, traffic, and other public area laws in a neighborhood predominantly occupied by people of a single race. The choice of neighborhood was not based on the number of 911 calls, number of arrests, or other pertinent reporting data specific to that area, but only on the general assumption that more drug-related crime occurs in that neighborhood because of its racial composition. This effort would be improper because it is based on generalized stereotypes.

- o *Example:* Authorities seeking to increase drug arrests use tracking software to plot out where, if anywhere, drug arrests are concentrated in a particular city, and discover that the clear majority of drug arrests occur in particular precincts that happen to be neighborhoods predominantly occupied by people of a single race. So long as they are not motivated by racial animus, authorities can properly decide to enforce all laws aggressively in that area, including less serious quality of life ordinances, as a means of increasing drug-related arrests. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.").

By contrast, where authorities are investigating a crime and have received *specific information* that the suspect is of a certain race (*e.g.*, direct observations by the victim or other witnesses), authorities may reasonably use that information, even if it is the only descriptive information available. In such an instance, it is the victim or other witness making the racial classification, and federal authorities may use reliable incident-specific identifying information to apprehend criminal suspects. Agencies and departments, however, must use caution in the rare instance in which a suspect's race is the only available information. Although the use of that information may not be unconstitutional, broad

targeting of discrete racial or ethnic groups always raises serious fairness concerns.

> o **Example:** The victim of an assault at a local university describes her assailant as a young male of a particular race with a cut on his right hand. The investigation focuses on whether any students at the university fit the victim's description. Here investigators are properly relying on a description given by the victim, part of which included the assailant's race. Although the ensuing investigation affects students of a particular race, that investigation is not undertaken with a discriminatory purpose. Thus use of race as a factor in the investigation, in this instance, is permissible.

## 2. *The Information Must be Relevant to the Locality or Time Frame*

Any information concerning the race of persons who may be involved in specific criminal activities must be locally or temporally relevant.

> o **Example:** DEA issues an intelligence report that indicates that a drug ring whose members are known to be predominantly of a particular race or ethnicity is trafficking drugs in Charleston, SC. An agent operating in Los Angeles reads this intelligence report. In the absence of information establishing that this intelligence is also applicable in Southern California, the agent may not use ethnicity as a factor in making local law enforcement decisions about individuals who are of the particular race or ethnicity that is predominant in the Charleston drug ring.

## 3. *The Information Must be Trustworthy*

Where the information concerning potential criminal activity is unreliable or is too generalized and unspecific, use of racial descriptions is prohibited.

> o **Example:** ATF special agents receive an uncorroborated anonymous tip that a male of a particular race will purchase an illegal firearm at a Greyhound bus terminal in a racially diverse North Philadelphia neighborhood. Although agents surveilling the location are free to monitor the movements of whomever they choose, the agents are prohibited from using the tip information, without more, to target any males of that race in the bus terminal. *Cf. Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (finding no reasonable basis for suspicion where tip "made all black men suspect"). The information is neither sufficiently reliable nor sufficiently specific.

## 4. *Race- or Ethnicity-Based Information Must Always be Specific to Particular Suspects or Incidents, or Ongoing Criminal Activities, Schemes, or Enterprises*

These standards contemplate the appropriate use of both "suspect-specific" and "incident-specific" information. As noted above, where a crime has occurred and authorities have eyewitness accounts including the race, ethnicity, or other distinguishing characteristics of the perpetrator, that information may be used. Federal authorities may also use reliable, locally relevant information linking persons of a certain race or ethnicity to a particular incident, unlawful scheme, or ongoing criminal enterprise—even absent a description of any particular individual suspect. In certain cases, the circumstances surrounding an incident or ongoing criminal activity will point strongly to a perpetrator of a certain race, even though authorities lack an eyewitness account

> o *Example*: The FBI is investigating the murder of a known gang member and has information that the shooter is a member of a rival gang. The FBI knows that the members of the rival gang are exclusively members of a certain ethnicity. This information, however, is not suspect-specific because there is no description of the particular assailant. But because authorities have reliable, locally relevant information linking a rival group with a distinctive ethnic character to the murder, Federal law enforcement officers could properly consider ethnicity in conjunction with other appropriate factors in the course of conducting their investigation. Agents could properly decide to focus on persons dressed in a manner consistent with gang activity, but ignore persons dressed in that manner who do not appear to be members of that particular ethnicity.

It is critical, however, that there be reliable information that ties persons of a particular description to a specific criminal incident, ongoing criminal activity, or particular criminal organization. Otherwise, any use of race runs the risk of descending into reliance upon prohibited generalized stereotypes.

> o *Example*: While investigating a car theft ring that dismantles cars and ships the parts for sale in other states, the FBI is informed by local authorities that it is common knowledge locally that most car thefts in that area are committed by individuals of a particular race. In this example, although the source (local police) is trustworthy, and the information potentially verifiable with reference to arrest statistics, there is no particular incident- or scheme- specific information linking individuals of that race to the particular interstate ring the FBI is investigating. Thus, without more, agents could not use ethnicity as a factor in making law enforcement decisions in this investigation.

Note that these standards allow the use of reliable identifying information about planned future crimes. Where federal authorities receive a credible tip from a reliable informant regarding a planned crime that has not yet occurred, authorities may use this information under the same restrictions applying to information obtained regarding a past incident. A prohibition on the use of reliable prospective information would severely hamper law

enforcement efforts by essentially compelling authorities to wait for crimes to occur, instead of taking pro-active measures to prevent crimes from happening.

> ○ ***Example***: While investigating a specific drug trafficking operation, DEA special agents learn that a particular methamphetamine distribution ring is manufacturing the drug in California, and plans to have couriers pick up shipments at the Sacramento, California airport and drive the drugs back to Oklahoma for distribution. The agents also receive trustworthy information that the distribution ring has specifically chosen to hire older couples of a particular race to act as the couriers. DEA agents may properly target older couples of that particular race driving vehicles with indicia such as Oklahoma plates near the Sacramento airport.

## II. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES INVOLVING THREATS TO NATIONAL SECURITY OR THE INTEGRITY OF THE NATION'S BORDERS

**In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.**

Since the terrorist attacks on September 11, 2001, the President has emphasized that federal law enforcement personnel must use every legitimate tool to prevent future attacks, protect our Nation's borders, and deter those who would cause devastating harm to our Nation and its people through the use of biological or chemical weapons, other weapons of mass destruction, suicide hijackings, or any other means. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).

The Constitution prohibits consideration of race or ethnicity in law enforcement decisions in all but the most exceptional instances. Given the incalculably high stakes involved in such investigations, however, Federal law enforcement officers who are protecting national security or preventing catastrophic events (as well as airport security screeners) may consider race, ethnicity, and other relevant factors to the extent permitted by our laws and the Constitution. Similarly, because enforcement of the laws protecting the Nation's borders may necessarily involve a consideration of a person's alienage in certain circumstances, the use of race or ethnicity in such circumstances is properly governed by existing statutory and constitutional standards. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975). [6] This policy will honor the rule of law and promote vigorous protection of our national security.

As the Supreme Court has stated, all racial classifications by a governmental actor are subject to the "strictest judicial scrutiny."*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224-25 (1995). The application of strict scrutiny is of necessity a fact-intensive process. *Id.*

at 236. Thus, the legality of particular, race-sensitive actions taken by Federal law enforcement officials in the context of national security and border integrity will depend to a large extent on the circumstances at hand. In absolutely no event, however, may Federal officials assert a national security or border integrity rationale as a mere pretext for invidious discrimination. Indeed, the very purpose of the strict scrutiny test is to "smoke out" illegitimate use of race, *Adarand*, 515 U.S. at 226 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)), and law enforcement strategies not actually premised on *bona fide* national security or border integrity interests therefore will not stand.

In sum, constitutional provisions limiting government action on the basis of race are wide-ranging and provide substantial protections at every step of the investigative and judicial process. Accordingly, and as illustrated below, when addressing matters of national security, border integrity, or the possible catastrophic loss of life, existing legal and constitutional standards are an appropriate guide for Federal law enforcement officers.

- *Example*: The FBI receives reliable information that persons affiliated with a foreign ethnic insurgent group intend to use suicide bombers to assassinate that country's president and his entire entourage during an official visit to the United States. Federal law enforcement may appropriately focus investigative attention on identifying members of that ethnic insurgent group who may be present and active in the United States and who, based on other available information, might conceivably be involved in planning some such attack during the state visit.
- *Example*: U.S. intelligence sources report that terrorists from a particular ethnic group are planning to use commercial jetliners as weapons by hijacking them at an airport in California during the next week. Before allowing men of that ethnic group to board commercial airplanes in California airports during the next week, Transportation Security Administration personnel, and other federal and state authorities, may subject them to heightened scrutiny.

Because terrorist organizations might aim to engage in unexpected acts of catastrophic violence in any available part of the country (indeed, in multiple places simultaneously, if possible), there can be no expectation that the information must be specific to a particular locale or even to a particular identified scheme.

Of course, as in the example below, reliance solely upon generalized stereotypes is forbidden.

- *Example*: At the security entrance to a Federal courthouse, a man who appears to be of a particular ethnicity properly submits his briefcase for x-ray screening and passes through the metal detector. The inspection of the briefcase reveals nothing amiss, the man does not activate the metal detector, and there is nothing suspicious about his activities or appearance. In the absence of any threat warning, the federal security screener may not order the man to undergo a further inspection solely because he appears to be of a particular ethnicity.

## FOOTNOTES

1. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) ("Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone.").

2. This guidance is intended only to improve the internal management of the executive branch. It is not intended to, and does not, create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or agents, or any person, nor does it create any right of review in an administrative, judicial or any other proceeding.

3. This guidance document does not apply to U.S. military, intelligence, protective or diplomatic activities conducted consistent with the Constitution and applicable Federal law.

4. These same principles do not necessarily apply to classifications based on alienage. For example, Congress, in the exercise of its broad powers over immigration, has enacted a number of provisions that apply only to aliens, and enforcement of such provisions properly entails consideration of a person's alien status.

5. Invidious discrimination is not necessarily present whenever there is a "disproportion" between the racial composition of the pool of persons prosecuted and the general public at large; rather, the focus must be the pool of "*similarly situated* individuals of a different race [who] were not prosecuted."*Armstrong*, 517 U.S. at 465 (emphasis added). "[R]acial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime."*Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality).

6. Moreover, as in the traditional law enforcement context described in the second standard, *supra*, officials involved in homeland security may take into account specific, credible information about the descriptive characteristics of persons who are affiliated with identified organizations that are actively engaged in threatening the national security.

# Exhibit D

**Exhibit D**



## City of Phoenix
OFFICE OF THE MAYOR

MAYOR PHIL GORDON

April 4, 2008

Honorable Michael B. Mukasey
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Re: Request for Civil Rights Investigation of the Maricopa County Sheriff**

Dear Mr. Attorney General:

I write to request that you direct the Civil Rights Division and the Federal Bureau of Investigation to initiate an investigation into Maricopa County Sheriff Joe Arpaio for potential civil rights violations. I do not make this request lightly. This request is based on Sheriff Arpaio's pattern and practice of conduct that includes discriminatory harassment, improper stops, searches, and arrests.

I understand these are serious allegations.

As Mayor of the City of Phoenix, I must speak out when the rights of our residents are violated and the safety of our neighborhoods threatened. In order that you may understand the gravity of the situation in our city, I provide you with this background and following examples of Sheriff Arpaio's activities in our city.

Phoenix is the fifth largest city in the nation. We are a diverse community that believes the role of law enforcement should be to pursue crime and protect its residents. Our Police Department is second to none in professionalism and ability to meet this goal. We reside within the boundary of Maricopa County, where Joe Arpaio is the elected Sheriff. State law provides Sheriff Arpaio with concurrent jurisdiction over offenses committed in Phoenix.

Over the past few weeks, Sheriff Arpaio's actions have infringed on the civil rights of our residents. They have put our residents' well-being, and the well-being of law enforcement officers, at risk.

200 WEST WASHINGTON STREET, 11TH FLOOR, PHOENIX, ARIZONA 85003-1611   PHONE 602-262-7111   FAX 602-495-5583   TTY 602 534 5500
www.phoenix.gov

1617

**Mukasey letter**
**Page two**

Over Easter weekend, Sheriff Arpaio announced he was going to target a specific Phoenix neighborhood by sending 200 posse members into a one square-mile area for "crime suppression". "We lock up murderers, we lock up everybody. We're here for crime suppression, and we're going to lock up everybody," according to the Sheriff.

But they didn't arrest murderers. Under his orders, they performed only routine traffic stops to check immigration status. According to our State's largest newspaper, *The Arizona Republic*:

*"Shortly after 5 p.m., a Sheriff's detective pulled over one sedan for stopping in the middle of the street and for having a broken brake light. After questioning, both men admitted they were in the country illegally and were sent on their way to a processing center to await deportation. By 7:30 p.m., the efforts had netted 13 arrests, including nine people suspected of being in the country illegally and four U.S. residents with outstanding warrants or other legal issues."*

All were Hispanic.

In announcing his "roundups" the Sheriff worded his news release in such a way -- by naming groups of "bikers" who agree with him and will show up to support him (many with guns and rifles) – that he deliberately sets the stage for shouting matches, confrontations or worse. That's not acceptable behavior for anyone, let alone someone whose job is to help make our community safer.

He repeated the same "crime suppression" program this past weekend, targeting and holding 27 Hispanics he believes might be in this country illegally. Sixteen others who were stopped, according *The Arizona Republic*, were only "guilty of looking Latino". By my math, that means Latinos represented 100% of his stops. But even if it were 75%, that would still be of serious concern for a community that is one-third Latino, not three-fourths.

And just last night, the Sheriff, for the third week in a row, staged another roundup -- this time, in the Town of Guadalupe. According to our local ABC affiliate, his posse members were stopping Hispanics on the sidewalks and asking them to produce identification. Guadalupe, by the way, usually ranks at or near the bottom in violent crime. Last month, there was just one violent crime committed in the Town of Guadalupe.

His expansion of these roundups, with no end in sight, has compelled me to write this letter today.

**Mukasey letter**
**Page three**

The events of the last three weeks are not aberrations. On February 16, the Sheriff said "I wish that the Phoenix Police Department would arrest everybody, even if they're not sure (of that person's status)". That comment, reflective of others, resulted in widespread community outrage – including a strong rebuke from former Maricopa County Attorney Rick Romley.

Legitimate news media sources have been reporting apparent violations of civil rights statutes for some time now. Again, the *Arizona Republic* reported that on September 26, 2007, one of Sheriff Arpaio's deputies detained Manuel de Jesus Ortega Melendres for eight hours before determining that he was lawfully in the United States. That detention is now the subject of a civil rights lawsuit brought by Mr. Melendres.

A member of my own staff was one of six drivers recently detained by one of the Sheriff's deputies for "off-roading" in a restricted area (as they were completing a U-turn to correct their mistake). The first five drivers were asked to show a drivers' license and released without being cited. My staff member was asked not for her license, but for her Social Security card – and was issued a citation. She was the only Hispanic of the six. The other five were Anglo.

These are but two events out of too many others. I have enclosed, as background, a sampling of news reports and video clips.

I believe that these events represent situations in which a civil rights investigation should be initiated.

I specifically and respectfully ask that you investigate whether Sheriff Arpaio's actions constitute a violation of the following laws:

1) Section 210401 of the Violent Control and Law Enforcement Act of 1994 (42 U.S.C. § 14141, Police Misconduct Provision). As you know, this provision of federal law makes unlawful the deprivation, by a law enforcement agency, of any rights, privileges, or immunities secured by the Constitution or laws of the United States.

2) Title VI of the Civil Rights Act of 1964. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

**Mukasey letter**
**Page four**

3) Section 809(c) of the Omnibus Crime Control and Safe Streets Act of 1968. "No person in any State shall on the ground of race, color, religion, national origin, or sex ... be subjected to discrimination ... in connection with any programs or activity funded in whole or in part with funds made available under this chapter."  42 U.S.C. §3789d(c)(1).

4) Such other statutes, including a "Color of Law" (18 U.S.C. § 242) violation, as you deem appropriate in the course of your investigation.

I have publicly spoken out against Sheriff Arpaio's actions.  I will continue to do so, and to use my position as Mayor of Phoenix to oppose those who violate the civil rights of others.  I, and the residents of Phoenix, now look to you to enforce the laws that ensure those rights.  Should you need additional information, please do not hesitate to contact me.

Sincerely,

Phil Gordon
Mayor

Enclosures

cc:   Hon. Diane Humetewa, U.S. Attorney, District of Arizona
     John Lewis, Special Agent in Charge, Federal Bureau of Investigation



*EXHIBIT 30*

Julie A. Pace (#014585)
**BALLARD SPAHR ANDREWS & INGERSOLL, LLP**
3300 North Central Avenue, Suite 1800
Phoenix, Arizona 85012-2518
Telephone:  602-798-5477
Fax:  602-998-3251
Email: seldend@ballardspahr.com
       pacej@ballardspahr.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL de JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>JOSEPH M. ARPAIO, in his individual and official capacity as Sheriff of Maricopa County, Arizona, JOHN DOES 1-10 in their individual and official capacities as sheriff's deputies for the County of Maricopa, and MARICOPA COUNTY, ARIZONA,<br><br>     Defendants. | Case No.<br><br>**COMPLAINT  (Class Action)**<br><br>**1. Violation of Equal Protection under the U.S. Constitution**<br>**2. Violation of Unreasonable Search and Seizure under U.S. Constitution**<br>**3. Violation of Due Process under U.S. Constitution**<br>**4. Violation of Right to Travel under U.S. Constitution**<br>**5. Violation of Due Process under Arizona Constitution**<br>**6. Violation of Right to Privacy under Arizona Constitution**<br>**7. Violation of Race Discrimination in Federally Funded Programs** |

Plaintiff, Manuel de Jesus Ortega Melendres ("Plaintiff" or "Mr. Ortega"), on behalf of himself and all others similarly situated, by and through his attorneys, Ballard Spahr Andrews & Ingersoll, LLP, alleges upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record, as follows:

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

**NATURE OF THE CASE**

1.     In this civil rights case, Plaintiff seeks to remedy and stop illegal, discriminatory and unauthorized enforcement of federal immigration laws against Hispanic persons in Maricopa County, Arizona.  Plaintiff also seeks damages for his unlawful arrest and detention.

**JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  This Court has authority to grant declaratory, injunctive, and monetary relief pursuant to 28 U.S.C. §§ 1343, 2201, and 2202, and to award attorneys' fees under 28 U.S.C. §§ 1988 and 2412.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

4.     Plaintiff Manuel de Jesus Ortega Melendres, a Hispanic male, is a citizen and resident of Sonora, Mexico.  At the time of the events that are the subject of this lawsuit, Mr. Ortega possessed a valid Visa issued by the United States Department of State and a valid Permit issued by the United States Department of Homeland Security.  Mr. Ortega is a retired school teacher.

5.     Defendant Maricopa County, Arizona, is a political subdivision of the State of Arizona that can sue and be sued in its own name.  Upon information and belief, Maricopa County receives federal funds.

6.     Defendant Joseph M. Arpaio ("Arpaio") was at all relevant times the Sheriff of Maricopa County, Arizona, acting within the scope of his employment as Sheriff.  He is responsible for, among other things, the implementation of the policies and/or practices of Maricopa County, including but not limited to, the control, supervision, operation and administration of the Maricopa County Sheriff's Office.

7.     Defendants John Does 1-10 were at all times relevant to this complaint, employed, duly appointed, and acting as sworn officers of the Maricopa County

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

2

Sheriff's Office, and were at all times acting under color of law and pursuant to the policies and/or usages of the County of Maricopa and the State of Arizona. Said Defendants are sued individually and in their official capacities as sheriff's deputies. Defendants are hereinafter referred to collectively as "Defendants."

## FACTS

### The Unlawful Stop and Detention of Manuel de Jesus Ortega

8.      On September 6, 2007, Mr. Ortega legally entered the United States at the border station in Nogales, Arizona.

9.      Mr. Ortega possesses a United States Visa that is valid through August 23, 2016, and possessed a Permit issued by the United States Department of Homeland Security that was valid through November 1, 2007.

10.      On or about September 26, 2007, at 6:15 a.m., Mr. Ortega was a passenger in a vehicle in Cave Creek, Arizona, that was stopped by officers from the Maricopa County Sheriff's Office. The vehicle was being driven by a Caucasian male, but the passengers, including Mr. Ortega, were Hispanic men.

11.      The officers told the driver that he was being stopped for speeding, but they did not give him a citation or take him into custody.

12.      The officers looked at Mr. Ortega sitting in the vehicle and asked him to produce identification.

13.      Mr. Ortega showed them the following documents that he had in his wallet: (a) his United States Visa, which has his photograph and fingerprint on it; (b) his Mexican Federal Voter Registration card, which also has his photograph and fingerprint on it; and (c) a copy of the Permit he was given by the United States Department of Homeland Security with a stamp that shows his admission to the United States was valid through November 1, 2007.

14.      Although Mr. Ortega produced identification establishing his legal status in the United States, the officers told him to exit the vehicle, which he did.

3

DMEAST #9915788 v1

1623

15.     After exiting the vehicle, the officers pushed Mr. Ortega against a Sheriff's Department vehicle and patted him down over his entire body in a rough manner.

16.     The Sheriff's officers then took everything out of Mr. Ortega' pockets, including his wallet and a small bottle of lotion that Mr. Ortega occasionally applies to his face so that his skin does not become dry.

17.     The Sheriff's officers, upon removal of the small bottle of lotion from Mr. Ortega's pocket, asked Mr. Ortega in a confrontational manner "How many times a week to you jack off?"

18.     Mr. Ortega was then handcuffed with his arms behind his back.  Mr. Ortega had a broken wrist years ago that did not heal correctly.  His wrist has a visible deformity and causes him pain.  Mr. Ortega asked the Sheriff's officers to please be careful in handcuffing him, but they handled him roughly.  The officers kept Mr. Ortega' hands handcuffed behind his back for approximately 40 minutes.

19.     The officers then put Mr. Ortega in the back of a Sheriff's vehicle and took him to the Sheriff's office in Cave Creek.

20.     At the Sheriff's office they placed Mr. Ortega in a holding cell where they left him for four hours.

21.     Throughout the time that Mr. Ortega was seized from the vehicle, patted down, handcuffed, transported to the Sheriff's office, placed in the holding cell and left to remain in the holding cell, no one from the Sheriff's office explained anything to him, and no one offered to get a Spanish speaking officer or translator to assist in communicating with him.

22.     The officers did not advise Mr. Ortega of his *Miranda* rights.

23.     The officers did not tell Mr. Ortega that he had the right to speak to an attorney.

24.     The officers did not tell Mr. Ortega anything about whether he could or should make any statements to them.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA  85012
(602) 798-5400 FAX (602) 798-5595

4

1624

25.   The officers did not give Mr. Ortega any opportunity to make a phone call.

26.   The officers did not tell Mr. Ortega what crime he allegedly committed, or if he was being charged with any crime.

27.   The officers did not say anything about what might happen to Mr. Ortega.

28.   The officers did not give Mr. Ortega any documents regarding his arrest or their putting him in jail.

29.   After the Sheriff's officers left Mr. Ortega in the jail in Cave Creek for four hours, they placed him in handcuffs again, with his arms behind his back and took him to a Hummer vehicle.  A driver and a driver's companion then drove him to downtown Phoenix.  The driver of that vehicle spoke Spanish.  Mr. Ortega explained that his wrist was quite painful and asked if he could be handcuffed with his hands in front of him rather than with his hands pulled behind his back.  The driver said that he could not do that.

30.   The officers drove Mr. Ortega to the U.S. Immigration and Customs Enforcement ("ICE") office on Central Avenue in downtown Phoenix.  They took him inside and removed the handcuffs.  Mr. Ortega' hands were swollen, and he was in pain.

31.   At the ICE office Mr. Ortega was placed in a holding cell and left unattended for more than one hour.

32.   After waiting in the cell, Mr. Ortega was taken to an ICE official.  He did not identify himself or give Mr. Ortega any identification.  The Sheriff's officers who arrested Mr. Ortega were also present.

33.   The ICE officer asked Mr. Ortega how he entered the United States.  Mr. Ortega told him that he came through legally at the port of entry at Nogales, Arizona.  The ICE officer asked for Mr. Ortega's documents.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA  85012
(602) 798-5400 FAX (602) 798-5595

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

34.     The Sheriff's officers gave Mr. Ortega's Visa and other documents to the ICE official.  The ICE official took look a quick look at the documents and said, "These documents are good."

35.     The ICE official told Mr. Ortega he was free to leave.

36.     Mr. Ortega was in custody from 6:15 a.m. until about 3:00 p.m.

37.     During the approximately nine hours that he was in custody, Mr. Ortega was never: (a) given any water, (b) given any food, (c) told his rights, or (d) given the name of any of the officers involved.

38.     Mr. Ortega also was never given any paperwork, other than a case number, with any information about his: (a) being stopped, (b) being taken into custody by the Sheriff's officers, (c) being held in jail by the Sheriff's officers, (d) being transferred to the ICE office, (e) being held in jail at the ICE office, or (f) his being released from custody.

39.     After being released in downtown Phoenix, Mr. Ortega had to make his own way from downtown Phoenix to Cave Creek.

40.     Because of Mr. Ortega' experience with the Maricopa County Sheriff's officers he is now afraid.

41.     Mr. Ortega is frightened to walk on the street or be seen in public in Maricopa County because he fears that the Sheriff's officers will come and arrest him again because he is Hispanic and does not speak English.

42.     Mr. Ortega is afraid that the Sheriff's officers will hurt him physically if they pick him up again.

43.     Mr. Ortega is afraid that he will be thrown in jail without any explanation, without any rights, and without any opportunity to get help even though the federal government of the United States has issued a Visa to him that gives him permission to be here.

6

**Defendants' Limited Authority to Perform Immigration Enforcement Functions**

44.    Pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. §1357(g), the Secretary of the U.S. Department of Homeland Security is authorized to enter into agreements with state and local law enforcement agencies to train and permit designated officers to perform certain immigration enforcement functions.  Under such a Memorandum of Agreement ("MOA"), the state and local officers are given training and supervised by appropriate ICE officers.

45.    According to ICE, "[t]he 287(g) program is designed to enable state and local law enforcement personnel, **incidental to a lawful arrest and during the course of their normal duties**, to question and detain individuals for potential removal from the United States, **if these individuals are identified as undocumented illegal aliens and they are suspected of committing a state crime**." *Fact Sheet, Section 287(g) of the Immigration and Nationality Act* (September 24, 2007)*, available at* http://www.ice.gov/pi/news/factsheets/factsheet287gprogover.htm (emphasis added)( a true copy of the *Fact Sheet* is attached hereto as Exhibit A).

46.    ICE also has made it clear that, "[t]he 287(g) program is not designed to allow state and local agencies to perform random street operations."  The 287(g) program also, "is not designed to impact issues such as excessive occupancy and day laborer activities."  Indeed, "ICE representatives repeatedly emphasized that it is designed to identify individuals for potential removal, **who pose a threat to public safety, as a result of an arrest and/or conviction for state crimes**." *Id.* (emphasis added).

47.    ICE guidelines specifically direct that, "**Police can only use 287(g) authority when people are taken into custody as a result of violating state or local criminal law.  Police cannot randomly ask for a person's immigration status or conduct immigration raids**," and officers may only, "use their authority when dealing with someone who is suspected of a state crime that is more than a traffic offense." *Id.* (emphasis added).

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

48. In or around January 2007, Defendants Maricopa County and Arpaio entered into an MOA with ICE which authorized up to a maximum of 160 nominated, trained, and certified personnel of the Maricopa County Sheriff's Office to perform certain immigration enforcement functions. A true copy of the MOA is attached hereto as Exhibit B.

49. Part I of the MOA provides that, "the exercise of the immigration enforcement authority granted under this MOA to participating LEA [Law Enforcement Agency] personnel shall occur only as provided in this MOA." Part V of the MOA specifically provides that the immigration enforcement authority granted to Defendants is, "subject to the limitations contained in this MOA."

50. Part XV of the MOA provides as follows:

> Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice "Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies" dated June 2003.

> Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

51. The U.S. Department of Justice Guidance Regarding the Use of Race By Federal Law Enforcement ("DOJ Guidance") to which Defendants are bound specifically states that, "'[r]acial profiling' at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures," and that, "[r]acial profiling in law enforcement is not merely wrong, but also ineffective." A true copy of the DOJ Guidance is attached hereto as Exhibit C.

52. The DOJ Guidance directs that, "[i]n making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

8

1    officers may not use race or ethnicity to any degree, except that officers may rely on

2    race and ethnicity in a specific suspect description."

3        53.    Defendants' authority to enforce federal immigration law is constrained

4    and limited by the U.S. Constitution, federal law and the MOA.

5        54.    Notwithstanding those profound limits on Defendants' authority,

6    Defendants, acting under and pursuant to Arpaio's policies, practices, philosophies

7    and directives, have grossly exceeded the limits of their lawful authority and in so

8    doing they have egregiously trampled the constitutional and civil rights of Ortega and

9    countless other Hispanic and Latino members of the Maricopa County community.

10       55.    By their actions described above and as set forth in more detail below,

11   Defendants have devised and implemented an invidious and unconstitutional custom,

12   policy and practice of racial profiling toward Hispanic and Latino persons in

13   Maricopa County.

14                    **Defendants' Racial Profiling and Abuse of Authority**

15       56.    In or about July, 2007, Arpaio established a dedicated hotline for people

16   to call the Maricopa County Sheriff's Office with information about alleged

17   unauthorized aliens.  Arpaio and Maricopa County do not have legal authority under

18   federal law or the MOA to establish and operate that hotline.

19       57.    Arpaio established and implemented a "Triple I" Unit (Illegal

20   Immigration and Interdiction) to investigate tips received on his illegal immigration

21   hotline.  Arpaio and Maricopa County do not have legal authority under federal law or

22   the MOA to operate the Triple I Unit.

23       58.    On September 27, 2007, Arpaio ordered his Triple I Unit to go to Cave

24   Creek, Arizona, to investigate and arrest illegal immigrants.  Acting under color of

25   law and Arpaio's orders, several Maricopa County Sheriff's officers detained,

26   questioned and arrested at least nine Hispanic individuals allegedly because they were

27   illegal immigrants.  Upon information and belief, those officers did not have probable

28   cause to believe that any of those detained, questioned or arrested had committed a

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

9

1   violation of Arizona state law.  Those arrested were transported directly to jail, not to

2   an ICE facility.

3       59.    On October 4, 2007, Arpaio ordered his Triple I Unit to go to Queen

4   Creek, Arizona, for an operation similar to that conducted in Cave Creek.  Again, at

5   least 16 Hispanic individuals were detained, questioned and arrested on suspicion of

6   being illegal immigrants.  Upon information and belief, the arresting officers did not

7   have probable cause to believe that any of those detained, questioned or arrested had

8   committed a violation of Arizona state law.  Those arrested were transported directly

9   to jail, not to an ICE facility.

10       60.    Recently, Arpaio entered into an agreement with the Maricopa County

11   Attorney's Office to jointly investigate possible violations of Arizona's new employer

12   sanctions law, A.R.S. Section 23-212.  According to Arpaio, his Triple I Unit will be

13   used to enforce that law.  Maricopa County Attorney Andrew Thomas sought the

14   agreement with Arpaio because he has, "a proven track record of enforcing

15   immigration laws and not caving in to political correctness."  The constitutionality

16   and validity of Arizona's new employer sanctions law is the subject of other cases

17   pending in this court.

18       61.    At a recent press conference, Arpaio clearly and emphatically outlined

19   his overzealous, illegal and unconstitutional policies and philosophies.  He described

20   his operation as a "pure program."  One designed, "to go after illegals, not the crime

21   first."  His practice is to "go after illegals… go after 'em and lock 'em up."  Arpaio

22   and Maricopa County do not have legal authority under federal law or the MOA to

23   engage in that conduct.

24       62.    On December 8, 2007, Sheriff's officers followed, questioned and

25   detained a Hispanic male in Cave Creek.  He was merely walking on the sidewalk.

26   He was followed by officers in a patrol car.  The officers stopped the car, approached

27   the man and detained him for questioning without probable cause or other lawful

28   basis..  The officers asked him for identification and his social security card.  They

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

1   questioned him at length about his citizenship status and his residence. He is a U.S.

2   citizen.

3       63.    For the past several weeks, Arpaio and his officers have detained,

4   questioned and arrested Hispanic protesters demonstrating in the vicinity of Pruitt's

5   Home Furnishings in east Phoenix. Upon information and belief, the arresting

6   officers did not have probable cause to believe that any of those detained, questioned

7   or arrested had committed a violation of Arizona state law.

8       64.    In a blatant affront to the Pruitt store protesters First Amendment rights,

9   Arpaio has announced that he will continue to harass and arrest those protesters until

10  and unless they stop their protests.

11      65.    Defendants' conduct violates the Constitution and laws of the United

12  States, the MOA and the DOJ Guidance. As such, it must be stopped.

### CLASS ALLEGATIONS

14      66.    This is a class action seeking declaratory and injunctive relief under

15  Federal Rule of Civil Procedure 23(b)(2) on behalf of Plaintiff and all other similarly

16  situated individuals.

17      67.    The class which Plaintiff seeks to represent consists of, "all individuals

18  of Hispanic descent who reside, are employed, attend school and travel within the

19  borders of Maricopa County, Arizona." This class is so numerous that joinder of all

20  members is impracticable.

21      68.    There are questions of law and fact common to all members of the class

22  and all class members have been directly affected by the challenged actions of

23  Defendants. Each putative class member has been subjected to arbitrary, racially-

24  discriminatory stops, detention, arrests and/or searches conducted by Defendants.

25  Each putative class member has been subjected to stops, detentions, interrogations

26  and/or searches without any reasonable articulable suspicion or probable cause that

27  such class member had committed a crime or was engaged in criminal activity.

28

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1631

69.    The claims and defenses of the representative plaintiff are typical of the claims and defenses of the class.

70.    The representative plaintiff will fairly and adequately protect the interests of the class.

71.    Defendants in this case have taken actions in violation of the class members' constitutional rights and/or refused to act in accordance with those rights, which are grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

72.    Plaintiff's counsel is competent and experienced in class action litigation of this type.

## FIRST CLAIM FOR RELIEF:
## EQUAL PROTECTION
### (Fourteenth Amendment)

73.    Plaintiff hereby incorporates by this reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

74.    As an Hispanic and a citizen of a foreign country, Mr. Ortega is a member of a protected class.

75.    As Hispanics and citizens of a foreign country, those individuals detained, questioned and arrested by Defendants' Triple I Unit on September 27 and October 4, are members of a protected class.

76.    Defendants, acting under color of law and in concert with one another, engaged in profiling of Mr. Ortega and other Hispanic individuals based on their race.

77.    Defendants, acting under color of law and in concert with one another, engaged in profiling of Mr. Ortega and other Hispanic individuals based on their national origin.

78.    Defendants did not have reasonable suspicion or probable cause to stop and/or detain Mr. Ortega or any of the other Hispanic individuals referred to above.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

79.     By purposefully stopping and detaining Mr. Ortega because of his race and/or national origin, Defendants deprived Mr. Ortega of the equal protection of the law within the meaning of the Fourteenth Amendment to the United States Constitution.  These actions violated Mr. Ortega' Fourteenth Amendment rights and 42 U.S.C. § 1983.

80.     By their conduct described above, Defendants in general, and Arpaio in particular, have devised and implemented a policy, custom and practice of illegally detaining and questioning Hispanic individuals solely because of their race and national origin.

81.     Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

82.     As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

## SECOND CLAIM FOR RELIEF:
## UNREASONABLE SEARCH AND SEIZURE
### (Fourth and Fourteenth Amendments)

83.     Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

84.     Pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, state and local governments are prohibited from conducting unreasonable searches and seizures.

85.     Defendants, acting under color of law and in concert with one another, stopped, seized, searched and arrested Mr. Ortega without probable cause or reasonable suspicion that he had committed any crime.  Such conduct violated the

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

13

1633

Fourth Amendment guarantee against unreasonable searches and seizures, the Fourteenth Amendment, and 28 U.S.C § 1983.

86.    Upon information and belief, Arpaio and the other Defendants, acting under color of law and in concert with one another, have engaged in a custom, practice and policy of stopping, seizing, searching and arresting Hispanic individuals in Maricopa County without probable cause or reasonable suspicion that they had committed any crimes under Arizona law.

87.    Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

88.    As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

### THIRD CLAIM FOR RELIEF:
### DUE PROCESS
### (Fourteenth Amendment)

89.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

90.    Defendants, acting under color of law and in concert with one another, stopped, seized, searched and arrested Mr. Ortega without probable cause or reasonable suspicion that he had committed any crime.

91.    Defendants, acting under color of law and in concert with one another, unlawfully detained Mr. Ortega without probable cause or reasonable suspicion that he had committed any crime.

92.    Defendants, acting under color of law and in concert with one another, failed to implement and/or follow proper procedures to determine Mr. Ortega's legal immigrant status prior to detaining, searching and arresting him.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1634

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

93.    Defendants, acting under color of law and in concert with one another, exceeded and/or abused the authority granted to them under federal law through the MOA, the DOJ Guidance and the Section 287(g) program.

94.    Defendants' wrongful conduct violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1983 in that they denied Mr. Ortega and other similarly situated individuals liberty and freedom without due process of law.

95.    As members of a suspect class, Mr. Ortega and other similarly situated Hispanic individuals are entitled to be treated fairly, equally and free from discrimination.    Defendants' wrongful conduct deprived Mr. Ortega and other similarly situated individuals of substantive due process in violation of the Due Process Clause of the Fourteenth Amendment in that those Defendants discriminated against Mr. Ortega and other similarly situated individuals on the basis of their race and national origin.

96.    Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

97.    As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

### FOURTH CLAIM FOR RELIEF
### RIGHT TO TRAVEL
#### (Commerce Clause, Article IV and Fourteenth Amendment)

98.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

99.    Defendants, acting under color of law and in concert with one another, have caused Mr. Ortega and other similarly situated individuals to be penalized and

15

deterred in the exercise of their fundamental right to interstate travel and migration on account of their race and/or national origin.  These actions violated those individuals' right to travel, in violation of the Commerce Clause, the Privileges and Immunities Clause of Article IV, the Fourteenth Amendment and 28 U.S.C. § 1983.

100.    Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

101.    As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

**FIFTH CLAIM FOR RELIEF:**
**VIOLATION OF ARTICLE II, § 4 OF THE ARIZONA CONSTITUTION**

102.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

103.    Article II, § 4 of the Arizona Constitution provides:  "No person shall be deprived of life, liberty, or property without due process of law."

104.    By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated rights guaranteed to Mr. Ortega and other similarly situated individuals under Article II, § 4 of the Arizona Constitution.

105.    Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1636

106.   As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

## SIXTH CLAIM FOR RELIEF:
## VIOLATION OF ARTICLE II, § 8 OF THE ARIZONA CONSTITUTION

107.   Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

108.   Article II, § 8 of the Arizona Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

109.   By their wrongful conduct described above, Defendants, acting under color of law and in concert with one another, have violated rights guaranteed to Mr. Ortega and other similarly situated individuals under Article II, § 8 of the Arizona Constitution.

110.   Defendants' actions have caused and will continue to cause Mr. Ortega and other similarly situated individuals to suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless these actions are stopped.

111.   As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

## SEVENTH CLAIM FOR RELIEF:
## RACE DISCRIMINATION IN FEDERALLY FUNDED PROGRAMS
### (Defendant County of Maricopa)

112.   Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

113.   Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

> [N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1637

discrimination under any program or activity receiving federal financial assistance.

114.   Defendant County of Maricopa is a political subdivision of the State of Arizona and, as a recipient of federal funds, is required to conduct its activities in a racially non-discriminatory manner, pursuant to Title VI of the Civil Rights Act of 1964.

115.   Federal regulations implementing Title VI further provide that no program receiving financial assistance through the U.S. Department of Justice shall utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.  28 C.F.R. § 42.104(b)(2).

116.   The methods employed by Arpaio and Maricopa County discriminate against individuals based on their race, color, and national origin, as described herein.

117.   Defendant Maricopa County's violation of 42 U.S.C. § 2000d and its implementing regulations has caused and will continue to cause Mr. Ortega and other similarly situated individuals tremendous harm and public humiliation in that they will continue to be subjected to unlawful discrimination unless it is stopped.

118.   As a direct, proximate result of Defendants' wrongful conduct, Mr. Ortega has suffered and will continue to suffer significant and substantial emotional and physical injuries.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1638

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of a class of all those similarly situated, respectfully demands judgment against Defendants awarding the following:

A.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race and national origin and denied Mr. Ortega and the class due process of law and the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1983;

B.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' detention, search and arrest of Mr. Ortega and other similarly situated individuals without probable cause or reasonable, articulable suspicion to believe that they had committed a crime, violated the Fourth Amendment's guarantee against unreasonable searches and seizures, the Fourteenth Amendment and 28 U.S.C. § 1983;

C.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' conduct violated Mr. Ortega's rights to procedural and substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1983;

D.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' conduct violated Mr. Ortega's right to travel interstate, in violation of the Commerce Clause, the Privileges and Immunities Clause of Article IV, the Fourteenth Amendment, and 28 U.S.C. § 1983;

E.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violated the procedural and substantive due process guarantees of Article II, § 4 of the Arizona Constitution;

F.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' actions are unconstitutional because they violated Mr. Ortega's privacy rights provided by Article II, § 8 of the Arizona Constitution;

G.   A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendants engaged in race discrimination in violation of Title VI of the Civil Rights Act of 1964 and 42 C.F.R. § 101 et seq.;

H.   A preliminary and permanent injunction prohibiting Defendants from continuing to engage in such race and national origin based discrimination as described herein and to put into place safeguards sufficient to ensure that such discrimination does not continue in the future;

I.   A preliminary and permanent injunction prohibiting Defendants from exceeding the limits of their authority under federal immigration law, the MOA and the DOJ Guidance;

J.   A preliminary and permanent injunction prohibiting Defendants from operating their so-called illegal alien hotline;

K.   A preliminary and permanent injunction directing Defendants to disband and dissolve their so-called Triple I Unit;

L.   An award of compensatory and consequential damages to Mr. Ortega in an amount to be determined at trial;

M.   An award of punitive damages against the individual Defendants for their wanton, willful and malicious violations of Mr. Ortega' constitutional and civil rights, in an amount to be determined at trial;

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1640

1    N.    An award of attorneys' fees and costs of suit, plus interest, pursuant to

2          42 U.S.C. §§ 1988 and 2412; and

3    O.    Such other relief as the Court deems just and proper.

**JURY DEMAND**

5    Plaintiff hereby demands a trial by jury.

6    RESPECTFULLY SUBMITTED this 12th day of December, 2007.

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP


By: /s/ Julie A. Pace
    Julie A. Pace
    3300 N. Central Avenue, Suite 1800
    Phoenix, Arizona 85012
    Attorneys for Plaintiffs


    Louis R. Moffa, Jr.
    Plaza 1000 Main Street
    Suite 500
    Voorhees, New Jersey 08043
    Phone:  856-761-3493
    Fax:    856-873-9050
    Email:  moffal@ballardspahr.com


I hereby certify that on the 12th_ day of December,
2007, I caused the foregoing document:

COMPLAINT

To be filed electronically with the Clerk of
Court through ECF; and that ECF will send
an e-notice of the electronic filing to the
following ECF participants:

And to be delivered as a courtesy hard copy
To:

/s/ Kathleen Reynolds

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
3300 NORTH CENTRAL AVENUE, SUITE 1800
PHOENIX, ARIZONA 85012
(602) 798-5400 FAX (602) 798-5595

DMEAST #9915788 v1

1641

# EXHIBIT A

 

- Skip Navigation
- Home
- Site Map
- Español

Search                    Go

Home
About Us
Partners
International Students
Public Information
Careers
Español

- Public Information
- Topics of Interest
- Annual Report
- News Releases
- Fact Sheets
- Speeches & Testimonies
- Email Sign Up
- Newsletters
- FOIA
- FAQs

Protecting National Security and Upholding Public Safety

# Fact Sheets

September 24, 2007

### Delegation of Immigration Authority Section 287(g)
### Immigration and Nationality Act

## Section 287(g) of the Immigration and Nationality Act

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA), effective September 30, 1996, added Section 287(g), performance of immigration officer functions by state officers and employees, to the Immigration and Nationality Act (INA). This authorizes the secretary of the U.S. Department of Homeland Security (DHS) to enter into agreements with state and local law enforcement

agencies, permitting designated officers to perform immigration law enforcement functions, pursuant to a Memorandum of Agreement (MOA), provided that the local law enforcement officers receive appropriate training and function under the supervision of sworn U.S. Immigration and Customs Enforcement (ICE) officers.

The cross-designation between ICE and state and local patrol officers, detectives, investigators and correctional officers working in conjunction with ICE allows these local and state officers: necessary resources and latitude to pursue investigations relating to violent crimes, human smuggling, gang/organized crime activity, sexual-related offenses, narcotics smuggling and money laundering; and increased resources and support in more remote geographical locations.

# Memorandum of Agreement

The MOA defines the scope and limitations of the authority to be designated. It also establishes the supervisory structure for the officers working under the cross-designation and prescribes the agreed upon complaint process governing officer conduct during the life of the MOA. Under the statute, ICE will supervise all cross-designated officers when they exercise their immigration authorities. Once the scope of limitations of the MOA has been reached, the assistant secretary of ICE, and the governor, a senior political entity, or the head of the local agency may sign the MOA, requesting the cross-designation.

# Officer Selection Requirement

- U.S. citizen;
- Current background investigation completed;
- Minimum two years experience in current position; and
- No disciplinary actions pending.

# Training Requirements

ICE offers two training programs including a five-week program for field level law enforcement officers and a four-week program for correctional personnel. The U.S. Immigration and Customs Enforcement Academy sets standards and testing. Certified instructors conduct the training.

# 287(g) Signed MOAs as of 9-19-07 : 28

- AL Alabama State Police
- AZ Department of Corrections
- AZ AZ Department of Public Safety
- AZ Maricopa County Sheriff's Office
- CA Los Angeles County Sheriff's Department
- CA Orange County Sheriff's Office
- CA Riverside County Sheriff's Office
- CA San Bernardino County Sheriff's Office
- CO CO Dept. of Public Safety
- CO El Paso County Sheriff's Office
- FL Collier County Sheriff's Office
- FL Florida Department of Law Enforcement

- GA Department of Public Safety
- GA Cobb County Sheriff's Office
- MA Department of Corrections
- MA Framingham Police Department
- MA Barnstable County Sheriff's Office
- NC Alamance County Sheriff's Office
- NC Cabarrus County Sheriff's Office
- NC Gaston County Sheriff's Office
- NC Mecklenburg County Sheriff's Office
- NH Hudson City Police Department
- OK Tulsa County Sherrif's Office
- TN Davidson County Sheriff's Office
- VA Herndon Police Department
- VA Prince William-Manassas Adult Detention Center
- VA Rockingham County Sheriff's Office
- VA Shenandoah County Sheriff's Office

- Number of Task Force MOAs in Field: 10
- Number of Jail MOAs in Field: 14
- Number of Joint MOAs in Field: 4
- Number of Officers Trained to date: 485
- Number of Arrests: More than 25,000

# Criminal Alien Program (CAP)

Under current MOAs, 287(g) participants in Arizona , California , and North Carolina currently ensure that criminal aliens incarcerated within federal, state and local facilities are not released into the community upon completion of their sentences. ICE is working to expand 287(g) authority to local and county correctional facilities that are not operational within normal ICE jurisdictions. The expansion of the 287(g) program into smaller county and local correctional facilities will act as a force multiplier for CAP and have a positive impact on this important program.

# A Law Enforcement Partnership

Terrorism and criminal activity are most effectively combated through a multi-agency/multi-authority approach that encompasses federal, state and local resources, skills and expertise. State and local law enforcement play a critical role in protecting our homeland security because they are often the first responders on the scene when there is an incident or attack against the United States . During the course of daily duties, they will often encounter foreign-born criminals and immigration violators who pose a threat to national security or public safety.

# Frequently Asked Questions

# What is the program designed to do?

The 287(g) program is designed to enable state and local law enforcement personnel, incidental to a lawful arrest and during the course of their normal duties, to question and detain individuals for potential removal from the United States, if these individuals are identified as undocumented illegal aliens and

they are suspected of committing a state crime.

## What is the program not designed to do?

The 287(g) program is not designed to allow state and local agencies to perform random street operations. It is not designed to impact issues such as excessive occupancy and day laborer activities. In outlining the program, ICE representatives have repeatedly emphasized that it is designed to identify individuals for potential removal, who pose a threat to public safety, as a result of an arrest and /or conviction for state crimes.

## How do I participate in the 287(g) Delegation of Authority program?

The interested agency must send a letter addressed to the U.S. Immigration and Customs Enforcement (ICE), attention Assistant Secretary, requesting participation in the 287(g) Delegation of Authority program. A sample letter can be obtained from the local 287(g) SAC point of contact.

## A law enforcement agency has requested to participate in the 287 (g) Delegation of Authority program, what's next?

ICE with assistance from the requesting law enforcement agency (LEA) conducts a field survey. This must be completed to determine the infrastructure required to support the request. If the local ICE office demonstrates they have the capability to fully support the request, it will then go to our ICE headquarters for further review. The final approval must come from the Assistant Secretary. An approved request requires the LEA enter into a Memorandum of Agreement (MOA) with ICE. The MOA defines the scope and limitations of the authority to be designated to the LEA. Once the MOA is signed and the parameters of the agreement are defined, ICE will train the LEA officers.

## What type of training is involved for participating agencies?

ICE offers two training programs including a five-week program for field-level law enforcement officers, and a four-week program for correctional/detention personnel. ICE sets standards and provides certified instructors to conduct the training. Training topics include such areas as immigration and criminal law, document examinations, cross-cultural communications and intercultural relations, alien status, ICE operations, statutory authority, removal charges, ICE Use of Force policy and avoidance of racial profiling. Upon successful completion of the training, officers receive official certification from ICE entitled "287(g) Authority." Re-certification is also required. After certification, ICE continues to provide supervision and support. By requirement, all grants of 287(g) authority must be supervised ICE to help state/local officers determine the appropriate response once they determine a suspect to be an immigration violator.

## Who Will Pay for Training?

ICE will pay for expenses associated with the training of officers under the 287(g) Delegation of Authority program.

# Who will pay for the salary of state/local officers while they attend training?

The LEA is required to pay its officers' salary.

# Who Will Pay for the Information Technology (Computer and Network Systems) Needed to Access the ICE Databases?

ICE will fund the costs associated with the Information Technology needed to access the ICE databases.

# What Are the Requirements for an Officer to Be Selected?

The officer must be a U.S. citizen, must have a background investigation completed by ICE, must have a minimum of two years experience in their current position, and have no disciplinary actions pending.

# What Role Does ICE Perform with 287(g) Trained State and Local Officers?

ICE will supervise the 287(g) trained officers while conducting immigration enforcement activities. ICE will also provide annual training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions.

# Can 287(g) Trained Officers Determine Alienage of any Person Suspected of Being an Illegal Alien?

The 287(g) trained officers are focused on identifying and processing criminal aliens for removal and on investigating criminal immigration violations.

# Does a person need to be convicted of a state crime for officers to use the 287(g) authority?

Officers trained and certified in the 287(g) program may use their authority when dealing with someone suspected of a state crime that is more than a traffic offense. If the person's identity is in question, the officer will be able to make an inquiry to the ICE system for help in making a positive identification. Officers can only use their 287(g) authority when dealing with persons suspected of committing state crimes and whose identity is in question or are suspected of being an illegal alien. While enforcing immigration law is primarily a federal responsibility, the 287(g) program provides a mechanism for enlisting the help of state and local law enforcement in this effort with a minimal impact on their normal duties.

# Will the police conduct raids looking for illegal aliens?

Police can only use 287(g) authority when people are taken into custody as a result of violating state or local criminal law. Police cannot randomly ask for a person's immigration status or conduct immigration

raids.

# Do LEAs receive special grants from ICE to fund their participation in the 287(g) program?

There are currently no ICE grants or payments made to LEAs for participation in the 287(g) program.

# Will participation in the 287(g) program allow LEAs to arrest any undocumented alien?

Incidental to an arrest for a state violation, 287(g) trained officers identify and process criminal aliens for removal from the U. S.

# Will LEA participation in the 287(g) program resolve all undocumented alien problems?

By providing training and assistance to LEAs across the country, 287(g) acts as a force multiplier for both the LEA and ICE to enforce the provisions of the INA. The requesting LEA should work closely with the local OI and DRO offices to identify the right mix of ICE services, which may or may not include 287(g) training, to address the local LEA concerns.

# What successes have 287(g) Delegation of Authority officers had?

ICE has established 22 Memorandum of Agreement's and has trained 349 law enforcement officers under the 287(g) program. These trained officers have arrested approximately 20,000 individuals under the 287(g) Delegation of Authority program. From January 19, 2007, thru March 18, 2007, Orange County, California, detention officers trained in 287(g) conducted approximately 1,508 interviews that resulted in 1,004 immigration detainers, Approximately 659 were for felony charges and approximately 345 were for misdemeanors. 71 of those detentions were affiliated with street gangs. In November 2005, the Arizona Department of Corrections (ADC) began processing alien inmates at their Intake Center as part of the 287(g) program. ADC estimates Arizona taxpayers have saved $9 million by accelerating ICE's removal of eligible state inmates.

# Contact Information

For more information on Section 287(g) of the Immigration and Nationality Act, you may request an information packet via the Section 287g form.

| |
|---|
| U.S. Immigration and Customs Enforcement (ICE) was established in March 2003 as the largest investigative arm of the Department of Homeland Security. ICE is comprised of five integrated divisions that form a 21st century law enforcement agency with broad |

responsibilities for a number of key
homeland security priorities.

Last Modified: Tuesday, October 16, 2007

- About Us
- Partners
- International Students
- Public Information
- Careers
- Home
- Site Map
- DHS
- USA.gov
- FOIA
- Privacy & Usuage Policy
- Español
- Get Plugins

U.S. Immigration and Customs Enforcement (ICE)

# EXHIBIT B

# MEMORANDUM OF AGREEMENT
## C-50-07-058-2-00

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and Maricopa County, a political subdivision of the State of Arizona, pursuant to which ICE authorizes up to a maximum of 160 nominated, trained, and certified personnel of the Maricopa County Sheriff's Office (hereinafter interchangeably referred to as MCSO or the "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The MCSO represents Maricopa County in the implementation and administration of this MOA. It is the intent of the parties that these delegated authorities will enable the LEA to identify and process immigration violators in Maricopa County consistent with the terms of this MOA. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

## I.    PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter perform certain functions of an immigration officer within the LEA. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken by participating LEA personnel pursuant to this agreement.

## II.    AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), also codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of the Department of Homeland Security, acting through the Assistant Secretary of ICE, to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

## III.    POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating MCSO personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating MCSO personnel are subject to ICE supervision while performing immigration-related duties pursuant to this MOA. For the purposes of this MOA, ICE officers will provide supervision for participating MCSO personnel only as to immigration enforcement functions. MCSO retains supervision of all other aspects of the employment and performance of duties of participating MCSO personnel.

## IV.   ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory 5 week (4 week for LEA personnel functioning solely in a correctional facility or ICE detention facility) training in the enforcement of federal immigration laws and policies as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers.  Only participating LEA personnel who are selected, trained, authorized, and supervised, as set out herein, have authority pursuant to this MOA to conduct the immigration officer functions enumerated in this MOA.

Participating LEA personnel performing immigration-related duties pursuant to this MOA will be LEA officers assigned to the Violent Fugitive Apprehension Squad (VFAS), Criminal Investigations Section (CIS), Anti-Gang Unit, Drug Enforcement Unit and Community Action Teams (CAT).   Participating LEA personnel will be exercising their immigration-related authorities during the course of criminal investigations involving aliens encountered within Maricopa County.  Any combination of these officers or others may be assigned and/or co-located as task force officers to assist ICE agents with criminal investigations.

The mission of these various LEA assignments are summarized as follows:

Violent Fugitive Apprehension Squad (VFAS): The LEA personnel assigned to the VFAS unit are charged with the responsibility of identifying high-risk felons who are wanted for crimes or offenses that represent a significant threat to public safety.

Criminal Investigation Section (CIS): The LEA personnel assigned to CIS by statute are charged with the responsibility of identifying criminal enterprises and other forms of organized criminal activities.

Anti-Gang Unit: The LEA personnel assigned to the anti-gang unit engage in law enforcement actions that are targeted against gang activity.

Drug Enforcement Unit: The LEA personnel assigned to these various drug enforcement units are involved with illegal trafficking in narcotics investigations, quite often they encounter individuals who may be in the country illegally.

Community Action Teams (CAT): The LEA personnel assigned to the Community Action Teams are officers who have been assigned to these special units and charged with the responsibility of assisting local authorities in urban areas who have requested assistance due to pervasive criminal activity occurring in hot spots within their communities.

## V.   DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel will be authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1)) and to process for immigration violations those individuals who are convicted of State or Federal felony offenses;

- The power to arrest without warrant any alien entering or attempting to unlawfully enter the United States, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained.  INA § 287(a)(2) and 8 C.F.R. 287.5(c)(1).

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens.  INA § 287(a)(4) and 8 C.F.R. § 287(c)(2).

- The power to serve warrants of arrest for immigration violations under 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required criminal alien processing, to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

- The power and authority to prepare charging documents (INA Section 239, 8 C.F.R. 239.1; INA Section 238, 8 C.F.R 238.1; INA Section 241(a)(5), 8 C.F.R 241.8; INA Section 235(b)(1), 8 C.F.R. 235.3) including the  preparation of the Notice to Appear (NTA) application or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors;

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for processing aliens in categories established by ICE supervisors; and

- The power and authority to detain and transport (8 C.F.R. § 287.5(c)(6)) arrested aliens to ICE-approved detention facilities.

## VI.   DETENTION ISSUES

The LEA is expected to pursue to completion prosecution of the state or local charges that caused the individual to be taken into custody.  ICE will assume custody of individuals who have been convicted of a State or local offense only after such individuals have concluded service of any sentence of incarceration.  ICE will also assume custody of aliens with prior criminal convictions and when immigration detention is required by statute.  The ICE Detention and Removal Field Office Director or designee will assess on a case-by-case basis the appropriate removal vehicle to be employed and/or whether to assume custody of individuals that do not meet the above criteria based on special interests or other extenuating circumstances after processing by the LEA.  The immigration laws provide ICE Detention and Removal Operations (DRO) with the discretion to manage limited DHS detention resources, and ICE Field Office Directors may exercise this discretion by declining to detain aliens whose detention is not mandated by federal statute.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which, the LEA will provide, for a reimbursable fee, detention of incarcerated aliens in LEA facilities, upon the completion of their sentences.  The LEA facility will be expected to meet the ICE detention standards for either a less than 72-hour or over 72-hour facility as determined by ICE, and consistent with the anticipated detention period.

The parties understand that the LEA will not continue to detain an alien after that alien is eligible for release from the LEA's custody in accordance with applicable law and LEA policy, except for a period of up to 48-hours, excluding Saturday, Sunday, and any holiday, pursuant to an ICE detainer issued in accordance with 8 C.F.R. § 287.7, absent an IGSA in place as described above.

Upon completion of processing and release from MCSO detention facilities of an individual who participating MSCO personnel have determined to be a removable alien, the alien will be transported by MCSO on the same day to the ICE detention office located at 2035 N. Central Ave., Phoenix, Arizona 85004 or another ICE designated office or facility, after notification to and coordination with the ICE supervisory officer, so that no further detention costs will be incurred by ICE.

## VII.   NOMINATION OF PERSONNEL

The Sheriff of Maricopa County will nominate candidates for initial training and certification under this MOA.  For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA.  All candidates must be United States citizens.  All candidates must have at least two years of LEA work experience.  All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any future expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties, but will be subject to all the requirements of this MOA.

## VIII.    TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory 4 and 5 week training tailored to the immigration functions to be performed. Training will take place at a mutually designated site in Maricopa County, utilizing ICE-designed curriculum and competency testing.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) Civil Rights laws; (vi) the U.S. Department of Justice "Guidance Regarding the Use Of Race By Federal Law Enforcement Agencies" dated June 2003; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law and the Vienna Convention on Consular Relations to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XX below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX.    CERTIFICATION AND AUTHORIZATION

The ICE Training Division will certify in writing to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of Training Division certification, the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of one year from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time by ICE or the LEA. Such revocation will require immediate notification to the other party to this MOA. The Maricopa County Sheriff and the ICE Special Agent in Charge and ICE Field Office Director in Phoenix will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XX below, shall constitute revocation of all immigration enforcement authorizations delegated hereunder.

## X.    COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material.

ICE will provide the instructors and training materials.  The LEA is responsible for the salaries and benefits, including overtime, for all of its personnel being trained or performing duties under this MOA, and for those personnel performing the regular functions of the participating LEA personnel while they are receiving training.  LEA will cover the costs of all LEA candidates' travel, housing, and per diem affiliated with the training required for participation in this agreement.  ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines that it is necessary, the LEA will enter into an Inter-Governmental Service Agreement (IGSA) with ICE pursuant to which the LEA will provide, for a reimbursable fee, transportation for all incarcerated aliens in the LEA's facilities, upon the completion of their sentences, or upon completion of processing in those circumstances in which state or local prosecution is not available, to a facility or location designated by ICE.  If ICE determines that it is necessary, the LEA will provide ICE, at not cost, with an office within each participating LEA facility for ICE supervisory employees to work.

ICE agrees to be responsible for the purchase, installation, and maintenance of technology (computer/IAFIS/Photo and similar hardware/software) necessary to support the investigative functions of participating LEA personnel at each LEA facility with an active 287(g) program. The use of this equipment is to be limited to the performance of responsibilities authorized by this MOA under section 287(g) of the INA by participating LEA personnel.  ICE also agrees to provide the necessary technological support and software updates for use by participating LEA personnel to accomplish the delegated functions.  Such hardware, software, and other technology purchased or provided by ICE, shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, or when deemed necessary by the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

## XI.    ICE SUPERVISION

Immigration enforcement activities conducted by the participating LEA personnel will be supervised and directed by ICE supervisory officers or the designated team leader in Phoenix. Participating LEA personnel are not authorized to perform immigration officer functions, except when working under the supervision of an ICE officer.  Participating LEA personnel shall give timely notice to the ICE supervisory officer within 24 hours or any detainer issued under the authorities set forth in this MOA.

In the correction setting, participating MCSO personnel shall give notice to the ICE supervisory officer as soon as practicable after, and in all cases within 24 hours of, any detainer issued under the authorities set forth in this MOA. In the field setting, participating MCSO deputies will contact an ICE duty officer at the time of exercising the authority in this MOA for guidance. The actions of participating MCSO personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to the ICE Special Agent in Charge and ICE Field Office Director in Phoenix, or designees, and the Sheriff of Maricopa County, or designee, when circumstances safely allow the concern to be raised. The Special Agent in Charge, the ICE Field Office Director in Phoenix, and the Sheriff of Maricopa County shall attempt to resolve the conflict.

Whenever possible, MCSO will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Office of Investigations (OI) or ICE's Office of Detention and Removal (DRO) prior to taking any enforcement action. This deconfliction will, at a minimum, include wants/warrants, criminal history, and a person, address, and vehicle check through TECS II.

MCSO participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE agents with criminal investigations.

## XII.   REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

XIII.   LIABILITY AND RESPONSIBILITY

If any participating LEA personnel are the subjects of a complaint of any sort that may result in that individual receiving employer discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by state law, immediately notify ICE of the existence and nature of the complaint.  The resolution of the complaint shall also be promptly reported to ICE.  Complaints regarding the exercise of immigration enforcement authority by participating LEA personnel shall be handled as described below.

Except as otherwise noted in this MOA or allowed by federal law, the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personnel expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will only be treated as federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function as authorized by this MOA. 8 U.S.C. § 1357(g)(7).  It is the understanding of the parties to this MOA that participating LEA personnel will enjoy the same defenses and immunities available to ICE officers from personal liability arising from tort lawsuits based on actions conducted in compliance with this MOA. 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice.  Such requests must be made in writing directed to the Attorney General of the United States, and will be handled in coordination with the ICE Special Agent in Charge and/or the ICE Field Office Director in Phoenix.  Requests for representation must be presented to the ICE Office of the Chief Counsel at 2035 N. Central Avenue, Phoenix, AZ  85004.  Any request for representation and related correspondence must be clearly marked "Subject to Attorney-Client Privilege."  The Office of the Chief Counsel will forward the individual's request, together with a memorandum outlining the factual basis underlying the event(s) at issue in the lawsuit, to the ICE Office of the Principal Legal Advisor, which will forward the request, the factual memorandum, and an advisory statement opining whether such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Torts Staff, Civil Division, Department of Justice.  ICE will not be liable for defending or indemnifying acts of intentional misconduct on the part of participating LEA personnel.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers.  It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with Garrity v. New Jersey, 385 U.S. 493 (1967).

As the activities of participating LEA personnel under this MOA are undertaken under federal authority, the participating LEA personnel will comply with federal standards and guidelines relating to the Supreme Court's decision in Giglio v. United States, 405 U.S. 150 (1972), and its progeny, which relates to the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

## XIV.   COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, with regard to activities undertaken under the authority of this MOA, is included at Appendix B.

## XV.   CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all federal civil rights statutes and regulations, including the U.S. Department of Justice "Guidance Regarding The Use Of Race By Federal Law Enforcement Agencies" dated June 2003.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter.   Qualified foreign language interpreters will be provided by the LEA as needed.

## XVI.   STEERING COMMITTEE

The ICE Special Agent in Charge, the ICE Field Office Director, and the Sheriff of Maricopa County shall establish a steering committee that will meet periodically to review and assess the immigration enforcement activities conducted by the participating LEA personnel and to ensure compliance with the terms of this MOA.   The steering committee will meet periodically in Maricopa County at locations to be agreed upon by the parties, or via teleconference.   Steering committee participants will be supplied with specific information on case reviews, individual participants' evaluations, complaints filed, media coverage, and, to the extent practicable, statistical information on increased immigration enforcement activity in Maricopa County.   An initial review meeting will be held no later than nine months after certification of the initial class of participating LEA personnel under Section IX, above.

## XVII.   COMMUNITY OUTREACH

The LEA may, at its discretion, engage in community outreach with individuals and organizations expressing an interest in this MOA.   ICE may participate in such outreach upon the LEA's request.

## XVIII. RELATIONS WITH THE NEWS MEDIA

LEA may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA. This MOA also describes the complaint procedures available to members of the public regarding actions taken by participating LEA personnel pursuant to this agreement.

The LEA hereby agrees to coordinate with ICE before releasing information to the media regarding actions taken under this MOA.  The points of contact for ICE and MCSO for this purpose are identified in Appendix C.

XIX.   MODIFICATION OF THIS MOA

Modifications to this MOA must be proposed in writing and approved by the signatories.

XX.   DURATION AND TERMINATION OF THIS MOA

This MOA will be in effect from the date of signing until it is terminated by either party.  Either party, upon written notice to the other party, may terminate the MOA at any time.  A termination notice shall be delivered personally or by certified or registered mail and termination shall take effect immediately upon receipt of such notice.

Either party, upon written or oral notice to the other party, may temporarily suspend activities under this MOA when resource constraints or competing priorities necessitate.  Notice of termination or suspension by ICE shall be given to the Sheriff of Maricopa County.  Notice of termination or suspension by MCSO shall be given to the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix.

Except for the provisions contained in Section XIII, this MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create, any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, and accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

Date: 2/24/07 _____          Date: _____

_____          (See attached page 10A)
Julie Myers                               _____
Assistant Secretary                          Maricopa County
Immigration and Customs Enforcement          Board of Supervisors
Office of Homeland Security

Date: Jan 19, 2007 _____

_____
Joe Arpaio
Sheriff
Maricopa County

1660

**Maricopa County Board of Supervisors**

ACTING Chairman of the Board                    Date

ATTEST:

Clerk of the Board                    Date

APPROVED AS TO FORM AND WITHIN THE POWERS AND AUTHORITY
GANTED UNDER THE LAWS OF THE STATE OF ARIZONA TO MARICOPA
COUNTY

Deputy County Attorney

This signature page is added and made part of
The Memorandum of Agreement (MOA) between
United States Immigration and Customs Enforcement (ICE)
and Maricopa County

(10A)

## APPENDIX A

### POINTS OF CONTACT

The ICE and MCSO points of contact for purposes of implementation of this MOA are:

For MCSO:      David A. Hendershott
                  Chief Deputy, Maricopa County Sheriff's Office
                  100 W. Washington Street, Suite 1900
                  Phoenix, AZ  85003
                  (602) 876-1824

For ICE DRO:    Jon Gurule
                  Assistant Field Office Director
                  Detention and Removal Operations
                  2035 N. Central Avenue
                  Phoenix, AZ 85004    (602)379-6696

For ICE OI:     Troy Henley
                  Deputy Special Agent in Charge
                  400 N. 5th Street, 11th Floor
                  Phoenix, AZ  85004
                  (602) 514-7392

# APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between DHS/ICE and the Maricopa County Sheriff's Office, hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under Federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

The MOA sets forth the process for designation, training, and certification of certain LEA personnel to perform certain immigration enforcement functions specified herein. Complaints filed against those personnel in the course of their non-immigration duties will remain the domain of the LEA and be handled in accordance with the LEA Manual of Policy and Procedures. The LEA will also handle complaints filed against personnel who may exercise immigration authority, but who are not designated and certified under this MOA. The number and type of the latter complaints will be monitored by the Steering Committee established under Section XVI of the MOA.

In order to simplify the process for the public, complaints against participating LEA personnel relating to their immigration enforcement can be reported in a number of ways. The ICE Headquarters Office of Professional Responsibility (OPR) and the LEA's Internal Affairs Division will coordinate complaint receipt and investigation.

The ICE OPR will forward complaints to the Department of Homeland Security's Office of Inspector General (DHS OIG) as appropriate for review, and ensure notification as necessary to the U.S. Department of Justice Civil Rights Division (DOJ CRD). The ICE OPR will coordinate complaints related to participating personnel with the LEA Internal Affairs Division as detailed below. Should circumstances warrant investigation of a complaint by the DHS OIG or the DOJ CRD, this will not preclude the DHS OIG, DOJ CRD, or ICE OPR from conducting the investigation in coordination with the LEA's Internal Affairs Division, when appropriate.

The ICE OPR will adhere to established procedures relating to reporting and resolving allegations of employee misconduct, and the LEA's Internal Affairs Division will follow applicable LEA policies and procedures, personnel rules, Arizona statutes, and collective bargaining agreement requirements.

1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures.

Complaints will be accepted from any source (e.g.: ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints can be reported to federal authorities as follows:

A.    Telephonically to the ICE OPR at the Joint Intake Center (JIC) in Washington, D.C. at the toll-free number 1-877-246-8253; or

B.    Telephonically to the Resident Agent in Charge of the ICE OPR office in Tucson, AZ at (520) 407-2200; or

C.    Via mail as follows:

> U.S. Department of Homeland Security
> U.S. Immigration and Customs Enforcement
> Office of Professional Responsibility
> 425 I Street, NW
> Room 3260
> Washington, D.C. 20536

Complaints can also be referred to and accepted by any of the following LEA entities:

A.    The LEA Internal Affairs Division; or

B.    The supervisor of any participating LEA personnel; or

C.    The LEA Internal Affairs Division as follows:
> Commander
> Internal Affairs Division.
> Maricopa County Sheriff's Office
> 100 W. Washington Street, Suite 1900
> Phoenix, AZ  85003

2.  Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR.  The ICE OPR will verify participating personnel status under the MOA with the assistance of the ICE Special Agent in Charge and the ICE Field Office Director in Phoenix. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

3. Complaint Resolution Procedures

Upon receipt of any complaint, the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above, the ICE OPR will adhere to existing ICE reporting requirements as they relate to the DHS OIG and/or the DOJ CRD. Complaints will be resolved using the existing procedures, supplemented as follows:

A. Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B. Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the Maricopa County Sheriff's Office shall be honored. If appropriate, an individual may be removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C. Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

## APPENDIX C

### PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section XVIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

For MCSO:

Lt. Paul Chagoya
Public Information Office
Maricopa County Sheriff's Office
100 W. Washington Street, Suite 1900
Phoenix, AZ 85003
(602) 525-6239

For ICE:

Virginia Kice
Western Regional Communications Director/Spokesperson
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Western Region Public Affairs
24000 Avila Road
Laguna Niguel, CA 92677
(949) 360-3096

# EXHIBIT C

**U.S. Department of Justice**
**Civil Rights Division**

# GUIDANCE REGARDING THE

# USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES

## June 2003

## INTRODUCTION AND EXECUTIVE SUMMARY

In his February 27, 2001, Address to a Joint Session of Congress, President George W. Bush declared that racial profiling is "wrong and we will end it in America." He directed the Attorney General to review the use by Federal law enforcement authorities of race as a factor in conducting stops, searches and other law enforcement investigative procedures. The Attorney General, in turn, instructed the Civil Rights Division to develop guidance for Federal officials to ensure an end to racial profiling in law enforcement.

"Racial profiling" at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures. It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity.

Racial profiling in law enforcement is not merely wrong, but also ineffective. Race-based assumptions in law enforcement perpetuate negative racial stereotypes that are harmful to our rich and diverse democracy, and materially impair our efforts to maintain a fair and just society. [1]

The use of race as the basis for law enforcement decision-making clearly has a terrible cost, both to the individuals who suffer invidious discrimination and to the Nation, whose goal of "liberty and justice for all" recedes with every act of such discrimination. For this reason, this guidance in many cases imposes more restrictions on the consideration of race and ethnicity in Federal law enforcement than the Constitution requires. [2] This guidance prohibits racial profiling in law enforcement practices without hindering the important work of our Nation's public safety officials, particularly the intensified anti-terrorism efforts precipitated by the events of September 11, 2001.

**I. Traditional Law Enforcement Activities.** Two standards in combination should guide use by Federal law enforcement authorities of race or ethnicity in law enforcement activities:

- **In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.**
- **In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that**

Case 2:07-cv-02513-GMS   Document 1   Filed 12/12/07   Page 49 of 57

links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.

**II. National Security and Border Integrity.** The above standards do not affect current Federal policy with respect to law enforcement activities and other efforts to defend and safeguard against threats to national security or the integrity of the Nation's borders, [3] to which the following applies:

- **In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.**

Any questions arising under these standards should be directed to the Department of Justice.

## THE CONSTITUTIONAL FRAMEWORK

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, for example, the decision of federal prosecutors "whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" [4] *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). The same is true of Federal law enforcement officers. Federal courts repeatedly have held that any general policy of "utiliz[ing] impermissible racial classifications in determining whom to stop, detain, and search" would violate the Equal Protection Clause. *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001). As the Sixth Circuit has explained, "[i]f law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solelyupon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). "A person cannot become the target of a police investigation solely on the basis of skin color. Such selective law enforcement is forbidden." *Id.* at 354.

As the Supreme Court has held, this constitutional prohibition against selective enforcement of the law based on race "draw[s] on 'ordinary equal protection standards.'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, impermissible selective enforcement based on race occurs when the challenged policy has "'a discriminatory effect and . . . was motivated by a discriminatory purpose.'" *Id.* (quoting *Wayte*, 470 U.S. at 608). [5] Put simply, "to the extent that race is used as a proxy" for criminality, "a racial stereotype requiring strict scrutiny is in operation." *Cf. Bush v. Vera*, 517 U.S. at 968 (plurality).

## I. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES

### A. Routine or Spontaneous Activities in Domestic Law Enforcement

In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers

**may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.**

Federal law enforcement agencies and officers sometimes engage in law enforcement activities, such as traffic and foot patrols, that generally do not involve either the ongoing investigation of specific criminal activities or the prevention of catastrophic events or harm to the national security. Rather, their activities are typified by spontaneous action in response to the activities of individuals whom they happen to encounter in the course of their patrols and about whom they have no information other than their observations. These general enforcement responsibilities should be carried out without *any* consideration of race or ethnicity.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer notices that nearly all vehicles on the road are exceeding the posted speed limit. Although each such vehicle is committing an infraction that would legally justify a stop, the officer may not use race or ethnicity as a factor in deciding which motorists to pull over. Likewise, the officer may not use race or ethnicity in deciding which detained motorists to ask to consent to a search of their vehicles.

Some have argued that overall discrepancies in certain crime rates among racial groups could justify using race as a factor in general traffic enforcement activities and would produce a greater number of arrests for non-traffic offenses (*e.g.*, narcotics trafficking). We emphatically reject this view. The President has made clear his concern that racial profiling is morally wrong and inconsistent with our core values and principles of fairness and justice. Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by federal law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping. It casts a pall of suspicion over every member of certain racial and ethnic groups without regard to the specific circumstances of a particular investigation or crime, and it offends the dignity of the individual improperly targeted. Whatever the motivation, it is patently unacceptable and thus prohibited under this guidance for Federal law enforcement officers to act on the belief that race or ethnicity signals a higher risk of criminality. This is the core of "racial profiling" and it must not occur.

The situation is different when an officer has specific information, based on trustworthy sources, to "be on the lookout" for specific individuals identified at least in part by race or ethnicity. In such circumstances, the officer is not acting based on a generalized assumption about persons of different races; rather, the officer is helping locate specific individuals previously identified as involved in crime.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer receives an "All Points Bulletin" to be on the look-out for a fleeing bank robbery suspect, a man of a particular race and particular hair color in his 30s driving a blue automobile. The Officer

may use this description, including the race of the particular suspect, in deciding which speeding motorists to pull over.

## B. Law Enforcement Activities Related to Specific Investigations

**In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.**

As noted above, there are circumstances in which law enforcement activities relating to particular identified criminal incidents, schemes or enterprises may involve consideration of personal identifying characteristics of potential suspects, including age, sex, ethnicity or race. Common sense dictates that when a victim describes the assailant as being of a particular race, authorities may properly limit their search for suspects to persons of that race. Similarly, in conducting an ongoing investigation into a specific criminal organization whose membership has been identified as being overwhelmingly of one ethnicity, law enforcement should not be expected to disregard such facts in pursuing investigative leads into the organization's activities.

Reliance upon generalized stereotypes is absolutely forbidden. Rather, use of race or ethnicity is permitted only when the officer is pursuing a specific lead concerning the identifying characteristics of persons involved in an *identified* criminal activity. The rationale underlying this concept carefully limits its reach. In order to qualify as a legitimate investigative lead, the following must be true:

- The information must be relevant to the locality or time frame of the criminal activity;
- The information must be trustworthy;
- The information concerning identifying characteristics must be tied to a particular criminal incident, a particular criminal scheme, or a particular criminal organization.

The following policy statements more fully explain these principles.

## 1. *Authorities May Never Rely on Generalized Stereotypes, But May Rely Only on Specific Race- or Ethnicity-Based Information*

This standard categorically bars the use of generalized assumptions based on race.

- *Example*: In the course of investigating an auto theft in a federal park, law enforcement authorities could not properly choose to target individuals of a particular race as suspects, based on a

generalized assumption that those individuals are more likely to commit crimes.

This bar extends to the use of race-neutral pretexts as an excuse to target minorities. Federal law enforcement may not use such pretexts. This prohibition extends to the use of other, facially race-neutral factors as a proxy for overtly targeting persons of a certain race or ethnicity. This concern arises most frequently when aggressive law enforcement efforts are focused on "high crime areas." The issue is ultimately one of motivation and evidence; certain seemingly race-based efforts, if properly supported by reliable, empirical data, are in fact race-neutral.

- ○ *Example*: In connection with a new initiative to increase drug arrests, local authorities begin aggressively enforcing speeding, traffic, and other public area laws in a neighborhood predominantly occupied by people of a single race. The choice of neighborhood was not based on the number of 911 calls, number of arrests, or other pertinent reporting data specific to that area, but only on the general assumption that more drug-related crime occurs in that neighborhood because of its racial composition. This effort would be improper because it is based on generalized stereotypes.

- ○ *Example:* Authorities seeking to increase drug arrests use tracking software to plot out where, if anywhere, drug arrests are concentrated in a particular city, and discover that the clear majority of drug arrests occur in particular precincts that happen to be neighborhoods predominantly occupied by people of a single race. So long as they are not motivated by racial animus, authorities can properly decide to enforce all laws aggressively in that area, including less serious quality of life ordinances, as a means of increasing drug-related arrests. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.").

By contrast, where authorities are investigating a crime and have received *specific information* that the suspect is of a certain race (*e.g.*, direct observations by the victim or other witnesses), authorities may reasonably use that information, even if it is the only descriptive information available. In such an instance, it is the victim or other witness making the racial classification, and federal authorities may use reliable incident-specific identifying information to apprehend criminal suspects. Agencies and departments, however, must use caution in the rare instance in which a suspect's race is the only available information. Although the use of that information may not be unconstitutional, broad

targeting of discrete racial or ethnic groups always raises serious fairness concerns.

○ **Example**: The victim of an assault at a local university describes her assailant as a young male of a particular race with a cut on his right hand. The investigation focuses on whether any students at the university fit the victim's description. Here investigators are properly relying on a description given by the victim, part of which included the assailant's race. Although the ensuing investigation affects students of a particular race, that investigation is not undertaken with a discriminatory purpose. Thus use of race as a factor in the investigation, in this instance, is permissible.

### 2. *The Information Must be Relevant to the Locality or Time Frame*

Any information concerning the race of persons who may be involved in specific criminal activities must be locally or temporally relevant.

○ **Example**: DEA issues an intelligence report that indicates that a drug ring whose members are known to be predominantly of a particular race or ethnicity is trafficking drugs in Charleston, SC. An agent operating in Los Angeles reads this intelligence report. In the absence of information establishing that this intelligence is also applicable in Southern California, the agent may not use ethnicity as a factor in making local law enforcement decisions about individuals who are of the particular race or ethnicity that is predominant in the Charleston drug ring.

### 3. *The Information Must be Trustworthy*

Where the information concerning potential criminal activity is unreliable or is too generalized and unspecific, use of racial descriptions is prohibited.

○ **Example**: ATF special agents receive an uncorroborated anonymous tip that a male of a particular race will purchase an illegal firearm at a Greyhound bus terminal in a racially diverse North Philadelphia neighborhood. Although agents surveilling the location are free to monitor the movements of whomever they choose, the agents are prohibited from using the tip information, without more, to target any males of that race in the bus terminal. *Cf. Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (finding no reasonable basis for suspicion where tip "made all black men suspect"). The information is neither sufficiently reliable nor sufficiently specific.

### 4. *Race- or Ethnicity-Based Information Must Always be Specific to Particular Suspects or Incidents, or Ongoing Criminal Activities, Schemes, or Enterprises*

Case 2:07-cv-02513-GMS Document 1 Filed 12/12/07 Page 64 of 87

These standards contemplate the appropriate use of both "suspect-specific" and "incident-specific" information. As noted above, where a crime has occurred and authorities have eyewitness accounts including the race, ethnicity, or other distinguishing characteristics of the perpetrator, that information may be used. Federal authorities may also use reliable, locally relevant information linking persons of a certain race or ethnicity to a particular incident, unlawful scheme, or ongoing criminal enterprise--even absent a description of any particular individual suspect. In certain cases, the circumstances surrounding an incident or ongoing criminal activity will point strongly to a perpetrator of a certain race, even though authorities lack an eyewitness account

- *Example*: The FBI is investigating the murder of a known gang member and has information that the shooter is a member of a rival gang. The FBI knows that the members of the rival gang are exclusively members of a certain ethnicity. This information, however, is not suspect-specific because there is no description of the particular assailant. But because authorities have reliable, locally relevant information linking a rival group with a distinctive ethnic character to the murder, Federal law enforcement officers could properly consider ethnicity in conjunction with other appropriate factors in the course of conducting their investigation. Agents could properly decide to focus on persons dressed in a manner consistent with gang activity, but ignore persons dressed in that manner who do not appear to be members of that particular ethnicity.

It is critical, however, that there be reliable information that ties persons of a particular description to a specific criminal incident, ongoing criminal activity, or particular criminal organization. Otherwise, any use of race runs the risk of descending into reliance upon prohibited generalized stereotypes.

- *Example*: While investigating a car theft ring that dismantles cars and ships the parts for sale in other states, the FBI is informed by local authorities that it is common knowledge locally that most car thefts in that area are committed by individuals of a particular race. In this example, although the source (local police) is trustworthy, and the information potentially verifiable with reference to arrest statistics, there is no particular incident- or scheme- specific information linking individuals of that race to the particular interstate ring the FBI is investigating. Thus, without more, agents could not use ethnicity as a factor in making law enforcement decisions in this investigation.

Note that these standards allow the use of reliable identifying information about planned future crimes. Where federal authorities receive a credible tip from a reliable informant regarding a planned crime that has not yet occurred, authorities may use this information under the same restrictions applying to information obtained regarding a past incident. A prohibition on the use of reliable prospective information would severely hamper law

enforcement efforts by essentially compelling authorities to wait for crimes to occur, instead of taking pro-active measures to prevent crimes from happening.

> ○ *Example*: While investigating a specific drug trafficking operation, DEA special agents learn that a particular methamphetamine distribution ring is manufacturing the drug in California, and plans to have couriers pick up shipments at the Sacramento, California airport and drive the drugs back to Oklahoma for distribution. The agents also receive trustworthy information that the distribution ring has specifically chosen to hire older couples of a particular race to act as the couriers. DEA agents may properly target older couples of that particular race driving vehicles with indicia such as Oklahoma plates near the Sacramento airport.

## II. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES INVOLVING THREATS TO NATIONAL SECURITY OR THE INTEGRITY OF THE NATION'S BORDERS

**In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.**

Since the terrorist attacks on September 11, 2001, the President has emphasized that federal law enforcement personnel must use every legitimate tool to prevent future attacks, protect our Nation's borders, and deter those who would cause devastating harm to our Nation and its people through the use of biological or chemical weapons, other weapons of mass destruction, suicide hijackings, or any other means. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).

The Constitution prohibits consideration of race or ethnicity in law enforcement decisions in all but the most exceptional instances. Given the incalculably high stakes involved in such investigations, however, Federal law enforcement officers who are protecting national security or preventing catastrophic events (as well as airport security screeners) may consider race, ethnicity, and other relevant factors to the extent permitted by our laws and the Constitution. Similarly, because enforcement of the laws protecting the Nation's borders may necessarily involve a consideration of a person's alienage in certain circumstances, the use of race or ethnicity in such circumstances is properly governed by existing statutory and constitutional standards. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975). [6] This policy will honor the rule of law and promote vigorous protection of our national security.

As the Supreme Court has stated, all racial classifications by a governmental actor are subject to the "strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224-25 (1995). The application of strict scrutiny is of necessity a fact-intensive process. *Id.*

at 236. Thus, the legality of particular, race-sensitive actions taken by Federal law enforcement officials in the context of national security and border integrity will depend to a large extent on the circumstances at hand. In absolutely no event, however, may Federal officials assert a national security or border integrity rationale as a mere pretext for invidious discrimination. Indeed, the very purpose of the strict scrutiny test is to "smoke out" illegitimate use of race, *Adarand*, 515 U.S. at 226 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)), and law enforcement strategies not actually premised on *bona fide* national security or border integrity interests therefore will not stand.

In sum, constitutional provisions limiting government action on the basis of race are wide-ranging and provide substantial protections at every step of the investigative and judicial process. Accordingly, and as illustrated below, when addressing matters of national security, border integrity, or the possible catastrophic loss of life, existing legal and constitutional standards are an appropriate guide for Federal law enforcement officers.

- *Example*: The FBI receives reliable information that persons affiliated with a foreign ethnic insurgent group intend to use suicide bombers to assassinate that country's president and his entire entourage during an official visit to the United States. Federal law enforcement may appropriately focus investigative attention on identifying members of that ethnic insurgent group who may be present and active in the United States and who, based on other available information, might conceivably be involved in planning some such attack during the state visit.
- *Example*: U.S. intelligence sources report that terrorists from a particular ethnic group are planning to use commercial jetliners as weapons by hijacking them at an airport in California during the next week. Before allowing men of that ethnic group to board commercial airplanes in California airports during the next week, Transportation Security Administration personnel, and other federal and state authorities, may subject them to heightened scrutiny.

Because terrorist organizations might aim to engage in unexpected acts of catastrophic violence in any available part of the country (indeed, in multiple places simultaneously, if possible), there can be no expectation that the information must be specific to a particular locale or even to a particular identified scheme.

Of course, as in the example below, reliance solely upon generalized stereotypes is forbidden.

- *Example*: At the security entrance to a Federal courthouse, a man who appears to be of a particular ethnicity properly submits his briefcase for x-ray screening and passes through the metal detector. The inspection of the briefcase reveals nothing amiss, the man does not activate the metal detector, and there is nothing suspicious about his activities or appearance. In the absence of any threat warning, the federal security screener may not order the man to undergo a further inspection solely because he appears to be of a particular ethnicity.

**FOOTNOTES**

**1. See United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000)** ("Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone.").

2. This guidance is intended only to improve the internal management of the executive branch. It is not intended to, and does not, create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or agents, or any person, nor does it create any right of review in an administrative, judicial or any other proceeding.

3. This guidance document does not apply to U.S. military, intelligence, protective or diplomatic activities conducted consistent with the Constitution and applicable Federal law.

4. These same principles do not necessarily apply to classifications based on alienage. For example, Congress, in the exercise of its broad powers over immigration, has enacted a number of provisions that apply only to aliens, and enforcement of such provisions properly entails consideration of a person's alien status.

5. Invidious discrimination is not necessarily present whenever there is a "disproportion" between the racial composition of the pool of persons prosecuted and the general public at large; rather, the focus must be the pool of "*similarly situated* individuals of a different race [who] were not prosecuted."*Armstrong*, 517 U.S. at 465 (emphasis added). "[R]acial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime."*Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality).

6. Moreover, as in the traditional law enforcement context described in the second standard, *supra,* officials involved in homeland security may take into account specific, credible information about the descriptive characteristics of persons who are affiliated with identified organizations that are actively engaged in threatening the national security.