CASE NO. 15-72440

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In Re: JOSEPH M. ARPAIO, Sheriff of Maricopa County, Arizona; *et al.*, Defendants

From the United States District Court
For the District of Arizona
The Honorable G. Murray Snow, Presiding
Case No. CV-07-2513

## <u>NOTICE OF FILING</u>

EXPEDITED ORAL ARGUMENT REQUESTED

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Jonathon Moseley, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Of Counsel (Not Admitted to Ninth Circuit)

Attorneys for Putative Intervenor Dennis L. Montgomery

<u>**NOTICE OF FILING**</u>

Putative Intervenor Dennis Montgomery hereby gives notice of filing of the Amended Emergency Motion to Stay filed in *Melendres v. Arpaio*, No. 15-16440 (9th Cir.) as the two appeals are related and intertwined. *See* Exhibit 1 – Emergency Motion for Stay.

Putative Intervenor Dennis Montgomery has no objection should the Court wish to consolidate these two appellate actions and respectfully requests oral argument with regard to the Emergency Motion for Stay and with regard to the Petition for Writ of Mandamus filed by Petitioner Sheriff Joseph M. Arpaio and the other petitioners in the related appeal.


EXPEDITED ORAL ARGUMENT IS REQUESTED.


Dated: August 14, 2015

Respectfully submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Avenue NW, Suite 345
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com

Jonathon Moseley
Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff
Of Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2015, I electronically filed and served by email the foregoing document with the Clerk of the Court and the parties' counsel by using the CM/ECF system, I hereby certify that I have served the following by email:

Honorable G. Murray Snow
United States District Courthouse
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2160

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Attorneys for Plaintiffs

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs

Cecilia D. Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres

Thomas P. Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Melvin McDonald
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, AZ 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org

212-549-2676
Attorney for Plaintiffs

Anne Lai
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, CA 92616
alai@law.uci.edu
949-824-9894

Jorge M. Castillo
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

Richard K. Walker
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County

/s/ *Larry Klayman*
Larry Klayman, Esq.

# Exhibit 1

CASE NO. 15-16440

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MANUEL de JESUS ORTEGA MELENDRES, *et al.*, Plaintiffs

v.

JOSEPH M. ARPAIO, Sheriff of Maricopa County,
Arizona; *et al.*, Defendants

and

DENNIS L. MONTGOMERY, Putative Intervenor

From the United States District Court
For the District of Arizona
The Honorable G. Murray Snow, Presiding
Case No. CV-07-2513

**AMENDED EMERGENCY MOTION FOR STAY ON APPEAL**

ORAL ARGUMENT REQUESTED

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Jonathon Moseley, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Of Counsel (Not Admitted to Ninth
Circuit)

Attorneys for Putative Intervenor Dennis L. Montgomery

## <u>CIRCUIT RULE 27-3 CERTIFICATE</u>

As the moving party, Putative Intervenor Dennis Montgomery, by counsel, certifies that to avoid irreparable harm Montgomery must obtain relief in less than 21 days, including because his property has already been released to a third party and he is continually suffering new harm as the underlying case progresses, and because evidentiary hearings are scheduled to resume in September 2015. *See,* Minute Order, July 20, 2015 (Doc. No. 1179). These matters need to be resolved before the case progresses with plenty of time to prepare.

**(i)** The telephone numbers, e-mail addresses, and office addresses of the attorneys for the parties;

Ms. Michele M. Iafrate, Esq.
Ms. Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's Office in Arizona

John T. Masterson, Esq.
M.Melvin McDonald, Esq.
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7827
jmasterson@jshfirm.com
mmcdonald@jshfirm.com

ii

jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's
Office in Arizona

Mr. Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County, Arizona


Thomas P. Liddy, Esq.
Civil Services Division
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Maricopa County and Maricopa County Sheriff's Office

Mr. Stanley Young, Esq.
Mr. Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Fax (650) 632-4800
Attorneys for Plaintiffs

Mr. Daniel Pochoda, Esq.
Mr. Joshua Bendor, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854

Attorney for Plaintiffs

Ms. Cecilia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiffs

Mr. Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs

Mr. Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

**(ii) Facts showing the existence and nature of the claimed emergency; and**

A dramatic transformation of the original case occurred in April 2015, which

is now targeting Dennis Montgomery, Putative Intervenor, although he is not a

party, has never been served, and should have nothing to do with the litigation.  As

a result, Montgomery's rights have been violated and are continuing to be violated

on a weekly and even daily basis in the case below. The underlying case was concluded by final judgment on October 2, 2013. (Docs. No. 606, 670.)

As one important example, on July 20, 2015, the presiding judge, the Honorable G. Murray Snow of the U.S. District Court for the District of Arizona ("District Court") granted a civil motion by the U.S. Department of Justice ("DoJ") to turn over to the U.S. Government the very same documents, data, and things that the U.S. District Court for the District of Nevada had already ordered DoJ to return to Montgomery once before. See, Transcript, July 20, 2015, Status Conference, *Melendres v. Arpaio,* Page 42-53, primarily Page 53 *(Emphases added);* Order, July 24, 2015. (Docket No. 1190.) Montgomery's intellectual property, medical records protected by the Health Insurance Portability and Accountability Act, proprietary trade secrets, work product, and personal property have been taken.

The U.S. District Court for the District of Nevada has already ruled that (1) the data, documents, intellectual property, tangible objects, and personal property at issue in this case belong to Dennis Montgomery, (2) none of it is classified, (3) the U.S. Government was required to return it all to Montgomery, and (4) the U.S. Government had deceived that court. See *Dennis Montgomery and the Montgomery Family Trust v. eTreppid Technologies, LLC, Warren Trepp and the U.S. Department of Defense*, Case Nos. 3:06-CV-00056-PMP-VPC and 3:06-CV-00145-PMP-VPC, Order, Judge Philip M. Pro, March 19,2007, and *In the Mater of*

the Search of:  The Residence Located at 12720 Buckthorne Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888 Madestro Drive, Reno, Nevada, Case Nos. 3:06-CV-0263-PMP-VPC and 3:06-MJ-00023-VPC, Order, Magistrate Judge Valerie P. Cooke, November 28, 2006 ("Nevada Orders").

Judge Snow did not order seizure documents and things *relevant* to the *Melendres v. Arpaio* case.  Judge Snow ordered that "all" documents relating to Montgomery be indiscriminately seized and distributed to Plaintiff's counsel, non-party counsel, and to the DoJ, explicitly acknowledging they might be irrelevant.

Evidentiary hearings (Order, January 16, 2015, Page 2, Doc. No. 856) will reconvene September 22nd through 25th and September 29th through October 2nd, 2015.  Minute Order, July 20, 2015 (Doc. No. 1179).  Judge Snow has also scheduled regular interim hearings at which he typically issues orders, often without providing notice or due process, and often affecting Montgomery.

As a result, emergency treatment of Montgomery's motion to stay is required.

**(iii) When and how counsel for the other parties were notified and whether they have been served with the motion; or, if not notified and served, why that was not done.**

 Counsel for the other parties were notified via email on July 24, 2015, before 9:00 AM local Arizona time, of Dennis L. Montgomery's intention to file

this motion for stay on an emergency basis.  Counsel will be served via email as soon as the motion has been filed with this Court.

# AMENDED [1] EMERGENCY MOTION FOR STAY

## I.    REQUEST FOR ORAL ARGUMENT

Dennis L. Montgomery ("Montgomery") respectfully requests oral argument on his motion, and expeditious handling of the motion and appeal.

## II.    INTRODUCTION

Montgomery respectfully moves this U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") to stay the proceedings.  Judge Snow admitted on July 20, 2015, that orders he has issued and continues to issue could be vacated if he later is recused.  Transcript, July 20, 2015, Status Conference, *Melendres v. Arpaio,* Pages 62-64, attached as Exhibit 12.  It will be impossible to "put the genie back in the bottle" if the case is not stayed.

Montgomery seeks to intervene solely to protect his legal and property rights, which are being run roughshod on by Judge Snow without an opportunity for him to protect his rights, assert his interests, receive due process, or be heard.

On July 15, 2015, Montgomery filed his Notice of Appeal (Docket No. 1173) appealing from the trial court's --

> a) Order of May 14, 2015 (Docket No. 1093) denying Pro Hac Vice Admission of Jonathon Moseley Striking Putative Intervenor's Motion to Intervene and Striking Putative Intervenor's Motion to Disqualify. (Moseley being

---

[1]    The motion is amended only in filing a companion addendum of relevant portions of the record as exhibits and adding cites herein to specific page numbers in those exhibits.

Montgomery's attorney as an associate to Larry Klayman.) Attached as Exhibit 6.

b) Order of June 10, 2015 (Docket No.1164) denying motion for disqualification.

c) Order of July 10, 2014 (Docket No. 1167) denying motion for reconsideration of Appellant's motion to intervene and application for attorney to practice *pro hac vice.*

d) All other orders and rulings adverse to and/or which refer or relate to Putative Intervenor Dennis L. Montgomery.

This Court previously vacated Judge Snow's over-use of Justice Department

monitors for matters that have

> no bearing on the constitutional rights at stake here. We
> therefore vacate these particular provisions and order the
> district court to tailor them so as to address only the
> constitutional violations at issue. See Milliken, 433 U.S.
> at 282.

*Melendres v. Arpaio*, Record No. 13-16285, U.S. Court of Appeals for the Ninth Circuit, Opinion April 15, 2015, page 23.

Yet many of the abuses against Montgomery's tangible property and

intellectual property and rights are occurring through Judge Snow's orders to his

monitors to seize Montgomery's property and take various actions without notice,

due process, or an opportunity to be heard, such as on April 23, 2015, in the

hearing, see Exhibit 1, attached, and by Order, April 27, 2015, (Docket No. 1033).

Judge Snow ruled that his monitors would not be "shackled" by Defendants'

constitutional rights. (Doc. No. 1117-1, Ex. 9., 5/14/15; Transcript at 49:15-21, 51, 56), attached as Exhibit 11.

It would be impractical for Montgomery to also file a motion for a stay in the trial court because Judge Snow refused to allow his counsel to enter the case pro hac vice and for him to intervene in the case.

However, a motion to stay in the trial court below awaiting appeal (Docket No. 1171) was filed by Defendant Sheriff Joe Arpaio ("Arpaio") and Chief Deputy Gerard Sheridan ("Sheridan") (specially appearing) of Arizona's MCSO. On July 20, 2015, by a Minute Order at (Docket No. 1179), Judge Snow denied the motion.

## III.   RELATED CASE WHICH MONTGOMERY RELIES ON

In a related petition before this Ninth Circuit, Defendant Arpaio and non-party Sheridan filed a petition for writ of mandamus on August 6, 2015, requiring Judge Snow's recusal. The petition is *Joseph Arpaio and Gerard Sheridan  v. U.S. District Court for the District of Arizona and Manuel de Jesus Ortega Melendres*, Case No. 15-72440.

Montgomery concurs in and agrees with Arpaio's and Sheridan's petition, joins in their petition for the recusal of Judge Snow, and incorporates Arpaio's and Sheridan's petition in all respects as if set forth herein in support of his motion for a stay the case, and also in support of his appeal directly.

Montgomery's motion for recusal of Judge Snow compares with Arpaio's and Sheridan's petition for writ of mandamus in only two respects:

(1) Montgomery also explicitly moves that the Ninth Circuit vacate the orders issued by Judge Snow subsequent to the conflict of interest.

(2) Montgomery also filed an affidavit under 28 U.S.C. § 144 on May 7, 2015 (Docket No. 1067) which compels unconditionally and without subjective analysis or discretion that Judge Snow stop all work on the case and that a different judge hear the question of recusal.

Both pleadings seeking recusal by both Arpaio and Sheridan and here Montgomery are informed by the expert analysis of noted judicial ethics expert Professor Ronald Rotunda, whose affidavits is attached as Exhibit 17.

## IV.   STATEMENT OF FACTS RELEVANT TO THE MOTION

Prior to April 23, 2015, Dennis Montgomery had never been involved or mentioned in the case below.  Yet in the evidentiary hearing April 21-24, Judge Snow expanded the case, and *sua sponte* started attacking Montgomery.  See, Transcript, April 23, 2015, attached as Exhibit 1, Pages 644:11-660:17.

Judge Snow then denied Montgomery's motions seeking to receive due process, notice, and an opportunity to be heard guaranteed by the Fifth Amendment to the U.S. Constitution concerning his property and the due process clause of the Fourteenth Amendment to the U.S. Constitution.  See Order, May 14,

4

2015, attached as Exhibit 6; Order, May 29, 2015, attached as Exhibit 7, Order July 10, 2015, attached as Exhibit 8.

The lawsuit filed in 2007 terminated on October 2, 2013, in the "Supplemental Permanent Injunction / Judgment Order." (Docs. No. 606, 670.) Implementation was set for a hearing in April 2015. (See, Order, January 16, 2015, Page 2, Doc. No. 856).

## V.    STANDARD OF REVIEW

Inervenor requests a stay pending appeal pursuant to Federal Rules of Appellate Procedure ("FRAP") Rule 8. In *Nken v. Holder,* the Supreme Court noted four factors required:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

556 U.S. 418, 434 (2009).

## VI.    ARGUMENT

### A. STANDING OF MONTGOMERY

It has already been decided that the intellectual property, documents, data, work product, copyrighted material, and things are Montgomery's personal property. *See* "Nevada Orders," identified, *supra.* Montgomery has a personal stake in this matter in which his property has been seized by verbal order on April

23, 2015, see Transcript, April 23, 2015, attached as Exhibit 1, Pages 653:18-25;

657:11-660:17, and by written Order, April 27, 2015, (Docket No. 1033).

## B. PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON HIS APPEAL ON THE MERITS

### 1) Application *Pro Hac Vice*

Montgomery has a substantial likelihood of prevailing on his appeal on his attorney's motion to appear *pro hac vice*. Montgomery has a right to choose attorneys whom he believes will be knowledgeable enough of his circumstances to represent him effectively and meaningfully, whom he can afford, and who will protect his rights on other topics.

But here, especially, Montgomery would suffer unusual hardship. Montgomery is both indigent and medically disabled. He could not afford regular counsel. Also, the litigation is controversial and political, so that it would be extremely difficult to find a local lawyer whose livelihood depends upon regularly appearing before Judge Snow to defend Montgomery against this rush to judgment.

A person is entitled to his choice of counsel, including an attorney appearing *pro hac vice*: "A defendant's right to the counsel of his choice includes the right to have an out-of-state lawyer admitted pro hac vice." *U.S. v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993); *see also Panzardi-Alvarez v. U.S.*, 879 F.2d 975, 980 (1st Cir. 1989)("[A] decision denying a pro hac vice admission necessarily implicates

6

constitutional concerns."), *cert. denied*, 493 U.S. 1082, 110 S. Ct. 1140, 107 L. Ed. 2d 1045 (1990). A person's right to retain counsel of his choice therefore represents " 'a right of constitutional dimension'" *U.S. v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir.1982) (citing *U.S. v. Wisniewski*, 478 F.2d 274, 285 (2d Cir.1973)), the denial of which may rise to the level of a constitutional violation. *Birt v. Montgomery*, 725 F.2d 587, 592 (11th Cir.) (*en banc*), cert. denied, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984); *Wilson*, 761 F.2d at 278-79. The right to retain counsel of choice stems from one's right to decide what kind of case he wishes to present. *U.S. v. Nichols*, 841 F.2d 1485, 1502 (10th Cir.1988).

"Attorneys are not fungible" and often "the most important decision a defendant makes in shaping his defense is his selection of an attorney." *U.S. v. Laura*, 607 F.2d 52, 56 (3d Cir.1979); *Nichols*, 841 F.2d at 1502; *Glasser v. U.S.*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).

Judge Snow denied Moseley's application to be admitted *Pro Hac Vice* on unsupported speculation that there could be a conflict of interest. But the record does not contain any basis for disqualification. Moseley filed a "Clarification of Motion for Admittance *Pro Hac Vice* of Jonathon A. Moseley," dated May 13, 2015, (Docs. No. 1080, 1081) stating that *(emphasis added):*

> Neither Dennis L. Montgomery nor his counsel are adverse to Sheriff Arpaio, his deputies, the Cold Case Posse, or MCSO **in any respect**, particularly since this case involves a contempt proceeding over allegations

of profiling illegal immigrants.

No party has moved for disqualification of Moseley as counsel for Montgomery. No facts have been entered in the record to establish any conflict.

Simply reciting that Moseley represents Arpaio in an unrelated matter does not establish any conflict of interest. Disqualification applies "where serious conflict exists." *See Dunton v. County of Suffolk*, 729 F.2d 903, 909 (2d Cir.1984), *amended* 748 F.2d 69 (2d Cir.1984). <u>*The proponent of disqualification must demonstrate the existence*</u> of a conflict of interest which is "serious."

The relevant test for disqualification is whether the other representation is "substantially related" to the current representation. *See Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1325 (9th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). A substantial relationship is found if the factual contexts of the two representations are similar or related. *Trone v. Smith*, 621 F.2d 994 (C.A.9 (Cal.), 1980) *(emphasis added)*.

> We held that the "relevant test for disqualification is whether the former representation is ***'substantially related' to the current representation.***" Id. at 998; see Gas-A-Tron of Arizona, supra, 534 F.2d at 1325; *Westinghouse Electric Co. v. Gulf Oil Corp.*, 588 F.2d 221, 223 (CA7 1978). "Substantiality is present ***if the factual contexts of the two representations are similar or related***." *Trone*, supra, 621 F.2d at 998.

*Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (C.A.9 (Mont.), 1983) *(Emphases added)*.

Here, the "*the factual contexts of the two representations*" are <u>not</u> "*similar or related.*" *Id.*  Representation of Montgomery in the current case shares no operative facts nor factual circumstances in common with Arpaio's challenge to the constitutionality of Obama's executive order on amnesty for illegal aliens.

Montgomery has nothing to do with immigration, immigration enforcement or law enforcement.  He has had no involvement with, role in, knowledge of, or experience in those topics.  Montgomery has no position on the proper way to conduct traffic stops, find probable cause, or the like.

### 2) Motion to Intervene

Montgomery has a substantial likelihood of prevailing on his appeal on his motion to intervene.  The U.S. Government admits that they do not claim to own the documents, items, or things claimed and owned by Montgomery.  The attorney representing the DoJ, Raphael Gomez, admitted in open Court on July 20, 2015:

> The United States ***does not know whether there are any documents in the Montgomery files*** that are in fact classified or sensitive, but ***there is a representation*** that there were documents that were of the United States.

Transcript, July 20, 2015, Status Conference, *Melendres v. Arpaio,* Page 43 *(Emphases added) (argument by Raphel Gomez for the DoJ).*

> MR. GOMEZ: Yes, Your Honor. I believe on May 8th ***the Court had issued an order to the defendants' counsel instructing the defendants' counsel to contact the United States; actually, the CIA general counsel's office***. At that point, we -- I'm an attorney in the Civil

> Division of the Department of Justice in Washington,
> D.C., and we were contacted, and pursuant to that
> instruction we had spoken to defendants' counsel, and
> with the purpose of, ***since there had been a
> representation made that documents contained in what
> I'll refer to as the Montgomery documents*** were either
> documents of the United States or documents that --
> implied – were classified or sensitive.

Transcript, July 20, 2015, Status Conference, *Melendres v. Arpaio,* Page 42
*(Emphases added).*

That is, Judge Snow ordered Montgomery's property to be handed over to

Raphael Gomez of the DoJ based on the off-chance and mere possibility that there

might be government documents among Montgomery's documents. ***This is the

same "callous disregard" for Montgomery's rights*** that the Honorable Phillip Pro

and Magistrate Valerie Cooke condemned in the Nevada Orders, *supra.*

Federal Rules of Civil Procedure ("FRCP") Rule 24 governs intervention by

additional parties in existing litigation in the federal courts:

> Rule 24. Intervention
>
> (a) INTERVENTION OF RIGHT. On timely motion, the court must
> permit anyone to intervene who:
> * * *
> (2) claims an interest relating to the property or
> transaction that is the subject of the action, and is so
> situated that disposing of the action may as a practical
> matter impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent that
> interest.
> (b) PERMISSIVE INTERVENTION.
> (1) *In General.* On timely motion, the court may permit
> anyone to intervene who:

* * *

    (B) has a claim or defense that shares with the main
action a common question of law or fact.

Montgomery's motion is timely. The case started to involve Montgomery only in late April of 2015. Montgomery filed his motion within two weeks. Montgomery also complied with FRCP Rule 24(c) by providing notice and a proposed pleading.

### 3) Motion for Disqualification of Judge Snow

Montgomery has a substantial likelihood of prevailing on his motion for recusal, as does Arpaio and Sheridan in their related petition for writ of mandamus also requesting recusal. Montgomery filed his affidavit under 28 U.S.C. § 144 on May 7, 2015 (Docket No. 1067), and in that pleading also further claimed essentially the same additional grounds requiring recusal of Judge Snow under 28 U.S.C. § 455 as raised by Arpaio and Sheridan.

Accordingly, Montgomery joins in and agrees with the petition by Arpaio and Sheridan in their arguments for recusal of Judge Snow, and incorporates their petition by reference herein for the purposes of this motion for a stay.

Montgomery is in agreement with the Defendants Arpaio and Sheridan, but adds an additional demand for recusal under 28 U.S.C. § 144 and also moves this Court to vacate Judge Snow's orders issued while a conflict of interest exists, particularly as they relate to Dennis Montgomery.

The demands for recusal are timely. Most of the circumstances requiring recusal were created by Judge Snow himself starting only on April 23, 2015.

The courts strive to eliminate even the appearance of bias. "Thus even if there is no bias in fact, an appearance of bias or prejudice requires recusal if it is sufficient to raise a question in the mind of 'the average citizen' about a judge's impartiality." *York v. United States,* 785 A.2d 651, 655 (D.C. 2001).

Judge Snow decided to make himself, his wife, and Montgomery major topics. Arpaio's lawyers filed an objection to procedures and on the last page also to Judge Snow "questioning Defendant Arpaio on areas on which he did not receive prior notice." (Docket No. 1032, April 28, 2015.) Judge Snow then ruled that his questioning about the "Grissom Investigation" (Judge Snow's wife) and the "Seattle operation" (Dennis Montgomery) will *not* be excluded. (Docket No. 1046, May 4, 2015.) Judge Snow injected personal issues into the case on April 23 and April 24, 2015. *See,* Motion for Recusal or Disqualification of District Court Judge G. Murray Snow, May 22, 2015, Pages 8-9. (Docket No. 1117).

Montgomery filed an affidavit and certificate under 28 U.S.C. § 144

> "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists…."

12

Montgomery's affidavit on May 7, 2015 (Docket No. 1067) compelled Judge Snow to "proceed no further" in the case" and requires "another judge shall be assigned to hear such proceeding," without subjective analysis or discretion.

A judge's impartiality "might reasonably be questioned" by the public where the judge's wife volunteers that the judge hates the defendant and will do anything to hound him from office (Docket No. 1117) – and neither the judge nor his wife have denied it, sought to explain the admission, nor apologized.

Karen Grissom, her husband Dale, and their son Scott encountered Judge Snow's wife, Cheri Snow, in a Someburros restaurant in Tempe, Arizona. Cheri Snow and Karen Morris (now Grissom) had known each other from childhood and caught up on news. Dale and Scott report passively listening. Cheri Snow boasted that her husband was presiding over the trial of Sheriff Joe Arpaio, that Judge Snow hated Arpaio and will do whatever it takes to get Arpaio out of office. An investigator confirmed that Judge Snow's wife was in the restaurant on that day and time. *See, Transcripts* of interviews with Karen Grissom, Dale Grissom, and Scott Grissom, attached to the motion for recusal of Arpaio and Montgomery.

Neither Judge Snow nor his wife have denied that Cheri Snow volunteered that Judge Snow hates Arpaio and will do anything to get him out of office, denied that Judge Snow in fact hates Arpaio or denied that Judge Snow is using the

litigation to embarrass Arpaio in his re-election to remove him from office. Judge Snow invited the U.S. Attorney to send a prosecutor to monitor this civil case.

The Grissoms have never wavered in their account. The Grissoms are by their own report and from the investigation non-political, uninterested witnesses who have never had any relationship with or support for Sheriff Joe Arpaio. Karen Grissom's recollection in the transcript is the most detailed and specific because, as Dale Grissom and Scott Grissom report in the transcript, the women were primarily talking to each other catching up on their lives since their childhood acquaintance. *See, Interview Transcripts, id.*

Judge Snow has "personal knowledge of disputed evidentiary facts concerning the proceeding." Judge Snow will have or already does have a private explanation from his own wife of these disputed facts and events.

Judge Snow has made clear that he insists on pursuing the Karen Grissom / Cheri Snow and the Montgomery investigation as proving some allegations (not yet identified) against the Defendants in the case below. Judge Snow over-ruled the Defendants' objections to exclude the topics. (Docket No. 1046.)

Therefore, any defense attorney must call Judge Snow and Judge Snow's wife as witnesses in order to present a thorough defense to whatever charges Judge Snow plans to bring. Judge Snow is likely to preside over the testimony and cross-examination of his own wife, (Docket No. 1117), who will be testifying about him.

Judge Snow simultaneously refuses to exclude the topics, yet claims that his wife would not offer admissible testimony. These are inextricably linked. Judge Snow's insistence, over objection, that the proceedings below must include the investigation into what his wife said about Judge Snow being biased necessarily causes his wife's testimony to become relevant. Without Cheri Snow's testimony, charges or allegations against the Defendants for investigating Karen Grissom's tip about what Cheri Snow said could not be sustained as relevant issues in the case.

## C. MONTGOMERY WILL BE IRREPARABLY HARMED ABSENT A STAY

A stay is required because Montgomery is being harmed in ways that cannot be adequately remedied. A stay is required because if this Court determines that Judge Snow should recuse himself, any and all orders or proceedings will likely have to be vacated, as Judge Snow admitted on July 20, 2015 --

> However, I am wondering if the County has been fully advised that one of the positions Mr. Popolizio and Mr. Masterson is taking is that *if in fact this Court is removed by the Ninth Circuit from presiding over this case, the supplemental permanent injunction and the findings of fact and conclusions of law I made three years ago should be vacated, in which case there would be no injunctive relief on which the County or the plaintiffs could rely.*
>
> * * * So I wonder if the County has been fully advised, if the plaintiffs in United States versus Arpaio have been fully advised, that *the movants are taking the position*

15

> *not only that* I should be removed from presiding over
> the contempt hearing, *but that the injunctive relief and*
> *the findings of fact and conclusions of law I entered*
> *years ago should be vacated.*

Transcript, July 20, 2015, Status Conference, *Melendres v. Arpaio,* Pages 62-64
*(emphases added).*

## D. PLAINTIFFS WILL NOT BE HARMED BY A STAY

It cannot be overlooked that this case was concluded on October 2, 2013

(Docs. No. 606, 670) – 21 months ago. Plaintiffs' attorneys suggest that they have

to wait for relief, but legally, they have already obtained a final judgment.

These are post-judgment proceedings that concern implementation only.

(See, Order, January 16, 2014, Page 2, Doc. No. 856). The only legitimate issue

remaining is whether MCSO disobeyed the injunction on purpose or was merely

slow in implementation in a Sheriff's office that serves 4 million Arizona residents.

However, the Plaintiffs will not receive implementation of the injunction any

faster or slower either way. Regardless of any stay, MCSO and Arpaio are facing

sufficient motivation to implement the injunction as quickly as possible. MCSO

still knows that it must comply with the permanent injunction and any delay can

and will be used against them when the stay is lifted.

## E. THE PUBLIC INTEREST FAVORS A STAY

This case is ostensibly about upholding the constitutional rights of the

Plaintiffs and those similarly-situated. Yet the District Court is violating the

constitutional rights of Montgomery.  It is in the public interest that the federal

courts respect all the constitutional rights of all persons.

Plaintiffs purport to represent the community.  The analysis is the same as in

(D) above.  Either MCSO is sufficiently motivated by now or they are not.  A stay

will not change that.  A possible decision as to state of mind will not change that.

However, the public interest is also served by improving the reputation of

the federal judiciary in the eyes of the public.

## VII.   CONCLUSION AND REQUEST FOR RELIEF

This Court should order a stay of the proceedings and vacate Judge Snow's

orders until the appeal is heard.

Dated:  August 13, 2015                          Respectfully submitted,

  /s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Avenue NW, Suite 345
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com
Admitted in the Ninth Circuit

Jonathon Moseley
Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com

17

Attorney for Plaintiff
Of Counsel (not admitted in Ninth Circuit)

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the page limitations of Fed. R. App.

27(d), and that this moion complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it

has been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman style.

## CERTIFICATE OF SERVICE [2]

I hereby certify that on August 13, 2015, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the Ninth Circuit's CM/ECF system, and I caused a copy of the foregoing document to be served upon the following counsel of record in the case in the trial court below by first-class U.S. mail, postage prepaid:

Ms. Michele M. Iafrate, Esq.
Ms. Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's
Office in Arizona

---

[2] Appellant / Movant , by counsel, carefully reviewed recent filings in the record in the court below to update and confirm this certificate of service for this amended version of the motion. Attorneys appearing in the case below include those representing many non-parties and witnesses and changes that resulted from the Ninth Circuit's ruling that the Maricopa County Sheriff's Office should be included legally as part of Maricopa County, Arizona.

John T. Masterson, Esq.
M.Melvin McDonald, Esq.
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7827
jmasterson@jshfirm.com
mmcdonald@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's
Office in Arizona

Mr. Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County, Arizona

Mr. Stanley Young, Esq.
Mr. Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Fax (650) 632-4800
Attorneys for Plaintiffs

Mr. Daniel Pochoda, Esq.
Mr. Joshua Bendor, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs

Ms. Cecilia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres

Thomas P. Liddy, Esq.
Civil Services Division
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Maricopa County and Maricopa County Sheriff's Office

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs

Mr. Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

Mr. Barry D. Mitchell, Esq.
MITCHELL STEIN CAREY
One Renaissance Square
2 North Central Avenue, Suite 1900

Phoenix, Arizona 85004
(602) 358-0290
Attorney for Chief Deputy Sheridan

Mr. Greg S. Como, Esq.
Mr. M. Craig Murdy, Esq.
Mr. Dane A. Dodd, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
Phoenix Plaza Tower II
2929 North Central Avenue, Suite 1700
Phoenix, Arizona 85012-2761
Telephone: 602.385.1040
Facsimile: 602.385.1051
Greg.Como@lewisbrisbois.com
Craig.Murdy@lewisbrisbois.com
Dane.Dodd@lewisbrisbois.com
Attorneys for Executive Chief Brian Sands

Mr. Timothy D. Mygatt, Esq.
Special Counsel
Mr. Mark Kappelhoff, Esq.
Deputy Assistant Attorney General
Civil Rights Division, Special Litigation Section
U.S. Department of Justice
601 D St. NW, Suite 5200
Washington, D.C. 20004
Tel. (202) 514-2000
Fax (202) 514-6273
edward.g.caspar@usdoj.gov
Attorneys for Intervenor the United States

/s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Avenue N.W., Suite 345
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com

CASE NO. 15-16440

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MANUEL de JESUS ORTEGA MELENDRES, *et al.*, Plaintiffs

v.

JOSEPH M. ARPAIO, Sheriff of Maricopa County,
Arizona; *et al.*, Defendants

and

DENNIS L. MONTGOMERY, Putative Intervenor

From the United States District Court
For the District of Arizona
The Honorable G. Murray Snow, Presiding
Case No. CV-07-2513

**EXHIBITS IN SUPPORT OF MOTION FOR STAY ON APPEAL**
**Exhibits 1 through 17**

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Jonathon Moseley, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Of Counsel (not admitted in Ninth
Circuit)

Attorneys for Putative
Intervenor Dennis L. Montgomery

Putative Intervenor Dennis L. Montgomery, by counsel, hereby files the

following exhibits in support of his motion for stay pending appeal:

Exhibit 1 – Transcript Excerpts, April 23, 2015, Evidentiary Hearing, introducing
into the case for the first time Dennis Montgomery and the seizure
and distribution of his documents, intellectual property, intangible
property and tangible property.

Exhibit 2 – Application of Attorney for Admission to Practice *Pro Hac Vice*
Pursuant to LRCiv 83.1(b)(2) of Jonathon Moseley May 7, 2015, to
represent Montgomery (attached statement remains under seal)

Exhibit 3 – Motion to Intervene of Dennis Montgomery, May 7, 2015

Exhibit 4 – Motion for Reconsideration of Motion for Admittance Pro Hac Vice
of Jonathon A. Moseley and Memorandum of Law in Support
Thereof, filed to represent Dennis Montgomery, May 18, 2015

Exhibit 5 – Order, Judge Snow, May 4, 2015

Exhibit 6 – Order, Judge Snow, May 14, 2015

Exhibit 7 – Order, Judge Snow, May 29, 2015

Exhibit 8 – Order, Judge Snow, July 10, 2015, denying Motion for Reconsideration
(Appellant is not aware of any hearing or hearing transcript related to
Judge Snow's order on Montgomery's Motion for Reconsideration)

Exhibit 9 – Order, Judge Snow, July 24, 2015

Exhibit 10 – Transcript Excerpts, May 8, 2015, Status Conference

Exhibit 11 -- Transcript Excerpts, May 14, 2015, Status Conference

Exhibit 12 -- Transcript Excerpts, July 20, 2015, Status Conference,

Exhibit 13 -- Transcript Excerpts, July 24, 2015, Status Conference

Exhibit 14 – Facebook Message from Karen Grissom to Sheriff Joe Arpaio

Exhibit 15 – Petition for Writ of Mandamus -- for disqualification of the
Honorable G. Murray Snow, filed by Sheriff Joe Arpaio and Gerard
Sheridan in Ninth Circuit as Case No. 15-72440, August 6, 2015
(attached here without exhibits)

Exhibit 16 – Excerpt of Transcript of Investigator's Interview with
Karen Grissom, October 26, 2013, concerning conversation
with the wife of Judge Snow concerning Sheriff Joe Arpaio

Exhibit 17 – Declaration of Professor Ronald Rotunda in support of
Dennis Montgomery's motion for recusal of Judge Snow

Dated:  August 13, 2015                    Respectfully submitted,

                                            /s/ *Larry Klayman*
                                           Larry Klayman, Esq.
                                           General Counsel
                                           Freedom Watch, Inc.
                                           D.C. Bar No. 334581
                                           2020 Pennsylvania Avenue NW, Suite 345
                                           Washington, DC 20006
                                           Telephone: (310) 595-0800
                                           Email: leklayman@gmail.com
                                           Admitted in the Ninth Circuit

                                           Jonathon Moseley
                                           Virginia State Bar No. 41058
                                           Freedom Watch, Inc.
                                           2020 Pennsylvania Avenue N.W., Suite 345
                                           Washington, D.C. 20006
                                           (310) 595-0800
                                           leklayman@gmail.com
                                           Attorney for Plaintiff
                                           Of Counsel (not admitted in Ninth Circuit)

# CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2015, I electronically filed the foregoing document and the exhibits identified herein with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the Ninth Circuit's CM/ECF system, and I caused a copy of the foregoing document to be served upon the following counsel of record in the case in the trial court below by first-class U.S. mail, postage prepaid:

Ms. Michele M. Iafrate, Esq.
Ms. Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's
Office in Arizona

John T. Masterson, Esq.
M.Melvin McDonald, Esq.
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7827
jmasterson@jshfirm.com
mmcdonald@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's
Office in Arizona

Mr. Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336

Attorney for Defendant Maricopa County, Arizona

Mr. Stanley Young, Esq.
Mr. Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Fax (650) 632-4800
Attorneys for Plaintiffs

Mr. Daniel Pochoda, Esq.
Mr. Joshua Bendor, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs

Ms. Cecilia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres

Thomas P. Liddy, Esq.
Civil Services Division
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Maricopa County and Maricopa County Sheriff's Office

Andre Segura, Esq.

ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs

Mr. Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

Mr. Barry D. Mitchell, Esq.
MITCHELL STEIN CAREY
One Renaissance Square
2 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
(602) 358-0290
Attorney for Chief Deputy Sheridan

Mr. Greg S. Como, Esq.
Mr. M. Craig Murdy, Esq.
Mr. Dane A. Dodd, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
Phoenix Plaza Tower II
2929 North Central Avenue, Suite 1700
Phoenix, Arizona 85012-2761
Telephone: 602.385.1040
Facsimile: 602.385.1051
Greg.Como@lewisbrisbois.com
Craig.Murdy@lewisbrisbois.com
Dane.Dodd@lewisbrisbois.com
Attorneys for Executive Chief Brian Sands

Mr. Timothy D. Mygatt, Esq.
Special Counsel

Mr. Mark Kappelhoff, Esq.
Deputy Assistant Attorney General
Civil Rights Division, Special Litigation Section
U.S. Department of Justice
601 D St. NW, Suite 5200
Washington, D.C. 20004
Tel. (202) 514-2000
Fax (202) 514-6273
edward.g.caspar@usdoj.gov
Attorneys for Intervenor the United States

                               /s/ *Larry Klayman*
                               Larry Klayman, Esq.
                               General Counsel
                               Freedom Watch, Inc.
                               D.C. Bar No. 334581
                               2020 Pennsylvania Avenue N.W., Suite 345
                               Washington, DC 20006
                               Telephone: (310) 595-0800
                               Email: leklayman@gmail.com

Exhibit 1

```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega        )
     Melendres, et al.,            )
 5                                 )
                 Plaintiffs,       )   CV 07-2513-PHX-GMS
 6                                 )
                 vs.               )   Phoenix, Arizona
 7                                 )   April 23, 2015
     Joseph M. Arpaio, et al.,     )   8:34 a.m.
 8                                 )
                 Defendants.       )
 9   _____ )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             BEFORE THE HONORABLE G. MURRAY SNOW

17          (Evidentiary Hearing Day 3, pages 512-817)

18

19

20

21

22   Court Reporter:              Gary Moll
                                  401 W. Washington Street, SPC #38
23                                Phoenix, Arizona  85003
                                  (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

1                          A P P E A R A N C E S

2

3    For the Plaintiffs:          Cecillia D. Wang, Esq.
                                  AMERICAN CIVIL LIBERTIES UNION
4                                 FOUNDATION
                                  Immigrants' Rights Project
5                                 39 Drumm Street
                                  San Francisco, California  94111
6                                 (415) 343-0775

7                                 Stanley Young, Esq.
                                  Hyun S. Byun, Esq.
8                                 COVINGTON & BURLING, L.L.P.
                                  333 Twin Dolphin Drive, Suite 700
9                                 Redwood Shores, California  94065
                                  (650) 632-4700
10
                                  Daniel J. Pochoda, Esq.
11                                Joshua D. Bendor, Esq.
                                  AMERICAN CIVIL LIBERTIES
12                                FOUNDATION OF ARIZONA
                                  3707 N. 7th St., Suite 235
13                                Phoenix, Arizona  85014
                                  (602) 650-1854
14
                                  Andre I. Segura, Esq.
15                                AMERICAN CIVIL LIBERTIES UNION
                                  FOUNDATION
16                                Immigrants' Rights Project
                                  125 Broad Street, 17th Floor
17                                New York, New York  10004
                                  (212) 549-2676
18
     For the Defendants:          Michele M. Iafrate, Esq.
19                                IAFRATE & ASSOCIATES
                                  649 N. 2nd Avenue
20                                Phoenix, Arizona  85003
                                  (602) 234-9775
21
     For the Defendant Maricopa County:
22
                                  Richard K. Walker, Esq.
23                                WALKER & PESKIND, P.L.L.C.
                                  16100 N. 71st Street
24                                Suite 140
                                  Scottsdale, Arizona  85254
25                                (480) 483-6336

1                    A P P E A R A N C E S

2

3   For the Defendant Arpaio:   A. Melvin McDonald, Esq.
                                JONES, SKELTON & HOCHULI, P.L.C.
4                               2901 N. Central Avenue, Suite 800
                                Phoenix, Arizona  85012
5                               (602) 263-1700

6   For Chief Deputy Sheridan: Lee D. Stein, Esq.
                               MITCHELL STEIN CAREY
7                              One Renaissance Square
                               2 North Central Avenue
8                              Suite 1900
                               Phoenix, Arizona  85004
9                              (602) 358-0290

10  For Executive Chief Sands:  Greg S. Como, Esq.
                                LEWIS BRISBOIS BISGAARD
11                              & SMITH, L.L.P.
                                Phoenix Plaza Tower II
12                              2929 N. Central Avenue
                                Suite 1700
13                              Phoenix, Arizona  85012-2761
                                (602) 385-1040
14
    For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
15                              DICKINSON WRIGHT, P.L.L.C.
                                Attorneys at Law
16                              1850 N. Central Avenue, Suite 1400
                                Phoenix, Arizona  85004
17                              (602) 285-5000

18  For Lieutenant Sousa:       David S. Eisenberg, Esq.
                                DAVID EISENBERG, P.L.C.
19                              2702 N. 3rd Street
                                Suite 4003
20                              Phoenix, Arizona  85004
                                (602) 237-5076
21
    ALSO PRESENT:               Chief Robert Warshaw
22                              Chief John Girvin
                                Chief Raul Martinez
23

24

25

1                        I N D E X

2   Witness:                                              Page

3   JOSEPH M. ARPAIO

4   Direct Examination Continued by Mr. Young             518
    Cross-Examination by Ms. Iafrate                      587
5   Redirect Examination by Mr. Young                     614
    Examination by the Court                              625
6
    JOSEPH SOUSA
7
    Direct Examination by Ms. Wang                        661
8   Cross-Examination by Ms. Iafrate                      757
    Cross-Examination by Mr. Como                         779
9   Redirect Examination by Ms. Wang                      789
    Recross-Examination by Ms. Iafrate                    797
10

11

12                        E X H I B I T S

13
    No.     Description                              Admitted
14
    78      MCSO News Release, *Sheriffs Deputies Raid*   561
15          *Phoenix Business for Employees using False ID,*
            *All Arrested Suspected of Being in US Illegally*
16          dated 9/20/2012

17  84      MCSO News Release, *Sheriffs Deputies Execute* 565
            *Search Warrant at Concrete Company in Glendale*
18          dated 10/18/2012

19  85      MCSO Shift Summary (Sonoran Concrete)         565
            DR 12-156907 dated 10/18/2012
20          (MELC157123 - MELC156125)

21  87      MCSO News Release, *72st Operation Targeting* 570
            *False Identifications Used to Gain Employment*
22          dated 3/14/2013

23

24

25

1                       E X H I B I T S

2    No.        Description                              Admitted

3    88         MCSO Shift Summary (America's Taco Shop)      571
                DR 12-108378, DOJ Ex. 284 dated 3/14/2013
4               (MCS001291219 - MCS001291221)

5    132        E-mail chain from Sousa re "FW: Updated stats" 756
                and attaching "Criminal Employments stats
6               03-28-12.doc; 03-28-12.doc" dated 3/28/2012
                (MELCl114928 - MELCl 14931)
7
     168        MCSO Memorandum from Sousa re "Document        706
8               Production Request Regarding Request IAM-22"
                dated 1/12/2015 (MELC 114948)
9
     169        E-mail chain from Sousa re "Current HSU Ops    677
10              Manual" originally dated March 27, 2012, then
                January 13, 2015, and attaching HSU ops manual
11              (MELCl114960 - MELCl14967)

12   180        MCSO News Release, *West Valley*               568
                *Asian/International Supermarket Under*
13              *Investigation by Sheriff's Office, Arpaio*
                *Says* dated 1/17/2013 (MELC109370 - MELC109371)
14
     182        MCSO News Release, *6 Adults and One Juvenile* 572
15              *Detained in Human Smuggling Operation* dated
                5/18/2013 (MELC167859 - MELC167860)
16
     193A       A Video Clip 1 of Story re Crime Sweep,        580
17              October 19, 2013

18   193B       Video Clip 2 of Story re Crime Sweep,          582
                October 19, 2013
19
     193C       Video Clip 3 of Story re Crime Sweep,          582
20              October 19, 2013

21   195A       Video Clip 1 of KNVX after 1070 Decision,      527
                June 25, 2012
22
     196A       Video Clip 1 of Fox Latino at Republican       545
23              Convention, August 31, 2012

24

25

E X H I B I T S

| No. | Description | Admitted |
|---|---|---|
| 196C | Video Clip 3 of Fox Latino at Republican Convention, August 31, 2012 | 547 |
| 196D | Video Clip 4 of Fox Latino at Republican Convention, August 31, 2012 | 548 |
| 196E | Video Clip 5 of Fox Latino at Republican Convention, August 31, 2012 | 550 |
| 197A | Video Clip 1 of Fox News after after 1070 Decision, June 26, 2012 | 536 |
| 198A | Video Clip 1 of Univision after 1070 Decision, June 25, 2012 | 529 |
| 198B | Video Clip 2 of Univision after 1070 Decision, June 25, 2012 | 530 |
| 199A | Video Clip 1 of CNN June 25, 2012 | 533 |
| 199B | Video Clip 2 of CNN June 25, 2012 | 534 |
| 200A | Video Clip 1 of Fox Cavuto June 25, 2012 | 539 |
| 201A | Video Clip 1 of Maldonado Interview published April 13, 2012 | 521 |
| 201B | Video Clip 2 of Maldonado Interview published April 13, 2012 | 524 |
| 203 | Video Excerpt from The Joe Show, released February 26, 2014 | 585 |
| 212` | Email Chain from J. Sousa to J. Spurgin, et. al., re "Master Stat Sheet for Op Desert Sky" dated March 31, 2011 (MELC172485 - MELC172503) Sousa Depo Exhibit 192 | 725 |
| 216 | Email from J. Sousa to M. Trowbridge, et al., re "The Saving of Emails for Ongoing Lawsuits per Att Tim Casey" dated March 27, 2012 (MELC173868 - MELC173870) | 668 |

1                    P R O C E E D I N G S

2

3              THE CLERK:  All rise.  The United States District

4    Court for the District of Arizona is now in session, the

5    Honorable G. Murray Snow presiding.                              08:34:20

6              THE COURT:  Please be seated.

7              THE CLERK:  Civil case number 07-2513, Melendres v.

8    Arpaio, on for continued evidentiary hearing.

9              THE COURT:  Do we have any matters of business,

10   housekeeping to take up?                                         08:34:34

11             MR. YOUNG:  Nothing from plaintiffs, Your Honor.

12             MS. IAFRATE:  No, Your Honor.

13             MR. WALKER:  Nothing from the County at this time,

14   Your Honor.

15             MR. COMO:  No, Your Honor.                             08:34:49

16             THE COURT:  Please proceed, Mr. Young.

17             MR. YOUNG:  Thank you, Your Honor.

18                    JOSEPH M. ARPAIO,

19   recalled as a witness herein, having been previously duly

20   sworn, was examined and testified further as follows:

21                    DIRECT EXAMINATION

22   BY MR. YOUNG:

23   Q.  Good morning, Sheriff.

24   A.  Good morning.

25   Q.  In the early part of 2012 you believed that illegal          08:34:56

```
 1   immigration was your job, and you continued -- and you intended

 2   to continue to do that job, correct?

 3   A.  Certain functions, yes.

 4   Q.  You focused on illegal immigration because many people

 5   thought it was important, right?                                    08:35:13

 6   A.  I can't hear you.  Could you repeat that?

 7   Q.  You did that because many people thought that illegal

 8   immigration was an important issue, is that right?

 9   A.  That's one of the reasons.  The other reason is to enforce

10   the laws.                                                           08:35:27

11   Q.  You did an interview with Hector Maldonado of Conservative

12   TV Online in April 2012, correct?

13   A.  I don't recall.

14   Q.  Well, I'm going to ask you to take a look at PX --

15   Exhibit 201A.                                                       08:35:47

16   A.  Is that in here?

17         THE COURT:  Do you want it played, Mr. Young?

18         MR. YOUNG:  Yes.  We're having a little trouble with

19   the sound, Your Honor, apologies.

20         (Video clip played as follows:)                              08:36:24

21         SHERIFF ARPAIO:  So I have a job to do, illegal

22   immigration.

23         (Video clip stopped.)

24         MS. IAFRATE:  This is not in evidence.

25         THE COURT:  Yes.  Shall we deal with -- I'm going to         08:36:48
```

```
 1   Q.  Sheriff, at the sheriff's office there's a chain of
 2   command, correct?
 3   A.  Yes.
 4   Q.  And you're the top link in that chain of command?
 5   A.  Yes.                                                    10:54:08
 6   Q.  And you have people that report to you, correct?
 7   A.  Yes.
 8   Q.  Back in 2011, can you tell me which chiefs directly
 9   reported to you?
10   A.  I believe it was Chief Deputy Sheridan.  He was the chief  10:54:27
11   deputy.
12   Q.  And then would he be the only direct report to you, or did
13   others directly report to you?
14   A.  I believe I had the public information officer reporting
15   directly to me.  We do have about 4500 employees, plus 8,500 in  10:54:50
16   the jails that I'm responsible for, but I do it through
17   delegating authority.
18   Q.  There was a group called the Human Smuggling Unit.  Are you
19   familiar with that unit?
20   A.  Yes.                                                    10:55:15
21   Q.  Who was the supervisor of that unit?
22   A.  I believe it was Chief Brian Sands.
23   Q.  Did he directly report to you?
24   A.  No.
25   Q.  In the human -- the Human Smuggling Unit wasn't housed in  10:55:28
```

1  the same building that you were at, correct?

2  A.  No, it was not.

3  Q.  How did you get your information regarding what was

4  occurring with the Human Smuggling Unit?

5  A.  Well, sometimes I would get it from our public information    10:55:55

6  officer that would receive calls on these type of situations,

7  and sometimes I would probably get it from Brian Sands.

8  Q.  Did you ever go out to the Human Smuggling Unit where they

9  were housed?

10  A.  I may have a couple times.    10:56:22

11  Q.  Did you receive briefings from anyone from the Human

12  Smuggling Unit?

13  A.  May have, but I don't recall.

14  Q.  I want to show you what was shown to you in direct

15  examination, Exhibit 78.    10:56:48

16        Sheriff, are you familiar with the different types of

17  duties that occurred at the Human Smuggling Unit?

18  A.  Are you referring to the rank?

19  Q.  No.  For example, what they did.  You -- we've heard about

20  interdictions, correct?    10:57:28

21  A.  Yes.

22  Q.  Traffic stops?

23  A.  Yes.

24  Q.  And then also there were search warrants executed regarding

25  employer ID and identity thefts, correct?    10:57:39

1   A.  Yes.

2   Q.  Those employer search warrants regarding identity thefts,

3   that was another area of the law that you could continue to

4   enforce, correct?

5   A.  Yes.                                          10:57:53

6   Q.  These search warrants, for example, the ID theft raid

7   discussed in this Exhibit 78, that wasn't the result of a

8   traffic stop, correct?

9   A.  No.

10  Q.  Sheriff, when did you become aware that some of your    10:58:37

11  previous actions from MCSO violated the preliminary injunction?

12  A.  I don't have the time frame, but it was, as I say, many,

13  many, many months later.  Could have been before the -- around

14  the time of the -- was it 1913, May 1913?

15  Q.  2013?                                          10:59:11

16  A.  2013.

17  Q.  When the judge issued its findings of fact and conclusions

18  of law?

19  A.  Yes.  And that's the time I sent a newsletter to all the

20  employees regarding the judge's decision.          10:59:27

21  Q.  You're saying that you sent out a newsletter.  Are you

22  talking about some sort of Briefing Board?

23  A.  Yes.

24  Q.  And why did you send out a Briefing Board in May 2013?

25  A.  It had to do with detainment and also using race.  Those   10:59:44

1   are two issues that I wanted to get across to our people.

2   Q.  Well, explain more.  What were you trying to get across to

3   your people in May 2013 regarding --

4   A.  That it should not be done.

5   Q.  That what should not be done?                              11:00:07

6   A.  By using race or detaining people illegally.

7   Q.  You were not familiar with those concepts in the

8   preliminary injunction until May 2013?

9   A.  No.

10  Q.  My statement was accurate?                                 11:00:25

11  A.  Yes.

12  Q.  There came a time where a monitor was appointed, correct?

13  A.  Yes.

14  Q.  Did you express what your involvement with the monitor

15  would be to your organization?                                 11:00:54

16  A.  If I recall, I think the monitor came to my office, I

17  believe it was around January 1914 -- 2014.  We had a nice

18  discussion.  He has a law enforcement background, so we had

19  something in common.

20          And I believe he mentioned that he would rather deal   11:01:17

21  with my staff, realizing that I had a large organization to

22  run, and I said, you know, that's a good idea.  Talk to my

23  staff.  And I believe that's what's been going on ever since.

24  Q.  Since the monitor has been appointed have you done anything

25  to block him from doing his job?                               11:01:47

1   A.  No.

2   Q.  Have you been open and honest with him?

3   A.  Yes.

4   Q.  Have you encouraged your staff to be open and honest with

5   him?                                                           11:01:59

6   A.  Yes.

7   Q.  There was a portion of the 2014 order that called for

8   community outreach.

9        Do you recall that?

10  A.  Yes.                                                       11:02:11

11  Q.  And it was ordered that your office was to do some meetings

12  regarding community outreach.

13       Do you recall that?

14  A.  Yes.

15  Q.  And your lawyers objected to that based on the First       11:02:24

16  Amendment and your First Amendment to either speak or not

17  speak, correct?

18  A.  Yes.

19  Q.  And ultimately the judge rescinded that piece of the order,

20  correct?                                                       11:02:43

21  A.  Yes.

22  Q.  On direct examination you were played an approximately

23  10-second clip in which you talked about community outreach.

24       Do you recall that?

25  A.  Yes.                                                       11:02:57

1   Q.  Although it was a small clip, do you recall what you meant

2   by that statement?

3   A.  Is that the one where I had an officer that was killed?

4   Q.  Yes.  And on the tape, the portion that was played for you

5   talked about community outreach.                                11:03:18

6        Do you recall what you were referring to?

7   A.  I was really occurring -- talking about myself, because

8   whether you want to call it outreach or not, I personally

9   stopped two vehicles with the four Hispanics in each vehicle.

10  They had no problems.  They were very friendly.  Came out,     11:03:48

11  wanted my photograph.  I let them take my pictures.

12       I call that my outreach where I actively got involved,

13  because I was there trying to give support to my deputies to

14  get intelligence on gang members that we believe killed my

15  officer.                                                       11:04:13

16  Q.  Investigating a shooting of one of your officers didn't

17  violate the preliminary injunction, did it?

18  A.  No.

19  Q.  Trying to find who killed that officer didn't violate the

20  preliminary injunction, did it?                                11:04:34

21  A.  No.

22  Q.  Were you involved in any way prior to the original trial in

23  gathering evidence?

24  A.  No.

25  Q.  Did anyone ever ask you to review documents and videos in  11:05:08

1   preparation for the original trial?

2   A.  No.

3   Q.  When a request for documents and/or videos comes into the

4   sheriff's office, where does it normally go?

5   A.  It would -- are you talking about legal documents?          11:05:43

6   Q.  So there's a request that someone in your agency gather

7   documents.  Where would that request go?

8   A.  I presume if it's legal it will go to our legal office.  If

9   it's other situations, it would go to the people responsible

10  for that request, I guess.                                      11:06:06

11  Q.  You don't get involved in the gathering and disseminating

12  of discovery requests?

13  A.  No.

14  Q.  That's up to your legal liaison's office, normally?

15  A.  Yes.                                                        11:06:26

16  Q.  Those are the people that process the paperwork?

17  A.  Yes.

18  Q.  I want to talk to you about the May 2014 hearing that you

19  attended.

20          Do you recall that?                                     11:06:44

21  A.  Yes.

22  Q.  It was a hearing that you attended, and you had interaction

23  with Judge Snow, correct?

24  A.  Yes.

25  Q.  And you all were talking about gathering some videotapes.   11:07:03

1          Do you recall that?

2    A.  Yes.

3    Q.  Do you recall what Judge Snow's directive was of you in

4    relation to gathering those videotapes?

5    A.  Well, if I recall, it was like a two-and-a-half-hour          11:07:18

6    session, but I believe he mentioned something about the

7    monitor, cooperate with the monitor.

8    Q.  Then following that hearing, where did you go?

9    A.  I went back to my office.

10   Q.  And what did you do there?                                   11:07:41

11   A.  Well, eventually we had a meeting, I believe, with the

12   chief deputy, counsel Tom Liddy and Tim Casey, and I believe

13   there was another lawyer in the room.

14   Q.  Christine Stutz?

15   A.  Yes.                                                         11:08:05

16   Q.  At some point we heard Chief Trombi say that he was

17   summoned into the room.

18          Do you recall that?

19   A.  Yes.

20   Q.  And he was told to send out an e-mail.                       11:08:16

21          Do you recall that?

22   A.  Yes.

23   Q.  You weren't the one that told him to send out an e-mail,

24   correct?

25   A.  I did not.                                                   11:08:23

1   Q.  Chief Sheridan told him to send out the e-mail?

2   A.  I believe he did.

3   Q.  Did anyone in the room object to that directive?

4   A.  No.

5   Q.  Not even counsel?                                    11:08:34

6   A.  No.

7   Q.  Do you know what happened as a result of that e-mail that

8   was sent out by Chief Trombi?

9   A.  You mean after the fact?

10  Q.  Yes.                                                 11:09:12

11  A.  Well, I don't directly know, but I believe they were trying

12  to obtain videos.

13  Q.  Do you know if videos were obtained?

14  A.  I believe they were.

15  Q.  Sheriff, on direct examination you were asked do you think  11:09:25

16  there should be consequences for your actions.

17       Do you recall that?

18  A.  Yes.

19       MS. IAFRATE:  And in fact, can you put up 71, page 2.

20  BY MS. IAFRATE:                                          11:10:11

21  Q.  This was the document that we started your testimony with.

22  In fact, in this document that was filed, with your permission

23  and your consent, says, on the second line, that there are

24  consequences for these violations, correct?

25  A.  What number --                                       11:10:32

1    Q.  It's the --

2    A.  -- paragraph?

3    Q.  -- first full sentence.

4    A.  Yes.

5    Q.  You admit that there should be consequences, correct?          11:10:44

6    A.  Yes.

7    Q.  Sheriff, you weren't hiding that the Human Smuggling Unit

8    continued to do interdictions, correct?

9    A.  Hiding?

10   Q.  Right.                                                          11:11:04

11   A.  No.

12   Q.  You weren't -- you weren't -- you were continuing to talk

13   about it to the press, correct?

14   A.  Yes.

15   Q.  The Human Smuggling Unit continued to generate paperwork as    11:11:12

16   a result of their operations, correct?

17   A.  Yes.

18   Q.  You didn't direct anyone not to talk about it, correct?

19   A.  No.

20   Q.  With all this press releases and documents that were           11:11:31

21   generated, were you willfully violating the Court's order, the

22   preliminary injunction?

23   A.  No.

24   Q.  Were you knowingly violating the Court's preliminary

25   injunction?                                                        11:11:48

1    A.  No.

2    Q.  There is a statement that was read to you that said, "If I

3    had to do it all over again under the same circumstances, I'd

4    do it again."  Do you recall that?

5    A.  Yes.                                                    11:12:04

6    Q.  What did you mean by that?

7    A.  I believe it had to do with an operation in Guadalupe,

8    could have been 2008.  Had information about violence, so we

9    did a crime suppression operation.

10        In the meantime, we had the authority under 287(g) to    11:12:26

11   enforce that type of law.  We had two top officials from

12   Washington there doing this operation.  We arrested about 45

13   people for different types of crimes, and six or seven were

14   here illegally that were booked in for those state charges, and

15   I believe two others we did not have any state law, so they     11:13:02

16   were turned over to ICE pursuant to our 287(g) authority.

17        But that operation had to do with violent crime --

18   Q.  So --

19   A.  -- and when the news media asked me I did say, I may have

20   been wrong, but I was talking about in that same circumstance    11:13:27

21   way back in those years where we had the authority, or we

22   always had the authority to go after those that commit crimes,

23   that I would have done it over again.

24   Q.  In 2008 you had the authority to do what you did pursuant

25   to the laws, correct?                                          11:13:48

1   A.  Yes.

2   Q.  Okay.  So now, knowing what you know regarding the

3   preliminary injunction, knowing what you know now, would you

4   have done the exact same things, activities, from 2011 to 2013

5   that your Maricopa County Sheriff's Office was conducting                    11:14:08

6   interdictions and either holding people or turning them over to

7   ICE or Border Patrol?

8   A.  We still would do the crime operations, but as far as that

9   part of it is yes, you're right, we would not do it now.

10  Q.  You wouldn't do it the same.                                            11:14:29

11  A.  No.

12  Q.  You know that that violates the preliminary injunction?

13  A.  Yes.

14          MS. IAFRATE:  I have nothing further.

15          THE COURT:  Mr. Walker.                                             11:14:44

16          MR. WALKER:  Your Honor, I was up to the wee hours of

17  this morning and came to the conclu- -- two conclusions.

18  Number one, that it just was not possible for me to prepare

19  competently to examine this witness at this time.  And I've

20  spoken to all counsel.  I'd like to take the Court up on its                11:15:02

21  offer to be able to recall the witness and potentially take his

22  deposition in the interim.

23          THE COURT:  Well, Mr. Walker, I -- I think that I will

24  at least allow you to make that request.  I'm not going to rule

25  on it now.  And the reason why is, as I think I've indicated               11:15:25

```
 1                           EXAMINATION

 2   BY THE COURT:

 3   Q.  I do appreciate that you have indicated that you have

 4   respect for the federal court and for judges.  I assume that I

 5   was intended to be included among that group when you said it?    11:30:26

 6   A.  Yes, sir.

 7   Q.  I want you to know that while we have disagreements, and I

 8   think some sharp ones in the past, I respect you in your

 9   position as the sheriff of Maricopa County, and recognize that

10   you have been elected by the people of this county and I want     11:30:41

11   to afford you that same respect.

12          So I'm going to have some questions, some of them may

13   be difficult to answer, and I'm going to certainly let your

14   attorneys participate if they have concerns, but I'm going to

15   try to ask you my questions with respect, and I hope you'll       11:31:01

16   afford me the same in response.

17   A.  Yes, sir.

18   Q.  Now, we began by discussing -- or you began your

19   testimony -- I can't even remember whether it was this morning

20   or last night -- by discussing the scope of the matters that     11:31:15

21   you had -- in which you admit that you're in civil contempt.

22   And there were actually three matters that I specified in my

23   order to show cause.

24          Do you remember those?  Do you remember what they

25   were?  Three separate matters that related to civil contempt.    11:31:30
```

1   Q.  Was that under the SID, Special Investigations Division?

2   A.  I'm not sure.

3   Q.  Does the Special Investigations Division do investigations

4   with confidential informants?  Are they -- do they handle

5   confidential informants?                                          11:53:00

6   A.  Yes.

7   Q.  And does the captain of SID have to approve investigations

8   involving confidential informants in terms of payments to them?

9   A.  Your Honor, I don't know how far down it goes for that

10  authority, whether it's a lieutenant or the captain or deputy    11:53:17

11  chief.

12  Q.  Okay.  But somebody in the SID has to approve payments that

13  are made to confidential informants?

14  A.  Yes.

15  Q.  Are there any exceptions to that policy?                      11:53:30

16  A.  I'm not sure.

17  Q.  Well, do you remember that right at the time -- and it was,

18  as I recollect, in June of 2014 -- that you named

19  Captain Bailey to become captain over the Professional

20  Standards Bureau instead of the Special Investigations           11:53:50

21  Division, that there was a newspaper article, maybe a blog,

22  that was published by somebody named Stephen Lemons?

23  A.  I know who he is.

24  Q.  Do you usually read the articles that he writes about you?

25  A.  Once in a while, yes.                                         11:54:08

```
 1   Q.  Do you remember him writing about investigations that he
 2   had sources were telling him your office was doing out of
 3   Seattle involving confidential informants?
 4   A.  He may -- I may remember that, yes.
 5   Q.  Let me just give you -- I've copied the article.  Let me          11:54:26
 6   give it to you and see if it helps to refresh your recollection
 7   that you've read it.
 8           Do you want to distribute that?
 9           (Off-the-record discussion between the Court and the
10   clerk.)                                                              11:54:57
11           THE COURT:  Hand it to the attorneys.
12           THE WITNESS:  It's a long article.
13   BY THE COURT:
14   Q.  It is a long article, and if you need to take the time to
15   read it, you can do that.  But I'm just asking if you have any       11:55:44
16   recollection, now having me give it to you, if you ever read
17   it.
18           I will tell you that in the article he says he talked
19   to you about some of the materials in the article, and that's
20   kind of on the last page, if that will help you.                    11:56:01
21           (Pause in proceedings.)
22   BY THE COURT:
23   Q.  Do you remember reading this article?
24   A.  I believe I read it.
25   Q.  And I just want to ask you some questions about the article     11:56:53
```

```
 1   and some of the things that it states.

 2          I recognize, and I believe Mr. Lemons does in the

 3   article, too, that he can't personally vouch for everything

 4   that the article says, it's just what he's had some sources

 5   tell him.                                                         11:57:10

 6          So I don't mean to suggest one way or another that the

 7   article is accurate.  I just want to ask about some of the

 8   things that it says so I understand them.  And I trust that

 9   you'll tell me the truth, and you understand you're under oath,

10   correct?                                                         11:57:24

11          Did you detail some of your personnel to conduct

12   investigations that resulted in their frequent trips and stays

13   in the Washington state area beginning in 2013 or 2014?

14   A.  We had a couple investigations -- investigators go up

15   there, yes.                                                      11:57:40

16   Q.  And who were those investigators?

17   A.  I think it was Zullo and Brian Mackiewicz.

18   Q.  And Mackiewicz is --

19   A.  A detective.

20   Q.  Is he in your -- is he assigned to you personally, your    11:57:52

21   risk detail?

22   A.  Well, we had a lot of threats on me and --

23   Q.  I understand that.  Is that generally his assignment, to

24   protect you and assess risks that come against you?

25   A.  Yes.                                                        11:58:09
```

 1   Q.  And so you were aware when he was gone to the Seattle area?

 2   A.  Yes.

 3   Q.  And what about -- I think there's a Mr. Anglin mentioned in

 4   the article.  Was he also an officer that was assigned to go to

 5   Seattle as well?                                          11:58:23

 6   A.  I think for a short period of time he did.

 7   Q.  And is zoo -- did you say Zulu?  Zullo.  Is he a posse

 8   member?

 9   A.  Yes.

10   Q.  And did you pay funds from Maricopa County for Mr. Zullo to   11:58:33

11   go to the Washington area?

12   A.  Yes.

13   Q.  And then I assume you paid Anglin and Mackiewicz their

14   travel costs?

15   A.  We don't pay for Zullo, but --                        11:58:47

16   Q.  But you paid Mackiewicz and Anglin.

17   A.  Yes.

18   Q.  And did you also hire a consultant in the Washington state

19   area to help you with this investigation or investigations that

20   Mackiewicz and Zullo were working with?                   11:59:02

21   A.  Not that I know of.  May have.

22   Q.  Did you have a confidential informant in the Washington

23   area that they were working with?

24   A.  Yes.

25   Q.  And does the article accurately identify who that         11:59:12

 1  confidential informant was?

 2      It says the name is Dennis Montgomery.  Is that the

 3  confidential informant?

 4  A.  Yes.

 5  Q.  And so when Mr. Montgomery was a confidential informant, he    11:59:38

 6  was some sort of a computer consultant?

 7  A.  Yes.

 8  Q.  And as a confidential informant, his fees would have to be

 9  paid, or approved, if in fact it was before the transfer of

10  Captain Bailey, his fees would have had to have been approved    11:59:57

11  by Captain Bailey, or any payments to him would have had to

12  have been approved by Captain Bailey?

13  A.  I'm not sure at the time period, Your Honor.

14  Q.  Now, the article says that you were personally conducting

15  these investigations and personally aware of them.    12:00:14

16      Were you?

17  A.  Well, on a certain issue I was.

18  Q.  And what issue was that?

19  A.  It was the president's birth certificate.

20  Q.  Okay.  So you were -- Mr. Montgomery was doing research    12:00:25

21  into the president's birth certificate.  Did Mr. Montgomery

22  ever tell you -- or, well, did you ever use Mr. Montgomery to

23  investigate anything about the Department of Justice?

24  A.  I don't believe that Montgomery was involved in the birth

25  certificate.  It was other violations that he was looking into.    12:00:46

```
 1   Q.  And what were those?

 2   A.  Had to do with computer tampering and also bank fraud, that

 3   type of thing.

 4   Q.  Did you ever -- you see that the article says that what

 5   Montgomery was actually doing was investigating me.          12:01:12

 6          You see that that's what the article says?

 7   A.  It's not true.

 8   Q.  All right.  Are you aware that I've ever been investigated

 9   by anyone?

10   A.  You investigated?                                        12:01:24

11   Q.  Yes.

12   A.  No.  No.

13   Q.  Any of my activities?

14   A.  No.

15   Q.  Any of my family members?                                12:01:31

16   A.  That have been investigated?

17   Q.  Yes.

18   A.  Not by our office.

19   Q.  Are you aware of anybody who's investigated any of my

20   family members by any -- any office.  Or anybody.            12:01:52

21   A.  I believe there was an issue, but once again, it wasn't my

22   office.

23   Q.  Well, whose office was it?

24   A.  It was an outside investigator not hired by us.

25   Q.  Who hired the outside investigator?                      12:02:12
```

1   A.  Could have been counsel.

2   Q.  "Counsel" meaning your counsel?

3   A.  Yes.

4   Q.  And would that have been Mr. Casey or Ms. Iafrate?

5   A.  I believe it would have been Mr. Casey.          12:02:30

6   Q.  And who did he hire?

7   A.  It was the counsel.

8   Q.  I'm sorry?

9   A.  Mr. Casey.

10  Q.  Mr. Casey.  Who did Mr. Casey hire?              12:02:42

11  A.  Pardon?

12  Q.  Who did Mr. Casey hire?  To investigate me or a member of

13  my family, or members of my family.

14  A.  We weren't investigating you, Your Honor.

15  Q.  Well, who were you investigating?               12:02:56

16  A.  We were investigating some comments that came to our

17  attention.

18  Q.  Okay.  And how did they come to your attention?

19  A.  Through e-mail.

20  Q.  And do you know who the author of the e-mail was?  12:03:10

21  A.  I don't have the name right now.

22  Q.  Okay.  Let me ask, in his article Mr. Lemons indicates --

23  well, let me get -- let me get this clear.  Your testimony is

24  that Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, never were involved

25  in any investigation of the Department of Justice or of me, is  12:03:33

1  that correct?

2  A.  Not -- no, not of you.

3  Q.  Well, were they involved in an investigation of the

4  Department of Justice?

5  A.  I'm not sure.                                        12:03:55

6  Q.  Were they trying to determine whether the Department of

7  Justice had contacted me in any way?

8  A.  I'm not sure about that.

9  Q.  You're not sure about that?

10 A.  No.                                                  12:04:09

11 Q.  And would Mr. Montgomery have been involved in assisting

12 them to determine whether the Department of Justice had

13 contacted me in any way?

14 A.  No.  I believe there was information about many judges

15 being infiltrated or wiretaps and that type of thing.  That's  12:04:29

16 what the informer said that right now we don't have much

17 confidence in.

18 Q.  Well, who was the informer and what did the informer say?

19 A.  We're speaking about Montgomery.

20 Q.  All right.  Montgomery said that judges had been        12:04:50

21 infiltrated?

22 A.  That many judges -- if I recall, that they're wire -- their

23 phones were tapped, e-mails, that type of thing.

24 Q.  By the Department of Justice?

25 A.  By someone.                                           12:05:08

```
 1   Q.  And so Mr. Montgomery proposed to -- who did he propose to

 2   at the MCSO that the DOJ was inappropriately --

 3              I assume it was of interest to you if they were

 4   wiretapping my phone, among others?

 5   A.  Yes.  And mine, too.                                         12:05:33

 6   Q.  And yours, too.

 7              And so were you conducting this investigation?

 8   A.  No.

 9   Q.  Who was in your department?

10   A.  This is Zullo and I think Mackiewicz.                        12:05:40

11   Q.  What rank does Mackiewicz have?

12   A.  He's a detective.

13   Q.  Who did he report to about this investigation?

14   A.  I think he and Zullo worked together.

15   Q.  And who did they report to?                                  12:05:52

16   A.  And Jerry Sheridan.

17   Q.  They reported to Deputy Chief Sheridan?

18   A.  At one time, but let me just say that the information

19   we're -- we've been getting is the informer's not very viable.

20   Q.  Well, I understand that, I think the article itself says,    12:06:11

21   that you became aware after a considerable amount of time that

22   the reporter was giving you junk.  Is that fair to say?

23   A.  Yes.

24   Q.  Or the informer was giving you junk?

25   A.  Yes.                                                         12:06:24
```

1    Q.  How much money did you spend on the informant?

2    A.  I don't recall.

3    Q.  How much money did you spend on the investigation?

4    A.  I don't have the figures.

5    Q.  Do you -- does the -- I guess I want to straighten some      12:06:35

6    things out to make sure that I understand them.

7            It's typical that confidential informants get control

8    numbers?

9    A.  I believe so.

10   Q.  And that they are maintained in a confidential informant     12:06:56

11   log and monitored by the Special Investigations Division

12   commander or his designee?

13   A.  I believe so.

14   Q.  And that for the time that this matter was going to be

15   investigated, or was being investigated, that would have been    12:07:14

16   Captain Bailey, correct?

17   A.  I'm still not sure on the time -- time frame, or whether he

18   knew about it.

19   Q.  Well, I will tell you that the article suggests that the

20   investigation began in October of 2013.  And Mr. Lemons, in the  12:07:29

21   article, says that as of January 2015 he kept making document

22   requests to the MCSO, and the MCSO continued to say this is an

23   ongoing investigation, we're not going to give you anything.

24           So is this investigation still ongoing, or have you

25   determined pretty much that the informant was unreliable and     12:07:51

1   it's not worth proceeding?

2   A.  Well, it's almost finished.

3   Q.  I'm sorry?

4   A.  It's almost finished on -- especially on his reliability.

5   Q.  All right.  Are you investigating him now?                    12:08:06

6   A.  I'm not sure.

7   Q.  Well, I want to understand exactly what it is that

8   Mr. Mont -- your understanding of what it is that

9   Mr. Montgomery told you DOJ was doing that you were

10  investigating.                                                    12:08:23

11  A.  Once again, he seemed to indicate that someone was

12  penetrating in the e-mails of our local attorneys and others,

13  judges, that type of thing, which we can't prove.

14  Q.  All right.  And was I one of those judges?

15  A.  I think you were one of the judges.                           12:08:50

16  Q.  And were you concerned then that that might be affecting my

17  judgment or neutrality in this lawsuit?

18  A.  No.

19  Q.  Who else was named by Mr. Montgomery as being targets of

20  this DOJ investigation?                                           12:09:08

21  A.  I believe the -- our local law firm, the attorneys working

22  for us on the Department of Justice lawsuit.

23  Q.  Who else?

24  A.  You mean other judges around -- I don't remember.

25  Q.  Anybody that Mr. Montgomery said that -- that the DOJ was   12:09:34

1  bugging their phones, or otherwise intruding into their private

2  communications.

3  A.  Well, I know I was.

4  Q.  You were one.  Your law firm was one.

5  A.  Jerry Sheridan, I believe.  And there's other local          12:09:53

6  officials.

7  Q.  And I was?

8  A.  You -- yes.

9  Q.  Did you keep any of the materials that Mr. Montgomery has

10  provided you?                                                    12:10:03

11  A.  I don't have them.

12  Q.  Who does?

13  A.  I believe Zullo does.

14  Q.  And is he subject to your control --

15  A.  Yes.                                                         12:10:13

16  Q.  -- as a member of your posse?

17  A.  Yes.

18  Q.  I'm going to direct you that you tell Mr. Zullo that he

19  keep all those documents.  All right?

20  A.  He what?                                                     12:10:22

21  Q.  He keep and maintain all of those documents.

22  A.  Yes.

23  Q.  I'm going to direct you that nothing pertaining to any of

24  this investigation be destroyed, including confidential

25  informant numbers.                                               12:10:32

1      Do you understand that direction?

2  A.  Yes.

3  Q.  Who else was aware of these investigations within the MCSO?

4  A.  I'm not sure.  Because of the sensitivity, we were trying

5  to keep it quiet.                                          12:10:51

6  Q.  Now, I think in addition to the investigation that may have

7  involved me and my phone or any contact or tapping by the

8  Department of Justice, you indicated that there were

9  investigations made into members of my family.

10      Did you indicate that?                               12:11:08

11  A.  That had nothing to do with Montgomery.

12  Q.  What did it have to do with?

13  A.  I believe there was a, as I say, e-mail that came to me.

14  Q.  And do you still have that e-mail?

15  A.  We may have it, yes.                                  12:11:28

16  Q.  I'm going to direct you to keep that e-mail.

17      What did the e-mail say, to the best of your

18  recollection?

19  A.  I think it mentioned that Judge Snow wanted to do

20  everything to make sure I'm not elected.                  12:11:43

21  Q.  Do you recall who the author of that e-mail was?

22  A.  I believe it was someone named Grissom.

23  Q.  Grissom?

24  A.  Grissom.

25  Q.  Okay.  And how did this person purport to know that?    12:12:02

```
 1   A.  The person met your wife in a restaurant, and she's the one
 2   that made those comments.
 3   Q.  According to whatever Mr. Grissom said.
 4   A.  There was other witnesses, yes.
 5   Q.  Okay.  And so you turned that over to your counsel and        12:12:28
 6   counsel hired a private investigator, and what did the
 7   investigator do?
 8   A.  He investigated it.
 9   Q.  And what was the result of the investigation?
10   A.  Results were that he confirmed that your wife was in that     12:12:37
11   restaurant and con -- I guess talked to the witnesses, three or
12   four, that confirm that remark was made.
13   Q.  All right.  And do you have any materials pertaining to
14   that investigation?
15   A.  We should have.                                               12:12:59
16   Q.  Okay.  Will you save those as well?
17   A.  Yes.
18   Q.  All right.  Thank you.
19        Who has told you that the information that
20   Mr. Montgomery provide -- or how is it that you've come to        12:13:08
21   conclude that the information you were getting from
22   Mr. Montgomery is not reliable?
23   A.  I think the investigators, as time progressed, figured that
24   he may not be reliable.
25   Q.  Did the MCSO also purchase computer equipment for             12:13:24
```

1    Mr. Montgomery or for the investigation?

2    A.  That's possible.

3    Q.  Well, I'm going to direct you, to the extent that any of

4    this material is in your control, that it be maintained.

5         Do you understand that direction?                      12:13:45

6    A.  Yes.

7    Q.  Would Captain Bailey have been involved in any of these

8    investigations?

9    A.  I don't believe so.

10   Q.  But if he was the commander of Special Investigations   12:13:56

11   Division, he would have been aware of the investigations?

12   A.  I'm not sure.

13   Q.  The commander of the Special Investigations Division would

14   have to sign off on payments made to confidential informants?

15   A.  Yes, normally.                                          12:14:14

16   Q.  And would they have to sign off on payments made for

17   investigations in which confidential informants were involved?

18   A.  I'm not sure if he would do it, or a lieutenant, or who

19   would do that.

20   Q.  Who is currently the director of the Special Investigations  12:14:34

21   Division?  Or the commander or the captain.

22   A.  I can't re -- I can't remember his name.  It's an Italian

23   name, but -- I know that Trombi is the top guy in charge of all

24   these elements.

25   Q.  Will you make sure that everybody in your division that has  12:15:09

```
 1   anything to do with any of this maintains all these records?

 2   A.  Yes.

 3           THE COURT:  I think, Sheriff, for the time being,

 4   those are my questions.  It's probably time for us to break for

 5   lunch, so could you be back in an hour?  We'll have an hour        12:16:07

 6   lunch break.

 7           THE WITNESS:  Yes, sir.

 8           THE COURT:  I appreciate your answers.

 9           THE WITNESS:  Thank you.

10           (Lunch recess taken.)                                      12:16:16

11           THE CLERK:  All rise.  Court is now in session.

12           THE COURT:  Thank you.  Please be seated.

13           You ready to proceed?

14           MS. WANG:  Yes, Your Honor.

15           THE COURT:  Sheriff, I just wanted to --                   13:23:01

16           Oh, I'm sorry.

17           MS. IAFRATE:  Yes, Your Honor.

18           THE COURT:  I just wanted to reiterate some of the

19   things I said during my questioning of you to make sure

20   everybody was clear.  I was told over lunch that posse funds      13:23:11

21   like Mr. Zullo -- Mr. Zullo's the head of one of your posses.

22           THE WITNESS:  Yes.

23           THE COURT:  Is it the Cold Case posse?

24           THE WITNESS:  Yes.

25           THE COURT:  I was told that you also have various          13:23:23
```

1   sources of funding within the MCSO, like the Cold Case posse

2   has its own funds.  Is that possible?

3           THE WITNESS:  No.

4           THE COURT:  Okay.  Do you know what the possible

5   funding sources were for the investigations that were related    13:23:34

6   to the Seattle operation?

7           When I say "operation," I mean the one involving

8   Mr. Montgomery and the investigations with Brian Mackiewicz and

9   Mr. Anglin.

10          THE WITNESS:  I'm not sure if it was our RICO, which    13:24:00

11  is drugs seized -- I mean moneys seized from drug peddlers, or

12  our general funds.

13          THE COURT:  Were there other possible funds that might

14  be involved that fund various like, for example, the Cold Case

15  posse?                                                           13:24:14

16          THE WITNESS:  They're independent 501(c) --

17          THE COURT:  501(c)(3).

18          THE WITNESS:  -- and they raise their own money.

19          THE COURT:  All right.  And you don't have any control

20  over those funds?                                                13:24:24

21          THE WITNESS:  No.

22          THE COURT:  What about asset forfeiture funds, would

23  any asset forfeiture funds have been involved in funding this

24  operation?

25          THE WITNESS:  I don't know where their funding came    13:24:35

 1    from.

 2         THE COURT:  Well, the point is this, and I think I

 3    made it clear, but I just want to make sure that I've made it

 4    clear, to the extent that you have any control over any funding

 5    records, over any reports, over any communications, over any          13:24:45

 6    overtime records, travel documentation, any e-mails of any and

 7    all people involved in the threat assessment unit or anywhere

 8    else, any communications from and to Montgomery, any computers

 9    or phones, cell phones or other information that in any way is

10    relevant or related to this investigation, I want you to direct       13:25:18

11    your people to put a hold on it immediately and preserve it.

12    And that includes any documentation or numbers that would

13    relate to Mr. Montgomery's confidential status.

14         You understand that?

15         THE WITNESS:  Your Honor, are you referring to this             13:25:39

16    investigation with the monitors and --

17         THE COURT:  No, no.  I'm referring to the

18    investigation that Mr. Montgomery was undertaking with

19    Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, anybody else from your

20    staff, anybody else from the MCSO, or anyone else from the           13:26:00

21    posse.  I want all records that in any way relate to it, all

22    electronic data or anything else, or the financing, funding of

23    that operation, all phone records, e-mails, reports, I want it

24    all preserved.

25         And I think I will send the monitor to begin taking             13:26:18

```
1    possession of those records and we'll do it confidentially,

2    imminently.  But I don't want in the interim any of those

3    records lost, inadvertently or otherwise.

4             You understand what I'm saying?

5             THE WITNESS:  Yes.                                   13:26:32

6             THE COURT:  And you'll so direct your people?

7             THE WITNESS:  Yes.

8             THE COURT:  All right.  Thank you, sir.

9             Mr. Young?

10            MR. YOUNG:  No further questions, Your Honor.        13:26:39

11            THE COURT:  Ms. Iafrate?

12            MS. IAFRATE:  Nothing, Your Honor.

13            MR. WALKER:  Subject to my earlier reservation,

14   nothing, Your Honor.

15            MR. COMO:  I have no questions, Your Honor.          13:26:47

16            THE COURT:  You may step down, Sheriff.  Thank you.

17            Next witness.

18            MS. WANG:  Your Honor, plaintiffs call Joseph Sousa.

19            THE CLERK:  Can you please state and spell your first

20   and last name for the record.                                13:27:18

21            THE WITNESS:  Joseph Sousa, J-o-s-e-p-h, S-o-u-s-a.

22            (Joseph Sousa was duly sworn as a witness.)

23            THE CLERK:  Can you please take our witness stand.

24            THE COURT:  Please, Ms. Wang.

25            MS. WANG:  Thank you, Your Honor.                    13:28:03
```

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

MANUEL de JESUS ORTEGA MELENDRES, et. al.

Plaintiff(s)/Petitioner(s),

vs.

JOSEPH M. ARPAIO, et. al.

Defendant(s)/Respondent(s)

CASE NO: CV-07-2513-PHX-GMS

**Application of Attorney For Admission To Practice Pro Hac Vice Pursuant to LRCiv 83.1(b)(2)**

### NOTICE: $35.00 APPLICATION FEE REQUIRED!

I, _Jonathon Alden Moseley_, hereby apply to the Court under LRCiv 83.1(b)(2) for pro hac vice admission to appear and practice in this action on behalf of _Dennis L. Montgomery, witness and proposed intervenor_

City and State of Principal Residence: Lake Placid, Florida, temporarily working in Springfield, Virginia

Firm Name: Freedom Watch, Inc.

Address: 2020 Pennsylvania Ave, N.W., Suite 345                Suite: 15-287

City: Washington               State: D.C.     Zip: 20006

Firm/Business Phone: ( 310 ) 595-0800

Firm Fax Phone: ( 703 ) 788-0449          E-mail Address: Contact@JonMoseley.com

I am admitted to practice before the following courts. (attach additional sheets if necessary)

| TITLE OF COURT | DATE OF ADMISSION | IN GOOD STANDING? |
|---|---|---|
| Supreme Court of Virginia, including all Virginia courts | 06/01/1997 | ☑Yes ☐No* |
| U.S. District Court for the Eastern District of Virginia | 08/20/2010 | ☑Yes ☐No* |
|  |  | ☐Yes ☐No* |

* Explain:

(An **Original** Certificate of Good Standing from a **FEDERAL BAR** in which an applicant has been admitted dated no more than 45 days prior to submission of this application is required.)

I have concurrently, or within 1 year of this application, made *pro hac vice* applications to this Court in the following actions (attach additional sheets if necessary):

| Case Number | Title of Action | Date Granted or Denied* |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

* Explain:

### ALL APPLICANTS ARE REQUIRED TO ANSWER THE FOLLOWING QUESTIONS.

*If you answer YES to either of the following questions, please explain all circumstances on a separate page.*

Are you currently the subject of a disciplinary investigation or proceeding by any Bar or Court?   ☐Yes ☑No

Have you ever been disbarred from practice in any Court? Suspended, see attchd   ☐Yes ☑No

I declare under penalty of perjury that the foregoing is true and correct; that I am not a resident of, nor paid regularly employed, engaged in business, professional or other activities in the State of Arizona; and that I am not currently suspended, disbarred or subject to disciplinary proceedings in any court. I certify that I have read and will ascribe to the Standards for Professional Conduct, will comply with the Rules of Practice of the United States District Court for the District of Arizona ("Local Rules"), and will subscribe to receive court notices as required by LRCiv 83.1(e).

Jonathan A. Moseley

Date May 2, 2015          Signature of Applicant

Fee Receipt #

(Rev. 04/12)

UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

## Motion and Order for Admission *Pro Hac Vice*

| Division | Brownsville | Case Number | Case No. 1:14-cv-254 |
|----------|-------------|-------------|----------------------|

STATE OF TEXAS, et al.

*versus*

UNITED STATES OF AMERICA, et al.

United States District Court
Southern District of Texas
FILED

JAN 1 5 2015

David J. Bradley, Clerk of Court

| Lawyer's Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone & Email<br>Licensed: State & Number<br>Federal Bar & Number | Jonathon A. Moseley, Esq.<br>Freedom Watch, Inc.<br>2020 Pennsylvania Avenue N.W., Suite 345<br>Washington, D.C. 20006<br>Virginia State Bar #41058<br>U.S. District Court for the Eastern District of Virginia |
|---|---|

| Name of party applicant seeks to appear for: | Amicus Curiae, Sheriff Joe Arpaio |
|---|---|

Has applicant been sanctioned by any bar association or court? Yes ✓ No _____

On a separate sheet for each sanction, please supply the full particulars.

| Dated: 1/14/2015 | Signed: *[signature]* |
|---|---|

The state bar reports that the applicant's status is: *Active*

| Dated: 1-15-15 | Clerk's signature *Sarah Bejarano* |
|---|---|

United States District Court
Southern District of Texas
ENTERED

JAN 1 6 2015

David J. Bradley, Clerk of Court

| Order | This lawyer is admitted *pro hac vice*. |
|---|---|

Dated: 1/16/15

*[signature]*

United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

## JAN 2 1 2015

David J. Bradley, Clerk of Court

**STATE OF TEXAS,** *et al.*

                              Plaintiffs,

              v.

**UNITED STATES OF AMERICA, et al.**

                              Defendants

Case No. 1:14-cv-254

---

## ORDER GRANTING MOTION FOR LEAVE TO PARTICIPATE AS
## *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS BY SHERIFF JOE ARPAIO

Before the Court is a Motion for Leave to Participate as *Amicus Curiae* in Support of

Plaintiffs by Sheriff Joe Arpaio, elected Sheriff of Maricopa County, Arizona.

The Court hereby grants leave for the aforementioned movant to participate as *Amicus

Curiae* and file a brief in support of Plaintiffs' motion for a preliminary injunction which the

Court may consider in assisting the Court evaluating the issues in the case.

Signed this 21st day of J_____, 2015.

_____
Hon. Andrew S. Hanen
United States District Judge

Exhibit 3

1  Jonathon A. Moseley
   Freedom Watch, Inc.
2  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
3  (310) 595-0800
   leklayman@gmail.com
4  Attorney for Intervenors

5  *(Pro hac vice pending)*

6  Larry Klayman
   Freedom Watch, Inc.
7  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
8  (310) 595-0800
   leklayman@gmail.com
9  Attorney for Intervenor

10 Of Counsel

FILED _____ LODGED
_____ RECEIVED _____ COPY

MAY 0 7 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

MANUEL de JESUS ORTEGA MELENDRES, on
behalf of himself and all others similarly
situated; *et al.*

Plaintiff,

v.

JOSEPH M. ARPAIO, in his individual
And official capacity as Sheriff of Maricopa
County, Arizona; *et al.*

Defendants.

DENNIS L. MONTGOMERY

Intervenor.

Civil Action No.
CV-07-2513-PHX-GMS

### DENNIS L. MONTGOMERY'S MOTION FOR INTERVENTION OF RIGHT

Pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 24(a)(2) Dennis L.

Montgomery hereby moves to intervene as of right in order, as further explained in his companion

Memorandum of Law and also his proposed motions.

- 1 -

Dennis Montgomery intervenes to demand a return of his documents, records, work product and proprietary interests; to move to strike false information about him from the record, which is also irrelevant to the proceedings, to disqualify the Honorable Murray Snow and file a demand for the immediate transfer of the case to a different judge pursuant to 28 U.S. Code § 144, and to move for a halt to the inquiry.

Dated: May 7, 2015

Respectfully submitted,
Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Of Counsel
*(Pro Hac Vice Application Pending)*

Jonathon Moseley, Esq.

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff
*(Pro Hac Vice Application Filed)*

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that on May 7, 2015, I served this document by U.S. Mail to:

3    Honorable John Z. Boyle
     United States District Courthouse
4    Sandra Day O'Connor U.S. Courthouse, Suite 322
     401 West Washington Street, SPC 75
5    Phoenix, AZ 85003-2160

6
     Honorable G. Murray Snow
7    United States District Courthouse
     Sandra Day O'Connor U.S. Courthouse, Suite 322
8    401 West Washington Street, SPC 75
     Phoenix, AZ 85003-2160
9

10   Stanley Young, Esq.
     Andrew Carl Byrnes, Esq.
11   COVINGTON & BURLING, LLP
     333 Twin Dolphin Road
12   Redwood Shores, CA 94065
13   *Attorneys for Plaintiffs*

14   Daniel Pochoda, Esq.
     ACLU FOUNDATION OF ARIZONA
15   3707 N. 7th Street, Suite 235
     Phoenix, AZ 85014
16   *Attorney for Plaintiffs*

17
     Cecilia D. Wang
18   ACLU FOUNDATION
     IMMIGRANTS' RIGHTS PROJECT
19   39 Drumm Street
     San Francisco, CA 94111
20   cwang@aclu.org
21   *Attorney for Plaintiff Melendres*

22   Thomas P. Liddy, Esq.
     CIVIL SERVICES DIVISION
23   MARICOPA COUNTY ATTORNEY'S OFFICE
     222 North Central Avenue, Suite 1100
24   Phoenix, AZ 85005
25   liddyt@mcao.maricopa.gov
     *Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*
26
     Michele M. Iafrate, Esq.
27   IAFRATE & ASSOCIATES

28

649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

Melvin McDonald
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, AZ 85012-2728
mmcdonald@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, NY 10004
*Attorney for Plaintiffs*

Anne Lai
UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, CA 92616

Jorge M. Castillo
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
*Attorney for Plaintiffs*

Richard K. Walker
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
Attorney for Defendant Maricopa County

Jonathon Moseley, Esq.

- 4 -

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

*(Pro Hac Vice Application Filed)*

Jonathon A. Moseley
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Intervenors

*(Pro hac vice pending)*

Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Intervenor

Of Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MANUEL de JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated; *et al.*<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH M. ARPAIO, in his individual And official capacity as Sheriff of Maricopa County, Arizona; *et al.*<br><br>Defendants.<br><br>DENNIS L. MONTGOMERY<br><br>Intervenors. | Civil Action No.<br>CV-07-2513-PHX-GMS |

## INTERVENOR DENNIS L. MONTGOMERY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR INTERVENTION OF RIGHT

**I.   INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 24(a)(2) Dennis L.

Montgomery hereby moves to intervene as of right in order to protect and vindicate his interests in being improperly investigated and having his documents, records, work product and intellectual property seized by the Court without any privilege review or protections for his propriety interests. Dennis Montgomery intervenes to demand a return of his documents, records, work product and intellectual property; to move to strike false information about him from the record, which is also irrelevant to the proceedings, to file a demand for recusal or disqualification and the immediate transfer of the case to a different judge pursuant to 28 U.S. Code § 144, and move for a halt to the inquiry.

## II.     GOVERNING LAW

Federal Rules of Civil Procedure ("FRCP") Rule 24 governs intervention by additional parties in existing litigation in the federal courts: [1]

> Rule 24. Intervention
>
> (a) INTERVENTION OF RIGHT. On timely motion, the court must permit anyone to intervene who:
>> (1) is given an unconditional right to intervene by a federal statute; or
>> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> (b) PERMISSIVE INTERVENTION.
>> (1) *In General.* On timely motion, the court may permit anyone to intervene who:
>>> (A) is given a conditional right to intervene by a federal statute; or
>>> (B) has a claim or defense that shares with the main action a common question of law or fact.

---

[1]     It does not appear that the Local Rules of the U.S. District Court for the District of Arizona present any additional rules or requirements for intervention.

(2) *By a Government Officer or Agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

(A) a statute or executive order administered by the officer or agency; or

(B) any regulation, order, requirement, or agreement issued or made under the statute or executive order.

(3) *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

(c) NOTICE AND PLEADING REQUIRED. A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

## III.    STATEMENT OF FACTS RELEVANT TO MOTION

There has been a dramatic change of this case, so that the case is now about entirely different albeit irrelevant, personal issues concerning the presiding judge and his wife in a new phase than when it began. The Court entered a final order on October 2, 2013. This is, in effect, now an entirely different case which is being used for improper purposes.

On or about April 23-24, 2015, the Honorable G. Murray Snow embarked on an inquiry of Dennis L. Montgomery extensively inquiring about the alleged dealings with the Maricopa County Sheriff's Office ("MCSO") and Cold Case Posse entirely unrelated to this litigation, seizing by his unprecedented and improper court order Dennis Montgomery's documents, records, work product, and intellectual property, and even demanding documents about and concerning Dennis Montgomery's attorney and a federal judge in the District of Columbia.

Mr. Montgomery's physical personal property and intellectual property has been affected and taken. Montgomery's proprietary interests have been invaded along with his attorney work product subject to privilege and other privileged material, documents, and/or information. Montgomery was deprived of the right to review the documents to protect privileged information and/or documents and proprietary information.

Judge Snow explicitly relied upon the so-called reporting from <u>The Phoenix New Times</u>, a disreputable and dishonest internet publication with a far-left political agenda which hates anyone remotely associated with Sheriff Joe Arpaio or his office.

As a result, the substance of the allegations which the inquiry is pursuing, based on the so-called reporting of <u>The Phoenix New Times</u>, clearly includes making profoundly significant determinations about Dennis Montgomery's honesty, legitimacy, career, work, and profession.

## IV.     ARGUMENT

### A.     <u>Dennis Montgomery Has a Direct Interest in the Property and Transaction</u>

Dennis Montgomery has a vested right to intervene.  Pursuant to FRCP Rule 24(a)(2) Dennis Montgomery claims an interest in property or transaction that is the subject of the action. The Court has seized his physical property and intellectual property, and attorney-client and work product privileges have been violated and trashed.  Montgomery seeks to file motions to quash and for the return of his documents, property, and intellectual property.

### B.     <u>Dennis Montgomery Will Be Impaired or Impeded</u>

Dennis Montgomery has a vested right to intervene as a matter of law and right.  Pursuant to FRCP Rule 24(a)(2) Dennis Montgomery is so situated that disposing of the action will as a practical matter impair or impede his ability to protect his interest.  The inquiry now launched is obviously intended to and will make decisions about Dennis Montgomery and his work, as well as harm his legal rights and interests.

### C.     <u>The Motion is Timely</u>

Intervenor's motion is timely.  Although the litigation has been going on for years, the case has entered a new and different phase only in late April of 2015.  The case only began to involve Dennis Montgomery in April 2015.  Therefore, Intervenor files this motion timely as soon as his interests became involved in the case by the actions of Judge Snow.

## V.    CONCLUSION

Dennis L. Montgomery has a vested right to intervene pursuant to FRCP Rule 24(a)(2) and should be granted the status of Intervenor for the purpose of seeking a transfer of the case to another judge, demanding return of his documents and intellectual property including by quashing the orders for their production, striking libelous information from the court record that have nothing to do with the ongoing contempt proceedings. Mr. Montgomery is also filing a motion to disqualify Judge Snow on the basis of his unethical judicial misconduct, which has resulted in him pursuing his own personal family interests and agenda, and egregiously violating attorney-client privileges and Mr. Montgomery's work product and intellectual property rights.

Dated: May 7, 2015                    Respectfully submitted,

Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com

Of Counsel


Jonathon Moseley, Esq.

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2015, I served this document by U.S. Mail to:

Honorable John Z. Boyle
United States District Courthouse
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2160

Honorable G. Murray Snow
United States District Courthouse
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2160

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, CA 94065
*Attorneys for Plaintiffs*

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
*Attorney for Plaintiffs*

Cecilia D. Wang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
*Attorney for Plaintiff Melendres*

Thomas P. Liddy, Esq.
CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

Michele M. Iafrate, Esq.

- 6 -

1
IAFRATE & ASSOCIATES
649 North Second Avenue
2
Phoenix, AZ 85003
miafrate@iafratelaw.com
3
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

4
Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
5
649 North Second Avenue
Phoenix, AZ 85003
6
miafrate@iafratelaw.com
7
*Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office*

8
Melvin McDonald
JONES SKELTON & HOCHULI, PLC
9
2901 N. Central Avenue, Suite 800
10
Phoenix, AZ 85012-2728
mmcdonald@jshfirm.com
11
Attorney for Defendant Sheriff Joseph Arpaio

12
Andre Segura, Esq.
ACLU FOUNDATION
13
IMMIGRANTS' RIGHTS PROJECT
14
125 Broad Street, 18th Fl.
New York, NY 10004
15
*Attorney for Plaintiffs*

16
Anne Lai
UCI School of Law
17
401 E. Peltason Drive. Suite 3500
18
Irvine, CA 92616

19
Jorge M. Castillo
MALDEF
20
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
21
*Attorney for Plaintiffs*

22
Richard K. Walker
23
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
24
Scottsdale, AZ 85254-2236
25
Attorney for Defendant Maricopa County

26

27
Jonathon Moseley, Esq.

28

- 7 -

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

*(Pro Hac Vice Application Filed)*

- 8 -

Exhibit 4

1  Jonathon A. Moseley
   Freedom Watch, Inc.
2  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
3  (310) 595-0800
   leklayman@gmail.com
4  Attorney for Intervenor

5  *(Pro hac vice pending)*

6  Larry Klayman
   Freedom Watch, Inc.
7  2020 Pennsylvania Avenue N.W., Suite 345
   Washington, D.C. 20006
8  (310) 595-0800
   leklayman@gmail.com
9  Attorney for Intervenor

10 *Of Counsel*

11           **IN THE UNITED STATES DISTRICT COURT**
12               **FOR THE DISTRICT OF ARIZONA**

13 MANUEL de JESUS ORTEGA
   MELENDRES,
14 on behalf of himself and all others similarly
   situated; *et al.*

15                    Plaintiff,

16         v.                                    Civil Action No.
                                                CV-07-2513-PHX-GMS
17 JOSEPH M. ARPAIO, in his individual
   And official capacity as Sheriff of Maricopa
18 County, Arizona; *et al.*

19                    Defendants

20 DENNIS L. MONTGOMERY

21                    Intervenor

22 **MOTION FOR RECONSIDERATION OF MOTION FOR ADMITTANCE PRO HAC VICE
   OF JONATHON A. MOSELEY AND MEMORANDUM OF LAW IN SUPPORT THEREOF**
23

24        Jonathon A. Moseley, Movant for admittance *pro hac vice* on behalf of Dennis L.

25 Montgomery, and Dennis L. Montgomery, hereby move this Court to reconsider and reverse its

26 decision, made without prejudice, concerning Moseley's and Montgomery's motion for Jonathon

27 Moseley to be admitted *pro hac vice* to represent Dennis Montgomery in this case.

28

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION**

## I.     INTRODUCTION AND STATEMENT OF RELEVANT FACTS

Pursuant to Rule 59(e), Rule 60(b)(6), and Rule 60(d)(1) of the Federal Rules of Civil Procedure and the continuing jurisdiction over and inherent authority of the Court over the matter, Movant asks for reconsideration of the Court's Order of May 14, 2015, based on errors of fact and law.

On May 14, 2015, the Court denied the motion of Dennis Montgomery and Jonathon Moseley for Jonathon Moseley to be admitted *pro hac vice* to represent Dennis Montgomery. The Court cited an alleged but unidentified conflict of interest as the basis for denying the *pro hac vice* admittance.

Merely reciting, as the Court apparently did, that Jonathon Moseley and Larry Klayman, the head of Freedom Watch, also represent Sheriff Arpaio in another case does not establish a conflict of interest.  Thus, the Court made a reversible error of fact and law.

To the contrary, responding to the Court's questions on May 8, 2015, Movant filed a "Clarification of Motion for Admittance *Pro Hac Vice* of Jonathon A. Moseley," dated May 13, 2015.  Movant stated to the Court in that filing that

Neither Dennis L. Montgomery nor his counsel are adverse to Sheriff Arpaio, his deputies, the Cold Case Posse, or MCSO **in any respect**, particularly since this case involves a contempt proceeding over allegations of profiling illegal immigrants. [Dkt. #1080].

No party has formally filed any pleading asserting, with established facts, that the Movant as counsel for Dennis Montgomery has any conflict of interest.   As a result, the record does not contain any basis for not admitting Movant *pro hac vice*.  There are no allegations nor facts whatsoever in the record to establish any conflict of interest, particularly since Freedom Watch's representation of Sheriff Arpaio in other cases, which is to enjoin President Obama's executive

actions granting amnesty to over 5 million illegal immigrants, that this does not show any conflict of interest. (*Arpaio v. Obama*, No. 14-5325 (D.C. Cir.); *Texas v. Untied States*, No. 14-254 (S.D. Tex)). To the contrary, it clearly shows a unity of interests.

In the matter before this Court, Movant and Freedom Watch do not intend to challenge any testimony by Sheriff Arpaio, his deputies, the Maricopa County Sheriff's Office (MCSO), or the Cold Case Posse. Also, it is Movant and Freedom Watch's expressed position that the issue of the "credibility" of Dennis Montgomery is not properly before this Court, so there is no need to take any adverse position to prior testimony here. And, Mr. Montgomery does not intend to do so in any event.

In addition, Dennis Montgomery is not seeking to take any position with regard any other issues remaining in the post-judgment proceedings in this case or the testimony involving the allegations of contempt of the Court's injunction brought by the Plaintiffs.

Dennis Montgomery seeks to intervene in this case only because his intellectual property, documents, data and work have been illegally seized by the Court in disregard of his work-product and attorney-client privilege and his proprietary rights. The U.S. District Court for the District of Nevada has already ruled that (1) the data and intellectual property belongs to Dennis Montgomery, (2) none of the data or information is classified, (3) the U.S. Government was required to return all of the data and information to Dennis Montgomery, and (4) the U.S. Government deceived that Court in falsely claiming that the data, information, and/or intellectual property did not belong to Dennis Montgomery and/or was classified. See *Dennis Montgomery and the Montgomery Family Trust v. eTreppid Technologies, LLC, Warren Trepp and the U.S. Department of Defense*, Case Nos. 3:06-CV-00056-PMP-VPC and 3:06-CV-00145-PMP-VPC, Order, Judge Philip M. Pro, March 19,2007, and *In the Mater of the Search of: The Residence Located at 12720 Buckthorne Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888*

*Madestro Drive, Reno, Nevada,* Case Nos. 3:06-CV-0263-PMP-VPC and 3:06-MJ-00023-VPC, Order, Magistrate Judge Valerie P. Cooke, November 28, 2006.  These Orders are *res judicata* and are now final.

Accordingly, the Court abused its discretion in not allowing Dennis Montgomery to appear *pro hac vice* by his chosen counsel.

## II.      RIGHT TO COUNSEL OF ONE'S OWN CHOOSING

A person is entitled to his choice of counsel, including an attorney appearing *pro hac vice*:

"A defendant's right to the counsel of his choice includes the right to have an out-of-state lawyer admitted pro hac vice." *United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993); *see also Panzardi-Alvarez v. United States*, 879 F.2d 975, 980 (1st Cir. 1989)("[A] decision denying a pro hac vice admission necessarily implicates constitutional concerns."), *cert. denied*,  493 U.S. 1082, 110 S. Ct. 1140,  107 L. Ed. 2d 1045 (1990).

"It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932).   The right to retain counsel of choice stems from a defendant's right to decide what kind of defense he wishes to present.  *United States v. Nichols*, 841 F.2d 1485, 1502 (10th Cir.1988).

"Attorneys are not fungible" and often "the most important decision a defendant makes in shaping his defense is his selection of an attorney." *United States v. Laura*, 607 F.2d 52, 56 (3d Cir.1979);  *Nichols*, 841 F.2d at 1502.  *See also Chandler v. Fretag*, 348 U.S. 3, 10, 75 S.Ct. 1, 5, 99 L.Ed. 4 (1954) ("a defendant must be given a reasonable opportunity to employ and consult with counsel; otherwise the right to be heard by counsel would be of little worth"); *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942) ("[defendant] wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an

1   accused should be respected.")

2       When a defendant is financially able to retain counsel, the choice of counsel rests in his

3   hands, not with the state. *United States v. Richardson*, 894 F.2d 492, 496 (1st Cir.1990); *Wilson v.*

4   *Mintzes*, 761 F.2d 275, 280 (6th Cir.1985). A defendant's right to retain counsel of his choice

5   therefore represents " 'a right of constitutional dimension'" *United States v. Cunningham*, 672 F.2d

6   1064, 1070 (2d Cir.1982) (citing *United States v. Wisniewski*, 478 F.2d 274, 285 (2d Cir.1973)), the

7   denial of which may rise to the level of a constitutional violation. *Birt v. Montgomery*, 725 F.2d

8   587, 592 (11th Cir.) (*en banc*), cert. denied, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984);

9   *Wilson*, 761 F.2d at 278-79.

10

11      Dennis Montgomery has a right to choose those attorneys whom he believes will be

12  knowledgeable enough about his circumstances to represent him effectively and meaningfully. This

13  is his Sixth Amendment right.

14  **III.   JUDGE MUST RECUSE HIMSELF EVEN APART FROM THE MOTIONS TO
15       DISQUALIFY AND INTERVENE**

16      It is obvious that the only reason that this Court has not admitted Dennis Montgomery's

17  chosen attorney *pro hac vice* is for it to avoid ruling upon the motion for recusal or disqualification

18  of The Honorable G. Murray Snow from the remaining alleged ongoing contempt proceeding.

19  However, even in the absence of any motion, the Code of Conduct for United States Judges and 28

20  U.S.C. § 455 require Judge Snow, *sua sponte*, to recuse himself or be disqualified from the case.

21  *See* Motions to Disqualify and Intervene attached at Docket Entries 1057, 1067.

22

23      As reported by Karen and Dale Grissom and their son Scott, Judge Snow's wife declared

24  that Judge Snow has a personal bias against Sheriff Joe Arpaio and "**will do anything to get**

25  **[Arpaio] out of office.**"   As Karen Morris Grissom communicated to Sheriff Arpaio closest in time

26  through a message over Facebook, attached as Exhibit 1:

27

28

> Judge Snow I know his wife and I talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her.

Neither Judge Snow nor his wife have denied the statement or sought to explain it. To the contrary, the statements by Judge Snow's wife were confirmed by interviews by Don Vogel in October 2013. *See* Exhibit 2, attached. More recently, in interviews with the media, Karen and Dale Grissom again confirmed Judge Snow's wife's statements. *See*, Exhibit 3, attached.

As set forth in Canon 2(B) and Canon 3(C)(1) of the Code of Conduct for United States Judges and 28 U.S.C. § 455(a), Judge Snow's impartiality may reasonably be questioned, because the Judge has a personal interest in the statements about himself by his own wife and in running an inquiry about investigations of his own wife and himself, and also, according to Professor Rotunda, because the transcript indicates Judge Snow investigated matters on his own outside of the evidentiary hearing. *See* Motion to Disqualify at Docket Entry 1067.

Pursuant to 28 U.S.C. § 455(b)(1) Judge Snow must recuse himself or be disqualified because he has personal knowledge of disputed evidentiary facts concerning the proceeding, and he and his wife are material witnesses who, if this matter continues any longer, will to be called themselves as witnesses by one or more of the parties. Judge Snow has undoubtedly already spoken to his wife about the prejudicial admission she made about the judge wanting to destroy Sheriff Arpaio's relection chances. Judge Snow has also admitted conducting his own investigations outside of court, without any knowledge of the parties. Judge Snow has thus admittedly cast himself as the U.S. Attorney, the judge, the jury and as the final arbiter of fact, on serious matters involving himself and his wife. Therefore, as Judge Snow has personal knowledge of the facts – and they are not in dispute – he has thrust himself into being not just all of the above, but also a material witness along with his wife. This is untenable and highly unethical if Judge Snow continues on to preside on

this case and issue orders, as he has even after being asked to recuse himself.

Under § 455(a) and Canons 2 and 3, a judge must recuse himself if a reasonable person with knowledge of all the facts would conclude that his impartiality might reasonably be questioned." *United States v. Nelson,* 718 F .2d 315, 321 (9th Cir. 1983). Disqualification or recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.'" *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994));

Here, the average citizen will assume that Judge Snow's wife and Judge Snow himself will actually know if Judge Snow **hates Sheriff Arpaio** and "**will do anything to get [Arpaio] out of office.**" If Judge Snow's wife is correct, then Judge Snow cannot preside over the case. The Supreme Court has held that a violation of section 28 U.S.C. § 455(a) takes place even if the judge is unaware of the circumstance that created the appearance of impropriety. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988).

The U.S. Courts of Appeals for the First, Fifth, Sixth, Tenth, and Eleventh Circuits have said that close questions should be decided in favor of recusal. *See Republic of Pan. v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

In short, Judge Snow must either recuse himself or be disqualified from this case, as he has so infected the proceeding with his and his wife's personal interests, that he cannot continue under any circumstances.

**IV.    CONCLUSION**

For the foregoing reasons, the Court should reconsider and reverse its decision and approve the Movant's application for admission *pro hac vice*. To do otherwise would represent just another attempt by the Court to sidestep and avoid having to rule on Movant's motions to intervene and disqualification.

Plaintiff does not consent to this motion for reconsideration. Intervenor of Right Montgomery did not receive a response from any other party when he asked for consent.

Dated: May 18, 2015                                Respectfully submitted,

                                                   Larry Klayman
                                                   The Klayman Law Firm
                                                   7050 W Palmetto Park Road, Suite 15-287
                                                   Boca Raton, Florida 33433
                                                   (310) 595-0800
                                                   leklayman@gmail.com
                                                   Attorney for Dennis Montgomery

                                                   Of Counsel

                                                   Jonathon Moseley, Esq.

                                                   Virginia State Bar No. 41058
                                                   The Klayman Law Firm
                                                   7050 W Palmetto Park Road, Suite 15-287
                                                   Boca Raton, Florida 33433
                                                   (310) 595-0800
                                                   leklayman@gmail.com
                                                   Attorney for Dennis Montgomery

**CERTIFICATE OF CONSULTATION**

On May 19, 2015, I inquired by email of all attorneys admitted in the case if they consented to or objected to Intervenor Dennis Montgomery's or could resolve the dispute without the need for court action.  I received a reply from attorney Stanley Young notifying me that the Plaintiffs in this case oppose the Intervenor's Motion for Reconsideration.

Jonathon Moseley, Esq.

Virginia State Bar No. 41058
The Klayman Law Firm
7050 W Palmetto Park Road, Suite 15-287
Boca Raton, Florida 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Dennis Montgomery

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2015, I served the foregoing document by email and U.S. Mail on the following counsels' of record:

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
333 Twin Dolphin Road
Redwood Shores, California 94065
syoung@cov.com
650-632-4700
Attorneys for Plaintiffs
(Service via Email)

Daniel Pochoda, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs
(Service via Email)

Cecilia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres
(Service via Email)

Thomas P. Liddy, Esq.

CIVIL SERVICES DIVISION
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, Arizona 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
miafrate@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Joseph Arpaio and Maricopa County Sheriff's Office
(Service via Email)

Melvin McDonald, Esq.
JONES SKELTON & HOCHULI, PLC
2901 N. Central Avenue, Suite 800
Phoenix, Arizona 85012-2728
mmcdonald@jshfirm.com
602-263-1700
Attorney for Defendant Sheriff Joseph Arpaio
(Service via Email)

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.
New York, New York 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs
(Service via Email)

Anne Lai, Esq.

UCI School of Law
401 E. Peltason Drive. Suite 3500
Irvine, California 92616
alai@law.uci.edu
949-824-9894
(Service via Email)

Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, California 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs
(Service via Email)

Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, Arizona 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County
(Service via Email)

Jonathon Moseley, Esq.

Virginia State Bar No. 41058

Attorney for Plaintiff
*(Pro Hac Vice Application Filed)*

Exhibit 1

https://www.facebook.com/ArvarioFans?ref=hl



| 1.4k | 194 | Search for people, places and things | 🔍 |

**New!** Add multiple photos, message friends of friends and more.                    Hide !   See What's I

**Inbox (99+)**  Other          More          **Karen Morris Grissom**          New Message     Actions

Search                        🔍

**Angela Blom**          2:30pm
Show her how much u love a... 1 new

**Amal Elsawy**          2:13pm
hi                              1 new

**Jason Mcmullin**          2:05pm
Thank God for men like you h...1 new

**Karen Morris Grissom** 1:28pm
Judge Snow I know his wife a...

**Michael Homer Sr.**          1:20pm
I have such respect for you.  ... 1 new

**David Pemberton**          1:19pm
you go Joe I don't care what ... 1 new

**Сергей Грек**          1:02am
В современной мировой эко... 3 new

**Randy Pistorius**          Wed
??                              5 new

**Karl Douglas Allen**          Wed
The corrupted two party s... 3 new

**Eric Heinz**          Wed
You need to run for President...

**David Neiggemann**          Wed
Hang tough sheriff ... you are...2 new

**Paul Gnau**          Wed
I am a retired Army Officer as...2 new

Conversation started today

**Karen Morris Grissom**
Judge Snow I know his wife and talked with her one day
she recognized me from our childhood  she told me that her
husband hates u and will do anything to get u out of office.
This has bothered me since last year when I saw her.

Sent from Phoenix

Write a reply...

✎ Add Files      📷 Add Photos          Press Enter to send      Rep

MELC198706

Exhibit 2

# SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

### ATTORNEYS AT LAW

Timothy J. Casey
e-mail:  timcasey@azbarristers.com

Client No.: 5754.030

November 6, 2013

### *ATTORNEY-CLIENT PRIVILEGED/ATTORNEY WORK PRODUCT*
### *PRIVILEGED/CONFIDENTIAL/NOT SUBJECT TO A PUBLIC RECORDS REQUEST*

### VIA HAND-DELIVERY

Hon. Joseph M. Arpaio
MARICOPA COUNTY SHERIFF'S OFFICE
100 W. Washington St., Suite 1900
Phoenix, Arizona 85003-1812

Re:  *Melendres v. Arpaio, CV2007-02513-PHX-GMS (United States District Court*
*for the District of Arizona)*

Dear Sheriff Arpaio:

This letter provides the following information for your consideration: (1) the transcripts of private investigator Don Vogel regarding Karen Morris Grissom, Dale Eugene Grissom, and Scott Grissom; (2) the potential legal options available to you and the MCSO based on the Grissom investigatory materials; and (3) my analysis and recommendation to you and defendant MCSO regarding the Grissom information.

Upon my receipt later this week of the balance of Mr. Vogel's investigation report, I will forward the same to you immediately.

## A.   EXECUTIVE SUMMARY

Karen and Dale Grissom, husband and wife, had a chance encounter at a Tempe restaurant with a woman who was, in fact, Judge Murray Snow's wife. Mrs. Snow mistook Karen for her sister Irene. This encounter probably occurred in May of 2012. The encounter led to a conversation between Ms. Grissom and Mrs. Snow in the presence of Dale Grissom and Scott Grissom (the adult son of Karen and Dale Grissom). The fact that the woman was married to Judge Snow came up in the conversation. Mrs. Snow made a comment that Karen and Dale interpreted as hostile, negative, or unfavorable toward you. Karen Grissom reported to you the contact with Mrs. Snow 14 months after it happened. According to investigator Mr. Vogel, Karen and Dale Grissom present as sincere and truthful in their statements about what they believe they heard from Mrs. Snow ("the Grissom information").



## B.  BACKGROUND INFORMATION

To place this letter and its advice in context, some background information and key dates in this case are important to know.

### 1.  Key Litigation Dates

The bench trial in this matter took place on July 19, July 24-26, July 31, August 1, and August 2, 2012 before the Honorable Murray Snow. The trial received daily local and national print and television media attention.

On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law (Dkt#579). The Court held that defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendment to the United States Constitution. The Court, therefore, issued various permanent injunctions as set forth in that Order. The Court's Order received considerable local and national media attention.

On June 14, 2013, the Court held a status hearing with the parties. The parties advised the Court of their mutual desire to try to negotiate the terms of a consent decree to ensure defendants' compliance with the Court's injunction. The Court also indicated its current intention to implement certain elements into any final order (i.e., a monitor). This hearing was

2

covered extensively by the local and national media.

On August 16, 2013, the parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement and terms on which they could not agree. The parties' proposal also received significant coverage in the media.

On or about August 21-22, 2013, a person named Karen Morris Grissom sent you a private message on your *Facebook* page purporting to have had a conversation in 2012 with Judge Snow's wife wherein Mrs. Snow reported that her husband, Judge Snow, did not like you and wanted you out of office.

On August 30, 2012, the Court held a hearing to discuss the terms agreed-upon by the parties and to hear oral argument on the terms the parties could not agree to. Argument was extensive. This hearing was covered by the media.

On October 2, 2013, the Court issued its Supplemental Permanent Injunction/Judgment Order (Dkt#606). Again, this Order was extensively covered in the media.

### 2. Karen Morris Grissom Message to Sheriff Arpaio

On or about August 21-22, 2013, Karen Morris Grissom sent the following private[1] message to you on your *Facebook* page:

> "Karen Morris Grissom
> Judge Snow I know his wife and talked with her one day she recognized me from our childhood she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

(Lack of punctuation and spelling not changed).

Upon being advised of the foregoing and directed by your office to do so, I began to try to locate Ms. Grissom and interview her. I eventually sent a message to Ms. Grissom on her *Facebook* page and she called me on my cell telephone on August 28, 2013.

I spoke with Ms. Grissom around 3:00 p.m. on August 28, 2013 and explained the reason for contacting her. She advised that she and her husband (Dale) were driving to a job interview for her in Avondale (a teaching assistant position), she was experiencing poor cell phone connection, and we talked for a period of time and each time I lost the cell phone connection with her I called her back and she answered my call.

In short summary, and as you may recall from my prior oral report, Ms. Grissom, age 63, reported that she grew up in Yuma, Arizona, she went to the same church as Judge Snow's wife when she was a single woman, the judge's wife (as a single woman) was her piano teacher at one

---

[1] The message was private to you only. The message was not publicly posted. ██████████

time, and something to the effect that the Judge's wife had a step-mother that was murdered in Yuma years ago.

Ms. Grissom advised that on an unknown date in 2012 she and her husband were eating at a *Some Burros* Mexican food restaurant at Baseline Road and Mill Road in Tempe, Arizona when a middle-aged woman came into the restaurant with a younger woman (they left a dog outside) and walked up to her and her husband. The woman asked Ms. Grissom if she was "Irene." Ms. Grissom believed that the date of this encounter was sometime before school started, so likely in July or August 2012. The woman was tall, thin, with short hair, and light brown-colored hair. Ms. Grissom said that she was not Irene, that Irene was her younger sister (age 55), and the woman began to tell Ms. Grissom that she was friends with Irene, that she (the woman) eventually went to BYU, was a teacher, she married a man that was now a federal judge, and her husband was ruling on a case involving Sheriff Arpaio. According to Ms. Grissom, the woman volunteered that her husband "wanted to burn the Sheriff because he did not like him."

Ms. Grissom advised that her husband, Dale, was present and heard the same exchange. *She did not remember the woman's first name, or her maiden name.* She was firm in what she claimed to have heard, and that she was speaking the truth. We discussed the reasons she waited over a year to disclose this information to you. Ms. Grissom advised that the woman's statement "bothered [her] at the time but eventually [she] needed to share this." Ms. Grissom stated that she viewed your public services very favorably but had never met or interacted with you.

I wanted to meet Ms. Grissom in person to evaluate her credibility, and obtain from her either a recorded statement or a statement under oath before a court reporter. Ms. Grissom advised that she was willing to meet with me in person, to provide a statement under oath, and that she would call me back after her job interview. She was adamant that she was telling the truth about what the judge's wife had said to her. She expressed no fear or reservation about telling the truth. Ms. Grissom again told me she would call me back after her job interview. The call ended.

As I reported initially to you and Chief Sheridan, Ms. Grissom came across telephonically as sincere and credible (despite not knowing the date of the encounter, the name of the woman, and the 12-13 month delay in reporting the incident) but I reserved final credibility judgment until I could meet her in person and speak with her in detail.

Ms. Grissom, however, did not call me back after the job interview. She also did not take my two separate telephone calls to her around 5:30 pm that same date (08/28/13).

Over the next four weeks, Ms. Grissom and I had no contact despite my occasional telephone call into her. It appeared to me that Ms. Grissom did not wish to talk further for whatever reason. I reported the same to you and your chiefs and further shared my prior historical experience with witnesses sometimes being willing to say certain things privately on a telephone call to an attorney and then decline further involvement or more formal documentation of the substance of the earlier communication. The absence of further contact from Ms. Grissom after August 28, 2013 led me to personally conclude the matter was over and the information from Ms. Grissom lacked substance or merit.

4

### 3. Retention of Vogel Investigations

Pursuant to the conversation we had at your office on October 17, 2013 with Chief Sheridan regarding Ms. Grissom, I formally retained on October 23, 2013 investigator Don Vogel. The scope of Mr. Vogel's services were the following: (1) to try to interview Ms. Grissom (and possibly, her husband Dale Eugene Grissom) in order to learn the details of the communication from Ms. Grissom to your *Facebook* page that occurred on or about August 21-22, 2013, and to try to learn her motivations and timing for communicating with you; (2) to voluntarily obtain, if allowed, a recorded and/or sworn statement about the same from Ms. Grissom and/or her husband; (3) to provide me with Mr. Vogel's candid assessment of the credibility of Ms. Grissom (and possibly her husband); and (4) to provide me with Mr. Vogel's findings and any statement(s) from the Grissoms.

## C.  THE INFORMATION FROM INVESTIGATOR VOGEL

Attached for your review and file are the transcripts of Mr. Vogel's recorded interviews with the Grissoms.

### 1. Karen Grissom

Mr. Vogel showed up unannounced to the Grissom residence on Saturday, October 26, 2013. Dale Grissom was not at home. Karen Grissom, however, agreed to talk to Mr. Vogel and provide a recorded statement. The recorded statement lasted 20 minutes and 29 seconds.

Ms. Grissom is supportive of you and your law enforcement policies. While the precise details and context of the statement are contained on the attached transcript and audio, Ms. Grissom, her husband Dale, and their adult son, Scott, visited a *Some Burros* restaurant in Tempe Arizona on an unknown date in 2012. A woman entered the restaurant and approached Ms. Grissom and asked if she was Irene, the sister of Ms. Grissom. Irene and Karen apparently look very similar even though they differ in age by about a decade. The woman introduced herself as Sherry Snow; that name meant nothing to Ms. Grissom and the woman then mentioned her maiden name was Smock (or Smoch). The woman then described her background and that she was married to a federal judge. She presented as proud of her husband serving as a judge. Somehow the subject of Sheriff Arpaio surfaced in the conversation. The operative part of Ms. Grissom's statement is where Mrs. Snow is reported to have said to Ms. Grissom in response to a question by Ms. Grissom that **"my husband does not like him [Arpaio] and wants him out of office."**

Mr. Vogel's separate report will assesses Ms. Grissom's credibility from his perspective.

### 2. Dale Grissom

Mr. Vogel arranged to meet with Dale Grissom the following Monday.

Mr. Vogel interviewed and took a recorded statement of Dale Grissom on Monday, October 28, 2013. Mr. Grissom is age 64, but will turn 65 in a few weeks. The recorded

5

statement lasted 20 minutes and 41 seconds. Dale Grissom is supportive of you and your law enforcement policies. The details and context of the statement are contained on the attached transcript and audio. The operative part of Dale Grissom's statement is where Mrs. Snow is reported to have said in his presence to Karen Grissom sometime in late April or May of 2012 that **"my husband wants to get him [Arpaio] or wants him to go down"** or something negative to that effect.

Mr. Grissom does not remember the precise details about what was said. He does not recall Mrs. Snow ever reporting that her husband had actually said that her statements or views were those held by her husband but Mr. Grissom assumed that Mrs. Snow got her information or positions from her husband. While he does not remember the details of the conversation, and would be unable to personally identify Mrs. Snow in person or by photograph, he remembers that whatever precisely was said was negative toward you. Mr. Grissom also reported that there may have been two people with Mrs. Snow, a younger female and a younger male.

Mr. Grissom followed the *Melendres* case in the media stories as they were published or aired. Eventually, he learned that you and Judge Snow were "at odds."

Mr. Grissom was unaware of whether Karen Grissom had returned any of my telephone calls. He thought she had on an occasion but was uncertain.

Mr. Vogel's separate report will assesses Mr. Grissom's credibility from his perspective.

### 3. Scott Grissom

Mr. Vogel interviewed and took a recorded statement of Scott Grissom on Monday, October 28, 2013. Scott Grissom is the adult son (age 40) of Karen and Dale Grissom. He was visiting his parents and recalls eating a meal at *Some Burros*. The details and context of the statement are contained on the attached transcript and audio. The operative part of Scott Grissom's statement is where he remembers hearing, despite the noise in the restaurant, someone saying something to the effect of **"I'm going to get him or somebody's going to get him."** This occurred while his mother was speaking with an unknown woman. Scott Grissom remembers very little else about that date or the characteristics of the woman. He has no idea what or who the woman was talking about.

Mr. Vogel's separate report will assesses Scott Grissom's credibility from his perspective.









10









I am available at your convenience to discuss or answer any questions you might have regarding the foregoing analysis or recommendation.

Sincerely,

SCHNECK SMYTH CASEY & EVEN, P.C.

Timothy J. Casey

TJC:eh

Encls.

cc:    Chief Jerry Sheridan, via hand-delivery w/encl.
Chief Jack MacIntyre, via hand-delivery w/encl.
Tom Liddy, via e-mail w/o encl.

Exhibit 3


Case: 15-72440, 08/13/2015, ID: 9646056, DktEntry: 6, Page 133 of 434

# How Mexican food drew couple into heart of Arpaio case

Yvonne Wingett Sanchez, The Republic | azcentral.com    *12:45 p.m. MST May 8, 2015*

*Dale Grissom never expected his family to be caught up in a federal court case involving Maricopa County Sheriff Joe Arpaio. But thanks to a craving for Mexican food on a summer day back in 2012, they are now key figures in Arpaio's civil contempt hearing.*



*(Photo: Michael Schennum/The Republic)*

Dale Grissom never expected his family to be caught up in a federal court case involving Maricopa County Sheriff Joe Arpaio (/topic/joe-arpaio/).

But here they are, thanks to a craving for Mexican food from their favorite restaurant, Someburros, back in summer 2012.

The events of that day led to an important disclosure during civil-contempt proceedings last month against Arpaio in U.S. District Court. Under questioning by Judge G. Murray Snow, Arpaio confirmed a probe into remarks allegedly made to the Grissoms by the judge's wife at the restaurant.

The contempt hearings have focused on the defiance by Arpaio and others of Snow's orders in an ongoing racial-profiling lawsuit.

Snow's questioning of Arpaio left the man of many words nearly speechless and thrust the Grissoms into the middle of a high-stakes political and legal drama.

"It just blew up a couple of weeks ago — like *kapow*," said Grissom, speaking publicly for the first time about the case from behind a screen door as the nightly news blared on TV in his south Phoenix home.

"We just thought, 'Wow — what happened here? And we've been following it right along. We're not trying to hide anything, we're just telling the truth, and that's the way it was, and that's what she said, and hey, whatever happens, happens."

**PREVIOUSLY:** Attorneys prep for 2nd bout of Arpaio contempt hearings in June (/story/news/local/phoenix/2015/05/07/sheriff-joe-arpaio-contempt-hearings-secound-bout-june/70931926/)

The judge's wife, Cheri Snow, declined comment when reached by phone Thursday.

About a month after their lunch-time encounter at Someburros, Snow presided over the start of a trial to weigh allegations that Arpaio's office engaged in a pattern of discriminatory policing.

Dale said that he and his family sat at a table just a few feet from Cheri. He said Cheri began talking to Karen, confusing her with Karen's sister, an acquaintance of Cheri's from their childhood days in Yuma.

"She was talking to my wife and I don't even know how it got brought up," recalled Dale, 66. "And I heard them start talking about Sheriff Joe and how her husband wanted him out and didn't want him back in office again, and that's kind of where it went, then they talked about school.

"I didn't pay attention. As soon as that came up, that stuck to me, and I thought, 'How rude is that? Why is this guy, a federal judge, telling his wife he doesn't want Sheriff Joe back in office — and why is she out telling people?' "

The Grissoms returned home and didn't think much of Cheri's remarks until May 2013, when they heard that her husband had ruled Arpaio and his deputies violated the constitutional rights of Hispanics by targeting them during raids and traffic stops.

Dale says he's not a die-hard Arpaio fan or critic, saying, "There's a lot of things where he kind of goes overboard, but I think he's a good sheriff."

But news of Snow's decision upset his wife in light of Cheri's alleged comments, Dale recalled. (Karen would not come to the front door to speak to *The Arizona Republic*.)

"It went on and on and on, and it just got to bothering her and she said, 'I think they need to know,' " Dale remembered.

Three months later, in August 2013, Karen sent a Facebook message to Arpaio that described her encounter with Cheri. It said, in part, that "she told me that her husband hates u and will do anything to get u out of office. This has bothered me since last year when I saw her."

Days later, a private investigator arrived at their home. Jerry Sheridan, Arpaio's chief deputy, said Tim Casey, Arpaio's former defense attorney on the racial-profiling case, hired the investigator to look into the veracity of the message.

Sheridan said the office was obligated to look into Karen's note: "The sheriff and I felt that we should have our lawyer look into the comment in the event that it was made, and it was credible, because it went to the judge's state of mind," Sheridan said in an interview.

Dale said he was outside when the private investigator stopped by.

"They came to talk to us and to see how we were and ... if we were a bunch of kooks with tinfoil hanging on our heads," Dale said, laughing.

He says he never learned what happened after their interviews, "But I don't believe the investigator went to investigate Snow's wife."

When asked that question, Sheridan said Casey told him and Arpaio there wasn't enough evidence to take the tip any further.

"And it sat in my desk drawer for a year and a half, until it came out in court when the sheriff was on the stand," Sheridan said. "We had no intention to do anything with it because we were told it would be unethical for us to make a complaint on a third-party hearsay."

Dale stands by his story, saying he and his wife were truthful in their account.

"I would not go as far to lie for Sheriff Joe," he said. "I mean, I like the guy, but I wouldn't go as far and say ... this. I wouldn't do that. You just don't do that.

*Reach the reporter at yvonne.wingett@arizonarepublic.com or 602-444-4712.*

Read or Share this story: http://azc.cc/1bDNNe3

**MORE STORIES**



**Dang it! Sen. John McCain needs a new 'Barney**

(/story/ejmontini/2015/05/10/sen-john-mccain-sheriff-paul-babeu-joe-arpaio-barney-fife-chief-wiggum/70958158/)
**Fife' (/story/ejmontini/2015/05/10/sen-john-mccain-sheriff-paul-babeu-joe-arpaio-barney-fife-chief-wiggum/70958158/)**
May 10, 2015, 7:48 a.m.



**Letting them go, and hoping everything will be OK**

(/story/karinabland/2015/05/08/karina-bland-my-so-called-midlife-mothers-day-letting-go-college/70976970/)
**(/story/karinabland/2015/05/08/karina-bland-**

my-so-called-midlife-mothers-day-letting-go-
college/70976970/)
May 9, 2015, 10:10 p.m.



**Despite tumult, key stock-
market tenets stand test of time**

(/story/money/business/consumer/2015/05/08/despite
tumult-key-
stock-market-
tenets-stand-
test-
time/27005601/)
**(/story/money/business/consumer/2015/05/08/despite-
tumult-key-stock-market-tenets-key-stand-test-
time/27005601/)**
May 8, 2015, 3:08 p.m.

## IMMIGRATION AND SHERIFF JOE ARPAIO

| 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| MANUEL de JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated; *et al.*<br><br>                Plaintiff,<br><br>     v.<br><br>JOSEPH M. ARPAIO, in his individual And official capacity as Sheriff of Maricopa County, Arizona; *et al.*<br><br>                Defendants.<br><br>DENNIS L. MONTGOMERY<br><br>                Intervenor. | Civil Action No.<br>CV-07-2513-PHX-GMS |

## [PROPOSED] ORDER GRANTING MOTION FOR RECONSIDERATION OF MOTION FOR ADMITTANCE PRO HAC VICE OF JONATHON A. MOSELEY

Upon consideration of Motion For Reconsideration Of Motion For Admittance Pro Hac Vice Of Jonathon A. Moseley, the Court, having considered same, and all papers and argument in connection therewith, finds as follows:

IT IS HEREBY:

**ORDERED**: that Motion For Reconsideration Of Motion For Admittance Pro Hac Vice Of Jonathon A. Moseley is hereby **GRANTED**. Jonathon A. Moseley is hereby admitted to practice before this Court pro hac vice.

DATED this _____ day of _____, 20____.

_____
Hon. G. Murray Snow
United States District Judge

Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office ("Defendants") have filed objections to the procedure for document preservation and production outlined at the Show Cause proceedings and in this Court's April 27, 2015 Order (Doc. 1032).

First, Defendants have requested time to review the sequestered documents for attorney-client privilege, work-product immunity, and/or any other applicable privilege. To the extent that this amounts to an objection by Defendants to the Court's previous directions that the documents be transmitted "as soon as is reasonably possible," (*see id.* at 1), the Court hereby orders that Defendants expeditiously complete their privilege review of all documents, memoranda, reports, records, notes, e-mails, social media messages, photographs, audio/video recordings, contracts, meeting minutes, timesheets, financial records, or other materials disclosed to the Monitor during the evidentiary hearing that pertain to the Seattle, Washington/Dennis Montgomery and Grissom

investigations, and turn over Bates-stamped copies to the Plaintiffs and the Monitor by the May 8, 2015 status conference. The Court notes that counsel for Defendants were present and conducting a review for privilege contemporaneously with the initial disclosure of documents to the Monitor. Counsel has now had over a week to continue this process. No further production has apparently occurred, however, since the date of this Court's initial orders on April 23 and 24. The process set forth by the Court with respect to these documents is necessary in light of Defendants' history of spoliation of evidence and non-compliance with orders relating to document discovery. Defendants are to promptly respond to all related future requests for documents by the Monitor by either producing the materials sought or seeking an appropriate protective order from the Court.

Second, Defendants' contention that Sheriff Arpaio's due process rights were implicated by the April 23, 2015 colloquy with the Court is untimely and without merit. The Court notes at the outset that Defendants have requested no specific relief stemming from this objection. The Federal Rules of Evidence extend to the Court the right to participate in questioning, and even call its own, witnesses. Fed. R. Evid. 614. The Court also has inherent power to compel testimony, concomitant with its authority to police litigants whose actions show bad faith or the intent to hamper enforcement of court orders. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). Furthermore, incident to their responsibility to ensure the fairness of the process for all parties, trial courts have an obligation to clarify the evidence presented and ensure that all facts relevant to the proceedings are brought out. *United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001). It follows that the Court's intervention in witness examination is particularly appropriate when one party has restricted the other's ability to develop an evidentiary record through pre-trial discovery.

Neither Sheriff Arpaio's civil nor criminal counsel objected to the examination at the time, and counsel for Defendants elicited testimony on the same subject matter from Chief Deputy Sheridan the following day. Defendants offer no precedent for their assertion that a fact witness in a legal proceeding is entitled to notice of all questions that

1    might be posed to him. The questions posed by the Court, and later by defense counsel,

2    relate to the efficacy and integrity of MCSO's internal investigative processes, the

3    agency's approach to addressing conflicts of interest, and the relative resistance of

4    MCSO's command staff to the authority of the federal court. As the Court explained

5    during the hearing, whether the events giving rise to the charged bases in the Order to

6    Show Cause were isolated incidents of non-compliance or a reflection of a larger pattern

7    of the Maricopa County Sheriff's Office's subversion of this Court's orders is relevant

8    both to the Defendants' liability in contempt as well as to the scope of appropriate

9    remedies for Defendants' conduct. Defendants' objection is, therefore, overruled.

10        Third, consistent with its oral orders on April 24, 2015, the Court **GRANTS**

11   Defendants' Motion to Seal Document 1021 Transcript (Doc. 1038). The Court directs

12   the Clerk of the Court to seal the transcript of the April 22, 2015 Evidentiary Hearing

13   (Doc. 1021) to preserve the privileged nature of the information communicated to the

14   Court by Thomas Liddy, of the Maricopa County Attorney's Office, regarding the nature

15   of his ethical conflict and pending Motion to Withdraw. A version of the transcript that

16   omits the challenged sidebar discussion will be refiled and available for order shortly

17   thereafter. The privileged excerpt of the April 22, 2015 hearing transcript, page 307, line

18   23 to page 311, line 16, shall be maintained under seal.

19        **IT IS SO ORDERED**.

20        Dated this 4th day of May, 2015.

21

22        _____
          Honorable G. Murray Snow
23        United States District Judge

24

25

26

27

28

- 3 -

Exhibit 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

A status conference in this action was held on May 14, 2015. The Court orders the following:

1.  On May 07, 2015, Magistrate Judge John Z. Boyle issued a ruling regarding the applicability of attorney-client privilege and/or work-product immunity to certain disclosures made by Thomas Liddy and Karen Clark, on behalf of former defense counsel Timothy Casey. (*See* Doc. 1053.) Subsequent to this order, Chief Deputy Gerard Sheridan voluntarily disclosed Mr. Casey's mental impressions, opinions, and advice in an interview with the *Arizona Republic*.[1] Thus, the matter is referred back to Judge Boyle for re-evaluation on the continued applicability of the opinion

---

[1] *See* Yvonne Wingett Sanchez, *How Mexican Food Drew Couple Into Heart of Arpaio Case*, Ariz. Republic, May 08, 2015, *available at* http://www.azcentral.com/story/news/local/phoenix/2015/05/07/mexican-fooddrew%20-grissom-couple-heart%20-sheriff%20-joe-arpaio-civil-contempt%20-case/70990098/.

work-product doctrine to these materials in light of Chief Deputy Sheridan's statements to the press. Although, of course, Judge Boyle will fix any briefing schedule, the Court requests that if the parties wish to brief the issue they do so expeditiously.

2. The Application of Attorney for Admission to Practice Pro Hac Vice received by Jonathon A. Moseley, who practices in Virginia, is denied. The record demonstrates that actual and potential conflicts of interest exist between Mr. Moseley's current representation of Sheriff Arpaio in another action and his proposed representation of Mr. Dennis L. Montgomery before this Court. *See* E.R. 1.7(a) ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest."); *Cole v. U.S. Dist. Court for the Dist. of Idaho*, 366 F.3d 813, 822 (9th Cir. 2004) ("Attorneys admitted pro hac vice are held to the same professional responsibilities and ethical standards as regular counsel. . . ."). Mr. Moseley was given the opportunity to appear telephonically at the status conference but did not do so. The Court denies Mr. Moseley's application. Accordingly, his pending Motion to Intervene (Doc. 1057) and Motion to Disqualify (Doc. 1067) are hereby stricken pursuant to Federal Rule of Civil Procedure 12(f) and Local Rule 7.2(m)(1).

3. In light of the newly disclosed documents, the Court orders that the parties proceed as follows so as to effectively manage the discovery period prior to the continuation of the show cause hearing:

   a. The Monitor, pursuant to its authority to evaluate the integrity of MCSO's operations and compliance efforts, shall investigate matters that are raised by the documents recently disclosed to them by Defendants. The Parties shall fully cooperate with such investigations. Although the Monitor has broad authority to set the direction of an investigation, this authority is limited by the orders previously entered in this matter. Ongoing investigations by the MCSO Professional Standards Bureau do not restrict

the Monitor in his investigative authority.

b. Chief Sherry Kiyler is authorized to be involved in all investigations pertaining to recent MCSO disclosures.

c. To the extent that the Monitor interviews persons who are in the employ of MCSO, any and all counsel may be present at the interviews. All parties and specially appearing non-parties will have the right to pay for and obtain transcripts of any interview done by the Monitor.

d. The witness is entitled to counsel at his or her own expense, and is also entitled to all rights and privileges which are available to him or her under federal law.

e. The Parties and named non-party contemnors may conduct their own depositions coextensively with the Monitor, so long as they obtain the approval of the Monitor prior to scheduling such depositions so as not to interfere with the Monitor's investigation. Copies of transcripts from all such deposition shall be provided to the Monitor.

f. Aspects of the "Seattle operation" are germane to the show cause proceedings, and shall be addressed by the Parties insofar as they relate to the charged bases for contempt or the appropriateness of any remedial measures. The Court will consult with the Parties on the topics that merit addressing at the hearings to be resumed on June 16, 2015 once the scope of relevant issues are sufficiently refined by document review and the Monitor's investigations.

Dated this 14th day of May, 2015.

_____
Honorable G. Murray Snow
United States District Judge

- 3 -

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**CLARIFICATION RE DOCUMENTS 1117 AND 1120 AND VACATING EVIDENITIARY HEARING OF JUNE 16-19; 23-26, 2015** |

On May 22, 2015, Sheriff Joseph Arpaio, and non-party contemnor Chief Deputy Gerard Sheridan filed a Motion for Recusal/Motion to Disqualify Judge. (Doc. 1117.) In light of this Motion, this Court issued an order vacating the three status conferences set for May 29, June 5 and June 12, 2015. It further indicated that "it shall issue no further orders until the motion has been briefed and/or a ruling has been issued." (Doc. 1120.)

Neither Defendants' Motion nor this Court's May 22, 2015 Order suspended or called into question any of the Court's previous orders. Specifically, the Order did not suspend the responsibilities of Defendants or the Monitor as are set forth in the Permanent Injunction, the Supplemental Permanent, Injunction, or any amendments thereto, which enforce the terms of this Court's findings of facts and conclusions of law and which have been upheld in virtually all respects by the Ninth Circuit Court of Appeals. *See Melendres v. Arpaio*, No. 13-16285, 2015 WL 1654550, at *10 (9th Cir.

Apr. 15, 2015). The Court's May 22 Order merely aims to preserve the status quo vis-à-vis the civil contempt proceedings that were scheduled to resume in mid-June until the Court rules on Defendants' Motion. Nevertheless, after Defendants filed their Motion, counsel for MCSO and Sheriff Arpaio contacted the Monitor to state that "[b]ased on the Court's Order . . . the *Melendres* case is stayed until a decision is made regarding the Motion to Recuse or Motion to Disqualify (Doc. 1117). Therefore, the Monitor's . . . site visits scheduled are stayed as well." The Monitor had a regular monitoring site visit and community meeting, as required by the terms of the Supplemental Permanent Injunction, scheduled for the following week. To avoid confrontation, the Monitor cancelled its scheduled site visit and community meeting. Nothing about the Court's May 22 order suggested such a cancellation.

Nevertheless, until the Court rules on Defendants' Motion, the Monitor shall not seek to conduct independent investigations within the MCSO relating to the subjects of Order to Show Cause. This does not affect, however, the Monitor's authority to act pursuant to the terms of the Supplemental Permanent Injunction or other self-enforcing orders—*e.g.*, those that do not require further action from this Court. In supervising administrative investigations undertaken by the MCSO that bear relation to the constitutional rights of the Plaintiff class, including those investigations that may have been triggered by events also relevant to the civil contempt hearing (such as those arising from the posthumous inquiry into Deputy Armendariz), the IA Monitors act pursuant to the terms of the Supplemental Permanent Injunction and self-enforcing provisions of this Court's November 20, 2014 Order. (*See* Doc. 795, *amended by* Doc. 825.) Should the Court be required to enter additional orders to preserve the relative positions of the Parties in the interim period, it will vacate its previous Order (Doc. 1120).

In addition, the Court has received Defendants' objection to the United States Department of Justice's examination of the documents that were allegedly harvested from the Central Intelligence Agency and provided to Defendants by Dennis Montgomery. (Doc. 1138.) Therefore, the Monitor shall not cooperate with the DOJ on a voluntary

basis to facilitate such examination, pending the Court's ruling on Defendants' Motion.

Lastly, the Court has received the Parties' stipulation that Plaintiffs' Response to the Motion for Recusal will be filed by June 12, and Defendants' Reply will be filed by June 22. Because those dates continue up through the dates held for the continued contempt proceedings, the Court hereby **VACATES** the evidentiary hearing scheduled for June 16-19; 23-26, 2015. This matter will be reset following the resolution of Defendants' Motion.

Dated this 1st day of June, 2015.

Honorable G. Murray Snow
United States District Judge

Exhibit 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

In early May 2015, the Court received an Application of Attorney for Admission to Practice Pro Hac Vice from Mr. Jonathan A. Moseley, who practices in Virginia. The application was accompanied by a two page letter dated May 2, 2015 and a three page document entitled Additional Information. Mr. Moseley subsequently filed a Motion to Intervene in this action on behalf of Dennis Montgomery, along with various other motions and memoranda. (*See* Docs. 1057, 1058, 1067, *stricken by* Doc. 1093.) Following a status conference at which Mr. Moseley was invited to appear telephonically in support of his request for admission pro hac vice, and at which he did not appear, the Court denied Mr. Moseley's application. (*See* Doc. 1093.) Mr. Moseley now moves for reconsideration of his application for admission on the grounds that (1) the record does not reflect the existence of any conflict of interest between Mr. Moseley's representation of Sheriff Joseph Arpaio in another action and his intended representation of Mr.

1    Montgomery in this case; (2) Mr. Montgomery's Sixth Amendment right to counsel

2    would be violated if Mr. Moseley is unable to represent him pro hac vice; and (3) the

3    Court should recuse itself. (Doc. 1112.) Mr. Montgomery has since filed three

4    supplements to this Motion. (Docs. 1140, 1160, 1161.)

        Local Rule of Civil Procedure 7.2(g) provides that a party seeking reconsideration

5    of a ruling shall, in that motion, "point out with specificity the matters that the movant

6    believes were overlooked or misapprehended by the Court, any new matters being

7    brought to the Court's attention for the first time and the reasons they were not presented

8    earlier, and any specific modifications being sought in the Court's Order." The movant

9    may not repeat any argument previously made in support of the motion that resulted in

10   the challenged order. L.R. Civ. 7.2(g). Motions for reconsiderations are disfavored, and

11   will ordinarily not be granted "absent a showing of manifest error or a showing of new

12   facts or legal authority that could not have been brought to its attention earlier with

13   reasonable diligence." *Id.*; *Morgal v. Maricopa Cnty. Bd. of Supervisors*, No. CIV-07-

14   0670-PHX-RCB, 2012 WL 2368478, at *1 (D. Ariz. June 21, 2012) (noting motions for

15   reconsideration should be granted only in rare circumstances). As with all motions,

16   failure to comply with the local rules of procedure are grounds for denial of the motion.

17   L.R. Civ. 7.2(g).

18        As a preliminary matter, Mr. Moseley's challenge of the Court's articulated

19   concern that his admission could create a conflict of interest fails to advance any grounds

20   different from those contained in his Clarification of Motion for Admittance Pro Hac

21   Vice, filed prior to the Court heard argument on his application for admission. (*See* Doc.

22   1080); L.R. Civ. 7.2(g) ("No motion for reconsideration of an Order may repeat any . . .

23   argument made by the movant in support of or in opposition to the motion that resulted in

24   the Order."). Moreover, his Motion for Reconsideration does not address the issues raised

25   at the status conference the Court held in these matters on May 14, 2015, at which Mr.

26   Moseley's application was discussed and, ultimately, denied.[1] Under the Arizona Rules

27

28         [1] As noted above, Mr. Moseley was authorized to appear telephonically at this

of Professional Conduct, a lawyer may not represent a client if the representation involves a concurrent conflict of interest, such as where "the representation of one client will be directly adverse to another client" or where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . ." E.R. 1.7(a). "Attorneys admitted pro hac vice are held to the same professional responsibilities and ethical standards as regular counsel. . . ." *Cole v. U.S. Dist. Ct. for the Dist. of Idaho*, 366 F.3d 813, 822 (9th Cir. 2004). The comments to E.R. 1.7 offer some guidance on whether an impermissible conflict exists: the comments provide that a "lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated." A conflict may also "exist by reason of substantial discrepancy in the parties' testimony, [or] incompatibility in positions in relation to an opposing party . . . ." E.R. 1.7 (advisory notes).

The interests of Mr. Montgomery are adverse to the interests of Sheriff Arpaio and the MCSO, or at least the risk of such adversity, is sufficiently present to warrant denying Mr. Moseley's application to represent the former. (*See also* Doc. 1145 (noting the parties' differences with some positions taken by Mr. Moseley)). Mr. Moseley concedes that he has an attorney-client relationship with Sheriff Arpaio stemming from his affiliation with Freedom Watch, which represents the Sheriff in another action in the Circuit Court for the District of Columbia challenging President Obama's executive action on immigration. Mr. Moseley seeks admission on behalf of Mr. Montgomery, who was hired as a confidential informant by the MCSO. Sheriff Arpaio has testified in this action that the material MCSO received from Mr. Montgomery was "junk." (Tr. of Apr. 23, 2015 Evid. Hr'g 650:20–25, Docs. 1027.). Facts involving the Seattle operation and the credibility of Mr. Montgomery are squarely before this Court, at least insofar as those

---

conference, but he gave no indication of his presence during the initial counsel roll call or, later, when directly addressed by the Court at this time the issues of his application and the potential conflict of interest it posed were raised. (*See* Tr. May 14, 2015 Status Conf. 32, Doc. 1097.)

issues reflect the truthfulness of testimony offered in this matter, and the MCSO's efforts, or lack thereof, in implementing this Court's orders at the same time it may have been devoting resources to funding an investigation to possibly discredit this Court. Therefore, Mr. Moseley's litigating of Mr. Montgomery's stake in the evidence at issue, the validity of which has been repudiated by Sheriff Arpaio, will most likely involve credibility determinations and competing factual testimony. This would seem to necessarily impact the attorney-client relationships Mr. Moseley has with Mr. Montgomery and Sheriff Arpaio, and likely violate his duty of loyalty to one or both of them. Further, Sheriff Arpaio has objected on the record to the positions taken by Mr. Moseley in one of his supplemental pleadings for admission pro hac vice: "Putative intervenor's attorneys Klayman and Mosely [*sic*] neither represent Sheriff Arpaio and Chief Deputy Sheridan, nor speak for the interests of the MCSO in this action or in any proceeding related to this action." (Doc. 1145 at 2.) This is additional evidence that there is sufficient adversity of interests to deny Mr. Moseley's request for admission. The Court has a recognized interest in ensuring that the proceedings in this case are conducted within the standards of the profession. *Cf. Wheat v. United States*, 486 U.S. 153, 160 (1988).

In addition to the potential conflict posed by Mr. Moseley's application for admission, there is evidence that Mr. Moseley's representation of Mr. Montgomery would stand in the way of the orderly administration of justice. Mr. Moseley attached a letter dated May 02, 2015 to his pro hac vice application. There is a notation on the letter that counsel of record were sent copies of his application and accompanying materials; yet, no other attorney in this action has ever received these documents from Mr. Moseley. In the letter, Mr. Moseley claims that his appearance would be for the purpose of presenting answers to this Court. However, before his application for admission pro hac vice was considered, Mr. Moseley filed several substantive motions not previously referenced in his application or accompanying letter. Mr. Moseley subsequently acknowledged that portions of the letter relating to his filing of an amicus curiae brief for Sheriff Arpaio were also inaccurate. Following that, Mr. Moseley attempted to withdraw

the letter in its entirety. Then, Mr. Moseley reached out to the Court about appearing telephonically in support of his Motion for Reconsideration and failed to do so or explain his absence, although he contacted the Court about obtaining a transcript of the proceedings following their conclusion. At the hearing, Plaintiffs provided the Court with information that raises additional concerns about Mr. Moseley's ethical fitness to be admitted to practice in this district pro hac vice. (Tr. May 14, 2015 Status Conf. 34:22– 39:9, Doc. 1097 (referencing *Moseley v. Virginia State Bar, ex rel. Seventh Dist. Comm.*, 280 Va. 1, 1, 694 S.E.2d 586, 588 (2010)).) Mr. Moseley's engagement in this action to date demonstrates a substantial likelihood that his conduct would hinder the efficacious administration of justice if he were to be admitted. Where "an out-of-state attorney strongly suggests through his behavior that he will neither abide by the court's rules and practices . . . nor be readily answerable to the court, the judge may reject his pro hac vice application." *Ries*, 100 F.3d at 1471. Mr. Moseley fails to demonstrate how the Court's previous denial of his application amounted to manifest error.

The second point in Mr. Moseley's Motion for Reconsideration is also misplaced. There is no constitutional right to counsel in a civil action, which this is. *United States v. Sardone*, 94 F.3d 1233, 1236 (9th Cir. 1996). Further, in any case, a litigant's right to choose his counsel is not unlimited and may give way to serve a "compelling purpose" such as "the efficient and orderly administration of justice." *United States v. Walters*, 309 F.3d 589, 591–92 (9th Cir. 2002); *see also United States v. Ries*, 100 F.3d 1469 (9th Cir. 1996) (finding court may impinge on right to have chosen attorney admitted pro hac vice where the attorney's admission is sought for a dilatory purpose or is otherwise subversive of the ethical and orderly judicial process). For the reasons stated above, the record strongly suggests that admission of Mr. Moseley would indeed interfere with the orderly adjudication of this case. Thus, the interest underlying the Court's denial of Mr. Moseley's application also provides a sufficiently compelling reason to warrant depriving Mr. Montgomery of his preferred choice of counsel.

Mr. Moseley's third point is a reiteration of previous arguments made in support

of the Motion to Intervene he filed concomitantly with seeking admission pro hac vice, and does not constitute "new facts or legal authority" to justify this Court's reconsideration of his application.[2] *See* L.R. Civ. 7.2(g).

**IT IS THEREFORE ORDERED** that Mr. Moseley's Motion for Reconsideration (Doc. 1112) is **DENIED**.

Dated this 10th day of July, 2015.

G. Murray Snow
Honorable G. Murray Snow
United States District Judge

---

[2] None of the supplements filed by Mr. Moseley and Mr. Klayman address the apparent conflict of interest between Mr. Montgomery and Sheriff Arpaio or present new arguments sufficient to cause this Court to reconsider the denial of their application.

- 6 -

Exhibit 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| | **ORDER** |
| Plaintiffs, | |
| v. | |
| Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

The Court held a hearing with the parties on July 24, 2015. Defendants are hereby ordered to turn over all items of evidence associated with DR 14-007250, including hard drives, documents, and/or any other and materials, to the custody of the United States Marshals Service by the end of the day today, July 24, 2015. The Marshals shall store this evidence in a secure location and make it available, upon request and under secure conditions, to the parties and to the United States Government for copying pursuant to the Court's previous orders. Defendants are further ordered to produce to the Marshals the 1,459 identifications that lack an associated DR number.

**IT IS SO ORDERED.**

Dated this 24th day of July, 2015.

Honorable G. Murray Snow
United States District Judge

Exhibit 10

1

```
 1                 UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega        )
     Melendres, et al.,            )
 5                                 )
                Plaintiffs,        )   CV 07-2513-PHX-GMS
 6                                 )
                vs.                )   Phoenix, Arizona
 7                                 )   May 8, 2015
     Joseph M. Arpaio, et al.,     )   9:01 a.m.
 8                                 )
                Defendants.        )
 9   _____)

10

11

12

13

14

15             REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             BEFORE THE HONORABLE G. MURRAY SNOW

17                   (Status Conference)

18

19

20

21

22   Court Reporter:              Gary Moll
                                  401 W. Washington Street, SPC #38
23                                Phoenix, Arizona  85003
                                  (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

1                          A P P E A R A N C E S

2

3    For the Plaintiffs:

4    (Telephonically)              Cecillia D. Wang, Esq.
                                   AMERICAN CIVIL LIBERTIES UNION
5                                  FOUNDATION
                                   Immigrants' Rights Project
6                                  39 Drumm Street
                                   San Francisco, California  94111
7                                  (415) 343-0775

8                                  Stanley Young, Esq.
     (Telephonically)              Hyun Byun, Esq.
9                                  COVINGTON & BURLING, L.L.P.
                                   333 Twin Dolphin Drive
10                                 Suite 700
                                   Redwood Shores, California  94065
11                                 (650) 632-4700

12                                 Daniel J. Pochoda, Esq.
                                   Joshua Bendor, Esq.
13                                 AMERICAN CIVIL LIBERTIES
                                   FOUNDATION OF ARIZONA
14                                 P.O. Box 17148
                                   Phoenix, Arizona  85011-0148
15                                 (602) 650-1854

16   (Telephonically)              Andre Segura, Esq.
                                   AMERICAN CIVIL LIBERTIES UNION
17                                 125 Broad Street, 18th Floor
                                   New York, New York  10004
18                                 (212) 549-2676

19   For the Defendant Maricopa County:

20                                 Richard K. Walker, Esq.
                                   WALKER & PESKIND, P.L.L.C.
21                                 16100 N. 71st Street
                                   Suite 140
22                                 Scottsdale, Arizona  85254
                                   (480) 483-6336

23

24

25

1                        A P P E A R A N C E S

2

3   For the Defendants Arpaio and MCSO:

4                              Michele M. Iafrate, Esq.
                               IAFRATE & ASSOCIATES
5                              649 N. 2nd Avenue
                               Phoenix, Arizona  85003
6                              (602) 234-9775

7   For the Defendant Arpaio:  A. Melvin McDonald, Esq.
                               Linda Tivorsak, Esq.
8                              JONES, SKELTON & HOCHULI, P.L.C.
                               2901 N. Central Avenue, Suite 800
9                              Phoenix, Arizona  85012
                               (602) 263-1700
10

11  For Chief Deputy Sheridan:  Barry D. Mitchell, Esq.
                               MITCHELL STEIN CAREY
                               One Renaissance Square
12                             2 North Central Avenue
                               Suite 1900
13                             Phoenix, Arizona  85004
                               (602) 358-0290
14

15  For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
                               DICKINSON WRIGHT, P.L.L.C.
                               Attorneys at Law
16                             1850 N. Central Avenue, Suite 1400
                               Phoenix, Arizona  85004
17                             (602) 285-5000

18  For Executive Chief Brian Sands:

19                             Greg S. Como, Esq.
                               LEWIS BRISBOIS BISGAARD
20                             & SMITH, L.L.P.
                               Phoenix Plaza Tower II
21                             2929 N. Central Avenue
                               Suite 1700
22                             Phoenix, Arizona  85012-2761
                               (602) 385-1040
23

24

25

1                        A P P E A R A N C E S

2

3    For Lieutenant Joseph Sousa:

4    (Telephonically)          David S. Eisenberg, Esq.
                                DAVID EISENBERG, P.L.C.
5                               2702 N. 3rd Street
                                Suite 4003
6                               Phoenix, Arizona  85004
                                (602) 237-5076
7
     For Tom Liddy, Ann Uglietta, and Douglas Schwab:
8
                                Terrence P. Woods, Esq.
9                               BROENING OBERG WOODS & WILSON, P.C.
                                P.O. Box 20527
10                              Phoenix, Arizona  85036
                                (602) 271-7700
11
     Also present:
12
     (Telephonically)          Chief Robert S. Warshaw, Monitor
13   (Telephonically)          Deputy Monitor John Girvin
     (Telephonically)          Deputy Monitor Raul Martinez
14                             Ms. Sandi Wilson
                                Karen Clark, Esq.
15                             Ms. Cari Shehorn

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3              THE COURT:  Please be seated.

4              THE CLERK:  This is civil case number 07-2513,

5    Melendres v. Arpaio, on for status conference.                09:01:18

6              Counsel, please announce your appearances.

7              MR. YOUNG:  Good morning, Your Honor.  For plaintiffs,

8    Stanley Young, Covington & Burling.

9              MR. BENDOR:  Josh Bendor, ACLU of Arizona.

10             MR. POCHODA:  Dan Pochoda, ACLU of Arizona.          09:01:30

11             MS. IAFRATE:  Good morning, Your Honor.  Michele

12   Iafrate, and with me is my law clerk, Cari Shehorn, on behalf

13   of Sheriff Arpaio.

14             THE COURT:  Good morning.

15             MR. BIRNBAUM:  Good morning, Your Honor.  Gary        09:01:39

16   Birnbaum.  I'm appearing specially for Deputy Chief John

17   MacIntyre.

18             THE COURT:  Good morning.

19             MR. BIRNBAUM:  Thank you.

20             MR. WALKER:  Good morning, Your Honor.  Richard Walker  09:01:46

21   appearing on behalf of that portion of the Maricopa County

22   government embodied by the board of supervisors, the county

23   manager, and the appointed county officers reporting to them.

24             THE COURT:  Good morning.  Is Ms. Wilson here this

25   morning?                                                      09:02:01

1    and that's why we're making the request.

2         Ms. Iafrate did advise yesterday that she is still

3    considering our request for those documents, and so we have not

4    received defendants' position on that yet.

5         THE COURT:  Ms. Iafrate.                          09:21:44

6         MS. IAFRATE:  Your Honor, I received this request on

7    May 5th in a letter.  I would beg your indulgence --

8         THE COURT:  You have it.  We're going to meeting every

9    week.  Let me just say, and I was going to raise this later,

10   and perhaps I will raise it later, but it strikes me that    09:21:59

11   plaintiffs do have the opportunity, in light of the deficits

12   that have been discovered, to seek to reopen the nature of the

13   injunctive relief that I have requested.  It does strike me

14   also that, you know, Maricopa County can resist that, has the

15   right to resist it.                                      09:22:24

16        It seems to me the practical reality of that, though,

17   is I either make a determination based on this record that we

18   develop over the next couple of months or I reset this matter

19   for a whole new trial.  It strikes me as being worth the effort

20   for the -- whatever else you're going to say, it seems to me   09:22:43

21   that civil contempt -- a civil contempt order is going to be --

22   at least a civil contempt order is going to be entered here at

23   least against some defendants.  They've confessed it.

24        And again, I don't want to prohibit your rights,

25   Ms. Iafrate, I don't want to prohibit your rights, Mr. Young, I   09:23:00

1   don't want to prohibit your rights, Mr. Como, or anybody

2   else's, but it seems to me that it would be worthwhile for you

3   to talk and see what kind of remedies, Mr. Young, you would

4   propose, and see if those are acceptable to Ms. Iafrate.

5          And if they are -- and I realize that you may not be          09:23:23

6   able to provide specific ones until the evidence is developed,

7   but at least the general types of remedies -- because if they

8   are, I think it would be, arguably, to the benefit of all

9   parties, because I'm going to give, at a minimum, if Maricopa

10  County fights everything, I'm going to give a new trial to the    09:23:39

11  plaintiffs as -- it's extremely likely, and I'm not going to

12  make them wait and submit a fee award.  Since the trials have

13  been very expensive, I will require monthly payments to be made

14  to the plaintiffs' counsel to pay for that trial since they

15  should not have to pay for it, in light of the fact that          09:23:58

16  this -- it would be part of a civil contempt award.

17         And I don't say that to be threatening, I'm just

18  telling you what I'm thinking, so that it might make sense from

19  your perspective and from their perspective to either stipulate

20  to a field of discovery that they want, to discover this and      09:24:12

21  see if you can arrive at remedies that you can all live with,

22  because it does seem to me like, and we'll discuss this in

23  others respects, too, the option is a whole new trial of this

24  case from the beginning, or at least that's certainly one

25  option.  So I'd like to sort of set that in place so that you     09:24:33

1    can consider it.

2         But Ms. Iafrate, as you consider their request, I

3    guess to the extent any of that sort of musing of mine is

4    helpful, I wanted to give it to you.  And I think I wanted to

5    raise it a little bit later on as it pertains to other issues,          09:24:45

6    because I think there are issues that we can do something about

7    and there are issues that we can't do much about, and of course

8    I want to have counsels' input on that.

9         And if we can't do much about them in this hearing,

10   then I think that we need to figure out what the appropriate              09:25:01

11   response is but not waste a lot of time on it.  If we can do

12   something about it and can agree, then we can eliminate issues,

13   and then we can try the issues that deserve to be tried and get

14   this matter resolved.

15        Mr. Young.                                                            09:25:19

16        MR. YOUNG:  Your Honor, I assume the new trial you're

17   referring to would be on the subject of remedies.

18        THE COURT:  That's correct.

19        MR. YOUNG:  Yes.  There is one more issue relating to

20   the February 12 order, and I'm going to ask Ms. Iafrate's                 09:25:30

21   forgiveness, since this was in the May 5th order -- the May 5th

22   letter that we sent her, but I have not spoken to her about it

23   since then, which is the scope of disclosure with respect to

24   individuals who were detained outside the traffic stop context.

25        We did request in our May 5th letter that we receive                 09:25:52

1    believe that in previous discussions with you, you believed

2    that these individuals did fit within the class.  Sheriff

3    Arpaio would object.

4            THE COURT:  I do have the class here, I think.

5            MS. IAFRATE:  Beg your pardon?                         09:27:35

6            THE COURT:  The class is, quote, all Latino persons

7    who, since January 2007, have been, or will be in the future,

8    stopped, detained, questioned, or searched by MCSO agents while

9    driving or sitting in a vehicle on a public roadway or parking

10   area in Maricopa County, Arizona.                              09:28:00

11           It does seem to me -- and again, I'm going to give you

12   a full opportunity to make your argument -- but it does seem to

13   me that if MCSO is detaining someone to take them to Border

14   Patrol because they have no state charge and they're doing it

15   in a motor vehicle on a public roadway, they're the ones that  09:28:14

16   have made them a member of the plaintiff class by definition.

17           And I did ask, I think I recall, I think you're right,

18   I think I recall asking, was it Lieutenant Jakowinicz that?

19           MS. IAFRATE:  I don't recall which witness, but I know

20   that it was solicited from your questioning, Your Honor.       09:28:31

21           THE COURT:  Well, yeah, I did question him about that.

22           MS. IAFRATE:  Right.

23           THE COURT:  And it -- just because it does seem to me

24   that when you've done, that you've created a -- I mean, it

25   seems to me that fits within the plaintiff class.  But I'll    09:28:46

```
 1   allow you more time to make an objection on that point.

 2        MS. IAFRATE:  Well, Your Honor, would you like me to

 3   do it orally or would you like me to do it in writing,

 4   because if it's --

 5        THE COURT:  I want to give you the chance to do it in    09:28:56

 6   writing --

 7        MS. IAFRATE:  Thank you.

 8        THE COURT:  -- and we can take it up.

 9        MS. IAFRATE:  Thank you.  Just for a brief statement,

10   Your Honor, of course, I was not part of the original trial.  09:29:01

11        THE COURT:  Right.

12        MS. IAFRATE:  However --

13        THE COURT:  Hardly anybody was any more.

14        MS. IAFRATE:  Right.  Few people left standing, but --

15        THE COURT:  Um-hum.                                      09:29:13

16        MS. IAFRATE:  -- I can tell you that in my review of

17   not only the pretrial discovery, but also the testimony at

18   trial, and even afterward, everything was anticipated that it

19   was resulting from traffic stops and the --

20        THE COURT:  Well --                                      09:29:25

21        MS. IAFRATE:  -- interdiction patrols that were being

22   done by the Sheriff.

23        MR. SCHWAB:  I don't think that's a misstatement of

24   the record, and so I'll let you make your argument, but the

25   class is what the class is and the class certified is the class  09:29:36
```

1   certified.  And the class was certified for a reason, and it

2   just seems to me that that fits within the definition of the

3   class.  But I'm not arguing with you, and so I'm going to give

4   the chance to make your -- make your record, and give you the

5   chance to do it in writing.                                    09:29:54

6          MS. IAFRATE:  Okay.

7          THE COURT:  All right?

8          MR. YOUNG:  Your Honor, will there be a timetable for

9   that, given the hearings that are set for June?

10         THE COURT:  Yes.  When do you think you'll be able to   09:30:03

11  make it?

12         MS. IAFRATE:  As to that issue?

13         THE COURT:  To file your objection to the discovery

14  request filed by the plaintiffs.

15         MS. IAFRATE:  Friday.                                   09:30:16

16         THE COURT:  Okay.  So if you will make it Friday, then

17  we will resolve it the following status conference, if you can

18  get a response on.

19         MR. YOUNG:  So --

20         THE COURT:  So it would be Friday the fif- -- let's     09:30:25

21  see, today is what?

22         MS. IAFRATE:  Today is the 8th, Your Honor.

23         THE COURT:  Okay.  So it would be Friday the 15th

24  you'll have it filed by.

25         MS. IAFRATE:  Yes.                                      09:30:34

1        THE COURT:  And we will resolve it at the May 22nd.

2        MS. IAFRATE:  Very well.

3        MR. WALKER:  Your Honor, just for the record, and I'm

4   sure you recall at our last hearing, my client also objects and

5   respectfully disagrees that the operations, what we call          09:30:47

6   worksite operations are within the scope of the class as

7   defined --

8        THE COURT:  All right.  You know, this raises another

9   issue.  I've been trying -- and I was going to discuss this

10  later, but I might as well raise it now since it's the issue.     09:31:05

11  I do think that one of the purposes of contempt is

12  compensation.  Clearly, there have been lots of victims, and

13  clearly it's to the defendants' interests to argue about how

14  broad or how narrowly those interests are defined.

15       But I'm trying to think, is there any way I can             09:31:27

16  compensate the victims of the sheriff's contempt in a realistic

17  way, and I'm having trouble with it.  I told the plaintiffs

18  this earlier.  I mean, I don't -- I don't know that there is

19  anything I can do in this lawsuit that would restrict the right

20  of anybody to bring a class action or anything else they want    09:31:44

21  to bring.

22       And I suppose that I could compel the creation of a

23  fund as against which claims could be made if somebody wanted

24  to surrender their claims, but I'm not sure -- you know, if I

25  were to do that, that would not have the benefit to the          09:32:09

```
 1   defendants of eliminating liability.  And if it wouldn't have
 2   the benefit of eliminating liability, then perhaps the
 3   plaintiffs ought to either determine whether or not they wanted
 4   to bring their own class action, whether they want to associate
 5   class counsel, whether they want to provide some sort of            09:32:25
 6   procedure whereby we could, if necessary, sever the
 7   compensatory aspects of this in a class action that then would
 8   be reassigned to me where arguments like this can be made.
 9           MR. YOUNG:  Well, Your Honor, I can report --
10           THE COURT:  And you wouldn't have to -- you wouldn't       09:32:44
11   have to reinvent the wheel with a judge who isn't very familiar
12   with what's going on here.
13           I mean, it seems to me we have a lot of possibilities,
14   but they require some thinking.  And I will say, you know, as
15   to whether or not I'm going to -- just so nobody's confused by     09:32:59
16   it, if I feel like I can't give, and I'm not likely to be able
17   to give, any sort of adequate remedy to persons damaged by the
18   sheriff's violation of my preliminary injunction, that does
19   make some difference to me as to whether or not I ought to
20   order up this matter for criminal contempt, just so it's on the    09:33:20
21   table.
22           So Mr. Young?
23           MR. YOUNG:  Well, I can -- I appreciate the Court's
24   thoughts on this issue.  I can report on where we are.
25           We do intend, in the June hearings, to present             09:33:36
```

```
 1    evidence on this issue of compensation.  We do believe that's

 2    an important, very important part of this proceeding, and we

 3    appreciate, actually, the expedition that the Court has

 4    expressed its desire to achieve.

 5         So we have also had some discussions with Mr. Walker      09:33:53

 6    and Ms. Iafrate about having a discussion Monday, actually,

 7    starting a discussion on whether we can agree on a process for

 8    compensation of class members, the people who are victims of

 9    the injunction.  We haven't yet fleshed that out, but

10    obviously, I mean, I don't think it's too much of a leap to say 09:34:23

11    that if someone obtains compensation in the course of that

12    process, whether it's agreed upon or imposed as a remedy by

13    this Court, that they wouldn't be free in some other lawsuit to

14    seek additional compensation.

15         So it would be our desire to have that compensation       09:34:38

16    for those people who were detained unlawfully in violation of

17    the injunction to obtain compensation as part of the remedy

18    process in this case.

19         THE COURT:  All right.  Well, I'd suggest, then, that

20    that be a matter that you discuss with defendants and see if    09:34:56

21    you can arrive at a procedure that I will buy.  And I'm going

22    to advise you that even if you buy it, and even if they buy it,

23    I might not buy it.

24         MR. YOUNG:  Understood.

25         THE COURT:  But I think it is worthwhile for you to        09:35:08
```

 1    pursue.  Have we resolved that topic?  Are we ready to go on to

 2    another?

 3              The next is the status of defendants' compliance with

 4    the Court's April 23rd-24th, 2015 orders relating to document

 5    production.                                                          09:35:27

 6              I have noticed, Ms. Iafrate, that over the last day or

 7    maybe two days, you've started to produce those documents and

 8    provide them to all sides.  The monitor started to review them

 9    and he gave me a couple of concerns that, frankly, I hadn't

10    been aware of, and I want to raise them with you, and I gather     09:35:42

11    that you'll probably have a couple of both logistical and

12    perhaps other concerns you want to raise.

13              Apparently, the materials that you are providing

14    involve records that I -- and, Bob, if I misstate this, tell

15    me -- but I believe the monitor on first cut thinks, based         09:36:04

16    partly on Chief Deputy Sheridan's testimony, there was

17    something I hadn't anticipated.  I had not anticipated that

18    Mr. Montgomery would have done a file dump with the MCSO of

19    those files that he apparently procured without authoriza- --

20    or claims to have procured without authorization from the CIA.     09:36:25

21              Is that an issue?

22              MS. IAFRATE:  That is an issue, Your Honor.

23              THE COURT:  All right.  And in those files, at least

24    according to the initial review of my monitor, there is a

25    number of names, addresses, telephone numbers of individuals.      09:36:43

1          So I'm just going to instruct the parties, I've

2   instructed Ms. Iafrate, and I think she's doing her best to

3   comply, to review this material for attorney-client privilege

4   or work product immunity and do a privilege log, but if she

5   doesn't, but all the other documents she's providing in Bates      09:37:04

6   stamped order, and I gather that we may some need to discuss

7   and work that through to all parties so you're all getting

8   material that has peoples names, addresses, and telephone

9   numbers --

10         MS. IAFRATE:  As well as Social Security numbers and         09:37:18

11  banking documents, Your Honor.

12         THE COURT:  Okay.  So there are some banking documents

13  and Social Security numbers.  None of that material can be

14  released without authorization of the Court.  All right?  You

15  can have it.  You can review it.  You can use it in preparing      09:37:31

16  for this action.  But you cannot review it -- or you cannot

17  release it without authorization of the Court.

18         Ms. Iafrate, it occurred to me that if in -- and I

19  know that Chief Deputy Sheridan said that -- and again, Chief,

20  you're here.  I don't mean to put words in your mouth; I'm just    09:37:48

21  trying to summarize essentially what your testimony was -- that

22  Mr. Montgomery, the MCSO has determined that he was not

23  credible.  And again, you can correct that characterization if

24  you wish to.

25         And so it may be that -- well, I'm sorry.  It may be        09:38:06

```
 1    that the doc -- it may be that his assertion that these

 2    actually were documents that are a CIA dump are not correct.

 3    But it occurs to me that if there is a chance that you believe

 4    that you did receive CIA files, if you haven't already done it,

 5    if you have not already done it, I'm going to ask you to

 6    contact the chief counsel for the CIA and inform him that you

 7    received these documents, the date you received these

 8    documents, and see if they wish to intervene in this action and

 9    take any protective measures with respect to these documents.

10            Do you have any problem doing that?

11            MS. IAFRATE:  I do not have any problem doing that,

12    Your Honor.  I think, I think that that would be prudent.

13            THE COURT:  All right.  Any objection by anybody if I

14    order Ms. Iafrate to do that?

15            MR. YOUNG:  None from plaintiffs, Your Honor.

16            MR. WALKER:  No objection, Your Honor.

17            MR. McDONALD:  None, Your Honor.

18            MR. COMO:  I have none, Your Honor.

19            THE COURT:  All right.  Other issues that you have,

20    Ms. Iafrate.

21            MS. IAFRATE:  I do have other issues regarding --

22    regarding that production.  I received a call from Chief Girvin

23    yesterday very concerned regarding the release of these

24    documents to others rather than the monitors, and I advised

25    them that I was ordered to do so by Your Honor in --
```

09:38:31

09:38:48

09:38:59

09:39:08

09:39:27

1          THE COURT:  And you were.

2          MS. IAFRATE:  -- docket 1032.  So --

3          THE COURT:  No, no, you clearly were.  I hadn't

4    anticipated that you had a document dump like this, so you're

5    right, I did make that order.                                    09:39:40

6          MS. IAFRATE:  So the monitors have received documents

7    well before plaintiffs, because we were given the opportunity

8    to then review them and Bates stamp them and get them in order

9    to send them out to plaintiffs as well as the other attorneys.

10   There is a hard drive that has over two terabytes of data dump  09:39:59

11   on it in sub-folders.

12         THE COURT:  Are these the alleged CIA documents?

13         MS. IAFRATE:  Yes.  This has --

14         THE COURT:  Let me ask, are you -- and I'm sorry to

15   interrupt you -- are you able to segregate what the alleged CIA 09:40:16

16   documents are from other documents that were prepared by

17   Mr. Montgomery?

18         MS. IAFRATE:  To a point, Your Honor.  This hard drive

19   is the one that's most troubling, and I think that it -- I

20   think that the monitors would agree that it would be the most   09:40:33

21   troubling, not only the content that's on this hard drive is

22   personal in nature to hundreds of thousands of alleged victims

23   of identity theft, but also to duplicate it and get it in a

24   process that would be usable for plaintiffs and other attorneys

25   would require weeks of effort on the part of our third-party    09:40:58

1    vendor, and each shot would be approximately $87,000.

2          So the paper and the thumb drives and the other

3    information that has been provided to us, we have pushed that

4    out to plaintiffs, but this hard drive that I believe is

5    concerning -- and I won't speak for Chief Girvin, but he          09:41:22

6    expressed concern, too -- this is the bulk of the data dump

7    that I think that we should be most cautious about.

8          THE COURT:  All right.  Let me -- well, does anybody

9    have anything else they want to say before I venture some

10   thoughts?                                                          09:41:42

11         It seems to me that we can do this.  In addition to

12   the concern that the monitor raised, he's also indicated to me,

13   at least based on a rough initial look, that there are clearly

14   documents in that file that are very relevant to this

15   litigation.  And I believe that the plaintiffs have to have a      09:42:01

16   chance to look at that, and I guess -- so I don't want to

17   prevent them from looking at those things, but I see your point

18   that, you know, this data dump -- whether it's real, whether

19   it's false, whether it's partly real, partly false -- may be

20   very large, and may have lots of information.                      09:42:24

21         Does anybody object if I have my monitor coordinate

22   with Ms. Iafrate in terms of attempting to characterize

23   documents that you have in your possession, but I -- I guess

24   I'll just say just set them aside until the monitor coordinates

25   with Ms. Iafrate, looks at them, determines if their --           09:42:46

 1   determines what their contents is in general, can disclose to

 2   you what their content appears to be in general, and then you

 3   can determine, or we can all determine in these status

 4   conferences, what parts of that larger document file, if any,

 5   are relevant to the ongoing proceeding here.  And that will not        09:43:11

 6   prevent you from looking at other documents that are not part

 7   of that file.

 8          Does that work for you, Ms. Iafrate?

 9          MS. IAFRATE:  Yes, Your Honor.  However, just to

10   complicate matters, I think that there are duplications from           09:43:31

11   the paper documents that have been provided --

12          THE COURT:  Already?

13          MS. IAFRATE:  Already, and there is some data dump in

14   those documents as well.

15          THE COURT:  All right.  Well, I think -- I think, and           09:43:43

16   tell me if you object to this, to the extent that you've

17   already done paper documents and put Bates stamps on them that

18   have been disclosed, we will let the plaintiffs look at those

19   subject to the protective order I just entered, which is they

20   are not to release them without order of this Court.                   09:43:59

21          And then I guess I'm going to ask you, Ms. Iafrate,

22   would you please, unless you have an objection to doing so,

23   copy all counsel -- and the Court -- on your letter to -- or on

24   your communication, whatever it is, to counsel for the Central

25   Intelligence Agency?                                                   09:44:23

```
 1              MS. IAFRATE:  Your Honor, I feel comfortable copying
 2    you.  I need to think about whether I can be as candid as I
 3    would like to be if you're ordering me to also provide it to
 4    plaintiffs' counsel.
 5              THE COURT:  All right.  Well, is there an issue you        09:44:37
 6    want to talk to me about at sidebar on this?
 7              MS. IAFRATE:  No, I'm just thinking out loud, Your
 8    Honor, that this is a very sensitive matter that relates to CIA
 9    intelligence, and potentially Mr. Montgomery's motive or
10    technique.  I'm just concerned that --                             09:44:53
11              THE COURT:  Well --
12              MS. IAFRATE:  -- I'd like to be as candid as possible,
13    but I'm in an adversary position with plaintiffs' counsel as it
14    relates to my client.
15              THE COURT:  Mr. Young?                                    09:45:06
16              MR. YOUNG:  Well, Your Honor, plaintiffs have no
17    interest in receiving sensitive information that isn't relevant
18    to this case.  If it is relevant to the case, obviously, we
19    would be interested in it, and your suggested -- the Court's
20    suggested procedure to have the monitor make that                  09:45:21
21    determination, or make it with the plaintiffs -- with the
22    defendants is fine with.
23              THE COURT:  All right.  Then I'm asking you about the
24    letter.  Do you care to receive the letter that Ms. Iafrate's
25    going to send to CIA counsel?                                      09:45:35
```

1       MR. YOUNG:  If Ms. Iafrate thinks that she can write a

2   better letter that's more informative to the CIA without

3   copying us on it, we're fine not getting it.

4       THE COURT:  All right.  How about you, Mr. Como?

5       MR. COMO:  I don't need to be copied on that letter,          09:45:49

6   Your Honor.

7       THE COURT:  Mr. Walker?

8       MR. WALKER:  Your Honor, I don't think I need to have

9   a copy, although I must say I'm confused by this whole

10  discussion, probably primarily because I'm hearing a lot of     09:46:01

11  this for the first time.  But the letter --

12      THE COURT:  You were here, sir, with all the rest of

13  us; you were here.

14      MR. WALKER:  But to answer the Court's question

15  directly, I don't believe that I need to receive the letter.    09:46:11

16      THE COURT:  All right.  Well, you know, I think,

17  Ms. Iafrate, if you can't send it to the parties, I probably

18  ought not to receive it, either, but will authorize you to send

19  it to CIA counsel, ask you to retain a copy because it may

20  become relevant.                                                 09:46:28

21      And it does seem to me -- and I think that if you

22  would, and you can refer to the minutes of this hearing, you

23  can tell the CIA in a letter that we have an ongoing hearing.

24  It's my determination that allegations are relevant to the

25  ongoing hearing, and we're going to proceed with this ongoing    09:46:41

1    hearing.  So if it has interests that it wants to assert, it's

2    going to be too late if it tries to assert them three or four

3    weeks from now.

4         MS. IAFRATE:  Well, Your Honor, would you like me to

5    relay a deadline for them?  I mean, they're just going to be          09:46:57

6    made aware of this by my letter.

7         THE COURT:  Well you can make them aware of it by the

8    letter and however else you want to do it.  And perhaps if the

9    press is here they'll make them aware of it, too, but -- well,

10   I -- but we can't rely on that.  And so you can tell them that      09:47:19

11   they should notify -- they should notify us within two weeks if

12   they want to assert any privilege.

13        MS. IAFRATE:  Very well.  I will let them know.

14        THE COURT:  All right.

15        Anything else relating to those matters, if we have            09:47:39

16   the monitor work these matters through with plaintiffs'

17   counsel?

18        MR. YOUNG:  Your Honor, there's one detail, and I'm

19   not sure whether Ms. Iafrate is the right person or not, but we

20   did notice in the sealed order that was filed yesterday by          09:47:59

21   Judge Boyle that there were some interview transcripts that

22   were referred to in the correspondence which were not part of

23   that set of documents that was given to Magistrate Boyle, and

24   it would seem to us and it would be our assumption that as part

25   of the production of the documents that Your Honor ordered          09:48:17

 1   to operate, I'm not going to say so unless the parties don't --

 2   don't request the depositions and I think it's absolutely

 3   necessary.

 4           In conjunction with that, and I'm not sure how many

 5   parties will have received this and how many parties will not     10:04:21

 6   have received this, but I received a request for admission

 7   pro hac vice from a Jonathan Alden Moseley.  The reason I raise

 8   it is he indicated that he had provided copies of this request

 9   for admission to all parties of record.  He also provided me a

10   letter with that request for admission pro hac vice.              10:04:46

11           There are some parts relating to confidential matters

12   pertaining to whether or not I would admit him to practice

13   here, and he requests that they, for the most part, be kept

14   confidential unless they need to be known, and I think I want

15   to honor that request.  I don't see any reason that it -- that   10:05:08

16   it's relevant, but my concern is this.

17           Pursuant to Arizona rules, I admit somebody

18   pro hac vice only if I'm going to admit them as a party to a

19   particular action.  Now, I have -- although there are a lot of

20   people here that are representing others, they are not parties   10:05:29

21   to the action.  And Mr. Moseley I'm not sure -- well, he's --

22   he's provided inconsistent information, because in his

23   application he says -- I ask -- in his application for his

24   admission pro hac vice, he says I ask that the Court and the

25   parties consider that I, Jonathan Moseley, am not proposing to   10:05:57

1   actually participate in the conduct of this case, but merely to

2   sponsor the filing of an amicus curiae brief for Sheriff Joe

3   Arpaio by attorney Larry Klayman of Freedom Watch.

4           And then, in a letter dated the same date, he says

5   that he wants to enter an appearance on behalf of Dennis                10:06:16

6   Montgomery because he says without naming who, but it must

7   either be Sheriff Arpaio or Sheriff Sheridan, that one of the

8   witnesses doesn't know what they're talking about with respect

9   to some of the testimony he's heard that they issued about

10  Dennis Montgomery's work, and that he wants to correct the              10:06:35

11  record and answer any questions, and he will be happy to do

12  that however the Court deems best fit.

13          Now, he tells me that he's copied all counsel of

14  record.  Have you all received this letter?

15          MR. YOUNG:  Plaintiffs have not, Your Honor.                    10:06:53

16          MS. IAFRATE:  I have not, Your Honor.

17          MR. WALKER:  I have not, Your Honor.

18          MR. COMO:  I'm not aware of receiving it.

19          THE COURT:  Well, my concern, I'll just say it, is I

20  know that Mr. Klayman is representing Sheriff Arpaio in the             10:07:02

21  D.C. Circuit action, and it seems to me that if he's trying to

22  represent, and he may be trying to represent Sheriff Arpaio

23  here, he says he is.  But then he says he's trying to represent

24  Dennis Montgomery here, and he says that he's an associate with

25  Mr. Klayman in Freedom Watch.                                          10:07:22

 1        Well, as I understand it, Freedom Watch is a special

 2   interest law firm that's representing Sheriff Arpaio in another

 3   action and cannot then take positions adverse to his

 4   representation here.

 5        So I have some real concerns about granting this                10:07:37

 6   pro hac vice application.  I will, if you haven't received this

 7   application, copy it and provide it to all parties.  But I

 8   propose, unless anybody has an objection, that we set the

 9   opportunity at our next status hearing for Mr. Klayman to

10   appear if he wishes to and seek to be admitted pro hac vice and   10:07:57

11   clarify who and what and why he wants to be admitted

12   pro hac vice; and how, if in fact he wishes to represent Dennis

13   Montgomery and be critical of testimony offered by the

14   defendants in this matter, he can do so without a conflict.

15        And that may be something, Ms. Iafrate, you may wish           10:08:14

16   to explore prior to that hearing.  So I will make copies

17   available to all parties.  I assume at least that that

18   indicates he's willing to be deposed in this matter if any of

19   the parties believe that that deposition would be beneficial.

20        I've already discussed with you some of my thoughts           10:08:38

21   about whether or not it wouldn't be worthwhile for you to talk

22   and see if there's ways to simplify this action in terms of

23   possible remedies, be they damages remedies to individual

24   plaintiffs, be they expansion of the relief that this Court is

25   entitled, and the scope of the injunction that needs to monitor   10:09:00

Exhibit 11

```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega        )
     Melendres, et al.,            )
 5                                 )
                  Plaintiffs,      )   CV 07-2513-PHX-GMS
 6                                 )
                  vs.              )   Phoenix, Arizona
 7                                 )   May 14, 2015
     Joseph M. Arpaio, et al.,     )   9:35 a.m.
 8                                 )
                  Defendants.      )
 9   _____)

10

11

12

13

14

15             REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             BEFORE THE HONORABLE G. MURRAY SNOW

17                    (Status Conference)

18

19

20

21

22   Court Reporter:             Gary Moll
                                 401 W. Washington Street, SPC #38
23                               Phoenix, Arizona  85003
                                 (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

```
 1                        A P P E A R A N C E S

 2

 3    For the Plaintiffs:          Cecillia D. Wang, Esq.
                                   AMERICAN CIVIL LIBERTIES UNION
 4                                 FOUNDATION
                                   Immigrants' Rights Project
 5                                 39 Drumm Street
                                   San Francisco, California  94111
 6                                 (415) 343-0775

 7                                 Stanley Young, Esq.
                                   COVINGTON & BURLING, L.L.P.
 8                                 333 Twin Dolphin Drive
                                   Suite 700
 9                                 Redwood Shores, California  94065
                                   (650) 632-4700
10
      (Telephonically)            Tammy Albarran, Esq.
11                                 COVINGTON & BURLING, L.L.P.
                                   One Front Street, 35th Floor
12                                 San Francisco, California  94111
                                   (415) 591-7066
13
                                   Daniel J. Pochoda, Esq.
14                                 Joshua Bendor, Esq.
                                   AMERICAN CIVIL LIBERTIES
15                                 FOUNDATION OF ARIZONA
                                   P.O. Box 17148
16                                 Phoenix, Arizona  85011-0148
                                   (602) 650-1854
17
      (Telephonically)            Andre Segura, Esq.
18                                 AMERICAN CIVIL LIBERTIES UNION
                                   125 Broad Street, 18th Floor
19                                 New York, New York  10004
                                   (212) 549-2676
20
      For the Defendant Maricopa County:
21
                                   Richard K. Walker, Esq.
22                                 WALKER & PESKIND, P.L.L.C.
                                   16100 N. 71st Street
23                                 Suite 140
                                   Scottsdale, Arizona  85254
24                                 (480) 483-6336

25
```

1                          A P P E A R A N C E S

2

3    For the Defendants Arpaio and MCSO:

4                                 Michele M. Iafrate, Esq.
                                  IAFRATE & ASSOCIATES
5                                 649 N. 2nd Avenue
                                  Phoenix, Arizona  85003
6                                 (602) 234-9775

7    For the Defendant Arpaio:  A. Melvin McDonald, Esq.
                                JONES, SKELTON & HOCHULI, P.L.C.
8                               2901 N. Central Avenue, Suite 800
                                Phoenix, Arizona  85012
9                               (602) 263-1700

10   For Chief Deputy Sheridan:  Barry D. Mitchell, Esq.
                                 MITCHELL STEIN CAREY
11                               One Renaissance Square
                                 2 North Central Avenue
12                               Suite 1900
                                 Phoenix, Arizona  85004
13                               (602) 358-0290

14   For Deputy Chief MacIntyre: Gary L. Birnbaum, Esq.
                                 DICKINSON WRIGHT, P.L.L.C.
15                               Attorneys at Law
                                 1850 N. Central Avenue, Suite 1400
16                               Phoenix, Arizona  85004
                                 (602) 285-5000

17

     For Executive Chief Brian Sands:

18

                                  Greg S. Como, Esq.
19                                LEWIS BRISBOIS BISGAARD
                                  & SMITH, L.L.P.
20                                Phoenix Plaza Tower II
                                  2929 N. Central Avenue
21                                Suite 1700
                                  Phoenix, Arizona  85012-2761
22                                (602) 385-1040

23

24

25

1                    A P P E A R A N C E S

2

3   For Lieutenant Joseph Sousa:

4                            David S. Eisenberg, Esq.
                             DAVID EISENBERG, P.L.C.
5                            2702 N. 3rd Street
                             Suite 4003
6                            Phoenix, Arizona  85004
                             (602) 237-5076
7
    For Timothy J. Casey:    Karen Clark, Esq.
8                            ADAMS & CLARK, P.C.
                             520 E. Portland Street
9                            Suite 200
                             Phoenix, Arizona  85004
10                           (602) 258-3542

11  Also present:           Chief Robert S. Warshaw, Monitor
                            Deputy Monitor John Girvin
12                          Deputy Monitor Sherry Kiyler
    (Telephonically)        Deputy Monitor Raul Martinez
13                          Ms. Cari Shehorn

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3            THE COURT:  Please be seated.

4            THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

5    on for status conference.                                    09:35:06

6            Counsel, please announce your appearances.

7            MS. WANG:  Good morning, Your Honor.  Cecillia Wang of

8    the ACLU for plaintiffs.

9            THE COURT:  Good morning.

10           MR. YOUNG:  Good morning, Your Honor.  Stanley Young,   09:35:14

11   Covington & Burling, for plaintiffs.

12           MR. BENDOR:  Good morning, Your Honor.  Josh Bendor,

13   ACLU of Arizona, for plaintiffs.

14           MR. POCHODA:  Dan Pochoda, ACLU of Arizona, for

15   plaintiffs.                                                  09:35:26

16           MS. IAFRATE:  I thought the people on the phone were

17   going to announce, Your Honor.  That's why I paused.

18           Michele Iafrate on behalf of Sheriff Arpaio.  With me

19   is my law clerk, Cari Shehorn.

20           MR. WALKER:  Richard Walker on behalf of the County as  09:35:40

21   I've defined in previous proceedings.

22           MR. McDONALD:  Mel McDonald, limited appearance for

23   Sheriff Arpaio.

24           MR. COMO:  Good morning, Your Honor.  Greg Como on

25   behalf of former Chief Brian Sands.                          09:35:53

1          MS. CLARK:  Correct.  That's why I would suggest that

2    we need you there, Judge Snow.

3          THE COURT:  Well, it hasn't been scheduled yet.  If I

4    can be there, I will be.

5          MS. CLARK:  It will be very difficult for me to advise    10:12:27

6    him about how to answer in light of what you just said.

7          THE COURT:  All right.

8          MS. CLARK:  Thank you, Judge.

9          THE COURT:  Uh-huh.

10          Now, I want to take up the application for admission    10:12:36

11    to practice pro hac vice of Mr. Jon -- oh, was there anybody

12    else who had anything to say on that?

13          I want to take up the application for admission to

14    practice pro hac vice of Mr. Jonathon A. Moseley.  He called

15    and asked to appear telephonically.  We authorized him to    10:12:52

16    appear telephonically but I did not hear him appear.

17          Are you there, Mr. Moseley?  Mr. Moseley?

18          All right.  Let me tell you my concerns, and I guess

19    I'm going to lay them out.

20          Ms. Iafrate, Mr. Moseley is affiliated with Freedom    10:13:11

21    Watch, which represents Sheriff Arpaio in another action in the

22    district court of -- or in the D.C. Circuit now, so he has an

23    attorney-client relationship with Sheriff Arpaio.  Sheriff

24    Arpaio, and I believe Chief Deputy Sheridan, have both

25    testified in this action that the material they received from    10:13:35

1   Mr. Montgomery has been discredited, and I don't mean to put

2   words in their mouth but I think it's pretty clear they said

3   that on a number of occasions.  At my invitation, I think

4   Sheriff Arpaio at one time called it junk.  I mean, that was my

5   word but he said yes.                                          10:13:52

6           Is the sheriff -- are you withdrawing that testimony?

7           MS. IAFRATE:  No, Your Honor, we're not withdrawing

8   it.

9           THE COURT:  If that's the case, then it seems to me

10  like it's just not possible for Mr. Moseley, without creating a  10:14:04

11  conflict, to represent Mr. Montgomery in this action while

12  representing Sheriff Arpaio in another action and challenging

13  the validity of Sheriff Arpaio and Chief Deputy Sheridan's

14  statements about Mr. Moseley in this action.  And Mr. Moseley's

15  not appearing, and so it is my determination that I'm going to   10:14:29

16  deny his petition -- or application for admission to practice

17  pro hac vice, because it seems to me that it would create a

18  conflict in this case.

19          MS. IAFRATE:  Well, Your Honor, it's unfortunate that

20  Mr. Moseley is not here because this is his motion, not mine.    10:14:48

21  However, all that I can tell you is that within his pleading

22  papers they're saying that there is no conflict.  I would like

23  to ask -- I was hopeful that Mr. Moseley would be on the phone

24  so that we could ask how could he say that.  Without him

25  appearing to answer those questions, I just have -- I have no    10:15:06

 1  understanding regarding whether there is a conflict or there is

 2  not a conflict.

 3         THE COURT:  Well, I understand the position you're in,

 4  but he's not here.  We did authorize him to be here.  You can

 5  understand why I think there is an apparent conflict, despite          10:15:23

 6  what he says.

 7         I will say I've read his motion to intervene and I

 8  don't think that's well taken.  But, of course, I'm not going

 9  to rule on it because I'm going to strike it because I'm not

10  going to allow his admission.  I'm certainly not going to               10:15:36

11  prevent Mr. Montgomery from seeking to intervene if he wishes

12  to do so.  But he has to do so through counsel that is not

13  going to create a conflict by his very appearance, and it

14  surely seems to me like Mr. Moseley does that.

15         So how about we do this?  I'm going to deny                      10:15:54

16  Mr. Moseley's application for admission to practice pro hac

17  vice without prejudice if he wants to appear and take it up.

18  But even if I admit him pro hac vice, we still have to then

19  deal with his motion to intervene, which strikes me, as I said,

20  to be a little bit problematic, anyway.  But that's --                  10:16:12

21         Did you want to be heard on that, Mr. Young?

22         MR. YOUNG:  I do want to be heard on the motion for

23  pro hac vice admission, Your Honor.

24         Our view is that the Court has the discretion and

25  should exercise that discretion to deny the motion for                 10:16:31

1   additional reasons beyond what Your Honor has just stated, and

2   I'll state those on the record now since the motion may be

3   renewed.

4          Under Local Rule 83.1(b)(2), this is a discretionary

5   issue for the Court under United States versus Ries,                10:16:47

6   100 F.3d 1469 (9th Cir. 1996):  "Where an out-of-state attorney

7   strongly suggests through his behavior that he will neither

8   abide by the court's rules and practices - thus impeding the

9   'orderly administration of Justice' - nor be readily answerable

10  to the court, the Judge may ... deny the pro hac vice              10:17:09

11  application."  And here already, based on the filings that have

12  been made, it is our view that that likelihood exists.

13         I would refer first to Mr. Moseley's May 2nd letter,

14  which is attached to the Court's May 8 order.  There is a

15  notation there that counsel of record were copied.  As of May     10:17:28

16  8, I believe the Court asked counsel of record and none of them

17  had received it.  We still have not received the letter.  We

18  only have it because of the Court's order.

19         The letter also states that Montgomery was not engaged

20  in relation to this case; he was engaged to help research other   10:17:45

21  matters, not this case.  We believe that statement by

22  Mr. Moseley is false.  We won't get into the substance of that

23  for now but we believe it is not correct.

24         Mr. Moseley's May 2nd letter also says that his

25  appearance would be, quote, for the purpose of presenting         10:18:05

1   answers to the Court.  That's also not true, because he

2   subsequently filed a motion to intervene.  That's not just

3   providing information to the Court about the testimony of the

4   witnesses in the earlier hearing, but it's actually filing a

5   motion that's not anticipated or not mentioned in this letter.   10:18:23

6   So we believe that that letter by itself is indicative of

7   disruption and, frankly, the possibility of improper activity

8   if he were to be admitted.

9        Now, this has been -- some of this letter has been

10  later withdrawn, but I believe that you can't just make a       10:18:51

11  statement about something that's material to a matter before

12  the Court and just say, "Oh, sorry," later, and withdraw it

13  without even apologizing or offer much explanation.

14       THE COURT:  Well, for what it's worth, Mr. Young, I

15  noted that he wanted to withdraw it -- he might want to         10:19:08

16  withdraw it, but I've attached it to my order and I'm not

17  withdrawing it from my order.

18       MR. YOUNG:  And that's the reason why we're able to

19  see it ourselves, Your Honor.

20       There was also a sealed document which was              10:19:19

21  accompanied -- which accompanied the May 2nd letter, and as

22  Your Honor noted previously, that communication said that the

23  purpose of the filing by Mr. Moseley was to file an amicus

24  brief on behalf of Sheriff Arpaio.  That statement has also

25  been withdrawn through a clarification paper that was filed     10:19:37

 1   late yesterday, with some explanation that relates to what

 2   apparently was a word processing error on the part of

 3   Mr. Moseley, but there wasn't even an apology for that error.

 4   And again you have a material misstatement in a document filed

 5   in this court.  And he hasn't even been admitted to appear in          10:19:57

 6   this case yet, and I believe that just tells us that it would

 7   not be a wise thing to have him admitted.

 8          Even more seriously, although Mr. Moseley's letter

 9   refers to a Virginia Supreme Court case relating to his earlier

10   suspension from practice for a period of six months in that          10:20:21

11   court, I believe looking at the Virginia Supreme Court decision

12   will disclose that there is a lot that has not been disclosed

13   to this Court, and the citation for it is 694 S.E.2d.

14          THE COURT:  Wait.  Give me that again.

15          MR. YOUNG:  694 S.E.2d 586.  And I have copies of the          10:20:43

16   decision if you would like to see them.

17          THE COURT:  Yes, please provide copies.

18          MR. YOUNG:  Now, what happened in the Virginia case

19   that caused Mr. Moseley's suspension was that there was a key

20   document with an arbitration clause which was not disclosed          10:21:15

21   prior to a hearing by Mr. Moseley.

22          At the hearing, and this is what Mr. Moseley does not

23   say, according to the Virginia Supreme Court, on

24   cross-examination Mr. Moseley's client admitted that he had

25   given a copy of that document to Mr. Moseley, and that that          10:21:34

1    contract did contain an arbitration clause, which would make

2    the action that Mr. Moseley had filed improper.  So the courts

3    in Virginia decided, well, that's not proper behavior, and they

4    suspended him for that.

5        In addition, the Virginia court noted -- and this is                10:21:54

6    also omitted from Mr. Moseley's letter to you -- the court

7    found that Mr. Moseley filed in excess of 80 pleadings and

8    motions in the case and used abusive discovery tactics and

9    filed frivolous pleadings.

10       The court also found that Mr. Moseley wrote letters to          10:22:14

11   the adverse party that were unprofessional and intended to

12   intimidate and harass.  And Mr. Moseley stated that the judge

13   in that case issued an absurd decision, was a wacko judge who

14   he believed was bribed, and he believed that opposing counsel

15   were demonically empowered.                                              10:22:36

16       The Virginia Supreme Court then said the following,

17   quote:  "Moseley clearly made derogatory statements about the

18   integrity of the judicial officer adjudicating his matters, and

19   those statements were made either with knowing falsity or with

20   reckless disregard for their truth or falsity."  Now, that's          10:22:56

21   information that we believe is highly relevant to any

22   application by Mr. Moseley to appear in this case.

23       Your Honor has already noted the conflict issue.

24   Mr. Moseley's clarification statement filed yesterday says,

25   quote:  "Neither Dennis L. Montgomery nor his counsel are              10:23:20

1  adverse to Sheriff Arpaio, his deputies, the Cold Case Posse or

2  the MCSO in any respect."  We believe that for the reasons that

3  Your Honor has already noted, and for other reasons in some of

4  the documents that have been produced, which I won't go into,

5  that statement also is false.                                    10:23:41

6        So for making all these false statements to the Court,

7  and for the behavior that led him to be suspended in the

8  Virginia bar, we believe that any application for pro hac vice

9  appearance in this case by Mr. Moseley should be denied.

10        THE COURT:  Thank you.  Ms. Iafrate.                      10:23:56

11        MS. IAFRATE:  Your Honor, I'll leave it to your

12  discretion.  I do not advocate or have any opinion regarding

13  what Your Honor should do regarding the admission pro hac vice.

14        THE COURT:  Mr. Como?

15        MR. COMO:  I have no position on this issue, Your         10:24:12

16  Honor.

17        THE COURT:  All right.  Then I'm going to deny the

18  application, and if he wants me to move to reconsider he can do

19  that, but the application is denied.

20        The last matter, and I have some fairly important         10:24:21

21  things to say here, and I think we've all recognized that this

22  is a very unusual case with permutations that are new, and I've

23  decided to handle this in this way.  I have ordered the

24  defendants to produce certain documents, and I believe that

25  they have been doing so.  Among those documents are the         10:24:53

1  documents that are apparently a data dump of some kind by

2  Mr. Montgomery to MCSO.  And then in addition to those

3  documents there are other documents about what I will call the

4  Seattle operations with Mr. Montgomery that are not data dumps.

5       Last week I ordered Ms. Iafrate to contact the CIA                  10:25:20

6  since I think at least it was Chief Deputy Sheridan's

7  understanding, that I think has been confirmed by some of the

8  documents that I've seen, that at least Mr. Montgomery claims

9  that some of these documents were taken from the CS -- or the

10  CIA.  And again, I don't know whether that's true or not, but    10:25:38

11  we've given the CIA another week to come lay any claim to any

12  sort of protection it wants.

13       And so I'm going to order the parties, at least with

14  respect to those documents that are the Montgomery data dump,

15  do not disclose them in any way.  I'm not saying you can't look    10:25:55

16  at them.  If you choose to, look at them all you want, but

17  don't disclose them to anybody else.  And that will give the

18  United States another week in which to act if it wishes to do

19  so.  I've been credibly informed that they're aware of your

20  letter.                                                               10:26:16

21       MS. IAFRATE:  That's good to know, Your Honor.

22       I have a piece of information that I would like to

23  share with you also when it's my time.

24       THE COURT:  Go ahead.

25       MS. IAFRATE:  I have heard that the CIA is aware of        10:26:27

1    the letter, and I filed a notice just so that you saw that the

2    letter actually did get sent out.

3         Yesterday I was contacted by phone several times, and

4    then by e-mail, from two people that said that they were part

5    of the Department of Justice and they wanted the letter.      10:26:54

6         THE COURT:  They wanted the letter you sent the CIA?

7         MS. IAFRATE:  Correct.  So I said -- I asked them if

8    they were representing the CIA and they said no.  I asked them

9    if they had authority from the CIA for me to give them the

10   letter, if there was someone that I could talk to.  They said  10:27:13

11   no.  I said I feel uncomfortable providing you with this letter

12   if I don't have someone from the CIA saying that you have

13   authority.

14        Your Honor, this is all new territory to me.  They

15   didn't write me a letter requesting it.  And when I asked      10:27:29

16   specifically regarding whether they had authority on behalf of

17   the CIA, they said no.

18        THE COURT:  Well, let me just say isn't it a good

19   thing we live in a country where there's a separation of

20   powers?  And I've told everybody, every party here, you can    10:27:43

21   hang on to the documents, and nobody's going to be taking those

22   documents.  You're going to have them.  They may be under some

23   sort of protective order.  We will proceed in an orderly

24   fashion.  So --

25        MS. IAFRATE:  Well, Your Honor, the reason --          10:28:02

1            THE COURT:  -- why don't you just direct them, if they

2      wish, to come to a proceeding or contact the Court or the

3      Court's monitor.

4            MS. IAFRATE:  Very well.

5            THE COURT:  Okay.                                          10:28:10

6            We have had issues, apparently, lately with the

7      County, Mr. Walker, about the County not being sure -- the

8      monitor has made requests to try and follow the financial trail

9      about payments that may have been made to Mr. Montgomery,

10     payments that may have been made to MCSO folks, and travel       10:28:28

11     costs and hardware costs and software costs that may have been

12     expended on this operation.

13           The folks at the County are not really sure about

14     whether or not they have such documents, in response to the

15     monitor's request.  Let me just throw something out there and   10:28:46

16     see if the parties can live with it.

17           Because we've had some past dealings with Sandi Wilson

18     in this case, I know she knows where the budgets are and where

19     things are kept if the County has them.  Is there any problem

20     if the monitor contacts Ms. Wilson about where or not -- where  10:29:05

21     these documents may be found if they are in the possession of

22     the County?

23           MR. WALKER:  Your Honor, I have no problem with

24     Ms. Wilson speaking directly with the monitor as long as I or

25     someone from my office can also be present.                     10:29:23

1    If I could just elaborate a little bit, I think the

2  problem is the way expense documents are filed.  And what I

3  understand is they're filed by a vendor name.  So if the office

4  management -- office management and budget is looking -- is

5  looking for a document, say one of my bills, and they know the          10:29:50

6  name of my firm, that's fairly easy.  If they don't know the

7  name of the vendor it's like looking for a needle in a

8  haystack.

9    So the only problem I think we have is there's a

10  degree of coordination that needs to happen between          10:30:10

11  Ms. Wilson's office and the Sheriff's Office so that we have

12  the information we need so that a meaningful search for the

13  documents can be conducted.

14    THE COURT:  I think that's understandable and the

15  monitor can coordinate that with Ms. Wilson, with you, with          10:30:25

16  Ms. Iafrate, and whoever's handling document production at the

17  sheriff's Office.  If we can set up those meetings and avoid

18  problems, it sounds like a great solution.

19    Any problem with that, Chief?

20    CHIEF WARSHAW:  No, sir.          10:30:45

21    THE COURT:  Okay.  Now, I'd like to talk about how

22  we're going to go forward in light of these new documents.

23  There are a great number of them, even excluding the data dump.

24  And my monitor has had a chance to look at several of them but

25  far from the totality.          10:31:03

1    He has shown me several, 50 or so documents, that

2    cause me great concern.  And I acknowledge that we're all

3    plowing new ground here.  But I'm going to say what those

4    documents show, and I'm going to say that it is a concern that

5    I expect the MCSO to address in the resumption of our May              10:31:23

6    hearing, and I'm going to propose how we proceed.

7        The documents that I have seen pertain to what appears

8    to be some of the activities of the Seattle operation we

9    involve Dennis Montgomery as a confidential informant.  The

10   documents seem to reveal that as at least part of their                10:31:43

11   operations, the Seattle operatives attempted to construct an

12   alleged conspiracy that supposedly involved this Court; one of

13   this Court's former law clerks; Eric Holder, the attorney

14   general of the United States; Lanny Breuer, the Chief Deputy

15   Attorney General of the United States in charge of the criminal        10:32:02

16   division; Phil Gordon, the mayor of Phoenix; and Brian Sands,

17   the executive chief of the MCSO.  The purpose of the alleged

18   conspiracy was apparently to covertly investigate the MCSO and

19   deprive the sheriff and the MCSO of the due process of law in

20   this particular case and in a related case brought against the        10:32:22

21   sheriff by the DOJ.

22       This Seattle operation work product seems to purport

23   that by allegedly using a database of information harvested by

24   the CIA and confiscated by him, Mr. Montgomery was able to

25   reproduce fragments of e-mails that had been sent in 2009 and          10:32:40

 1    2010 between persons within the Department of Justice, Mayor

 2    Gordon, and Brian Sands.

 3         As it pertains to this Court, the Seattle operation

 4    work product, which was apparently prepared and revised over a

 5    number of months, not a few, it began apparently -- the first          10:32:56

 6    contact was in September of 2013.  There were meetings in

 7    December.  These documents began being created in December and

 8    January, and at least their properties indicate that they have

 9    been revised many times over a period of substantial months.

10         Anyway, the documents purport to track telephone calls           10:33:15

11    between this Court, Eric Holder, Lanny Breuer, and Dennis Burke

12    to reproduce those phone calls which occurred years earlier.

13    And between the Court and one of its former law clerks, who

14    apparently allegedly was supposed to have served as this

15    Court's liaison with the Department of Justice regarding this          10:33:35

16    case.

17         The documents appear to allege or suggest that this

18    Court had contact with the Department of Justice about this

19    case before the Court was ever assigned to it.  It further

20    seems to suggest that when Judge Murguia recused from this             10:33:48

21    case, the random selection process of this Court was subverted

22    so that the case was deliberately assigned to this Court.  The

23    documents further suggest that thereafter this Court had

24    conversations with Eric Holder and Lanny Breuer about this

25    case, and it also alleges that this Court issued an order to           10:34:05

 1    tap the MCSO's phones after being assigned as the judge in this

 2    case.

 3            It also seems to allege that this Court had

 4    conversations, as I've indicated, with the Department of

 5    Justice, through one of its former law clerks as an            10:34:19

 6    intermediary.

 7            Now, I will tell you I've looked at these documents

 8    closely and I think there are a great deal of problems with

 9    them.  But I don't intend to put them on the screen and go over

10    those problems because I believe that Sheriff Arpaio and        10:34:35

11    Chief Sheridan have both acknowledged that the materials

12    received from Montgomery are not credible and/or are junk.  So

13    I'm not presuming at this point that the MCSO is alleging that

14    anything the documents contain in this respect are true.

15            If, Ms. Iafrate, you're going to assert that, I will    10:34:53

16    tell you that I'm going to require good faith assertions that

17    any of that information is true, and I have a number of

18    questions that you will have to respond to.  Nevertheless,

19    assuming, as I do, that the sheriff and Chief Sheridan both

20    will say that those documents are not credible, the very        10:35:16

21    existence of these documents in the MCSO's files causes this

22    Court some concerns.

23            In addition to their tendency to suggest that previous

24    testimony offered in this matter may have been untruthful, the

25    Court wonders why, when the MCSO should have been spending       10:35:33

 1   their time, money, and resources in implementing its order,

 2   they were funding a confidential informant as well as three

 3   MCSO deputies or posse members to be in Seattle, Washington,

 4   and other places, accruing overtime, travel, and salary

 5   expenses, as well as significant technology costs, attempting          10:35:51

 6   to construct some bogus conspiracy theory to discredit this

 7   Court.

 8          The Court notes that as of the monitor's last report,

 9   the MCSO was only 29 percent in compliance with the injunctive

10   order entered a year and a half ago, approximately the same            10:36:06

11   time as this Seattle operation began.  There may be some

12   explanation for all of this, I realize that these are only

13   documents in MCSO's file, but I'm going to require you to

14   address that in the hearing that's coming up in June.

15          I also want to say that when upon the death -- I think          10:36:25

16   before I began questioning Sheriff Arpaio, I explained to him

17   why I was questioning about these things and how I viewed this

18   as being relevant to the contempt hearing, and I think it's

19   relevant for reasons I've already stated.  But when upon the

20   death of Deputy Armendariz it became clear to the Court that           10:36:46

21   the members of the plaintiff class in this case may have been

22   commonly subjected to deprivations not previously disclosed at

23   or prior to trial, and that this information as well as a great

24   deal of additional information sought prior to trial had never

25   been provided, this Court suggested to the MCSO that it arrange        10:37:02

1    for an independent investigation of these matters.  Rather than

2    do so, the MCSO elected to conduct a self-investigation through

3    its own Professional Standards Bureau.

4         This Court's orders were violated at the very start of

5    that investigation, and that is part of the notice contempt.          10:37:19

6    And even though many of the allegations of misconduct arose --

7    that were at issue in the Armendariz investigation arose from

8    the conduct of the HSU, the MCSO transferred in as the new

9    captain of the Professional Standards Bureau the previous

10   captain of the special investigation divisions -- Special            10:37:37

11   Investigations Division, which was over the HSU.

12        There is evidence that before his transfer to the PSB,

13   Captain Bailey was sent an inquiry memoranda regarding seized

14   identifications from within the HSU, which memorandum and

15   documents were subsequently sent for destruction.  Further, the      10:37:56

16   Special Investigations Division had responsibilities for

17   operations like the Seattle operation and would likely have

18   played a role in the Grissom inquiries.

19        Of course, Captain Bailey was supervised at both the

20   SID and the PSB by Chief Deputy Sheridan and by Sheriff Arpaio.       10:38:14

21   The Court has held repeated hearings regarding its concerns

22   about the inadequate investigations conducted by the PSB of

23   these matters.  There is evidence that the PSB accepted

24   facially inadequate explanations for the confiscation of

25   identifications of the members of the plaintiff class.  There        10:38:31

1   is evidence that such seizure practices existed

2   department-wide.  There is further evidence that the MCSO

3   failed to adequately investigate and evaluate the seizure of

4   items of value from members of the plaintiff class, attempted

5   to destroy relevant evidence and manipulate internal and        10:38:46

6   independent investigations to exonerate those whom it may have

7   wished to clear, or to mitigate any possible discipline.

8          This evidence may thus tend to demonstrate that the

9   MCSO attempted to keep all matters pertaining to this case, its

10  speculative investigations into this Court, and to the          10:39:05

11  investigations triggered by the unfortunate death of Deputy

12  Armendariz, in the hands of a relative few people who may not

13  have been working to implement this Court's order in good

14  faith.

15         Further, it may tend to demonstrate that contemptuous     10:39:18

16  actions that have been noticed by this Court in its order to

17  show cause hearing were part of a pattern of knowing defiance

18  rather than inadvertence.  This may affect necessary remedies

19  for members of the plaintiff class in civil contempt.  It is

20  for these reasons that the Seattle operations materials may be   10:39:35

21  relevant to this action.

22         Nevertheless, the Montgomery materials are

23  considerable, and they have only been reviewed in small part.

24  When they are reviewed in more complete detail, it may suggest

25  other potential problems in the operations of the MCSO that are  10:39:54

1    beyond the scope of this contempt hearing and that I have no

2    intent to raise in this contempt hearing except to the extent

3    that it bears some relation to it.  I do not want to lose the

4    focus of obliging the MCSO to comply with its orders and to

5    cure the existing and admitted contempts that have impaired for    10:40:14

6    a very long time the rights of the plaintiffs' class.

7            I'm going to set forth my proposed solution to this

8    problem, and I will hear your comments on it if you have

9    suggestions.  I remind the parties that because of the

10   cooperation you made in the first week of the hearing where we    10:40:35

11   both -- where we were questioning witnesses at the same time,

12   we made substantial headway towards ending the hearing, and it

13   seems to me we shouldn't lose the focus on what the hearing is

14   about, recognizing that there now are other matters that may be

15   relevant.                                                          10:40:56

16           But when the Armendariz investigation came forth I

17   made it clear, and it's on the record, and we have several

18   orders that supplement the monitor's original investigative

19   authority with his investigative authority to ensure the

20   integrity, the adequacy of MCSO's investigative operations.  He    10:41:12

21   has authority to investigate all matters pertaining to this

22   contempt hearing and to the MCSO self-investigations in the

23   previous orders.

24           I propose, and I am likely to order, that based upon

25   his ongoing review of the documents provided, that he be          10:41:36

Exhibit 12

```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3

 4    Manuel de Jesus Ortega         )
      Melendres, et al.,             )
 5                                   )
                     Plaintiffs,     )   CV 07-2513-PHX-GMS
 6                                   )
                     vs.             )   Phoenix, Arizona
 7                                   )   July 20, 2015
      Joseph M. Arpaio, et al.,      )   11:03 a.m.
 8                                   )
                     Defendants.     )
 9    _____)

10

11

12

13

14

15               REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              BEFORE THE HONORABLE G. MURRAY SNOW

17                      (Status Conference)

18

19

20

21

22    Court Reporter:            Gary Moll
                                 401 W. Washington Street, SPC #38
23                               Phoenix, Arizona  85003
                                 (602) 322-7263
24
      Proceedings taken by stenographic court reporter
25    Transcript prepared by computer-aided transcription
```

1                          A P P E A R A N C E S

2

3    For the Plaintiffs:          Stanley Young, Esq.
                                  COVINGTON & BURLING, L.L.P.
4                                 333 Twin Dolphin Drive
                                  Suite 700
5                                 Redwood Shores, California  94065
                                  (650) 632-4700
6
     (Telephonically)            Cecillia D. Wang, Esq.
7                                 AMERICAN CIVIL LIBERTIES UNION
                                  FOUNDATION
8                                 Immigrants' Rights Project
                                  39 Drumm Street
9                                 San Francisco, California  94111
                                  (415) 343-0775
10
                                  Daniel J. Pochoda, Esq.
11                                Joshua Bendor, Esq.
                                  AMERICAN CIVIL LIBERTIES
12                                FOUNDATION OF ARIZONA
                                  P.O. Box 17148
13                                Phoenix, Arizona  85011-0148
                                  (602) 650-1854
14
     (Telephonically)            Jorge M. Castillo, Esq.
15                                MEXICAN AMERICAN LEGAL DEFENSE
                                  AND EDUCATIONAL FUND
16                                Regional Counsel
                                  634 S. Spring Street, 11th Floor
17                                Los Angeles, California  90014
                                  (213) 629-2512
18
     (Telephonically)            Andre Segura, Esq.
19                                AMERICAN CIVIL LIBERTIES UNION
                                  125 Broad Street, 18th Floor
20                                New York, New York  10004
                                  (212) 549-2676
21

22

23

24

25

1                        A P P E A R A N C E S

2

3    For the Defendants MCSO      Michele M. Iafrate, Esq.
     and Joseph M. Arpaio:        IAFRATE & ASSOCIATES
4                                 649 N. 2nd Avenue
                                  Phoenix, Arizona  85003
5                                 (602) 234-9775

6                                 A. Melvin McDonald, Jr., Esq.
                                  John T. Masterson, Esq.
7                                 Joseph J. Popolizio, Esq.
                                  JONES, SKELTON & HOCHULI, P.L.C.
8                                 2901 N. Central Avenue, Suite 800
                                  Phoenix, Arizona  85012
9                                 (602) 263-1700

10   For Maricopa County:         Richard K. Walker, Esq.
                                  Charles W. Jirauch, Esq.
11                                WALKER & PESKIND, P.L.L.C.
                                  16100 N. 71st Street, Suite 140
12                                Scottsdale, Arizona  85254
                                  (480) 483-6336
13
     For Chief Deputy Sheridan:   Lee D. Stein, Esq.
14                                Barry D. Mitchell, Esq.
                                  MITCHELL STEIN CAREY
15                                One Renaissance Square
                                  2 North Central Avenue
16                                Suite 1900
                                  Phoenix, Arizona  85004
17                                (602) 358-0290

18   For Deputy Chief MacIntyre:  David J. Ouimette, Esq.
                                  DICKINSON WRIGHT, P.L.L.C.
19                                Attorneys at Law
                                  1850 N. Central Avenue, Suite 1400
20                                Phoenix, Arizona  85004
                                  (602) 285-5000
21
     For Lieutenant Joseph Sousa:
22
                                  David S. Eisenberg, Esq.
23                                DAVID EISENBERG, P.L.C.
                                  2702 N. 3rd Street
24                                Suite 4003
                                  Phoenix, Arizona  85004
25                                (602) 237-5076

1                          A P P E A R A N C E S

2


3   For Executive Chief Brian Sands:

4                              Greg S. Como, Esq.
                               LEWIS BRISBOIS BISGAARD
5                              & SMITH, L.L.P.
                               Phoenix Plaza Tower II
6                              2929 N. Central Avenue
                               Suite 1700
7                              Phoenix, Arizona  85012-2761
                               (602) 385-1040
8
    For William Montgomery and Maricopa County Attorney's Office:
9
                               April M. Hamilton, Esq.
10                             RIDENOUR HIENTON, P.L.L.C.
                               Chase Tower
11                             201 N. Central Avenue
                               Suite 3300
12                             Phoenix, Arizona  85004
                               (602) 254-9900
13
    For the United States:
14
    (Telephonically)          Lynnette C. Kimmins
15  (Telephonically)          Rosaleen T. O'Gara
                               Assistant United States Attorneys
16                             UNITED STATES ATTORNEY'S OFFICE
                               405 W. Congress Street, Suite 4800
17                             Tucson, Arizona  85701
                               (520) 620-7300
18
    For the United States:     Raphael O. Gomez
19                             Senior Trial Counsel
                               U.S. Department of Justice
20                             Washington, D.C.  20530
                               (202) 514-1318
21
    For Timothy J. Casey:      Karen Clark, Esq.
22                             ADAMS & CLARK, P.C.
                               520 E. Portland Street
23                             Suite 200
                               Phoenix, Arizona  85004
24                             (602) 258-3542

25

```
 1                    A P P E A R A N C E S

 2


 3   For Thomas P. Liddy and Christine Stutz:

 4                              Terrence P. Woods, Esq.
                               BROENING, OBERG, WOODS
 5                             & WILSON, P.C.
                               P.O. Box 20527
 6                             Phoenix, Arizona  85036-0527
                               (602) 271-7705
 7
     For Dennis Montgomery:    Larry Klayman, Esq.
 8                             FREEDOM WATCH, INC.
                               2020 Pennsylvania Avenue N.W.
 9                             Suite 345
                               Washington, D.C.  20006
10                             (310) 595-0800

11   Also present:      Chief Robert S. Warshaw, Monitor
                        Commander John Girvin, Deputy Monitor
12                      Chief Raul Martinez, Deputy Monitor
                        Sheriff Joseph M. Arpaio
13                      Chief Deputy Gerard Sheridan
                        Executive Chief Brian Sands
14                      Lieutenant Joseph Sousa
                        Deputy Chief John MacIntyre
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3            THE COURT:  Please be seated.

 4            THE CLERK:  This is civil case number 07-2513,

 5   Melendres v. Arpaio, on for status conference.             11:03:26

 6            MR. YOUNG:  Good morning, Your Honor.  Stanley Young,

 7   Covington & Burling, for plaintiffs.

 8            THE COURT:  Good morning.

 9            MR. BENDOR:  Good morning.  Josh Bendor, ACLU of

10   Arizona, for plaintiffs.                                   11:03:40

11            MR. POCHODA:  Dan Pochoda, ACLU of Arizona, for

12   plaintiffs.

13            THE COURT:  Good morning.

14            MS. IAFRATE:  I was waiting for those on the phone,

15   Your Honor.                                                11:03:48

16            THE COURT:  Well, why don't we take everybody present

17   in the courtroom, and then we'll take those on the phone.

18            MS. IAFRATE:  Very well.  Good morning.  Michele

19   Iafrate on behalf of Joseph Arpaio and the alleged non-party

20   contemnors.                                                11:03:59

21            THE COURT:  Good morning.

22            MR. MASTERSON:  Good morning, Judge.  John Masterson

23   and Joe Popolizio for Sheriff Arpaio.

24            THE COURT:  Good morning.

25            MR. WALKER:  Good morning, Your Honor.  Richard Walker  11:04:08
```

```
 1    and Charles Jirauch on behalf of that portion of the Maricopa

 2    County government consisting of the Board of Supervisors, the

 3    county manager, and the employees who work under their

 4    supervision.

 5            THE COURT:  Good morning.                                    11:04:20

 6            MR. MITCHELL:  Good morning, Judge.  Barry Mitchell

 7    and Lee Stein specially appearing on behalf of Chief Gerard

 8    Sheridan.

 9            THE COURT:  Good morning.

10            MR. McDONALD:  Good morning, Your Honor.  Mel McDonald   11:04:32

11    making a special appearance on behalf of Joe Arpaio.

12            THE COURT:  How are you different, Mr. McDonald, from

13    Mr. Masterson and Mr. Popolizio?

14            MR. McDONALD:  I'm sorry, I can't hear you.

15            THE COURT:  How are you different from Mr. Masterson    11:04:43

16    and Mr. Popolizio?

17            MR. McDONALD:  They are on the civil end working with

18    Ms. Iafrate, I am solely on the potential issue at the end of

19    the case, so we're playing different roles.

20            THE COURT:  All right.  Even though you're from the     11:04:55

21    same law firm?

22            MR. McDONALD:  Even though we're from the same firm.

23            THE COURT:  Okay.

24            MR. COMO:  Good morning, Your Honor.  Greg Como

25    representing Brian Sands.                                       11:05:07
```

 1         MR. WOODS:  Terry Woods, Your Honor.  I represent the

 2    nonparties Tom Liddy and Christine Stutz.

 3         MS. HAMILTON:  Good morning, Your Honor.  April

 4    Hamilton, Ridenour Hienton, representing non-party Maricopa

 5    County Attorney's Office.                                   11:05:20

 6         MR. OUIMETTE:  David Ouimette, specially appearing for

 7    Deputy Chief MacIntyre, who is also here.

 8         MR. EISENBERG:  Good morning, Your Honor.  David

 9    Eisenberg, specially appearing on behalf of Lieutenant Joseph

10    Sousa, who is present.                                      11:05:31

11         THE COURT:  Good morning.

12         MS. CLARK:  Good morning, Judge.  Karen Clark, ethics

13    counsel for Tim Casey.

14         THE COURT:  Anyone else present in the courtroom?

15         MR. KLAYMAN:  Yes, Your Honor, Larry Klayman.  I        11:05:43

16    submitted a pro hac vice application on Friday.

17         MR. GOMEZ:  Good morning, Your Honor.  My name is

18    Raphael Gomez.  I represent the United States.

19         THE COURT:  Please approach a microphone, Mr. Gomez.

20         MR. GOMEZ:  Good morning, Your Honor.  My name is       11:06:08

21    Raphael Gomez.  I'm an attorney with the Department of Justice

22    and I represent the United States.  Item number 4 addresses, of

23    the Court's status conference today addresses the subject of

24    review and -- copying and review of the documents, which I'll

25    refer to as the Montgomery documents, and if the Court had      11:06:34

 1   questions, I'm available today.  That's why I am present.

 2              THE COURT:  All right.  Thank you.

 3              MR. GOMEZ:  Yes.

 4              THE COURT:  Anyone else?

 5         All right.  Those who are on the telephone?                    11:06:48

 6              MS. WANG:  Good morning, Your Honor.  Cecillia Wang of

 7   the ACLU Immigrants' Rights Project.  Andre Segura and I are

 8   here appearing telephonically for the plaintiff.

 9              THE COURT:  All right.  Good morning.  Anyone else?

10              MS. KIMMINS:  Good morning, Your Honor.  Lynnette        11:07:08

11   Kimmins and Rosaleen O'Gara, specially appearing nonparties

12   from the U.S. Attorney's Office.

13              MR. CASTILLO:  This is Jorge Castillo with MALDEF on

14   behalf of the plaintiff.

15              THE COURT:  Anyone else?                                 11:07:24

16         All right.  I do note the presence of the monitor and

17   the Monitoring Team in the jury box.  The monitor's in the

18   witness box.  This is one of their weeks of regular quarterly

19   review and investigation and they are present.

20         We have a number of items to take up that I ordered         11:07:44

21   for the status conference today.  Since that time, the parties

22   have filed motions to stay -- a motion to stay, which has been

23   fully briefed.  Nobody requested oral argument.  I've reviewed

24   the pleadings and I'm prepared to rule and explain my reasons

25   therefor.  I might have a question or two to the parties          11:08:06

```
 1    regarding that motion to stay.  I think we ought to rule on it
 2    first.  Basically, last week the movants --
 3            Now, Mr. Popolizio, are you and Mr. Masterson on
 4    behalf of the -- I'm not taking oral argument on this but I
 5    have a few questions.  Are you here on behalf of the movants or      11:08:27
 6    are you here on behalf of the defendants?
 7            MR. POPOLIZIO:  I'm here on behalf of Sheriff Arpaio.
 8    This is a joint motion for stay.
 9            THE COURT:  Well, wait a minute.  Are you here
10    representing the defendants or are you here trying to represent       11:08:41
11    Sheriff Arpaio separately?
12            MR. POPOLIZIO:  Today both, Your Honor.  Jerry
13    Sheridan is on this motion also.
14            THE COURT:  I know.  Are you representing any of the
15    alleged non-party contemnors other than Sheriff Arpaio and           11:08:53
16    sheriff -- or Deputy Chief Sheridan?
17            MR. POPOLIZIO:  Well, I represent the defendants
18    civilly, Your Honor.
19            THE COURT:  All right.  Then I'll note that you filed
20    last week a motion for stay, which basically said you disagreed     11:09:08
21    with my ruling on the motion to recuse -- not a big surprise --
22    and that you asked that I enter a stay based upon that
23    disagreement and the importance of the issue to this case.  You
24    didn't cite any legal authority, and you didn't say why this
25    met with the legal authority.                                       11:09:29
```

```
1              Plaintiffs, in their response, filed legal authority,

2     and you, in your reply, then apparently accepted that authority

3     and joined the argument.

4              Normally, of course, we don't consider replies,

5     arguments raised in reply that weren't raised in the motion,        11:09:44

6     and so I'm inclined not to consider yours, except for I do

7     think that it's an important issue in this case.

8              Number one, whether you have made a strong showing

9     that you're likely to prevail on the merits, with all due

10    respect, I entered a 40-page order.  And while I appreciate        11:09:59

11    that your motion is filed in good faith, I developed in great

12    detail why I think the motion does not have any merit, let

13    alone any likelihood of success.  That doesn't mean I think

14    your motion is brought in bad faith.  The Ninth Circuit can do

15    what the Ninth Circuit will do and I respect that and             11:10:16

16    acknowledge it, but I do not think that you've shown a strong

17    likelihood of success on the merits.

18             Number 2, whether the applicant will be irreparably

19    injured absent a stay.  Well, as you do note, in fairness, the

20    supplemental injunctive relief has been largely affirmed by the   11:10:34

21    Ninth Circuit Court of Appeal, 784 F.3d 1254.  Your clients

22    have twice admitted to being in contempt of my order.  Sheriff

23    Arpaio has admitted to being in contempt in all three aspects

24    of the notice of contempt, and sheriff -- Deputy Chief Sheridan

25    has admitted to being in contempt of two of them.                 11:10:53
```

1       And the matters of interest, particularly pertaining

2   to the Montgomery investigation, which is the only thing that

3   we might go forward on in addition to the other things that

4   your client was supposed to provide but hasn't, which is what

5   required the continuation of the contempt hearing in the first        11:11:07

6   place, I think they're going to be of interest to whoever the

7   presiding judge is, whether it's me or whether it's another

8   judge.  The attitude and the documents revealed -- and of

9   course, the whole story hasn't been told, and I'm not assuming

10  that it has been told.  I've invited your clients to provide an      11:11:25

11  explanation for those documents and I haven't made any

12  decisions about them.  But it does seem to me that what they

13  suggest is going to be worth exploration, and so I can't see

14  how your clients will be injured absent a stay.

15      Whether the stay will substantially injure the other          11:11:45

16  parties in the litigation, Mr. Young has set forth that these

17  are constitutional violations identifying and compensating

18  members of the plaintiff class whose rights were deprived by

19  your client will be more difficult the longer this goes on.  I

20  think that's almost undeniable.  And it's certainly undeniable      11:12:02

21  and certainly suggested that -- or at least there have been

22  facts which would suggest that your own client and the MCSO

23  have not taken adequate steps to deal with the Armendariz

24  investigation and matters that have been revealed as a result

25  thereto.                                                            11:12:22

1    I certainly agree with you that the public interest

2  does stand in favor of the impartiality of the judiciary, and

3  that that's an important consideration.  But the public

4  interest also stands in favor of not having judges be

5  manipulated in favor of going forth with proceedings that have          11:12:44

6  already been going on for years and bringing an end to

7  litigation.

8    So as I look at all those factors and as I analyze

9  Nken, which apparently you acknowledge is the correct

10  authority, your motion to stay is denied, and you may          11:13:00

11  proceed -- I would also note that you asked me to evaluate a

12  motion to stay based on a writ of mandamus that you haven't

13  filed yet.  It's very difficult for me to make such an

14  evaluation, but based on the matters you put in your reply I've

15  given them substantive consideration.          11:13:17

16    Is there anything else you wanted to say on that

17  matter?

18    MR. POPOLIZIO:  Just one thing, Your Honor.  I know

19  that you're not granting oral argument, but I just wanted to

20  bring to the Court's attention --          11:13:27

21    THE COURT:  Would you please approach the microphone?

22    MR. POPOLIZIO:  I know Your Honor is not granting oral

23  argument.  You were clear on that, and I'm just going to bring

24  to the Court's attention that there was a case that I found

25  over the weekend, and that case's name is Fiore versus Apollo          11:13:42

1    Education Group.  It was Judge Wake's decision on a situation

2    very similar to this with a brother-in-law who was an equity

3    partner in another firm on a firm that was before Judge Wake.

4         And he did side with your analysis and he cited you as

5    authority, but in that decision that I did not know about on          11:14:04

6    Friday when we filed the reply, that's why I'm bringing this to

7    the Court's attention, he wrote the Advisory Committee with

8    regard to the Advisory Opinion No. 58, and the Committee came

9    back and stated that it was grounds for recusal.

10        I just wanted to bring that to the Court's attention           11:14:24

11   so that could become part of the record that I realize that

12   this case existed -- exists now, but did not on Friday.

13        THE COURT:  Well, I do think to some extent your

14   motion reflects a misunderstanding of my order.  Back when we

15   dealt with this three years ago, I believe that my                   11:14:39

16   determination was that my brother-in-law has no substantial

17   interest, based on the facts set forward.  And that sort of

18   cuts out the Advisory Committee Note, although I did note that

19   the Advisory Committee Note violates the rule.  And the better

20   legal authority, including the Pashaian case out of the Second       11:14:59

21   Circuit, says as much.

22        I have not, by the way, said that you waived any

23   argument as it pertains to (b)(4), but as to (b)(1) you have

24   waived, and the authority is clear on that point.

25        I appreciate your providing me the supplemental                 11:15:14

```
 1    authority.  I didn't know about it, either.  If you want to
 2    file any supplemental briefing, you can certainly do that.  But
 3    I will tell you in advance that the advisory opinion and what
 4    the Advisory Committee does on this point is not going to
 5    change my mind about something that we ruled on three years          11:15:30
 6    ago.  But you can file a supplemental brief if you wish.
 7            MR. POPOLIZIO:  I understand that, Your Honor, and
 8    thank you for that opportunity.
 9            THE COURT:  All right.  Thank you.
10            The motion for definition of -- oh, I do expect -- the       11:15:41
11    Monitoring Team is here, and I have lifted the stay, and I
12    expect all of the defendants and all of the movants to fully
13    and completely comply with the document requests that have
14    already been made, those clear back in February that have not
15    yet been complied with, those made in May that have not yet         11:16:01
16    been complied with, and the investigative requests of the
17    monitor.  And I will be available if enforcement or
18    disciplinary action needs to be taken, but I don't anticipate
19    that that will be necessary.
20            Motion for definition of plaintiff class.  That was         11:16:18
21    your motion, I believe, was it not, Mr. Walker?
22            MR. WALKER:  Yes, Your Honor.  And with the Court's
23    permission, I'd like Mr. Jirauch to address that issue.
24            THE COURT:  Has Mr. Jirauch entered an appearance in
25    this matter?                                                        11:16:40
```

1          MR. JIRAUCH:  I have, Your Honor.

2          THE COURT:  All right.  Well, Mr. Jirauch, I would ask

3     you to address documents 480, 488, and 489 in your oral

4     argument.  And I will tell you what those documents are so

5     you're not completely out at sea, because I realize that many          11:16:53

6     of you don't have much history in this case.

7          Back in 2011, December of 2011, parties filed motions

8     for summary judgment, and before I heard summary judgment I

9     asked the parties to provide supplemental briefing, and the

10    supplemental briefing I asked them to address:  What good faith          11:17:15

11    legal basis is there, if any, for MCSO to assert that it has

12    the authority going forward to enforce civil violations of the

13    federal immigration law?

14         The plaintiffs put forth a brief which set forth the

15    law as it has since been reaffirmed that you had none, and even          11:17:33

16    your own client in his supplemental brief indicated that he had

17    none, and so I entered the preliminary injunction as it

18    pertained to your client's ability to attempt to enforce civil

19    violations of the federal immigration law even if they had

20    knowledge that somebody was in the country without          11:17:54

21    authorization if they didn't have any basis to charge the

22    person based on state law.  So to the extent that you have

23    argued, to the extent that Ms. Iafrate or Mr. Masterson has

24    argued, that the class doesn't include those people, I want to

25    know why it doesn't.  They clearly fall within the definition          11:18:12

1    of the plaintiff class.

2            So to the extent you're trying to say that I'm

3    expanding the plaintiff class, I'm not; to the extent that

4    you're asserting that in some way this was not an issue that

5    was anticipated by the evidence, well, summary judgment was          11:18:28

6    granted on this issue in 2011 before there ever was any

7    evidence.

8            So I guess I invite you to tell me how I am expanding,

9    or how -- and I haven't made any ruling on this point; I'm not

10   sure I have to make any ruling on this point -- but how I'm          11:18:44

11   expanding the plaintiff class.

12           MR. JIRAUCH:  Well, Your Honor, due process requires

13   that parties be given notice of the claims that are going to be

14   asserted against them.

15           THE COURT:  And you don't think I gave you notice          11:18:56

16   prior to ruling on --

17           MR. JIRAUCH:  Well, Your Honor, I --

18           THE COURT:  -- summary judgment allowing supplemental

19   briefing?

20           MR. JIRAUCH:  -- I wasn't there, so I can't comment on     11:19:01

21   what happened.  There is so much in this case that just getting

22   into it in the last 60 to 90 days neither I nor Mr. Walker had

23   familiarity with and we're just learning it.  But based upon

24   the pleadings in the case, based upon the evidence at trial,

25   and based upon the ruling that Your Honor made, they're all in     11:19:15

1    the context of stops.

2          The language of the class definition refers to people

3    who are driving or sitting in a vehicle.  "Sitting" obviously

4    is reference to the passenger in a car; otherwise, it makes no

5    sense in the context of a traffic stop.                          11:19:36

6          The detention itself refers, I believe, in the context

7    of the evidence that was presented at the trial, refers to a

8    detention that occurs as a consequence of a pretextual stop

9    that's discriminating in nature.  The stops that occur --

10         THE COURT:  Are you arguing for an exception that         11:19:57

11   would swallow the whole class?

12         MR. JIRAUCH:  I'm sorry, Your Honor?

13         THE COURT:  Are you arguing for an exception that

14   would swallow the whole class?

15         MR. JIRAUCH:  No, Your Honor.  We're only trying to       11:20:07

16   say that as to people who are detained as a consequence of work

17   force enforcement actions they are not pretextual in nature,

18   first; they are as a consequence of search warrants and arrest

19   warrants that are issued by the judiciary, the state courts;

20   they are the consequence of having detained someone who is      11:20:24

21   Latino, and believed possibly to be in the country illegally;

22   the Sheriff's Office policy was, insofar as we know, was

23   enforced in all cases but possibly one, that they would talk

24   with ICE or the Border Patrol and inquire as to the individual

25   and whether they were in the United States illegally.           11:20:44

1          Only when ICE or the Border Patrol did a search of the

2   federal database and came back and advised the Sheriff's Office

3   that these individuals were in the United States illegally were

4   they retained at the request of ICE and the Border Patrol.  At

5   no time did the Sheriff's Office exercise independent decision          11:21:06

6   making --

7          THE COURT:  What about all the evidence I have that

8   says that that was Sheriff Arpaio's policy, in his own press

9   release, that the detention was a result of his policy?

10          MR. JIRAUCH:  Well, the facts are and the evidence          11:21:17

11   that developed -- all I can talk to is what the evidence was in

12   the United States versus Arpaio, because that case I have been

13   involved in for some period of time and I have familiarity with

14   it.

15          THE COURT:  Which case is that?          11:21:32

16          MR. JIRAUCH:  Pardon?

17          THE COURT:  Which case is that, the --

18          MR. JIRAUCH:  That's --

19          THE COURT:  -- one in front of Judge Silver?

20          MR. JIRAUCH:  That's the one that's before Judge          11:21:37

21   Silver.

22          THE COURT:  Well, what doesn't -- I mean, with all due

23   respect, you might have knowledge about that; I don't.

24          MR. JIRAUCH:  I understand that.

25          THE COURT:  But I do understand that Judge Silver has          11:21:42

```
 1   adopted all of the rulings that I made in this case in that

 2   case, has she not?

 3           MR. JIRAUCH:  I believe not as to work force

 4   enforcement.

 5           THE COURT:  Yeah, there is no issue --          11:21:51

 6           MR. JIRAUCH:  Right.

 7           THE COURT:  -- pertaining to that, except to the

 8   extent that you might have detained them in motor vehicles

 9   afterwards.

10           MR. JIRAUCH:  That's right.                     11:22:02

11           THE COURT:  I don't presume that she otherwise did

12   that, so what's your point?

13           MR. JIRAUCH:  I was trying to respond to Your Honor's

14   comment that Judge Silver had adopted all the rulings here, and

15   I understood that --                                    11:22:12

16           THE COURT:  Oh, okay.

17           MR. JIRAUCH:  -- that was not the case as to the work

18   force enforcement proceedings, so that was my only point.

19           THE COURT:  Okay.

20           MR. JIRAUCH:  The other issue I'd like to make, Your   11:22:19

21   Honor, is the plaintiffs don't contest the issues.  They didn't

22   raise the one that Your Honor now has raised, and so -- in

23   their briefing, so we're not prepared to respond to that.

24           THE COURT:  Which issue?

25           MR. JIRAUCH:  The issue that there was summary      11:22:34
```

```
1    judgment --

2              THE COURT:  Oh --

3              MR. JIRAUCH:  -- given on the basis of --

4              THE COURT:  -- on the 480, 489, 488 --

5              MR. JIRAUCH:  Right, I --                              11:22:39

6              THE COURT:  That's fine, because I guess I'm going to

7    have a question for the plaintiffs now, if you're through,

8    which is:  Why do I have to rule on this one way or another as

9    long as you get the discovery you're looking for?  Mr. Young?

10             MS. IAFRATE:  Your Honor, just a point of            11:22:50

11   clarification.  I also filed the motion regarding this issue.

12             THE COURT:  You know, it wasn't logged as a motion.  I

13   viewed it as a joinder.  I did see that you filed something.

14   But it wasn't logged as a motion and wasn't cited as a motion.

15             Did you want to address something, Ms. Iafrate?       11:23:04

16             MS. IAFRATE:  I would, Your Honor.

17             THE COURT:  All right.  Do you want to address the

18   questions I asked Mr. Jirauch?

19             MS. IAFRATE:  Yes, in part.

20             THE COURT:  Okay.                                      11:23:13

21             MS. IAFRATE:  I will not reiterate what was already

22   discussed.

23             THE COURT:  All right.

24             MS. IAFRATE:  Your Honor, in my motion, or whatever

25   it's called, I discuss the elements of 23(b).  I'm not going to  11:23:24
```

```
 1    reiterate all of those.  I know that you have read it.  The

 2    questions that you asked regarding Mr. Jirauch deal with what

 3    authority did Sheriff Arpaio have to enforce immigration laws,

 4    and that is a case that I have pending in another court -- it's

 5    actually next door in Judge Campbell's court -- and it deals          11:23:49

 6    with Puente v. Arizona.  There's --

 7              THE COURT:  Well, again, I'm talking only about this

 8    case.

 9              MS. IAFRATE:  I understand, Your Honor --

10              THE COURT:  What I'm doing is --                            11:23:58

11              MS. IAFRATE:  -- but you wanted to know what

12    authority.

13              THE COURT:  -- addressing the argument that I believe

14    you made that this was never an issue when I certified the

15    class.  It clearly was an issue because I asked about it, and I      11:24:04

16    asked for supplemental briefing before I certified the class.

17              And then when I certified the class -- and this was

18    also in the motion for summary judgment -- I asked for this as

19    it particularly pertained for the motion for summary judgment

20    and if -- unless I misread it, plaintiffs clearly said you had       11:24:21

21    no authority, and I think you conceded that you had no

22    authority under the state of the existing law to detain persons

23    without authorization based only on the belief that they'd

24    violated civil immigration law.  So that was very much an issue

25    in this case at that time --                                         11:24:37
```

```
 1            MS. IAFRATE:  Your Honor, even --

 2            THE COURT:  -- and that's why I asked the question.

 3            MS. IAFRATE:  I understand, Your Honor.  Even

 4    plaintiffs didn't realize that it was an issue in this case

 5    because they subsequently filed Puente v. Arizona that deals        11:24:45

 6    with 13-2008 and 13-2009, which is the identity theft statutes

 7    that Sheriff Arpaio had authority in order to investigate based

 8    on valid search warrants at the workplace locations.

 9            So in response to your question to Mr. Jirauch, that

10    was the authority that was being relied on, and subsequent to      11:25:07

11    your motion for summary judgment ruling, subsequent to your

12    certification of the class, the recertification of the class,

13    plaintiffs themselves, the ACLU, filed that lawsuit because

14    they did not believe that those individuals were subject to

15    this class action.                                                 11:25:24

16            THE COURT:  All right.  Well, I'll ask plaintiffs

17    about that, and I don't know to what extent you want me to take

18    judicial notice of issues that are involved there in some sort

19    of a complex argument, but let me ask you this, Ms. Iafrate.

20            A lot of this related to plaintiffs' request that they     11:25:39

21    receive the identifications which I think, as I recall,

22    Lieutenant Jakowinicz testified that he had made the

23    enumerations not only of people they turned over to Border

24    Patrol that had resulted from their own operations, HSU's

25    operations in terms of -- oh, I don't know what the word would     11:26:01
```

1  be, but traffic stops; and they'd also made the enumeration of

2  persons that had been turned over to Border Patrol but not

3  charged as a result of workplace enforcement raids that had

4  been in motor vehicles.

5       Plaintiffs asked for that information as a matter of          11:26:15

6  discovery, and whether or not Maricopa County is going to be on

7  the hook for violating workplace raid detentions folks that

8  were subsequently taken to Border Patrol, I did order that it

9  was relevant and should be provided.

10      Have you provided that information to plaintiffs?            11:26:30

11      MS. IAFRATE:  I do not believe I have, Your Honor.

12      THE COURT:  All right.  Is there any reason why at

13  this point I have to rule one way or another on Mr. Walker's

14  motion and your motion?

15      MS. IAFRATE:  Yes, Your Honor.  To define the class          11:26:40

16  and to --

17      THE COURT:  Well, the class has already been defined a

18  long time ago.  The question is:  Are folks involved in

19  workplace enforcement members of the class, and why should I

20  rule on that before I've heard the evidence?                     11:26:56

21      MS. IAFRATE:  That's exactly the point, Your Honor.

22  No evidence was ever heard regarding this subset that we're now

23  referring to.

24      THE COURT:  By all means, we've got a whole second

25  round of a hearing.  Do you want to present evidence on that     11:27:06

```
 1    case?

 2              MS. IAFRATE:  I do not, Your Honor, because I want

 3    that to be addressed in the case that's more fully set forth in

 4    Judge Campbell's court next door.

 5              THE COURT:  Well, you can make whatever motions you        11:27:16

 6    want to make, but in the meantime you need to provide that

 7    discovery.  Anything else?

 8              MS. IAFRATE:  Your Honor, the reason that I did not

 9    provide that previously, first of all, this issue needed to be

10    presented.  We did not file a reply and then the stay was put       11:27:31

11    in place.  So that's the reason that we have not provided it to

12    the plaintiffs.

13              I can tell you that during the time where I believed

14    that there was a full stay in place we continued to gather

15    documents and prepare them to be processed, so they will be         11:27:48

16    processed expeditiously.

17              THE COURT:  Thank you.

18              Mr. Jirauch?

19              MR. JIRAUCH:  Your Honor, I can --

20              THE COURT:  Can I get you to a microphone, please?        11:27:57

21              MR. JIRAUCH:  Your Honor, I'm hesitant to begin

22    talking about the record in this case since there's a very

23    little part of it that I'm intimately familiar with.  But I did

24    look at Your Honor's order with respect to the class

25    definition, and it was -- it was entered pursuant to Rule           11:28:16
```

 1    23(b)(2), which is related only to injunctive and declaratory

 2    relief, not damages.

 3            What clearly is happening --

 4            THE COURT:  Well, I think that there is a point there,

 5    which was what I was just about to ask Mr. Young, and which is          11:28:28

 6    why I'm reluctant to rule now to determine one way or another,

 7    and that is simply this.

 8            It seems to me that your client is in contempt -- he's

 9    already admitted he's in contempt; there were all kinds of

10    enforcement operations -- and people are entitled to                   11:28:44

11    compensation as a result of contempt, they're not entitled to

12    damages as a result of contemptuous behavior.  And so it seems

13    to me that I have to decide what's the difference between

14    compensation because your client violated their constitutional

15    rights and damages because your clients violated their                 11:29:06

16    constitutional rights.

17            I'm not sure, for the reasons I've just said to

18    Ms. Iafrate and to you, I have to make that determination right

19    now.  But I am pretty sure that the identities of those folks

20    are relevant, at least for purposes of discovery, and that's          11:29:21

21    why I've ordered Ms. Iafrate to disclose them.

22            Do you understand what I'm getting at?

23            MR. JIRAUCH:  Yes, Your Honor, I fully understand.

24    Fully understand.

25            Could I make one correction?                                   11:29:32

```
 1              THE COURT:  Sure.

 2              MR. JIRAUCH:  I believe Your Honor said that my

 3    client, the sheriff.

 4              THE COURT:  Oh, you're right; you're Maricopa County.

 5              MR. JIRAUCH:  And so I don't want to, by my silence --    11:29:45

 6              THE COURT:  Well, let me just say --

 7              MR. JIRAUCH:  -- suggest --

 8              THE COURT:  You know, we'll --

 9              MR. JIRAUCH:  Not that I would have objection to that,

10    but it's --                                                        11:29:45

11              THE COURT:  I'm sorry.  I understand that you are

12    Maricopa County.

13              MR. JIRAUCH:  Yes, Your Honor.

14              THE COURT:  But it seems to me that Maricopa County

15    requested the Ninth Circuit to reconsider its ruling and it        11:29:51

16    didn't do it, so you're on the hook for whatever Sheriff Arpaio

17    may have done that's wrong.

18              Do you contest that?

19              MR. JIRAUCH:  We may, Your Honor, but at this point

20    I'm certainly not prepared to argue that issue.                    11:30:02

21              THE COURT:  And if you're going to contest that, where

22    are you going to contest it, the United States Supreme Court?

23              MR. JIRAUCH:  I don't know the answer to that at this

24    point, Your Honor, but that's certainly an issue that will be

25    considered.                                                        11:30:16
```

1    THE COURT:  All right.  But it's my understanding, and

2   you can correct me if I'm wrong, that the mandate did issue by

3   the Ninth Circuit Court of Appeals.

4    MR. JIRAUCH:  It did.

5    THE COURT:  And so I'm bound by what -- the          11:30:23

6   Ninth Circuit Court of Appeals.

7    MR. JIRAUCH:  I agree with that.

8    THE COURT:  All right.  Thank you.

9    MR. JIRAUCH:  You're welcome, Your Honor.

10    THE COURT:  Mr. Young, I don't know if you were going   11:30:31

11   to argue this or Mr. Bendor was, but here's my question.  I

12   mean, I'm not sure that, for reasons I've already said, that I

13   have to rule one way or another on this issue at this point.

14   But I will tell you that when it gets down to it, it seems to

15   me that the case law requires me to differentiate between      11:30:45

16   compensation and damages when I'm talking about -- when I'm

17   dealing with the results of a civil contempt.

18    Do you understand where I'm coming from?

19    MR. YOUNG:  Your Honor, Rule 71 of the Federal Rules

20   of Civil Procedure does give this Court the power and does give  11:30:58

21   people who were injured by the violation of the injunction the

22   ability to compensate for and deal with the consequences of

23   that violation.

24    And as to Your Honor's question, I don't think you

25   need to rule anything now at this point about the class          11:31:14

```
 1    definition.  That was done a long time ago, it's already been

 2    ruled on, the class definition says what it says, and as long

 3    as Your Honor has ruled on the discovery issue, that's really

 4    the only thing that needs to be ruled on at this point.  And as

 5    I understand it, Your Honor has ruled that the discovery on the      11:31:33

 6    workplace raid people, and we're going to talk about other

 7    issues that go outside the narrow group of people that the

 8    plaintiffs want -- that the defendants want to produce evidence

 9    on, as long as those discovery issues are resolved, I think the

10    issues of compensation remain to be determined after the            11:31:50

11    further hearing that Your Honor is going to set.

12            THE COURT:  All right.  Thank you.  I have ruled on

13    the discovery issue, and as I understand what Ms. Iafrate told

14    me, she has compiled and collected those documents and is ready

15    to provide them, now that I've lifted the stay.                     11:32:08

16            Mr. Jirauch.  Can you grab a microphone, please?

17            MR. JIRAUCH:  I'd like to say something very quickly.

18            THE COURT:  Sure.

19            MR. JIRAUCH:  I do want to respond to the argument

20    with respect to Rule 71.  It is simply a procedural mechanism       11:32:23

21    that allows the Court to enter.  It's not a basis --

22            THE COURT:  All right.  I'm not going to make any

23    rulings on 71 until later.

24            MR. JIRAUCH:  I do have a more substantive point I'd

25    like to make.                                                       11:32:36
```

1          THE COURT:  All right.

2          MR. JIRAUCH:  This is being presented on the part of

3    people who are not parties to this action, people who -- these

4    are not members of a class.  They are not plaintiffs in this

5    law --                                                          11:32:45

6          THE COURT:  Doesn't that remain to be seen, whether

7    they're members of the class?

8          MR. JIRAUCH:  At this point in time they are not

9    members of the class.

10         THE COURT:  Why?  Weren't they transported in a motor    11:32:51

11   vehicle within Maricopa County and they were detained in a

12   motor vehicle?

13         MR. JIRAUCH:  Your Honor, we've presented our

14   arguments why we believe that the definition that you've just

15   cited doesn't cover people under these circumstances where the 11:33:01

16   evidence will show that the only reason that they were

17   transported is that they were instructed by ICE to do so on the

18   basis of their reviewing the federal database, with one

19   exception.  And that doesn't fall within --

20         THE COURT:  Do you think that ICE can countermand an     11:33:17

21   order of this Court?  Is that what --

22         MR. JIRAUCH:  No.

23         THE COURT:  -- you're saying?

24         MR. JIRAUCH:  No, I'm not saying that at all.  I'm

25   saying that Your Honor's order is given in the context of       11:33:24

```
 1    pretextual traffic stops.  This is not a pretextual traffic

 2    stop.  It is also based upon the decision to --

 3            THE COURT:  I've already heard all of this, with all

 4    due --

 5            MR. JIRAUCH:  Oh.                                    11:33:40

 6            THE COURT:  -- respect, Mr. Jirauch.

 7            MR. JIRAUCH:  Okay, Your Honor.

 8            THE COURT:  What's your point?

 9            MR. JIRAUCH:  I've made my point.

10            THE COURT:  All right.  Thank you.                   11:33:45

11            MR. JIRAUCH:  Thank you.

12            THE COURT:  Motion to compel.

13            Ms. Iafrate, I think this is you, although you might

14    turn it over to Mr. Masterson.

15            You did file a response on 543 and said that was     11:33:55

16    complete and no discipline was imposed, is that correct?

17            When I say "543," I'm referring to your internal

18    investigation number.

19            MS. IAFRATE:  I understand.

20            THE COURT:  And in May you filed a response to       11:34:14

21    plaintiffs' motion to compel in which you said 543 was

22    complete.

23            MS. IAFRATE:  Yes.

24            THE COURT:  And I assume, since no discipline was

25    imposed, nobody has appealed.                               11:34:25
```

1        MS. IAFRATE:  That's correct.

2        THE COURT:  And a copy has been provided to all

3   parties?

4        MS. IAFRATE:  Yes.

5        THE COURT:  And that is the case in which, though your          11:34:31

6   independent investigator, Mr. Vogel, recommended or found

7   violations, Captain Olson, for some reason, found that no

8   discipline was appropriate?

9        MS. IAFRATE:  No major discipline, correct.

10       THE COURT:  All right.  Chief Warshaw, it was --          11:34:50

11  pursuant to the November order, I assigned you to investigate

12  and evaluate self-investigations done by the MCSO.

13       Have you had a chance to undertake 540- -- their

14  self-evaluation of 543 at this point?

15       CHIEF WARSHAW:  We have taken a look at 543, Your          11:35:10

16  Honor.  Due to the hiatus in actions of the Court recently,

17  we've not made any inquiry of the MCSO regarding people with

18  whom we'd like to speak to, specifically Chief Olson.  So our

19  final report regarding our evaluation of 543 is not yet

20  complete.          11:35:35

21       As it pertains to 542, while we have some information,

22  at least as we understand it from representatives of the

23  County, that investigation is not fully completed.

24       THE COURT:  Did 542 appeal?  Is that going to be an

25  issue I need to rule on?          11:35:57

 1        MS. IAFRATE:  542 is the one, I believe, that deals

 2   with Mr. Armendariz.

 3        No.  Excuse me.  542 has been completed, Your Honor.

 4        THE COURT:  And has not been provided?

 5        MS. IAFRATE:  Correct, because there was major                    11:36:12

 6   discipline in that one, and the appeal time has run, and so it

 7   will be provided.

 8        THE COURT:  All right.  So I assume you'll do an

 9   investigation --

10        CHIEF WARSHAW:  We will, Your Honor.                             11:36:22

11        THE COURT:  -- or an evaluation of the

12   542 investigation.

13        CHIEF WARSHAW:  Yes, we will.  And we will be making

14   contact with representatives of MCSO so we can speak with

15   certain individuals to make our evaluation of those two              11:36:33

16   investigations comprehensible.

17        THE COURT:  And I understand that one of those people

18   will be Captain Olson you need to --

19        CHIEF WARSHAW:  Will be Chief Olson.  We are certainly

20   concerned about the disparity between the ultimate findings,         11:36:48

21   certainly, in 543, as opposed to the preliminary findings, yes.

22        THE COURT:  All right.  Is Chief Olson available this

23   week?

24        MS. IAFRATE:  May I have a moment?

25        THE COURT:  If he's not --                                       11:37:02

1    MS. IAFRATE: I can usually get ahold of him, but this

2    wasn't anticipated or on the agenda, so I will check on his

3    availability and let the monitors know today.

4    THE COURT: Well, as it -- thank you.

5    As it relates to the other topic of the motion to                    11:37:13

6    compel, one was 542. One was 543. There were two other

7    investigations, as long as we're on them, that Vogel was going

8    to complete and then he declined to complete and you had to

9    complete on your own. Are those complete?

10   MS. IAFRATE: Yes.                                                    11:37:31

11   THE COURT: What numbers are those?

12   MS. IAFRATE: I'm sorry, Your Honor. I don't --

13   THE COURT: Know what they are?

14   MS. IAFRATE: -- have those numbers off the top of my

15   head. There are so many.                                            11:37:37

16   THE COURT: That's all right. They're completed?

17   MS. IAFRATE: They are.

18   THE COURT: And have they been provided to the monitor

19   and to the plaintiffs, and to the other parties?

20   MS. IAFRATE: I believe that they have, because they                 11:37:44

21   were done expeditiously to beat the deadline. I believe that

22   they were provided prior to the stay.

23   THE COURT: Do you know one way or another?

24   CHIEF WARSHAW: Chief Kiyler indicates she believes,

25   at least.                                                           11:37:55

1        CHIEF KIYLER:  I know one has been provided for sure.

2   I'm not sure on the second one.

3        THE COURT:  Can you contact Ms. Iafrate and confirm

4   whether or not we need any other investigations?

5        CHIEF KIYLER:  Yes, sir.                                    11:38:16

6        MS. IAFRATE:  We're going to see each other right

7   after this regarding PSB, so we will definitely work together

8   to make certain that they do have all of them.

9        THE COURT:  Then the third topic on the motion to

10  compel had to do --                                             11:38:27

11       MR. SEGURA:  Your Honor, this is Andre Segura.  Sorry

12  for the interruption.  I had planned to address this, with your

13  permission, over the phone.

14       THE COURT:  Well, you can address it when I call on

15  you, Mr. Segura.                                                11:38:37

16       MR. SEGURA:  Just to circle back before you read the

17  first category, I want to clarify one thing.

18       THE COURT:  Mr. Segura, you can address it when I call

19  on you.  Thank you.

20       MR. SEGURA:  Yes, Your Honor.                              11:38:48

21       THE COURT:  With respect to the third object of the

22  plaintiffs' class, it had to do with, I believe, internal

23  investigations that involved racial discrimination, and you'd

24  objected to the overbreadth.  Let me tell you what my concern

25  is on that.                                                     11:39:11

 1           I agree that it's overbroad to the extent it might

 2   apply to races other than those involved in the plaintiff

 3   class: Latino, Hispanic, and otherwise.  But to the extent that

 4   you suggest that the plaintiffs are only entitled to 2014

 5   forward, I disagree, because one of the purposes of this                11:39:25

 6   hearing is to figure out what appropriate remedial action is

 7   appropriate in light of all of the material that existed that

 8   was not provided to the plaintiff class prior to the underlying

 9   lawsuit.

10           And if in fact that material suggests, as I think much          11:39:40

11   of it does, that there was a lack in internal investigation,

12   discipline, and complaint, one of the things I'm going to have

13   to do is figure out what remedial action is.  And it seems to

14   me that to the extent that you have complaints involving

15   discrimination of members of the plaintiff class from 2008             11:39:58

16   forward, that is relevant to that consideration.

17           So I'll allow you to address that, Ms. Iafrate.

18           MS. IAFRATE:  Well, Your Honor, the overbreadth also

19   deals with the type of complaint.  So, for example, people in

20   detention file grievances and --                                       11:40:19

21           THE COURT:  You mean like in jail?

22           MS. IAFRATE:  Yes.

23           THE COURT:  Holding in jail?

24           Do you want to narrow that any, Mr. Segura?

25           MR. JIRAUCH:  I'm sorry.  Your Honor?                           11:40:30

1        MR. SEGURA:  Yes, we're -- we're agreeable to that, to

2    misconduct that occurs within the jails.

3        One concern that we do have is that we do know that

4    detention officers have also participated in patrol activities,

5    so as long as that, those investigations would also be                    11:40:43

6    encompassed, that we would be amenable to excluding any

7    investigation of misconduct occurring solely within an MCSO

8    jail.

9        THE COURT:  Does that help?

10        MS. IAFRATE:  It helps, but I have a little bit           11:41:00

11    further --

12        THE COURT:  Okay.

13        MS. IAFRATE:  -- Your Honor.

14        THE COURT:  Well, we'll take them one at a time.

15        MS. IAFRATE:  That's fine.  Your Honor, the rationale      11:41:05

16    behind my objection dealt with the mandate that -- well, the

17    potential mandate that has now been issued regarding tailoring

18    things narrowly to address the constitutional violations.

19        The way that I read the request, it was overbroad

20    dealing not only with the Fourth and Fourteenth Amendment, not    11:41:22

21    just the Hispanic race, and not just as it relates to traffic

22    enforcement, but the fact that they were doing a catch-all to

23    try to -- not try, that could potentially allow all IAs to be

24    reviewed, which I do not think satisfies the mandate of the

25    Court.                                                              11:41:44

1         And in fact, the reason that I suggested that it start

2    at 2014 was because that was the time when Your Honor -- I know

3    that you don't like the word "expanded" -- but expanded the

4    monitor's abilities and powers to deal with IAs, which was

5    never part of this litigation or the OSC.  It started becoming          11:42:06

6    an issue in this Court's eyes in 2014.  And so that's why,

7    pursuant to the narrow mandate that has been issued, I would

8    argue that this exceeds the authority of this Court.

9         THE COURT:  Well, I'd just point out -- to the extent

10   I understand what you just said, and I want to clarify it --           11:42:30

11   that in 2014 that expanded mandate, if that's what you want to

12   call it, was issued with your full cooperation and opportunity

13   for input.  Whatever objections you made or didn't make at the

14   time, you did or didn't make, but you'll recall that I put

15   forward an order, suggested order, I allowed -- and I said            11:42:46

16   we'll operate under this but I'll allow you to make suggestions

17   and revisions.  You did.  I incorporated those suggestions.

18        And it resulted from finding out that your client had

19   never implemented my preliminary injunction, and it resulted at

20   the same time finding documents that related to Captain Bailey        11:43:04

21   that apparently were put into property under a destruction

22   order, and it also resulted from other concerns related to

23   conflicts of interest in internal investigations.  And I grant

24   you that all of those things are pretty unusual, but they do

25   require some sort of action to address them, and that's how we        11:43:25

1    address them.

2           And so to the extent that I understand your objection,

3    I certainly don't have any problem to the extent that you say

4    that plaintiffs are not entitled to all IAs; I agree they are

5    not.  But I think they are entitled to all IAs that would          11:43:43

6    involve allegations of racial discrimination against any member

7    of the plaintiff class from 2008 forward.

8           Do you have any problem with that?

9           MS. IAFRATE:  Yes, Your Honor, if I may just make one

10   more point.  In 2014 I did object regarding this expansion.        11:43:55

11   One of the reasons, or rationales that you provided was that

12   the mandate had not yet issued.

13          THE COURT:  Well, one of the last items I've added to

14   the agenda that I didn't put on the order because the mandate

15   had only issued the day before --                                  11:44:15

16          MS. IAFRATE:  Right.

17          THE COURT:  -- I'll allow both parties to suggest what

18   is appropriate -- an appropriate revision to the supplemental

19   injunctive relief in light of the mandate.  But as I read the

20   Ninth Circuit's order, it is that the power to look at internal    11:44:25

21   investigations ought to have relation to the plaintiff class.

22          MS. IAFRATE:  Correct.

23          THE COURT:  And I fully intend to implement that

24   order, both formally and informally.  Before I issue any

25   change, I'll allow you to make suggested comments and I'll         11:44:41

1    allow the plaintiffs to do the same.

2         But it certainly seems to me that because the

3    plaintiffs filed their lawsuit in 2007 and the request is only

4    from information from 2008 forward, and I've just limited it to

5    members of the Hispanic or Latino culture or race, I've just          11:44:59

6    taken away your objection, have I not?

7         MS. IAFRATE:  Well, Your Honor, I guess that as I'm

8    standing up here and we're changing ever so slightly -- to my

9    benefit, I understand -- the discovery request, I would ask

10   that either in your order regarding the status conference or        11:45:19

11   plaintiffs provide the language that I am to follow in doing

12   this discovery request so I don't have to guess and guess

13   wrong.

14        THE COURT:  That's fine.

15        Will you please provide that update, Mr. Segura?              11:45:33

16        MR. SEGURA:  Yes, and we're happy to -- to meet and

17   confer on this issue.

18        THE COURT:  All right.  Is there anything else you

19   wanted to say on this point, Mr. Segura?

20        MR. SEGURA:  No, not on the -- on this category of           11:45:44

21   documents.

22        THE COURT:  All right.  Was there anything else in

23   your motion to compel that I haven't addressed?

24        MR. SEGURA:  Yes, Your Honor.  In our -- the first

25   category, documents relating to the four investigations            11:45:54

1  originally assigned to Mr. Vogel, we had also asked for all

2  versions or drafts of the reports, including e-mail

3  communications or other communications regarding that

4  investigation.  This was in that footnote to our motion.  It's

5  our understanding that at least one report by Mr. Vogel was          11:46:18

6  forwarded to MCSO and then returned with comments prior to its

7  completion, so we are interested in that information.

8           THE COURT:  Any problem with that, Ms. Iafrate?

9           MS. IAFRATE:  As long as I can get the cooperation of

10  the investigator, because he does not work for MCSO, he was         11:46:43

11  contracted, so I will make that request.

12           THE COURT:  All right.  Thank you.

13           Anything else, Mr. Segura?

14           MR. SEGURA:  No, Your Honor.  Thank you.

15           THE COURT:  All right.  Do we have any remaining           11:46:55

16  outstanding internal investigations that arose from Armendariz,

17  the Armendariz-Cisco Perez allegations within the MCSO?

18           MS. IAFRATE:  One, Your Honor.

19           THE COURT:  Which is?

20           MS. IAFRATE:  It's 221, and that's the comprehensive       11:47:09

21  Armendariz investigation.  It has been completed but it's on

22  review.  It took over 25 people to work on it.  It's 27

23  binders.  It's very, very voluminous, but it has been

24  completed.  This encompasses everything regarding Armendariz

25  except for his supervision, which was subject to another IA.       11:47:37

```
 1            THE COURT:  All right.  And as soon as that's

 2   completed, you'll provide it to the parties?

 3            MS. IAFRATE:  Correct.

 4            THE COURT:  Do you have an estimated date for me?

 5            MS. IAFRATE:  I do not, Your Honor.                    11:47:47

 6            THE COURT:  Can you have one by the time of our next

 7   status conference?

 8            MS. IAFRATE:  Yes.

 9            THE COURT:  Thank you.

10            DOJ's request to examine and copy the database of   11:47:59

11   documents given by Montgomery.  We had a representative from

12   the Department of Justice here.  Do you want to come forward

13   and tell us what your request is.

14            MR. GOMEZ:  Yes, Your Honor.  I believe on May 8th the

15   Court had issued an order to the defendants' counsel         11:48:25

16   instructing the defendants' counsel to contact the United

17   States; actually, the CIA general counsel's office.  At that

18   point, we -- I'm an attorney in the Civil Division of the

19   Department of Justice in Washington, D.C., and we were

20   contacted, and pursuant to that instruction we had spoken to 11:48:46

21   defendants' counsel, and with the purpose of, since there had

22   been a representation made that documents contained in what

23   I'll refer to as the Montgomery documents were either documents

24   of the United States or documents that -- implied -- were

25   classified or sensitive.                                     11:49:15
```

1          Pursuant to that, the United States attempted to make

2    a -- or contacted the defendants' counsel to see if we can make

3    arrangements to copy and examine those documents to determine

4    whether they're classified or sensitive or otherwise the

5    property of the United States.  We were unable to reach an          11:49:38

6    agreement, I guess, with the defendants' counsel, and we

7    contacted the Court-appointed monitor, Mr. Warshaw, and made

8    that request to him.

9          The United States does not know whether there are any

10   documents in the Montgomery files that are in fact classified      11:49:59

11   or sensitive, but there is a representation that there were

12   documents that were of the United States.

13          Pursuant to Mr. Warshaw and our discussion, we were

14   able to make -- reach an agreement that we would copy the

15   documents under the supervision of the Court-appointed monitor.    11:50:24

16   Essentially, we would -- I believe there are two Banker Boxes

17   of documents, and a hard drive that contains something like

18   200-some megabytes.

19          We would take and copy them at the FBI office and then

20   here in Phoenix, with court-appointed security officers from       11:50:45

21   Washington, who would take custody of the documents, and then

22   we would examine those documents in Washington.

23          And at that point, I believe there was a motion --

24   there was notification to the parties, there was a motion for

25   recusal, and it was -- that was suspended and --                   11:51:04

1          THE COURT:  If I authorize you to receive such

2    documents for your examination, I assume that you would have no

3    objection if I order you not to disclose any of those documents

4    to any third party without further order of this Court.

5          MR. GOMEZ:  That's correct, Your Honor.  We would be          11:51:25

6    prepared to do that.  However, if the documents contained

7    classified or sensitive information, we -- the review would be

8    conducted by the United States.  There may be various entities

9    that may have to review it.  We would have a central -- or

10   central entities that would conduct the review at its -- at the   11:51:45

11   beginning.  If there was a need to contact other government

12   entities as part of the United States, then I assume that that

13   prohibition wouldn't preclude that kind of review.

14         THE COURT:  It doesn't prohibit agents of the United

15   States reviewing the documents; it does prohibit any             11:52:05

16   dissemination to any third party.

17         MR. GOMEZ:  The United States has no objection to

18   that, Your Honor.

19         THE COURT:  All right.   Any party object?

20         MS. IAFRATE:  May I be heard, Your Honor?                  11:52:19

21         THE COURT:  You may.

22         MR. GOMEZ:  Oh, one point, Your Honor.  If we are

23   authorized to conduct the review, I would request the Court's

24   permission to either meet with the Court-appointed monitor,

25   Mr. Warshaw, today, or its designee, to make the arrangements.   11:52:33

1    Thank you.

2           THE COURT:  All right.

3           MS. IAFRATE:  Your Honor, I kept you abreast of this

4    situation when it was unfolding.  You had ordered me to write a

5    letter to the CIA, which I did do and noticed the Court.                    11:52:50

6           I then received a call from people that I did not know

7    that said that they were the United States and they were

8    entitled to those documents.  I inquired whether they had the

9    permission of the CIA and they said no, but they were the

10   United States and they were entitled to them.                               11:53:06

11          I did not feel comfortable giving documents -- I

12   objected, based on that rationale, that if these are indeed CIA

13   documents, then the CIA needs to be the one to say whether they

14   can be disclosed or not.

15          The other thing, Your Honor, that we discussed                       11:53:22

16   previously, and it's your document 1086, was a procedure that

17   the monitor and I were going to perform in order to protect

18   some private information.  Because the stay was implemented,

19   the Monitor Team and I never got around to performing that

20   procedure that would protect some of these people's bank                    11:53:47

21   accounts, Social Security numbers, things of that nature.  And

22   in fact, plaintiffs have some of these documents which you

23   told, You may look at, but please don't do anything with them

24   until we go through that procedure.

25          I would ask that if you were inclined to allow the                   11:54:03

```
1    U.S. Attorney's Office to review these, that we would first be

2    allowed to go through that procedure for the sake of these

3    individuals' privacy interests.

4          THE COURT:  Well, the United States would be subject

5    to the same protective order that plaintiffs are subject to;     11:54:19

6    they wouldn't be able to disclose any of that information

7    pending their review.

8          MS. IAFRATE:  It is my understanding that despite

9    that, we would still perform that procedure that you requested

10   in document 1086 --                                              11:54:35

11         THE COURT:  Have you taken any steps to do that in the

12   two months between the middle of May and now?

13         MS. IAFRATE:  Well, actually, Your Honor, the document

14   says that the monitor was to coordinate and contact me, so, no,

15   we have not done anything in order to perform that.              11:54:48

16         THE COURT:  All right.  Any other objections?

17         MS. IAFRATE:  No, Your Honor.

18         THE COURT:  Anybody else wish to be heard?

19         MR. KLAYMAN:  Your Honor, I don't know if you'll allow

20   me to be heard on my pro hac vice application, Mr. Klayman.  I   11:54:58

21   represent Mr. Montgomery.

22         THE COURT:  Well, let me tell you, Mr. Klayman, I did

23   receive your pro hac vice -- I don't know whether it's "vise"

24   or "veechay" application -- just before I took the bench.  I

25   don't know whether you filed it Friday night or sometime today,  11:55:13
```

1    but I didn't get it till just now.

2              I have a couple of concerns.  I have the concern that

3    you have the same conflicts that Mr. Moseley was subject to as

4    it pertains to your client, Mr. Montgomery, and the testimony

5    that we've already received from your client, Sheriff Arpaio,          11:55:28

6    and Chief Deputy Sheridan that I had outlined in denying his

7    admission pro hac vice.  It seems to me like you're subject to

8    those same objections.

9              It also seems to me, and I don't want to be

10   precipitous on this, but some of the documents that have since        11:55:44

11   been disclosed raise at least the possibility that you yourself

12   might be a witness in this action, and so I'm a little

13   concerned to grant your admission pro hac vice without at least

14   allowing the other parties to be heard on it.

15             To the extent that you want to speak on behalf of           11:56:03

16   Mr. Montgomery, I will briefly allow you to do so as long as

17   you keep within the confines of ethics and propriety.

18             MR. KLAYMAN:  Yes, Your Honor.  May I address the

19   Bench --

20             THE COURT:  You may.                                        11:56:17

21             MR. KLAYMAN:  -- from the lectern?

22             THE COURT:  You may.

23             MR. KLAYMAN:  Thank you.

24             Let me deal with the issues that Your Honor raised

25   first.                                                                11:56:27

```
 1            THE COURT:  No.  You don't need to deal with them.
 2   We're not going to address them now.  I'm going to allow the
 3   other parties --
 4            MR. KLAYMAN:  Well -- okay.  That's fine.
 5            THE COURT:  You can talk to whether or not I allow the    11:56:35
 6   Department of Justice to review the materials under seal that
 7   Maricopa County has indicated that your client provided to them
 8   indicating that it was material that he had taken from Central
 9   Intelligence Agency as a result of their harvesting of
10   documents.                                                         11:56:57
11            MR. KLAYMAN:  Let me explain why I want to come in pro
12   hac vice.
13            THE COURT:  No.  You can address what I've just told
14   you you can address.
15            MR. KLAYMAN:  Mr. Montgomery obviously opposes that       11:57:01
16   until such time as our appeal is heard by the Ninth Circuit.
17   We've appealed Your Honor not allowing us to intervene, and the
18   reason for that --
19            THE COURT:  I didn't rule on your motion to intervene,
20   because I didn't allow --                                          11:57:14
21            MR. KLAYMAN:  Correct.
22            THE COURT:  -- Mr. Moseley to appear.
23            MR. KLAYMAN:  And that's the re --
24            THE COURT:  Your client can hire any other attorney
25   that doesn't present the conflict that you and Mr. Moseley do.     11:57:20
```

1    MR. KLAYMAN:  We submit, Your Honor, that we don't

2  have a conflict.

3    THE COURT:  All right.  Then I don't want to hear

4  that.

5    MR. KLAYMAN:  All right.                                    11:57:30

6    THE COURT:  I will hear it in due course when --

7    Did you provide your motion for admittance

8  pro hac vice to the other -- all the other --

9    MR. KLAYMAN:  We did, Your Honor.  We e-mailed it to

10 everybody and it's been served by mail.                       11:57:43

11   THE COURT:  All right.  Then what I'll do is I will

12 hear that next status conference.

13   MR. KLAYMAN:  That's fine, Your Honor, but we do

14 request that before that's heard, and if Your Honor should

15 grant it -- and I would like an opportunity to reply to that;  11:57:53

16 we just simply submitted the application pro hac vice -- that

17 you not release documents until such time as you make a ruling

18 on that, because Mr. Montgomery would like to renew his motion

19 to intervene to protect what he claims are his property

20 interests in those documents.                                 11:58:10

21   THE COURT:  Well, the only testimony that we have in

22 this action is that those are documents that he -- I don't know

23 how to -- I don't want to use words other than Chief Deputy

24 Sheridan used, but those are documents that he took from the

25 CIA that the CIA was harvesting from American citizens.  It    11:58:27

1    doesn't sound to me like he has any property interest in such

2    documents.

3           To the extent that he does have such property

4    interests, and to the extent that -- because there may be other

5    documents in there that are -- and, in fact, there may be no          11:58:42

6    documents taken from the CIA; that possibility has been raised

7    by the evidence.  If that is so, how is he damaged by allowing

8    the United States of America to review and confirm that they

9    have no property interest in those documents?  What property

10   interest does Mr. Montgomery have in such documents that would        11:58:59

11   in any way be infringed by allowing the United States to review

12   those documents under seal to make sure that they have no

13   security interest in them?

14          MR. KLAYMAN:  We did submit with the motion to

15   intervene, as part of the various pleadings, a court -- and          11:59:13

16   we've cited it -- a court ruling in Nevada where the Department

17   of Justice was ordered to give documents back to

18   Mr. Montgomery.

19          THE COURT:  And that was a 2006 ruling.

20          MR. KLAYMAN:  That's correct.                                 11:59:26

21          THE COURT:  Well, this case supposedly reconstructed

22   material from a database that pertained to alleged telephone

23   calls and e-mails that occurred in 2009 and 2010.

24          How does that Nevada 2006 ruling relate to any

25   database that alleges to have 2009-2010 documents in it?             11:59:44

```
 1          MR. KLAYMAN:  That's something that Mr. Montgomery

 2   would like the opportunity to argue in front of this Court.

 3          THE COURT:  Well, I'm giving you the opportunity right

 4   now.

 5          MR. KLAYMAN:  I don't have that information, Your            11:59:54

 6   Honor.  I don't have it.  But we want an opportunity to, in a

 7   systematic way, put forward a brief to this Court on that

 8   issue.

 9          THE COURT:  And I think that you can have that

10   opportunity, but you need to explain to me now why any interest   12:00:07

11   that Mr. Montgomery might have in such materials is in any way

12   infringed by allowing the United States to review them under

13   seal to make sure that there are no secured documents that

14   belong to the CIA in those materials.

15          MR. KLAYMAN:  Your Honor, I'm not taking a position on      12:00:28

16   that; I'm simply wanting an opportunity to brief it in the

17   ordinary course.  And we came before this Court, and I don't

18   have any conflict with Sheriff Arpaio.  We --

19          THE COURT:  Well --

20          MR. KLAYMAN:  -- we stated that we're not --                12:00:37

21          THE COURT:  -- you may take your seat.

22          MR. KLAYMAN:  -- taking any adverse position.

23          THE COURT:  You may take your seat, because I've

24   already ruled on that.  I'm going to allow the other parties to

25   address your renewed motion to intervene.  But I would point      12:00:46
```

1    out that you also signed Mr. Moseley's motions and

2    Mr. Moseley's appeal.  And I don't see how you're any different

3    than Mr. Moseley, and we will allow you the opportunity to be

4    heard to the extent that the other parties have an opportunity

5    to address it in an orderly fashion, which is not today.          12:01:01

6            MR. KLAYMAN:  Your Honor, may I just say I did not

7    sign those pleadings.  I was listed as Of Counsel but I never

8    signed those pleadings.  Only Mr. Moseley signed the pleadings.

9            THE COURT:  Okay.  It looked to me like you'd signed

10   them, but I'm not saying you did.  And we will give you the       12:01:17

11   orderly opportunity for your motion, or your pro hac vice

12   application to be heard, but an appeal to the Ninth Circuit

13   would take years, and I'm not going to hang up the review of

14   the United States in documents that your client may have

15   claimed to Chief Deputy Sheridan were procured from the CIA for   12:01:30

16   that period of time.

17           So thank you, and we will hear your motion when the

18   other parties have had a chance to address it.

19           MR. KLAYMAN:  May I have an opportunity to reply to

20   that, because I --                                                12:01:46

21           THE COURT:  Yes.  In fact, if you don't have an

22   adequate time to reply, we'll schedule it for the next status

23   conference out, so that we can have a fair response, a reply, a

24   full opportunity to be heard on the point.

25           MR. KLAYMAN:  Thank you.                                  12:02:00

1    THE COURT:  In the meantime, I am going to grant the

2  United States' motion to review the documents that have been

3  provided.  I am ordering the United States that while they have

4  the authorization to have government employees and agents

5  review the material, the material will be disseminated to no            12:02:12

6  third party under any condition without the prior approval of

7  this Court.

8    I'm going to further authorize the monitor to make

9  whatever arrangements are necessary to do a secured transfer of

10  such documents to the United States.  I'm also going to         12:02:26

11  authorize a representative from the defendants to be present

12  during such transfer if they wish to be.

13    Anything else on that matter?  All right.

14    Do you know, what are we going to do in terms of

15  MCS -- Maricopa County having independent representation from       12:02:49

16  Sheriff Arpaio?  I don't question that you have the ability to

17  have separate counsel, if that's how you choose to pursue the

18  matter, but I'm not sure that you have -- I'm not sure, to the

19  extent --

20    Well, let me ask, Mr. Walker, are you taking the       12:03:07

21  position -- well, I think I've already spelled this out with

22  Mr. Jirauch.  Are you taking the position that Maricopa County

23  is not going to be liable for any liability, if any, that

24  Sheriff Arpaio, Chief Deputy Sheridan, and the MCSO are

25  responsible for after the issuance of the mandate by the Ninth        12:03:25

1   Circuit?

2          MR. WALKER:  To try to be clear on this, Your Honor,

3   in terms of financial responsibility, the Board of Supervisors

4   has the responsibility to fund costs associated with remedies

5   that are the result of this proceeding.  That's a statutory        12:03:48

6   obligation under Arizona law.

7          We do take the position that because of the unusual

8   nature of the structure of county government under the Arizona

9   Constitution statutes, that the portion of the county

10  government that I represent -- that's the Board of Supervisors,    12:04:11

11  the county manager, and employees working under their direct

12  supervision -- do not have the kind of authority over the

13  actions of other constitutional officers, including the

14  sheriff, that make the County either legally liable for the

15  actions of the sheriff or in a position to control those          12:04:36

16  actions, so --

17         THE COURT:  Well, I mean, you are legally liable for

18  them to the extent you're liable for damages and corrective

19  action, correct?

20         MR. WALKER:  The financial responsibility, yes, that's      12:04:50

21  beyond question, and provided for clearly under Arizona

22  statute.  And if I could --

23         THE COURT:  But what you're saying is the County Board

24  of Supervisors can't issue directives to Sheriff Arpaio.

25         MR. WALKER:  That's correct, Your Honor.                    12:05:02

1          THE COURT:  All right.  So how does that result in

2     differences in terms of issues that are presented by this

3     contempt hearing?

4          MR. WALKER:  Well, I think, Your Honor, our position

5     is that the County was not and is not in a position to control          12:05:17

6     or to have any direct effect on the decisions that are within

7     the province of constitutional officers under the constitution

8     and the statutes, and that includes the sheriff.

9          Now, I read the Ninth Circuit decision as essentially

10    saying -- ordering that the County be added as a party, but          12:05:44

11    then saying:  If you have the County, you don't need the

12    sheriff.  Well, I think the reverse is also true:  If you have

13    the sheriff, you don't need the County.  And I think the -- the

14    plaintiffs --

15         THE COURT:  Well, that certainly seems to run contrary          12:06:05

16    to the court of appeals decision out of the Arizona Court of

17    Appeals, doesn't it, that was cited by the Ninth Circuit?

18         MR. WALKER:  Well, I think the -- there actually is

19    quite a bit of authority to the contrary under -- in the

20    Arizona court system.          12:06:23

21         THE COURT:  Even if what you say is true, Mr. Walker,

22    and it may be, do I have any authority to do anything different

23    once a mandate has been issued by the Ninth Circuit?

24         MR. WALKER:  I don't see that the Court would be

25    precluded from concluding on the basis I just articulated, and          12:06:39

```
 1   particularly given that the plaintiffs earlier in this
 2   proceeding stipulated that the County is not a necessary party
 3   for full and complete relief, that I don't see that the Court
 4   would be precluded from concluding that with the sheriff in
 5   this proceeding, the County is not a necessary party and          12:06:59
 6   dismissing us out.
 7            THE COURT:  All right.  Well, I guess I'll allow you,
 8   to the extent you wish to, to continue to urge that.  It seems
 9   to me it's precluded by the Ninth Circuit ruling.  But to the
10   extent you want to be here to represent whatever interests you   12:07:16
11   believe that the County may have that are separate, I'm not
12   going to allow you to delve into a whole lot of stuff that
13   isn't relevant to the contempt hearing, but I'll allow you to
14   be here to represent the County.
15            MR. WALKER:  Thank you, Your Honor.                     12:07:31
16            THE COURT:  Thank you.  While you're here, I did
17   respond, it wasn't really an order, but I responded with
18   thoughts relating to procedures on the independent review of
19   the monitor's billings.  Were you able to read that?
20            MR. WALKER:  Yes, Your Honor.                           12:07:48
21            THE COURT:  Do you have any thoughts about that?  Have
22   you talked to the other parties?
23            I mean, truthfully, I don't have any huge objection --
24   except for I want to be sure that we operate ethically in
25   conjunction with all the parties -- I don't have any huge        12:07:59
```

1    objection if Ms. Wilson continues to review the detailed

2    confidential billings of the monitor, to the extent that that

3    isn't going to run the monitor a huge legal expense because the

4    County's trying to, you know, manipulate that process to get

5    some sort of a contract entered with the monitor.  By the same          12:08:16

6    token, I want to be sure that the monitor and this Court's

7    orders are responsive to the County's fiscal concerns.

8              Have you explored with the other parties whether they

9    have objections to Ms. Wilson continuing to review the

10   monitor's confidential billings on an ex parte basis?                   12:08:33

11             MR. WALKER:  I have not, Your Honor, and the reason

12   being that we feel that as long as the County is a party, that

13   presents a bit of a problem, at least from an appearance

14   standpoint.  We think that --

15             THE COURT:  Well, I understand that.  I accept it.            12:08:52

16             Have you thought about designating any non-CPAs that

17   might be less expensive?

18             MR. WALKER:  Yes, Your Honor, and Ms. Wilson and her

19   people are working on identifying potential candidates for

20   that, and --                                                             12:09:09

21             THE COURT:  All right.

22             MR. WALKER:  -- we'll get back to the Court with a

23   proposal.

24             THE COURT:  As I said, I'm open to any kind of

25   proposal that's workable to the parties, not expensive as               12:09:16

 1    between, you know, raising all sorts of expense and

 2    inefficiencies, but I am certainly amenable to work with the

 3    County so that the County can fulfill its responsibility to the

 4    taxpayers.

 5            MR. WALKER:  We appreciate that, Your Honor.                    12:09:28

 6            THE COURT:  All right.

 7            MR. WALKER:  Could I just make a couple points?

 8            One is in your order you suggested that there

 9    currently is no contract, and that's not quite accurate.  Under

10    the terms of the contract, if a new contract was not               12:09:41

11    negotiated, it fell back on the old terms, so there's an

12    evergreen provision.

13            So there is a contract in effect.  There's also

14    another contract that the parties are trying to negotiate.  I'm

15    not privy to those negotiations, but my understanding is that       12:10:00

16    they're pretty close to concluding an agreement.

17            The second point I wanted --

18            THE COURT:  Before you go to the second point, I have

19    looked at that first contract before back when it was in force.

20    It does seem to me that it doesn't incorporate typical County       12:10:15

21    contract provisions.  It has different provisions.  So we'll

22    assume that that is the contract going forward?

23            MR. WALKER:  Until it's replaced by a new one.

24            THE COURT:  Yeah.  And I did invite you to tell me in

25    the order if you're not going to pay when I order you to pay       12:10:30

1    the monitor.

2            MR. WALKER:  No, we are.  In fact, that's my second

3    point, Your Honor.  We are holding the bill currently from the

4    monitor, and given that we don't have any independent review

5    process in place, we're awaiting the Court's order with respect    12:10:46

6    to that bill.

7            THE COURT:  All right.  Thank you.

8            MR. WALKER:  Thank you.

9            MR. YOUNG:  Your Honor, may I be heard briefly on that

10   issue?                                                              12:10:54

11           THE COURT:  You certainly may.

12           MR. YOUNG:  Plaintiffs have not been involved very

13   much, if at all, in this process.  We do have a concern,

14   though, that since the County is a party in the case, that

15   review of the monitor's bills by parties should not have the       12:11:05

16   effect of impeding or delaying actions by the monitor.  We just

17   want to make it clear that we do have an interest in this

18   issue, because we want the Court's orders to be fully

19   implemented, and we would be concerned if the review process

20   with the County does impede that process.                          12:11:22

21           THE COURT:  All right.  Thank you.

22           With respect -- and I mentioned this with Ms. Iafrate

23   earlier -- we're going to set -- well, we have some scheduling

24   matters that we need to raise.  Maybe we ought to raise those

25   first.                                                             12:11:40

```
1              We've had a lot of talk about other lawsuits that may

2    involve the sheriff or may involve similar issues in this court

3    in front of other courts, and I must confess that I do not

4    know -- I mean, I know something about those lawsuits because

5    one of them, the one in front of Judge Silver, has been an          12:11:58

6    issue here before, even though briefly.  I don't know a lot

7    about it.

8              But it did seem to me that I have read in the paper

9    that that has -- and maybe I need to talk to you again,

10   Mr. Walker -- that the County Board of Supervisors has approved     12:12:17

11   settlement of large and substantial portions of that lawsuit,

12   and the reason why I ask is twofold:  First, I want to

13   reschedule, at a time that will be convenient for everybody,

14   the resumption of this contempt hearing.  I have no intention

15   of rescheduling it, of course, on top of when the defendants        12:12:36

16   may have to be in Judge Silver's court; nor do I have any

17   intention of rescheduling it until I'm sure that all the

18   documents and other matters have been provided so that we can

19   do this once and be done with it; nor do I have any intention

20   of putting this off very long.                                      12:12:56

21             I do believe, Mr. Masterson, that you will have time

22   to -- Mr. Popolizio, or --

23             I'm sorry, what's your name?

24             MR. POPOLIZIO:  Popolizio, Your Honor.

25             THE COURT:  Popolizio.  I apologize.                      12:13:09
```

```
 1              I do believe, Mr. Masterson and Mr. Popolizio, that

 2     you will have time to file, if you do it timely, I'm not going

 3     to -- I'm not going to try and sneak any hearing in before you

 4     can get the Ninth Circuit to consider your writ of mandamus.  I

 5     think you'll have time to get that up there, and if they're        12:13:25

 6     going to act on it, they can act on it.  But I do want to

 7     schedule it in an efficacious, speedy fashion that will be fair

 8     to all the parties.

 9              Did you have something you wanted to say,

10     Mr. Masterson?                                                     12:13:41

11              MR. MASTERSON:  Just briefly, Judge, and I think

12     possibly --

13              THE COURT:  Do you want to go to a microphone or else

14     pull that one up to you?  You're tall.

15              MR. MASTERSON:  I believe you already may know this,      12:13:51

16     and Mr. Walker will be addressing the other case, United States

17     versus Arpaio, that Mr. Popolizio and I are also defending that

18     case.

19              THE COURT:  I do.  I do, and -- well, I don't think it

20     poses any problem as long as I don't overlap.  But here is my      12:14:05

21     problem, here are a couple of my problems.

22              One, the County has authorized settlement, according

23     to the newspaper, and I'm not taking this at face value; I'm

24     putting it out there.  One of the reasons that settlement

25     occurred was a reliance on the injunctive relief that was          12:14:24
```

 1    already in place in this action, and the no perceived need to

 2    duplicate compliance.  I get that.  I appreciate it.  I

 3    understand why the County would act that way.

 4            However, I am wondering if the County has been fully

 5    advised that one of the positions Mr. Popolizio and                    12:14:43

 6    Mr. Masterson is taking is that if in fact this Court is

 7    removed by the Ninth Circuit from presiding over this case, the

 8    supplemental permanent injunction and the findings of fact and

 9    conclusions of law I made three years ago should be vacated, in

10    which case there would be no injunctive relief on which the           12:15:06

11    County or the plaintiffs could rely.

12            Now, obviously, I don't think that's going to happen,

13    but I'm not the Ninth Circuit, and I haven't suggested the

14    action is brought by Mr. Popolizio in bad faith.  So I wonder

15    if the County has been fully advised, if the plaintiffs in            12:15:19

16    United States versus Arpaio have been fully advised, that the

17    movants are taking the position not only that I should be

18    removed from presiding over the contempt hearing, but that the

19    injunctive relief and the findings of fact and conclusions of

20    law I entered years ago should be vacated.                            12:15:45

21            Are you aware whether the County Board of Supervisors

22    has been so advised?

23            MR. WALKER:  Yes, I think the Board of Supervisors is

24    aware, and I think I can clarify this to some extent.

25            The settlements -- which, incidentally, were submitted        12:16:01

1    to the Court, to Judge Silver, on Friday -- cover the

2    Department of Justice's claims with respect to worksite

3    operations, alleged retaliation, and treatment of LEP prisoners

4    in the jails.  The settlements do not cover the claims related

5    to such things as traffic stops and so forth.                    12:16:22

6          Now, Judge Silver issued a motion for summary judgment

7    which we understand to reflect a conclusion that this Court's

8    rulings with respect to alleged discriminatory activity in

9    connection with traffic stops conducted in the context of

10   immigration enforcement, that that -- that ruling is binding in  12:16:46

11   the DOJ litigation.

12         DOJ is -- at least was seeking relief for alleged

13   discrimination in other forms of policing activity.  We had

14   to -- we were required to submit to Judge Silver this

15   morning -- and since I've been here, I'm not sure that          12:17:14

16   happened, but I assume it was -- a statement to Judge Silver

17   about what the parties, the respective parties, meaning the

18   Department of Justice, the sheriff, and the County, perceive as

19   needing yet to be tried in that case.

20         And we have a bit of a disagreement, which presumably     12:17:31

21   Judge Silver will resolve, but the issues of appropriate

22   remedies with respect to either the portion of the case on

23   which Judge Silver issued summary judgment, or any additional

24   alleged improper activity that the United States is still

25   planning to litigate, those are issues that at this point       12:18:02

1    remain to be resolved.

2        THE COURT:  All right.  And so if in theory not only

3    was I removed from this case, but the Ninth Circuit took the

4    unusual step of vacating a case they've already affirmed on

5    appeal, that case would be subject to retrial, then, in the                12:18:20

6    United States -- or those issues would be subject to retrial in

7    United States versus Arpaio as well as in the plaintiffs'

8    lawsuit here?

9        MR. WALKER:  Well, let me put it this way.  The

10   settlements that Your Honor has been reading about in the paper          12:18:38

11   don't touch that issue.  The issue of the implications of this

12   Court's order for the Department of Justice claims is the issue

13   that we think still remains to be resolved.

14       If this Court's order were vacated, you know, I think,

15   theoretically, a Rule 60 motion in Judge Silver's court might           12:19:06

16   be appropriate.  But I can also tell Your Honor that we're

17   working with the Department of Justice to see if we can resolve

18   that last bit, and I think we'll know this week whether that's

19   going to happen.

20       THE COURT:  Mr. Popolizio, do you anticipate going to             12:19:23

21   trial in front of Judge Silver?

22       MR. POPOLIZIO:  That remains to be seen, Your Honor.

23   As Mr. Walker has stated, we are trying to resolve that issue,

24   but if so, it will be on August 10th.

25       THE COURT:  And Mr. Masterson, Mr. Popolizio, if you             12:19:36

1  do go to trial, you've resolved a lot of the issues.

2        How long is trial going to take?

3        MR. MASTERSON:  Well, Judge, we settled, probably,

4  regardless of how the final issues work out, we probably got

5  rid of a good 75 percent of the issues by settlement agreement.  12:19:50

6        I cannot tell the Court at this point how many days

7  the remainder may take, because frankly, I do not know at this

8  point what the United States intends to present in the event we

9  go forward.

10        The trial was initially set for 15 days.  That was for  12:20:13

11 all issues.  Both sides, including the County, reported to

12 Judge Silver that we felt it would take at least three months

13 to try all issues of the case.  So having reduced that by

14 75 percent, possibly we could fit the remainder in the 15 days

15 currently scheduled.                                          12:20:34

16        But like I said, Judge, I don't know at this point, or

17 I'm not sure the United States knows what they intend to

18 present in the event we have to go forward.  I think everyone

19 at this point is focusing on how can we resolve the issues

20 before we have to head down there?                            12:20:50

21        THE COURT:  All right.  Thank you.

22        Did you want to be heard on this at all, Mr. Young?

23        MR. YOUNG:  No, Your Honor.

24        THE COURT:  All right.  It does seem to me that it's

25 fairly likely that the August matter will go away            12:21:00

1    substantially, if not completely, and whatever happens to this

2    case after whatever the Ninth Circuit may or may not do, I

3    intend to move it forward.

4           As I said, I don't intend to move it so forward so

5    quickly, Mr. Masterson, Mr. Popolizio, Ms. Iafrate, that your        12:21:14

6    writ of mandamus can't at least be heard by them.  But I do

7    intend to move it forward, because, for reasons that everybody

8    appreciates, we need to move forward, and we need to correct

9    anything that's problematic and resolve this case.  I'm sure

10   that all parties agree.                                              12:21:37

11          As I raised with Ms. Iafrate earlier, the Ninth

12   Circuit mandate does require at least slight revision to the

13   supplemental permanent injunction, so I'd invite all parties,

14   if they want to put forward suggested language, to do so prior

15   to our next status conference.                                       12:21:54

16          I'm going to set the next status conference for Friday

17   the 31st at 2 p.m.  That will probably be in a different

18   courtroom because this courtroom is going to go -- undergo,

19   thankfully -- or it may be in a different courtroom, this

20   courtroom is going to, thankfully, undergo some electronic           12:22:08

21   updates.

22          I'm not sure, Mr. Klayman, if your motion for

23   admission pro hac vice will be fully briefed at that point.  If

24   it is, we'll hear that then; if it's not, we'll hear it at the

25   next status conference, which will probably be no more than a        12:22:25

1    week away.  But we will try and let you know well in advance so

2    that you will be ready.

3              As for rescheduling the ultimate hearing on this

4    matter, I am holding September 22nd through September 25th and

5    September 29th through October 2nd, and I invite you all to          12:22:48

6    clear your calenders.

7              But I will say that if for some reason I believe that

8    we don't have full disclosure of documents, that there are

9    other documents that existed that may have been destroyed or

10   otherwise dealt with, I'm going to take whatever time is          12:23:04

11   necessary to make sure that we have our arms around everything,

12   that we have the interviews and evaluations done, so that we

13   can then move forward, have the hearing, and proceed to

14   whatever relief may be merited.

15             Is there anything else that needs to be addressed by    12:23:21

16   the parties?

17             MR. YOUNG:  Your Honor, we have one issue we would

18   like to raise.

19             THE COURT:  All right.

20             MR. YOUNG:  This relates to the documents that were     12:23:33

21   ordered released publicly by the Court recently relating to the

22   so-called Seattle investigation in which it seems apparent that

23   members of the MCSO were attempting to obtain information.

24             As has been discussed, that information that they did

25   obtain was junk, but from what we understand, the investigation   12:23:56

1  has not been terminated, and we don't know whether the MCSO

2  people are still seeking information through whatever means

3  they might happen to identify.

4      It appears from the documents that the information

5  that they trying to obtain, or thought they were obtaining or     12:24:16

6  might have been obtaining, included at least in part

7  communications, or information about communications, of

8  plaintiffs' counsel.  There were references to telephone calls;

9  there was, as late as April of this year, just prior to the

10  previous hearing on this contempt issue, communications urging    12:24:37

11  that the efforts continue, and that genuine and usable

12  information be obtained.

13      We are somewhat concerned about that, obviously.  We

14  think it would be improper for the MCSO to continue to obtain

15  information through extrajudicial means that it would then use    12:24:54

16  in the context of this lawsuit.  Obviously, there are issues

17  about parties seeking each other's -- information about each

18  other's electronic communications, and we would like some

19  assurance that that will not continue, that those efforts will

20  have ceased.                                                      12:25:16

21      So I throw that open for the Court.  I have raised it

22  with counsel for the sheriff, and I don't know what the

23  response is going to be.

24      THE COURT:  Ms. Iafrate.

25      MS. IAFRATE:  Your Honor, Mr. Young addressed this           12:25:33

```
 1   issue with me out in the hallway right before we walked in, so

 2   this is a new issue that I heard about this morning.

 3          I disagree with his characterizations of what did or

 4   did not happen during that investigation.  And in fact, you

 5   yourself, Your Honor, said the whole story has not yet been        12:25:53

 6   told.  So regarding the characterizations of what MCSO did or

 7   did not do, or what they requested, I completely disagree with

 8   the statements that were just made.

 9          Regarding any sort of insurance -- assurance, I would

10   ask that I be provided with either a discovery request or at       12:26:09

11   least a letter in writing, and then I can address it with the

12   other side.

13          THE COURT:  Well, I understand that, and I do agree

14   that the whole story's not been told.  I've invited you to --

15   to tell that story.  I intend to provide you the full             12:26:25

16   opportunity to do.

17          It does seem to me that to the extent Mr. Young is

18   asking for the assurance that your client is not attempting to

19   survey his communications with his client, that's not an

20   inappropriate request.                                            12:26:48

21          MS. IAFRATE:  I never said that it was, Your Honor,

22   and in fact, out in the hallway I said that it wouldn't be

23   pertinent for me to respond to that, because it was never

24   raised with me, and so I merely asked that I be provided with

25   it in writing so that we can respond to it appropriately.         12:27:03
```

1      THE COURT:  All right.  If you'll provide that request

2  in writing, Mr. Young.

3      MR. YOUNG:  We will do that, Your Honor.

4      THE COURT:  All right.  And if I need to further

5  address the matter, I will do so.                              12:27:15

6      MR. YOUNG:  Thank you very much.

7      THE COURT:  Anything else?

8      Mr. Masterson.

9      MR. MASTERSON:  Thank you, Judge.

10      This is my first time appearing down here in this          12:27:23

11  case -- at least at counsel table, I've been here previously --

12  and I think I have everyone sorted out fairly well, including

13  Mr. Gomez from the Department of Justice.  But there's someone

14  on the phone from the United States Attorney's Office and I

15  don't know the connection of that person to this case, or even  12:27:38

16  which office they're appearing from.

17      THE COURT:  Ms. Kimmins, whose appearance I heard, and

18  Ms. O'Gara, are from the Tucson office of the United States

19  attorneys for Arizona.

20      As I invited your clients to have criminal                 12:28:00

21  representation if they wished to do so, because it is possible

22  that -- it is at least conceivable that I'll make a referral

23  for criminal contempt, which is why I've allowed, for example,

24  Mr. Stein, your partner, and others to be here in that special

25  capacity, at the same time I invited the United States          12:28:23

1    Attorney's Office to be here because they would be the people

2    to whom I would have to refer such a criminal contempt

3    proceeding.

4         I think for the most part they've declined that

5    activity.  As I've set forth, and I think as you know, in my    12:28:38

6    recusal order I invited them to see if we could negotiate a

7    global conclusion to this before the hearing.  I invited them

8    to engage in sort of pre-referral negotiations to see if we

9    could resolve any criminal contempt with your clients prior to

10   undergoing any contempt hearing, and they declined to do that.  12:28:55

11   But they still have the right as a member of the public to be

12   here, just as your clients have been given the additional right

13   to have criminal representation represent their interests in

14   this civil proceeding.  That's who they are.

15        MR. MASTERSON:  I understand.  Thank you, Judge.          12:29:13

16        THE COURT:  Um-hum.

17        MR. MASTERSON:  One last question.  I caught the

18   September 22 to 25 dates you want us to keep open, but I did

19   not catch the October dates.

20        THE COURT:  That would be September 29 through October     12:29:23

21   2nd.

22        MR. MASTERSON:  That you.

23        MR. YOUNG:  Your Honor, one more issue.

24        With respect to those dates, in order for us to do

25   those, we'll need the documents that are supposed to be        12:29:32

1    produced, and I wonder whether we could address the time line

2    for that.

3         Ms. Wang did send a letter to Ms. Iafrate on July 9

4    listing a number of things that have not yet been produced that

5    should have been produced, in our view, some time ago.  We have          12:29:51

6    not had a response to that yet, and I wonder whether we could

7    try to implement some sort of schedule that would allow us to

8    have the hearing on those September dates.

9         THE COURT:  Why don't I suggest this?  I had

10   previously set weekly status conferences to make that possible          12:30:05

11   in the interim between the two hearings.  I intend to hold

12   regular status conferences now to accomplish that same purpose:

13   to make sure that the documents are provided, or if they're

14   not, to take the action necessary to get them provided, and, if

15   necessary, to reschedule the hearing to make sure that we have          12:30:27

16   everything available.

17        Why don't I suggest that you get with Ms. Iafrate and

18   see if you can come up with hard dates and propose them to me

19   next Friday, a schedule.  And if you can't, then you tell me

20   what you don't have and why you need it, and I will set dates          12:30:43

21   next Friday myself if you can't arrive at them.

22        MR. YOUNG:  Thank you, Your Honor.

23        THE COURT:  Anything else?

24        MR. WALKER:  Just a question, Your Honor.

25        You said "next Friday."  Do you mean July 31st?          12:30:54

 1          THE COURT:  That is what I mean.  I meant the Friday

 2    after this week.

 3          All right.  I'll see you then.  Thank you.

 4          THE CLERK:  All rise.

 5          (Proceedings concluded at 12:31 p.m.)

```
 1
 2                    C E R T I F I C A T E
 3
 4
 5
 6
 7          I, GARY MOLL, do hereby certify that I am duly
 8     appointed and qualified to act as Official Court Reporter for
 9     the United States District Court for the District of Arizona.
10          I FURTHER CERTIFY that the foregoing pages constitute
11     a full, true, and accurate transcript of all of that portion of
12     the proceedings contained herein, had in the above-entitled
13     cause on the date specified therein, and that said transcript
14     was prepared under my direction and control.
15
16
17          DATED at Phoenix, Arizona, this 21st day of July,
18     2015.
19
20
21                         s/Gary Moll
22
23
24
25
```

Exhibit 13

```
 1                 UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega          )
     Melendres, et al.,              )
 5                                   )
                Plaintiffs,          )   CV 07-2513-PHX-GMS
 6                                   )
                vs.                  )   Phoenix, Arizona
 7                                   )   July 24, 2015
     Joseph M. Arpaio, et al.,       )   3:04 p.m.
 8                                   )
                Defendants.          )
 9   _____)

10

11

12

13

14

15             REPORTER'S TRANSCRIPT OF PROCEEDINGS

16           BEFORE THE HONORABLE G. MURRAY SNOW

17                    (In-Court Hearing)

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

(61 of 1964)

Case: 15-72440, 08/06/2015, ID: 9648262, DktEntry: 6-7, Page 289 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing    2

1                        A P P E A R A N C E S

2

3    For the Plaintiffs:           Daniel J. Pochoda, Esq.
                                   Joshua Bendor, Esq.
4                                  AMERICAN CIVIL LIBERTIES
                                   FOUNDATION OF ARIZONA
5                                  P.O. Box 17148
                                   Phoenix, Arizona  85011-0148
6                                  (602) 650-1854

7    (Telephonically)             Stanley Young, Esq.
                                   COVINGTON & BURLING, L.L.P.
8                                  333 Twin Dolphin Drive
                                   Suite 700
9                                  Redwood Shores, California  94065
                                   (650) 632-4700
10
     (Telephonically)             Cecillia D. Wang, Esq.
11                                 AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION
12                                 Immigrants' Rights Project
                                   39 Drumm Street
13                                 San Francisco, California  94111
                                   (415) 343-0775
14
     (Telephonically)             Andre Segura, Esq.
15                                 AMERICAN CIVIL LIBERTIES UNION
                                   125 Broad Street, 18th Floor
16                                 New York, New York  10004
                                   (212) 549-2676
17
     For the Defendants MCSO      Michele M. Iafrate, Esq.
18   and Joseph M. Arpaio:        IAFRATE & ASSOCIATES
                                   649 N. 2nd Avenue
19                                 Phoenix, Arizona  85003
                                   (602) 234-9775
20
     (Telephonically)             A. Melvin McDonald, Jr., Esq.
21                                 John T. Masterson, Esq.
                                   Joseph J. Popolizio, Esq.
22                                 JONES, SKELTON & HOCHULI, P.L.C.
                                   2901 N. Central Avenue, Suite 800
23                                 Phoenix, Arizona  85012
                                   (602) 263-1700
24

25

1                    A P P E A R A N C E S

2

3  For Maricopa County:

4                           Richard K. Walker, Esq.
   (Telephonically)        Charles W. Jirauch, Esq.
5                           WALKER & PESKIND, P.L.L.C.
                            16100 N. 71st Street, Suite 140
6                           Scottsdale, Arizona  85254
                            (480) 483-6336
7

   For Chief Deputy Sheridan:  Barry D. Mitchell, Esq.
8                           MITCHELL STEIN CAREY
                            One Renaissance Square
9                           2 North Central Avenue
                            Suite 1900
10                          Phoenix, Arizona  85004
                            (602) 358-0290
11

   For Deputy Chief MacIntyre:
12
   (Telephonically)        David J. Ouimette, Esq.
13                          DICKINSON WRIGHT, P.L.L.C.
                            Attorneys at Law
14                          1850 N. Central Avenue, Suite 1400
                            Phoenix, Arizona  85004
15                          (602) 285-5000

16  For Executive Chief Brian Sands:

17  (Telephonically)        Greg S. Como, Esq.
                            LEWIS BRISBOIS BISGAARD
18                          & SMITH, L.L.P.
                            Phoenix Plaza Tower II
19                          2929 N. Central Avenue
                            Suite 1700
20                          Phoenix, Arizona  85012-2761
                            (602) 385-1040
21

22

23

24

25

(63 of 1964)

Case: 15-72440, 08/13/2015, ID: 9638466, DktEntry: 6-3, Page 289 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing    4

```
 1                        A P P E A R A N C E S

 2

 3   For William Montgomery and Maricopa County Attorney's Office:

 4                              April M. Hamilton, Esq.
                                RIDENOUR HIENTON, P.L.L.C.
 5                              Chase Tower
                                201 N. Central Avenue
 6                              Suite 3300
                                Phoenix, Arizona  85004
 7                              (602) 254-9900

 8   For Timothy J. Casey:

 9   (Telephonically)          Karen Clark, Esq.
                                ADAMS & CLARK, P.C.
10                              520 E. Portland Street
                                Suite 200
11                              Phoenix, Arizona  85004
                                (602) 258-3542
12

     For Thomas P. Liddy and Christine Stutz:
13

14   (Telephonically)          Terrence P. Woods, Esq.
                                BROENING, OBERG, WOODS
15                              & WILSON, P.C.
                                P.O. Box 20527
16                              Phoenix, Arizona  85036-0527
                                (602) 271-7705

17   Also present:     Chief Robert S. Warshaw, Monitor
                        Commander John Girvin, Deputy Monitor
18                      Chief Raul Martinez, Deputy Monitor
                        The Monitoring Team
19

20

21

22

23

24

25
```

(64 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638266, DktEntry: 6-3, Page 291 of 273
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing    5

```
 1                    P R O C E E D I N G S

 2

 3          THE COURT:  Please be seated.

 4          THE CLERK:  This is civil case number 07-2513,

 5   Melendres v. Arpaio, on for in-court hearing.              15:04:13

 6          Counsel, please announce your appearances.

 7          MR. POCHODA:  Good afternoon.  Dan Pochoda from the

 8   ACLU of Arizona for plaintiffs.

 9          MR. BENDOR:  Good afternoon.  Josh Bendor of the ACLU

10   of Arizona for plaintiffs.                                 15:04:24

11          THE COURT:  Good afternoon.

12          MR. MASTERSON:  Good afternoon, Judge.  John Masterson

13   and Joe Popolizio for Sheriff Arpaio.

14          THE COURT:  Good afternoon.

15          MS. IAFRATE:  Good afternoon, Your Honor.  Michele    15:04:34

16   Iafrate on behalf of Joe Arpaio.

17          THE COURT:  Good afternoon.

18          MR. MITCHELL:  Good afternoon, Judge.  Barry Mitchell

19   on behalf of Chief Gerard Sheridan.  He's not present today,

20   Your Honor.                                                15:04:52

21          THE COURT:  Good afternoon.  Anyone else?

22          MR. WALKER:  Richer Walker on behalf of that portion

23   of Maricopa County government embodied in the Board of

24   Supervisors, the county manager, and the employees reporting to

25   them.                                                      15:05:03
```

(68 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638466, DktEntry: 6-3, Page 291 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing    9

1    acknowledged to the monitor.

2        THE COURT:  Did you determine who gave that

3    instruction?

4        CHIEF WARSHAW:  We attempted to, and the answer we

5    received was that would be an attorney-client matter.            15:09:33

6        THE COURT:  All right.

7        CHIEF WARSHAW:  With the full belief that this matter

8    is at the heart of the issue before the Court and our

9    determination to at least see these documents, I instructed one

10   of our two deputy monitors, Commander Girvin, last night to      15:09:52

11   make an attempt to reach out to senior executives of the MCSO

12   for the simple purpose of making arrangements to see if we

13   could see these IDs.

14       Commander Girvin attempted to call both telephonically

15   and by text message Captain Steven Bailey, the commanding       15:10:09

16   officer of the Professional Standards Bureau, as well as Chief

17   Deputy Sheridan, but with no luck.

18       Further, at my instruction, and after a reasonable

19   passage of time, Commander Girvin reached out to Captain Russ

20   Skinner, who's the commander of the agency's court compliance   15:10:30

21   implementation division, and he is the official contact of the

22   MCSO for -- the contact for us.

23       Captain Skinner was very cooperative and he attempted

24   to reach Captain Bailey, Chief Deputy Sheridan, and he reported

25   back to Commander Girvin that he also had attempted to reach     15:10:53

(69 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638466, DktEntry: 6-3, Page 292 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  10

1    counsel but with no luck.

2          At that point, knowing full well that we very much

3    wanted to see these documents but were not getting cooperation

4    with the lack of response, I initiated an e-mail to every

5    attorney involved in this case advising that I might very well          15:11:13

6    ask for an emergency hearing for the purposes of getting relief

7    from the Court so we could in fact access those documents.

8          This morning I noted an e-mail from Ms. Iafrate.  I

9    did call her at approximately 7:45 this morning.  She inquired

10   with more specificity as to what it is that we wanted.  I               15:11:40

11   advised her that we were looking to gain access to 1500 IDs

12   that had been brought to our attention as well as 50

13   hard drives that we believed to be in the Property Unit and

14   were associated with the Dennis Montgomery matter.

15         I would note that back on April 27th, when we received           15:12:03

16   the single hard drive that we did get at that time, we were

17   told by Chief Knight that that material was the only material

18   in the possession of the agency relevant to the Montgomery

19   matter.  I gave Ms. Iafrate the DR number, the department

20   report number that was associated with the 50 hard drives.             15:12:24

21         Though I didn't hear back from Ms. Iafrate, we

22   proceeded to the Professional Standards Bureau and got there

23   about 8:30 this morning, myself, Chief Martinez, and

24   Chief Kiyler.  We were met by Lieutenant Kratzer, who advised

25   us that he had been told by Captain Bailey that we were coming.        15:12:49

(73 of 1964)

Case: 15-72440, 08/18/2015, ID: 9636466, DktEntry: 6-3, Page 293 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   14

 1   these particular documents were slated for destruction, and had

 2   this matter not come to our attention and had we not made the

 3   kind of inquiry that we made, these items in fact would have

 4   been destroyed.

 5        THE COURT:  When you talk about the 50 hard drives          15:18:24

 6   related to the Montgomery investigation, where did you find out

 7   about those?

 8        CHIEF WARSHAW:  As a result of document requests that

 9   were made of the MCSO, after the initial release of the single

10   hard drive we got on April 27th, it became apparent, in looking   15:18:45

11   at various e-mail streams, that there were references to

12   hard drives that were reposited in the Property Unit.

13        THE COURT:  Did anybody look -- did you request the

14   hard drives in the Property Unit?

15        CHIEF WARSHAW:  We request -- I'm sorry, Judge.             15:19:06

16        THE COURT:  I think -- did you request that the

17   hard drives be turned over that were in the Property Unit?

18        CHIEF WARSHAW:  We request any and all.  Yes, we

19   certainly today requested that today, yes, sir.

20        THE COURT:  And you talked about a specific DR number.      15:19:17

21        Is that a locker?  What is that?

22        CHIEF WARSHAW:  The DR number would be -- a DR

23   number is the department report number, so it would be a filing

24   mechanism in which they could find the items in the particular

25   bin based upon what the DR number is.                            15:19:34

(74 of 1964)

Case: 15-72440, 08/18/2015, ID: 9636466, DktEntry: 6-3, Page 294 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  15

 1          THE COURT:  Did you request what the contents of that

 2    particular DR unit was?  Did you ask anybody to verify the

 3    contents of that unit?

 4          CHIEF WARSHAW:  Yes.

 5          THE COURT:  And what were you told?                    15:19:46

 6          CHIEF WARSHAW:  We were told that the number that we

 7    gave did in fact correspond to 50 hard drives.

 8          THE COURT:  Was there anything else in the unit?

 9          CHIEF WARSHAW:  I do not believe.  I don't believe.

10          THE COURT:  Okay.  And so you haven't had any response  15:20:04

11    in --

12          CHIEF WARSHAW:  We've had no response.

13          THE COURT:  -- in terms of your request to have those

14    50 hard drives.

15          CHIEF WARSHAW:  That is correct.  And we made that      15:20:11

16    very clear to Lieutenant Kratzer, that that was also part of

17    our mission this morning.

18          THE COURT:  Ms. Iafrate.

19          MS. IAFRATE:  Your Honor, if I could rely on

20    co-counsel to talk about this chain of events, I've kind of   15:20:36

21    been out of commission the last 24 hours.

22          I can tell you that I did have a conversation with

23    Mr. Warshaw this morning.  He provided me with the DR number.

24    I called over to Property and Evidence in order to make certain

25    that that property was pulled, and I received information that  15:20:53

(77 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638466, DktEntry: 6-3, Page 295 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   18

```
 1          THE COURT:  Did you ask the MCSO to provide you with

 2   these documents back in February?

 3          MS. IAFRATE:  Your Honor, I believe that that's a

 4   privileged communication.

 5          THE COURT:  All right.  All right.  You're right.        15:23:13

 6          Anything else you want to say?

 7          MS. IAFRATE:  Your Honor, regarding the other

 8   chronology of events, I apologize that I'm not prepared to

 9   testify regarding that, and I would hope that Mr. Masterson

10   would have the opportunity to answer any further questions.     15:23:27

11          THE COURT:  Well, as it pertains to the 50

12   hard drives, I did, too, notice in the documents that have been

13   made public that some of the e-mails reference 50 or 60

14   hard drives taken from Mr. Montgomery, and noted that

15   apparently you -- by "you" I don't mean you personally; I mean  15:23:43

16   your client -- produced only one in May.

17          Have you made any effort to determine what is in that

18   DR file that Mr. Warshaw asked you about?

19          MS. IAFRATE:  Yes.

20          THE COURT:  And what is in there?                        15:24:00

21          MS. IAFRATE:  There are approximately 40 to 50

22   hard drives that may potentially relate to documents from the

23   Seattle investigation.

24          THE COURT:  Anything else in there?

25          MS. IAFRATE:  No.                                        15:24:12
```

0018

(78 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638466, DktEntry: 6-3, Page 295 of 273
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   19

 1              THE COURT:  Thank you.

 2              Mr. Masterson.

 3              MR. MASTERSON:  Judge, I guess I'd first like to

 4    address -- well, I have a question, perhaps the Court already

 5    answered this question, where in the Court's order setting this    15:24:36

 6    hearing today the Court says that defendants have "declined to

 7    provide access."

 8              THE COURT:  Yes, I did answer that question.

 9              MR. MASTERSON:  Okay.

10              THE COURT:  I don't know that you've declined to    15:24:47

11    provide access; that was a misunderstanding on my part.

12              MR. MASTERSON:  All right.  The second thing I --

13              THE COURT:  Are you going to provide those

14    hard drives?

15              MR. MASTERSON:  I knew nothing of the hard drives    15:24:56

16    until --

17              THE COURT:  How about my order that the hard drives be

18    produced right now?

19              MR. MASTERSON:  Well, I don't have them with me, but

20    here's my question.  I'm going to object, and I assume there    15:25:10

21    have been objections before, as to relevance of these

22    hard drives in the Montgomery materials, because I do not

23    see --

24              THE COURT:  I've already ruled on that 40 times.

25    Objection's overruled.    15:25:22

0019

(79 of 1964)

Case: 15-72440, 08/13/2015, ID: 9638468, DktEntry: 6-3, Page 296 of 273
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  20

 1              MR. MASTERSON:  Well, let me make my record, please,

 2    Judge.

 3              THE COURT:  The record has been made.  Go ahead and

 4    make it, Mr. Masterson.

 5              MR. MASTERSON:  Your Honor --                          15:25:30

 6              THE COURT:  Let me tell you something.  I realize that

 7    you're new to this litigation, but you certainly have read,

 8    have you not, my questioning of Sheriff Arpaio?

 9              MR. MASTERSON:  I have read your questioning.

10              THE COURT:  When I required him to turn over all these  15:25:44

11    things?

12              MR. MASTERSON:  You asked him to hold on to them.

13              THE COURT:  And I said we would send the monitor over

14    to retrieve them, didn't I.

15              MR. MASTERSON:  You did.                               15:25:54

16              THE COURT:  And that it needed to be done immediately,

17    didn't I.

18              MR. MASTERSON:  You did.

19              THE COURT:  All right.

20              MR. MASTERSON:  But that doesn't make them relevant --  15:25:58

21              THE COURT:  All right.

22              MR. MASTERSON:  -- to the OSC.

23              THE COURT:  Make your objection --

24              MR. MASTERSON:  To the --

25              THE COURT:  Make your objection on the record.          15:26:02

(80 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638266, DktEntry: 6-3, Page 297 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   21

1          MR. MASTERSON:  Your Honor, there are distinct --

2     three distinct issues in the OSC proceeding.  There are

3     underlying issues which --

4          THE COURT:  Well --

5          MR. MASTERSON:  -- the Court ruled on --                15:26:10

6          THE COURT:  -- let me tell you what.  We're not going

7     to go through this.  I'll tell you this.  They may not be

8     relevant.  I realize that they may not be relevant.  But they

9     also may be very relevant.  And they were demanded to be

10    produced and they haven't been produced.                     15:26:23

11         So I would propose this.  I'm going to send the

12    marshals over.  You'll provide everything that's in that DR

13    locker.  We'll hold it here.  I won't look at it.  You can have

14    full access to it.  So can the monitor.  If you have --

15    whatever's in there, and I don't know what's in there, but if   15:26:43

16    whatever is in there is material that I've already ordered --

17    for instance, if, it seems to me, that the other documents

18    suggest -- that's the database that Montgomery downloaded --

19    then it's going to be turned over to the United States

20    Government under the same terms the other matter was turned     15:27:03

21    over.  You can preserve whatever objections you have to its

22    relevance in the current proceeding and we'll hear then.  There

23    may be nothing that is relevant, but I certainly don't know

24    that now.

25         MR. MASTERSON:  I understand that, Judge, and I'm         15:27:14

(81 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638466, DktEntry: 6-3, Page 299 of 434
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   22

```
 1   not -- I'm not resisting that or saying that the Court does not

 2   have the authority -- I'm certainly not saying the Court does

 3   not have the authority to order them produced.  I am objecting,

 4   and I think the objection's been made before and ruled upon,

 5   but I will make a continuing objection to the relevance of        15:27:29

 6   those materials to this proceeding.

 7            THE COURT:  And why don't we find out what those

 8   materials are first.

 9            MR. MASTERSON:  Let's do that.

10            THE COURT:  All right.                                     15:27:40

11            MR. MASTERSON:  Now, I --

12            THE COURT:  Any problem if I order the marshal to go

13   over and take those documents and put them in the evidence

14   locker of the marshals today?

15            MR. MASTERSON:  I don't know.  May I consult with         15:27:52

16   counsel, please?

17            THE COURT:  You may.

18            MS. IAFRATE:  Your Honor, may I have a court order

19   referencing the DR number that I know that Mr. Warshaw has --

20            THE COURT:  Sure.                                          15:28:04

21            MS. IAFRATE:  -- so that then we can remove it from

22   Property and then put it back into the marshal property --

23            THE COURT:  Sure.

24            MS. IAFRATE:  -- just so that we have a chain

25   of custody.                                                        15:28:11
```

(82 of 1964)

Case: 15-72440, 08/18/2015, ID: 9638466, DktEntry: 6-3, Page 299 of 273
CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   23

```
1        THE COURT:  Sure, absolutely.  I don't know what that

2   is, but I'll -- that's a reasonable request.

3        MS. IAFRATE:  Thank you.

4        THE COURT:  So we've resolved that one.  Let me just

5   be clear on the record, you can have access to it here, and the      15:28:18

6   monitor can have access to it here.  And you can review it for

7   privileged materials or whatever else.  I'm going to require it

8   to be done with some expedition.

9        What about the -- and then -- then if there's anything

10  in it that I think may be relevant or that the parties think        15:28:40

11  may be relevant, you can raise your -- you can re-raise your

12  relevance objections then.  Because it may well be that if that

13  is, for example, the Montgomery database, and it actually turns

14  out to be full of stuff that doesn't relate to anything and

15  isn't taken from the CIA, then there may be limited relevance      15:29:01

16  here except to the extent -- well, there may be no relevance,

17  depending upon what the facts are, other than to verify that

18  the Montgomery investigation was based on whatever, if anybody

19  tries to assert its truthfulness, but that's a very limited

20  relevance, I'll grant you.  There may be something in it that's    15:29:23

21  relevant, but I think that we're all entitled to make that

22  determination based on the documents.

23        That being said, was there anything else you wanted to

24  say about the document, the hard drives?

25        MR. MASTERSON:  No, I have -- no, nothing about the           15:29:35
```

Exhibit 14



MELC198706

Exhibit 15



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

August 06, 2015

No.:             15-72440
D.C. No.:        2:07-cv-02513-GMS
Short Title:     Joseph Arpaio, et al v. USDC-AZP

Dear Petitioner/Counsel

A petition for writ of mandamus and/or prohibition has been received in the Clerk's Office of the United States Court of Appeals for the Ninth Circuit. The U.S. Court of Appeals docket number shown above has been assigned to this case. Always indicate this docket number when corresponding with this office about your case.

If the U.S. Court of Appeals docket fee has not yet been paid, please make immediate arrangements to do so. If you wish to apply for in forma pauperis status, you must file a motion for permission to proceed in forma pauperis with this court.

Pursuant to FRAP Rule 21(b), no answer to a petition for writ of mandamus and/or prohibition may be filed unless ordered by the Court. If such an order is issued, the answer shall be filed by the respondents within the time fixed by the Court.

Pursuant to Circuit Rule 21-2, an application for writ of mandamus and/or prohibition shall not bear the name of the district court judge concerned. Rather, the appropriate district court shall be named as respondent.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona, | No. |
| Defendant/Petitioner, | U.S. District Court No. CV 07-02513-PHX-GMS |
| and GERARD A. SHERIDAN, | |
| Specially appearing non-party/Petitioner, | |
| vs. | |
| UNITED STATES DISTRICT COURT for the District of Arizona, | |
| Respondent Court, | |
| and | |
| MANUEL DE JESUS ORTEGA MELENDRES, et al., | |
| Plaintiffs/Real Parties in Interest. | |

---

## PETITION FOR WRIT OF MANDAMUS

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone: (602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners Joseph M. Arpaio in his official capacity
as Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone: 602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners Joseph M. Arpaio in his official capacity
as Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity
as Sheriff of Maricopa County, Arizona

# TABLE OF CONTENTS

**Page**

RELIEF SOUGHT ................................................................1

ISSUE PRESENTED ............................................................1

RELEVANT FACTS AND STATEMENT OF THE CASE ............................1

    A.    Events leading up to the civil contempt hearing ..................1

    B.    Motion to vacate contempt hearing ......................................4

    C.    The court's *sua sponte* inquiry into irrelevant subjects during the contempt hearing ....................................6

    D.    Judge Snow's post hearing expansion of the Monitor's duties ................................................................10

    E.    Recusal motion and further proceedings ...........................11

THIS RECORD CLEARLY CALLS FOR MANDAMUS RELIEF ...............13

    I.    AUTOMATIC RECUSAL WAS REQUIRED; THUS THE COURT'S DENIAL WAS CLEARLY ERRONEOUS ..............14

    A.    Recusal is mandatory under § 455(b)(5)(iv) because the court turned himself and his wife into material witnesses ................................................................16

    B.    The court's expansion of the Monitor's powers and authority was in contravention of this Court's previous order, violated Petitioners' Due Process Rights, and violated § 455(b)(1), (a). ................................19

    C.    The court, by *ex parte,* extrajudicial investigation, gained personal knowledge of disputed evidentiary facts requiring recusal under §§ 455(b)(1), (a)..................21

    D.    Recusal is mandatory under § 455(b)(5)(iii) because Judge Snow's brother-in-law is an equity partner in Covington & Burling, counsel for Plaintiffs .....................25

    E.    An objective independent observer would recognize the appearance of bias under § 455(a) ...............................32

i

# TABLE OF CONTENTS
## (continued)

**Page**

II.   PETITIONERS HAVE NO OTHER ADEQUATE
      REMEDY TO OBTAIN RELIEF ..................................37

III.  PETITIONERS WILL BE PREJUDICED IN A WAY NOT
      CORRECTABLE ON APPEAL ..................................38

IV.   THE ORDER REFUSING RECUSAL MANIFESTS
      PERSISTENT DISREGARD OF THE FEDERAL RULES ........38

V.    THE ORDER REFUSING RECUSAL RAISES NEW AND
      IMPORTANT ISSUES OF LAW OF FIRST IMPRESSION ......39

VI.   PETITIONERS' RECUSAL MOTION WAS TIMELY ..............39

CONCLUSION ................................................40

CERTIFICATE OF COMPLIANCE ................................42

CERTIFICATE OF SERVICE ..................................43

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alexander v. Primerica Holdings, Inc.,*
    10 F.3d 155 (3d Cir. 1993) ................................................................35

*Andros Compania Maritima, S.A. v. Marc Rich & Co.*, A.G.,
    579 F.2d 691 (2d Cir.1978) ...........................................................30

*Bauman v. United States District Court,*
    557 F.2d 650 (9th Cir. 1977) .........................................................13

*Bradley v. Milliken,*
    426 F.Supp. 929 (E.D. Mich. 1977).................................................32

*Calderon v. United States Dist. Ct.,*
    98 F.3d 1102 (9th Cir. 1996) .........................................................14

*Clemens v. U.S. Dist. Ct. for Central Dist. of California,*
    428 F.3d 1175 (9th Cir. 2005) .......................................................18

*DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.,*
    268 F.3d 829 (9th Cir. 2001) .........................................................19

*Fairley v. Andrews,*
    423 F. Supp. 2d 800 (N.D. Ill. 2006).............................................33

*Fiore v. Apollo Educ. Grp. Inc.,*
    2015 WL 1883980, at *2 (D. Ariz. Apr. 24, 2015). ................. 26, 28

*Firestone Tire & Rubber Co. v. Risjord,*
    449 U.S. 368, 101 S.Ct. 669 L.Ed.2d 571 (1981)...........................37

*In re Bernard,*
    31 F.3d 842 (9th Cir. 1994) ...........................................................26

*In re Cement Antitrust Litig. (MDL No. 296),*
    688 F.2d 1297 (9th Cir. 1982) .......................................................14

**TABLE OF AUTHORITIES**
**(continued)**

                                                                                                        **Page**

*In re Cement Antitrust Litig., (MDL No. 296),*
    673 F.2d 1020 (9th Cir. 1982) .......................................................37

*In re Faulkner,*
    856 F.2d 716 (5th Cir. 1998) .........................................................35

*In re Kansas Pub. Employees Ret. Sys.,*
    85 F.3d 1353 (8th Cir. 1996) .........................................................29

*In re Mason,*
    916 F.2d 384 (7th Cir. 1990) .........................................................35

*In re U.S.,*
    572 F.3d 301 (7th Cir. 2009) .........................................................34

*In the Matter of Edgar v. K.L., et al.,*
    93 F.3d 256 (7th Cir. 1996) .................................................. 22, 23, 24, 40

*Int'l Union, United Mine Workers of America v. Bagwell,*
    512 U.S. 821 (1994)......................................................................19

*Liljeberg v. Health Svcs. Acq. Corp,*
    486 U.S. 847 (1988).......................................................................25

*Liteky v. United States,*
    510 U.S. 540 (1994)......................................................................35

*Matter of National Union Fire Ins. Co.,*
    839 F.2d 1226 (7th Cir.1988) ......................................................30

*Melendres v. Arpaio,*
    No. 13-16285, 2015 WL 1654550, at *10 (9th Cir. Apr. 15, 2015)........ 11, 21

*Melendres v. Arpaio,* No.
    CV-07-02513-PHX-GMS, 2013 WL 5498218, at *32, ¶ 126 (D. Ariz. Oct.
    2, 2013). ....................................................................................22

iv

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Organization for Reform of Marijuana Laws v. Mullen,*
   828 F.2d 536 (4th Cir. 1987) ........................................................13

*Postashnick v. Port City Constr. Co.,*
   609 F.2d 1101 (5th Cir. 1980) .............................................. 27, 31

*Preston v. United States,*
   923 F.2d 731 (9th Cir. 1991) .......................................... 15, 32, 40

*Price Bros. Co. v. Philadelphia Gear Corp.,*
   629 F.2d 444 (6th Cir. 1980) .......................................................24

*S.E.C. v. Loving Spirit Found. Inc.,*
   392 F.3d 486 (D.C.Cir.2004).......................................................32

*SCA Services, Inc. v. Morgan,*
   557 F.2d 110 (7th Cir. 1977) ................................................ 24, 27

*Stuart v. United States,*
   813 F.2d 243 (9th Cir.1987) ........................................................19

*Survival Systems of Whittaker Corp. v. United States Dist. Ct.,*
   825 F.2d 1416 (9th Cir. 1987) .....................................................14

*Taiwan v. United States Dist. Ct. for No. Dist. Of Calif. (Tei Yan San),*
   128 F.3d 712 (9th Cir. 1997) .......................................................13

*Taylor v. Hayes,*
   418 U.S. 488 (1974).....................................................................21

*Taylor v. Regents of Univ. of Cal.,*
   993 F.2d 701 (9th Cir. 1993) .......................................................15

*U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.,*
   971 F.2d 244 (9th Cir. 1992) .......................................................28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*U.S. v. Kehlbeck*,
   766 F.Supp. 707 (S.D. Ind. 1990)...................................39

*United States v. Alabama*,
   828 F.2d 1532 (11th Cir. 1987) ...................................18

*United States v. Conforte*,
   624 F.2d 869 (9th Cir. 1980) .....................................35

*United States v. Holland*,
   519 F.3d 909 (9th Cir. 2008). ........................... 15, 16, 32

*United States v. Johnson*,
   610 F.3d 1138 (9th Cir. 2010) ....................................37

*United States v. Kelly*,
   888 F.2d 732 (11th Cir. 1989) ....................................30

*United States v. O'Brien*,
   18 F. Supp. 3d 25 (D. Mass. 2014).................................32

*United States v. Powers*,
   629 F.2d 619 (9th Cir. 1980) .....................................19

*United States v. Sibla*,
   624 F.2d 864 (9th Cir. 1980) .....................................32

*United States v. Wilson*,
   16 F.3d 1027 (9th Cir. 1994) .....................................20

*Valley Broadcasting Co. v. United States Dist. Ct.*,
   798 F.2d 1289 (9th Cir. 1986) ....................................13

## STATUTES

28 U.S.C. § 1651..................................................1

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

28 U.S.C. § 455(a) and (b).......................................................... passim

**RULES**

Rule 21, Fed. R. App. P ...........................................................1

**OTHER AUTHORITIES**

Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility § 10.2-2.11 ...........................30

## RELIEF SOUGHT

Pursuant to 28 U.S.C. § 1651 and Rule 21, Fed. R. App. P., Petitioners Joseph M. Arpaio and Gerard A. Sheridan respectfully request the Court to enter a Writ of Mandamus directing the United States District Court for the District of Arizona, Honorable G. Murray Snow, to recuse himself from further proceedings in this action. The district court's actions require recusal under 28 U.S.C. § 455(a) and (b). Sheriff Arpaio and Chief Deputy Sheridan have no other plain, speedy, or adequate remedy by appeal.

## ISSUE PRESENTED

The record demonstrates that Judge Snow's recusal was mandated under 28 U.S.C. § 455(a) and (b). Was the court's refusal to grant the motion to recuse clear error requiring mandamus relief?

## RELEVANT FACTS AND STATEMENT OF THE CASE

### A.   Events leading up to the civil contempt hearing.

In December 2007, Latino motorists brought a § 1983 class action against the Maricopa County Sheriff's Office ("MCSO") and Sheriff Arpaio in his official capacity, among others, alleging that Defendants engaged in a custom, policy, and practice of racially profiling Latinos, and had a policy of

1

unconstitutionally stopping persons without reasonable suspicion in violation of Plaintiffs' Fourth and Fourteenth Amendment rights.[1]  [Doc. 1, Ex. 30, amended by Doc. 26, Ex. 29].  Plaintiffs sought declaratory and injunctive relief.  [Doc. 1 at 19-20, Ex. 30].

After discovery closed, the parties filed competing motions for summary judgment.  Plaintiffs' motion included a request for a preliminary injunction. [Docs. 413, Ex. 27; 421, Ex. 26].  The court granted Plaintiffs' motion in part, and entered a preliminary injunction on December 23, 2011.  [Doc. 494, Ex. 25].  The injunction prohibited MCSO from "detaining individuals in order to investigate civil violations of federal immigration law," and from "detaining any person based on actual knowledge, without more, that the person is not a legal resident of the United States."  [*Id.* at 39, Ex. 25].  Absent probable cause, officers could detain individuals only based on reasonable suspicion that "criminal activity may be afoot."  [*Id.* at 5, Ex. 25].

A bench trial took place, and the court issued Findings of Fact and Conclusions of Law, finding that MCSO's operations and procedures were unconstitutional.  [Doc. 579 at 115–31, Ex. 22].  After allowing the parties to attempt to negotiate the terms of a consent decree, in October 2013, the court

---

[1] This Court recently ordered the dismissal of MCSO, a non-jural entity, as a named defendant and the substitution of Maricopa County in its place. *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015).

ordered supplemental injunctive relief to remedy the violations and defined enforcement mechanisms for such remedies.  [Doc. 606, Ex. 21].

On May 14, 2014, Defendants, on their own initiative, informed the court and Plaintiffs' counsel that a former member of the MCSO Human Smuggling Unit, Deputy Charley Armendariz, who testified at the bench trial, had committed suicide; and that MCSO had discovered in Armendariz's garage numerous items such as driver's licenses and license plates apparently confiscated from people Armendariz had stopped, and video recordings of traffic stops Armendariz had conducted.  [Doc. 880 at 3-4, Ex. 18].  Some of those videos revealed what MCSO characterized as "problematic activity" by Deputy Armendariz.  [*Id.*, Ex. 18].

In light of the Armendariz videotapes and the uncertainty as to whether other officers had also recorded stops, the court ordered Defendants to quietly retrieve all stop recordings.  [*Id.*, Ex. 18].  The Court also found documents apparently requiring some officers to make such recordings during the time relevant to Plaintiffs' claims, which had not been disclosed to Plaintiffs.  [*Id.* at 5, Ex. 18].

The Armendariz videotapes resulted in administrative interviews with MCSO personnel.  Those interviews revealed that for seventeen months after the court issued the preliminary injunction, Defendants conducted immigration

interdiction operations, and detained persons in violation of the court's preliminary injunction order.

The court ruled that civil contempt proceedings were necessary to determine whether Defendant Sheriff Arpaio and others at MCSO, including non-party Chief Deputy Gerard Sheridan, should be held in contempt for: (1) failing to implement and comply with the preliminary injunction; (2) violating discovery obligations; and (3) acting in derogation of the court's May 14, 2014 Order. [*Id.* at 26, Ex. 18]. The court opined that the record in the contempt proceedings will help the court evaluate whether civil remedies will vindicate the rights of the Plaintiff class, or whether a criminal contempt referral is necessary and appropriate. The court also ordered a number of MCSO supervisors, including Chief Deputy Sheridan, to attend the contempt hearing as potential contemnors. Each obtained separate criminal counsel.

### B. Motion to vacate contempt hearing.

On March 17, 2015, Sheriff Arpaio and Chief Deputy Sheridan ("Movants") consented to the imposition of civil contempt sanctions against them, and moved to vacate the contempt hearing. [Doc. 948, Ex. 17]. Movants stipulated to the facts stated in the Court's Order to Show Cause [Doc. 880, Ex. 18], to the entry of a civil contempt order [Doc. 948 at 3, Ex. 17], and expressed

sincere remorse that they had violated the preliminary injunction. [*Id.* at 2, Ex. 17].

The court made it clear that before it would accept Movants' proposal, Arpaio would need "skin in the game," which Movants understood to mean that he would need to pay a sanction from his personal funds (though this lawsuit names Defendant Arpaio only in his official capacity). Movants proposed a non-exclusive list of remedial measures, including: (1) the payment of $100,000 from Defendant Arpaio's personal funds to a public interest group; (2) acknowledging the violations in a public forum; (3) the creation and initial funding of a reserve to compensate victims of MCSO's violation; (4) a plan to identify victims of the violation; (5) permitting the Monitor to investigate any matter that related to the violations; (6) moving to dismiss the then-pending Ninth Circuit appeal; and (7) paying Plaintiffs' reasonable attorney's fees necessary to ensure compliance with the court's orders. [Doc. 948 (Ex. B), Ex. 17]. Given these proposals, Movants asked the court to vacate the evidentiary hearing. [*Id.* at 4, Ex. 17]. The court refused.

Not only did the court refuse to vacate the contempt proceedings and enter judgment as stipulated to by Movants [Doc. 1007, Ex. 16], but the court asked the United States Attorney's Office for the District of Arizona to attend the contempt settlement proceedings to determine, among other things, whether

the evidence would justify holding the individuals in <u>criminal</u> contempt. The U.S. Attorney's Office declined the invitation to participate in this capacity, noting that its participation was against departmental policy. [Doc. 1164 at 5:16-18, Ex. 8].

### C. **The court's *sua sponte* inquiry into irrelevant subjects during the contempt hearing.**

The civil contempt hearing commenced on April 21, 2015. On April 23, 2015, after both parties had finished questioning Sheriff Arpaio while he was on the stand, [4/23/15 Tr. at 624, Ex. 15], the court *sua sponte* initiated its own inquiry into matters (described below) that no party had raised, and which are wholly unrelated to any of the three defined grounds for the contempt proceeding.[2]

The court's questions stemmed entirely from hearsay statements the court had apparently read in a Phoenix New Times blog post by Stephen Lemons. [Doc. 1117 (Ex. 2), Ex. 11; *see also* 4/23/15 Tr. at 643, 648-649, Ex. 15]. This blog post had never been disclosed to the parties during the hearing or to their counsel. Neither was any advance notice given to anyone involved in the contempt proceeding that the article would be discussed or relied upon by the

---

[2] Again, those issues are: (1) failing to implement and comply with the preliminary injunction; (2) violating discovery obligations; and (3) acting in derogation of this Court's May 14, 2014 Orders. [Doc. 880 at 26, Ex. 18].

court in any way.[3]  Instead, the court waited until Sheriff Arpaio was on the stand, under oath, to raise the issues for the first time, depriving him of the opportunity to prepare for the questioning or to consult with his counsel.  Such conduct would never have been tolerated from a litigant.

The following day, the court continued this inquiry into these matters during Chief Deputy Sheridan's testimony.[4]

### 1.    The Grissom Investigation.

The court reviewed the New Times blog post in open court, despite it not being marked as an exhibit, and showed it to Sheriff Arpaio without giving Sheriff Arpaio the opportunity to review it with his counsel, and then asked Sheriff Arpaio whether he was aware that the court or any of his family members had ever been investigated by anyone.  [4/23/15 Tr. at 647:8-17, Ex. 15].  In response, Sheriff Arpaio stated that MCSO had not investigated the court or the court's family, but there was investigation of other people about

---

[3] Indeed, the court recognized that it "opened [a] can of worms" by inquiring into the Grissom/Montgomery investigations.  [4/24/15 Tr. at 941:25-942:2, Ex. 14].

[4] Although Sheriff Arpaio's counsel initiated questioning of Chief Deputy Sheridan regarding the Grissom/Montgomery investigations, counsel only inquired into these matters in order to clarify Sheriff Arpaio's testimony that was solely elicited by the court the prior day.  [4/24/15 Tr. at 920-22, 955:12-15, Ex. 14].  Moreover, after counsel began questioning the Chief Deputy, the court proceeded to interject itself several times, and directly examined the Chief Deputy once the Grissom investigation came up.  [*Id.* at 961:24-25, 963:13-18, 964:7-966:21, Ex. 14].

statements the court's wife made to those people. [*Id.* at 647-48, Ex. 15]. In August 2013, Karen Grissom sent the Sheriff a Facebook post stating that Judge Snow's wife told Mrs. Grissom in a restaurant that Judge Snow hated Sheriff Arpaio and would do anything to get Sheriff Arpaio out of office. [*Id.* at 654-55, Ex. 15; 4/24/15 Tr. at 962:14-16, Ex. 14; Doc. 1117 (Ex. 5), Ex. 11]. The court's wife made this statement in the restaurant to Mrs. Grissom during the litigation of this case, just prior to the bench trial.[5] [*See* Doc. 1117 (Exs. 6-7), Ex. 11]. Mrs. Grissom was upset enough about the statement to report it to the MCSO. [Doc. 1117 (Ex. 5), Ex. 11].

As a result of Mrs. Grissom's message, the Sheriff's then-attorney hired a private investigator to interview three individuals: Karen Grissom, her husband Dale Grissom, and their adult son Scott Grissom (not the court's wife or family members), to assess the truth of Mrs. Grissom's report. [4/23/15 Tr. at 655, Ex. 15]. The Grissoms have been unwavering in their recollection of Judge Snow's wife's statement that Judge Snow hated the Sheriff and would do anything to get him out of office. [Doc. 1117 (Exs. 6-8), Ex. 11].[6] Of course, MCSO's

---

[5] The interview of Mrs. Grissom revealed that she had known the court's wife for many years, since they both grew up in Yuma, Arizona. [Doc. 1117 (Ex. 6 at 7-8), Ex. 11].

[6] Even though these individuals were deemed credible, and even though they verified that Judge Snow's wife made the statements, Sheriff Arpaio never "went any further than just verifying that [a] conversation [between Karen

investigation into Mrs. Grissom's report had absolutely nothing to do with the Sheriff's Office's failure to comply with the preliminary injunction; its violation of discovery obligations, or the district court's May 14, 2014 Order. Despite this, the court continued to interrogate Sheriff Arpaio and Chief Deputy Sheridan regarding this issue during the contempt proceedings.

## 2. **The Montgomery Investigation.**

Judge Snow also questioned Sheriff Arpaio and Chief Deputy Sheridan about a second investigation, equally unrelated to the three contempt issues. This inquiry related to MCSO's use of a confidential informant named Dennis Montgomery who claimed he had information of alleged e-mail breaches (including the e-mails of the Sheriff's attorneys), wiretaps of the Sheriff and judges, and computer hacking of 50,000 bank accounts of Maricopa County citizens. [4/23/15 Tr. at 647:1-3, 649, Ex. 15; 4/24/15 Tr. at 1003:9-11,1006:6-10, Ex. 14]. Judge Snow himself later recognized that the documents involved in the Montgomery investigation "appear to allege or suggest that this Court had contact with the Department of Justice about this case before the Court was ever assigned to it." [5/14/15 Transcript at 45:17-19, Ex. 12]. Moreover, Judge Snow stated on the record that the Montgomery Investigation appears to allege

---

Grissom and the court's spouse] . . . occurred." [4/24/15 Tr. at 966:11-16, Ex. 14].

that the random selection process of this court was subverted so that the case was deliberately assigned to him and that he had conversations with Eric Holder and Lanny Breuer about this case.  [*Id.* at 45:19-25, Ex. 12].    Again, this inquiry stemmed entirely from hearsay statements in a Phoenix New Times blog post and were entirely unrelated to the three clearly defined topics of the contempt hearing.[7]

### D.    Judge Snow's Post Hearing Expansion of the Monitor's Duties.

After this part of the contempt hearing concluded, Judge Snow authorized the Monitor (who had been appointed to oversee the injunctive remedies) to investigate these unrelated issues and any other areas he deemed fit.  [*See* 5/14/15 Tr. at 49:15-21, 50:24-51:6, Ex. 12].

Sheriff Arpaio's counsel objected to (a) the court morphing the contempt proceeding into an inquiry into matters unrelated to the areas of contempt that had been noticed by the court and (b) the expansion of the Monitor's powers as a violation of Sheriff Arpaio's due process rights.   The court overruled the

---

[7] During an emergency hearing on July 24, 2015, defense counsel raised an objection regarding the relevancy of the Montgomery Investigation materials requested by the Court through his Monitor because they did not relate to the three distinct issues in the contempt proceedings.   In response, overruling counsel's objection, the court admitted it was unsure of the relevance of the Montgomery Investigation,  stating as follows: "I'll tell you this.  They may not be relevant.  I realize that they may not be relevant.  But they also may be very relevant.   And they were demanded to be produced and they haven't been produced."  [7/24/15 Tr. at 21:6-10; Ex. 1].

objection and refused to "unduly shackle [the Monitor]." [*Id.* at 56-57, Ex. 12]. The court declared that it is "not going to limit the Monitor's authority and . . . not going to require [the Monitor] to provide [Defendant Arpaio's counsel] with advance notice of what [the Monitor] wants to inquire into." [*Id.* at 53:15-21, 58:1-7 Ex. 12].

The expansion of the Monitor's powers also comes shortly after the Ninth Circuit recently vacated portions of the court's permanent injunctive order so the powers of the Monitor would be narrowly tailored to address the constitutional violations at issue. *See Melendres v. Arpaio*, No. 13-16285, 2015 WL 1654550, at *10 (9th Cir. Apr. 15, 2015) ("We therefore vacate these particular provisions and order the district court to tailor them so as to address only the constitutional violations at issue."). In short, the court gave the Monitor unbridled investigative powers that are not even available to the FBI or other federal law enforcement agencies.[8]

### E.    **Recusal Motion and Further Proceedings.**

In light of the foregoing events, Petitioners moved to recuse Judge Snow. [Doc. 1117, Ex. 11]. The primary focus of the motion was the spontaneous

---

[8] The Monitor's most recent quarterly report verifies this increased authority and power. [*See* Doc. 1170, Ex. 7 ("Subsequent to my appointment, and as a result of further Court proceedings, my duties have been expanded in the areas of   . . . oversight of internal investigations and independent investigative authority.")].

injection of the Grissom/Montgomery investigations into the contempt hearing, the court's independent investigation of these issues, and any other issues, through its Monitor, in contravention of the recent Ninth Circuit decision limiting the role of the Monitor to issues involving the violation of the Fourth and Fourteenth Amendments, and the court's failure to recuse itself in light of his brother-in-law's partnership with Covington & Burling.  The motion was fully briefed [*see* Docs. 1150, Ex. 10; 1158, Ex. 9] and denied [Doc. 1164, Ex. 8].  The court then set a hearing to discuss, among other things, "the status of MCSO's remaining internal investigations" (which include the Grissom and Montgomery matters, *see* Doc. 1164 at 40, Ex. 8) and "the Department of Justice's request to see the database of documents given by Montgomery to the MCSO."  [*Id.*, Ex. 8].  Petitioners requested a stay of the proceedings in anticipation of filing this Petition for Writ of Mandamus [Docs. 1171, Ex. 6; 1175, Ex. 5; 1176, Ex. 4], which the court denied.  [7/20/15 Tr. at 10-15, Ex. 2; Doc. 1179, Ex. 3].

## THIS RECORD CLEARLY CALLS FOR MANDAMUS RELIEF

*Bauman v. United States District Court*, 557 F.2d 650 (9th Cir. 1977), sets forth five factors to consider in determining whether mandamus relief is appropriate:

> (1) The party seeking the writ has no other adequate means, such as direct appeal, to attain the relief desired.
>
> (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal.
>
> (3) The district court's order is clearly erroneous as a matter of law.
>
> (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules.
>
> (5) The district court's order raises new and important problems, or issues of law of first impression.

*Id.* at 654-55; *see also Organization for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 541 (4th Cir. 1987).

A petitioner need not satisfy all five *Bauman* factors. *Taiwan v. United States Dist. Ct. for No. Dist. Of Calif. (Tei Yan San)*, 128 F.3d 712, 719 (9th Cir. 1997) (mandamus granted even though fourth factor, recurring error, not satisfied); *Valley Broadcasting Co. v. United States Dist. Ct.*, 798 F.2d 1289, 1293 n. 3 (9th Cir. 1986) (where three of five Bauman factors were satisfied, deciding factor was whether trial court decision was clearly erroneous). The

third factor, a determination that the lower court's decision is clearly erroneous, is dispositive. *See Calderon v. United States Dist. Ct.*, 98 F.3d 1102, 1105 (9th Cir. 1996); *Survival Systems of Whittaker Corp. v. United States Dist. Ct.*, 825 F.2d 1416, 1418, fn. 1 (9th Cir. 1987).

The district court's refusal to recuse itself in this case satisfies all five of the *Bauman* factors, making mandamus relief appropriate. Petitioners address the third *Bauman* factor (clearly erroneous) first, however, because it is dispositive. *Calderon*, 98 F.3d at 1105; *Survival Systems*, 825 F.2d at 1418, n.1.

## I. AUTOMATIC RECUSAL WAS REQUIRED; THUS THE COURT'S DENIAL WAS CLEARLY ERRONEOUS

"Clearly erroneous" in a mandamus analysis means the "district court has erred in deciding a question of law." *In re Cement Antitrust Litig. (MDL No. 296),* 688 F.2d 1297, 1307 (9th Cir. 1982). But even if an error cannot be characterized as "clearly erroneous," this Court may exercise its mandamus authority where the issue is particularly important to trial court administration -- especially in the context of the denial of a recusal motion. *In re Cement Antitrust Litig.,* 688 F.2d at 1306-07 ("we see no legitimate reason for refraining from exercising our supervisory authority where we can determine that an error has been made but cannot, for whatever reason, characterize the error as 'clearly' erroneous.").

The district court's refusal to recuse itself here satisfies the third *Bauman* standard no matter how it is characterized. Petitioners sought recusal under 28 U.S.C. § 455, which is a self-enforcing provision – i.e., recusal does not require any action by the parties (though parties may also enforce it). *United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008). Section 455 has two recusal provisions. Subsection (a) covers circumstances that *appear* to create a conflict of interest, even if there is no actual bias. *Preston v. United States*, 923 F.2d 731, 734 (9th Cir. 1991). The section states that a "judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). An objective standard applies to disqualification under § 455(a), so recusal is required when a "reasonable person with knowledge of all the facts would conclude the judge's impartiality might reasonably be questioned." *Taylor v. Regents of Univ. of Cal.,* 993 F.2d 701, 712 (9th Cir. 1993).

Subsection (b) covers situations in which an *actual* conflict of interest exists, even if there is no appearance of impropriety. *Preston*, 923 F.2d at 734. It requires a judge to recuse himself, even if there is no appearance of impropriety:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

…

(4) He knows that he, individually, or as a fiduciary, or his spouse . . . has a financial interest in the subject matter in controversy . . . or any other interest that could be substantially affected by the outcome of the proceeding; [or]

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such person:

…

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; [or]

(iv) Is to the judge's knowledge likely to be a material witness to the proceeding.

28 U.S.C. § 455(b)(1)-(5).[9]

### A. Recusal is mandatory under § 455(b)(5)(iv) because the court turned himself and his wife into material witnesses.

Under 28 U.S.C. § 455(b)(5)(iv), a judge shall disqualify himself if he or his spouse is likely to be a material witness to the proceeding. Here, the court made both himself and the his wife material witnesses to the proceedings by *sua sponte* interrogating Sheriff Arpaio and Chief Deputy Sheridan about the Grissom investigation. [*See* Doc. 1117 (Exs. 5-8), Ex. 11]. The court examined

---

[9] As is shown below, the trial court's conduct also falls outside the seven traditionally identified judicial actions this Court has enumerated "which will not ordinarily require recusal under § 455." *See United States v. Holland,* 519 F.3d 909, 914, n.5 (9th Cir. 2008).

16

Sheriff Arpaio and Chief Deputy Sheridan about why the MCSO investigated Mrs. Grissom's report that Mrs. Snow said her husband hated Sheriff Arpaio and would do anything to get Sheriff Arpaio out of office; and whether the MCSO investigated the court's family when ascertaining the truth of Mrs. Grissom's report of Mrs. Snow's comment. Although the Grissom report had nothing whatsoever to do with the contempt proceedings,[10] the court examined the witnesses about this matter, directed Sheriff Arpaio to preserve and turn over all evidence related to this investigation, and directed his Monitor to further investigate the matter on behalf of the court.

As Petitioners noted in their recusal motion, if Mrs. Grissom's report is true (and all three Grissoms maintain it is), then both Judge Snow and his wife are material witnesses regarding whether he did in fact tell his wife that he hates the Sheriff and would do anything to get him out of office. It hardly needs stating how blatantly material it is to a (potentially criminal) contempt proceeding that the judge presiding over that proceeding hates the potential contemnor so much that the judge would do anything to make sure that party is never re-elected.

---

[10] Even Magistrate Judge Boyle noted that the Grissom investigation was irrelevant to the contempt proceedings. [*See* Doc. 1053 at 6-7, Ex. 13].

Accordingly, on this record, the recusal motion was most certainly not just an "unsubstantiated suggestion of personal bias or prejudice" as the court below stated.  [Doc. 1164 at 34:10-11, Ex. 8].[11]  No reasonable person with knowledge of the facts could deny that the court injected himself and his wife as witnesses to an issue that should not have been, but is now apparently part of, the contempt proceeding.  Not only that, the court has ordered the Monitor to ensure that documentation related to the Grissom investigation is preserved and produced to the court, thus making himself the investigator of this matter as well as the judge and the finder of fact.  [*See* Doc. 1164 at 21:18-20, Ex. 8]. Under no circumstances could this conduct escape mandatory recusal under § 455(b)(5)(iv).  *See United States v. Alabama,* 828 F.2d 1532, 1545 (11th Cir. 1987) (disqualification required when the judge was "forced to make factual findings about events in which he was an active participant.").[12]  The court's refusal to recuse himself was clearly erroneous.

------

[11] The court's order stated that "Movants do not suggest a single example of admissible testimony that the Court's wife could offer."  [Doc. 1164 at 33:13-17, Ex. 8].

[12]  Given this record, the court inaptly relied on a 2013 memo from the Sheriff's former defense counsel for the proposition that recusal was unnecessary.  Not only are counsel's comments stale in light of the court having injected the Grissom issue into the contempt hearing, but one attorney's subjective opinion is not a substitute for the objective impartial observer standard under § 455(a).  *Clemens v. U.S. Dist. Ct. for Central Dist. of*

**B.    The court's expansion of the Monitor's powers and authority was in contravention of this Court's previous order, violated Petitioners' Due Process Rights, and violated § 455(b)(1), (a).**

At a minimum, a court must provide an alleged contemnor with notice and an opportunity to be heard, *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994), which means prior disclosure and provision of documents to be used at trial, and prior identification of areas of examination.  *See generally, Stuart v. United States*, 813 F.2d 243, 251 (9th Cir.1987), rev'd on other grounds, 489 U.S. 353 (1989); *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd*., 268 F.3d 829, 846-47 (9th Cir. 2001).  Such notice is consistent with an alleged contemnor's right to present a defense.  *See United States v. Powers*, 629 F.2d 619, 625 (9th Cir. 1980).  Further, the law requires progressively greater procedural protections for indirect contempts of complex injunctions that necessitate more elaborate and in-depth fact finding, as in this case.  *See Bagwell*, 512 U.S. 821 at 833-34.

The record is uncontested that Judge Snow ordered only ***three*** issues to be determined during the April 2015 OSC hearing.  [Doc. 880 at 26, Ex. 18].  None of these issues included MCSO internal investigations.  Moreover, neither the Court nor any other party gave notice that Sheriff Arpaio nor Chief Deputy

---

*California*, 428 F.3d 1175, 1178 (9th Cir. 2005) (In determining whether disqualification is proper, courts apply an objective test).

Sheridan would be questioned regarding the Grissom and Montgomery internal investigations or that MCSO's internal investigations would be at all relevant to the contempt proceedings. While a court may examine witnesses and comment on evidence, as the court noted [Doc. 1164 at 23:15-25, Ex. 8], the court cannot inquire into matters entirely ***unrelated*** to the current proceeding, and which ***directly*** implicates the court's impartiality. *United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994) (new trial necessary when judicial remarks and questioning of witnesses projected the "appearance of advocacy or partiality.").[13]

Finally, Judge Snow subsequently directed his Monitor to investigate further into these irrelevant matters. [Doc. 1117 (Ex. 9), Ex. 11; 5/14/15 Transcript at 49:15-21, 51, Ex. 12]. Over Petitioners' objections, Judge Snow ruled that his Monitor would not be "shackled" by Petitioners' constitutional rights. [*See id.* at 56, Ex. 12]. Indeed, Judge Snow indicated in his Order that he will continue an investigation into "the status of MCSO's remaining internal investigations," which includes the Grissom and Montgomery investigations. [*See* Doc. 1164 at 40, Ex. 8]. The Court's comments outlined above are

---

[13] Petitioners have always maintained that it is the court's *sua sponte* inquiry into these irrelevant matters in violation of Petitioners' due process rights that demonstrates the perception of bias and requires recusal – not the due process violations themselves.

particularly alarming in light of the Ninth Circuit's recent decision limiting the powers of the Monitor to ensure they are "narrowly tailored to addressing only the relevant violations of federal law at issue here." *Melendres v. Arpaio*, 784 F.3d 1254, 1267 (9th Cir. 2015). In contempt proceedings, procedural protections such as prior notice are crucial "in view of the heightened potential for abuse posed by the contempt power." *Taylor v. Hayes*, 418 U.S. 488, 498 (1974). The court's failure to abide by these fundamental and basic constitutional requirements further demonstrates his bias under § 455(a) and (b)(1) requiring his disqualification and recusal.

### C. The court, by *ex parte*, extrajudicial investigation, gained personal knowledge of disputed evidentiary facts requiring recusal under §§ 455(b)(1), (a).

During the contempt hearing, the court admitted that he engaged in improper, *ex parte* communication "over the lunch hour" by which he gained personal knowledge of disputed evidentiary facts he believed were relevant to the contempt hearing.[14] [*See* Doc. 1164 at 20:4-12, Ex. 8].

Sheriff Arpaio had testified about the source of funding for the Montgomery Investigation, indicating that Maricopa County had not paid for investigatory personnel trips to Seattle for that investigation. [Doc. 1164 at

---

[14] The court made clear in its order that it believed the funding of the Montgomery Investigation was at issue in the contempt hearing. [*See* Doc. 1164 at 27:21-28:6, Ex. 8].

21

20:4-9, Ex. 8]. During the lunch break, outside the presence of the parties, the court spoke with someone who told the court "that the Cold Case Posse may have separate finances from MCSO." [*Id.* at 20:9-10, Ex. 8]. The court did not reveal to the parties the source of this information. [*Id.*, Ex. 8]. He simply stated on return from lunch: "*I was told over lunch* that posse funds like Mr. Zullo – Mr. Zullo's the head of one of your posses … *I was told* that you also have various sources of funding within the MCSO, like the Cold Case Posse has its own funds. Is that possible?" [4/23/15 Tr. 657:20-21, 657:25-58:2 (emphasis added), Ex. 15].[15] Clearly, by the court's own admission, he had received new information, *ex parte*, regarding matters directly related to, and which the court believed was at issue in, the contempt hearing.[16] The court then interrogated Sheriff Arpaio on the record regarding this new information. [4/23/15 Tr. at 657:18-60:8, Ex. 15].[17]

---

[15]  It was not until much later, when the court issued the order denying recusal, that the source of those *ex parte* communications (the Monitor) was revealed. [*See* Doc. 1164 at 20:9-10, Ex. 8].

[16]  The court attempted to justify its *ex parte* communication with the Monitor as part of the Monitor's role to "oversee and coordinate Defendants' compliance with existing judicial orders on the Court's behalf." [Doc. 1164 at 20:15-17, Ex. 8]. But nothing in the court's existing judicial orders gives the Monitor a right or duty to advise the court regarding the accuracy of testimony given during the contempt proceeding. *See Melendres v. Arpaio,* No. CV-07-02513-PHX-GMS, 2013 WL 5498218, at *32, ¶ 126 (D. Ariz. Oct. 2, 2013).

[17]  Thus, the information the court received was, in fact, from an "extrajudicial source," contrary to the court's statement in its order denying

Under 28 U.S.C. § 455(b)(1), a judge *shall* disqualify himself "[w]here he has, . . . *personal knowledge* of disputed evidentiary facts concerning the proceeding." (Emphasis added). The information relayed by the Monitor to the court is a disputed fact. When the court directly questioned Sheriff Arpaio regarding whether the Cold Case Posse has its own funds, Sheriff Arpaio answered "No." [4/23/15 Tr. 657:25-58:3, Ex. 15]. Nothing in the Sheriff's further testimony contradicted this statement. [*See id.* at 657-58, Ex. 15]. Moreover, as stated in the previous section, the relevance of *any* fact regarding the Montgomery Investigation to the contempt proceedings is disputed. The court, therefore, violated § 455(b)(1) by gaining personal knowledge of disputed evidentiary facts through an *ex parte* communication with the Monitor during the lunch break of the contempt hearing.

The Court's *ex parte* conversation with the Monitor itself also requires recusal under § 455(a) because "[a] judge should ... except as authorized by law, neither initiate nor consider *ex parte* communications on the merits, or

---

recusal. [Doc. 1164 at 24:24-25:12, Ex. 8]. Statements received by a judge outside of judicial proceedings are extrajudicial. *See In the Matter of Edgar v. K.L., et al.,* 93 F.3d 256, 259 (7th Cir. 1996) ("Knowledge received in other ways, which can be neither accurately stated nor fully tested, is 'extrajudicial.' . . . What information passed to the judge, and how reliable it may have been, are now unknowable. This is 'personal' knowledge no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated.").

procedures affecting the merits, of a pending or impending proceeding." *In the Matter of Edgar v. K.L., et al.,* 93 F.3d 256, 258 (7th Cir. 1996) (quotations omitted). Regardless of whether Sheriff Arpaio's subsequent testimony confirmed or refuted the Monitor's information, it is the court's *ex parte* conversation that gave him personal knowledge regarding evidentiary matters at issue that constitutes the appearance of impropriety and requires recusal. [*See* Doc. 1164 at 20:10-12, Ex. 8]. *See, e.g., SCA Services, Inc. v. Morgan,* 557 F.2d 110, 116 (7th Cir. 1977), where recusal was required regardless of whether *ex parte* communications confirmed accurate information:

> [T]he judge's 'Memorandum of Decision' suggests that he made a confidential inquiry, presumably to his brother, to determine in what capacity Donald A. Morgan was involved in this case. Counsel were not present and were unaware of the inquiry at the time it was made. While it is understandable why the judge may have felt his brother could present the most accurate evidence as to his role in the pending litigation, the judge's inquiry creates an impression of private consultation and appearance of partiality which does not reassure a public already skeptical of lawyers and the legal system.

*Id.; see also Edgar*, 93 F.3d at 259 (mandatory disqualification under § 455(b)(1) required when trial judge was briefed off the record regarding the litigation and declined to inform parties about the briefing's contents); *Price Bros. Co. v. Philadelphia Gear Corp.,* 629 F.2d 444, 446-47 (6th Cir. 1980)

(noting that gaining information from a law clerk's independent investigation of disputed facts would be a violation of Canon 3(c)(1)(a) and § 455).

Surely a thoughtful observer aware of all the facts (the standard under § 455(a), *see Liljeberg v. Health Svcs. Acq. Corp,* 486 U.S. 847, 865 (1988)) would conclude that a preview of evidence carries an unacceptable potential for compromising impartiality. *Edgar*, 93 F.3d at 259-60. That is exactly what occurred here. Moreover, the appearance of impropriety is more intensified because the record is not even clear that the Monitor gave Judge Snow accurate information, as the court claimed. [Doc. 1164, 20:10-12, Ex. 8]. In short, the court's conferring *ex parte* during the lunch hour about disputed facts to the proceeding, not to mention its subsequent failure to disclose the details of that conference, required recusal under § 455(b)(1) and (a). The court's refusal to do so was clearly erroneous under *Bauman*, warranting mandamus relief.

**D.**   **Recusal is mandatory under § 455(b)(5)(iii) because Judge Snow's brother-in-law is an equity partner in Covington & Burling, counsel for Plaintiffs.**

**1.**   **The court's brother-in-law's equity partnership interest in Plaintiffs' law firm creates an unwaivable conflict under § 455(b)(5)(iii).**

28 U.S.C. § 455(b)(5)(iii) requires that a Judge shall disqualify himself when a "[p]erson within the third degree of relationship of [the Judge or his spouse]…[i]s known by the judge to have an interest that could be substantially

25

affected by the outcome of the proceeding." *See also* Code of Conduct for United States Judges, Canon 3(C)(1)(d)(iii) (mirroring § 455(b)(5)(iii)). Commentary to Canon 3C(1)(d)(ii) provides that "if … the relative is known by the Judge to have an interest in the law firm that could be 'substantially affected by the outcome of the proceeding' under Canon 3C(1)(d)(iii), the judge's disqualification is *required*." (emphasis added). Judge Snow's brother-in-law is an equity partner with Covington & Burling, the Plaintiffs' law firm. As an equity partner in the Plaintiffs' counsel's law firm, Judge Snow's brother-in-law has an interest in this case that could be "substantially affected by the outcome of the proceeding," requiring the court's mandatory recusal.

Judicial Ethics Advisory Opinion No. 58[18] states a <u>categorical rule of recusal</u> when a relative within the third degree of relationship is an equity partner in a law firm in the case, notwithstanding his residence in a different office and the lack of any involvement or effect on his income. *Fiore v. Apollo Educ. Grp. Inc*., 2015 WL 1883980, at *2 (D. Ariz. Apr. 24, 2015). The Committee concluded that:

---

[18] "The Judicial Conference of the United States has established a committee, consisting of federal judges, '[t]o provide advice on the application of the Code of Conduct for United States Judges.' Jurisdictional Statement of the Committee on Codes of Conduct of the Judicial Conference of the United States. Although judges are neither required to consult the committee nor bound by its rulings, the committee provides invaluable guidance and a detached viewpoint." *In re Bernard*, 31 F.3d 842, 844 (9th Cir. 1994).

> an equity partner in a law firm generally has "an interest that could be substantially affected by the outcome of the proceeding" **in all cases where the law firm represents a party before the court**. Therefore**,** "if the relative ... is an equity partner in a law firm that represents a party, the judge must recuse."

*Id*. (emphasis added) (quotations omitted).   As the Committee noted, "one might reasonably question a judge's impartiality when his or her relative is an equity partner in a law firm that represents a party before that court." *Id.* at *3. Other cases are in accord.  *See Postashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980) ("when a partner in a law firm is related to a judge within the third degree, that partner will ***always be*** 'known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's firm."); *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 115 (7th Cir. 1977) (recusal required because judge's brother was a senior partner in a party's firm, though not directly involved in the case).

In refusing to recuse himself, Judge Snow stated that "the Advisory Opinion's per se rule is contrary to the Code of Conduct and the commentaries thereto which make clear that '[t]he fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself disqualify the judge.'" [Doc. 1164, n. 18, Ex. 8; Doc. 542, Ex. 23]. Respectfully, this misinterprets Advisory Opinion No. 58.   The Advisory

Opinion does not state that *relation alone* constitutes disqualifying interest, but rather, an *equity interest* in the firm does. In fact, Opinion 58 notes that "recusal is not mandated" when the family member in the firm before the court is "an associate or non-equity partner . . . [whose] compensation is in no manner dependent upon the result of the case." Opinion 58 thus does not conflict with the commentary to the Judicial Canons, as the court posited.[19]

In refusing to recuse himself, the court also relied on his June 2012 order, which noted that recusal was not required at the time because there was only a "remote possibility" that Plaintiffs would be awarded attorney's fees (and if they did it would "be very small"); thus it "was speculative" whether the court's brother-in-law had a financial interest in the outcome of the case. [Doc. 542, Ex. 23]. As of 2015, however, Covington & Burling has been awarded nearly $3.5 million in fees and costs [Doc. 742, Ex. 20], and have requested nearly half a million dollars more in fees and costs for the appeal of the bench trial.[20] This

---

[19] The district judge in *Fiore v. Apollo Educ. Grp. Inc.*, 2015 WL 1883980, at *2 (D. Ariz. Apr. 24, 2015), refused to recuse himself citing this inaccurate ruling by Judge Snow, and failing to consider adequately the equity partner's non-economic interests. *Id.* at *2-3. In addition, *Fiore* did not involve a multi-million dollar award of fees and costs to the judge's relative's law firm.

[20] *See* Ninth Circuit Case No. 13-16285, 13-17238, Dkt. 89, Declaration of Stanley Young, Ex. E. The Court can take judicial notice of this fee request. *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (Federal courts may "take notice of proceedings in other

is hardly a "very small" amount.  *See* Canon 3(C)(3)(c) (holding that "'financial interest' means ownership of a legal or equitable interest, *however small* …") (emphasis added).  And the record is devoid of evidence that the court's brother-in-law did not receive some financial benefit (either directly or indirectly) from this substantial award.

Regardless, as the Advisory Committee notes, § 455(b)(5)(iii) serves to protect both economic and *non-economic* interests.[21]  Indeed,

> This "general interest" reflects the big picture-the equity partner's stake in the law firm's profits as well as in its continued existence, which requires lasting client relationships and a respected name in the profession.  An equity partner stands to benefit when his or her law firm does good work no matter who does that work or where that work is done.

*Fiore*, 2015 WL 1883980 at *3; *see also In re Kansas Pub. Employees Ret. Sys.,* 85 F.3d 1353, 1359 (8th Cir. 1996) ("The interest described in § 455(b)(5)(iii) includes noneconomic as well as economic interests.").

In short, based on this record, the statutes, Advisory Opinion 58, and relevant case authority, the court's recusal is mandated.  The court's brother-in-

---

courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.").

[21]   The Committee has rejected the line of cases from the Second Circuit that focuses only on economic interests.  *Fiore*, 2015 WL 1883980 at *3; *see also In re Kansas Pub. Employees Ret. Sys.,* 85 F.3d 1353, 1359 (8th Cir. 1996) ("The interest described in § 455(b)(5)(iii) includes noneconomic as well as economic interests.")

law has both economic and noneconomic interests that could be substantially affected by the outcome of the proceeding.[22]   Judge Snow's failure to recuse himself was, therefore, clearly erroneous.

## 2.    Petitioners did not waive the conflict.

One of the court's reasons for refusing to recuse was that the Sheriff waived the "appearance of impartiality" conflict back in 2012.  [Doc. 1164, pp. 36-37, Ex. 8; Doc. 541, Ex. 24].  This was incorrect for two reasons (aside from the enormous attorneys' fees and costs award recently granted to Covington & Burling, which greatly enhanced the conflict).   First, conflicts under § 455(b)(5)(iii), such as those occurring when the court's relative has an interest that could be affected by the proceeding's outcome, are simply not waivable.[23]

---

[22] Even if this Court is disinclined to adopt a categorical rule of recusal expressed under Advisory Opinion No. 58, based the specific facts of this case, recusal was still necessary under 455(b)(5)(iii).

[23] Moreover, courts generally frown on waiver from counsel because "Judges should not be able to pressure a waiver of disqualification by figuratively cloaking the judge's iron fist in a velvet glove."   Ronald D. Rotunda & John S. Dzienkowski, LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY § 10.2-2.11; *see also United States v. Kelly*, 888 F.2d 732, 745-46 (11th Cir. 1989) ("as a general rule, 'a federal judge should reach his own determination [on recusal], without calling upon counsel to express their views.... The too frequent practice of advising counsel of a possible conflict, and asking counsel to indicate their approval of a judge's remaining in a particular case is fraught with potential coercive elements which make this practice undesirable.'") (quoting *Matter of National Union Fire Ins. Co.*, 839 F.2d 1226, 1231 (7th Cir.1988)); *see also Andros Compania Maritima, S.A. v. Marc Rich & Co.*, A.G., 579 F.2d 691, 699 (2d Cir.1978) ("Generally, a

30

28 U.S.C. § 455(b)(5)(iii), (e); *Postashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1115 (5th Cir. 1980) ("The express language of section 455(e) dictates that a judge cannot accept a waiver of disqualification on section 455(b)(5)(iii) grounds, such as when a relative of the judge has an interest which could be affected by the outcome of the proceeding."). Thus the court, as a matter of law, could not accept a waiver of the conflict from Sheriff Arpaio. Second, the potential civil contemnors, including Petitioner Chief Deputy Sheridan, could not have waived anything, as they were not parties to the case in 2012. They were not civilly or criminally at risk until the court made them a part of contempt proceedings in 2015. These individuals have the right to be separately informed of and have a chance to object to the conflict.

Moreover, if this conflict was waivable (which it is not), before the contempt proceedings began, the court should have: (1) disclosed the conflict, (2) permitted counsel to confer with their clients outside his presence, and (3) provide either a written waiver or note their waiver on the record. *See* Canon 3D. At a minimum, the court's failure to follow this process creates the appearance of bias under § 455(a) and violates the ethical canons.

---

federal judge may not state for the record possible disqualifying circumstances and ask the parties to decide whether they want him to continue.").

Finally, recusal was required regardless of the courts' timeliness concerns. Our courts have an "unwavering commitment to the perception of fairness in the judicial process." *United States v. O'Brien*, 18 F. Supp. 3d 25, 32 (D. Mass. 2014) (finding recusal motion untimely but nevertheless addressing the merits and finding recusal necessary); *S.E.C. v. Loving Spirit Found. Inc*., 392 F.3d 486, 494 (D.C.Cir.2004) (recusal motion untimely but addressing merits). The court therefore had a continuing duty under § 455 to recuse himself, regardless of the timeliness of the motion. *United States v. Sibla,* 624 F.2d 864, 868 (9th Cir. 1980); *Bradley v. Milliken*, 426 F.Supp. 929, 931 (E.D. Mich. 1977).

## E. An objective independent observer would recognize the appearance of bias under § 455(a).

On this record, a reasonably objective observer would perceive the appearance of bias by the court. 28 U.S.C. § 455(a); *Preston v. United States*, 923 F.2d 731, 734 (9th Cir. 1991) ("The relevant test for recusal under § 455(a) is whether "a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial."); *United States v. Holland*, 519 F.3d 909, 911 (9th Cir. 2008) (when a case is close, the balance should tip in favor of recusal).

- Sheriff Arpaio and Chief Deputy Sheridan consented to a finding of civil contempt.

- The court ordered the Sheriff to put "skin in the game" by pledging his own funds to settle the contempt allegations, though the suit is only against him in his official capacity.

- The court *sua sponte* turned the contempt hearing into an investigation into matters personal to the court but entirely unrelated to the preliminary injunction, in violation of Petitioners' due process rights, cross-examining the witnesses on a matter involving the judge's wife, thereby making himself and his spouse material witnesses.[24]

- The court also inquired into MCSO's investigation involving Dennis Montgomery, which the Court characterized as a "bogus" conspiracy theory to discredit the court.[25]

---

[24] The court repeatedly insinuated – with no evidence whatsoever -- that Petitioners "may have hired a confidential informant at least partly in an attempt to discredit this Court by linking it to a speculative conspiracy" and that "to the extent that Movants are responsible for creating the circumstances that they now offer as grounds for their Motion, the Montgomery materials provide no basis for judicial recusal." [*See* Doc. 1164 at 24:19-20, 29:4-16, Ex. 8]. The accusation is baseless, as the record is entirely devoid of any evidence that Petitioners ever solicited information from either the Grissom family or Dennis Montgomery. It is undisputed that two different sources voluntarily approached MCSO with information regarding Judge Snow and his alleged bias against Sheriff Arpaio. The Grissom/Montgomery matters would never have been mentioned had the court not injected them into the proceeding. From the court's scornful remarks alone, a reasonable observer in this case **would** find an appearance of bias under § 455(a). *Fairley v. Andrews*, 423 F. Supp. 2d 800, 821 (N.D. Ill. 2006) ("In this case, none of this Court's individual statements, when viewed in their proper context, warrant recusal under section 455(a). However, in doing the required self-evaluation under this section, this Court finds that all of this Court's statements and interactions with Defendants in this case, taken together, may give pause to a non-legal observer, not versed in the ways of the courtroom and the risks of litigation.").

[25] *See* 5/14/15 Tr. at 46:23-47:7, Ex. 12.

33

- The court, clearly angry over the suggestion that
  he hates the Sheriff and would do what it takes to
  get him out of office, morphed from objective
  adjudicator into an advocate, giving his own
  testimony, asking leading questions, becoming
  argumentative with the putative contemnors when
  they testified, and taking "evidence" from outside
  of court.

- The court then directed his Monitor to investigate
  further into these irrelevant matters after the
  contempt hearing, refusing to "shackle" the
  Monitor when the movants objected to the
  unprecedented and unbridled power given to the
  Monitor, despite recently being reversed by the
  Ninth Circuit for giving the Monitor too much
  authority.

- In denying recusal, the court indicated and has in
  fact continued to, investigate the status of
  "MCSO's remaining internal investigations"
  (which include the irrelevant matters).

These are the <u>facts</u> on which the recusal motion was based.[26]  And based on the

foregoing facts, a reasonably objective observer would perceive the appearance

of bias necessitating the court's recusal.[27]  *See United States v. Conforte*, 624

---

[26]  Contrary to the court's order [Doc. 1164 at 26:10-12, 25, 33, Ex. 8],
the motion was thus not based on "[r]umor, speculation, beliefs, conclusions,
innuendo, suspicion, opinion, or similar non-factual matters."

[27]  Judge Snow impermissibly cited statements by Sheriff Arpaio, Chief
Deputy Sheridan, and their defense counsel in concluding that a reasonable
person would not believe recusal necessary under 28 U.S.C. § 455(a).  [*See e.g.,*
Doc. 1164 at 26-27, 31, Ex. 8].  A party to the litigation is not an objective
impartial observer under § 455(a).  *In re U.S.*, 572 F.3d 301, 313 n.12 (7th Cir.
2009) (rejecting trial court's reliance on fact that party did not desire recusal as
meeting the objective standard under 28 U.S.C. § 455(a)).  Moreover, the

F.2d 869, 881 (9th Cir. 1980) ("It is a general rule that the appearance of partiality is as dangerous as the fact of it."); *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 163, 166 (3d Cir. 1993) ("When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced."); *see also In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990) (an independent outside observer is "less inclined to credit judges' impartiality and mental discipline than the judiciary…."); *In re Faulkner*, 856 F.2d 716, 721 (5th Cir. 1998) ("[p]eople who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges."); *Holland*, 519 F.3d at 911 (To the extent the facts are disputed, the balance tips in favor of recusal).[28]

The court also misplaced reliance on *Liteky v. United States,* 510 U.S. 540 (1994), for the proposition that Petitioners' recusal motion did not offer a valid basis for bias or partiality. [*See* Doc. 1164 at 15:9-20, 24:24-25:10, Ex.

---

statements cited were made *before* the court injected irrelevant matters into the proceeding, before the court gave unbridled power to the Monitor, and before the enormous award of attorneys' fees to Plaintiffs' counsel.

[28] Judge Murguia previously recused herself under § 455(a), because comments allegedly made by her *sister* and her sister's *organization* were highly disparaging of Sheriff Arpaio. [Doc. 138 at 26-27, Ex. 28]. Recusal in this instance is even stronger under § 455(a) because the undisputed allegations from the Grissoms demonstrate that Judge Snow *himself* may have made highly disparaging comments regarding Defendant Arpaio. [*See* Doc. 1117 (Exs. 5-8), Ex. 11].

8]. *Liteky* actually recognizes that judicial rulings and comments **do** provide a basis for recusal under § 455, and a recusal motion is **not** required to be grounded in an extrajudicial source. *Liteky*, 510 U.S. at 551 (an extrajudicial source is a "*common* basis [for disqualification] but not the *exclusive* one.") (emphasis added); *id.* at 541 (judicial rulings "*almost* never constitute a valid basis for a bias or partiality motion.") (emphasis added); *id.* at 555 ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" "constitute a basis for a bias or partiality motion" if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible."). Indeed, the *Liteky* Court explained that remarks made during judicial proceedings will require disqualification when they: (1) reveal an extrajudicial bias, or (2) reveal an excessive bias arising from information acquired during judicial proceedings. *Id.* at 555. We have both here. The court's obvious anger at the Grissom investigation (seeing as Mrs. Snow's statement to Mrs. Grissom clouds any reasonable observer's perception of the court's objectivity in this case), coupled with: (a) the court's reactive cross-examination of the witnesses into Grissom (and other) matters, (b) giving the Monitor unbridled authority to intrude into every investigation at MCSO (regardless of its relevance to the preliminary injunction or contempt hearing), (c) the court's insistence that it was going to

36

continue investigating these irrelevant matters, and (d) the court's unfounded accusation that Petitioners might have hired a confidential informant to try to discredit the court – at the very minimum give the perception of both extrajudicial bias and bias arising from information acquired during the proceedings. Recusal was required and its refusal was clear error.[29]

## II. PETITIONERS HAVE NO OTHER ADEQUATE REMEDY TO OBTAIN RELIEF.

This Court has recognized that a denial of a motion for recusal is exactly the kind of "exceptional circumstance" for which a writ of mandamus is designed:

> It is not necessary to create a general rule permitting immediate appeal of all recusal decisions in order to resolve the exceptional situations. *See Firestone Tire & Rubber Co. v. Risjord*, [449 U.S. 368, 378 n. 13, 101 S.Ct. 669, 676 n. 13, 66 L.Ed.2d 571 (1981)]. Ultimately, if dissatisfied with the district judge's decision and confident that the litigation will be greatly disrupted, a party may seek a writ of mandamus from the court of appeals. ***It is for just such an exceptional circumstance that the writ was designed.***

---

[29] Even if bias had to be based on an extrajudicial source, we have those here, including (but not limited to): (1) an *ex parte* communication from the Monitor regarding MCSO funding sources, (2) statements from the Grissoms and Dennis Montgomery, and (3) the court's brother-in-law's equity partnership at Covington & Burling. These are all extrajudicial sources. *See United States v. Johnson,* 610 F.3d 1138, 1147 (9th Cir. 2010) (describing an extrajudicial source as "something other than rulings, opinions formed or statements made by the judge during the course of trial).

37

*In re Cement Antitrust Litig., (MDL No. 296),* 673 F.2d 1020, 1025 (9th Cir. 1982) (emphasis added).  Moreover, given that this case is in the remedial stage of litigation, the district court will not be issuing a "final order" that can be appealed.  Petitioners have no remedy other than mandamus to obtain relief.

## III.  PETITIONERS WILL BE PREJUDICED IN A WAY NOT CORRECTABLE ON APPEAL

Absent mandamus relief, Petitioners will be prejudiced in a way not correctable on later appeal.  It is axiomatic that Judge Snow's continued participation in the contempt proceedings and compliance phase of this action endangers not only the Petitioners' rights, but also the appearance of the court's fairness and impartiality.  For this reason, Petitioners requested a stay of all proceedings pending resolution of this Petition [Docs. 1171, Ex. 6; 1176, Ex. 4], which the court denied.  [7/20/15 at 10-15, Ex. 2; Doc. 1179, Ex. 3].  Because the compliance and contempt proceedings are continuing, mandamus relief is necessary to prevent further prejudice to Petitioners, which cannot be corrected on later appeal.

## IV.  THE ORDER REFUSING RECUSAL MANIFESTS PERSISTENT DISREGARD OF THE FEDERAL RULES

The district court's refusal to recuse itself comes only after the court engaged in an *ex parte* conversation and then questioned witnesses regarding that *ex parte* information, refused to disclose the source of its information until

much later, injected irrelevant yet very personal matters (personal to the court) into the contempt hearing, and gave the Monitor unbridled and unprecedented authority to investigate those matters. This evidences persistent disregard of not only the federal rules, but also the parties' due process rights.

## V.  THE ORDER REFUSING RECUSAL RAISES NEW AND IMPORTANT ISSUES OF LAW OF FIRST IMPRESSION.

This Court has not yet adopted the Committee's Advisory Opinion No. 58, setting forth a categorical rule of recusal when a relative within the third degree of relationship is an equity partner in a law firm in the case. As such, this is an important legal issue of first impression that satisfies the last element of *Bauman* test.

## VI.  PETITIONERS' RECUSAL MOTION WAS TIMELY.

The district court repeatedly asserted that Petitioners' recusal motion was untimely because Petitioners knew about the Grissom/Montgomery investigations for some time prior to their recusal motion. [Doc. 1164 at 2, 27, 32, and 33, Ex. 8].[30] In truth, the recusal motion was timely. It was filed within one month of the court's April 23, 2015 injection of the Grissom and

---

[30]  A motion for recusal under § 455(a) does not have a strict time deadline. *U.S. v. Kehlbeck*, 766 F.Supp. 707 (S.D. Ind. 1990); *see also Conforte*, 624 F.2d at 880 ("we leave open here the question whether timeliness may be disregarded in exceptional circumstances.").

Montgomery matters into the contempt proceedings.[31]  Furthermore, the court's subsequent order directing that the Monitor be given unfettered access to investigate these and other irrelevant matters did not occur until May 14, 2015. The recusal motion was filed within a week of that, on May 22, 2015.  [Doc. 1117, Ex. 11].  Recusal motions are timely even if filed a year or more after the case begins, where the grounds for recusal do not arise until later.  *See, e.g., Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991) (recusal motion timely when filed eighteen months after  assignment to trial judge; grounds for recusal did not arise until ten days before  recusal motion filed); *Edgar v. K.L.*, 93 F.3d 256, 257-58 (7th Cir. 1996) (recusal motion timely after a year because defendants, only two weeks before the motion, learned that judge was discussing merits of case with experts).  Here, the recusal motion was not untimely.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request the Court to (1) issue a writ of mandamus directing Judge Snow to recuse himself from all proceedings in this action and (2) appoint a new judge to preside over this case.

---

[31]  Petitioners never argued that the grounds for recusal arose out of the Grissom/Montgomery investigations themselves.  It was the court's improper inquiry into these matters during the April 2015 contempt hearings that suddenly made these investigations supposedly relevant to the proceedings.

RESPECTFULLY SUBMITTED this 6th day of August, 2015.

JONES, SKELTON & HOCHULI, P.L.C.

By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES

By /s/ John T. Masterson  *(w/permission from)*
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.

By /s/ John T. Masterson  *(w/permission from)*
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Specially appearing counsel for
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County, Arizona

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X]   this brief contains 9,847 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]   this brief uses a monospaced typeface and contains ___ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because:

    [X]   this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2010 14pt Times New Roman, *or*

    [ ]   this brief has been prepared in a monospaced spaced typeface using Microsoft Office 2010 with ____ characters per inch (*insert name of font style here*) _____.


Signature            /s/ John T. Masterson _____

Attorney for         Defendants/Petitioners Joseph M. Arpaio and Gerard A. Sheridan

Date                 August 6, 2015

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing PETITION FOR WRIT OF MANDAMUS with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 6th day of August, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/Karen Gawel

4388211.1

Exhibit 16

Transcript of

Recorded Interview of Karen Grissom

Conducted by Don Vogel

on October 26, 2013

DESERT HILLS REPORTING, INC.
2415 E. CAMELBACK ROAD
SUITE 700
PHOENIX, ARIZONA  85016
BY:   TERESE M. HEISIG/RPR
CERTIFIED COURT REPORTER 50378
TRANSCRIPTIONIST

Case 2:07-cv-02513-GMS Document 1117-6 Filed 05/22/15 Page 3 of 31
Case: 15-16440, 08/18/2015, ID: 9640956, DktEntry: 6-7, Page 359 of 424

Page 2

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Okay.  The tape recorder is
2   going.  It is Saturday morning, October 26th.  It is
3   just about 9 o'clock in the morning.  My name is Don
4   Vogel.  And can you go ahead and say your name for the
5   tape?

6          KAREN GRISSOM:  Karen Grissom.

7          DON VOGEL:  Okay.  Karen, just to kind of
8   bring the tape up to speed, I've been here somewhere in
9   the neighborhood of five to ten minutes.

10         KAREN GRISSOM:  Yes.

11         DON VOGEL:  Um, I explained to you that I was
12  here because of some information that has been kind of
13  passed to me through some different channels of
14  Mr. Casey's office that, um, you may have heard a
15  conversation in a restaurant some time back when you
16  were with your husband, and it may involve a situation
17  involving Sheriff Arpaio.

18         KAREN GRISSOM:  Yes.

19         DON VOGEL:  And I've told you that I do not
20  work for the sheriff's office.  I'm a licensed private
21  investigator.  I -- I spoke with you a little bit about
22  my background so that you could be comfortable.  I told
23  you that I have -- I have been retired from a local
24  police department, not the sheriff's office, for
25  eight years.  And we just kind of talked about wanting

Karen Grissom     -     10/26/2013

```
 1  to, I guess, get a -- get an understanding of exactly
 2  what it is that you heard on tape, and you have
 3  knowledge that this is being recorded.
 4            KAREN GRISSOM:  Yes.
 5            DON VOGEL:  Okay.  Is there anything that we
 6  talked about that I haven't kind of included in the
 7  summary?
 8            KAREN GRISSOM:  No.
 9            DON VOGEL:  Okay.  Karen, how old are you
10  roughly, if you don't want to say.
11            KAREN GRISSOM:  I just turned 64.
12            DON VOGEL:  Okay.  Um, and I know you are
13  short on time this morning, so we will do this as
14  quickly as we can.  We may have to come back and touch
15  up some of the details when we talk with your -- with
16  your husband Dale.  But, um, you had -- do you remember
17  this conversation -- we haven't discussed it, but this
18  conversation that, obviously, I'm here to talk with you
19  about.
20            KAREN GRISSOM:  Yes.
21            DON VOGEL:  When -- do you remember when that
22  occurred?
23            KAREN GRISSOM:  It was last year.  I don't
24  know -- I don't remember if it was in the summer or
25  beginning of the summer.
```

Case 2:07-cv-02513-GMS   Document 1147-6   Filed 05/22/15   Page 5 of 31
Case: 15-18440, 08/19/2015, ID: 9640956, DktEntry: 6-7, Page 361 of 424

Page 4

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Okay.  So somewhere in the area

2    of maybe 13 to 16 months ago.

3          KAREN GRISSOM:  Yes.

4          DON VOGEL:  Okay.  And where did the

5    conversation occur.

6          KAREN GRISSOM:  At Sombrero's Restaurant.

7          DON VOGEL:  And which Sombrero's Restaurant

8    were you at?

9          KAREN GRISSOM:  On Mill Avenue and Baseline.

10          DON VOGEL:  Okay.  Do you remember what day

11    of the week it was.

12          KAREN GRISSOM:  No, I don't.

13          DON VOGEL:  Okay.  Do you remember

14    approximately what time of day it was.

15          KAREN GRISSOM:  Lunchtime, because we were

16    there for lunch.

17          DON VOGEL:  Okay.

18          KAREN GRISSOM:  It had to have been probably

19    on a Saturday.

20          DON VOGEL:  Okay.

21          KAREN GRISSOM:  3:00, you know, that is when

22    we probably go.

23          DON VOGEL:  Okay.  And, um, you were with

24    your husband, obviously.

25          KAREN GRISSOM:  Yes.

Case 2:07-cv-02513-GMS  Document 1117-6  Filed 05/22/15  Page 6 of 31
Case: 15-78440, 08/18/2015, ID: 9640956, DktEntry: 6, Page 369 of 424

Page 5

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Was there anybody else with you
2    when you got to the restaurant.
3          KAREN GRISSOM:  There were -- I think our son
4    was with us.
5          DON VOGEL:  And what is your son's name.
6          KAREN GRISSOM:  Scott Grissom.
7          DON VOGEL:  And how old is Scott.
8          KAREN GRISSOM:  He is 40.
9          DON VOGEL:  Okay.  And where does Scott
10   reside.
11         KAREN GRISSOM:  In California.
12         DON VOGEL:  Can you tell me what city.
13         KAREN GRISSOM:  He is in Oxnard.
14         DON VOGEL:  Okay.  And if it would become
15   necessary, would you be able to give me his cell phone
16   number for him.
17         KAREN GRISSOM:  Yes.
18         DON VOGEL:  Okay.  So you, your husband, and
19   your son Scott were at Sombrero's Restaurant.  Do you
20   remember what you were doing on that side of town?
21         KAREN GRISSOM:  Ah, we go over there quite a
22   bit to eat, and, um, we were -- that is why we go there.
23   We have been going there since they opened.
24         DON VOGEL:  Okay.  And even though you live
25   here on the west side, that is really not that far of a

Case 2:07-cv-02513-GMS Document 1117-6 Filed 05/22/15 Page 7 of 31
Case: 15-10440, 08/13/2015, ID: 9646936, DktEntry: 6-4 Page 369 of 424

Page 6

Karen Grissom    -    10/26/2013

```
1   drive from here.

2           KAREN GRISSOM:  No, it is not.

3           DON VOGEL:  Within 10 to 15 minutes probably,

4   maybe 15 minutes.

5           Um, where were you seated at in the

6   restaurant?  I'm pretty familiar with that restaurant.

7           KAREN GRISSOM:  We were over on the south

8   side of the door --

9           DON VOGEL:  Okay.  So when you --

10          KAREN GRISSOM:  -- at the window.

11          DON VOGEL:  Okay.  So when you walk in, there

12  is a tremendous amount of seating to your left, and

13  there is just a few tables off to your --

14          KAREN GRISSOM:  On the right.

15          DON VOGEL:  -- right.  And you were off to

16  the right?

17          KAREN GRISSOM:  Right next to the window.

18          DON VOGEL:  Okay.  And do you remember if

19  that is a booth or a table.

20          KAREN GRISSOM:  Table.

21          DON VOGEL:  Okay.  Um, what happened?

22          KAREN GRISSOM:  We were just sitting there

23  eating our lunch, and, um, this girl, tall girl comes

24  up.  I didn't know who she was, and she asked, Irene?  I

25  says, no, I'm Karen.
```

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Okay.  So she asked you if you
2   were Irene?
3          KAREN GRISSOM:  My sister, my younger sister.
4          DON VOGEL:  Okay.  Is Irene -- and you had
5   mentioned when I got here that Irene -- one of your
6   sisters is a paralegal.
7          KAREN GRISSOM:  That is her.
8          DON VOGEL:  Is that -- okay.  What last name
9   does she go by now.
10          KAREN GRISSOM:  Winterburn.
11          DON VOGEL:  Okay.  So she asked if you were
12   Irene.  Do you look like Irene?
13          KAREN GRISSOM:  Yes.
14          DON VOGEL:  Okay.  So is -- does that -- does
15   that happen in the past, where people have --
16          KAREN GRISSOM:  Yes.
17          DON VOGEL:  -- confused you guys?
18          KAREN GRISSOM:  Even -- yeah, even at church.
19          DON VOGEL:  Okay.  Um, so she asked if you
20   were Irene, and you were -- that is nothing new, so you
21   immediately knew that --
22          KAREN GRISSOM:  M'hum.
23          DON VOGEL:  -- somebody was confusing you and
24   your sister.  What happened next.
25          KAREN GRISSOM:  And she -- and then I asked

Case 2:07-cv-02513-GMS Document 1147-6 Filed 05/22/15 Page 9 of 31
Case: 15-16440, 08/18/2015, ID: 9646986, DktEntry: 6-4, Page 369 of 424

Page 8

Karen Grissom    -    10/26/2013

1   her who she was, and she said Sheri Smoch -- Snow.

2           DON VOGEL:  Okay.  She said Sheri Smoch.  Did

3   she say know, too, or are you just adding that.

4           KAREN GRISSOM:  No.  Um, she said Sheri, um,

5   Snow, and I says, well, I don't know you.  And, oh, she

6   said I'm Sheri Smoch.  Remember my family.

7           DON VOGEL:  Okay.

8           KAREN GRISSOM:  From Yuma.

9           DON VOGEL:  Okay.

10          KAREN GRISSOM:  I said, oh, yeah, I remember

11  your dad.  He was a railroad man.

12          DON VOGEL:  What was the dad's name?

13          KAREN GRISSOM:  Um, I don't remember.

14          DON VOGEL:  I thought you just said it.

15          KAREN GRISSOM:  He was a railroad -- he

16  worked in railroad.

17          DON VOGEL:  Oh, okay.

18          KAREN GRISSOM:  Railroad.

19          DON VOGEL:  Okay.

20          KAREN GRISSOM:  And, um -- and I remember her

21  mother.  I don't remember her mother's name.

22          DON VOGEL:  Okay.

23          KAREN GRISSOM:  I remember her stepmother was

24  my piano teacher in college.

25          DON VOGEL:  Okay.

Case 2:07-cv-02513-GMS Document 1117-6 Filed 05/22/15 Page 10 of 31
Case: 15-18440, 08/13/2015, ID: 9646960, DktEntry: 6, Page 366 of 424

Page 9

Karen Grissom    -    10/26/2013

1              KAREN GRISSOM:  But she was murdered.  I
2    don't know if they ever found out who did it.
3              DON VOGEL:  What city was she murdered in.
4              KAREN GRISSOM:  In Yuma.
5              DON VOGEL:  Okay.  Now, are you from Yuma.
6              KAREN GRISSOM:  Yes.
7              DON VOGEL:  What year did you -- were you
8    born in Yuma.
9              KAREN GRISSOM:  No.
10             DON VOGEL:  Did -- when did you live there.
11             KAREN GRISSOM:  Um, since I was about
12   six years old.
13             DON VOGEL:  Until when.
14             KAREN GRISSOM:  1970 we moved away.
15             DON VOGEL:  So you lived there for quite some
16   time.
17             KAREN GRISSOM:  Yes.
18             DON VOGEL:  So what year were you born.
19             KAREN GRISSOM:  '49.
20             DON VOGEL:  So you lived there from, like,
21   194- -- excuse me, 1955 until '77 -- until 70.
22             KAREN GRISSOM:  Somewhere around there.
23             DON VOGEL:  Okay.  So you lived there for
24   quite some time.  Um, so she ident- --- she told you her
25   name was Sheri Snow, and then you were kind of puzzled.

Karen Grissom    -    10/26/2013

1   And what was her maiden name, again.

2          KAREN GRISSOM:  Smoch.

3          DON VOGEL:  Do you know how to spell that.

4          KAREN GRISSOM:  S-m-o-c-h or k.

5          DON VOGEL:  Okay.  Had you known her growing

6   up.

7          KAREN GRISSOM:  Growing up, yes.  We just

8   lived a few blocks away from her.

9          DON VOGEL:  Were you friends, or did you just

10  kind of know each other.

11         KAREN GRISSOM:  We were friends.  I would go

12  over to her mother -- to her house and -- and we would

13  play.

14         DON VOGEL:  Okay.

15         KAREN GRISSOM:  We were a different age.

16         DON VOGEL:  Okay.  So after she introduced

17  herself and kind of figured out who everybody was, what

18  happened.

19         KAREN GRISSOM:  Um, she -- and then I said,

20  well, what do you do?  She said, well, I used to be a

21  teacher.  I was a teacher.  I went to BYU, she said.

22  And I think that is where she said she met her husband,

23  and he is a federal judge.

24         DON VOGEL:  Okay.

25         KAREN GRISSOM:  Snow.

Case 2:07-cv-02513-GMS Document 1175-6 Filed 05/22/15 Page 12 of 31
Case 15-15746, 08/13/2015, ID: 9646966, DktEntry: 6-1, Page 368 of 434

Page 11

Karen Grissom    -    10/26/2013

1          DON VOGEL:  Did she say his first name.

2          KAREN GRISSOM:  I don't think so.

3          DON VOGEL:  Okay.  Did you know he was a

4  federal judge before that, or did she --

5          KAREN GRISSOM:  No.

6          DON VOGEL:  -- offer that to you.

7          KAREN GRISSOM:  No.  She brought that up.

8          DON VOGEL:  Okay.  What happened next.

9          KAREN GRISSOM:  And, ah -- and, oh -- and I

10  said, oh, he is the one that is after Joe, the sheriff.

11  Oh, yes, he is.

12          DON VOGEL:  Now, you said, "after Joe, the

13  sheriff."  What did you mean by that.

14          KAREN GRISSOM:  Um, what I meant is, he is

15  the judge on the -- on the -- on the case that --

16          DON VOGEL:  Okay.

17          KAREN GRISSOM:  -- that he had a lawsuit.

18          DON VOGEL:  Okay.

19          KAREN GRISSOM:  I've seen it on T- -- on --

20  on the news.  That is all I knew.

21          DON VOGEL:  Okay.  Now, did you remember

22  if -- if she said he is the one after Joe, or he is the

23  one that is on the case involving Joe, or don't you

24  remember.

25          KAREN GRISSOM:  I think it was probably

Case 2:07-cv-02513-GMS Document 1117-6 Filed 05/22/15 Page 13 of 31
Case: 15-18446, 08/13/2015, ID: 9648960, DktEntry: 6, Page 369 of 424

Page 12

Karen Grissom    -    10/26/2013

```
 1   after.
 2           DON VOGEL:  Okay.
 3           KAREN GRISSOM:  Not that...
 4           DON VOGEL:  Okay.  Um, now, were you
 5   following that case in the news, or was it just
 6   something that you would see from --
 7           KAREN GRISSOM:  It is just --
 8           DON VOGEL:  -- time to time.
 9           KAREN GRISSOM:  -- I had seen on the news.
10           DON VOGEL:  Okay.  So it wasn't something you
11   watched for on --
12           KAREN GRISSOM:  Because I like --
13           DON VOGEL:  -- the news every night.
14           KAREN GRISSOM:  -- Joe, and I don't -- I
15   didn't like the way he, you know, has been treated, you
16   know.
17           DON VOGEL:  Okay.
18           KAREN GRISSOM:  And, ah -- and then she
19   started, yeah, my husband, um, doesn't like him.  He
20   wants him out of the -- out of his office.  And he --
21   anything he can do to get him out of the office.
22           DON VOGEL:  Okay.  Um, how did you respond to
23   that.
24           KAREN GRISSOM:  I didn't respond to anything
25   to it, because I didn't want to voice my opinion about
```

Karen Grissom    -    10/26/2013

```
 1   it.
 2             DON VOGEL:  Okay.  Now, do you think your
 3   husband heard that comment that you made.
 4             KAREN GRISSOM:  Yes, he did.
 5             DON VOGEL:  Did your son hear it.
 6             KAREN GRISSOM:  I don't know.
 7             DON VOGEL:  Okay.
 8             KAREN GRISSOM:  I didn't -- I haven't never
 9   talked to him --
10             DON VOGEL:  Okay.
11             KAREN GRISSOM:  -- about it.
12             DON VOGEL:  Was there any reason that your
13   son wouldn't have heard it?  Was he on the phone?  Was
14   he talking to somebody else?
15             KAREN GRISSOM:  Um, probably -- he probably
16   would have heard it if --
17             DON VOGEL:  Okay.  So he was there and
18   present for the conversation.
19             KAREN GRISSOM:  Yes.
20             DON VOGEL:  Okay.  Um.
21             KAREN GRISSOM:  At the time, I think he was
22   living with us.
23             DON VOGEL:  Okay.  Do you remember why he was
24   living with you.
25             KAREN GRISSOM:  His wife kicked him out.
```

Case 2:15-cv-02503-GMS  Document 64-5  Filed 05/22/15  Page 371 of 434

1          DON VOGEL:  Okay.  So is he back together.

2          KAREN GRISSOM:  No.

3          DON VOGEL:  Didn't work out.

4          KAREN GRISSOM:  No.

5          DON VOGEL:  I'm sorry.

6          KAREN GRISSOM:  They are divorced now.

7          DON VOGEL:  Okay.  Um, what does your son do

8   in Oxnard.

9          KAREN GRISSOM:  He, ah, worked for a company.

10  He is a project manager.  They -- he is over the crew

11  that takes care of the streets down by the ocean from

12  the streets on the --

13         DON VOGEL:  Okay.  So he works for the city.

14         KAREN GRISSOM:  No.  It is a contract job.

15         DON VOGEL:  Okay.

16         KAREN GRISSOM:  Because I don't know the

17  company.

18         DON VOGEL:  Okay.  Um, so she said that --

19  that her husband wanted Joe out of office.

20         KAREN GRISSOM:  M'hum.

21         DON VOGEL:  What happened next.

22         KAREN GRISSOM:  Oh, we just talked, and she

23  talked about her daughter going to -- leaving for BYU

24  when school starts.  And that is pretty much the

25  conversation.

Case 2:07-cv-02513-GMS   Document 1117-6   Filed 05/22/15   Page 16 of 31
Case: 15-15440, 08/13/2015, ID: 9646966, DktEntry: 6, Page 382 of 434

Page 15

Karen Grissom        -        10/26/2013

1            DON VOGEL:  Was anybody with her.

2            KAREN GRISSOM:  She had one of her -- one of

3   her daughters with her.

4            DON VOGEL:  Do you remember which one.

5            KAREN GRISSOM:  No.

6            DON VOGEL:  Can you describe her for me?

7            KAREN GRISSOM:  Kind of sandy blonde hair.

8            DON VOGEL:  How old.

9            KAREN GRISSOM:  Oh, in her 20s, maybe not

10  even that.

11            DON VOGEL:  Okay.

12            KAREN GRISSOM:  Probably just out of high

13  school or that.

14            DON VOGEL:  Okay.  Can you describe Sheri for

15  me?

16            KAREN GRISSOM:  She had short hair.

17            DON VOGEL:  Okay.  Is she -- is she white,

18  Hispanic?

19            KAREN GRISSOM:  She is white.

20            DON VOGEL:  Okay.  So she is a white female.

21            KAREN GRISSOM:  M'hum.

22            DON VOGEL:  About how old.

23            KAREN GRISSOM:  She is probably about 55, 56.

24            DON VOGEL:  Okay.  About how tall.

25            KAREN GRISSOM:  Oh, she is probably about 5'

Desert Hills Reporting, Inc.
602.999.3223

Case 2:07-cv-02513-GMS   Document 1117-6   Filed 05/22/15   Page 17 of 31
Case: 15-16440, 08/13/2015, ID: 9646961, DktEntry: 6, Page 386 of 424

Page 16

Karen Grissom   -   10/26/2013

```
 1   9", 5' 10".

 2              DON VOGEL:  And is she heavy?  Is she thin.

 3              KAREN GRISSOM:  She is -- she is thin.

 4              DON VOGEL:  Okay.  And what color hair.

 5              KAREN GRISSOM:  It looked like a -- it wasn't

 6   quite blonde, but it was -- it had blonde streaks in it.

 7   Sandy blonde or --

 8              DON VOGEL:  Was the rest of it lighter, the

 9   part that didn't have blonde streaks.

10              KAREN GRISSOM:  Yeah, it was darker.

11              DON VOGEL:  What color would you say the --

12   if you had to tell me what color hair she had, what

13   color hair did she have.

14              KAREN GRISSOM:  Ah, light brown.

15              DON VOGEL:  Okay.  Um, and did she have any

16   distinguishing characteristics about her.

17              KAREN GRISSOM:  No.

18              DON VOGEL:  Okay.  Do you remember what color

19   shirt she was wearing.

20              KAREN GRISSOM:  No.

21              DON VOGEL:  Um.

22              KAREN GRISSOM:  She had a white dog with her.

23              DON VOGEL:  She had a -- what kind of dog.

24              KAREN GRISSOM:  Um, probably a, I don't know,

25   a lab short -- real short hair.
```

Karen Grissom    -    10/26/2013

1            DON VOGEL:  Big dog or little dog.

2            KAREN GRISSOM:  It was a big dog.  They had

3  it outside.

4            DON VOGEL:  Okay.  Was anybody outside

5  watching the dog.

6            KAREN GRISSOM:  Another daughter, I believe.

7            DON VOGEL:  Okay.

8            KAREN GRISSOM:  Or it was -- you know, I

9  think another daughter was outside.

10           DON VOGEL:  Okay.  And the daughter that was

11  in was also a white female.

12           KAREN GRISSOM:  Yes.

13           DON VOGEL:  And she was how old, did you say?

14           KAREN GRISSOM:  Oh, probably in her 20s.  I

15  don't --

16           DON VOGEL:  Mid, early, late?

17           KAREN GRISSOM:  Mid 20s, early 20s.

18           DON VOGEL:  Do you remember what color hair.

19           KAREN GRISSOM:  She had -- I think she had

20  long hair.  It is was blonde.

21           DON VOGEL:  Okay.  Any -- um, about how tall?

22           KAREN GRISSOM:  About same tall -- height as

23  her mother.

24           DON VOGEL:  And was she thin, heavy --

25           KAREN GRISSOM:  Thin.

Case 2:07-cv-02513-GMS Document 1117-6 Filed 05/22/15 Page 19 of 31
Case: 15-16440, 08/13/2015, ID: 9646966, DktEntry: 6, Page 365 of 424

Page 18

Karen Grissom    -    10/26/2013

```
 1          DON VOGEL:  Okay.  Do you remember what
 2  color -- what clothing she had on.
 3          KAREN GRISSOM:  No.
 4          DON VOGEL:  Did she say anything in the
 5  conversation.
 6          KAREN GRISSOM:  No, I don't think so.
 7          DON VOGEL:  Was she close enough to the table
 8  to hear what was going on.
 9          KAREN GRISSOM:  She was, ah, kind of back.
10  She probably would have --
11          DON VOGEL:  Okay.
12          KAREN GRISSOM:  -- was there.
13          DON VOGEL:  Would it surprise you if, with
14  the activity in the restaurant, based on her position,
15  if we asked her if she heard this comment, would you
16  expect her to be able to have heard it, or would you be
17  surprised if she said she didn't hear it.
18          KAREN GRISSOM:  I would be surprised if he
19  didn't hear it.
20          DON VOGEL:  Okay.  Did -- when she said that
21  comment was there a lot of emotion behind it?  Was she
22  making any faces or anything.
23          KAREN GRISSOM:  No, uh-uh.  Just like that
24  was just her -- she just was, ah, talking with us, you
25  know, about him and --
```

Karen Grissom    -    10/26/2013

```
1              DON VOGEL:  Kind of matter of factly.
2              KAREN GRISSOM:  Kind of bragging about her
3    husband.
4              DON VOGEL:  Bragging about her husband.
5              KAREN GRISSOM:  Yes.
6              DON VOGEL:  Okay.
7              KAREN GRISSOM:  That he was a judge.
8              DON VOGEL:  Okay.  Um, would you have any
9    problems responding to a subpoena if you were issued a
10   subpoena to talk about this.
11             KAREN GRISSOM:  No.
12             DON VOGEL:  Okay.  Um, and something I want
13   to ask you, and, obviously, you know this is being
14   taped.  It is very important, um, I certainly would
15   never ask you to keep any secrets from your husband, but
16   I -- but I would like you to not tell him about the
17   content of what we talked about.  Certainly, you are
18   going to tell him I was here.
19             KAREN GRISSOM:  Yes.
20             DON VOGEL:  Certainly, you are going to tell
21   him it was about this situation in the restaurant.  But
22   if you could not go into specifics about what we talked
23   about, I think that would be best.
24             KAREN GRISSOM:  Yeah.
25             DON VOGEL:  And then, um, as well with your
```

Case 2:07-cv-02513-GMS Document 1975 Filed 05/22/15 Page 314 of 431
Case 2:16-cv-04418-GMS Document 16-46906 Filed 05/22/15 Page 314 of 431
Page 20

Karen Grissom    -    10/26/2013

1  son.  Maybe not even contact your son about this.  Let

2  us contact him.

3          KAREN GRISSOM:  I haven't done anything, even

4  my sister.

5          DON VOGEL:  Okay.  Um, that is my next

6  question.  Who else have you told about this.

7          KAREN GRISSOM:  Just -- just between my

8  husband and I.  That is all.

9          DON VOGEL:  Now, did you make an entry on a

10  Facebook page about this.

11          KAREN GRISSOM:  Yes.

12          DON VOGEL:  Okay.  When did you do that.

13          KAREN GRISSOM:  Oh, it was just --

14          DON VOGEL:  How long after the incident.

15          KAREN GRISSOM:  It has been a while.

16          DON VOGEL:  Why did -- what prompted you to

17  make the entry into the Facebook page.

18          KAREN GRISSOM:  It was after, ah, some ruling

19  that -- in court about something being dismissed and

20  not -- had to do with immigration.  It was -- I don't

21  remember.  But it just bothered me all the time that

22  when -- after she had said that and then knowing that he

23  was the federal judge on the case.  And for her to say

24  that, because she wouldn't be saying that unless her

25  husband was talking about it.

Case 2:07-cv-02513-GMS Document 1176 Filed 05/22/15 Page 32 of 31
Case 2:15-14540 08/13/2015 ID: 9648966 DktEntry: 6-1 Page 304 of 424

Page 21

Karen Grissom    -    10/26/2013

```
 1            DON VOGEL:  Okay.

 2            KAREN GRISSOM:  And things like that, we were

 3  always brought up to, if there is a problem, you tell

 4  the truth, and, you know, you tell somebody.

 5            DON VOGEL:  Okay.  So when you made that

 6  Facebook entry, it was as a result --

 7            KAREN GRISSOM:  It was of concern.  It was a

 8  big concern.

 9            DON VOGEL:  Because of you were following

10  some different rulings by the Court from -- did you ever

11  go down to court and watch it --

12            KAREN GRISSOM:  No.

13            DON VOGEL:  -- or did you just see it on TV.

14            KAREN GRISSOM:  No, just news.

15            DON VOGEL:  So you saw it on TV, and then

16  because of the particular ruling that was -- I'm

17  assuming was that adverse to Sheriff Arpaio?

18            KAREN GRISSOM:  M'hum.  I messaged him

19  personally on because -- Facebook, because I didn't want

20  it to be publicized.

21            DON VOGEL:  Okay.  So that entry was to him

22  as a personal message.

23            KAREN GRISSOM:  Yes.

24            DON VOGEL:  It wasn't out for the world to

25  see.
```

Karen Grissom    -    10/26/2013

```
 1              KAREN GRISSOM:  No.  No, it wasn't.
 2              DON VOGEL:  Have you been contacted by
 3   anybody at all prior to me.
 4              KAREN GRISSOM:  No.
 5              DON VOGEL:  Okay.  Mr. Casey spoke with
 6   you --
 7              KAREN GRISSOM:  Yes --
 8              DON VOGEL:  -- by telephone about --
 9              KAREN GRISSOM:  -- Mr. Casey.
10              DON VOGEL:  -- this.  Any -- anyone other
11   than myself or Mr. Casey --
12              KAREN GRISSOM:  No.
13              DON VOGEL:  -- speak with you.
14              If I -- okay.  Have you made any other
15   special messages to Sheriff Arpaio?
16              KAREN GRISSOM:  No.
17              DON VOGEL:  Okay.  Have you made any phone
18   calls to him.
19              KAREN GRISSOM:  No.
20              DON VOGEL:  Have you ever met him.
21              KAREN GRISSOM:  No.
22              DON VOGEL:  Do you have any relationship with
23   him at all.
24              KAREN GRISSOM:  No.
25              DON VOGEL:  Does your husband or your son
```

Case 2:07-cv-02513-GMS Document 1765-6 Filed 05/22/15 Page 344 of 431
Case 2:07-cv-02513-GMS Document 646-66 Filed 07/2/15 Page 380 of 434

Page 23

Karen Grissom    -    10/26/2013

1  have any relationship with him.

2          KAREN GRISSOM:  No.

3          DON VOGEL:  Is there any reason that you

4  would be making a false statement about this.

5          KAREN GRISSOM:  No.

6          DON VOGEL:  Have you ever been in trouble.

7          KAREN GRISSOM:  No.

8          DON VOGEL:  Have you ever been arrested.

9          KAREN GRISSOM:  No.

10          DON VOGEL:  No criminal convictions.

11          KAREN GRISSOM:  No.

12          DON VOGEL:  How about your husband or your

13  son.

14          KAREN GRISSOM:  No.

15          DON VOGEL:  Okay.  Before I leave, could I

16  get a cell phone number from your son.

17          KAREN GRISSOM:  Um, my phone is not working

18  right now.

19          DON VOGEL:  No -- oh, so you can't get it off

20  your phone?

21          KAREN GRISSOM:  It has something to do with

22  iCloud and passwords.  It is an Apple phone.  I don't

23  know, it is --

24          DON VOGEL:  If you want, I've been through

25  that within the last few days.

Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Civil Action No. 07-2513-PHX-GMS
Judge G. Murray Snow

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) | |
| Plaintiffs, | ) | CV 07-2513-PHX-GMS |
| v. | ) | |
| Joseph M. Arpaio, et al., Defendants. | ) | |
| | ) | The Hon. G. Murray Snow, *Judge Presiding*. |

## DECLARATION OF RONALD D. ROTUNDA

I, RONALD D. ROTUNDA, declare as follows:

### I.   INTRODUCTION

1. My name is Ronald D. Rotunda.  I am currently the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University School of Law in Orange, California, where I teach courses in Legal Ethics and Constitutional Law. Attached, as Exhibit A is a copy of my current resume.

2. Except where otherwise noted, I make this declaration based on my personal knowledge and if called upon as a witness, I could and would testify competently to its contents.

1.

- 2 -

## II.  QUALIFICATIONS

3.  Before I joined Chapman U. in August 2008, I was the George Mason University Foundation Professor of Law from August 2002 (when I started teaching at George Mason University School of Law), until August 2006, when I became University Professor and Professor of Law at George Mason University School of Law.  Please see my resume, Exhibit 1, for more information, including a list of my publications.

4.  Prior to that (from 1993 until 2002), I was the Albert E. Jenner, Jr. Professor of Law at the University of Illinois.  I left the University of Illinois in 2002, and then began working full-time at George Mason University.

5.  I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.  During the course of my legal career, I have practiced law in Illinois, New York, Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee.

6.  I am the co-author of PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including ROTUNDA & DZIENKOWSKI, LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA/Thompson, 2014).

7.  In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume.  State and federal courts at every level have cited my treatises and articles over 1000

- 3 -

times. From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

8. In 2000, the University of Chicago Press published a lengthy study that sought to determine the influence, productivity, and reputations of law professors over the last several decades. That study ranked me as the 17th highest in the nation. *See Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000).

9. The 2002-2003 New Educational Quality Ranking of U.S. Law Schools (EQR) ranked me the 11th most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml . I was selected the Best Lawyer in Washington, DC, in 2009 in Ethics and Professional Responsibility Law, as published in the November 2008 in the Washington Post in association with the Legal Times. I was also selected as one of the Best Lawyers in Southern California, in 2010 in Ethics and Professional Responsibility Law, and yet again in 2011, 2012, 2013, 2014, as published in the Los Angeles Times, in association with American Law Media.

10. I am a member of the bars of New York, Illinois, Washington, D.C., the Second Circuit, Seventh Circuit, the D.C. Circuit, the Fourth Circuit, the Central District of Illinois, D.C. District Court, and the U.S. Supreme Court.

11. Over the years, I have spoken at various ABA conferences on legal ethics and was a featured speaker on an ABA videotape series on legal ethics. I am a former —

- Member of the Bar Admissions Committee of the Association of American Law Schools;
- Chair of the Section on Professional Responsibility of the Association of American Law Schools;
- Member of the ABA Standing Committee on Professional Discipline (1991-1997);

- 4 -

- Chair of the ABA Subcommittee on Model Rules Review (1992-1997); member of the Consultant Group of the American Law Institute's Restatement of the Law Governing Lawyers.
- Member of the Advisory Council to Ethics 2000, the ABA Commission that proposed revisions to the ABA Model Rules of Professional Conduct (1998-2000).
- Liaison to the ABA Standing Committee on Ethics and Professional Responsibility (1994-1997).

12. Since 1994, I have been a member of the Publications Board of the A.B.A. Center for Professional Responsibility. I am a Life Fellow of the American Bar Foundation and the Illinois Bar Foundation, and a former consultant to the Administrative Conference of the United States on various issues relating to legal ethics.

13. During May 1996, I was the Consultant to the Chamber of Advocates of the Czech Republic: under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for lawyers in the Czech Republic. I also wrote the original draft of the first Czech Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of that Court to create an independent judiciary.

14. During November-December, 2002, I was Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law in, Leuven, Belgium.

15. In May 2004, and December 2005, I was visiting lecturer at the Institute of Law and Economics, Institut für Recht und Ökonomik, at the University of Hamburg.

16. During July 2007, I was in Latvia where I conferred with various judges from the Baltic States on judicial ethics, under the auspices of the U.S. Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. A copy of my curriculum vitae is attached.

### III.  DOCUMENTS

- 5 -

17. I have reviewed the followings documents in connection with this matter. It appears that

the judge is getting most of his "information" from articles of the Phoenix New Times:

    a. http://blogs.phoenixnewtimes.com/valleyfever/2015/04/judge_murray_snow_joe_arpaio_contempt_trial.php

    b. http://blogs.phoenixnewtimes.com/valleyfever/2015/04/arpaio_cops_to_investigating_federal_judge_judges_wife_confirming_new_times.php ("judge's spouse allegedly made at a restaurant, to the effect that Judge Snow wanted to 'make sure' Arpaio's not re-elected")

    c. http://blogs.phoenixnewtimes.com/valleyfever/2015/04/arpaios_chief_deputy_confirms_wack_investigations_of_judges_wife_cia_doj_et.php ("I know Judge Snow's wife, she told me he hates you and wants to see you out of office.")

    d. Order re evidentiary hearing of 4/27/2015; MEO re Day 4 evidentiary hearing

    e. Transcripts of Evidentiary Hearing of 4/21/2015; 4/22/2015;/ 4/23/2015; 4/24/2015

## IV. SUMMARY OF THE FACTS

18. On April 22, 2015, and on April 23, 2015, Judge Snow conducted a cross examination of

Sheriff Arpaio. Judge Snow quickly learned that Sheriff Arpaio was not investigating the

judge (Evidentiary Hearing, 4/23/2015, p. 648, l. 14.) Instead, the judge was interested in

learning all he could about an email that Sheriff Arpaio received from "someone named

Grissom," who met the judge's wife in a restaurant." (Evidentiary Hearing, 4/23/2015, p.

654-55.). Mr. Grisson heard the judge's wife say that "Judge Snow wanted to do

everything to make sure I'm [Sheriff Arpaio] not elected." (Evidentiary Hearing,

4/23/2015, p. 655, ll. 19-20.)

19. Sheriff Arpaio wanted to confirm that Mr. Grisson's statement was actually true. The

judge then asked Sheriff Arpaio various leading questions (indicating that the judge was

cross-examining the witness). Q is Judge; A. is Sheriff

    Q.    *Okay. And so you turned that over to your counsel and counsel hired a private investigator,* and what did the investigator do?

    A.    He investigated it.

- 6 -

> Q. And what was the result of the investigation?
>
> A. Results were that *he confirmed that your wife was in that restaurant* and con -- I guess *talked to the witnesses, three or four, that confirm that remark was made.* [Evidentiary Hearing, 4/23/2015, p. 655, ll. 5-12(emphasis added)]

20. The *judge apparently engaged in his own investigation of facts outside the courtroom* he thought relevant that were not in evidence. (Evidentiary Hearing, 4/23/2015, at p. 657, l. 25 & p. 658, ll. 1-2.) The judge said, "I *was told* [during the luncheon break] that you also have various sources of funding within the MSCO," and Sheriff Arpaio responded that the judge's information was false. [Emphasis added.] The judge did not say who told him this false information, nor does he say if he questioned others as well.

21. Later, the *judge* said, "Well, so he found information that the DOJ [Department of Justice] had sent a communication to my computer?" Evidentiary Hearing of 4/24/2015, at p. 1000, ll. 19-20. Note that this is a leading question, to which the witness (Sheridan) responds, "Something to that effect, yes."

22. Shortly thereafter, Mr. Sheridan said that he did not think the evidence of this email showed "collusion," to which the judge promptly replied, "Well, I certainly agree with that . . . ." Evidentiary Hearing of 4/24/2015, at p. 1002, l.3.

23. The judge appears to be taking evidence outside of court (See ¶ 20), asking leading questions (e.g. ¶ 21), and giving his own testimony (¶ 22).

24. The judge also becomes argumentative. He tells Mr. Sheridan that he did not have to hire Mr. Montgomery as a "confidential" consultant — "Well, but what was he doing that needed to be confidential for?" The witness tries to answer, but the judge *interrupted* the witness, preventing him from finishing his sentence. Then the judge argues that there

- 7 -

was no need for confidentiality because the consultant was not a mole infiltrating organized crime. The witness responds that the investigation was confidential because it concerns the CIA breaching personal information at least 50,000 American citizens, including "citizens that lived here in Maricopa County." However, the judge became more argumentative, telling the witness, "I still don't understand" why such a witness should be called "confidential," even though the witness informed the judge that this informant qualified as "confidential" under the *written* rules of the operations manual. Evidentiary Hearing of 4/24/2015, at pp. 1005-0116.

25. I am told that Judge Snow is now ordering that documents showing communications with or referring to Larry Klayman, the lawyer for Mr. Montgomery, be turned over to him, including documents covered at least by the Attorney Work Product Privilege.

    **a.**  Mr. Klayman and Mr. Montgomery are not parties to this case;
    **b.**  No party has issued subpoenas for any of these documents;
    **c.**  I am advised that the documents are confidential and within the Attorney Client and/or Work Product Privileges.

26. In the judge's order of April 27, he states that he ordered the "MCSO defendants to *immediately disclose* certain materials discussed in the Court's colloquy Sheriff Arpaio." [Emphasis added.] The judge states, "Attorney review for privilege was conducted contemporaneously with this production . . . ." I have been advised that this is not true.

## V.   CONCLUSION

27. We know that several people report that the judge's wife said that her husband, Judge Snow, "Judge Snow wanted to do everything to make sure [that Sheriff Arpaio is] not elected." It should be quite obvious that whatever the duties of a federal judge are, that job description does not include conducting a judicial proceeding in a way to insure that

- 8 -

Sheriff Arpaio is not elected and to pursue an investigation that is even broader than that for what appears to be personal reasons.

28. Moreover, we also know that in the several days of hearing, the judge —

    **a.** asked leading questions,
    **b.** gave his own version of the facts,
    **c.** conducted his own investigation outside the courtroom,
    **d.** argued with witnesses, and
    **e.** was extremely interested in what evidence existed concerning the statement he made to his wife that he would do all that he could to make sure that Sheriff Arpaio is not elected.

29. Under these set of facts, the judge should be disqualified because of his personal bias or prejudice against a party, Sheriff Arpaio. See 28 U.S.C. §144. This section has no provision for any waiver.

30. The judge should also be disqualified pursuant to 28 U.S.C. §455(b)(1) ("personal bias or prejudice concerning a party" *or* "personal knowledge of disputed evidentiary facts concerning the proceeding." Section 455(e) allows for waiver of some disqualifications but does not allow any waiver for any disqualification under §455(b). 28 U.S.C 144 is also implicated here.

31. I declare under penalty of perjury that the foregoing is true and correct and that I signed this declaration on 6 May 2015, in Orange, California.

                                                 RONALD D. ROTUNDA

Attachment A

RONALD D. ROTUNDA
Email: rrotunda@chapman.edu

April 27, 2015
Home Page 🏠 http://www1.chapman.edu/~rrotunda

**Office Address:**

>Chapman University
>Dale E. Fowler School of Law
>Room 406
>One University Drive
>Orange, CA 92866-1005
>☎: (714) 628-2698
>Fax: (714) 628-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

- 2 -

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:**      HARVARD LAW SCHOOL     (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:**    HARVARD COLLEGE     (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000). Best teacher selected by George Mason U. Law School Graduating Class of 2003.

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times*, picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

### LIST OF PUBLICATIONS:

## BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

MODERN CONSTITUTIONAL LAW: CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM: LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

MODERN CONSTITUTIONAL LAW: CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

THE POLITICS OF LANGUAGE: LIBERALISM AS WORD AND SYMBOL (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

CONSTITUTIONAL LAW: PRINCIPLES AND CASES (West Publishing Co., St. Paul, Minnesota, 1987).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

Ronald D. Rotunda

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

Treatise on Constitutional Law: Substance and Procedure — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차를 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

Ronald D. Rotunda

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

> 2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> 2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

> 2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

Ronald D. Rotunda

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

Ronald D. Rotunda

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

- 14 -                                                                   Ronald D. Rotunda

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY** (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION** (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

 2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

 2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

 2014 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Academic Publishing, St. Paul, Minnesota, 2014).

概論 アメリカの法曹倫理 第3版——事例解説 [**INTRODUCTION TO AMERICAN LEGAL ETHICS**] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson Reuters, Eagan, Minnesota, 2014) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA- Thomson Reuters, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, St. Paul, MN. 12th ed. 2014) (with Thomas D. Morgan & John S. Dzienkowski).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson Reuters, Eagan, Minn., 12th ed. 2014) (a Treatise on legal ethics, jointly published by the ABA and Thomson Reuters) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(unabridged edition).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 11th ed. 2015)(abridged edition).

Ronald D. Rotunda

**ARTICLES:**

*The "Liberal" Label: Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant: Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions: An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74*, 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE: A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

Ronald D. Rotunda

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies: Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases: Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information: The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time: Can the E.R.A. Be Saved*, 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

Ronald D. Rotunda

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

Ronald D. Rotunda

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews: The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism: A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights: A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox: What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

Ronald D. Rotunda

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

Ronald D. Rotunda

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised?*, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319 (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law: An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

Ronald D. Rotunda

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process,* 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act*: *Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

Ronald D. Rotunda

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible*, WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

- 28 -                                    Ronald D. Rotunda

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act,* 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal,* 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege,* 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union,* 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues,* 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts,* 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers,* 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY McBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom,* 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments,* 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice,* in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores,* 32 INDIANA LAW REVIEW 163 (1998).

Ronald D. Rotunda

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers,* 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics,* 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich,* CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?,* WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study,* 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums,* LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts,* WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate,* 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws,* LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers,* THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence,* LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment,* 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention,* CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

Ronald D. Rotunda

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

Ronald D. Rotunda

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

Ronald D. Rotunda

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

Ronald D. Rotunda

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21 LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April 2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203 (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223 (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008, http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

Ronald D. Rotunda

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

Ronald D. Rotunda

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution*, NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

Ronald D. Rotunda

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United,* 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparența Judiciară, Etica Judiciară și o Soluție Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United,* 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?,* REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?,* FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration,* NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit,* FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case,* WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge,* JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs,* ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

Ronald D. Rotunda

*Lessons of Watergate*, 54 Orange County Lawyer 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, National Law Journal, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, The Jerusalem Post, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, New York Post, June 1, 2012.

*ObamaCare Legal Battles Not Over*, Orange County Register, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, Washington Times, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* Orange County Register, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, Washington Times, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in Model, Resource, or Outlier? What Effect Has the U.S. Constitution Had on the Recently Adopted Constitutions of Other Nations?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What did he know, and when did he know it?*', Washington Times, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over*: *This Time Around, Take a Closer Look at America's Bill of Rights*, Wall Street Journal, July 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, Washington Post, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, Wall Street Journal, July 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

Ronald D. Rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata,* 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade,* CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil,* THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial,* WALL STREET JOURNAL, May 2, 2014, at p. A13.

*The Ninth Circuit Departs from Tinker in Upholding Ban on American Flag T-Shirts in School,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 12, 2014, http://verdict.justia.com/2014/05/12/ninth-circuit-departs-tinker-upholding-ban-american-flag-t-shirts-school#sthash.pHSroRA6.dpuf

*Prayers before Meetings of the Town Board of Greece, New York,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, May 19, 2014, http://verdict.justia.com/2014/05/19/prayers-meetings-town-board-greece-new-york#sthash.pIt3d53k.dpuf

*Amending the First Amendment,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 9, 2014, http://verdict.justia.com/2014/06/09/amending-first-amendment

*Increasing Revenue by Lowering Taxes,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, June 23, 2014, http://verdict.justia.com/2014/06/23/increasing-revenue-lowering-taxes

*Changes in the Legal Profession and the Progress of Female Lawyers,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 7, 2014, http://verdict.justia.com/2014/07/07/changes-legal-profession-progress-female-lawyers#sthash.wKzv73e1.dpuf

*Banning the Export of American Oil,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, July 21, 2014, http://verdict.justia.com/2014/07/21/banning-export-american-oil

Ronald D. Rotunda

*Using Facebook as a Discovery Device*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 4, 2014, http://verdict.justia.com/2014/08/04/using-facebook-discovery-device

*Suing the President*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Aug. 18, 2014, http://verdict.justia.com/2014/08/18/suing-president

*IRS Monitoring Religious Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 15, 2014, http://verdict.justia.com/2014/09/15/irs-monitoring-religious-groups

*A Special Counsel to Investigate the IRS Targeting of Tea Party Groups*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Sept. 29, 2014, http://verdict.justia.com/2014/09/29/special-counsel-investigate-irs-targeting-tea-party-groups

*Qualifications for Representatives,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 64-67 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Privileges and Immunities Clause,* in, THE HERITAGE GUIDE TO THE CONSTITUTION 349-54 (Regnery Publishing 2nd ed. 2014)(with David F. Forte).

*Civil Forfeiture in Philadelphia*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 6, 2014, http://verdict.justia.com/2014/10/06/civil-forfeiture-philadelphia

*The Military Commissions Are Still Proceeding*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Oct. 20, 2014, http://verdict.justia.com/2014/10/20/military-commissions-still-proceeding

*Law Firms Creating In-House Ethics Counsel*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 3, 2014, http://verdict.justia.com/2014/11/03/law-firms-creating-house-ethics-counsel

*Targeting Political Speech for the Next Election*, WALL STREET JOURNAL, Nov. 5, 2014, p. A19, http://online.wsj.com/articles/ronald-rotunda-targeting-political-speech-for-the-next-election-1415145765

*The Problem of Inflating Billable Hours*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Nov. 17, 2014, http://verdict.justia.com/2014/11/17/problem-inflating-billable-hours

*The Mystery of Case Assignment in the Ninth Circuit,* VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 1, 2014, http://verdict.justia.com/2014/12/01/mystery-case-assignment-ninth-circuit

Ronald D. Rotunda

*The Ferguson, Missouri, Tragedy and the Future of Eyewitness Identification*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 15, 2014, http://verdict.justia.com/2014/12/15/ferguson-missouri-tragedy-future-eyewitness-identification

*Jonathan Gruber and the Wisdom of Crowds*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Dec. 29, 2014, https://www.facebook.com/ronald.rotunda/posts/10205409160371299?notif_t=like

*The President's Power to Waive the Immigration Laws*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Jan. 12, 2015, http://verdict.justia.com/2015/01/12/presidents-power-waive-immigration-laws

*The House of Representatives Lawsuit against the Executive Branch*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 2, 2015, https://verdict.justia.com/2015/02/02/house-representatives-lawsuit-executive-branch

*Je Suis Charlie Hebdo*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Feb. 16, 2015, https://verdict.justia.com/2015/02/16/je-suis-charlie-hebdo?utm_source=twitter&utm_campaign=wordtwit&utm_medium=web

*Protecting Rights in the Supreme Court*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 3, 2015, https://verdict.justia.com/2015/03/02/protecting-rights-supreme-court

*Lawyers Lying in Negotiations*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, MAR. 16, 2015, HTTPS://VERDICT.JUSTIA.COM/2015/03/16/LAWYERS-LYING-IN-NEGOTIATIONS

*King v. Burwell and the Rise of the Administrative State,* 23 U. MIAMI BUSINESS REV. 267 (2015)

*Hillary's Emails and the Law*, WALL STREET JOURNAL, March 17, 2015

*Is the Federal Government Really a State, if the IRS Says It Is*?, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, Mar. 30, 2015, https://verdict.justia.com/2015/03/30/is-the-federal-government-really-a-state-if-the-irs-says-it-is

*Ignoring the Supreme Court When You Don't Like the Result*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 13, 2015, https://verdict.justia.com/2015/04/13/ignoring-the-supreme-court-when-you-dont-like-the-result

*The Way of Death in the Netherlands, Oregon, and, Perhaps, California*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 27, 2015, https://verdict.justia.com/2015/04/27/the-way-of-death-in-the-netherlands-oregon-and-perhaps-california

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
   CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations

Ronald D. Rotunda

Transitional Authority in Cambodia) and Cambodian political leaders, who were charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

Ronald D. Rotunda

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, Distinguished International Research Fellow at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, Associate Editor of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).