# EXHIBIT 11

1  Timothy J. Casey (#013492)
   James L. Williams (#026402)
2  SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
   1221 East Osborn Road, Suite 105
3  Phoenix, AZ 85014-5540
   Telephone: (602) 277-7000
4  Facsimile:  (602) 277-8663
   timcasey@azbarristers.com
5  Counsel for Defendants Joseph M. Arpaio and
   the Maricopa County Sheriff's Office
6
   Thomas P. Liddy (#019384)
7  MARICOPA COUNTY ATTORNEY'S OFFICE
   Civil Services Division
8  222 N. Central, Suite 1100
   Phoenix, Arizona 85004
9  602-506-8066
   Co-counsel for Defendants Joseph M. Arpaio and
10 the Maricopa County Sheriff's Office

11                **IN THE UNITED STATES DISTRICT COURT**

12                   **FOR THE DISTRICT OF ARIZONA**

13

14  Manuel de Jesus Ortega Melendres, et al.,

                          Plaintiffs,         No. CV 07-02513-PHX-GMS

15  vs.                                       **DEFENDANTS' NOTICE OF WAIVER
                                              ON LIMITED ISSUE**
16  Joseph M. Arpaio, et al.,

17                          Defendants.

18

19        In follow-up to the Status Conference heard this date (Dkt#540), defendants Joseph

20  M. Arpaio ("Arpaio") and the Maricopa County Sheriffs Office ("MCSO") hereby waive any

    and all appeal issues regarding only the Court's potential bias, impartiality, and/or conflict of
21
    interest as set forth in the Court's Order dated June 19, 2012 (Dkt#537).  This waiver is
22
    authorized by Arpaio on his own behalf and on behalf of the MCSO.
23
          Arpaio and MCSO expressly reserve the right to appeal any other issue(s).
24
          DATED this 29th day of June, 2012.
25
                                        SCHMITT SCHNECK SMYTH CASEY & EVEN,
26                                      P.C.

27                                      */S/Timothy J. Casey*
                                        Timothy J. Casey
28                                      James L. Williams

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C
Professional
Corporation

1221 E. Osborn Rd., Suite 105
Phoenix, Arizona 85014
Telephone: (602) 277-7000
Facsimile:(602) 277-8663
timcasey@azbarristers.com
Counsel for Defendants Joseph M. Arpaio and the
Maricopa County Sheriff's Office

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

The Honorable G. Murray Snow
United States District Court
401 West Washington Street,
Phoenix, Arizona 85003-2158

Stanley Young, Esq.
Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, California 94065
Counsel for Plaintiffs

Daniel Pochoda, Esq.
Annie Lai, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Counsel for Plaintiffs

Cecillia Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Counsel for Plaintiffs

Andre Segura, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Counsel for Plaintiffs

Nancy Ramirez, Esq.
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Counsel for Plaintiffs

SCHMITT SCHNECK SMYTH
CASEY & EVEN, P.C.
Professional
Corporation

1406

1  Thomas P. Liddy
   Deputy County Attorneys, Civil Services Division
2  Maricopa County Attorney's Office
   222 N. Central, Suite 1100
3  Phoenix, Arizona 85004
   Co-counsel for Defendants Joseph M. Arpaio and
4  the Maricopa County Sheriff's Office

5
    _/S/Eileen Henry_____
6  Eileen Henry, Paralegal
   SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 12

1    WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Manuel de Jesus Ortega Melendres, et al.,)    No. CV-07-2513-PHX-MHM
                                             )
10                   Plaintiff,              )    **ORDER**
                                             )
11   vs.                                     )
                                             )
12                                           )
     Joseph M. Arpaio, et al.,               )
13                                           )
                     Defendant.              )
14   _____)
                                             )
15

16

17
         Currently pending before the Court is Defendants Sheriff Joseph M. Arpaio, Maricopa
18
     County, and the Maricopa County Sheriff's Office's Motion for Recusal. (Dkt.#63.)  After
19
     reviewing the relevant documents and determining oral argument unnecessary, the Court
20
     issues the following Order.
21
     **I.      PROCEDURAL HISTORY AND FACTUAL BACKGROUND**
22
         Having already issued two substantive Orders in this case (Dkt.##25, 60.), the Court
23
     is intimately familiar with the underlying facts and sees no reason to go through them now
24
     in great detail.  On December 12, 2007, Plaintiffs Manuel de Jesus Ortega Melendres, Jessica
25
     Quitugua Rodriguez, David Rodriguez, Velia Meraz, Manuel Nieto, Jr., and Somos America
26

27

28

1   filed suit—on behalf of themselves and all others similarly situated[1]—against Defendants
2   pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, Title
3   VI of the Civil Rights Act, and Article II, § 8 of the Arizona Constitution alleging racial
4   profiling and unlawful detention of persons of Hispanic appearance and/or descent during
5   Defendants' attempt to enforce federal immigration laws.  On January 3, 2008, Defendants
6   moved to dismiss the Complaint; Plaintiffs subsequently sought leave to amend.
7   (Dkt.##12,17.)  On September 5, 2008, the Court granted leave to amend and denied as moot
8   Defendants' motion to dismiss. (Dkt.#25.)  Thereafter, Defendants renewed their dismissal
9   motion.  On February 10, 2009, after holding oral argument, the Court denied Defendants'
10  renewed motion to dismiss on the merits.  <u>See</u> <u>Melendres v. Arpaio</u>, 598 F. Supp. 2d 1025
11  (D. Ariz. 2009); (Dkt.#60.)  On February 23, 2009, thirteen days after the Court's Order was
12  entered, Defendants moved to recuse the Court under both 28 U.S.C. § 144 and 28 U.S.C.
13  § 455.

14          In support of their Motion for Recusal, Defendants submitted the affidavit of Mr.
15  David Hendershott, Chief of the Maricopa County Sheriff's Office ("MCSO"), as well as
16  supporting exhibits.  Plaintiffs responded in opposition with a declaration from Mr. Aaron
17  Lockwood, an attorney with the law firm of Steptoe and Johnson, along with supporting
18  exhibits. The factual background, as reflected in the filings made by the affiant and declarant,
19  is as follows.

20          The Court has an identical twin sister, Janet Murguia.  Janet Murguia is currently
21  President and CEO of the National Council of La Raza ("NCLR").  NCLR is the largest
22  national Latino civil rights organization in the United States.  Janet Murguia previously
23  served as Deputy Director of Legislative Affairs to President William J. Clinton, and as
24  Executive Vice Chancellor for University Relations of the University of Kansas.
25  Furthermore, one of the Court's older brothers, Ramon Murguia, an attorney in private

---

27  [1]Plaintiffs have filed a "Motion to Certify the Class," and that Motion is currently
28  pending with the Court.  (<u>See</u> Dkt.#93.)

- 2 -

1 practice in Kansas City, Kansas, has also been affiliated with NCLR, having served on the

2 organization's Board of Directors, including a term as its Chairman.

3 Defendants contend that it was not until February 11, 2009—the day after the Court

4 ruled against them in its first potentially dispositive Order—that they became aware of the

5 Court's relationship with her sister and her sister's connection to NCLR. According to

6 Defendants, on February 11, 2009 the *Phoenix Business Journal* published an article entitled,

7 "Federal Court sides with ACLU against Arpaio in round 1 of profiling case." Among other

8 things, this article mentioned that Janet Murguia is "president and CEO of the National

9 Council of La Raza, a leading Hispanic advocacy group." (Dkt.#63, Exhibit 1.) That same

10 day, an online version of the *Phoenix New Times* published an article commenting on the

11 Court's Order. Among other things, the *New Times* article noted that the Court is the "[f]irst

12 Latina judge appointed to the U.S. District Court in Phoenix." (Id. at Exhibit 2.) Similarly,

13 on February 12, 2009, *The Arizona Republic* ran a story in its local section concerning the

14 instant case, in which it discussed the Court's personal background, along with that of her

15 sister. (Id.)

16 Through their affiant, Defendants contend that after these and other media sources

17 publicized the Court's personal background, including her sister's work at NCLR,

18 Defendants were contacted by members of the public—who were apparently looking to

19 express their disappointment with the Court's ruling in the instant case. According to

20 Defendants, it was through these public comments that they were first alerted to the Court's

21 personal history. Defendants also claim public reaction to the Court's February 10, 2009

22 Order was alarming, since, according to Defendants, the public appeared to be more focused

23 on the relationship between the Court and her sister than on the underlying merits of the

24 action. To this end, Defendants have submitted five 'reader comments' that were posted on

25 websites belonging to the *The Arizona Republic* and the *Phoenix Business Journal*. These

26 reader comments were posted alongside online versions of the newspapers' aforementioned

27 February 11, 2009 articles. Defendants contend that these five reader comments typify the

28 sentiments communicated to them by members of the public, and that these selected reader

1   comments underscore what Defendants perceive to be the public's reaction to Court's

2   continued role in this case. Defendants' proffered reader comments include the following:

3   •   "Of course this Judge will let the lawsuit stand. Her sister is the President of

4       La Raza. Can you say CONFLICT OF INTEREST!"

5   •   "They [*The Arizona Republic*] seem to have left out that Judge Murguia is the

6       sister of the head of La Raza. Kind of important fact to leave out, don't you

7       think?"

8   •   "Judge Murguia … is only making her sister's job easier."

9   •   "Wrong is just WRONG…. I would have made the same ruling and MY sister

10      is not connected to La Raza."

11  •   "[Judge] Murguia is the twin sister of Janet Murguia, president and CEO of the

12      National Council of La Raza, a leading Hispanic advocacy group. This judge

13      should be impeached for not recusing herself. Peter Kozinets should be fired

14      by the plaintiffs for tainting their lawsuit by getting a judge with such an

15      obvious conflict of interest to the case. If they ever had a shred of legitimate

16      claim, this blows it away."

17      Defendants additionally claim that while researching the Court's background they

18  came upon a 2004 newspaper article published in the *Kansas City Star*.  This article noted

19  that the Court and Janet Murguia are the youngest of six children, and that the Court and her

20  siblings constitute "one big chain," and "[i]f not for one, the chain would be broken." (See

21  Dkt.#63, ¶ 11.)   The article also describes the relationship between the Court and her

22  identical twin sister as "close," reporting that they "talk constantly," and speak "to each other

23  several times a week." (Id.)

24      Questioning Defendants' factual representations, Plaintiffs responded with their own

25  submission. Specifically, Plaintiffs point out that on December 11, 2007, the day before the

26  instant case was filed, *The Arizona Republic*—which is the State of Arizona's largest daily

27  circulation newspaper—published a front page story detailing the Court's sibling relationship

28  with Janet Murguia.  Because this article contains quotes from Sheriff Arpaio as well as the

- 4 -

1   Maricopa County Attorney, and because the article focused on another high profile federal

2   lawsuit involving many of the same Defendants, Plaintiffs argue that the article contradicts

3   Defendants' stated position that they were unaware of the Court's background until February

4   11, 2009.  (Dkt.#70, Exhibit A.)  Plaintiffs further note that this story was picked up and

5   reported nationally by the Associated Press.  (Id. at Exhibit B.)

6           With respect to Janet Murguia's work with NCLR, Defendants allege that NCLR has

7   continually offered public comments about the facts of this case, including published articles

8   and speeches by Janet Murguia herself.  For example, according to Defendants, NCLR is on

9   record as "strongly oppos[ing] efforts to make state and local police responsible for the

10  enforcement of federal immigration laws." (See id. at Exhibit 7.)  Similarly, according to

11  Defendants, NCLR has issued statements claiming that the local enforcement of federal

12  immigrations laws is "having a serious negative impact on Latino communities," and that

13  "delegation of immigration authority is likely to result in racial profiling, police misconduct,

14  and civil rights violations." (Id. at ¶ 15.)

15          Defendants have also submitted evidence that NCLR has a Phoenix office, and

16  therefore has a direct presence in Maricopa County.  (Id. at ¶ 19.)  Defendants also note that

17  NCLR's website directs individuals who believe that their rights have been violated to

18  contact one of NCLR's affiliate organizations.  Among the organizations listed as affiliates

19  are the American Civil Liberties Union ("ACLU") and the Mexican American Legal Defense

20  and Education Fund ("MALDEF").  Both the ACLU and MALDEF, while not parties to this

21  case, are providing legal representation to the named Plaintiffs.

22          Among the litany of reasons Defendants submit to support their recusal motion, one

23  concerns a recent public awareness campaign launched by NCLR, "We Can Stop the Hate."

24  (See www.wecanstopthehate.org.)    The We Can Stop the Hate campaign contains a

25  prominent picture of Janet Murguia, and links to several of her public speeches.  Specifically,

26  Defendants point to a February 4, 2009 article available on the website. This article addresses

27  actions taken by Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO").

28  Although the actions of Sheriff Arpaio and Maricopa County addressed in the article appear

- 5 -

1  to be unrelated to the instant lawsuit,[2] Defendants point out that disparaging statements

2  directed towards Sheriff Arpaio and MCSO are included in the online publication. Examples

3  of such statements include the following: "[i]n true Arpaio form, his office sent a press

4  release to the media inviting them to this event, proving that he's more interested in drawing

5  attention to himself than actually doing his job." (Dkt.#63, at ¶ 17; Exhibit 9.)  Among an

6  assortment of epithets, Sheriff Arpaio is called "a relentlessly self-promoting caricature of

7  a sheriff (ever closer to 'I'm not a real Sheriff, I just play one on TV' territory), not an actual

8  law enforcement official. The march is yet another stunt to distract people from his

9  incompetent, lawsuit-riddled folly of a department." (Id.)  The article further refers to

10  members of the MCSO as "Arpaio and his thugs." (Id.)

11      The Court notes that after independently reviewing the We Can Stop the Hate

12  campaign's website, it encountered numerous other articles relating to Sheriff Arpaio and the

13  MCSO. For reasons that are altogether unclear, these articles were not made part of

14  Defendants' factual submission.  Interestingly, two such articles directly address the

15  underlying facts of the instant case.  Given the nature of the assertions that Defendants have

16  raised against the Court in their recusal motion, the absence of these highly relevant articles

17  from Defendants' factual submission is somewhat puzzling.  The first article encountered by

18  the Court is dated January 20, 2009 and entitled "Join a Call for an Investigation of Sheriff

19  Arpaio." In this article, NCLR asks members of the public to support a public call for an

20  immediate investigation by the federal government into the legality of the agreement between

21  U.S. Immigration and Customs Enforcement and MCSO, which permits MCSO to work with

22  federal law agencies to aid in the enforcement of federal immigration laws.  This agreement

23

24

---

25      [2]Although the article refers to a "parade" of "hundreds of detained immigrants in shackles through the streets of Phoenix," which seemingly implicates and casts aspersions

26  on Defendants immigration enforcement policy, the thrust of the article is concerned with Sheriff Arpaio's general treatment of detained prisoners, rather than the legality of an

27  immigration detention and whether such detentions were predicated upon constitutional

28  violations. (Id.)

1    is referred to as the "§ 287(g)" agreement.[3]  In the instant lawsuit, Plaintiffs' claim

2    Defendants have violated their civil rights in the course of carrying out their activities under

3    the § 287(g) agreement, and Plaintiffs seek to enjoin Defendants from enforcing federal

4    immigration laws pursuant to the 287(g) agreement.

5        The second article independently encountered by the Court is dated October 22, 2008

6    and is entitled "Sheriff Joe Strikes Again."[4]  In this article, NCLR refers to Sheriff Arpaio

7    as "a man who has made a career of humiliating prisoners, harassing Latinos of every variety,

8    wasting taxpayer dollars with dubious results, and having a less than stellar respect for civil

9    rights and due process." (Id.)   The article goes on to characterize Sheriff Arpaio as

10   "unrepentant, arrogant, and monumentally disingenuous." (Id.)  It also addresses the precise

11   legal and factual issues of the instant lawsuit.  Specifically, this article alleges that Sheriff

12   Arpaio and MCSO deputies have engaged in acts of racial profiling. The article states that

13   "Arpaio claims he does not know what racial profiling is since he can't possibly define

14   something he's never engaged in.  Here's a hint, Joe: the stuff you're doing to Latinos in

15   Arizona—the ACLU noted in July that 'Arpaio has made no secret that he believes physical

16   appearance alone is sufficient reason to stop and question individuals regarding their

17   immigration status'—that's racial profiling." (Id.)

18       Another item in Defendants' factual submission concerns an April 16, 2008 speech

19   by Janet Murguia entitled "Conventional Wisdom." This speech is also available on the We

20   Can Stop the Hate website. (Id. at ¶ 18; Exhibit 10.)  While Janet Murguia's speech refers

21

22       [3]
     See We Can Stop the Hate,

23   http://www.wecanstopthehate.org/site/latest/join_the_call_for_an_investigation_of_sherif

24   f_arpaio (last visited June 1, 2009.)

25       [4]
     See We Can Stop the Hate,

26   http://www.wecanstopthehate.org/site/latest/sheriff_joe_strikes_again (last visited June 1,

27   2009.)

28

1528

to "hate groups and extremists pulling the levers and turning the wheels," these comments were not directed towards any of the Defendants, and no reasonable person could infer that the speech was in any sense about them. In fact, the "Conventional Wisdom" speech, for all practical purposes, appears to be completely unrelated to the instant case, other than the fact that it highlights Janet Murguia and NCLR's involvement in Latino civil rights issues. (Id.)

Lastly, Defendants point to Plaintiff Somos America's website, which lists the organization's political and social interests. (See Dkt.#63, ¶ 21.) Defendants argue that Somos America's website demonstrates that it shares a common ideology with NCLR, and presumably with the Court's sister. Defendants lastly state that Somos America's website contains a link to Janet Murguia's "Conventional Wisdom" speech. (Id.) .

## II.    LEGAL STANDARD

Two statutes govern the recusal of district judges: 28 U.S.C. § 144 and 28 U.S.C. § 455(a)-(b) . Section 144 applies when a party to a proceeding believes that the district judge "has a personal bias or prejudice either against him or in favor of any adverse party[.]" 28 U.S.C. § 144. "Section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit." United States v. Sibla, 624 F.2d 864, 867 (9th Cir. 1980) (citations omitted). Specifically, the statute provides:

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144. When a party files a timely and legally sufficient affidavit pursuant to § 144 that plainly sets forth a compelling case for recusal, the district judge "shall proceed no further therein, but another judge shall be assigned to hear such proceeding." Id.; Sibla, 624 F.2d at 867. However, "if the motion and affidavit required by [§] 144 [are] not presented to the judge, no relief under [§] 144 is available." Sibla, 624 F.2d at 868.

Section 455 has two recusal provisions. The first provision, subsection (a), states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself [or herself]

- 8 -

in any proceeding in which his [or her] impartiality might reasonably be questioned."

28 U.S.C. § 455(a).  Subsection (b) provides that any justice, judge, or magistrate shall also

disqualify themselves under the following situations:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

> * * *

> (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

> * * *

> (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

> * * *

> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

28 U.S.C. § 455.

Unlike section 144, section 455 "sets forth no procedural requirements."  Sibla, 624 F.2d at 867-68.  Instead, that section is directed towards the judge, rather than the parties, and is self-enforcing on the part of the judge.  Id.  Moreover, "section 455 modifies section 144 in requiring the judge to go beyond [a] section 144 affidavit and consider the merits of the [recusal] motion pursuant to section 455[]."  Id. at 868.  The recusal standards under § 144 and § 455 are identical, and decisions interpreting one section are controlling in the interpretation of the other.  Id.

## IV.   DISCUSSION

Because Defendants have moved to recuse the Court under both § 144 and multiple sub-sections of § 455, the Court will address each of these claims in turn.  Before turning to

1530

1   the merits of Defendants' individual contentions, the Court will first address whether

2   Defendant's recusal motion has been timely filed.

3        **A.**     **Whether Defendants' Motion is Untimely**

4       Recusal motions brought under either § 144 and § 455 must be filed in a timely

5   manner. <u>See</u> 28 U.S.C. § 144(a) (motions "must be made in a timely fashion"); <u>Davies v.</u>

6   <u>Commissioner</u>, 68 F.3d 1129, 1131 (9th Cir. 1995) ( motions under § 455 must also "be made

7   in a timely fashion"). The recusal statute "is not intended to give litigants a veto power over

8   sitting judges, or a vehicle for obtaining a judge of their choice." <u>United States v. Cooley</u>,

9   1 F.3d 985, 993 (10th Cir. 1993). Moreover, "where the facts are known before a legal

10  proceeding is held, waiting to file . . . a motion until the court has ruled against a party is

11  untimely." <u>Summers v. Singletary</u>, 119 F.3d 917, 921 (11th Cir. 1997).

12      Plaintiffs contend that the instant motion to recuse is untimely and has been brought

13  in bad faith, since this case was first assigned to the Court in December 2007 and Defendants

14  waited for over a year before moving for recusal. Plaintiffs cite examples where other

15  courts have rejected recusal motions when the delays at issue involved appreciably shorter

16  time periods than here. <u>See e.g.</u>, <u>United States v. Simmons</u>, 1997 U.S. Dist. LEXIS 22658,

17  *17 (E.D. Cal. July 28, 1997) ("foreclos[ing] relief" for a 10-month delay); <u>Singer v.</u>

18  <u>Waldman</u>, 745 F.2d 606, 608 (10th Cir. 1984) (denying a recusal motion filed over one-year

19  after the complaint).

20      Plaintiffs also take issue with Defendants' assertion of prior ignorance regarding the

21  Court's family background. Plaintiffs argue that Defendants' contentions strain all credulity

22  and should be rejected. According to Plaintiffs, the Court's background, including her

23  sister's position with NCLR, was a matter of public record as far back as 2001, when the

24  *Washington Post* printed an article discussing the Court's relationship with her twin sister.

25  Furthermore, Plaintiffs have submitted a December 2007 front page article from *The Arizona*

26  *Republic*, which details the Court's family history, including Janet Murguia's work at NCLR.

27  Notably, Plaintiffs also point to the fact that this article quoted both Sheriff Arpaio and the

28  Maricopa County Attorney at length. Plaintiffs contend that because the article was focused

1    on MCSO's implementation of a controversial and well-known statewide law sanctioning

2    Arizona employers who hire illegal workers, Defendants must have read the article and been

3    aware of its contents. Plaintiffs argue that from the surrounding circumstances one could

4    reasonably infer that Defendants have intentionally held on to this information, and are now

5    seeking to recuse the Court after having lost the first round of substantive briefing. In other

6    words, Plaintiffs have accused Defendants of knowing about the Court's sister and NCLR,

7    and attempting to use this information as a proverbial ace in the hole, to be pulled out and

8    played when it made convenient trial strategy to do so.

9        Plaintiffs also contend that if the Court is unwilling to make a determination that

10   Defendants possessed actual knowledge regarding the Court's background around the time

11   the lawsuit was filed, then Defendants should at least be charged with 'constructive

12   knowledge' of all facts that were readily available and commonly known during that same

13   period of time. See Drake v. Birmingham Bd. of Edu., 476 F. Supp. 2d 1341, 1347 (N.D.

14   Ala. 2007) (rejecting a recusal motion on timeliness ground where a party could have

15   discovered through reasonable diligence that the judge was a deacon in the same church as

16   plaintiff and her husband). This would, of course, include knowledge that the Court has a

17   twin sister who serves as President and CEO of NCLR.

18       In their reply brief, Defendants adamantly deny that they intentionally waited to file

19   their recusal motion until after the Court had ruled against them on their renewed motion to

20   dismiss. Instead, Defendants claim that they were genuinely unaware of the Court's

21   background during the early stages of the litigation. According to Defendants, the Court's

22   February 10, 2009 ruling is relevant to the timing of their recusal motion only insofar as the

23   Order was the catalyst for local and national media reporting, after which members of the

24   public allegedly began to contact Defendants' offices. Defendants claim that, in actuality,

25   their recusal motion was brought within days of discovering the Court's relationship with her

26   sister. According to Defendants, the Court's Order played little role in the timing of their

27   motion because they were not expecting to win the motion anyway. As Defendants note,

28   there is nothing particularly unusual about a district court denying a motion to dismiss

- 11 -

1   brought under Fed. R. Civ. P. 12(b)(6), particularly when the facts are heavily disputed, as

2   they are here.  Defendants invoke the Ninth Circuit holding that "[i]t is axiomatic that the

3   motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."

4   See Gilligan v. Jamco Dev. Corp., 108 F.3d 246 (9th Cir. 1997).

5          The Court finds that serious questions exist as to the veracity of the representations

6   made by Defendants, their affiant, and defense counsel as to whether Defendants were aware

7   of the Court's relationship with her twin sister prior to the February 10, 2009 Order.  The

8   Court agrees with Plaintiffs that the timing of Defendants' motion was bound to raise

9   significant questions as to whether the filing constitutes a bad faith litigation tactic,

10  particularly in light of the December 2007 front page article in *The Arizona Republic*, which

11  discussed the Court's personal history and includes quotes from a key Defendant and

12  counsel.  The Court further agrees that under the circumstances it seems implausible that

13  Defendants were unaware of the Court's sister's role at NCLR, and were not at least on

14  notice that there might be a familial relationship between Janet Murguia and the Court.

15  Indeed, Defendants' own arguments themselves undermine their claim to reasonable

16  ignorance.  Noting that the standard for recusal under 28 U.S.C. § 455(a) is applied by

17  considering "a reasonable person with knowledge of all the facts," Taylor v. Regents of

18  Univ. of Cal., 993 F.2d 710, 712 (9th Cir. 1993), cert. denied, 510 U.S. 1076 (1994),

19  Defendants argue that such a reasonable person would know about Janet Murguia and the

20  activities and interests of NCLR and would question the Court's impartiality based upon that

21  knowledge.  At the same time, Defendants assert that they themselves were not aware that

22  the Court had a twin sister who is the President and CEO of NCLR until some 15 months into

23  the litigation.  Effectively, then, Defendants ask this Court to find that they were less aware

24  of the relevant facts than a "reasonable person" would have been.  This strains credulity,

25  especially in light of the public record described earlier and the Defendants' participation in

26  the public debate surrounding the issues that underlie this case.  Nevertheless, there is no

27  direct evidence conclusively demonstrating that Defendants or their counsel have made a

28

1    factual misrepresentation to the Court— notwithstanding the improbability of Defendants'

2    claims.

3         Overall, the law supports the denial of Defendants' recusal motion as untimely.

4    However, because the Court must abide by an unwavering commitment to the perception of

5    fairness in the judicial process, it will not deny the petition on the basis of timeliness and will

6    instead address the substantive questions raised by the request for recusal.

7    **B.     Whether The Court Is Actually Biased Against Defendants Under §
         455(b)(1)**

8

9         Defendants' first substantive argument is that, pursuant to § 455(b)(1), the Court is

10   actually and personally biased against Defendants.  The moving party carries a "substantial

11   burden" of overcoming the presumption that a district court is free from bias.  United States

12   v. Denton, 434 F.3d 1104, 1111 (8th Cir. 2006).  Under § 455(b)(1), actual bias is defined

13   as "a personal animus or malice that the judge harbors against [a party] of a kind that a fair-

14   minded person could not entirely set aside when judging certain persons or causes." Hook

15   v. McDade, 89 F.3d 350, 355 (7th Cir. 1996).  Recusal for actual bias is required only if the

16   moving party can prove by "compelling evidence" that "a reasonable person would be

17   convinced the judge was biased." Id.

18        Defendants set forth their bias argument by asserting, without reference to any

19   evidence whatsoever, that the Court "has a natural, personal bias in favor of Plaintiffs, as well

20   as [a] corresponding, natural prejudice against Defendants." (Dkt.#63, at p. 14.)  This bare

21   bones assertion, even in combination with similar statements peppered throughout

22   Defendants' motion, falls well short of the "compelling evidence" standard promulgated by

23   the Seventh Circuit in Hook.  See Hook, 89 F.3d at 355.  As Plaintiffs argue in their

24   opposition brief, Defendants can point to nothing the Court has ever done to suggest that it

25   holds an opinion of any party that is wrongful or inappropriate.

26        Moreover, Defendants, in particular Maricopa County and Sheriff Arpaio, are frequent

27   litigants before this Court on a wide variety of civil matters.  It is not an overstatement to say

28   that the Court has presided over a countless number of cases involving these Parties, and it

- 13 -

1   has ruled in Defendants' favor on scores of their dispositive motions.  The Court can think of

2   no other case involving either Maricopa County or Sheriff Arpaio where it has been accused

3   of harboring  a "personal animus or malice" towards either one of them.  See Hook, 89 F.3d

4   at 355.  In fact, as recently as September 2008, the Court presided over a bench trial where

5   Sheriff Arpaio was the only named Defendant.  See Mitchell v. Arpaio, CV-06-1963-PHX-

6   MHM; 2008 U.S. Dist. LEXIS 80179 (D. Ariz. Sept. 19, 2008).  After reviewing all

7   admissible evidence in that case, which included live in-court testimony given personally by

8   Sheriff Arpaio, the Court ruled in the Sheriff's favor, holding that "Defendant [was] entitled

9   to judgment dismissing the . . . Complaint with prejudice." Id. at * 16.  Certainly, Sheriff

10  Arpaio's victory in the September 2008 Mitchell bench trial, along with many other

11  successfully defended civil actions before this Court, undercuts any claim of actual bias

12  towards him or any of the other Defendants.  See Alexander v. Primerica Holdings, 10 F.3d

13  155, 163-64 (3d Cir. 1993) (noting that there is heightened concern regarding judicial recusal

14  in a bench trial where the court is "deciding each and every substantive issue at trial").

15          In light of the record before the Court, Defendants' "natural bias" contention could

16  easily be interpreted as an argument that this Court's alleged bias somehow flows from her

17  racial heritage.  Obviously, such an argument would be unwarranted and baseless.  Beyond

18  that, the idea that an Hispanic judge should never preside over a controversial case concerning

19  alleged acts of racial profiling purportedly committed against Hispanics is repugnant to the

20  notion that all parties are equal before the law, regardless of race. See Plessy v. Ferguson, 163

21  U.S. 537, 559 (1896) (Harlan, J., dissenting) ("Our Constitution is color-blind, and neither

22  knows nor tolerates classes among citizens.").[5]  Given the absence of any factual foundation

23

24          [5]In their reply brief, Defendants proclaim that the Court's race played no role in their

25  recusal motion, and that they are not contesting whether a Hispanic judge should ever sit on
    a case concerning Hispanic civil rights, only that this Court should not sit on this case given

26  the nature of her sister's work and the public positions advocated by her employer. (Dkt#.73
    at p. 2.)  However, Defendants main brief does not appear to be quite as measured as their

27  reply.  For example, Defendants, for reasons that are both unstated and unknown, quoted in

28  bold the following passage from an article found in the *Phoenix New Times*: "Hmm - we

- 14 -

1    supporting Defendants' claim of bias, and given the Court's extensive history of presiding

2    over disputes involving Sheriff Arpaio, MCSO and Maricopa County in a neutral and

3    impartial manner, the Court does not see how any reasonable attorney could set forth an

4    accusation of actual bias.  As the Second Circuit stated, in upholding the imposition of

5    sanctions under Rule 11 of the Federal Rules of Civil Procedure against an attorney, the

6    "suggestion that a judge cannot administer the law fairly because of the judge's racial and

7    ethnic heritage is extremely serious and should not be made without a factual foundation

8    going well beyond the judge's membership in a particular racial or ethnic group." See

9    MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,138 F.3d 33, 37 (2d Cir. 1998).

10         The Court therefore rejects the unsupported assertion that it is actually biased against

11   Maricopa County, Sheriff Arpaio or MCSO, in this or any other case.  Further, the Court

12   admonishes counsel for Defendants that in all future pleadings he should adhere scrupulously

13   to the requirements of Fed. R. Civ. P. 11(b) or be prepared to face sanctions for failing to do

14   so.

15         **C.     Whether The Court Has An Interest That Could Be Substantially Affected
                By The Outcome Of These Proceedings Under § 455(b)(4)**

16

17         Under § 455(b)(4), a judge must recuse herself if "individually or as a fiduciary . . .

18   [the court has] a financial interest in the subject matter in controversy or is a party to the

19   proceeding, or any other interest that could be substantially affected by the outcome of the

     proceeding."  28 U.S.C. § 455(b)(4).

20
         Defendants contend that the Court's interest in the well being of her sister constitutes
21
     an "other interest" within the meaning of § 455(b)(4), since a victory on the merits for
22
     Plaintiffs would, according to Defendants, help to advance NCLR's stated social and political
23
     goals, and, in turn, advance Janet Murguia's career.  Plaintiffs respond by arguing that courts
24
     have narrowly defined "other interests" to include only financial or pecuniary interests of
25

26   _____

27   can't but wonder what the first Latina judge appointed to the U.S. District Court in Phoenix
     thinks of the idea that 'physical appearance alone' should merit a police investigation." (See
28   Dkt.#63 at p. 4.)

- 15 -

1  some variety, see e.g., In re Virginia Elec. & Power Co., 539 F.2d 357, 367-68 (4th Cir.

2  1976), and that a purported interest in the career advancement of one's sibling does not square

3  with any accepted interpretation of the statute. See Guardian Pipeline, L.L.C. v. 950.80 Acres

4  of Land, 525 F.3d 554, 557 (7th Cir. 2008);   In re New Mexico Natural Gas Antitrust Litig.,

5  620 F.2d 794, 796 (10th Cir. 1980).  Defendants, in reply, cite to In re Virginia Elec. & Power

6  Co., arguing that Plaintiffs' reliance upon that case is misplaced, since in that case the Fourth

7  Circuit specifically stated:

> 8   Unlike [the term] 'financial interest' [found in § 455(b)(4)], the term 'any other
>     interest' [also found in § 455(b)(4)] is not defined in terms of ownership or in
> 9   any other manner. It is not easy to conclude what the term means. But it must
>     have been the congressional intent to make an interest of lesser degree than
> 10  ownership disqualify. That would seem to be so for otherwise there would be
>     no purpose in defining financial interest in terms of ownership and failing to
> 11  apply such a limitation on any other interest.

12  In re Virginia Elec. & Power Co., 539 F.2d at 367 (emphasis added).

13       With respect to Defendants novel interpretation of § 455(b)(4), the Court does not

14  accept that a sibling relationship can constitute an 'interest' within the meaning of the recusal

15  statute. Notwithstanding Defendants' argument, the language of Virginia Elec. discusses 'any

16  other interest' in terms of the degree of ownership over something that is financial or

17  proprietary in nature.  See also E. & J. Gallo Winery v. Encana Energy Serv., Inc., 2004 U.S.

18  Dist. LEXIS 29380, *13-15  (E.D. Cal. Feb. 20, 2004) (citing to Virginia Elec. and

19  characterizing an 'other interest' as decidedly financial, albeit one that is indirect or remote

20  in nature).  Moreover, the Court is not aware of any case law that would tend to support

21  Defendants' proffered reading. The Court will not endorse an untethered expansion of the

22  recusal statute to the point where a litigant can engage in a broad based fishing expedition to

23  dig up potentially disqualifying 'interests' that a judge may be accused of having in a

24  particular case.  The Court therefore agrees with Plaintiffs that the term 'any other interests'

25  should be interpreted as being limited to financial or pecuniary interests, whether by

26  ownership or some other means.

27       Defendants go on to claim that even if the Court were to apply the more restricted

28  interpretation of § 455( b)(4) advocated by Plaintiffs—that the Court's interest must involve

- 16 -

1   "an investment or other asset whose value depends on the outcome, or some other concrete

2   financial effect"—recusal would still be warranted. (See Dkt.#70 at p. 10.)  This, according

3   to Defendants, is because an adverse ruling here would likely cause an appreciable drop in the

4   amount of "public donations" to NCLR, since "the positions, causes and relationships it

5   advances and develops [may not be bearing] fruit in society's executive, legislative, or judicial

6   branches of government." (See Dkt.#72 at p. 8.)

7         There is nothing in the record, however, to support Defendants' speculation that the

8   Court's sister's career or her organization would be materially affected by the outcome of the

9   proceedings.  Similarly, there is nothing in the record to suggest that the Court has an interest

10   in her sister's well being that would somehow be inconsistent with the fair resolution of this

11   case, or that the Court has a personal stake in the advancement of her sister's career that

12   would create an untenable conflict of interest. Furthermore, even if a victory for Plaintiffs here

13   would somehow help to advance Janet Murguia's interests, nothing in the record suggests that

14   the Court itself would derive any type of financial, proprietary or otherwise tangible benefit

15   from her sister's potential career advancement.  Defendants' theory that NCLR might stand

16   to lose "public donations" depending on the outcome of this case is not actionable under the

17   relevant sub-section of the recusal statute, since § 455(b)(4) is directed towards interests held

18   by the Court, not its siblings or its siblings' employer.[6]

19   _____

20      [6]There is one final issue under § 455(b)(4) which, in an abundance of caution, the
Court must raise, even though it was not addressed by either of the Parties.  This issue is

21   whether the Court is a potential member of Plaintiffs' proposed class, and if so, whether
recusal is required. In their First Amended Complaint, Plaintiffs redefined their proposed

22   class to include the following individuals: "all Latino persons who, since January 2007, have
been or will be in the future, stopped, detained, questioned or searched by MCSO agents

23   while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County,

24   Arizona." (See Dkt.#18 at p. 24.) Although the Court can be fairly characterized as a "Latino
person," it has not, admittedly, been "stopped, detained, questioned or searched by MCSO

25   agents" since January 2007.  Moreover, the Court does not foresee being stopped,

26   questioned, detained or searched in the near future, but must concede that it always remains
a theoretical possibility, even if remote.  While the Court is mindful of the Ninth Circuit's

27   admonition that "no man can be the judge in his own case [or] try cases where he has an

28   interest in the outcome," Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994), the

Thus, the Court has no conceivable interest in this case that would serve as a grounds for recusal under § 455(b)(4).

**D.**    **Whether The Court's Sister Has An Interest That Could Be Substantially Affected By The Outcome Of This Lawsuit Under § 455(b)(5)(iii)**

Under § 455(b)(5)(iii), recusal is mandated where "a person within the third degree of relationship . . . [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(iii). The phrase "third degree of relationship" has been to interpreted to include a judge's siblings. See generally Harris v. Champion, 15 F.3d 1538, 1571 (10th Cir. 1994) (finding that § 455(b)(5)(iii) should apply to the district court's uncle).

Pursuant to this sub-section, Defendants broadly assert that the Court's sister has "ideological, political, social and activist interests" in this lawsuit that are contrary to Defendants' interests. (See Dkt.#63 at p. 5.) In response, Plaintiffs point to the Seventh Circuit case of SCA Serv. v. Morgan, 557 F.2d 110, 116 (7th Cir. 1977), which held that a partner's interest in the reputation and goodwill of his law firm fell within § 455(b)(5)(iii). Id. Plaintiffs argue that the connection between a business's reputation and goodwill and the interests of one of its owners are obviously financial in nature, whereas "ideological, political, social and activist interests" are obviously not. As such, Plaintiffs argue that the definition of 'interests' under § 455(b)(5)(iii) should be co-extensive with the meaning of 'interests' under § 455(b)(4). Plaintiffs note that Defendants have cited no examples where courts have defined the term interests differently under § 455(b)(4) and § 455(b)(5)(iii). See e.g., Guardian Pipeline, L.L.C., 525 F.3d at 557.

---

Court is not presently a member of Plaintiffs' proposed class and cannot state with any degree of certainty whether it will become a member in the future. In any event, even under the unlikely scenario that the Court becomes an unnamed class member, its interest in the outcome of the case would likely be de minimis and too insubstantial to necessitate recusal. See In re New Mexico Natural Gas Antitrust Litig., 620 F.2d 794, 796 (10th Cir. 1980) (holding that the district court's recusal under § 455(b)(4) was unwarranted where the judge, like all other consumers in New Mexico, may have benefitted from a lower gas and electric bill in a class action lawsuit brought against a statewide utility company).

1539

1    The Court agrees with Plaintiffs. It is not at all clear how the word interests could be

2    given two different meanings in the same statute, when used in a nearly identical context. See

3    Ratzlaf v. United States, 510 U.S. 135,143 (1994) ("A term appearing in several places in a

4    statutory text is generally read the same way each time it appears."). Thus, if the term

5    interests is to be given a consistent meaning throughout § 455, then Defendants have failed

6    to show how the Court's sister has an interest in the instant lawsuit that can be reasonably

7    characterized as financial or proprietary in nature. And as previously stated, "ideological,

8    political, social and activist" interests are not generally recognized as actionable.

9    Additionally, Defendants have not even suggested, much less explained, how any

10   interest, even under the rejected "social, political, or ideological" standard, might be

11   "substantially" affected by the outcome of this case, particularly when the degree of any

12   potential impact on the interests of the Court's sister or NCLR seems indirect at best. Neither

13   the Court's sister, nor her employer, are parties in this case, employed by a party in this case,

14   or have a direct affiliation with a party in this case or with their counsel. It is far too

15   speculative to suggest that because Janet Murguia and NCLR might arguably share common

16   values or pursue the same political or social goals as Plaintiffs and their counsel, that they

17   might be substantially affected by the outcome of this case. See ESPN, 767 F. Supp. at 1080.

18   The Court therefore rejects § 455(b)(5)(iii) as a basis for recusal in this case.

19

20

21   **E.     Whether The Court's Impartiality Might Reasonably Be Questioned under
            §455(a)**

22   The more difficult question presented by this motion is whether the Court's impartiality

23   might reasonably be questioned under 28 U.S.C. §455(a). The standard for recusal under

24   §455(a) is "whether a reasonable person with knowledge of all the facts would conclude the

25   judge's impartiality might reasonably be questioned." Taylor v. Regents of Univ. of Cal., 993

26   F.2d 710, 712 (9th Cir. 1993), cert. denied, 510 U.S. 1076 (1994).

27   The Court is acutely aware that it owes an independent duty to uphold the integrity of

28   the judicial system, see Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 860 (1988)

- 19 -

1  (recognizing that the purpose of § 455(a) is "to promote public confidence in the integrity of

2  the judicial process by avoiding even the appearance of impropriety whenever possible"),

3  even when a party's pleadings are bombastic and its position relies upon inflammatory and

4  meritless forms of argumentation.  This Court will not dodge the critical question of whether

5  its continued role in this case is appropriate under the circumstances, even though it would

6  have been entirely justified in denying Defendants' recusal motion on timeliness grounds

7  alone.

8       Two competing concerns govern the Court's decision on the merits of this question.

9  First, of course, "[t]he test for recusal under [§ 455(a)] asks "whether a reasonable person with

10  knowledge of all the facts would conclude the judge's impartiality might reasonably be

11  questioned." Taylor, 993 F.2d at 712. Critically, "the judge's actual state of mind, purity of

12  heart, incorruptibility, or lack of partiality are not the issue." Nichols v. Alley, 71 F.3d 347,

13  351 (10th Cir. 1995) (internal quotations and citations omitted).  The test is purely an

14  objective one, which focuses on "whether a reasonable person perceives a significant risk that

15  the judge will resolve the case on [any] basis other than the merits." In re Mason, 916 F.2d

16  384, 385 (7th Cir. 1990); Preston v. United States, 923 F.2d 731, 734 (9th Cir. 1991) ("The

17  inquiry is whether a reasonable person would have a reasonable basis for questioning the

18  judge's impartiality, not whether the judge is in fact impartial.").

19       It must be noted that in the recusal context, a reasonable person means a

20  "well-informed, thoughtful observer," as opposed to a "hypersensitive or unduly suspicious

21  person." In re Mason, 916 F.2d at 386. Thus, to the extent that the selected reader comments

22  left on the *Phoenix Business Journal* and *The Arizona Republic* websites have been offered

23  by Defendants to exemplify the public's reaction to the Court's continued involvement in this

24  case,[7] that position is rejected.  Judges must decide whether to recuse themselves "not by

25  _____

26       [7]Of course, not all of the comments cited by the Defendants supported their contention

27  that the public's reaction to the Court's February 10, 2009 Order was one of suspicion and
mistrust.  See e.g. these comments: "Wrong is just WRONG . . . I would have made the same

28  ruling and MY sister is not connected to La Raza"; and "[t]his judge, like any judge in her

- 20 -

1  considering what a straw poll of the only partly informed man-in-the-street would show[,] but

2  by examining the record facts and the law, and then deciding whether a reasonable person

3  knowing and understanding all the relevant facts would recuse the judge." In re Drexel

4  Burnham Lambert, Inc., 861 F.2d 1307, 1313 (2d Cir. 1988). "Articles and features in the

5  media suggesting impropriety cannot act as a barometer" of the reasonable person. TV

6  Commc'ns Network, Inc. V. ESPN, Inc., 767 F. Supp. 1077, 1080 (D. Colo. 1991).

7  Obviously, no Court should permit anonymous bloggers to wield a veto power over its

8  participation in any case.

9      Second, courts have "a strong duty to sit" when there is no legitimate reason to recuse.

10 Clemens v. U.S. Dist. Ct. For the Cent. Dist. of Cal., 428 F.3d 1175, 1179 (9th Cir. 2005).

11 A judge should not recuse him or herself based "on unsupported, irrational, or highly tenuous

12 speculation; were he or she to do so, the price of maintaining the purity of appearance would

13 be the power of litigants or third parties to exercise a negative veto over the assignment of

14 judges." In re United States, 666 F.2d 690, 694 (1st Cir. 1981).

15     As the Parties acknowledge in their filings, this is a high profile case, one that is not

16 likely to be free from controversy, regardless of who is presiding over it.  The issue of

17 whether Maricopa County, Sheriff Arpaio and MCSO ought to be enforcing federal

18 immigration laws elicits strong feelings, both within the local Phoenix community as well as

19 across the nation.  Further, allegations of violations of Constitutional rights often arouse

20 strong public passions.  These passions are no doubt shared by both those who allege the

21 violations and those who dispute them.  The Court also recognizes the controversial and

22 sensitive nature of the immigration issue generally within the country.  Nothing in this set of

23 circumstances would, by itself, warrant recusal under the appropriate standard.[8]

24  _____

25 position, simply upheld the legal standard for a motion to dismiss. There were enough facts
   alleged to let the case go to the next step."
26

27     [8]In the Court's view this case is not about whether sound public policy—which is set
   by the political branches and not by the courts—favors having a local Sheriff and his
28 deputies enforce federal immigration laws. If it were, this case would never have withstood

1542

1   Nonetheless, the Court recognizes its somewhat unique position, in that the Court's

2   twin sister plays a prominent public role in advocating policy positions that diametrically

3   oppose those taken by Defendants.   At the same time, the statute does not require the Court

4   to recuse itself from a matter merely because a case concerns Hispanic civil rights, our

5   nation's immigration policy, or some related matter.   Section 455(a) does not require such a

6   cautious approach on the part of a judge, and the Court must be careful to avoid allowing her

7   sister's public profile to serve as a proxy for a race-based recusal challenge.   Also providing

8   context to this inquiry is the rather unremarkable yet often overlooked proposition that "[a]

9   district judge is not a sterile creature who dons judicial robes without any prior contacts in the

10  community but rather is very likely to be a man or woman with a broad exposure to all kinds

11  of citizens of all shades of persuasion and background." United States v. Suren, 1992 U.S.

12  App. LEXIS 38216, *16 (9th Cir. Aug. 18 1992) (Memorandum Opinion) (quoting In re

13  Searches Conducted on March 5, 1980, 497 F. Supp. 1283, 1290 (E.D. Wis. 1980) (internal

14  citations omitted)).

15  Both Parties devote a great deal of space in their briefs to arguing over the proper

16  interpretation of two leading U.S. Supreme Court cases dealing with recusal motions brought

17  under § 455(a): Microsoft v. United States, 530 U.S. 1301 (2000) and Cheney v. United States

18  Dist. Ct., 541 U.S. 913 (2004). Microsoft concerned whether Chief Justice Rehnquist should

19  have recused himself from a case where his son, a lawyer who represented Microsoft in

20  potentially related anti-trust matters, might have stood to gain from a favorable ruling towards

21  the company.   Id. at 1301-02.   After rejecting the possibility that his son might have an

22  interest that could be substantially affected by the outcome of the case, the Chief Justice

23  addressed whether his continued involvement created the appearance of impropriety.   Id.

24

25  even the flimsiest motion to dismiss. Instead, this lawsuit concerns only whether Defendants

26  have violated Plaintiffs' rights under the Fourth Amendment, Fourteenth Amendment, and
    the Arizona State Constitution, while carrying out their otherwise lawful duties to enforce

27  federal immigration laws. The Court has not been asked to pass judgment on the wisdom of

28  the § 287(g) authorization, nor would it do so if asked.

- 22 -

1  Ultimately, Chief Justice Rehnquist decided against recusal.  In so doing, he noted that a

2  "decision by this Court as to Microsoft's antitrust liability could have a significant effect on

3  Microsoft's exposure to antitrust suits in other courts . . . [but] [e]ven our most unremarkable

4  decision interpreting an obscure federal regulation might have a significant impact on the

5  clients of our children who practice law." Id. at 1303.  The Chief Justice went on to comment

6  on the Supreme Court's unique  institutional role, stating:

7       [I]t is important to note the negative impact that the unnecessary
         disqualification of even one Justice may have upon our Court.  Here—unlike
8       the situation in a District Court or a Court of Appeals—there is no way to
         replace a recused Justice.  Not only is the Court deprived of the participation
9       of one of its nine members, but the even number of those remaining creates a
         risk of affirmance of a lower court decision by an equally divided court.

10  Id.

11      Cheney involved an attempt to force the recusal of Justice Scalia from a case

12  concerning whether the executive branch was required to disclose the identity of persons who

13  had served on the Vice President's energy task force. See Cheney, 541 U.S. at 914-16.  The

14  substance of the recusal motion focused on a hunting trip that Justice Scalia had taken with

15  Vice President Cheney and others.  At issue, among other things, was that the host of the trip

16  had ties to the energy industry and that members of the hunting party, including Justice Scalia,

17  had traveled to their final destination on the Vice President's government-issued airplane. Id.

18  In deciding against recusal, Justice Scalia stated that media commentary constituting "a blast

19  of largely inaccurate and uninformed opinion cannot determine the recusal question." Id. at

20  924.  Justice Scalia further commented that recusal might be advisable, "if I were sitting on

21  a Court of Appeals," where the recused judge's place on the panel "would be taken by another

22  judge and the case would proceed normally." Id. at 915.  Echoing the sentiments of Chief

23  Justice Rehnquist, Justice Scalia opined that the Supreme Court operated quite differently,

24  since, "[t]he Court proceeds with eight Justices, raising the possibility that, by reason of a tie

25  vote, it will find itself unable to resolve the significant legal issue presented by the case." Id.

26      The helpfulness of the Microsoft and Cheney opinions is debatable in this case.  Chief

27  Justice Rehnquist's Memorandum, although quite informative in its analysis of when a close

28  family member's potential interest in a case might cast aspersions on a judge's apparent

- 23 -

neutrality, is the writing of only one Justice. It is not the opinion of the Court. As such, Microsoft is not binding precedent. Similarly, Justice Scalia's Memorandum in Cheney discussing his personal friendship with Vice President Cheney and the media's coverage of their hunting trip, is non-precedential.

More importantly, those cases do not deal with the recusal of a trial court judge. When a federal district court judge recuses herself from a case, another judge can easily step into her place. Because every district court judge has taken the same oath to faithfully apply the law, which includes applying binding precedent from the U.S. Supreme Court as well as the law of the relevant circuit, very little prejudice results from a district court judge's recusal. On the other hand, as Chief Justice Rehnquist and Justice Scalia have observed, the U.S. Supreme Court is sui generis, or one of a kind. There are only nine members, and when one recuses, only eight will sit. As was noted, the votes of at least five Justices are required to overturn a lower court opinion. Therefore, when that body is short one or more of its members, there is a substantial risk that an important legal issue will go completely unresolved, without a majority opinion. No other case, certainly not one from the federal district court, presents an analogous situation.

One of the focal points of the Parties' arguments in this case is the notion that a judge might be seen as unwilling to take a position inconsistent with her sibling's ideological, political or social interests. Defendants argue that a reasonable observer, one who is apprised of all the facts, might assume that siblings, like the Court and her sister, share common pursuits, points of view or even political ideology. Defendants further claim that siblings who are personally close are likely to influence each other's thinking, even indirectly. When the siblings are twins, no less identical twins, according to Defendants, the likelihood of confusion is even greater. Plaintiffs respond by arguing that people frequently disagree with their siblings, even with their identical twin, on a wide variety of issues and that no reasonable person would question this Court's ability to do so here. Additionally, the Plaintiffs argue, the mere fact that Janet Murguia is President and CEO of an organization that advocates for the rights of Latinos would not cause a reasonable person to question the Court's impartiality.

- 24 -

1   In weighing the Parties' competing views, there is little, if any, guidance from case

2   law.  The Parties have not cited to—and the Court is not aware of—a similar case, where

3   nothing more than a sibling's political or social affiliations could arguably create the

4   appearance of impropriety for a judge under § 455(a).  Cognizant that a "reasonable person"

5   is well-informed and thoughtful, the Court agrees with Plaintiffs that no reasonable person

6   would automatically ascribe the views of one sibling to another.  It is certainly part of the

7   common experience that brothers and sisters often disagree about all sorts of issues, regardless

8   of how personally close they are or how often they speak on the telephone.  There is no reason

9   to believe that this reality would change when the siblings are identical twins.  A reasonable

10  and impartial observer apprised of all the facts would not conclude that identical twins are

11  more likely to share a common view point or interests than other siblings, much less that a

12  twin who is a judge would be incapable of impartiality. The Court is not aware of any

13  evidence that would tend to show that it has been unduly influenced by her sister's political

14  or social views.  Moreover, there is no proof that the Court, in light of her sister's stated

15  positions, would be hesitant to rule against Plaintiffs, if the law so required. That the Court's

16  identical twin is on record as opposing the enforcement of federal immigration laws by Sheriff

17  Arpaio and MCSO does not by itself mandate the Court's recusal under § 455(a).  If the only

18  grounds for recusal were Janet Murguia's role as President and CEO of NCLR and the public

19  comments that she has made pursuant to that role, the Court's inquiry would stop there.

20  However, this is not the case, as the Court must also address the issue of the We Can Stop the

21  Hate website, which was launched by NCLR while the Court's sister was serving as President

22  and CEO as a campaign to address acts of discrimination against Latino communities

23  throughout the United States.

24      Whether the Court's impartiality might reasonably be questioned based on the content

25  of these internet-based articles is a difficult issue.  Obviously, the Court has no connection to

26  the We Can Stop the Hate campaign.  There is also nothing in the record to suggest that the

27  Court's sister is the author of the offending articles or that she had any personal involvement

28

- 25 -

1  in their publication. Yet, the Court is mindful that it must be vigilant to avoid even the

2  slightest appearance of impropriety.

3       Without question, these articles greatly disparage MCSO deputies and personally

4  attack Sheriff Arpaio.  As has been previously pointed out, these articles refer to Sheriff

5  Arpaio as a "relentlessly self-promoting caricature," who has "less than stellar respect for civil

6  rights and due process," and who is "unrepentant, arrogant, and monumentally disingenuous."

7  With respect to the MCSO, its deputies are referred to as "thugs," while the department is

8  generally characterized as a "lawsuit-riddled folly" of an agency, among other things.  In the

9  context of a motion for recusal, when comments like these originate from a website that is

10 associated with the Court's sister or the organization that she leads, they cannot be taken

11 lightly.

12      Besides being insulting, the We Can Stop the Hate online articles speak directly to

13 MCSO's decision to enforce federal immigration laws pursuant to its § 287(g) authority.  In

14 fact, these articles specifically assert that MCSO has failed to adequately safeguard basic

15 constitutional rights through its departmental procedures, and that MCSO deputies have

16 engaged in wide-spread acts of racial profiling and have blatantly violated the Fourth

17 Amendment rights of detained immigration suspects by predicating stops on "physical

18 appearance alone."  The instant litigation sets out to determine these exact questions, i.e.,

19 whether the Fourth and Fourteenth Amendment rights of Latino persons in Maricopa County

20 have been violated.[9]

21      In applying the objective standard of § 455(a), the Court believes that whether a

22 reasonable person apprised of all relevant facts would question its impartiality based on

23 circumstances surrounding the publication of the We Can Stop the Hate website is a close call.

24 _____

25      [9]The Court must also note that a prominent picture of Janet Murguia sits immediately
   adjacent to each We Can Stop the Hate online article. Even though the picture is correctly
26 labeled as belonging to Janet Murguia and not the Court, the Court seeks to avoid the risk of
   confusing the Court's picture with that of her sibling. The Court must consider the possibility
27 that a reasonably well-informed and impartial observer might mistake the Court for her
28 identical twin sister.

- 26 -

On the one hand, the views of the Court's sister and her organization cannot be fairly imputed to the Court, and there is nothing in the record to support an inference that the Court would be unwilling to issue a ruling contrary to her sister's publicly-held positions. On the other hand, much of the commentary contained in the articles is highly disparaging of specific Defendants in this case, and the website takes a strong stand on disputed factual matters lying at the heart of the litigation.

The United States Court of Appeals for the Ninth Circuit has instructed that when a case is close, the balance should tip in favor of recusal. United States v. Holland, 519 F.3d 909, 911 (9th Cir. 2008) (quoting United States v. Dandy, 998 F.2d 1344, 1349 (6th Cir. 1993)). No Court should tolerate even the slightest chance that its continued participation in a high profile lawsuit could taint the public's perception of the fairness of the outcome. Certainly, this Court is unwilling to take such a risk. Thus, because at the district court level all doubts should be resolved in favor of recusal when the issue is close, strictly on the sole issue remaining—whether the Court's impartiality might reasonably be questioned under Section 455 (a)—the Court, in an abundance of caution, will recuse itself from this matter. **Accordingly,**

**IT IS HEREBY ORDERED** granting Defendants' Motion for Recusal. (Dkt.#63.)

**IT IS FURTHER ORDERED** directing that the Clerk reassign this case to another judge in the District of Arizona by random lot.

DATED this 15th day of July, 2009.

Mary H. Murguia
United States District Judge

- 27 -

1548

# EXHIBIT 13

1

1                UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ARIZONA

3

4  Manuel de Jesus Ortega Melendres,   )
      et al.,                      )

5                        )
              Plaintiffs,   )  No. CV 07-2513-PHX-GMS

6                        )
                vs.          )  Phoenix, Arizona

7                        )  July 31, 2015
      Joseph M. Arpaio, et al.,      )  2:03 p.m.

8                        )
              Defendants.   )

9  _____)

10

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16         BEFORE THE HONORABLE G. MURRAY SNOW

17       Status Conference Volume 1, Pages 1-70

18          (Sealed Proceedings Omitted)

19

20

21

22

23

24
    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:
             American Civil Liberties Union Foundation
4            Immigrants' Rights Project
             By:  Cecillia D. Wang, Esq.
5            39 Drumm Street
             San Francisco, California  94111
6
             American Civil Liberties Union Foundation
7            Immigrants' Rights Project
             By:  Andre Segura, Esq. - Telephonically
8            125 Broad Street, 18th Floor
             New York, New York  10004
9
             American Civil Liberties Foundation of Arizona
10           By:  Daniel J. Pochoda, Esq.
             By:  Joshua David R. Bendor, Esq.
11           P.O. Box 17148
             Phoenix, Arizona  85011
12
             Covington & Burling, LLP
13           By:  Tammy Albarran, Esq. - Telephonically
             By:  Lauren E. Pedley, Esq.
14           1 Front Street, 35th Floor
             San Francisco, California  94111
15
             Covington & Burling, LLP
16           By:  Stanley Young, Esq.
             333 Twin Dolphin Drive, Suite 700
17           Redwood Shores, California  94065

18   For the Defendant Maricopa County:
             Walker & Peskind, PLLC
19           By:  Richard K. Walker, Esq.
             By:  Charles W. Jirauch, Esq.
20           SGA Corporate Center
             16100 N. 7th Street, Suite 140
21           Phoenix, Arizona  85254

22   For the Defendant Joseph M. Arpaio:
             Jones, Skelton & Hochuli, PLC
23           By:  A. Melvin McDonald, Jr., Esq.
             By:  Joseph T. Popolizio, Esq.
24           2901 N. Central Avenue, Suite 800
             Phoenix, Arizona  85012

25

```
1                    A P P E A R A N C E S

2


3    For the Defendant Joseph M. Arpaio and Maricopa County
     Sheriff's Office:
4              Iafrate & Associates
               By:  Michele M. Iafrate, Esq.
5              649 N. 2nd Avenue
               Phoenix, Arizona  85003
6
     For the Movants Christine Stutz and Thomas P. Liddy:
7              Broening, Oberg, Woods & Wilson, PC
               By:  Jathan P. McLaughlin, Esq.
8              P.O. Box 20527
               Phoenix, Arizona  85036
9
     For the Movants Maricopa County Attorney's Office and Maricopa
10   County Attorney William Montgomery:
               Ridenour Hienton, PLLC
11             By:  April M. Hamilton, Esq.
               Chase Tower
12             201 N. Central Avenue, Suite 3300
               Phoenix, Arizona  85004
13
     For Deputy Chief Jack MacIntyre:
14             Dickinson Wright, PLLC
               By:  Gary L. Birnbaum, Esq.
15             1850 North Central Avenue, Suite 1400
               Phoenix, Arizona  85004
16
     For Chief Deputy Gerard Sheridan:
17             Mitchell Stein Carey, PC
               By:  Lee D. Stein, Esq.
18             1 Renaissance Square
               2 North Central Avenue, Suite 1900
19             Phoenix, Arizona  85004

20   For Executive Chief Brian Sands:
               Lewis, Brisbois, Bisgaard & Smith, LLP
21             By:  Greg S. Como, Esq.
               2929 N. Central Avenue, Suite 1700
22             Phoenix, Arizona  85012

23   For Lieutenant Joseph Sousa:
               David Eisenberg, PLC
24             By:  David Eisenberg, Esq.
               2702 N. 3rd Street, Suite 4003
25             Phoenix, Arizona  85004
```

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 4

```
1                    A P P E A R A N C E S

2

3  For Timothy J. Casey:
           Adams & Clark, PC
4          By:  Karen Clark, Esq.
           520 E. Portland Street
5          Phoenix, Arizona  85004

6  Also present:
           Commander John Girvin, Deputy Monitor - Telephonically
7          Chief Raul Martinez, Deputy Monitor - Telephonically
           Executive Chief Brian Sands
8          Chief Deputy Gerard Sheridan
           Deputy Chief Jack MacIntyre
9          Lieutenant Joseph Sousa

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3        THE CLERK:  Civil case number 07-2513, Melendres and

4    others versus Arpaio and others.  This is the time set for

5    status conference.  Counsel, please announce for the record.    14:03:06

6        MS. WANG:  Good afternoon, Your Honor.  Cecillia Wang

7    of the ACLU for the plaintiffs.

8        MR. YOUNG:  Good afternoon, Your Honor.  Stanley Young

9    for the plaintiffs.

10       MR. BENDOR:  Good afternoon.  Josh Bendor of the ACLU    14:03:17

11   for plaintiffs.

12       MS. PEDLEY:  Lauren Pedley of Covington & Burling for

13   plaintiffs.

14       MR. POCHODA:  Dan Pochoda of the ACLU for plaintiffs.

15       MS. IAFRATE:  Good afternoon, Your Honor.  Michele    14:03:28

16   Iafrate on behalf of defendant.

17       MR. POPOLIZIO:  Good afternoon, Your Honor.  Joseph

18   Popolizio on behalf of Sheriff Arpaio.

19       MR. WALKER:  Good afternoon, Your Honor.  Richard

20   Walker of Walker & Peskind on behalf of that portion of    14:03:40

21   Maricopa County government embodied in the Board of

22   Supervisors, the county manager, and the employees reporting to

23   them.

24       MR. COMO:  Greg Como on behalf of Brian Sands, who is

25   present in the courtroom today, Your Honor.    14:03:55

1          MR. McDONALD:  Good afternoon.  Mel McDonald, special

2     appearance for Sheriff Joe Arpaio.

3          MR. JIRAUCH:  Charles Jirauch of Walker & Peskind on

4     behalf of Maricopa County.

5          MR. STEIN:  Good afternoon, Your Honor.  Lee Stein on                    14:04:10

6     behalf of Jerry Sheridan, who's present in the courtroom.

7          MR. BIRNBAUM:  Good afternoon, Your Honor.  Gary

8     Birnbaum on behalf of Jack MacIntyre, and Mr. MacIntyre's

9     present in the courtroom as well.

10          MR. McLAUGHLIN:  Good afternoon, Your Honor.  Jake                      14:04:25

11     McLaughlin on behalf of Thomas Liddy and Christine Stutz.

12          MR. EISENBERG:  Good afternoon, Your Honor.  David

13     Eisenberg on behalf of Lieutenant Joseph Sousa, who's in the

14     courtroom in the gallery.

15          MS. HAMILTON:  Good afternoon, Your Honor.  April                       14:04:38

16     Hamilton, Ridenour Hienton, on behalf of the Maricopa County

17     Attorney's Office and Maricopa County Attorney William

18     Montgomery.

19          MS. CLARK:  Good afternoon, Judge.  Karen Clark,

20     ethics counsel for Tim Casey.                                                14:04:50

21          THE COURT:  Do we have monitors on the line?

22          DEPUTY MONITOR GIRVIN:  Here, Your Honor.  Deputy

23     Monitor Girvin on the line.

24          DEPUTY MONITOR MARTINEZ:  And good afternoon, Your

25     Honor.  Raul Martinez, deputy monitor, on the line.                          14:05:06

1          THE COURT:  Do we have anybody else on the line?

2          MR. SEGURA:  Andre Segura of Covington & Burling on

3   behalf of plaintiffs.

4          MS. ALBARRAN:  Good afternoon, Your Honor.  Tammy

5   Albarran from Covington & Burling on behalf of the plaintiffs.    14:05:18

6          THE COURT:  All right.  Good afternoon.

7          Mr. Como, you filed with me a -- sort of a protective

8   concern about trial date.  Have you resolved that?

9          MR. COMO:  Yes, Your Honor.  We settled that other

10  case this week so I no longer have a conflict.    14:05:32

11         THE COURT:  All right.  Let me just say I'm going to

12  ask the parties to hold some dates and we're going to hold the

13  dates because we need flexibility.  After I announced trial

14  dates, or dates for the resumption of the hearing -- and I

15  think we can hold those dates, at least -- the monitor informed    14:05:51

16  me that he will be unable to make any of those dates.  I don't

17  think we need the monitor here to have the hearing; he has key

18  members that are perfectly adequate to cover for him.  But it

19  did strike me that to the extent we are having him evaluate the

20  MCSO self-investigations and to the extent that is an issue in    14:06:10

21  this lawsuit, the monitor may well need -- somebody may well

22  want him to testify at some point, so we're going to need to

23  set additional hearing dates.

24         Further, I'm going to raise some additional issues,

25  which may require -- or at least will give the parties the    14:06:25

 1    option to explore different issues if they wish to.  And I do

 2    not want to continue this hearing forever, I suspect no party

 3    wants to continue this hearing forever, so I'm going to throw

 4    out some dates right now and ask you to hold them -- I asked

 5    you to bring your calendars -- and if you know that those won't          14:06:41

 6    work for you, please tell me now.

 7              In addition to September 22nd through September 25th

 8    and September 29th through October 2nd, which were the dates

 9    that I already told everybody to hold, can people hold the 8th

10    and 9th of October?  Any problem with the 8th and 9th of                14:07:00

11    October?

12              I will tell you that the monitor is not available on

13    those dates, either, but if we need them we can have them, if

14    they're available, so I'll have everybody hold those dates.

15              October 13 and 14, the monitor is available on those         14:07:18

16    dates, if in fact his testimony is going to be needed in this

17    matter.  Does that work for everybody?

18              Seeing no objections.

19              And then we could also go the 27 through the 30th.

20    However, before -- and look at that.  Before I discuss the 27th        14:07:39

21    through the 30th, we could also go November 2nd through the 6th

22    and the 12th and 13th.  But I already have a firm trial set on

23    that date.  I've checked with the parties, and they have no

24    objection to giving up those dates if they can have the 27

25    through the 30 dates of October, the end of October.                   14:08:00

1     So I would ask the parties to hold the 13th through

2  the -- October 8th in addition to the dates already held: 8, 9,

3  13, 14, 27 through 30, November 2, 3, 4, 5, and 6, November 10,

4  November 12, and 13.  If anybody has any problem holding those

5  dates, please let me know right now.                          14:08:22

6     As soon as I can -- as soon as we can get preferences,

7  as soon as I go through what I intend to do today, we will try

8  to free up the dates for you so you're not just sitting on

9  those dates; I realize you're all busy people.  But I also

10 intend -- this won't be a surprise to anybody -- to hold status  14:08:37

11 conferences fairly regularly, almost every week, so that we can

12 make adjustments as we go along.

13     The other thing that occurred to me is that even

14 though Mr. Warshaw is not available on some dates, so we'll

15 have to hold some dates out of the current trial date, it       14:08:53

16 occurred to me, after considering some of the things that

17 Mr. Masterson said last week, that really there may be whole

18 areas, after the monitors do the interviews they're now doing

19 and after they provide you with transcripts of those

20 interviews, there may be a whole host of areas we can eliminate  14:09:12

21 by stipulation that won't require a lot of trial testimony.

22     For example, and maybe I'm misremembering this, but if

23 the material provided by Mr. Montgomery, the database that he

24 supposedly took from the CIA that included the 50 hard drives

25 that I had taken -- or that the sheriffs provided under my       14:09:36

1    order last week, if in fact there's a stipulation by all sides

2    that that material is junk, then I don't see why we have to

3    spend a whole lot of time on other issues that may involve the

4    50 hard drives but don't relate to this lawsuit.  It does seem

5    to me that they relate to the lawsuit to the extent that they        14:09:56

6    are junk and to the extent they were told -- or Mr. Montgomery

7    was told -- or told the MCSO what they were and what he was

8    using them for.  But we don't have to -- if there's a

9    stipulation by all sides that they're junk, we don't have to

10   waste a whole lot of time messing around with stuff like that.       14:10:13

11          I offer that merely as an example; I don't offer it as

12   a mandate.  It may well be that when we look in the 50

13   hard drives there is something that's relevant, although that

14   is a huge amount of material, so it seems to me that would be

15   one area where we could just sort of eliminate a lot of             14:10:30

16   problems.

17          It seems to me, too -- and I received a summary from

18   the monitor that I think you all heard last week.  I haven't

19   looked at the investigations or seen the transcripts, but as I

20   said last week, the transcripts are available to any party or       14:10:49

21   specially appearing party who wants them.  But it occurs to me

22   that other issues that come forth in the transcripts may not be

23   seriously disputed by any side, and if we can just arrive at

24   stipulations, we may be able to shorten the resumed hearing

25   considerably.  I just offer that for what it's worth.               14:11:07

1       And so with that being said, I did notice that

2  Maricopa County and the Sheriff's Office filed this week a

3  Statement For Proposed Deadlines Re Document Production.

4       Now, let me ask, it is more convenient for my

5  schedule, because I usually do criminal matters on Monday, I do   14:11:30

6  trials Tuesday, Wednesday, Thursday, sometimes Friday, I keep

7  Friday open for my civil dates, it's much more convenient for

8  me to do regular status conferences on Fridays, and you have

9  set the deadlines, Ms. Iafrate, Ms. Walker, you've set the

10  deadlines for document productions on Friday.   14:11:49

11       I'm wondering if we can move them one day earlier, so

12  that when I have the status conference, I can get a report as

13  to whether or not you produced the documents that were due the

14  day before, so that we don't have a whole lot of slippage that

15  I tolerate in terms of the document productions.   14:12:04

16       Do you understand what I'm saying?

17       MR. WALKER:  Yes, Your Honor.

18       MS. IAFRATE:  Yes.

19       THE COURT:  Is it possible to take the deadlines that

20  you've suggested -- and I'm not --   14:12:15

21       I'll hear from you, Ms. Wang, in terms of whether or

22  not, you know, you have any concerns about that, but I'm just

23  asking if it's possible to take those deadlines and move them a

24  day earlier so that the very next day I'll be here.  I'll know

25  whether you've produced the documents.  If you haven't, we can   14:12:27

1   deal with the matter.

2          MS. IAFRATE:  Your Honor, that's fine today with the

3   deadline for certain documents and they have been provided, so

4   with the exception of today's deadline, you're asking that the

5   ones in the future be moved back one day.                          14:12:41

6          THE COURT:  Right.

7          MS. IAFRATE:  That's fine.

8          THE COURT:  From Friday to Thursday.

9          MR. WALKER:  And the County has no objection, either,

10  Your Honor.                                                        14:12:48

11         THE COURT:  All right.  Does the plaintiff have any

12  concerns with that or with the proposal generally offered by

13  the County and the sheriff and the MCSO?

14         MS. WANG:  No, Your Honor.  And we appreciate the

15  production before each status conference; that makes good        14:13:00

16  sense.

17         THE COURT:  All right.  So let me just say that

18  last -- not last week but last status conference, which was

19  about closer to two weeks ago, we discussed both Mr. Walker's

20  and Ms. Iafrate's objection and motion to the class definition.   14:13:26

21  I indicated that I wasn't going to rule on that at that time,

22  so for those of you who look at your docket and you're worried

23  about outstanding little gavels that show I haven't ruled, I'm

24  not going to rule on that until we decide what is necessary for

25  reparations to those who were harmed by the violation of my       14:13:50

1    preliminary injunction.  I don't see any need to do that.  It's

2    still an open issue, except to the extent that I did rule that

3    it's relevant and needs to be turned over, and I assume that

4    you are incorporating that in your schedule, Ms. Iafrate,

5    Mr. Walker.                                                    14:14:09

6        MS. IAFRATE:  Your Honor, that is in the schedule as

7    it relates to item 6, so a deadline has been set, subject to

8    our objections that you already heard last time.

9        THE COURT:  All right.  So document 1085 as well,

10   which is the motion to compel production of Internal Affairs   14:14:24

11   reports, looks to me like that is also taken care of in

12   defendants' statement re proposed deadlines.

13       Ms. Wang?

14       Ms. Iafrate, did you want to address that?

15       MS. IAFRATE:  I was just going to say, Your Honor, we      14:14:39

16   met and conferred regarding all of the outstanding motions to

17   compel issues as well as the document requests, and, yes, the

18   outstanding request for the IA has been addressed in our

19   recommended deadline.

20       THE COURT:  Ms. Wang?                                      14:14:51

21       MS. WANG:  Your Honor, there's one outstanding issue

22   that we're currently meeting and conferring on, and that is how

23   to limit the definition of items, Internal Affairs

24   investigations going back to 2008.  That may be a different

25   item in your list, but --                                      14:15:09

1    THE COURT: No, no. That is an item that is in

2  defendants' proposed deadlines. I think it's, like, number 9

3  or number 10.

4    MS. WANG: Right. We have agreed in principle, I

5  think, on how to limit that request, and Ms. Iafrate's          14:15:23

6  requested that we reduce that to writing for her, and we're in

7  the process of doing so.

8    THE COURT: All right. Now, let me --

9    Oh. Go ahead, Ms. Iafrate.

10    MS. IAFRATE: Your Honor, I think that in response to    14:15:34

11  your previous question of me, it's number 8 on the deadlines

12  that talks about the -- essentially, what we were calling

13  spin-off IAs, the remaining 19 or 20, plus the two that were

14  originally sent to Mr. Vogel and then returned, so that also

15  has been addressed in the deadline.                             14:15:51

16    THE COURT: Yes, it seems to me that 7 and 8 address

17  the matters you've just addressed, both 7 and 8.

18    Yes, Mr. Eisenberg.

19    MR. EISENBERG: Your Honor, I don't mean to interrupt

20  the flow but I've checked my calendar. I do have a case in      14:16:04

21  this courthouse starting November the 3rd, United States versus

22  Aceves-Rivera. It's a multi-defendant case, but I can avow to

23  the Court that it will actually go on that date.

24    THE COURT: Okay. Well, I appreciate your pointing it

25  out. I'll keep it in mind and remember you pointed it out, but  14:16:21

 1   to the extent that we get next billing, I want next billing in

 2   case that case goes away.

 3          MR. EISENBERG:  Yes, Your Honor.

 4          THE COURT:  All right.  Thank you.

 5          Let's take up, then, Mr. Casey's objection to                14:16:32

 6   number 10, Ms. Iafrate.

 7          Ms. Clark, are you here to address that?

 8          MS. CLARK:  I'm here, Your Honor, for any questions

 9   you may have.

10          THE COURT:  Well, it does seem to me, Ms. Iafrate,           14:16:46

11   that Ms. Clark's objection is well taken.  If you have the

12   documents, if you're asserting the privilege, then I'm not sure

13   that Mr. Casey ought to be obliged to assert the privilege of

14   his own time and expense.

15          MS. IAFRATE:  Understood, Your Honor.  I provided           14:17:00

16   documents responsive to discovery requests and asserted the

17   privilege as it relates to the subset of documents that I have

18   that involved Tim Casey.  Then there was a subpoena deuces

19   tecum and a subpoena that went to Tim Casey and his counsel.

20   They provided me their documents that they gathered.  I went       14:17:19

21   through it for a privilege, created the privilege log, and then

22   sent it back to Ms. Clark, because it's the subpoena that goes

23   to her that these documents would be responsive to.  I've

24   already done the privilege identification and created the log

25   on behalf of my client.                                            14:17:36

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference  16

1          THE COURT:  All right.  Ms. Clark?

2          MS. CLARK:  Yes, Your Honor.  I don't really have much

3     to add to the objection that we filed.  I mean, Tim Casey was

4     withdrawn from this matter in December of last year and this is

5     a dispute between parties.                                    14:17:49

6          THE COURT:  Let me just see if I understood what

7     Ms. Iafrate just told me, because maybe I didn't.

8          Ms. Iafrate, are you authorizing Mr. Casey to turn

9     over every document except for the documents that are listed in

10    your privilege log?                                           14:18:03

11         MS. IAFRATE:  That is correct of the documents that

12    were provided to me by his counsel, I went through them to

13    assert my client's privilege and that has been done.

14         THE COURT:  All right.  So those documents can be

15    provided immediately as well as the privilege log can be      14:18:13

16    provided immediately.

17         Is that correct, Ms. Iafrate?

18         MS. IAFRATE:  They were sent back to Tim Casey's

19    counsel for that purpose.

20         THE COURT:  Okay.  So you have no objection if          14:18:25

21    Mr. Casey produces all documents that they provided -- that

22    they identified to you that are not contained in the privilege

23    log you sent back to them.

24         MS. IAFRATE:  Correct.

25         THE COURT:  And you have no problem if they provide     14:18:38

1    the privilege log.

2            MS. IAFRATE:  I would assume that they would.

3            THE COURT:  All right.  Can you do that immediately,

4    Ms. Clark?

5            MS. CLARK:  Judge, I can get that done on Monday,      14:18:46

6    August 3rd.

7            THE COURT:  All right.  Thank you.

8            Is that satisfactory to the plaintiffs?

9            MS. WANG:  Your Honor, the production on the 3rd is

10   satisfactory.  I just want to flag two issues for the Court.   14:18:56

11        We have raised two issues about Tim Casey's production

12   in response to our subpoena duces tecum, both with Ms. Clark

13   and with Ms. Iafrate.  First, we believe that Mr. Casey's

14   search for the documents was inadequate.  We have documents

15   from the defendants that should be in Mr. Casey's possession.  14:19:19

16   For example, if they're e-mails that went to him that were not

17   produced or listed in his privilege log that was provided from

18   Ms. Clark.

19        Second, we also believe that there are some privilege

20   issues remaining.  We're still meeting and conferring about     14:19:37

21   that.  We intend to take that up again once we get the new

22   production on August 3rd, but I alert the Court just because

23   there may be some additional matters we want to take up with

24   you.

25            THE COURT:  Let me just suggest, then, that in         14:19:51

```
 1    addition to the subpoena that you serve Mr. Casey you serve a
 2    document production request to the defendants that encompasses
 3    those same subpoena matters, and then to the extent that the
 4    defendants have maintained or have matters in their file that
 5    Mr. Casey has not retained, they will have to assert an          14:20:05
 6    additional privilege log.
 7            Is that a fair suggestion?
 8            MS. WANG:  That certainly is.  I believe we already
 9    have done so, but we will double-check that.
10            THE COURT:  All right.  Because I assume, Ms. Clark --   14:20:17
11    well, you represented, I think, in your pleading, that
12    Mr. Casey had reviewed everything that he had retained.
13            MS. CLARK:  That's correct, Judge.
14            THE COURT:  Okay.  So if you have that issue,
15    Ms. Wang, you can act as you deem best fit, but you'll provide   14:20:30
16    what you have on August 3rd together with the privilege log
17    given you by Ms. Iafrate?
18            MS. CLARK:  Absolutely, Judge.
19            THE COURT:  All right.
20            Yes.  Ms. Wang, anything else?                           14:20:41
21            MS. WANG:  No, Your Honor.  Thank you.
22            THE COURT:  All right.  We do have issues, of course,
23    that arise from the documents that came to light last week, and
24    I guess before we take those up I'm going to check with the
25    monitors as to any developments this week in terms of new       14:21:05
```

     1    documents found, a concern about whether or not we've got all

     2    the documents or tried to get all the documents that were

     3    identified last week, and any other issues of potential

     4    cooperation.

     5              Are you there?  Do you hear me?                          14:21:23

     6              DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.

     7    Chief Martinez, deputy monitor, and hopefully you can hear me

     8    fine in the courtroom also.

     9              Yes, we do have a couple of issues to bring up --

    10              THE COURT:  Chief?                                       14:21:33

    11              DEPUTY MONITOR MARTINEZ:  -- to the Court.

    12              THE COURT:  Chief?

    13              DEPUTY MONITOR MARTINEZ:  Yes, sir.

    14              THE COURT:  We can hear you here, but the speakerphone

    15    always provides a bit of distortion.  And so the court reporter   14:21:43

    16    can get down everything you're saying, I'm going to ask you to

    17    speak as slowly and distinctly as possible so that we can all

    18    hear you, please.

    19              DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  We do have

    20    a couple of issues to bring up to the Court's attention, the      14:21:58

    21    first one being last Friday, the 24th, Chief Warshaw and myself

    22    went to PSB and met with Lieutenant Kratzer, wherein we were

    23    taking a look, our first look at the 1459 slash 1500 IDs.

    24              During that meeting with Lieutenant Kratzer, a

    25    question was asked if there were any other instances of found     14:22:21

1    IDs, cases with IDs, that was not mentioned at the Monday

2    briefing with PSB, not to include the 1500.  Lieutenant Kratzer

3    mentioned yes, that there was one additional instance where 42

4    additional IDs were found in the training kit that belonged to

5    one of the sergeants, and that they had opened an IA case on        14:22:47

6    the IA number 15-0475.

7         Our concern is neither the order of the 24th that you

8    filed about the hard drives nor the order of the 27th has the

9    two DR numbers which match the casing that PSB informed us on

10   Monday covering those 42 IDs.  That's one of the concerns --        14:23:15

11        THE COURT:  All right.

12        DEPUTY MONITOR MARTINEZ:  -- that we need to get ahold

13   of those IDs just last week, just as the other two DR numbers

14   where IDs were -- were gathered.

15        THE COURT:  All right.  If you have other concerns,           14:23:29

16   hang on to them for a second.

17        Ms. Iafrate?

18        MS. IAFRATE:  Your Honor, I do believe that that IA

19   number and the information was provided to the monitors during

20   a weekly report.  They might be backlogged in their weekly         14:23:44

21   reports because we issued a -- or you issued what we perceived

22   to be a stay.  So once the stay was lifted, we pushed out all

23   of the back weekly reports, and I believe that that case is in

24   the weekly report.  But if you want to issue another order to

25   encompass this DR, I can go back and make certain that it was      14:24:06

1  indeed previously provided.

2          THE COURT:  I'll do that.  If I understood the chief

3  correctly, it's an IA number --

4          MS. IAFRATE:  It is.

5          THE COURT:  -- not a DR number.                    14:24:17

6          MS. IAFRATE:  It is, but a lot of IAs have DRs going

7  with it, yes.

8          THE COURT:  All right.  The only thing I want to make

9  sure of is that we get the plaintiffs, all the identifications

10  of members of the plaintiff class, to the extent that's still  14:24:27

11  possible, that are roaming around anywhere in the MCSO.  So if

12  these haven't been provided, I will issue an order directing

13  you to provide them.  If you can determine that they've already

14  been provided pursuant to my other orders, then please identify

15  which ones they are.                                      14:24:43

16          MS. IAFRATE:  Very well.

17          THE COURT:  Okay.  Chief, anything else?

18          DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  Just one

19  last statement about this Lieutenant Kratzer instance.  I'm not

20  doubting what Ms. Iafrate is saying.  There's a lot of         14:24:56

21  information that was dumped in the -- during the -- or after

22  the stay period, but I want to make sure that they were --

23          THE COURT:  You know what?

24          Chief.  Chief.  Chief.  Chief.  You're starting to go

25  too fast and we can't follow you.  You have to go slowly.      14:25:09

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference  22

```
 1          DEPUTY MONITOR MARTINEZ:  All right, sir.  I

 2   apologize.

 3          THE COURT:  It's all right.

 4          DEPUTY MONITOR MARTINEZ:  I want to make sure that

 5   what we're asking for is not just a copy of the IA number, but   14:25:18

 6   copies of those 42 IDs.

 7          THE COURT:  Right.  Well, I think that what the order

 8   will direct, just because I've -- the monitor's now -- I'm

 9   sorry, not the monitor, the marshal is now holding those IDs,

10   I'll just direct that the IDs be given to the marshal and so we  14:25:34

11   have them in one central location.

12          Will that meet your concerns, Chief?

13          DEPUTY MONITOR MARTINEZ:  Yes, sir, it would.

14          And if I may, there are a couple of other issues that

15   we have communicated with Ms. Iafrate that she has informed us   14:25:54

16   of some confidentiality that is involved with those issues, so

17   she may want to address the Court before we speak about it.

18          THE COURT:  Ms. Iafrate.

19          MS. IAFRATE:  Your Honor, the monitors and I discussed

20   this issue this morning.  I asked them to please not present     14:26:11

21   this issue in open court, as it would potentially compromise an

22   investigation.  I don't know if Your Honor would be amenable to

23   clearing the courtroom regarding this issue or if we could take

24   it up some other way rather than in open court, because there

25   is a confidentiality issue that I'm concerned about regarding    14:26:34
```

1    one of the monitor's requests.

2          THE COURT:  What is the confidentiality issue?

3    Pursuant to what statute or privilege?

4          MS. IAFRATE:  It's a concern regarding compromising a

5    criminal prosecution.                                    14:26:49

6          THE COURT:  All right.  Let me make this suggestion.

7          I'm going to go through everything else that we have

8    to go through, and then at the end I will hear you under seal

9    on your representation that you believe that there may be

10   issues that should be taken up under seal.  If I determine that   14:27:11

11   there is no reason to seal, then I'll open the transcript.

12         Will that be acceptable to you?

13         MS. IAFRATE:  That's fine, Your Honor.

14         THE COURT:  All right.  Does anybody else have any

15   objection to proceeding in that fashion?                 14:27:23

16         MS. WANG:  No object -- excuse me.  No objection, Your

17   Honor.

18         THE COURT:  All right.  Chief, anything else?

19         DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  There was

20   a second document that we are waiting for Ms. Iafrate to -- to   14:27:34

21   release.  It had to do with some minutes of a meeting.

22   Ms. Iafrate stated she was reviewing it for any privileges, and

23   we have not received any -- any response since our last

24   conversation with her as to whether it's going to be a release

25   in full or we are going to get a redacted version of that   14:27:59

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 24

1  document.

2  THE COURT:  All right.  And that request was made to

3  Ms. Iafrate when?

4  DEPUTY MONITOR MARTINEZ:  It was made in writing

5  yesterday after an interview that we conducted, and we had a          14:28:08

6  conversation about this document this afternoon.

7  THE COURT:  Can you identify the document at all, like

8  who -- who was the author, and what it was prepared in

9  conjunction with?

10  DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  During an          14:28:29

11  interview of Lauren Sanchez, who is, I believe, an analyst

12  assigned to PSB for the Maricopa County Sheriff's Office.  And

13  she was the scribe at the Friday, July 17th, meeting with PSB

14  and counsel in preparation for the monitor's visit.

15  THE COURT:  All right.  And you're reviewing that for          14:28:49

16  attorney-client privilege, Ms. Iafrate?

17  MS. IAFRATE:  Yes, Your Honor.  Actually, I received

18  the request after-hours last night; I didn't see it until this

19  morning.

20  THE COURT:  No problem.  I'll give you a reasonable          14:29:00

21  time to review it.  If you are going to redact any of it, would

22  you please file a privilege log indicating -- or the document

23  itself may indicate these actions, but just if you're going to

24  redact any of it, let us know.

25  MS. IAFRATE:  Very well.          14:29:12

1    THE COURT:  Anything else, Chief?

2    DEPUTY MONITOR MARTINEZ:  Your Honor, I believe

3  Commander Girvin has an item.

4    THE COURT:  All right.  Chief Girvin?

5    DEPUTY MONITOR GIRVIN:  Yes, Your Honor.  Can you hear    14:29:21

6  me okay?

7    THE COURT:  Yes, we can hear you.  But again, as with

8  Chief Martinez, you need to speak slowly, because there is some

9  distortion because of the speakerphone.

10    DEPUTY MONITOR GIRVIN:  Yes, Your Honor, I will do    14:29:33

11  that.

12    As you're aware, Your Honor, that we are in possession

13  of a hard drive which we received from MCSO pursuant to our

14  initial document request in the wake of the April hearings.  We

15  received that hard drive from Chief Knight.  Chief Knight was    14:29:50

16  designated by the defendants as our point of contact for these

17  document requests.

18    Chief Knight was interviewed this past week by our

19  monitor and during the course of that interview it was revealed

20  that the hard drive that was initially provided to us, which is    14:30:11

21  purported to have the Montgomery investigation material, is

22  actually a compilation of material from a couple of different

23  sources.

24    The first source is a hard drive that apparently

25  Detective Mackiewicz brought into Chief Knight's office when he    14:30:33

1    responded to Chief Knight's request that he provide, you know,

2    the relevant documents.  And when Detective Mackiewicz was in

3    Chief Knight's office, he asked Chief Knight and was granted

4    access to his office computer so that Detective Mackiewicz

5    could access the department's H drive.                              14:30:56

6              The H drive is really a shared drive that every

7    employee in the office will let -- can get to and use to store

8    documents, so it functions like a hard drive, but it's a large

9    drive that's maintained by the office and you have to log into

10   it.  So Detective Mackiewicz was allowed to log into his        14:31:16

11   section of the H drive on Chief Knight's computer.

12             So we were informed that the contents of the

13   hard drive which we were provided immediately after the April

14   hearing is actually a compilation of material that Detective

15   Mackiewicz had on the personal hard drive which he brought to    14:31:36

16   Chief Knight's office and material which he downloaded to --

17   from the H drive.  That was downloaded to two hard drives:  One

18   was provided to us, and the other we were told was provided to

19   Ms. Iafrate.

20             During questioning then Chief Knight volunteered that  14:31:56

21   he still has in his possession, and has had since that meeting,

22   the original hard drive that Detective Mackiewicz brought to

23   his office.  So we are requesting that we be allowed to take

24   possession of that hard drive, which is really the source

25   material, or supposedly the source material, for a copy that we  14:32:16

1   were provided in April.

2       THE COURT:  Let me ask you some questions to make sure

3   I understand.  Detective Mackiewicz brought in a hard drive, or

4   the material from the H drive was downloaded to the hard drive?

5       DEPUTY MONITOR GIRVIN:  He brought in a hard drive, a          14:32:44

6   separate external hard drive, and he also brought in three

7   binders' worth of paper which we needed and are now in

8   possession of.

9       THE COURT:  Well, again, I got you said that he

10  brought in a hard drive, and then I thought I heard you say he     14:32:58

11  brought in three binders' worth of paper material?

12      DEPUTY MONITOR GIRVIN:  He did.  He entered the office

13  with the external hard drive and three binders' worth of paper.

14  And the paper we're not questioning; we believe we have

15  received copies of that pursuant to our request.                  14:33:15

16      THE COURT:  Okay.  But you don't have the original

17  hard drive, and you don't know what was on the H drive that may

18  have been downloaded by Detective Mackiewicz?

19      DEPUTY MONITOR GIRVIN:  The hard drive which we have

20  in our possession is alleged to contain the contents of the       14:33:33

21  original hard drive that Detective Mackiewicz went into

22  Chief Knight's office with, and whatever material Detective

23  Mackiewicz added to that hard drive that he felt was responsive

24  and pulled off of the H drive.

25      THE COURT:  All right.  Ms. Iafrate.                           14:33:52

1       Let me ask first:  Do you know whether or not we've

2    received the copies of these three binders, the material in

3    these three binders?

4       MS. IAFRATE:  Yes, Your Honor.

5       THE COURT:  Do you know if it has been designated as

6    material from the three binders provided by Detective

7    Mackiewicz?

8       MS. IAFRATE:  I don't know how it was labeled, Your

9    Honor, but I assume that it was labeled to be identified that

10   way.

11      THE COURT:  Okay.  Can you check on that for me?

12      MS. IAFRATE:  Yes.

13      THE COURT:  Do you have any objection if I order the

14   marshals to take possession of the hard drive that is in

15   Chief Knight's possession?

16      MS. IAFRATE:  Yes, Your Honor.

17      THE COURT:  And what is that objection?

18      MS. IAFRATE:  Your Honor, this hard drive not only

19   contains information regarding the Montgomery case, but it also

20   contains other materials.

21      What Chief Knight and Sergeant Mackiewicz -- or

22   Detective Mackiewicz attempted to do was be responsive to your

23   request during that hearing to provide everything that was

24   responsive as to the Montgomery investigation.  And that is why

25   not only did they not stop with the paper or the hard drive;

1    they also searched the H drive to ensure that they had the

2    comprehensive amount of documents responsive to your request.

3    So that's why they went the --

4         THE COURT:  And they provided everything but the 50

5    hard drives?                                                    14:35:09

6         MS. IAFRATE:  You know, Your Honor, that Chief Knight

7    was not aware of those 50 hard drives.

8         THE COURT:  I don't know anything.  And I'm not

9    accusing him of anything.  I haven't seen the contents of the

10   interview, and that may be well what he said.  But I am at this  14:35:20

11   point not prepared to take anybody's word for what was what.

12   Let me propose this and see if it's acceptable to you.

13        I'm going to order the marshals to take possession of

14   that hard drive.  I'm going to, as I have in the past, order

15   them to let nobody have access to it till a forensic copy is    14:35:40

16   made.  And then I will give you first access so that you can

17   review it and claim as privileged or nonresponsive material

18   that's in the hard drive.

19        Is that acceptable to you?

20        MS. IAFRATE:  Yes, Your Honor.  Could I provide these     14:35:56

21   myself to the marshals rather than having the marshals go over

22   and seize them?

23        THE COURT:  Well, first off, I realize that it was

24   characterized places as a seizure.  I just want to say that it

25   was in response to my order.  I provided an order last week.  I  14:36:12

1    have no basis to believe that -- and the marshals have informed

2    me that there was no resistance from the MCSO.

3          And so I believe that part of the reason I issued the

4    order, Ms. Iafrate, is you had chain of custody concerns and

5    they were very valid, and I think I put that in the order, too.    14:36:30

6    And so just to not -- to avoid any possible chain of custody

7    concerns I'm going to have the marshals receive the hard drive

8    directly from Chief Knight.

9          But I'm not characterizing it as a seizure, I'm

10   characterizing it as a response to my order, which is what I    14:36:46

11   believe last week was, too.  Is that satisfactory?

12         MS. IAFRATE:  Well, I would still object to the

13   process, Your Honor, but I understand what you're saying.

14         The other problem that I have is this hard drive is in

15   a secure location, and Chief Knight is the custodian of it    14:37:00

16   because he received it from Detective Mackiewicz.  Chief Knight

17   is not in today.  Could we make some arrangements so that the

18   marshals can come Monday, seeing that it's Friday afternoon?

19         THE COURT:  Well, I'm going to order that the marshals

20   contact you today.    14:37:20

21         MS. IAFRATE:  That's fine.

22         THE COURT:  And that if they receive assurances that

23   nothing's going to hap -- they receive adequate assurances that

24   it's in a secure location, then we can have it on Monday.

25         MS. IAFRATE:  Very well.    14:37:32

1    THE COURT:  If they don't, I'm going to send them over

2  to get it.

3    MS. IAFRATE:  Understood.

4    THE COURT:  All right.  Anything else, Chief Girvin?

5    DEPUTY MONITOR GIRVIN:  Just on that topic, one more          14:37:40

6  request or observation, Your Honor.  If you could direct that

7  that hard drive from this point forward not be plugged into any

8  computing device whatsoever.  You indicated that you're going

9  to order a forensic copy be made, so we're just concerned that

10  any -- plugging into any computer device at this point would          14:37:59

11  alter the metadata on the hard drive.

12    THE COURT:  Any objection to that, Ms. Iafrate?

13    MS. IAFRATE:  No, Your Honor.

14    THE COURT:  All right.

15    Are those your issues, Chief Martinez?          14:38:15

16    DEPUTY MONITOR GIRVIN:  Yes, Your Honor.

17    THE COURT:  All right.

18    DEPUTY MONITOR MARTINEZ:  Yes, sir.

19    THE COURT:  All right.  I'm going to address something

20  that pertains to the material seized last week and some of what          14:38:29

21  Chief Warshaw characterized as the contents of the interviews

22  that caused him concern and caused him to call for the

23  emergency hearing which resulted in my order directing the

24  acquisition of the 50 hard drives, which I take it you're not

25  contesting were materials Montgomery provided to the MCSO, and          14:38:51

1    the identifications.

2            Am I wrong about that statement, Ms. Iafrate?

3            MS. IAFRATE:  That we're not contesting that they

4    were --

5            THE COURT:  That the 50 hard drives contain material    14:39:03

6    that Montgomery provided to the MCSO.

7            MS. IAFRATE:  Your Honor, we still have not evaluated

8    that issue.

9            THE COURT:  All right.

10           MS. IAFRATE:  So it's a non-answer to you.  I do not    14:39:14

11   have an answer for you.

12           THE COURT:  That's fine.  In any case, I directed

13   their confiscation and they were provided, as I said, without

14   incident.  And I have not read -- and as far as I know, they

15   haven't even been transcribed -- some of the interviews that   14:39:30

16   Chief Warshaw described to me last week.  And so I obviously

17   don't know what their contents were, and I recognize that

18   everyone has a right to be heard before any decisions are made,

19   and I expect that I will provide that.

20           But I'm going to lay out a little bit what my concerns  14:39:52

21   were about some of those issues so that everybody is aware of

22   what my concerns were, and are, and what I intend to do about

23   those concerns and what I would propose that we do.

24           The very first injunctive order that I entered in this

25   matter back in October 2013 says:  Defendant shall ensure that  14:40:25

1    there was -- that the issue was resolved.

2         I issued two more orders in the next week in response

3    to your objections and concerns, document 1032 and document

4    1046, indicating that I expected the immediate production of

5    all such documents.  And then -- and I believe all parties have    14:53:07

6    this, but if they don't, I have it here and I'm going to give

7    every party a copy -- Chief Knight provided to you,

8    Ms. Iafrate, and to the Monitoring Team, a response, request by

9    request, of his response to our request for those documents.

10        There's a lot them that relate to the documents, but    14:53:30

11   the one that I'm most concerned about today -- and by the way,

12   it's my understanding from the monitor that you provided these

13   documents to everybody.  Not just to the monitor; you put them

14   in the drop box and they went to everybody.  If they didn't, I

15   don't see why they shouldn't go to everybody, but that is their    14:53:49

16   understanding.

17        So if that's incorrect and there's some reason I

18   shouldn't read from this, can you tell me that now?

19        MS. IAFRATE:  Your Honor, I cannot avow that they went

20   to the plaintiff, but there's no problem with you reading from    14:54:00

21   that document.

22        THE COURT:  All right.  So one of the many requests

23   that the monitor asked for you to immediately provide is "the

24   work product of Dennis Montgomery, including memoranda,

25   reports, notes, photographs from the Seattle, Washington    14:54:11

1   investigation, and activities referred to in the article by

2   Stephen Lemons in the Phoenix New Times dated June 4th, 2014."

3           And the response from Chief Knight is:  "Deputy

4   Mackiewicz delivered all files in the possession of MCSO

5   provided by Dennis Montgomery on an external hard drive.  This          14:54:28

6   information was transferred to another external hard drive and

7   provided to monitor Anders and counsel Michele Iafrate on April

8   24th and April 27th, 2015."

9           MS. IAFRATE:  Your Honor, could you tell me the

10  number of that --          14:54:43

11          THE COURT:  You know what?  It's not Bates numbered.

12          MS. IAFRATE:  No, no, no.  Didn't he say -- didn't

13  Chief Knight indicate what request he's responding to?

14          THE COURT:  ITR 9.

15          MS. IAFRATE:  Thank you.          14:54:51

16          THE COURT:  Number 9.  But in this document,

17  Ms. Iafrate, which, again, I think you provided to everybody,

18  there's a number of requests that relate to that.  I'm only

19  reading one, because I don't want to relate them all, because I

20  think that covers it.          14:55:05

21          So after last Friday, when I went home and turned on

22  the news and I saw a report in which Mr. Popolizio was standing

23  next to Chief Sheridan and Chief Sheridan said they didn't

24  provide these documents because they'd never been asked for, I

25  realized that I didn't share that view.  That he may be          14:55:20

1  Monitor has timely, full and direct access to all documents

2  that the Monitor reasonably deems necessary to carry out its

3  duties, 145.

4       And then in 146 it specifies that the defendants may

5  withhold from the Monitor any documents or data protected by         14:40:43

6  the attorney-client privilege, acknowledging that that

7  privilege does exist, but, of course, if a -- if the defendants

8  decline to provide that access, they have to give a privilege

9  log, and that's in 146.

10      And in 147 it says -- paragraphs, I'm referring to --    14:40:57

11  Defendants shall ensure that Plaintiffs' representatives and

12  their consultative experts and agents shall have full and

13  direct access to all of Defendants' documents upon reasonable

14  notice.

15      We, as I've set forth before and don't have to go into   14:41:16

16  in great detail, have encountered several circumstances which

17  have required adjustment of the monitor's authority, including

18  when we discovered -- including when the MCSO elected to handle

19  matters itself that arose from the Armendariz-Perez

20  allegations; and further, when we discovered that the          14:41:37

21  preliminary injunction order had not been complied with at all.

22  And I set forth an order on November 20th, 2014, which said:

23  "An adequate internal affairs division must be willing to

24  engage in thorough examination and, in appropriate cases,

25  agency exposure to discipline and painful public             14:41:55

1   accountability.  Of course, to make an appropriate assessment

2   of whether MCSO's PSB is so acting, the Monitor must

3   necessarily have complete access to Defendants' internal

4   affairs investigations.  This includes familiarity with the

5   manner in which MCSO pursues an investigation -- be it criminal   14:42:12

6   or administrative in nature -- the investigation's initial and

7   continuing scope in light of the information the investigation

8   uncovers, the performance of the investigators, and the kind of

9   discipline -- if any -- ultimately imposed at its conclusion."

10        There's a number of other provisions in that order   14:42:30

11   which relate to the requirement that the monitor have full and

12   complete access to documents, both in the Internal Affairs

13   Division and of the MCSO, as was the first order.  However, on

14   that November 20th order I provided it to all parties and said

15   we're going to operate under this order from henceforth, but   14:42:51

16   I'm going to allow you to raise objections and complaints.

17        And Ms. Iafrate, you did, in the December 4th hearing,

18   and I want to read that -- part of that with you.

19        "Ms. Iafrate:  Thank you, Your Honor.

20        "Regarding the November 20th order, on page 16 where   14:43:07

21   you're talking about orders concerning ongoing

22   investigations --"

23        And I say:  "Yes."

24        "-- at line 10 it specifically talks about this case

25   and PSB dealing with the constitutional rights of the members   14:43:19

1    of the plaintiff class are guaranteed by MCSO going forward."

2         And I say:  "Yes."

3         And you say:  "And, of course, MCSO would agree with

4    that, that that was the structure of this litigation."

5         And then we make sure that we're talking about the          14:43:33

6    same order and so you say:  "So at page 17 of the November 20th

7    order you talk about the monitor must necessarily have complete

8    access to defendants' Internal Affairs investigations."

9         And I said:  "Um-hum."

10         And you said:  "Our concern, Your Honor, is that some       14:43:50

11    internal investigations do not deal with the underlying

12    litigation in this matter, so I'd ask that that be curtailed

13    ever so slightly to coincide with what you wrote on page 16,

14    where it deals with investigations of MCSO personnel as it

15    relates to either compliance with the order, meaning your        14:44:06

16    injunctive order, or the constitutional rights of members of

17    the plaintiffs' class."

18         And I tell you:  "Show me what line you're talking

19    about."

20         And you say:  I'm talking about page 17, line 14."          14:44:18

21         And I tell you:  "How about if I do this, Ms. Iafrate?

22    One of the things we've discovered, and I think we've all

23    discovered it, is that there's lots of things that relate to

24    this case and to this -- to this suit in terms of Internal

25    Affairs investigations, PSB investigations.  That doesn't mean   14:44:34

1    that everything does; I acknowledge that.

2            "How about if I put in here -- I don't want to limit

3    the monitor's right to have complete access to the PSB because

4    you don't know what you don't know until you know it.  But I

5    will put in here the right for you to object, saying that the          14:44:54

6    monitor is investigating matters that can have no relation to

7    this lawsuit and raise the matter to me.

8            "Would that be acceptable to you?"

9            And you say:  "That would be acceptable."

10           And that, in fact, is precisely what I did in document        14:45:08

11   825 filed December 9, 2013.  I reference our colloquy and I

12   note that upon the recommendation of your parties I'm going to

13   change my order, and I say: "In its Order, the Court indicated

14   that the 'Monitor must necessarily have complete access to

15   Defendants' internal affairs investigations.  Defendants are          14:45:30

16   further authorized to file objections with the Court if and

17   when they dispute the Monitor's involvement in particular

18   investigative processes as bearing no relation to the Monitor's

19   evaluation of whether the Professional Standards Bureau is

20   operating in compliance with the Supplemental Permanent               14:45:44

21   Injunction or other Orders of this Court, or as otherwise

22   exceeding the power vested in the Monitor by the Court..."  I

23   go on; I'm not going to read it.

24           In February of 2015 I entered an order requiring

25   expedited discovery that says:  "Copies of identification            14:46:01

1    documents seized by MCSO personnel from apparent members of the

2    Plaintiff Class" must be provided."

3        Now, we had -- and again, I don't mean to

4    mischaracterize it, and it wasn't under oath, but it was a

5    characterization of the monitor about what some of the                 14:46:21

6    witnesses said they were informed in a Friday meeting prior to

7    the monitor's visit that certain identifications located and

8    found that did contain members of the plaintiffs' class were

9    not to be discussed with the monitor, or something to that

10   effect.                                                               14:46:39

11       That violates my orders, and it does so in a direct

12   way.  It violates my orders both about what had to be

13   disclosed, and it violates my orders about the access that the

14   monitor has, and should be given, to information in the

15   Internal Affairs Division.                                            14:46:59

16       And if in fact there is any effort by the MCSO to

17   subvert those orders by lying to the monitor or telling him

18   less than the truth, or informing or instructing their people

19   to do so, that is in fact even a more serious and gross

20   violation of my order.  I'm not saying that happened, and        14:47:18

21   again, everybody has an opportunity to be correctly heard.

22       As it pertains to the 50 hard drives that apparently

23   were also -- or at least there was also some information in

24   interviews that there was 50 hard drives that were provided by

25   Montgomery, and not only was there information provided in the   14:47:45

1   interviews, but I noticed when I lifted the documents from

2   under seal that Ms. Wang provided in her response to the motion

3   to compel, I noticed that a number of those documents discussed

4   50 hard drives of downloaded material received from

5   Mr. Montgomery.                                                                14:48:03

6          And we received some information that such materials

7   existed and we found 50 hard drives, and again, Ms. Iafrate,

8   I'm not representing what they are one way or the other.  I

9   recognize that they may not be hard drives provided by

10  Mr. Montgomery.  Even if they are, I believe, at least based on   14:48:22

11  the testimony I've heard, and it is at least suggested by the

12  e-mails that Ms. Wang provided, that they may be junk, and they

13  may not be what Mr. Montgomery represented to the MCSO they

14  were.  I don't know that, either.  I recognize there's all

15  kinds of possibilities out there.                                             14:48:47

16         But I will point out that in the sheriff's testimony

17  on April 23rd I directed him very directly:  "... to the extent

18  that you have any control over any funding records, over any

19  reports, over any communications, over any overtime records,

20  travel documentation, any e-mails of any and all people                       14:49:02

21  involved in the threat assessment unit or anywhere else, any

22  communications from and to Montgomery, any computers or phones,

23  cell phones or other information that in any way is relevant or

24  related to this investigation, I want you to direct your people

25  to put a hold on it immediately and preserve it.  And that                    14:49:18

1   includes any documentation or numbers that would relate to

2   Mr. Montgomery's confidential status.

3        "You understand that?"

4        And the sheriff:  "Your Honor, are you referring to

5   this investigation with the monitors and --"                    14:49:31

6        And I said:  "No, no.  I'm referring to the

7   investigation that Mr. Montgomery was undertaking with

8   Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, anybody else from your

9   staff, anybody else from the MCSO, or anyone else from the

10  posse.  I want all records that in any way relate to it, all    14:49:47

11  electronic data or anything else, or the financing, funding of

12  that operation, all phone records, e-mails, reports, I want it

13  all preserved."

14       "And I think I will send the monitor to begin taking

15  possession of those records and we'll do it confidentially,     14:50:03

16  imminently.  But I don't want in the interim any of those

17  records lost, inadvertently or otherwise."

18       The next day, Chief Deputy Sheridan was testifying and

19  ran into a snafu.  We'd agreed on a procedure whereby you could

20  have folks over there, and you did.  You cooperated.            14:50:23

21  Ms. Iafrate, you had attorneys over there doing rushed review,

22  because that's what I'd ordered that you do.  And we ran into a

23  problem where folks were not providing my monitor with the

24  documents, and they wouldn't provide them until you looked at

25  then, approved them, and Bates stamped them, and I told them    14:50:40

1    that under the circumstances, that is not what I ordered, and

2    you will remember that I set out a separate procedure.

3            Chief Sheridan was still on the stand, and so I

4    said -- we went through the objections and I said:  "And so I'm

5    going to require that those documents be released immediately.      14:50:58

6    I mean, not without your review.  Whoever your designated

7    attorney is, get over there and review them.  We'll make some

8    sort of a list of the documents that have been provided, and

9    then we can -- we can match them up when you Bates stamp them.

10   But I want those documents provided."                              14:51:14

11           And then I turned to Deputy Chief Sheridan and I said:

12   "Do you have an issue with that, Chief, that we need -- that we

13   need to discuss or concerns that you wanted to raise that I

14   should consider?"

15           And he said:  "No, sir."                                   14:51:26

16           And then I said:  "Okay.  Is that okay with you?"

17           And he said:  "Yes, sir."

18           Then you may remember that after the lunch break I

19   said:  "Before we begin, apparently there's been a

20   miscommunication.  Chief, I know you were over trying to          14:51:38

21   facilitate or getting those documents over the noon hour, and

22   as soon as you left, folks indicated they wouldn't give the

23   documents until Ms. Iafrate had a chance to review them and

24   they were Bates stamped, which I think we already resolved

25   prior to lunch."                                                  14:51:53

1        "Is there anything you can do to facilitate that

2    production right away, Chief?  Who is the captain that said he

3    wouldn't give them?"

4        And then there was an indication that it was

5    Chief Knight.                                                    14:52:02

6        And then I said:  "I'm really trying -- the thought

7    occurred to me over lunch, Chief.  I'm not trying to use these

8    today.  There's going to be too much other stuff.  But I really

9    do think it's important to secure the documents.  So I'm still

10   going to hold to that order, unless you have some reason,        14:52:14

11   Chief, why I shouldn't.  I think it's very important, in light

12   of the history of the case, that we get the documents in a set

13   today."

14       And then, Ms. Iafrate, you said:  "From what I

15   understand, Your Honor, at one point there were three requests,  14:52:25

16   and now I think that there are way more requests --"

17       And I said:  "Yeah."

18       You said:  "-- so it's a moving target."

19       I said:  "Yeah, it wouldn't surprise me if the

20   requests are coming in fast and furious, because my folks want   14:52:35

21   to get this arms around everything today.  So that may be part

22   of the confusion.  But I'm sure I was clear, and I suspect that

23   the chief deputy went over to try to facilitate that, and there

24   must be some confusion, so if you'll call Chief Knight and

25   we'll wait for you."  You called Chief Knight and told me that   14:52:50

1    correct, he certainly has an opportunity to be heard, but I

2    thought that it was well that I point out my concerns about

3    what is happening, in light of the attorney-client privilege

4    that's been invoked I have concerns about what is happening and

5    who is giving the direction not to discuss to the monitor.          14:55:43

6              But again, you have a legitimate right to

7    attorney-client privilege at some level which -- which is lost,

8    and I'm not saying that you gave that advice, I don't make that

9    assumption, but I have all of those concerns.

10             Now, let me tell you what I propose to do about it.  I    14:56:00

11   do not want to offset the relief that members of the plaintiff

12   class are entitled to, nor do I want to delay any longer

13   corrective action that I think must occur within the Maricopa

14   County Sheriff's Office and revisions to the injunctive relief

15   order, if that ought to happen.                                     14:56:18

16             Further, I recognize that this is a civil contempt

17   hearing that relates to three matters that I have directly set

18   forth, and these two what I view as direct violations of my

19   order -- and I'm not sure that they are, but they appear to be

20   direct violations of my order -- aren't noticed for this civil     14:56:41

21   contempt hearing.

22             But I think I've made it very plain, which is why we

23   have specially appearing counsel here, that if I determine at

24   the end of the civil contempt hearing that there is a basis and

25   a need to refer any or all of these matters for criminal           14:56:56

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 45

1    contempt, I will do so.

2         It also seems to me that these matters, even though

3    they cannot and should not, in and of themselves, be the

4    subject of civil contempt, are relevant to the civil contempt

5    hearing in terms, as I've said all along, about the need and          14:57:11

6    the necessity and the extent of the remedy required that may be

7    sought by the plaintiff class for materials and other matters

8    that were not provided by the Maricopa County Sheriff's Office

9    prior to the trial in this matter, so here is what I would

10   propose.                                                              14:57:32

11        I'm not going to adjust these civil contempt hearings

12   to incorporate those matters which I believe may have been but

13   I do not know were direct violations of my order, but I'm not

14   going to view them necessarily as irrelevant.  I don't know

15   whether the attorney-client privilege may have been waived,          14:57:48

16   based on the content of the interviews; I haven't even seen the

17   content of the interviews.  But I'm not going to hold a civil

18   contempt hearing concerning them, even though I'm not going to

19   find them irrelevant to the present civil contempt hearing.

20   Nor do I make a representation that they will not possibly be         14:58:06

21   the subject of a future criminal contempt hearing if I

22   determine at the end of these hearings that civil contempt

23   cannot serve the purposes that are required by the nature of

24   the contempt itself.

25        That is how I propose to proceed.  Is there any                 14:58:26

1    concern or comment by the parties?

2          MS. IAFRATE:  I have nothing to add, Your Honor.

3          THE COURT:  Okay.  Ms. Wang?

4          MS. WANG:  Your Honor, we had intended to inform the

5    Court and defendant today that we were going to file a motion          14:58:49

6    for a new order to show cause why defendant Arpaio should not

7    be held in contempt for what appears to be the deliberate

8    withholding of documents in violation of this Court's orders

9    and after consultation with counsel.  It was our intent to file

10   that motion early next week, but Your Honor has now stated a           14:59:11

11   proposal to proceed otherwise.

12         I think we do agree with the Court that there are

13   issues relating to these new facts that we have learned from

14   the Monitor Team initially last Friday that would be related

15   to, and overlapping with, the ongoing civil contempt                   14:59:37

16   proceeding.  But we do believe that there are new grounds for a

17   civil contempt proceeding, and quite potentially for a criminal

18   contempt proceeding, which, of course, would be in the Court's

19   sole discretion to refer for investigation by the United States

20   Attorney's Office or a special prosecutor.                             14:59:54

21         But I offer that, Your Honor, because it had been our

22   intent to inform the Court, because it could have a bearing on

23   the scheduling and the scope of the ongoing proceeding.

24         THE COURT:  Well, you know, Ms. Wang, I do not want to

25   preclude you from any remedy that you may choose to seek, and          15:00:12

1   I'll consider that.  I just put this forth as a proposal so

2   that we could expedite matters that currently exist.

3         I believe that Mr. Birnbaum and others have repeatedly

4   said that there may be people who are not involved here that

5   shouldn't be drug along in the context of a civil contempt          15:00:32

6   hearing, raising to a possible criminal contempt hearing, any

7   longer than necessary.

8         I also, frankly, as I'm sure you do, have concerns

9   about providing prompt and immediate relief and reparation to

10  the plaintiff class, and so my concerns, and I will say it          15:00:48

11  frankly, have been we need to get this first part over.  There

12  isn't any part, if I determine that a criminal referral is

13  necessary --

14        (Beeping sound on telephone.)

15        THE COURT:  Are you still there?  Chief Martinez?          15:01:00

16        DEPUTY MONITOR MARTINEZ:  Yes, sir, I'm here.

17        THE COURT:  Okay.  Did anybody join the call?

18        There isn't any part of anything that I want --

19  because I haven't yet determined that a criminal contempt

20  citation is necessary, I haven't ordered one; I still haven't          15:01:19

21  considered that it's necessary.  But I certainly also have not

22  bound myself, if I determine that a criminal referral is

23  necessary, to limiting it only to the three matters of this

24  civil contempt.

25        And it does seem to me that if any criminal contempt          15:01:37

1   proceeding is desirable, I don't want to piecemeal out that

2   criminal contempt hearing; I want to just do one, as I've

3   indicated before.  I do believe it's important, for lots of

4   reasons, and justified that I stay on the civil hearing and the

5   enforcement process that pertains to this injunctive order, but   15:01:52

6   I have every intention of referring out not only to the United

7   States Attorney any criminal contempt that may be necessary,

8   but that would go to a different judge.  So I don't have any

9   intention of piecemealing one out to one judge, one out to

10  another judge, because, as you know, these matters are randomly   15:02:11

11  drawn.

12          So all the parties can consider what I've just said as

13  you consider how to appropriate -- if you want to do anything

14  with respect to it, I'm not trying to limit any party with

15  respect to any sought relief, but I'm just proposing how we      15:02:24

16  proceed and setting forth my concerns, my inclinations, and

17  that's how we're going to proceed.

18          Again, to the defendants, to the extent you want to

19  introduce evidence in this matter, because I do think, as it

20  seems to me today, it's relevant, although it's not an item or   15:02:41

21  a matter of civil contempt, it is relevant to the civil

22  contempt hearing, so I'm not going to presume to try to prevent

23  you from introducing evidence that you may want to introduce in

24  this action pertaining to it.  But as I proposed that we have

25  regular status conferences, these are matters that I hope we     15:02:58

 1    can address and adjust in conjunction with the deadlines and

 2    the trial dates that we have.

 3          And before I'm through today, I do wish to set status

 4    conferences on a fairly regular basis.  And let me suggest that

 5    one of the things -- I'm going to talk to the monitor here          15:03:19

 6    again in a second.  I think that their investigations may be

 7    coming -- I know that they still have to talk to Chief Olson.

 8    I'm not sure if Chief Olson's around.  I think they have some

 9    other interviews that they want you to arrange, Ms. Iafrate,

10    but I think that those requests are going to be made pretty         15:03:40

11    rapidly.  If you respond pretty rapidly, those will be over,

12    and it seems to me that one of the things that might be

13    profitable for the parties to do is, as I've said earlier, see

14    if based on those interviews you can arrive at certain

15    stipulations that obviate the need to spend a lot of time on        15:03:59

16    irrelevant things.

17          MS. IAFRATE:  Your Honor, we have gone through one

18    round of interviews related to these new investigations.  I

19    just got an e-mail right before I walked in here requesting

20    approximately 20 more interviews.  So we are scheduling them as     15:04:16

21    quickly as we possibly can.  We've done round 1 and round 2.

22    The Chief Olson interview is separate and apart from these

23    interviews that they provide us with an e-mail and say:  Please

24    schedule these interviews.

25          THE COURT:  All right.                                        15:04:36

1      MS. IAFRATE:  So we're working through both of those.

2      THE COURT:  As far as I'm aware, at least as far as

3  the monitor's indicated to me, you've been cooperative, in the

4  large main, in scheduling the interviews, and I anticipate that

5  you'll continue to be so.  And if there's a problem, you can          15:04:48

6  always ask for an emergency hearing, as we had last week, if

7  it's necessary, after we set the status orders.

8      All right.  I received suggestions from Maricopa

9  County and from the plaintiffs on suggested revisions to the

10 supplemental permanent injunction.  I looked at them both.  I          15:05:18

11 don't know if either party wants to address them.  I must say I

12 think something more simple along the lines suggested by

13 Mr. Masterson is what I'm going to do, but if plaintiffs want

14 to be heard on their a little bit more expansive suggestion.

15     I do want to make it clear, though, to defendants that          15:05:35

16 even if I accept Mr. Masterson's definition and restriction as

17 being in line with the Ninth Circuit authority, the Ninth

18 Circuit authority did not consider in its appeal any of the

19 supplemental adjustments made to the monitor's authority, and

20 those still all go forward.          15:05:56

21     Ms. Iafrate?  Or not Ms. Iafrate, I'm sorry.

22     Ms. Wang, did you want to be heard?

23     MS. WANG:  Sure, Your Honor, briefly.

24     Your Honor, the reason we've presented what I think

25 you just characterized as a more expansive language for the two          15:06:10

 1  paragraphs in the supplemental injunction is that I think it's

 2  become clear, particularly given the more recent events in this

 3  case, that we need to get a handle on MCSO's Internal Affairs

 4  investigations and the way that complaints are handled and that

 5  discipline is meted out to MCSO personnel.                          15:06:33

 6          And the concern we have, Your Honor, is that simply

 7  limiting the language to fourth and fourteenth --

 8          THE COURT:  Let me make a suggestion to you, Ms. Wang,

 9  and see --

10          MS. WANG:  Yes, sir.                                        15:06:46

11          THE COURT:  -- what you think about this.

12          MS. WANG:  Okay.

13          THE COURT:  I feel myself bound by the Ninth Circuit

14  Court of Appeals, for some strange reason, and the Ninth

15  Circuit indicated that I needed to limit the scope of my          15:06:54

16  injunction to matters involving the plaintiff class.

17          It seems to me that Mr. Masterson's and

18  Mr. Popolizio's suggestion does that pretty clearly, but as

19  I've indicated, that does not change the adjustments made to

20  the monitor's authority in light of intervening events.           15:07:09

21          If you believe that intervening events require this

22  Court to again adjust the monitor's authority upward, let me

23  suggest that I would be more inclined to adjusting the

24  monitor's authority upward in light of intervening events

25  rather than curtailing my original injunctive order, which I      15:07:33

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 52

1    believe the Ninth Circuit has already indicated I need to
2    narrow slightly.
3            MS. WANG:   Understood, Your Honor.   And but separate
4    and apart from the intervening events, we believe just on the
5    record through the trial, and in light of the Ninth Circuit's          15:07:46
6    order, the language that Mr. Masterson has proposed doesn't
7    capture the full range of activity.   That is limited to the
8    plaintiff class.   We think that our proposal captures -- is
9    limited to the plaintiff class as the Ninth Circuit directs,
10   but would also encompass violations of agency policy that could       15:08:05
11   implicate the rights of the plaintiff class that do go to the
12   issues of discriminatory policing, and, Your Honor, I think
13   this point has been discussed before in court, don't leave it
14   in the hands of MCSO to classify a particular matter as falling
15   within the ambit of a Fourth or Fourteenth Amendment violation.       15:08:32
16   Our language is only slightly more expansive, and I would
17   submit discusses policy violations, which are often the focus
18   of the charged violations in Internal Affairs investigations.
19           So, in other words, from what we have seen and from
20   standard law enforcement practices, I think that Internal              15:08:51
21   Affairs investigations often are focused on violations of
22   agency policy, in this case of MCSO's policy and procedures
23   manual, and not necessarily explicitly involving violations of
24   the Constitution.
25           I therefore think that the language that we've                 15:09:09

1    proposed, setting aside intervening events and based solely on

2    the trial record and not in light of the Ninth Circuit's

3    opinion, would capture a much more limited category of material

4    than what Your Honor first ordered in October of 2013, but

5    would be limited to the plaintiff class as the Ninth Circuit          15:09:27

6    has ordered.

7          THE COURT:  I'll consider that, Ms. Wang, but doesn't

8    some of that go to a possible remedy, if in fact I find that

9    the material that you were deprived and should have received

10   indicates that their Internal Affairs problem has processed --        15:09:46

11   or their Internal Affairs process has problems, and that their

12   complaints from the public have problems and everything else,

13   and that that material would have -- or the material that was

14   withheld would have provided you with that information so that

15   you could have presented it at trial, don't I have to make that       15:10:04

16   finding first?

17         MS. WANG:  Your Honor, I think that as you noted, we

18   could be seeking additional and different relief after the

19   outcome of the ongoing proceeding.  I'm just speaking based on

20   the trial record.  I think what we have is a Ninth Circuit            15:10:21

21   order, an opinion that said that the original paragraphs 136I

22   and J were not limited to the plaintiff class.  We think that

23   our proposed language is limited to the plaintiff class, but is

24   going to capture the disciplinary outcomes and misconduct

25   complaints in the way that they are categorized and classified        15:10:43

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference    54

1    in a normal MCSO Internal Affairs proceeding.

2           Just to be clear, because I'm not sure I was, I think

3    that the way that Internal Affairs, or now PSB, files are kept,

4    what's normally charged, in terms of misconduct alleged against

5    a deputy, is a violation of agency policy.  We haven't seen        15:11:04

6    that many files that explicitly allege that a deputy has

7    violated the Fourth and the Fourteenth Amendments of the

8    Constitution.  That's my main point in why I think our language

9    is both necessary, and is limited in the way the Ninth Circuit

10   ordered.                                                           15:11:25

11          THE COURT:  All right.  I follow you.  Thank you.

12          MS. WANG:  Thank you.

13          THE COURT:  Mr. Popolizio, do you want to be heard on

14   this?

15          Or is it you, Ms. Iafrate?                                  15:11:30

16          MS. IAFRATE:  It's me, Your Honor.

17          THE COURT:  Okay.

18          MS. IAFRATE:  I don't have anything to add to our

19   proposed language, Your Honor.  The way that we proposed it was

20   we went back to the Ninth Circuit's language and incorporated     15:11:37

21   that into our proposal.  Therefore, it tracks the Ninth

22   Circuit's mandate.

23          THE COURT:  You wouldn't contest Ms. Wang's point,

24   though, that if agency policy has been violated with respect to

25   the members of the plaintiff class, that wouldn't violate the     15:11:52

 1   Ninth Circuit's order.

 2           MS. IAFRATE:  It wouldn't violate the Ninth Circuit

 3   order --

 4           THE COURT:  I mean, the Ninth Circuit's mandate to me

 5   back saying you need to limit it to activities involving          15:12:00

 6   members of the plaintiff class, so it doesn't have to be just

 7   constitutional violations.

 8           MS. IAFRATE:  Correct, Your Honor, it doesn't have to

 9   be just constitutional violations, but the way that plaintiffs

10   have worded their proposal, it expands it much further than      15:12:14

11   what you just posed to me.

12           THE COURT:  I agree, but I do agree, I think, with

13   Ms. Wang's supplemental point, which is that it does requi- --

14   I should make sure that the issues are related to members of

15   the plaintiff class.  But the members of the plaintiff class     15:12:29

16   are entitled to the benefits of MCSO policy just like every

17   other citizen is entitled to the benefits of MCSO policy, are

18   they not?

19           MS. IAFRATE:  Yes.

20           THE COURT:  Okay.  So you wouldn't have any dispute       15:12:42

21   with Ms. Wang's final point there.

22           MS. IAFRATE:  The point that she makes, I would agree

23   the language that she posed does not say the final point that

24   she said.

25           THE COURT:  Okay.                                         15:12:51

1        MS. IAFRATE:  I think that it's more expansive.

2        THE COURT:  No, I agree that the language she proposed

3   was more expansive than that, and I'll take a look at it and

4   enter an order this week.

5        MS. IAFRATE:  Very well.                                    15:12:59

6        THE COURT:  All right.  We have responses to

7   Mr. Klayman's motion for admission pro hac vice.

8        Is he here, and does he wish to be heard?

9        All right.  He's not here.  Now, I'm not -- let me

10   just say that I told him that I would give him a full          15:13:13

11   opportunity to reply if he wished to.  And he hasn't replied,

12   and the time hasn't run for his reply so I'm not going to rule

13   on that today.  I'll allow him to appear -- file a reply if he

14   wishes to and appear at the next status conference and argue

15   that he should be admitted to pro hac vice status.             15:13:31

16        I am going to note the plaintiffs have opposed his

17   admission for reasons that I raised with him last week, which

18   is he has signed -- he signed all of Mr. Moseley's appli- --

19   well, he didn't sign them, but he was on the block, on the

20   signature block, and on the -- he's in the same law firm.  I   15:13:54

21   don't see that there's any different analysis, and it seems to

22   me that the conflict is still the same.  I'm concerned about

23   him being a witness.

24        And as I've said before, I'm also concerned that his

25   motion to intervene as it pertains to the ability to claim     15:14:07

1    rights in Mr. Montgomery's property is not well taken because

2    we're not adjudicating Mr. Montgomery's rights to his own

3    property in this proceeding.  But those are the matters, if

4    Mr. Klayman gets a copy of the transcript, that I am concerned

5    about, and we will let him address it at that time.                    15:14:23

6         I do have one concern that I want to share with

7    Maricopa County, and by that I mean Mr. Walker.

8         Mr. Walker, last week I think you indicated that you

9    really don't have any right to substantively argue anything

10   different than the sheriff, because while you have no power to     15:14:38

11   control the sheriff, and you may or may not agree with him,

12   Maricopa County is bound legally and liability-wise by his

13   actions.  And you filed a different -- you filed a substantive

14   opposition to the admission for pro hac vice of Larry Klayman

15   when the sheriff explicitly took no possession one way or the    15:15:04

16   other.

17        I don't know that you have any authority to do that,

18   do you?

19        MR. WALKER:  Yes, Your Honor, I think that I do, and

20   it sounds as though I may have left the Court with a             15:15:14

21   misimpression the last time we spoke about this issue.

22        Let me try to be clear.  What you and I were

23   discussing at the last status conference had to do with

24   financial responsibility for the costs related to remedial

25   orders coming out of this proceeding.  And the point I was       15:15:40

1    trying to make is there's an Arizona statute that requires the

2    board of supervisors to provide funding for reasonable and

3    necessary activities, law enforcement activities, of the

4    sheriff.  And that, we interpret as requiring, at least to the

5    extent that we're not talking about willful violations, that      15:16:08

6    the County has a financial obligation under that statute and

7    has been acting --

8            THE COURT:  Well, I understand that.  Let me get right

9    to the point.

10           MR. WALKER:  Okay.                                          15:16:22

11           THE COURT:  What point -- what argument, as I think I

12   read the Ninth Circuit opinion, and I'll go back and reread it

13   before we meet next week, I'm not going to prohibit you from

14   being a party here because you're providing and you're

15   responding to document production requests.  You clearly are a   15:16:35

16   party.  But as I read the Ninth Circuit order, you're a party

17   because you're going to be liable for any judgment, not because

18   you have any substantively different legal right to protect.

19           Can you identify for me what substantively different

20   legal right the County has to protect in defending itself        15:16:52

21   against liability that is incurred by the sheriff but not by

22   you?

23           MR. WALKER:  Certainly, Your Honor.  The Board of

24   Supervisors, and the portion of the county government that

25   operates under their direct supervision and direction, has a     15:17:09

1  direct fiscal responsibility to the taxpayers of this county to

2  ensure that the tax revenues are used in appropriate ways.  The

3  sheriff has no independent responsibility with respect to that,

4  so in that sense, the interests are very different.

5         As Your Honor I would imagine is well aware, it is not   15:17:38

6  uncommon for the Board of Supervisors and the sheriff to be on

7  opposite sides of litigation, and --

8         THE COURT:  But the liability here is not based on

9  anything that the Maricopa County Board of Supervisors has done

10 at all, so I don't know that you have -- I mean, I think you're   15:17:58

11 a party here because you're going to be liable for the

12 judgment, but I don't know that you have any ability to make

13 any liability argument separate from the sheriff.

14        Why don't you consider that, because I don't want to

15 deprive you of that right if you've got it; I just don't know   15:18:15

16 that you have it.

17        MR. WALKER:  Could I just speak very briefly to the

18 Klayman motion?

19        THE COURT:  To what?

20        MR. WALKER:  The Klayman --   15:18:25

21        THE COURT:  No.  And the reason I'm not going to let

22 you speak to the Klayman motion isn't because I'm not sure that

23 I won't let you be heard on it; it's that Mr. Klayman is not

24 here.  We're not going to take up that motion because I told

25 him I would give him a chance to reply, and the time for reply   15:18:37

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference  60

```
 1   has not yet run so that may be why he's not here.
 2              But if I decide that you have a right to be heard on
 3   it, I'll let you be heard when we take up the Klayman motion.
 4              Okay?
 5              MR. WALKER:  Okay.  Thank you, Your Honor.          15:18:51
 6              THE COURT:  Thank you, Mr. Walker.
 7              The Department of Justice has filed a motion to
 8   intervene.  The plaintiffs have filed a non-opposition to such
 9   a motion.  Are the defendants going to oppose the motion?
10              The time hasn't run, so if you're going to oppose the   15:19:03
11   motion, I think you have, like, two or three days left to file
12   an opposition if you're going to.  I just want to know if
13   you're going to.  If you're not going to, I'm going to grant
14   the motion.
15              MS. IAFRATE:  Your Honor, we would like the full time.   15:19:14
16   I think that it's August 6th.
17              THE COURT:  Oh, is it?  Okay.
18              MS. IAFRATE:  That was my calendaring.
19              THE COURT:  I didn't count it.  I'll accept your
20   representation.                                                15:19:24
21              MR. WALKER:  As would the County, Your Honor.
22              THE COURT:  Okay.  Why don't we set status
23   conferences, and these may need to be adjusted, but right now
24   why don't we set status conferences for August 14th at
25   9:00 a.m., August 21st at 10:00 a.m., August 28th at 9:30,     15:19:35
```

1    September 4th at 9:00 a.m.

2            I, unfortunately, already have a matter all Friday the

3    11th, so I would like to set it for September 10th at

4    9:00 a.m., and September 18th, which will just be four days

5    before the hearing resumes, at 10:30.                          15:20:00

6            MS. IAFRATE:  I do have a conflict with one of those

7    dates, Your Honor.  I will be in trial August 21st.

8            THE COURT:  Do you have anybody you could send,

9    Ms. Iafrate?

10           MS. IAFRATE:  Well, Your Honor, I will see if I can    15:20:13

11   work --

12           THE COURT:  How about we do this?  Set those dates,

13   everybody put down those dates, and just tell me if you've got

14   a problem, and we'll see if we can make adjustments at the next

15   status conference.                                             15:20:32

16           MS. IAFRATE:  Very well.

17           THE COURT:  Does that work?

18           MS. WANG:  It does, Your Honor.  On the plaintiffs'

19   side, we already know that none of plaintiffs' counsel are

20   available on August 14th.  We could be available the Monday of  15:20:38

21   that week.

22           THE COURT:  "The Monday" meaning what?  You mean the

23   following Monday?

24           MS. WANG:  No, the previous Monday, or the following

25   Monday; either one, I think.                                   15:20:53

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference   62

1          Oh, wait.  Sorry.  The previous Monday.

2          THE COURT:  So that would be -- I'm terrible.

3          MS. WANG:  I'm sorry.  Let me --

4          THE COURT:  Would that be the 10th?

5          MS. WANG:  -- get the calendar in front of me.          15:21:03

6          THE COURT:  That would be August 10th?

7          MS. WANG:  The 10th.  August 10th.

8          THE COURT:  All right.  I will maybe -- we won't

9    schedule one on the 14th.  I will look at setting one on the

10   10th, but I will tell you that normally my Mondays are          15:21:09

11   completely filled with criminal matters, so it's going to be

12   either very early in the morning, very late.  And hopefully, it

13   won't be of this extent, because I simply won't have this time.

14   But I think we've resolved a lot of things here today, I hope

15   so.                                                             15:21:26

16         Mr. Birnbaum.

17         MR. BIRNBAUM:  Yes.  Thank you, Your Honor.

18         Your Honor, I --

19         THE COURT:  I need to have you speak in a microphone.

20         MR. BIRNBAUM:  Let me pull on one.                        15:21:35

21         THE COURT:  You can approach the podium.

22         MR. BIRNBAUM:  Oh.  Thank you.

23         Your Honor, just on --

24         THE COURT:  I need to have you speak at a microphone,

25   Mr. Birnbaum.                                                   15:21:40

1    MR. BIRNBAUM:  Your Honor, just on the scheduling

2    issue, I'm sorry to take your time, I just want to advise the

3    Court that I teach at the ASU Law School --

4         THE COURT:  Um-hum.

5         MR. BIRNBAUM:  -- Friday morning from 8:30 to 11:30.    15:21:52

6    Is not a problem.  I will have somebody from my office attend

7    the status conferences.  But it is likely that unless something

8    specifically is agendized that involves Mr. MacIntyre, it is

9    likely I will not attend any of those conferences personally,

10   with the Court's permission.                                15:22:15

11        THE COURT:  You have it.  Thank you, Mr. Birnbaum.

12        MR. BIRNBAUM:  Thank you.

13        THE COURT:  Ms. Clark.

14        MS. CLARK:  Judge, just briefly, I had reached out to

15   Ms. Wang to ask her if she's aware whether there's going to be  15:22:28

16   an issue for a status conference that is going to involve

17   Mr. Casey, that she let me know ahead of time so I can here.

18        As you know, Mr. Casey's --

19        THE COURT:  That seems to me to be perfectly

20   reasonable.  Is everybody okay with that?                  15:22:47

21        MS. CLARK:  So I will not --

22        THE COURT:  Everybody has nodded their assent, let me

23   state for the record.

24        Let me just say I don't think the monitor has any

25   intent to -- I may be wrong about this, I may be completely    15:22:55

1    wrong, so maybe I ought to shut up, but I do think that I

2    haven't precluded the parties, if they want to do depositions,

3    from doing depositions.  I've only said you need to talk -- get

4    the clearance of the monitor first.

5            I think the monitor's pretty much given to Ms. Iafrate    15:23:09

6    the interviews that he wants to do, so if you want to depose

7    people that aren't on that list, check with him and you can

8    begin depositions, and I know there may be an issue with that

9    with respect to Mr. Casey.  Otherwise, I think we ought to not

10   require Ms. Clark to be here every time, and we should do her    15:23:24

11   the courtesy of letting her know in advance if there's going to

12   be an issue that involves Mr. Casey.

13           Any problem with that?

14           MS. WANG:  No, Your Honor, not from plaintiffs.

15           MS. IAFRATE:  No, Your Honor.                            15:23:35

16           MR. WALKER:  That's fine, Your Honor.

17           MR. COMO:  I have no objection, Your Honor.

18           MS. CLARK:  Thank you, Judge.  Mr. Casey just asked me

19   to raise two issues regarding his deposition, his potential

20   deposition, and that is just since it's been a while with the    15:23:48

21   motion to stay, that he's hoping that Your Honor is going to be

22   present for his deposition.  He doesn't want to have to come

23   back for repeated depositions.

24           It's such a unique case and such a unique deposition

25   of the defendant's former counsel, there will be constant        15:24:08

 1    issues of confidentiality, privilege, and perhaps other issues,

 2    that would -- he's going to need a ruling on in order to be

 3    able to answer questions.  And to get this done timely and

 4    efficiently for Mr. Casey, as well as the parties and the

 5    Court, he's again reiterating that he very much would like you          15:24:24

 6    to be present for his deposition.

 7         Secondly, he is just concerned that production issues,

 8    privilege issues concerning production, obviously all be

 9    resolved prior at his deposition.

10         THE COURT:  All right.  Well, I think we've tried to              15:24:40

11    undertake steps towards that today.  Counsel probably will be

12    in touch with you -- counsel will probably be in touch with you

13    trying to coordinate that deposition, and it isn't an ex parte

14    contact for counsel and you to contact my judicial assistant to

15    try and find a date that's going to convenient for me to be            15:25:05

16    there.  I think we've already discussed that if I could be,

17    that would be optimal.  But I also have a schedule, Ms. Clark,

18    with all due respect, so we'll have to do what we can do.

19         MS. CLARK:  Yes, Judge.

20         THE COURT:  But I will try to be there.                          15:25:18

21         MS. CLARK:  Yes, Judge.  Thank you.

22         And finally, the last point is we will be producing

23    the documents as discussed earlier on August 3rd.  I will be

24    out of the country and unavailable August 4th through the 14th.

25    So if there are other production issues that come up during           15:25:28

1    that time, I'll have to be handling them when I get back on the

2    17th.

3              THE COURT:  Happy vacation.

4         MS. CLARK:  Thank you.

5              THE COURT:  If there's nothing else, then I am, as I        15:25:39

6    indicated I would, going to take the matter that Ms. Iafrate

7    asked be addressed under seal under seal.

8              Are there other matters to be raised?

9         MS. WANG:  One other issue we wanted to flag for Your

10   Honor because it could bear on the scheduling of the actual         15:25:53

11   hearing.  We've been in the process of meeting and conferring

12   with the defendants about a process for making whole the

13   victims of the preliminary injunction violations.  We don't

14   know yet whether we're going to come to any agreement.

15             It may be necessary for us to put on some testimony on     15:26:08

16   that subject, and Ms. Pedley, my co-counsel from Covington, has

17   been taking the lead for us in that meet and confer process and

18   can alert the Court, if you wish, as to the status of those

19   conversations and what the issues may be.

20             THE COURT:  All right.  Ms. Hedley, please approach --     15:26:27

21   either grab a microphone or approach the podium, please.

22         MS. PEDLEY:  Thank you, Your Honor.  As my co-counsel

23   mentioned, we have been meeting and conferring.  We would

24   recommend that we use a claims administration firm.  We hope to

25   reach consent on that issue, the advantage of that being they      15:26:43

1    can handle many of the issues, including notice and evaluating

2    claims and processing those claims.

3         If we are unable --

4         MR. WALKER:  I have to object.  We talked about this

5    before this status conference began, and my understanding was          15:27:01

6    that the Court was going to be informed that we have been

7    engaged in meet and confer, and continue to be, without getting

8    into the substance of those discussions.

9         THE COURT:  That's fine.  Let's not get into the

10   substance, then, Ms. Hedley.                                           15:27:19

11        MS. PEDLEY:  Absolutely, Your Honor.  We just wanted

12   to alert the Court that if we are unable to reach an agreement

13   as to the process, we will have to put on testimony as to what

14   that process we would advocate look like.

15        THE COURT:  All right.  I'm aware of that.  That seems            15:27:32

16   to me to be an issue.  I think from now on we're going to try

17   to refine issues.  If we can stipulate and solve them, we're

18   going to eliminate them.  And we will refine this until we have

19   a very, hopefully, efficient and succinct hearing available for

20   everyone.                                                              15:27:46

21        MS. PEDLEY:  Thank you, Your Honor.

22        THE COURT:  Anything else?  Mr. Eisenberg.

23        MR. EISENBERG:  Your Honor, to the extent that this

24   next portion is a sealed hearing, I feel very secure it

25   probably doesn't pertain to my client and I would ask that I be       15:28:00

1    permitted to be excused.

2            THE COURT:  You may be excused if you wish to be.

3            Anybody else who wishes to be excused may be excused

4    except for plaintiffs and defendants.

5            And, of course, you, Mr. Como, can't be excused.  I'm        15:28:11

6    sorry.  You're separately representing.

7            Well, I suppose if you asked to be excused, you can be

8    excused.

9            MR. YOUNG:  Your Honor, with respect to what

10   Mr. Walker just said, and I was the one that had the            15:28:25

11   conversation prior to the hearing and I apologize if there was

12   a misunderstanding, I think my thought was that we weren't

13   going to discuss the substance of the conversations that we had

14   been having, but we were, certainly, wanting to inform the

15   Court of what we were thinking, at least on our side, the Court   15:28:40

16   should order.

17           So if that was a failure on my part to communicate as

18   to what we intended to say, my apologies to Mr. Walker and

19   Ms. Iafrate.

20           THE COURT:  I think Mr. Walker acted promptly in order   15:28:52

21   to defend his client's rights, and if he wants to do anything

22   further about it, he can, and we'll take it up from there, but

23   I understand your correction.

24           All right.  The hearing is now under seal.  I'm going

25   to ask everybody who is not a party to this lawsuit or not a     15:29:09

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 69

1    specially appearing party to be excused.

2              (The courtroom is cleared.)

3              (Sealed proceedings omitted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 70

C E R T I F I C A T E

I, GARY MOLL, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 3rd day of August, 2015.

s/Gary Moll

# EXHIBIT 14

Emerg Hearing 8-7-15  SEALED.txt

1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega Melendres,      )
    et al.,                                )
5                                          )
                   Plaintiffs,             )  No. CV 07-2513-PHX-GMS
6                                          )
                   vs.                     )  Phoenix, Arizona
7                                          )  August 7, 2015
    Joseph M. Arpaio, et al.,              )  1:03 p.m.
8                                          )
                   Defendants.             )
9                                          )

10

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          BEFORE THE HONORABLE G. MURRAY SNOW

15                   In-Court Hearing

16               (Volume 1, Pages 1-24)

17

18                  SEALED PROCEEDINGS

19

20

21

22   Court Reporter:        Gary Moll
                            401 W. Washington Street, SPC #38
23                          Phoenix, Arizona  85003
                            (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing     2

1                    A P P E A R A N C E S

2

                         Page 1

```
                    Emerg Hearing 8-7-15  SEALED.txt
 3    For the Plaintiffs:
              American Civil Liberties Union Foundation
 4            Immigrants' Rights Project
              By:  Cecillia D. Wang, Esq. - Telephonically
 5            39 Drumm Street
              San Francisco, California  94111
 6
              American Civil Liberties Union Foundation
 7            Immigrants' Rights Project
              By:  Andre Segura, Esq. - Telephonically
 8            125 Broad Street, 18th Floor
              New York, New York  10004
 9
              American Civil Liberties Foundation of Arizona
10            By:  Joshua David R. Bendor, Esq.
              P.O. Box 17148
11            Phoenix, Arizona  85011

12            Covington & Burling, LLP
              By:  Lauren E. Pedley, Esq. - Telephonically
13            1 Front Street, 35th Floor
              San Francisco, California  94111
14
              Covington & Burling, LLP
15            By:  Michelle L. Morin, Esq. - Telephonically
              333 Twin Dolphin Drive, Suite 700
16            Redwood Shores, California  94065

17            Mexican American Legal Defense and Educational Fund
              By:  Jorge M. Castillo, Esq. - Telephonically
18            634 S. Spring Street, 11th Floor
              Los Angeles, California  90014
19
      For the Defendant Maricopa County:
20            Walker & Peskind, PLLC
              By:  Richard K. Walker, Esq.
21            By:  Charles W. Jirauch, Esq.
              SGA Corporate Center
22            16100 N. 7th Street, Suite 140
              Phoenix, Arizona  85254
23

24

25

          SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    3


 1                       A P P E A R A N C E S

 2

 3    For the Defendant Joseph M. Arpaio:
              Jones, Skelton & Hochuli, PLC
 4            By:  John T. Masterson, Esq.
              By:  Joseph T. Popolizio, Esq.
 5            By:  Linda Tivorsak, Esq.
              2901 N. Central Avenue, Suite 800
 6            Phoenix, Arizona  85012

 7    For the Defendant Joseph M. Arpaio and Maricopa County
                             Page 2
```

```
                    Emerg Hearing 8-7-15  SEALED.txt
        Sheriff's Office:
    8            Iafrate & Associates
                 By:  Michele M. Iafrate, Esq.
    9            649 N. 2nd Avenue
                 Phoenix, Arizona  85003
   10
        For the Movants Christine Stutz and Thomas P. Liddy:
   11            Broening, Oberg, Woods & Wilson, PC
                 By:  Terrence P. Woods, Esq. - Telephonically
   12            P.O. Box 20527
                 Phoenix, Arizona  85036
   13
        For Chief Deputy Gerard Sheridan:
   14            Mitchell Stein Carey, PC
                 By:  Barry D. Mitchell, Esq.
   15            1 Renaissance Square
                 2 North Central Avenue, Suite 1900
   16            Phoenix, Arizona  85004

   17   For Executive Chief Brian Sands:
                 Lewis, Brisbois, Bisgaard & Smith, LLP
   18            By:  Greg S. Como, Esq.
                 2929 N. Central Avenue, Suite 1700
   19            Phoenix, Arizona  85012

   20            Wilenchik & Bartness, PC
                 By:  John Wilenchik, Esq.
   21            2810 N. 3rd Street, Suite 103
                 Phoenix, Arizona  85004
   22
        For Lieutenant Joseph Sousa:
   23            David Eisenberg, PLC
                 By:  David Eisenberg, Esq.
   24            2702 N. 3rd Street, Suite 4003
                 Phoenix, Arizona  85004
   25

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing     4


    1                     A P P E A R A N C E S

    2

    3   Also present:
                 Chief Robert Warshaw, Monitor - Telephonically
    4            Chief Raul Martinez, Deputy Monitor - Telephonically
                 Chief Deputy Gerard Sheridan
    5            Victoria Lopez, Esq.
                 Captain Steve Bailey
    6            Jennifer Grisham

    7

    8

    9

   10

   11

                            Page 3
```

Emerg Hearing 8-7-15  SEALED.txt

12
13
14
15
16
17
18
19
20
21
22
23
24
25

♀

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing     5

1                    P R O C E E D I N G S

2

3        THE COURT:  Please be seated.

4        THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

5   on for status conference.

6           Counsel, please announce your appearances.

7        MR. BENDOR:  Good afternoon, Your Honor.  Josh Bendor

8   of the ACLU of Arizona representing plaintiff.  With me is

9   Victoria Lopez, who's an attorney with, and the legal director

10  of, the ACLU of Arizona, but has not entered a notice of

11  appearance in this case.  I also have co-counsel on the phone.

12       THE COURT:  Any objection to Ms. Lopez appearing?

13       MS. IAFRATE:  No, Your Honor.

14       THE COURT:  Or being present?  All right.

15       MS. IAFRATE:  Good afternoon, Your Honor.  Michele

16  Iafrate on behalf of Sheriff Arpaio and the non-party alleged

Page 4

Emerg Hearing 8-7-15  SEALED.txt

17  contemnors.

18         MR. MASTERSON:  Good afternoon, Judge.  John Masterson

19  and Joe Popolizio for Sheriff Arpaio.

20         THE COURT:  Good afternoon.

21         MR. WALKER:  Good afternoon, Your Honor.  Richard

22  Walker and Charles Jirauch, also with us is one of our

23  paralegals, Jennifer Grisham, on behalf of the Maricopa County

24  as embodied in the Board of Supervisors, the county manager --

25         THE COURT:  Who's Ms. Grisham, so I know for sure?

         SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      6


1          MR. WALKER:  This lady sitting here in this blue.

2          THE COURT:  Thank you.

3          MR. WALKER:  On behalf of the portion of Maricopa

4   County Government embodied in the board of supervisors, the

5   county manager, and the employees working under their direction

6   and supervision.

7          MR. COMO:  Good afternoon, Your Honor.  Greg Como

8   appearing on behalf of Brian Sands.

9          MR. MITCHELL:  Good afternoon, Judge.  Barry Mitchell,

10  specially appearing on behalf of Chief Gerard Sheridan.

11         MS. TIVORSAK:  Linda Tivorsak, standing in for Mel

12  McDonald, specially appearing for Sheriff Joe Arpaio.

13         MR. EISENBERG:  Good afternoon, Your Honor.  David

14  Eisenberg, specially appearing on behalf of Lieutenant Joseph

15  Sousa.  I would waive his appearance for this hearing.

16         THE COURT:  Thank you.

17         MR. WILENCHIK:  Your Honor, John Wilenchik, specially

18  appearing for Brian Sands.

19         MS. IAFRATE:  Your Honor, I would also note that I

20  have Captain Steve Bailey in the courtroom with me, potentially

Emerg Hearing 8-7-15  SEALED.txt

21  to answer any questions that you have regarding some of the

22  issues that were noticed for today's hearing.

23      THE COURT:  Thank you.  I recognize, of course, the

24  federal marshals in the back of the room.  Is everybody

25  satisfied that everybody who's in the room is appropriate to be

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      7

1  here?  Nobody concerned about anybody?

2      Let me take up a few matters and see --

3      MR. WOODS:  Your Honor, there are a bunch of us

4  appearing by phone.

5      THE COURT:  Ah, thank you.  Please, enter your

6  appearances.

7      MS. WANG:  Good afternoon, Your Honor.  Cecillia Wang

8  of the ACLU for the plaintiffs.  My co-counsel, Jorge Castillo

9  of MALDEF, has asked me to announce his appearance as well, as

10  he's calling in from a cell phone in a noisy place.

11      THE COURT:  All right.

12      CHIEF WARSHAW:  And good afternoon, Your Honor.  This

13  is Chief Warshaw, and with me is Chief Martinez.

14      THE COURT:  Good afternoon.

15      MR. WOODS:  Terry Woods on behalf of nonparties Stutz

16  and Liddy.

17      MR. SEGURA:  Andre Segura of the ACLU for the

18  plaintiff.

19      MS. PEDLEY:  Lauren Pedley of Covington & Burling on

20  behalf of the plaintiff.

21      MS. MORIN:  Your Honor, this is Michelle Morin of

22  Covington & Burling, also on the plaintiffs' team.  My

23  pro hac vice appearance is on its way to the Court, or

24  application is on its way to the Court.

25      THE COURT:  Any objection to her appearance on the

Page 6

Emerg Hearing 8-7-15  SEALED.txt
SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      8

1  telephone?
2        MS. IAFRATE:  I'm sorry, Your Honor, I missed where
3  she was from.
4        THE COURT:  Covington & Burling.
5        MS. IAFRATE:  No objection.
6        MR. WALKER:  No objection on behalf of the County,
7  Your Honor.
8        MR. COMO:  No objection, Your Honor.
9        THE COURT:  Ms. Iafrate, in the order I asked you to
10  have the representative from the Attorney General's Office
11  here.  Is he here?
12        MS. IAFRATE:  Your Honor, I do not see him here.  He
13  was contacted this morning, and I was told that he would either
14  appear telephonically or in person.
15        THE COURT:  Can you identify him or her for me,
16  please.
17        MS. IAFRATE:  Paul Ahler, A-h-l-e-r.
18        THE COURT:  All right.  And did he tell you he would
19  be here?
20        MS. IAFRATE:  I had a representative discuss the
21  order, bring a physical order over to him and discuss it, and I
22  was told that he would either be here or be available
23  telephonically.
24        THE COURT:  I would like to discuss something with
25  Mr. Ahler.  Do you want to check and see if he's outside or --

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      9

1        MS. IAFRATE:  Sure.
2        THE COURT:  -- one of his representatives is outside?

Page 7

Emerg Hearing 8-7-15  SEALED.txt

3      MS. IAFRATE:  Sure.

4      (Pause in proceedings.)

5      MS. IAFRATE:  Your Honor, he is not out there.  May I

6  make a phone call?

7      THE COURT:  I'm not sure that we need to go to that

8  trouble; we may at the end of the hearing.

9      Maybe you can answer my question.  Do you know when

10  Mr. Ahler became involved in the investigation that's the topic

11  of the sealed proceedings?

12      MS. IAFRATE:  I do not.  May I have a moment?

13      THE COURT:  Sure.

14      (Pause in proceedings.)

15      MS. IAFRATE:  Your Honor, it's my understanding that

16  Mr. Ahler was initially contacted via telephone about six weeks

17  ago just for a small briefing, and then it was a formal

18  briefing about three weeks ago.

19      THE COURT:  I guess I'm not sure whether or not we

20  need to have him here, but I think I can address this with you

21  directly and we may not need to have him here.

22      One of the things I noticed was whether or not we need

23  to continue to hold these matters under seal, and the reason I

24  ask that is I've been provided with a newspaper article in

25  which representatives of the Maricopa County Sheriff's Office

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing     10

1  made it public that who I understand to be the subject of the

2  investigation we're talking about is subject -- being subjected

3  to a criminal investigation.

4      And since the MCSO has made that information public,

5  and since that was the basis on which you wished to have these

6  hearings held under seal, since I believe that the monitor, in

7  preparing for this hearing, indicated to me that he thinks that

Page 8

Emerg Hearing 8-7-15  SEALED.txt

8  that subject has been placed on administrative leave by the
9  MCSO sometime this week, I'm not sure if there's really any
10 reason to continue having these proceedings under seal, so I
11 raise that initially.

12        Do you have a response to that?

13        MS. IAFRATE:  I do, Your Honor.  I would ask the Court
14 to keep these proceedings under seal.  I, too, read the
15 newspaper article and was surprised at some of the things that
16 were revealed in that newspaper article.

17        I do not think that the subject fully understands the
18 extent of the investigation or, quite frankly, what the
19 investigation is fully about, and I would ask the Court to keep
20 these under seal because we do not want to compromise the
21 criminal investigation that is continuing.

22        THE COURT:  Well, I guess I want to assist you in
23 that, Ms. Iafrate, but I don't know how the subject's going to
24 find out any more than what was in the newspaper, because, as I
25 indicated last week, the information turned over to the monitor

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    11

1  and the parties must remain with the monitor and the parties.

2         And so the only thing that he will know by these
3  hearings is that there is a criminal investigation, and he
4  already knows that.  So help me understand what's going to be
5  served by proceeding under seal when the public does have a
6  right to know.

7         MS. IAFRATE:  Well, Your Honor, I would ask that it
8  not be permanently under seal; just until the investigation is
9  completed.  What we're trying to do is not compromise an
10 ongoing criminal investigation that is being handled by MCSO
11 and the AG's office.  What the target knows and doesn't know, I

Emerg Hearing 8-7-15 SEALED.txt
12  have no information regarding that.

13       THE COURT:  I understand that.  But I don't have any

14  information regarding it, either, but the subject isn't going

15  to find it out by these proceedings unless you reveal it in

16  court, and it hasn't been revealed yet.

17       So I'm certainly not going to keep this under seal

18  until the investigation is complete, and I guess I'm asking you

19  to tell me why I should keep it under seal even this afternoon,

20  given the public in- --

21       Well, let me ask you, the newspaper article quotes

22  Ms. Allen, who is the public -- I don't know.  I don't know

23  exactly what her title is, but she handles the public relations

24  for the MCSO -- as confirming that Mr. Mackiewicz is under

25  criminal investigation.

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      12


1        Is that accurate?  Did Ms. Allen give that information

2   to the press?

3        MS. IAFRATE:  I do not know that, Your Honor.

4        THE COURT:  Do you know whether Detective Mackiewicz

5   has been placed on administrative leave by the MCSO?

6        MS. IAFRATE:  Yes, Your Honor.

7        THE COURT:  He has been?

8        MS. IAFRATE:  He has.

9        THE COURT:  And has he been informed, as a part of

10  that process, that he is under criminal investigation?

11       MS. IAFRATE:  May I have a moment?

12       THE COURT:  Sure.

13       (Pause in proceedings.)

14       MS. IAFRATE:  Your Honor, my understanding is that the

15  target was placed on administrative leave for administrative

16  IAs, not being briefed regarding the criminal IA.

Emerg Hearing 8-7-15  SEALED.txt

17          THE COURT:  Now, I understand that administrative IAs

18   can be criminal IAs as well, but he wasn't given that

19   specification?

20          MS. IAFRATE:  He was not given the information that's

21   the subject of the criminal investigation; it was specifically

22   regarding separate instances regarding administrative IAs.

23          THE COURT:  Who's speaking on behalf of plaintiff?

24          Is it you, Mr. Bendor?

25          MR. BENDOR:  I believe it's going to be Ms. Wang on

    SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      13


1    these issues, Your Honor.

2           THE COURT:  Ms. Wang, do you wish to --

3           MS. WANG:  Yes, Your Honor.

4           THE COURT:  Do you wish to be heard on this?

5           MS. WANG:  Sure.  I don't believe that the defendants

6    have met the standard for continuing to seal the proceedings.

7    I think it's become very clear that, based on information that

8    we've received -- for example, in the course of the monitor's

9    interviews -- that Mr. Mackiewicz is aware of the issues.

10          And, you know, plaintiffs are very much aware of our

11   obligations to keep material confidential that has been ordered

12   to be kept confidential, and we certainly don't have any

13   interest in compromising an ongoing criminal investigation or

14   proceeding.  But I don't think that the defendants have borne

15   their burden to show why this proceeding should be sealed, and

16   I think that should be taken on a proceeding-by-proceeding

17   basis.

18          THE COURT:  You know, Ms. Iafrate, even if Ms. Allen

19   didn't give the quote to the newspaper, it certainly was

20   published.  And certainly Mr. Mackiewicz has been informed,

                            Page 11

Emerg Hearing 8-7-15   SEALED.txt
21   even whether or not it's accurate, that he's being criminally

22   investigated by the MCSO.  So I don't see how keeping this

23   under seal promotes any purpose whatsoever.

24          Can you tell me how it does?

25          MS. IAFRATE:  Your Honor, some of your assumptions I'm

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      14


1    not certain are accurate.  I do not believe that the target was

2    told that he was under criminal investigation.

3           THE COURT:  No, I think maybe you've misunderstood my

4    question.  If it has been publicly disseminated, as it has

5    been, that Mr. Mackiewicz is being criminally investigated by

6    the MCSO, what difference does it make, what benefit does the

7    MCSO have, by keeping these proceedings under seal?

8           MS. IAFRATE:  Well, Your Honor, the dissemination that

9    you're talking about is the New Times article?

10          THE COURT:  That's the only one I know of.

11          MS. IAFRATE:  That's the only one I know of, too.  So

12   we're relying on the dissemination of a New Times article

13   regarding a quote that I don't know is accurate or not accurate

14   as a basis for is this --

15          THE COURT:  As well as Detective Mackiewicz being told

16   that he's on administrative leave.

17          MS. IAFRATE:  Correct, which is different than

18   criminal investigation.

19          THE COURT:  Well, I guess --

20          MS. IAFRATE:  He was well aware of the administrative

21   investigations for quite some time.  This criminal

22   investigation was a new event that he has not been told about.

23          THE COURT:  Well, he was aware of administrative

24   investigations for how long?

25          MS. IAFRATE:  May I have a minute?
                              Page 12

1      THE COURT:  Yes.

2      (Pause in proceedings.)

3      MS. WANG:  Your Honor, Cecillia Wang speaking, if I

4  may interject.  I haven't heard from the defendants how keeping

5  this proceeding not under seal would compromise the ongoing

6  criminal proceeding, and I guess plaintiffs would be interested

7  in hearing that.

8      THE COURT:  I will certainly ask it, Ms. Wang.

9      MS. WANG:  Thank you, Your Honor.

10     (Pause in proceedings.)

11     MS. IAFRATE:  Your Honor, I'm sorry, but I didn't hear

12  what Ms. Wang said, so I guess we can get to that after I

13  answer your question?

14     THE COURT:  Fair enough.

15     MS. IAFRATE:  My understanding is that there have been

16  multiple investigations, and Detective Mackiewicz became aware

17  of the administrative investigations through IA approximately a

18  month ago, but we have information that indicates that he was

19  probably made well aware of them by other sources before IA

20  officially notified him.

21     THE COURT:  All right.  What Ms. Wang wanted to know

22  is what in this hearing is going to tip him off, or what in

23  this hearing is going to justify keeping this matter under

24  seal?

25     MS. IAFRATE:  Well, Your Honor, I assume that after

1  this conversation, we're going to get into the documents that

2  were the subject of your order.  What I don't want is for there

Emerg Hearing 8-7-15  SEALED.txt

3   to be any sort of tie-in between now we have said his name, and

4   previously we had not mentioned his name in the previous sealed

5   hearing.  The documents that have been released involve the

6   criminal investigation, and you ordered that they go to the

7   monitor.  I would not want the link of the ongoing criminal

8   investigation to be available to the public until the

9   investigation is not compromised by that release.

10          THE COURT:  Well, I've indicated that no party is to

11   release the information to anybody without further order of

12   this Court.

13          Here's what I propose we do.  I have received your

14   notice indicating that you have complied with all the

15   document -- with all my orders.  But frankly, the monitor, and

16   he indicated to me prior to the hearing, just as we were

17   getting ready to go, and I want to tell you what was indicated

18   to me so that you can address it, he indicated to me that in

19   the middle of Chief Sheridan's interview this week

20   Chief Sheridan refused to answer questions because it was the

21   subject of an ongoing criminal investigation.  That

22   Mr. Popolizio and Mr. Stein, the one he raised that the order

23   last Friday required him to discuss this information,

24   Mr. Popolizio and Mr. Stein were unaware of any order; that

25   they requested the monitor to provide such an order; that after

          SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    17


1   several minutes of confusion, Mr. Popolizio pulled the order up

2   on the computer and then confirmed that there was an order,

3   after which Chief Sheridan responded to the questions.

4          Now, I don't know whether you were there or not, but

5   my --

6          MS. IAFRATE:  I was not.

7          THE COURT:  -- my confusion is this.  If in fact

                              Page 14

Emerg Hearing 8-7-15 SEALED.txt

8    that's accurate, Chief Sheridan was here last week,

9    Mr. Popolizio was here last week, and Mr. Stein was here last

10   week.  What about my order was unclear?

11        Mr. Popolizio, do you want to answer that?

12        MR. POPOLIZIO:  Yes, Your Honor.  I did not pull it up

13   on the computer, but it was pulled up on the computer and that

14   portion of your order was looked at.

15        I don't remember what hour it was during the chief

16   deputy's interview that that subject actually came up, because

17   the interview lasted approximately eight hours.

18        THE COURT:  Um-hum.

19        MR. POPOLIZIO:  Somewhere well into that interview.

20        I believe that the monitor, Chief Anders, referenced

21   an order, "Are you familiar with an order?" and we asked, "Can

22   we see the order?" that he's referring to?  It wasn't, you

23   know, Do you realize, or that there's an order saying that you

24   can speak about this or not?  We asked to see it, I believe, if

25   my recollection is correct, that he would not.  That's why

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    18


1    Mr. Stein tried to bring it up on his phone and other people

2    did that.  We took a recess, we came in, and then we discussed

3    that it could be spoken about.

4         THE COURT:  Well, you were here, right?

5         MR. POPOLIZIO:  Yes.

6         THE COURT:  Was there anything about my order last

7    week that wasn't clear?

8         MR. POPOLIZIO:  No, Your Honor.  I would say -- I

9    would not say that at all.  But going through hours and hours

10   of interviews and having it posed that way, it's, "Well, which

11   order are you talking about?" and then we went from there.  By

                              Page 15

Emerg Hearing 8-7-15 SEALED.txt

12  no means after that was anything kept from Chief Anders, and

13  the delay was so slight, it was minutes.

14      THE COURT: I think that that's -- that is as

15  Chief Anders had indicated it to me. And I wasn't trying to

16  suggest that you withheld anything; I'm just trying to make

17  sure my order is clear enough that everybody understands it,

18  and that you did understand it.

19      And so, Ms. Iafrate, as long as we're under seal, why

20  don't you tell me what you have provided in response to my

21  order.

22      MS. IAFRATE: Your Honor, in response to your order we

23  have provided the entire criminal investigation of Detective

24  Mackiewicz, absent one interview that just occurred out of

25  state.

     SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    19

1      THE COURT: Okay. And so you'll keep the monitor

2  posted on those --

3      MS. IAFRATE: Yes.

4      THE COURT: -- interviews as they go?

5      MS. IAFRATE: Yes.

6      THE COURT: And then there was also a matter of

7  attorney -- possible notes in which you were going to claim

8  attorney-client privilege?

9      MS. IAFRATE: Those have been released as well.

10     THE COURT: Has a privilege log been provided as well?

11     MS. IAFRATE: Yes.

12     THE COURT: Were they redacted, or --

13     MS. IAFRATE: They were redacted.

14     THE COURT: Okay. Anything else provided?

15     MS. IAFRATE: Oh, yes, Your Honor, hundreds of

16  thousands of documents this week. But as we --

Page 16

Emerg Hearing 8-7-15  SEALED.txt

17        THE COURT:  I'm talking about in response to my order.

18        MS. IAFRATE:  No.  No, Your Honor.

19        THE COURT:  What hundreds of thousands of documents

20   were provided this week?

21        MS. IAFRATE:  There are over 80 ITRs that we continue

22   to respond to.  Those are the requests from the monitors.

23   There's CAD raw data that's been disclosed.  There's over a

24   hundred CDs regarding press coverage.

25        THE COURT:  So they're responses to the monitor's

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      20

1    earlier ITRs.

2         MS. IAFRATE:  They're responses to the monitors.  You

3    also have an order in which you set forth, I think, eight items

4    that we agreed to regarding the plaintiffs' counsel.  Some of

5    those have been responded; some, the due dates are not yet

6    here.

7         We have provided the remaining IAs that were

8    responsive to the monitor's request.  We responded to the

9    weekly requests and the monthly requests.  We responded to the

10   joint site visit requests.

11        THE COURT:  That's all good, but that's in response to

12   previous requests; that's not in response to my order from last

13   week.

14        MS. IAFRATE:  Correct.

15        THE COURT:  Okay.  I would propose, then, that we now

16   take the hearing out from under seal, because I want to discuss

17   the Tuesday hearing date, and I want to discuss what we're

18   going to do at the Tuesday hearing date unless you need to have

19   it reschedule, because you indicated to me when we discussed

20   this that you might need to have it rescheduled, so I just

Page 17

Emerg Hearing 8-7-15  SEALED.txt

21  wanted to make sure what the status was with that, and just a

22  few other matters, but I don't think any of them -- I might

23  represent what I think you've already done in a public filing

24  that you have complied completely with my order of last week.

25  You've done that in a public filing, haven't you?

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    21

1        MS. IAFRATE:  Yes, but I was very careful in the way

2   that I worded it, Your Honor.

3        THE COURT:  I'll be very careful, too, but before we

4   take this matter out from under seal, I guess I'm going to say,

5   out of an excess of caution, and I haven't heard any reason

6   that justifies not opening this first half of this hearing

7   under seal and last week's hearing that's under seal, that

8   would in any way affect your criminal investigation, in light

9   of the fact that I'm ordering the monitor and the parties to

10  keep it confidential absent further order of the Court.

11        But I will give you until Tuesday to verify with

12  Ms. Allen whether or not she gave that interview to the press,

13  and/or provide any reason why you think you need to have this

14  matter under seal in terms of the ongoing criminal

15  investigation.

16        Do you understand what I'm looking for on Tuesday?

17        MS. IAFRATE:  I do understand.

18        THE COURT:  All right.  With that, I will leave this

19  part of this hearing under seal.  Anybody who is here or on the

20  line who is either a party to the contempt proceeding, or a

21  specially appearing non-party, can have a copy of the

22  transcript either of this part of the hearing this week before

23  we go out from under seal, or last week, without further order

24  of the Court.  But any such party, or specially appearing

25  non-party, is under the obligation to keep everything in that

Page 18

Emerg Hearing 8-7-15  SEALED.txt
SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      22

1    hearing confidential and -- absent further order of the Court.
2              Is everybody clear on that?
3              MS. IAFRATE:  Yes, Your Honor.
4              MR. MASTERSON:  Yes, Your Honor.
5              MR. COMO:  Yes, Your Honor.
6              MR. WALKER:  Yes, Your Honor.
7              THE COURT:  All right.  Then I don't know if there's
8    anybody out there who wants to come in, but --
9              MS. IAFRATE:  There are.
10             THE COURT:  -- we're going to now open up the hearing.
11             MR. POPOLIZIO:  Your Honor, before we do that, before
12   people start piling in, there's a 1:30 interview scheduled for
13   Detective Mackiewicz by the monitors.
14             THE COURT:  Do you need to go?
15             MR. POPOLIZIO:  If, well, we could delay it a little
16   bit, because we've talked about it.  We were in Chief Deputy
17   Sheridan's interview when the order came out, I believe, I'm
18   not sure, then we saw it, and --
19             THE COURT:  Well --
20             MR. POPOLIZIO:  -- so they are waiting, but there's a
21   lot of us --
22             THE COURT:  Well, why don't you go ahead.  I will tell
23   you it's just going to be a few minutes.  Mr. Masterson can
24   represent your interests here.
25             MR. POPOLIZIO:  Well, it's not only that, it's

SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing      23

1    other -- other attorneys will be attending that also.  So I
2    just wanted you to know that --

Emerg Hearing 8-7-15  SEALED.txt

3       THE COURT:  That's fine.  We won't be long.

4       MR. POPOLIZIO:  Okay.

5       (Sealed proceedings concluded at 1:28 p.m.)

6       (Volume 2 of this transcript is filed under separate

7   cover.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

♀

        SEALED, CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing    24

1

2                       C E R T I F I C A T E

3

4

5

6

7       I, GARY MOLL, do hereby certify that I am duly
                        Page 20

Emerg Hearing 8-7-15  SEALED.txt

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 10th day of August,

18   2015.

19

20                                      s/Gary Moll

21

22

23

24

25

Page 21

Emerg Hearing 8-7-15.txt

25

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega Melendres,    )
     et al.,                              )
 5                                        )
                   Plaintiffs,            )  No. CV 07-2513-PHX-GMS
 6                                        )
                   vs.                    )  Phoenix, Arizona
 7                                        )  August 7, 2015
     Joseph M. Arpaio, et al.,            )  1:28 p.m.
 8                                        )
                   Defendants.            )
 9                                        )

10

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15         BEFORE THE HONORABLE G. MURRAY SNOW

16                  In-Court Hearing

17              (Volume 2, Pages 25-39)

18

19

20

21

22   Court Reporter:        Gary Moll
                            401 W. Washington Street, SPC #38
23                          Phoenix, Arizona  85003
                            (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        26

```
 1              A P P E A R A N C E S

 2
```

Page 1

```
                        Emerg Hearing 8-7-15.txt
 3      For the Plaintiffs:
                American Civil Liberties Union Foundation
 4              Immigrants' Rights Project
                By:  Cecillia D. Wang, Esq. - Telephonically
 5              39 Drumm Street
                San Francisco, California  94111
 6
                American Civil Liberties Union Foundation
 7              Immigrants' Rights Project
                By:  Andre Segura, Esq. - Telephonically
 8              125 Broad Street, 18th Floor
                New York, New York  10004
 9
                American Civil Liberties Foundation of Arizona
10              By:  Joshua David R. Bendor, Esq.
                P.O. Box 17148
11              Phoenix, Arizona  85011

12              Covington & Burling, LLP
                By:  Lauren E. Pedley, Esq. - Telephonically
13              1 Front Street, 35th Floor
                San Francisco, California  94111
14
                Covington & Burling, LLP
15              By:  Michelle L. Morin, Esq. - Telephonically
                333 Twin Dolphin Drive, Suite 700
16              Redwood Shores, California  94065

17              Mexican American Legal Defense and Educational Fund
                By:  Jorge M. Castillo, Esq. - Telephonically
18              634 S. Spring Street, 11th Floor
                Los Angeles, California  90014
19
        For the Defendant Maricopa County:
20              Walker & Peskind, PLLC
                By:  Richard K. Walker, Esq.
21              By:  Charles W. Jirauch, Esq.
                SGA Corporate Center
22              16100 N. 7th Street, Suite 140
                Phoenix, Arizona  85254
23

24

25

                CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        27


 1                      A P P E A R A N C E S

 2

 3      For the Defendant Joseph M. Arpaio:
                Jones, Skelton & Hochuli, PLC
 4              By:  John T. Masterson, Esq.
                By:  Joseph T. Popolizio, Esq.
 5              By:  Linda Tivorsak, Esq.
                2901 N. Central Avenue, Suite 800
 6              Phoenix, Arizona  85012

 7      For the Defendant Joseph M. Arpaio and Maricopa County
                                Page 2
```

                        Emerg Hearing 8-7-15.txt
         Sheriff's Office:
 8              Iafrate & Associates
                By:  Michele M. Iafrate, Esq.
 9              649 N. 2nd Avenue
                Phoenix, Arizona  85003
10
         For the Movants Christine Stutz and Thomas P. Liddy:
11              Broening, Oberg, Woods & Wilson, PC
                By:  Terrence P. Woods, Esq. - Telephonically
12              P.O. Box 20527
                Phoenix, Arizona  85036
13
         For Chief Deputy Gerard Sheridan:
14              Mitchell Stein Carey, PC
                By:  Barry D. Mitchell, Esq.
15              1 Renaissance Square
                2 North Central Avenue, Suite 1900
16              Phoenix, Arizona  85004

17       For Executive Chief Brian Sands:
                Lewis, Brisbois, Bisgaard & Smith, LLP
18              By:  Greg S. Como, Esq.
                2929 N. Central Avenue, Suite 1700
19              Phoenix, Arizona  85012

20              Wilenchik & Bartness, PC
                By:  John Wilenchik, Esq.
21              2810 N. 3rd Street, Suite 103
                Phoenix, Arizona  85004
22
         For Lieutenant Joseph Sousa:
23              David Eisenberg, PLC
                By:  David Eisenberg, Esq.
24              2702 N. 3rd Street, Suite 4003
                Phoenix, Arizona  85004
25

              CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        28


 1                    A P P E A R A N C E S

 2

 3       Also present:
                Chief Robert Warshaw, Monitor - Telephonically
 4              Chief Raul Martinez, Deputy Monitor - Telephonically
                Chief Deputy Gerard Sheridan
 5              Victoria Lopez, Esq.
                Captain Steve Bailey
 6              Jennifer Grisham

 7

 8

 9

10

11

                            Page 3

Emerg Hearing 8-7-15.txt

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing          29


1                    P R O C E E D I N G S

2

3          (Volume 1 of this transcript is sealed and filed

4    under separate cover.)

5          THE COURT:  All right.  We have a status hearing that

6    has been set for next Tuesday.  If I remember correctly,

7    Ms. Iafrate, you indicated that you might have to request that

8    that hearing be moved.

9          Are you available for that hearing?

10         MS. IAFRATE:  I am, Your Honor.  The more concerning

11   one was the latter one that you wanted me to find a substitute

12   for, but for Tuesday I'm good to go.

13         THE COURT:  All right.  Does anybody else have any

14   problem with the Tuesday status hearing?

15         MR. WALKER:  I don't, Your Honor.

16         MR. COMO:  Your Honor, Dane Dodd of our office, who

Emerg Hearing 8-7-15.txt
17    has appeared in this case, will be attending for me.
18          THE COURT:  All right.  Let me just say that I would
19    propose the following topics at least for this Tuesday status
20    hearing, and then if anybody else has any they wish to raise
21    they can raise them.
22          It appears that no party has any opposition to the
23    intervention of the federal government in this matter.  I do
24    take it -- I haven't read it very completely, but I take it
25    that the sheriff would -- has no opposition to the extent that
              CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing          30


1     the federal government doesn't try to expand the scope of this
2     hearing.  And I'll take that into consideration and probably
3     rule on it Tuesday.
4           We still have a pending renewal of pro hac vice
5     application for Mr. Klayman.  I indicated I would give him time
6     to file a reply in this matter.  I have not yet received a
7     reply.  I think he's out of time to file a reply.  But if he
8     wishes to be heard on his pending renewal of the pro hac vice
9     application or his -- I don't know whether he wishes to
10    characterize it as his separate application, we will take that
11    up on Tuesday.
12          I think we need to take up what we're going to do with
13    the 1500 driver's licenses that are in the marshals' custody.
14    I understand that there is some confusion about whether or not
15    there is an ongoing Internal Affairs investigation with respect
16    to those, and I will seek the monitor's clarification about
17    what has been indicated to him.  But it does seem to me that
18    the plaintiffs should be heard on whether or not they wish
19    access to those, especially to the extent that they have been
20    represented to contain within them large numbers of members of
                              Page 5

Emerg Hearing 8-7-15.txt
21  the plaintiff class.

22       We also probably need to address what we're going to

23  do with the 50 hard drives in the monitor's custody and how we

24  wish to proceed as to those.  I am informed that the United

25  States Government is going to be here on Monday and begin the

CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        31

1   copying process, and we may have an update from the monitor as

2   to what they plan to do or intend to do with respect those, and

3   then we can take appropriate action as well.

4        I will note that just before this hearing the

5   defendant has filed a notice that is a public notice indicating

6   that the defendant is now in complete compliance with the order

7   that I entered last week under seal.  We will take up the

8   monitor's evaluation as to whether or not he has any concerns

9   that any information is still outstanding on that Tuesday

10  hearing.  I do note that I believe he indicated that interviews

11  this week may have indicated some material that should be

12  present in the file, and that will give him a chance to assess

13  whether it's there.

14       Chief Sands has filed a request to be excused from

15  status conferences in the future.  I suppose we can take that

16  up as swell if anybody has any objections.  Those are the

17  matters that I would propose we take up on Tuesday.

18       Does anybody else have any matters that they wish to

19  raise?  Mr. Masterson?

20       You need to find, remember, a microphone, so I can

21  hear you.

22       MR. MASTERSON:  Thank you very much, Judge.

23       I do have a question concerning -- well, some

24  questions concerning the interviews that have been taking

25  place.
                         Page 6

Emerg Hearing 8-7-15.txt
CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing          32

1          THE COURT:  Right.
2          MR. MASTERSON:  And I'm a little concerned about the
3    purpose of the interviews.  My assumption is that the Court
4    intends to use the results or information determined during
5    interviews with respect to issues of civil contempt and/or
6    possibly a criminal referral.
7          My concern, then, is that at the beginning of each
8    interview, counsel is told that counsel may not participate.
9    And if the Court is going to use this information, basically,
10   in any way against the parties, I'm concerned that the parties
11   need effective representation of counsel at the interviews.
12         THE COURT:  Well, I have not -- I think I've made it
13   clear on the record, Mr. Masterson, that you're there and you
14   can assert any privileges that you have, both you and specially
15   hearing counsel, if they need to invoke privileges that are
16   applicable to the scope of their representation.
17         Does that take care of your response?
18         I mean, it doesn't --
19         MR. MASTERSON:  Somewhat.
20         THE COURT:  -- mean that you can ask questions,
21   because I haven't precluded you from doing depositions at all.
22         MR. MASTERSON:  Well, I believe, though, effective
23   representation would include questions, if deemed appropriate
24   by counsel of the person being interviewed.
25         THE COURT:  Well, you can do that in a deposition.

CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing          33

1          MR. MASTERSON:  And we can do it at the interview.
2          If the Court intends to use the interviews in any

Page 7

Emerg Hearing 8-7-15.txt

3  affirmative way against the parties, I think, then, the parties

4  should be allowed to ask questions, if deemed appropriate, at

5  the interviews, and raise appropriate objections at the

6  interviews.

7      THE COURT:  So do you want to raise that Tuesday?  Is

8  that something you'd like to raise Tuesday?

9      MR. MASTERSON:  I would, Judge.

10     THE COURT:  All right.  We'll discuss it on Tuesday.

11  If you want to file anything before then, you can do that.

12     I do believe the interviews are mostly done.  The

13  interviews, as I indicated last week, hopefully will help

14  streamline the process, eliminate -- identify issues that are

15  relevant, eliminate issues that are not relevant, and go

16  forward from there.

17     MR. MASTERSON:  And let me just raise one more thing,

18  and it came to mind -- well, actually, it came to mind before I

19  got down here but it was recharged in my mind when you were

20  speaking with Mr. Popolizio.  I think the problem with respect

21  to the Court's order yesterday was not that the order was not

22  understood but that the monitor, as has occurred many times

23  during the interviews, referred to documents without providing

24  copies to counsel or the parties.  And therefore, counsel and

25  the parties are unable to determine what the document is.

CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        34

1  Items have not been referenced according to Bates numbers.  And

2  whether the document is being read properly, taken out of

3  context, misread, misinterpreted, we don't know, because we

4  don't have copies of the documents.

5      So what I'm trying to do is get a fair -- some ground

6  rules, and so everybody is operating under the same rules, and

7  everybody has a fair chance to protect their rights, and for

Page 8

Emerg Hearing 8-7-15.txt

8   the monitors to seek information they need at these interviews.

9        THE COURT:  I'll talk to the monitors about providing

10  copies of the documents they're going to use.  I do understand

11  that documents do come up during the interviews that we did not

12  know existed before, it's hard for the monitors to provide

13  copies of those, but I'll talk to them about that.

14       MR. MASTERSON:  Thank you, Judge.  And if I have

15  anything further to address, we can do that on Tuesday.

16       THE COURT:  All right.

17       MR. MASTERSON:  Thank you very much.

18       THE COURT:  Uh-huh.

19       MR. BENDOR:  Your Honor, if I may.

20       THE COURT:  Yes.

21       MR. BENDOR:  Just for the record, I've been present at

22  numerous interviews -- and I haven't been present with

23  Mr. Masterson at any interviews, I don't know if he has been

24  present -- and I have seen counsel on numerous times objecting

25  on the grounds of privilege or on other grounds, and counsel

             CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        35


1   have requested for the monitor doing the interview to state the

2   Bates number or to show them the document.  So those sorts of

3   things are happening in the interviews and, in terms of the

4   documents have been, to my experience, worked out in the course

5   of the interviews.

6        THE COURT:  All right.

7        MR. POPOLIZIO:  Your Honor, may I --

8        THE COURT:  You know what?  We're not going to get in

9   a big argument about this now, Mr. Popolizio.

10       MR. POPOLIZIO:  I don't intend to argue, Your Honor; I

11  just wanted to comment.

Page 9

Emerg Hearing 8-7-15.txt

12      THE COURT:  Okay.

13      MR. POPOLIZIO:  And that is --

14      THE COURT:  Yes, please, a microphone.

15      MR. POPOLIZIO:  Yes.  I'm sorry.

16      That's true.  There are times when I have, and others

17  have, asked for Bates numbers and whatnot.  I asked for copies,

18  you know, maybe we could do that.  I didn't want, you know,

19  prior notice, but just so that we can all look at the same

20  thing when we're in the room, as Mr. Masterson has shared with

21  you.  And the answer that was given is that, from Chief Anders,

22  that he would ask.  So I just think it's fair, and it would

23  make it run, I think, smoother.

24      THE COURT:  Well, I will talk to them about that.

25  Certainly, as I've indicated, all parties who want one are

                CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        36


1   going to be given a copy of the transcript.  And if you feel

2   like there's issues that the transcripts reveal, you'll have

3   the chance to raise those.

4       MR. POPOLIZIO:  Yes, and we discussed that also, Your

5   Honor.  However, if, say, it's not identified by Bates or

6   otherwise, or date, and the interview is moving, discussion was

7   had about that also, and it was said, Well, I read right from

8   it.  You could find that language.

9       My response to that is, and I don't mean to -- to make

10  light of it, is we have lots of documents.  So --

11      THE COURT:  Well --

12      MR. POPOLIZIO:  -- we would have to search that.  It's

13  a haystack to find the needle.

14      THE COURT:  Let me just say, and I'm going to hear

15  Mr. Masterson out on Tuesday, but these really -- these

16  interviews of the monitor aren't your interviews; they're the
                            Page 10

Emerg Hearing 8-7-15.txt

17    monitor's interviews to perform the monitor's functions.

18          As I've said, that doesn't mean that you won't have

19    the chance to depose whoever you want to impose, and certainly

20    we can be reasonable, and, you know, reasonable requests, if we

21    can accommodate them, like documents, identification of

22    documents, to the extent we haven't done that, I'll talk to

23    them about that, and then we can raise that on Tuesday.  We

24    don't have very long to go and we'll do that on Tuesday.

25          So I will see the parties Tuesday morning, 9 o'clock.

          CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing        37


1     Those will be the issues that are discussed.

2           Yes, Mr. Walker.

3           MR. WALKER:  Excuse me, Your Honor.  I just want to

4     note for the record you made reference a little while ago to

5     the sheriff's having filed a response to the DOJ motion for

6     intervention, and I just wanted you to be aware that the County

7     has also filed a response.  It was filed late last night, so it

8     perhaps hasn't landed on your desk yet, but --

9           THE COURT:  Is it different than the sheriff's

10    position?

11          MR. WALKER:  There are some differences, yes, Your

12    Honor.

13          THE COURT:  Well, I indicated to you, and maybe we

14    need to discuss this sooner rather than later, I'm really not

15    sure, as it relates to the merits of this lawsuit, that you're

16    in a position to take any position different than the Sheriff's

17    Office, and I think we discussed that last week.  You were

18    going to brief that issue for me, or address it for me in

19    further detail.

20          MR. WALKER:  And I haven't had the opportunity to do

Page 11

Emerg Hearing 8-7-15.txt

21  that yet, Your Honor.  The differences just have to do -- and I

22  think they're slight -- have to do with the scope of the

23  intervention.

24       THE COURT:  All right.  Well, I'll invite you to

25  provide me whatever authority you have on the County's ability

CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing          38


1   in this case to take substantive positions that are different

2   than the Sheriff's Office.  That will be an interesting issue.

3        MR. WALKER:  We'll be happy to address it, Your Honor.

4        THE COURT:  All right.  Mr. Como?

5        MR. COMO:  Your Honor, just one other issue.

6        Yesterday we filed a motion for summary judgment on

7   behalf of Chief Sands, and perhaps on Tuesday we could set a

8   briefing schedule on that, unless the Court intends to just

9   follow the briefing schedule set forth in the rules.

10       THE COURT:  Why wouldn't I do that?

11       MR. COMO:  Just because we're sort of in the middle of

12  a contempt hearing and, you know --

13       THE COURT:  And some people might need longer time?

14       I guess that's a point.  If people feel like they need

15  a longer time to respond to the motion, would you please so

16  indicate on Tuesday, in light of the schedule?

17       MR. BENDOR:  Yes, Your Honor, we can.

18       Plaintiffs are of the position that this issue has

19  been heard by the Court and ruled on and does not require

20  further briefing to deny the motion, and we could talk about

21  that now or on Tuesday.

22       THE COURT:  All right.  Anything else?

23       All right.  Thank you all.

24       THE CLERK:  All rise.

25       (Proceedings concluded at 1:40 p.m.)
                              Page 12

Emerg Hearing 8-7-15.txt
CV07-2513, Melendres v. Arpaio, 8/7/15 Hearing          39

```
 1
 2                    C E R T I F I C A T E
 3
 4
 5
 6
 7        I, GARY MOLL, do hereby certify that I am duly
 8   appointed and qualified to act as Official Court Reporter for
 9   the United States District Court for the District of Arizona.
10        I FURTHER CERTIFY that the foregoing pages constitute
11   a full, true, and accurate transcript of all of that portion of
12   the proceedings contained herein, had in the above-entitled
13   cause on the date specified therein, and that said transcript
14   was prepared under my direction and control.
15
16
17        DATED at Phoenix, Arizona, this 10th day of August,
18   2015.
19
20
21                              s/Gary Moll
22
23
24
25
```

Page 13

# EXHIBIT 15

Status Conference 8-11-15.txt

1

1           UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega Melendres,      )
    et al.,                                )
5                                          )
                     Plaintiffs,           ) No. CV 07-2513-PHX-GMS
6                                          )
                vs.                        ) Phoenix, Arizona
7                                          ) August 11, 2015
    Joseph M. Arpaio, et al.,              ) 9:04 a.m.
8                                          )
                     Defendants.           )
9                                          )

10

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16         BEFORE THE HONORABLE G. MURRAY SNOW

17                  (Status Conference)

18

19

20

21

22   Court Reporter:        Gary Moll
                            401 W. Washington Street, SPC #38
23                          Phoenix, Arizona  85003
                            (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

         CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    2

1                    A P P E A R A N C E S

2

                            Page 1

Status Conference 8-11-15.txt
```
 3   For the Plaintiffs:
             American Civil Liberties Union Foundation
 4           Immigrants' Rights Project
             By:  Cecillia D. Wang, Esq.
 5           39 Drumm Street
             San Francisco, California  94111
 6
             American Civil Liberties Union Foundation
 7           Immigrants' Rights Project
             By:  Andre Segura, Esq. - Telephonically
 8           125 Broad Street, 18th Floor
             New York, New York  10004
 9
             American Civil Liberties Union of Arizona
10           By:  Joshua David R. Bendor, Esq.
             P.O. Box 17148
11           Phoenix, Arizona  85011

12           Covington & Burling, LLP
             By:  Michelle L. Morin, Esq. - Telephonically
13           333 Twin Dolphin Drive, Suite 700
             Redwood Shores, California  94065
14
     For the Defendant Maricopa County:
15           Walker & Peskind, PLLC
             By:  Richard K. Walker, Esq.
16           By:  Charles W. Jirauch, Esq.
             SGA Corporate Center
17           16100 N. 7th Street, Suite 140
             Phoenix, Arizona  85254
18
     For the Defendant Joseph M. Arpaio:
19           Jones, Skelton & Hochuli, PLC
             By:  A. Melvin McDonald, Jr., Esq.
20           By:  John T. Masterson, Esq.
             By:  Joseph T. Popolizio, Esq.
21           2901 N. Central Avenue, Suite 800
             Phoenix, Arizona  85012
22
     For the Defendant Joseph M. Arpaio and Maricopa County
23   Sheriff's Office:
             Iafrate & Associates
24           By:  Michele M. Iafrate, Esq.
             649 N. 2nd Avenue
25           Phoenix, Arizona  85003

     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    3


 1                    A P P E A R A N C E S

 2

 3   For the Movants Christine Stutz and Thomas P. Liddy:
             Broening, Oberg, Woods & Wilson, PC
 4           By:  Terrence P. Woods, Esq.
             P.O. Box 20527
 5           Phoenix, Arizona  85036

 6   For the Movants Maricopa County Attorney's Office and Maricopa
     County Attorney William Montgomery:
 7           Ridenour Hienton, PLLC
                          Page 2
```

```
                    Status Conference 8-11-15.txt
                By:  Ernest Calderon, Esq.
 8              Chase Tower
                201 N. Central Avenue, Suite 3300
 9              Phoenix, Arizona  85004

10   For the Intervenor United States of America:
                United States Department of Justice - Civil Rights
11              By:  Edward G. Caspar, Esq. - Telephonically
                By:  Paul Killebrew, Esq. - Telephonically
12              950 Pennsylvania Avenue NW, 5th Floor
                Washington, D.C.  20530
13
     For Deputy Chief Jack MacIntyre:
14              Dickinson Wright, PLLC
                By:  Gary L. Birnbaum, Esq.
15              1850 North Central Avenue, Suite 1400
                Phoenix, Arizona  85004
16
     For Chief Deputy Gerard Sheridan:
17              Mitchell Stein Carey, PC
                By:  Lee D. Stein, Esq.
18              1 Renaissance Square
                2 North Central Avenue, Suite 1900
19              Phoenix, Arizona  85004

20   For Executive Chief Brian Sands:
                Lewis, Brisbois, Bisgaard & Smith, LLP
21              By:  Dane A. Dodd, Esq.
                2929 N. Central Avenue, Suite 1700
22              Phoenix, Arizona  85012

23   For Lieutenant Joseph Sousa:
                David Eisenberg, PLC
24              By:  David Eisenberg, Esq.
                2702 N. 3rd Street, Suite 4003
25              Phoenix, Arizona  85004

         CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   4


 1                    A P P E A R A N C E S

 2

 3   Also present:
                Chief Raul Martinez, Deputy Monitor - Telephonically
 4              Deputy Chief Jack MacIntyre
                Lieutenant Joseph Sousa
 5              Raphael O. Gomez, Esq.

 6

 7

 8

 9

10

11
                          Page 3
```

Status Conference 8-11-15.txt

12
13
14
15
16
17
18
19
20
21
22
23
24
25

⚲

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    5

1                    P R O C E E D I N G S
2
3          THE COURT:  Please be seated.
4          THE CLERK:  This is civil case number 07-2513,
5    Melendres, et al., v. Arpaio, et al., on for status conference.
6          Counsel, please announce your appearances.
7          MS. WANG:  Good morning, Your Honor.  Cecillia Wang of
8    the ACLU for the plaintiffs.
9          THE COURT:  Good morning.
10          MR. BENDOR:  Good morning.  Josh Bendor of the ACLU of
11    Arizona for plaintiffs.
12          THE COURT:  Good morning.
13          MS. IAFRATE:  Good morning, Your Honor.  Michele
14    Iafrate on behalf of Sheriff Arpaio and the alleged nonparty
15    contemnors.
16          THE COURT:  Good morning.

Page 4

Status Conference 8-11-15.txt

17        MR. MASTERSON:  Good morning, Judge.  John Masterson
18   and Joe Popolizio for Sheriff Arpaio.
19        THE COURT:  Good morning.
20        MR. WALKER:  Good morning, Your Honor.  Richard Walker
21   and Charles Jirauch on behalf of that portion of the Maricopa
22   County government embodied in the Board of Trustees, the county
23   manager, and the county employees who work under their
24   direction and supervision.
25        THE COURT:  Let me just ask you, Mr. Walker, the

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference      6

1    people you've just set forth are not parties to this action,
2    are they?
3         MR. WALKER:  They are not.
4         THE COURT:  Thank you.
5         MR. McDONALD:  Good morning, Your Honor.
6    Mel McDonald, special appearance for Sheriff Joe Arpaio.
7         THE COURT:  Good morning.
8         MR. WOODS:  Good morning, Your Honor.  Terry Woods.  I
9    represent nonparties Liddy and Stutz.
10        MR. DODD:  Good morning, Your Honor.  Dane Dodd on
11   behalf of retired Chief Brian Sands.
12        THE COURT:  Good morning.
13        MR. BIRNBAUM:  Good morning, Your Honor.  Gary
14   Birnbaum, appearing specially for Deputy Chief MacIntyre, who
15   is also present in the courtroom.
16        MR. CALDERON:  Good morning, Your Honor.  Ernest
17   Calderon on behalf of Maricopa County Attorney Bill Montgomery
18   and his office, nonparty.
19        MR. STEIN:  Good morning, Your Honor.  Lee Stein on
20   behalf of Chief Deputy Sheridan, who is not present.

                            Page 5

```
                    Status Conference 8-11-15.txt
21          THE COURT:  And you're specially appearing, Mr. Stein?
22          MR. STEIN:  I am.  I apologize, I'm specially
23   appearing.
24          MR. EISENBERG:  Good morning, Your Honor.
25          MR. CASPAR:  Good morning, Your Honor.  This is Edward
        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    7


1    Caspar and Paul Killebrew with the U.S. Department of Justice,
2    counsel for the United States relevant to the intervention
3    motion.
4           THE COURT:  Good morning.
5           MR. KILLEBREW:  Good morning.
6           MR. EISENBERG:  Good morning, Your Honor.  David
7    Eisenberg, specially appearing on behalf of Lieutenant Joseph
8    Sousa.  The lieutenant is present.
9           MR. GOMEZ:  Good morning, Your Honor.  My name is
10   Raphael Gomez with the U.S. Department of Justice in Washington
11   concerning the Montgomery case.
12          THE COURT:  Good morning.
13          Is there anyone else on the line?
14          MR. SEGURA:  Good morning, Your Honor.  This is Andre
15   Segura for the plaintiffs from the ACLU.  There are a few
16   others on the line.
17          CHIEF MARTINEZ:  Good morning, Your Honor.  Chief Raul
18   Martinez from the monitoring team.
19          THE COURT:  Good morning, Chief.
20          CHIEF MARTINEZ:  Good morning.
21          MS. MORIN:  Good morning, Your Honor.  Michelle Morin
22   of Covington & Burling for the plaintiffs.  I believe my
23   pro hac vice is still being processed or en route to the -- to
24   the court.
25          THE COURT:  Anyone else?
                            Page 6
```

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    8

1        Is Mr. Klayman on the line?
2        All right.  First matter, why don't we discuss the
3    United States' motion to intervene.  I have no objections to
4    that motion.  I did receive a reply from Mr. Caspar in support
5    of his motion in which he rejects -- or chafes at the
6    limitations which Maricopa County, from his perspective, sought
7    to impose on his intervention.
8        Let me just say, and I'll hear any parties who want to
9    discuss it, but it seems to me that I'm going -- in light of
10   the fact that there aren't any objections to the intervention,
11   that I am going to allow it.  And if there are objections as to
12   the scope of the intervention, I'll hear them as we go along,
13   so that if you believe that the United States is exceeding the
14   scope of this matter, I will allow you to raise those as we go
15   along.  But it seems better to me to do that in a fact-specific
16   context than try to carve out some sort of limitation at this
17   point when I don't know what possible issues might be raised.
18        It certainly seems -- Mr. Masterson, Mr. Popolizio, I
19   don't know who's going to address this, but you have now
20   arrived at some sort of settlement completely with the
21   Judge Silver action?
22        MR. MASTERSON:  Judge, I believe we have.  Now, it's
23   still contingent on Judge Silver's approval of one certain
24   settlement agreement between the United States and the
25   defendants, but we have resolved all the issues as between the

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    9

1    United States and my clients.
2        I believe Mr. Walker has some -- Mr. Walker may want

Page 7

Status Conference 8-11-15.txt

3  to address issues he may have in that case, but we believe on

4  behalf of Sheriff Arpaio we have resolved all pending claims

5  with the United States through settlement agreements and then

6  the intervention into this case.

7          THE COURT:  All right.  Let me just say,

8  Mr. Masterson, it does seem to me, and I don't -- and maybe you

9  didn't make this objection or limitation, but I think

10  Mr. Caspar indicated that they objected to any notion that they

11  wouldn't be able to participate in the retrial of this case,

12  and I think you've frankly indicated to me, and it makes sense,

13  or at least I understand your position, that if you get me

14  recused, you may well also seek to re -- from the Ninth

15  Circuit, you may well also seek to vacate my May 2013 findings

16  of fact and the appropriate -- or the associated supplemental

17  permanent injunction.

18          I don't know that you'll try to do that, but you may,

19  and you've indicated that you may try to do that if you achieve

20  success.  I appreciate that straightforward assessment, but it

21  seems to me at this point, because, as I understand it, and

22  maybe I'm wrong about this, Judge Silver's order incorporated

23  the order that I'd entered in this case, if that gets vacated,

24  I don't see why I should prevent the United States from

25  assisting in the retrial of the case.  And so that's one of the

      CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  10


1  reasons why I'm disinclined to impose any limitations on their

2  intervention at this point, but certainly at that point you can

3  raise the matter.

4          If that point were to occur, of course, it wouldn't be

5  in front of me, and so I want to make clear that their motion

6  for intervention that I'm going to grant is without prejudice

7  to you raising individual objections as to its scope as we go

Page 8

Status Conference 8-11-15.txt

8    along, but I'm not going to limit it at this point unless you

9    have some additional concerns you want to raise.

10          MR. MASTERSON:  I do not, Judge, and that's how I

11    understood the Court's intended ruling.

12          THE COURT:  Okay.  Did you have anything that you

13    wanted to raise, Mr. Walker?

14          MR. WALKER:  No, Your Honor.  I understand your

15    inclination on this and we will raise objections as we go

16    along.  As I pointed out in the response, though, we have a

17    concern that the Department of Justice is trying to do an

18    end run around the consequences of the action that it chose to

19    bring before Judge Silver and to litigate before Judge Silver,

20    and to that extent, we don't think the Department of Justice,

21    as with any party, should be permitted to do that.

22          THE COURT:  I think I understand your concerns and

23    objections.  I think they'll probably be better placed in a

24    particular fact-specific focus, and we can raise it at that

25    time.  Certainly, I'll note, and I don't think it's news to

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  11


1    anybody, that the ACLU and Covington and the law firms before

2    that have borne the brunt of this litigation, along with the

3    plaintiffs.

4          Ms. Wang, do you have anything you wish to say on the

5    motion to intervene?

6          MS. WANG:  No, Your Honor.

7          THE COURT:  All right.  Well, then I will file an

8    order, probably within later today or in a day or two, granting

9    that motion.  And I'm granting it without limitation but I do,

10    as I think I've made clear, grant it without prejudice to any

11    assertion by the defendants that the United States is exceeding

Status Conference 8-11-15.txt

12 the appropriate scope of the intervention in a fact-specific

13 context.

14      We have before us the pending renewal of the

15 pro hac vice application of Larry Klayman.  Mr. Klayman is not

16 here.  I had indicated my intent to hear that today and I guess

17 it's still my intent.

18      I note that the sheriff hasn't taken any position on

19 that intervention.  I notice that plaintiffs have opposed it.

20 I notice that to the extent that Maricopa County is a separate

21 entity and a nonparty, they've also introduced a filing.

22      I will say I have read the filing.  I'm not sure that

23 I'm going to take it into account, and I'm not sure that I need

24 to.  When Mr. Klayman was here, I asked him to address some

25 specific issues, and he did not do that, from my perspective,

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   12

1 in his reply, and they remain for me very concerning.

2      It does seem to me that Mr. Klayman filed -- entered

3 with Mr. Moseley on Mr. Moseley's previous attempt, and Moseley

4 is an associate of Mr. Klayman's, and Mr. Klayman filed and

5 represented himself as of counsel on all of Mr. Moseley's

6 previous briefs.  Mr. Klayman represents Sheriff Arpaio in the

7 District of Columbia action and he doesn't seem to contest

8 that.  He says that he's not going to seek to challenge Sheriff

9 Arpaio here, and yet in his reply he is vigorously critical of

10 Sheriff Arpaio's representation, which I believe is -- and

11 infused issues and invective in this lawsuit that are simply

12 not issues, and suggests that he cannot fulfill his duty to

13 both of his clients -- Sheriff Arpaio, on the one hand, and

14 Mr. Montgomery on the other -- especially if he is not going to

15 seek in any way to challenge what Sheriff Arpaio has said in

16 his testimony, which would tend to indicate that

Page 10

Status Conference 8-11-15.txt

17    Mr. Montgomery -- and again, I'm not saying it does indicate

18    it, but based on the testimony as we have it to date the

19    sheriff is -- I think it was Chief Deputy Sheridan who said

20    that the representation was that these were documents taken

21    from the CIA, and that both Chief Deputy Sheridan -- and by

22    "the representation," I mean the representation that

23    Mr. Montgomery made to the MCSO -- and that both the sheriff

24    and the chief deputy have indicated that that material appears

25    to be extremely unreliable and junk.

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    13

1     Certainly, some of the documents that have been

2     produced since then seem to support the sheriff's view, and as

3     it relate -- and Mr. Klayman says that he wishes to intervene

4     in this action to protect his ownership rights in the property,

5     and yet I asked him how anything about this action has to do

6     with whether or not he has ownership in the property.  The only

7     thing we've done is turned it over -- at this point, authorized

8     the Department of Justice to look at it, and they are under an

9     order not to diffuse it in any way without further order of

10    this Court, and I asked him how that in any way impaired

11    Mr. Klayman's ownership interest and he didn't have an answer

12    for me at that time, and he doesn't provide an answer in his

13    reply, at least as I read it.

14    I also pointed out that at least according to the

15    testimony and the documents that have been provided as I

16    understood them -- and again, I understand we don't have a

17    complete story here -- that what Mr. Montgomery was purporting

18    to be able to do to the Maricopa County Sheriff's Office was

19    reproduce phone calls and computer records between this Court,

20    the Department of Justice, between the Department of Justice

Status Conference 8-11-15.txt

21  officials, and phone taps that may have taken place as against

22  the sheriff, as against Mr. Popolizio and Mr. Masterson, as

23  against this Court, as against other judges, in 2009 and 2010.

24  And I didn't understand -- when he said to me that the District

25  Court of Nevada had already found that he had certain materials

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   14

1  related to a company that he operated and they had ruled in

2  2006 and 2007 that he owned those materials, I didn't

3  understand how, if they were claiming those were the same

4  materials, you could get anything from 2009 and 2010 on them,

5  so we must be talking materials that are different, if they are

6  as he represented them to be, than the materials from the

7  district court judgment, and again, he was unable to answer

8  that question and does not answer that question in his reply.

9      And again, I think that it's possible that Mr. Klayman

10  himself may be a witness in this case, based on the documents

11  that have been disclosed.  And I'm not saying he will be a

12  witness and I'm not even saying he has relevant testimony, but

13  the documents disclosed in connection with the motion to recuse

14  I think suggest strongly that Mr. Klayman himself may have even

15  been involved in efforts to convince Maricopa County that

16  Mr. Montgomery was providing them with real stuff.

17      And for all those reasons -- I appreciate what

18  Mr. Klayman says, that Mr. Montgomery has difficult finding

19  counsel, and I'm certainly not preventing him from appearing

20  here, either individually unrepresented or with any other

21  counsel.  But I do not believe that Mr. Klayman or anyone in

22  his law firm, for reasons I've stated, including the fact that

23  in addition to what I view to be his -- at least, as far as I

24  can tell to date, unwarranted attacks on Ms. Iafrate and others

25  of the sheriff's counsel, and I think he's also attacked this

Page 12

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference 15

1    Court, he's attacked plaintiffs, he's attacked everybody else
2    and raised all kinds of issues that seem to me to be
3    extraneous, including the allegation that this Court and
4    various newspapers in town have a bias against the sheriff, it
5    just seems to me that in light of his conflict, in light of the
6    fact that I don't think he's raised -- he's raising anything
7    that relates to this case and that would merit intervention,
8    and in light of the fact that his behavior suggests that he
9    would infuse invective in this lawsuit and issues that are
10   simply not at issue, and in light of his past disciplinary
11   history, as well as in light of the past disciplinary history
12   of Mr. Moseley, I am not granting his motion to intervene at
13   this point.
14          Does anybody want to be heard on that one?
15          MS. WANG:  No, Your Honor.
16          MR. MASTERSON:  I have nothing, Judge.
17          MR. WALKER:  The County has nothing further, Your
18   Honor.
19          THE COURT:  All right.  I think now we need to start
20   focusing in on narrowing the issues and determining what's
21   going to take place in the September hearing if it goes
22   forward, and it seems to me there's some issues to address in
23   that respect.
24          First is the 1500 driver's licenses or other
25   identifications and the PSB investigation of those matters.  We
          CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference 16

1    currently have those identifications at the Marshals'.  I
2    believe, but I'm not sure, that PSB has initiated an

Page 13

Status Conference 8-11-15.txt

3   investigation into those identifications as well as the other

4   identifications and the other matters that we also have, and I

5   need to know whether the MCSO needs to get access back to those

6   identifications to figure out where they came from or to

7   complete their investigation, I need to know what access

8   plaintiffs would like to those identifications, and I need to

9   know if the monitor needs those identifications for purposes of

10  evaluating the adequacy of MCSO's investigation, but I presume

11  that that would abide the completion of MCSO's investigation.

12  But since it doesn't seem to be contested that a number of

13  those identifications involve members of the plaintiff class,

14  it seems to me that it may well be relevant.

15          I don't know, do you want to be heard on this,

16  Ms. Wang?

17          MS. WANG:  Yes, Your Honor.  Thank you.

18          Your Honor, plaintiffs would seek production of the

19  1500 identification documents and further discovery, so that we

20  can determine whether any of the owners of those documents were

21  victims of violations of the preliminary injunction or other

22  constitutional violations by MCSO personnel.

23          We believe that they're certainly discoverable and

24  very -- potentially go to the heart of the constitutional

25  violations that were found at trial in this case.  So we would

    CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   17


1   seek them and other documents, for example, any way to link

2   those identification documents to departmental reports or

3   incident reports that could link the identifications to an

4   owner and to a particular traffic stop or other encounter with

5   MCSO personnel.

6          THE COURT:  Ms. Iafrate, Mr. Masterson, I assume that

7   PSB is -- that's part of the investiga- -- what they're doing

                            Page 14

Status Conference 8-11-15.txt

8    in their own investigation.

9         MR. MASTERSON:  Judge, PSB can certainly do that, but

10   there's a couple things with respect to these identifications

11   that I'd like to clear up, and a couple of those were

12   misstatements by the monitor.  And one of the misstatements by

13   the monitor was made on July 24th, where the monitor told the

14   Court that these particular documents were slated for

15   destruction, and had this matter not come to the monitor's

16   attention and they made the kind of inquiry that had been paid,

17   then they would have been destroyed.

18        THE COURT:  You know, what I understood, and maybe I

19   misunderstood him, was that they were slated for destruction

20   when they were in Property, but that they weren't in Property

21   when he found them.  I thought they were with PSB.

22        MR. MASTERSON:  They were slated for destruction

23   between 2006 and 2010, between five and nine years ago, and

24   they were in Property.

25        THE COURT:  Yeah, I think that was what my

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   18

1    understanding was as well.

2         MR. MASTERSON:  Then they were removed from Property,

3    according to MCSO policy, taken into possession by a sergeant

4    who was going to give a training class.  He didn't give the

5    training class and had sought to return the IDs to Property.

6    Property, then having known of this litigation, brought it to

7    PSB's attention and here we are.

8         THE COURT:  Yeah, that is my understanding, what

9    you've just said.

10        MR. MASTERSON:  Okay.  Because I was afraid that the

11   Court was convinced -- the monitor seemed to me to indicate

Page 15

Status Conference 8-11-15.txt

12    that he saved the day and saved these IDs from destruction,

13    when that was never going to happen.

14        THE COURT:  No.  The only thing I did understand the

15    monitor to say, in fairness, is that he discovered that the

16    MCSO wished to withhold those documents from his attention.

17        MR. MASTERSON:  Well, that I don't know, and I don't

18    know whether that's an accurate statement by the monitor or

19    not.

20        THE COURT:  And maybe I've misparaphrased him, but

21    that was my understanding, and that remains my understanding,

22    but I did not understand -- I did understand that at one point

23    they were scheduled for destruction but that they were

24    removed -- that was when they were in Property, and they were

25    removed from Property, and they weren't under any imminent risk

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   19


1    of destruction at that point; they were just at an imminent

2    risk of non-disclosure, which is why --

3        MR. MASTERSON:  Okay.

4        THE COURT:  -- I ordered them to be seized.

5        MR. MASTERSON:  I understand.  Thank you, then, Judge.

6        The other misstatement by the monitor is -- and again,

7    maybe it's an implication I'm drawing from what he said -- but

8    he made an allegation that the Property Unit is being used as a

9    repository for holding away from public scrutiny or court

10    scrutiny documents that were obtained unscrupulously or

11    illegally.  And I'll tell you what.  I'd like the monitor to

12    come forth and give us the evidence that any of these IDs were

13    taken unscrupulously or illegally.  In fact, just one.  Just

14    come prove to us that one of them was taken away.

15        THE COURT:  Well, is there any basis -- I think that

16    that's going to be at the very heart of the hearing that we're

Page 16

Status Conference 8-11-15.txt

17    going to have, isn't it?

18         MR. MASTERSON:  Well, I suppose, Judge, and I suppose

19    we could try to determine the origin of every one of those

20    1459, but I think it's going to be extraordinarily difficult.

21    I mean, these IDs could come into the possession of MCSO in so

22    many different ways.

23         THE COURT:  Well, let me just tell you my concern, and

24    I believe that there is some testimony when I talked to deputy

25    chief -- Chief Deputy Sheridan about this.  There was some

         CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   20


1     representation initially that these matters were just taken --

2     these identifications were taken for fraud training by only a

3     few officers.  Then I think it became quite clear that many

4     officers were taking identifications as a matter of course.

5     They were taking -- some were taking drivers's -- not just

6     driver's licenses, but most of them were Mexican

7     identification cards printed by the Mexican government, which,

8     I mean, why would they forge those?  And I discussed that some

9     with Chief Deputy Sheridan.

10         And then there was -- the monitor did some

11    investigation, as I recall, where all throughout the various --

12    is it districts or divisions of MCSO -- they have bins, and

13    officers acknowledge that they just seized these

14    identifications and put them in the bins without putting them

15    in Property, and it seems to me, in addition with the other

16    evidence that's been found that was disclosed prior to your

17    entry in this lawsuit but I'm sure you've been made aware of

18    that there was a rather -- or at least there's the potential of

19    a rather widespread practice of just seizing folks'

20    identification cards without legal justification for doing so,

Page 17

Status Conference 8-11-15.txt

21 which is one of the issues in this lawsuit. And it seems to me

22 that that's one of the things we're going to address at the

23 hearing.

24     Does that resolve your concern about your ability to

25 address that --

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   21


1     MR. MASTERSON:  Well --

2     THE COURT:  -- that assumption?

3     MR. MASTERSON:  I understand there's been allegations

4 that documents have been seized unlawfully, but there are many

5 instances in which a deputy sheriff can lawfully seize --

6     THE COURT:  Sure.

7     MR. MASTERSON:  -- a license plate, a driver's

8 license.

9     THE COURT:  And when he does that, I presume there's

10 a -- or there should be a procedure by which that is accounted

11 for in Property or elsewhere.

12     MR. MASTERSON:  Well, I suspect that if it came in --

13 it would depend on how it came into the deputy's possession.

14 You could have found it, found items as well.

15     THE COURT:  And, you know, we can go through all that

16 if you want to, but it doesn't seem to me that there's really

17 an issue that -- well, we'll wait and see.

18     MR. MASTERSON:  I guess what concerns me, Judge, is

19 the -- I mean, we've got a significant preliminary and final

20 injunction to comply with, and we're kind of getting

21 sidetracked from doing just that. And here's another instance

22 where now we're going to have to go look at 1459 individual IDs

23 when there's absolutely no proof, one, that any of them belong

24 to the plaintiffs' class. I will give you that in the few I

25 looked through, I found one or two Hispanic names in maybe the

Page 18

Status Conference 8-11-15.txt

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    22

1    24, 25 I looked at, so I don't know whether they're in the
2    plaintiffs' class or not.  But I can tell you an awful lot of
3    them were blatantly --
4            THE COURT:  Well, I'll tell you --
5            MR. MASTERSON:  -- horrible fabrications of driver's
6    licenses.
7            THE COURT:  Well, let me just tell you, Mr. Masterson,
8    that to date, and I don't mean to be pejorative in any way, but
9    to date, your client's track record for producing requested
10   documents and to destroy -- is very poor.  Your client has
11   destroyed documents that were definitely responsive to what
12   happened here.
13           The description I've got, and I haven't looked at
14   them, is that about half -- I think that I'm stating this
15   right, about half of those identifications involved members of
16   the plaintiff class or what appear to be members of the
17   plaintiff class.  There are a number of others that involve
18   members of the plaintiff class that I've already seen that are
19   just unaccounted for.
20           And I think, it seems to me, unless you can tell me
21   otherwise, that I heard evidence that MCSO just took these
22   things from folks that they were arresting.  Not everybody, to
23   be sure, but that enough, and certainly more than Sergeant
24   Armendariz were doing it, and that seems to me to be a
25   significant -- you know, if you -- significant deprivation, or

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    23

1    possibly significant deprivation of their personal property
2    that MCSO had no basis to take in at least some instances.

Page 19

Status Conference 8-11-15.txt

3    Because that information, and because those documents

4 which were in MCSO's possession were requested and never

5 returned in the underlying lawsuit, I think that plaintiffs'

6 class has a right to say this was another issue that would have

7 been raised in the underlying lawsuit if there had been

8 appropriate disclosure.

9    And so while I agree with you and I think your point

10 is a correct one, that we need focus on the remedy to the

11 plaintiff class here; we need to focus on implementing the

12 remedies that I've already ordered.  But in addition, we need

13 to realize that there are other remedies that may well have

14 been ordered if your client would have complied with its

15 discovery obligations, which it admittedly did not do.

16    And so this hearing -- and you're right, we shouldn't

17 lose focus of the need for your clients to comply with existing

18 orders -- but this hearing is also, a major purpose of it is to

19 see what needs to be done to rectify the rights of the

20 plaintiff class in light of the fact that your client withheld

21 all these documents.

22    MR. MASTERSON:  Well, I understand, and I understand

23 with respect to the Armendariz documents that's a concern.

24 What I'm focusing on are the 1459 when there's absolutely no --

25 not a scintilla of evidence that any of these were taken

   CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   24


1 unlawfully or that anything unlawful was done with them, and --

2    THE COURT:  Well, so do you want access to them?  Do

3 you need access to them?

4    MR. MASTERSON:  Well, if the Court is going to

5 compel -- well, if the Court's going to make an inquiry into

6 the origin of each one of these 1459 documents, I'd certainly

7 like to have access to whatever -- or however that inquiry is

Page 20

Status Conference 8-11-15.txt

8    being made.

9        THE COURT: Well, yeah, and perhaps you'll end up

10   making the inquiry. But certainly I don't think there's any

11   need to inquire as to all 1459, since it's my understanding

12   that a substantial number of them nobody contests is a member

13   of the plaintiff class.

14        But it does seem to me that you have a track record

15   that is at least worthy of investigation about whether or not

16   these identifications were correctly seized, because clearly, I

17   think, and I don't wish to misstate the record, but we have, I

18   believe, a number of officers who have indicated that they just

19   took those things as trophies, they hung them on the wall; and

20   the monitor I think did say this to me, Chief Martinez, you can

21   correct me if I'm wrong, that in their interviews out in the

22   districts they just took those things and threw them in a bin.

23   And they called the bin something like the unicorn bin. And I

24   forget the reason why, but it was something like make-believe

25   that they'd ever be put into Property or something. And that

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  25


1    was not the statement of my monitor; that was the statement of

2    your officers.

3        And so it seems to me that there is evidence that

4    there has been, at least among a number of MCSO officers, an

5    ongoing practice of doing this kind of thing, which is a

6    substantial deprivation, or could be a substantial deprivation

7    of rights of the plaintiff class. And simply because it may be

8    problematic now for you to find out where those licenses came

9    from, you know, if you had done it -- and again, I don't know,

10   but it seems to me that if you would have recorded these in

11   Property pursuant to an arrest, or a stop, which would be

Page 21

Status Conference 8-11-15.txt

12  normal police procedure, it wouldn't be problematic for you to

13  say:  This document was seized in connection with this stop.

14  But you didn't do that, so now you have to go back and see who

15  you stopped, and where and why, and it seems to me that that is

16  not an unreasonable request if in fact plaintiffs make it.

17        But you're certainly entitled, Mr. Masterson, to look

18  at those documents in conjunction with the plaintiffs, exclude

19  ones that really don't seem to implicate members of the

20  plaintiff class.  And maybe you can make stipulations as to

21  others; it will make your life more easy.  All I want to do in

22  this proceeding is figure out what we need to do to provide you

23  access, the plaintiffs access, and figure out where we need to

24  go from here so that we can proceed.

25        MR. MASTERSON:  All right.  So let me understand:  Are

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   26

1  we free, then, to meet with the plaintiffs to discuss how we're

2  going to go through these documents?

3        THE COURT:  Sure.  Absolutely.

4        MR. MASTERSON:  In addition, there's an awful large --

5  I shouldn't say that.  The ones I looked at, a large number of

6  them were blatantly false documents.  A driver's license,

7  somebody was apparently trying to -- my guess, trying to buy

8  booze and made themselves to be 25, and it was a horrible

9  fabrication of an Arizona driver's license.  There's a lot of

10  those.  So I think we could weed --

11        THE COURT:  By all means, weed --

12        MR. MASTERSON:  -- weed those out, too.

13        THE COURT:  Yes.  Meet with plaintiffs, and if, you

14  know, they can agree that they should be weeded out, I think

15  that, you know.  I will tell you for the benefit of what

16  history says is that it seems to me that counsel have --

Page 22

Status Conference 8-11-15.txt

17  despite the sharp division of legal authority and legal
18  positions in this lawsuit, counsel have been able, at least
19  frequently, to be very professional in terms of limiting the
20  issues and simplifying them, which I think -- I have no reason
21  to think you can't do here.
22          MR. MASTERSON:  Thank you, Judge.  That's all I have
23  on these issues.
24          THE COURT:  All right.
25          Ms. Wang.

       CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   27


1           MS. WANG:  Your Honor, may I respond briefly to some
2   of the things Mr. Masterson has presented?
3           THE COURT:  Yes.
4           MS. WANG:  Thank you.  Your Honor, earlier I responded
5   to the Court's narrow question about whether plaintiffs are
6   seeking discovery of the 1459 IDs.  Mr. Masterson brought up an
7   important point, which is what happened with those IDs once
8   their existence was discovered by the defendants.
9           To be clear, plaintiffs will also seek discovery into
10  those matters.  We think those also go centrally to compliance
11  and defendants' compliance in this case, including whether they
12  have forthrightly come forward with evidence and whether they
13  have failed to comply with the Court's orders regarding
14  disclosure of things like the IDs, and whether they have taken
15  inappropriate steps to fail to disclose those documents.
16          We think those issues are centrally important to this
17  case and to the rights of the plaintiff class, and we do intend
18  to take discovery prior to the resumption of the evidentiary
19  hearing on September 22nd.
20          We would be happy to meet and confer with the

                           Page 23

Status Conference 8-11-15.txt

21    defendants.  For the past year or more, we have attempted to

22    work with them on various things and recently have asked for

23    their assistance in trying to locate people whose rights were

24    violated through violations of the preliminary injunction

25    order, and we would very much hope that the defendants would be

          CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   28


1    cooperative in trying to come up with a way to identify those

2    victims.

3              THE COURT:  Thank you.

4              MS. WANG:  Thank you.

5              THE COURT:  Anybody else want to be heard on the 1500

6    IDs?

7              MR. WALKER:  I have nothing to add, Your Honor.

8              THE COURT:  All right.  If you have nothing to add,

9    you can simply remain quiet; if you have something you want to

10   say, signal me.

11             What about the 50 hard drives and Mr. Mackiewicz's

12   hard drive?  Mr. Gomez, do you want to come forward and tell us

13   what the government has done and what it intends to do?

14             I will say that I received the visit of a court

15   security officer prior to this hearing, just so everybody

16   knows.  The court security officer said that while he had been

17   initially contacted through the Department of Justice, I could

18   take -- I could assert jurisdiction over him so that he

19   responds to my commands and not yours, Mr. Gomez.

20             MR. GOMEZ:  That's correct, Your Honor.

21             THE COURT:  All right.  So do you want to tell us what

22   you have done to date?

23             MR. GOMEZ:  We have contacted -- the Department of

24   Justice has contacted the court security office and requested

25   that they bring -- that two court security officers come down

                              Page 24

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   29

1    for copying of the two Banker Boxes and one hard drive --
2          THE COURT:  Well --
3          MR. GOMEZ:  -- of the Montgomery material.
4          THE COURT:  -- there are 51 hard drives of the
5    Montgomery material.
6          MR. GOMEZ:  That's correct, Your Honor.
7          THE COURT:  So which hard drive are you talking about?
8          MR. GOMEZ:  Back in May, the end of May, there had
9    been initially identified two Banker Boxes and one hard drive.
10   And then I believe at a subsequent time -- it may have been
11   even in July, but it could have been in June -- there were 50
12   additional hard drives, I believe, that were identified as
13   being Montgomery hard drives, at least as I was informed by the
14   court monitor.
15         The government initially had intended to -- its review
16   was to look at the two Banker Boxes and the one hard drive, and
17   then when it became aware that there were 50 additional
18   hard drives, some of which we don't know what the volume is in
19   each of the hard drives, we received an inventory from the
20   U.S. Marshals Service as to the hard drives, but no one has
21   opened those hard drives.
22         The client entities that I am dealing with for the
23   United States have decided that they would like to look -- go
24   forward with their review as to the two Banker Boxes and the
25   one hard drive and determine whether there's either property of
          CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   30

1    the United States or classified material in those documents,
2    and at that point make a determination whether they would then
                         Page 25

Status Conference 8-11-15.txt

3  proceed to review the -- copy and review the 50 additional

4  hard drives.

5      I just want to say, Your Honor, that it's -- there's

6  also the possibility that while this review is going on, my

7  office at the Department of Justice is giving consideration as

8  to whether if a copy is made of the 50 hard drives, that either

9  someone from -- myself or someone -- myself and maybe some

10  other U.S. representatives may come, if it's agreeable to the

11  court monitor, to just look at some of the contents of those

12  hard drives if they're going to be copied.

13      One concern that the United States has, at least at

14  this point, is that we believe those are original hard drives,

15  they're not a copy of them at this point, and if the United

16  States -- if I were to go, and I have the technical people here

17  with me today, but if we were to go and open up any of those

18  hard drives, we potentially could change the metadata in the

19  hard drive, and while that may or may not be an issue, it may

20  not be an issue for the court monitor or for anyone else, if it

21  were to be an issue, we don't want to interject the United

22  States in that kind of a problem.

23      So I think at this point, just to be clear, the United

24  States will look at the -- is looking at -- we've copied the

25  two Banker Boxes and one hard drive.  A representative of the

       CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   31

1  defendant was present yesterday at the FBI office along with, I

2  believe, Chief Sharon Kiyler was present from the court monitor

3  while we conducted the copying, and so we've made that copy and

4  we'll be taking that material back to Washington.

5      We will Bate number all the hard copy pages.  We've

6  put them on PDFs.  That way, if we do find something, we'll be

7  able to point -- be able to provide a Bate number page to the

Page 26

Status Conference 8-11-15.txt

8    Court or to the court monitor as to what material, if it turns
9    out there's material the United States should take custody or
10   restrict access to.
11          THE COURT:  well, let me ask a question.
12          Ms. Iafrate, were you going to ask a question?
13          MS. IAFRATE:  I was actually going to inform the Court
14   regarding my knowledge of what happened yesterday.
15          THE COURT:  All right.
16          MS. IAFRATE:  Your Honor, my understanding was that
17   the Department of Justice --
18          THE COURT:  Were you there?  Did you --
19          MS. IAFRATE:  I was not; a representative from my
20   office was there on my behalf.  My understanding was that the
21   50 hard drives were going to be forensically copied yesterday.
22   That did not occur.  Instead, what happened was the hard drive
23   that was taken from Chief Knight's office recently was the
24   hard drive that was indeed copied.
25          If you recall, Your Honor, the last time you and I

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   32


1    spoke in court I had concerns regarding that hard drive because
2    it contains a vast amount of other things other than just
3    Montgomery material.  And so you had asked me if I would like
4    first crack at that hard drive in order to catalog regarding
5    what's on it, what's relevant, what's not.  That has not
6    occurred, obviously, prior to the copying of that one
7    hard drive.
8           My understanding was that yesterday and today was set
9    aside for the forensic copying of those 50 hard drives, which
10   did not occur.  I now have concern regarding the one that was
11   copied, that it has other materials on it that you had provided

Status Conference 8-11-15.txt

12    me the opportunity to review prior to any copying.

13        THE COURT:  I don't -- I mean, I'm not questioning

14    what you're saying, Ms. Iafrate.  I don't have specific

15    recollection of what you're saying, but I don't question it.

16        Did you take me up on that or not?

17        MS. IAFRATE:  The hard drive --

18        THE COURT:  Did you say you wanted to have first crack

19    at the --

20        MS. IAFRATE:  I did say that, yes, and you said very

21    well.

22        THE COURT:  Okay.  Well, I'll confirm that.  If that's

23    so, then I'm going to require the FBI, before it -- or the

24    Department of Justice, before it does anything, to provide a

25    copy to Ms. Iafrate.  And I'll give you the chance to review it

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  33


1     and to claim that certain materials don't have anything to do

2     with the materials provided by Montgomery and provide that

3     claim to the -- to me and to the monitor and the Department of

4     Justice.  And I'll ask the Department of Justice at that time

5     to review -- to restrict your review to the materials that

6     Ms. Iafrate identifies as not being otherwise related.

7         Which doesn't mean, if you contest the other

8     materials, that we can't raise that at a later -- at a later

9     date.  But one of the things I am going to require,

10    Ms. Iafrate, is that you do what you're going to do with

11    dispatch.

12        MS. IAFRATE:  Understood.

13        THE COURT:  You have a problem with that, Mr. Gomez?

14    You wish to be heard on it?

15        MR. GOMEZ:  May I confer just with one of the court

16    security officers, in terms of the technical --

                        Page 28

Status Conference 8-11-15.txt

17          THE COURT:  Yes.

18          MR. GOMEZ:  -- copying?

19          (Pause in proceedings.)

20          CHIEF MARTINEZ:  Your Honor, this is Chief Martinez.

21    May I add some information to what he said?

22          THE COURT:  I'm sorry, Chief.  What did you say?

23          CHIEF MARTINEZ:  May I add some information to what

24    has been said about the 50 hard drives and the hard drives?

25          THE COURT:  Yes.  But keep in mind, Chief, that

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    34


1     because you're on a speakerphone, sometimes there's a

2     distortion and you cut out, so if you'd speak slowly and

3     clearly, that would be helpful.

4           CHIEF MARTINEZ:  Yes, sir.

5           The copy that was the hard drive that was copied

6     yesterday for Mr. Gomez was the hard drive that was provided to

7     us back on April 24th or April 27th by Chief Knight.

8           THE COURT:  So it's not --

9           CHIEF MARTINEZ:  They received a copy of the

10    hard drive.

11          THE COURT:  All right.  So it is not the Mackiewicz

12    hard drive taken from Chief Knight's office; it is the material

13    previously provided by plaintiffs.

14          CHIEF MARTINEZ:  Yes, sir.

15          THE COURT:  I'm sorry, by defendants.

16          CHIEF MARTINEZ:  The chief -- I'm sorry, Your Honor.

17    The Chief Knight slash Mackiewicz hard drive is in the process

18    of being forensically copied.  They haven't finished doing the

19    copying yet because it takes many hours, and that still has not

20    been fully copied yet.

Page 29

Status Conference 8-11-15.txt
21          THE COURT:  All right.  So you've already reviewed
22    this material.
23          MS. IAFRATE:  I am not concerned, if that is indeed
24    the hard drive that was copied.  I was under the impression
25    that it was the one that was seized from Chief Knight's office.

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   35


1          THE COURT:  All right.  So you can go ahead and review
2     everything you've got.
3          MR. GOMEZ:  Yes, Your Honor.
4          THE COURT:  But that does leave sort of the elephant
5     in the room about what do you want to -- I mean, the only
6     reason -- well, let me restate what appears to be the state of
7     things at this moment, and I can't say it is the state of
8     things because things are still in flux.  But it appears, based
9     on documents that we have seen, that MCSO actually took
10    possession of 50 hard drives provided to them by
11    Mr. Montgomery, which he represented to be CIA-harvested
12    material.
13          Those 50 hard drives were brought here to Maricopa
14    County and placed in an evidence locker.  We don't have
15    absolute confirmation that the 50 hard drives we have seized
16    are those hard drives, but it appears that that, at least for
17    present purposes, is not contested.
18          The reason why you're involved at all, of course, is
19    because Ms. Iafrate contacted you and said that MCSO had this
20    material that had been represented to them as having been taken
21    from the CIA.  And if that is true with respect to the one
22    hard drive that you now have, it may also be true with respect
23    to the 50 hard drives that we now have.
24          We also have documents, but they are only documents,
25    which purport to be communications between members of the MCSO
                              Page 30

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   36

1   and Mr. Montgomery in which the MCSO expresses severe doubts
2   about the credibility of what Mr. Montgomery told them about
3   the contents of those hard drives.  So I can't represent to you
4   that those 50 hard drives in fact have CIA-harvested material
5   on them, but, of course, I can't represent to you that they
6   don't.
7         But I can say that I don't intend to wait for this
8   lawsuit for the Department of Justice to decide whether or not
9   it's going to review those 50 hard drives, and if they've got
10  secure material on them, they've got secure material on them,
11  but I'm going to make them available to the plaintiffs and to
12  the defendants if they want to review the material on that
13  hard drive.
14        And I understand your concern about not, you know,
15  altering the metadata that's on those hard drives, and I don't
16  know computer stuff, but I do understand that we can make ghost
17  copies of those existing hard drives and make them available to
18  both parties, or all parties who may want to look at them, so
19  that we can establish whether in fact those are the materials
20  provided by Mr. Montgomery to the MCSO, and if in fact they
21  contain what Mr. Montgomery purported to the MCSO that they
22  contained.
23        It may be, as I said last time, that the parties may
24  be able to stipulate that those are the -- for example, that
25  those are the materials provided by Montgomery to the MCSO, and

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   37

1   that they don't seem to contain the material that Montgomery
2   indicated that they did.  But I don't know that the parties can

Page 31

Status Conference 8-11-15.txt

3  stipulate to that, or that they will care to.

4        And if you have a concern that you have -- that there

5  is secured material on them, we want to accommodate that

6  concern.  But we're not going to sit here while you decide, you

7  know, for months while you decide whether or not you're going

8  to look at them.

9        Do you understand what I'm saying?

10       MR. GOMEZ:  I understand, Your Honor.

11       THE COURT:  So how do you propose that we proceed?

12       MR. GOMEZ:  Well, the client entities that I'm

13 speaking to, you know, from the United States, have expressly,

14 and reaffirmed yesterday, that they want to take this one step

15 at a time and look at the two Banker Boxes and the one

16 hard drive, and if there's material on there, make a

17 determination of how best to proceed.

18       Those are my instructions from the client.

19       THE COURT:  All right.  Well, would you please tell

20 your client entities that I have no intention of waiting on

21 their decision to proceed or not to proceed.

22       MR. GOMEZ:  Yes, Your Honor.

23       THE COURT:  That we are going to go forward.  That we

24 will, of course, accommodate the United States Government to

25 the extent that they have reasonable concerns that there may be

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  38


1  material on there that needs to be protected, but that doesn't

2  mean we're just going to sit here.

3        MR. GOMEZ:  Yes, Your Honor.

4        THE COURT:  All right.  You can stay right there,

5  because Mr. Masterson has something he wants to say.

6        MR. MASTERSON:  Just a question, Judge:  Do we get to

7  know who these client entities are, or is that top secret for

                              Page 32

Status Conference 8-11-15.txt

8   some reason?

9        THE COURT: I don't see why you can't know who those

10  client entities are.

11       MR. GOMEZ: If there is classified information in the

12  material, then it would be -- we would not be able to identify

13  the entity or entities, so at this point we -- until we look at

14  the material, if in fact the material is of the nature where an

15  entity can't be identified because it's classified, then we

16  can't disclose, at least at this point --

17       THE COURT: And what law are you basing that on?

18       MR. GOMEZ: Well, based on the -- if the material is

19  in fact classified and the information as to the, you know,

20  executive order, I at the moment have -- I think it's 12386,

21  but I'll have to confirm the actual number, if the entity can't

22  be identified because it's classified, then along with the

23  other substantive material it, by executive order, is precluded

24  from disclosure.

25       THE COURT: Well, I guess I'm not going to make you

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  39

1  disclose that today, but an executive order I'm not sure binds

2  this Court. We'll see.

3       MR. GOMEZ: Yes, Your Honor.

4       THE COURT: The other thing that I guess I want to

5  know is: Do your client entities have any idea how long it's

6  going to be before they get back to us whether they think

7  they've got any secured material in that material they're

8  reviewing?

9       MR. GOMEZ: I haven't been given a time line, but I've

10  expressed to them that, you know, the proceeding -- this case

11  is proceeding forward, and there are, in fact, at least as I

Page 33

Status Conference 8-11-15.txt

12  understand it, matters that are going forward as early as

13  September 22nd, and that there's not much time --

14      THE COURT: Well, let me just say, it is going forward

15  on September 22nd.

16      MR. GOMEZ: Yes, Your Honor.

17      THE COURT: And let me also just say, and maybe we can

18  shortcut this, to the extent that you're only reviewing what

19  the defendants have already provided in April, I have the sense

20  that it has been thoroughly reviewed already by plaintiffs and

21  defendants. Do any of you want to characterize --

22      MS. Iafrate, you may have the best view of any of

23  this. Is there anything in there that you think may be secured

24  material?

25      MS. IAFRATE: Your Honor, I don't feel confident to

            CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  40

1   determine what's confidential and what's not confidential

2   information.

3       THE COURT: Have you reviewed it all?

4       MS. IAFRATE: I have.

5       THE COURT: Ms. Wang, have you reviewed it all?

6       MS. WANG: I have not personally, but our team has, I

7   believe.

8       THE COURT: Okay. Well, you can tell the United

9   States Government, then, and whatever entities they are,

10  they're well behind the eight ball in reviewing what this

11  material is. And so again, I'm glad to accommodate national

12  security interests, if there are any, but I think we need to

13  move forward.

14      MR. GOMEZ: Yes, Your Honor.

15      THE COURT: Okay. Now, with respect to the 50

16  hard drives, Ms. Iafrate, Mr. Masterson, Ms. Wang, do you want

            Page 34

Status Conference 8-11-15.txt

17    access to those now, or do you want to give the United States a
18    little bit of time?  I mean, you've had them for many, many
19    months, or years, but I don't know whether they're the topic of
20    a current investigation from MCSO or any other Arizona or
21    national law enforcement that you would have provided access to
22    for --
23          MS. IAFRATE:  Your Honor, we would like access to
24    them, and I think that waiting until the eve of the next trial
25    would not be prudent --

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  41

1          THE COURT:  Yeah, I have no intention of doing that.
2          Why don't we do this?  Ms. Wang, let me hear from you.
3          MS. WANG:  Yes, Your Honor.  Plaintiffs also would
4     like to have access.  It seems like a large volume of material
5     to review, and so the sooner the better, in our view.
6          THE COURT:  In addition with your discussion about the
7     1500 identifications, why don't you discuss with the monitor
8     protocols for accessing the 50 hard drives that -- and we can
9     see if we can limit any disruption of metadata or anything else
10    that may be on those hard drives, if we can agree to a
11    procedure, and then let me know next status conference or
12    before and we can enter an order to provide access.
13          MS. IAFRATE:  Your Honor, that would be fine, and we'd
14    be willing to work with plaintiffs and the monitor.
15          The one other hard drive that was seized from
16    Chief Knight, what protocol should I follow?  Should I file
17    something with the Court in order to obtain access to that one
18    to make a copy?
19          THE COURT:  Well, Chief Martinez, did you say that the
20    monitor is already making a forensic copy?

Page 35

Status Conference 8-11-15.txt

21     CHIEF MARTINEZ:  Yes, Your Honor, and it should be

22  finalized later on today.  It took, like, 90 hours to copy.

23     THE COURT:  Okay.  Why don't when do this?  Why don't

24  we make another copy, or maybe two copies of that copy, and

25  give one of the copies to Ms. Iafrate.

     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  42

1     And then, Chief, I'm going to ask you, I'm going to

2  require Ms. Iafrate to review it promptly, but I'm going to ask

3  you not to review your forensic copy until we've given

4  Ms. Iafrate a chance to characterize, or at least attempt --

5  give you a chance to say what is on there that doesn't relate

6  in any way to the Montgomery matter.

7     CHIEF MARTINEZ:  Yes, sir.

8     THE COURT:  All right.  Does that work, Ms. Iafrate?

9     MS. IAFRATE:  Thank you.

10    THE COURT:  Any objection with respect to that,

11  Ms. Wang?

12    MS. WANG:  Your Honor, I just have one question.  We

13  have no clue what other material is unrelated to the Montgomery

14  issue, but I don't know whether any of the other contents of

15  the hard drive that fall into that category might be relevant

16  to this case or to the rights of the plaintiff class.

17    THE COURT:  Well, why don't we have, then,

18  Ms. Iafrate, you can do a privilege log with respect to

19  material that you think should be withheld, which you can

20  describe that material sufficient for plaintiffs to know what

21  it is.

22    Will that work?

23    MS. IAFRATE:  That will work.

24    THE COURT:  All right.  Thank you.

25    Ms. Iafrate filed this morning a document, a Notice to

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    43

1    the Court Regarding Documents Provided Pursuant to Court's
2    Orders.  I don't know if you've had a chance to look at that,
3    Ms. Wang.
4           MS. WANG:  I looked at it in a very cursory way on
5    Mr. Bendor's cell phone before we walked into court this
6    morning, Your Honor.  I believe that that comports with our
7    understanding of what's been produced.
8           More broadly, I did confer with Ms. Iafrate about some
9    of the document productions that have not been made.  She
10   assures me that the hard drive containing the press interviews
11   or press conferences given by Sheriff Arpaio is on its way to
12   plaintiffs.  That was a bit late, but that's all right; I'm
13   assured it's on its way.
14          And there were two other issues where documents have
15   not been produced yet.  I don't know if the Court wants --
16          THE COURT:  And what are those?
17          MS. WANG:  -- to hear about that.
18          THE COURT:  Yes.
19          MS. WANG:  The first, Your Honor, is the
20   identifications that were found in the training kit used by
21   Sergeant Marshall and identified by Lieutenant Kratzer.  This
22   was a separate set of IDs.  Ms. Iafrate informs me that she
23   does not have those, either, and that those are among the
24   documents that were taken into custody by the U.S. Marshals.
25   Plaintiffs would like get a copy of those.

       CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    44

1           And then secondly is the issue of the ongoing
2    internal -- criminal Internal Affairs investigation.  That is

Page 37

Status Conference 8-11-15.txt

3   obviously still in dispute between the parties.

4           THE COURT:  I thought that you'd provided that

5   material to the monitor.

6           MS. IAFRATE:  I did provide it to the monitor.

7           THE COURT:  All right.  And you didn't provide it in

8   the general box that would give it to all parties?

9           MS. IAFRATE:  No.

10          THE COURT:  All right.  We'll address that, then,

11  maybe, in conjunction with some other things in a little -- in

12  a minute.  Don't let me forget that, Ms. Wang.

13          MS. WANG:  Yes, Your Honor.

14          THE COURT:  Chief Martinez, it was my understanding, I

15  think, and I think you were the one that had the concern about

16  the Kratzer IDs, but didn't you confirm for me that the Kratzer

17  IDs were within the materials that MCSO provided to the

18  marshals in response to this Court's order and had been

19  separately identified?

20          CHIEF MARTINEZ:  Your Honor, you're correct.  The

21  Kratzer IDs, you know, better known as the Sergeant Marshall's

22  42 IDs in a training kit, we received photostatic copies of

23  those forty-some IDs.

24          We still do not have copies of another instance that

25  we were briefed by PSB on July 20th of about 40 IDs that

        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   45


1   Chief Warshaw testified in the court hearing of the 24th that

2   were seized -- that were identified by a Deputy Dickner -- and

3   I may be mispronouncing his name -- from Lake Patrol.

4           There's another instance of 20 to 25 shredded IDs, and

5   MCSO did provide to the U.S. Marshal a baggie full of 20, maybe

6   25 shredded IDs, and we have a picture of a baggie full of

7   shredded IDs.

                        Page 38

Status Conference 8-11-15.txt

8   THE COURT:  All right.  So the 20 to 25 shredded IDs
9 are in the custody of the marshal, is that correct?
10   CHIEF MARTINEZ:  Yes, sir.
11   THE COURT:  Agent Hershey, you remember --
12   CHIEF MARTINEZ:  Yes.
13   THE COURT:  -- shredded IDs?
14   DEPUTY U.S. MARSHAL HERSHEY:  That is, Your Honor.
15   THE COURT:  All right.  So we have the shredded IDs;
16 we have the Kratzer IDs; what we're not sure we have is the
17 Dickner IDs?
18   CHIEF MARTINEZ:  Yes, Your Honor.  And we were briefed
19 on that on the 24th, and they came from -- it's about 40 of
20 them came from Lake Patrol.
21   THE COURT:  Forty from Lake Patrol, and there are 44
22 IDs?
23   CHIEF MARTINEZ:  Four zero, Your Honor, 40.
24   THE COURT:  All right.  Four zero.
25   All right.  I'm going to ask you to follow up with

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference 46

1 Ms. Iafrate, or whoever it is that you've been following up, to
2 make sure that we get those identifications disclosed, or have
3 them accounted for.
4   MS. IAFRATE:  Your Honor, was there a date on which
5 those were requested?  Because I'm trying to find the request
6 and further identify what exactly it is that we're talking
7 about.
8   THE COURT:  Well, let me just say, Ms. Iafrate, and
9 I'm sorry if I seem a little impatient, I don't mean to be, but
10 I don't care what the monitor's request was.  I entered a
11 discovery order back in February that all identifications

Page 39

Status Conference 8-11-15.txt

12    involving potential members of the plaintiffs' class were to be

13    disclosed.

14         And so I will certainly have the monitor identify the

15    request, but I want to make it clear now, as I have made it

16    clear a number of times, if you find identifications that

17    belong, or may belong, to members of the plaintiffs' class, you

18    must disclose them.

19         MS. IAFRATE:  I understand that, Your Honor.  I'm

20    trying to get the request of the monitor answered in a timely

21    fashion, and if I knew when they requested it, I could go back

22    and look at the request to find exactly --

23         THE COURT:  Well, I'll have him -- I'll have Chief

24    contact you after the hearing and give you that number.

25         MS. IAFRATE:  Thank you.

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   47


1          THE COURT:  Anything else that needs to be discussed

2    with respect to the documents?

3          MS. WANG:  Your Honor, to be clear, may plaintiffs

4    have a copy of all of the identification documents just

5    discussed?

6          THE COURT:  Yes.

7          MS. WANG:  Thank you.

8          THE COURT:  But it will be one of the things that I

9    think -- most of those documents, as far as I can tell, are in

10    the custody of the marshal.  And I think it's reasonable to

11    have both parties have complete copies of those documents.  But

12    why don't you discuss that in conjunction with your other

13    discussion of those materials.

14         Now, one of the reasons why we're having virtually

15    weekly status conferences is I don't want to get up to the end

16    of September and then have all this discovery that hasn't been

Page 40

Status Conference 8-11-15.txt

17    provided, or have all these deposition requests that cannot be
18    accommodated.  And so I would ask you, Ms. Wang, and I don't
19    know if you know already, what depositions you want, and who
20    you want to depose.
21         MS. WANG:  Your Honor, we have some idea, I can't say
22    that we have decided for final purposes, but we may take the
23    depositions of all the named contemnors.  Given the withheld
24    documents and now the productions of those documents, we may
25    seek to reopen any of those depositions.  Similarly, we may

         CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    48


1     seek to reopen the depositions of anyone we've previously
2     deposed.
3          Of the new witnesses we may depose, we have in mind
4     potentially Tim Casey, Tom Liddy, Christine Stutz, Steve
5     Bailey, Sergeant Tennyson, Detective Mackiewicz, Detective
6     Anglin, Mr. Zullo, and Mr. Vogel.  That's who I have in mind
7     right now as our potential universe.  Of course, we may add
8     additional witnesses, or we may not depose all the ones I've
9     just listed.
10         THE COURT:  All right.  Thank you.
11         Mr. Masterson, do you have people you wish to depose?
12    That you have yet identified.
13         MR. MASTERSON:  Not yet, Judge, I do not.
14         Now, there are some people that, depending upon where
15    we head in discovery, that we may want to depose.  And I will
16    alert the Court now that some of those people may well be the
17    monitors.
18         THE COURT:  Well, I understand that, that that may be
19    the case.  I do think that there are issues of judicial
20    privilege with the monitors that we need to be careful about,

Page 41

Status Conference 8-11-15.txt

21 but it also seems to me that in terms of some of the things

22 that I've asked the monitors to do, like evaluate the adequacy

23 of your department's investigation, it seems to me that you may

24 well be entitled to make such inquiries, and so I understand if

25 that's what you want to do.

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    49

1         MR. MASTERSON:  But at this point I can't identify any

2 further specific witnesses we may want to depose.

3         THE COURT:  All right.  And I'm going to take this up

4 again in a minute with respect to what Mr. Masterson raised he

5 wanted to discuss -- raised last week he wanted to discuss this

6 week, but let me just suggest that -- well, I'll get there when

7 I get there.

8         Chief Sands has requested to be excused from all

9 future status conferences.  If nobody objects, I'm going to

10 allow him to be excused.  Clearly, Sheriff Arpaio is a

11 contemnor, Chief Deputy Sheridan, aren't here.  They don't come

12 and I haven't required them to be here.

13         I appreciate, Chief MacIntyre, that you're here;

14 Lieutenant Sousa, you're here.  If you want to be excused,

15 unless a party objects, you can be excused as well.  But if I

16 see a reason to have you present during a status conference I

17 will inform you.

18         Does anybody have any objection, any party or nonparty

19 have any objection?  All right.

20         I understand, Chief Martinez, that although the

21 interviews of Deputy Mackiewicz and -- I don't know, Mike Zullo

22 is the head of the Cold Case Posse.  I don't know if he has a

23 title other than that, whether he has a rank or anything --

24 that they had their interviews scheduled last week by the

25 monitor and declined to be interviewed.

Page 42

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    50

1        Can you give me any insight into that?
2        CHIEF MARTINEZ:  Yes, Your Honor.  We had both their
3   names on the list of members to be interviewed.  They did show
4   up under orders by command staff by MCSO.  Deputy Mackiewicz
5   showed up with his own private counsel, an attorney by the last
6   name of Nash, and she instructed Detective Mackiewicz not to
7   respond to any questions, because there were no protections for
8   Deputy Mackiewicz -- or Detective Mackiewicz, I apologize, and
9   that there was an open investigation by the Maricopa County
10  Sheriff's Office.  That happened last Friday, the 7th, probably
11  1:00 p.m. in the afternoon.
12       Cold Case Posse, I think they call him "Commander,"
13  but I can't swear that's his actual title within the Posse rank
14  structure, did show up on Friday in the morning.  He advised us
15  that he had been made aware since Monday night if I decided to
16  interview him, that he had been trying to acquire counsel since
17  then but had not been able to, and that he would communicate to
18  us through attorney Popolizio as to when he acquires counsel
19  and when he's ready to be interviewed.
20       THE COURT:  Do you have any update for us,
21  Mr. Popolizio?
22       MR. POPOLIZIO:  I do not, Your Honor.
23       THE COURT:  Okay.  You haven't heard from
24  Commander Zullo at all.
25       MR. POPOLIZIO:  No, I have not, and certainly not with
     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    51

1   regard to whether he has retained counsel.
2        THE COURT:  Okay.
                    Page 43

Status Conference 8-11-15.txt

3        MR. POPOLIZIO:  Your Honor, just to clarify, he did

4  also tell the monitors and everyone else present that he was,

5  of course, trying to retain counsel, and thought he had but

6  somebody, whomever he talked to, had a conflict.

7        THE COURT:  Okay.  Last -- was it Friday? --

8  Mr. Masterson, you raised the issue of the monitor's

9  interviews, and I indicated that you had the right to depose

10  whoever you wanted, and I wanted the monitor's interviews to be

11  the monitor's interviews.  But I did say I would more fully

12  discuss that with you this week, today, to make sure I

13  understood your request, and see what we could do that might

14  address your concern, so if you want to raise that matter.

15        If I can just say and sort of reset the setting, and

16  if I misstate, you can correct me, but I think you said, Look,

17  Judge, you know, these monitor interviews, you're going to be

18  using them in the contempt hearing, and they may be used for

19  other purposes later, and so I think you said that you wanted

20  to be able to participate by actually doing questioning in the

21  interviews.

22        And Mr. Popolizio raised some concerns about how

23  documents were used in the interview, and I went back and

24  talked to the monitor, and he said, Look.  They don't know,

25  because documents are identified in interviews to them.  But

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   52

1  when they have a document, they always identify it by Bates

2  number, they always allow the witness to take whatever time he

3  wants to review it, and counsel in the room to review it.  And

4  if you find instances where that's not true that you think have

5  caused concern, you can raise them to my attention, but that's

6  how the monitors intend to proceed.

7        As I thought about it, I do -- you know, the

Status Conference 8-11-15.txt

8      interviews themselves, from my perspective, were designed to
9      weed out issues and to identify issues, and also for the
10     monitor to conduct his -- his task, which was in part to
11     evaluate the adequacy and effectiveness of MCSO's
12     self-interview process, and determine whether other matters
13     were being not raised that should have been raised, or
14     inappropriately dealt with.  And also there was -- I gave him
15     authority to inquire about the Montgomery investigation,
16     matters related to that.
17            Obviously, those interviews can't be introduced into
18     evidence, and I didn't presume that that's what you were
19     saying.  They probably could be used as statements that -- I
20     mean, to the extent that somebody testified inconsistently with
21     what they said in their interview, I suppose they could be used
22     as prior inconsistent statements.  But I really did authorize
23     both you and all specially appearing counsel to be there to
24     make sure that their clients' interests were protected in those
25     interviews, and my monitor says that you've been active.

       CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   53


1             Let me tell you what I would propose, though, and see
2      if it will meet your concerns.  I understand your desire to
3      actively and vigorously represent your client.  One of the
4      reasons I asked, frankly, Ms. Wang to tell me who she intended
5      to depose was because I've spoken with the monitor about how we
6      could accommodate your concerns of being able to question
7      during these question processes to say that your -- to be able
8      to more vigorously represent the interests of your client.  And
9      I reviewed with him whether he thought it would be possible --
10     and, of course, he has no participation in a deposition -- but
11     whether it would be possible to just allow Ms. Wang or the ACLU

Page 45

Status Conference 8-11-15.txt

12    to depose those people they want to depose, and obviously you

13    can question in those depositions if you wish to do so.  And if

14    Ms. Wang covers all the ground he was going to cover anyway,

15    then he has no need to do his investigation.  I should say

16    Ms. Wang, or you, or anybody else who might participate, then

17    he has no need to repeat his investigation, and that might more

18    readily meet your concerns.

19         And if he did have issues relating to his evaluations

20    of the adequacy, for example, of an investigation, that he felt

21    like Ms. Wang or nobody else covered, then he would raise it

22    with me to conduct a follow-up investigation, but again, you

23    would be allowed to participate as you have been.

24         Would that largely address your concerns?

25         MR. MASTERSON:  The deposition process certainly would

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  54


1    address my concerns, because my concern with respect to the

2    interview process is fundamental, and it relates to due

3    process --

4         THE COURT:  Well, you can make whatever arguments you

5    want to make on that.

6         MR. MASTERSON:  Well, Judge, the problem I have is if

7    the Court intends to use information learned from the monitors

8    during interviews, the people interviewed and my clients were

9    not adequately represented at the interviews.

10         THE COURT:  Well, I don't know how I could use it.

11    How could I use it?  The only purpose was, as I mentioned last

12    week, that maybe with the interview process, the parties could

13    stipulate to facts.  But I'm not assuming the truth of anything

14    that's said in an interview and it's not independently

15    admissible in evidence.  So I understand your con -- I mean,

16    your desire to be especially proactive in your concerns about

Page 46

Status Conference 8-11-15.txt

17    your client, but how could I use that information?

18         And I will say, Ms. Masterson -- Mr. Masterson, that,

19    you know, I am roughly aware of who's being interviewed, and

20    roughly aware of the topics of the interview, because I have

21    the obligation under the order to supervise the monitor's work.

22    But I haven't read any of the interviews, and I haven't assumed

23    the truth of anything in the interviews.  I know that some

24    things have been said, and I suspect that Ms. Wang is going to

25    want to have transcripts of the interviews, and everybody else,

      CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   55


1     before they do depositions, but I don't have any intention to

2     use the information in the interview other than in those

3     settings.

4          And as I said, the only other way I could think it

5     might come up is if somebody testifies here in court and they

6     make a statement that is inconsistent with a prior statement

7     they made in an interview, then that might come up.  But that's

8     the only -- I don't intend to use the interviews for that

9     purpose.

10         The monitor, of course, is doing the interviews in

11    part to determine the internal investigative processes that

12    have been going on at MCSO and to evaluate them, as well as to

13    determine whether or not they've been adequate, whether or not

14    other areas need to be investigated, but frankly, your client

15    consented to that long ago, and I don't know that you can

16    revisit that now.

17         And again, I understand your desire to adequately and

18    vigorously represent your client, but I'm not going to use that

19    information in court, and I am not going to read it like you

20    parties are unless it's brought to my attention.  And I'm not

Page 47

Status Conference 8-11-15.txt

21 assuming the truth of anything otherwise that I hear, and any
22 concerns I have I raise openly to all parties so they can
23 address them.
24      MR. MASTERSON:  I guess I'm having a difficult time
25 understanding why we went through a very expensive process of

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference    56

1 conducting these interviews if the Court doesn't intend to rely
2 on them for any purpose.  Depositions --
3      THE COURT:  Well, I intend to have you rely on them to
4 determine what is evidence and what is not evidence; what can
5 be eliminated from this lawsuit and what is relevant.  And I
6 think it was actually -- and, of course, I may be wrong, as I
7 may be on many things -- but I think it was actually a far more
8 cost-effective way to eliminate issues that may not relate to
9 this lawsuit at all, to the extent that you intend to use them
10 wisely, in conjunction with plaintiffs, to stipulate to some
11 issues that no one contests, to stipulate to other issues that
12 may not relate to this lawsuit at all, and then to identify and
13 narrow the issues.
14      MR. MASTERSON:  The Court also raised another concern
15 of mine in the interview arena, and that is -- that is what
16 appear to be ex-parte communications between the monitors and
17 the Court about the interviews.  And it came to light
18 specifically in my mind when the Court made inquiry last Friday
19 of Mr. Popolizio to certain questions and answers given by
20 Chief Sheridan during his interview.  Ex parte communications
21 between the monitor with respect to interviews concerns me a
22 great deal with respect to protecting my client's due process
23 rights.
24      THE COURT:  Well, as I said, if anything gets raised,
25 and it was raised to me right before court in concern of --
                          Page 48

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   57

1  related to the concern to the extent that you might have been
2  obstructing the ability of the monitor to conduct an effective
3  interview, and the way I dealt with that is I raised it
4  immediately with you.  And I do have the obligation, under both
5  injunctions, to supervise the monitor in his work.  And I think
6  I -- I don't know how to do that without having some
7  communication with the monitor.
8         And so you've preserved the issue to the extent that
9  you believe it is a problem, but I think it's clear that I have
10  the obligation to supervise the monitor in his work.  I've
11  tried to do that in a way so that if there's ever any issue, I
12  raise it with you directly and immediately.  I haven't assumed
13  the truth of anything my monitor says or anything that any
14  party says, but I've raised with you to allow you to address
15  it.  And I don't know how else to proceed, in light of the very
16  unusual situation in which we are placed, and in light of the
17  contempt hearing, and in light of all of the evidence that has
18  been destroyed and apparently conceal -- possibly concealed,
19  about which I'm going to allow you a full opportunity to be
20  heard.
21         But you have preserved it for the record.  Is there
22  anything else you'd like to say on it?
23         MR. MASTERSON:  Well, yes.  And I think possibly the
24  Court's suggestion with respect to depositions in lieu of
25  interviews might remedy this situation.  It certainly doesn't
     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   58

1  fix what happened in the past but it would remedy the situation
2  going forward, is that I do have a problem with the monitor's
                              Page 49

Status Conference 8-11-15.txt
3    investigations overall.  It seems to me it's gone, to a large
4    extent, from a general fishing expedition to a specific
5    inquisition in certain areas.  And the Court has been asked to
6    limit the authority of the monitor and specifically refused to
7    limit the authority of the monitor.
8         THE COURT:  Well, that's, in my view, a misstatement
9    of the record.  I realize that you said that in your recusal
10   motion, but I think that I was very clear to Ms. Iafrate at the
11   time that if she had objections that the monitor's questioning
12   was going beyond the scope of this lawsuit, that she could
13   terminate the investigation and bring those to me.  I think I
14   was very clear about that.
15        MR. MASTERSON:  Okay.  And here let's go back to the
16   interviews for a second, because the Court just raised a
17   question about defense counsel obstructing an interview.  Well,
18   my under --
19        THE COURT:  Well --
20        MR. MASTERSON:  My understanding is that the
21   interviews are not compelled; they're voluntary.
22        THE COURT:  That's true.
23        MR. MASTERSON:  So the witness can walk out at any
24   time, not answer --
25        THE COURT:  That is true.

     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   59


1         MR. MASTERSON:  -- any question for any reason.
2         THE COURT:  That is true.
3         MR. MASTERSON:  So I'm not certain how defense counsel
4    can obstruct an interview --
5         THE COURT:  Well --
6         MR. MASTERSON:  -- under those circumstances.
7         THE COURT:  -- you know, it was my choice of terms.
                         Page 50

Status Conference 8-11-15.txt

8      The monitor just was concerned that defense counsel were
9      inserting themselves in the interview in a way that prevented
10     him from doing what he felt like he needed to do.
11           I think you're absolutely right:  If the witnesses
12     want to go up and leave the interview, they can, except the
13     monitor is compelled to have access under my orders, and I
14     would then determine what I was going to do about it.  But I
15     made it clear to Ms. Iafrate initially that if she wanted to
16     terminate an interview because she had a problem and bring it
17     before the Court, I would rule on it right away.
18           MR. MASTERSON:  You did, Judge, and it was the May
19     14th discussion that you had with Ms. Iafrate, and she asked
20     for some limitation on the monitor's authority and the Court
21     did not do that.  And the specific issue --
22           THE COURT:  Well, I believe I did do that.  I said it
23     has to relate to the members of the plaintiff class in this
24     lawsuit, and if you have a problem and think it doesn't, bring
25     it before me.

     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   60


1            MR. MASTERSON:  Well, what we asked for was
2      notification of issues that the monitor's going to be looking
3      at, so we're not sitting there while the monitor runs rampant
4      over the rights of our clients during interviews or any other
5      investigations.
6            THE COURT:  Well, I mean, to the extent -- again, I
7      haven't read the interviews; I don't know what's in them; I'm
8      not assuming the truth of anything that's in them.  To the
9      extent that you believe you have a basis to object in any part
10     of the hearing that happens that would involve the use of the
11     interviews, you're welcome to make that objection.

                              Page 51

Status Conference 8-11-15.txt

12          MR. MASTERSON:  Okay, Judge.  I think I've covered

13  what I needed to cover.

14          THE COURT:  Anything else?

15          MR. MASTERSON:  Not right now.

16          THE COURT:  Let me see if I --

17          Ms. Wang, do you have anything you want to say?

18          MS. WANG:  No, Your Honor.

19          THE COURT:  Let me see if I've covered what I need to

20  cover.

21          Ms. Iafrate, you were going to research whether Lisa

22  Allen's quote in the New Times article was in fact given by

23  Lisa Allen.

24          MS. IAFRATE:  It was.

25          THE COURT:  It was?

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  61

1          MS. IAFRATE:  It was.

2          THE COURT:  Is there any reason why, then, I have to

3  leave under seal anything that took place in the last -- in the

4  meeting of last Friday or the week before?

5          MS. IAFRATE:  Your Honor, I would just re-urge the

6  same arguments that I made previously that despite the target

7  is aware of a pending criminal investigation, that the target

8  is not aware of the extent or the issues.  Therefore, I would

9  ask that you keep not only the two hearings under seal, but

10  also I have provided that investigation to the monitors only.

11  I would ask that it be just with the monitors only and to not

12  provide it to the plaintiffs until the investigation is

13  completed.

14          THE COURT:  Well, there was no discussion, as I

15  recall, to the extent of any investigation in these court

16  hearings, was there?

Page 52

Status Conference 8-11-15.txt

17      MS. IAFRATE:  Yes, there was.

18      THE COURT:  Do you want to identify that for me at

19  sidebar?  Well, not at sidebar, because that's still in the

20  hearing, but we'll go under seal and you can identify for me in

21  those court hearings to what extent the extent of any

22  investigation was identified in the court hearings.  I don't

23  believe it was.

24      MS. IAFRATE:  You're talking about the issues?

25      THE COURT:  Yes.

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   62

1       MS. IAFRATE:  No, I spoke in broad terms regarding the

2   investigation.

3       THE COURT:  Okay.  So as it pertains to the court

4   hearings, why can't the seal be lifted on those court hearings?

5       MS. IAFRATE:  Your Honor, I would just re-urge what I

6   had argued before, that to tie not only the investigation to

7   target, and now the investigation that has been provided to the

8   monitors, we don't want to compromise an ongoing criminal

9   investigation.

10      THE COURT:  All right.  Well, I'm going to unseal the

11  court hearings, to the extent they were sealed last week and

12  the week before, because there wasn't any specification of any

13  topic of investigation in those hearings discussed.  And the

14  MCSO itself has indicated that the subject was the target of an

15  internal criminal investigation, which was the material that

16  you initially stated you wished to protect and why you asked

17  for this hearing to go under seal, and so seeing as you have

18  now disclosed that, I'm going to lift the seal on those court

19  hearings.

20      With respect to the internal investigation materials

Page 53

Status Conference 8-11-15.txt
21  which you have provided to the monitor, it does seem to me that
22  to the extent that those are relevant to the plaintiff class's
23  damages and remedies, the plaintiff class has to know about
24  them.  But there may not be relevant information there, and I
25  don't know how you want me to evaluate that without having a
        CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   63

1   court hearing about it.
2           And I don't know how I can have a court hearing where
3   I consider that unless plaintiffs are given access to that
4   material and then we have a closed court hearing.  But the
5   plaintiffs would be under the same obligation as is the
6   monitor, which is they are to reveal that information to no one
7   at all.
8           Do you have any other recommendation about how I
9   proceed?  I certainly -- especially in light of the concerns
10  that Mr. Masterson has just said about wanting to be sure that
11  his client isn't prejudiced by any inappropriate ex parte
12  communication between me and the monitor.  I don't see how I
13  can get any sort of evaluation of whether or not that is
14  relevant material unless I let the plaintiffs and the other
15  parties see that material but place them under the order that
16  they are to disclose it to no one.
17          MS. IAFRATE:  Well, Your Honor, that would defeat the
18  purpose of provi- -- if we provide it to them, then they have
19  access to it.  So I would ask that the procedure be that I
20  review the investigation and make a determination regarding
21  relevance, and if it's relevant, then it will be disclosed; and
22  if it's not relevant, then I would do some sort of log
23  regarding how you would go about normal discovery.
24          THE COURT:  And so you would ask for the right to
25  represent the plaintiffs' class interests in evaluating the
                            Page 54

Status Conference 8-11-15.txt
CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   64

1    relevance of the material?

2          MS. IAFRATE:  No, I would ask that I represent my

3    clients' interests in determining the relevance of the

4    material.

5          THE COURT:  Which is precisely what you should do, and

6    Ms. Wang has to represent the interests of the plaintiff class.

7          Do you want to be heard on this, Ms. Wang?

8          MS. WANG:  Yes, Your Honor.

9          Plaintiffs do seek disclosure of those documents, and

10   we will, of course, submit to any protective order that the

11   Court issues, and would be happy to meet with Ms. Iafrate, for

12   that matter, to work out the details of such protective order.

13         Ms. Iafrate just suggested that it would be a typical

14   process for her to conduct a review for relevance.  Obviously,

15   that's not true.  Counsel can do a review for privilege issues,

16   but certainly plaintiffs would not agree to have defense

17   counsel try to determine what's relevant in this context.

18         Based on what we know already, having observed many of

19   the monitor's interviews, we believe that there's every

20   indication that there is very relevant material in these

21   documents that we're discussing.

22         THE COURT:  All right.  Then I'm going to request --

23   I'm going to order that you try to work out the terms of a

24   protective order with the plaintiffs pursuant to which you and

25   other separately represented parties will be given access to

     CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   65

1    this material, and you bring it before me at the next status

2    conference if you can or cannot agree, and we'll deal with it

Page 55

Status Conference 8-11-15.txt

3  at that time.

4       MS. WANG:  Yes, Your Honor.

5       THE COURT:  Anything else?

6       MS. WANG:  Your Honor, you reminded me to -- oh, never

7  mind.  That was the thing you asked me to remind you about.

8       THE COURT:  All right.

9       MS. WANG:  Your Honor, there is one other issue, if I

10  could ask the Court's indulgence.  We see that the Court has

11  not yet issued an order on the issue of the amendment to the

12  supplemental injunction on remand from the Ninth Circuit.

13      THE COURT:  Um-hum.

14      MS. WANG:  We did argue that last week.  I neglected

15  to make one point.  If I could ask the Court's permission just

16  to make that briefly --

17      THE COURT:  All right.

18      MS. WANG:  -- I would appreciate the opportunity.

19      THE COURT:  I will allow, of course, the other side to

20  respond.

21      MS. WANG:  Okay.

22      THE COURT:  And whoever's got your cell phone on and

23  is getting an alert, please turn it off.

24      MS. WANG:  Thank you, Your Honor.

25      Last week I addressed the issue of why we have

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  66


1  proposed that the language not be limited to constitutional

2  violations, but also encompass violations of MCSO policy and

3  procedure.  The new issue --

4       THE COURT:  I think Ms. Iafrate agreed with that.

5       MS. WANG:  Right.  The new issue, Your Honor, and it's

6  not an issue but an argument, is that I wanted to point out

7  that the language we proposed for the amended provision

Status Conference 8-11-15.txt

8    included issues related to discriminatory policing, unlawful
9    detentions and arrests, immigration enforcement, or violations
10   of the 4th and 14th Amendments to U.S. Constitution.
11          I merely wanted to point out, Your Honor, that the
12   Ninth Circuit specifically affirmed similar language in a
13   separate paragraph, subparagraph G of 136, where the court had
14   ordered that the monitor have the ability to look into civilian
15   complaints regarding biased policing or unlawful detentions and
16   arrests.
17          The point here, Your Honor, just to sum up, is that
18   there may be unlawful detentions that are not specifically
19   related to discriminatory policing as it's defined in the
20   Court's order.  For example, the Court's preliminary
21   injunction, which was repeated in the permanent injunction, was
22   that MCSO deputies not detain people based solely on suspicion
23   that a person is illegally in the United States.  Such
24   detention may not have anything to do with race discrimination,
25   but we contend that that should be within the monitor's ability
         CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  67


1    to look into complaints from civilians.
2          That was the only point.  I wanted to make an
3    explanation of why we stated biased policing or unlawful
4    detentions in the disjunctive.
5          THE COURT:  I have no problem with the unlawful
6    detention.  It did seem to me, though, that the scope of the
7    remainder of it was a bit broader than the Ninth Circuit might
8    have indicated.
9          MS. WANG:  Well, I thought, Your Honor, that the Ninth
10   Circuit's concern was that these provisions be tailored to the
11   plaintiff --

Status Conference 8-11-15.txt
12      THE COURT:  It was.

13      MS. WANG:  -- class's concerns, and we have no

14  objection about that.

15      THE COURT:  All right.  Ms. Iafrate.

16      MS. IAFRATE:  Your Honor, I was not prepared to

17  discuss this issue again.  However, I think last time you and I

18  were in agreement, for a change, and that we believed that the

19  scope of the --

20      THE COURT:  For a change I frequently agree with you,

21  Ms. Iafrate.

22      MS. IAFRATE:  I believe that the language that was

23  proposed by the plaintiffs expanded further than the issues

24  than what they were trying to present.  I agreed with the issue

25  on its face --

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference  68


1       THE COURT:  I am preparing a revised order, but I can

2   hold off for another week if you want a chance to look at that

3   section Ms. Wang addressed and address it to me next status

4   conference.

5       MS. IAFRATE:  Very well.

6       THE COURT:  All right.  Anything else?

7       MR. BENDOR:  Yes, Your Honor.  Brian Sands has filed a

8   motion for summary judgment, and we said we would take that up

9   at least to figure out the status of that motion at this status

10  conference.

11      THE COURT:  Well, the only reason we were going to

12  take that up is if people needed more than the average

13  deadline, in light of the fact that you're all scurrying around

14  doing other stuff preparing for the hearing.

15      Is that what you wanted to take up?

16      MR. BENDOR:  It is, Your Honor.  I would also note
                    Page 58

Status Conference 8-11-15.txt

17  that Mr. Sands raised this issue at the contempt hearing, Your

18  Honor ruled on the issue then and denied the motion, so

19  plaintiffs are of the view that this motion's already been

20  ruled on.

21          THE COURT:  All right.

22          MR. BENDOR:  And should be denied for the same reason.

23          THE COURT:  So are you waiving your response?

24          MR. BENDOR:  We are not, Your Honor.

25          THE COURT:  Okay.  So do you need more time for the

    CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   69


1   response?

2           MR. BENDOR:  We do.  We think that it's untimely to

3   file now, four months after the conclusion of the contempt

4   hearing and as we are getting into the middle of very intensive

5   discovery, and we also think that --

6           THE COURT:  Well, four months after the first part of

7   the contempt hearing.  We still have a contempt hearing.  We're

8   in the middle of it, right?

9           MR. BENDOR:  Precisely.  But we think it's untimely,

10  and the due date, the normal due date would be September 6th,

11  which is right when we'll be in the middle of depositions,

12  likely, and much of --

13          THE COURT:  How much time do you need, Mr. Bendor?

14          MR. BENDOR:  We would like until three weeks after the

15  conclusion of the contempt hearings --

16          THE COURT:  I'm not going to --

17          MR. BENDOR:  -- because --

18          THE COURT:  Go ahead.

19          MR. BENDOR:  Much of the issues raised by the motion

20  are untimely when we're in the middle of discovery, because the

Page 59

Status Conference 8-11-15.txt

21  argument is that Mr. Sands has been prejudiced by the lack of

22  evidence.  We're just getting evidence right now in terms of

23  this very large e-mail search that we have not yet gotten, have

24  not yet reviewed.

25          THE COURT:  So do you want to file a 56(d) affidavit?

       CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   70


1           Do you know what I'm talking about?

2           MR. BENDOR:  I apologize.  No, Your Honor.

3           THE COURT:  A 56(d) affidavit is a way to respond to a

4   motion for summary judgment.  And in that, what you have to do

5   is identify what information you don't have that you --

6   specifically, what information you don't have that you need

7   that you're going to pursue in discovery in order to adequately

8   and effectively respond to the motion for summary judgment.

9           MR. BENDOR:  We can do that, Your Honor.  I think that

10  if --

11          THE COURT:  That is the normal procedure if you

12  believe that there's relevant material that you don't have that

13  you need to respond to summary judgment.

14          MR. BENDOR:  We can do that.  I think if the other

15  side is amenable, it would be a more efficient use of the party

16  and the Court's resources to wait on the resolution of this

17  motion.  But we can do that as a normal deadline if the Court

18  so requires.

19          THE COURT:  Do you wish to respond to that?

20          MR. DODD:  Yes, Your Honor.  I would like to respond

21  specifically to --

22          THE COURT:  Would you like to find a microphone?

23          MR. DODD:  Thank you, Your Honor.

24          I would like to respond to his assertion that the

25  Court has already ruled on this matter.  I think that is not

Page 60

1  the case.  I read the portion of the transcript of the hearing
2  where Greg Como raised the issue.  I think it was an
3  evidentiary objection, and he said he would later be filing
4  papers on this matter, which we have now done.  And I think the
5  untimeliness of the contempt -- plaintiffs raising the contempt
6  issue was never --
7          THE COURT:  All right.  Well, let me ask you this:
8  Are you opposed to plaintiffs' request for additional time to
9  respond to your motion?
10          MR. DODD:  It depends on how much time they seek.
11          THE COURT:  How much time do you want, Mr. Bendor?
12          MR. BENDOR:  I mean, I don't think we're going -- we
13  can do the 56(d) affidavit, that won't be difficult, but I
14  think if we're going to really address the motion, it should be
15  after the contempt hearings conclude.
16          THE COURT:  All right.  Well, then why don't you
17  timely file your 56(d) affidavit, and then I'll rule if there's
18  a reason to give you an extension on that.
19          MR. BENDOR:  Understood, Your Honor.
20          MR. DODD:  We have no problem with that, Your Honor.
21          THE COURT:  All right.  Anything else?
22          I'll see you at the next scheduled status hearing.
23          (Proceedings concluded at 10:37 a.m.)
24
25

CV07-2513, Melendres v. Arpaio, 8/11/15 Status Conference   72

1
2                     C E R T I F I C A T E
                          Page 61

Status Conference 8-11-15.txt

3
4
5
6
7        I, GARY MOLL, do hereby certify that I am duly
8    appointed and qualified to act as Official Court Reporter for
9    the United States District Court for the District of Arizona.
10       I FURTHER CERTIFY that the foregoing pages constitute
11   a full, true, and accurate transcript of all of that portion of
12   the proceedings contained herein, had in the above-entitled
13   cause on the date specified therein, and that said transcript
14   was prepared under my direction and control.
15
16
17       DATED at Phoenix, Arizona, this 11th day of August,
18   2015.
19
20                              s/Gary Moll
21
22
23
24
25

# EXHIBIT 16

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega      )
     Melendres, et al.,          )
 5                               )
                 Plaintiffs,     )   CV 07-2513-PHX-GMS
 6                               )
                 vs.             )   Phoenix, Arizona
 7                               )   July 24, 2015
     Joseph M. Arpaio, et al.,   )   3:04 p.m.
 8                               )
                 Defendants.     )
 9   _____)

10

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16         BEFORE THE HONORABLE G. MURRAY SNOW

17                (In-Court Hearing)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
```

```
 1                       A P P E A R A N C E S

 2

 3    For the Plaintiffs:         Daniel J. Pochoda, Esq.
                                  Joshua Bendor, Esq.
 4                                AMERICAN CIVIL LIBERTIES
                                  FOUNDATION OF ARIZONA
 5                                P.O. Box 17148
                                  Phoenix, Arizona  85011-0148
 6                                (602) 650-1854

 7    (Telephonically)            Stanley Young, Esq.
                                  COVINGTON & BURLING, L.L.P.
 8                                333 Twin Dolphin Drive
                                  Suite 700
 9                                Redwood Shores, California  94065
                                  (650) 632-4700
10
      (Telephonically)            Cecilia D. Wang, Esq.
11                                AMERICAN CIVIL LIBERTIES UNION
                                  FOUNDATION
12                                Immigrants' Rights Project
                                  39 Drumm Street
13                                San Francisco, California  94111
                                  (415) 343-0775
14
      (Telephonically)            Andre Segura, Esq.
15                                AMERICAN CIVIL LIBERTIES UNION
                                  125 Broad Street, 18th Floor
16                                New York, New York  10004
                                  (212) 549-2676
17
      For the Defendants MCSO     Michele M. Iafrate, Esq.
18    and Joseph M. Arpaio:       IAFRATE & ASSOCIATES
                                  649 N. 2nd Avenue
19                                Phoenix, Arizona  85003
                                  (602) 234-9775
20
      (Telephonically)            A. Melvin McDonald, Jr., Esq.
21                                John T. Masterson, Esq.
                                  Joseph J. Popolizio, Esq.
22                                JONES, SKELTON & HOCHULI, P.L.C.
                                  2901 N. Central Avenue, Suite 800
23                                Phoenix, Arizona  85012
                                  (602) 263-1700
24

25
```

1                              A P P E A R A N C E S

2


3    For Maricopa County:

4                                 Richard K. Walker, Esq.
     (Telephonically)            Charles W. Jirauch, Esq.
5                                 WALKER & PESKIND, P.L.L.C.
                                  16100 N. 71st Street, Suite 140
6                                 Scottsdale, Arizona  85254
                                  (480) 483-6336
7

     For Chief Deputy Sheridan:  Barry D. Mitchell, Esq.
8                                 MITCHELL STEIN CAREY
                                  One Renaissance Square
9                                 2 North Central Avenue
                                  Suite 1900
10                                Phoenix, Arizona  85004
                                  (602) 358-0290
11

     For Deputy Chief MacIntyre:
12
     (Telephonically)            David J. Ouimette, Esq.
13                                DICKINSON WRIGHT, P.L.L.C.
                                  Attorneys at Law
14                                1850 N. Central Avenue, Suite 1400
                                  Phoenix, Arizona  85004
15                                (602) 285-5000

16   For Executive Chief Brian Sands:

17   (Telephonically)            Greg S. Como, Esq.
                                  LEWIS BRISBOIS BISGAARD
18                                & SMITH, L.L.P.
                                  Phoenix Plaza Tower II
19                                2929 N. Central Avenue
                                  Suite 1700
20                                Phoenix, Arizona  85012-2761
                                  (602) 385-1040

21

22

23

24

25

```
 1                      A P P E A R A N C E S

 2


 3    For William Montgomery and Maricopa County Attorney's Office:

 4                                 April M. Hamilton, Esq.
                                   RIDENOUR HIENTON, P.L.L.C.
 5                                 Chase Tower
                                   201 N. Central Avenue
 6                                 Suite 3300
                                   Phoenix, Arizona  85004
 7                                 (602) 254-9900

 8    For Timothy J. Casey:

 9    (Telephonically)            Karen Clark, Esq.
                                   ADAMS & CLARK, P.C.
10                                 520 E. Portland Street
                                   Suite 200
11                                 Phoenix, Arizona  85004
                                   (602) 258-3542
12
      For Thomas P. Liddy and Christine Stutz:
13
      (Telephonically)            Terrence P. Woods, Esq.
14                                 BROENING, OBERG, WOODS
                                   & WILSON, P.C.
15                                 P.O. Box 20527
                                   Phoenix, Arizona  85036-0527
16                                 (602) 271-7705

17    Also present:      Chief Robert S. Warshaw, Monitor
                         Commander John Girvin, Deputy Monitor
18                       Chief Raul Martinez, Deputy Monitor
                         The Monitoring Team
19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3          THE COURT:  Please be seated.

4          THE CLERK:  This is civil case number 07-2513,

5   Melendres v. Arpaio, on for in-court hearing.                    15:04:13

6          Counsel, please announce your appearances.

7          MR. POCHODA:  Good afternoon.  Dan Pochoda from the

8   ACLU of Arizona for plaintiffs.

9          MR. BENDOR:  Good afternoon.  Josh Bendor of the ACLU

10  of Arizona for plaintiffs.                                       15:04:24

11         THE COURT:  Good afternoon.

12         MR. MASTERSON:  Good afternoon, Judge.  John Masterson

13  and Joe Popolizio for Sheriff Arpaio.

14         THE COURT:  Good afternoon.

15         MS. IAFRATE:  Good afternoon, Your Honor.  Michele       15:04:34

16  Iafrate on behalf of Joe Arpaio.

17         THE COURT:  Good afternoon.

18         MR. MITCHELL:  Good afternoon, Judge.  Barry Mitchell

19  on behalf of Chief Gerard Sheridan.  He's not present today,

20  Your Honor.                                                      15:04:52

21         THE COURT:  Good afternoon.  Anyone else?

22         MR. WALKER:  Richer Walker on behalf of that portion

23  of Maricopa County government embodied in the Board of

24  Supervisors, the county manager, and the employees reporting to

25  them.                                                            15:05:03

1          THE COURT:  Good afternoon.

2          MS. HAMILTON:  Good afternoon.  April Hamilton,

3   Ridenour Hienton, on behalf of the Maricopa County Attorney's

4   Office and Maricopa County Attorney.

5          THE COURT:  We have folks present on the phone.          15:05:17

6          Would you announce, please, telephonically?

7          MS. WANG:  Yes, Your Honor.  Good afternoon.  It's

8   Cecillia Wang of the ACLU for the plaintiffs.

9          MR. SEGURA:  Andre Segura of the ACLU for the

10  plaintiffs.                                                      15:05:34

11         MR. YOUNG:  Stan Young, Covington & Burling, for the

12  plaintiffs.

13         MR. McDONALD:  Mel McDonald, special appearance for

14  Sheriff Joe Arpaio.

15         MR. WOODS:  Terry Woods for nonparties Liddy and          15:05:44

16  Stutz.

17         MR. JIRAUCH:  Charles Jirauch on behalf of Maricopa

18  County.

19         MS. CLARK:  Karen Clark, ethics counsel for Tim Casey.

20         MR. OUIMETTE:  David Ouimette for Deputy Chief            15:05:58

21  MacIntyre.

22         MR. COMO:  Greg Como on behalf Brian Sands.

23         THE COURT:  All right.  I did receive word from

24  Mr. Eisenberg that he would not be appearing.

25         I did set the order this morning indicating the          15:06:11

1    monitor had requested the Court's intervention in a matter that

2    he thought sufficiently important.  I have noted that I may

3    have misstated that the parties have refused his request for

4    documents.  It's my understanding that they simply haven't

5    acted on the request, at least with respect to some of the          15:06:30

6    documents.  But I am going to hear from the monitor as to why

7    he's requested this hearing, and then I'll allow -- I'll hear

8    from you, Ms. Iafrate, or Mr. Masterson, and then I'm going to

9    have some -- then I'll handle the matters as they come up.

10            Chief?                                                       15:06:52

11            CHIEF WARSHAW:  Good afternoon, Judge.

12            The monitoring team is here this week as part of its

13   regular quarterly site visits.  Early in the week we had heard

14   that there had been a recent discovery of nearly 1500

15   identifications that were in the possession of the Maricopa        15:07:06

16   County Sheriff's Office.

17            During the meeting that we had on this past Monday,

18   the 21st, with representatives of the Professional Standards

19   Bureau, we were apprised of two new cases relevant to ID

20   findings, one regarding 40 IDs and another involving 20, but       15:07:23

21   there was no mention of 1,500 identifications that recently had

22   been found.

23            Chief Kiyler, who's in the room, was present with me

24   in the room, and we did inquire at the time:  Had there been

25   any additional findings other than the two they represented to     15:07:45

1    us, the 40 and the 20?

2           During our investigative inquiries of other matters

3    that --

4           THE COURT:  Well, what was the response?

5           CHIEF WARSHAW:  That there were none other; there were    15:07:59

6    no other.

7           THE COURT:  So they did not indicate that 1500 had

8    been found.

9           CHIEF WARSHAW:  They did not.

10          THE COURT:  All right.    15:08:05

11          CHIEF WARSHAW:  During our investigative inquiries

12   this week regarding other matters that the Court and the

13   parties are aware of, we did query certain MCSO personnel

14   regarding these 1500 IDs.  Those queries confirmed for us there

15   were in fact 1500 IDs that had been found.  We felt that the    15:08:24

16   significance of these IDs was at the heart of the matter and we

17   chose to pursue more invasive questions regarding this matter.

18          At a minimum, and as a direct result of our

19   questioning, we learned that there had been a meeting last

20   Friday, July 17th, among PSB staff, including Chief Deputy    15:08:51

21   Sheridan and counsel; a meeting, as we understand, that was a

22   preparatory meeting in which the agency was preparing for our

23   site visit.  That at some point during that meeting the 1500

24   IDs did come up, and we learned that there was an instruction

25   given that the existence of those 15 IDs not be volunteered or    15:09:20

1    acknowledged to the monitor.

2         THE COURT:  Did you determine who gave that

3    instruction?

4         CHIEF WARSHAW:  We attempted to, and the answer we

5    received was that would be an attorney-client matter.          15:09:33

6         THE COURT:  All right.

7         CHIEF WARSHAW:  With the full belief that this matter

8    is at the heart of the issue before the Court and our

9    determination to at least see these documents, I instructed one

10   of our two deputy monitors, Commander Girvin, last night to      15:09:52

11   make an attempt to reach out to senior executives of the MCSO

12   for the simple purpose of making arrangements to see if we

13   could see these IDs.

14        Commander Girvin attempted to call both telephonically

15   and by text message Captain Steven Bailey, the commanding        15:10:09

16   officer of the Professional Standards Bureau, as well as Chief

17   Deputy Sheridan, but with no luck.

18        Further, at my instruction, and after a reasonable

19   passage of time, Commander Girvin reached out to Captain Russ

20   Skinner, who's the commander of the agency's court compliance     15:10:30

21   implementation division, and he is the official contact of the

22   MCSO for -- the contact for us.

23        Captain Skinner was very cooperative and he attempted

24   to reach Captain Bailey, Chief Deputy Sheridan, and he reported

25   back to Commander Girvin that he also had attempted to reach      15:10:53

1    counsel but with no luck.

2           At that point, knowing full well that we very much

3    wanted to see these documents but were not getting cooperation

4    with the lack of response, I initiated an e-mail to every

5    attorney involved in this case advising that I might very well        15:11:13

6    ask for an emergency hearing for the purposes of getting relief

7    from the Court so we could in fact access those documents.

8           This morning I noted an e-mail from Ms. Iafrate.  I

9    did call her at approximately 7:45 this morning.  She inquired

10   with more specificity as to what it is that we wanted.  I            15:11:40

11   advised her that we were looking to gain access to 1500 IDs

12   that had been brought to our attention as well as 50

13   hard drives that we believed to be in the Property Unit and

14   were associated with the Dennis Montgomery matter.

15          I would note that back on April 27th, when we received        15:12:03

16   the single hard drive that we did get at that time, we were

17   told by Chief Knight that that material was the only material

18   in the possession of the agency relevant to the Montgomery

19   matter.  I gave Ms. Iafrate the DR number, the department

20   report number that was associated with the 50 hard drives.          15:12:24

21          Though I didn't hear back from Ms. Iafrate, we

22   proceeded to the Professional Standards Bureau and got there

23   about 8:30 this morning, myself, Chief Martinez, and

24   Chief Kiyler.  We were met by Lieutenant Kratzer, who advised

25   us that he had been told by Captain Bailey that we were coming.     15:12:49

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   11

1    Lieutenant Kratzer gave us some updates regarding some recently

2    found IDs and gave us some details about some of the matters

3    that had been alluded to at our meeting on Monday.  When we

4    requested to see the 1500 IDs in question, he did in fact

5    produce them.  They were in a large plastic bag in no                      15:13:17

6    particular order.  There was no subset, sub-packaging; one

7    large bag.  Lieutenant Kratzer advised us --

8              THE COURT:  Let me interrupt you, and hold your spot.

9              Did any of the IDs appear to be the identifications of

10   members of the plaintiff class in this matter?                            15:13:36

11             CHIEF WARSHAW:  Yes, that was quite apparent.  This

12   was a clear plastic bag, and whether it was in the form of

13   driver's licenses or other identification cards, that was very

14   clear.

15             THE COURT:  What kind of other identification cards         15:13:49

16   were there?

17             CHIEF WARSHAW:  There was Arizona identification

18   cards; there were passports; there were other official

19   governmental identification cards.

20             THE COURT:  Like from Mexico and elsewhere, or --           15:14:00

21             CHIEF WARSHAW:  Yes.

22             THE COURT:  All right.

23             CHIEF WARSHAW:  Lieutenant Kratzer advised us that the

24   Professional Standards Bureau became aware of these IDs when

25   they were returned to the Property Unit by a sergeant, a               15:14:15

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  12

1   sergeant by the name of Sergeant Knapp.  Sergeant Knapp had

2   received permission, as we were told, commencing in 2006, to

3   obtain these IDs because he wanted to teach a class on

4   fraudulent IDs.  Sergeant Knapp went to the Property Unit on

5   several occasions over the years to obtain what aggregated to        15:14:35

6   1459, so when I earlier referred to 1500, the actual number is

7   1,459.  Accord- --

8         THE COURT:  459 or 1459?

9         CHIEF WARSHAW:  1,459, yes, sir.

10        According to Lieutenant Kratzer, there was no                   15:14:57

11   documentation as to when the sergeant got which IDs, what the

12   circumstances were, and when, specifically, that he returned to

13   receive additional documents.  It seemed there was some

14   uncertainty if he had simply gone at will.  But a point that

15   was most noteworthy to us was we were advised by Lieutenant         15:15:20

16   Kratzer that Sergeant Knapp has in fact never taught a class in

17   fraudulent IDs.

18        We asked Lieutenant Kratzer what we believed to be one

19   of the more significant questions, and that was whether he or

20   anyone else knew precisely how the Maricopa County Sheriff's       15:15:41

21   Office ever came into possession of these IDs in the first

22   place.  He said he had no ID -- he had no idea as to how that

23   would have occurred, but what he did say was that these items,

24   because they were in the Property Unit and were appearing to

25   have no more useful purpose, were in the Property Unit for         15:16:06

1    purposes of being destroyed.

2            In our discussions -- and counsel for the counsel was

3    present -- the question, or the statement was made that this

4    was a waste of time.  Counsel also added that would every piece

5    of property in the Property Unit belonging to a Spanish person,    15:16:34

6    you know, have to be looked at?

7            But even in the presence of our suggestions that a

8    reasonable attempt should be made to determine how these

9    documents were procured and what the purpose was, there seemed

10   to have been no interest in undertaking any attempt to            15:16:52

11   determine the reasons these IDs had been -- had come into their

12   possession in the first place, or any attempt to reasonably

13   identify whether or not there were still people living in the

14   people who were looking for their lost ID.

15           We felt, Your Honor, that based on various histories       15:17:13

16   in this particular case relevant to property, whether we saw it

17   in the Armendariz matter or other matters that have been

18   brought before this Court, that our great concern has been and

19   is whether or not this Property Unit is being used as a

20   repository or as a lockbox for holding away from either public    15:17:36

21   scrutiny or court scrutiny documents that were obtained either

22   unscrupulously, illegally, or whether the Property Unit is

23   being used as a lockbox for purposes simply unknown to us.

24           And, of course, our greatest concern, and the matter

25   which we want to bring to this Court's attention, was that        15:18:08

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   14

1   these particular documents were slated for destruction, and had

2   this matter not come to our attention and had we not made the

3   kind of inquiry that we made, these items in fact would have

4   been destroyed.

5         THE COURT:  When you talk about the 50 hard drives        15:18:24

6   related to the Montgomery investigation, where did you find out

7   about those?

8         CHIEF WARSHAW:  As a result of document requests that

9   were made of the MCSO, after the initial release of the single

10  hard drive we got on April 27th, it became apparent, in looking   15:18:45

11  at various e-mail streams, that there were references to

12  hard drives that were reposited in the Property Unit.

13        THE COURT:  Did anybody look -- did you request the

14  hard drives in the Property Unit?

15        CHIEF WARSHAW:  We request -- I'm sorry, Judge.           15:19:06

16        THE COURT:  I think -- did you request that the

17  hard drives be turned over that were in the Property Unit?

18        CHIEF WARSHAW:  We request any and all.  Yes, we

19  certainly today requested that today, yes, sir.

20        THE COURT:  And you talked about a specific DR number.    15:19:17

21        Is that a locker?  What is that?

22        CHIEF WARSHAW:  The DR number would be -- a DR

23  number is the department report number, so it would be a filing

24  mechanism in which they could find the items in the particular

25  bin based upon what the DR number is.                          15:19:34

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  15

1    THE COURT:  Did you request what the contents of that

2  particular DR unit was?  Did you ask anybody to verify the

3  contents of that unit?

4    CHIEF WARSHAW:  Yes.

5    THE COURT:  And what were you told?                    15:19:46

6    CHIEF WARSHAW:  We were told that the number that we

7  gave did in fact correspond to 50 hard drives.

8    THE COURT:  Was there anything else in the unit?

9    CHIEF WARSHAW:  I do not believe.  I don't believe.

10    THE COURT:  Okay.  And so you haven't had any response  15:20:04

11  in --

12    CHIEF WARSHAW:  We've had no response.

13    THE COURT:  -- in terms of your request to have those

14  50 hard drives.

15    CHIEF WARSHAW:  That is correct.  And we made that    15:20:11

16  very clear to Lieutenant Kratzer, that that was also part of

17  our mission this morning.

18    THE COURT:  Ms. Iafrate.

19    MS. IAFRATE:  Your Honor, if I could rely on

20  co-counsel to talk about this chain of events, I've kind of  15:20:36

21  been out of commission the last 24 hours.

22    I can tell you that I did have a conversation with

23  Mr. Warshaw this morning.  He provided me with the DR number.

24  I called over to Property and Evidence in order to make certain

25  that that property was pulled, and I received information that  15:20:53

 1    the monitors were over in PSB, and I informed them that the

 2    property regarding the DR number had been pulled.  That was the

 3    last that I heard.

 4           THE COURT:  Let me ask, and I realize there may be

 5    privilege issues that need to be asserted here, I don't want to      15:21:11

 6    trample on anybody's rights, but were you aware that the 1500

 7    identifications were found?

 8           MS. IAFRATE:  Yes, I was, Your Honor, and we did not

 9    lie to the monitors or keep that from the monitors.  In fact,

10    when the questions --                                                15:21:30

11           THE COURT:  Well, let me ask you, are you aware that

12    any instruction was given to MCSO that they were not to

13    volunteer that information?

14           MS. IAFRATE:  No, and any further conversation is

15    privileged.                                                         15:21:42

16           THE COURT:  Well, it may or may not be privileged.

17           MS. IAFRATE:  Well, I would assert the privilege to --

18           THE COURT:  I understand that you may assert the

19    privilege, and we're not going to resolve that here this

20    afternoon.                                                          15:21:54

21           MS. IAFRATE:  Understood.

22           Your Honor, I was in that meeting.

23           THE COURT:  You were in that meeting?

24           MS. IAFRATE:  I was in -- no.  Excuse me.  I was in

25    the meeting with Chief Kiyler when it was discussed regarding       15:21:59

1   pending current investigations regarding IDs, and there were

2   two.

3           THE COURT:  Which involved the 40 and the 20.

4           MS. IAFRATE:  Correct.

5           THE COURT:  But not the 1500.                          15:22:11

6           MS. IAFRATE:  Correct.

7           THE COURT:  So there's actually 1459 IDs, plus 40 more

8   IDs, plus 20 more IDs.

9           MS. IAFRATE:  Correct.  And the 40 and the 20 are over

10  in Property.                                                   15:22:25

11          THE COURT:  You're aware that in February I issued an

12  order that the MCSO was to disclose -- let me see if I can find

13  that.  I entered an order that MCSO was to disclose copies of

14  identification documents seized by MCSO personnel from apparent

15  members of the plaintiff class --                              15:22:39

16          MS. IAFRATE:  Yes.

17          THE COURT:  -- are you not?

18          MS. IAFRATE:  Yes.

19          THE COURT:  And these are yet an additional -- well,

20  I'm not sure that they all involve members of the plaintiff     15:22:49

21  class, but apparently you've shown them to my Monitor Team and

22  a number of them involve members of the plaintiff class,

23  correct?

24          MS. IAFRATE:  I don't know what number does or does

25  not.  I would assume that there would likely be some.          15:23:00

 1          THE COURT:  Did you ask the MCSO to provide you with

 2   these documents back in February?

 3          MS. IAFRATE:  Your Honor, I believe that that's a

 4   privileged communication.

 5          THE COURT:  All right.  All right.  You're right.                15:23:13

 6          Anything else you want to say?

 7          MS. IAFRATE:  Your Honor, regarding the other

 8   chronology of events, I apologize that I'm not prepared to

 9   testify regarding that, and I would hope that Mr. Masterson

10   would have the opportunity to answer any further questions.              15:23:27

11          THE COURT:  Well, as it pertains to the 50

12   hard drives, I did, too, notice in the documents that have been

13   made public that some of the e-mails reference 50 or 60

14   hard drives taken from Mr. Montgomery, and noted that

15   apparently you -- by "you" I don't mean you personally; I mean          15:23:43

16   your client -- produced only one in May.

17          Have you made any effort to determine what is in that

18   DR file that Mr. Warshaw asked you about?

19          MS. IAFRATE:  Yes.

20          THE COURT:  And what is in there?                                15:24:00

21          MS. IAFRATE:  There are approximately 40 to 50

22   hard drives that may potentially relate to documents from the

23   Seattle investigation.

24          THE COURT:  Anything else in there?

25          MS. IAFRATE:  No.                                                15:24:12

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   19

| | |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | Mr. Masterson. |
| 3 | MR. MASTERSON:  Judge, I guess I'd first like to |
| 4 | address -- well, I have a question, perhaps the Court already |
| 5 | answered this question, where in the Court's order setting this |
| 6 | hearing today the Court says that defendants have "declined to |
| 7 | provide access." |
| 8 | THE COURT:  Yes, I did answer that question. |
| 9 | MR. MASTERSON:  Okay. |
| 10 | THE COURT:  I don't know that you've declined to |
| 11 | provide access; that was a misunderstanding on my part. |
| 12 | MR. MASTERSON:  All right.  The second thing I -- |
| 13 | THE COURT:  Are you going to provide those |
| 14 | hard drives? |
| 15 | MR. MASTERSON:  I knew nothing of the hard drives |
| 16 | until -- |
| 17 | THE COURT:  How about my order that the hard drives be |
| 18 | produced right now? |
| 19 | MR. MASTERSON:  Well, I don't have them with me, but |
| 20 | here's my question.  I'm going to object, and I assume there |
| 21 | have been objections before, as to relevance of these |
| 22 | hard drives in the Montgomery materials, because I do not |
| 23 | see -- |
| 24 | THE COURT:  I've already ruled on that 40 times. |
| 25 | Objection's overruled. |

15:24:36

15:24:47

15:24:56

15:25:10

15:25:22

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  20

1          MR. MASTERSON:  Well, let me make my record, please,

2     Judge.

3          THE COURT:  The record has been made.  Go ahead and

4     make it, Mr. Masterson.

5          MR. MASTERSON:  Your Honor --                          15:25:30

6          THE COURT:  Let me tell you something.  I realize that

7     you're new to this litigation, but you certainly have read,

8     have you not, my questioning of Sheriff Arpaio?

9          MR. MASTERSON:  I have read your questioning.

10         THE COURT:  When I required him to turn over all these  15:25:44

11    things?

12         MR. MASTERSON:  You asked him to hold on to them.

13         THE COURT:  And I said we would send the monitor over

14    to retrieve them, didn't I.

15         MR. MASTERSON:  You did.                               15:25:54

16         THE COURT:  And that it needed to be done immediately,

17    didn't I.

18         MR. MASTERSON:  You did.

19         THE COURT:  All right.

20         MR. MASTERSON:  But that doesn't make them relevant --  15:25:58

21         THE COURT:  All right.

22         MR. MASTERSON:  -- to the OSC.

23         THE COURT:  Make your objection --

24         MR. MASTERSON:  To the --

25         THE COURT:  Make your objection on the record.         15:26:02

1          MR. MASTERSON:  Your Honor, there are distinct --

2     three distinct issues in the OSC proceeding.  There are

3     underlying issues which --

4          THE COURT:  Well --

5          MR. MASTERSON:  -- the Court ruled on --                    15:26:10

6          THE COURT:  -- let me tell you what.  We're not going

7     to go through this.  I'll tell you this.  They may not be

8     relevant.  I realize that they may not be relevant.  But they

9     also may be very relevant.  And they were demanded to be

10    produced and they haven't been produced.                        15:26:23

11         So I would propose this.  I'm going to send the

12    marshals over.  You'll provide everything that's in that DR

13    locker.  We'll hold it here.  I won't look at it.  You can have

14    full access to it.  So can the monitor.  If you have --

15    whatever's in there, and I don't know what's in there, but if  15:26:43

16    whatever is in there is material that I've already ordered --

17    for instance, if, it seems to me, that the other documents

18    suggest -- that's the database that Montgomery downloaded --

19    then it's going to be turned over to the United States

20    Government under the same terms the other matter was turned     15:27:03

21    over.  You can preserve whatever objections you have to its

22    relevance in the current proceeding and we'll hear then.  There

23    may be nothing that is relevant, but I certainly don't know

24    that now.

25         MR. MASTERSON:  I understand that, Judge, and I'm          15:27:14

```
 1    not -- I'm not resisting that or saying that the Court does not
 2    have the authority -- I'm certainly not saying the Court does
 3    not have the authority to order them produced.  I am objecting,
 4    and I think the objection's been made before and ruled upon,
 5    but I will make a continuing objection to the relevance of         15:27:29
 6    those materials to this proceeding.
 7         THE COURT:  And why don't we find out what those
 8    materials are first.
 9         MR. MASTERSON:  Let's do that.
10         THE COURT:  All right.                                        15:27:40
11         MR. MASTERSON:  Now, I --
12         THE COURT:  Any problem if I order the marshal to go
13    over and take those documents and put them in the evidence
14    locker of the marshals today?
15         MR. MASTERSON:  I don't know.  May I consult with            15:27:52
16    counsel, please?
17         THE COURT:  You may.
18         MS. IAFRATE:  Your Honor, may I have a court order
19    referencing the DR number that I know that Mr. Warshaw has --
20         THE COURT:  Sure.                                             15:28:04
21         MS. IAFRATE:  -- so that then we can remove it from
22    Property and then put it back into the marshal property --
23         THE COURT:  Sure.
24         MS. IAFRATE:  -- just so that we have a chain
25    of custody.                                                       15:28:11
```

1    THE COURT:  Sure, absolutely.  I don't know what that

2  is, but I'll -- that's a reasonable request.

3    MS. IAFRATE:  Thank you.

4    THE COURT:  So we've resolved that one.  Let me just

5  be clear on the record, you can have access to it here, and the         15:28:18

6  monitor can have access to it here.  And you can review it for

7  privileged materials or whatever else.  I'm going to require it

8  to be done with some expedition.

9    What about the -- and then -- then if there's anything

10  in it that I think may be relevant or that the parties think         15:28:40

11  may be relevant, you can raise your -- you can re-raise your

12  relevance objections then.  Because it may well be that if that

13  is, for example, the Montgomery database, and it actually turns

14  out to be full of stuff that doesn't relate to anything and

15  isn't taken from the CIA, then there may be limited relevance         15:29:01

16  here except to the extent -- well, there may be no relevance,

17  depending upon what the facts are, other than to verify that

18  the Montgomery investigation was based on whatever, if anybody

19  tries to assert its truthfulness, but that's a very limited

20  relevance, I'll grant you.  There may be something in it that's         15:29:23

21  relevant, but I think that we're all entitled to make that

22  determination based on the documents.

23    That being said, was there anything else you wanted to

24  say about the document, the hard drives?

25    MR. MASTERSON:  No, I have -- no, nothing about the         15:29:35

1    hard drives.

2             THE COURT:  What about the identifications?

3             MR. MASTERSON:  That I do have something to say about,

4    and the first thing I'd like to do is correct some

5    misstatements by Chief Warshaw.                                    15:29:46

6             First off, let me explain how I came to even be

7    involved in this issue is last night I received an e-mail from

8    Chief Warshaw at 9:17 p.m., basically threatening me --

9             THE COURT:  Where did he -- do you have a copy of that

10   e-mail?                                                            15:30:07

11            MR. MASTERSON:  I do.

12            THE COURT:  I'll tell you that I received a copy that

13   he sent to everybody else.  It said 9:17, but I think he's got

14   his Eastern time stamp set on it because I got it about

15   6 o'clock.  So I just -- are you sure you received it at 9:17?    15:30:22

16            MR. MASTERSON:  I know I did not receive it at

17   6 o'clock, Judge.  Maybe this is more than everyone needs to

18   know in the courtroom, but what the heck, I'll throw it out

19   there.

20            THE COURT:  You don't need to if it's personal.         15:30:35

21            MR. MASTERSON:  I was lying in bed reading, and it was

22   after 9:00 when I --

23            THE COURT:  All right.  So what does he say in there

24   that threatens you?

25            MR. MASTERSON:  Well, that basically he's saying that   15:30:43

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   25

```
 1   he's -- he's being denied access to documents, and that he's

 2   going to request an emergency hearing.

 3          THE COURT:  What about that's a threat?

 4          MR. MASTERSON:  I immediately responded.  I know --

 5          THE COURT:  Well, what about that is a threat,          15:30:57

 6   Mr. Masterson?

 7          MR. MASTERSON:  Well, Judge, when anyone tells me

 8   that, you know, that I have to jump out of bed at 9 o'clock at

 9   night and do something --

10          THE COURT:  He didn't tell you that.  He said he was    15:31:06

11   going to -- he was requesting documents, and that he might

12   raise the matter today.  Right?

13          MR. MASTERSON:  Well, that's a -- Judge, it's a

14   threat.  He's telling me if I don't -- if I don't do something

15   immediately, he's going to run to the judge.  To me, that's a  15:31:20

16   threat.  It's at 9 o'clock at night, that's a bigger threat.  I

17   don't like that.  So I responded --

18          THE COURT:  Let me just say that I have given the

19   monitor the authority to do precisely that when he runs into

20   issues that cannot be resolved.  So if you feel like it's a    15:31:35

21   threat, I'm sorry that your feelings were hurt, but we need to

22   resolve this matter.  And we need to resolve it fairly, and we

23   need to make sure that evidence is preserved.

24          MR. MASTERSON:  My feelings don't get hurt easily, but

25   what I will tell you, Judge, as a litigant, as an attorney for 15:31:51
```

1    litigants, we are told by the federal court that if we have a

2    dispute, contact the other side.  Pick up the phone and try to

3    work it out before you contact the Court.

4            THE COURT:  I believe he did that all morning, didn't

5    he?                                                              15:32:08

6            MR. MASTERSON:  Like I say, I became aware that the

7    first contact he had with one of my clients was with

8    Captain Skinner past 6 o'clock in the evening.  The first I

9    became aware of it was past 9 o'clock in the evening.  I

10   immediately responded to the e-mail --                          15:32:20

11           THE COURT:  And you were with him this morning.

12           MR. MASTERSON:  I was with him this morning at 8:45 --

13           THE COURT:  And he made the request to Ms. Iafrate

14   this morning.

15           MR. MASTERSON:  Excuse me?                               15:32:28

16           THE COURT:  He made the request on the 50 hard drives

17   to Ms. Iafrate this morning.

18           MR. MASTERSON:  Correct.

19           THE COURT:  And you did -- you were with him this

20   morning when --                                                 15:32:35

21           MR. MASTERSON:  Correct.

22           THE COURT:  -- he did -- when you did provide the

23   identifications.

24           MR. MASTERSON:  Correct.

25           THE COURT:  Thank you.                                   15:32:42

1          MR. MASTERSON:  So I'm wondering why we're here for

2     some emergency when he got the access --

3          THE COURT:  Well, one of the --

4          MR. MASTERSON:  -- to these documents that he

5     requested.                                                    15:32:47

6          THE COURT:  -- reasons we're here is the hard drives.

7     And one of the concerns I have, Mr. Masterson, and I know you

8     weren't involved in the case then, I asked for identifications

9     to be provi- -- all the identifications that Maricopa County

10    had.  Let me find the language.                               15:32:58

11         "Copies of identification documents seized by MCSO

12    personnel from apparent members of the plaintiff class," I

13    ordered that that be produced in February.  I ordered that it

14    be produced by February 27th, and I entered the order on

15    February 12th.  And we still get these documents that are -- I   15:33:17

16    would say "trickling in," but I hardly think 1400 is a trickle.

17         And then, when I hear that there were directions given

18    that they were not -- their presence was not to be volunteered

19    to the monitor, I'm very -- and when I consider your clients'

20    track record in this case, where one of the reasons we're       15:33:40

21    having this hearing is because they did not provide documents

22    that were requested before; they destroyed documents and were

23    sanctioned for it; and now I entered this order, and

24    Ms. Iafrate, to her credit, acknowledged that they'd never even

25    provided these documents prior to the hearing.  Somebody has to   15:33:57

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   28

1   be held responsible sometime.

2          And I realize that you've come to this case late, but

3   you're representing your clients, your clients are going to be

4   held responsible, and it's going to be now.

5          MR. MASTERSON:   Judge, then let's get -- let's go into          15:34:15

6   a little background on these 1500 documents, 1459.

7          THE COURT:   You know what?   I'm afraid that I know the

8   background a whole lot better than you do, sir.   So what do you

9   have to say about it?

10          MR. MASTERSON:   What I have to say about it is these          15:34:28

11   were documents that were held in Property.   They were scheduled

12   for de- --

13          THE COURT:   Slated for destruction.

14          MR. MASTERSON:   Absolutely.   I assume every single day

15   there are -- there are evidence -- or evidence and other items          15:34:37

16   in Property scheduled for destruction.

17          THE COURT:   Yeah.

18          MR. MASTERSON:   I assume that's an ongoing process.

19          THE COURT:   You are aware that I have had very great

20   concern about other items in this case that were sent to          15:34:48

21   Property and slated for destruction that involved memos to

22   Captain Bailey covered over some of these other identifications

23   that were sent to be destroyed after Captain Bailey was placed

24   in charge of the unit that was investigating these very

25   document seizures by the MCSO.          15:35:03

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  29

1          Were you aware of that, sir?

2          MR. MASTERSON:  I was not.

3          THE COURT:  Well, you are now.  I'm very concerned

4     about how your clients run their Property Unit.  It was

5     something that I went over with Chief Deputy Sheridan in his          15:35:18

6     testimony in April, if you wanted to review that.

7          MR. MASTERSON:  There is absolutely no evidence that

8     these 15 -- 1459 items were seized improperly, held improperly,

9     at all.  That's pure speculation.

10          THE COURT:  Well, let me tell you, I got an order that          15:35:34

11     required them to be produced five months ago and they were not

12     produced.  That's pretty persuasive evidence that causes me at

13     least concern, when they haven't been produced and when I hear

14     my monitor say that there was some sort of instruction not to

15     volunteer their presence.          15:35:52

16          MR. MASTERSON:  That I know nothing about.

17          THE COURT:  Do you know anything about it,

18     Ms. Iafrate, any more than you've said and assert a privilege

19     on?

20          MS. IAFRATE:  I have already expressed everything that          15:36:01

21     I can reveal to you, Your Honor.

22          THE COURT:  All right.  Well, that is the basis of my

23     concern, Mr. Masterson, that we are -- that your client is far

24     from forthcoming.  And even assuming that there isn't any

25     conscious intent to withhold documents, there's certainly a          15:36:18

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   30

1   negligent, if not reckless or grossly negligent, failure to

2   comply with discovery orders in this case.  That's my concern.

3        MR. MASTERSON:  I understand that's been a problem in

4   the past.

5        THE COURT:  No, it's a problem right now.                15:36:35

6        MR. MASTERSON:  Well, I don't think it's a problem

7   with these 1400 licenses, et cetera, Judge, because --

8        THE COURT:  Because why?

9        MR. MASTERSON:  -- my understanding --

10       THE COURT:  Because they weren't produced when I asked   15:36:46

11  them five months ago?

12       MR. MASTERSON:  Because a sergeant had them who was

13  using them or going to use them for a legitimate purpose, did

14  not use them for that purpose, admittedly, and then returned

15  them.  If there had been some intention --                    15:36:55

16       THE COURT:  What about my instruction would permit

17  that sergeant to keep those documents without providing them to

18  the plaintiffs?  Nothing.

19       MR. MASTERSON:  I have no idea whether that particular

20  sergeant --                                                   15:37:13

21       THE COURT:  Well --

22       MR. MASTERSON:  -- realized he was holding

23  information.

24       THE COURT:  -- here's what we're going to do.  You're

25  going to provide every one of those --                        15:37:20

```
 1              Let me ask you this:  Are you satisfied with respect
 2      to the 40, the 20, and the 1459, that the defendants have
 3      accounted for them and will provide access to them without us
 4      having to take them into our custody?
 5              CHIEF WARSHAW:  No.                                      15:37:34
 6              THE COURT:  All right.  Then I'm going to order the
 7      monitor -- I'm going to order the marshal to go over this
 8      afternoon, and together with the contents of the DR locker,
 9      he's going to take possession of those licenses.
10              MR. MASTERSON:  Judge, obviously we will comply with    15:37:49
11      that order.  I'd just like the monitors to provide information
12      to me and why you feel that is necessary.
13              THE COURT:  We're not going to have this kind of a
14      discussion.  I've already ruled.  And I'm going to enter one
15      other order, and that is nothing, nothing will be taken out of, 15:38:02
16      or destroyed, from the Property Unit of the Maricopa County
17      Sheriff's Office without accounting for it to the monitor
18      between now and the -- and a time when the monitor can review
19      that more fully with the Maricopa County Sheriff's Office
20      policy and procedure.                                          15:38:24
21              Do you understand that order?
22              MR. MASTERSON:  No, because I assume --
23              THE COURT:  I didn't ask whether you agreed with the
24      order.
25              MR. MASTERSON:  No, no, I don't understand.            15:38:33
```

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   32

1          Are you saying -- and again, I would assume on a daily

2    basis items are removed from Property for, say, use in trial --

3          THE COURT:  Oh, I get your point.  I get your point.

4          When those are removed for that purpose, I just

5    want -- I assume when they're removed there has to be a record      15:38:52

6    kept of their removal.

7          MR. MASTERSON:  Correct, there -- there's a law.

8          THE COURT:  I want a complete record kept of every

9    removal from Property; I want nothing destroyed from the

10   Property Unit until the monitor is able to assess found            15:39:02

11   property or other matters that may be there that may be

12   relevant to this case.

13         MR. MASTERSON:  That, I understand.

14         THE COURT:  All right.  Thank you.  Thank you for

15   allowing me to clarify.                                            15:39:15

16         MS. IAFRATE:  Judge, could I do a housekeeping matter?

17         THE COURT:  Yeah, we have several.  Go ahead.

18         MS. IAFRATE:  Well, regarding your orders, the --

19   we're just using round numbers, I think, the 40 and the 20?

20         THE COURT:  Yes.                                             15:39:37

21         MS. IAFRATE:  Those are in Property and Evidence, so

22   along with the DR number that you're going to issue an order

23   of, if we could have that order, we would serve it upon

24   Property and Evidence so that that can be removed and there

25   would be a chain of custody.  But the 1500, the monitors          15:39:50

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing 33

1   reviewed them in PSB this morning and so they're still lock and

2   key, behind a lock and key in PSB.  So those don't need to be

3   removed from Property and Evidence.

4         THE COURT:  Well, I don't know what DR number or

5   anything else the 40 and the 20 may be under in Property.     15:40:07

6         Do you know what that is?

7         MS. IAFRATE:  No, but I can provide it to you.

8         THE COURT:  If you'll provide it immediately, I'll

9   give you your order.

10        MS. IAFRATE:  Thank you.     15:40:16

11        THE COURT:  And then if you have the DR number for the

12   hard drives and whatever else may be in that file, if you

13   provide that, I'll give you the order.

14        MS. IAFRATE:  I do.  I received it for the first time

15   this morning from Chief Warshaw, so I know he has it.     15:40:25

16        THE COURT:  Well, if you'd give it to me, I'd

17   appreciate it.  I will direct the marshal -- I'll finish that

18   order.  I'll direct the marshal to take custody of it as I've

19   indicated.  Whenever you want to see these materials you can

20   come over and look at them.  You can arrange with the monitor     15:40:39

21   to have them ghost-copied so everybody has a full copy of the

22   hard drives.  Any other documents, you can have copies of and

23   you can have full access, but they'll remain here.  At least

24   until we can assert whether there's any relevance, or whether

25   there's any disputes about their relevance.     15:40:58

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing 34

1     Any concern about that?

2     MS. IAFRATE:  No, except for I received a letter that

3   I'm sure Chief Warshaw received also from the person that was

4   here representing the United States that they would like to

5   remove those and have them copied August 7th, and so I don't          15:41:16

6   know if you are going to permit them to remove them from here

7   to go have them copied.

8     THE COURT:  I think they were going to -- I think

9   wasn't -- they wanted to copy them in some sort of secure

10  facility?                                                             15:41:33

11    MS. IAFRATE:  Yes.

12    THE COURT:  If in fact those are the Montgomery dump,

13  then I will allow that to happen.  But as I said before,

14  Ms. Iafrate, if you or Mr. Masterson or Mr. Popolizio or

15  whoever wants to accompany, you can do that.  It's my            15:41:44

16  understanding you may have to provide some citation to be

17  cleared to get into the SCIF.

18    MS. IAFRATE:  Yes, understood.  But just so that we

19  can think through the process in the future, if I could come up

20  with a suggestion regarding how we could keep the chain of       15:41:57

21  custody from them now coming over here to get them rather than

22  checking them out from Property, just so that we can all be

23  comfortable with the chain of custody.

24    THE COURT:  All right.  If you have any problem with

25  me directing the marshal to take them into his custody, we'll    15:42:13

1   direct an inventory be made, he'll keep them here under lock

2   and key in the evidence room, or wherever they keep them, and

3   then you can go over with them on the SCIF.

4           Any problem with that?

5           MS. IAFRATE:  No.                                    15:42:25

6           THE COURT:  All right.

7           Let me just raise a few housekeeping matters of my

8   own.  I received from Mr. Como some concern about his

9   availability on scheduling for the renewed hearing.

10          I did just say what dates I was hope -- I was holding,  15:42:40

11  hoping they would work for everybody, they may not work for

12  everybody, so in the hearing next Friday we may take up

13  scheduling.  I don't intend to have this matter be hanging

14  around for very long, but if the dates I gave are really

15  unworkable for the parties or for necessary witnesses, we can  15:42:56

16  adjust them; we can take it up then.

17          The monitor, I think I've indicated before, has done

18  interviews this week, and they may be continuing next week in

19  terms of the investigations he's undertaking pertaining to

20  adequacy of investigation and other matters.  I've directed   15:43:14

21  that any party that wants transcripts of those interviews is

22  entitled to have them, and I just guess I want to make that

23  clear.

24          That's all I have.  Any other concerns?

25          MR. POCHODA:  No, Your Honor.                         15:43:43

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing   36

1           MS. WANG:  Your Honor, this is Cecillia Wang on behalf

2    of the plaintiff.  I just want to say on the record that in

3    addition to what appears to be a violation of the Court's

4    February 2015 order relating to these identifications that were

5    newly discovered by the Court-appointed monitor and which were          15:44:00

6    apparently withheld from the monitor, plaintiffs are very

7    concerned about that issue.  In addition to being required to

8    be turned over by the Court's order, plaintiffs specifically

9    asked defendants repeatedly over the course of the past several

10   months for information and documents that would help to                  15:44:22

11   identify potential victims of the MCSO's violations of the

12   Court's preliminary injunction order.

13          In addition, given the time frame of those documents,

14   identification documents that the court-appointed monitor,

15   Chief Warshaw, outlined, it does sound like some of them would          15:44:43

16   go back to the pretrial discovery period in this case.  And so

17   plaintiffs are concerned.  We would request that we get copies

18   of all those identifications once they are secured by the

19   Marshal's Office.

20          And finally, Your Honor, I would add that we're very             15:44:59

21   troubled by what we're hearing about the apparent involvement

22   of defense counsel in the withholding of those identification

23   documents from the court-appointed monitor and from plaintiffs,

24   for that matter, and we'll -- we'll consider next steps on

25   that.                                                                    15:45:18

1        THE COURT:  Yes, I believe I am concerned that we

2   would not have discovered these matters if the monitor hadn't

3   discovered them.  I share that concern, but I do recognize that

4   everybody has a right to be heard.

5        Clearly, issues that have been raised today are issues    15:45:31

6   that cannot resolved today, and I will be open to your

7   suggestions.  I'm also very concerned that we receive -- we get

8   our arms around all the documents that are relevant to this

9   hearing before we go forward whether or not they've been

10  intentionally or negligently withheld, and then we can sort out    15:45:50

11  what needs to happen as a result of that afterward.

12       So it will probably -- you know, I'll welcome any

13  concerns you have, we will raise it as a topic Friday making

14  sure -- next Friday making sure that we have done everything

15  that needs to be done to make as sure as we can that we have    15:46:06

16  all the documents that we need, and then we can determine what

17  other steps may be necessary in light of what we know now and

18  what we may know later.

19       Anything else.

20       MR. POCHODA:  If I may, just briefly, Your Honor, it    15:46:16

21  doesn't appear that the orders, the February 15th order and

22  other orders, have been transmitted to all of the members of

23  MCSO, and we would ask, as you would with a preservation

24  letter, no less an order from this Court that there be some

25  sort of broadcast to all of those types of things that have to    15:46:37

CV07-2513, Melendres v. Arpaio, 7/24/15 In-Court Hearing  38

1    be maintained.  And it's not up to defense counsel to decide

2    whether there's any evidence --

3           THE COURT:  Well --

4           MR. POCHODA:  -- that any documents were obtained

5    illegally --                                                        15:46:47

6           THE COURT:  I appreciate all that, Mr. Pochoda.  We're

7    not going to raise it in today's hearing.  But I'll tell you,

8    even if there has been a broadcast, it's clearly not been

9    adequate.

10          MR. POCHODA:  Well, that's right.                            15:46:56

11          THE COURT:  And so we're going to have to figure out

12   what adequate steps have to be taken to make sure that we don't

13   have any more incidents like this.

14          We'll see you next Friday.

15          THE CLERK:  All rise.                                        15:47:10

16          (Proceedings concluded at 3:47 p.m.)

17

18

19

20

21

22

23

24

25

1

2                           C E R T I F I C A T E

3

4

5

6

7         I, GARY MOLL, do hereby certify that I am duly

8 appointed and qualified to act as Official Court Reporter for

9 the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11 a full, true, and accurate transcript of all of that portion of

12 the proceedings contained herein, had in the above-entitled

13 cause on the date specified therein, and that said transcript

14 was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 25th day of July,

18 2015.

19

20                         s/Gary Moll

21

22

23

24

25