CASE NOS. 15-16440 & 15-72440

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MANUEL de JESUS ORTEGA MELENDRES, *et al.*, Plaintiffs
v.
JOSEPH M. ARPAIO, Sheriff of Maricopa County,
Arizona; *et al.*, Defendants
and
DENNIS L. MONTGOMERY, Putative Intervenor

In Re: JOSEPH M. ARPAIO, Sheriff of Maricopa County,
Arizona; *et al.*, Defendants

From the United States District Court
For the District of Arizona
The Honorable G. Murray Snow, Presiding
Case No. CV-07-2513

## APPELLANT'S REPLY TO APPELLEES' OPPOSITION TO AMENDED EMERGENCY MOTION FOR STAY ON APPEAL

ORAL ARGUMENT REQUESTED

Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Jonathon Moseley, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Of Counsel (Not Admitted to Ninth Circuit)

*Attorneys for Putative Intervenor Dennis L. Montgomery*

# APPELLANT'S REPLY TO APPELLEES' OPPOSITION TO AMENDED EMERGENCY MOTION FOR STAY

## I. REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument and expeditious handling.

## II. INTRODUCTION

Appellant is also filing this pleading in the case of *In Re: Joseph M. Arpaio,* No. 15-72440, as this case is related to this appeal. The U.S. District Court for the District of Nevada ("Nevada District") has already ruled that the documents, records, information, intellectual property, and tangible and intangible property at issue are the property of Dennis L. Montgomery ("Montgomery"). The final judgment of the Nevada District was not appealed, has become final, and is now binding within this Circuit and indeed throughout the Federal courts nationwide. [1]

Because the documents, items, and property seized by the Honorable G. Murray Snow in the case below, some of which may contain sensitive information and then handed over the American Civil Liberties Union (ACLU) and other adverse parties, which the ACLU then on information and belief provided to third parties in violation of law, the Appellant and Putative Intervenor Montgomery has

---

[1] See *Dennis Montgomery and the Montgomery Family Trust v. eTreppid Technologies, LLC, Warren Trepp and the U.S. Department of Defense*, Case Nos. 3:06-CV-00056-PMP-VPC and 3:06-CV-00145-PMP-VPC, Order, Judge Philip M. Pro, March 19, 2007, and *In the Matter of the Search of: The Residence Located at 12720 Buckthorne Lane, Reno, Nevada, and Storage Units 136, 140, 141, 142 and 143, Double R Storage, 888 Madestro Drive, Reno, Nevada,* Case Nos. 3:06-CV-0263-PMP-VPC and 3:06-MJ-00023-VPC, Order, Magistrate Judge Valerie P. Cooke, November 28, 2006 ("Nevada Orders").

standing to intervene ***as of right*** and a strong likelihood of success on the merits. This Court should order a stay of the proceedings below, at least with regard to all items concerning Montgomery and/or his documents.

Secondly, the seizure and redistribution of Montgomery's property starting on April 23, 2015, is in violation of this Circuit's mandate to Judge Snow on April 15, 2015. This Court vacated parts of Judge Snow's orders and ordered him to narrow his orders on April 15, 2015, especially concerning the use of monitors, as to address only the constitutional violations at issue in the original case. But instead, in violation of and in contempt of this Court's orders, on April 23, 2015, Judge Snow radically expanded the scope of the case and expanded the use of monitors to seize Montgomery's property and investigate Montgomery, all as a means to investigate his wife's recounted statements that Snow intended to destroy Defendant Sheriff Joseph Arpaio.

Thirdly, although Judge Snow inappropriately expanded the case to involve Montgomery and seize his property as a means of getting at Arpaio and covering up the judge's conflict of interest and need to recuse himself, this should never have happened. There is fundamentally no relevance of Montgomery in the proceedings below at all. And yet Montgomery's rights are in fact being trampled. Montgomery should be left alone, his property returned, and all orders concerning Montgomery vacated. To allow for him to argue his case, Montgomery, who is

severely disabled as a result of a brain aneurism and related strokes, is dependent on his lawyers gaining pro hac vice entry into the case to represent his property and related interests. He cannot afford to hire other lawyers and these lawyers are thus representing him pro bono. And given the hot potato controversial nature of this case particularly in the District of Arizona, and Judge Snow's hostility and uncontrolled if not illegal and unethical actions, all of which have gained large media coverage, there are no other lawyers who will now step in to represent Montgomery, a destitute disabled person who could die at any moment as a result of his brain aneurism and related complications.

As a result, the Opposition falls flat because the Appellees cannot articulate any legitimate interest in the parties or Judge Snow forcing Montgomery and/or his property to be part of the proceedings below. The parties will not be prejudiced if a totally irrelevant topic (Montgomery) is excluded from the case. The damage to Montgomery and his property outweighs the complete lack of any legitimate interest of the Plaintiffs / Appellants in his property.

## III.  ARGUMENT

### 1)  MONTGOMERY'S PROPERTY HAS BEEN IMPROPERLY TAKEN

It is conclusively established by the Nevada Orders in the Nevada District that Montgomery has standing here to intervene to protect his own property. It is conclusively established that Montgomery is nearly certain to prevail on the merits of the appeal because not only have the items been established as his property but no one offers anything to the contrary but the vaguest of speculation.

The Nevada Orders, attached as Exhibit A and B, particularly the Order by Magistrate Cooke, Exhibit B, discuss at length that the property is Montgomery's own intellectual property, computer programming work product, trade secrets, proprietary techniques, methods, inventions, and information. *Id.*

The Opposition cannot even state, but only imply in the vaguest of terms, bald speculation that the property could conceivably not be Montgomery's property purely because it was taken directly from MCSO.

But this Court cannot entertain such raw speculation. The record demonstrates that MCSO was investigating crimes reported by Montgomery. The record is clear that Montgomery entrusted his property only temporarily to MCSO.

As Montgomery stated in his Intervenor Dennis L. Montgomery's Motion to Disqualify Judge G. Murray Snow under 28 U.S.C. §144, May 7, 2015:

> Dennis Montgomery provided his software work, analysis, technological work, copyrighted material, patents, programs, source code, output data, and information to the MCSO. Thus, Dennis Montgomery retains a proprietary interest in those documents including as intellectual property and/or trade secrets.

> Yet, documents about and generated by Dennis Montgomery working on confidential matters were demanded by Judge Snow and turned over without the opportunity for a review of privilege or documents subject to trade secrets protection or confidentiality agreements with third parties.

There is nothing in the record to support the supposition suggested by the Opposition that the documents, records, or tangible and intangible property ever ceased to be the property of Montgomery.

As a result, the Opposition's challenge to standing and to the likelihood of success on the merits must fail as premised upon an unsupported assumption.

## 2) JUDGE SNOW's ACTIONS CONCERNING MONTGOMERY EXCEED THE LEGITIMATE SCOPE OF THE PROCEEDINGS BELOW

On April 23, 2015, Judge Snow dramatically expanded the proceedings to attack Montgomery and illegally and unethically seize his property and redistribute it to counsel and others.

But on April 15, 2015, this Court had _already_ vacated Judge Snow's orders and over-use of monitors expanding the case beyond the scope of the final order, including for matters that have

> no bearing on the constitutional rights at stake here. We therefore vacate these particular provisions and order the district court to tailor them so as to address only the constitutional violations at issue. See _Milliken_, 433 U.S. at 282.

6

*Melendres v. Arpaio*, Record No. 13-16285, U.S. Court of Appeals for the Ninth Circuit, Opinion April 15, 2015, page 23.

The Opposition fails to present any legitimate reason for Montgomery or any of his property, documents, or information to be included in this case. This Court has already admonished Judge Snow to stop expanding the case to matters unrelated to the issues arising under the final judgment.

As a result, the need for Montgomery to protect his intellectual property, information, and other property against the callous disregard of his rights is heightened. And there is no burden or harm to the Plaintiffs because there can be no legitimate reason for dragging Montgomery into the proceedings below.

Ultimately, the importance, right, and urgency of Montgomery having a right to be heard, with assistance of his own counsel, is amplified by the sudden, inexplicable, attack upon Montgomery by Judge Snow, *sua sponte*, unannounced, and out of the blue. The sudden and unexpected attack upon Montgomery's property rights, without warning, heightens the need for Montgomery to have legal representation and a right to be heard, on short notice, by his existing attorneys.

### 3) OPPOSITION FAILS BECAUSE MONTGOMERY IS NOT RELEVANT TO THE PROCEEDINGS BELOW

Ultimately, the Opposition to Montgomery's motion for stay fails, because Montgomery is not relevant to the proceedings below. The case below went to

final judgment on October 2, 2013. The Complaint involved whether the MCSO

considered race or appearance while conducting traffic stops and other law

enforcement and in immigration status sweeps.

Yet, Judge Snow has suggested that he will charge MSCO and Sheriff

Arpaio, and perhaps others like Montgomery.  Judge Snow ordered that:

> f. Aspects of the "Seattle operation" are germane to the
> show cause proceedings, and shall be addressed by the
> Parties insofar as they relate to the charged bases for
> contempt or the appropriateness of any remedial
> measures. The Court will consult with the Parties on the
> topics that merit addressing at the hearings to be resumed
> on June 16, 2015 once the scope of relevant issues are
> sufficiently refined by document review and the
> Monitor's investigations.

Order, *Melendres v. Arpaio,* May 14, 2015.

The "Seattle operation" refers to MCSO's staff work with Dennis

Montgomery.  And Judge Snow stated further:

> And the matters of interest, ***particularly pertaining
> to the Montgomery investigation, <u>which is the only
> thing that we might go forward on</u>*** in addition to the
> other things that your client was supposed to provide but
> hasn't, which is what required the continuation of the
> contempt hearing in the first place, I think they're going
> to be of interest to whoever the presiding judge is,
> whether it's me or whether it's another judge. The attitude
> and the documents revealed -- and of course, ***the whole
> story hasn't been told, and I'm not assuming that it has
> been told.*** I've invited your clients to provide an
> explanation for those documents and I haven't made any
> decisions about them. ***But it does seem to me that what***

8

> ***they suggest is going to be worth exploration,*** and so I
> can't see how your clients will be injured absent a stay.

Transcript, July 20, 2015, Status Conference, *Melendres v. Arpaio,* Page 12 *(Emphases added).*

And yet neither the Plaintiffs / Appellees in their Opposition nor in their participation in the proceedings below, nor Judge Snow have or are able to identify what the issue might be involving Montgomery.

Montgomery suffered a brain aneurysm in the middle of 2014, was technically dead on the operating table, and remains medically disabled.  Judge Snow's continued harassment of Montgomery is not justified. See Exhibit C – Letters from Some Physicians.

As a result, Montgomery is entitled to protection of his property rights and constitutional and civil rights and the assistance of counsel.  It will do no good for Montgomery to receive the assistance of counsel years down the road after his rights have already been thoroughly trampled.

The case must be placed on stay to limit the harm to Montgomery, to allow him to have his pro bono counsel's pro hac vice applications granted, intervene by the attorneys he has available on short notice and to defend his property rights, constitutional rights, and civil rights.

### 4)  THERE CAN BE NO MATERIAL CONFLICT OF INTEREST

One consequence of Montgomery's irrelevance to the case is that there can be no conflict of interest with Jonathon Moseley's or Larry Klayman's legal representation of Montgomery in *Melendres v. Arpaio* which qualifies as material. Indeed, Montgomery's counsel made it clear to Judge Snow that he wanted only to intervene to protect his property interests and would take no action adverse to any of the Defendants, including but not limited to Sheriff Arpaio. Moreover, Montgomery's lawyers represent the sheriff in another unrelated case (*Arpaio v. Obama*, No. 14-5325 (D.C. Cir.)) and thus as a client the attorneys can ethically not take any adverse position to Arpaio in this case.

Montgomery's attorney Moseley stated in his "Clarification of Motion for Admittance *Pro Hac Vice* of Jonathon A. Moseley," dated May 13, 2015, (Docs. No. 1080, 1081) stating that *(emphasis added):*

> Neither Dennis L. Montgomery nor his counsel are adverse to Sheriff Arpaio, his deputies, the Cold Case Posse, or MCSO **in any respect**, particularly since this case involves a contempt proceeding over allegations of profiling illegal immigrants.

The mere fact that Moseley represents Arpaio in an unrelated matter does not establish any conflict of interest here. Disqualification applies "where serious conflict exists." *See Dunton v. County of Suffolk*, 729 F.2d 903, 909 (2d Cir.1984), *amended* 748 F.2d 69 (2d Cir.1984). The proponent of disqualification must demonstrate the existence of a conflict of interest which is "serious."

10

A conflict of interest can only be found where the two cases have "factual contexts" which are similar or related. But, in the *Melendres* case here, there are no operative facts shared in common between the case below and the other lawsuit challenging the power of President Barack Obama to issue amnesty to illegal aliens:

> We held that the "relevant test for disqualification is whether the former representation is *'substantially related' to the current representation.*" Id. at 998; see Gas-A-Tron of Arizona, supra, 534 F.2d at 1325; *Westinghouse Electric Co. v. Gulf Oil Corp.*, 588 F.2d 221, 223 (CA7 1978). "Substantiality is present *if the factual contexts of the two representations are similar or related*." *Trone*, supra, 621 F.2d at 998.

*Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (C.A.9 (Mont.), 1983) *(Emphases added).*

As the Appellant stated, he cannot take any position contrary to MSCO or Sheriff Arpaio in the case below, including because: "Montgomery has nothing to do with immigration, immigration enforcement or law enforcement. He has had no involvement with, role in, knowledge of, or experience in those topics. Montgomery has no position on the proper way to conduct traffic stops, find probable cause, or the like." Montgomery has no practical ability to take any conflicting position, because he has no knowledge or experience on those issues.

Even worse for the Opposition, while a mere difference of opinion or recollection does not create a conflict of interest, a difference of opinion *about a topic irrelevant to the case* is surely not grounds for disqualification of counsel.

The Opposition attempts to speculate as to some unidentified issue about Montgomery's credibility, repeating false smears and defamation of Montgomery. However, because Montgomery's testimony and documents are not relevant, there is no basis to consider credibility. The Opposition's attempt to cobble together a conflict of interest where none exists must fail.

Thus, Montgomery should be allowed to intervene by the admittance *pro hac vice* of his previously-existing attorneys available to him. There is no conflict with interest for Moseley or Klayman protecting Montgomery's property rights, constitutional rights, or civil rights. Judge Snow and the pliant ACLU have manufactured a conflict where none exists.

**5) STATUS OF MONTGOMERY PROPERTY.**

Montgomery, by counsel, cited in his motion and in the record below to decisions of the Nevada Orders, summarizing that that Court ruled that (1) the data, documents, intellectual property, tangible objects, and personal property at issue in this case belong to Dennis Montgomery, (2) none of it is classified, (3) the U.S.

Government was required to return it all to Montgomery, and (4) the U.S. Government had deceived that court.

After inquiry as to whether the Nevada District actually did rule upon whether the records, data, technology, and property taken from Montgomery were classified or secret under national security laws, Appellant, by counsel, examined the Nevada Orders in detail and provides this supplement and clarification.

Judge Philip M. Pro upheld the order of the magistrate on March 19, 2007, in an order, attached as Exhibit A, that found no error in the order of the magistrate. But Judge Pro did not clarify the details of each objection ruled upon. Therefore, one must examine magistrate's ruling.

Magistrate Cooke, issued the order November 28, 2006, attached as Exhibit B, deciding in detail the rights of the Montgomery parties in relation to the U.S. Government's unconstitutional search warrant and illegal search and seizure of Montgomery's records, information, and property.

Magistrate Cooke ordered that the U.S. Government return to Montgomery the items that had been taken from Montgomery's residence and storage units because of a lack of probable cause. Specifically, Magistrate Cooke found that the affidavit used to justify the search warrant was false and misleading. Magistrate Cooke condemned the U.S. Court's "Callous Disregard" for Montgomery's rights by seizing his records, documents, information and property.

Magistrate Cooke explained the problem on pages 30:25 – 31:3 of her

November 28, 2006, Order:

> SA West blindly relied on the documents, sworn
> statements, and evidence supplied by eTreppid, and he
> never appeared to question whether he had become an
> agent, not for the Government, but for private interests
> engaged in litigation valued in millions of dollars. The
> litigation that has ensued based upon the seizure of
> Montgomery's property is a cautionary tale to heed the
> admonition that trade secrets litigation is best left to the
> civil forum.

And Magistrate Cooke further stated her conclusions on page 29:20 – 30:2:

> The over-arching concern in this proceeding is that SA
> West became an unwitting pawn in a civil dispute, and as
> a result of his inexperience and lack of training, he
> prepared search warrant affidavits that are riddled with
> incorrect statements, edited documents, and
> uncorroborated conclusions, which caused this court to
> exercise its formidable power to authorize the
> government to search Montgomery's home and storage
> units.

As a result, Magistrate Cooke did not actually rule on a presentation of

evidence concerning whether Montgomery's records and documents are classified,

but found a lack of probable cause for the search warrant based on the defects in

the supporting affidavit. Magistrate Cooke noted in *dicta* that the U.S.

Government decided not to pursue that issue. See, page 13:24 – 14:4, Exhibit B.

Previously, however, on September 19, 2006, Director of National

Intelligence John D. Negroponte had filed in the same case before the Nevada

Court a "Declaration and Formal Claim of State Secrets and Statutory Privileges" to formally assert the state secrets privilege under the National Security Act pursuant to 50 U.S.C. § 403-1(i)(1) to protect intelligence sources and methods from unauthorized disclosure. See Exhibit D, attached.

## IV. CONCLUSION

This Court should order a stay of the proceedings and vacate Judge Snow's orders until the appeal is heard.

Dated: August 26, 2015                    Respectfully submitted,

                                                   /s/ *Larry Klayman*
                                                   Larry Klayman, Esq.
                                                   General Counsel
                                                   Freedom Watch, Inc.
                                                   D.C. Bar No. 334581
                                                   2020 Pennsylvania Avenue NW, Suite 345
                                                   Washington, DC 20006
                                                   Telephone: (310) 595-0800
                                                   Email: leklayman@gmail.com
                                                   Admitted in the Ninth Circuit

                                                   Jonathon Moseley
                                                   Virginia State Bar No. 41058
                                                   Freedom Watch, Inc.
                                                   2020 Pennsylvania Avenue N.W., Suite 345
                                                   Washington, D.C. 20006
                                                   (310) 595-0800
                                                   leklayman@gmail.com
                                                   Attorney for Plaintiff
                                                   Of Counsel (Not admitted in Ninth Circuit)

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2015, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit, and counsel of record, by using the Ninth Circuit's CM/ECF system:

Ms. Michele M. Iafrate, Esq.
Ms. Deborah L. Garner, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
dgarner@iafratelaw.com
602-234-9775
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's Office in Arizona

John T. Masterson, Esq.
M.Melvin McDonald, Esq.
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7827
jmasterson@jshfirm.com
mmcdonald@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorney for Defendant Sheriff Joseph Arpaio and Maricopa County Sheriff's Office in Arizona

Mr. Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Defendant Maricopa County, Arizona

Mr. Stanley Young, Esq.

16

Mr. Andrew Carl Byrnes, Esq.
COVINGTON & BURLING, LLP
333 Twin Dolphin Road
Redwood Shores, CA 94065
syoung@cov.com
650-632-4700
Fax (650) 632-4800
Attorneys for Plaintiffs

Mr. Daniel Pochoda, Esq.
Mr. Joshua Bendor, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
602-650-1854
Attorney for Plaintiffs

Ms. Cecilia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org
415-343-0775
Attorney for Plaintiff Melendres

Thomas P. Liddy, Esq.
Civil Services Division
MARICOPA COUNTY ATTORNEY'S OFFICE
222 North Central Avenue, Suite 1100
Phoenix, AZ 85005
liddyt@mcao.maricopa.gov
602-506-8541
Attorney for Maricopa County and Maricopa County Sheriff's Office

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Fl.

New York, NY 10004
asegura@aclu.org
212-549-2676
Attorney for Plaintiffs

Mr. Jorge M. Castillo, Esq.
MALDEF
634 S. Spring Street, 11th Fl.
Los Angeles, CA 90014
jcastillo@maldef.org
213-629-2512
Attorney for Plaintiffs

Mr. Barry D. Mitchell, Esq.
MITCHELL STEIN CAREY
One Renaissance Square
2 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
(602) 358-0290
Attorney for Chief Deputy Sheridan

Mr. Greg S. Como, Esq.
Mr. M. Craig Murdy, Esq.
Mr. Dane A. Dodd, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
Phoenix Plaza Tower II
2929 North Central Avenue, Suite 1700
Phoenix, Arizona 85012-2761
Telephone: 602.385.1040
Facsimile: 602.385.1051
Greg.Como@lewisbrisbois.com
Craig.Murdy@lewisbrisbois.com
Dane.Dodd@lewisbrisbois.com
Attorneys for Executive Chief Brian Sands

Mr. Timothy D. Mygatt, Esq.
Special Counsel
Mr. Mark Kappelhoff, Esq.
Deputy Assistant Attorney General
Civil Rights Division, Special Litigation Section

U.S. Department of Justice
601 D St. NW, Suite 5200
Washington, D.C. 20004
Tel. (202) 514-2000
Fax (202) 514-6273
edward.g.caspar@usdoj.gov
Attorneys for Intervenor the United States

/s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Avenue N.W., Suite 345
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com

Exhibit A

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DENNIS MONTGOMERY and the )
MONTGOMERY FAMILY TRUST, )           3:06-CV-00056-PMP-VPC
                              )       **BASE FILE**
            Plantiffs,        )
                              )       3:06-CV-00145-PMP-VPC
v.                            )
                              )       **O R D E R**.
ETREPPID TECHNOLOGIES, LLC;   )
WARREN TREPP; and the UNITED  )
STATES DEPARTMENT OF DEFENSE, )
                              )
            Defendants.       )
_____ )
                              )
AND ALL RELATED MATTERS.      )
                              )
_____ )

        Attached hereto is a copy of the Order entered this date in "IN THE MATTER

OF THE SEARCH OF: THE RESIDENCE LOCATED AT 12720 BUCKTHORNE LANE,

RENO, NEVADA, AND STORAGE UNITS 136, 140, 141, 142, AND 143, DOUBLE R

STORAGE, 888 MADESTRO DRIVE, RENO, NEVADA, 3:06-CV-0263-PMP-VPC,

3:06-MJ-00023-VPC."

        Counsel for the parties to this action are hereby directed to comply with the

requirements set forth in the attached Order that they forthwith review the sealed case file

and file any objections to the unsealing of any portion thereof within twenty-one days of

this date.

        IT IS SO ORDERED.

DATED:  March 19, 2007.

_____
PHILIP M. PRO
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

IN THE MATTER OF THE SEARCH OF: )
                                 )
THE RESIDENCE LOCATED AT 12720   )      3:06-CV-0263-PMP-VPC
BUCKTHORNE LANE, RENO,           )      3:06-MJ-00023-VPC
NEVADA, AND STORAGE UNITS 136,   )
140, 141, 142, AND 143, DOUBLE R )
STORAGE, 888 MAESTRO DRIVE,      )
RENO, NEVADA.                    )      ORDER
                                 )
_____ )

On November 28, 2006, the Honorable Valerie P. Cooke, United States

Magistrate Judge, entered an Order (#86) granting the Motion of Dennis Montgomery,

Brenda Montgomery, and the Montgomery Family Trust ("Montgomery") to unseal search

warrant affidavits and return seized property pursuant to Federal Rule of Criminal

Procedure 41(g) (#21).  Magistrate Judge Cooke's Order further denied Montgomery's

Motion for Segregation and Sealing of all Attorney-Client and Trade Secret Material as

moot because the Court ordered the return of all seized property.

On December 12, 2006, Respondent United States of America filed Objections to

Magistrate Judge Cooke's Order (#99).  On December 21, 2006, Dennis Montgomery filed

an Opposition to the Government's Objections (#100).  On February 21, 2007, this action

was reassigned to the undersigned District Judge for further proceedings (#112).

/ / /

/ / /

/ / /

/ / /

## I. FACTUAL BACKGROUND

The FBI searched Dennis and Brenda Montgomery's home and leased storage space pursuant to search warrants executed on March 1, 2006, and March 3, 2006. In granting Montgomery's Motion to unseal the search warrant affidavits and return seized property, Magistrate Judge Cooke followed the line of authority that requires the Government to demonstrate a compelling government interest in keeping the affidavit under seal and that no less restrictive means are available to prevent disclosure. Following a three day evidentiary hearing and extensive pre- and post-hearing briefing, Magistrate Judge Cooke found the Government failed to meet its burden of establishing a compelling Government interest to prevent unsealing the search warrant affidavits and the return of property seized pursuant to Rule 41(g). Additionally, Magistrate Judge Cooke concluded the Government had made no showing whatsoever that probable cause existed to justify the issuance of the search warrants in this case based on a violation of 18 U.S.C. § 1832.

## II. AUTHORITY TO ISSUE THE ORDER

The Government argues that 28 U.S.C. § 636 does not authorize a magistrate judge to issue an order unsealing documents or returning seized property to putative property owners in the context of a pre-indictment Rule 41(g) motion. As a result, the Government argues Magistrate Judge Cooke's order should be treated as a finding and recommendation. In Response, Montgomery argues Magistrate Judge Cooke did not exceed her authority by issuing an "order."

Title 28, United States Code, § 636(b)(1)(A) outlines the authority of a magistrate judge in pertinent part as follows:

> . . . a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a

claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.

28 U.S.C. § 636(b)(1)(A). Section 636(b)(1)(B) provides:

. . . a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for postrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

28 U.S.C. § 636(b)(1)(B). Therefore, if Magistrate Judge Cooke's Order derived its authority from section 636(b)(1)(A), the district court may reconsider the Order if it is clearly erroneous or contrary to law. If Magistrate Judge Cooke's Order was issued pursuant to section 636(b)(1)(B), the district court's review is de novo.

In ruling on Montgomery's motion, Magistrate Judge Cooke labeled her decision as an "Order" indicating the decision was made pursuant to section 636(b)(1)(A). In addition, her Order cited to LR IB 3-1 and stated, "any party wishing to object to this order shall . . . file and serve specific written objection to the ruling together with points and authorities in support thereof." LR IB 3-1 is essentially a local rule setting forth a magistrate judge's authority under 28 U.S.C. § 636(b)(1)(A). Therefore, Magistrate Judge Cooke's Order was issued pursuant to 28 U.S.C. § 636(b)(1)(A).

The Government cites In the Matter of Application and Affidavit for a Search Warrant v. Hughes, 923 F.2d 324 (4th Cir. 1991) and United States v. Urlacher, 136 F.R.D. 550 (W.D. N.Y. 1991) for the proposition that Magistrate Judge Cooke exceeded her authority. In Hughes, a newspaper requested the federal court unseal a search warrant affidavit. 923 F.2d at 325. A magistrate judge held a hearing on the matter and denied the motion. Id. The parties appealed to the district court. Id. After hearing argument, the district judge ruled that the affidavit should be released in its entirety. Id. In reviewing the

1   prior proceedings, the Fourth Circuit determined that the district court's decision would be

2   reviewed for an abuse of discretion.  However, in a footnote, the court addressed the

3   dissent's assertions that the discretion of the magistrate judge and not the district judge, was

4   at issue in the case.  Id. at 325 n.2

5           In Hughes, the overriding concern about unsealing the affidavit was the prejudice

6   that might result to the criminal defendant in that case.  The Hughes court opined, "[t]he

7   dissent's assertion that a reviewing court must ignore the judgment of a district court and

8   defer to the opinion of a magistrate who has no experience with voir dire in felony cases

9   involving pretrial publicity cannot stand as a matter of logic or law."  Id.  However, the

10  Hughes court did note that "[w]here a magistrate holds hearings and issues complete

11  findings and the district court only summarily reviews the ruling . . . evaluation of the

12  magistrate's actions may be appropriate."  Id.  In Hughes, "the magistrate's order provided

13  a legally inadequate record and the district court properly reconsidered the issue by holding

14  hearings and making findings."  Id.  The Hughes court noted that "[a] magistrate's power to

15  seal or unseal a document derives from the district court's power to take such actions and

16  the dissent points to no statute or court rule empowering magistrates to making final rulings

17  in such cases."  Id.

18          In Urlacher, a magistrate judge ordered the unsealing of the motion papers and

19  the docket entries relating to a motion for a subpoena duces tecum.  However, in a footnote,

20  the magistrate  judge noted that the portion of the order directing unsealing was, in essence,

21  a report and recommendation for the reasons stated in Hughes.  136 F.R.D. at 559 n.5.  "A

22  stay thus ensures district court review before unsealing is accomplished.  Such review

23  would be meaningless if the unsealing recommended here was effected prior to the district

24  court review ensured here."  Id.

25          Although the cases cited by the Government arguably support the proposition that

26  Magistrate Judge Cooke's decision should be reviewed *de novo* as a report and

recommendation, the plain language of section 636 indicates otherwise. Section 636(b)(1)(A) initially permits a magistrate judge to "hear any pretrial matter pending before the court." Section 636(b)(1)(A) continues by not permitting a magistrate judge to decide the following motions: motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. 28 U.S.C. § 636(b)(1)(A). Applying the statutory cannon of construction *expressio unius est exclusio alterius* indicates that magistrate judges are permitted to decide any pretrial matter not included within the list above. Therefore, Magistrate Judge Cooke had the authority to issue her Order pursuant to 28 U.S.C. § 636(b)(1)(A) and this Court's review is limited to whether the Order is clearly erroneous or contrary to law.

Regardless, for the reasons set forth below, this Court would reach the same result under a *de novo* standard of review.

## III. THE GOVERNMENT'S SPECIFIC OBJECTIONS

The Government objects to several specific findings made by Magistrate Judge Cooke.

### A. Page Three

Page three of Magistrate Judge Cooke's Order states that in the affidavit of February 28, 2006, in support of the search warrants, Special Agent ("SA") Michael West relied on three categories of eTreppid documents: the Contribution Agreement, the amended and restated operating agreement of eTreppid, and ten patent assignments from Montgomery to eTreppid. The Government argues that a review of the affidavit demonstrates that a majority of the affidavit speaks to software development efforts on the part of all software developers at eTreppid.

Although the Government is correct that a small portion of the affidavit relates to the three documents discussed by Magistrate Judge Cooke, her finding is not clearly erroneous.

**B. Page Three, Line 10-13**

With respect to the Contribution Agreement, Magistrate Judge Cooke's Order states, "[t]he court drew the inference from this summary of the Contribution Agreement that Montgomery assigned *all* intellectual property and related property he owned to eTreppid because that is what the plain meaning of the excerpt of the Contribution Agreement states." The Government points to language in SA West's affidavit that ends with the following language: "relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology."

The paragraph of SA West's affidavit relating to the Contribution Agreement reads as follows:

> MONTGOMERY signed a Contribution Agreement, dated September 28, 1998, in which MONTGOMERY effectively assigned all rights to his "Contributed Assets" to eTreppid in exchange for a fifty percent (50%) interest Management Interest in eTreppid. The "Contributed Assets" means all of MONTGOMERY's know-how; trade secrets; patent rights, copyrights, trademarks, licenses and permits, registered or unregistered, pending or approved; software programs and all programming and Source Codes used in connection therewith or otherwise required to operate any component thereof; and all programming documentation, designs, materials and other information, all in whatever form and wherever located, relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology.

(Aff. of Michael A. West (#1) at 2.) It was not clearly erroneous for Magistrate Judge Cooke to infer that this Contribution Agreement assigned all intellectual property from Montgomery to eTreppid. There is no indication in the affidavit that Montgomery owned any additional intellectual property that was not part of the Contribution Agreement.

**C. Page Four, Lines 1-3**

The pertinent lines of Magistrate Judge Cooke's Order relevant to the

7

1   Government's objection are as follows: "The affidavit states that through these patent

2   assignments, Montgomery assigned full and exclusive use of the technologies described in

3   the patents to eTreppid. The next paragraph of the affidavit describes 'trade secrets,' which

4   [Magistrate Judge Cooke] inferred were the patented technologies Montgomery assigned to

5   eTreppid in 2000-2001: Software programs relating to data compression, pattern

6   recognition, and change and anomaly detection." The Government argues that SA West's

7   affidavit contains no indication that the trade secrets were covered by the ten patents

8   described in the preceding paragraph of the affidavit.

9            The relevant language in SA West's affidavit is as follows:

10               MONTGOMERY filed ten Patent Assignment applications with
      the United States Patent and Trademark Office during the period of
11    November 2000 to November 2001 for patents pertaining to various
      technologies developed by MONTGOMERY while an employee at
12    eTreppid and on each patent MONTGOMERY assigned full and
      exclusive rights, title, and interest of these technologies to eTreppid.
13
               Trepp considers eTreppid's trade secrets to be various software
14    programs relating to data compression, pattern recognition, change and
      anomaly detection, among other things, which derive independent
15    economic value, actual or potential, from not being generally known
      to, and not being readily ascertainable through proper means by the
16    public. eTreppid has earned in excess of ten million dollars in
      revenues since 1998 from various government and commercial
17    contracts. Trepp anticipates that eTreppid's development efforts will
      result in other multi-million dollar contracts.
18

19   (Aff. of Michael A. West (#1) at 3.) SA West's affidavit indicates that Montgomery

20   assigned patents relating to various technologies to eTreppid. In reviewing the affidavit,

21   Magistrate Judge Cooke was attempting to determine whether there was probable cause to

22   support the issuance of a search warrant. Specifically, the alleged criminal activity related

23   to the theft of trade secrets and unlawfully retaining national defense information. Because

24   the subject matter of the trade secrets was of primary importance to the affidavit, it was not

25   clearly erroneous for Magistrate Judge Cooke to infer that the trade secrets were related to

26   the assigned patents.

**D. Page Fourteen, Lines 15-18**

At page fourteen, lines fifteen through eighteen, Magistrate Judge Cooke's Order states, "[t]he Government has denied Montgomery is a target, and there has never been any indication that either Ms. Montgomery or the Montgomery Family Trust is a search warrant target. Nine months have passed since the Government executed the search warrants, and it appears there are no current plans to prosecute any of the movants." The Government objects to this portion of the Order stating that no evidence has been presented that would indicate whether law enforcement has terminated their investigation of Mr. Montgomery. The Government further asserts that the investigation is ongoing. According to the Government, "While the sworn statements/declarations of eTreppid employees provide evidence of criminal conduct on the part of Mr. Montgomery, it is apparent that the results of a forensic examination of the seized computer storage media would provide strong corroboration of their statements."

Magistrate Judge Cooke, in the relevant section of her Order, was discussing the issue of whether there was an adequate remedy at law. This is one factor to be considered before the Court can reach the merits on a pre-indictment motion pursuant to Rule 41(g). See United States v. Kama, 394 F.3d 1236, 1238 (9th Cir. 2005). In light of the fact that almost one year had passed since the Government executed the search warrants, this Court does not find clearly erroneous the statement by Magistrate Judge Cooke that "it appears there are no current plans to prosecute any of the movants."

**E. Page Sixteen, Lines 20-24**

The relevant language to this objection is as follows:

[t]urning to the evidence in the proceeding, the redactions involve
direct and recent contacts Montgomery had with other individuals, and
it is difficult to imagine that the Government is concerned about
revealing identities of witnesses or protecting an ongoing investigation.
In fact, Montgomery has already surmised that part of the redaction
relates to seeking investors for the source code. Moreover, at the June
29, 2006, evidentiary hearings, SA West revealed the identity and

1    involvement of SA Haraldsen during his testimony.

2    The Government argues that Montgomery's suppositions about investigative techniques

3    should not result in an order directing the Government to disclose information to support his

4    beliefs. The Government further asserts that, with the exception of Magistrate Judge

5    Cooke's Order, there was no disclosure of investigative techniques used by SA Haraldsen.

6    In the relevant section of the Order, Magistrate Judge Cooke was addressing the

7    issue of whether the Government had demonstrated a compelling government interest in

8    keeping the affidavit under seal. Upon addressing this issue and the relevant language

9    above, Magistrate Judge Cooke found that the Government has not met its burden to

10   establish a compelling government interest. Here, the Government has failed to show clear

11   error in Magistrate Judge Cooke's reasoning. Even if new information would be revealed,

12   the Government has not made any showing to this Court that would establish a compelling

13   government interest.

14   **F. Page Nineteen, Lines 22-26**

15   The Order reads:

16   [h]ad this court been provided the entire contribution
     agreement, it would have concluded that whatever is on
17   CD No. 1 - nothing more and nothing less - belonged to
     eTreppid. The court would have expected the
18   Government to demonstrate there was probable cause to
     believe that CD No. 1 contained the disputed trade
19   secrets. However, SA West testified that he does not
     know what CD 1 contains, and he never inquired as to
20   how long Montgomery has been creating software
     technology.

21   The Government argues that this finding ignores the majority of the search warrant

22   affidavit, which describes the efforts of eTreppid software developers. According to the

23   Government, the affidavit clearly established that the search warrant was for evidence of

24   source code that both Montgomery and other software developers worked on while at the

25   eTreppid facility, and not certain technology contained on CD No. 1.

26

                                        10

1    In discussing the business relationship between Montgomery and eTreppid,

2 Magistrate Judge Cooke stated that SA West had a "fundamental misunderstanding of the

3 operating agreement and the business relationship between Montgomery and eTreppid."

4 This statement was based on SA West's testimony that he believed that eTreppid owned

5 more than what was on CD No 1. because Montgomery had worked at eTreppid for eight

6 years.  Based on the record before the Court and the affidavit in support of the search

7 warrant at issue, it is unclear exactly when the source code was developed, who developed

8 it and who owns it.  However, the affidavit in support of the search warrant does not

9 "clearly establish" that the search was for a source code developed while Montgomery was

10 employed at eTreppid.  Magistrate Judge Cooke's findings in this regard are not clearly

11 erroneous.

12         **G.  Page twenty-two through twenty-three, Lines 11-8**

13    In her Order, Magistrate Judge Cooke wrote, "[a]lthough SA West referred to the

14 patent assignments to illustrate Montgomery's employment relationship with eTreppid, this

15 is what the reference conveyed to this court:  that since Montgomery had conveyed all of his

16 technological know-how to eTreppid, the ten patents bore an integral relationship to the

17 trade secrets that Montgomery allegedly stole."  The Order continues, "[i]t is now evident

18 that these patents had nothing to do with the trade secrets alleged to have been stolen."

19 The Government argues that Magistrate Judge Cooke focused on "software technology

20 contained on a certain CD that was not identified or referenced in the initial affidavit to the

21 exclusion of the allegedly stolen eTreppid software that was explicitly identified in the

22 search."

23    The affidavit does discuss the Contribution Agreement that began the business

24 relationship between eTreppid and Montgomery.  As a result, it was not clearly erroneous

25 for Magistrate Judge Cooke to conclude that the software on CD No. 1 was at issue and that

26 the patents bore a relationship to the trade secrets that Montgomery allegedly stole.

**H.  Pages twenty-three through twenty-five**

Pages twenty-three through twenty-five of Magistrate Judge Cooke's Order discuss the security clearance of Montgomery and eTreppid.  Magistrate Judge Cooke concluded that "although SA Haraldsen and Venables represented to SA West that eTreppid possessed a facility clearance to store secret material, eTreppid did not have one."  With respect to Montgomery, Magistrate Judge Cooke stated, "Although SA West's affidavit never specifically stated the level of Montgomery's security clearance, the inference was that it was tied to his work at eTreppid and that he lost it.  However, SA West's testimony conflicts as to whether he knew what, if any, security clearance Montgomery possessed at the time of the search."  According to the Government, "the affidavit established that SA West ascertained that eTreppid did have a facility clearance and that Montgomery no longer had a special access program, top secret clearance based on his interview with Special Agent Paul Haraldsen, Air Force Office of Special Investigations and Director of Policy for Special Access Programs, United States Air Force."  Therefore, the Government disputes Magistrate Judge Cooke's finding that SA West displayed callous disregard for the constitutional rights of Montgomery because he did not obtain additional information.  The Government asserts that Magistrate Judge Cooke's finding "begs the question of what additional investigation, beyond consulting with an AFOSI Special Agent and the USAF Director of Policy for Special Access Programs and obtaining DoD documents indicating that Montgomery's clearance has been suspended."

Magistrate Judge Cooke's Order states, "[a]fter examination of his affidavit, his testimony concerning his investigation, and the protocols the Department of Justice has implemented for these crimes, this Court can only conclude that SA West acted with callous disregard of Montgomery's fundamental Fourth Amendment rights."  Therefore, it is clear that Magistrate Judge Cooke based her ruling on the totality of the circumstances surrounding the issuance of the search warrant.  With respect to the security clearance

issues, the Government does not dispute Magistrate Judge Cooke's conclusions concerning

whether or not Montgomery and eTreppid had security clearances.  Even if this Court were

to accept the Government's argument that SA West adequately investigated this portion of

the case, Magistrate Judge Cooke's ultimate conclusion is not clearly erroneous in light of

the other findings made in the Order.

**I.  Page twenty-seven, lines 13-18**

A portion of Magistrate Judge Cooke's Order reads, "[a]s a preliminary

observation, the court notes that SA West never disclosed in his affidavit that Trepp and

Montgomery were engaged in civil litigation concerning ownership of the trade secrets,

which are intertwined with the allegation in the affidavit that Montgomery engaged in the

criminal theft of trade secrets."  The Government disputes this statement and points out that

the affidavit references a TRO filed against Montgomery by eTreppid.  The reference in the

affidavit referred to by the Government states as follows:

> On or about February 26, 2006, at approximately 8:00 p.m. (Eastern
> Standard Time) SA Haraldsen, received an unsolicited call from
> MONTGOMERY in which MONTGOMERY expressed concerns
> about providing SA Haraldsen with information concerning anomoly
> detection and pattern recognition technical capabilities as doing so
> would violate the Temporary Restraining Order filed against him by
> eTreppid.  MONTGOMERY suggested that the U.S. Government
> remove the Temporary Restraining Order if they were truly interested
> in these capabilities.

(Aff. of Michael A. West (#1) at 12.)

The fact that the affidavit makes reference to a temporary restraining order does

not render Magistrate Judge Cooke's statement clearly erroneous.  There is no explicit

reference to the two related civil cases or the fact that the parties are disputing the

ownership of the software code at issue.  From the portion of the affidavit stated above, the

exact nature of the dispute between Montgomery and eTreppid is unclear.

**J.  Pages twenty-nine through thirty**

The Government's final objection to the Order challenges Magistrate Judge

1    Cooke's findings concerning callous disregard of Montgomery's constitutional rights.  First,

2    the Government disputes Magistrate Judge Cooke's reliance on a Department of Justice

3    manual that suggests disputes between two potential owners are better left to a civil forum.

4    According to the Government, the Order ignores the evidence establishing that the software

5    purportedly stolen from eTreppid premises was not subject to a legitimate ownership

6    dispute.  In addition, the Government asserts that "SA West personally interviewed SA Paul

7    Haraldsen, Warren Trepp, Sloan Venables, and Patty Gray, along with obtaining sworn

8    declarations of Venkata Kalluri and Barjinder Bal."  The Government concludes, "In doing

9    so, he focused on individuals knowledgeable regarding allegations of trade secrets, i.e.,

10   employees of the victim company, and corroborated this information by obtaining DoD

11   documents and interviewing an AFOSI Special Agent and USAF Director of Policy for

12   Special Access Programs."

13           The Court finds untenable the Government's argument that the software at issue

14   is not subject to a legitimate ownership dispute which has manifested itself in related

15   federal civil actions filed by both Montgomery and eTreppid currently pending before this

16   Court.  See Dennis Montgomery, et al. v. eTreppid Technologies, Inc., et al., 3:06-CV-

17   0056-PMP (VPC) and eTreppid Technologies, Inc., et al., v. Dennis Montgomery, et al.,

18   3:06-CV-0145-PMP (VPC).  Magistrate Judge Cooke's reference to the Department of

19   Justice manual in support of her finding that the ownership of material seized pursuant to

20   search warrants is better left to the pending civil litigation cannot be characterized as clearly

21   erroneous.  This is particularly so in light of the numerous examples cited by Magistrate

22   Judge Cooke wherein she was misled by unchallenged factual representations which upon

23   closer examination were reveled to be inaccurate.

24   / / /

25   / / /

26   / / /

14

**IV. THE RELATED CIVIL ACTIONS  3:06-CV-0056-PMP-(VPC) and
3:06-CV-0145-PMP-(VPC)**

In resolving the Governments objections to Magistrate Judge Cooke's Order for the return of seized property, this Court is mindful that the ownership of some of the items seized pursuant to the search warrants is heavily contested by Montgomery and eTreppid in two civil lawsuits currently pending before this Court.  See Dennis Montgomery, et al. v. eTreppid Technologies, Inc., et al., 3:06-CV-0056-PMP (VPC) and eTreppid Technologies, Inc., et al., v. Dennis Montgomery, et al., 3:06-CV-0145-PMP (VPC).  As a result, both in this case and the related civil cases eTreppid has expressed its objection to the return of any property to Montgomery as which to eTreppid claims an ownership interest.  Indeed, eTreppid unsuccessfully attempted to intervene in this action by way of a motion for return of seized property (#88).

However, property which is the subject of the ownership dispute between Montgomery and eTreppid in the two related civil actions is the subject of a Preliminary Injunction entered February 8, 2006, by the Honorable Robert Perry, District Judge of the Second Judicial District Court, State of Nevada.  As a result, any items currently in the Government's possession which the Court's orders returned to Montgomery in this case, and which also are subject to the ownership dispute in the related civil cases, remain subject to the Preliminary Injunction, unless and until that Preliminary Injunction is modified by order of this Court.

Nevertheless, there is one additional issue which must be confronted by this Court before it enters an order unsealing the volumes of materials filed in this case over the past year.  On March 15, 2007, the Court conducted a status conference hearing in the related civil cases.  Those proceedings involve assertions of state secrets privileges on behalf of the United States and trade secrets on behalf of eTreppid.  It is unclear whether any of the filings made in this case concerning the return of seized property under Rule 41

15

(g), contain material which maybe subject to a valid claim of privilege by the parties in the related civil cases.  This rather anomalous circumstance stems from the fact that all of the filings in this case have to date been filed under seal and thus were not in every instance available for review by each of the parties to the two related civil cases.  As a result, as the Court advised the parties at the status conference conducted March 15, 2006, in the related civil cases, it is appropriate to permit counsel for the parties to the two related civil cases to review the sealed filings made in this case prior to giving effect to the order unsealing these proceedings.

It should be understood by the parties to the related civil actions that the permission granted by this Court to review the filings in this case prior to unsealing does not extend to an examination of the items of property seized pursuant to the search warrants at issue.  Those items of property were in the possession of Montgomery prior to execution of the warrants and shall be returned to him.  To the extent those items of property are otherwise implicated in the two related civil actions, they remain subject to the Preliminary Injunction entered in the related civil actions.

**V.  CONCLUSION**

IT IS THEREFORE ORDERED that the Objections filed on December 12, 2006, by Respondent United States of America (#99), to Magistrate Judge Cooke's Order (#86), are overruled and  Magistrate Judge Cooke's Order is affirmed.

IT IS FURTHER ORDERED that within ten days of the date of this order, Respondent United States shall return to Dennis Montgomery all materials seized pursuant to the search warrants at issue in the case which were executed on March 1, 2006  and March 3, 2006.  To the extent any of the property returned to Montgomery is the subject of dispute in the related civil cases,  Dennis Montgomery, et al. v. eTreppid Technologies, Inc., et al., 3:06-CV-0056-PMP (VPC) and eTreppid Technologies, Inc., et al., v. Dennis Montgomery, et al., 3:06-CV-0145-PMP (VPC), said property remains subject to the

1    Preliminary Injunction issued in those related cases.

2         IT IS FURTHER ORDERED that all filings made in this action with the

3    exception of the declaration of Dennis Montgomery (#115) filed on February 28, 2007,

4    shall be unsealed unless for good cause shown the Court determines that assertion of state

5    secrets, trade secrets, or other privilege is found to be meritorious and requires the

6    continued sealing of a particular filing, declaration or exhibit in this case.  In this regard,

7    counsel for the parties in the related civil actions shall have twenty-one days from the date

8    of this order within which to review the sealed case file in this case **and** to file with the

9    Court any objection to the unsealing of any portion thereof.  To assist in the review of the

10   sealed search warrant case file, counsel for Montgomery, eTreppid, and the United States

11   shall immediately contact Chief Deputy Clerk of Court, Cynthia Jensen, at (702) 464-5477,

12   who will provide limited access to the sealed case file through the Court's electronic case

13   filing system.

14        IT IS FURTHER ORDERED that the Government's Motion to Strike Pleadings

15   filed by Michael James Flynn and preclude Pro Hac Vice of Michael James Flynn (#110),

16   filed February 13, 2006, is DENIED as moot.

17        IT IS FURTHER ORDERED that eTreppid Technologies Motion for

18   Reconsideration (#98), filed December 12, 2006 is DENIED.

19        IT IS FURTHER ORDERED that the Motion to Intervene ( #120), March 13,

20   2006, by proposed intervener Reno Newspapers Inc., is DENIED as moot.

21   DATED:  March 19, 2007.

22

23   _____

24   PHILIP M. PRO
     United States District Judge

25

26

Exhibit B



# **United States District Court**

**District of Nevada**

Bruce R. Thompson U.S. Courthouse and Federal Building
400 South Virginia Street, Room 404
Reno, Nevada 89501

Chambers of Valerie P. Cooke                                                 Telephone: (775) 686-5855
United States Magistrate Judge                                               Facsimile:  (775) 686-5864

## **FAX TRANSMITTAL**

DATE:          November 28, 2006

THE FOLLOWING PAGES ARE BEING FAXED TO:

NAME:          Michael J. Flynn, Esq.  (#1-888-235-4279)
               Phillip Stillman, Esq. (#1-888-235-4279)
               Ronald Logar, Esq.  (#786-7544)
               Eric A. Pulver, Esq. (#786-7544)
               Paul Pugliese, Esq. (#784-5181)

RE:            In the Matter of the search of 12720 Buckthorn Lane

NUMBER OF PAGES INCLUDING COVER SHEET:   34

FROM:          The Honorable Valerie P. Cooke
               United States Magistrate Judge

PHONE:         (775) 686-5855

FAX NO.:       (775) 686-5864

If you do not receive all the pages indicated above or the message is poorly received, please
contact our office as soon as possible at the phone number above. If the reader of this message
is not the intended recipient, please contact our office as soon as possible at the phone number
listed above.

ADDITIONAL COMMENTS:

1

2

3

4

5                              **UNITED STATES DISTRICT COURT**

6                                  **DISTRICT OF NEVADA**

7
        In the matter of the search of:          )       3:06-CV-0263-LRH (VPC)
8       12720 BUCKTHORN LANE,                     )       3:06-MJ-0023-VPC
        RENO, NEVADA,                             )
9       and                                       )
        888 MAESTRO DRIVE, RENO,                  )       **ORDER**
10      NEVADA, STORAGE UNITS                     )
        136, 140, 141, 142, and 143,             )
11 _____)

12          Before the court is a motion by Dennis Montgomery, Brenda Montgomery and the Montgomery

13   Family Trust ("Montgomery") (1) to unseal search warrant affidavits; (2) for the return of property

14   pursuant to Fed. R. Crim. P. 41(g); and (3) for the segregation and sealing of all attorney client and trade

15   secret material seized (#21, 50). The Government opposed (#s 23, 24, & 25) and Montgomery replied

16   (#26). The parties engaged in additional briefing (#s 45, 46, 47, 48, 49, 50, & 51), and the court held

17   an evidentiary hearing on June 29, July 31, and August 17, 2006. Thereafter, the parties submitted post-

18   hearing briefs (#s 74, 76, & 77).

19          The court has thoroughly reviewed the record and the papers submitted herein, and

20   Montgomery's motion is granted as follows: 1) the search warrant affidavits shall be unsealed, and 2)

21   Montgomery's property shall be returned.[1]

22                          **I. HISTORY & PROCEDURAL BACKGROUND**

23          **A. Basis for Probable Cause for Search Warrant Applications and Affidavits**

24          Dennis and Brenda Montgomery ("Montgomery") own a home located at 12720 Buckthorne

25   Lane, Reno, Nevada and lease storage space located at 888 Maestro Drive, Reno, Nevada, storage unit

26   numbers 136, 140, 141, 142, and 143 (#21). The Federal Bureau of Investigation ("FBI") searched both

27   _____

28      [1]Since the court is ordering the return of Montgomery's property, the request to segregate and
        seal all attorney-client and trade secret material is denied as moot.

1   the residence and storage units pursuant to search warrants executed on March 1 and March 3, 2006.

2   *Id.* This court granted the Government's motions to seal the affidavits in support of the warrants (#3,

3   14). A copy of the warrant and receipt for items seized was left with counsel for Montgomery (#15).

4   On March 8, 2006, returns on the search warrants were executed, and the requisite inventories of items

5   seized were provided to this court. (#15-20).

6       The Government set forth the original basis for probable cause in the affidavits accompanying

7   the applications for the search warrants (#s 1, 4, 6, 8, 10, & 12).[2] With respect to the search of the

8   Montgomery residence at 12720 Buckthorne Lane, Reno, Nevada, Michael West, Special Agent, Federal

9   Bureau of Investigation ("SA West"), states that he first became involved in the investigation of Dennis

10  Montgomery based on a complaint made by Warren Trepp ("Trepp"), management committee chair of

11  eTreppid Technologies, LLC, of Reno, Nevada (#1). Trepp alleged that Dennis Montgomery, eTreppid's

12  chief technical officer, removed eTreppid computer equipment and storage media containing "source

13  code" files derived from eTreppid's development of certain data compression and pattern recognition

14  software, removed hard disk drives containing "Secret" information provided to the Department of

15  Defense ("DOD"), and systematically deleted source code files from the remaining eTreppid data

16  servers, all in violation of 18 U.S.C. § 1832, Theft of Trade Secrets, and 18 U.S.C. § 793(e), Unlawful

17  Retention of National Defense Information. *Id.*

18      The basis for probable cause is described in detail below; in sum, the majority of information was

19  provided by Trepp or eTreppid employees. The only other information appears to have come from Neil

20  Azzinaro, a businessperson with whom Montgomery allegedly had a conversation about seeking

21  investors for the source code and/or a new business venture of Montgomery's, and Air Force Special

22  Agent Haraldsen ("SA Haraldsen") with whom Montgomery had conversations about continuing to

23  perform work for the government, independent of eTreppid. To better understand the chronology of

24  events and the complex factual issues giving rise to these searches, the court has divided its discussion

25  of the affidavit into six segments.

26

27      [2]For the ease of reference, this order will refer to docket #1 as the search warrant affidavit.

28                                              2

1          **1.    The Documents Offered in Support of the Affidavit**

2          To establish probable cause for the search warrant SA West relied on three categories of

3   eTreppid documents: 1) a contribution agreement between Montgomery and eTreppid ("contribution

4   agreement"); 2) the eTreppid amended and restated operating agreement ("operating agreement"); and

5   3) ten patent assignments from Montgomery to eTreppid.

6          **a.    The Contribution Agreement - page 2, lines 3-12[3]**

7          SA West attested that Montgomery signed a contribution agreement in which he assigned his

8   rights to "contributed assets" to eTreppid in exchange for fifty percent management interest in eTreppid.

9   According to the affidavit, "contributed assets" included trade secrets, patent rights, copyrights, licenses

10  and permits, software programs and source codes, etc. (#1, 2:3-12). The court drew the inference from

11  this summary of the contribution agreement that Montgomery assigned *all* intellectual property and

12  related property he owned to eTreppid because that is what the plain meaning of the excerpt of the

13  contribution agreement states.

14         **b.    The eTreppid Amended and Restated Operating Agreement -**
                   **2:13-25; 3:1-4**

15
           Montgomery also signed an amended and restated operating agreement of eTreppid
16
    Technologies, and SA West quoted a provision of that agreement which states that Montgomery agreed
17
    to devote substantially all of his time and efforts to the business and affairs of eTreppid and also
18
    restricted Montgomery's independent activities; in other words, it is a non-compete agreement.
19
    According to the affidavit, Trepp considered eTreppid's trade secrets to be various software programs
20
    relating to data compression pattern recognition, change and anomaly detection, among other things.
21
    *Id.* at 3:10-13.
22
           **c.    Ten Patent Assignments from Montgomery to eTreppid - 3:5-16**
23
           Finally, SA West identified ten patents that Montgomery, as an eTreppid employee, assigned to
24
    eTreppid in 2000-2001. *Id.* at 3:5-9. The affidavit states that through these patent assignments,
25

26         [3]The references that follow are to the page and line numbers in SA West's affidavit in support
    of the search warrant (#1).
27

28                                                      3

1  Montgomery assigned full and exclusive use of the technologies described in the patents to eTreppid.
2  The next paragraph of the affidavit describes "trade secrets," which the court inferred were the patented
3  technologies Montgomery assigned to eTreppid in 2000-2001: software programs relating to data
4  compression, pattern recognition, and change and anomaly detection. *Id.* at 10-16.

5              **2.      The Source Code and eTreppid Security - 3:17-26; 4:1-12**

6            The next section of the affidavit is devoted to a description of the protocols eTreppid established
7  to insure the security for the source code files, which contained data compression and pattern recognition
8  software. *Id.* at 3:17-26. The affidavit states that only two eTreppid employees, Montgomery and Sloan
9  Venables ("Venables"), had access rights to duplicate, modify or delete source code. The affidavit
10  describes Montgomery's responsibility to maintain a back-up copy of the source code server data on
11  specifically described hardware units, and that Trepp required Montogomery to provide him with current
12  source code files, which Trepp stored at a secure off-site location. *Id.* at 4:7-9. The affidavit then
13  summarizes eTreppid's locks, alarm system and video surveillance system. *Id.* at 4:10-12.

14           **3.      The SOCOM Contract and Montgomery's Security Clearance -
                        4:13-26; 5:1-4**

15           Having established ownership of the technology in eTreppid, Montgomery's role in the work of
16  eTreppid, and the sophisticated security system in place at eTreppid, the affidavit turns to a March 2003
17  agreement between eTreppid and U.S. Special Operations Command ("SOCOM"), which required
18  eTreppid to have access to secret material. *Id.* at 4:13-18. The affidavit states that eTreppid was
19  permitted to store secret material onsite pursuant to DD Form 254. *Id.* at 4:16-18.

20           The affidavit then states that Montgomery received and signed two security briefings in August
21  and September of 2003, which outlined his obligation to protect classified material of concern to the
22  United States, to protect unauthorized disclosures, and to prevent negligent handling of marked or
23  unmarked classified information, which could irreparably damage the United States and be used to
24  advantage by a foreign nation. *Id.* at 4:19-26; 5:1-4.
25
26
27
28                                                        4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

       **4.      November 2005 Visit to Nellis Air Force Base and the Nine Secret Hard Drives - 5:5-13**

In the next section of the affidavit, SA West develops the chronology of events concerning the "nine eTreppid hard drives," which are then characterized as the "nine Secret hard drives," and ultimately transformed into "classified material." In November 2005, Patty Gray ("Gray") of eTreppid visited the Predator Drone Operations Center at Nellis Air Force Base where she recorded "Secret Predator Drone video images" onto nine eTreppid hard drives for use in developing "Automatic Target Recognition" software. *Id.* at 5:5-8. The affidavit states that pursuant to instructions from "contractor personnel at Nellis AFB," Gray marked these nine hard drives with "red standard U.S. Government Secret labels" and mailed them to eTreppid's facility in Reno. *Id.* at 5:8-11. The nine secret hard drives were stored in a GSA-approved safe as required by the DOD. Gray, Trepp and Montgomery were the only persons with access to the safe. *Id.* at 5:11-13.

       **5.      December 2005: Montgomery's Breaches of Protocol, Deletion of Classified Material and Trade Secrets, and Removal of Classified Material and Trade Secrets from eTreppid - 5:14-26; pages 6, 7, 8, 9, and 10**

15 This portion of the affidavit recounts the events which led to the allegations of theft of trade

16 secrets and unlawful retention of national defense information. According to SA West's affidavit,

17 during December 2005, Gray and other eTreppid employees noticed that Montgomery was not following

18 the standard protocols for use and storage of the nine secret hard drives. Gray discovered on two

19 occasions that Montgomery was not properly securing them in the safe, and they were returned after

20 Montgomery was questioned. *Id.* at 5:14-26;6:1-7. Despite these incidents, Gray continued to find the

21 nine secret hard drives missing from the safe, and Trepp intervened to insure that all "classified material"

22 be kept in the top drawer of the safe. *Id.* at 6:13-17. Gray changed the combination to the top drawer

23 of the safe, and she was the only eTreppid employee who had it. *Id.* at 6:15-17.

24 Montgomery requested access to the classified material, and Trepp not only gave Montgomery

25 authorization; he also instructed Gray to give Montgomery the combination to the top drawer of the safe,

26 which she did. *Id.* at 6:18-22. From December 18th until December 21st, other eTreppid employees

27 reported that Montgomery was deleting eTreppid source code files and that certain computer hardware

28

                                              5

1 was missing. *Id.* at 6:23-26;7:1-6. When asked about the missing equipment, Montgomery responded
2 that he had taken the equipment home, although the eTreppid employee who reported the missing
3 equipment had never known Montgomery to take this equipment home. *Id.* at 7:6-12.

4        Prior to leaving for the holidays, Venables installed software to back up all of eTreppid's server
5 data, including the source code server, and he verified that it was operating properly before his departure.
6 *Id.* at 7:13-17. Two key eTreppid employees, Gray and Venables, departed for the holidays on
7 December 22, 2005, and did not return until January 3, 2006. *Id.* at 7:18-19. During their absence, one
8 eTreppid employee discovered portions of the eTreppid source code he was working on had been
9 deleted, and when he asked Montgomery about this, Montgomery advised he would provide the
10 employee with the source code he needed to do his work. *Id.* at 7:20-26;8:1-3. Montgomery also asked
11 another eTreppid employee to load some boxes into Montgomery's truck, which had never happened
12 before. *Id.* at 8:4-8.       After Venables returned from the holidays in January, he noticed that the source
13 code server cabinet and keyboard were in disarray and the screen was active. *Id.* at 8:9-10. When he
14 asked Montgomery about this, Montgomery responded that he was "cleaning up stuff," but when
15 Venables went into the warehouse, he also noticed that the units Montgomery used to back up the source
16 code server were still missing. *Id.* at 8:13-17. Montgomery told Venables he would bring back the
17 equipment, as he no longer needed it. *Id.* at 8:17-19. When he looked at the source code server,
18 Venables discovered that most of the folders used by the eTreppid software developers had been deleted,
19 and he could not access the ISA server either. *Id.* at 8:20-23.

20        Shortly thereafter, Trepp became aware source code was missing when employees complained
21 that they could not operate their computer systems, and Venables reported that all source code had been
22 deleted from the source code server, the ISA server, and all of the software developers' work stations.
23 *Id.* at 8:24-26;9:1-2. Although Montgomery then told Trepp that the source code could be located on
24 removable hard drives, a two-day analysis failed to locate the source code. *Id.* at 9:3-5. It was also at
25 this time that Gray found seven hard drives containing copies of the nine original secret hard drives from
26 Nellis AFB in Montgomery's file cabinet, and she found seven additional hard drives also containing
27 copies of the nine original hard drives in the safe. *Id.* at 9:6-10. A search of the eTreppid facility failed

28                                                          6

1 to locate the nine original secret hard drives, and Gray and Montgomery were the only employees with
2 access to the top drawer of the safe. *Id.* at 9:10-14. At Trepp's request, Venables reviewed all of the
3 video surveillance cameras and found that none was recording video, and he also discovered that all
4 stored video had been deleted. *Id.* at 9:15-18.

5     Despite Montgomery's assurances that the source code was stored on hard drives in the building,
6 the hard drives were never located, and on his last day at eTreppid, Montgomery was reported to have
7 said that if Trepp wanted the source code, "he [Trepp] needs to give me big money if he wants it." *Id.*
8 at 9:19-24. Montgomery never returned to eTreppid and he was terminated on January 18, 2006. *Id.*
9 at 10:14-16. Warren Trepp told SA West that Montgomery had devoted eight years of his life to
10 developing software products at eTreppid, that Montgomery worked on these products every day and
11 on weekends, that Montgomery would never delegate these projects to anyone else, and that in order to
12 continue this work, Montgomery would require substantial computing power, similar to the workstation
13 and RAID unit removed from the warehouse, and have access to the nine secret hard drive video images.
14 *Id.* at 10:4-13.

15          **6.    Montgomery's Conversations with Neil Azzinaro and Special Agent
               Paul Haraldsen ("SA Haraldsen") – p. 10:17-24; 11:1-26; 12:1-7**

16     Apart from the information provided SA West from Trepp and eTreppid employees, SA West
17 also relied on two other individuals who had conversations with Montgomery during this same time
18 period. The first is Neil Azzinaro, a casino host and Montgomery's friend. In a January 2006
19 conversation, Montgomery recounted the business dealings of Trepp, Montgomery's unhappiness that
20 he had not received a raise, and Montgomery's interest in looking for individuals who would invest
21 several million dollars. *Id.* at 10:17-23. Montgomery specified the investor would have to be an
22 individual with United States citizenship. *Id.* at 10:23-24. SA West stated that based on this
23 conversation with Azzinaro, and possibly others, it appeared that Montgomery may have provided source
24 code to others and was looking for investors for the source code. *Id.* at 11:1-3.
25     In mid-February 2006, SA West was contacted by SA Haraldsen, Air Force Office of Special
26 Investigations, Pentagon. During this period SA Haraldsen placed consensual, recorded telephone calls
27
28                                          7

1   with Montgomery. During these calls, Montgomery made several representations to SA Haraldsen: 1)
2   that Trepp did not have the capability to continue the work; 2) that Montgomery had made certain that
3   the assets of the U.S. Government were protected; 3) that if the work is to continue, it must be through
4   Montgomery; and, 4) that the capability to do the work continued to exist. *Id.* at 11:4-10. SA Haraldsen
5   and Montgomery had two additional telephone calls on February 24, 2006, during which Montgomery
6   indicated he might just give the technology to the government, and when SA Haraldsen asked for proof
7   that the technology still exists, Montgomery became agitated. *Id.* at 11:11-17. Later that same day,
8   Montgomery purchased computer disks, and business card stock. *Id.* at 11:18-21.

9        Finally, on February 26, 2006, Montgomery telephoned SA Haraldsen again and expressed
10  concerns about supplying SA Haraldsen with information about anomaly detection and pattern
11  recognition technical capabilities, as to do so might violate a temporary restraining order filed against
12  him by eTreppid. *Id.* at 12:1-7.

13       Based upon SA West's affidavit, the court found probable cause existed that Montogmery may
14  have unlawfully retained classified material and stolen trade secrets, and it issued the search warrant.
15  The court also granted the Government's motion to seal the affidavit (#3).

16  **B.     The Search Warrants for the Storage Units**

17       With respect to the search of the storage units, SA West's affidavit sets forth the following basis
18  for probable cause: the CPU and RAID storage unit used by Montgomery and the nine original secret
19  hard drives were not located during the search of the residence of Buckthorne Lane (#4, 6, 8, 10, 12).
20  Montgomery rented five storage units at Double R Storage in Reno, Nevada. *Id.* The storage units were
21  accessed a total of ninety-two times between November 1, 2005 and March 3, 2006. *Id.* Double R
22  Storage's video surveillance showed that a truck registered to Brenda Montgomery entered the facility
23  on March 3, 2006, an individual walked between the storage unit and the truck, but no observable items
24  were taken from or transported to the truck. *Id.* SA West stated that this constituted probable cause to
25  believe that the storage units contained the evidence of theft of trade secrets and unlawful retention of
26  national defense information. *Id.* Based upon SA West's affidavit, the court found probable cause
27
28                                                    8

1   existed for issuance of these search warrants, and the court also ordered these search warrant affidavits

2   sealed (#14).

3          The court granted the Government's motion to seal the search warrants and affidavits because

4   the Government argued that the information contained therein related to proprietary intellectual property

5   and national security classified materials (#3, 14).

6          **C. Search Warrant Returns**

7          The following items were seized from the Montgomery residence:

8       HP Pavilion laptop
        6 SanDisk compact flash cards
9       letter on white paper and yellow pages of ripped up paper
        rolodex
10      15 computer CDs
        white shredded paper
11      miscellaneous post-it notes
        Network Solutions account paperwork 4 pages
12      check stubs – Montgomery Family Trust
        Western Digital hard drive serial number WEAL 71844911
13      Grante digital devserver labled 12/17/2005 serial number F05090650042-A
        silver CPV (tower) labeled ATI 3
14      16 computer CDs
        3 pieces of paper containing phone numbers
15      Grante digital server labeled DEO 1/2/06 PROG
        8 containers of medicine, each with 40-168 tablets
16  (#15).

17         The following items were seized from storage unit 140:

18         1 yellow/gray case containing eTreppid disks
        7 compact disks
19      9 mini DV cassettes
        1 Sony Hi8 video cassette
20      1 USB (black 2.0 flashback)
        1 256MB SanDisk compact flash card
21      1 IBM travel star hard drive serial number V29CH7080N5
        11 sealed Western Digital hard drives
22      1 TDK mini DV video cassette
        10 various manufacturer hard drives
23      1 box containing 78 compact disks
        bank statements 12/2005 through 1/2006
24      financial documents and phone bills
        1 removable hard drive labeled "Dennis Eyes Only" and 1 compact disk labeled
25      eTreppid
    (#17).
26
           No items were seized from the other four storage units searched (#16, 18, 19, 20).
27

28                                           9

1          **D. Chronology of Motions**

2          On March 10, 2006, Montgomery filed a motion to unseal the search warrants and affidavits and
3     for the return of property pursuant to Fed. R. Crim. P. 41(g) and for the segregation and sealing of all
4     attorney-client privileged materials seized (#21). Montgomery argued that he has a Fourth Amendment
5     right to view the search warrant affidavits and that the Government cannot show a compelling
6     governmental interest that cannot be served by a less restrictive means than withholding the entire
7     affidavits. *Id.* Next, he contended that the warrants are facially invalid because they lack specificity and
8     are overbroad. *Id.* Therefore, Montgomery asserted that he is entitled to the return of his property. *Id.*
9     Finally, Montgomery also sought to have attorney-client privileged information segregated prior to any
10    inspection by the Government. *Id.* Montgomery's overarching argument is that the entire investigation
11    stems from Trepp having convinced the United States Attorney to use the power of the federal
12    government to achieve what Trepp could not accomplish through a civil action – a search of
13    Montgomery's property in an effort to obtain certain technology. *Id.*

14         The Government filed three separate responses (#23, 24, 25). In its response to the Rule 41(g)
15    motion, the Government first argued that because the balance of the equities favored the Government,
16    the court should decline to consider the merits of this pre-indictment Rule 41(g) motion (#23). The
17    Government further asserted that it would produce evidence at an evidentiary hearing to demonstrate
18    that probable cause for the searches existed, that the warrants were valid, and to refute Montgomery's
19    assertions regarding how the searches were executed. *Id.* In its response to the motion to unseal the
20    search warrant affidavits, the Government contended that Montgomery failed to support his position that
21    he has a constitutional right for pre-indictment review of the affidavits (#24). The Government also
22    asserted that its interests in maintaining the secrecy of the information in the affidavits including: (1)
23    the premature identification of possible witnesses; (2) the possibility that such witnesses could be
24    compromised or influenced; (3) the possibility that potential subjects could alter, remove, or destroy
25    information sought by the Government; and, (4) that the affidavits identify specific, sensitive
26    information. *Id.* Finally, the Government opposed the motion to seal and segregate all attorney-client
27    privileged information and trade secrets prior to the DOD conducting an analysis of the seized electronic

28                                        10

1  storage media and documents for classified information and information relating to the national defense

2  (#25). Montgomery replied to the government's oppositions (#26).

3          The court set a sealed evidentiary hearing for May 3, 2006, on the motion to unseal the affidavits,

4  return the property pursuant to Rule 41(g) and segregate attorney-client privileged information and trade

5  secrets (#27).    On April 19, 2006, the court further ordered that the parties file simultaneous

6  supplemental briefs concerning certain specific issues identified by the court (#28). On April 28, 2006,

7  the Government filed a partial compliance with court order of April 19, 2006 (#31). The Government

8  explained that it had provided redacted affidavits to Montgomery and did not oppose supplemental

9  filings by Montgomery subsequent to his review of the affidavits. *Id.* The Government argued that the

10 redacted information could (1) expose witnesses; (2) identify investigative techniques prior to

11 completion of the investigation; (3) interfere with the identification of other suspects; and (4) interfere

12 with the recovery of equipment that may contain evidence of criminal violations. *Id.* Also on April 28,

13 2006, the court vacated the hearing set for May 3, 2006 and vacated the order for supplemental briefing

14 (#32). The court stated that there appeared to be serious concerns about the search warrants issued by

15 the court as they relate to certain classified information. *Id.*

16         On May 8, 2006, the Government moved for a protective order prohibiting disclosure of

17 classified information (#34). Montgomery opposed (#36, 39), and the Government replied (#38). The

18 court held a hearing and denied the motion (#42).    At the hearing, the Government provided

19 Montgomery with redacted versions of the applications and affidavits for the search warrants,[4] which

20 were supplemented on June 1, 2006 (#40, 41, 43, 44). The only portions of the affidavits that remain

21 redacted, after the supplements, are the conversation between Montgomery and a business friend about

22 finding investors for the source code, and Montgomery's telephone conversations with SA Haraldsen.

23 *Id.*; *compare* #40 at 10-12 to #1 at 10-12.

24

25

---

26         [4]It is unclear whether this is the second redacted version of af fidavits provided by the
27 Government, or the same version referred to in Government's partial compliance with court order of
   April 19, 2006 (#31).

28                                            11

1      On June 2, 2006, Montgomery filed a supplemental memorandum in support of his motion to
2   unseal the affidavits, return the property, and seal attorney-client communications (#45). Montgomery
3   again stated that the court need not hold an evidentiary hearing on the Rule 41(g) issues. *Id.* The
4   Government filed a response to issues identified in court minute order of April 19, 2006 (#46). The
5   Government noted in parentheses that recent information provided by the DOD indicated that the
6   information was not classified. *Id.* at 2. The Government argued that the search warrants set forth
7   probable cause and described the items sought as specifically as possible. *Id.* The Government did not
8   explain whether the determination that the information was improperly classified affects whether
9   probable cause for the search existed, and thus apparently took the position that probable cause existed
10  independent of the belief that classified information was sought. *Id.* The Government provided a
11  declaration by SA West which describes the execution of the searches in detail (#47). The Government
12  still sought to establish a protocol to screen attorney-client privileged material and suggested two
13  alternatives (#46).

14      Upon receipt of the redacted affidavits and the supplements, Montgomery filed a second
15  supplemental memorandum in support of its motion to unseal the search warrant affidavits, for the return
16  of property pursuant to Rule 41(g), and to segregate privileged material (#48, 49, 50). Montgomery then
17  requested an evidentiary hearing, arguing that a hearing is the only way to pin down the Government's
18  shifting positions (#50). He asserted: "The Government has essentially admitted that it did not raid Mr.
19  Montgomery's property to retrieve 'classified information being in a place it shouldn't be;' but rather
20  to do the bidding of wealthy Warren Trepp and thrust itself into a private, civil dispute between the two
21  owners and founders of eTreppid Technologies. The search for 'classified information' was obviously
22  only the cover story seeking to justify the search." *Id.* Montgomery also stated that Assistant United
23  States Attorney Pugliese informed Montgomery's counsel that the "classified information thought to be
24  in Mr. Montgomery's possession had been found." *Id.* at 3. Montgomery's counsel included his
25  declaration that he had conversations with AUSA Pugliese and SA West, during which they discussed
26  approximately ten compact discs, which were the only materials marked "classified" and the only
27
28                                             12

1   material sought in the search (#49). Montgomery questioned why the Government did not list that
2   information or the storage media containing it in the search warrants (#50).

3          The court held an evidentiary hearing over the course of three days, which concluded on August
4   17, 2006. At the conclusion of the final day of the hearing, the court directed the parties to file post-
5   hearing briefs (#67). The Government filed three separate post-hearing briefs addressing Montgomery's
6   motion to unseal search warrant affidavits (#74), the motion to seal and segregate all attorney-client and
7   trade secret information (#76), and the motion for return of the seized property (#77). Montgomery filed
8   a consolidated brief regarding all three issues (#80).

9                          **II.  DISCUSSION AND ANALYSIS**

10         **A.     Equitable Jurisdiction over Rule 41(g) Motion to Return Property**

11         Federal Rule of Criminal Procedure 41(g) generally is used to seek the return of property after
12  an indictment is issued; however, "district courts have the power to entertain motions to return property
13  seized by the government when there are no criminal proceedings pending against the movant."
14  *Ramsden v. United States,* 2 F.3d 322, 324 (9th Cir. 1993). "These motions are treated as civil equitable
15  proceedings, and, therefore, a district court must exercise 'caution and restraint' before assuming
16  jurisdiction." *Id.*

17         Before the court can reach the merits of a pre-indictment motion pursuant to Rule 41(g), the court
18  must consider whether: (1) "the Government displayed callous disregard for the constitutional rights of
19  the movant; (2) the movant has an individual interest in and need for the property he wants returned; (3)
20  the movant would be irreparably injured by denying return of the property; and (4) the movant has no
21  adequate remedy at law for the redress of his grievance." *U.S. v. Kama,* 394 F.3d 1236, 1238 (9th Cir.
22  2005) (internal citations omitted). If the balance of equities favors reaching the merits, the court should
23  exercise its equitable jurisdiction to entertain the Rule 41(g) motion. *Ramsden,* 2 F.3d at 326.

24                          **1.     Callous Disregard**

25         Here, the Government has conceded that *none* of the seized material is classified; therefore, there
26  is a question whether the Government displayed callous disregard for Montgomery's constitutional
27  rights. SA West testified that the central focus of the search was classified information: ". . . [The search

28                                          13

1  warrant] was based on the possession of classified information. Obviously there's a lot of things going
2  on at eTreppid, but nothing was more influential than the information that [Montgomery] may have been
3  in possession of secret information." Tr. II, 144:17-19.[5]  As will be more fully discussed herein, the
4  court concludes that the Government acted in callous disregard of Montgomery's rights.

**2.      Individual's Interest in and Need for the Property**

6  Montgomery has established that the seized property includes items covering many years of his
7  work as a computer programmer, an inventor, as well as items of personal family property (#21, 26; Tr.
8  Ex. 38). Many of the items seized are also integral to the two civil actions pending between Montgomery
9  and Trepp/eTreppid. *Id.  See In re Singh,* 892, F.Supp. 1, 3 (D.D.C. 1995).

**3.      Irreparable Harm**

11  In addition to the concerns identified above regarding Montgomery's interest in and need for
12  the property, he contends that some of the seized information includes attorney-client privileged
13  information, which will be compromised if a third party reviews it. *See id.* at 3-4.

**4.      No Adequate Remedy at Law**

15  The Government has denied Montgomery is a target, and there has never been any indication that
16  either Ms. Montgomery or the Montgomery Family Trust is a search warrant target. Nine months have
17  passed since the Government executed the search warrants, and it appears there are no current plans to
18  prosecute any of the movants. *See Ramsden,* 2 F.3d at 326 (movant does not have the opportunity to
19  challenge the seizure of the documents and request their return at a later date, without a current plan to
20  prosecute). Mindful that Montgomery has not been indicted, the balance of equities favors reaching the
21  merits of his 41(g) motion. *Id.* at 4.

22  The court now considers Montgomery's requested relief: (1) the unsealing of the redacted
23  portions of the search warrants affidavits, and (2) the return of the seized property.

**B.      Right to View Affidavits**

26  [5]Transcript I is the transcript of the June 29, 2006 evidentiary hearing.
27  Transcript II is the transcript of the July 31, 2006 continued evidentiary hearing.
   Transcript III is the transcript of the August 17, 2006 continued evidentiary hearing.

28                                          14

1    Some courts have held that no right to inspect sealed affidavits for search warrants exists under
2    the Constitution or the Federal Rules of Criminal Procedure prior to the initiation of a criminal
3    proceeding against the movant. *See Matter of Eyecare Physicians of America*, 100 F.3d 514, 517 (7th
4    Cir. 1996); *Matter of the Search of S & S Custom Cycle Shop*, 372 F.Supp.2d. 1048, 1051-52 (S.D. Ohio
5    2003).[6] The court in *Eyecare Physicians* applied a "right of access committed to the sound discretion
6    of the court." *Eyecare Physicians*, 100 F.3d at 517.

7    Other courts have held that a search target has a pre-indictment Fourth Amendment right to
8    examine the search warrant affidavit. *In re Search Warrants Issued on April 26, 2004*, 353 F.Supp. 2d
9    584, 585 (D. Md. 2004), *see also United States v. Oliver*, 208 F.3d 211, 2000 WL 263954 (4th Cir.
10   2000) (unpublished opinion); *In re Search Warrants Issued Aug. 29, 1994*, 889 F.Supp. 296, 299 (S.D.
11   Ohio 1995); *In re the Search of Up North Plastics, Inc.*, 940 F.Supp. 229, 232 (D. Minn. 1996). The
12   right is not unqualified; the Government bears the burden to "demonstrate compelling government
13   interests in keeping the affidavit under seal and . . . that no less restrictive means, such as redaction, is
14   available to prevent disclosure." *In re Search Warrants Issued on Apr. 26, 2004*, 353 F.Supp. 2d at 587.
15   The United States District Court for the District of Maryland emphasized that the plain words of the
16   Fourth Amendment protect the public from unreasonable intrusions and specifically require that
17   probable cause support search warrants. *Id*. at 588. The Court reasoned that "implicit in that language
18   is the public's right to challenge both the reasonableness of the search and the degree to which the
19   warrant was supported by probable cause." *Id.* The Court invoked Justice Harlan's statement that
20   "constitutional provisions for the security of person and property should be liberally construed" and
21   concluded that without a right to access the affidavit upon which a search warrant is based, a search
22   target could never challenge the warrant for probable cause. *Id.* "More than a conclusory allegation

25   [6]In *Search of S&S Custom Cycle Shop*, the court stated that "Absent the existence of a criminal
26   action, an individual simply has no basis for bringing a motion to unseal an affidavit under the Criminal
     Rules. If it is a constitutional right, such as the Fourth Amendment right to be free from unreasonable
27   search and seizures, that has been violated by federal authorities, vindication is civil in nature and can
     be achieved through a *Bivens* action." 372 F. Supp. 2d at 1051.

28                                                   15

1   about the need to protect a continuing investigation is necessary to meet the Government's burden of
2   showing compelling need" to keep the affidavits sealed. *Up North Plastics*, 940 F.Supp. at 232.

3          Apart from the arguments it advanced initially to seal the entire affidavit – generalized concerns
4   that unsealing will reveal witnesses, investigative techniques, or compromise on ongoing criminal
5   investigation – the Government has not explained why remaining portions of the affidavit should still
6   remain redacted (#74). The Government contends the standard in the Ninth Circuit for unsealing such
7   information is the balancing test established in *United States v. Napier*, 436 F.3d 1133, 1137 (9th Cir.
8   2006). However, *Napier* had nothing to do with a search target's pre-indictment Fourth Amendment
9   right to review a search warrant affidavit; rather, it concerned a post-indictment challenge to a search
10  warrant that the defendant sought to unseal in order to make the "substantial preliminary showing"
11  required by *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). In that instance, the court rejected the
12  view that *Franks* creates an unlimited right to all information possibly needed to meet the preliminary
13  showing requirement and held that the court must balance the defendant's interests against those of the
14  government. *Napier* at 1133.

15         The court has considered the authorities addressing a search target's pre-indictment Fourth
16  Amendment right to review the search warrant and concurs with those courts that have required the
17  Government to "demonstrate compelling government interests in keeping the affidavit under seal and
18  . . . that no less restrictive means, such as redaction, is available to prevent disclosure." *In re Search*
19  *Warrants Issued Apr. 26, 2004*, 353 F.Supp. 2d at 587.

20         Turning to the evidence in this proceeding, the redactions involve direct and recent contacts
21  Montgomery had with other individuals, and it is difficult to imagine that the Government is concerned
22  about revealing identities of witnesses or protecting an ongoing investigation. In fact, Montgomery has
23  already surmised that part of the redaction relates to seeking investors for the source code (#50).
24  Moreover, at the June 29, 2006 evidentiary hearing, SA West revealed the identity and involvement of
25  SA Haraldsen during his testimony. Tr. I, 15. Accordingly, the court finds that the Government has not
26  met its burden to establish a compelling government interest in keeping the remaining portions of the
27  affidavits sealed, and it further finds that Montgomery has a right to view the affidavits in their entirety.

28                                                    16

1

2    **C.**    **Return of Montgomery's Seized Property Based Upon Lack of Probable Cause**

3

4       The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause,

5 supported by Oath or affirmation, and particularly describing the place to be searched, and the persons

6 or things to be seized." U.S. Const. Amend. IV. "A search warrant . . . is issued upon a showing of

7 probable cause to believe that the legitimate object of a search is located in a particular place, and

8 therefore safeguards an individual's interest in the privacy of his home and possessions against the

9 unjustified intrusion of the police." *U.S. v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006) quoting

10 *Steagald v. United States*, 451 U.S. 204, 213 (1981). The United States Supreme Court has

11       reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. The task of the issuing magistrate is simply to make a practical, common-sense decision

12       whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will

13       be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for

14       conclu[ding] that probable cause existed.

15 *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The Supreme Court also explained that the "probable

16 cause standard . . . is a practical, nontechnical conception." *Id.* at 231. Further, "probable cause is a

17 fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or

18 even usefully, reduced to a neat set of legal rules. *Id.* at 232. "[A]n affidavit may be based on hearsay

19 information and need not reflect the direct personal observations of the affiant, so long as the magistrate

20 is informed of some of the underlying circumstances supporting the affiant's conclusions . . . ." *United*

21 *States v. Ventresca*, 380 U.S. 102, 108 (1965).

22       "In assessing whether a warrant passes constitutional muster, a court is therefore obliged to make

23 two inquiries: first, whether the scope of the search authorized by the warrant was justified by probable

24 cause and, second, whether the warrant was sufficiently particular to limit the discretion of the officers."

25 *In re Grand Jury Investigation Concerning Solid State Devices, Inc.*, 130 F.3d 853, 856 (9th Cir. 1997).

26 If the court finds that a search warrant lacked probable cause and, thus, that movant was aggrieved by

27 the unlawful search and seizure of his property, Rule 41(g) dictates the remedy: "the court must return

28             17

1   property to the movant, but may impose reasonable conditions to protect access to the property and its
2   use in later proceedings." Since this court finds that the Government lacked probable cause, as more
3   fully explained below, the court does not reach the particularity analysis.

4          Montgomery argues that no probable cause supports SA West's affidavits in support of the
5   search warrants (#21). The Government responds that SA West properly investigated Trepp's
6   allegations, including interviewing Trepp and other employees and compiling information SA Haraldsen
7   provided (#23). It is now clear that no probable cause existed to believe that Montgomery had removed
8   classified information from eTreppid and improperly stored it at his home because after the warrants
9   issued, it was determined that the material was, in fact, not classified (#46; Tr. Ex. 4). As noted earlier,
10  SA West testified that the central focus of the search was classified information: ". . . [the search
11  warrant] was based on the possession of classified information. Obviously there's a lot of things going
12  on at eTreppid, but none was more influential than the information that [Montgomery] may have been
13  in possession of secret information." Tr. II, 144. Three months after the search was executed, the
14  Government determined that the information sought was not classified. Tr. I, 123.

15         In light of this very critical fact, the court now examines SA West's affidavit and testimony at
16  the evidentiary hearing to determine whether probable cause exists to support the search warrants.[7]

17              **1.     Documents Offered in Support of the Affidavit**

18         SA West relied on three documents discussed below to support a finding that there was probable
19  cause to believe Montgomery had stolen eTreppid's trade secrets.

20                       **a.     The Contribution Agreement**

21         As noted earlier, SA West referred to the 1998 contribution agreement, and he quoted an excerpt
22  from the agreement which stated that Montgomery contributed *all* of his intellectual property, software
23  programs, and source codes to eTreppid; therefore, this court inferred that eTreppid owned *all* of the
24  assets described in the balance of SA West's affidavit. This inference was incorrect. At the evidentiary

25

26         [7]For ease of reference, the court considers SA West's affidavit in the same order set forth in the
    section of this order entitled "procedural history," *supra*, at pages 3-8.
27

28                                              18

1  hearing, the entire contribution agreement was admitted into evidence, and the relevant portions state

2  as follows:

3          1.2 <u>Contributed Assets</u>.    As used in this Agreement, the term
           "<u>Contributed Assets</u>" shall mean and include, collectively, all the
4          following assets, together with all of Contributor's rights, title and
           interest therein, tangible and intangible, present or future, including, but
5          not limited to, all development, distribution and exploitation rights, or to
           any proceeds derived therefrom:

6
           1.2.1  All of Contributor's know-how; trade secrets; patent rights,
7          copyrights, trademarks, licenses and permits, registered or unregistered,
           pending or approved; software programs and all programming and source
8          codes used in connection therewith or otherwise required to operate any
           component thereof; and all programming documentation, designs,
9          materials and other information, all in whatever form and wherever
           located, relating to or used in connection with, or otherwise describing or
10         consisting of any part of, the software compression technology *contained
           on that certain Software Compression Engine Development Program
11         contained on CD No. 1, all of which is being contributed by Contributor
           hereunder (collectively, the "<u>Technology</u>").*

12
           1.2.2  Certain of Contributor's tangible personal property used in
13         connection [sic] the Technology as more particularly described on
           SCHEDULE 1.2.2 attached hereto and made part of this Agreement.

14
           1.2.3 All of Contributor's books and records relating to the Contributed
15         Assets.

16         *1.3   Excluded Assets and Liabilities.    Notwithstanding any of the
           foregoing, Contributor is specifically not contributing, transferring or
17         conveying to INTREPID under this Agreement or by any other means,
           nor is INTREPID acquiring from Contributor, any other tangible or
18         intangible assets of Contributor not specified herein, and expressly is not
           assuming any claims, liabilities or obligations of Contributor of any kind
19         or nature, whether existing as of the Closing Date or arising thereafter,
           on account of Contributor's ownership, development, exploitation or
20         operation of the Contributed Assets at any time prior to the Closing Date.*

21
   Tr. Ex. 7 (emphasis supplied).[8]
22
        Had this court been provided the entire contribution agreement, it would have concluded that
23
   whatever is on CD No. 1 – nothing more and nothing less – belonged to eTreppid. The court would have
24
   expected the Government to demonstrate there was probable cause to believe that CD No. 1 contained
25
   the disputed trade secrets. However, SA West testified that he does not know what CD 1 contains, and
26

27         [8]INTREPID was the predecessor of eTreppid.

28                                    19

1   he never inquired as to how long Montgomery has been creating software technologies. Tr. I, 51, 53,

2   60. SA West did not investigate whether Montgomery had created software that was not contributed

3   under the contribution agreement or ask what assets Montgomery had not contributed. Tr. I, 60. SA

4   West stated that the fact that his affidavit does not refer to CD No.1 was not intended to mislead the

5   court. Tr. II 124. His impression was that any work that Montgomery performed while at eTreppid was

6   also part of what eTreppid owned; he did not believe that it was limited to CD No. 1.  Tr. II, 124.

7   Montgomery's counsel and SA West had the following exchange:

8               Counsel:  . . . as I understand your testimony today you're saying that
                notwithstanding paragraph 1.3 [of the Contribution Agreement],
9               excluding everything if it's not specified, you thought that [Montgomery]
                conveyed everything, patents, trademarks, copyrights, didn't limit it to
10              CD No. 1.

11              SA West: No, I think what the – my thought at the time was that that
                agreement was in 1998 and that the CD and the particular CD 1 was
12              conveyed. We're in 2005. He has worked there for eight years working
                on various projects for eTreppid, one as the chief technology officer.
13              They've employed ten other programmers to do the programming, and
                what he took wasn't just his.

14
    Tr. II, 124.  This interchange conveys SA West's fundamental misunderstanding of the operating
15
    agreement and the business relationship between Montgomery and eTreppid.
16
           On the final day of the evidentiary hearing SA West was once again asked about CD No. 1 and
17
    the discrepancy between the entire contribution agreement and the excerpt quoted in his affidavit.  SA
18
    West testified that he received an incomplete copy of the contribution agreement from SA Haraldsen,
19
    who had sent it to him in a different "landscape format;" therefore, the crucial reference to CD No. 1 was
20
    cut off.  See Tr. Ex. 31; Tr. III, 47-54. SA West testified that he did not realize the tops of each page
21
    were missing until Government's counsel pointed it out to him. Tr. III, 52:17-53:6.  The court finds SA
22
    West's explanation difficult to comprehend, since one has only to read Exhibit 31 to realize that it is
23
    quite obviously an incomplete document with missing sentences and paragraphs.  Yet, it is this fatally
24
    incomplete document that SA West relied on to obtain the warrants to search Montgomery's home and
25
    the storage units for stolen trade secrets.
26

27

28                                              20

1

### b.    The eTreppid Operating Agreement

2    SA West quoted an excerpt from the operating agreement in his affidavit, which led this court

3    to conclude that Montgomery was contractually bound by a non-compete agreement; therefore,

4    Montgomery was prohibited from developing or purchasing any software programs or technology

5    competitive with eTreppid, or in engaging in any similar business to that of eTreppid. However, at the

6    evidentiary hearing the entire operating agreement was admitted, and it, too, revealed that SA West

7    omitted a critical phrase from the sentence he quoted in his affidavit:

8    6.6.   **Restriction on Independent Activities; Agreement not to
     Compete.** *So long as MONTGOMERY is appointed a Committee*
9    *Member and/or as Chief Technology Officer pursuant to this Agreement,*
     MONTGOMERY and his Affiliates agree that, during the terms of this
10   Agreement, non of them shall compete with the LLC, whether for their
     own account and/or for the account of others, individually, jointly with
11   others, or as a part of any other limited liability company, limited
     partnership, general partnership, joint venture, corporation, or other
12   entity, by: (i) developing, licensing or exploiting in any manner any
     software programs or other technology which is competitive with the
13   Technology or the Business of the LLC, or providing any services or
     supplies which are encompassed within the definition of the "Business"
14   of the LLC as set forth in this Agreement; (ii) purchasing or otherwise
     acquiring, owning, holding, operating, managing, investing in or
15   otherwise disposing of a like business of the LLC's Business and interests
     therein of any kind or nature; or (iii) otherwise engaging in any or all
16   aspects of a like business of the LLC's Business. MONTGOMERY's or
     his Affiliates' participation in any of the activities restricted by this
17   paragraph shall be deemed a breach of his duties and obligations as a
     Committee Member hereunder.

18
     Tr. Ex. 30 (emphasis in italics supplied). SA West omitted the beginning phrase of paragraph 6.6, which
19
     expressly limits the non-compete to Montgomery's tenure as a committee member or chief technology
20
     officer. Based on SA West's omission, this court drew the incorrect inference that in addition to giving
21
     all of his intellectual property to eTreppid, Montgomery had also agreed not to compete with eTreppid.
22
     This is not true.
23
     SA West testified that he had in his possession the entire operating agreement prior to preparing
24
     his affidavit. Tr. III, 34-35 and stated:
25
     No. It was not an intentional - - as I said before, I tried to capture the
26   pertinent parts out of these voluminous documents like you've done,
     giving me three pages of probably a fifty-page document, and to try to
27   capture those parts that were relevant to the investigation.

28                                    21

1   Tr. I, 173. SA West admitted that he included this excerpt of the operating agreement in his affidavit
2   to demonstrate that Montgomery had a covenant not to compete, and he also testified that the evidence
3   of Montgomery's efforts to sell to potential investors in violation of the operating agreement concerned
4   the redacted portion of his affidavit, which was the single conversation Montgomery had with Azzinaro
5   in late December or early January. Tr. I, 174-175. The affidavit states that Montgomery talked with
6   Azzinaro about his problems at eTreppid and inquired whether Azzinaro might know of anyone willing
7   "to invest" – nothing more (#1 at 10:17-24). Based upon the incomplete provision of the operating
8   agreement, followed by the conversation between Montgomery and Azzinaro, the court concluded that
9   in violation of the operating agreement, Montgomery solicited Azzinaro for new investors and intended
10  to use stolen trade secrets as a new competitor of eTreppid. This is not true.

11              **c.      The Ten Patent Assignments**

12          SA West identified ten patent assignments provided by SA Haraldsen, which he also referred to
13  in his affidavit. Tr. III, 5. SA West testified that he referred to these patent assignments to "illustrate that
14  Dennis Montgomery is employed by eTreppid and has done work at eTreppid, that he is assigned to
15  eTreppid." Tr. III, 6. SA West believed that these documents also confirmed that Montgomery was not
16  only an assignor of the patents, but also an "employee" of eTreppid, Tr. III, 7, and this is what SA West
17  stated in his affidavit (#1 at 3:5-9). However, Montgomery was not an employee of eTreppid when he
18  made these assignments; he was an independent contractor as evidenced by Montgomery's form K-1s
19  for the period 1999-2001. Tr. Ex. 29. SA West testified that he was unaware that Montgomery had
20  received 1099 independent contractor forms from eTreppid during the period November 2000 to
21  November 2001. Tr. II, 174.

22          The patent assignments concern various items, ranging from "method and apparatus for
23  streaming data using rotating cryptographic keys," to "system and method for generating alert conditions
24  in a surveillance system," to "method and apparatus for encoding information using multiple passes and
25  decoding in a single pass." Tr. Ex. 26. SA West did not ask Trepp whether Montgomery had assigned
26  patents to eTreppid for the source code that SA West sought. Tr. II, 174-175.

27

28                                              22

1    Although SA West referred to the patent assignments to illustrate Montgomery's employment
2    relationship with eTreppid, this is what the reference conveyed to this court: that since Montgomery had
3    conveyed all of his technological know-how to eTreppid, the ten patents bore an integral relationship
4    to the trade secrets that Montgomery allegedly stole. One has only to review SA West's affidavit to see
5    how the juxtaposition of his reference to the ten patent assignments to eTreppid's trade secrets –
6    software programs relating to "data compression, pattern recognition, change and anomaly detection"
7    – led the court to draw this conclusion. (#1 at 3:5-16). It is now evident that these patents had nothing
8    to do with the trade secrets alleged to have been stolen.

9                    **2.    The SOCOM Contract and eTreppid's Security Clearance**

10    SA West's affidavit states that a government contract from SOCOM in March 2003 required
11    eTreppid to have access to secret material; therefore, eTreppid received government authorization to
12    store secret material at its facility (#1 at 4:13-18). The court inferred from this portion of SA West's
13    affidavit that eTreppid was engaged in work for the United States involving secret materials, and that
14    eTreppid had the proper facility clearance to conduct this work. It appears eTreppid never had a facility
15    clearance.

16    SA West first stated that his understanding is that eTreppid had not received approval to store
17    certain classified material at eTreppid facilities. Tr. I, 145. Subsequently, SA West testified that, as
18    stated in his affidavit, eTreppid was permitted to store secret material at least since August 2005. Tr.
19    II, 156-62. To the query, "And to your knowledge despite the three years of government contracts,
20    Trepp's facility never got a facility clearance?" SA West responded, "I don't know what the reasoning
21    was. It could have been Montgomery that held it up." Tr. II, 186.

22    However, SA West testified later that SA Haraldsen told him that eTreppid had a facility
23    clearance to store secret material, which is based upon a DOD form DD 254. Tr. III, 141-142; Tr. Ex.
24    34. SA West relied on this information in preparing his affidavit, but he never saw the form. Instead,
25    he relied on SA Haraldsen's statements to him. Tr. III at 141-143. SA West included this information
26    in his affidavit "[t]o show that eTreppid had access, had permission by the U.S. Government or the
27    author of that form to possess secret information." Tr. III, 142. SA West only saw a copy of the actual

28                                                  23

1   DD 254 form just days prior to the final August 17, 2006 evidentiary hearing when Venables faxed it
2   to him. Tr. III, 103-104. Although a signature line is provided on form DD 254, presumably to signify
3   certification for a facility clearance, there is no signature. Tr. Ex. 34. Therefore, the court now
4   concludes that although SA Haraldsen and Venables represented to SA West that eTreppid possessed
5   a facility clearance to store secret material, eTreppid did not have one.

6                       **3.    Montgomery's Security Clearance**

7           SA West attested that Montgomery received and signed two security briefings in 2003, which
8   outlined his duty to protect classified material and to protect it from unauthorized disclosure (#1 at 4:19-
9   26;5:1-4). Later in the affidavit, SA West recounted a conversation between Montgomery and Gray
10  during which Gray warned Montgomery that his improper storage of classified material could result in
11  the loss of Montgomery's security clearance. *Id.* at 6:8-17. Montgomery allegedly replied, "I don't care
12  about my clearance. They'll always give me my clearance because they want me to do the work." *Id.*
13  at 6:12-13. The affidavit then recites continued problems with Montgomery's storage and handling of
14  classified material and, ultimately, the allegation that he removed it from eTreppid. *Id.* at 6:13-26-7:10.

15          The court concluded there was probable cause to believe that Montgomery breached his security
16  clearance and took classified materials in violation of the law. Although SA West's affidavit never
17  specifically states the level of Montgomery's security clearance, the inference was that it was tied to his
18  work at eTreppid and that he lost it. However, SA West's testimony conflicts as to whether he knew
19  what, if any, security clearance Montgomery possessed at the time of the search. SA West testified that
20  he knew Montgomery had a top secret clearance in the fall of 2005. Tr. I, 115. SA West stated that he
21  did not look into who at eTreppid had what level security clearance prior to November 2005. Tr. I, 114
22  at 9-13. SA West initially stated that he did not remember whether he contacted Defense Security
23  Services ("DSS"), the determining agency, regarding Montgomery's security clearance before or after
24  the search. Tr. I, 112-113. SA West subsequently testified that Jay Dixon of DSS and Venables both
25  told him that Montgomery's security clearance was suspended, and SA West said that he believed that
26  he learned that information prior to the search. Tr. I, 116-117. SA West later testified that Dixon told
27  him Montgomery's clearance was suspended, but only after the search. Tr. III, 92. In any event, SA

28                                              24

1  West made no reference to Dixon in his affidavit, and the court finds that SA West did not rely on
2  Dixon.

3        SA West testified that, as he understood it, Montgomery's clearance was contingent on his
4  employment with eTreppid. Tr. II, 113. SA West stated that he is unfamiliar with Jpass, the electronic
5  system that governs security clearance, but that Venables provided him with a computer printout
6  indicating that Montgomery's clearance had been suspended. Tr. II, 129-132. To the question "[s]o this
7  was an issue to you before you raided his home whether he still had his security clearance?" SA West
8  responded: "*Yes. I mean it would be significant if he had legitimate access to classified information
9  or not.*" Tr. II, 132 at 6-9 (emphasis supplied).

10       SA West stated that he did not know whether Montgomery had notice that his security clearance
11  had been suspended. Tr. II, 156-157. He testified that eTreppid tried to provide Montgomery with
12  termination documents and that he did not know if those documents informed Montgomery that his
13  security clearance had been suspended. Tr. II, 156. Montgomery's counsel questioned SA West about
14  DOD directives, which movant's counsel represented governed the revocation or suspension of security
15  clearance. Tr. II, 155-156. The DOD directive outlines steps that must be taken, including providing
16  notice and an opportunity to be heard to the applicant, before an "unfavorable clearance decision" is
17  made. Tr. II, 159-160. SA West had no knowledge of the directive or whether the procedures were
18  followed prior to suspending Montgomery's security clearance. Tr. II, 160. SA West testified that the
19  basis for searching Montgomery's home was the unlawful retention of national security information and
20  that Montgomery did not have permission to store it at home. Tr. II, 160-161. Contrary to SA West's
21  understanding, Montgomery attests that the Government has never revoked his security clearance. Tr.
22  Ex. 38, para. 21.

23                    **4.    The November 2005 Visit to Nellis Air Force Base and Nine Secret
                              Hard Drives**
24
25       The evidentiary centerpiece of SA West's affidavit insofar as it concerns unlawful retention of
26  classified material are the "nine Secret hard drives," which Gray recorded at Nellis Air Force Base and
27  "marked with red standard U.S. Government Secret labels as instructed by contractor personnel" and

28                                                 25

1  which were "stored [at eTreppid] in a GSA approved safe as required by DOD" (#1 at 5:5-12). These
2  are the "Secret hard drives" that metamorphosized into "classified material" three paragraphs later in
3  the affidavit. As is now clear, there was no secret material and there was no classified material;
4  therefore, no probable cause existed that Montgomery unlawfully retained national defense information
5  in violation of 18 U.S.C. § 793(e). The court agrees with SA West's testimony on one fact: *Nothing*
6  was more influential to this court in the issuance of these search warrants than the information that
7  Montgomery might unlawfully be in possession of secret material belonging to the United States. *See*
8  Tr. II, 144.

9       SA West testified that in mid-February, Gray provided him with an inventory of classified
10  material that was either missing or destroyed. Tr. III, 27-28.[9] The inventory itemizes hard disk drives,
11  dated November 4, 2005, "Nellis, SOCOM." Tr. Ex. 40. SA West testified that when Gray provided
12  him with the inventory, he did not inquire about the original classification authority, although Gray did
13  tell him that an unnamed contract employee from Nellis provided the information concerning
14  classification. Tr. III, 30-31. SA West never contacted Nellis Air Force Base or checked its logs to
15  verify whether the material was, in fact, classified. Tr. I, 96, 100, 124-126; Tr. III, 30-31. Venables and
16  Gray did tell him that the classified information was on "nine hard drives" and two digital videotapes,
17  but SA West did not include detailed descriptions in his affidavit. Tr. I, 39, 92-93, 103-104, 119-120;
18  #1. SA West testified that in addition to relying on interviews with Venables and Gray, as well as
19  Gray's inventory, he also "relied on Mr. Haraldsen, who had been working – who is an Air Force
20  official who is familiar with the project that eTreppid was working on, who said they were handling
21  classified information, and then the other, you know, disclosure documents that they – that eTreppid
22  employees had signed to take possession of classified information." Tr. II, 86-87; *see also* Tr. II, 104.

23

24

25       [9]The Government never provided the court with the actual inventory Gray provided to SA West.
26  Instead, the court was provided with a copy of an August 11, 2006 memo from the Government's
    counsel to Montgomery's counsel, which states that on February 14, 2006, Gray provided an inventory
27  of classified material to SA West. Tr. Ex. 40. That memo summarizes missing or destroyed classified
    material.

28                                          26

1    Based upon this section of SA West's affidavit, the court concluded that probable cause existed

2 that the nine eTreppid hard drives were classified as secret by the appropriate government agency, that

3 they contained information of importance of the United States government, and that the Department of

4 Defense had provided instructions concerning their classification, access, and storage. It is now

5 abundantly clear that this conclusion was incorrect because there was no classified material.

6       **5.  December 2005: Montgomery's Breaches of Protocol, Deletion of**

7          **Classified Material, and Removal of Classified Material and Trade**
           **Secrets from eTreppid**

8    Since it is now evident that there was no classified material, the court will only note that the

9 chronology of events in December 2005, which SA West described in his affidavit, led the court to

10 conclude that there was probable cause to believe that in breach of his security clearance, Montgomery

11 had unlawfully removed classified information from eTreppid. The court now turns to the theft of trade

12 secrets.

13    As a preliminary observation, the court notes that SA West never disclosed in his affidavit that

14 Trepp and Montgomery were engaged in civil litigation concerning ownership of the trade secrets, which

15 are intertwined with the allegation in the affidavit that Montgomery engaged in the criminal theft of trade

16 secrets.[10] Over the course of SA West's meetings with Trepp prior to the search warrant applications,

17 he knew that Trepp was engaged in trade secret litigation against Montgomery and that Trepp was

18 attempting to obtain a temporary restraining order against Montgomery . Tr. I. 20-22, 47. Trepp and

19 SA Haraldsen also provided SA West with declarations of eTreppid employees and other court

20

21      [10]In fact, two civil cases are pending in federal court: *Montgomery v. eTreppid Technologies,*
 *LLC, et al.,* 3:06-CV-0056-LRH (VPC); *eTreppid Technologies, LLC v. Montgomery, et al.,* 3:06-CV-

22 0145-LRH (VPC). In Case No. 3:06-CV-00056 LRH (VPC), the complaint was filed on January 31,
 2006 (#1), and as of the dates this court issued the search warrants, February 28 and March 3, 2006,

23 there were no matters under submission to this court; therefore, the court was unaware of this pending
 action. On January 25, 2006, Montgomery filed a petition to remove the state court proceeding initiated

24 by eTreppid against Montgomery to the United States District Court in Case No. 3:06-CV-00041-HDM
 (RAM); however, that matter was remanded to the state district court on January 31, 2006 (#14).

25 Thereafter, the United States Department of Defense filed its notice of removal to the United States
 District Court on March 20, 2006, in Case No. 3:06-CV-00145-LRH (VPC). Thus, this second civil

26 action between Montgomery and eTreppid was not pending in this court at the time the search warrants
 were issued.

27

28                 27

1 documents. Tr. I, 22-23, 74-75; Vol. II, 199-200; Tr. Ex. 10. SA West was aware that the trade secrets
2 at issue are valued in millions of dollars, but he did nothing during his pre-search warrant investigation
3 to determine the extent of Montgomery's claim to ownership. Tr. I, 60-62,141; Tr. II, 176, #1 at 3:10-16.
4 Had this court had even the slightest inkling that Trepp and Montgomery were engaged in civil litigation,
5 it is an understatement to say that the court would have scrutinized the theft of trade secrets allegation
6 very, very carefully.

7 As discussed earlier, SA West omitted critical portions of the contribution agreement and the
8 operating agreement, which stated that whatever Montgomery contributed to eTreppid could be found
9 on CD No. 1. However, SA West testified that he did not know what CD No. 1 contained. Tr. I, 51-53.
10 He never inquired as to how long Montgomery had been creating software technologies, Tr. I, 60. SA
11 West did not investigate whether Montgomery had created software that was not included under the
12 contribution agreement or ask anyone what assets Montgomery had not contributed. Tr. I, 62; Tr. II, 123,
13 128, 214. SA West testified that his impression was that any work Montgomery performed while at
14 eTreppid was also part of what eTreppid owned; he did not believe that it was limited to CD No. 1.

15 Putting aside the questions concerning SA West's investigation, the court understood that the
16 trade secret Montgomery had allegedly stolen was "source code" (#1 at 1:16-23). However, to this day,
17 it is unclear to the court exactly how "source code" is a trade secret that Montgomery allegedly stole.
18 SA West was unable to describe the allegedly stolen trade secret because no one at eTreppid was
19 adequately able to identify it. Tr. I, 84-85, 87, 131-132, 136, 152; Tr. II., 78-79, 192. SA West never
20 checked eTreppid's computers for the missing source code, and it appears that Trepp referred SA West
21 to Venables for source code questions. Tr. I, 84-87. However, Venables admitted that he did not know
22 what source code was "ever there" at eTreppid; therefore, Venables had no way of knowing what to look
23 for to confirm missing source code (Tr.I, 136; 152-154; Tr. Ex. 33, Vol. 1:11-120). Venables's
24 testimony at the preliminary injunction hearing appears to contradict the assertions SA West made in
25 his affidavit that the source codes at issue were located on the "source code server," using the "RAID
26 Unit" and "back-up ISA" on the premises at eTreppid, and that Venables had access to them (#1 at 3:17-
27 26; 18:1-2).

28                                                    28

1    Montgomery asserts that the term "source code" is meaningless and that the Montgomery Family

2    Trust owned the software pursuant to copyrights filed years before Montgomery's involvement with

3    Trepp (#21). Montgomery also states:

4              The sou rce codes used on military contracts are derived from my
               copyrighted source codes on file in the Copyright Office. None of those
5              source codes are on CD No. 1 or in the patents I assigned to eTreppid.
               They were all created by me with no other input from anyone and none
6              of them were created as part of my work at eTreppid. Approximately 90%
               of the codes were developed before September 28, 1998, and 99% were
7              developed prior to November 2002, when even eTreppid treated me as an
               independent contractor.

8
     Tr. Ex. 38, ¶ 16.
9
          Had the court been apprised of the civil litigation between Trepp and Montgomery and the
10
     disputed facts summarized herein, it would have concluded – as the court does now – that there was no
11
     probable cause to issue a search warrant based upon the allegation of theft of trade secrets.[11]
12

13                 **6.    Callous Disregard of Montgomery's Constitutional Rights**

14        The court has reviewed the record in this proceeding in great detail, since the power of the

15   Government to safeguard a citizen's privacy in his or her home and possessions against unjustified

16   intrusions by government officials is a "basic purpose" of the Fourth Amendment. *Camara v. Municipal

17   Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). In this proceeding, SA West was

18   charged with the investigation of two very serious and two potentially very complex criminal violations.

19   After examination of his affidavit, his testimony concerning his investigation, and the protocols the

20   Department of Justice has implemented for these crimes, this court can only conclude that SA West

21   acted with callous disregard of Montgomery's fundamental Fourth Amendment rights. The over-arching

22   concern in this proceeding is that SA West became an unwitting pawn in a civil dispute, and as a result

23   of his inexperience and lack of training, he prepared search warrant affidavits that are riddled with

     incorrect statements, edited documents, and uncorroborated conclusions, which caused this court to
24

25

26        [11]Because the court has concluded that there is no probable cause as to the trade secret allegation,
     the court notes that the conversations Montgomery had with Azzinaro and SA Harraldsen do not change
27   the court's finding of lack of probable cause, and they need not be addressed.

28                                            29

1  exercise its formidable power to authorize the government to search Montgomery's home and storage

2  units.

3          In 2000, the Department of Justice's Computer Crime and Intellectual Property Section

4  ("CCIPS") published the *Prosecuting Intellectual Property Crimes Manual.* Tr. Ex. 12. With respect

5  to theft of commercial trade secrets, it states:

6              The EEA [Economic Espionage Act of 1996] is violated only where
               someone acts knowingly without authorization. Under certain
7              circumstances, however, two individuals or companies may have a
               legitimate dispute over ownership rights in a trade secret. This type of
8              dispute is likely to arise where the two potential owners previously
               worked together to develop the disputed technology and where the
9              contractual arrangements governing each party's respective ownership
               interests are unclear or entirely absent. In these circumstances, unilateral
10             action with regard to the trade secret by one of the owners may precipitate
               an EEA referral. *Such cases are rarely appropriate for criminal*
11             *prosecution, especially where the party taking unilateral action has*
               *obtained advice of counsel.* Notwithstanding the passage of the EEA,
12             many disputes regarding ownership of intellectual property, including
               trade secrets, continue to be best resolved in a civil forum.

13
   *Id.* at 17, section VIII.B.6.e (emphasis supplied). Prior to this case, SA West had never investigated a
14
   trade secrets case, he was unfamiliar with Department of Justice manuals relating to intellectual property
15
   crimes, and he did not consult with anyone within the Department of Justice for guidance, such as the
16
   Department of Justice's Computer Hacking and Intellectual Property Unit ("CHIPS Unit"). Tr. I, 14,
17
   18, 23-24; Tr. II, 187-188; 216-218; Tr. Ex. 12, 14, 21, 25. Like SA West, SA Haraldsen had no training
18
   in investigating intellectual property crimes, and his role was to act as a liason between eTreppid and
19
   the U.S. Air Force and Department of Defense on contracts eTreppid had with these government
20
   agencies. Tr. I, 17-18.  SA West was aware that Trepp and Montgomery were engaged in civil trade
21
   secret litigation, and he relied on one side of that dispute – Trepp's – for critical evidence concerning
22
   potential criminal prosecution for theft of trade secrets against the adverse party, Montgomery. SA West
23
   relied on Trepp's representation that court records were sealed, but he never confirmed this
24
   representation. Tr. I, 74-76; 136-138. In fact, although certain portions of eTreppid's lawsuit were
25
   sealed, the parallel lawsuit filed by Montgomery was not. SA West blindly relied on the documents,
26
   sworn statements, and evidence supplied by eTreppid, and he never appeared to question whether he had
27

28                                               30

1   become an agent, not for the Government, but for private interests engaged in litigation valued in
2   millions of dollars. The litigation that has ensued based upon the seizure of Montgomery's property is
3   a cautionary tale to heed the admonition that trade secrets litigation is best left to the civil forum.

4        The court has similar concerns about SA West's investigation of unlawful retention of national
5   defense information. SA West took SA Haraldsen, Trepp, Venables, and Gray at their word and never
6   confirmed basic facts they alleged. Upon learning of these serious allegations, one would presume that
7   an FBI agent with no experience in this area would consult with Department of Justice officials or his
8   own supervisors regarding the investigation. However, SA West never confirmed with the proper
9   government agency whether eTreppid had a facility clearance to store classified materials; he simply
10  relied on statements of Haraldsen and Venables. SA West did not even see the actual DD Form 254
11  until a few days before the final day of the evidentiary hearing – six months after the search warrants
12  were issued. SA West never confirmed the status of Montgomery's security clearance with the
13  appropriate government agency, and once again relied on Venables's statement. Moreover, SA West
14  had no knowledge of government procedures for suspension or revocation of an individual's security
15  clearance. When Gray supplied SA West with a list of so-called classified materials, he never confirmed
16  with anyone at Nellis Air Force Base that they were, in fact, classified. He continued to rely on
17  Venables, Gray and Haraldsen's representations concerning classification, and he never verified himself
18  whether the allegedly classified materials were actually missing.

19       The evidence before this court compels the conclusion that SA West acted with callous disregard
20  of Montgomery's constitutional rights, which resulted in the improper search of Montgomery's home
21  and storage units, and the improper seizure of his property.

22       **7.    Conclusion**

23       Once the Government conceded that "nine Secret hard drives" were not, in fact, classified and
24  that the material "was not properly classified by an Original Classification Authority within the U.S. Air
25  Force," (Tr. Ex. 4), the obvious question is whether the search warrant can stand based on probable
26  cause that Montgomery violated 18 U.S.C. § 793(e), unlawful retention of national defense information.
27  Throughout the three days of the evidentiary hearing and in its post-hearing brief, the Government made

28                                                    31

1   no showing whatsoever that probable cause still exists to justify keeping the seized material based on
2   this criminal violation, notwithstanding this court's invitation that the Government do so. Tr. III, 211-
3   212. Likewise, the Government has also failed to demonstrate that probable cause exists to justify the
4   issuance of the search warrants in this case based on a violation of 18 U.S.C. § 1832, theft of trade
5   secrets. The Government's post-hearing brief is devoid of any legal or factual argument in opposition
6   to Montgomery's motion for a return of the seized property, other than a defense of SA West's
7   investigation prior to the issuance of the search warrants. Having considered the evidence adduced at
8   the hearing, and all of the papers submitted in this proceeding, the court grants Montgomery's motion
9   for a return of the seized property (#21).[12]

10                                    **III. ORDER**

11        Based upon the foregoing,

12        **IT IS ORDERED** that Montgomery's motion to unseal the search warrant affidavits (#21) is
13   **GRANTED,** and Montgomery's motion for the return of property pursuant to Fed.R.Crim.P. 41(g) (#21)
14   is **GRANTED**. Montgomery's motion for the segregation and sealing of all attorney-client and trade
15   secret material (#21) is **DENIED AS MOOT**, since the court has ordered the return of all seized
16   property.

17        Pursuant to LR IB 3-1, any party wishing to object to this order shall, on or before **Tuesday,**
18   **December 12, 2006,** file and serve specific a written objection to the ruling together with points and
19   authorities in support thereof. The opposing party shall within ten days thereafter file points and
20   authorities opposing the objection. Points and authorities filed in support of or in opposition to the order
21   are subject to the page limits set forth in LR 7-4. This proceeding shall remain sealed until the deadline
22   for filing a written objection has expired. If no objection to this order is filed by **Tuesday, December**
23   **12, 2006,** this order shall stand as the final order, and all papers filed in this proceeding shall be
24   **UNSEALED** without further order of this court.

25

26   _____

27   [12]Since this court concludes that the Government lacked probable cause, it does not reach the
     particularity analysis.

28                                          32

Case: 15-72440, 08/26/2015, ID: 9662059, DktEntry: 10, Page 72 of 88

1    **IT IS FURTHER ORDERED** that in the event an objection is filed, this proceeding shall

2    remain **SEALED** until such time as the District Court issues its final order. The parties shall file any

3    written objection to this order or opposition to the objection under seal by delivering any documents to

4    be filed in a sealed envelope addressed to Jake Herb or Lia Griffin or the U.S. District Court, District

5    of Nevada, Reno Office.

6    **IT IS SO ORDERED.**

7    Dated this 28th day of November, 2006.

8

9                                                     _____

                                                       UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          33

# Exhibit C



**SWEDISH** MEDICAL CENTER

January 6, 2015

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery unfortunately sustained recent multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He completed Swedish inpatient rehab unit under my guidance on 6/21/2014.  He is now in outpatient PT, OT to work on ongoing left sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.  He has severe left shoulder pain impacting his stroke recovery.  He will also undergo neuropsychological testing to evaluate his cognitive strengths and weakness.

Lastly, he is having false visual imagery related to his stroke and is being followed by neuro-ophthalmology with Dr. Eugen May.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

# Joe Eskridge, M.D.

Swedish Neuroscience Institute
550 17th Ave #500
Seattle WA 98122
206.320.4144

June 27, 2014

To Whom It May Concern

Dear Sirs,

I, Dr. Joe Eskridge recently treated Dennis Montgomery who is a 60 year old man who suffered from a cerebral aneurysm. His aneurysm was detected in 2011. He does not smoke and does not have any congenital blood vessel diseases that contribute to aneurysm development.

High blood pressure can accelerate aneurysm growth and increase the risk of rupture and stroke. Stress can increase blood pressure and contribute to aneurysm growth. On a more probable than not basis stress related hypertension caused the development and growth of his aneurysm.

I have performed over 5000 brain artery repair and embolization procedures over the past 30 years. I was Professor of Radiology and Neurosurgery at the University of Washington Medical School from 1987-2004.

Sincerely yours,

Joe Eskridge, M.D.



**SWEDISH** MEDICAL CENTER

May 27, 2014

Re: Dennis Lee Montgomery (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery underwent aneurysm surgery on 5/16/2014 that was unfortunately complicated by multi-infarct strokes with resultant severe left sided weakness and impaired vision. He is currently on the Swedish inpatient rehab unit and will be here until at least late June 2014. He will not be able to testify out of state as a result of his current disability.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

Exhibit D

**UNITED STATES' MOTION FOR
PROTECTIVE ORDER**

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

```
                              )
ETREPPID TECHNOLOGIES, LLC, a )
California Corporation,       )       CV-N-06-00415(BES)(VPC)
                              )
            Plaintiff         )
     v.                       )
                              )
                              )
DENNIS MONTGOMERY, et. al.,   )
                              )
            Defendants.       )
                              )

DENNIS MONTGOMERY, et. al.,   )
                              )
            Plaintiffs        )
                              )       CV-N-06-00056(BES)(VPC)
     v.                       )
                              )
                              )
ETREPPID TECHNOLOGIES, INC.,  )
et. al.                       )
                              )
            Defendants.       )
                              )
```

### DECLARATION AND FORMAL CLAIM OF
### STATE SECRETS AND STATUTORY PRIVILEGES
### BY JOHN D. NEGROPONTE,
### DIRECTOR OF NATIONAL INTELLIGENCE

I, JOHN D. NEGROPONTE, hereby declare as follows:

1.  I am the Director of National Intelligence (DNI) of the United States. I have held this position since April 21, 2005. From June 28, 2004, until my appointment as DNI, I served as the United States Ambassador to Iraq.

From September 18, 2001, until my appointment in Iraq, I served as the United States Permanent Representative to the United Nations. I have also served as Ambassador to Honduras (1981-1985), Mexico (1989-1993), and the Philippines (1993-1996), and as Deputy Assistant to the President for National Security Affairs (1987-1989).

2. The statements made herein are based on my personal knowledge, as well as on information provided to me in my official capacity as DNI, and on my personal evaluation of that information. In personally considering this matter, I have read the information contained in the separate classified declaration filed *in camera* and *ex parte* in this case.

3. The purpose of this declaration is to assert formally, in my capacity as DNI and head of the United States Intelligence Community, the state secrets privilege to protect intelligence information ("state secrets privilege"), as well as a statutory privilege under the National Security Act, 50 U.S.C. § 403-1(i)(1), to protect intelligence sources and methods from unauthorized disclosure. Unauthorized disclosure of information covered by the state secrets and statutory privileges reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the

United States, and such information should therefore be excluded from any use in this litigation.

## I. STATUTORY AND EXECUTIVE ORDER AUTHORITIES

4. The position of Director of National Intelligence was created by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947). Subject to the authority, direction, and control of the President of the United States, the DNI serves as the head of the United States Intelligence Community and as the principal advisor to the President, the National Security Council, and the Homeland Security Council for matters related to intelligence and national security. *See*, 50 U.S.C. § 403 (b)(1),(2).

5. The "United States Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal

3

SEP 19 2006 11:49AM   Case 3:06-cv-00056-PMP-VPC/2005  Document 623-29, Filed 09/25/2006  Page 5 of 11   NO 322   P. 5

Bureau of Investigation, and the Department of Energy; the

Office of Intelligence and Analysis of the Department of

the Treasury; the Drug Enforcement Administration's

Intelligence Division; the Bureau of Intelligence and

Research of the Department of State; elements of the

Department of Homeland Security concerned with the analysis

of intelligence information (including the Office of

Intelligence of the Coast Guard); and such other elements

of any other department or agency as the President may

designate, or as may be jointly designated by the DNI and

the head of the department or agency concerned, as an

element of the United States Intelligence Community. *See*,

50 U.S.C. § 401(a)(4).

6. The responsibilities and authorities of the DNI,

enumerated in the National Security Act, as amended, at 50

U.S.C. § 403-1, include ensuring that national intelligence

is provided to the President, the heads of the departments

and agencies of the Executive Branch, the Chairman of the

Joint Chiefs of Staff and senior military commanders, and

the Senate and House of Representatives and committees

thereof. 50 U.S.C. § 403-1(a)(1). The DNI is also charged

with establishing the objectives of, determining the

requirements and priorities for, and managing and directing

the tasking, collection, analysis, production, and

4

SEP.19.2006 11:49AM

dissemination of national intelligence by elements of the United States Intelligence Community. 50 U.S.C. § 403-1(f)(1)(A)(i), (ii). The DNI is responsible for developing and determining, based on proposals submitted by heads of agencies and departments within the United States Intelligence Community, an annual consolidated budget for the National Intelligence Program for presentation to the President, and for ensuring the effective execution of the annual budget for intelligence and intelligence-related activities, including managing and allotting appropriations for the National Intelligence Program. *Id.* § 403-1(c)(1)-(5).

7. In addition, the National Security Act of 1947, as amended, provides that "The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Consistent with this responsibility, the DNI establishes and implements the guidelines of the United States Intelligence Community for the classification of information under applicable law, Executive Orders, or other Presidential directives, and access and dissemination of intelligence. *Id.* § 403-1(i)(2)(A), (b). In particular, the DNI is responsible for the establishment of uniform standards and procedures for granting access to Sensitive

5

Compartmented Information to any officer or employee of any agency or department of the United States and for ensuring consistent implementation of those standards throughout such departments and agencies. *Id.* § 403-1(j)(1),(2).

8. By virtue of my position as the DNI, and unless otherwise directed by the President, I have access to all intelligence related to national security that is collected by any department, agency, or other entity of the United States. Pursuant to Executive Order 12958, as amended,[1] the President has authorized me to exercise original TOP SECRET classification authority. After personal consideration of the matter, I have determined that the classified *ex parte*, *in camera* declaration which accompanies this assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods is properly classified under § 1.3 of E.O. 12958, because the unauthorized public disclosure of information contained in that declaration reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the foreign policy and national security of the United States.

---

[1] Executive Order 12958 was amended by Executive Order 13292. *See* Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19825 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

## II. ASSERTION OF THE STATE SECRETS AND STATUTORY PRIVILEGES

9. After careful and actual personal consideration of the matter, I have determined that the unauthorized disclosure of certain information that may be implicated by the parties' claims in this matter, as set forth here and described in more detail in the classified *ex parte, in camera* declaration which accompanies this declaration, reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the United States, and thus must be protected from disclosure and excluded from this case. Therefore, I formally invoke and assert the state secrets privilege to prevent the disclosure of that information.

10. Through this declaration, I also invoke and assert a statutory privilege held by the DNI under the National Security Act, as amended, to protect the intelligence sources and methods implicated by this case. *See*, 50 U.S.C. § 403-1(i)(1). My assertion of this statutory privilege for intelligence sources and methods is coextensive with my state secrets privilege assertion.

11. With my assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods, I respectfully ask the Court to prevent any

party from testifying, eliciting testimony, producing, disclosing, entering into evidence or making any other use in discovery, at trial, or in any other way in connection with this case, information concerning: (a) the existence or non-existence of, any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the United States Intelligence Community, or any current or former official, employee, or representative thereof, and any individuals or entities associated with this lawsuit, on any current or former officer or employee thereof; and (b) any actual or proposed interest in, application, or use by any entity in the United States Intelligence Agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with this lawsuit.

12. I have determined that any unauthorized disclosure of the information described in Paragraph 11 reasonably could be expected to cause serious, and in some case exceptionally grave damage to national security since the United States can neither confirm nor deny such information without compromising the effectiveness of intelligence sources and methods. Public disclosure of

8

information that confirms the use of particular
intelligence sources and methods compromises the
effectiveness of those sources and methods by alerting
likely targets to their use, while public denial of the use
of particular intelligence sources and methods reveals to
adversaries that some practices are secure. Any truthful
response to confirm or deny allegations related to
intelligence sources or methods informs hostile foreign
intelligence agencies about the manner in which the United
States collects intelligence information, and could result
in a loss of valuable intelligence when our adversaries are
able to take countermeasures. Similarly, if the United
States government was required to admit or deny allegations
made in litigation concerning its classified contracting
process, then classified contract relationships could be
exposed, which would cause harm to the national security.
The precise nature of the harm that would ensue from the
disclosure of the information protected by the state
secrets privilege and statutory privilege to protect
intelligence sources and methods is set forth in detail in
the *in camera, ex parte* declaration.

## CONCLUSION

13.   I respectfully request that the Court grant the
Department of Defense's motion for a protective order.


I hereby declare under penalty of perjury that the
foregoing is true and correct.

Executed this _19th_ day of September 2006.


JOHN D. NEGROPONTE
DIRECTOR OF NATIONAL INTELLIGENCE