**No. 15-72440**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**In re JOSEPH M. ARPAIO, in his official capacity as Sheriff of Maricopa County, Arizona**
*Defendant/Petitioner*

and **GERARD A. SHERIDAN**
*Specially appearing non-party/Petitioner*

v.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**
*Respondent Court*

**and MANUEL DE JESUS ORTEGA MELENDRES, et al.**
*Plaintiffs/Real Parties in Interest.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
2:07-CV-02513-GMS
The Honorable G. Murray Snow, United States District Judge**

---

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3**

**PETITIONERS' REPLY IN SUPPORT OF MOTION TO STAY DISTRICT COURT PROCEEDINGS**

---

John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
Attorneys for Defendants/Petitioners Joseph M. Arpaio in his official capacity as
Sheriff of Maricopa County and Gerard A. Sheridan

Michele M. Iafrate, Bar #015115
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, Arizona 85003
Telephone: 602-234-9775
miafrate@iafratelaw.com
Attorneys for Defendants/Petitioners Joseph M. Arpaio in his official capacity
as Sheriff of Maricopa County and Gerard A. Sheridan

A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
mmcdonald@jshfirm.com
Specially appearing counsel for
Petitioner Joseph M. Arpaio in his official capacity
as Sheriff of Maricopa County, Arizona

# CIRCUIT RULE 27-3 CERTIFICATE

In order to avoid irreparable harm, Petitioners request this Court rule on their Motion to Stay prior to the resumption of contempt proceedings before Arizona District Court Judge G. Murray Snow on September 22, 2015. In the alternative, Petitioners request that this Court grant a temporary stay of the September 22, 2015 contempt proceedings until it can rule on Petitioners' Motion to Stay.

**(i)    The telephone numbers, e-mail addresses, and office addresses of the attorneys for the parties:**

Stanley Young, Esq.
Michelle Morin, Esq.
Hyun S. Byun, Esq.
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
650- 632-4700
syoung@cov.com
mmorin@cov.com
hbyun@cov.com
Attorneys for Plaintiffs

Tammy Albarran, Esq.
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
415-591-7036
talbarran@cov.com
Attorney for Plaintiffs

Daniel J. Pochoda, Esq.
Joshua Bendor, Esq.
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014

602-650-1854
dpochoda@acluaz.org
Attorney for Plaintiffs

Jorge Martin Castillo, Esq.
MEXICAN AMERICAN LEGAL AND EDUCATIONAL FUND
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
213-629-2512
jcastillo@maldef.org
Attorney for Plaintiffs

Cecillia D. Wang, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
415-343-0775
cwang@aclu.org
Attorney for Plaintiffs

Anne Lai, Esq.
401 E. Peltason Dr.
Law 4800-P
Irvine, CA 92697-8000
949-824-9894
alai@law.uci.edu
Attorney for Plaintiffs

Andre Segura, Esq.
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 17th Floor
New York, NY 10004
212-549-2676
asegura@aclu.org
Attorney for Plaintiffs

Mark Kappelhoff
Deputy Assistant Attorney General
Judy Preston (MD Bar, no numbers assigned)
Timothy D. Mygatt (DC Bar No. 1021564)
Edward G. Caspar (MA Bar No. 650566)
Jennifer L. Mondino (NY Bar No. 4141636)
Paul Killebrew (LA Bar No. 32176)
Puneet Cheema (CA Bar No. 268677)
Matthew J. Donnelly (IL No. 6281308)
U.S. Department of Justice, Civil Rights Division
Special Litigation Section
601 D St. NW, Suite 5200
Washington, D.C. 20004
202-514-2000
edward.g.caspar@usdoj.gov
Attorneys for the United States

Michele M. Iafrate, Esq.
IAFRATE & ASSOCIATES
649 North Second Avenue
Phoenix, AZ 85003
miafrate@iafratelaw.com
602-234-9775
Attorneys for Defendant Joseph Arpaio and Maricopa County Sheriff's Office

Richard K. Walker, Esq.
WALKER & PESKIND, PLLC
16100 N. 71st Street, Suite 140
Scottsdale, AZ 85254-2236
rkw@azlawpartner.com
480-483-6336
Attorney for Maricopa County, Arizona

**(ii)    Facts showing the existence and nature of the claimed emergency.**

Petitioners filed a Motion to Stay with the district court, asking that court to stay further contempt proceedings until this Court could decide whether Judge Snow should have recused himself from the proceedings. This motion was denied.

The same six discrete arguments made in that Motion and in Petitioners' currently pending Motion to Stay in this Court demonstrate that Judge Snow's continued participation in these proceedings violates 28 U.S.C. § 455 and requires his recusal.[1] Thus, Judge Snow's continued presence over these proceedings presents both a substantial risk to the Petitioners' constitutional rights and endangers the public's perception of an impartial judiciary.

Petitioners request emergency relief now because the district court's contempt proceedings will resume on September 22, 2015, thus increasing the exigency of this matter. Judge Snow is set to make evidentiary rulings, witness credibility determinations, and issue further orders on or before September 22, 2015, which will cause Petitioners irreparable harm. When Petitioners first filed their Motion to Stay on August 20, 2015, Petitioners hoped this Court would have accepted mandamus review and granted relief before resumption of the September 22 contempt proceedings, given the expedited nature of writs of mandamus. Because, this has not occurred, Petitioners now request this Court to, at the very

---

[1] These grounds are: (1) the Motion for Recusal was timely, (2) Judge Snow and his spouse are material witnesses in this action, (3) The injection of MCSO's internal investigations and expansion of the Monitor's powers was a violation of petitioners' due process rights and demonstrates bias by the court, (4) Judge Snow improperly engaged (and continues to engage) in an extrajudicial investigation of disputed facts, (5) Recusal was mandatory because Judge Snow's brother-in-law is a partner at Covington and Burling, and (6) An objective, independent observer would have found recusal necessary under § 455(a). As noted, below, these six reasons relate only to the ongoing contempt proceedings. *See infra* § II(C) at p. 12.

least, grant a temporary stay of the district court proceedings, set to resume on September 22, while the Court considers Petitioners' Motion to Stay and Petition for Writ of Mandamus.

### (iii) When and how counsel for the other parties were notified and whether they have been served with the Motion.

Petitioners contacted opposing counsel on September 14, 2015, notifying them that they have requested emergency review. Petitioners also provided all parties an electronic PDF copy of this Motion contemporaneously with their filing of this Motion with this Court. In addition, prior to filing this Motion, Petitioners notified the Clerk of Court that they will be requesting emergency relief pursuant to Circuit Rule 27-3(a).

## REPLY IN SUPPORT OF MOTION TO STAY

### I.     INTRODUCTION

The ACLU's[2] Response to Petitioners' Motion for Stay reads like an improperly authorized Answering Brief, attempting to inject entirely irrelevant facts and issues that have absolutely no bearing on whether this Court should grant a temporary stay of the district court's contempt proceedings to decide Petitioners' Writ of Mandamus.  For the foregoing reasons, a stay is warranted.

### II.    A STAY IS WARRANTED UNDER THE FOUR *NKEN* FACTORS

The ACLU's Response fails to acknowledge the proper standard for a stay on appeal.  In order to justify a stay "petitioners need not demonstrate that it is more likely than not that they will win on the merits." *Leiva-Perez v. Holder,* 640 F.3d 962, 966 (9th Cir. 2011).  The court in *Leiva-Perez*, while addressing the *Nken* factors, recognized that "[t]here are many ways to articulate the minimum quantum of likely success necessary to justify a stay—be it a reasonable probability or fair prospect, . . .  a substantial case on the merits, . . . or, . . . that serious legal questions are raised." (quotations omitted). *Leiva-Perez*, 640 F.3d at 967-68.  "Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits." *Id.* at 968.  Thus, Petitioners need only

---

[2] Petitioners refer to Plaintiffs-Appellees collectively as the "ACLU."

demonstrate that they have a "substantial case for relief on the merits" in order to be entitled to a stay.

### A.     Petitioners have a substantial case for relief on the merits.

For the foregoing reasons, *none* of the arguments in the ACLU's Response has diminished the fact that Petitioners have a "substantial case for relief on the merits" demonstrating that Judge Snow's failure to recuse himself was clearly erroneous for six discrete reasons.  *Id.*

### 1. Petitioners' Motion for Recusal was Timely.

The ACLU's Response commits the same error that the Court did when it ruled that Petitioners' Motion for Recusal was untimely – the basis for recusal did not arise in 2012, 2013, or even 2014 – it arose on April 23, 2015 when Judge Snow injected irrelevant and unrelated issues into the contempt proceedings.  First, Petitioners never argued that the grounds for recusal arose out of the Grissom/Montgomery investigations themselves.  It was the Court's improper inquiry into these matters during the April 2015 contempt hearings that injected these irrelevant investigations into the proceedings and ripened their grounds for recusal.  *See, Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991) (Recusal motions are timely, even if filed a year or more later, where the grounds for recusal do not arise until later); *Edgar v. K.L.*, 93 F.3d 256, 257-58 (7th Cir. 1996) (same). Second, the Court's subsequent order directing that the Monitor be given

2

unfettered access to investigate these and other irrelevant matters did not occur until May 14, 2015.  The recusal motion was filed within a week of that, on May 22, 2015.  Therefore, the recusal motion was timely.

### 2.    Judge Snow and his spouse are material witnesses in this action.

The ACLU incorrectly claims that Judge Snow and his spouse are not material witnesses because Petitioners: (1) failed to explain how the Grissom statements would make either the Court or his spouse a "material witness" in the contempt proceedings, (2) chose to disregard the Grissom statements, and (3) allegedly argued that the facts underlying the Grissom investigation did not relate to the contempt proceedings.  [ACLU Response at 12].  First, Petitioners clearly asserted that under 28 U.S.C. § 455(b)(5)(iv), *uncontradicted* evidence existed that Judge Snow's spouse told the Grissom family that he was biased against Sheriff Arpaio and that he would do everything in his power to ensure he was not re-elected.  [*See* Doc. 1117 (Exs. 5-8), Ex. 8].  Furthermore, the Court's subsequent orders directing the Monitor to investigate into these matters only further cements the Court's material witness status.  Second, Petitioners did not "disregard" the comments made by the Grissoms, rather, out of respect for the Court, Petitioners declined to further investigate into these matters (despite confirming they were in fact substantiated) and would never had raised them if the Court did not inquire into them.  Finally, the ACLU ignores, because they must, that once the Court

3

injected the Grissom investigation into the April 2015 contempt proceedings, this not only violated Petitioners due process rights, *see infra* § 3, but also made these issues relevant and ripened Judge Snow and his wife as material witnesses to the proceeding.[3]

Accordingly, through no fault other than his own, Judge Snow made himself and his spouse material witnesses in this action. *See United States v. Alabama*, 828 F.2d 1532, 1545 (11th Cir. 1987) (disqualification required when judge "forced to make factual findings about events in which he was an active participant.").

### 3. The expansion of the Monitor's powers was improper and violated Petitioners' Due Process Rights.

The ACLU claims that the Court "also possesses broad equitable authority to modify the monitoring and compliance tasks it delegates to the Monitor" but cites absolutely no authority to support that proposition.[4] [ACLU Response at 16-18].

---

[3] Moreover, when *directly questioned* whether the Court felt the Grissom investigation was relevant to the contempt proceedings, the Court failed to state that the Grissom investigation was not relevant to the contempt proceedings. [*See* 8/21/15 RT at 59:8-60:14]. Even if it did, however, it cannot now un-ring the bell.

[4] The ACLU's citation to *Rufo v. Inmates of Suffolk Cnty. Jail,* 502 U.S. 367, 380-81 (1992) and *Hutto v. Finney*, 437 U.S. 678, 687 (1978) do not support this proposition either because neither of these cases involved the expansion of a Court appointed monitor's duties. Moreover, these cases discuss the Court's authority to issue a *new* order or *modifying* an existing order in light of compliance issues, which was never done in this case, further demonstrating the Court's bias and its abuse of Petitioners' due process rights.

4

Regardless, the ACLU conflates Petitioners' violations of prior Court orders (the topics of the contempt proceedings) with the sufficiency of its internal investigations, neither of which are interrelated. Again, the Order to Show Cause only states *three distinct* areas of inquiry for the contempt proceedings, none of which involve inquiry into MCSO internal investigations. To date, the Court has never modified or issued a new order to show cause identifying that MCSO's internal investigations are one of the grounds for the contempt proceedings. Moreover, Petitioners' opportunity to be heard during future contempt proceedings is not a sufficient corrective measure to the Court's surprise, improper inquiry into these matters because it does not permit defense counsel adequate time to prepare a defense to the Court's ever expanding scope of ad hoc issues it deems related to the contempt proceedings.[5] Finally, even the Court has retreated from finding these matters relevant to the contempt proceedings (despite continuing to investigate them as part of the contempt proceedings). [*See* 7/24/15 Tr. at 21:6-10, Ex. 16; 7/31/15 RT at 44:16-21, Ex. 13]. Thus, the Court was not "well within its power" to inquire into these areas via its Monitor. *See Little v. Kern Cnty. Superior Court,*

---

[5] Indeed, this Court set contempt hearings to resume on September 22, 2015. The Court permitted the ACLU to request 26 depositions from September 3rd to the 21st, giving Petitioners' counsel less than *one day* to prepare for the continued contempt proceedings – the topics of which are still unclear to Petitioners. These stringent deadlines are only demonstrative of the continued bias Petitioners face from this Court, are not conducive to the preservation of Petitioners' due process rights, and would not be tolerated in any other circumstance.

5

294 F.3d 1075, 1081 (9th Cir. 2002) ("notice of the contempt charges and of the contempt hearing must be explicit in order to conform to the requirements of due process.").[6]  Accordingly, the Court's continued insistence to investigate into MCSO's internal investigations (with the assistance of its Monitor) as a basis for finding Petitioners in contempt is a violation of Petitioners' due process rights and patently demonstrates the Court's bias, requiring its recusal under §455(b)(1).[7]

### 4.  Judge Snow improperly engaged (and continues to engage) in an extrajudicial investigation of disputed facts.

No argument contained in Petitioners' Motion to Stay (or its Writ of Mandamus for that matter) asserts that the Court could not speak with its Monitor. Rather, Petitioners argued that certain *ex parte* communications between the Court

---

[6] While the ACLU is correct that a judge may question a witness, and a witness does not have a right to advance notice of every question, the Court cannot inquire into matters entirely *unrelated* to the current proceeding, and which *directly* implicates the Court's impartiality.  *See United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994).

[7] The ACLU's reference to Petitioners' failure to produce emails and the existence of additional identification documents recently discovered does not demonstrate the Court has authority to expand the Monitor's authority into MCSO's internal investigations because this information has come out long *after* the Court began improperly probing into MCSO's internal investigations. Moreover, Petitioners have complied with the Court's request to produce these emails on a rolling basis to the ACLU and have made additional identification documents available as soon as they became aware of them.  [*See* 8/28/15 RT at 31:19-32:21, attached as Ex. A]. Finally, Petitioners' failure to object to the Court's line of questioning does not waive their arguments now.  The ACLU cites no authority for this proposition and nothing under 28 U.S.C. § 455 requires an objection to be raised the moment it occurs during the proceedings.

and its Monitor are impermissible.[8]  These include those communications which

give the Court *personal knowledge* of disputed evidentiary facts concerning the

_____

[8]  Contrary to the ACLU's arguments, there are limitations on ex-parte communications between the Court and its Monitor.  In the Court's appointing order setting forth the Monitor's powers and duties, pursuant to F.R.C.P. 53(b)(2)(B), it was required to state "the circumstances, if any, in which the [Monitor] may communicate ex parte with the court or a party."  Courts have clearly applied Rule 53 to a Court appointed Monitor.  *See e.g.*, *United States v. Apple Inc.*, 787 F.3d 131, 139 (2d Cir. 2015); *Howe v. City of Akron*, 17 F. Supp. 3d 690, 692 (N.D. Ohio 2014).  Moreover, Courts have traditionally limited ex parte communications between a Court and its monitor to regard logistics, the nature of his activities, and other appropriate procedural matters.  *See e.g., Satyam Computer Servs., Ltd. v. Venture Global Eng'g, LLC,* No. 06-CV-50351-DT, 2007 WL 1806198, at *6 (E.D. Mich. June 21, 2007); *In re Oral Sodium Phosphate Solution-Based Products Liab. Action,* No. 1:09-SP-80000, 2009 WL 2601395, at *2 (N.D. Ohio Aug. 24, 2009).  This limitation complies with the commentary to Rule 53.  *See* Rule 53, 2003 amendment, cmt. b. ("Ex parte communications between a master and the court **present troubling questions**. Ordinarily the order should prohibit such communications, assuring that the parties know where authority is lodged at each step of the proceedings.") (Emphasis added).

As such, most Courts have strictly instructed their Monitor to not communicate with the Court on any substantive matter the Monitor learned during an ex parte communication between the Monitor and any party.  *See Howe v. City of Akron,* 17 F. Supp. 3d 690, 692 (N.D. Ohio 2014) ("The Monitor shall not communicate to the Court any substantive matter the Monitor learned during an ex parte communication between the Monitor and any party."); *see also Case v. French Quarter III LLC,* No. 9:12-CV-02518-DCN, 2014 WL 6971019, at *2 (D.S.C. Dec. 9, 2014) (same); *Sibley v. Sprint Nextel Corp.*, 298 F.R.D. 683, 686-87 (D. Kan. 2014) (same).

While the Court's appointing order in this case clearly permits ex parte communications with "the Parties" and its Monitor, it is entirely silent regarding ex parte communications between the Court and the Monitor.  [*See* Doc. 606 at ¶¶ 129, 119-159].  Therefore, because the appointing order is silent regarding ex parte communications between the Court and the Monitor, their ex parte communications should be limited, at best, to logistical and procedural matters.

7

contempt proceedings. 28 U.S.C. § 455(b)(1). Accordingly, the Court's ex parte communications with its Monitor *are limited* under Rule 53 and § 455(b)(1). Therefore, when Judge Snow proceeded to conduct an ex parte discussion with the Monitor, outside of the contempt proceedings, that regarded the very issues at the heart of the contempt proceedings, the communication was not authorized under Rule 53 and violated § 455(b)(1). *See Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444, 446-47 (6th Cir. 1980)* (noting that gaining information from a law clerk's independent investigation of disputed facts would be a violation of Canon 3(c)(1)(a) and § 455).[9] Given this communication, and that the Court continues to communicate *ex parte* regarding the Monitor's investigation into other contested factual issues,[10] Judge Snow's failure to recuse himself was clearly erroneous as a matter of law.

### 5. Recusal was mandatory because Judge Snow's brother-in-law is a partner in Covington & Burling.

The ACLU argues that "[t]he district court correctly concluded that the authorities did not create a *per se* rule of recusal, but only recognized that circumstances may require recusal when the partner's interest in the proceedings is

---

[9] Again, nothing in the Court's existing judicial orders gives the Monitor a duty to advise the Court regarding the accuracy of testimony given during the contempt proceeding. [*See* Doc. 606 at ¶ 126 (Setting forth the Monitor's duties)].

[10] *See e.g.,* 7/31/15 RT at 10:17-18, 18:22-19:4, attached as Ex. B; 8/7/15 RT at 16:15-18:15, 30:12-17, Ex. 14; 8/11/15 RT at 24:17-22, 51:22-52:3, 52:14-16, 53:5-10, Ex. 15.

8

'substantial,' which is a 'fact sensitive inquiry.'" [ACLU Response at 9]. However, the ACLU ignores that after Judge Snow's ruling, many of the grounds for his "fact sensitive inquiry" in 2012 have changed. In Judge Snow's June 2012 order, he noted that recusal was not required at the time because there was only a "remote possibility" that Plaintiffs would be awarded attorney's fees (and if they did it would "be very small"); thus it "was speculative" whether the Court's brother-in-law had a financial interest in the outcome of the case. [Doc. 542, Ex. 23]. As of 2015, however, Covington & Burling has been awarded nearly $3.5 million in fees and costs [Doc. 742, Ex. 20], and have requested nearly half a million dollars more in fees and costs for the appeal of the bench trial.[11] This is hardly a "very small" amount, making it no longer "speculative" that Covington & Burling has a financial interest in this litigation. *See* Canon 3(C)(3)(c) (holding that "'financial interest' means ownership of a legal or equitable interest, *however small* …") (emphasis added).[12] Finally, Judge Snow never indicated he wrote to

---

[11] *See* Ninth Circuit Case No. 13-16285, 13-17238, Dkt. 89, Ex. E.

[12] In addition, the June 2012 Letter sent by Covington & Burling to the Court and counsel states that Judge Snow's brother-in-law retired from Covington & Burling. However, as of September 7, 2015, he is still displayed as an active member of the firm. [*See* attached Ex. C, Bio of Keith A. Teel]. Moreover, decisions published as recently as June 8, 2015 note that he is still practicing on behalf of Covington & Burling. *See AstraZeneca LP v. Breath Ltd.,* 603 F. App'x 999, 1000 (Fed. Cir. 2015) (Keith A. Teel representing plaintiff on behalf of Covington & Burling); *United States v. Philip Morris USA Inc.,* No. CV 99-2496(GK), 2015 WL 3549622 (D.D.C. June 8, 2015) (representing defendants).

the Judicial Ethics Advisory Committee, as Judge Wake did in *Fiore v. Apollo*, *2015 WL 1883980 (D. Ariz. Apr. 24, 2014)*.  Importantly, in response to Judge Wake's inquiry regarding Judicial Advisory Opinion No. 58, the Committee reiterated that a categorical rule of recusal exists when a relative within the third degree of relationship is an equity partner in a law firm in the case, notwithstanding his residence in a different office and the lack of any involvement or effect on his income.

Both of these developments constitute significant changed factual circumstances that have occurred since the issuance of Judge Snow's June 2012 Order on this issue, and should have been raised by the Court, at the very least, before instituting the contempt proceedings against new parties.  However, the Court failed to do so, despite previously recognizing that, as the ACLU states, "any party" could have requested the Court to recuse himself.  [ACLU Response at 10].

> ### 6. <u>An objective independent observer would have found recusal necessary under 28 U.S.C. § 455(a).</u>

In light of all of the foregoing arguments, an objective independent observer would have found recusal necessary under 28 U.S.C. § 455(a).  The ACLU's arguments to the contrary, which are largely based on assertions that Petitioners

---

The record is therefore devoid of evidence that the court's brother-in-law did not receive some financial benefit (either directly or indirectly) from this substantial award, regardless of the June 2012 letter sent to the Court from Covington & Burling.

manufactured their basis for judicial disqualification, are not grounded in any facts and are rank speculation. It is a disguised attempt to distract this Court from a simple and undeniable truth – Judge Snow injected each and every one of the aforementioned issues into these proceedings. Defendants did not once raise any of these issues as an affirmative defense (or at all) during the contempt proceedings – in fact, they **admitted** contempt. As such, an objective independent observer, in light of all the issues raised above, would find that recusal was necessary under § 455(a). *See Fairley v. Andrews*, 423 F. Supp. 2d 800, 821 (N.D. Ill. 2006) ("all of this Court's statements and interactions with Defendants in this case, taken together, may give pause to a non-legal observer, not versed in the ways of the courtroom and the risks of litigation.").

### B. <u>Petitioners will be irreparably injured absent a stay.</u>

It is curious that the ACLU argues that the injured class' right to monetary compensation outweighs Petitioners' due process rights. It is axiomatic if Judge Snow is precluded from sitting on this case pursuant to 28 U.S.C. § 455, his continued participation in the contempt proceedings and compliance phase of this action endangers not only the Petitioners' rights, but also the appearance of the Court's fairness and impartiality to the public. As such, it is understandable that this Court has recognized that a denial of a Motion for Recusal is exactly the kind of "exceptional circumstance that [a writ of mandamus] was designed [for]."

11

*Cement Antitrust Litig., (MDL No. 296),* 673 F.2d 1020, 1025 (9th Cir. 1982). Moreover, given that this case is in the remedial stage of litigation, the district court will not be issuing a "final order" that can be appealed. Thus, absent mandamus relief, Petitioners will be prejudiced in a way not correctable on later appeal.

### C. Issuance of the stay will not substantially injure the other parties interested in the proceeding and will favor the public interest.

The ACLU argues that a "stay would substantially injury Plaintiffs by further delaying compensation to those who were detained in violation of the December 23, 2011 preliminary injunction" because it will be unable to locate those victims. However, there is absolutely nothing stopping the ACLU from locating the alleged victims of Petitioners' violation of the December 23, 2011 preliminary injunction. In fact, a stay will give the ACLU additional time to do so. As such, a stay will actually *favor* the ACLU.

The ACLU also presumes that Petitioners' compliance efforts would not continue with the existing permanent and supplemental injunctive orders if a stay were granted. This is an incorrect assumption. *Petitioners unequivocally assert that if this Court granted a stay, MCSO will continue to implement corrective action pursuant to the Court's permanent and supplemental injunctive orders. Petitioners only seek to stay all matters associated with the ongoing contempt proceedings*. Petitioners also reiterate that the right to a neutral and detached

12

judge in any proceeding is an integral part of maintaining the public's confidence in the judicial system. *See Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972). Accordingly, the public interest greatly favors a stay.

## III.    <u>CONCLUSION</u>

For the reasons stated above, Petitioners request this Court stay the district court's contempt proceedings pending resolution of their writ of mandamus.

RESPECTFULLY SUBMITTED this 14th day of September, 2015.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson
    John T. Masterson
    Joseph J. Popolizio
    Justin M. Ackerman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

IAFRATE & ASSOCIATES


By /s/ John T. Masterson  (w/permission from)
    Michele M. Iafrate
    649 North Second Avenue
    Phoenix, Arizona 85003
    Attorneys for Defendants/Petitioners
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County and
    Gerard A. Sheridan

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ John T. Masterson  (w/permission from)
    A. Melvin McDonald
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Specially appearing counsel for
    Joseph M. Arpaio in his official capacity
    as Sheriff of Maricopa County, Arizona

14

## **CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X]  this brief contains 3383 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]  this brief uses a monospaced typeface and contains ___ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because:

    [X]  this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2010 14pt Times New Roman, *or*

    [ ]  this brief has been prepared in a monospaced spaced typeface using Microsoft Office 2010 with ____ characters per inch (*insert name of font style here*) _____.

| | |
|---|---|
| Signature | /s/ John T. Masterson |
| Attorney for | Defendants/Petitioners Joseph M. Arpaio and Gerard A. Sheridan |
| Date | September 14, 2015 |

15

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **Petitioners' Reply in Support of Motion to Stay District Court Proceedings** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 14th day of September, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system:

/s/Karen Gawel _____

16

# EXHIBIT A

Status Conference 8-28-15.txt

1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega Melendres,    )
     et al.,                              )
5                                         )
                         Plaintiffs,      ) No. CV 07-2513-PHX-GMS
6                                         )
                   vs.                    ) Phoenix, Arizona
7                                         ) August 28, 2015
     Joseph M. Arpaio, et al.,            ) 9:38 a.m.
8                                         )
                         Defendants.      )
9                                         )

10

11

12

13

14                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              BEFORE THE HONORABLE G. MURRAY SNOW

16                       (Status Conference)

17

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

         CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    2

1                      A P P E A R A N C E S

2

                              Page 1

```
                    Status Conference 8-28-15.txt
 3    For the Plaintiffs:
              American Civil Liberties Union Foundation
 4            Immigrants' Rights Project
              By:  Cecillia D. Wang, Esq.
 5            39 Drumm Street
              San Francisco, California  94111
 6
              American Civil Liberties Union Foundation
 7            Immigrants' Rights Project
              By:  Andre Segura, Esq. - Telephonically
 8            125 Broad Street, 18th Floor
              New York, New York  10004
 9
              Covington & Burling, LLP
10            By:  Tammy Albarran, Esq.- Telephonically
              By:  Lauren E. Pedley, Esq.- Telephonically
11            1 Front Street, 35th Floor
              San Francisco, California  94111
12
              Covington & Burling, LLP
13            By:  Stanley Young, Esq.
              By:  Michelle L. Morin, Esq. - Telephonically
14            333 Twin Dolphin Drive, Suite 700
              Redwood Shores, California  94065
15
      For the Defendant Joseph M. Arpaio and Maricopa County
16    Sheriff's Office:
              Iafrate & Associates
17            By:  Michele M. Iafrate, Esq.
              649 N. 2nd Avenue
18            Phoenix, Arizona  85003
19            Jones, Skelton & Hochuli, PLC
              By:  A. Melvin McDonald, Jr., Esq. - Telephonically
20            By:  John T. Masterson, Esq.
              By:  Joseph T. Popolizio, Esq.
21            2901 N. Central Avenue, Suite 800
              Phoenix, Arizona  85012
22

23

24

25


          CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    3


 1                        A P P E A R A N C E S

 2

 3    For the Defendant Maricopa County:
              Walker & Peskind, PLLC
 4            By:  Richard K. Walker, Esq.
              By:  Charles W. Jirauch, Esq.
 5            SGA Corporate Center
              16100 N. 7th Street, Suite 140
 6            Phoenix, Arizona  85254

 7    For the Movants Christine Stutz and Thomas P. Liddy:
                            Page 2
```

```
                    Status Conference 8-28-15.txt
                Broening, Oberg, Woods & Wilson, PC
   8            By:  Terrence P. Woods, Esq.
                P.O. Box 20527
   9            Phoenix, Arizona  85036

  10    For the Movants Maricopa County Attorney's Office and Maricopa
        County Attorney William Montgomery:
  11            Ridenour Hienton, PLLC
                By:  Ernest Calderon, Esq.
  12            Chase Tower
                201 N. Central Avenue, Suite 3300
  13            Phoenix, Arizona  85004

  14    For the Intervenor United States of America:
                United States Department of Justice - Civil Rights
  15            By:  Edward G. Caspar, Esq. - Telephonically
                By:  Paul Killebrew, Esq. - Telephonically
  16            950 Pennsylvania Avenue NW, 5th Floor
                Washington, D.C.  20530
  17
        For Deputy Chief Jack MacIntyre:
  18            Dickinson Wright, PLLC
                By:  Mitesh V. Patel, Esq.
  19            1850 North Central Avenue, Suite 1400
                Phoenix, Arizona  85004
  20
        For Chief Deputy Gerard Sheridan:
  21            Mitchell Stein Carey, PC
                By:  Lee D. Stein, Esq.
  22            1 Renaissance Square
                2 North Central Avenue, Suite 1900
  23            Phoenix, Arizona  85004

  24

  25

        CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    4


   1                    A P P E A R A N C E S

   2


   3    For Executive Chief Brian Sands:
                Lewis, Brisbois, Bisgaard & Smith, LLP
   4            By:  Greg S. Como, Esq.
                2929 N. Central Avenue, Suite 1700
   5            Phoenix, Arizona  85012

   6    For Lieutenant Joseph Sousa:
                David Eisenberg, PLC
   7            By:  David Eisenberg, Esq.
                2702 N. 3rd Street, Suite 4003
   8            Phoenix, Arizona  85004

   9    Also present:
                Chief Robert Warshaw, Monitor - Telephonically
  10            Commander John Girvin, Deputy Monitor- Telephonically
                Chief Raul Martinez, Deputy Monitor - Telephonically
  11            Chief Deputy Gerard Sheridan
                Michelle Morin, Esq. - Telephonically
                            Page 3
```

Status Conference 8-28-15.txt

12      Raphael O. Gomez, Esq. - Telephonically

13

14

15

16

17

18

19

20

21

22

23

24

25

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   5

1                 P R O C E E D I N G S

2

3        THE COURT:  Please be seated.

4        THE CLERK:  This is CV 07-2513, Melendres v. Arpaio,

5  on for status conference.

6        Counsel, please announce your appearances.

7        MS. WANG:  Good morning, Your Honor.  Cecillia Wang of

8  the ACLU for the plaintiffs.

9        THE COURT:  Good morning.

10       MR. YOUNG:  Good morning, Your Honor.  Stanley Young,

11  Covington & Burling, for plaintiffs.

12       THE COURT:  Good morning.

13       MS. IAFRATE:  Good morning, Your Honor.  Michele

14  Iafrate on behalf of Sheriff Arpaio and the unnamed alleged

15  contemnors.

16       MR. MASTERSON:  Good morning, Judge.  John Masterson

Page 4

Status Conference 8-28-15.txt

17    and Joe Popolizio for Sheriff Arpaio.

18        THE COURT: You know, Mr. Masterson, I just have a

19    question: Are you just appearing for Sheriff Arpaio?

20        MR. MASTERSON: No, Judge. We're the same as

21    Ms. Iafrate. I just shortened it because --

22        THE COURT: I know, I appreciate that. I just wanted

23    to make clear.

24        MR. WALKER: Good morning, Your Honor. Richard Walker

25    and Charles Jirauch on behalf of Maricopa County as defined in

       CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    6

1    previous appearances and filings with the Court.

2        THE COURT: You know, Mr. Walker, I saw that you filed

3    something early this morning; I haven't read it yet.

4        Just for clarity's sake, it does seem to me -- I read

5    maybe, like, the first paragraph -- just for clarity's sake for

6    any party that may wish to respond, it does seem to me that

7    Maricopa County is a party and has a right to separate

8    representation. But you are a party to the extent that you are

9    the jural entity that needs to be sued when the Sheriff's

10    Office is sued.

11        So I'm not sure that you have a status here as

12    Maricopa County only representing certain aspects of its

13    organization, for what that's worth. That's why it troubles me

14    when you take a position that is substantively different than

15    the sheriff, sheriff's position.

16        And I don't know, because I haven't read your motion.

17    I just barely got it. I, like, glanced at the first page. I

18    don't know if you address that or not, but that's really what

19    concerns me. I'll just tell you that and then we'll move on.

20        MR. WALKER: Okay. Thank you, Your Honor.

Status Conference 8-28-15.txt
21          THE COURT:  All right.  Thanks.

22          MR. COMO:  Good morning, Your Honor.  Greg Como

23  representing Brian Sands, who has waived his appearance today.

24          MR. WOODS:  Terry Woods for Lutz and -- for Stutz and

25  Liddy.

        CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference      7


1           THE COURT:  All right.  Thank you.

2           MR. STEIN:  Good morning, Your Honor.  Lee Stein,

3   specially appearing for Chief Deputy Sheridan, who is present.

4           MR. EISENBERG:  Good morning, Your Honor.  David

5   Eisenberg, specially appearing on behalf of Lieutenant Sousa.

6   I would excuse his presence for this day only.

7           THE COURT:  All right. Thank you.

8           MR. CALDERON:  Good morning, Your Honor.  Ernest

9   Calderon on behalf of County Attorney William Montgomery and

10  his office.

11          MR. PATEL:  Good morning, Your Honor.  Mitesh Patel,

12  Dickinson Wright, specially appearing for Deputy Chief

13  MacIntyre.

14          THE COURT:  Who do we have on the phone?

15          CHIEF WARSHAW:  Yes.  Good morning, Your Honor.

16  Chief Warshaw, and with me are two deputy monitors: Chief Raul

17  Martinez and Commander John Girvin.

18          THE COURT:  Good morning.

19          MS. ALBARRAN:  Good morning, Your Honor.  On behalf of

20  plaintiffs, from Covington you have Tammy Albarran, Lauren

21  Pedley, and Michelle Morin; and from the ACLU, Andre Segura.

22          THE COURT:  Good morning.

23          MR. McDONALD:  Good morning, Your Honor.  Mel McDonald

24  making a special appearance on behalf of Sheriff Joe Arpaio.

25          THE COURT:  Good morning.
                        Page 6

Status Conference 8-28-15.txt

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    8

1        MR. KILLEBREW:  Good morning, Your Honor.  Paul
2   Killebrew and Ed Caspar for plaintiff-intervenor United States.
3        MR. GOMEZ:  Good morning, Your Honor.  Raphael Gomez
4   from Civil Division, U.S. Department of Justice.
5        THE COURT:  Is that everyone?
6        All right.  Good morning to you all.
7        Ms. Wang, I instructed -- or I asked you last week if
8   you would please -- we went through last week the status of
9   production of documents.  Ms. Iafrate had produced many things
10  to you.  There were a few things that were outstanding.  I
11  handled the things that they hadn't timely produced by denying
12  their motion.  They indicated they understood, and I entered
13  that in my order.
14        I also asked you, though, to confirm that Ms. Iafrate
15  had given you everything that she had given you.  Can you
16  confirm that?
17        MS. WANG:  I do have that update, Your Honor.
18        There are a couple of outstanding issues.  The first
19  is that -- and I should mention first that we noticed after
20  last week's status conference that there is a discrepancy
21  between documents 1203 and 1208 on the docket.  1208 is Your
22  Honor's order setting forth the dates for document production
23  and there appears to be a typographical error in it.  There are
24  two categories that are repeated.
25        The missing category that had been set forth in

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    9

1   Ms. Iafrate's filing, which was document 1203, related to
2   documents having to do with detentions in violation of the

Status Conference 8-28-15.txt

3    preliminary injunction order --

4              THE COURT:  Yes.

5              MS. WANG:  -- by non-Human Smuggling Unit units of

6    MCSO.

7              We have continued to meet and confer with Ms. Iafrate

8    on this issue.  Defendants' position -- and, of course, I'll

9    let Ms. Iafrate speak for herself -- is that they are unable to

10   do that search.

11             Their position is that plaintiffs should look at the

12   CAD database that was produced and identify such detentions in

13   violation of the preliminary injunction order by non-HSU

14   deputies, identify the stops at issue, and then they will

15   search for documents.

16             Plaintiffs' position is that they should undertake a

17   reasonable search for documents.  We, for example, suggest that

18   there may be documentation of contacts between non-HSU deputies

19   and federal immigration officials such as Border Patrol or ICE.

20   If such contacts were made, that could indicate that there was

21   such a detention by a non-HSU deputy, but we may be at an

22   impasse on whether that search should be conducted by the

23   defendants.

24             I believe the only other issue that we need to raise

25   with the Court right now is that last week there was a question

        CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  10


1    about whether there was a complete production of the internal

2    investigation files relating to any potential discrimination

3    against members of the plaintiff class going back to 2008.  In

4    fact, Ms. Iafrate, upon meeting and conferring with us after

5    last week's status conference, discovered there were six files

6    that had not been produced.

7              Those were produced to us I believe yesterday?

                        Page 8

Status Conference 8-28-15.txt

8          Yes, yesterday.

9          THE COURT:  All right.  What about the Mackiewicz

10   hard drive, which Ms. Iafrate was going to do a privilege

11   review and give you a privilege log, has that been provided?

12          MS. WANG:  That was the -- do you mean the Chief

13   Knight --

14          THE COURT:  Yes.

15          MS. WANG:  -- hard drive?

16          THE COURT:  Yes.  The Chief Knight hard drive that he

17   was holding that was my understanding he got from Detective

18   Mackiewicz.

19          MS. WANG:  I don't think we've gotten that privilege

20   log.

21          THE COURT:  All right.  But as far as you know, that's

22   the status of everything outstanding?

23          MS. WANG:  Yes, Your Honor.  You're already aware of

24   the issue with the PST files.  Those are being produced on an

25   ongoing basis.  And we are meeting and conferring with

     CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   11


1    Mr. Walker and Mr. Masterson about the 50-hard-drive issue.

2          THE COURT:  All right.  We'll raise that probably

3    later to see where we're at on that.

4          MS. WANG:  All right.

5          MR. YOUNG:  Your Honor, just to supplement, there is

6    one document production issue which relates to defendants as

7    well as to their former attorneys, Mr. Casey and the attorneys

8    at the MCAO, and it relates to the scope of Your Honor's May

9    14, 2015 order finding a waiver of privilege and work product

10   as to communications relating to the preliminary injunction

11   violation.  We are conferring about that now.  We've had some

Status Conference 8-28-15.txt

12  useful discussions this morning.

13        I do want to let Your Honor know that if we can't

14  reach agreement on that, we may be bringing certain privilege

15  logs to you next week to resolve those issues prior to the

16  depositions that we want to take.

17        THE COURT:  That makes sense.

18        Ms. Iafrate, did you want to be heard on this?

19        MS. IAFRATE:  Yes, please.

20        Your Honor, regarding the non-HSU deputies, this was a

21  conversation that I had with plaintiffs' counsel many, many

22  months ago regarding how best to capture this information.  It

23  was plaintiffs' suggestion that we do a CAD data dump so that

24  they could review the CAD to determine what stops they want to

25  look at.  I was attempting to make certain that they get what

          CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  12


1   they need.

2         The idea of doing some sort of search, one of the

3   reasons that we're here, Your Honor, is because MCSO did not

4   track these types of stops, and, therefore, there is no

5   documentation that would adequately satisfy plaintiffs'

6   request.  Therefore, the CAD areas that they were interested in

7   looking at have been provided to plaintiffs' counsel so that

8   when they determine which stops they want to look at, we can

9   provide those documents to them.

10        There's no way for us to do a search regarding non-HSU

11  individuals that may have had contact with the plaintiffs'

12  class.  It just wasn't tracked that way back then.  It is now.

13        Regarding the Chief Knight hard drive --

14        THE COURT:  Before we move on to the Chief --

15        MS. IAFRATE:  Okay.

16        THE COURT:  -- Knight hard drive, are there any

Status Conference 8-28-15.txt

17  records kept of contacts between MCSO deputies and Border
18  Patrol or ICE operatives or agents?
19          MS. IAFRATE:  I don't know the answer to that
20  question, Your Honor.
21          THE COURT:  All right.  Could you determine the answer
22  to that question?
23          MS. IAFRATE:  I could.
24          THE COURT:  Please to so, and if there are, provide
25  such records to the plaintiffs.

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  13


1           MS. IAFRATE:  Very well.
2           THE COURT:  Similarly, because, as I recall, there was
3   something that operated -- we referred to -- what was the
4   policy, LEAR policy?  I think we called it the LEAR policy?
5           MS. IAFRATE:  That was the federal government's
6   policy.  It was called --
7           THE COURT:  Right.  And I referred to it as LEAR.  But
8   it seems to me that in the operative directives underlying
9   trial, there was a directive for agents to contact their
10  supervisors and/or -- I guess there wouldn't be any 287(g)
11  folks after I entered the preliminary injunction, but would you
12  please check to see if there's any way for agents to con -- or
13  any procedure by which agents contacted their supervise --
14  deputies contacted their supervisors if they wanted to make
15  immigration holds or arrests, and if there was, provide that
16  information to --
17          MS. IAFRATE:  Okay.
18          THE COURT:  -- Ms. Wang.
19          MS. IAFRATE:  Okay.
20          THE COURT:  Ms. Wang, will that be satisfactory?

Page 11

Status Conference 8-28-15.txt

21      MS. WANG: Yes, Your Honor. Thank you.

22      THE COURT: All right. Thank you.

23      Now, the Mackiewicz -- or the Knight hard drive, or

24  the Mackiewicz hard drive, or whatever it is that --

25      MS. IAFRATE: Yes.

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  14

1      THE COURT: -- we're talking about.

2      MS. IAFRATE: Your Honor, I was actually doing -- I

3  received the hard drive from the monitors, and I've been

4  working with Commander Girvin regarding the Mackiewicz -- well,

5  I have to call it the Chief Knight hard drive.

6      THE COURT: That's fine.

7      MS. IAFRATE: Okay. So the Chief Knight hard drive is

8  actually a subset of the hard drive that was provided to the

9  monitors on the day that you requested that they go over and

10  get the information. Not only were they provided the relevant

11  information on that hard drive; they were also provided the

12  relevant information on Mackiewicz's H drive.

13      THE COURT: Are we talking about the Knight hard drive

14  now?

15      MS. IAFRATE: No. Okay. I'm going to start over so

16  that I don't --

17      THE COURT: No, no. Mackiewicz has his own access to

18  the H drive, which is the generally shared drive within the

19  MCSO?

20      MS. IAFRATE: All of that went onto a hard drive that

21  was ultimately provided to the monitors on that day.

22      THE COURT: I gotcha.

23      MS. IAFRATE: So the Knight hard drive was a subset of

24  what was provided -- there's actually more on the hard drive

25  that was provided to the monitors.

Page 12

Status Conference 8-28-15.txt

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   15

1       Long story short -- or short story long, whichever --
2   the monitors, I believe yesterday, or today, agreed that they
3   do not need to look at what we're calling the Knight hard
4   drive.  I was looking at that for relevance, not for privilege,
5   Your Honor.
6           THE COURT:  Okay.
7           MS. IAFRATE:  So I worked it out with the monitors;
8   I've not yet worked it out with plaintiffs' counsel.  I thought
9   that I would start with the monitors because they were the ones
10  that were in possession of it.
11          THE COURT:  All right.  Chief Girvin, is that
12  accurate, as far as you're concerned?
13          CHIEF GIRVIN:  Yes, Your Honor, it is.
14          THE COURT:  All right.  Thank you.
15          Anything else you wanted to say on that, on these
16  issues, Ms. Iafrate?
17          MS. IAFRATE:  No, Your Honor.
18          THE COURT:  All right.  Thank you.
19          As it pertains to the 50 hard drives -- I don't know
20  whether it's you or Mr. Masterson -- were you able to arrive at
21  stipulations?
22          MR. MASTERSON:  Actually, Judge, I probably should
23  have sent someone else up here.
24          Ms. Wang sent a letter yesterday afternoon concerning
25  a proposal with respect to the 50 hard drives.  Just prior to

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   16

1   that, an hour or two, Mr. Walker sent a letter proposing a
2   resolution, so maybe they should talk about it.  I can work

Page 13

Status Conference 8-28-15.txt

3    with either side and agree in the middle or agree to either

4    one, so we are working on the protocol and how we're going to

5    go about it; we just haven't reached a final agreement yet.

6            THE COURT:  Okay.  I did think, you know, you pointed

7    out -- I just have a thought.  Let me sort of throw it out

8    there as long as folks are talking about stuff.  You did point

9    out to me 26(b)(2) and the 2006 amendment, and I read that, and

10   it seems to me that what it talks about is access, and you

11   had -- well, I guess let me start back.

12           I want to make sure, and I don't mean to be offensive

13   here, but I want to make sure that we now have everything that

14   relates to the Montgomery investigation or that Montgomery

15   provided to the MCSO.  Has that either been disclosed or is it

16   in the Court's -- or is it in the Court's possession?

17           MR. MASTERSON:  To my knowledge -- well, if we're

18   talking to what Montgomery had, I think it's all on the

19   hard drives, which now are in the possession of the marshals.

20           THE COURT:  All right.  With respect to 50 -- I'm

21   sorry.  I just want to make clear as we go point by point, and

22   excuse me for interrupting, those 50 hard drives, or

23   approximately 50 hard drives that the monitor has, are the

24   hard drives that Montgomery gave to the MCSO.

25           MR. MASTERSON:  Correct.

     CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   17


1            THE COURT:  All right.  And you're not aware, at least

2    as you stand here today, that there is any other information

3    that Montgomery provided to the MCSO.

4            MR. MASTERSON:  That is what I don't know.  If there

5    is independent documentation -- notes, anything like that --

6    that, I don't know.

7            May I confer with Ms. Iafrate for a minute?

                         Page 14

Status Conference 8-28-15.txt

8      THE COURT:  Sure.

9      (Pause in proceedings.)

10     MR. MASTERSON:  The best I can tell you is we think

11  everything we have has been disclosed or the Court, through the

12  marshals, has taken possession, except there's one document

13  which we received this morning.  The Court made an inquiry

14  yester -- excuse me, not yesterday -- last week of me about

15  whether we retained experts to take a look at the materials.  I

16  was not certain about that.  I thought that we had two

17  individuals look at it; whether they were retained experts, I

18  did not know.

19     I've gotten a little further information on that.

20  They weren't retained experts, what they were is former NSA

21  employees, and the hard drives were provided to them, and we

22  received this morning a two-page memo, I'll say, about those

23  hard drives.

24     Not being a computer guy, I can't tell you what

25  exactly it means, but I can tell you what I read it to mean is

        CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   18


1  there's basically nothing here; that whatever Mr. Montgomery

2  told you was here isn't really -- that's not what this is.  And

3  we will provide that document to the Court and the plaintiffs.

4      THE COURT:  when was that document prepared, do you

5  remember?

6      (Pause in proceedings.)

7      MR. MASTERSON:  I'm told November 2014.

8      THE COURT:  Okay.  I guess I'm just going to ask you,

9  and I appreciate you're being as forthright as you can be, but

10  I'm going to ask you to check and make sure that everything

11  that the monitor's asked for that I've otherwise ordered has

Page 15

Status Conference 8-28-15.txt

12    been disclosed as far as you know, and to confirm that for me

13    next week.  And you don't need to wait to produce the document

14    to plaintiffs and other parties that you've just identified.

15              Is that okay?

16              MR. MASTERSON:  That's absolutely fine, Judge.

17              THE COURT:  All right.  Now, being that you just told

18    me what you told me, that may make this a lot easier, but --

19              Oh.  Did you have anything else you wanted to say

20    before I go on to my thoughts?

21              MR. MASTERSON:  Well, not till later, so --

22              THE COURT:  That's all right.  On the 26(b) thing, it

23    seems to me that you have had -- or your clients have had

24    access to these documents for years.  They did have,

25    apparently --

         CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   19


1     Were the NSA guys MCSO employees, or were they outside

2     consultants?  Or outside people.

3               MR. MASTERSON:  Outside people.

4               THE COURT:  And were they paid?

5               MR. MASTERSON:  I don't think so, but, again, I don't

6     know the answer to that.

7               THE COURT:  All right.  It just seems to me that to

8     the extent that MCSO might want to preserve any right to say

9     that there was information in those hard drives, or anything

10    else provided to you by Montgomery, that would have -- that you

11    believe would have allowed Mr. Montgomery to legitimately

12    construct the kinds of materials that we've seen in the record

13    and that I've provided you this week that I saw that Ms. Wang

14    provided in conjunction with the motion to recuse, I guess it's

15    fair to say identify that stuff, and there may be no issue, and

16    if there's no issue, there's no issue.  About that, at least.

                              Page 16

Status Conference 8-28-15.txt

17 And so you may be able to make the stipulations that we talked

18 about last week, and maybe then I just wait and see what kind

19 of stipulations, or how -- if you can resolve this within the

20 next week.  It sounds like at least there's movement being

21 made.

22         MR. MASTERSON:  I think so, Judge, and I think we can

23 get to the point of agreement, based upon the correspondence I

24 saw yesterday.

25         THE COURT:  All right.

   CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  20


1         Any disagreement with that, Ms. Wang?

2         MS. WANG:  No, Your Honor.  We'll continue to meet and

3 confer on that issue.

4         THE COURT:  All right.  Was there anything with

5 respect to the -- I think we must have resolved the new

6 identifications found last week.  Anything with respect to

7 that?  Are we moving along?  Have we resolved those issues?

8         MS. WANG:  Your Honor, all the parties trouped down to

9 the Marshal's Office after the status conference last week, and

10 speaking for the plaintiffs, we have received copies of the

11 identification documents, at least the ones that were not

12 shredded, so we're following up with our review of those

13 documents.

14         THE COURT:  Okay.

15         MR. MASTERSON:  May I consult with Ms. Wang for a

16 minute, please?

17         THE COURT:  Sure.

18         (Pause in proceedings.)

19         MR. MASTERSON:  Thanks, Judge.

20         MS. WANG:  Your Honor, I should clarify.  The form in

                          Page 17

Status Conference 8-28-15.txt

21 which we got copies of those identification documents was a

22 scanned copy from the Marshal's Office. There are some

23 documents and -- actually, there are some categories of

24 documents that are not very legible on those scans, so we have

25 discussed getting a color scan or photograph of those

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference 21

1 identification documents, and we are following up on that.

2 THE COURT: All right.

3 Mr. Casey's deposition date, I am informed, is

4 tentatively set for September 16th, is that correct?

5 MS. WANG: Yes, Your Honor.

6 THE COURT: My judicial assistant said, "You didn't

7 agree to go sit there during the whole deposition, did you?

8 Because we need you here throughout the day, and maybe if you

9 could just be consulted."

10 I said, Well, I think I kind of did agree to go sit

11 there." Is that the parties' understanding?

12 MS. WANG: Your Honor, I didn't have an understanding

13 one way or the other. My understanding was that the Court was

14 generally available to field any issues that would come up.

15 THE COURT: All right. I am generally available, and

16 if you want me to sit there, let me know in advance.

17 MS. WANG: I believe Ms. Clark may have expressed a

18 desire that Your Honor sit there, but she's not here, so --

19 THE COURT: Do you have a position on that,

20 Ms. Iafrate?

21 MS. IAFRATE: No, Your Honor. I would leave it up to

22 Ms. Clark to make her position known.

23 THE COURT: Mr. Walker?

24 MR. WALKER: Your Honor, I may be speaking out of turn

25 here, but I just wanted to throw out a suggestion. If there

Page 18

Status Conference 8-28-15.txt

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   22

1   were a room in the courthouse where the deposition could be
2   conducted, that might accommodate both the Court and the
3   parties a little better.
4            THE COURT:  Are you amenable to that?
5            MS. WANG:  That would be wonderful.
6            THE COURT:  Ms. Iafrate?
7            MS. IAFRATE:  That would be fine.
8            THE COURT:  Mr. Como?
9            MR. COMO:  Fine with me, Your Honor.
10           THE COURT:  All right.  I'll see if I can arrange
11  something.  I would appreciate that, just in terms of trying to
12  do my other business as well.
13           (Off-the-record discussion between the Court and the
14  clerk.)
15           THE COURT:  I did have a question.  It seems to me, as
16  we're trying to streamline and get to what is really relevant
17  and eliminate what's not really relevant, I did hear, I think,
18  certainly we had Lieutenant Sousa's testimony in the first half
19  of the contempt hearing.  All documents had not at that point
20  been provided, and I don't know whether any of the documents
21  shed any light on whether or not Lieutenant Sousa should remain
22  a party, or whether or not plaintiffs wished to present any
23  more testimony with respect to Lieutenant Sousa.
24           I understand why that may be distinct, for example,
25  with Chief MacIntyre, who plaintiffs have not yet called or who

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   23

1   has not yet been called, but if I've heard all the testimony
2   regarding Lieutenant Sousa, in light of the prolonged nature of

Status Conference 8-28-15.txt

3   this hearing and its continued prolongation, I must say,

4   without making this a ruling of any sort, that I did not hear

5   anything that would suggest that Lieutenant Sousa's conduct

6   rose to the level of civil contempt.

7        If plaintiffs desire to present additional evidence

8   with respect to Lieutenant Sousa, then I guess I would like to

9   know it, and I would like to know what doc -- or if you had

10  testimony that you'd intended with respect to Lieutenant Sousa,

11  I guess I'd just like you to think about that so that we don't

12  keep parties in here that we don't need to keep if there isn't

13  really a basis to keep them any longer.

14       And I guess, although I understand your desire to

15  proceed with Chief MacIntyre, we ought to be flexible, too, to

16  the extent and notion that once we've heard from him, once

17  we've heard your evidence, you can let me know if you think

18  you've presented your evidence on him.

19       And I suppose that goes for the other parties, too.  I

20  don't know if the -- I don't know if any of you have anything

21  you want to have said on that, but I would like, with respect

22  to Lieutenant Sousa, at least, since we've heard his testimony,

23  and I think we've heard all the testimony -- I don't know what

24  testimony you intend to produce, but heard a lot of testimony

25  about what Lieutenant Sousa's role was and what he did and

         CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   24


1   didn't do, I at least would like to entertain the possibility

2   of, if there's an early disposition for him, taking it, or

3   making it.

4        Mr. Como, do you have anything to say on that?

5        MR. COMO:  I have no position on that one way or the

6   other, Your Honor.

7        THE COURT:  Mr. Walker?

Status Conference 8-28-15.txt

8      MR. WALKER:  I also have no position on it at this
9  time, Your Honor.
10      THE COURT:  Ms. Iafrate?
11      MS. IAFRATE:  Yes, Your Honor.  I would like to
12  include some discussion regarding any evidence whatsoever
13  regarding Chief MacIntyre as it relates to civil contempt.  So
14  if you're entertaining Lieutenant Sousa possibly not being a
15  defendant for civil contempt, I would also urge Chief MacIntyre
16  as well.
17      THE COURT:  Well, as I just said, we haven't heard
18  from Chief MacIntyre; we have heard from Lieutenant Sousa.
19  Certainly, once we hear from Chief MacIntyre, once we've got
20  the case presented, plaintiffs' case with respect to Chief
21  MacIntyre, if I don't think there's a basis for civil contempt,
22  I'm open to dismissing him early, too, at that point.
23      Mr. Eisenberg, you're specially representing
24  Lieutenant Sousa.  Do you have anything to say on that one way
25  or another?

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   25

1      MR. EISENBERG:  I would be delighted with the Court's
2  decision to eliminate him from this case, Your Honor, but I
3  understand that that isn't a decision you're prepared to make
4  today.  I'll confer --
5      THE COURT:  You need to have a microphone in front of
6  you.
7      MR. EISENBERG:  I'll confer with the plaintiffs, Your
8  Honor, and determine what more, if anything, they need, and
9  perhaps I can help this process along.
10      THE COURT:  All right.  Thank you.
11      Those are my matters.  Ms. Wang, anything more you

Status Conference 8-28-15.txt
12  wanted to raise?

13        MS. WANG:  No, Your Honor.  With regard to

14  Lieutenant Sousa, we'll take it under consideration, but

15  obviously would want to reserve any decision pending the

16  production of the remaining PST files.  And I'd also point out

17  that he may still be needed as a witness one way or the other.

18        THE COURT:  Well, my excusing him as a named possible

19  contemnor does not preclude his testimony.

20        MS. WANG:  Understood.

21        Your Honor, can we have a date by which defendants

22  should produce the two categories of documents relating to

23  detentions by non-HSU personnel?

24        THE COURT:  Ms. Iafrate?

25        MS. IAFRATE:  Your Honor, I don't know what there is

        CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   26


1   or is not, so I would ask till --

2         THE COURT:  Can you have a date next week?

3         MS. IAFRATE:  Yes.

4         THE COURT:  And so you can consult with Ms. Wang, and

5   if you can agree on a date, fine; if not, we can take it up

6   next week.

7         MS. IAFRATE:  Yes.

8         THE COURT:  Okay.  Thanks.

9         MS. WANG:  One other issue, Your Honor.  We served

10  some of the interrogatories and requests for admission that

11  Your Honor permitted us leave to propound last week yesterday.

12  We requested that the defendants respond on a shortened

13  time line of 14 days to accommodate the continuation of the

14  hearing on the 22nd, and we don't have a position from the

15  defendants yet.  We tried to confer this morning before court

16  but weren't able to get an answer.

                          Page 22

Status Conference 8-28-15.txt

17          THE COURT:  Ms. Iafrate?  Or Mr. Masterson?  I don't
18   know.
19          MR. MASTERSON:  One moment, please, Judge.
20          THE COURT:  Sure.
21          (Pause in proceedings.)
22          MR. MASTERSON:  The answer to that question is, Judge,
23   we just got them last night.  I have not even reviewed them.  I
24   just discussed it with Mr. Popolizio.  We're not going to
25   request, obviously, the full time allowed by the federal rules,

           CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   27


1    but we will work on them immediately.  And we're talking with
2    plaintiffs' counsel about a lot of different things, so I will
3    consult with Mr. Young and Ms. Wang about that as well, and
4    hopefully, we can reach a satisfactory date to respond to that
5    discovery request.
6           THE COURT:  All right.  Did you have any issues,
7    Ms. Iafrate and Mr. Masterson, you wanted to raise?
8           MR. MASTERSON:  I have a couple, or a few.
9           Number one is -- and it's possible I missed something.
10   The complaint in intervention submitted by the Department of
11   Justice along with their motion to intervene included an order,
12   and I forgot to bring it with me this morning but it said
13   something along the lines of, "If you grant our motion, Judge,
14   will you deem our complaint in intervention filed?" or
15   something along those lines.  The Court --
16          THE COURT:  I don't know whether I did that at all.
17          MR. MASTERSON:  You did not.  And so I don't want
18   to -- I don't think the complaint in intervention has been
19   filed, but I wasn't positive about that, and I didn't want to
20   get defaulted by the clerk, so --

                              Page 23

                    Status Conference 8-28-15.txt
21          THE COURT:  No.  Thank you.

22          I just granted the motion to intervene, and I didn't

23     do -- or at least I don't recall taking any action with respect

24     to the complaint in intervention.  There's no objection to the

25     filing of the complaint in intervention, is there?

        CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   28


 1          MR. MASTERSON:  There is not.

 2          THE COURT:  All right.  So I will now order that the

 3     complaint in intervention be filed, and your time is running.

 4          MR. MASTERSON:  Thank you.  Just wanted to clear that

 5     up.

 6          THE COURT:  Thank you.

 7          MR. MASTERSON:  Number two is the Court inquired about

 8     the possibility of resolving this matter with the ACLU last

 9     Friday, and I just want to keep the Court up to date on what's

10     transpired since then.

11          THE COURT:  All right.  I guess that's fine, but we've

12     had a couple of different objections here about talking about

13     the content of settlement discussions.

14          MR. MASTERSON:  I'm not going to talk about settlement

15     suggestions, their specifics.  I'm just going to say that I did

16     reach out to Mr. Young and Ms. Wang yesterday and we've talked

17     about it, and hopefully we'll continue those discussions as we

18     move forward.

19          THE COURT:  All right.

20          MR. MASTERSON:  There was some concern, and I did

21     discuss with Mr. Young and Ms. Wang the possibility of asking

22     the Court to seek the assistance of a magistrate with

23     settlement discussions.  And the question we all talked about

24     was we're on a very short fuse here with respect to moving

25     forward with the contempt proceeding, so taking a bunch of time
                              Page 24

Status Conference 8-28-15.txt

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   29

1   for settlement discussions, if we don't know we're going to get
2   somewhere, might not be time well spent, but obviously, if we
3   were to reach an agreement, it would be time well spent.
4          But if we feel we're getting somewhere, would we have
5   any hope of getting magistrate assistance on such short notice?
6          THE COURT:  I'll tell you what.  I will just sort of
7   do a general blast, if the parties approve it, today to the
8   magistrate judges, saying:  Are any of you available on short
9   notice?
10          But do you have any idea what kind of time range
11   you're looking at so I can -- you know, if I say that, they'll
12   say, well, when?
13          MR. MASTERSON:  Yeah.  I don't, Judge.  What I'm
14   hoping to get from plaintiffs' counsel in the next week or so
15   is a proposal for resolution which, of course, will be proposed
16   remedies or additional injunctive relief.  I'm hoping that we
17   can get some proposals on that, and then I'll have the
18   opportunity to sit down with everybody involved and then get
19   back to them in short order.
20          So right now, today, I can't tell you, but hopefully,
21   maybe by next Friday.
22          THE COURT:  That would be good.  I do think -- you
23   know, the magistrate judges here try their best to be very
24   helpful, and I'm sure that they would try to be available, but
25   they have schedules, too.  They're pretty busy.

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   30

1          MR. MASTERSON:  Understood.
2          THE COURT:  But I'm sure that if, you know, any of

Status Conference 8-28-15.txt

3  them could rearrange things or whatever, I expect, based on

4  their past performance, they'd do all they could to be of any

5  help.

6         MR. MASTERSON:  Understood.  Another issue is -- and I

7  should have asked you this last week and I just did not, and

8  that's my fault, is I was talking about seeking the billing

9  records of the monitor and the Court said:  File your motion.

10        THE COURT:  Um-hum.

11        MR. MASTERSON:  That confused me when I got back to

12  the office, because typically I would submit a subpoena, and --

13        THE COURT:  Yeah.

14        MR. MASTERSON:  -- then if somebody's got a beef --

15        THE COURT:  Why don't we do -- I'm sorry.  Let me let

16  you finish.

17        MR. MASTERSON:  If somebody's got a beef, then they

18  can move to quash the subpoena or seek --

19        THE COURT:  Yeah.

20        MR. MASTERSON:  -- some relief.

21        THE COURT:  And I was just thinking we'd do that by

22  motion.  I think -- and, you know, if you want to do it

23  expedited, expedite it, but to the extent that you're talking

24  about areas that may or may not have some privilege attaching,

25  no privilege that I've seen is absolute, so you may well be

          CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  31


1  able to overcome the privilege, in light of the circumstances,

2  but the tests in the case they gave you last week and several

3  others, they're sort of laid out.

4         So I guess what I was shorthanding is if you're going

5  to ask for things that I would at least think might be

6  privileged, I would ask you to set forth what it is you want;

7  why you want it; and why you think, to the extent the privilege

Page 26

Status Conference 8-28-15.txt

8    might apply, that you're entitled to receive it.

9        I don't mind doing those ex parte, but I think that

10   it's probably wise we be as clear as we can and -- when I said

11   "ex parte" I didn't mean "ex parte." I don't mind doing those

12   expedited.

13        MR. MASTERSON: Right.

14        THE COURT: But I think we need to be as clear as we

15   can so that everybody knows what the basis of my rulings are,

16   what the basis of your request is, and so we can proceed

17   in clarity.

18        MR. MASTERSON: Fair enough.

19        I've got one more that I hate to bring up but I have

20   to: Somewhere between 61 and 65 more IDs showed up.

21        THE COURT: Okay.

22        MR. MASTERSON: An IA number's been pulled. The

23   investigation has been started. I believe the monitors have

24   been informed. Copies of the IDs have been made and will be

25   provided to plaintiffs either by the monitors or by counsel.

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   32

1        The investigation into it, at this point I know one

2   person has been interviewed as of Wednesday afternoon. I

3   haven't follow up since Wednesday afternoon to see where the

4   investigation was headed from there. I know one other person

5   to be interviewed was out of town, not available till next

6   Monday. So I can't give the Court any further information

7   other than that the IDs showed up, we've got them, we've made

8   copies, we've given information to the monitors, and we're

9   going to give that to plaintiffs either through the monitors or

10   directly, and an IA has been commenced on the issue.

11        THE COURT: Thank you. Were any of them involving

Status Conference 8-28-15.txt

12   members of the plaintiff class?

13       MR. MASTERSON:  I certainly can't tell you whether

14   there are members of the plaintiffs' class.  I can tell you

15   that I have been informed -- I have not seen any of them, and I

16   have not even talked to anyone who has seen them, but my

17   information is that there are a number of IDs with Hispanic

18   last names.

19       THE COURT:  All right.  Thank you.  I appreciate and

20   expect your forthcomingness in this -- in this matter and

21   others, but appreciate it.

22       MR. MASTERSON:  And that's a wrap for me, Judge.

23       THE COURT:  All right.  Thank you.  Mr. Walker?

24       MR. WALKER:  Nothing further, Your Honor.

25       THE COURT:  Mr. Como?

     CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  33

1       MR. COMO:  I have nothing further, Your Honor.

2       THE COURT:  Mr. Young?

3       MR. YOUNG:  Yes, Your Honor.  On the issue of

4   settlement, Mr. Masterson did accurately recite the course of

5   our discussion.  I should note that we are certainly intending

6   to have further discussions on whether we can agree on some

7   remedies, although I would note that we have been receiving,

8   and continue to receive, a lot of information that will be

9   highly relevant to the issue of what type of remedy we think

10   ought to be put into place.

11       The internal investigation process is certainly very

12   important.  We've recently been getting a number of IA

13   documents that are highly relevant to the issue of a remedy.  I

14   think we're continuing to get them.  We've heard just now that

15   there will be some more coming.  We'll want to look at those in

16   order to be able to propose a remedy to try to prevent the

Page 28

Status Conference 8-28-15.txt

17    kinds of abuses that have occurred.

18            In addition, we do have the 16,000 documents coming

19    out of the PST archives of the people who are highly relevant.

20    We did receive several hundred of those last Monday, Monday

21    this week.  I understand that we'll be receiving a bunch more

22    today and Monday, but we don't know when we'll get the last of

23    those.  And generally speaking, at least in my experience, one

24    is in the best position to figure out what a settlement is when

25    one has the information that is relevant to the case and to the

                CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   34


1    proposed remedy, so we'll do our best.

2            THE COURT:  Well, I understand that, and I, you know,

3    do not expect you to settle this basis -- settle this case on

4    any basis other than one that you can find acceptable after

5    being fully informed.

6            It does seem to me, Ms. Iafrate, unless I misremember,

7    that even had I granted your motion for an extension, which I

8    didn't do, you would have provided all of that information

9    prior to the next time we have a status conference, so I assume

10   they're going to have it, plaintiffs will have it prior to the

11   next status conference.

12           MS. IAFRATE:  Yes, Your Honor.  We have six people

13   working on it full time.

14           THE COURT:  Thank you very much.

15           MR. YOUNG:  Thank you, Your Honor.

16           THE COURT:  All right.  Let's see, is the next status

17   conference next Friday?

18           MR. YOUNG:  I believe it is.

19           THE CLERK:  Yes, Judge.

20           THE COURT:  We'll see you then.  Thank you.

                            Page 29

Status Conference 8-28-15.txt

21    MR. KILLEBREW:  Your Honor?  Your Honor, this is Paul

22  Killebrew for the United States.

23    THE COURT:  Yes.

24    MR. KILLEBREW:  Could we raise a couple of issues with

25  the Court?

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   35

1    THE COURT:  Yes.

2    MR. KILLEBREW:  Thank you.  First of all, on discovery

3  matters, we just want to be sure that the parties are providing

4  discovery to the United States when it's provided to the

5  plaintiff class as well.  And related to that, there's some

6  discovery that was previously provided to plaintiffs' class

7  under an attorneys'-eyes-only designation.

8    We've worked on getting as much information as we can,

9  but the plaintiffs would prefer us to make a request directly

10  to the defendants for those kinds of materials.  We would like

11  to do that, but it may require -- we don't know if discovery is

12  going to close on September 22nd at the start of the hearing.

13    THE COURT:  Well, that is -- discovery, hopefully,

14  will be closed well before then, but it seems to me -- and

15  again, I don't intend any criticism by this comment, but

16  Mr. Masterson, in candor, has come forth and identified 65

17  additional documents, or 65 additional identifications today,

18  and so I'm not going to remove defendants from any obligation

19  to continue to provide relevant information that they discover.

20  But I will take them at their word that as far as they know,

21  they have provided all the information they had, except to the

22  extent they have identified that they haven't provided it for

23  some reason, or that they're in the course of providing it.

24    So yes, I expect all discovery will be well closed

25  prior to that, but I'm not going to remove any obligation that

Page 30

Status Conference 8-28-15.txt

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  36

1   defendants have to continue to provide relevant information,
2   and I assume they're doing that to the best of their ability.
3           MR. KILLEBREW:  Your Honor -- oh, I'm sorry.
4           THE COURT:  I'm sorry.  There wouldn't be any
5   objection to providing all the information you're providing to
6   plaintiffs to the plaintiff-intervenors in this case, would
7   there, Ms. Iafrate?
8           MS. IAFRATE:  No, and I believe that we are doing
9   that.
10          THE COURT:  Okay.  And about the attorneys'-eyes-only
11  designation, do you have any concern if the Department of
12  Justice contacts you directly about receiving that information?
13          MS. IAFRATE:  No, Your Honor.
14          THE COURT:  All right.  Does that take care of your
15  concerns and issues?
16          MR. KILLEBREW:  Yes, one of them, Your Honor.  I have
17  an additional one related to discovery as well.
18          THE COURT:  All right.
19          MR. KILLEBREW:  We are considering the possibility of
20  retaining an expert.  In recognition that the Court is going to
21  be considering additional injunctive remedies, we believe an
22  expert's testimony could be very helpful, and especially in the
23  area of internal accountability of explaining what kind of
24  remedies may be appropriate or would prevent future violations
25  of the law.  But to do so, we think that that will not be

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference  37

1   completed by September 22nd, especially if the defendants would
2   want to depose the expert, as we expect they would.  We also

Status Conference 8-28-15.txt

3   think the expert would probably be best suited to do his work

4   after the monitor has filed his report on the IA investigations

5   resulting from the Armendariz suicide.

6        So we just wanted to flag this for the Court and also

7   get the Court's guidance on the timing of when an expert could

8   come in.

9        THE COURT:  Do you have any reaction to that

10  immediately, Mr. Masterson?  Ms. Iafrate?

11       MR. MASTERSON:  Well, my initial reaction is no.  If

12  it is allowed, then we're going to have to deal with

13  26(a)(2)(B) reports, depositions --

14       THE COURT:  You know, I must say initially my reaction

15  was the monitor's kind of the court-appointed expert on this

16  issue, and that's what the report is related to, anyway.  And I

17  assumed that we were all going to go forward with the monitor's

18  report based on our discussion last week.

19       So that doesn't mean I'm going to tell the Department

20  of Justice no, but my inclination, I share some of the same

21  concerns you have, Mr. Masterson.  Why don't I let the parties

22  think about it this week, talk about it, and then we can decide

23  next week how we intend to approach it.

24       MR. MASTERSON:  Thank you.

25       MR. KILLEBREW:  Thank you, Your Honor.

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   38


1        MR. GOMEZ:  Your Honor, this is Raphael Gomez from

2   Civil Division.  I wanted to raise one matter with you.

3        THE COURT:  All right.

4        MR. GOMEZ:  Your Honor, with respect to the 50

5   hard drives, the United States -- and I understand there was

6   some proposal, though I didn't hear what it was from

7   Ms. Wang --

Page 32

Status Conference 8-28-15.txt

8          THE COURT:  Do you know what, Mr. Gomez?  The Court's
9     audio here tends to distort people, and so you're starting --
10          MR. GOMEZ:  Yes, Your Honor.
11          THE COURT:  -- you're starting to slur in a way I
12     can't quite understand you; and I'm not saying you're slurring,
13     but it kind of comes across a little unclear.
14          Could I have you speak very slowly, distinctly, and
15     loudly, so we can understand you, please?
16          MR. GOMEZ:  Yes, Your Honor.  The United States, with
17     respect to the 50 hard drives, in terms of reviewing them, is
18     proposing that a small sample be pulled from the 50
19     hard drives; that a forensic copy be made by a vendor there, a
20     cleared vendor there in the Phoenix area; and that that sample
21     be reviewed by the government with respect to whether there's
22     any classified information, you know, in the 50 hard drives,
23     and hopefully, that could be resolved through a review of the
24     sample.
25          THE COURT:  All right.  Why don't you provide the

                CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference   39


1     parties with the specifics of your proposal, and I'll either
2     approve it or not next week, or hear objections to it.
3          MR. GOMEZ:  Yes, Your Honor.
4          THE COURT:  All right.  Anything else?
5          All right.  We'll see you next week, then.
6          (Proceedings concluded at 10:23 a.m.)
7
8
9
10
11

                              Page 33

Status Conference 8-28-15.txt

12
13
14
15
16
17
18
19
20
21
22
23
24
25

CV07-2513, Melendres v. Arpaio, 8/28/15 Status Conference    40

1
2                          C E R T I F I C A T E
3
4
5
6
7         I, GARY MOLL, do hereby certify that I am duly
8    appointed and qualified to act as Official Court Reporter for
9    the United States District Court for the District of Arizona.
10         I FURTHER CERTIFY that the foregoing pages constitute
11   a full, true, and accurate transcript of all of that portion of
12   the proceedings contained herein, had in the above-entitled
13   cause on the date specified therein, and that said transcript
14   was prepared under my direction and control.
15
16
                              Page 34

Status Conference 8-28-15.txt

17   DATED at Phoenix, Arizona, this 2nd day of September,

18 2015.

19

20

21

              s/Gary Moll

22

23

24

25

# EXHIBIT B

1

1        UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega Melendres,      )
    et al.,                                 )
5                                           )
                   Plaintiffs,             )   No. CV 07-2513-PHX-GMS
6                                           )
             vs.                           )   Phoenix, Arizona
7                                           )   July 31, 2015
    Joseph M. Arpaio, et al.,              )   2:03 p.m.
8                                           )
                   Defendants.             )
9   _____)

10

11

12

13

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

            BEFORE THE HONORABLE G. MURRAY SNOW
17
            Status Conference Volume 1, Pages 1-70
18
                (Sealed Proceedings Omitted)
19

20

21

22

23

24
    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

```
 1                        A P P E A R A N C E S

 2


 3    For the Plaintiffs:
              American Civil Liberties Union Foundation
 4            Immigrants' Rights Project
              By:  Cecillia D. Wang, Esq.
 5            39 Drumm Street
              San Francisco, California  94111
 6
              American Civil Liberties Union Foundation
 7            Immigrants' Rights Project
              By:  Andre Segura, Esq. - Telephonically
 8            125 Broad Street, 18th Floor
              New York, New York  10004
 9
              American Civil Liberties Foundation of Arizona
10            By:  Daniel J. Pochoda, Esq.
              By:  Joshua David R. Bendor, Esq.
11            P.O. Box 17148
              Phoenix, Arizona  85011
12
              Covington & Burling, LLP
13            By:  Tammy Albarran, Esq. - Telephonically
              By:  Lauren E. Pedley, Esq.
14            1 Front Street, 35th Floor
              San Francisco, California  94111
15
              Covington & Burling, LLP
16            By:  Stanley Young, Esq.
              333 Twin Dolphin Drive, Suite 700
17            Redwood Shores, California  94065

18    For the Defendant Maricopa County:
              Walker & Peskind, PLLC
19            By:  Richard K. Walker, Esq.
              By:  Charles W. Jirauch, Esq.
20            SGA Corporate Center
              16100 N. 7th Street, Suite 140
21            Phoenix, Arizona  85254

22    For the Defendant Joseph M. Arpaio:
              Jones, Skelton & Hochuli, PLC
23            By:  A. Melvin McDonald, Jr., Esq.
              By:  Joseph T. Popolizio, Esq.
24            2901 N. Central Avenue, Suite 800
              Phoenix, Arizona  85012
25
```

1                        A P P E A R A N C E S

2


3    For the Defendant Joseph M. Arpaio and Maricopa County
     Sheriff's Office:
4              Iafrate & Associates
               By:  Michele M. Iafrate, Esq.
5              649 N. 2nd Avenue
               Phoenix, Arizona  85003
6
     For the Movants Christine Stutz and Thomas P. Liddy:
7              Broening, Oberg, Woods & Wilson, PC
               By:  Jathan P. McLaughlin, Esq.
8              P.O. Box 20527
               Phoenix, Arizona  85036
9
     For the Movants Maricopa County Attorney's Office and Maricopa
10   County Attorney William Montgomery:
               Ridenour Hienton, PLLC
11             By:  April M. Hamilton, Esq.
               Chase Tower
12             201 N. Central Avenue, Suite 3300
               Phoenix, Arizona  85004
13
     For Deputy Chief Jack MacIntyre:
14             Dickinson Wright, PLLC
               By:  Gary L. Birnbaum, Esq.
15             1850 North Central Avenue, Suite 1400
               Phoenix, Arizona  85004
16
     For Chief Deputy Gerard Sheridan:
17             Mitchell Stein Carey, PC
               By:  Lee D. Stein, Esq.
18             1 Renaissance Square
               2 North Central Avenue, Suite 1900
19             Phoenix, Arizona  85004

20   For Executive Chief Brian Sands:
               Lewis, Brisbois, Bisgaard & Smith, LLP
21             By:  Greg S. Como, Esq.
               2929 N. Central Avenue, Suite 1700
22             Phoenix, Arizona  85012

23   For Lieutenant Joseph Sousa:
               David Eisenberg, PLC
24             By:  David Eisenberg, Esq.
               2702 N. 3rd Street, Suite 4003
25             Phoenix, Arizona  85004

1                      A P P E A R A N C E S

2


3    For Timothy J. Casey:
             Adams & Clark, PC
4            By:  Karen Clark, Esq.
             520 E. Portland Street
5            Phoenix, Arizona  85004

6    Also present:
             Commander John Girvin, Deputy Monitor - Telephonically
7            Chief Raul Martinez, Deputy Monitor - Telephonically
             Executive Chief Brian Sands
8            Chief Deputy Gerard Sheridan
             Deputy Chief Jack MacIntyre
9            Lieutenant Joseph Sousa

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2

3           THE CLERK:  Civil case number 07-2513, Melendres and

4    others versus Arpaio and others.  This is the time set for

5    status conference.  Counsel, please announce for the record.        14:03:06

6           MS. WANG:  Good afternoon, Your Honor.  Cecillia Wang

7    of the ACLU for the plaintiffs.

8           MR. YOUNG:  Good afternoon, Your Honor.  Stanley Young

9    for the plaintiffs.

10          MR. BENDOR:  Good afternoon.  Josh Bendor of the ACLU        14:03:17

11   for plaintiffs.

12          MS. PEDLEY:  Lauren Pedley of Covington & Burling for

13   plaintiffs.

14          MR. POCHODA:  Dan Pochoda of the ACLU for plaintiffs.

15          MS. IAFRATE:  Good afternoon, Your Honor.  Michele          14:03:28

16   Iafrate on behalf of defendant.

17          MR. POPOLIZIO:  Good afternoon, Your Honor.  Joseph

18   Popolizio on behalf of Sheriff Arpaio.

19          MR. WALKER:  Good afternoon, Your Honor.  Richard

20   Walker of Walker & Peskind on behalf of that portion of          14:03:40

21   Maricopa County government embodied in the Board of

22   Supervisors, the county manager, and the employees reporting to

23   them.

24          MR. COMO:  Greg Como on behalf of Brian Sands, who is

25   present in the courtroom today, Your Honor.                       14:03:55

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference   6

1          MR. McDONALD:  Good afternoon.  Mel McDonald, special

2    appearance for Sheriff Joe Arpaio.

3          MR. JIRAUCH:  Charles Jirauch of Walker & Peskind on

4    behalf of Maricopa County.

5          MR. STEIN:  Good afternoon, Your Honor.  Lee Stein on          14:04:10

6    behalf of Jerry Sheridan, who's present in the courtroom.

7          MR. BIRNBAUM:  Good afternoon, Your Honor.  Gary

8    Birnbaum on behalf of Jack MacIntyre, and Mr. MacIntyre's

9    present in the courtroom as well.

10          MR. McLAUGHLIN:  Good afternoon, Your Honor.  Jake          14:04:25

11    McLaughlin on behalf of Thomas Liddy and Christine Stutz.

12          MR. EISENBERG:  Good afternoon, Your Honor.  David

13    Eisenberg on behalf of Lieutenant Joseph Sousa, who's in the

14    courtroom in the gallery.

15          MS. HAMILTON:  Good afternoon, Your Honor.  April          14:04:38

16    Hamilton, Ridenour Hienton, on behalf of the Maricopa County

17    Attorney's Office and Maricopa County Attorney William

18    Montgomery.

19          MS. CLARK:  Good afternoon, Judge.  Karen Clark,

20    ethics counsel for Tim Casey.          14:04:50

21          THE COURT:  Do we have monitors on the line?

22          DEPUTY MONITOR GIRVIN:  Here, Your Honor.  Deputy

23    Monitor Girvin on the line.

24          DEPUTY MONITOR MARTINEZ:  And good afternoon, Your

25    Honor.  Raul Martinez, deputy monitor, on the line.          14:05:06

1     THE COURT:  Do we have anybody else on the line?

2     MR. SEGURA:  Andre Segura of Covington & Burling on

3  behalf of plaintiffs.

4     MS. ALBARRAN:  Good afternoon, Your Honor.  Tammy

5  Albarran from Covington & Burling on behalf of the plaintiffs.    14:05:18

6     THE COURT:  All right.  Good afternoon.

7     Mr. Como, you filed with me a -- sort of a protective

8  concern about trial date.  Have you resolved that?

9     MR. COMO:  Yes, Your Honor.  We settled that other

10  case this week so I no longer have a conflict.    14:05:32

11     THE COURT:  All right.  Let me just say I'm going to

12  ask the parties to hold some dates and we're going to hold the

13  dates because we need flexibility.  After I announced trial

14  dates, or dates for the resumption of the hearing -- and I

15  think we can hold those dates, at least -- the monitor informed    14:05:51

16  me that he will be unable to make any of those dates.  I don't

17  think we need the monitor here to have the hearing; he has key

18  members that are perfectly adequate to cover for him.  But it

19  did strike me that to the extent we are having him evaluate the

20  MCSO self-investigations and to the extent that is an issue in    14:06:10

21  this lawsuit, the monitor may well need -- somebody may well

22  want him to testify at some point, so we're going to need to

23  set additional hearing dates.

24     Further, I'm going to raise some additional issues,

25  which may require -- or at least will give the parties the    14:06:25

1    option to explore different issues if they wish to.  And I do

2    not want to continue this hearing forever, I suspect no party

3    wants to continue this hearing forever, so I'm going to throw

4    out some dates right now and ask you to hold them -- I asked

5    you to bring your calendars -- and if you know that those won't    14:06:41

6    work for you, please tell me now.

7         In addition to September 22nd through September 25th

8    and September 29th through October 2nd, which were the dates

9    that I already told everybody to hold, can people hold the 8th

10   and 9th of October?  Any problem with the 8th and 9th of    14:07:00

11   October?

12        I will tell you that the monitor is not available on

13   those dates, either, but if we need them we can have them, if

14   they're available, so I'll have everybody hold those dates.

15        October 13 and 14, the monitor is available on those    14:07:18

16   dates, if in fact his testimony is going to be needed in this

17   matter.  Does that work for everybody?

18        Seeing no objections.

19        And then we could also go the 27 through the 30th.

20   However, before -- and look at that.  Before I discuss the 27th    14:07:39

21   through the 30th, we could also go November 2nd through the 6th

22   and the 12th and 13th.  But I already have a firm trial set on

23   that date.  I've checked with the parties, and they have no

24   objection to giving up those dates if they can have the 27

25   through the 30 dates of October, the end of October.    14:08:00

1        So I would ask the parties to hold the 13th through

2   the -- October 8th in addition to the dates already held: 8, 9,

3   13, 14, 27 through 30, November 2, 3, 4, 5, and 6, November 10,

4   November 12, and 13.  If anybody has any problem holding those

5   dates, please let me know right now.                          14:08:22

6        As soon as I can -- as soon as we can get preferences,

7   as soon as I go through what I intend to do today, we will try

8   to free up the dates for you so you're not just sitting on

9   those dates; I realize you're all busy people.  But I also

10  intend -- this won't be a surprise to anybody -- to hold status   14:08:37

11  conferences fairly regularly, almost every week, so that we can

12  make adjustments as we go along.

13       The other thing that occurred to me is that even

14  though Mr. Warshaw is not available on some dates, so we'll

15  have to hold some dates out of the current trial date, it       14:08:53

16  occurred to me, after considering some of the things that

17  Mr. Masterson said last week, that really there may be whole

18  areas, after the monitors do the interviews they're now doing

19  and after they provide you with transcripts of those

20  interviews, there may be a whole host of areas we can eliminate  14:09:12

21  by stipulation that won't require a lot of trial testimony.

22       For example, and maybe I'm misremembering this, but if

23  the material provided by Mr. Montgomery, the database that he

24  supposedly took from the CIA that included the 50 hard drives

25  that I had taken -- or that the sheriffs provided under my       14:09:36

1    order last week, if in fact there's a stipulation by all sides

2    that that material is junk, then I don't see why we have to

3    spend a whole lot of time on other issues that may involve the

4    50 hard drives but don't relate to this lawsuit.  It does seem

5    to me that they relate to the lawsuit to the extent that they          14:09:56

6    are junk and to the extent they were told -- or Mr. Montgomery

7    was told -- or told the MCSO what they were and what he was

8    using them for.  But we don't have to -- if there's a

9    stipulation by all sides that they're junk, we don't have to

10   waste a whole lot of time messing around with stuff like that.         14:10:13

11        I offer that merely as an example; I don't offer it as

12   a mandate.  It may well be that when we look in the 50

13   hard drives there is something that's relevant, although that

14   is a huge amount of material, so it seems to me that would be

15   one area where we could just sort of eliminate a lot of               14:10:30

16   problems.

17        It seems to me, too -- and I received a summary from

18   the monitor that I think you all heard last week.  I haven't

19   looked at the investigations or seen the transcripts, but as I

20   said last week, the transcripts are available to any party or         14:10:49

21   specially appearing party who wants them.  But it occurs to me

22   that other issues that come forth in the transcripts may not be

23   seriously disputed by any side, and if we can just arrive at

24   stipulations, we may be able to shorten the resumed hearing

25   considerably.  I just offer that for what it's worth.                 14:11:07

1          And so with that being said, I did notice that

2     Maricopa County and the Sheriff's Office filed this week a

3     Statement For Proposed Deadlines Re Document Production.

4          Now, let me ask, it is more convenient for my

5     schedule, because I usually do criminal matters on Monday, I do          14:11:30

6     trials Tuesday, Wednesday, Thursday, sometimes Friday, I keep

7     Friday open for my civil dates, it's much more convenient for

8     me to do regular status conferences on Fridays, and you have

9     set the deadlines, Ms. Iafrate, Ms. Walker, you've set the

10    deadlines for document productions on Friday.                          14:11:49

11         I'm wondering if we can move them one day earlier, so

12    that when I have the status conference, I can get a report as

13    to whether or not you produced the documents that were due the

14    day before, so that we don't have a whole lot of slippage that

15    I tolerate in terms of the document productions.                       14:12:04

16         Do you understand what I'm saying?

17         MR. WALKER:  Yes, Your Honor.

18         MS. IAFRATE:  Yes.

19         THE COURT:  Is it possible to take the deadlines that

20    you've suggested -- and I'm not --                                     14:12:15

21         I'll hear from you, Ms. Wang, in terms of whether or

22    not, you know, you have any concerns about that, but I'm just

23    asking if it's possible to take those deadlines and move them a

24    day earlier so that the very next day I'll be here.  I'll know

25    whether you've produced the documents.  If you haven't, we can         14:12:27

 1   deal with the matter.

 2        MS. IAFRATE:  Your Honor, that's fine today with the

 3   deadline for certain documents and they have been provided, so

 4   with the exception of today's deadline, you're asking that the

 5   ones in the future be moved back one day.                    14:12:41

 6        THE COURT:  Right.

 7        MS. IAFRATE:  That's fine.

 8        THE COURT:  From Friday to Thursday.

 9        MR. WALKER:  And the County has no objection, either,

10   Your Honor.                                                  14:12:48

11        THE COURT:  All right.  Does the plaintiff have any

12   concerns with that or with the proposal generally offered by

13   the County and the sheriff and the MCSO?

14        MS. WANG:  No, Your Honor.  And we appreciate the

15   production before each status conference; that makes good    14:13:00

16   sense.

17        THE COURT:  All right.  So let me just say that

18   last -- not last week but last status conference, which was

19   about closer to two weeks ago, we discussed both Mr. Walker's

20   and Ms. Iafrate's objection and motion to the class definition.  14:13:26

21   I indicated that I wasn't going to rule on that at that time,

22   so for those of you who look at your docket and you're worried

23   about outstanding little gavels that show I haven't ruled, I'm

24   not going to rule on that until we decide what is necessary for

25   reparations to those who were harmed by the violation of my   14:13:50

1    preliminary injunction. I don't see any need to do that. It's

2    still an open issue, except to the extent that I did rule that

3    it's relevant and needs to be turned over, and I assume that

4    you are incorporating that in your schedule, Ms. Iafrate,

5    Mr. Walker.                                                          14:14:09

6        MS. IAFRATE: Your Honor, that is in the schedule as

7    it relates to item 6, so a deadline has been set, subject to

8    our objections that you already heard last time.

9        THE COURT: All right. So document 1085 as well,

10   which is the motion to compel production of Internal Affairs        14:14:24

11   reports, looks to me like that is also taken care of in

12   defendants' statement re proposed deadlines.

13       Ms. Wang?

14       Ms. Iafrate, did you want to address that?

15       MS. IAFRATE: I was just going to say, Your Honor, we            14:14:39

16   met and conferred regarding all of the outstanding motions to

17   compel issues as well as the document requests, and, yes, the

18   outstanding request for the IA has been addressed in our

19   recommended deadline.

20       THE COURT: Ms. Wang?                                            14:14:51

21       MS. WANG: Your Honor, there's one outstanding issue

22   that we're currently meeting and conferring on, and that is how

23   to limit the definition of items, Internal Affairs

24   investigations going back to 2008. That may be a different

25   item in your list, but --                                           14:15:09

1    THE COURT:  No, no.  That is an item that is in

2    defendants' proposed deadlines.  I think it's, like, number 9

3    or number 10.

4    MS. WANG:  Right.  We have agreed in principle, I

5    think, on how to limit that request, and Ms. Iafrate's          14:15:23

6    requested that we reduce that to writing for her, and we're in

7    the process of doing so.

8    THE COURT:  All right.  Now, let me --

9    Oh.  Go ahead, Ms. Iafrate.

10    MS. IAFRATE:  Your Honor, I think that in response to   14:15:34

11    your previous question of me, it's number 8 on the deadlines

12    that talks about the -- essentially, what we were calling

13    spin-off IAs, the remaining 19 or 20, plus the two that were

14    originally sent to Mr. Vogel and then returned, so that also

15    has been addressed in the deadline.                            14:15:51

16    THE COURT:  Yes, it seems to me that 7 and 8 address

17    the matters you've just addressed, both 7 and 8.

18    Yes, Mr. Eisenberg.

19    MR. EISENBERG:  Your Honor, I don't mean to interrupt

20    the flow but I've checked my calendar.  I do have a case in    14:16:04

21    this courthouse starting November the 3rd, United States versus

22    Aceves-Rivera.  It's a multi-defendant case, but I can avow to

23    the Court that it will actually go on that date.

24    THE COURT:  Okay.  Well, I appreciate your pointing it

25    out.  I'll keep it in mind and remember you pointed it out, but  14:16:21

```
 1    to the extent that we get next billing, I want next billing in
 2    case that case goes away.
 3              MR. EISENBERG:  Yes, Your Honor.
 4              THE COURT:  All right.  Thank you.
 5              Let's take up, then, Mr. Casey's objection to            14:16:32
 6    number 10, Ms. Iafrate.
 7              Ms. Clark, are you here to address that?
 8              MS. CLARK:  I'm here, Your Honor, for any questions
 9    you may have.
10              THE COURT:  Well, it does seem to me, Ms. Iafrate,       14:16:46
11    that Ms. Clark's objection is well taken.  If you have the
12    documents, if you're asserting the privilege, then I'm not sure
13    that Mr. Casey ought to be obliged to assert the privilege of
14    his own time and expense.
15              MS. IAFRATE:  Understood, Your Honor.  I provided        14:17:00
16    documents responsive to discovery requests and asserted the
17    privilege as it relates to the subset of documents that I have
18    that involved Tim Casey.  Then there was a subpoena deuces
19    tecum and a subpoena that went to Tim Casey and his counsel.
20    They provided me their documents that they gathered.  I went       14:17:19
21    through it for a privilege, created the privilege log, and then
22    sent it back to Ms. Clark, because it's the subpoena that goes
23    to her that these documents would be responsive to.  I've
24    already done the privilege identification and created the log
25    on behalf of my client.                                           14:17:36
```

1    THE COURT: All right. Ms. Clark?

2    MS. CLARK: Yes, Your Honor. I don't really have much

3    to add to the objection that we filed. I mean, Tim Casey was

4    withdrawn from this matter in December of last year and this is

5    a dispute between parties.                                    14:17:49

6    THE COURT: Let me just see if I understood what

7    Ms. Iafrate just told me, because maybe I didn't.

8    Ms. Iafrate, are you authorizing Mr. Casey to turn

9    over every document except for the documents that are listed in

10   your privilege log?                                          14:18:03

11   MS. IAFRATE: That is correct of the documents that

12   were provided to me by his counsel, I went through them to

13   assert my client's privilege and that has been done.

14   THE COURT: All right. So those documents can be

15   provided immediately as well as the privilege log can be       14:18:13

16   provided immediately.

17   Is that correct, Ms. Iafrate?

18   MS. IAFRATE: They were sent back to Tim Casey's

19   counsel for that purpose.

20   THE COURT: Okay. So you have no objection if          14:18:25

21   Mr. Casey produces all documents that they provided -- that

22   they identified to you that are not contained in the privilege

23   log you sent back to them.

24   MS. IAFRATE: Correct.

25   THE COURT: And you have no problem if they provide     14:18:38

1  the privilege log.

2         MS. IAFRATE:  I would assume that they would.

3         THE COURT:  All right.  Can you do that immediately,

4  Ms. Clark?

5         MS. CLARK:  Judge, I can get that done on Monday,          14:18:46

6  August 3rd.

7         THE COURT:  All right.  Thank you.

8         Is that satisfactory to the plaintiffs?

9         MS. WANG:  Your Honor, the production on the 3rd is

10  satisfactory.  I just want to flag two issues for the Court.    14:18:56

11         We have raised two issues about Tim Casey's production

12  in response to our subpoena duces tecum, both with Ms. Clark

13  and with Ms. Iafrate.  First, we believe that Mr. Casey's

14  search for the documents was inadequate.  We have documents

15  from the defendants that should be in Mr. Casey's possession.   14:19:19

16  For example, if they're e-mails that went to him that were not

17  produced or listed in his privilege log that was provided from

18  Ms. Clark.

19         Second, we also believe that there are some privilege

20  issues remaining.  We're still meeting and conferring about     14:19:37

21  that.  We intend to take that up again once we get the new

22  production on August 3rd, but I alert the Court just because

23  there may be some additional matters we want to take up with

24  you.

25         THE COURT:  Let me just suggest, then, that in           14:19:51

1    addition to the subpoena that you serve Mr. Casey you serve a

2    document production request to the defendants that encompasses

3    those same subpoena matters, and then to the extent that the

4    defendants have maintained or have matters in their file that

5    Mr. Casey has not retained, they will have to assert an                    14:20:05

6    additional privilege log.

7            Is that a fair suggestion?

8            MS. WANG:  That certainly is.  I believe we already

9    have done so, but we will double-check that.

10           THE COURT:  All right.  Because I assume, Ms. Clark --    14:20:17

11   well, you represented, I think, in your pleading, that

12   Mr. Casey had reviewed everything that he had retained.

13           MS. CLARK:  That's correct, Judge.

14           THE COURT:  Okay.  So if you have that issue,

15   Ms. Wang, you can act as you deem best fit, but you'll provide   14:20:30

16   what you have on August 3rd together with the privilege log

17   given you by Ms. Iafrate?

18           MS. CLARK:  Absolutely, Judge.

19           THE COURT:  All right.

20           Yes.  Ms. Wang, anything else?                            14:20:41

21           MS. WANG:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  We do have issues, of course,

23   that arise from the documents that came to light last week, and

24   I guess before we take those up I'm going to check with the

25   monitors as to any developments this week in terms of new        14:21:05

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 19

1   documents found, a concern about whether or not we've got all

2   the documents or tried to get all the documents that were

3   identified last week, and any other issues of potential

4   cooperation.

5          Are you there?  Do you hear me?                    14:21:23

6          DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.

7   Chief Martinez, deputy monitor, and hopefully you can hear me

8   fine in the courtroom also.

9          Yes, we do have a couple of issues to bring up --

10         THE COURT:  Chief?                                  14:21:33

11         DEPUTY MONITOR MARTINEZ:  -- to the Court.

12         THE COURT:  Chief?

13         DEPUTY MONITOR MARTINEZ:  Yes, sir.

14         THE COURT:  We can hear you here, but the speakerphone

15  always provides a bit of distortion.  And so the court reporter  14:21:43

16  can get down everything you're saying, I'm going to ask you to

17  speak as slowly and distinctly as possible so that we can all

18  hear you, please.

19         DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  We do have

20  a couple of issues to bring up to the Court's attention, the    14:21:58

21  first one being last Friday, the 24th, Chief Warshaw and myself

22  went to PSB and met with Lieutenant Kratzer, wherein we were

23  taking a look, our first look at the 1459 slash 1500 IDs.

24         During that meeting with Lieutenant Kratzer, a

25  question was asked if there were any other instances of found   14:22:21

1    IDs, cases with IDs, that was not mentioned at the Monday

2    briefing with PSB, not to include the 1500.  Lieutenant Kratzer

3    mentioned yes, that there was one additional instance where 42

4    additional IDs were found in the training kit that belonged to

5    one of the sergeants, and that they had opened an IA case on          14:22:47

6    the IA number 15-0475.

7           Our concern is neither the order of the 24th that you

8    filed about the hard drives nor the order of the 27th has the

9    two DR numbers which match the casing that PSB informed us on

10   Monday covering those 42 IDs.  That's one of the concerns --         14:23:15

11          THE COURT:  All right.

12          DEPUTY MONITOR MARTINEZ:  -- that we need to get ahold

13   of those IDs just last week, just as the other two DR numbers

14   where IDs were -- were gathered.

15          THE COURT:  All right.  If you have other concerns,           14:23:29

16   hang on to them for a second.

17          Ms. Iafrate?

18          MS. IAFRATE:  Your Honor, I do believe that that IA

19   number and the information was provided to the monitors during

20   a weekly report.  They might be backlogged in their weekly          14:23:44

21   reports because we issued a -- or you issued what we perceived

22   to be a stay.  So once the stay was lifted, we pushed out all

23   of the back weekly reports, and I believe that that case is in

24   the weekly report.  But if you want to issue another order to

25   encompass this DR, I can go back and make certain that it was       14:24:06

1    indeed previously provided.

2            THE COURT:  I'll do that.  If I understood the chief

3    correctly, it's an IA number --

4            MS. IAFRATE:  It is.

5            THE COURT:  -- not a DR number.                          14:24:17

6            MS. IAFRATE:  It is, but a lot of IAs have DRs going

7    with it, yes.

8            THE COURT:  All right.  The only thing I want to make

9    sure of is that we get the plaintiffs, all the identifications

10   of members of the plaintiff class, to the extent that's still   14:24:27

11   possible, that are roaming around anywhere in the MCSO.  So if

12   these haven't been provided, I will issue an order directing

13   you to provide them.  If you can determine that they've already

14   been provided pursuant to my other orders, then please identify

15   which ones they are.                                            14:24:43

16           MS. IAFRATE:  Very well.

17           THE COURT:  Okay.  Chief, anything else?

18           DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  Just one

19   last statement about this Lieutenant Kratzer instance.  I'm not

20   doubting what Ms. Iafrate is saying.  There's a lot of          14:24:56

21   information that was dumped in the -- during the -- or after

22   the stay period, but I want to make sure that they were --

23           THE COURT:  You know what?

24           Chief.  Chief.  Chief.  Chief.  You're starting to go

25   too fast and we can't follow you.  You have to go slowly.       14:25:09

1      DEPUTY MONITOR MARTINEZ:  All right, sir.  I

2  apologize.

3      THE COURT:  It's all right.

4      DEPUTY MONITOR MARTINEZ:  I want to make sure that

5  what we're asking for is not just a copy of the IA number, but    14:25:18

6  copies of those 42 IDs.

7      THE COURT:  Right.  Well, I think that what the order

8  will direct, just because I've -- the monitor's now -- I'm

9  sorry, not the monitor, the marshal is now holding those IDs,

10  I'll just direct that the IDs be given to the marshal and so we   14:25:34

11  have them in one central location.

12      Will that meet your concerns, Chief?

13      DEPUTY MONITOR MARTINEZ:  Yes, sir, it would.

14      And if I may, there are a couple of other issues that

15  we have communicated with Ms. Iafrate that she has informed us    14:25:54

16  of some confidentiality that is involved with those issues, so

17  she may want to address the Court before we speak about it.

18      THE COURT:  Ms. Iafrate.

19      MS. IAFRATE:  Your Honor, the monitors and I discussed

20  this issue this morning.  I asked them to please not present      14:26:11

21  this issue in open court, as it would potentially compromise an

22  investigation.  I don't know if Your Honor would be amenable to

23  clearing the courtroom regarding this issue or if we could take

24  it up some other way rather than in open court, because there

25  is a confidentiality issue that I'm concerned about regarding     14:26:34

1   one of the monitor's requests.

2       THE COURT: What is the confidentiality issue?

3   Pursuant to what statute or privilege?

4       MS. IAFRATE: It's a concern regarding compromising a

5   criminal prosecution.                                    14:26:49

6       THE COURT: All right. Let me make this suggestion.

7       I'm going to go through everything else that we have

8   to go through, and then at the end I will hear you under seal

9   on your representation that you believe that there may be

10  issues that should be taken up under seal. If I determine that   14:27:11

11  there is no reason to seal, then I'll open the transcript.

12      Will that be acceptable to you?

13      MS. IAFRATE: That's fine, Your Honor.

14      THE COURT: All right. Does anybody else have any

15  objection to proceeding in that fashion?                 14:27:23

16      MS. WANG: No object -- excuse me. No objection, Your

17  Honor.

18      THE COURT: All right. Chief, anything else?

19      DEPUTY MONITOR MARTINEZ: Yes, Your Honor. There was

20  a second document that we are waiting for Ms. Iafrate to -- to   14:27:34

21  release. It had to do with some minutes of a meeting.

22  Ms. Iafrate stated she was reviewing it for any privileges, and

23  we have not received any -- any response since our last

24  conversation with her as to whether it's going to be a release

25  in full or we are going to get a redacted version of that   14:27:59

1  document.

2        THE COURT:  All right.  And that request was made to

3  Ms. Iafrate when?

4        DEPUTY MONITOR MARTINEZ:  It was made in writing

5  yesterday after an interview that we conducted, and we had a      14:28:08

6  conversation about this document this afternoon.

7        THE COURT:  Can you identify the document at all, like

8  who -- who was the author, and what it was prepared in

9  conjunction with?

10        DEPUTY MONITOR MARTINEZ:  Yes, Your Honor.  During an     14:28:29

11  interview of Lauren Sanchez, who is, I believe, an analyst

12  assigned to PSB for the Maricopa County Sheriff's Office.  And

13  she was the scribe at the Friday, July 17th, meeting with PSB

14  and counsel in preparation for the monitor's visit.

15        THE COURT:  All right.  And you're reviewing that for     14:28:49

16  attorney-client privilege, Ms. Iafrate?

17        MS. IAFRATE:  Yes, Your Honor.  Actually, I received

18  the request after-hours last night; I didn't see it until this

19  morning.

20        THE COURT:  No problem.  I'll give you a reasonable       14:29:00

21  time to review it.  If you are going to redact any of it, would

22  you please file a privilege log indicating -- or the document

23  itself may indicate these actions, but just if you're going to

24  redact any of it, let us know.

25        MS. IAFRATE:  Very well.                                  14:29:12

1      THE COURT:  Anything else, Chief?

2      DEPUTY MONITOR MARTINEZ:  Your Honor, I believe

3  Commander Girvin has an item.

4      THE COURT:  All right.  Chief Girvin?

5      DEPUTY MONITOR GIRVIN:  Yes, Your Honor.  Can you hear     14:29:21

6  me okay?

7      THE COURT:  Yes, we can hear you.  But again, as with

8  Chief Martinez, you need to speak slowly, because there is some

9  distortion because of the speakerphone.

10     DEPUTY MONITOR GIRVIN:  Yes, Your Honor, I will do     14:29:33

11 that.

12     As you're aware, Your Honor, that we are in possession

13 of a hard drive which we received from MCSO pursuant to our

14 initial document request in the wake of the April hearings.  We

15 received that hard drive from Chief Knight.  Chief Knight was     14:29:50

16 designated by the defendants as our point of contact for these

17 document requests.

18     Chief Knight was interviewed this past week by our

19 monitor and during the course of that interview it was revealed

20 that the hard drive that was initially provided to us, which is     14:30:11

21 purported to have the Montgomery investigation material, is

22 actually a compilation of material from a couple of different

23 sources.

24     The first source is a hard drive that apparently

25 Detective Mackiewicz brought into Chief Knight's office when he     14:30:33

1    responded to Chief Knight's request that he provide, you know,

2    the relevant documents.  And when Detective Mackiewicz was in

3    Chief Knight's office, he asked Chief Knight and was granted

4    access to his office computer so that Detective Mackiewicz

5    could access the department's H drive.                         14:30:56

6         The H drive is really a shared drive that every

7    employee in the office will let -- can get to and use to store

8    documents, so it functions like a hard drive, but it's a large

9    drive that's maintained by the office and you have to log into

10   it.  So Detective Mackiewicz was allowed to log into his      14:31:16

11   section of the H drive on Chief Knight's computer.

12        So we were informed that the contents of the

13   hard drive which we were provided immediately after the April

14   hearing is actually a compilation of material that Detective

15   Mackiewicz had on the personal hard drive which he brought to  14:31:36

16   Chief Knight's office and material which he downloaded to --

17   from the H drive.  That was downloaded to two hard drives:  One

18   was provided to us, and the other we were told was provided to

19   Ms. Iafrate.

20        During questioning then Chief Knight volunteered that     14:31:56

21   he still has in his possession, and has had since that meeting,

22   the original hard drive that Detective Mackiewicz brought to

23   his office.  So we are requesting that we be allowed to take

24   possession of that hard drive, which is really the source

25   material, or supposedly the source material, for a copy that we  14:32:16

1    were provided in April.

2         THE COURT:  Let me ask you some questions to make sure

3    I understand.  Detective Mackiewicz brought in a hard drive, or

4    the material from the H drive was downloaded to the hard drive?

5         DEPUTY MONITOR GIRVIN:  He brought in a hard drive, a      14:32:44

6    separate external hard drive, and he also brought in three

7    binders' worth of paper which we needed and are now in

8    possession of.

9         THE COURT:  Well, again, I got you said that he

10   brought in a hard drive, and then I thought I heard you say he    14:32:58

11   brought in three binders' worth of paper material?

12        DEPUTY MONITOR GIRVIN:  He did.  He entered the office

13   with the external hard drive and three binders' worth of paper.

14   And the paper we're not questioning; we believe we have

15   received copies of that pursuant to our request.                 14:33:15

16        THE COURT:  Okay.  But you don't have the original

17   hard drive, and you don't know what was on the H drive that may

18   have been downloaded by Detective Mackiewicz?

19        DEPUTY MONITOR GIRVIN:  The hard drive which we have

20   in our possession is alleged to contain the contents of the      14:33:33

21   original hard drive that Detective Mackiewicz went into

22   Chief Knight's office with, and whatever material Detective

23   Mackiewicz added to that hard drive that he felt was responsive

24   and pulled off of the H drive.

25        THE COURT:  All right.  Ms. Iafrate.                        14:33:52

1          Let me ask first:  Do you know whether or not we've

2     received the copies of these three binders, the material in

3     these three binders?

4          MS. IAFRATE:  Yes, Your Honor.

5          THE COURT:  Do you know if it has been designated as          14:34:04

6     material from the three binders provided by Detective

7     Mackiewicz?

8          MS. IAFRATE:  I don't know how it was labeled, Your

9     Honor, but I assume that it was labeled to be identified that

10    way.                                                            14:34:14

11         THE COURT:  Okay.  Can you check on that for me?

12         MS. IAFRATE:  Yes.

13         THE COURT:  Do you have any objection if I order the

14    marshals to take possession of the hard drive that is in

15    Chief Knight's possession?                                       14:34:22

16         MS. IAFRATE:  Yes, Your Honor.

17         THE COURT:  And what is that objection?

18         MS. IAFRATE:  Your Honor, this hard drive not only

19    contains information regarding the Montgomery case, but it also

20    contains other materials.                                        14:34:33

21         What Chief Knight and Sergeant Mackiewicz -- or

22    Detective Mackiewicz attempted to do was be responsive to your

23    request during that hearing to provide everything that was

24    responsive as to the Montgomery investigation.  And that is why

25    not only did they not stop with the paper or the hard drive;     14:34:52

1   they also searched the H drive to ensure that they had the

2   comprehensive amount of documents responsive to your request.

3   So that's why they went the --

4           THE COURT:  And they provided everything but the 50

5   hard drives?                                          14:35:09

6           MS. IAFRATE:  You know, Your Honor, that Chief Knight

7   was not aware of those 50 hard drives.

8           THE COURT:  I don't know anything.  And I'm not

9   accusing him of anything.  I haven't seen the contents of the

10  interview, and that may be well what he said.  But I am at this  14:35:20

11  point not prepared to take anybody's word for what was what.

12  Let me propose this and see if it's acceptable to you.

13          I'm going to order the marshals to take possession of

14  that hard drive.  I'm going to, as I have in the past, order

15  them to let nobody have access to it till a forensic copy is  14:35:40

16  made.  And then I will give you first access so that you can

17  review it and claim as privileged or nonresponsive material

18  that's in the hard drive.

19          Is that acceptable to you?

20          MS. IAFRATE:  Yes, Your Honor.  Could I provide these  14:35:56

21  myself to the marshals rather than having the marshals go over

22  and seize them?

23          THE COURT:  Well, first off, I realize that it was

24  characterized places as a seizure.  I just want to say that it

25  was in response to my order.  I provided an order last week.  I  14:36:12

1    have no basis to believe that -- and the marshals have informed

2    me that there was no resistance from the MCSO.

3         And so I believe that part of the reason I issued the

4    order, Ms. Iafrate, is you had chain of custody concerns and

5    they were very valid, and I think I put that in the order, too.    14:36:30

6    And so just to not -- to avoid any possible chain of custody

7    concerns I'm going to have the marshals receive the hard drive

8    directly from Chief Knight.

9         But I'm not characterizing it as a seizure, I'm

10   characterizing it as a response to my order, which is what I    14:36:46

11   believe last week was, too.  Is that satisfactory?

12        MS. IAFRATE:  Well, I would still object to the

13   process, Your Honor, but I understand what you're saying.

14        The other problem that I have is this hard drive is in

15   a secure location, and Chief Knight is the custodian of it    14:37:00

16   because he received it from Detective Mackiewicz.  Chief Knight

17   is not in today.  Could we make some arrangements so that the

18   marshals can come Monday, seeing that it's Friday afternoon?

19        THE COURT:  Well, I'm going to order that the marshals

20   contact you today.    14:37:20

21        MS. IAFRATE:  That's fine.

22        THE COURT:  And that if they receive assurances that

23   nothing's going to hap -- they receive adequate assurances that

24   it's in a secure location, then we can have it on Monday.

25        MS. IAFRATE:  Very well.    14:37:32

1      THE COURT:  If they don't, I'm going to send them over

2  to get it.

3      MS. IAFRATE:  Understood.

4      THE COURT:  All right.  Anything else, Chief Girvin?

5      DEPUTY MONITOR GIRVIN:  Just on that topic, one more          14:37:40

6  request or observation, Your Honor.  If you could direct that

7  that hard drive from this point forward not be plugged into any

8  computing device whatsoever.  You indicated that you're going

9  to order a forensic copy be made, so we're just concerned that

10 any -- plugging into any computer device at this point would     14:37:59

11 alter the metadata on the hard drive.

12     THE COURT:  Any objection to that, Ms. Iafrate?

13     MS. IAFRATE:  No, Your Honor.

14     THE COURT:  All right.

15     Are those your issues, Chief Martinez?                        14:38:15

16     DEPUTY MONITOR GIRVIN:  Yes, Your Honor.

17     THE COURT:  All right.

18     DEPUTY MONITOR MARTINEZ:  Yes, sir.

19     THE COURT:  All right.  I'm going to address something

20 that pertains to the material seized last week and some of what  14:38:29

21 Chief Warshaw characterized as the contents of the interviews

22 that caused him concern and caused him to call for the

23 emergency hearing which resulted in my order directing the

24 acquisition of the 50 hard drives, which I take it you're not

25 contesting were materials Montgomery provided to the MCSO, and   14:38:51

1   the identifications.

2          Am I wrong about that statement, Ms. Iafrate?

3          MS. IAFRATE:  That we're not contesting that they

4   were --

5          THE COURT:  That the 50 hard drives contain material          14:39:03

6   that Montgomery provided to the MCSO.

7          MS. IAFRATE:  Your Honor, we still have not evaluated

8   that issue.

9          THE COURT:  All right.

10         MS. IAFRATE:  So it's a non-answer to you.  I do not          14:39:14

11  have an answer for you.

12         THE COURT:  That's fine.  In any case, I directed

13  their confiscation and they were provided, as I said, without

14  incident.  And I have not read -- and as far as I know, they

15  haven't even been transcribed -- some of the interviews that          14:39:30

16  Chief Warshaw described to me last week.  And so I obviously

17  don't know what their contents were, and I recognize that

18  everyone has a right to be heard before any decisions are made,

19  and I expect that I will provide that.

20         But I'm going to lay out a little bit what my concerns          14:39:52

21  were about some of those issues so that everybody is aware of

22  what my concerns were, and are, and what I intend to do about

23  those concerns and what I would propose that we do.

24         The very first injunctive order that I entered in this

25  matter back in October 2013 says:  Defendant shall ensure that          14:40:25

1    Monitor has timely, full and direct access to all documents

2    that the Monitor reasonably deems necessary to carry out its

3    duties, 145.

4        And then in 146 it specifies that the defendants may

5    withhold from the Monitor any documents or data protected by        14:40:43

6    the attorney-client privilege, acknowledging that that

7    privilege does exist, but, of course, if a -- if the defendants

8    decline to provide that access, they have to give a privilege

9    log, and that's in 146.

10       And in 147 it says -- paragraphs, I'm referring to --      14:40:57

11   Defendants shall ensure that Plaintiffs' representatives and

12   their consultative experts and agents shall have full and

13   direct access to all of Defendants' documents upon reasonable

14   notice.

15       We, as I've set forth before and don't have to go into     14:41:16

16   in great detail, have encountered several circumstances which

17   have required adjustment of the monitor's authority, including

18   when we discovered -- including when the MCSO elected to handle

19   matters itself that arose from the Armendariz-Perez

20   allegations; and further, when we discovered that the            14:41:37

21   preliminary injunction order had not been complied with at all.

22   And I set forth an order on November 20th, 2014, which said:

23   "An adequate internal affairs division must be willing to

24   engage in thorough examination and, in appropriate cases,

25   agency exposure to discipline and painful public                14:41:55

1   accountability.  Of course, to make an appropriate assessment

2   of whether MCSO's PSB is so acting, the Monitor must

3   necessarily have complete access to Defendants' internal

4   affairs investigations.  This includes familiarity with the

5   manner in which MCSO pursues an investigation -- be it criminal        14:42:12

6   or administrative in nature -- the investigation's initial and

7   continuing scope in light of the information the investigation

8   uncovers, the performance of the investigators, and the kind of

9   discipline -- if any -- ultimately imposed at its conclusion."

10           There's a number of other provisions in that order        14:42:30

11  which relate to the requirement that the monitor have full and

12  complete access to documents, both in the Internal Affairs

13  Division and of the MCSO, as was the first order.  However, on

14  that November 20th order I provided it to all parties and said

15  we're going to operate under this order from henceforth, but        14:42:51

16  I'm going to allow you to raise objections and complaints.

17           And Ms. Iafrate, you did, in the December 4th hearing,

18  and I want to read that -- part of that with you.

19           "Ms. Iafrate:  Thank you, Your Honor.

20           "Regarding the November 20th order, on page 16 where        14:43:07

21  you're talking about orders concerning ongoing

22  investigations --"

23           And I say:  "Yes."

24           "-- at line 10 it specifically talks about this case

25  and PSB dealing with the constitutional rights of the members        14:43:19

1   of the plaintiff class are guaranteed by MCSO going forward."

2           And I say:  "Yes."

3           And you say:  "And, of course, MCSO would agree with

4   that, that that was the structure of this litigation."

5           And then we make sure that we're talking about the        14:43:33

6   same order and so you say:  "So at page 17 of the November 20th

7   order you talk about the monitor must necessarily have complete

8   access to defendants' Internal Affairs investigations."

9           And I said:  "Um-hum."

10          And you said:  "Our concern, Your Honor, is that some     14:43:50

11  internal investigations do not deal with the underlying

12  litigation in this matter, so I'd ask that that be curtailed

13  ever so slightly to coincide with what you wrote on page 16,

14  where it deals with investigations of MCSO personnel as it

15  relates to either compliance with the order, meaning your       14:44:06

16  injunctive order, or the constitutional rights of members of

17  the plaintiffs' class."

18          And I tell you:  "Show me what line you're talking

19  about."

20          And you say:  I'm talking about page 17, line 14."        14:44:18

21          And I tell you:  "How about if I do this, Ms. Iafrate?

22  One of the things we've discovered, and I think we've all

23  discovered it, is that there's lots of things that relate to

24  this case and to this -- to this suit in terms of Internal

25  Affairs investigations, PSB investigations.  That doesn't mean   14:44:34

1  that everything does; I acknowledge that.

2          "How about if I put in here -- I don't want to limit

3  the monitor's right to have complete access to the PSB because

4  you don't know what you don't know until you know it. But I

5  will put in here the right for you to object, saying that the          14:44:54

6  monitor is investigating matters that can have no relation to

7  this lawsuit and raise the matter to me.

8          "Would that be acceptable to you?"

9          And you say:  "That would be acceptable."

10         And that, in fact, is precisely what I did in document          14:45:08

11  825 filed December 9, 2013.  I reference our colloquy and I

12  note that upon the recommendation of your parties I'm going to

13  change my order, and I say:  "In its Order, the Court indicated

14  that the 'Monitor must necessarily have complete access to

15  Defendants' internal affairs investigations.  Defendants are          14:45:30

16  further authorized to file objections with the Court if and

17  when they dispute the Monitor's involvement in particular

18  investigative processes as bearing no relation to the Monitor's

19  evaluation of whether the Professional Standards Bureau is

20  operating in compliance with the Supplemental Permanent          14:45:44

21  Injunction or other Orders of this Court, or as otherwise

22  exceeding the power vested in the Monitor by the Court...'  I

23  go on; I'm not going to read it.

24         In February of 2015 I entered an order requiring

25  expedited discovery that says:  "Copies of identification          14:46:01

1   documents seized by MCSO personnel from apparent members of the

2   Plaintiff Class" must be provided."

3        Now, we had -- and again, I don't mean to

4   mischaracterize it, and it wasn't under oath, but it was a

5   characterization of the monitor about what some of the

6   witnesses said they were informed in a Friday meeting prior to

7   the monitor's visit that certain identifications located and

8   found that did contain members of the plaintiffs' class were

9   not to be discussed with the monitor, or something to that

10  effect.

11       That violates my orders, and it does so in a direct

12  way.  It violates my orders both about what had to be

13  disclosed, and it violates my orders about the access that the

14  monitor has, and should be given, to information in the

15  Internal Affairs Division.

16       And if in fact there is any effort by the MCSO to

17  subvert those orders by lying to the monitor or telling him

18  less than the truth, or informing or instructing their people

19  to do so, that is in fact even a more serious and gross

20  violation of my order.  I'm not saying that happened, and

21  again, everybody has an opportunity to be correctly heard.

22       As it pertains to the 50 hard drives that apparently

23  were also -- or at least there was also some information in

24  interviews that there was 50 hard drives that were provided by

25  Montgomery, and not only was there information provided in the

1  interviews, but I noticed when I lifted the documents from

2  under seal that Ms. Wang provided in her response to the motion

3  to compel, I noticed that a number of those documents discussed

4  50 hard drives of downloaded material received from

5  Mr. Montgomery.                                                          14:48:03

6        And we received some information that such materials

7  existed and we found 50 hard drives, and again, Ms. Iafrate,

8  I'm not representing what they are one way or the other.  I

9  recognize that they may not be hard drives provided by

10 Mr. Montgomery.  Even if they are, I believe, at least based on  14:48:22

11 the testimony I've heard, and it is at least suggested by the

12 e-mails that Ms. Wang provided, that they may be junk, and they

13 may not be what Mr. Montgomery represented to the MCSO they

14 were.  I don't know that, either.  I recognize there's all

15 kinds of possibilities out there.                               14:48:47

16       But I will point out that in the sheriff's testimony

17 on April 23rd I directed him very directly:  "... to the extent

18 that you have any control over any funding records, over any

19 reports, over any communications, over any overtime records,

20 travel documentation, any e-mails of any and all people        14:49:02

21 involved in the threat assessment unit or anywhere else, any

22 communications from and to Montgomery, any computers or phones,

23 cell phones or other information that in any way is relevant or

24 related to this investigation, I want you to direct your people

25 to put a hold on it immediately and preserve it.  And that      14:49:18

1    includes any documentation or numbers that would relate to

2    Mr. Montgomery's confidential status.

3         "You understand that?"

4         And the sheriff:  "Your Honor, are you referring to

5    this investigation with the monitors and --"                      14:49:31

6         And I said:  "No, no.  I'm referring to the

7    investigation that Mr. Montgomery was undertaking with

8    Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, anybody else from your

9    staff, anybody else from the MCSO, or anyone else from the

10   posse.  I want all records that in any way relate to it, all      14:49:47

11   electronic data or anything else, or the financing, funding of

12   that operation, all phone records, e-mails, reports, I want it

13   all preserved."

14        "And I think I will send the monitor to begin taking

15   possession of those records and we'll do it confidentially,       14:50:03

16   imminently.  But I don't want in the interim any of those

17   records lost, inadvertently or otherwise."

18        The next day, Chief Deputy Sheridan was testifying and

19   ran into a snafu.  We'd agreed on a procedure whereby you could

20   have folks over there, and you did.  You cooperated.              14:50:23

21   Ms. Iafrate, you had attorneys over there doing rushed review,

22   because that's what I'd ordered that you do.  And we ran into a

23   problem where folks were not providing my monitor with the

24   documents, and they wouldn't provide them until you looked at

25   then, approved them, and Bates stamped them, and I told them      14:50:40

1    that under the circumstances, that is not what I ordered, and

2    you will remember that I set out a separate procedure.

3           Chief Sheridan was still on the stand, and so I

4    said -- we went through the objections and I said:  "And so I'm

5    going to require that those documents be released immediately.    14:50:58

6    I mean, not without your review.  Whoever your designated

7    attorney is, get over there and review them.  We'll make some

8    sort of a list of the documents that have been provided, and

9    then we can -- we can match them up when you Bates stamp them.

10   But I want those documents provided."                            14:51:14

11          And then I turned to Deputy Chief Sheridan and I said:

12   "Do you have an issue with that, Chief, that we need -- that we

13   need to discuss or concerns that you wanted to raise that I

14   should consider?"

15          And he said:  "No, sir."                                  14:51:26

16          And then I said:  "Okay.  Is that okay with you?"

17          And he said:  "Yes, sir."

18          Then you may remember that after the lunch break I

19   said:  "Before we begin, apparently there's been a

20   miscommunication.  Chief, I know you were over trying to         14:51:38

21   facilitate or getting those documents over the noon hour, and

22   as soon as you left, folks indicated they wouldn't give the

23   documents until Ms. Iafrate had a chance to review them and

24   they were Bates stamped, which I think we already resolved

25   prior to lunch."                                                 14:51:53

1          "Is there anything you can do to facilitate that

2     production right away, Chief?  Who is the captain that said he

3     wouldn't give them?"

4          And then there was an indication that it was

5     Chief Knight.                                                    14:52:02

6          And then I said:  "I'm really trying -- the thought

7     occurred to me over lunch, Chief.  I'm not trying to use these

8     today.  There's going to be too much other stuff.  But I really

9     do think it's important to secure the documents.  So I'm still

10    going to hold to that order, unless you have some reason,        14:52:14

11    Chief, why I shouldn't.  I think it's very important, in light

12    of the history of the case, that we get the documents in a set

13    today."

14         And then, Ms. Iafrate, you said:  "From what I

15    understand, Your Honor, at one point there were three requests,  14:52:25

16    and now I think that there are way more requests --"

17         And I said:  "Yeah."

18         You said:  "-- so it's a moving target."

19         I said:  "Yeah, it wouldn't surprise me if the

20    requests are coming in fast and furious, because my folks want   14:52:35

21    to get this arms around everything today.  So that may be part

22    of the confusion.  But I'm sure I was clear, and I suspect that

23    the chief deputy went over to try to facilitate that, and there

24    must be some confusion, so if you'll call Chief Knight and

25    we'll wait for you."  You called Chief Knight and told me that   14:52:50

1   there was -- that the issue was resolved.

2           I issued two more orders in the next week in response

3   to your objections and concerns, document 1032 and document

4   1046, indicating that I expected the immediate production of

5   all such documents.  And then -- and I believe all parties have          14:53:07

6   this, but if they don't, I have it here and I'm going to give

7   every party a copy -- Chief Knight provided to you,

8   Ms. Iafrate, and to the Monitoring Team, a response, request by

9   request, of his response to our request for those documents.

10          There's a lot them that relate to the documents, but          14:53:30

11  the one that I'm most concerned about today -- and by the way,

12  it's my understanding from the monitor that you provided these

13  documents to everybody.  Not just to the monitor; you put them

14  in the drop box and they went to everybody.  If they didn't, I

15  don't see why they shouldn't go to everybody, but that is their          14:53:49

16  understanding.

17          So if that's incorrect and there's some reason I

18  shouldn't read from this, can you tell me that now?

19          MS. IAFRATE:  Your Honor, I cannot avow that they went

20  to the plaintiff, but there's no problem with you reading from          14:54:00

21  that document.

22          THE COURT:  All right.  So one of the many requests

23  that the monitor asked for you to immediately provide is "the

24  work product of Dennis Montgomery, including memoranda,

25  reports, notes, photographs from the Seattle, Washington          14:54:11

1   investigation, and activities referred to in the article by

2   Stephen Lemons in the Phoenix New Times dated June 4th, 2014."

3           And the response from Chief Knight is:  "Deputy

4   Mackiewicz delivered all files in the possession of MCSO

5   provided by Dennis Montgomery on an external hard drive.  This        14:54:28

6   information was transferred to another external hard drive and

7   provided to monitor Anders and counsel Michele Iafrate on April

8   24th and April 27th, 2015."

9           MS. IAFRATE:  Your Honor, could you tell me the

10  number of that --                                                    14:54:43

11          THE COURT:  You know what?  It's not Bates numbered.

12          MS. IAFRATE:  No, no, no.  Didn't he say -- didn't

13  Chief Knight indicate what request he's responding to?

14          THE COURT:  ITR 9.

15          MS. IAFRATE:  Thank you.                                     14:54:51

16          THE COURT:  Number 9.  But in this document,

17  Ms. Iafrate, which, again, I think you provided to everybody,

18  there's a number of requests that relate to that.  I'm only

19  reading one, because I don't want to relate them all, because I

20  think that covers it.                                                14:55:05

21          So after last Friday, when I went home and turned on

22  the news and I saw a report in which Mr. Popolizio was standing

23  next to Chief Sheridan and Chief Sheridan said they didn't

24  provide these documents because they'd never been asked for, I

25  realized that I didn't share that view.  That he may be             14:55:20

1   correct, he certainly has an opportunity to be heard, but I

2   thought that it was well that I point out my concerns about

3   what is happening, in light of the attorney-client privilege

4   that's been invoked I have concerns about what is happening and

5   who is giving the direction not to discuss to the monitor.          14:55:43

6           But again, you have a legitimate right to

7   attorney-client privilege at some level which -- which is lost,

8   and I'm not saying that you gave that advice, I don't make that

9   assumption, but I have all of those concerns.

10          Now, let me tell you what I propose to do about it.   I    14:56:00

11  do not want to offset the relief that members of the plaintiff

12  class are entitled to, nor do I want to delay any longer

13  corrective action that I think must occur within the Maricopa

14  County Sheriff's Office and revisions to the injunctive relief

15  order, if that ought to happen.                                    14:56:18

16          Further, I recognize that this is a civil contempt

17  hearing that relates to three matters that I have directly set

18  forth, and these two what I view as direct violations of my

19  order -- and I'm not sure that they are, but they appear to be

20  direct violations of my order -- aren't noticed for this civil   14:56:41

21  contempt hearing.

22          But I think I've made it very plain, which is why we

23  have specially appearing counsel here, that if I determine at

24  the end of the civil contempt hearing that there is a basis and

25  a need to refer any or all of these matters for criminal         14:56:56

1    contempt, I will do so.

2            It also seems to me that these matters, even though

3    they cannot and should not, in and of themselves, be the

4    subject of civil contempt, are relevant to the civil contempt

5    hearing in terms, as I've said all along, about the need and          14:57:11

6    the necessity and the extent of the remedy required that may be

7    sought by the plaintiff class for materials and other matters

8    that were not provided by the Maricopa County Sheriff's Office

9    prior to the trial in this matter, so here is what I would

10   propose.                                                              14:57:32

11           I'm not going to adjust these civil contempt hearings

12   to incorporate those matters which I believe may have been but

13   I do not know were direct violations of my order, but I'm not

14   going to view them necessarily as irrelevant.  I don't know

15   whether the attorney-client privilege may have been waived,          14:57:48

16   based on the content of the interviews; I haven't even seen the

17   content of the interviews.  But I'm not going to hold a civil

18   contempt hearing concerning them, even though I'm not going to

19   find them irrelevant to the present civil contempt hearing.

20   Nor do I make a representation that they will not possibly be        14:58:06

21   the subject of a future criminal contempt hearing if I

22   determine at the end of these hearings that civil contempt

23   cannot serve the purposes that are required by the nature of

24   the contempt itself.

25           That is how I propose to proceed.  Is there any             14:58:26

1    concern or comment by the parties?

2           MS. IAFRATE:  I have nothing to add, Your Honor.

3           THE COURT:  Okay.  Ms. Wang?

4           MS. WANG:  Your Honor, we had intended to inform the

5    Court and defendant today that we were going to file a motion          14:58:49

6    for a new order to show cause why defendant Arpaio should not

7    be held in contempt for what appears to be the deliberate

8    withholding of documents in violation of this Court's orders

9    and after consultation with counsel.  It was our intent to file

10   that motion early next week, but Your Honor has now stated a          14:59:11

11   proposal to proceed otherwise.

12          I think we do agree with the Court that there are

13   issues relating to these new facts that we have learned from

14   the Monitor Team initially last Friday that would be related

15   to, and overlapping with, the ongoing civil contempt                   14:59:37

16   proceeding.  But we do believe that there are new grounds for a

17   civil contempt proceeding, and quite potentially for a criminal

18   contempt proceeding, which, of course, would be in the Court's

19   sole discretion to refer for investigation by the United States

20   Attorney's Office or a special prosecutor.                             14:59:54

21          But I offer that, Your Honor, because it had been our

22   intent to inform the Court, because it could have a bearing on

23   the scheduling and the scope of the ongoing proceeding.

24          THE COURT:  Well, you know, Ms. Wang, I do not want to

25   preclude you from any remedy that you may choose to seek, and          15:00:12

1    I'll consider that.  I just put this forth as a proposal so

2    that we could expedite matters that currently exist.

3         I believe that Mr. Birnbaum and others have repeatedly

4    said that there may be people who are not involved here that

5    shouldn't be drug along in the context of a civil contempt          15:00:32

6    hearing, raising to a possible criminal contempt hearing, any

7    longer than necessary.

8         I also, frankly, as I'm sure you do, have concerns

9    about providing prompt and immediate relief and reparation to

10   the plaintiff class, and so my concerns, and I will say it          15:00:48

11   frankly, have been we need to get this first part over.  There

12   isn't any part, if I determine that a criminal referral is

13   necessary --

14        (Beeping sound on telephone.)

15        THE COURT:  Are you still there?  Chief Martinez?         15:01:00

16        DEPUTY MONITOR MARTINEZ:  Yes, sir, I'm here.

17        THE COURT:  Okay.  Did anybody join the call?

18        There isn't any part of anything that I want --

19   because I haven't yet determined that a criminal contempt

20   citation is necessary, I haven't ordered one; I still haven't       15:01:19

21   considered that it's necessary.  But I certainly also have not

22   bound myself, if I determine that a criminal referral is

23   necessary, to limiting it only to the three matters of this

24   civil contempt.

25        And it does seem to me that if any criminal contempt          15:01:37

1    proceeding is desirable, I don't want to piecemeal out that

2    criminal contempt hearing; I want to just do one, as I've

3    indicated before.  I do believe it's important, for lots of

4    reasons, and justified that I stay on the civil hearing and the

5    enforcement process that pertains to this injunctive order, but        15:01:52

6    I have every intention of referring out not only to the United

7    States Attorney any criminal contempt that may be necessary,

8    but that would go to a different judge.  So I don't have any

9    intention of piecemealing one out to one judge, one out to

10   another judge, because, as you know, these matters are randomly      15:02:11

11   drawn.

12          So all the parties can consider what I've just said as

13   you consider how to appropriate -- if you want to do anything

14   with respect to it, I'm not trying to limit any party with

15   respect to any sought relief, but I'm just proposing how we          15:02:24

16   proceed and setting forth my concerns, my inclinations, and

17   that's how we're going to proceed.

18          Again, to the defendants, to the extent you want to

19   introduce evidence in this matter, because I do think, as it

20   seems to me today, it's relevant, although it's not an item or       15:02:41

21   a matter of civil contempt, it is relevant to the civil

22   contempt hearing, so I'm not going to presume to try to prevent

23   you from introducing evidence that you may want to introduce in

24   this action pertaining to it.  But as I proposed that we have

25   regular status conferences, these are matters that I hope we         15:02:58

1    can address and adjust in conjunction with the deadlines and

2    the trial dates that we have.

3            And before I'm through today, I do wish to set status

4    conferences on a fairly regular basis.  And let me suggest that

5    one of the things -- I'm going to talk to the monitor here        15:03:19

6    again in a second.  I think that their investigations may be

7    coming -- I know that they still have to talk to Chief Olson.

8    I'm not sure if Chief Olson's around.  I think they have some

9    other interviews that they want you to arrange, Ms. Iafrate,

10   but I think that those requests are going to be made pretty       15:03:40

11   rapidly.  If you respond pretty rapidly, those will be over,

12   and it seems to me that one of the things that might be

13   profitable for the parties to do is, as I've said earlier, see

14   if based on those interviews you can arrive at certain

15   stipulations that obviate the need to spend a lot of time on      15:03:59

16   irrelevant things.

17           MS. IAFRATE:  Your Honor, we have gone through one

18   round of interviews related to these new investigations.  I

19   just got an e-mail right before I walked in here requesting

20   approximately 20 more interviews.  So we are scheduling them as   15:04:16

21   quickly as we possibly can.  We've done round 1 and round 2.

22   The Chief Olson interview is separate and apart from these

23   interviews that they provide us with an e-mail and say:  Please

24   schedule these interviews.

25           THE COURT:  All right.                                     15:04:36

1    MS. IAFRATE:  So we're working through both of those.

2    THE COURT:  As far as I'm aware, at least as far as

3    the monitor's indicated to me, you've been cooperative, in the

4    large main, in scheduling the interviews, and I anticipate that

5    you'll continue to be so.  And if there's a problem, you can          15:04:48

6    always ask for an emergency hearing, as we had last week, if

7    it's necessary, after we set the status orders.

8    All right.  I received suggestions from Maricopa

9    County and from the plaintiffs on suggested revisions to the

10   supplemental permanent injunction.  I looked at them both.  I         15:05:18

11   don't know if either party wants to address them.  I must say I

12   think something more simple along the lines suggested by

13   Mr. Masterson is what I'm going to do, but if plaintiffs want

14   to be heard on their a little bit more expansive suggestion.

15   I do want to make it clear, though, to defendants that          15:05:35

16   even if I accept Mr. Masterson's definition and restriction as

17   being in line with the Ninth Circuit authority, the Ninth

18   Circuit authority did not consider in its appeal any of the

19   supplemental adjustments made to the monitor's authority, and

20   those still all go forward.          15:05:56

21   Ms. Iafrate?  Or not Ms. Iafrate, I'm sorry.

22   Ms. Wang, did you want to be heard?

23   MS. WANG:  Sure, Your Honor, briefly.

24   Your Honor, the reason we've presented what I think

25   you just characterized as a more expansive language for the two          15:06:10

1    paragraphs in the supplemental injunction is that I think it's

2    become clear, particularly given the more recent events in this

3    case, that we need to get a handle on MCSO's Internal Affairs

4    investigations and the way that complaints are handled and that

5    discipline is meted out to MCSO personnel.                           15:06:33

6           And the concern we have, Your Honor, is that simply

7    limiting the language to fourth and fourteenth --

8           THE COURT:  Let me make a suggestion to you, Ms. Wang,

9    and see --

10          MS. WANG:  Yes, sir.                                          15:06:46

11          THE COURT:  -- what you think about this.

12          MS. WANG:  Okay.

13          THE COURT:  I feel myself bound by the Ninth Circuit

14   Court of Appeals, for some strange reason, and the Ninth

15   Circuit indicated that I needed to limit the scope of my           15:06:54

16   injunction to matters involving the plaintiff class.

17          It seems to me that Mr. Masterson's and

18   Mr. Popolizio's suggestion does that pretty clearly, but as

19   I've indicated, that does not change the adjustments made to

20   the monitor's authority in light of intervening events.            15:07:09

21          If you believe that intervening events require this

22   Court to again adjust the monitor's authority upward, let me

23   suggest that I would be more inclined to adjusting the

24   monitor's authority upward in light of intervening events

25   rather than curtailing my original injunctive order, which I       15:07:33

1    believe the Ninth Circuit has already indicated I need to

2    narrow slightly.

3         MS. WANG:  Understood, Your Honor.  And but separate

4    and apart from the intervening events, we believe just on the

5    record through the trial, and in light of the Ninth Circuit's          15:07:46

6    order, the language that Mr. Masterson has proposed doesn't

7    capture the full range of activity.  That is limited to the

8    plaintiff class.  We think that our proposal captures -- is

9    limited to the plaintiff class as the Ninth Circuit directs,

10   but would also encompass violations of agency policy that could         15:08:05

11   implicate the rights of the plaintiff class that do go to the

12   issues of discriminatory policing, and, Your Honor, I think

13   this point has been discussed before in court, don't leave it

14   in the hands of MCSO to classify a particular matter as falling

15   within the ambit of a Fourth or Fourteenth Amendment violation.         15:08:32

16   Our language is only slightly more expansive, and I would

17   submit discusses policy violations, which are often the focus

18   of the charged violations in Internal Affairs investigations.

19        So, in other words, from what we have seen and from

20   standard law enforcement practices, I think that Internal               15:08:51

21   Affairs investigations often are focused on violations of

22   agency policy, in this case of MCSO's policy and procedures

23   manual, and not necessarily explicitly involving violations of

24   the Constitution.

25        I therefore think that the language that we've                     15:09:09

1    proposed, setting aside intervening events and based solely on

2    the trial record and not in light of the Ninth Circuit's

3    opinion, would capture a much more limited category of material

4    than what Your Honor first ordered in October of 2013, but

5    would be limited to the plaintiff class as the Ninth Circuit          15:09:27

6    has ordered.

7             THE COURT:  I'll consider that, Ms. Wang, but doesn't

8    some of that go to a possible remedy, if in fact I find that

9    the material that you were deprived and should have received

10   indicates that their Internal Affairs problem has processed --      15:09:46

11   or their Internal Affairs process has problems, and that their

12   complaints from the public have problems and everything else,

13   and that that material would have -- or the material that was

14   withheld would have provided you with that information so that

15   you could have presented it at trial, don't I have to make that     15:10:04

16   finding first?

17            MS. WANG:  Your Honor, I think that as you noted, we

18   could be seeking additional and different relief after the

19   outcome of the ongoing proceeding.  I'm just speaking based on

20   the trial record.  I think what we have is a Ninth Circuit          15:10:21

21   order, an opinion that said that the original paragraphs 136I

22   and J were not limited to the plaintiff class.  We think that

23   our proposed language is limited to the plaintiff class, but is

24   going to capture the disciplinary outcomes and misconduct

25   complaints in the way that they are categorized and classified      15:10:43

1    in a normal MCSO Internal Affairs proceeding.

2            Just to be clear, because I'm not sure I was, I think

3    that the way that Internal Affairs, or now PSB, files are kept,

4    what's normally charged, in terms of misconduct alleged against

5    a deputy, is a violation of agency policy.  We haven't seen          15:11:04

6    that many files that explicitly allege that a deputy has

7    violated the Fourth and the Fourteenth Amendments of the

8    Constitution.  That's my main point in why I think our language

9    is both necessary, and is limited in the way the Ninth Circuit

10   ordered.                                                             15:11:25

11           THE COURT:  All right.  I follow you.  Thank you.

12           MS. WANG:  Thank you.

13           THE COURT:  Mr. Popolizio, do you want to be heard on

14   this?

15           Or is it you, Ms. Iafrate?                                   15:11:30

16           MS. IAFRATE:  It's me, Your Honor.

17           THE COURT:  Okay.

18           MS. IAFRATE:  I don't have anything to add to our

19   proposed language, Your Honor.  The way that we proposed it was

20   we went back to the Ninth Circuit's language and incorporated       15:11:37

21   that into our proposal.  Therefore, it tracks the Ninth

22   Circuit's mandate.

23           THE COURT:  You wouldn't contest Ms. Wang's point,

24   though, that if agency policy has been violated with respect to

25   the members of the plaintiff class, that wouldn't violate the       15:11:52

1    Ninth Circuit's order.

2            MS. IAFRATE:  It wouldn't violate the Ninth Circuit

3    order --

4            THE COURT:  I mean, the Ninth Circuit's mandate to me

5    back saying you need to limit it to activities involving          15:12:00

6    members of the plaintiff class, so it doesn't have to be just

7    constitutional violations.

8            MS. IAFRATE:  Correct, Your Honor, it doesn't have to

9    be just constitutional violations, but the way that plaintiffs

10   have worded their proposal, it expands it much further than      15:12:14

11   what you just posed to me.

12           THE COURT:  I agree, but I do agree, I think, with

13   Ms. Wang's supplemental point, which is that it does requi- --

14   I should make sure that the issues are related to members of

15   the plaintiff class.  But the members of the plaintiff class     15:12:29

16   are entitled to the benefits of MCSO policy just like every

17   other citizen is entitled to the benefits of MCSO policy, are

18   they not?

19           MS. IAFRATE:  Yes.

20           THE COURT:  Okay.  So you wouldn't have any dispute       15:12:42

21   with Ms. Wang's final point there.

22           MS. IAFRATE:  The point that she makes, I would agree

23   the language that she posed does not say the final point that

24   she said.

25           THE COURT:  Okay.                                          15:12:51

1    MS. IAFRATE:  I think that it's more expansive.

2    THE COURT:  No, I agree that the language she proposed

3  was more expansive than that, and I'll take a look at it and

4  enter an order this week.

5    MS. IAFRATE:  Very well.                          15:12:59

6    THE COURT:  All right.  We have responses to

7  Mr. Klayman's motion for admission pro hac vice.

8    Is he here, and does he wish to be heard?

9    All right.  He's not here.  Now, I'm not -- let me

10  just say that I told him that I would give him a full        15:13:13

11  opportunity to reply if he wished to.  And he hasn't replied,

12  and the time hasn't run for his reply so I'm not going to rule

13  on that today.  I'll allow him to appear -- file a reply if he

14  wishes to and appear at the next status conference and argue

15  that he should be admitted to pro hac vice status.           15:13:31

16    I am going to note the plaintiffs have opposed his

17  admission for reasons that I raised with him last week, which

18  is he has signed -- he signed all of Mr. Moseley's appli- --

19  well, he didn't sign them, but he was on the block, on the

20  signature block, and on the -- he's in the same law firm.  I  15:13:54

21  don't see that there's any different analysis, and it seems to

22  me that the conflict is still the same.  I'm concerned about

23  him being a witness.

24    And as I've said before, I'm also concerned that his

25  motion to intervene as it pertains to the ability to claim    15:14:07

1   rights in Mr. Montgomery's property is not well taken because

2   we're not adjudicating Mr. Montgomery's rights to his own

3   property in this proceeding.  But those are the matters, if

4   Mr. Klayman gets a copy of the transcript, that I am concerned

5   about, and we will let him address it at that time.                    15:14:23

6           I do have one concern that I want to share with

7   Maricopa County, and by that I mean Mr. Walker.

8           Mr. Walker, last week I think you indicated that you

9   really don't have any right to substantively argue anything

10  different than the sheriff, because while you have no power to    15:14:38

11  control the sheriff, and you may or may not agree with him,

12  Maricopa County is bound legally and liability-wise by his

13  actions.  And you filed a different -- you filed a substantive

14  opposition to the admission for pro hac vice of Larry Klayman

15  when the sheriff explicitly took no possession one way or the    15:15:04

16  other.

17          I don't know that you have any authority to do that,

18  do you?

19          MR. WALKER:  Yes, Your Honor, I think that I do, and

20  it sounds as though I may have left the Court with a              15:15:14

21  misimpression the last time we spoke about this issue.

22          Let me try to be clear.  What you and I were

23  discussing at the last status conference had to do with

24  financial responsibility for the costs related to remedial

25  orders coming out of this proceeding.  And the point I was       15:15:40

1    trying to make is there's an Arizona statute that requires the

2    board of supervisors to provide funding for reasonable and

3    necessary activities, law enforcement activities, of the

4    sheriff.  And that, we interpret as requiring, at least to the

5    extent that we're not talking about willful violations, that                15:16:08

6    the County has a financial obligation under that statute and

7    has been acting --

8          THE COURT:  Well, I understand that.  Let me get right

9    to the point.

10         MR. WALKER:  Okay.                                                      15:16:22

11         THE COURT:  What point -- what argument, as I think I

12   read the Ninth Circuit opinion, and I'll go back and reread it

13   before we meet next week, I'm not going to prohibit you from

14   being a party here because you're providing and you're

15   responding to document production requests.  You clearly are a          15:16:35

16   party.  But as I read the Ninth Circuit order, you're a party

17   because you're going to be liable for any judgment, not because

18   you have any substantively different legal right to protect.

19         Can you identify for me what substantively different

20   legal right the County has to protect in defending itself             15:16:52

21   against liability that is incurred by the sheriff but not by

22   you?

23         MR. WALKER:  Certainly, Your Honor.  The Board of

24   Supervisors, and the portion of the county government that

25   operates under their direct supervision and direction, has a          15:17:09

1   direct fiscal responsibility to the taxpayers of this county to

2   ensure that the tax revenues are used in appropriate ways.  The

3   sheriff has no independent responsibility with respect to that,

4   so in that sense, the interests are very different.

5           As Your Honor I would imagine is well aware, it is not    15:17:38

6   uncommon for the Board of Supervisors and the sheriff to be on

7   opposite sides of litigation, and --

8           THE COURT:  But the liability here is not based on

9   anything that the Maricopa County Board of Supervisors has done

10  at all, so I don't know that you have -- I mean, I think you're   15:17:58

11  a party here because you're going to be liable for the

12  judgment, but I don't know that you have any ability to make

13  any liability argument separate from the sheriff.

14          Why don't you consider that, because I don't want to

15  deprive you of that right if you've got it; I just don't know    15:18:15

16  that you have it.

17          MR. WALKER:  Could I just speak very briefly to the

18  Klayman motion?

19          THE COURT:  To what?

20          MR. WALKER:  The Klayman --                               15:18:25

21          THE COURT:  No.  And the reason I'm not going to let

22  you speak to the Klayman motion isn't because I'm not sure that

23  I won't let you be heard on it; it's that Mr. Klayman is not

24  here.  We're not going to take up that motion because I told

25  him I would give him a chance to reply, and the time for reply   15:18:37

 1   has not yet run so that may be why he's not here.

 2         But if I decide that you have a right to be heard on

 3   it, I'll let you be heard when we take up the Klayman motion.

 4         Okay?

 5         MR. WALKER:  Okay.  Thank you, Your Honor.          15:18:51

 6         THE COURT:  Thank you, Mr. Walker.

 7         The Department of Justice has filed a motion to

 8   intervene.  The plaintiffs have filed a non-opposition to such

 9   a motion.  Are the defendants going to oppose the motion?

10         The time hasn't run, so if you're going to oppose the   15:19:03

11   motion, I think you have, like, two or three days left to file

12   an opposition if you're going to.  I just want to know if

13   you're going to.  If you're not going to, I'm going to grant

14   the motion.

15         MS. IAFRATE:  Your Honor, we would like the full time.   15:19:14

16   I think that it's August 6th.

17         THE COURT:  Oh, is it?  Okay.

18         MS. IAFRATE:  That was my calendaring.

19         THE COURT:  I didn't count it.  I'll accept your

20   representation.                                        15:19:24

21         MR. WALKER:  As would the County, Your Honor.

22         THE COURT:  Okay.  Why don't we set status

23   conferences, and these may need to be adjusted, but right now

24   why don't we set status conferences for August 14th at

25   9:00 a.m., August 21st at 10:00 a.m., August 28th at 9:30,    15:19:35

1   September 4th at 9:00 a.m.

2           I, unfortunately, already have a matter all Friday the

3   11th, so I would like to set it for September 10th at

4   9:00 a.m., and September 18th, which will just be four days

5   before the hearing resumes, at 10:30.                          15:20:00

6           MS. IAFRATE:  I do have a conflict with one of those

7   dates, Your Honor.  I will be in trial August 21st.

8           THE COURT:  Do you have anybody you could send,

9   Ms. Iafrate?

10          MS. IAFRATE:  Well, Your Honor, I will see if I can      15:20:13

11  work --

12          THE COURT:  How about we do this?  Set those dates,

13  everybody put down those dates, and just tell me if you've got

14  a problem, and we'll see if we can make adjustments at the next

15  status conference.                                             15:20:32

16          MS. IAFRATE:  Very well.

17          THE COURT:  Does that work?

18          MS. WANG:  It does, Your Honor.  On the plaintiffs'

19  side, we already know that none of plaintiffs' counsel are

20  available on August 14th.  We could be available the Monday of  15:20:38

21  that week.

22          THE COURT:  "The Monday" meaning what?  You mean the

23  following Monday?

24          MS. WANG:  No, the previous Monday, or the following

25  Monday; either one, I think.                                   15:20:53

CV07-2513, Melendres v. Arpaio, 7/31/15 Status Conference 62

1        Oh, wait.  Sorry.  The previous Monday.

2        THE COURT:  So that would be -- I'm terrible.

3        MS. WANG:  I'm sorry.  Let me --

4        THE COURT:  Would that be the 10th?

5        MS. WANG:  -- get the calendar in front of me.     15:21:03

6        THE COURT:  That would be August 10th?

7        MS. WANG:  The 10th.  August 10th.

8        THE COURT:  All right.  I will maybe -- we won't

9 schedule one on the 14th.  I will look at setting one on the

10 10th, but I will tell you that normally my Mondays are     15:21:09

11 completely filled with criminal matters, so it's going to be

12 either very early in the morning, very late.  And hopefully, it

13 won't be of this extent, because I simply won't have this time.

14 But I think we've resolved a lot of things here today, I hope

15 so.     15:21:26

16        Mr. Birnbaum.

17        MR. BIRNBAUM:  Yes.  Thank you, Your Honor.

18        Your Honor, I --

19        THE COURT:  I need to have you speak in a microphone.

20        MR. BIRNBAUM:  Let me pull on one.     15:21:35

21        THE COURT:  You can approach the podium.

22        MR. BIRNBAUM:  Oh.  Thank you.

23        Your Honor, just on --

24        THE COURT:  I need to have you speak at a microphone,

25 Mr. Birnbaum.     15:21:40

1    MR. BIRNBAUM:  Your Honor, just on the scheduling

2    issue, I'm sorry to take your time, I just want to advise the

3    Court that I teach at the ASU Law School --

4        THE COURT:  Um-hum.

5        MR. BIRNBAUM:  -- Friday morning from 8:30 to 11:30.        15:21:52

6    Is not a problem.  I will have somebody from my office attend

7    the status conferences.  But it is likely that unless something

8    specifically is agendized that involves Mr. MacIntyre, it is

9    likely I will not attend any of those conferences personally,

10   with the Court's permission.        15:22:15

11       THE COURT:  You have it.  Thank you, Mr. Birnbaum.

12       MR. BIRNBAUM:  Thank you.

13       THE COURT:  Ms. Clark.

14       MS. CLARK:  Judge, just briefly, I had reached out to

15   Ms. Wang to ask her if she's aware whether there's going to be        15:22:28

16   an issue for a status conference that is going to involve

17   Mr. Casey, that she let me know ahead of time so I can here.

18       As you know, Mr. Casey's --

19       THE COURT:  That seems to me to be perfectly

20   reasonable.  Is everybody okay with that?        15:22:47

21       MS. CLARK:  So I will not --

22       THE COURT:  Everybody has nodded their assent, let me

23   state for the record.

24       Let me just say I don't think the monitor has any

25   intent to -- I may be wrong about this, I may be completely        15:22:55

1    wrong, so maybe I ought to shut up, but I do think that I

2    haven't precluded the parties, if they want to do depositions,

3    from doing depositions.  I've only said you need to talk -- get

4    the clearance of the monitor first.

5            I think the monitor's pretty much given to Ms. Iafrate    15:23:09

6    the interviews that he wants to do, so if you want to depose

7    people that aren't on that list, check with him and you can

8    begin depositions, and I know there may be an issue with that

9    with respect to Mr. Casey.  Otherwise, I think we ought to not

10   require Ms. Clark to be here every time, and we should do her    15:23:24

11   the courtesy of letting her know in advance if there's going to

12   be an issue that involves Mr. Casey.

13           Any problem with that?

14           MS. WANG:  No, Your Honor, not from plaintiffs.

15           MS. IAFRATE:  No, Your Honor.                            15:23:35

16           MR. WALKER:  That's fine, Your Honor.

17           MR. COMO:  I have no objection, Your Honor.

18           MS. CLARK:  Thank you, Judge.  Mr. Casey just asked me

19   to raise two issues regarding his deposition, his potential

20   deposition, and that is just since it's been a while with the    15:23:48

21   motion to stay, that he's hoping that Your Honor is going to be

22   present for his deposition.  He doesn't want to have to come

23   back for repeated depositions.

24           It's such a unique case and such a unique deposition

25   of the defendant's former counsel, there will be constant        15:24:08

1    issues of confidentiality, privilege, and perhaps other issues,

2    that would -- he's going to need a ruling on in order to be

3    able to answer questions.  And to get this done timely and

4    efficiently for Mr. Casey, as well as the parties and the

5    Court, he's again reiterating that he very much would like you                15:24:24

6    to be present for his deposition.

7            Secondly, he is just concerned that production issues,

8    privilege issues concerning production, obviously all be

9    resolved prior at his deposition.

10           THE COURT:  All right.  Well, I think we've tried to                   15:24:40

11   undertake steps towards that today.  Counsel probably will be

12   in touch with you -- counsel will probably be in touch with you

13   trying to coordinate that deposition, and it isn't an ex parte

14   contact for counsel and you to contact my judicial assistant to

15   try and find a date that's going to convenient for me to be                    15:25:05

16   there.  I think we've already discussed that if I could be,

17   that would be optimal.  But I also have a schedule, Ms. Clark,

18   with all due respect, so we'll have to do what we can do.

19           MS. CLARK:  Yes, Judge.

20           THE COURT:  But I will try to be there.                               15:25:18

21           MS. CLARK:  Yes, Judge.  Thank you.

22           And finally, the last point is we will be producing

23   the documents as discussed earlier on August 3rd.  I will be

24   out of the country and unavailable August 4th through the 14th.

25   So if there are other production issues that come up during                   15:25:28

1   that time, I'll have to be handling them when I get back on the

2   17th.

3           THE COURT:  Happy vacation.

4           MS. CLARK:  Thank you.

5           THE COURT:  If there's nothing else, then I am, as I          15:25:39

6   indicated I would, going to take the matter that Ms. Iafrate

7   asked be addressed under seal under seal.

8           Are there other matters to be raised?

9           MS. WANG:  One other issue we wanted to flag for Your

10  Honor because it could bear on the scheduling of the actual          15:25:53

11  hearing.  We've been in the process of meeting and conferring

12  with the defendants about a process for making whole the

13  victims of the preliminary injunction violations.  We don't

14  know yet whether we're going to come to any agreement.

15          It may be necessary for us to put on some testimony on       15:26:08

16  that subject, and Ms. Pedley, my co-counsel from Covington, has

17  been taking the lead for us in that meet and confer process and

18  can alert the Court, if you wish, as to the status of those

19  conversations and what the issues may be.

20          THE COURT:  All right.  Ms. Hedley, please approach --       15:26:27

21  either grab a microphone or approach the podium, please.

22          MS. PEDLEY:  Thank you, Your Honor.  As my co-counsel

23  mentioned, we have been meeting and conferring.  We would

24  recommend that we use a claims administration firm.  We hope to

25  reach consent on that issue, the advantage of that being they       15:26:43

1   can handle many of the issues, including notice and evaluating

2   claims and processing those claims.

3         If we are unable --

4         MR. WALKER:  I have to object.  We talked about this

5   before this status conference began, and my understanding was          15:27:01

6   that the Court was going to be informed that we have been

7   engaged in meet and confer, and continue to be, without getting

8   into the substance of those discussions.

9         THE COURT:  That's fine.  Let's not get into the

10  substance, then, Ms. Hedley.                                           15:27:19

11        MS. PEDLEY:  Absolutely, Your Honor.  We just wanted

12  to alert the Court that if we are unable to reach an agreement

13  as to the process, we will have to put on testimony as to what

14  that process we would advocate look like.

15        THE COURT:  All right.  I'm aware of that.  That seems          15:27:32

16  to me to be an issue.  I think from now on we're going to try

17  to refine issues.  If we can stipulate and solve them, we're

18  going to eliminate them.  And we will refine this until we have

19  a very, hopefully, efficient and succinct hearing available for

20  everyone.                                                             15:27:46

21        MS. PEDLEY:  Thank you, Your Honor.

22        THE COURT:  Anything else?  Mr. Eisenberg.

23        MR. EISENBERG:  Your Honor, to the extent that this

24  next portion is a sealed hearing, I feel very secure it

25  probably doesn't pertain to my client and I would ask that I be       15:28:00

1   permitted to be excused.

2          THE COURT:  You may be excused if you wish to be.

3          Anybody else who wishes to be excused may be excused

4   except for plaintiffs and defendants.

5          And, of course, you, Mr. Como, can't be excused.  I'm          15:28:11

6   sorry.  You're separately representing.

7          Well, I suppose if you asked to be excused, you can be

8   excused.

9          MR. YOUNG:  Your Honor, with respect to what

10  Mr. Walker just said, and I was the one that had the          15:28:25

11  conversation prior to the hearing and I apologize if there was

12  a misunderstanding, I think my thought was that we weren't

13  going to discuss the substance of the conversations that we had

14  been having, but we were, certainly, wanting to inform the

15  Court of what we were thinking, at least on our side, the Court          15:28:40

16  should order.

17          So if that was a failure on my part to communicate as

18  to what we intended to say, my apologies to Mr. Walker and

19  Ms. Iafrate.

20          THE COURT:  I think Mr. Walker acted promptly in order          15:28:52

21  to defend his client's rights, and if he wants to do anything

22  further about it, he can, and we'll take it up from there, but

23  I understand your correction.

24          All right.  The hearing is now under seal.  I'm going

25  to ask everybody who is not a party to this lawsuit or not a          15:29:09

1    specially appearing party to be excused.

2               (The courtroom is cleared.)

3               (Sealed proceedings omitted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

1
2
3
4
5
6
7           I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15
16
17           DATED at Phoenix, Arizona, this 3rd day of August,

18   2015.

19
20                              s/Gary Moll
21                    _____

22
23
24
25

# EXHIBIT C

# COVINGTON



### Keith A. Teel
**Partner**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: +1 202 662 5501
kteel@cov.com

Keith Teel litigates patent and product liability cases. He emphasizes trial work, but has also argued in various appellate courts, including the U.S. Supreme Court. He has extensive experience developing and overseeing the enactment of state legislation focusing on liability issues, and is highly experienced in handling issues involving sensitive political or public policy considerations. Mr. Teel co-chairs the firm's patent litigation practice group.

## Practices

- Intellectual Property
  - Patent Litigation
- Litigation
  - Insurance Coverage Litigation & Arbitration
  - Product Liability & Mass Tort Defense
- Public Policy & Government Affairs
  - Congressional & Federal Agency Advocacy
- Food & Drug

## Industries

- Life Sciences

## Education

- University of Virginia School of Law, J.D., 1981
  - *Virginia Law Review*
- Washington and Lee University, B.S. (Chemistry), 1978
  - *magna cum laude*

## Bar Admissions

- District of Columbia
- U.S. Patent and Trademark Office

## Representative Matters

- Counsel for name-brand pharmaceutical manufacturers in Hatch-Waxman litigation and trials, and for other product manufacturers in patent litigation involving various kinds of technology.

- Representation of major pharmaceutical manufacturers in product liability litigation and related insurance coverage disputes.

- Represented all of the major U.S. tobacco manufacturers in their disputes with state attorneys general that culminated in the November 1998 Master Settlement Agreement, taking the lead in discussions with elected officials throughout the United States.

- Developed and oversaw the enactment in over forty states of state legislation relating to liability standards and litigation procedure, involving issues such as product liability reform, consumer protection reform, appeal bond limits, and punitive damages legislation, and class action procedures.

- National coordinating counsel for product liability litigation involving the Tobacco Institute.

# COVINGTON

- Coverage counsel for policyholders in disputes with insurers over product liability claims, environmental disputes, and other liabilities.

- Briefed and argued in the United States Supreme Court on behalf of petitioners in *Traynor v. Turnage*, 485 U.S. 535 (1988), which determined that administrative decisions of the Veterans Administration could be appealed in the federal courts and led to the creation of the Court of Veterans Appeals, and which also considered the applicability of the Rehabilitation Act of 1973 to the Veterans Administration.

- Representation of death row inmates, including serving as lead counsel in a case that resulted in the release in February 2012 of an Alabama prisoner who had spent the preceding seventeen years on death row.

## Honors and Rankings

- *Washington D.C. SuperLawyers*, Product Liability Defense

- *Best Lawyers in America*, Product Liability Defense

- *Euromoney's Guide to the World's Leading Insurance and Reinsurance Lawyers*

- Various Who's Who

- American Tort Reform Association, Legal Reform Champion